No. 24-50149

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THE STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants-Appellants*

———————————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees*

*v.*

STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTORY OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant-Appellant.*

———————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

———————

**DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY**

———————

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General

KATELAND R. JACKSON
JOSEPH N. MAZZARA
Assistant Solicitors General
Kateland.Jackson@oag.texas.gov

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendants-Appellants

# Certificate of Interested Persons

No. 24-50149

## United States of America,

*Plaintiff-Appellee,*

*v.*

## The State of Texas; Greg Abbott in his official capacity as Governor of Texas; Texas Department of Public Safety; Steven C. McCraw, in his official capacity as Director of Texas Department of Public Safety,

*Defendants-Appellants*

---

## Las Americas Immigrant Advocacy Center; American Gateways; County of El Paso, Texas,

*Plaintiffs-Appellees*

*v.*

## Steven C. McCraw, in his official capacity as Directory of the State of Texas Department of Public Safety,

*Defendant-Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as a governmental party, need not furnish a certificate of interested persons.

/s/ Kateland R. Jackson
Kateland R. Jackson
*Counsel of Record for*
*Defendants-Appellants*

## Nature of Emergency

In 2023, Texas enacted Senate Bill 4 (S.B.4) to stem the flood of illegal immigrants into the United States that has resulted from the federal government's failure to defend Texas's borders. The federal government's actions have led to millions of individuals and hundreds of millions of fatal doses of fentanyl, often trafficked by transnational criminal cartels, illegally entering Texas. The district court nonetheless enjoined the law facially on February 29, just days before it was to take effect on Tuesday, March 5, 2024. Exh. K. Texas thus respectfully requests a decision by **12pm Monday, March 4, 2024**. Alternatively, Texas seeks an immediate administrative stay pending this Motion's resolution. *See, e.g.*, *BST Holdings v. OSHA*, No. 21-60845, 2021 WL 5166656, at *1 (5th Cir. Nov. 6, 2021) (per curiam).

This Court should stay the injunction pending appeal. *First*, Plaintiffs are unlikely to succeed on the merits of their claims. Indeed, the private plaintiffs and El Paso County lack standing and all Plaintiffs lack a cause of action under the Supremacy Clause. Regardless, S.B.4 is not preempted by federal law under any of Plaintiffs' theories and does not violate the Foreign Commerce Clause, and at a minimum some applications of S.B.4 are constitutional, by itself defeating a facial injunction. *Second*, the other equitable factors favor a stay. By any measure, the district court's injunction rests on legal error and should be stayed pending appeal.

## Background

**1.** Texas is the nation's first-line defense against transnational criminal cartels. Despite the existence of 28 legal entry points in Texas, U.S. Border Patrol

encounters with individuals illegally crossing the border between ports of entry have increased from "a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.). Between 2021 and 2024, Border Patrol apprehended nearly 2,000 gang members and encountered 336 individuals on the terrorist watchlist at the border.[1] And the number of unaccompanied minors has skyrocketed from 15,381 in 2020 to 118,938 in 2023—a 673% increase.[2] "[T]he majority of" these minors cross the border "on very dangerous, not-nice, human-smuggling networks that transport them through Central America and Mexico to the United States."[3] In recent years, such conduct has metastasized "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, including some of Mexico's most violent drug cartels."[4]

Border towns like Eagle Pass are increasingly at the "epicenter" of this humanitarian crisis. According to Eagle Pass Mayor Rolando Salinas, Jr., the recent surge of border crossings is like "nothing that we've seen ever."[5] After roughly 14,000

---

[1] Exh. F at ¶¶21, 23.

[2] *Id*. at ¶15.

[3] Vice President Joe Biden, Remarks to the Press in Guatemala (June 20, 2014) (transcript available at obamawhitehouse.archives.gov/the-press-office/2014/06/20/remarks-press-qa-vice-president-joe-biden-guatemala).

[4] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

[5] Gaige Davila, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023), transcript at

people—about half of Eagle Pass's population—entered the city in less than two weeks, Mayor Salinas declared a state of disaster.

The federal government has not only failed to contain the border crisis, it has helped create it. One of the first actions taken by the current Administration was to terminate the "Remain in Mexico" program that required "certain non-Mexican nationals arriving by land from Mexico [to be] returned to Mexico to await the results of their removal proceedings." *Biden v. Texas*, 597 U.S. 785, 791 (2022). Further, the federal government has ordered Immigration and Customs officers *not* to arrest and deport aliens as required by federal law.[6]

**2.** In response to this unprecedented border crisis, the Texas Legislature passed S.B.4, which tracks federal law in criminalizing the entry (or reentry) into Texas directly from a foreign nation between lawful ports of entry. S.B.4 also allows magistrates and judges to order aliens who have crossed the border illegally to return to the foreign nation from which they entered. *See* TEX. CODE CRIM. PROC. ch. 5B; TEX. PENAL CODE ch. 51. S.B.4 provides an affirmative defense to prosecution if the alien's conduct does not violate federal law, 8 U.S.C. §1325, or if the federal government has granted the alien lawful presence or asylum, TEX. PENAL CODE §51.02(c)(1)-(2). S.B.4 also recognizes an affirmative defense if the alien was

―――――――――――――

https://www.npr.org/2023/09/22/1201215460/high-migration-through-texas-border-town-of-eagle-pass-strains-resources.

[6] Memorandum from Acting Director, U.S. Immigration & Customs Enforcement, Dep't of Homeland Security (Feb. 18, 2021), https://tinyurl.com/fu6h7epf.

approved for benefits under the Deferred Action for Childhood Arrivals program between June 2012 and July 2021. TEX. PENAL CODE §51.02(c)(3).

**3.** On December 19, 2023, Las Americas Immigrant Advocacy Center and American Gateways, along with El Paso County, sued Steven C. McCraw, in his official capacity as Director of the Texas Department of Public Safety, and Bill D. Hicks, in his official capacity as District Attorney for the 34th Judicial District of Texas. Exh. A. On January 3, 2024, the United States sued Texas; Greg Abbott, in his official capacity as Governor; the Texas Department of Public Safety; and Director McCraw in his official capacity. Exh. B. All Plaintiffs moved for injunctive relief on January 12, 2024. Exh. C; Exh. D. The Court consolidated the cases on January 31, 2024. On February 29, 2024, the Court enjoined S.B.4. Exh. J. Consistent with Rule 8(a)(1), Texas sought a stay below before seeking relief here. Exh. I. The district court denied the stay essentially for the reasons supporting the preliminary injunction. Exh. J, 110-14; *see* Fed. R. App. P. 8(a)(2)(A)(ii).

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This Court has "inherent" power to hold a preliminary injunction "in abeyance while it assesses the legality of the order." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). All stay factors are met here: (1) The State will likely succeed on the merits; (2) it

will suffer irreparable harm absent a stay; (3) a stay won't substantially harm Plaintiffs; and (4) the public interest favors a stay. *Id.*; *see also Whole Woman's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021) (per curiam).

Furthermore, "pre-enforcement facial challenges to legislative acts are 'disfavored,'" *NetChoice, LLC v. Paxton*, 49 F.4th 439, 448 (5th Cir. 2022) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)), and "the legal standard for them is extraordinarily high," *Id.* at 449. Accordingly, to succeed, a plaintiff bringing such a facial challenge must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## I. Texas Will Likely Succeed on the Merits.

### A. Plaintiffs' Claims Are Not Justiciable.

**1.** The private plaintiffs and El Paso County have not made a "clear showing" that they have standing. *Barber v. Bryant,* 860 F.3d 345, 352 (5th Cir. 2017). Indeed, they cannot satisfy any element: they have not identified (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action; and (3) that is likely to be redressed by a favorable decision. *El Paso County v. Trump*, 982 F.3d 332, 337 (5th Cir. 2020). Nor can they show Texas's "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law]," and "a credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) (quotation omitted).

In their sole claim, the private plaintiffs allege that S.B.4 "violates the Supremacy Clause." Exh. A. But the Supremacy Clause is not the source of any constitutional right. *See, e.g.*, *United States v. Texas*, No. EP-21-cv-173, 2022 WL 868717, at *5 (W.D. Tex. Feb. 17, 2022) (Cardone, J.), *rev'd and remanded on other grounds*, *United States v. Abbott*, 85 F.4th 328 (5th Cir. 2023). And the private plaintiffs' intended conduct—namely, distributing educational materials and resources—is not "arguably proscribed" by S.B.4. *Susan B. Anthony List*, 573 U.S. at 162. Therefore, any threat of prosecution under S.B.4 will not affect their routine activities, and enjoining the law will not redress their purported injuries. *See Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Their claims are jurisdictionally barred. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020).

Nor has El Paso County demonstrated standing. Not only do local governments generally lack standing to sue the parent States that created them under State law, *see, e.g.*, *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923); *Town of Ball v. Rapides Par. Police Jury*, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984), but El Paso County fails to identify a cognizable injury-in-fact that is concrete, not speculative, and "certainly impending." *Clapper*, 568 U.S. at 409.

And the district court's view (at 10-18) that *Susan B. Anthony List* does not apply is simply wrong. An injury is an injury, whether direct or indirect. Diversion of resources alone does not suffice to confer standing. The question of indirectness

typically goes to questions of traceability, not injury-in-fact. *See, e.g.*, *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016). Regarding the nature of the injury itself, the Supreme Court has repeatedly said it requires a showing that "the threatened injury is real, immediate, *and direct*." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added). "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Ass'n for Retarded Citizens v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994).

**2.** Furthermore, plaintiffs must show they have "a legislatively conferred cause of action" encompassing their claim. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). In other words, courts "ask[ ] whether this particular class of persons has a right to sue under this substantive" law. *Id.*; *see also Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979). The district court erred in finding that any plaintiffs have a cause of action under the Supremacy Clause.

Under *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015), there is no private cause of action under the Supremacy Clause. Rather, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Plaintiffs cannot identify a statute that contains any "'rights-creating' language" permitting their suit. *Id.* at 288. And *Ex parte Young*'s exception to sovereign immunity—which is unavailable to plaintiffs here as sovereign immunity bars the private plaintiffs' and El Paso County's suit because they do not meet any of the requirements to avail themselves of *Ex Parte Young*—does not provide

one. An equitable cause of action is available to a private plaintiff under that case only when state officers responsible for enforcing the statute "threaten and are about to commence proceedings" against the litigant. *Young*, 209 U.S. 123, 155-56 (1908). Here, Plaintiffs do not allege enforcement of S.B.4 threatens imminent legal proceedings against them, nor have they sued any official who may potentially enforce the law against them.

The United States has also failed to identify any cause of action. It seeks an injunction under the Supremacy Clause, but "injunctions are merely remedies, not causes of action." *Starrett v. City of Richardson*, 766 F. App'x 108, 112 (5th Cir. 2019) (per curiam) (citing *Reyes v. N. Tex. Tollway Auth.*, 861 F.3d 558, 565 n.9 (5th Cir. 2017)). Via the Supremacy Clause, Congress may pass legislation creating causes of action. *See, e.g.*, U.S. Const. art. I, §8; U.S Const. amend. XIV, §5. But "the Supremacy Clause [itself] is not the source of any federal rights" and "certainly does not create a cause of action," either expressly or impliedly, and it "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong*, 575 U.S. at 324–25 (cleaned up). Though Congress may create public causes of action, *see, e.g.*, *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 457 (1974), it has not done so here.

Indeed, though "the general rule [is] that the United States may sue to protect its interests," *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967), the Supremacy Clause merely "creates a rule of decision," *Armstrong*, 575 U.S. at 324. "The federal government, of course may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just

"like any other plaintiff." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). The federal government's sovereign status does not change the analysis. "When the state as plaintiff invokes the aid of a court of equity, it is not exempt from the rules applicable to ordinary suitors." 1 John Norton Pomeroy, Jr., A Treatise On Equitable Remedies at 586 §330 (1905). "[I]t must establish a case of equitable cognizance, and a right to the particular relief demanded." *Id.* Thus, a court cannot award relief unless "a cause of action cognizable in equity is alleged and proved," even when one sovereign sues another. *Texas v. Florida*, 306 U.S. 398, 411 (1939); *see also Denver & R.G.R. Co. v. United States*, 241 F. 614, 616 (8th Cir. 1917).

When the Supreme Court has allowed suits "to enjoin unconstitutional actions by state and federal officers," those cases have not been brought under the Supremacy Clause. *Armstrong*, 575 U.S. at 327. Of course, to the extent the United States seeks to rely on *Ex parte Young* to show it "has an equitable cause of action," it cannot, *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 n.3 (5th Cir. 2021), because that cause of action may not be brought by governments—it is limited to "private parties." *Whole Women's Health v. Jackson*, 142 S. Ct. 522, 532 (2021); *Armstrong*, 575 U.S. at 326-327.

*In re Debs*, 158 U.S. 564 (1895), is not to the contrary. The Supreme Court there had no occasion to imply a cause of action under the Supremacy Clause because it was considering a petition for habeas corpus. Further, at issue was the well-known equitable cause of action to abate a public nuisance. "[T]he obstruction of a highway is a public nuisance, and a public nuisance has always been held subject to abatement at the instance of the government." *Id.* at 587 (citation omitted). Since long before

9

*Debs*, it had been "settled, that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general." *City of Georgetown v. Alexandria Canal Co.*, 37 U.S. (12 Pet.) 91, 98 (1838). "The crux of the *Debs* decision" was "that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest." *United Steelworkers of Am. v. United States*, 80 S. Ct. 177, 186 (1959) (Frankfurter, J., concurring); *see also* Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 737 (2022). That cause of action, however, is no help to the United States here.

And contrary to the district court (at 24-27), the fact that the United States "has brought many lawsuits under the Supremacy Clause… without any questioning of [it] as the basis for a federal cause of action," *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021), is irrelevant. Cases where courts did not address whether there was a cause of action—an argument that is subject to forfeiture, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)—"are not to be considered as having been so decided as to constitute precedents." *Gann v. United States*, 142 S.Ct. 1, 2 (2021) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)).

## B.  S.B.4 Does Not Violate the Supremacy Clause.

"In all pre-emption cases," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), courts should "start with the assumption that the historic police powers of the States were not to be superseded … unless that was the clear and manifest purpose of Congress," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Here, however, Plaintiffs allege that S.B.4 violates the Supremacy Clause because three of its parts are either field or conflict preempted by federal law: (1) its prohibition on illegal entry, (2) its

prohibition on illegal reentry, and (3) its provisions regarding return orders. The district court agreed (at 29-62), but only by misreading *Arizona v. United States*, 567 U.S. 387 (2012), and flipping the presumption against preemption on its head.

1. The district court overreads *Arizona* (at 33) to broadly hold there is a "field of immigration" that is entirely preempted by federal interests. But *Arizona* says no such thing; indeed, that Court held three of the four challenged provisions of Arizona's law were *not* field preempted, including a provision that would have directly impacted the removal of illegal aliens. *Arizona*, 567 U.S. at 416. And the Supreme Court has elsewhere rejected that federal law field preempts "every state enactment which in any way deals with aliens." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). Otherwise, no State could ever enact or enforce any law affecting immigration—a patently absurd result.

No provision of S.B.4 is field preempted. Courts infer field preemption *rarely*—only when an "unambiguous congressional mandate," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963), ousts the State entirely from a field that "Congress occupies" exclusively, *Arizona*, 567 U.S. at 401. Nothing approaches such a mandate here. When, as here, the law "expressly contemplates concurrent regulation with States and localities," "[t]hat ends the matter." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 797 (5th Cir. 2024).

States generally enjoy wide latitude to regulate alien misconduct and prosecute crimes involving illegal entry. In fact, the federal immigration code regularly encourages States to aid federal entry and removal, and recognizes States' authority and role in carrying out the type of conduct covered in S.B.4. *See, e.g.*, 18 U.S.C. §758

(crime for alien to "flee" from "State, or local law enforcement" around immigration checkpoints); 8 U.S.C. §1324(c) (States have authority to make arrests for violation of alien smuggling prohibition); 22 U.S.C. §7105(c)(3)(C)(i) (contemplating "State or local" prosecution of alien "trafficking"); 8 U.S.C. §1101(a)(15)(T)(i) (contemplating "State or local investigation or prosecution" of illegal trafficking); *id.* §1101(a)(15)(U) (State and local criminal laws can include trafficking). Courts thus have never "conclude[d] that the States are without any power to deter the influx of persons entering the United States… and whose numbers might have a discernable impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982). Nor does the federal code preclude States from facilitating illegal aliens finding their way to ports of entry.

Plaintiffs and the district court rely on *Arizona* to suggest that S.B.4's provisions regarding illegal entry and return orders are field preempted because they intrude on the government's allegedly exclusive federal authority. But the Supreme Court used the word "exclusive" twice in *Arizona*, and only to describe the standard for finding field preemption. The only field preemption recognized in *Arizona* is "the field of alien registration," which is inapplicable here. 567 U.S. at 403. Moreover, *Arizona* did not find that State laws concerning entry and removal were field preempted, and nothing in *Arizona* precludes States from regulating entry and reentry. The district court erred in ruling to the contrary—itself reason to vacate the injunction.

**2.** Nor does S.B.4 implicate conflict preemption, which arises only when it is "impossib[le]" to comply with both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress." *Arizona*, 567 U.S. at 399. In the preemption context, "there can by definition be no conflict" between the laws of two sovereigns when they *comport* with one another, even if one imposes additional requirements. *Chamber of Com. v. Whiting*, 563 U.S. 582, 601–03 (2011); *cf. Arizona*, 567 U.S. at 402–03 (noting that challenged state law authorized harsher criminal penalties than federal law). And "[t]he mere fact that state laws like" S.B.4 "overlap to some degree with federal criminal provisions" on immigration "does not even begin to make a case for" preemption. *Kansas v. Garcia*, 140 S. Ct. 791, 806 (2020). "[I]f we were to hold that federal criminal law preempts state law whenever they overlap," the "federal system would be turned upside down." *Id.* "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Id.* What is more, "with respect to illegal aliens," State laws that "mirror[] federal objectives" are *more*—not less—likely to be upheld. *Plyler*, 457 U.S. at 225.

At every step, S.B.4 comports with federal law. Like its federal counterpart, S.B.4 makes it a state crime for an individual to cross into Texas at any location other than a port of entry, TEX. PENAL CODE §51.02(a); 8 U.S.C. §1325(a)(1), or to illegally re-enter the country after having previously been "denied admission," been involuntarily "removed," or having voluntarily "departed the United States," TEX. PENAL CODE §51.03(a); 8 U.S.C. §1326(a). S.B.4 also provides for return orders and, in lieu of prosecution, permits an alien to depart voluntarily—something that no federal law prohibits, and which aliens are free to do themselves. TEX. CODE CRIM. PROC. art. 5B.002(c), (d); 8 U.S.C. §1225(b)(1)(A)(i), §§1229a(d), 1229c(a)(1). And

like federal law, S.B.4 makes failure to comply with a return order a crime. TEX. PENAL CODE §51.04(a); 8 U.S.C. §§1253(a)(1), 1229a(c)(5).

An alien can comply with *both* the federal immigration code and S.B.4 by entering this country legally at a port of entry, not reentering illegally, and complying with a valid return or removal order. Even the United States recognizes the operative provisions in S.B.4 are "like" or "similar to" Congress's proscriptions in the federal immigration code. Exh. B. And S.B.4 is consistent with and reflects Texas's enforcement of its state criminal trespass law, TEX. PENAL CODE §30.05, which has been used for years via Operation Lone Star to prohibit an alien's illegal entry and presence in Texas. The federal government has never—and does not now—challenge the State's authority under Operation Lone Star to enforce the State's equally complementary border-based criminal trespass law.

## C.  S.B.4 Does Not Violate the Foreign Commerce Clause

Nor does S.B.4 violate the Foreign Commerce Clause. Sovereign States have considerable authority to enact laws that may affect interstate or international commerce. *See, e.g.*, *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 766 (1945). They also are generally free to exercise their police powers despite consequences for foreign affairs. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 496-98 (2008). Here, the United States conceded that S.B.4 is not motivated by protection of a domestic market—the "principal[]" concern of dormant Commerce Clause cases—and made no effort to show how S.B.4 flunks the *Pike* balancing test. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368-71, 377-80 (2023).

Even assuming that *illegal* border crossings somehow constitute "commerce," there is nothing "dormant" about Congress's lawmaking. "Congress has undoubted power" to supersede the dormant commerce clause. *S. Pac. Co.*, 325 U.S. at 769. Here, Congress not only declined to preempt the field, but criminalized illicit, cross-border human traffic and welcomed state cooperation.

### D.  S.B.4 Is Not Facially Invalid In All Events.

Finally, even if S.B.4 somehow conflicted with federal statutory law or offended the dormant Commerce Clause, the district court erred because at least *some* applications of S.B.4 are constitutional. Plaintiffs thus have not satisfied a basic requirement of a facial injunction.

"No state shall, without the Consent of Congress, … engage in War, unless actually invaded …." U.S. Const. art. I, §10, cl. 3. This provision represents "an acknowledgement of the States' sovereign interest in protecting their borders." *Arizona*, 567 U.S. at 419 (Scalia, J., dissenting in part). By definition, the Constitution trumps federal statutory law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803); *see also United States v. Abbott*, 92 F.4th 570, 579-80 (5th Cir. 2024) (per curiam) (Ho, J., dissenting) (mem.).

The district court dismissed the relevance of Texas's right to self-defense by contending (repeatedly) that immigration is not an invasion. But even it admitted (at 70) that the word "invasion" includes "a 'hostile entrance into the possession of another,'" "particularly" by "a hostile army" seeking "conquest or plunder." The district court also admitted (at 84 n.40), as it must, that "'invasion' can refer to actions by non-state actors,"—indeed, the United States itself sent forces into Mexico

to pursue a band of non-state actors because the Mexican government "was incapable of policing" its own border and tracking down Pancho Villa. John S.D. Eisenhower, *Intervention! The United States and the Mexican Revolution 1913-1917*, at 227–50 (1993). Texas did the same without federal pre-approval in response to marauders who crossed the border, both before and after statehood. *See, e.g.*, H. Rep. No. 343, at 13-17 (Feb. 29, 1876). Accordingly, at a minimum, S.B.4 cannot be preempted to the extent it applies against cartel members who "have increasingly acquired a transnational dimension" and operate as "potent paramilitary force," complete "with heavily armed mobile units able to stand their ground against the Mexican military."[7]

The district court conceded (at 73) that "some small fraction of immigrants may cross the border with malicious intent and… may be affiliated with paramilitary cartels,"—a concession that *itself* should have defeated a facial injunction.[8] The district court nonetheless concluded (at 76) that an invasion requires a threat that cartels "will imminently overthrow the state government." But no one thought Pancho

---

[7] William P. Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (March 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731?mod=article_inline.

[8] That armed and dangerous cartel members cross the border is not subject to reasonable dispute. *See, e.g.*, Anna Giaritelli, *Texas Drone Spots Armed Smuggler Leading Immigrants Across the Border*, Wash. Examiner (Aug. 3, 2023), https://tinyurl.com/29r5wz8k; Victor Nava, *Armed Men Believed to Be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, N.Y. Post (Aug. 8, 2023), https://tinyurl.com/36apzadn; Office of Tex. Governor, Press Release, *Texas Arrests MS-13 Gang Members, Smugglers Known for Sexual Abuse* (Aug. 11, 2023), https://tinyurl.com/y7cy95au.

Villa was on the cusp of conquering Texas, or that smugglers were about to over-throw Virginia. *See, e.g.*, 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 413-14 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836). The court also suggested (at 86-87) that S.B.4 is not a "wartime measure" because it uses "standard operations of criminal enforcement." Yet "the greater power" to wage war against invaders and insurrectionists "includes the lesser" power to arrest them. *Moyer v. Peabody*, 212 U.S. 78, 84-85 (1909). The district court further ventured (at 89-90) that "SB 4 is not limited to times of invasions" and Texas's efforts to repel invasions cannot be "perpetual." But even if true, the stand-ard for a facial injunction asks whether S.B.4 can *ever* be constitutionally enforced.

## II.  The Remaining Factors Favor a Stay.

As with its mistaken assessment of the merits, the district court also legally erred in numerous respects with respect to the other relevant factors. Any of these legal errors by itself requires vacating the injunction and remanding with instructions to apply the correct standard. *See, e.g.*, *Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc). When all the errors are combined, there can be no doubt.

**1.** To begin, the district court erred (at 99) by asserting that "the United States has shown irreparable harm as a matter of law." Such an argument, however, rests on the district court's mistaken view of preemption. Additionally, the United States' alleged diplomatic harms are nothing more than speculative. *See Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011); *see also United States v. Abbott*, 87 F.4th 616, 642 (5th Cir. 2023) (Willett, J., dissenting), *reh'g en banc granted, opinion vacated*, 90

F.4th 870 (5th Cir. 2024). The private plaintiffs fare no better: They merely allege a change in business structure that is insufficient to demonstrate the harm necessary for this extraordinary remedy.

**2.** The equities also heavily favor a stay. The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. States enjoined from effectuating their statutes necessarily suffer irreparable injury. *See, e.g.*, *Vote.org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022). And that injury harms the public's interest in seeing that laws are enforced. *See, e.g.*, *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017). Here, a stay is in the public interest because enforcing S.B.4 prevents illegal border crossings. By the same token, a stay will not "substantially injure" Plaintiffs. *Nken*, 556 U.S. at 426. The United States can continue to enforce immigration laws when S.B.4 goes into effect, and no other Plaintiff has shown a harm.

At a minimum, even if some provisions of S.B.4 are preempted, there would be no basis to enjoin enforcement of the entire law. S.B.4 contains a robust severability provision, and "[i]t is axiomatic that 'a statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006). "[W]hen confronting a constitutional flaw," the district court should have "tr[ied] to limit the solution to the problem" and "to enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Id.* at 328-29. But the district court refused to meaningfully engage with the plain language of S.B.4's severability provision, claiming (at 110 n.57) that it "would not be practicable" to "respect" severability here.

## III. The Court Should Enter an Administrative Stay.

Texas also requests an administrative stay to prevent irreparable harm while the Court considers this Motion. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 227-28 (5th Cir. 2020).

## CONCLUSION

The Court should grant an administrative stay and a stay pending appeal.

Respectfully submitted.

| | |
|---|---|
| KEN PAXTON | AARON L. NIELSON |
| Attorney General of Texas | Solicitor General |
| | |
| BRENT WEBSTER | /s/ Kateland R. Jackson |
| First Assistant Attorney General | KATELAND R. JACKSON |
| | JOSEPH N. MAZZARA |
| | Assistant Solicitors General |
| | Kateland.Jackson@oag.texas.gov |
| Office of the Attorney General | COY ALLEN WESTBROOK |
| P.O. Box 12548 (MC 059) | Assistant Attorney General |
| Austin, Texas 78711-2548 | |
| Tel.: (512) 936-1700 | |
| Fax: (512) 474-2697 | Counsel for Defendants-Appellants |

## CERTIFICATE OF COMPLIANCE WITH RULE 27.3

I certify the following in compliance with Fifth Circuit Rule 27.3:

- Before filing this Motion, counsel for Appellants contacted the Clerk's Office and opposing counsel to advise them of the intent to file this Motion. Counsel also phoned the offices of opposing counsel before filing.

- The facts stated herein supporting emergency consideration of this Motion are true and complete.

- Because Appellants requests an injunction pending appeal as soon as practicable and, or alternatively, an immediate temporary administrative injunction, the Court's review of this motion is requested by March 4, 2024.

- True and correct copies of relevant orders and other documents are attached as exhibits to this Motion.

- This Motion is being served at the same time it is being filed.

- The names of counsel representing the parties, including contact information of counsel, are as follows:

Daniel Tenny
daniel.tenny@usdoj.gov
primary: (202) 514-1838
Cell: (202) 514-1838
United States Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Anand Balakrishnan
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
212-549-2536
Email: abalakrishnan@aclu.org

Adriana Cecilia Pinon
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288
713-942-8146
Email: apinon@aclutx.org

Cody Wofsy
American Civil Liberties Union Foundation

Immigrants' Rights Project
425 California Street
Ste 7th Floor
San Francisco, CA 94104
415-343-0785
Email: cwofsy@aclu.org

Daniel Hatoum
Texas Civil Rights Project
Beyond Borders
1017 West Hackberry Ave
Alamo, TX 78516
903-539-7129
Email: daniel@texascivilrightsproject.org

Erin D. Thorn
Texas Civil Rights Project
1017 West Hackberry Avenue
Alamo, TX 78516
956-787-8171
Email: erin@texascivilrightsproject.org

Hannah Schoen
ACLU Immigrants' Rights Project
425 California Street
94104
San Francisco, CA 94104
332-204-2777
Email: irp_hs@aclu.org

Lee Gelernt
American Civil Liberties Union
125 Broad St., 18th Floor
New York, NY 10004
212-549-2616
Fax: 212-549-2654
Email: lgelernt@aclu.org

Morgan Russell
American Civil Liberties Union Foundation
425 California Street, Ste 7th Floor
San Francisco, CA 94104
415-343-0776
Email: mrussell@aclu.org

Tamara F. Goodlette
Texas Civil Rights Project
139 Brightwood Place
San Antonio, TX 78209
303-589-6401
Email: tami@texascivilrightsproject.org

Wafa Junaid
American Civil Liberties Union Foundation
66 W 38th St., Ste 29c
New York, NY 10018
646-256-2274
Email: wjunaid@aclu.org

/s/ Kateland R. Jackson
KATELAND R. JACKSON

## CERTIFICATE OF CONFERENCE

On March 1, 2024, counsel for Appellants conferred with counsel for Appellees, who stated that Appellees oppose the relief requested in this Motion.

/s/ Kateland R. Jackson
KATELAND R. JACKSON

## Certificate of Service

On March 1, 2024, this Motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Kateland R. Jackson
Kateland R. Jackson

## CERTIFICATE OF COMPLIANCE

This Motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,132 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Kateland R. Jackson
KATELAND R. JACKSON

No. 24-50149

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THE STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants-Appellants*

—————————————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees*

*v.*

STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTORY OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant-Appellant.*

————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

————

**EXHIBITS IN SUPPORT OF DEFENDANTS' OPPOSED EMERGENCY MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND FOR AN ADMINISTRATIVE STAY**

————

## Index of Exhibits[1]

Exhibit

ECF 1, Plaintiff ACLU Complaint (Dec. 19, 2023)................................................ A

ECF 1, Plaintiff USA Complaint (Jan. 3, 2024) ....................................................B

ECF 14, Plaintiff USA's Motion for Preliminary and Permanent Injunction........ C

ECF 30, Plaintiff ACLU's Motion for Preliminary Injunction ............................D

ECF 25, Defendants' Consolidated Response to Motions for Preliminary
Injunction ........................................................................................................E

ECF 25-1, Declaration of Mike Banks.............................................................F

ECF 32, Plaintiff USA's Reply in Support of Its Motion for Preliminary and
Permanent Injunction ...................................................................... G

ECF 33, Plaintiff ACLU's Reply in Support of Its Motion for Preliminary
Injunction ......................................................................................................H

Preliminary Injunction Hearing Transcript...........................................................I

ECF42, Order Granting Preliminary Injunction ...................................................J

ECF 43, Defendants' Notice of Appeal ............................................................... K

---

[1] In these Exhibits, "ECF ___" refers to the district court docket number.

# Exhibit A: ECF 1, Plaintiff ACLU Complaint (Dec. 19, 2023)

Case: 24-50149   Document: 36   Page: 31   Date Filed: 03/01/2024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER; AMERICAN
GATEWAYS; and THE COUNTY OF EL
PASO, TEXAS,

          *Plaintiffs,*

  v.

STEVEN C. MCCRAW, in his official
capacity as Director of the State of Texas
Department of Public Safety, and BILL D.
HICKS, in his official capacity as District
Attorney for the 34th District,

          *Defendants.*

Cause No. 1:23-cv-1537

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.  This action challenges Senate Bill 4 (88th Leg. (4th special session)) ("S.B. 4"), which

    purports to give Texas state officials the unprecedented power to arrest, detain, and deport

    noncitizens in the State of Texas.  Under this novel system, the State of Texas has created

    its own immigration entry and re-entry crimes; state police arrest noncitizens for alleged

    violations of these crimes; state prosecutors bring charges in state courts; state judges order

    deportation; and state officers carry out those orders.  The federal government has no role

    in, and no control over, Texas's scheme.

2.  S.B. 4 violates the Supremacy Clause of the United States Constitution.  Immigration is a

    quintessentially federal authority.  Congress has created a carefully calibrated immigration

    system, with detailed procedures that determine whether a person may remain in the United

States, when criminal entry and re-entry charges may be deployed in the exercise of prosecutorial discretion, and what protections people receive to ensure that they are not removed to a place where they face persecution.

3.  Congress placed all of the relevant tools and decision-making in the hands of *federal* officials—in keeping with the federal government's exclusive immigration powers and the sensitive foreign policy implications of these powers. S.B. 4 jettisons this system, grasping control over immigration from the federal government and depriving people subject to that system of *all* of the federal rights and due process that Congress provided to them, including the rights to contest removal and seek asylum.

4.  S.B. 4 is patently illegal.  A state cannot replace Congress's immigration scheme with its own.  Plaintiffs hereby file this complaint for declaratory and permanent injunctive relief. Plaintiffs will seek a preliminary injunction necessary to enjoin enforcement of S.B. 4 in advance of the law's March 5, 2024 effective date.

## JURISDICTION AND VENUE

5.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6.  Venue is proper in the Western District of Texas because a substantial portion of the relevant events occurred or will occur in the District and because Defendants reside in the District.  28 U.S.C. § 1391(b).

## PARTIES

7.  Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization dedicated to serving the legal needs of low-income noncitizens and asylum seekers in West Texas, Southern New Mexico, and Ciudad Juarez, Mexico.

Case: 24-50149   Document: 36   Page: 33   Date Filed: 03/01/2024

8. Las Americas is headquartered in El Paso, Texas, and is one of the only organizations in this region that provides pro bono representation to noncitizens. Las Americas' mission is to provide high-quality legal services to low-income immigrants; to advocate for human rights, including by ensuring that newly arrived noncitizens can access the humanitarian protections available under federal law; and to integrate noncitizens into the community through referrals with shelters and local partners.

9. Las Americas' work includes direct representation of noncitizens in every stage of the federal removal system; legal advice and referral support; and Know Your Rights seminars on federal immigration policies.

10. Plaintiff American Gateways is a nonprofit organization founded in 1987 that is incorporated in Texas and has offices in Austin, San Antonio, and Waco, Texas. American Gateways provides a broad range of low- and no-cost legal services to noncitizens throughout the region, including asylum seekers and victims of family violence, sexual assault, and human trafficking.

11. Plaintiff El Paso County, Texas is a county recognized as a legal subdivision of the State. Tex. Const. art. 11, § 1. El Paso County has the constitutional and statutory authority to set policies and regulations, raise revenue, and administer programs for its residents in certain areas. This includes administering its county judicial system and providing health and social services to El Paso County residents, including residents who are immigrants. El Paso County's mission is to deliver exceptional public service to the people of El Paso County through judicious, efficient, and responsive government, and the conscientious development of ideas that produce compassionate solutions to the community's obligations, challenges, and ever-changing needs.

3

Case: 24-50149   Document: 36   Page: 34   Date Filed: 03/01/2024

12. Defendant Steven C. McCraw is the Director and Colonel of the Texas Department of Public Safety ("DPS"). He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities, and has stated that DPS will enforce S.B. 4. Tex. Gov't Code § 411.006(a)(1)-(2). He is sued in his official capacity.

13. Defendant Bill D. Hicks is the District Attorney for the 34th Judicial District, which includes Culbertson, Hudspeth, and El Paso Counties. Tex. Gov't Code § 43.120(a). As the District Attorney for the 34th Judicial District, District Attorney Hicks "represents the state in all criminal cases before every district court having jurisdiction in El Paso County" and "represents the state in all criminal cases pending in the inferior courts having jurisdiction in El Paso County," which will include charges brought under S.B. 4. Tex. Gov't Code §§ 43.120(b), (c). District Attorney Hicks is sued in his official capacity.

## STATEMENT OF FACTS

### A. Legal Background: Comprehensive Federal Immigration System

14. The federal government has exclusive power over immigration. *See, e.g., Arizona v. United States*, 567 U.S. 387, 394-95 (2012).

15. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 et seq.

16. Federal immigration statutes and the associated implementing regulations and precedential administrative law decisions form an exceptionally detailed, complex, and finely reticulated regulatory regime. Congress has frequently amended the relevant provisions of the INA, including particularly significant legislation in 1952, 1965, 1980, 1986, 1990, 1996, 2000, 2001, 2005, and 2008, along with dozens of other Acts modifying the

4

Case: 24-50149    Document: 36    Page: 35    Date Filed: 03/01/2024

immigration regime in countless ways.  Immigration legislation is proposed in every single Congress and frequently forms a point of major national debate.

17. The INA was amended in 1980 by the Refugee Act, Pub. L. No. 96-21, to codify certain protections for those fleeing violence and danger.  Under U.S. law, every noncitizen "who is physically present in the United States or who arrives in the United States" has the right to apply for asylum, "whether or not" they enter at a port of entry.   8 U.S.C. § 1158(a)(1).

18. Congress provided a range of other protections within the INA.   Consistent with international obligations, people cannot be removed to countries where they will face persecution, 8 U.S.C. § 1231(b)(3)(A), or torture, *id.* § 1231.   Likewise, Congress has provided various other forms of relief, including status for unaccompanied children, *id.* § 1101(a)(27)(J), trafficking victims, *id.* § 1101(a)(15)(T), and victims of crimes, *id.* § 1101(a)(15)(U).  All of these protections allow the federal government to permit a person who otherwise would have no legal status to avoid removal.

19. The INA contains complex and exclusive procedures for determining immigration and citizenship status and for determining whether an individual may lawfully remain in the United States, either temporarily or permanently. *See*, *e.g.*, 8 U.S.C. § 1229a(a)(3).  Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not be permitted to remain in the United States.  The answer to that question can only be reached through the processes outlined in the INA and may depend on the discretionary determinations of federal officials.

20. Many people who enter the United States between ports of entry ultimately obtain federal authorization to remain in the United States temporarily, indefinitely, or permanently.

Case: 24-50149      Document: 36      Page: 36      Date Filed: 03/01/2024

21. Congress has established that entry into the United States is a crime under certain circumstances. 8 U.S.C. § 1325 ("Improper Entry by Alien") provides criminal penalties for noncitizens who, *inter alia*, enter the United States at any time or place other than as designated by immigration officers. 8 U.S.C. § 1326 provides criminal penalties for noncitizens who reenter the United States without authorization after entry of an order of removal. 8 U.S.C. § 1253 ("Penalties related to removal") provides criminal penalties for a failure to comply with a federal order of removal.

22. Congress also created specific procedures to remove individuals from the United States. These are generally called removal proceedings and can take multiple forms, including full removal proceedings, pursuant to 8 U.S.C. § 1229a; expedited removal proceedings, pursuant to 8 U.S.C. § 1225; and reinstatement of removal proceedings, pursuant to 8 U.S.C. § 1231(a)(5). Each of these proceedings requires, at a minimum, notice and an opportunity to contest the grounds for removal, as well as an opportunity to raise humanitarian claims for protection from removal, including under the withholding of removal statute and the Convention Against Torture.

23. Under federal law, people are allowed to remain in the United States while administrative removal proceedings prescribed by the INA are pending.

24. Prosecution for the federal entry crimes, the decision to pursue the removal of a given person from the country, and the choice of which of the available removal processes to invoke, are matters of federal discretion. Federal agents and policymakers may choose to deploy these tools—or not—for a wide range of reasons, including national priorities, migration patterns, international relationships, and humanitarian concerns.

**B. S.B. 4**

25. On December 18, 2023, Governor Abbott signed S.B. 4 into law. It is effective on March 5, 2024.

26. S.B. 4. creates three new state law offenses: Illegal Entry from Foreign Nation, Tex. Penal Code §51.02; Illegal Reentry By Certain Aliens, *id.* § 51.03; and Refusal to Comply with [State] Order to Return to Foreign Nation, *id.* §51.04.

27. Each of these offenses can only be committed by a "person who is an alien," meaning any person who is not a citizen or national of the United States.

28. S.B. 4 creates a new state judicial power to deport individuals from the United States. Specifically, it authorizes state judges to "order [a defendant] to return to the foreign nation from which the person entered." Tex. Code Crim. Pro. art. 5B.002. S.B. 4 makes an "Order to Return" a mandatory part of all judgments imposed for a conviction of the new illegal entry and reentry crimes.

29. Texas Penal Code Section 51.02 ("State Illegal Entry") criminalizes a noncitizen's entry or attempt to enter into Texas directly from a foreign nation at any location other than a port of entry.

30. "[A]ffirmative defense[s] to prosecution" for State Illegal Entry exist when a noncitizen has been granted "lawful presence" or "asylum" by the federal government, if the conduct was not a violation of the federal illegal entry statute, 8 U.S.C. §1325(a), or if the noncitizen was approved for benefits under the federal Deferred Action for Childhood Arrivals (DACA) program.

31. S.B. 4 does not provide a defense for people who are currently seeking asylum, other humanitarian protection, or any other relief available under federal law. The new law

7

Case: 24-50149    Document: 36    Page: 38    Date Filed: 03/01/2024

prohibits courts from abating "the prosecution of an offense under [S.B. 4] on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Pro. art. 5B.003.

32. S.B. 4 specifies that certain "federal programs"— the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program and "any program not enacted by the United States Congress that is a successor to or materially similar to DACA or DAPA"— are not affirmative defenses to prosecution.

33. A first violation of State Illegal Entry is a Class B Misdemeanor. A repeat offense is a state jail felony.

34. S.B. 4 also creates a state crime of Illegal Reentry ("State Illegal Reentry"). Texas Penal Code Section 51.03 makes it a state crime if a noncitizen "enters, attempts to enter, or is at any time found in this state after the person (1) has been denied admission to, excluded, deported, or removed from the United States; or (2) departed from the United States while an order of exclusion, deportation, or removal was outstanding."

35. For purposes of State Illegal Reentry, S.B. 4 defines "removal" to include a state Order to Return to a foreign nation.

36. S.B. 4 creates no affirmative defenses to a violation of State Illegal Reentry.

37. State Illegal Reentry is punishable as a Class A misdemeanor. Where an individual was previously removed subsequent to certain criminal convictions or, based on certain criminal charges, a violation is punishable as a felony of the Second or Third Degree, authorizing sentences of up to twenty years in prison.

8

38. S.B. 4's removal provision amends the Texas Code of Criminal Procedure to require state magistrates and judges to issue a State "Order to Return" as part of the judgment for every conviction of State Illegal Entry or Reentry.

39. A State Order to Return "takes effect on completion of the term of confinement or imprisonment imposed by the judgment" and requires a person to return to the foreign nation from which they entered or attempted to enter.

40. Alternatively, a state magistrate or judge may enter a State Order to Return prior to a conviction for State Illegal Entry or Reentry in lieu of continuing the prosecution. After making a determination that probable cause exists, a state magistrate or judge may issue an Order to Return if the individual agrees to the order and meets certain requirements.

41. Texas Penal Code Section 51.04 creates a third criminal offense: Refusal to Comply with Order to Return to Foreign Nation.

42. Refusal to Comply with Order to Return to Foreign Nation is a felony of the Second degree, punishable by between 2 and 20 years in prison.

43. There is no affirmative defense to a violation of Section 51.04.

**C. The Effect of S.B. 4 on Plaintiffs**

44. S.B. 4 creates a new state system to regulate immigration that completely bypasses and conflicts with the federal system. It allows state officers to arrest, detain, and remove individuals from the United States and mandates removal for those who are convicted of the new state crimes of illegal entry and reentry—all without any input or involvement whatsoever from federal officials.

45. S.B. 4 requires state officers to make determinations of federal immigration status and to incarcerate and remove noncitizens pursuant to these determinations, but it does not

9

provide noncitizens with any of the mechanisms or pathways to apply for or receive federal protection from removal. Moreover, the system prohibits state courts from pausing cases to obtain determinations of status from the federal government or abstaining while federal immigration proceedings take place.

46. The State adopted the statute, as a whole, to address the perceived failures of the federal government to arrest, detain and remove noncitizens. The Legislature failed to adopt prior versions that did not include the removal authority.

47. In testimony before the Texas legislature in 2023, Director McCraw stated that DPS estimates there could be approximately 72,000 arrests per year under the new law.

48. Enforcement of S.B. 4 will directly frustrate Plaintiff Las Americas' mission to ensure access to humanitarian protection and immigration relief to as many noncitizens as it can reach.

49. The majority of individuals served by Las Americas' programming, including programs that provide *pro se* legal information, are nondetained noncitizens living in the community. A significant portion of these individuals have recently entered without inspection. These community-based clients have been released after an initial arrest by Customs and Border Protection (CBP) or Immigration and Customs Enforcement officers(ICE), or they have never encountered a federal immigration officer.

50. In addition, Las Americas assists noncitizens who are detained in the federal immigration system and are facing expedited removal. Las Americas has developed relationships with ICE facilities to provide Know Your Rights presentations and assistance to individuals in their credible fear proceedings, which is a system developed by federal authorities to adjudicate the claims of noncitizens in expedited removal proceedings.

51. Enforcement of S.B. 4 will require Las Americas to restructure its services. Las Americas does not currently provide any services to people detained or incarcerated for state crimes. But under S.B. 4, noncitizens will be imprisoned for alleged state immigration offenses and then deported through the state mandatory removal system. In intention or effect, the state will preclude the communities Las Americas serves from ever coming into contact with the federal immigration process. To continue to pursue its mission, Las Americas will need to develop an entirely new system of tracking, counseling, and representing individuals held in state and county jails and prisons to ensure that they are screened and advised of their eligibility for federal immigration relief, and are assisted in applying for relief.

52. Las Americas will need to prioritize outreach and assistance to noncitizens arrested under S.B. 4 because the time they spend incarcerated could cause them to lose eligibility for asylum. Indeed, individuals have one year from their date of arrival to the United States to apply for asylum or otherwise lose their eligibility. *See* 8 U.S.C. § 1158(a)(2)(B). Las Americas has structured its operations to ensure that noncitizens are able to meet this filing deadline, as failing to do so can result in an individual's return to persecution or torture in their home country. These individuals, who currently access Las Americas' services in the community, will be located in state and county jails and prisons pursuant to S.B. 4. Las Americas will have to shift its work into these facilities in order to screen individuals for asylum eligibility and prepare applications for protection.

53. Enforcement of S.B. 4 will require Las Americas to dedicate more resources to ensure access to asylum and protection to those detained in the state system created by S.B. 4. Currently, Las Americas' asylum work for individuals out of custody concludes upon an

11

initial application, as individuals may leave the El Paso area to join family members elsewhere in the United States.   Thus, Las Americas relies on referrals to other organizations and lawyers in the United States to continue representation.  S.B. 4 changes this operational model.  Because such out-of-state referrals will not be available for people detained pursuant to S.B. 4, Las Americas will need to provide continuing representation to those individuals.  Each case will require more of Las Americas' resources.  As a result, Las Americas will be able to serve fewer clients, frustrating its organizational mission.

54. S.B. 4's removal provisions will increase the need for Las Americas to prioritize reaching those arrested under the law.   As early as their first appearance before a magistrate, individuals arrested under S.B. 4 may be asked to accept the entry of an Order to Return in lieu of prosecution.  Las Americas will thus need to seek to access defendants as early as possible to ensure they understand their rights under federal law to humanitarian protection and their individual eligibility for relief from federal removal.  Las Americas will also need to prioritize counseling for individuals who are convicted under S.B. 4 to ensure that they can pursue asylum or other relief under existing federal law before their state detention ends and an Order to Return is entered.

This work will require Las Americas to develop wholly new materials and resources to advise individuals how to seek federal immigration relief while subject to S.B. 4.

55. Las Americas will further need to develop and implement new advocacy models to protect individuals applying for asylum from removal where they are subject to a State Order to Return.

Case: 24-50149      Document: 36      Page: 42      Date Filed: 03/01/2024

Case: 24-50149   Document: 36   Page: 43   Date Filed: 03/01/2024

56. To meet and prioritize the needs of those arrested and detained under S.B. 4, Las Americas will need to divert resources away from the representation of those it currently serves in the community.

57. S.B. 4 will decrease the total number of noncitizens Las Americas is able to assist in seeking asylum and other forms of immigration relief. Community based representational models allow Las Americas to assist the greatest number of individuals, as Las Americas can connect with and serve individuals or groups of individuals in its offices much more efficiently than when the individuals it is serving are detained. Because S.B. 4 creates a new detention scheme for immigrants, Las Americas will have to divert resources to serve immigrants in the less efficient setting of state prison facilities. Ultimately, this diminishes the number of immigrants Las Americas can serve.

58. The creation of new programs to serve those arrested and detained under S.B. 4—including the requisite training, staff time spent in criminal justice facilities, and advocacy with a sweeping range of law enforcement agencies and state stakeholders—will necessarily decrease the number of people represented in the community, as well as in federal immigration detention facilities. Budget allocations and staff will need to be diverted from programs that help community members with their federal immigration claims to programs that help immigrants detained in state jails.

59. S.B. 4 will also frustrate Las Americas' programming designed to connect noncitizens who may have lived longer in the community with local law enforcement. The program is designed to bring noncitizen communities out of the shadows and allow them to apply for visas the federal government has developed for crime victims and victims of trafficking. In bypassing the federal system and threatening state immigration enforcement, S.B. 4

Case: 24-50149   Document: 36   Page: 44   Date Filed: 03/01/2024

creates the heightened perception that a noncitizen reporting a crime will be arrested for illegal entry or reentry and removal, foreseeably chilling participation in the program and impairing the organization's ability to fulfill its mission.

60. Plaintiff American Gateways provides direct representation to people appearing in the San Antonio Immigration Court.  It also provides legal orientation, immigration workshops, and pro bono legal representation at three immigrant detention facilities in Taylor, Pearsall, and Karnes City, Texas.

61. S.B. 4 will frustrate American Gateways' mission to provide free, culturally sensitive, trauma-informed legal representation to individuals and families seeking asylum and other forms of humanitarian immigration relief in the United States.

62. S.B. 4 will frustrate American Gateways' mission to represent low-income noncitizens in securing asylum and other forms of immigration relief.  S.B. 4 will eliminate American Gateways' ability to assist noncitizens in securing protection because they will be detained and removed by the State before they can seek federal protections.  SB 4 will also detrimentally affect the representation that American Gateways provides to crime victims eligible for immigration relief, as they will fear arrest and deportation should they report their victimization.

63. S.B. 4 will also force American Gateways to divert organizational resources and develop new programming.  In addition to providing legal services, a central feature of American Gateways' mission is to engage and educate immigrant communities and local stakeholders about the immigration system and individuals' rights in the immigration process.

64. American Gateways regularly holds trainings on these topics in the communities it serves. American Gateways will have to divert its resources to educate clients and community

members about the impact of S.B. 4. The organization has received calls from community members concerned about S.B. 4 and how the law might expose them and their loved ones to arbitrary arrest and detention, removal, and separation from their families. American Gateways has already been asked to conduct several Know Your Rights sessions focused on S.B. 4 in each of its offices, which will require the diversion of staff time and resources from other programs.

65. Determining how best to communicate about S.B. 4, what the legislation requires, how it might be applied to individuals, and how people can protect themselves, will require time and effort. American Gateways anticipates needing to make significant changes to the community education materials it uses to train staff, community members, lawyers, and others.

66. Plaintiff El Paso County represents a multicultural border community largely made up of immigrants. El Paso County has over 850,000 residents, more than 82 percent of whom are Hispanic and more than 25 percent of whom are foreign-born.

67. Immigrant households are an integral part of the El Paso community. Many of these households are mixed-status families, with U.S. citizens living with undocumented family members who are their fathers, mothers, or children.

68. El Paso's immigrant community pays approximately $591.8 million in taxes. It includes individuals who have naturalized, individuals who hold legal permanent resident status, individuals with temporary status, and individuals who are undocumented.

69. El Paso County's strategic vision involves serving its constituency by fostering inclusion and quality of life for local immigrants and refugees and promoting collaboration with external partners such as Mexico. An example of the programming created by El Paso

15

County to serve its strategic vision is the Office of New Americans (ONA), which aims to improve the inclusion, integration, and overall quality of life for the County's immigrants and refugees through enhanced collaboration with the community, education institutions, nonprofits, and interfaith organizations. In collaboration with other County departments, the ONA supports and facilitates community programs and presentations on topics such as citizenship workshops, English as a Second Language (ESL) classes, and legal rights. The ONA will need to develop new materials and resources to advise individuals of their rights under S.B. 4 and its impact on them.

70. El Paso County additionally manages, administers, and funds a migrant support services center. The center first opened on October 10, 2022, when the El Paso area saw an influx of migrants. In one year of operations, the center assisted approximately 56,247 migrants by facilitating self-pay travel needs of asylum seekers who have a sponsor in the U.S. and have the resources to travel to their destination quickly. S.B. 4 will interfere with the operation of the migrant support service center provided by the County by potentially subjecting people whom El Paso County is assisting to reach their final destinations to state criminal prosecution and state removal.

71. The County is further responsible for funding and managing the County jail system, the County Public Defender's office, and providing funding for the state judicial system. Under S.B. 4, the County will be forced to expend its limited resources to implement the law, likely redirecting funds from existing programs and needs.

72. Upon information and belief, El Paso County could see an additional 8,000 arrests per year pursuant to S.B. 4, and the County will have to house those individuals in its jails. The main detention facility in El Paso County is the El Paso County jail. DPS agents book

16

detainees into the El Paso County jail and the jail staff are required by state law to take custody of those persons. El Paso County would potentially be liable for the unlawful detention of persons held in an El Paso County jail facility under S.B. 4.

73. Given that number of anticipated arrests, the County will incur nearly $24 million per year in additional costs to simply house these additional defendants. The County estimates it will need to authorize and spend a further $162 million to build additional jail and bed space.

74. S.B. 4 further requires law enforcement agents to collect certain biometric information and cross-reference that information with existing databases. Implementation of S.B. 4 thus requires additional expenditure by the County to provide access to this information.

75. S.B. 4 will require El Paso County to provide training to peace officers who are funded by the County, including Constables and Sheriff's staff. The County will need to expend resources to do so. The County will also have to fund the legal defense of any County official sued under federal law for implementing S.B. 4.

76. El Paso County issued a 2020-2024 Strategic Plan that lists as one of its top priorities "Leading in Justice Reform." One of the key strategies in achieving that priority is to make best efforts to only incarcerate those that are a high risk to public safety. S.B. 4 will directly frustrate the County's goal of leading justice reform by forcing it to incarcerate persons that may not be a high risk to public safety.

77. The County funds and manages legal services to families in a broad range of areas that include mental health, adult protective services, child protective services, juvenile and family violence. El Paso County relies on public trust to enforce laws and to support the most vulnerable residents of the County. S.B. 4 directly frustrates the County's efforts to

provide these legal services by diluting the trust the El Paso County community has in its local government, making it less likely that community members cooperate with local law enforcement and with County staff that seek to provide them with legal services.

## CLAIMS FOR RELIEF

### Count One: Preemption

78. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

79. Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

80. S.B. 4 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

81. S.B. 4 further violates the Supremacy Clause because it conflicts with federal laws, contradicts federal admission and release decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and directs state officers to take unilateral immigration enforcement actions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

    a. Declare that S.B. 4 is unlawful in its entirety;

    b. Preliminarily and permanently enjoin Defendant from enforcing S.B. 4;

Case: 24-50149    Document: 36    Page: 48    Date Filed: 03/01/2024

c.  Grant any other and further relief that this Court may deem fit and proper.

Case: 24-50149   Document: 36   Page: 49   Date Filed: 03/01/2024

Case: 24-50149    Document: 36    Page: 50    Date Filed: 03/01/2024

Dated: December 19, 2023

Anand Balakrishnan*
Omar Jadwat*
Lee Gelernt*
Wafa Junaid*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

Spencer Amdur*
Cody Wofsy*
Hannah Schoen*
Morgan Russell*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-0770
F: (415) 395-0950
samdur@aclu.org
cwofsy@aclu.org
hschoen@aclu.org
mrussell@aclu.org

*For Plaintiffs Las Americas Immigrant
Advocacy Center, American Gateways,
and County of El Paso*


*Pro Hac Vice Motion Forthcoming

/s/ *David A. Donatti*
David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES UNION OF
TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs Las Americas Immigrant Advocacy
Center, American Gateways, and County of El
Paso*

Tamara F. Goodlette (TX Bar No. 24117561)
Erin D. Thorn (TX Bar No. 24093261)
Daniel Hatoum (TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
erin@texascivilrightsproject.org
daniel@texascivilrightsproject.org

*For Plaintiffs Las Americas Immigrant Advocacy
Center and American Gateways*

Jo Anne Bernal, (TX Bar No. 02208720)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz, (TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

# Exhibit B: ECF 1, Plaintiff USA Complaint (Jan. 3, 2024)

Case: 24-50149   Document: 36   Page: 52   Date Filed: 03/01/2024

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | Case No. 1:24-cv-00008 |
| v. | |
| THE STATE OF TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, in his official capacity as Director of Texas Department of Public Safety, | |
| *Defendants.* | |

## COMPLAINT

Case: 24-50149    Document: 36    Page: 53    Date Filed: 03/01/2024

1. The United States brings this action to preserve its exclusive authority under federal law to regulate the entry and removal of noncitizens. Texas's Senate Bill 4 (SB 4) creates purported state immigration crimes for unlawful entry and unlawful reentry, permits state judges and magistrates to order the removal of noncitizens from the country, and mandates that state officials carry out those removal orders. But Texas cannot run its own immigration system. Its efforts, through SB 4, intrude on the federal government's exclusive authority to regulate the entry and removal of noncitizens, frustrate the United States' immigration operations and proceedings, and interfere with U.S. foreign relations. SB 4 is invalid and must be enjoined.

2. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona v. United States*, 567 U.S. 387, 394 (2012). Indeed, "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. *Hines v. Davidowitz*, 312 U.S. 52, 66 (1941). Texas's SB 4 is preempted by federal law and thus violates the Supremacy Clause of the United States Constitution. That conclusion is strongly reinforced by the Foreign Commerce Clause, which is one of the sources of Congress's power to regulate immigration, and which simultaneously limits the power of the States to engage in such regulation. In this action, the United States seeks a declaration invalidating, and an order enjoining the enforcement of, SB 4 before it takes effect on March 5, 2024.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345, and the United States seeks remedies under 28 U.S.C. §§ 1651, 2201, and 2202.

4. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants reside within this district and because a substantial part of the acts or omissions giving rise to this action occurred within this judicial district.

Case: 24-50149    Document: 36    Page: 54    Date Filed: 03/01/2024

## PARTIES

5.      Plaintiff, the United States, regulates immigration and conducts foreign relations under its constitutional and statutory authorities and through its Executive Branch agencies, including the Department of Homeland Security (DHS) and its component agencies—U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS)—the Department of Justice, and the Department of State.

6.      Defendant State of Texas is a State of the United States.

7.      Defendant Greg Abbott is the Governor of Texas.  He is sued in his official capacity.

8.      Defendant Texas Department of Public Safety (DPS) is an agency of Texas, responsible for enforcing the laws protecting the public safety and providing for the prevention and detection of crimes.  Tex. Gov't Code § 411.002.

9.      Defendant Steven C. McCraw is the Director of DPS.  Tex. Gov't Code §§ 411.006(a)(1)–(2).  He is responsible for the conduct of DPS's affairs and serves as executive director of DPS, among other duties and responsibilities.  *Id.*  He is sued in his official capacity.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

10.     Under the Constitution's Supremacy Clause, the Constitution and federal immigration laws, including the Immigration and Nationality Act (INA), are—like all federal laws—"the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Through the Supremacy Clause, state laws may be preempted in various ways.

11.     Under the doctrine of field preemption, "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."  *Arizona*, 567 U.S. at 399.  "The intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress

left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.*

12.     State laws are also "preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399. "This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

13.     The Constitution tasks the federal government with regulating immigration, foreign affairs, and foreign commerce. The Constitution affords the federal government the power to "establish an uniform Rule of Naturalization," U.S. Const., art. I § 8, cl. 4, to "regulate Commerce with foreign Nations," *id.* art. I § 8, cl. 3, and to exercise authority inherent in the United States' national sovereignty, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936).

14.     Thus, as the Supreme Court recognized, the "Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona*, 567 U.S. at 394. Congress has exercised its authority over immigration to make laws comprehensively governing the entry, admission, presence, status, and removal of noncitizens by enacting the INA, 8 U.S.C. § 1101 *et seq.*, and other laws regulating immigration.

15.     As relevant here, Congress established a comprehensive, integrated framework governing the entry of noncitizens into the United States.[1] It has identified who may enter, *see, e.g.,* 8 U.S.C. §§ 1181–82, 1188, and how they may enter, *see, e.g.,* 8 U.S.C. §§ 1223–25.[2]

---

[1] Following the Homeland Security Act of 2002, many references in the to the "Attorney General" are now read to mean the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

[2] This complaint uses the term "noncitizen" as equivalent to the statutory term "alien." *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (quoting 8 U.S.C. § 1101(a)(3)).

Case: 24-50149   Document: 36   Page: 55   Date Filed: 03/01/2024

16.    Congress has also imposed federal criminal penalties on noncitizens who enter or reenter the United States unlawfully.  Two provisions are most relevant here.  First, 8 U.S.C. § 1325, titled "Improper entry by [noncitizen]," makes it a crime for any noncitizen to "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers," such as the unlawful entry between ports of entry.  Second, 8 U.S.C. § 1326, titled "Reentry of removed [noncitizens]," states that, subject to certain exceptions, "any [noncitizen] who . . . has been denied admission . . . or removed or has departed the United States while an order of . . . removal is outstanding, and thereafter . . . enters, attempts to enter, or is at any time found in, the United States . . . shall be fined . . . or imprisoned not more than 2 years, or both."

17.    In terms of removal, the Supreme Court has confirmed "that the removal process" must be "entrusted to the discretion of the Federal Government," in part because a "decision on removability . . . touch[es] on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409.  Federal law sets forth a comprehensive removal framework. It identifies the grounds for removal, the requirements for commencing and administering removal proceedings, and the protections afforded to noncitizens throughout the process. *See*, *e.g.*, 8 U.S.C. §§ 1182, 1225, 1227, 1229, 1229a, 1231(a)–(b).  For example, federal law states that during removal proceedings, which are overseen by specialized immigration judges, *see* 8 U.S.C. § 1101(b)(4), noncitizens must be given certain rights, including (i) the right to "be[] represented . . . by counsel of the [noncitizen's] choosing," and (ii) "a reasonable opportunity to examine the evidence against the [noncitizen], to present evidence on the [noncitizen's] own behalf, and to cross-examine witnesses presented by the Government."   8 U.S.C. § 1229a(b)(4); *see also id.* § 1229a(b)(1).  Congress has also provided for judicial review of final removal orders in a court of appeals, and allowed for a stay of removal pending judicial review. 8 U.S.C. § 1252; *Nken v. Holder*, 556 U.S. 418 (2009).  Moreover, certain noncitizens may be subject to expedited removal proceedings described in 8 U.S.C. § 1225(b)(1), in which the noncitizens will be "removed from the United States without further hearing or review,"

4

Case: 24-50149      Document: 36      Page: 57      Date Filed: 03/01/2024

unless they claim a fear of persecution or torture, or express an intent to apply for asylum. *Id.* § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(4). There are further procedures to assess whether a noncitizen has a credible fear. *See* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30.

18.     A noncitizen may apply for relief or protection from removal. For example, with certain exceptions, *see* 8 U.S.C. § 1158(a)(2) & (b)(2), Congress has specified that a noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum," *id.* § 1158(a)(1). In addition, certain noncitizens may be entitled to withholding of removal, with limited exceptions, *see id.* § 1231(b)(3)(B), if they establish the likelihood that they would face persecution if removed to the proposed country of removal, *id.* § 1231(b)(3). And noncitizens may also be entitled to protection from removal consistent with U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment of Punishment (Convention Against Torture), if they would be tortured when removed to the proposed country of removal. 8 C.F.R. § 1208.16(c), 18(a). If the noncitizen is an unaccompanied child, Congress has provided additional protections, *see* 8 U.S.C. § 1232, including that the child must be transferred to the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS), which generally must place the child with a care provider in the least restrictive setting that is in the best interest of the child, *id.* § 1232(c)(2)(A).

19.     Federal law also provides recourse to noncitizens who are subject to removal proceedings. Certain noncitizens in removal proceedings may apply for relief from removal, 8 U.S.C. § 1229a(c)(4), and if ordered removed, may file a motion for reconsideration, *id.* § 1229a(c)(6), or reopening, *id.* § 1229a(c)(7). In lieu of being subject to removal proceedings or formal removal, certain noncitizens may be permitted to depart the United States at their own expense, at the discretion of federal immigration officials. *See id.* § 1229c. Further, federal law establishes a comprehensive process for the execution of removal orders, including how the United States determines where a noncitizen may be removed to and the physical

Case: 24-50149     Document: 36     Page: 58     Date Filed: 03/01/2024

process of removal. *See id.* § 1231(b)–(c). Notably, federal law explicitly gives federal officials the responsibility to work with foreign governments to determine whether they will accept noncitizens who are subject to final removal orders. *See id.* § 1231(b)(1)–(2); 8 C.F.R. § 241.15; *see also* 8 U.S.C. § 1158(a)(2)(A) (noting bilateral agreements with foreign nations).

20.     Congress has also established an enforcement apparatus to target those who enter unlawfully. For example, CBP, "in coordination with" ICE and USCIS, is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter . . . the United States" and "the detection, interdiction, removal, departure from the United States . . . of persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8). And U.S. Border Patrol has "primary responsibility for interdicting persons attempting to illegally enter . . . the United States . . . at a place other than a designated port of entry." *Id.* § 211(e)(3).

21.     Federal law also gives DHS "the power and duty to control and guard" the border against illegal entry and to "perform such other acts as . . . necessary for carrying out [such] authority." 8 U.S.C. § 1103(a)(3), (5). In doing so, immigration officers enforce prohibitions on unlawful entry. *See id.* § 1357(a) (detailing the authority of federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States"); *see, e.g., id.* § 1357(a)(3) (authorizing access to certain private lands "for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States"); H.R. Rep. No. 82-1377, at 3 (1957), 1952 U.S.C.C.A.N. 1358, 1360 (explaining that § 1357(a)(3) was designed to prevent illegal entries, protect "the national security," and preserve "the sovereign right of the United States to protect its own boundaries against the entry of [noncitizens]").

## SENATE BILL 4

22.     On December 18, 2023, the Governor of Texas signed SB 4 into law, adding a Chapter 5B to the Texas Code of Criminal Procedure and a Chapter 51 to the Texas Penal

Code.[3] SB 4 will become effective on March 5, 2024. This new law would create new state crimes and impose state penalties on noncitizens who unlawfully enter or attempt to enter Texas. It also would allow state courts to order the removal of noncitizens from the country in lieu of being prosecuted for, or following successful prosecution of, such crimes. SB 4 contains three principal provisions.

23.    First, SB 4 effectively makes it a state crime for a noncitizen to violate 8 U.S.C. § 1325(a), which as noted bars noncitizens from "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers." Like 8 U.S.C. § 1325(a), SB 4 bars noncitizens from "enter[ing] or attempt[ing] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." SB 4, § 2, 88th Legis., 4th Spec. Sess. (Tex. 2023) (codified at Tex. Penal Code § 51.02(a)). SB 4 creates affirmative defenses to this crime if (1) the federal government has "granted" the noncitizen "lawful presence" or asylum, (2) the noncitizen "was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021," or (3) the noncitizen has not violated 8 U.S.C. § 1325(a). SB 4, § 2 (codified at Tex. Penal Code § 51.02(c)). SB 4's new state crime is punishable as a Class B misdemeanor, which includes a fine of up to $2,000 and/or imprisonment for up to 180 days. SB 4, § 2 (codified at Tex. Penal Code § 51.02(b)); *see* Tex. Penal Code § 12.22. If, however, the noncitizen had previously been convicted under SB 4, then a subsequent violation of that provision is a "state jail felony," SB 4, § 2 (codified at Tex. Penal Code. § 51.02(b)), which is generally punishable by a fine of up to $10,000 and/or imprisonment for a term between 180 days and two years, *see* Tex. Penal Code § 12.35(a)–(b).

24.    Second, SB 4 seeks to track 8 U.S.C. § 1326(a), which generally bars noncitizens from "enter[ing], attempt[ing] to enter, or" being "found in, the United States" if they previously have been "denied admission . . . or removed" or "ha[ve] departed the United Stats

---

[3] *See* SB 4, as enacted, is available at Texas Legislature Online, https://capitol.texas.gov/BillLookup/Text.aspx?LegSess=884&Bill=SB4.

Case: 24-50149    Document: 36    Page: 60    Date Filed: 03/01/2024

while an order of . . . removal is outstanding." SB 4, similar to § 1326(a), makes it a crime for a noncitizen to "enter[], attempt[] to enter," or be found in Texas after the person "has been denied admission to" or removed from the United States, or "has departed from the" United States "while an order of . . . removal is outstanding." SB 4, § 2 (codified at Tex. Penal Code § 51.03(a)). Unlike with the state crime of unlawful entry, there are no affirmative defenses to a violation of the provision on unlawful re-entry. An order of "removal" means an order issued under either federal or state law or any other agreement in which a noncitizen stipulates to removal pursuant to a criminal proceeding under either federal or state law. SB 4, § 2 (codified at Tex. Penal Code § 51.03(c)). This new state crime is generally a Class A misdemeanor, punishable by a fine of up to $4,000 and/or imprisonment for up to one year. *See id.*; Tex. Penal Code § 12.22. Under certain circumstances, such a violation is a third-degree felony (with a maximum fine of $10,000 and/or imprisonment for a term between two to ten years) or a second-degree felony (maximum fine of $10,000 and imprisonment for a term between two and twenty years). SB 4, § 2 (codified at Tex. Penal Code § 51.03(b)); *see* Tex. Penal Code §§ 12.33, 12.34.

25.    Texas courts cannot "abate the prosecution of an offense" under SB 4 "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." SB 4, § 1 (codified at Tex. Code of Crim. Proc. Art. 5B.003).

26.    Third, SB 4 allows state judges and magistrates to order the removal of noncitizens from the country. SB 4, § 1 (codified at Tex. Code of Crim. Proc. Art. 5B.002). When a person is charged (but not yet convicted) under SB 4, a magistrate judge or state judge may "discharge the person and require the person to return to the foreign nation from which the person entered or attempted to enter" if, among other things, "the person agrees to the order" and has not "previously been" charged with or convicted of certain specified crimes. SB 4, § 1 (codified at Tex. Code of Crim. Proc. Art. 5B.002(b), (c)). Additionally, if a person does not consent to removal and is ultimately *convicted* under SB 4, removal is mandatory. SB 4, § 1 (codified at Tex. Code of Crim. Proc. Art. 5B.002(d)). In that scenario, the state judge

Case: 24-50149     Document: 36     Page: 61     Date Filed: 03/01/2024

"*shall* enter . . . an order requiring the person to return to the foreign nation from which the person entered or attempted to enter," with that order "tak[ing] effect on completion of the term of confinement or imprisonment imposed by the judgment." *Id.* (emphasis added). A noncitizen's failure to comply with a removal order is itself a second-degree felony. SB 4, § 2 (codified at Tex. Penal Code § 51.04).

27.    SB 4 contains a severability provision, providing that if any application of any provision is found by a court to be invalid for any reason, the remaining applications of that provision to all other persons and circumstances shall be severed. SB 4, § 8.

## SB 4's EFFECTS ON IMMIGRATION OPERATIONS, FEDERAL LAW ENFORCEMENT, AND FOREIGN RELATIONS

28.    If SB 4 takes effect, it will interfere with federal immigration operations, including the carefully calibrated law-enforcement scheme governing entry and the comprehensive removal scheme, which also includes relief or protection from removal. It will interfere with the exclusive authority of the federal government to control entry into the United States and removal of noncitizens to foreign countries as well as the conduct of foreign relations.

29.    As the Supreme Court has recognized, the United States must speak with one voice in immigration matters. "The authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal government." *Truax v. Raich*, 239 U.S. 33, 42 (1915). "If it be otherwise, a single State [could], at her pleasure, embroil us in disastrous quarrels with other nations." *Chy v. Freeman*, 92 U.S. 275, 280 (1875). Thus, a "principal feature" of federal immigration laws "is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

30.    SB 4 interferes with the comprehensive statutory scheme Congress enacted—in some cases by preventing the Executive Branch from executing that scheme at all.

31.    Even to the extent that SB 4 "has the same aim as federal law and adopts its substantive standards," "[w]ere [SB 4] to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances

Case: 24-50149   Document: 36   Page: 62   Date Filed: 03/01/2024

where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402. Moreover, SB 4 imposes a unique scheme of state penalties for violations. *See id.* at 402–03 (noting "an inconsistency between [state law] and federal law with respect to penalties").

32.    SB 4 would also impede the federal government's ability to take appropriate enforcement actions and assess a noncitizen's national-security and public-safety risks. For example, the time-sensitive enforcement tool of expedited removal may be unavailable to federal officials for noncitizens who are arrested, detained, and prosecuted by Texas. And if a noncitizen exits a port of entry without a federal removal order and later reenters the country, the federal government may not be able to prosecute the noncitizen for illegal reentry.

33.    SB 4 also interferes with federal immigration proceedings. The state law forbids abatement of an SB 4 prosecution when the noncitizen has a pending determination of immigration status before the federal government, including an application for asylum or adjustment of status. SB 4, § 1 (codified at Tex. Code Crim. Proc. Art. 5B.003); *see* 8 U.S.C. § 1158(a)(1) (a noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such [noncitizen's] status, may apply for asylum"); *id.* § 1255 (providing that certain noncitizens are eligible to apply for adjust their status to that of a lawful permanent resident); 8 C.F.R. §§ 208.8, 1208.8 (a noncitizen's departure from the United States during the application process may be treated as an abandonment of their asylum application). A noncitizen facing SB 4 enforcement proceedings while a federal determination of their immigration status is pending—including but not limited to the removal proceeding—may be impeded from participating in the federal proceedings.

34.    SB 4 would interfere with the federal government's ability to conduct foreign relations by imposing criminal penalties and immigration consequences on foreign nationals based on their entry into the United States. "The dynamic nature of relations with other

10

Case: 24-50149   Document: 36   Page: 63   Date Filed: 03/01/2024

countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 397.

35.     The foreign-relations concerns are exacerbated because the purpose and effect of SB 4 would be to remove noncitizens to Mexico, regardless of their nationality. SB 4 permits state judges and magistrates to order the removal of noncitizens to Mexico, regardless of their country of citizenship, and without any indication that Mexico is willing to accept them, potentially subjecting noncitizens to further criminal penalty if Mexico denies entry. Texas's unilateral removal orders therefore may impair the United States' relations with Mexico. Indeed, Mexico has already expressed its opposition to SB 4, noting that SB 4 would interfere with Mexico's sovereign right to determine who enters its territory. *See* Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), *available at* https://perma.cc/RP7H-JXZR. In addition, Mexican President Lopez Obrador has stated that the Mexican government would engage the United States diplomatically through the Ministry of Foreign Affairs. Any diplomatic engagement with Mexico must occur through the federal government. By attempting to force "non-Mexican nationals" to return to Mexico, SB 4 "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden v. Texas*, 597 U.S. 785, 806 (2022).

36.     SB 4 also does not accommodate the United States' treaty obligations, as implemented in federal law (many of which govern the treatment of foreign nationals), or statutory limitations on removal. For example, the United States is a party to the Convention Against Torture, which has been implemented through federal law to prohibit the return of noncitizens to a country where they are likely to face torture. 8 C.F.R. §§ 1208.16–.18; *see* 8 U.S.C. § 1231 note 2 (United States Policy with Respect to the Involuntary Return of Person in Danger of Torture). Similarly, under the international obligations of the 1967 United Nations Protocol Relating to the Status of Refugees, which Congress implemented in the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, noncitizens may be entitled to withholding of removal if they would be persecuted in the country of removal on account of race, religion,

nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3). SB 4 does not provide a process or otherwise account for an individual who fears persecution (8 U.S.C. § 1231(b)(3)) or torture (implemented at 8 C.F.R. §§ 1208.16-.18). As a consequence, SB 4 could improperly result in refoulement of noncitizens—that is, the return of noncitizens to a country where they would face torture or persecution.

37.     Moreover, the implementation of SB 4 would undermine U.S. efforts to convince governments worldwide to implement or strengthen their international protection systems and uphold their respective non-refoulement obligations. The international community would view SB 4 as a sign that the United States is scaling back its commitment to international protection and could encourage other governments to abandon or minimize their own efforts—all without a deliberate policy choice by the federal government.

38.     By empowering state officials to arrest and commence removal proceedings against noncitizens who those officials suspect have entered or reentered the country illegally, SB 4 also risks the "unnecessary harassment" of certain persons. *Arizona*, 567 U.S. at 408. This too can impair the federal government's ability to conduct foreign relations. *See id.* at 395 ("It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States.").

39.     The federal government sent a letter to Texas on December 28, 2023, explaining that "SB 4 is preempted and violates the United States Constitution," and that "the United States intends to file suit to enjoin the enforcement of SB 4 unless Texas agrees to refrain from enforcing the law." Ex. 1. The letter noted, however, that if Texas "believe[s] there are any facts or law supporting the validity of SB 4," the State "should promptly bring them to our attention." *Id.* Texas has not done so.

## COUNT I — PREEMPTION

40.     Plaintiff realleges paragraphs 1 – 39.

41.     SB 4 unconstitutionally intrudes on the federal government's exclusive author-ity to regulate the entry and removal of noncitizens and therefore is field preempted.  Federal law delineates when it is unlawful for noncitizens to enter or reenter the United States and imposes penalties for violating those proscriptions.  Federal law also establishes a compre-hensive apparatus for the federal government to enforce those rules.  *See generally* 6 U.S.C. § 211; 8 U.S.C. §§ 1103(a), 1225(d), 1325, 1326.  It further sets forth a comprehensive frame-work governing the removal of noncitizens to foreign countries, a function that directly affects foreign relations.  Federal law identifies the grounds for removal, the requirements for com-mencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed.  *See, e.g.*, 8 U.S.C. §§ 1182(a), 1225, 1227, 1229, 1229a, 1231(a)–(b).  And the Supreme Court has confirmed "that the removal process" must be "entrusted to the discretion of the Federal Government," in part because a "decision on removability . . . touch[es] on foreign relations and must be made with one voice."  *Arizona*, 567 U.S. at 409.

42.     The federal interest is dominant in these areas: "[t]he power to regulate immi-gration—an attribute of sovereignty essential to the preservation of any nation—has been en-trusted by the Constitution to the political branches of the Federal Government."  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982).  That power stems from both Congress's au-thority to regulate immigration, *see Fiallo v. Bell*, 430 U.S. 787, 792 (1977), and the President's "executive power to control the foreign affairs of the nation," *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950).  Indeed, only the federal government is charged with the conduct of foreign affairs.  *See, e.g., Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government in the first place.").

13

Case: 24-50149      Document: 36      Page: 66      Date Filed: 03/01/2024

Relatedly, the control of an international "border has a clear and strong connection to national security," *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020), and "[n]ational-security policy is the prerogative of the Congress and President," *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017). SB 4's provisions criminalizing entry and providing for removal to foreign countries thus are field preempted.

43.    SB 4's provisions also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.  Congress granted the federal government the responsibility under federal law to regulate the entry and removal of noncitizens and granted federal officers broad discretion in the manner by which those provisions are enforced.  By purporting to empower state officials to police unlawful entry and to remove noncitizens, SB 4 interferes with the federal government's statutory authority to enforce the entry and removal provisions of federal law, and it conflicts with various provisions of federal law permitting noncitizens to seek relief or protection from removal. Under SB 4, a noncitizen who is eligible for relief or protection from removal under federal law could be subject to removal under Texas law.  As a consequence, SB 4 could result in the refoulement of such noncitizens.  In this way, Texas is attempting to undertake its own removals without adhering to the removal scheme Congress devised.

44.    Beyond that, federal officials must often work with foreign governments to determine whether they will accept noncitizens who are subject to final removal orders, the timing of such removals, and the logistics of such removals. *See* 8 U.S.C. § 1231(b).  But States have no authority to do so.  As a result, allowing Texas to conduct its own removal process would frustrate the United States' ability to handle noncitizen removals "with one voice." *Arizona*, 567 U.S. at 409.

45.    SB 4's criminal provisions also are preempted by various other statutory provisions, which together form a framework for state assistance with the federal government's immigration enforcement in certain respects.  Congress has mandated that state officials may assist in the enforcement of immigration law only with adequate training and supervision by

14

the federal government, 8 U.S.C. § 1357(g), and in specified circumstances, *see, e.g., id.* § 1103(a)(10) (allowing the federal government to designate state officers for certain immigration enforcement in the face of an "imminent mass influx of" noncitizens); *id.* § 1252c (state officers "are authorized to arrest and detain an individual who . . . is [a noncitizen] illegally present in the United States," but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody"); *id.* § 1324(c) (allowing state officers to arrest individuals for certain crimes of human smuggling). None of these statutory provisions, however, permits a State to impose criminal penalties for illegal entry or reentry or to remove noncitizens.

46.     Other statutory provisions highlight the conflict between SB 4 and federal law. For example, while both federal law and SB 4 criminalize the reentry of removed or deported noncitizens, federal law includes exceptions, like consent from the Secretary of Homeland Security. *See* 8 U.S.C. § 1326.  But SB 4's reentry provision has no affirmative defenses or exceptions, prohibiting noncitizens' reentry even if they have the Secretary of Homeland Security's permission, thus conflicting with the federal scheme.  In addition, noncitizens who were paroled into the United States under certain DHS parole processes or who otherwise legally reentered the United States after removal may also be prosecuted under SB 4 for illegal reentry because the law extends to any noncitizen "found in th[e] state."  SB 4 § 2 (codified at Tex. Penal Code § 51.03(a)).  And to the extent Texas seeks to arrest, detain, and prosecute unaccompanied noncitizen children, that would conflict with the protections Congress afforded such noncitizens, including transfer to HHS's ORR and placement in the least restrictive setting that is in the best interest of the child.  *See* 8 U.S.C. § 1232.

## COUNT II — FOREIGN COMMERCE CLAUSE

47.     Plaintiff realleges paragraphs 1 – 46.

Case: 24-50149   Document: 36   Page: 68   Date Filed: 03/01/2024

48.     The Commerce Clause allows Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "One of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976). Under the Constitution, "[f]oreign commerce is pre-eminently a matter of national concern." *Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 448 (1979). And the Foreign Commerce Clause is one of the sources of Congress's power to regulate immigration through the INA and other statutes. The Foreign Commerce Clause thus strongly reinforces the preemptive force of the federal immigration scheme as discussed above.

49.     Here, SB 4 improperly regulates foreign commerce itself. It regulates *solely* the movement of noncitizens across an international boundary *into* Texas. "Although the Commerce Clause speaks only of Congress's power, it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce." *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006).

50.     SB 4 also improperly "create[s] a substantial risk of conflicts with foreign governments" and "undermine[s] the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *Piazza's Seafood*, 448 F.3d at 750. By attempting to force "non-Mexican nationals" to return to Mexico, SB 4 "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden*, 597 U.S. at 806. And Mexico has already asserted its right to "determine its own policies regarding entry into its territory" by "categorically reject[ing] any measure" like SB 4 that "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023).

### PRAYER FOR RELIEF

The United States respectfully requests that this Court:

Case: 24-50149   Document: 36   Page: 69   Date Filed: 03/01/2024

a) Declare that SB 4 violates the Supremacy Clause and Foreign Commerce Clause and is therefore invalid;

b) Preliminarily and permanently enjoin Defendants—as well as their successors, officers, agents, servants, employees, attorneys, and any other persons in active concert or participation with those individuals—from enforcing SB 4;

c) Award the United States its costs in this action; and

d) Grant any other relief this Court deems just and proper.

DATED: January 3, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAIME ESPARZA
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs Branch

/s/ Stephen Ehrlich
STEPHEN EHRLICH
KUNTAL CHOLERA
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

Samuel M. Shapiro
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
samuel.shapiro@usdoj.gov
Tel: (210) 384-7392

*Attorneys for the United States*

17

Case: 24-50149     Document: 36     Page: 70     Date Filed: 03/01/2024

# Exhibit 1



**U.S. Department of Justice**
Civil Division

*Office of the Assistant Attorney General*

*Washington, DC 20044*

December 28, 2023

*By Electronic Mail*

The Honorable Greg Abbott
Governor of Texas
P.O. Box 12428
Austin, TX 78711-2428
c/o james.sullivan@gov.texas.gov

    Re:   <u>Texas Senate Bill 4</u>

Dear Governor Abbott:

Texas recently enacted Senate Bill 4 (SB 4), which will become effective on March 5, 2024. The law purports to create new state crimes tied to federal prohibitions on unlawful entry and reentry by noncitizens into the United States, and it would authorize state judges to order the removal of certain noncitizens from the country. SB 4 is preempted and violates the United States Constitution. Accordingly, the United States intends to file suit to enjoin the enforcement of SB 4 unless Texas agrees to refrain from enforcing the law. The United States is committed to both securing the border and ensuring the processing of noncitizens consistent with the Immigration and Nationality Act (INA). SB 4 is contrary to these goals.

The U.S. Constitution tasks the federal government with regulating immigration and controlling the international borders. *See Arizona v. United States*, 567 U.S. 387, 394 (2012) ("the Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens). To that end, Congress has established a comprehensive scheme governing the entry and removal of noncitizens, including, among other things, penalties for unlawful entries, grounds for removal, and protections from removal, consistent with U.S. obligations under international human rights and refugee laws. SB 4 effectively creates a separate state immigration scheme by imposing criminal penalties for violations of federal provisions on unlawful entry and reentry into the United States, 8 U.S.C. §§ 1325, 1326, and by authorizing state judges to order the removal of noncitizens from the United States. SB 4 therefore intrudes into a field that is occupied by the federal government and is preempted. Indeed, the Supreme Court has confirmed that "the removal process" must be "entrusted to the discretion of the Federal Government" because a "decision on removability" touches "on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409.

SB 4 also conflicts with various provisions of the INA. For example, it interferes with the federal government's ability to enforce the entry and removal provisions of federal law, and it conflicts with various provisions of federal law permitting noncitizens to seek protection from

The Hon. Greg Abbott
Page 2

removal to avoid persecution or torture. SB 4 likewise improperly regulates the movement of persons across an international boundary and undermines the United States' foreign relations.

Because SB 4 is unconstitutional and will disrupt the federal government's operations, we request that Texas forbear in its enforcement. To the extent you believe there are any facts or law supporting the validity of SB 4, we urge you to promptly bring them to our attention.

Please consider this letter to constitute notice, pursuant to § 1-10.100 and § 4-6.240 of the Justice Manual, that the Department of Justice intends to bring a lawsuit to enforce the supremacy of federal law and to enjoin the operation of SB 4. If you have not confirmed by January 3, 2024, that Texas will forbear enforcement of SB 4, the United States will pursue all appropriate legal remedies to ensure that Texas does not interfere with the functions of the federal government.

Sincerely,

Brian M. Boynton
Principal Deputy Assistant Attorney General

cc: The Hon. Ken Paxton, Attorney General

Ryan Walters, Office of the Attorney General

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Stephen Ehrlich
U.S. Department of Justice
970 Broad Street, Newark, NJ 07102; (202) 305-9803

## DEFENDANTS

STATE OF TEXAS; GREG ABBOTT; STEVEN C. MCCRAW; TEXAS DEPARTMENT OF PUBLIC SAFETY

County of Residence of First Listed Defendant  **Travis County**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☒ 1 | U.S. Government Plaintiff | ☐ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*  and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**        **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane          ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product          Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability          ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &          Pharmaceutical Slander          Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'          Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability          ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine          Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product          Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability          **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle          ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle          ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability          ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal          Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury          ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -          Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**      **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights      **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting          ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment          ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/          Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations      ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -      ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment          **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities -      ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☒ 950 Constitutionality of |
| | Other          ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education          ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |     ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1651, 2201, and 2202

Brief description of cause:
Constitutional challenge to Texas's newly enacted law, SB 4

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:      ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*      JUDGE  Judge Docket II          DOCKET NUMBER 1:23-cv-01537

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| Jan 3, 2024 | /s/ Stephen Ehrlich |

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

# Exhibit C: ECF 14, Plaintiff USA's Motion for Preliminary and Permanent Injunction

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

UNITED STATES OF AMERICA,

             Plaintiff,

    v.

STATE OF TEXAS, *et al.*,

             Defendants.

Case No. 1:24-cv-00008-RP

# UNITED STATES' MOTION FOR
# PRELIMINARY AND PERMANENT INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

I.  The federal government controls foreign policy, and Congress has enacted a comprehensive statutory scheme governing the entry and removal of noncitizens. ... 3

II.  The United States has long enforced the comprehensive federal scheme—with only a limited role for States—and uses diplomatic tools to deter unlawful entry and encourage noncitizens to enter the United States legally .......................... 6

III.  Texas passes Senate Bill 4 to regulate the entry and removal of noncitizens. .......... 10

LEGAL STANDARDS ................................................................................. 13

ARGUMENT .................................................................................................. 14

I.  The United States is likely to succeed on the merits because SB 4 intrudes into areas within the federal government's exclusive authority. ............................ 14

  A.  SB 4 is field preempted because it intrudes on the federal government's exclusive authority to regulate the entry and removal of noncitizens. .......... 14

  B.  SB 4 is conflict preempted by various provisions of federal law, including those that allow for state cooperation in only narrow circumstances ............. 21

  C.  SB 4 violates the dormant Foreign Commerce Clause by regulating international commerce and interfering with the United States' foreign relations ................................................................................... 27

II.  SB 4 would impair foreign relations and immigration operations, causing irreparable harm to the United States and the public. ............................................ 30

III.  Texas has no legitimate countervailing interest in maintaining an unconstitutional law. ................................................................................. 35

IV.  The Court should enter a permanent injunction because there are no material facts in dispute .................................................................................... 36

CONCLUSION .............................................................................................. 36

# TABLE OF AUTHORITES

## Cases

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
   878 F.2d 806 (5th Cir. 1989) ...................................................................... 14

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ................................................................................... 3

*Arizona v. United States*,
   567 U.S. 387 (2012) ...........................................................................*passim*

*Atkins v. Salazar*,
   677 F.3d 667 (5th Cir. 2011) ...................................................................... 37

*Barzelis v. Flagstar Bank, FSB*,
   784 F.3d 971 (5th Cir. 2015) ...................................................................... 18

*Biden v. Texas*,
   597 U.S. 785 (2022) ............................................................................24, 30

*Buckman Co. v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001) ................................................................................... 27

*Chy Lung v. Freeman*,
   92 U.S. 275 (1875) ...............................................................................29, 34

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ...................................................................... 27

*Clark v. Martinez*,
   543 U.S. 371 (2005) ................................................................................... 4

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) ............................................................................30, 33

*Crown Castle Fiber, L.L.C. v. City of Pasadena*,
   76 F.4th 425 (5th Cir. 2023) ...................................................................... 14

*DeCanas v. Bica*,
   424 U.S. 351 (1976) ................................................................................4, 17

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
   691 F.3d 1250 (11th Cir. 2012) ...............................................18, 19, 21, 22

*Galvan v. Press,*
    347 U.S. 522 (1954) ................................................................. 1

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824) ............................................... 28, 29

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013) ............................................... 35

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ............................................................... 36

*Hernandez v. Mesa,*
    885 F.3d 811 (5th Cir. 2018) ................................................ 17

*Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.,*
    471 U.S. 707 (1985) ............................................................... 16

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ................................................... 16, 22, 23

*Holmes v. Jennison,*
    39 U.S. 540 (1840) ............................................................... 23

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ................................................................. 5

*Jama v. Immigr. & Customs Enf't,,*
    543 U.S. 335 (2005) ............................................................... 17

*Japan Line, Ltd. v. Los Angeles Cnty.,*
    441 U.S. 434 (1979) .................................................2, 15, 28, 30

*Las Americas Immigrant Advocacy Center v. McCraw,*
    1:23-cv-01537 (W.D. Tex. Dec. 19, 2023) .............................. 13

*Lozano v. City of Hazleton,*
    724 F.3d 297 (3d Cir. 2013) ................................................. 18

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ............................................................... 36

*Michelin Tire Corp. v. Wages,*
    423 U.S. 276 (1976) ............................................................... 28

*Molina v. Home Depot USA, Inc.*,
  20 F.4th 166 (5th Cir. 2021) .................................................................. 37

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018) ......................................................................... 31

*Nat'l Collegiate Athletic Ass'n v. Christie*,
  926 F. Supp. 2d 551 (D.N.J. 2013) ......................................................... 31

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999) ................................................................... 30

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023) ............................................................................. 29

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
  491 U.S. 350 (1989) ............................................................................. 30

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................... 5

*Patel v. Garland*,
  596 U.S. 328 (2022) ............................................................................. 19

*Piazza's Seafood World, LLC v. Odom*,
  448 F.3d 744 (5th Cir. 2006) .......................................................... 29, 30

*Plyler v. Doe*,
  457 U.S. 202 (1982) ............................................................................. 24

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
  831 F.3d 500 (D.C. Cir. 2016) .............................................................. 14

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) ................................................................ 14

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
  2023 WL 4375518 (W.D. Tex. July 6, 2023) .......................................... 37

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) .............................................................. 35

*Rowe v. N.H. Motor Transp. Ass'n*,
  552 U.S. 364 (2008) ............................................................................. 35

*Schrader v. Dist. Att'y of York Cnty.*,
   74 F.4th 120 (3d Cir. 2023) ................................................................ 36

*Takahashi v. Fish & Game Comm'n*,
   334 U.S. 410 (1948) ......................................................................... 16

*Truax v. Raich*,
   239 U.S. 33 (1915) ............................................................................. 2

*U.S. ex rel. Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ...................................................................... 1, 17

*United States v. Abbott*,
   87 F.4th 616 (5th Cir. 2023) ......................................................... 32, 34

*United States v. Alabama*,
   691 F.3d 1269 (11th Cir. 2012) .......................................................... 18

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) .............................................................. 31

*United States v. Curtiss-Wright Exp. Corp.*,
   299 U.S. 304 (1936) .......................................................................... 20

*United States v. Delgado-Garcia*,
   374 F.3d 1337 (D.C. Cir. 2004) .......................................................... 17

*United States v. Guest*,
   383 U.S. 745 (1966) .......................................................................... 29

*United States v. Hanigan*,
   681 F.2d 1127 (9th Cir. 1982) ............................................................ 28

*United States v. Hernandez-Guerrero*,
   963 F. Supp. 933 (S.D. Cal. 1997) ...................................................... 29

*United States v. South Carolina*,
   720 F.3d 518 (4th Cir. 2013) ................................................... 18, 21, 34

*United States v. Texas*,
   557 F. Supp. 3d 810 (W.D. Tex. 2021) ........................................... 14, 31

*United States v. Valenzuela-Bernal*,
   458 U.S. 858 (1982) .......................................................................... 16

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ................................................................ 21

*Villas at Parkside Partners v. City of Farmers Branch*,
  726 F.3d 524 (5th Cir. 2013) ............................................................ 24, 26

*Washington Cnty. v. Gunther*,
  452 U.S. 161 (1981) ............................................................................. 19

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ............................................................................. 17

*Zschernig v. Miller*,
  389 U.S. 429 (1968) .......................................................................... 3, 22

**Constitutional Provisions**

U.S. Const. art. I, § 8 ............................................................................. 3

U.S. Const. art. I, § 10 ....................................................................... 4, 23

U.S. Const. art. II, § 2 ........................................................................... 3

U.S. Const. art. IV ........................................................................... 4, 14

**Statutes**

6 U.S.C. § 202 ...................................................................................... 7

6 U.S.C. § 211 .................................................................................. 7, 19

6 U.S.C. § 557 ...................................................................................... 4

8 U.S.C. § 1101 .................................................................................... 5

8 U.S.C. § 1103 ............................................................................. *passim*

8 U.S.C. § 1158 ..................................................................... 5, 6, 23, 34

8 U.S.C. §1181 ................................................................................. 4, 5

8 U.S.C. § 1182 ........................................................................ 4, 20, 22

8 U.S.C. § 1223 .................................................................................... 4

8 U.S.C. § 1224 .................................................................................... 4

8 U.S.C. § 1225 ...................................................................................................*passim*

8 U.S.C. § 1227 ..................................................................................................5, 20

8 U.S.C. § 1229 ..................................................................................................5, 20

8 U.S.C. § 1229a .................................................................................................*passim*

8 U.S.C. § 1231 ...................................................................................................*passim*

8 U.S.C. § 1232 ..................................................................................................6, 25

8 U.S.C. § 1252 ...................................................................................................... 5

8 U.S.C. § 1252c .................................................................................8, 19, 26, 36

8 U.S.C. § 1323 ...................................................................................................... 18

8 U.S.C. § 1324 ...................................................................................................*passim*

8 U.S.C. § 1325 ............................................................................................ 4, 11, 18

8 U.S.C. § 1326 ..........................................................................................4, 12, 18, 24

8 U.S.C. § 1327 ...................................................................................................... 18

8 U.S.C. § 1328 .................................................................................................18, 19

8 U.S.C. § 1357 ...................................................................................................*passim*

**State Statutes**

Tex. Code of Crim. Proc. art. 5(B).002 .......................................................12, 13

Tex. Code Crim. Proc. art. 5B.003 .....................................................13, 23, 34

Tex. Penal Code § 12.21 ..................................................................................... 12

Tex. Penal Code § 12.22 ..................................................................................... 12

Tex. Penal Code § 12.23 ..................................................................................... 12

Tex. Penal Code § 12.35 ..................................................................................... 12

Tex. Penal Code § 51.02 ........................................................................... 11, 12, 24

Tex. Penal Code § 51.03 ..................................................................... 12, 13, 25

Tex. Penal Code § 51.04 ..................................................................... 13

**Rules**

Fed. R. Civ. P. 65(a)(2) ...................................................................... 37

**Executive Orders and Regulations**

8 C.F.R. § 208.3 ............................................................................... 35

8 C.F.R. § 208.30 ............................................................................. 5

8 C.F.R. § 235.3 ............................................................................... 5

8 C.F.R. § 241.15 ............................................................................. 6

8 C.F.R. § 1208.16 .................................................................. 6, 23, 33, 35

8 C.F.R. § 1208.17 .................................................................. 33, 35

8 C.F.R. § 1208.18 .................................................................. 6, 33, 35

88 Fed. Reg. 31314 (May 16, 2023) ........................................... 10, 11

Exec. Order 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021) ................... 32, 33

**Other Authorities**

142 Cong. Rec. H2378-05, 1996 WL 120181 (Mar. 19, 1996) .......... 26

*Authorize*, Black's Law Dictionary (5th ed. 1979) ......................... 19

CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023),
   https://perma.cc/XQW4-55XW ............................................... 9, 10

CBP, Southwest Land Border Encounters,
   https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters .................. 9

Congressional Research Service, *The 287(g) Program: State and Local Immigration Enforcement*
   (Aug. 12, 2021), https://perma.cc/GQN4-DVVF ......................... 9

House Research Organization, Bill Analysis of SB 4 (Nov. 14, 2023),
   https://perma.cc/W8UV-XPKY ........................................... 13, 23, 35

ICE, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act*,
https://perma.cc/KJX7-Q9V3 ............................................................9, 36

Jennifer Gordon, *Immigration As Commerce: A New Look at the Federal
Immigration Power and the Constitution*,
93 Ind. L.J. 653 (2018)...................................................................... 28

Kif Augustine Adams, *The Plenary Power Doctrine After September 11*,
38 U.C. Davis L. Rev. 701 (2005) ....................................................... 28

Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023),
https://perma.cc/RP7H-JXZR ..................................................... 2, 13, 24

The Federalist No. 11 (Gideon ed., 2001)................................................. 28

The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023),
https://perma.cc/92CW-APKE ............................................................ 10

## INTRODUCTION

It is well settled that the "Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona v. United States*, 567 U.S. 387, 394 (2012). Entry into the United States "is granted to [a noncitizen] only upon such terms as the United States shall prescribe" and "must be exercised in accordance with the procedure which the United States provides." *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). Similarly, "the removal process" for noncitizens must be "entrusted to the discretion of the Federal Government": it touches "on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409. It is thus "about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government" that "the formulation of" policies "pertaining to the entry of [noncitizens] and their right to remain here" are "entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954).

Texas's recently enacted Senate Bill 4 flouts these principles. In seeking to displace the federal government's "well settled" power "to determine immigration policy," *Arizona*, 567 U.S. at 395, SB 4 creates state immigration crimes for illegal entry and illegal reentry, allows state judges to order removal of noncitizens from the country, and mandates that state officials carry out those removal orders. But "[t]his is not the system Congress created." *Arizona*, 567 U.S. at 408. The federal government alone is responsible for the entry and removal of noncitizens. "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," *id.*, and States are not permitted to undertake their own *unilateral* immigration enforcement. Exclusive federal control is important because "[t]here are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable." *Id.* By authorizing state officials to arrest, detain, prosecute, and remove noncitizens, SB 4 disrupts Congress's finely reticulated immigration scheme and "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Id.* at 409.

The Supreme Court has already held that a State may not disrupt the federal statutory regime in this way. In *Arizona v. United States*, the Court held that States may not "undermine federal [immigration] law." 567 U.S. at 416. In that case, the Court prohibited Arizona from (1) requiring noncitizens to register with the State, (2) criminalizing unlawfully present persons from seeking work, and (3) arresting potentially removable noncitizens in the absence of a federal warrant. *Id.* at 403, 406, 410. SB 4 undermines federal immigration law even more directly than Arizona's law: Texas's law straightforwardly regulates the entry and removal of noncitizens, which is the core of the federal government's sovereign prerogatives to regulate immigration. *See id.* at 409 ("The authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal Government." (quoting *Truax v. Raich*, 239 U.S. 33, 42 (1915)). SB 4 is therefore preempted. *See id.* at 416. Texas's attempt to regulate the movement of persons across an international boundary also violates the Foreign Commerce Clause and impedes the federal government's ability to "speak with one voice" in foreign relations. *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 449 (1979).

Implementation of SB 4 would likewise inflict irreparable harm on the federal government and the public, interfering with both the United States' conduct of foreign relations and its ability to execute the comprehensive federal immigration scheme. Internationally, the Government of Mexico has already objected, "categorically reject[ing] any measure that," like SB 4, "allows state or local authorities to detain and return Mexicans or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), *available at* https://perma.cc/RP7H-JXZR. Domestically, SB 4 conflicts with federal statutes, impairing both the federal government's ability to enforce immigration laws and to conduct immigration operations, including ensuring that noncitizens eligible for relief or protection from removal are not removed.

To the extent Texas wishes to help with immigration enforcement, it can do so by working cooperatively with the federal government through the statutory framework Congress established, *see* 8 U.S.C. § 1357(g), or by working with Congress to change the law. It

may not unconstitutionally usurp the federal government's authority in core areas of federal control: the entry and removal of noncitizens. Immigration policy can "affect trade, investment, tourism, and diplomatic relations for the entire Nation," and "[p]erceived mistreatment of" noncitizens "in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395. It "is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* Texas has disregarded that cardinal principle, and the Court should preliminarily and permanently enjoin SB 4.

## BACKGROUND

### I. The federal government controls foreign policy, and Congress has enacted a comprehensive statutory scheme governing the entry and removal of noncitizens.

"[T]he Constitution entrusts foreign policy exclusively to the National Government." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003); *Zschernig v. Miller*, 389 U.S. 429, 436 (1968). It is the national government that "make[s] Treaties," commissions and receives "Ambassadors, other public Ministers and Consuls," "regulate[s] commerce with foreign nations," and "establish[es] a uniform Rule of Naturalization." U.S. Const. art. I, § 8; *id.* art. II, § 2. It also has "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 567 U.S. at 395. And when diplomacy fails, it is also the national government—with the President as "commander in chief"—that "raise[s] and support[s] Armies," "provide[s] and maintain[s] a Navy," "declare[s] war, grant[s] Letters of Marque and Reprisal," and "make[s] rules concerning captures on land and water." U.S. Const. art. I, § 8; *id.* art. II, § 2. In stark contrast, States are explicitly prohibited from conducting foreign affairs: "[n]o state shall enter into any treaty, alliance, or confederation" and "[n]o State shall," without Congress's consent, "enter into any agreement or Compact" with "a foreign Power." *Id.* art. I, § 10.

3

These constitutional provisions and the federal laws enacted thereunder are "the supreme Law of the Land." *Id.* art. VI; *Arizona*, 567 U.S. at 399. And over the last seven decades, Congress has exercised its authority over foreign affairs to codify a vast framework of laws governing the entry and removal of noncitizens. Starting in 1952, Congress enacted the Immigration and Nationality Act as "the comprehensive federal statutory scheme for [the] regulation of immigration."[1] *DeCanas v. Bica*, 424 U.S. 351, 353 (1976).

As relevant here, the current federal scheme sets forth detailed rules governing the entry and removal of noncitizens. It identifies who may enter, *see, e.g.*, 8 U.S.C. §§ 1181–82, 1188, and how they may enter, *see, e.g.*, 8 U.S.C. §§ 1223–25. It also imposes both criminal and civil penalties on those who unlawfully enter the United States. Section 1325—titled "Improper entry by [noncitizen]"—makes it a crime for any noncitizen who "enters or attempts to enter the United States at any time or place other than as designated by immigration officers." 8 U.S.C. § 1325. For the first violation, the person will be fined, "imprisoned not more than 6 months, or both," and, for any subsequent violation, the person will be fined, "imprisoned not more than 2 years, or both." *Id.* The provision also imposes civil penalties "in addition to, and not in lieu of," those criminal penalties. *Id.* Similarly, § 1326—titled "Reentry of removed [noncitizens]"—mandates fines, imprisonment "not more than 2 years, or both" for any noncitizen who has been "denied admission" or "removed" and subsequently "enters, attempts to enter, or is at any time found in, the United States." *Id.* § 1326.

Federal law also comprehensively regulates the removal of noncitizens from the country. It identifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed. *See, e.g., id.* §§ 1182(a), 1225, 1227, 1229, 1229a, 1231(a)–(b). For example, federal law mandates that

---

[1] After the Homeland Security Act of 2002, many references in the INA to the "Attorney General" are now read to mean the Secretary of Homeland Security. *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

certain removal proceedings are overseen by specialized immigration judges. *See id.* § 1101(b)(4); *see id.* § 1229a. And during those proceedings, noncitizens must be given certain rights. These include the right to be represented by counsel of their choosing and to have "a reasonable opportunity to examine the evidence against the [noncitizen], to present evidence on the [noncitizen's] own behalf, and to cross-examine witnesses presented by the Government." *Id.* § 1229a(b)(4); *see also id.* § 1229a(b)(1). Congress has also provided for judicial review of final removal orders in a court of appeals and allowed for a stay of removal pending judicial review. *Id.* § 1252; *Nken v. Holder*, 556 U.S. 418 (2009). Certain noncitizens may alternatively be subject to expedited removal proceedings. *See id.* § 1225(b)(1). In those proceedings, noncitizens will be "removed from the United States without further hearing or review," unless they claim a fear of persecution or torture, or express an intent to apply for asylum. *Id.* § 1225(b)(1)(A)(i); 8 C.F.R. § 235.3(b)(4). There are further procedures to assess whether a noncitizen in expedited removal has a credible fear of persecution or torture. *See* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30; Declaration of Ted Kim ¶¶ 12–15.

A noncitizen generally may also apply for relief or protection from removal under the federal scheme. For example, with certain exceptions, a noncitizen, "who is physically present in the United States or who arrives in the United States . . . whether or not at a designated port of arrival . . . may apply for asylum." 8 U.S.C. § 1158(a)–(b). And certain noncitizens may be entitled to withholding of removal, with limited exceptions, if they establish a likelihood that they would face persecution if removed to the proposed country of removal. *See id.* § 1231(b)(3); *see INS. v. Cardoza-Fonseca*, 480 U.S. 421 (1987). Noncitizens may also be entitled to protection from removal consistent with regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (Convention Against Torture), if they would be tortured when removed to the proposed country of removal. 8 C.F.R. §§ 1208.16(c), 1208.18(a). If the noncitizen is an unaccompanied child, Congress has provided additional protections. *See* 8 U.S.C.

§ 1232.  The child may not be subjected to expedited removal, *id.* § 1232(a)(5)(D)(i), and generally must be transferred to the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS), where the child must generally be placed with a care provider in the least restrictive setting that is in the best interest of the child, *id.* § 1232(c)(2)(A).

Importantly, federal law establishes a comprehensive process for the execution of removal orders, including how the United States determines the country to which a noncitizen may be removed and the physical process of removal.  *See id.* § 1231(b)–(c).  Federal law explicitly gives federal officials the responsibility to work with foreign governments to determine whether they will accept noncitizens who are subject to final removal orders.  *See id.* § 1231(b)(1)–(2); 8 C.F.R. § 241.15; *see also* 8 U.S.C. § 1158(a)(2)(A) (noting bilateral agreements with foreign nations).  This can require extensive diplomatic negotiations, as each country—like the United States—has a sovereign right to allow or deny the entry of noncitizens into its territory.  Federal law also specifies how those officials must proceed if the government of the relevant country "is unwilling to accept the [noncitizen] into that country's territory."  8 U.S.C. § 1231(b)(1)(C).  It also regulates the logistics of how removals must occur.  *See id.* § 1231(d), (e).  And it identifies the scenarios in which a noncitizen subject to a removal order may be granted protection.  *See id.* § 1231(b)(3); *id.* § 1229a(c)(6)–(7) (noncitizens can move to reconsider or reopen removal decisions).

## II.    The United States has long enforced the comprehensive federal scheme—with only a limited role for States—and uses diplomatic tools to deter unlawful entry and encourage noncitizens to enter the United States legally.

Overlaying the substantive immigration-law provisions is a comprehensive enforcement scheme.  Congress has charged the Department of Homeland Security (DHS) and its component agency, U.S. Customs and Border Protection (CBP), with, among other things, controlling the border and ports of entry.  The Secretary of Homeland Security, for example, is given "the power and duty to control and guard" the border against illegal entry and to "perform such other acts" as "necessary for carrying out [such] authority."   8 U.S.C

§ 1103(a)(3), (5); 6 U.S.C. § 202 (tasking the Secretary with "[s]ecuring the borders" and "[e]stablishing national immigration enforcement policies and priorities"); *see also* 8 U.S.C. § 1357(a) (detailing the authority of federal immigration officers to "interrogate" and "arrest" noncitizens "entering or attempting to enter the United States" or already "in the United States"). CBP—in coordination with U.S. Immigration and Customs Enforcement (ICE) and U.S. Citizenship and Immigration Services (USCIS)—is tasked with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of "persons unlawfully entering, or who have recently unlawfully entered, the United States." 6 U.S.C. § 211(c)(8).

CBP must also "ensure the interdiction of persons and goods illegally entering or exiting the United States"; "facilitate and expedite the flow of legitimate travelers and trade"; and "safeguard the borders of the United States to protect against the entry of dangerous goods." *Id.* § 211(c). Among its many tasks, CBP, through the U.S. Border Patrol, also has responsibility "for interdicting persons attempting to illegally enter" the United States "at a place other than a designated port of entry" as well as "deter[ing] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband." *Id.* § 211(e)(3). And in doing so, they are authorized to "board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe [noncitizens] are being brought into the United States," 8 U.S.C. § 1225(d)(1), and to access private lands within 25 miles of the border "for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States," *id.* § 1357(a)(3).

Within this comprehensive enforcement scheme are specific avenues for state participation in immigration enforcement. For example, the federal government may "authorize any State or local law enforcement officer" to perform immigration duties in the face of an "imminent mass influx of" noncitizens. *Id.* § 1103(a)(10). And state officers are given the "authority" to arrest individuals for certain crimes of human smuggling. *See id.* § 1324(c).

State officers are also "authorized to arrest and detain an individual" who "is [a noncitizen] illegally present in the United States" but only if, among other things, the individual "has previously been convicted of a felony" and is detained "only for such period of time as may be required for" federal immigration authorities "to take the individual into Federal custody." *Id.* § 1252c.  And under 8 U.S.C. § 1357(g), "the [Secretary of Homeland Security] may enter into a written agreement with a State" allowing state officers "who [are] determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States" to "carry out such function" consistent with state law.  *Id.* § 1357(g)(1).  The State must "certif[y]" that such state officers "performing the function under the agreement have received adequate training" and, "[i]n performing [that] function," the officer "shall be subject to the direction and supervision of the [Secretary]."  *Id.* § 1357(g)(2)–(3).

Historically, many state and local law enforcement entities have used § 1357(g) agreements to assist in immigration enforcement.  There were 72 such agreements in 2011, which more than doubled to 150 by 2020.  Congressional Research Service, *The 287(g) Program: State and Local Immigration Enforcement* (Aug. 12, 2021), https://perma.cc/GQN4-DVVF.  Notably, as of June 2023, 26 Sheriff's Offices *in Texas* have § 1357(g) agreements with the federal government.  *See* ICE, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act* (last visited Jan. 12, 2024), https://perma.cc/KJX7-Q9V3.  More broadly, ICE has § 1357(g) "agreements with 62 law enforcement agencies in 18 states" for the "identif[ication] and process[ing] [of] removable noncitizens" with "criminal or pending criminal charges" and § 1357(g) agreements "with 75 law enforcement agencies in 11 states" for state and local officers to "serve and execute administrative warrants on noncitizens" in their jails.  *Id.*  Beyond formal agreements, § 1357(g) also allows states to "communicate with the [Secretary] regarding the immigration status of any individual" and "otherwise to cooperate with the [Secretary] in the identification, apprehension, detention, or removal of [noncitizens] not law-

fully present in the United States." 8 U.S.C. § 1357(g)(10)(B). Such cooperation could include participation in a "joint task force with federal officers, provid[ing] operational support in executing a warrant, or allow[ing] federal immigration officials to gain access to detainees held in state facilities." *Arizona*, 567 U.S. at 410.

The federal government has been using its enforcement authority to address unlawful entry at the southwest border. CBP, for instance, had roughly 2.5 million noncitizen encounters at the southwest border in fiscal year 2023, and has so far had over 400,000 encounters at the southwest border in fiscal year 2024 (*i.e.* since October 1, 2023). *See* CBP, Southwest Land Border Encounters (last visited Jan. 12, 2024), https://www.cbp.gov/news-room/stats/southwest-land-border-encounters. "Individuals and families without a legal basis to remain in the U.S. continue to be subject to removal," and from May to November 2023, "DHS removed or returned over 400,000 individuals," the "vast majority" of whom were "from southwest border encounters." CBP, *CBP releases November 2023 monthly update* (Dec. 22, 2023), https://perma.cc/XQW4-55XW. These removal numbers "nearly [equal] the number removed and returned in all of fiscal year 2019 and exceeds the annual totals for each year 2015 – 2018." *Id.* "Daily removals and enforcement returns per day are nearly double what they were compared to the pre-pandemic average (2014 – 2019)." *Id.*

The federal government has adopted various measures that seek to deter unlawful entry and instead encourage noncitizens to enter the United States legally. For example, under the Circumvention of Lawful Pathways rule, "noncitizens who" cross "the southwest land border or adjacent coastal borders" without "avail[ing] themselves of a lawful . . . pathway to the United States [or] seek[ing] asylum or other protection in a country through which they travel" are, with certain exceptions, "presumed ineligible for asylum." 88 Fed. Reg. 31314 (May 16, 2023). DHS has also established parole processes for certain noncitizens that couple "a mechanism for those noncitizens to seek entry into the United States in a lawful, safe, and orderly manner, with the imposition of new consequences for those who cross the border without authorization to do so—namely returns to Mexico." *See id.* 31316–17.

9

Diplomatic negotiations with Mexico and other countries are part of U.S. efforts to address irregular migration at the southwestern border. In late December 2023, the President of Mexico met with senior U.S. officials, including the Secretary of State and the Secretary of Homeland Security. The White House, *Mexico-U.S. Joint Communique* (Dec. 28, 2023), https://perma.cc/92CW-APKE. The two countries noted their "[o]ngoing cooperation" and their "enhanced efforts to disrupt human smuggling, trafficking, and criminal networks, and continuing the work to promote legal instead of irregular migration pathways." *Id.* The Mexican President also "stressed the need to continue the diplomatic and political engagement with all countries in the region." *Id.*

The federal government has also engaged in other diplomatic efforts to "secur[e] the border and stem[] irregular migration." Declaration of Eric Jacobstein ¶ 14. The State Department, for example, has "sent a series of high-level delegations to Guatemala" and "worked with countries throughout the region, including by gaining agreement for flights repatriating irregular migrants without a lawful reason to remain in the United States; supporting enhanced border-enforcement efforts in Colombia, Panama, Costa Rica, Honduras, El Salvador, Guatemala, and Mexico; and leading the Los Angeles Declaration on Migration and Protection Working Group on Countering Human Smuggling and Trafficking." *Id.* DHS has also resumed "limited repatriations to Venezuela after securing the consent of representatives of Maduro to receive repatriated migrants," and the United States "also brought the governments of Colombia and Panama together to jointly increase efforts to stem the flow of irregular migrants through the Darién Gap." *Id.*

## III. Texas passes Senate Bill 4 to regulate the entry and removal of noncitizens.

Despite a comprehensive federal immigration framework, as well as the current enforcement and diplomatic efforts by the United States, the Texas legislature passed (and the Governor signed) SB 4. When the law goes into effect on March 5, 2024, it will impose state

criminal penalties on noncitizens who unlawfully enter or attempt to enter Texas from Mexico and will allow Texas courts to order the removal of noncitizens from the country. SB 4 contains three principal provisions.

First, SB 4 effectively makes it a state crime for a noncitizen to violate 8 U.S.C. § 1325(a)—the federal unlawful entry statute—by barring noncitizens from "enter[ing] or attempt[ing] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a). It is an affirmative defense to prosecution if the noncitizen (1) has been granted "lawful presence" or asylum by the federal government, (2) "was approved for benefits under the federal Deferred Action for Childhood Arrivals [(DACA)] program between June 15, 2012, and July 16, 2021," or (3) has not violated 8 U.S.C. § 1325(a).[2] *Id.* § 51.02(c). SB 4 does not explain what will constitute "lawful presence." A § 51.02 violation is generally a Class B misdemeanor, *see id.* § 51.02(b), which is punishable by a fine of up to $2,000 and/or imprisonment for up to 180 days, *see id.* § 12.22. But if the noncitizen had previously been convicted under § 51.02, then a subsequent violation is a "state jail felony," *see id.* § 51.02(b), which is generally punishable by a fine of up to $10,000 and/or imprisonment for between 180 days and two years, *see id.* § 12.35.

Second, SB 4 seeks to track 8 U.S.C. § 1326(a) by making it a state crime for a noncitizen to "enter[], attempt[] to enter," or be found in Texas after the person "has been denied admission to" or removed from the United States, or "has departed from the" United States "while an order" of "removal is outstanding." Tex. Penal Code § 51.03. There are no affirmative defenses to this new state crime, which is generally a Class A misdemeanor, *see id.* § 51.03(b), punishable by a fine of up to $4,000 and/or imprisonment for up to one year, *see*

---

[2] Section 51.02(d) also specifies that certain "federal programs"—the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program and "any program not enacted by the United States Congress that is a successor to or materially similar to [DACA or DAPA]"—are not affirmative defenses to prosecution.

*id.* § 12.21.  Under certain circumstances, a § 51.03 violation is a third-degree felony (maximum fine of $10,000 and/or imprisonment for a term between two to ten years, *see id.* § 12.34) or a second-degree felony (maximum fine of $10,000 and/or imprisonment for a term between two and twenty years, *see id.* § 12.33).

Third, SB 4 allows state judges to, under certain circumstances, order the removal of noncitizens.  Tex. Code of Crim. Proc. art. 5(B).002.  It states that, when a person is charged but not yet convicted under § 51.02 (SB 4's illegal entry) or § 51.03 (SB 4's illegal reentry), a magistrate judge or state judge may "discharge the person and require the person to return to the foreign nation from which the person entered or attempted to enter," if, among other things, "the person agrees to the order" and has not "previously been" charged with or convicted of specified crimes.  *Id.* art. 5(B).002(a)–(c).  If, however, a person is *convicted* under SB 4, then the state judge "*shall* enter" an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter" after completion of the sentence.  *Id.* Art. 5(B).002(d) (emphasis added).  A Texas law-enforcement officer must monitor a noncitizen's compliance with any state removal order.  *Id.*  Art. 5(B).002(e).  And a person's failure to comply with that order is itself a second-degree felony.  *See* Tex. Penal Code § 51.04.

SB 4 also states that a "court may not abate the prosecution of an offense under Chapter 51" of the Penal Code—*e.g.*, under § 51.02, § 51.03, or § 51.04—"on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  Tex. Code of Crim. Proc. art. 5(B).003.  And despite its intrusion into a federal field, SB 4 does not instruct state officers to coordinate with federal officials in any way.

Both before and after SB 4 was enacted, various groups and the Government of Mexico expressed their opposition.  Critics of SB 4 noted that "the obligation and power to control international borders and enforce immigration laws lies with the federal government" and SB 4 "would subject migrants across Texas to the threat of detention or forced removal and could lead to an increase in racial profiling."  House Research Organization, Bill Analysis of SB 4 at 8–10 (Nov. 14, 2023), *available at* https://perma.cc/W8UV-XPKY.  Mexico also took

issue with SB 4, asserting "its own legitimate right" to "determine its own policies regarding entry into its territory" and "categorically reject[ing] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), *available at* https://perma.cc/RP7H-JXZR. And immediately after SB 4 was signed into law, two public-interest organizations and El Paso County sued to enjoin SB 4. *See Las Americas Immigrant Advocacy Center v. McCraw*, Compl., ECF No. 1, 1:23-cv-01537 (W.D. Tex. Dec. 19, 2023).

For its part, the federal government sent a letter to Texas in late December, explaining that "SB 4 is preempted and violates the United States Constitution," and providing notice that "the United States intends to file suit to enjoin the enforcement of SB 4 unless Texas agrees to refrain from enforcing the law." Compl. Ex. 1, ECF No. 1-1. The letter noted, however, that if Texas "believe[s] there are any facts or law supporting the validity of SB 4," the State should "promptly bring them to our attention." *Id.* It never did. The United States then filed this suit on January 3, 2024 and now moves for an order enjoining SB 4.

## LEGAL STANDARDS

"The decision whether to grant a preliminary injunction is within the discretion of a district court." *United States v. Texas*, 557 F. Supp. 3d 810, 814 (W.D. Tex. 2021) (quoting *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)). "A preliminary injunction is meant to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Id.* To prevail, a movant must demonstrate (1) a likelihood of succeeding on the merits; (2) a "substantial threat of irreparable injury if the injunction is not granted"; (3) "the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted"; and (4) "the injunction will not disserve the public interest." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). Where the federal government seeks a preliminary injunction, the second and fourth factors—irreparable harm and the public interest—merge because "the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831

13

F.3d 500, 511 (D.C. Cir. 2016). Obtaining a permanent injunction requires a similar showing, but the movant must establish actual success on the merits for the first element. *See Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023).

## ARGUMENT

**I.** **The United States is likely to succeed on the merits because SB 4 intrudes into areas within the federal government's exclusive authority.**

Under the Supremacy Clause, federal law is "the supreme law of the land," preempting any contrary state laws. U.S. Const. art. VI; *Arizona*, 567 U.S. at 399. While the Constitution or Congress can explicitly preempt state law, they can also do so implicitly in two ways. *Arizona*, 567 U.S. at 399. First, "States are precluded from regulating conduct in a field that" Congress commits to the federal government's "exclusive governance." *Id.* Second, "state laws are preempted when they conflict with federal law," either because compliance with both "is a physical impossibility" or the "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* Because Texas, through SB 4, is attempting to establish its own immigration system governing entry and removal of noncitizens, each of the law's challenged provisions is field and conflict preempted. And because SB 4 regulates foreign commerce and impedes the federal government's ability to "speak with one voice" in foreign relations, it also violates the Foreign Commerce Clause. *Japan Line*, 441 U.S. at 449. The United States is therefore likely to succeed on the merits.

### A. SB 4 is field preempted because it intrudes on the federal government's exclusive authority to regulate the entry and removal of noncitizens.

SB 4 is field preempted because it regulates a field—entry and removal of noncitizens—that Congress has committed to the federal government's "exclusive governance." *Arizona*, 567 U.S. at 399. Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." *Id.* Here, Congress's clear intent was for the federal government—not the 50 individual States—to control the entry and removal of noncitizens.

14

SB 4 intrudes into a field marked by "dominant" "federal interest[s]" relating to immigration, foreign relations, and control of an international border. *Id.* It is the United States, not Texas, that "has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Id.* at 394. The Supreme Court has repeatedly admonished that "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941); *see Arizona*, 567 U.S. at 401; *Hillsborough Cnty. v. Automated Med. Lab'ys., Inc.*, 471 U.S. 707, 719 (1985) (recognizing "the dominance of the federal interest" in immigration and foreign affairs as the paradigmatic example of field preemption); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (acknowledging that States "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of [noncitizens] in the United States or the several states"); *cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government."). SB 4 not only regulates core aspects of immigration—noncitizens' entry, reentry, and removal—but also directly implicates the United States' foreign relations.

"Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." *Arizona*, 567 U.S. at 395. It is "fundamental" that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Id.* That is important because "perceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id.* As a result, "[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free

15

from local interference." *Hines*, 312 U.S. at 63. If States can unilaterally arrest, detain, prosecute, and remove noncitizens for unlawful entry, the federal government cannot ensure the status, safety, and security of noncitizens in the United States, nor communicate effectively with foreign countries as "one national sovereign." *Arizona*, 567 U.S. at 395.

That is precisely why the federal government's discretion within the field of noncitizen entry and removal must be exclusive: the "discretionary decisions" on immigration enforcement "involve policy choices that bear on this Nation's international relations," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." *Id.* at 396–97. This is especially true for removal decisions. Such decisions include "the selection of a removed [noncitizen]'s destination" and "may implicate our relations with foreign powers," requiring "consideration of changing political and economic circumstances." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 348 (2005) (citation omitted). The "removal process" must be "entrusted to the discretion of the Federal Government" because it touches "on foreign relations and must be made with one voice." *Arizona*, 567 U.S. at 409.

The same is true for the federal power to control an international border. *De Canas*, 424 U.S. at 354 (determining which noncitizens may enter and remain in the United States "is unquestionably exclusively a federal power"). "[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States," *Hernandez v. Mesa*, 885 F.3d 811, 819 (5th Cir. 2018) (quoting *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004)), *aff'd*, 140 S. Ct. 735 (2020), and "[n]ational-security policy" and foreign policy are "the prerogative of the Congress and President," *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017). As the Supreme Court explained long ago, "[a]dmission of [noncitizens] to the United States is a privilege granted by the sovereign United States Government." *Knauff*, 338 U.S. at 542. "Such privilege is granted to [a noncitizen] only upon such terms as the United States shall prescribe" and "must be exercised in accordance with the procedure which the United States provides." *Id.* Texas's attempt to criminalize actions

at an international border, and regulate core immigration functions, tramples on these over-riding, federal interests.[3]

SB 4 also runs headlong into a "framework of regulation so pervasive that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399; *see Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) ("Policies pertaining to the entry of [noncitizens] and their right to remain here are entrusted exclusively to Congress," so "[a]n attempt by Texas to establish an alternative classification system . . . would be preempted"). While SB 4's crim-inal provisions attempt to track the federal provisions on illegal entry and reentry (8 U.S.C. §§ 1325–26), there is already a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States. *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012) ("*GLAHR*"). Congress has "authorized criminal penalties for individuals who bring [noncit-izens] into the United States," *id.* (citing 8 U.S.C. § 1323), has "penalize[d] the transportation, concealment, and inducement of unlawfully present [noncitizens]," *id.* (citing 8 U.S.C. § 1324), has "impose[d] civil and criminal penalties for unlawful entry" and reentry, *id.* (citing 8 U.S.C. § 1325–26), has prohibited "aid[ing] the entry of an inadmissible [noncitizen]," *id.* (citing 8 U.S.C. § 1327), and has banned the "import [of] [a noncitizen] for an immoral pur-pose," *id.* (citing 8 U.S.C. § 1328).

These comprehensive statutory provisions are backed by an equally comprehensive enforcement scheme. *See* Background Section II., *supra*. The Secretary of Homeland Security

---

[3] For these reasons, the presumption against preemption does not apply. *See Barzelis v. Flagstar Bank, FSB*, 784 F.3d 971, 973 n.2 (5th Cir. 2015) (no presumption of preemption where "there is a history of federal presence" in an area); *see United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) ("[T]he presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government."); *Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (noting that state distinctions that hinge "solely on immigration status" intrude on an area of "significant federal presence" and therefore the presumption against preemption does not apply); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (immigration is "an area of core federal concern," and a State's "thinly veiled attempt to regulate immigration" is not entitled to the presumption).

has "the power and duty to control and guard" the border against illegal entry, and immigration officers are empowered to perform all necessary actions to effectuate those statutory mandates, including the ability to "interrogate" and "arrest" noncitizens, "board and search any" conveyance or vehicle "in which they believe [noncitizens] are being brought into the United States," and access private lands within 25 miles of the border to prevent illegal entry. *See id.*; 8 U.S.C. § 1103(a)(3), (5); *id.* § 1225(d)(1); *id.* § 1357(a). In short, Congress has vested DHS and its subagencies with the sole responsibility for "enforc[ing] and administer[ing] all immigration laws," especially "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of those here unlawfully. 6 U.S.C. § 211(c)(8); Background Section II., *supra*.

Importantly, under this federal scheme, States wishing to assist in enforcing federal immigration laws may do so only in specified and narrow circumstances. *See* Background Section II., *supra*; 8 U.S.C. § 1103(a)(10) (state enforcement in the face of an "imminent mass influx of" noncitizens); *id.* § 1252c (state arrests and detention of noncitizens in particular circumstances until federal immigration authorities can take the person into federal custody); *id.* § 1324(c) (state arrests for human smuggling); *id.* § 1357(g) (state authority under a written agreement with the federal government). These provisions—each of which authorizes state officials to take certain immigration actions under circumscribed conditions—would be meaningless if States already had the authority to criminalize, arrest, detain, and remove noncitizens for violating federal immigration law.[4] And certainly none of those provisions leaves any room for States to enact a law, like SB 4, that empowers state officials to unilaterally *prosecute* and *remove* noncitizens based on their unlawful entry or reentry.

---

[4] "[T]he word 'authorize' . . . ordinarily denotes affirmative *enabling action*; "'[t]o empower; to give a right or authority to act.'" *Washington Cnty. v. Gunther*, 452 U.S. 161, 169 (1981) (quoting Black's Law Dictionary 122 (5th ed. 1979)) (emphasis added). So one can only be "authorized"—*i.e.* enabled—to do something if they otherwise lacked that authority.

Congress also could not have been clearer that unless otherwise provided by federal law, a removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see Patel v. Garland*, 596 U.S. 328, 331 (2022) ("Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal."); *Arizona*, 567 U.S. at 399; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936) (explaining that only the federal government is invested "with the powers of external sovereignty" and "the power to expel undesirable" noncitizens exists "as inherently inseparable from the conception of nationality"). Indeed, the comprehensive statutory scheme identifies the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to noncitizens throughout the process, and the process for selecting the country to which noncitizens may be removed. *See* Background Section I., *supra*; *see, e.g.*, 8 U.S.C. §§ 1182(a), 1225, 1227, 1229, 1229a, 1231. It also lays out, in detail, how removal orders are to be executed and calls upon federal officials to coordinate with foreign governments. *See* Background Section I., *supra*; 8 U.S.C. § 1231(b). Through these comprehensive enactments, Congress has occupied the field of noncitizen entry and removal.

Just as the Supreme Court found a state noncitizen-registration law field preempted in *Arizona*, SB 4 is field preempted here. There, as here, a State attempted to "add[] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400. There, as here, "[t]he federal statutory directives provide a full set of standards," including "the punishment for noncompliance." *Id.* at 401. There, as here, the statutory framework "was designed as a harmonious whole." *Id.* And there, as here, "[p]ermitting the State to impose its own penalties for the federal offenses [ ] would conflict with the careful framework Congress adopted." *Id.* at 402. Thus, as in *Arizona*, even if SB 4 is a "complementary state regulation," it "is impermissible." *Id.* at 401. Otherwise, "the State would have the power to bring criminal

charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402. Worse yet, Texas can unilaterally *remove* noncitizens from the country under SB 4 without adhering to the panoply of federal removal requirements. Even the dissenters in *Arizona* did not think that was allowable; they agreed that ultimate removal decisions must be made by the federal government. *Id.* at 427 (Scalia, J., dissenting in part) (arguing that the Arizona law was constitutional because state officials were only allowed "to arrest a removable [noncitizen], contact federal immigration authorities, and follow their lead on what to do next"); *id.* at 438 (Thomas, J., dissenting in part) (similar); *id.* at 457 (Alito, J., dissenting in part) (arguing that "[s]tate and local officers do not frustrate the removal process by arresting criminal [noncitizens]" because "[t]he Executive retains complete discretion over whether those [noncitizens] are ultimately removed"). If anything, then, SB 4's determinations about unlawful entry and removal of noncitizens are even more intrusive than Arizona's unconstitutional noncitizen-registration law.

Since *Arizona*, courts have routinely held that state immigration crimes paralleling their federal counterparts are field preempted. For example, numerous courts have found that the federal provision on human smuggling (8 U.S.C. § 1324) preempts state human-smuggling crimes, both because § 1324 "provides a comprehensive framework," and because it functions as part of the larger statutory scheme of "federal statutes criminalizing the acts undertaken by [noncitizens]," including "§ 1325, [which] imposes civil and criminal penalties for unlawful entry into the United States." *GLAHR*, 691 F.3d at 1263–64; *see also United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013) (holding that state laws making it a felony to violate § 1324 were "field preempted because the vast array of federal laws and regulations on this subject . . . is so pervasive . . . that Congress left no room for the States to supplement it"); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024-25 (9th Cir. 2013) (holding that a state law "attempt[ing] to regulate conduct" that "the federal scheme also addresses" in § 1324 is field

preempted because the state scheme, "like the registration scheme addressed in *Arizona*" provides "a full set of standards designed to work as a 'harmonious whole'"). As those courts recognized, the breadth of these illegal-entry provisions "illustrates an overwhelmingly dominant federal interest in the field" concerning the "entry, movement, and residence of [noncitizens] within the United States." *GLAHR*, 691 F.3d at 1264. Because SB 4 also seeks to track that "comprehensive framework," *id.* at 1263, it is field preempted in the same way the state human-smuggling crimes were field preempted.

In the end, "Congress has provided a broad and comprehensive plan describing the terms and conditions upon which [noncitizens] may enter this country, how they may acquire citizenship, and the manner in which they may be deported." *Hines*, 312 U.S. at 69. And when Congress enacted the various provisions governing noncitizen entry and removal, "it plainly manifested a purpose to do so in such a way as to" create "one uniform national [ ] system." *Id.* at 74. States "cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Id.* at 66–67. If SB 4 were allowed to stand, and "every State could give itself independent authority to" unilaterally arrest, detain, prosecute, and remove noncitizens for federal immigration crimes, the United States would lose its ability to "ensure that enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 397, 402. There could be no "great[er] potential for disruption or embarrassment" than the chaos that would ensue from 50 different immigration systems with varying (and likely conflicting) provisions for illegal entry and noncitizen removal. *Zschernig*, 389 U.S. at 435. SB 4's unprecedented intrusion into the field of noncitizen entry and removal is wholesale preempted.

**B. SB 4 is conflict preempted by various provisions of federal law, including those that allow for state cooperation in only narrow circumstances.**

Given the dominant federal interests and comprehensive federal scheme in this area, it is no surprise that SB 4 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. To begin, SB 4 allows

Texas to unilaterally remove noncitizens from the country without adhering to any of the federal grounds for removal, requirements for commencing and administering removal proceedings, and protections afforded to noncitizens. *See* Background Section I., *supra*; 8 U.S.C. §§ 1182, 1225, 1227, 1229, 1229a, 1231. Texas's removal orders could effectively prevent a noncitizen from asserting affirmative defenses to removal that would have been available in the federal system, including asylum, *see* 8 U.S.C. § 1158(a)(1), withholding of removal, *id.* § 1231(b)(3), or protection under regulations implementing Article 3 of the Convention Against Torture, 8 C.F.R. § 1208.16(c)(2). SB 4 even specifically says that "a court may not abate the prosecution" on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003; *see* House Research Organization, Bill Analysis of SB 4 at 7 (Nov. 14, 2023) (supporters of SB 4 noting that "a pending asylum application would not be an affirmative defense to prosecution"). SB 4 thus expressly contemplates interference with the federal scheme by allowing Texas to imprison and remove people whose legal ability to remain in the United States may be under review by federal officials.

SB 4 also conflicts with the federal process for identifying the countries to which noncitizens may be removed, which allows federal officials to work with foreign governments to determine if they will accept those noncitizens. *See* 8 U.S.C. § 1231(b). But States have no authority to have those types of diplomatic discussions with foreign governments. *See* U.S. Const. art. I, § 10 ("No State shall enter into any Treaty, Alliance, or Confederation" and "[n]o State shall," without Congress's consent, "enter into any Agreement or Compact" with "a foreign Power."); *Hines*, 312 U.S. at 63 ("The Federal Government. . . is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties."); *Holmes v. Jennison*, 39 U.S. 540, 572 (1840) (disallowing an informal extradition arrangement between the Governor of Vermont and a Canadian official and explaining that the Framers "anxiously desired to cut off all connection or communication between a state and a foreign power"). And yet, SB 4 simply notes that a removal order will "require the person to return to the

foreign nation from which the person entered or attempted to enter," regardless of nationality or whether that foreign nation has agreed to accept the person. Allowing Texas to conduct its own removal process will undoubtedly frustrate the United States' ability to handle foreign relations "with one voice." *Arizona*, 567 U.S. at 409.

Mexico's objection to SB 4 demonstrates exactly why that is a problem. Even before SB 4's enactment, Mexico "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023). And as the Supreme Court recently explained, attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden v. Texas*, 597 U.S. 785, 806 (2022).

Other attributes of SB 4 also illustrate its incompatibility with the comprehensive federal scheme. For example, SB 4 allows an affirmative defense to its illegal-entry provision if the noncitizen has been granted "lawful presence" by the federal government. Tex. Penal Code § 51.02(c). But federal law does not define "lawful presence"; it means different things in different contexts. An individual may be considered lawfully present for purposes of certain benefits, for instance, but not for purposes of accrual periods in admissibility. Under SB 4, however, a state magistrate or judge will purport to decide whether the noncitizen is "lawfully present"—a state determination that the Fifth Circuit has already held preempted. *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 535–36 (5th Cir. 2013) (plurality). As the court explained, "[t]he federal government alone" has "the power to classify noncitizens." *Id.* at 536. There are "significant complexities" in determining immigration status. *Id.* at 535–36; *see also Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which [noncitizens] are entitled to residence, and which eventually will be deported."). And "even a determinative federal answer on this question" would not bring SB 4 "into compliance with federal law." *Farmers Branch*, 726 F.3d at 535–36.

23

SB 4's proscriptions are also broader than their federal counterparts, creating another conflict. While both federal law and SB 4 criminalize the reentry of removed or deported noncitizens, federal law includes exceptions, like consent from the Secretary of Homeland Security. *See* 8 U.S.C. § 1326. But SB 4's reentry provision has no affirmative defenses or exceptions, prohibiting noncitizens' reentry even if they have the Secretary of Homeland Security's permission. Indeed, noncitizens who were removed but then permitted to reenter the United States for any reason may be prosecuted under SB 4 for illegal reentry because the law extends to *any* noncitizen who was previously removed and later "found in th[e] state." Tex. Penal Code § 51.03(a). And to the extent Texas seeks to arrest, detain, and prosecute unaccompanied noncitizen children, that would conflict with the protections Congress afforded such children, including transfer to HHS's ORR and placement in the least restrictive setting that is in the best interest of the child. *See* 8 U.S.C. § 1232. All of these features interfere with federal law and "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399.

Beyond that, SB 4 conflicts with the statutory scheme Congress enacted that "specifies [the] limited circumstances in which state officers may" assist with immigration enforcement. *Arizona*, 567 U.S. at 408; *see also* Argument Section I.A., *supra*. Most prominently, under 8 U.S.C. § 1357(g), the Secretary of Homeland Security "may enter into a written agreement with a State" or any of its "political subdivision[s]," allowing state or local officers "who [are] determined by the [Secretary] to be qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens] in the United States" to "carry out such function" consistent with state law. 8 U.S.C. § 1357(g)(1). The State must "certif[y]" that such officers "performing the function under the agreement have received adequate training" and, in performing that function, the officer "shall be subject to the direction and supervision of the [Secretary]." *Id.* § 1357(g)(2)–(3); *Arizona*, 567 U.S. at 409 ("There are significant complexities involved in enforcing federal immigration law," and

agreements under § 1357(g) must "contain written certification that officers have received adequate training."). The purpose of § 1357(g) was to "expand the number of personnel who are involved in picking up people in violation of the law" while subjecting those personnel to "ongoing Federal supervision" so that "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards." 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (Rep. Cox).

SB 4 flouts § 1357(g) and the other narrow provisions for state participation. *See* Background Section II., *supra*; 8 U.S.C. § 1103(a)(10); *id.* § 1252c; *id.* § 1324(c). Those federal provisions mean nothing if States can enact their own immigration crimes and then arrest, detain, prosecute, and remove noncitizens without federal authorization, without any special training, and without being "subject to the direction and supervision of the" United States. *See* 8 U.S.C. § 1357(g)(3). States could pick from the menu of federal immigration laws and enforce them as they see fit. "This is not the system Congress created." *Arizona*, 567 U.S. at 408; *cf. id.* at 413 (it would "disrupt the federal framework to put state officers in the position of holding [noncitizens] in custody for possible unlawful presence without federal direction and supervision"). Nor can SB 4 be treated as "cooperat[ion]." *See* 8 U.S.C. § 1357(g)(10)(B). That cooperation refers to joint action between the States and the federal government. As the Supreme Court emphasized, "no coherent understanding of the term would incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government." *Arizona*, 567 U.S. at 410. Texas's disregard for § 1357(g) and other cooperative provisions "stands as an obstacle" to the federal oversight Congress envisioned. *Id.* at 399.

The Fifth Circuit has suggested as much. In *Farmers Branch*, the court addressed a local ordinance that criminalized the housing of noncitizens. 726 F.3d at 531. Although the city argued that its ordinance "will concurrently enforce federal anti-harboring law" under § 1324, the court found it conflict preempted. *Id.* at 529. In so holding, the court explained that the "significant complexities involved in enforcing federal immigration law" reinforce

"the importance of the federal government's supervisory role over the limited contexts" where "the Attorney General has delegated arrest authority to state officers." *Id.* at 531 (citation omitted). And "by giving state officials authority to act as immigration officers outside the limited circumstances specified by federal law," the ordinance at issue "interfere[d] with the careful balance struck by Congress." *Id.* These concerns were reiterated in *City of El Cenizo*, where the Fifth Circuit noted that state officers can "become de facto immigration officers, competent to act on their own initiative" under § 1357(g) agreements with the federal government. *City of El Cenizo v. Texas*, 890 F.3d 164, 180 (5th Cir. 2018). And it specifically upheld a state law only because it did *not* allow "unilateral enforcement activity." *Id.*

Here, SB 4 does exactly what the Fifth Circuit and the Supreme Court warned against: it allows "unilateral enforcement" of the prohibitions on illegal entry (§ 1325) and illegal reentry (§ 1326) by state officials without the federal authorization, oversight, or training required by federal law. *Id.*; *see Arizona*, 567 U.S. at 410. This allows Texas to independently render judgments about the "investigation, apprehension, or detention" of noncitizens when Congress wanted those decisions to be made in coordination with the federal government. *See* 8 U.S.C. § 1357(g). And if Congress specified only narrow circumstances where States may assist in the "investigation, apprehension, or detention" of noncitizens, there is no reason to think it would have allowed unilateral state *prosecutions* followed by unilateral state *removal* of noncitizens to a foreign country.

As discussed above, the federal government alone must determine whether a noncitizen's entry into the United States is lawful, and whether any consequences should be imposed for unlawful entry. Just as there was an impermissible "conflict" when the FDA's enforcement sought to achieve a "somewhat delicate balance" that would be "skewed by allowing fraud-on-the-FDA claims under state tort law," *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 348 (2001), so too would the federal government's immigration enforcement be improperly skewed by SB 4. Immigration enforcement involves a sensitive balancing of United States' interests in national security and foreign relations, including the reciprocal

26

treatment of U.S. citizens abroad. *See* Argument Section I.A., *supra*. And allowing each State to arrest, detain, prosecute, and remove foreign nationals would fundamentally undermine that delicate balance. In sum, SB 4 directly interferes with the comprehensive federal immigration scheme; it is both field and conflict preempted.

**C.** **SB 4 violates the dormant Foreign Commerce Clause by regulating international commerce and interfering with the United States' foreign relations.**

SB 4 also violates the Commerce Clause. The Constitution provides that Congress may "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This power is critically important. "One of the major defects of the Articles of Confederation, and a compelling reason for the calling of the Constitutional Convention of 1787, was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976); *see* The Federalist No. 11, at 49 (Gideon ed., 2001) (Hamilton noting that "intercourse with foreign countries" is "one of those points about which there is least room to entertain a difference of opinion, and which has, in fact, commanded the most general assent of men who have any acquaintance with the subject"). Under the Constitution, therefore, "[f]oreign commerce is preeminently a matter of national concern." *Japan Line*, 441 U.S. at 448. "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Id.* (citation omitted). Simply put, "[t]he commerce of the United States with foreign nations, is that of the whole United States." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824) (Marshall, C.J.).

Perhaps unsurprisingly, then, "[f]rom early in the nation's history, it was understood that the Commerce Clause permitted the federal government to control certain aspects of immigration." Jennifer Gordon, *Immigration As Commerce: A New Look at the Federal Immigration Power and the Constitution*, 93 Ind. L.J. 653, 671 (2018); Kif Augustine-Adams, *The Plenary Power Doctrine After September 11*, 38 U.C. Davis L. Rev. 701, 718 (2005) ("[M]any scholars

identify the Commerce Clause as an explicit constitutional text that empowers the federal government to control immigration into the United States."). And one of those aspects is the "movement of persons," including "the movement of undocumented [noncitizen] laborers across a national boundary into this country." *United States v. Hanigan*, 681 F.2d 1127, 1130–31 (9th Cir. 1982) (citing *Gibbons*, 22 U.S. at 190); *United States v. Guest*, 383 U.S. 745, 758–59 (1966) ("[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate commerce of persons as well as commodities."). The "illegal entry of foreign nationals" also "substantially affect[s] interstate commerce." *United States v. Hernandez-Guerrero*, 963 F. Supp. 933, 938 (S.D. Cal. 1997), *aff'd*, 147 F.3d 1075 (9th Cir. 1998).

States therefore cannot regulate the movement of noncitizens across an international border. "Although the Commerce Clause speaks only of Congress's power, it has long been understood that there is a dormant or negative aspect of the Commerce Clause that limits the power of the states to regulate commerce." *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) (the authority to enact immigration laws "belongs to Congress, and not to the States" because Congress "has the power to regulate commerce with foreign nations," and "the responsibility for the character of those regulations, and for the manner of their execution, belongs *solely* to the national government" (emphasis added)). "State regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce." *Piazza's Seafood*, 448 F.3d at 750. "Regulations that facially discriminate" against foreign commerce "are virtually per se invalid," and "nondiscriminatory state regulations affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *Id*. Here, SB 4 is invalid on all these grounds.

SB 4 discriminates against foreign commerce on its face: it criminalizes *solely* the movement of noncitizens across an international boundary *into* Texas, including by imposing removal as a penalty. SB 4 criminalizes nothing about movement *within* or *out of* Texas. Nor does it criminalize anything about the movement of American *citizens* entering Texas. While SB 4 does not look like the protectionist economic regulations that usually arise under the dormant Commerce Clause, "[a] law need not be designed to further local economic interests in order to run afoul of the Commerce Clause." *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 67 (1st Cir. 1999), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). And even assuming SB 4 were "consistent with federal policy" or "furthers the goals we might believe that Congress had in mind," a "state statute that violates the Commerce Clause cannot be saved by a showing that it is consistent with the purposes behind federal law." *Piazza's Seafood*, 448 F.3d at 751. There is simply no "express statement" in federal law that allows Texas to "discriminate[] against foreign commerce" by prosecuting noncitizens' illegal entry into the United States. *Id.*

But even if SB 4 were nondiscriminatory, it still improperly "create[s] a substantial risk of conflicts with foreign governments" and "undermine[s] the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." *Id.* at 750. By definition, restricting movement over an international boundary implicates the United States' foreign affairs. It already has. As noted above, Mexico has "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023). And the United States is currently using its diplomatic channels to discuss immigration with Mexico and other countries in the region. *See* Background Section II., *supra*. As the Supreme Court said, attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden*, 597 U.S. at 806. By inappropriately regulating foreign

commerce—movement of noncitizens across an international border—SB 4 "impair[s] fed-
eral uniformity in an area where federal uniformity is essential." *Japan Line*, 441 U.S. at 448.

## II. SB 4 would impair foreign relations and immigration operations, causing irrepara-
ble harm to the United States and the public.

The United States and the public will suffer immediate and irreparable harm if SB 4
takes effect. As courts have explained, irreparable harm necessarily results from enforcement
of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S.
350, 366–67 (1989) (noting that irreparable injury may be established "by a showing that the
challenged state statute is flagrantly and patently violative of" the Supremacy Clause); *United
States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (finding irreparable harm from only the
"alleged constitutional infringement" because "the interest of preserving the Supremacy
Clause is paramount"), *aff'd in part, rev'd on other grounds,* 567 U.S. 387 (2012); *United States v.
Texas*, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021) ("Because the United States has established
a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is pre-
sumed."); *Nat'l Collegiate Athletic Ass'n v. Christie*, 926 F. Supp. 2d 551, 578 (D.N.J. 2013) (A
"violation of the Supremacy Clause, alone, likely constitutes an irreparable harm."), *reversed
on other grounds Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). SB 4's violation
of the Supremacy Clause alone suffices to establish harm.

But SB 4's harm extends far beyond that legal injury. Internationally, "[i]f allowed to
enter into force, SB 4 would result in significant and ongoing negative consequences for U.S.
foreign relations." Jacobstein Decl. ¶ 6. When a State takes immigration enforcement actions
"without any input from the Federal Government," it effectively "achieve[s] its own immi-
gration policy" and "[t]he result could be unnecessary harassment of some [noncitizens] (for
instance, a veteran, college student, or someone assisting with a criminal investigation) who
federal officials determine should not be removed." *Arizona*, 567 U.S. at 408; *see also* Jacob-
stein Decl. ¶¶ 7, 9, 32. This is especially true of SB 4, which imposes its own criminal penalties
for unlawful entry and reentry on noncitizens and allows state magistrates and judges to force

non-Mexican nationals into Mexico, without any indication that Mexico is willing to accept them. This "[p]erceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395; Jacobstein Decl. ¶¶ 31–32. And as the State Department's Deputy Assistant Secretary Eric Jacobstein further explains, "foreign governments' reactions to immigration policies and the treatment of their nationals in the United States affects not only immigration matters, but also any other issues in which the United States may seek cooperation with foreign countries, including international trade, tourism, and security cooperation." Jacobstein Decl. ¶ 5.

Here, "Mexico has signaled emphatically that [Texas's] actions would frustrate the United States' relations with Mexico regarding noncitizen removals and likely other important bilateral issues." *Id.* ¶ 12. That is significant because "Mexico is an essential partner for the United States" in addressing regional irregular migration and its root causes. *Id.* ¶ 19; *see also* Exec. Order 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021). Indeed, the two governments have issued a joint declaration "in which they committed to immigration policies that recognize the dignity of migrants and the imperative of orderly, safe, and regular migration." Jacobstein Decl. ¶ 19. "They [have] further committed to collaborate on a joint effort to address the root causes of regional migration, improve migration management, and develop legal pathways for migration." *Id.*

Officials from the United States and Mexico meet frequently to "take stock of [their] cooperative efforts," "identify new areas of cooperation, and reinforce [the two governments'] joint commitments." *Id.* ¶ 20; *see also* Final Rule, Circumvention of Lawful Pathways, 88 Fed. Reg. at 31316–17 (noting that negotiations with Mexico permitted DHS to implement certain parole processes for citizens of countries where those noncitizens could be returned to Mexico as a consequence of not following certain pathways, and that Mexico previously "had not been willing to accept the return of such nationals"). "SB 4 undermines these efforts" because it represents a single State's unilateral attempt to regulate immigration without regard to the United States' foreign relations. Jacobstein Decl. ¶¶ 9–33. Just recently, the Fifth Circuit

upheld a preliminary injunction in part because Mexico protested Texas's actions at the border. *United States v. Abbott*, 87 F.4th 616, 633–34 (5th Cir. 2023) (affirming preliminary injunction enjoining Texas's placement of a buoy barrier in the Rio Grande River to stop migrants from crossing into the United States); *see Crosby*, 530 U.S. at 385 (citing State Department testimony for the proposition that a state law "stands as an obstacle in addressing the congressional obligation to devise a comprehensive, multilateral strategy"). That should be enough here too. And SB 4 will also "necessarily antagonize[ ] foreign governments and their populations, both at home and in the United States." Jacobstein Decl. ¶ 9. Because of how their citizens will be treated by Texas under SB 4, foreign nations may be "less willing to negotiate, cooperate with, or support the United States across a broad range of important foreign policy issues." *Id.*

Not only will SB 4 undermine the United States' comprehensive policy framework to address regional irregular migration, *see* Jacobstein Decl. ¶¶ 18–23; Exec. Order 14010, but it also "threatens to undermine [the United States'] standing before regional and multilateral bodies that address migration and human rights matters" and hamper the United States' effective advocacy "for the advancement of human rights" and the "protection for individuals fleeing persecution or torture." Jacobstein Decl. ¶ 29. Specifically, SB 4 does not accommodate the United States' treaty obligations—like those under the Convention Against Torture and the Refugee Protocol—which were implemented through federal law to prevent refoulement (the return of noncitizens to a country where they are likely to face torture or persecution). *See id.* ¶¶ 24–28; Kim Decl. ¶¶ 4–5, 16; 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(3); *see* 8 U.S.C. § 1231 note; 8 C.F.R. § 1208.16–.18. Consequently, the international community would view SB 4 as a sign that the United States is scaling back its commitment to international protection, which could encourage other governments to abandon or minimize their own efforts—all without a deliberate policy choice by the federal government. Jacobstein Decl. ¶ 30. SB 4 would therefore undermine U.S. efforts to convince governments worldwide to strengthen their international protection systems and uphold their

respective nonrefoulement obligations. *Id.* ¶ 29. If States like Texas could implement their own laws governing the entry and removal of noncitizens, "a single State [could], at her pleasure, embroil us in disastrous quarrels with other nations." *Chy Lung*, 92 U.S. at 280; *South Carolina*, 720 F.3d at 533 (finding "irreparable injury to the nation's foreign policy" if a State's parallel immigration law "take[s] effect").

SB 4 is just as likely to cause imminent harm domestically. For one, the state law would impede the federal government's ability to assess a noncitizen's national-security and public-safety risks and take appropriate enforcement actions. Declaration of David S. BeMiller ¶¶ 5–11. For example, "if Border Patrol is unable to conduct immediate independent interviews with apprehended migrants" because they have been arrested, detained, or removed by Texas, the federal government "may miss important timely national security information or be unable to develop analytical trends from the intelligence gathered." *Id.* ¶ 10. This information "is vital for gathering data such as methods/modes of travel, funding, and what messaging is being propagated outside of the United States, so that Border Patrol can gain awareness of the tactics of human trafficking networks, drug cartels, terrorist or foreign intelligence operations, or other criminal activity." *Id.* For another, the time-sensitive enforcement tool of expedited removal (used to remove certain noncitizens within 14 days of their arrival) may be unavailable to federal officials if noncitizens are arrested, detained, and prosecuted by Texas. *Id.* ¶ 11. These "danger[s] to federal government operations, including those of the Border Patrol," independently constitute irreparable harm. *Abbott*, 87 F.4th at 635 n.20.

SB 4 is also expected to interfere with federal immigration proceedings and operations. *See* BeMiller Decl. ¶¶ 6–11; Declaration of Russell Hott, ¶¶ 19–26; Kim Decl. ¶¶ 17–18. In fact, the law forbids abatement of an SB 4 prosecution when the federal government is making asylum or adjustment-of-status determinations for the noncitizens at issue. Tex. Code Crim. Proc. art. 5B.003. And a noncitizen facing simultaneous SB 4 enforcement proceedings and federal proceedings may be impeded from participating in the federal proceedings. Kim Decl. ¶¶ 8–10, 14, 17–18. Noncitizens can generally apply for asylum even when they have not

entered through a port of entry.  8 U.S.C. § 1158(a).  But if asylum applicants may be arrested, prosecuted, detained, and removed by Texas during the pendency of their application, they will be prevented from participating in federal processes that allow for a grant of asylum or related protection from removal.  Kim Decl. ¶¶ 17–18; House Research Organization, Bill Analysis of SB 4 at 7 (Nov. 14, 2023) (supporters of SB 4 noting that "a pending asylum application would not be an affirmative defense to prosecution"); *see* 8 C.F.R. §§ 208.3(b); 208.16-.18; 208.30.  A removal that inhibits screening for, or adjudication of, federal statutory withholding of removal or protection under the Convention Against Torture is harmful to the government and the public.  *See* 8 U.S.C § 1231(b)(3); 8 C.F.R. § 1208.16(c), 17–18.  And SB 4 can also be expected to cause a change in noncitizens' migration pattern, encouraging noncitizens to enter through other border States and potentially requiring DHS to reallocate its assets, resources, and personnel, which would be a significant undertaking.  BeMiller Decl. ¶ 6; Hott Decl. ¶¶ 19–24.

These serious harms are compounded by the fact that, if SB 4 is allowed to stand, other States could be emboldened to impose similar restraints.  *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (noting that allowing a State to set a requirement that conflicts with federal law "would allow other States to do the same").  At best, this could create a problematic "patchwork" system of laws.  *Id.*  At worst, there may be a disastrous impact on the federal government's ability to carry out its core immigration functions.  *See South Carolina*, 720 F.3d at 533 ("[T]he likelihood of chaos resulting from [a State] enforcing its separate immigration regime is apparent.").  Either way, allowing other States to follow Texas's lead would severely undermine both the United States' conduct of foreign affairs and the "integrated scheme of regulation created by Congress," wresting control of immigration from "one national sovereign" and giving it to "the 50 separate States."  *Arizona*, 567 U.S. at 395, 402.

### III. Texas has no legitimate countervailing interest in maintaining an unconstitutional law.

In contrast to the harm suffered by the United States and the public, Texas has no legitimate interest in running its own unconstitutional immigration system: it "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990). And "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023) (same). In any event, Texas would not be harmed by an injunction.

Texas is free to assist in the enforcement of federal immigration law without enacting its own parallel scheme; it must simply proceed under the constraints Congress established. *See, e.g.*, 8 U.S.C. § 1103(a)(10); *id.* § 1252c; *id.* § 1324(c); *id.* § 1357(g). Most expansively, Texas can enter an agreement with the federal government to aid in the "investigation, apprehension, or detention of [noncitizens] in the United States" if state officers receive adequate training and are "subject to the direction and supervision of the" federal government. *Id.* § 1357(g). This is no hardship: as of June 2023, 26 Sheriff's Offices in Texas *already have* § 1357(g) agreements in place. *See* ICE, *Delegation of Immigration Authority Section 287(g) Immigration and Nationality Act* (last visited Jan. 12, 2024). But Texas has no lawful interest in unilaterally encroaching on an exclusive federal domain. This is nothing new for Texas. The United States has been enforcing *federal* crimes of illegal entry (§ 1325) and illegal reentry (§ 1326) in Texas since they were enacted in 1952. Yet Texas has gone at least seven decades without an unconstitutional state counterpart like SB 4.

And, in a suit brought by the United States, Texas can assert no cognizable interest in protecting its citizens from purported immigration-related harms. *Cf. Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (Texas had no standing to assert claim on behalf of its citizens because

"[a] State does not have standing as *parens patriae* to bring an action against the Federal Government"). As explained above, the entry and removal of noncitizens is an exclusively federal field. And "[i]n that field it is the United States, and not the [S]tate, which represents" Texans; "to the former, and not to the latter, they must look for such protective measures as flow from that status." *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923). At bottom, any interest the State could muster cannot outweigh the imminent and irreparable harm to the United States and the public from enforcing an unconstitutional state statute.

## IV. The Court should enter a permanent injunction because there are no material facts in dispute.

Because the purely legal issues in this motion are dispositive, the Court could proceed directly to final judgment. Under either Rule 56 or Rule 65, the Court can simply apply the Supremacy Clause and the Commerce Clause to the undisputed facts and enter a permanent injunction in favor of the United States. *See* Fed. R. Civ. P. 65(a)(2) ("Before or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."); *Molina v. Home Depot USA, Inc.*, 20 F.4th 166, 169 (5th Cir. 2021) (recognizing that district courts may "grant summary judgment *sua sponte*" if they give "the parties ten days' notice"); *Atkins v. Salazar*, 677 F.3d 667, 678 (5th Cir. 2011); *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 2023 WL 4375518, at *4 (W.D. Tex. July 6, 2023) (Pitman, J.) (addressing a preliminary-injunction motion and cross motions for summary judgment under Rule 65(a)(2)). The Court should do so here.

## CONCLUSION

For the reasons explained above, the Court should grant the United States' motion and enjoin enforcement of SB 4.

DATED:  January 12, 2024           Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAIME ESPARZA
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs Branch

_/s/  Stephen Ehrlich_____
KUNTAL CHOLERA
STEPHEN EHRLICH
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC  20005
Phone:  (202) 305-9803
Email:   stephen.ehrlich@usdoj.gov

Samuel M. Shapiro
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
samuel.shapiro@usdoj.gov
Tel: (210) 384-7392

_Attorneys for the United States_

# Exhibit D: ECF 30, Plaintiff ACLU's Motion for Preliminary Injunction

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; and THE COUNTY OF EL PASO, TEXAS, | |
| *Plaintiffs*, | |
| v. | Case No. 1:23-cv-1537 |
| STEVEN C. MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety, and BILL D. HICKS, in his official capacity as District Attorney for the 34th District, | |
| *Defendants*. | |

**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................ 1

    A.    The Federal Government Has Exclusive Authority to Regulate Immigration. ................ 1

    B.    Texas Enacts S.B. 4 to Regulate Entry into and Removal from the Country. ................. 3

STANDARD OF REVIEW ................................................................................ 5

ARGUMENT ..................................................................................................... 5

    I.    S. B. 4 is Preempted. ................................................................................. 5

        A.    S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal. ................. 5

        B.    S.B. 4 Conflicts with the Federal Immigration System. ............................................ 10

    II.    The Equities Strongly Favor an Injunction. .................................................... 17

        A.    Plaintiffs Have Standing and S.B. 4 Will Irreparably Harm Them. ........................... 17

        B.    The Balance of Equities and Public Interest Support an Injunction ......................... 19

CONCLUSION ................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States*,
567 U.S. 387 (2012)................................................................................ passim

*Biden v. Texas*,
142 S. Ct. 2528 (2022)...................................................................................... 3

*Biden v. Texas*,
597 U.S. 785 (2022)......................................................................................... 14

*Chy Lung v. Freeman*,
92 U.S. 275 (1875)..................................................................................... 6, 13

*City of Alpine v. Abbot*,
730 F. Supp. 2d 630 (W.D. Tex. 2010)......................................................... 18

*City of El Cenizo, Texas v. Texas*,
890 F.3d 164 (5th Cir. 2018) ......................................................................... 13

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)........................................................................................ 15

*Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*,
76 F.4th 425 (5th Cir. 2023) .......................................................................... 17

*De Canas v. Bica*,
424 U.S. 351 (1976).......................................................................................... 6

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
691 F.3d 1250 (11th Cir. 2012) ............................................................... passim

*Garcia v. Kerry*,
557 F. App'x 304 (5th Cir. 2014) .................................................................... 7

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) ....................................................................... 11

*Gutierrez v. State*,
380 S.W.3d 167 (Tex. Crim. App. 2012)...................................................... 7, 8

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)........................................................................................ 18

ii

*Hernandez v. State*,
   613 S.W.2d 287 (Tex. Crim. App. 1980) .................................................. 7

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) .............................................................. 6, 7, 10, 13

*Huisha-Huisha v. Mayorkas*,
   27 F.4th 718 (D.C. Cir. 2022) ................................................................ 20

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987) ............................................................................. 10

*INS v. Yueh-Shaio Yang*,
   519 U.S. 2 (1996) ................................................................................... 3

*Jama v. ICE*,
   543 U.S. 335 (2005) ............................................................................. 13

*Lewis v. Hughs*,
   475 F. Supp. 3d 597 (W.D. Tex. 2020) ............................................... 18

*Lozano v. City of Hazleton*,
   724 F.3d 297 (3d Cir. 2013) ................................................................... 7

*Make the Road New York v. Pompeo*,
   475 F. Supp. 3d 232 (S.D.N.Y. 2020) ................................................. 21

*Ms. L. v. ICE*,
   310 F. Supp. 3d 1133 (S.D. Cal. 2018) ............................................... 20

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................. 20

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013) ........................................................... 19

*Ortega-Melendres v. Arpaio*,
   836 F. Supp. 2d 959 (D. Ariz. 2011) ................................................... 20

*Pennsylvania v. Nelson*,
   350 U.S. 497 (1956) ............................................................................... 8

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ............................................................................. 12

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1990) ........................................................................... 6

*Rogers v. Brockette*,
    588 F.2d 1057 (5th Cir.1979) ......................................................... 19

*Singh v. Gonzales*,
    499 F.3d 969 (9th Cir. 2007) ........................................................... 8

*Speaks v. Kruse*,
    445 F.3d 396 (5th Cir. 2006) ........................................................... 5

*Takahashi v. Fish & Game Comm'n*,
    334 U.S. 410 (1948) ........................................................................... 6

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ........................................................... 7

*Toll v. Moreno*,
    458 U.S. 1 (1982) ........................................................................ 7, 13

*Trans World Airlines, Inc. v. Mattox*,
    897 F.2d 773 (5th Cir. 1990) ......................................................... 19

*Truax v. Raich*,
    239 U.S. 33 (1915) ....................................................................... 6, 7

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ............................................... passim

*United States v. Sanchez-Milam*,
    305 F.3d 310 (5th Cir. 2002) ......................................................... 16

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ..................................................... 10, 13

*United States v. South Carolina*,
    840 F. Supp. 2d 898 (D.S.C. 2011) ............................................... 10

*United States v. Texas*,
    599 U.S. 670 (2023) ......................................................................... 12

*Villas at Parkside Partners v. City of Farmers Branch, Tex.*,
    726 F.3d 524 (5th Cir. 2013) ..................................................... passim

**Statutes**

8 U.S.C. § 1101(a)(15)(T)..................................................................... 3, 11

8 U.S.C. § 1101(a)(15)(U)..................................................................... 3, 11

8 U.S.C. § 1101(a)(27)(J) ......................................................................... 3

8 U.S.C. § 1103 ........................................................................................ 9

8 U.S.C. §§ 1151–1382 ............................................................................ 2

8 U.S.C. § 1158 .................................................................... 2, 9, 10, 11

8 U.S.C. § 1182 .................................................................... 2, 8, 9, 17

8 U.S.C. § 1225 ................................................................................ passim

8 U.S.C. § 1226 ........................................................................................ 9

8 U.S.C. § 1227 ........................................................................................ 8

8 U.S.C. § 1229 ................................................................................ passim

8 U.S.C. § 1231 ................................................................................ passim

8 U.S.C. § 1232 ...................................................................................... 11

8 U.S.C. § 1254(a) .................................................................................... 3

8 U.S.C. § 1321 ........................................................................................ 2

8 U.S.C. § 1323 .................................................................................... 2, 9

8 U.S.C. § 1324 .............................................................................. 2, 9, 15

8 U.S.C. § 1325 ................................................................................ passim

8 U.S.C. § 1326 .......................................................................... 2, 9, 12, 16

8 U.S.C. § 1327 ........................................................................................ 9

8 U.S.C. § 1328 ........................................................................................ 9

8 U.S.C. § 1329 ........................................................................................ 9

Senate Bill 4 (88th Leg. (4th special session)) ..................................................... passim

Tex. Code of Crim. Proc. Art. 5B.002(a)........................................................... 4

Tex. Code of Crim. Proc. Art. 5B.002(b) ........................................................ 4

Tex. Code of Crim. Proc. Art. 5B.002(c) ........................................................ 4

Tex. Code of Crim. Proc. Art. 5B.002(d) ..................................................... 4, 14

Tex. Code of Crim. Proc. Art. 5B.003 ........................................................ 5, 11

Tex. Penal Code § 51.02 ........................................................................... 14

Tex. Penal Code § 51.02(a)........................................................................ 4

Tex. Penal Code § 51.02(c)........................................................ 4, 11, 16, 17

Tex. Penal Code § 51.03 ...................................................................... 16, 17

Tex. Penal Code § 51.04 ............................................................................ 4

## Other Authorities

Government of Mexico, Press Release 476 (Nov. 15, 2023),

    https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-immigrant-legislation-

    passed-in-texas?idiom=en.................................................................... 15

Office of the Texas Gov., *Governor Abbott Signs Historic Border Security Measures In*

    *Brownsville* (Dec. 18, 2023), *available at* https://gov.texas.gov/news/post/governor-abbott-

    signs-historic-border-security-measures-in-brownsville (Texas Governor Greg Abbott's

    statement at signing that President Biden's "deliberate inaction has left Texas to fend for

    itself.") ........................................................................................... 3

## Regulations

8 C.F.R. § 208.4 ....................................................................................... 9

8 C.F.R. § 212.2(d) ................................................................................. 16

## INTRODUCTION

The regulation of immigration—determining which noncitizens can enter the country, under what conditions, what status they are afforded while here, and whether, when, and how they might be removed—is an exclusive federal power. But in S.B. 4, Texas has created a draconian *state* immigration system, in which the State unilaterally arrests, convicts, and removes noncitizens for entering the country between ports, with no federal control. In 150 years of federal immigration legislation, no state has ever passed a law like S.B. 4. If the law takes effect on March 5, 2024, it will sweep aside the extremely detailed procedures and substantive rights Congress created to govern entry and removal. It will severely disrupt the federal system's balance between criminal enforcement, civil removal, and forms of relief from removal. It will eliminate the federal Executive's broad discretion over immigration decisions and disrupt the United States' sovereign power over foreign relations with our southern neighbor.

The harms of enforcement will be immense. Vulnerable noncitizens seeking safety will face removal to persecution or torture without access to the federally mandated removal process and protections. Communities face the arrest and summary removal of loved ones, and the separation of families. And the Plaintiffs—advocates dedicated to helping noncitizens access critical federal protections like asylum, and the County of El Paso, which must bear the fiscal and human costs of implementing the State's new law—will be severely impacted.

## BACKGROUND

### A. The Federal Government Has Exclusive Authority to Regulate Immigration.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). In the Immigration and Nationality Act ("INA"), Congress created a complex system to regulate entry into and removal from the United States. *See generally,* 8 U.S.C. §§ 1151–1382.

1

That scheme balances policy goals, including discouraging irregular entry between ports and providing for humanitarian and other protections. To do so, it offers federal officers a range of tools to regulate immigration, including civil immigration procedures and criminal charges.

On the civil side, Congress has specified categories of noncitizens who may be denied admission to the United States, *see* 8 U.S.C. § 1182, including those who enter between ports of entry, *see id*. § 1182(a)(6). To decide whether a person who entered without inspection at a port will be removed, Congress has established several alternative removal procedures, including full removal proceedings with trial-like processes subject to administrative and judicial appeals, 8 U.S.C. § 1229a, and expedited removal proceedings, a shortened form of proceedings applicable to recent border crossers, 8 U.S.C. § 1225(b)(1). On the criminal side, unlawful entry and reentry into the country are federal offenses, along with various other criminal regulations related to irregular entries. 8 U.S.C. §§ 1325, 1326; *see also, e.g.*, §§ 1321, 1323, 1324 (criminalizing the "unauthorized landing of aliens," and "unlawful bringing of aliens" into the country).

Even as it rendered noncitizens entering between ports "inadmissible" and subject to criminal penalties, Congress enacted a range of protections that are available despite unlawful entry. Asylum, a form of humanitarian protection that can lead to permanent residence and eventually citizenship, is specifically available "whether or not" a noncitizen enters "at a designated port of arrival," and "irrespective of such [noncitizen's] status." 8 U.S.C. § 1158(a)(1). Congress also barred federal officials from removing people to likely persecution or torture, in compliance with the United States' obligations under international treaties. *See id.* § 1231(b)(3); Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231). In addition, individuals who are placed in full removal proceedings may apply for other forms of relief Congress has extended, including cancellation of

removal.  8 U.S.C. § 1229b(b).  Noncitizens who have entered without inspection may also apply affirmatively for numerous other forms of relief outside of removal proceedings, including visas for victims of crimes and trafficking, § 1101(a)(15)(U); 1101(a)(15)(T); temporary protected status, § 1254(a), and Special Immigrant Juvenile Status for noncitizens under 21 years of age, § 1101(a)(27)(J).

Given the complexities of the immigration system, federal discretion and control is vital. A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.  Federal officials  "decide whether it makes sense to pursue removal at all." *Id.*  Federal officials choose among the several removal processes Congress established.  *See Biden v. Texas*, 142 S. Ct. 2528, 2535 (2022).  Federal officials decide whether to deploy the associated criminal immigration charges.  *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012).  And once removal procedures have been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens.  *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

**B. Texas Enacts S.B. 4 to Regulate Entry into and Removal from the Country.**

S.B. 4 is a blatant attempt to supersede this complex federal system.[1]  It establishes three new state crimes that criminalize irregular entry into the United States and direct state officers to effectuate deportations without any federal discretion or protection from removal.

The challenged law makes it a crime under Texas law for a noncitizen to enter or attempt to enter Texas directly from a foreign nation—which, as a practical matter, means entry across

---

[1] *See, e.g.,* Office of the Texas Gov., *Governor Abbott Signs Historic Border Security Measures In Brownsville* (Dec. 18, 2023), *available at* https://gov.texas.gov/news/post/governor-abbott-signs-historic-border-security-measures-in-brownsville (Texas Governor Greg Abbott's statement at signing that President Biden's "deliberate inaction has left Texas to fend for itself.").

the United States-Mexico border—at any location other than a port of entry. SB 4, § 2, 88th Legis., 4th Spec. Sess. (Tex. 2023) (codified at Tex. Penal Code § 51.02(a)). Affirmative defenses are available when the conduct did not violate the federal illegal entry statute or when a noncitizen has been granted "lawful presence," asylum, or benefits under the Deferred Action for Childhood Arrivals program. S.B. 4 § 51.02(c). S.B. 4 does not provide an affirmative defense for noncitizens seeking federal status, including asylum, or who wish to petition the federal government for relief. *Id.*

S.B. 4 also creates a new state "reentry" charge, applicable if a noncitizen enters, attempts to enter, or is at any time found in Texas after the person has been denied admission to, excluded, deported, or removed from the United States, or departed from the United States while an order of exclusion, deportation, or removal was outstanding. S.B. 4 § 51.03(a). There are no affirmative defenses for this crime. *Id.*

Finally, S.B. 4 creates a mechanism for the State of Texas to unilaterally deport individuals from the United States. If a person is convicted under S.B. 4's entry or reentry provisions, the state judge *must* enter an Order to Return, which requires the defendant to return to the foreign nation from which they entered. SB 4, § 1 (codified at Tex. Code of Crim. Proc. Art. 5B.002(d)). A state magistrate or judge may alternatively enter an Order to Return in lieu of continuing the prosecution if certain conditions are met. S.B. 4 Art. 5B.002(a)-(c). Refusal to comply with an Order to Return is a state crime punishable by up to 20 years in prison; there are no affirmative defenses. S.B. 4 § 51.04. In addition to state deportation, S.B. 4 provides that an "Order to Return" is a predicate deportation for the State's reentry crime.

As to all of these offenses, S.B. 4 specifically prohibits "abat[ing] the prosecution . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  S.B. 4. Art. 5B.003.

## STANDARD OF REVIEW

"A preliminary injunction should issue if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury . . . , (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006) (quotation marks omitted).

## ARGUMENT

### I.      S. B. 4 is Preempted.

S.B. 4 regulates entry and removal—the quintessential exclusively federal field.  S.B. 4 also conflicts with federal law in numerous ways, eliminating immigration relief and federal discretion and interfering with foreign policy and Congress's calibrated regulation of irregular entry.

### A. S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal.

In S.B. 4, Texas established an unprecedented state immigration system that entirely bypasses Congress's comprehensive scheme.  Texas has regulated and criminalized entry into the United States; chosen for itself who will be permitted to remain in the country, what statuses will qualify as defenses to removal, and what procedures will apply; and claimed the power to deport noncitizens by ordering them to depart the United States on pain of severe additional punishment.  But immigration is an exclusively federal power, and Congress has long occupied the field of entry and removal.  This case is thus simple: S.B. 4 is field preempted.

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1990)).

The federal interest in immigration, *see id.* at 399, is "overwhelmingly dominant." *Ga. Latino All.*, 691 F.3d at 1264. For 150 years—ever since Congress began systematically regulating immigration—the Supreme Court has been crystal clear: Regulation of entry into and expulsion from the United States are exclusively federal matters from which the States are excluded. *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration . . . and deportation"); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States [and] the period they may remain," and "the states are granted no such powers"); *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Arizona*, 567 U.S. at 409 ("the removal process is entrusted to the discretion of the Federal Government").[2]

---

[2] The federal government's exclusive authority derives from multiple constitutional sources, including the Federal Governments power 'to establish a uniform Rule of Naturalization,' its power 'to regulate Commerce with foreign Nations,' and its broad authority over foreign

In light of this unbroken line of precedent, the Fifth Circuit has likewise recognized that entry, exclusion, and deportation are exclusively federal matters. *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) (because "[p]olicies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted") (cleaned up); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 537 (5th Cir. 2013) (en banc); *Garcia v. Kerry*, 557 F. App'x 304, 308 (5th Cir. 2014).[3]  Other lower federal courts are in accord. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power."); *Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) (similar).  Even Texas's state courts recognize that "the matter of entry into the United States" is "wholly preempted by federal law," *Hernandez v. State*, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980), as are "matters involving deportation," *Gutierrez v. State*, 380 S.W.3d 167, 173, 176 (Tex. Crim. App. 2012).

Indeed, courts have struck down laws as preempted even when they only *indirectly* infringe on the federal government's power over entry and removal. *See, e.g.*, *Truax*, 239 U.S. at 42 (state regulation of noncitizens "opportunity of earning a livelihood" amounted to an impermissible regulation of their "entrance and abode"); *Alabama*, 691 F.3d at 1294-95 (state

---

affairs," *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (cleaned up, citations omitted); *see also Hines*, 312 U.S. at 62.

[3] While the preemption analysis of the housing ordinance at issue in *Farmers Branch* yielded disagreement and a number of separate opinions, *not one* member of the en banc Court disagreed with "the longstanding, unremarkable principle that the federal government's authority to exclude or remove foreign nationals . . . is necessarily exclusive of infringement by state or local legislation."  726 F.3d at 545(Dennis, J., specially concurring); *see id.* at 557 (Owen, J., concurring in part) ("the federal government undeniably has the exclusive power to determine questions of removal and deportation"); *id.* at 559 & n.77 (similar); *id.* at 567 (Jones, J., dissenting) (the Constitution "vests exclusive control over the 'authority to control immigration—to admit or exclude aliens— . . . solely in the Federal government'").

law limits on noncitizens' ability to enter into contract reflected a preempted "policy of expulsion"); *see also Gutierrez*, 380 S.W.3d at 170, 173 (striking down probation condition directing defendant to leave the United States). Here, Texas has *directly* regulated entry and authorized state deportations.

Consistent with this dominant federal interest, Congress's entry-and-removal regime is highly "pervasive." *Arizona*, 567 U.S. at 399 (internal quotation marks omitted). Through the INA, Congress has established an exceptionally detailed, complex, and finely reticulated regulatory framework governing the inspection, admission, and removal of noncitizens seeking to enter the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225, 1227, 1229c, 1229b, 1231; *see also Alabama*, 691 F.3d at 1294 (discussing "Congress's comprehensive statutory framework governing alien removal"). Congress has specifically provided that the INA's provisions shall be "the sole and exclusive procedure" for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States. 8 U.S.C. § 1229a(a)(3); *see Farmers Branch*, 726 F.3d at 537. To call the immigration statutes—and their implementing regulations and precedential administrative adjudications—comprehensive is an understatement; the immigration laws have "been described as second only to the Internal Revenue Code in complexity." *Singh v. Gonzales*, 499 F.3d 969, 980 (9th Cir. 2007) (cleaned up). And Congress has frequently amended this statutory scheme, including multiple significant amendments to the provisions most relevant here. *See Ga. Latino All.*, 691 F.3d at 1264 n.10 (discussing similar history of legislation to support field preemption) (citing *Pennsylvania v. Nelson*, 350 U.S. 497 (1956)).[4]

---

[4] *See, e.g.*, Immigration and Nationality Act, Pub. L. No. 414, 66 Stat. 163 (1952); Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 102; Illegal Immigration Reform and Immigrant Responsibility

In particular, Congress has extensively regulated individuals who enter between ports of entry—those whom Texas is attempting regulate through S.B. 4.  On one hand, as explained, the federal scheme contains a variety of enforcement mechanisms.  Congress has created multiple removal pathways, with detailed procedures and multiple layers of review by federal officials, including a special "expedited removal" system specifically for those who arrive at our borders without visas or other valid immigration documents.  *See, e.g.*, 8 U.S.C. §§ 1225(b)(1) (expedited removal procedures), 1229, 1229a (regular removal procedures), 1231(a)(5) (reinstatement of removal).  Congress has also criminalized entry and re-entry between ports of entry, along with efforts to assist or facilitate entry between ports.  *See id.* §§ 1325, 1326, 1323, 1324, 1327, 1328, 1329; *Ga. Latino All.*, 691 F.3d at 1264 (discussing the "larger context of federal statutes" addressing entry).  And Congress has provided a detailed set of standards and procedures for when people who enter between ports may be arrested and detained by federal officials.  *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A).  On the other hand, Congress has established numerous forms of relief from removal for people who enter between ports: Asylum is available "whether or not" a noncitizen arrives "at a designated port of arrival," *id.* § 1158(a)(1), and can be accessed through multiple procedural channels, *see id.* § 1225(b)(1)(B), 1158(d); 8 C.F.R. § 208.4.  Withholding of removal bars a person's removal to any country where they face persecution or torture.  *See* 8 C.F.R. § 1231(b)(3) and Note.  And Congress has given federal officials "broad discretion" to decide whether it makes sense to detain, remove, or prosecute in the first place.  *Arizona*, 567 U.S. at 398; 8 U.S.C. § 1103(a)(1), (a)(5).

---

Act of 1996, Pub. L. 104–208, Div. C, 110 Stat. 3009-546.  Further changes are proposed in every Congress—and are often a focus of intense national political debate.

Through these many intricate and interrelated provisions, Congress has established "a full set of standards governing" those who enter between ports, "including the punishment for noncompliance"—a system that is "designed as a 'harmonious whole.'"  *Arizona*, 567 U.S. at 401 (quoting *Hines*, 312 U.S. at 72).  As such, "States may not enter" this field "in any respect," and "even complementary state regulation is impermissible."  *Id*. at 401-02.

In sum, when it comes to regulating noncitizens' entry into the United States, their permission to remain, and their removal, the case for field preemption is straightforward.  Indeed, "[t]he regulation of immigration is *the* quintessential example of field preemption." *United States v. South Carolina*, 840 F. Supp. 2d 898, 913 (D.S.C. 2011), *aff'd,* 720 F.3d 518 (4th Cir. 2013) (emphasis added).  Probably for that very reason—and because for 150 years the Supreme Court has reiterated that states lack authority over such matters—no state has ever sought to seize the federal government's prerogatives and set up its own state-law alternative immigration system.  Until now.  S.B. 4 is unlawful and should be immediately enjoined.

### B.  S.B. 4 Conflicts with the Federal Immigration System.

In addition, S.B. 4 is conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in multiple respects.  *Arizona*, 567 U.S. at 399 (quoting *Hines,* 312 U.S. at 67).

*First*, S.B. 4 bypasses *all* of the defenses to removal that Congress has established. Perhaps most notably, as explained above, Congress carefully enshrined asylum and other protection from persecution and torture as defenses to removal, specifically providing that asylum would be available to individuals who enter the country between ports of entry.  *See* 8 U.S.C. §§ 1158(a)(1) (providing for asylum "whether or not at a designated port of arrival"), 1231(b)(3), 1231 note; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).  And when

10

Congress established the expedited removal system to address noncitizens arriving at our borders without valid visas, it took care to provide access to such humanitarian protections through the "credible fear" screening process. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B); *Grace v. Barr*, 965 F.3d 883, 887, 902 (D.C. Cir. 2020) (discussing credible fear process). Other relief is also available in the federal system, including special protections for unaccompanied minors and victims of crime and trafficking. 8 U.S.C. § 1232; 8 U.S.C. § 1101(a)(15)(T)-(U).

Under Texas's new immigration system, all this is wiped away. Noncitizens are arrested by state officers, held in state custody, and then ordered deported by state agents. Because this new process entirely sidesteps Congress's removal system, noncitizens will be subjected to state removal without the opportunity to seek asylum or other forms of humanitarian protection available under federal law. Indeed, S.B. 4 makes this explicit, providing that a "court may not abate the prosecution of an offense under" its new criminal provisions "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." S.B. 4. Tex. Code Crim. Proc. Art. 5B.003.[5]

A state cannot simply take away people's federal right to seek asylum or numerous other defenses to removal. Texas has impermissibly declared that noncitizens entering between ports "cannot be tolerated within its territory, without regard for any of the [federal] statutory processes or avenues for granting an alien permission to remain lawfully within the country." *Alabama*, 691 F.3d at 1295. But Congress's clear policy is that relief from removal, including

---

[5] If a noncitizen has been actually *granted* asylum, that fact provides an affirmative defense to the state illegal entry crime (although not to the illegal reentry crime). S.B. 4. § 51.02(c)(1)(B). But federal law enshrines the right to *seek* asylum, which, if eventually granted, precludes removal, *see* 8 U.S.C. § 1158(a)(1), (c)(1)(A)—a right S.B. 4 denies.

asylum, is available to individuals even when they enter the country between ports. S.B. 4 impermissibly rejects, obstructs, and frustrates that policy, and is accordingly preempted.

*Second*, S.B. 4 obstructs federal law by entirely wresting from the federal government *all* discretion over the immigration processing, prosecution, and removal of noncitizens entering between ports. "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Specifically, Congress has provided federal Executive Branch officials with a range of tools to address noncitizens entering between ports. Federal prosecutors may choose to bring criminal charges under 8 U.S.C. §§ 1325 or 1326; immigration officials may initiate ordinary removal proceedings, *id.* § 1229a, or expedited proceedings if applicable, *id.* § 1225(b)(1); and immigration agents or administrative hearing officers may exercise discretion to forego removal proceedings, defer removal, or take other discretionary action to ameliorate the potential harshness of the immigration laws. *see Arizona*, 567 U.S. at 396, 409. Indeed, in a case decided last term rejecting one of Texas's recent efforts to dictate immigration policy, the Supreme Court emphasized the federal government's broad discretion over questions of arrests, initiating removal proceedings, and removals, explaining that such discretion "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

But under S.B. 4, the federal government gets no say at all over whether a noncitizen is prosecuted, detained, or removed; it is entirely cut out of the process. The statute thus blatantly "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409; *Farmers Branch*, 726 F.3d at 534 (same); *id.* at 546 (Dennis, J., specially concurring) (same). Indeed, the violation is even starker here than in

*Arizona*, which involved state police conducting arrests but otherwise left the removal process in federal hands. *See Farmers Branch*, 726 F.3d at 534 (discussing *Arizona*). Here, Texas has enacted an unprecedented "usurpation of federal power over immigration"—leaving no federal discretion at all. *Toll*, 458 U.S. at 29 (Rehnquist, J., dissenting). That "is not a decision for [Texas] to make." *Alabama*, 691 F.3d at 1295 (statute conflict preempted where state had "taken it upon itself to unilaterally determine that any alien unlawfully present in the United States cannot live within the state's territory, regardless of whether the Executive Branch would exercise its discretion to permit the alien's presence"); *United States v. South Carolina*, 720 F.3d 518, 531-32 (4th Cir. 2013) (provisions preempted where they "improperly place in the hands of state officials the nation's immigration policy, and strip federal officials of the authority and discretion necessary in managing foreign affairs"); *Georgia Latino All.*, 691 F.3d at 1265 (similar, emphasizing discretion of federal prosecutors over immigration crimes); *cf. City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 179-80 (5th Cir. 2018) (holding state law did not interfere with federal discretion because it "require[d] a predicate federal *request* for assistance").

 *Third*, S.B. 4 also injects Texas directly into sensitive foreign policy matters reserved exclusively for the federal government. Determinations regarding the entry into the United States by foreign nationals, and their removal from it, "touch on foreign relations," and therefore "must be made with one voice." *Arizona*, 567 U.S. at 409; *see also Jama v. ICE*, 543 U.S. 335, 348 (2005) (similar). Indeed, the obvious danger that unilateral state immigration regulation could "embroil us in disastrous quarrels with other nations" has for 150 years been a cornerstone of the doctrine (explained above) that "[t]he passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States." *Chy*, 92 U.S. at 280; *see Hines*, 312 U.S. at 63-64 (similar). That risk is only heightened in this

case, as the United States has negotiated and committed to humanitarian international commitments, and Texas now proposes to toss those agreements aside.

Here, that general interference with federal foreign affairs authority is heightened because S.B. 4 has already created a direct conflict with national policy towards Mexico.  Under its terms, state judges order noncitizens—regardless of their nationality—"to return to the foreign nation from which the person entered," on penalty of even more severe punishment.  S.B. 4 Art. 5B.002(d).  For all (or nearly all) defendants, that will be Mexico.  *See* S.B. 4 § 51.02 (criminalizing entry into Texas "directly from a foreign country" and not at a port).

As the Supreme Court recently observed in rejecting another Texas effort to dictate immigration policy, given Mexico's sovereignty even the federal government "cannot unilaterally return . . . migrants to Mexico."  *Biden v. Texas*, 597 U.S. 785, 806 (2022).  The same is obviously true of Texas.  As the Court explained, the federal government's efforts to negotiate such returns with Mexico had "'played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.'"  *Id.* (internal quotation marks omitted).  The Court rejected Texas's proffered statutory interpretation, which would have "tie[d] the hands of the Executive" by allowing a court to supervise such foreign policy negotiations to obtain Mexican agreement.  *Id*.  Here, the interference with foreign policy is worse.  Rather than supervising federal negotiations, S.B. 4 purports to cut the federal government out entirely, as it would be Texas—not the United States—either negotiating with Mexico or ignoring Mexico's wishes and violating its sovereignty.[6]

---

[6] Notably, in response to S.B. 4's passage, Mexico stated that it "categorically rejects any measure that allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory."  Government of Mexico, Press Release 476 (Nov. 15, 2023),

*Fourth*, and finally, S.B. 4's new entry and re-entry crimes present an obstacle to Congress's criminal entry statutes and overall removal scheme. Indeed, that conclusion follows from the *en banc* Fifth Circuit's conclusions in *Farmers Branch*. There, the Court struck down an ordinance requiring noncitizens to be "lawfully present" as a condition to rent property, and establishing state criminal procedures to enforce that requirement. 726 F.3d at 526-27.[7]

Like the *Farmers Branch* ordinance, S.B. 4's entry and re-entry crimes "disrupt[] the federal immigration framework" by "allowing state officers to hold aliens in custody" for immigration crimes "without federal direction and supervision." *Farmers Branch*, 726 F.3d at 529 (cleaned up). Under Congress's system, "the federal government retains sole authority under the statute to prosecute, convict, and sentence offenders" for unlawful entry and reentry. *Id.* at 530. But S.B. 4 purports to grant "unilateral state authority to prosecute as well as to detain" for parallel state entry crimes. *Id*. at 534. Because even "the fact of a common end" cannot "neutralize[] conflicting means," S.B. 4—no less than the *Farmers Branch* ordinance— "interferes with the careful balance struck by Congress with respect to" entry crimes. *Id*. at 528, 531 (cleaned up); *see also Alabama*, 691 F.3d at 1287 (finding state analog to 8 U.S.C. § 1324 conflict preempted for similar reasons); *Ga. Latino All.*, 691 F.3d at 1266 ("Each time a state enacts its own parallel to the INA, the federal government loses control over enforcement of the INA, thereby further detracting from the integrated scheme of regulation created by Congress.") (cleaned up).

---

https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-immigrant-legislation-passed-in-texas?idiom=en; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 382-85 (2000) (citing protests lodged by foreign nations as evidence that state statute interfered with federal foreign policy).

[7] Judge Higginson wrote the lead opinion for five judges. Judge Dennis's special concurrence for four more judges largely agreed with Judge Higginson's analysis but explained that the ordinance was "even more fundamentally flawed." 726 F.3d at 543-44.

Nor is that the only problem.  For example, the state re-entry crime is far broader than the corresponding federal statute.  A noncitizen cannot be convicted of the latter if she has obtained federal "consent" to again seek admission to the United States.  8 U.S.C. § 1326(a)(2)(A).  So, for example, a noncitizen previously removed from the United States who has access to an immigrant visa may seek and obtain federal consent to return to the United States and be admitted as a lawful permanent resident.  *See United States v. Sanchez-Milam*, 305 F.3d 310, 312 (5th Cir. 2002) (per curiam); 8 C.F.R. § 212.2(d).  That person is not subject to federal prosecution under § 1326(a)(2)(A).  But the new Texas law contains no such limitation.  *See* S.B. 4 §51.03 (criminalizing noncitizen "found in this state after" she "has been . . . removed").  Indeed, unlike the new state *entry* crime, nothing in S.B. 4 curtails the vastly wider scope of the state re-entry provision.  *Cf.* S.B. 4 §51.03(c)(2) (providing affirmative defense, inapplicable to re-entry crime, where "the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a)").  The result is that people who the federal government has expressly permitted to return to the United States, and who have been granted long-term legal status, are nevertheless criminalized by Texas.  This represents an enormous and "'untenable expansion of the federal [reentry] provision." *Farmers Branch*, 726 F.3d at 531 n.9 (quoting *Alabama*, 691 F.3d at 1288).

Finally, the entry provision also incorporates a key flaw emphasized by *Farmers Branch*: empowering "state courts to assess the legality of a non-citizen's presence."  *Id*. at 536.  Under S.B. 4, state courts are tasked with deciding who "the federal government has granted . . . lawful presence in the United States."  S.B. 4 § 51.02(c)(1).  That term has no general meaning in immigration law that applies to the question of whether a noncitizen should be permitted to enter or allowed to remain in the United States; rather, as noted above, those questions are answered through federal removal proceedings as well as Executive discretion.  Therefore, as in *Farmers*

*Branch*, there is "no definition that would be applicable" to these state criminal proceedings, thus "opening the door to conflicting state and federal rulings on the question." 726 F.3d at 533, 536.[8]  And S.B. 4 similarly requires state courts to make numerous other determinations about federal immigration law that may conflict with federal determinations.  *See, e.g.*, S.B. 4 § 51.02(c)(2) (whether conduct violates 8 U.S.C. § 1325(a)); S.B. 4 § 51.03(b)(1) (whether prior removal was based on 8 U.S.C. § 1182(a)(3)(B) or 1231(a)(4)(B)).

## II.     The Equities Strongly Favor an Injunction.

### A.  Plaintiffs Have Standing and S.B. 4 Will Irreparably Harm Them.

S.B. 4 directly conflicts with and frustrates the mission of the El Paso based Plaintiff Las Americas Immigrant Advocacy Center, which is dedicated to serving those must vulnerable to removal to seek relief through the federal immigration system.[9]  Babaie Dec. ¶¶ 3, 11, 12.  *See N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (injury where an organization's "ability to pursue its mission is 'perceptibly impaired' by the need to divert resources "to counteract the defendant's conduct."). Las Americas currently serves its clients, many of whom have entered the state between ports, in the community and in federal immigration detention.  *Id.* ¶¶ 26-29.  S.B. 4 will instead place these clients in state and local jails and prisons, and result in their removal under state law, outside the federal removal processes.  *Id.* ¶¶ 30, 40-41.

Las Americas will need to develop an entirely new program to identify, counsel, and advocate for noncitizens in state and local jails so that they can attempt obtain asylum and other

---

[8] Indeed, the en banc Fifth Circuit was *unanimous* in concluding that state court's unilateral assessment of lawful presence was preempted.  *See* 726 F.3d at 549 (Dennis, J., concurring); *id*. at 558-59 (Owen, J., concurring in part); *id*. at 584 (Jones, J., dissenting).

[9] The plaintiffs have an equitable cause of action to challenge S.B. 4 as preempted.  *See Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*, 76 F.4th 425, 433-35 (5th Cir. 2023).

17

protections from removal.  *Id.* ¶¶ 30-31.  Las Americas has no such program in place, and will need to "divert resources from its usual activities in order to lessen [S.B 4's] harm to its mission."  *Lewis v. Hughs,* 475 F. Supp. 3d 597, 612 (W.D. Tex. 2020) (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982)).  Las Americas will necessarily have to divert resources from community representation to the resource intensive process of representing people detained under S.B. 4, decreasing the total number of people served in obtaining immigration relief.  Babaie Decl. ¶ 38.  S.B. 4 will curtail Las Americas' specific program to assist victims of crime regularize status through immigration visas such as U and T Visas. *Id.* ¶¶ 44-49. Cooperating with law enforcement in reporting and investigating crimes is a necessary predicate to relief, but S.B. 4 now exposes noncitizens who report crimes to arrest and removal.

Plaintiff American Gateways is dedicated to providing free immigration assistance to noncitizens in Texas, with a particular focus on asylum representation.  Yang Decl. ¶¶ 12-13.  American Gateways provides assistance in *federal* immigration detention facilities and in *federal* removal proceedings.  *Id.*  ¶¶ 8, 13.  S.B. 4 will place American Gateways' clients—the majority of whom have entered without inspection—into a separate state system, severely impacting American Gateways' ability to ensure their access to protections.  *Id.*  ¶¶ 18, 22.  This shift will impact American Gateways' operations and efficacy, as the organization must divert resources to provide additional representation to clients who must seek asylum but face removal by the State under S.B. 4.  *Id.*  ¶¶ 22-24.

The County of El Paso will bear the costs of implementing a law that it believes to "violate[] the Supremacy Clause of the constitution because it is inconsistent with" the INA, and inconsistent with the County's own values.  *City of Alpine v. Abbot*, 730 F. Supp. 2d 630, 632 (W.D. Tex. 2010) ("where a suit by a political subdivision against its state creator is based on a

constitutional provision that protects structural rights — such as the Supremacy Clause — the political subdivision may sue"); *see also Rogers v. Brockette*, 588 F.2d 1057 (5th Cir.1979). The County will have to pay to hold defendants charged under the law in its jails (likely requiring new jail space), provide counsel for indigent defendants, and train and hire Sheriff staff, police officers, and court personnel; moreover, the demands will frustrate its goal of minimizing incarceration of low public safety risk persons. Carillo Decl. ¶¶ 11-13. A drastic increase in expenditures will likely require elimination of programs or an increase in taxation. *Id.* ¶ 15. S.B. 4 will erode the public trust the County has set as a strategic goal, and cause families to fear that interaction with County services, including domestic violence and child protective services, will result in removal. Gutierrez Decl. ¶ 18. S.B. 4 will frustrate the Counties' programming to integrate its diverse community local agencies and officers, including the Office of New Americans (ONA) and the migrant support services center. *Id.* ¶¶ 8-13.

### B. The Balance of Equities and Public Interest Support an Injunction

The State has no legitimate interest in enforcing an unconstitutional law or regulating in an exclusively federal arena. *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (states faced no injury from injunction of preempted regulation); *Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation").

The public interest also clearly favors an injunction. States' "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301. That is particularly so where state action invades federal domains, and interferes with federal foreign relations. *See, e.g.*, *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013). Furthermore, under S.B. 4, individuals crossing the border into the United States—including those fleeing persecution and torture—will be arrested, prosecuted, and

19

removed without any opportunity to raise federal defenses to removal. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). That harm is acute because S.B. 4 directs that noncitizens be removed to Mexico, where it is well documented that migrants face truly extraordinary dangers of abduction, rape, torture, and death. *See* Junaid Decl., Exh. 1-20 (documenting harms to asylum seekers in Mexico); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (pointing to "stomach-churning evidence of death, torture, and rape" caused by policy of expelling migrants, primarily to Mexico). S.B. 4 contains no prohibition on enforcement against parents, who would likely have to be separated from their children for prosecutions to take place. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1148-49 (S.D. Cal. 2018) (enjoining government policy of separating noncitizen families).

S.B. 4 applies to the interior, and is not limited to very recent entrants, and thus threatens to rip individuals away from their families and communities years after they entered the country. Even those who have status will fear being targeted and racially profiled. *See Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979-980 (D. Ariz. 2011); Junaid Decl., Exh. 21 (documenting racial profiling in state policing of the border). Noncitizens and their families will fear that interaction with officials, to report crimes, or obtain assistance, will result in their removal. S.B. 4 will erode the public trust that governments like the County have worked to create with migrant communities that is integral to public safety. *See Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y. 2020) (enjoining public charge rule because of chilling effect the rule had on immigrants seeking services).

## CONCLUSION

The Court should grant a preliminary injunction.

| | |
|---|---|
| Dated: January 12, 2024 | /s/ Cody Wofsy |
| | Cody Wofsy |
| David A. Donatti (TX Bar No. 24097612) | Spencer Amdur |
| Adriana C. Piñon (TX Bar No. 24089768) | Hannah Schoen |
| AMERICAN CIVIL LIBERTIES UNION OF | Morgan Russell |
| TEXAS | AMERICAN CIVIL LIBERTIES |
| P.O. Box 8306 | UNION FOUNDATION |
| Houston, TX 77288 | IMMIGRANTS' RIGHTS PROJECT |
| Telephone: (713) 942-8146 | 39 Drumm Street |
| Facsimile: (713) 942-8966 | San Francisco, CA 94111 |
| ddonatti@aclutx.org | T: (415) 343-0770 |
| apinon@aclutx.org | F: (415) 395-0950 |
| | cwofsy@aclu.org |
| *For Plaintiffs Las Americas Immigrant* | samdur@aclu.org |
| *Advocacy Center, American Gateways, and* | hschoen@aclu.org |
| *County of El Paso* | mrussell@aclu.org |
| | |
| Tamara F. Goodlette (TX Bar No. 24117561) | Anand Balakrishnan |
| Erin D. Thorn (TX Bar No. 24093261) | Omar Jadwat |
| Daniel Hatoum (TX Bar No. 24099136) | Lee Gelernt |
| TEXAS CIVIL RIGHTS PROJECT | Wafa Junaid |
| 1017 W. Hackberry Ave. | AMERICAN CIVIL LIBERTIES |
| Alamo, TX 78516 | UNION FOUNDATION |
| Telephone: (512) 474-5073, ext. 207 | IMMIGRANTS' RIGHTS PROJECT |
| Facsimile: (956) 787-6348 | 125 Broad St., 18th Floor |
| tami@texascivilrightsproject.org | New York, NY 10004 |
| erin@texascivilrightsproject.org | T: (212) 549-2660 |
| daniel@texascivilrightsproject.org | F: (212) 549-2654 |
| | abalakrishnan@aclu.org |
| *For Plaintiffs Las Americas Immigrant* | ojadwat@aclu.org |
| *Advocacy Center and American Gateways* | lgelernt@aclu.org |
| | wjunaid@aclu.org |
| Jo Anne Bernal, (TX Bar No. 02208720) | |
| El Paso County Attorney | *For Plaintiffs Las Americas Immigrant* |
| 320 S. Campbell St., Suite 200 | *Advocacy Center, American Gateways,* |
| El Paso, Texas 79901 | *and County of El Paso* |
| Tel: (915) 273-3247 | |
| joanneb@epcounty.com | |
| | |
| Bernardo Rafael Cruz, (TX Bar No. 24109774) | |
| Assistant County Attorney | |
| 320 S. Campbell St., Suite 200 | |
| El Paso, Texas 79901 | |
| Tel: (915) 273-3247 | |
| b.cruz@epcounty.com | |
| | |
| *For Plaintiff County of El Paso* | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2024, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this document has been served via the Court's CM/ECF system on all counsel of record.

*/s/ Cody Wofsy*
Cody Wofsy

# Exhibit E: ECF 25, Defendants' Consolidated Response to Motions for Preliminary Injunction

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

UNITED STATES OF AMERICA,

    *PLAINTIFF,*

V.

THE STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

    *DEFENDANTS.*

CASE NO. 1:24-CV-00008-DAE (LEAD CASE)

CONSOLIDATED WITH 1:23-CV-1537-DAE

## DEFENDANTS' CONSOLIDATED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Index of Authorities ................................................................................................... iii

Background ................................................................................................................... 1

Standard of Review ..................................................................................................... 9

Argument ................................................................................................................... 10

    I.   Plaintiffs are not likely to succeed on the merits .............................................. 10

        A.  SB4 is not preempted because it comports—rather than "conflicts"—with federal immigration laws. ........................................................................... 11

        B.  No provision of SB4 is field preempted. ........................................................ 15

        C.  To the extent "field" preemption remains viable at all, SB4 is not preempted when the federal government has abandoned the "field" it now purports to occupy. .......................................................................................................... 19

        D.  Texas is entitled to defend itself from invasion when the federal government abdicates its own duties—and *Arizona* never said anything to the contrary .. 22

        E.  The Foreign Commerce Clause does not prohibit States from proscribing illicit cross-border traffic of goods and people. ................................................... 31

        F.  All Plaintiffs face justiciability problems that bar this Court from awarding relief. ........................................................................................................... 35

    II.  Plaintiffs cannot satisfy the remaining factors for injunctive relief. ...................... 53

        A.  Allowing Texas to enforce state criminal laws that track federal criminal laws already on the books would not inflict irreparable harm on the Plaintiffs ...... 54

        B.  The equities do not favor Plaintiffs, who either ignore their obligations under federal law or rest their injury on anticipated criminal entry. ........................ 55

        C.  Enforcing SB4 to deter drug smuggling, human trafficking, and terrorism is in the public interest. ........................................................................................ 56

    III. Other equitable considerations caution against broadly enjoining SB4. ............... 58

        A.  Abstention doctrines caution against entertaining this pre-enforcement challenge. ...................................................................................................... 58

        B.  The Court should not enjoin the enforcement of constitutional applications of SB4. ............................................................................................................... 60

        C.  If the Court enters an injunction on behalf of the Organizational Plaintiffs, it should not protect any non-parties. ............................................................. 62

Conclusion ................................................................................................................. 62

CERTIFICATE OF SERVICE ......................................................................................... 64

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*S. Pac. Co. v. Arizona ex rel. Sullivan*,
    325 U.S. 761 (1945) .............................................................................32

*Abbott v. Biden*,
    70 F.4th 817 (5th Cir. 2023) ...............................................................25

*In re Abbott*,
    954 F.3d 772 (5th Cir. 2020), *vacated as moot*, 141 S. Ct. 1261 (2021)....................................61

*In re Abbott*,
    956 F.3d 696 (5th Cir. 2020), *cert. granted, judgment vacated as moot sub nom,*
    *Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021) .........................................52

*In re Academy, Ltd.*,
    625 S.W.3d 19 (Tex. 2021).................................................................14

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)...................................................... 36, 38, 39, 40

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) (Ginsburg, J., dissenting) .......................................34

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................. *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) .....................................................................36, 42

*Arnone v. Dallas Cnty.*,
    29 F.4th 262 (5th Cir. 2022) ...............................................................51

*Ass'n of Cmty. Organizations for Reform Now v. Fowler*,
    178 F.3d 350 (5th Cir. 1999) ..............................................................47

*Ayotte v. Planned Parenthood of Northern New England*,
    546 U.S. 320 (2006) .....................................................................60, 61

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979) .........................................................................58

*Barber v. Bryant*,
    860 F.3d 345 (5th Cir. 2017) .......................................................................... 41

*Barclays Bank, PLC v. Franchise Tax Bd. of Cal.*,
    512 U.S. 298 (1994) ........................................................................................34

*Bas v. Tingy*,
    4 U.S. (4 Dall.) 37 (1800) (Washington, J.) ............................................... 24

*Booth v. Galveston Cnty.*,
    352 F.3d 718 (S.D. Tex. 2019) ..................................................................... 51

*Brown v. United States*,
    12 U.S. (8 Cranch) 110 (1814) .....................................................................27

*Bruni v. Hughs*,
    468 F. Supp. 3d 817 (S.D. Tex. 2020) ........................................................50

*Builder Recovery Servs., LLC v. Town of Westlake*,
    650 S.W.3d 499 (Tex. 2022) ......................................................................... 61

*Cal. Coastal Comm'n v. Granite Rock Co.*,
    480 U.S. 572 (1987) ....................................................................................... 31

*California v. Texas*,
    141 S. Ct. 2104 (2021) ................................................................................... 61

*California v. United States*,
    104 F.3d 1086 (9th Cir. 1997) ......................................................................23

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
    520 U.S. 564 (1997) ................................................................................ 34, 53

*Canal Auth. of State of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ..........................................................................9

*CASA de Maryland, Inc. v. Trump*,
    971 F.3d 220 (4th Cir. 2020), *vacated on other grounds*, 981 F.3d 311 (4th Cir.
    2020) ............................................................................................................... 44

*Chacon v. Granata*,
    515 F.2d 922 (5th Cir. 1975) ........................................................................53

*Chae Chan Ping v. United States*,
    130 U.S. 581 (1889) .......................................................................................33

*Chamber of Commerce of U.S. v. Whiting,*
563 U.S. 582 (2011) ................................................................ 11, 13, 21

*Chiles v. United States,*
69 F.3d 1094 (11th Cir. 1995) ................................................................ 23

*Chy Lung v. Freeman,*
92 U.S. ................................................................................................ 32

*City of Austin v. Paxton,*
943 F.3d 993 (5th Cir. 2019) ................................................................ 52

*City of Georgetown v. Alexandria Canal Co.,*
37 U.S. (12 Pet.) 91 (1838) ................................................................ 37

*City of Trenton v. New Jersey,*
262 U.S. 182 (1923) ................................................................ 47

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................ *passim*

*Commonwealth of Mass. v. Mellon,*
262 U.S. 447 (1923) ................................................................ 62

*Ctr. for Biological Diversity v. United States Envtl. Prot. Agency,*
937 F.3d 533 (5th Cir. 2019) ................................................................ 41

*Davis v. Passman,*
442 U.S. 228 (1979) ................................................................ 35

*In re Debs,*
158 U.S. 564 (1895) ................................................................ 37, 38

*DeCanas v. Bica,*
424 U.S. 351 (1976) ................................................................ 15, 16, 18

*Def. Distributed v. U.S. Dep't of State,*
No. 1:15-cv-372, 2018 WL 3614221 (W.D. Tex. July 27, 2018) ................................................................ 45

*Denver & R.G.R. Co. v. United States,*
241 F. 614 (8th Cir. 1917) ................................................................ 35

*Doran v. Salem Inn, Inc.,*
422 U.S. 922 (1975) ................................................................ 61

*Dorchy v. Kansas,*
264 U.S. 286 (1924) ................................................................ 61

*Douglas v. Indep. Living Ctr. of S. Cal., Inc.*,
132 S. Ct. 1204 (2012) (Roberts, C.J., dissenting, joined by Scalia, Thomas,
and Alito, JJ.) ............................................................................................ 40

*Edelman v. Jordan*,
415 U.S. 651 (1974) ................................................................................... 51

*El Paso County v. Trump*,
982 F.3d 332 (5th Cir. 2020) ..................................................................... 41

*English v. General Elec. Co.*,
496 U.S. 72 (1990) ..................................................................................... 13

*Equal Access Educ. v. Merten*,
305 F. Supp. 2d 585 (E.D. Va. 2004) ......................................................... 33

*Esteves v. Brock*,
106 F.3d 674 (5th Cir. 1997) ..................................................................... 51

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) ................................................................................... 15

*Florida v. United States*,
660 F. Supp. 3d 1239 (N.D. Fla. 2023) ...................................................... 20

*Freedom From Religion Found., Inc. v. Mack*,
4 F.4th 306 (5th Cir. 2021) ....................................................................... 38

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990) ................................................................................... 41

*Gann v. United States*,
142 S. Ct. 1 (2021) ..................................................................................... 37

*Gilbert v. Minnesota*,
254 U.S. 325 (1920) ................................................................................... 12

*Graber v. Fuqua*,
279 S.W.3d 608 (Tex. 2009) ...................................................................... 11

*Green Valley Special Util. Dist. v. City of Schertz*,
969 F.3d 460 (5th Cir. 2020) (Oldham, J., concurring) .............................. 39

*Guy v. Baltimore*,
100 U.S. 434 (1880) ................................................................................... 31

*Hafer v. Melo,*
　502 U.S. 21 (1991) ............................................................................. 51

*Haitian Refugee Center v. Gracey,*
　809 F.2d 794 (D.C. Cir 1987) (Bork, J.) ................................................ 46

*Harman v. Forssenius,*
　380 U.S. 528 (1965) ........................................................................... 58

*Harris Cnty. Comm'rs Court v. Moore,*
　420 U.S. 77 (1975) ............................................................................. 59

*Henderson v. Mayor of City of New York,*
　92 U.S. (2 Otto) 259 (1875) ........................................................... 32, 33

*Hernandez v. Mesa,*
　140 S. Ct. 735 (2020) ......................................................................... 39

*Hersh v. U.S. ex rel. Mukasey,*
　553 F.3d 743 (5th Cir. 2008) ............................................................... 30

*Hines v. Davidowitz,*
　312 U.S. 52 (1941) ............................................................................. 33

*House v. Mayes,*
　219 U.S. 270 (1911) ........................................................................... 29

*Huron Portland Cement Co. v. City of Detroit,*
　362 U.S. 440 (1960) ........................................................................... 11

*Int'l Shoe Co. v. Pinkus,*
　278 U.S. 261 (1929) ........................................................................... 19

*Japan Line v. Los Angeles,*
　441 U.S. 434 (1979) ........................................................................... 34

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't,*
　849 F.3d 615 (5th Cir. 2017) ............................................................... 42

*Jones v. Wells Fargo Bank, N.A.,*
　No. 5-14-cv-943, 2015 WL 12734177 (W.D. Tex. Jan. 21, 2015) ............... 36

*Kansas v. Garcia,*
　140 S. Ct. 791 (2020) .................................................................. *passim*

*Kurns v. R.R. Friction Prods. Corp.,*
　565 U.S. 625 (2012) (Kagan, J., concurring) ......................................... 19

*Lafler v. Cooper*,
566 U.S. 156 (2012) (Scalia, J., dissenting) ...................................................54

*Lane v. Holder*,
703 F.3d 668 (4th Cir. 2012) ..................................................................44, 45

*Las Americas Immigrant Advocacy Center v. McCraw*,
1:23-cv-1537 (W.D. Tex.) .................................................................................1

*Leavitt v. Jane L.*,
518 U.S. 137 (1996) ..........................................................................................61

*Lebo v. State*,
90 S.W.3d 324 (Tex. Crim. App. 2002) .......................................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ..........................................................................................35

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................................... 41, 43, 49

*Martin v. Mott*,
25 U.S. (12 Wheat.) 19 (1827) (Story, J.) ...................................................25

*Mathews v. Diaz*,
426 U.S. 67 (1976) ............................................................................................33

*Mayor of New York v. Miln*,
36 U.S. (11 Pet.) 102 (1837) ..........................................................................32

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam) ....................................................... 9, 39, 42

*McKenzie v. City of Chicago*,
118 F.3d 552 (7th Cir. 1997) ..........................................................................61

*McKinley v. Abbott*,
643 F.3d 403 (5th Cir. 2011) ..........................................................................51

*Medellin v. Texas*,
552 U.S. 491 (2008) ...................................................................................35, 54

*Melendez v. City of New York*,
16 F.4th 992 (2d Cir. 2021) ............................................................................24

*Mi Familia Vota v. Abbott*,
977 F.3d 461 (5th Cir. 2020) ..........................................................................52

*Michelin Tire Corp. v. Wages*,
    423 U.S. 276 (1976) ................................................................................ 32

*Miller v. United States*,
    78 U.S. 268 (1870) ................................................................................ 24

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) .................................................................. 10

*Moore v. La. Bd. of Elementary & Secondary Educ.*,
    743 F.3d 959 (5th Cir. 2014) .................................................................. 40

*Moyer v. Peabody*,
    212 U.S. 78 (1909) (Holmes, J.) ............................................ 23, 25, 29

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ............................................................ 41, 43

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) .......................................................................... 32, 33

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) .................................................................. 15

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ............................................................... 44

*Nat'l Treasury Emps. Union v. United States*,
    929 F. Supp. 484 (D.D.C. 1996) ............................................................ 47

*Nationwide Mut. Ins. Co. v. Unauthorized Prac. of L. Comm., of State Bar of Texas*,
    283 F.3d 650 (5th Cir. 2002) .................................................................. 59

*Ne. Ohio Coal. for Homeless v. Blackwell*,
    467 F.3d 999 (6th Cir. 2006) .................................................................. 41

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ............................................................ 58, 59

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996) ..................................................................... 23

*New York v. New Jersey*,
    143 S. Ct. 918 (2023) ............................................................................. 55

*Nichols v. Alcatel USA, Inc.*,
    532 F.3d 364 (5th Cir. 2008) .................................................................. 53

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................55

*Novedea Sys., Inc. v. Colaberry, Inc.*,
   No. 6:20-cv-180, 2020 WL 9211073 (E.D. Tex. Dec. 11, 2020) ............36

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ................................................................54

*Padavan v. United States*,
   82 F.3d 23 (2d Cir. 1996) ..........................................................23

*Parker Drilling Mgmt. Serv., Ltd. v. Newton*,
   139 S. Ct. 1881 (2019) ..............................................................12

*Parker v. Brown*,
   317 U.S. 341 (1943) ................................................................20

*Pennhurst State Sch. & Hosp. v. Halderman*,
   465 U.S. 89 (1984) ..................................................................51

*Ex parte Perry*,
   483 S.W.3d 884 (Tex. Crim. App. 2016) ........................................14

*Piazza's Seafood World, LLC v. Odom*,
   448 F.3d 744 (5th Cir. 2006) ......................................................32

*Portee v. Morath*,
   No. 1:23-cv-551, 2023 WL 4688528 (W.D. Tex. July 21, 2023) ............55

*Preiser v. Rodriguez*,
   411 U.S. 475 (1973) ................................................................39

*Railroad Comm'n of Tex. v. Pullman Co.*,
   312 U.S. 496 (1941) ................................................................58

*Richardson v. Tex. Sec'y of State*,
   978 F.3d 220 (5th Cir. 2020) ......................................................55

*Rose v. Raffensperger*,
   584 F. Supp. 3d 1278 (N.D. Ga. 2022) ..........................................23

*Roy v. City of Monroe*,
   950 F.3d 245 (5th Cir. 2020) ......................................................58

*Rucho v. Common Cause*,
   139 S. Ct. 2484 (2019) ..............................................................23

*Sabine Consol., Inc. v. State,*
   806 S.W.2d 553 (Tex. Crim. App. 1991) ............................................... 14

*SBC Commc'ns, Inc. v. FCC,*
   154 F.3d 226 (5th Cir. 1998) ............................................................... 27

*Seals v. McBee,*
   898 F.3d 587 (5th Cir. 2018) ............................................................... 43

*Seminole Tribe of Florida v. Florida,*
   517 U.S. 44 (1996) ............................................................................... 39

*Siegel v. LePore,*
   234 F.3d 1163 (11th Cir. 2000) ........................................................... 53

*Smith v. Turner,*
   48 U.S. (7 How.) 283 (1849) (McLean, J.) ........................................... 22

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ........................................................ 40, 45

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ........................................................................ 36, 41

*Sterling v. Constantin,*
   287 U.S. 378 (1932) ...................................................................... 23, 25

*Stockton v. Offenbach,*
   336 S.W.3d 610 (Tex. 2011) ............................................................... 14

*Stringer v. Whitley,*
   942 F.3d 715 (5th Cir. 2019) ............................................................... 41

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ............................................................................ 45

*Sumner v. Mata,*
   449 U.S. 539 (1981) ............................................................................ 23

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ...................................................................... 42, 43

*Sveen v. Melin,*
   584 U.S. 811 (2018) (Gorsuch, J., dissenting) ................................... 24

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
   139 S. Ct. 2449 (2019) ....................................................................... 34

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020) ...................................................52

*Texas All. for Retired Americans v. Scott,*
    28 F.4th 669 (5th Cir. 2022) ...................................................52

*Texas v. Biden,*
    20 F.4th 928 (5th Cir. 2021), *rev'd,* 142 S. Ct. 2528 (2022) ..................... 20

*Texas v. DHS,*
    No. 2:23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.) ............... *passim*

*Texas v. Florida,*
    306 U.S. 398 (1939) ...................................................35

*Texas v. White,*
    74 U.S. (7 Wall.) 700 (1868) ................................................... 22

*Toledo v. State,*
    519 S.W.3d 273 (Tex. App.–Houston [1st Dist.] 2017) ...................................................14

*Town of Ball v. Rapides Par. Police Jury,*
    746 F.2d 1049 (5th Cir. 1984) ...................................................47, 48

*McCarthy ex rel. Travis v. Hawkins,*
    381 F.3d 407 (5th Cir. 2004) ...................................................52

*Truax v. Raich,*
    239 U.S. 33 (1915) ...................................................17

*United States v. Abbott,*
    No. 1:23-cv-853, 2023 WL 5740596 (W.D. Tex. Sept. 6, 2023), *aff'd,* 87 F.4th
    616 (5th Cir. 2023), *reh'g en banc granted, opinion vacated,* 90 F.4th 870 (5th
    Cir. 2024) ...................................................8

*United States v. Abbott,*
    No. 23-50632, 2023 WL 6376357 (5th Cir. Sept. 21, 2023) ...................................................10

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ...................................................56

*United States v. California,*
    655 F.2d 914 (9th Cir. 1980) ...................................................35

*United States v. City of Jackson,*
    318 F.2d 1 (5th Cir. 1963) ...................................................38

*United States v. City of Philadelphia,*
    644 F.2d 187 (3d Cir. 1980)..................................................................38

*United States v. Cooley,*
    141 S. Ct. 1638 (2021) ....................................................................... 24

*United States v. Hansen,*
    143 S. Ct. 1932 (2023) .........................................................................30

*United States v. Hansen,*
    599 U.S. 762 (2023) .............................................................................54

*United States v. Hartford Acc. & Indem. Co.,*
    460 F.2d 17 (9th Cir. 1972) ................................................................36

*United States v. Mattson,*
    600 F.2d 1295 (9th Cir. 1979) ...........................................................38

*United States v. Solomon,*
    563 F.2d 1121 (4th Cir. 1977) ...........................................................37

*United States v. Texas,*
    557 F. Supp. 3d 810 (W.D. Tex. 2021) ..............................................36

*United States v. Texas,*
    No. EP-21-cv-173, 2022 WL 868717 (W.D. Tex. Feb. 17, 2022) (Cardone, J.) ...................... 42

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) .............................................................................27

*United Steelworkers of Am. v. United States,*
    80 S. Ct. 177 (1959) (Frankfurter, J., concurring) ...............................37

*Va. Office for Prot. & Advocacy v. Stewart,*
    563 U.S. 247 (2011) (Kennedy, J., concurring, joined by Thomas, J.)...................................40

*Virginia Uranium, Inc. v. Warren,*
    139 S. Ct. 1894 (2019) (lead opinion of Gorsuch, J., joined by Thomas and Kavanaugh, JJ.) .................................................................19

*Virginia v. Hicks,*
    539 U.S. 113 (2003) .............................................................................61

*Vote.Org v. Callanen,*
    39 F.4th 297 (5th Cir. 2022) ...............................................................55

*Wardair Canada, Inc. v. Fla. Dep't of Revenue*,
    477 U.S. 1 (1986) ...................................................................................34

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ...............................................................................55

*In re Wiles*,
    No. 08-18-00177-CR, 2019 WL 1810756 (Tex. App.—El Paso Apr. 24, 2019) ...................... 13

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ............................................................................ 39, 51

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ......................................................................... 9, 10, 55

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
    248 F.3d 411 (5th Cir. 2001) ...................................................................10

*Wyandotte Transportation Co. v. United States*,
    389 U.S. 191 (1967) ............................................................................ 37, 38

*Ex parte Young*,
    209 U.S. 123 (1908).......................................................................... *passim*

*Younger v. Harris*,
    401 U.S. 37 (1971) ..................................................................................59

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................................ 38, 39

*Zimmerman v. City of Austin*,
    881 F.3d 378 (5th Cir. 2018)................................................................. 43, 52

**Statutes**

8 U.S.C. § 1101(a)(15)(T)(i) ........................................................................ 18

8 U.S.C. § 1324(c) .......................................................................................... 15

8 U.S.C. § 1325 ......................................................................................... 9, 17

8 U.S.C. §§ 1325 and 1326 ........................................................................... 17

8 U.S.C. §§ 1325, 1326, 1327........................................................................ 20

8 U.S.C. §1325(a) ..................................................................................... 12, 17

8 U.S.C. § 1325(a)(1) .............................................................................. 11

8 U.S.C. § 1326(a) .............................................................................. 12, 17

8 U.S.C. § 1326(b) .............................................................................. 12

18 U.S.C. § 758 .............................................................................. 15, 18

18 U.S.C. §§ 3559(a)(5), 3571(b)(3) .......................................................... 12

18 U.S.C. §§ 3559(a)(7), 3571(b)(6) .......................................................... 12

22 U.S.C. § 7105(c)(3)(C)(i) .................................................................. 15

42 U.S.C. § 1983 .............................................................................. 39

Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001) ................................ 27

1 Stat. 264 .................................................................................... 27

1 Stat. 424 .................................................................................... 27

TEX. CODE CRIM. PROC. Art. 2.251(a) ...................................................... 13

TEX. CODE CRIM. PROC. Art. 5B.002 ........................................................ 16

TEX. CODE CRIM. PROC. Art. 5B.002(c)(1) .................................................. 16

TEX. CODE CRIM. PROC. Art. 5B.002(c), (d) ................................................ 12

TEX. CODE CRIM. PROC. ch. 5B ................................................................ 9

TEX. GOV'T CODE § 411.002 .................................................................... 51

TEX. PENAL CODE ch. 51 ........................................................................ 9

TEX. PENAL CODE §§ 51.02 ..................................................................... 17

TEX. PENAL CODE § 51.02(b) ................................................................... 12

TEX. PENAL CODE § 51.02(c)(1)–(2) ........................................................... 9

TEX. PENAL CODE § 51.02(c)(2) ............................................................... 17

TEX. PENAL CODE § 51.02(c)(3) ................................................................ 9

TEX. PENAL CODE § 51.03(b) ................................................................... 12

Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ § 51.04(a) ........................................................................12

**Other Authorities**

Wright & Miller, 17A Fed. Prac. & Proc. Juris. § 4242 (3d ed.) ......................................59

1 Noah Webster, American Dictionary of the English Language 113 (1828) ................................ 28

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 42 .......................................35

Dictionary of the English Language 164 (1806) ................................................. 28

Federal Constitution 413–14 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836) ...................26

Jennifer Gordon, *Immigration as Commerce: A New Look at the Federal Immigration Power and the Constitution*, 93 Ind. L.J. 653, 671 (2018) ......................................... 33

John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 999 (2008) ................................. 40

John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 ........................35

Julian G. Ku, *Gubernatorial Foreign Policy*, 115 Yale L.J. 2380 (2006) ........................................19

Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 Br. J. Am. Leg. Studies 1, 7 (2024) ....................... 22

Tex. Const. art. IV, § 7 .....................................................................23, 25

U.S. Const. art. I, § 4, cl. 1 .................................................................23

U.S. Const. art. I, § 8 ........................................................................26

U.S. Const. art. I, § 8, cl. 11 ................................................................27

U.S. Const. art. I, § 10, cl. 2 .............................................................24, 30

U.S. Const. art. I, § 10, cl. 3 ..........................................................*passim*

U.S. Const. art. II, § 3 .......................................................................21

U.S. Const. art. VI, § 2 ......................................................................21

U.S. Constitution Article IV, Section 4 .................................................*passim*

On December 19, 2023, Las Americas Immigrant Advocacy Center and American Gateways (the "Nonprofit Plaintiffs"), along with the County of El Paso (collectively, the "Organizational Plaintiffs") filed suit against Steven C. McCraw, in his official capacity as Director of the Texas Department of Public Safety; and Bill D. Hicks, in his official capacity as District Attorney for the 34th Judicial District of Texas. ECF No. 1 in *Las Americas Immigrant Advocacy Center v. McCraw*, 1:23-cv-1537 (W.D. Tex.). On January 3, 2024, the United States filed suit against the State of Texas; Greg Abbott, in his official capacity as Governor of Texas; the Texas Department of Public Safety; and Director McCraw in his official capacity. ECF No. 1. Both the Organizational Plaintiffs and the United States (collectively, the "Plaintiffs") filed motions for preliminary injunction on January 12, 2024. ECF No. 14 ("US PI Mot."); ECF No. 30 in *Las Americas*, 1:23-cv-1537 ("OP PI Mot."). On Defendants' unopposed motion, ECF No. 17; ECF No. 38 in *Las Americas*, 1:23-cv-1537, the Court consolidated the cases on January 31, 2024. ECF No. 45 in *Las Americas*, 1:23-cv-1537.

Plaintiffs seek to enjoin the enforcement of Texas's recently enacted Senate Bill 4 (SB4), which, among other things, creates criminal offenses related to illegal entry or reentry into the State from a foreign nation, and authorizes magistrates and judges to issue orders to return to the foreign nation from which illegal entry or reentry occurred. *See* S.B. 4, 88th Leg., 4th C.S. (2023). This law does not go into effect until March 5, 2024. Plaintiffs' pre-enforcement, facial challenges to SB4 are based on speculative assumptions about how SB4 will be implemented and unsound legal conclusions. The Court should deny their motions for a preliminary injunction.

## BACKGROUND

There is a full-scale invasion of transnational criminal cartels across our southern border— and Texas is ground zero.[1] Despite the existence of twenty-eight legal entry points in the State,

---

[1] *See* Letter to Governor Abbott, Congress of the United States (Feb. 2, 2024), https://static.foxnews.com/foxnews.com/content/uploads/2024/02/Final-letter-to-Governor-Abbott-Texas-Del-2.2.2024.pdf ("[T]he current situation at our Southern Border is a complete and total invasion.").

U.S. Border Patrol encounters with aliens illegally crossing the border between ports of entry have increased from "a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.). And it is only getting worse. A new record for monthly encounters—over 225,000—was set in December 2023.[2] Unlawful crossings of the Southwest border in Fiscal Year 2023 further reached a record high of 2,475,699, and in the last three months of 2024, that record number appeared steady, with 785,422 border encounters.[3] President Biden has "smashed records for illegal immigration,"[4] and "America is suffering the highest volume of illegal immigration in the history of our country."[5]

The border crisis is not confined to harms caused by the unprecedented influx of unlawful immigration for which the cartels are responsible. It also includes deadly drug smuggling, human trafficking, and infiltration by suspected terrorists.

This rampant criminal activity along our southern border has had predictable and harmful

---

[2] *See* Camilo Montoya-Galvez, *Migrant Crossings at U.S. Southern Border Reach Record Monthly High in December*, CBS NEWS (Dec. 26, 2023), https://www.cbsnews.com/news/migrant-crossings-u-s-southern-border-record-monthly-high-december/.

[3] Banks Decl. ¶ 14.

[4] Governor of Texas, Statement (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf (explaining that "President Biden has enticed illegal immigrants away from the 28 legal entry points along this State's southern border—bridges where nobody drowns—and into the dangerous waters of the Rio Grande" and that "more than 6 million illegal immigrants have crossed our southern border in just 3 years," which is "more than the population of 33 different States in this country").

[5] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf.

effects in Texas and across the country.[6] Both Texas citizens and aliens themselves—many of them unaccompanied minors[7]—are often at the mercy of cartels that see illicit activity along the border as good business.[8] These transnational criminal organizations that ferry violent crime across the Rio Grande daily "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military."[9] One former U.S. Attorney General has stated that the cartels pose security threats that look "more like ISIS than like the American mafia."[10] In one recent incident, these hostile non-state actors were able to overwhelm Mexico's military with "700 cartel paramilitary fighters with armored cars, rocket launchers and heavy machine guns."[11] Under President Biden, the federal government has chosen to "accept a failed narco-state on our border, providing sanctuary to narco-terrorist groups preying on the American people."[12]

These violent criminal organizations shuttle deadly and illegal narcotics like fentanyl from Mexico into every corner of this country. In addition to trafficking drugs, Mexican cartels also traffic human beings. "For the first time in history, the cartel proceeds from human smuggling

---

[6] *See, e.g.*, Banks Decl. ¶¶ 18–19 (stating that ranches and homesteads are being burglarized by migrants while border community residents are regularly subjected to dangerous vehicle bailouts by illegal immigrants such that, as of February 5, 2024, roughly 4,353 bailouts and 9,886 criminal trespass arrests have occurred near the border since the beginning of OLS); *see also id.* ¶ 25 (declaring that Texas has spent $11.2 billion to help secure the border and protect public safety as part of OLS since 2021).

[7] "[T]he number of unaccompanied minors the department has cared for over the course of a year has skyrocketed from 15,381 in FY 2020 to 118,938 in FY 2023." Banks Decl. ¶ 15.

[8] TODD BENSMAN, OVERRUN: HOW JOE BIDEN UNLEASHED THE GREATEST BORDER CRISIS IN U.S. HISTORY 29–32, 193 (2023).

[9] William Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, WALL ST. J. (Mar. 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[may] have surpassed those from drug smuggling."[13] Trafficking across the southern border has changed "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, some of Mexico's most violent drug cartels."[14] These "cartels, terror groups, and other bad actors are taking advantage of the chaos by the border to orchestrate a mass influx of people."[15] "Gangs are using the flood of people to hide their 'predator' members as they enter the United States."[16] Cartels demand thousands of dollars from aliens to facilitate their illegal entry, commodifying them as human "inventory" with "numbered, colored wrist band[s]."[17] Women and children are raped and abused while journeying to the border, only to be trafficked for further sexual violence upon arriving in the United States.[18] Many newly arrived aliens live in constant fear of visits by cartel members shaking them down for the thousands of

---

[13] BENSMAN, *supra* n.8, at 41.

[14] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

[15] Letter from Multiple State Attorneys General to President of the United States, Joseph R. Biden, Jr., and Secretary of the U.S. Department of Homeland Security, Alejandro Mayorkas (Jan. 29, 2024), https://www.texasattorneygeneral.gov/sites/default/files/images/press/AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

[16] *Id.*

[17] BENSMAN, *supra* n.8, at 32.

[18] *See* Laura Gottesdiener *et al.*, *Migrants Are Being Raped at the Mexico Border as they Await Entry to US*, REUTERS (Sept. 29, 2023), https://www.reuters.com/world/migrants-are-being-raped-mexico-border-they-await-entry-us-2023-09-29/; Virginia Allen, *'America's New Slave Trade' Is Here at Hands of Mexican Cartels, Border Expert Tells Lawmakers*, DAILY SIGNAL (July 19, 2023), https://www.dailysignal.com/2023/07/19/new-slave-trade-arrived-america-hands-mexican-cartels-border-expert-tells-congress/.

dollars they still owe.[19] "What happens at the border does not stay at the border,"[20] and the cartels will make sure that their deadly fentanyl and human-trafficking victims "reach far and wide."[21]

And as of January of 2024, "DHS has still failed to account for over 85,000 missing children, many 'placed in the hands of probable traffickers by HHS.'"[22] In Fiscal Year 2023, "148 migrants died in just the El Paso Sector while attempted border crossings"—"the highest number ever recorded and more than double the number of fatalities in the Sector in FY 2022."[23] In sum, these cartels smuggle narcotics and weapons into the United States to fund their illegal enterprises; they force women and children into human and sex trafficking; and they murder innocent people, including women and children.[24] Thus, while cartels are growing wealthier by trafficking deadly fentanyl and even human beings across a porous border, Texans are paying an especially high price

---

[19] Tim Hains, *Sen. Katie Britt: What I Saw at the Border Was Not the American Dream, It Was a Nightmare,* REALCLEARPOLITICS (Sept. 27, 2023), https://www.realclearpolitics.com/video/2023/09/27/sen_katie_boyd_britt_what_i_saw_at_t he_border_was_not_the_american_dream_it_was_a_nightmare.html.

[20] Letter from Multiple State Attorneys General to President of the United States, Joseph R. Biden, Jr., and Secretary of the U.S. Department of Homeland Security, Alejandro Mayorkas (Jan. 29, 2024), https://www.texasattorneygeneral.gov/sites/default/files/images/press/ AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

[21] Letter from Governor of Texas, Greg Abbott, and Governor of Arizona, Doug Ducey, to Fellow Governors (Jun. 10, 2021), available at https://gov.texas.gov/uploads/files/press/Abbott-Ducey_Compact_Letter_to_Governors.pdf.

[22] Letter from Multiple State Attorneys General to President of the United States, Joseph R. Biden, Jr., and Secretary of the U.S. Department of Homeland Security, Alejandro Mayorkas (Jan. 29, 2024), https://www.texasattorneygeneral.gov/sites/default/files/images/press /AGs%20Letter%20Supporting%20Abbott%20and%20Paxton.pdf.

[23] Banks Decl. ¶ 17 (also explaining that "a total of 2,321 migrants have died attempted to cross the southern border," and "556 of those deaths were in the Del Rio Sector alone").

[24] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr., and Vice President, Kamala D. Harris (Apr. 15, 2021), available at https://gov.texas.gov/uploads/files/press/O-Biden_Harris202104140659.pdf.

for the Biden Administration's failure—sometimes even paying that price with their very lives.[25] After all, "as a result of drug trafficking by Mexican cartels, fentanyl is now the leading cause of death for citizens between the ages of 18 and 45," and "at least 5,351 Texans have died in fentanyl poisoning-related events" since President Biden has been in office.[26]

Texas has used the sovereign powers reserved to it under the U.S. Constitution to fight back.[27] In response to the multifaceted crisis at the Southwest Border, Governor Abbott declared a border security disaster in 2021 and has repeatedly renewed it.[28] As President Biden's border crisis worsened, Governor Abbott repeatedly explained that Texas was experiencing an unabated "invasion" into its territory by transnational criminal organizations.[29] And he repeatedly sought aid from the President of the United States pursuant to Article IV, Section 4 of the U.S.

---

[25] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Jan. 8, 2023), https://gov.texas.gov/uploads/files/press/President_Joseph_R._Biden_sig_.pdf.

[26] Banks Decl. ¶ 24.

[27] For example, Texas has been able to deter hundreds of thousands of illegal immigrants from harming Texas, and America, through Operation Lone Star and its other recent border security measures. *See, e.g.*, Banks Decl. ¶¶ 29–32.

[28] May 31, 2021 Proclamation by the Governor of the State of Texas, https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-2021.pdf; *see also* Banks Decl. ¶ 26.

[29] *See, e.g.*, Governor of Texas, Executive Order GA-41 (July 7, 2022), https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf; Banks Decl. ¶ 28 & Ex. B; Governor of Texas, Executive Order GA-42 (Sept. 21, 2022), https://gov.texas.gov/uploads/files/press/EO-GA-42_Mexican_cartels_foreign_terrorist_orgs_IMAGE_09-21-2022.pdf; Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Nov. 16, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph_11.16.22.pdf; Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Dec. 20, 2022), https://gov.texas.gov/uploads/files/press/BidenJoseph_12.20.22.pdf; Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (July 24, 2023), https://gov.texas.gov/uploads/files/press/O-BidenJoseph_07.24.23.pdf; Governor of Texas, Statement (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf.

Constitution. On one occasion, the Governor even hand-delivered a letter that explained how President Biden had "violated [his] constitutional obligation to defend the States against invasion" and detailed five steps the President could take immediately to begin securing the border and reining in "the cartels, who grow wealthy by trafficking deadly fentanyl and even human beings."[30]

Governor Abbott is not alone in recognizing that Texas is experiencing an invasion. Just last month, retired FBI officials explained that "an invasion of the homeland … is unfolding now. Military aged men from across the globe, many from countries or regions not friendly to the United States, are landing in waves on our soil by the thousands."[31] The numbers bear out their predictions that since "[t]he country has been invaded," America "is extraordinarily less safe." In 2020, Border Patrol apprehended just 3 aliens on the terrorist watchlist; in 2023, Border Patrol apprehended 172 of them—the "highest total ever recorded."[32] Border Patrol also encountered 336 persons on the terrorist watchlist from FY 2021 to FY 2024 at the southern border, which is up from 15 of such individuals encountered from FY 2017 to 2020, and in Fiscal Year 2023, Border Patrol agents arrested 15,267 illegal immigrants that had criminal convictions in the United States—a record high.[33] After Governor Abbott reiterated his declaration of an invasion, the Speaker of the U.S. House of Representatives and twenty-five Governors expressed their agreement: "The authors of the U.S. Constitution made clear that in times like this, states have a

---

[30] Letter from Governor of Texas, Greg Abbott, to President of the United States, Joseph R. Biden, Jr. (Jan. 8, 2023), https://gov.texas.gov/uploads/files/press/President_Joseph_R._Biden_sig_.pdf.

[31] Isabel Vincent & Jon Levine, *Biden Admin Border Policy Puts US in 'Imminent Danger' with Military-aged' Migrant Invasion: Former FBI Officials*, N.Y. POST (Jan. 27, 2024), https://nypost.com/2024/01/27/news/biden-admin-border-policy-puts-us-in-imminent-danger-with-military-aged-migrant-invasion-former-fbi-officials/.

[32] MaryAnn Martinez, *Feds Prevented Over 160 People on Terror Watchlist from Crossing US Borders Illegally—Highest Total Ever Recorded: DHS*, N.Y. POST (Sept. 15, 2023), https://nypost.com/2023/09/15/160-people-on-terror-watch-list-stopped-at-us-border-in-2023/.

[33] Banks Decl. ¶¶ 20–21 & Ex. A; *see also id.* ¶ 23 ("Border Patrol reported that it apprehended 1,819 illegal immigrants with gang affiliations from FY 2021 to FY 2024.").

right of self-defense" in the face of "historic levels of illegal immigrants, deadly drugs like fentanyl, and terrorists entering our country."[34] A few days later, twenty-six state Attorneys General—more than half of the chief law enforcement officers in the country—likewise agreed: "Millions of people illegally coming into Texas as part of a coordinated assault on our border is an invasion."[35] What is now obvious to all these government officials has long been clear to the American people, "[m]ore than half of [whom] say there's an 'invasion' at the southern border."[36]

Article IV, Section 4 of the U.S. Constitution obligates the United States to "protect each [State] against Invasion." Instead of coming to Texas's aid and repelling this invasion, the Biden Administration has chosen to compound the problem by allowing 99.7% of the illegal aliens in custody to be released.[37] Remarkably, its priority is to do everything in its power to stop Texas from defending itself. It has sued to prevent Texas from deploying a floating border barrier in the Rio Grande. *See United States v. Abbott*, No. 1:23-cv-853, 2023 WL 5740596, at *1 (W.D. Tex. Sept. 6, 2023), *aff'd*, 87 F.4th 616 (5th Cir. 2023), *reh'g en banc granted, opinion vacated,* 90 F.4th 870

---

[34] Republican Governors Association, Republican Governors Band Together, Issue Joint Statement Supporting Texas's Constitutional Right to Self-Defense (Jan. 25, 2024), https://www.rga.org/republican-governors-ban-together-issue-joint-statement-supporting-texas-constitutional-right-self-defense/; Rebecca Beitsch, *Speaker Johnson Backs Abbott's Border 'Invasion' Decree*, THE HILL (Jan. 25, 2024), https://thehill.com/homenews/house/4428993-speaker-johnson-backs-abbotts-border-invasion-decree/.

[35] David Zimmerman, *GOP Attorneys General, Arizona Lawmakers Back Texas's Right to 'Defend Against Invasion,'* NAT'L REV. (Jan. 29, 2024), https://www.nationalreview.com/news/gop-attorneys-general-arizona-lawmakers-back-texas-right-to-defend-against-invasion/.

[36] Joel Rose, *A Majority of Americans See an 'Invasion' at the Southern Border, NPR Poll Finds*, NPR (Aug. 18, 2022), https://www.npr.org/2022/08/18/1117953720/a-majority-of-americans-see-an-invasion-at-the-southern-border-npr-poll-finds.

[37] New Data Reveal Worsening Magnitude of the Biden Border Crisis and Lack of Interior Immigration Enforcement, Subcommittee on Immigration Integrity, Security, and Enforcement, United States House of Representatives, available at https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2024-01-18-new-data-reveal-worsening-magnitude-of-the-biden-border-crisis-and-lack-of-interior-immigration-enforcement.pdf.

(5th Cir. 2024). It has repeatedly destroyed Texas's concertina-wire fencing to allow aliens to enter Texas by the thousands. All while "[t]he evidence amply demonstrates the utter failure of the Defendants to deter, prevent, and halt unlawful entry into the United States" in contradiction to "the statutory duties they are so obviously derelict in enforcing." *Texas*, 2023 WL 8285223, at \*14. This lawsuit by the United States—tied to the similar one it is consolidated with here—is more of the same.

In response to this unprecedented crisis, the Texas Legislature passed SB4, which makes it a state-law crime to enter (or reenter after removal) the State of Texas directly from a foreign nation between lawful ports of entry, and allows magistrates and judges to order aliens who have crossed the border illegally to return to the foreign nation from which they entered. *See* TEX. CODE CRIM. PROC. ch. 5B; TEX. PENAL CODE ch. 51. SB4 provides an affirmative defense to prosecution if the alien's conduct does not violate 8 U.S.C. § 1325 (the federal illegal-entry statute), or if the federal government has granted the alien lawful presence or asylum. TEX. PENAL CODE § 51.02(c)(1)–(2). It also recognizes an affirmative defense if the alien was approved for benefits under the Deferred Action for Childhood Arrivals (DACA) program between June 15, 2012, and July 16, 2021. TEX. PENAL CODE § 51.02(c)(3). SB4 does not prevent illegal aliens from seeking asylum or other relief under federal law.

## STANDARD OF REVIEW

"'A preliminary injunction is an extraordinary remedy never awarded as of right.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To be entitled to a preliminary injunction, a plaintiff must establish: (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Id.* at 20. "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). This is a steep burden, indeed, and it requires a "*a clear showing*" as to each element. *Mazurek v. Armstrong*, 520

U.S. 968, 972 (1997) (per curiam).

If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001). As Texas has explained before, the United States is not uniquely immune from the need to satisfy all four *Winter* factors. *See United States v. Abbott*, No. 23-50632, 2023 WL 6376357, at *40–41 (5th Cir. Sept. 21, 2023). And even when a movant satisfies each of the four factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Granting a preliminary injunction is the exception—never the rule. *Id.*

ARGUMENT

## I.    Plaintiffs are not likely to succeed on the merits.

SB4 is not facially preempted because a state law that duplicates federal law does not "conflict" with that federal law. Nor can Plaintiffs end-run this commonsense conclusion by retreating to "field" preemption. To the extent field preemption remains a viable ground for preemption at all, it cannot apply where the federal government has abandoned the field. And *Arizona v. United States*, 567 U.S. 387 (2012), does not tie this Court's hands because it did not address the types of provisions at issue here, and never considered how the U.S. Constitution allows the States to fend for themselves when the federal government would leave them at the mercy of hostile non-state actors.

Nor does SB4 violate some dormant aspect of the Foreign Commerce Clause. The United States concedes that SB4 is not motivated by economic protectionism—the principal concern of the Constitution's supposedly implied restrictions on State commercial regulations. The United States cannot then recast SB4 as discriminating against foreign commerce by prohibiting the illicit traffic in terrorism, human beings, and drugs—for contraband and criminal activity are not the kind of "commerce" the Constitution cares about.

Finally, even assuming some of these claims were somehow meritorious, all Plaintiffs run

into justiciability doctrines that would prevent this Court from awarding relief. The Supremacy Clause furnishes no cause of action—for the United States, the Organizational Plaintiffs, or anyone else. And the Organizational Plaintiffs lack standing and their claims are barred by sovereign immunity because they fail to fall within the exception of *Ex parte Young*.

### A. SB4 is not preempted because it comports—rather than "conflicts"—with federal immigration laws.

Plaintiffs principally challenge three elements of SB4—namely, its prohibition on illegal entry, its prohibition on illegal reentry, and its provision for orders to return. *See* US Compl. ¶¶ 22–26 (describing "three principal provisions" of SB4); Las Americas Compl. ¶¶ 26–43 (identifying "three new state law offenses" created by SB4). None of those elements are conflict-preempted by federal law.

Conflict preemption exists only where it is "impossib[le]" to comply with both state and federal law, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (cleaned up). Courts do not lightly find conflict preemption. "In all cases," the alleged "conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress," *Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020), not from some "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (cleaned up). And "[t]here is no federal preemption in *vacuo*." *Kansas*, 140 S. Ct. at 801 (cleaned up). "To hold otherwise would be to ignore the teaching of [Supreme] Court[] decisions which enjoin seeking out conflicts between state and federal [law] where none clearly exists." *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446 (1960). In addition, where the preemption question is close, the court "must err in favor of the states." *Graber v. Fuqua*, 279 S.W.3d 608, 620 (Tex. 2009). Plaintiffs cannot satisfy this standard.

First, consider what federal immigration laws say. Congress has made it a crime for an alien to cross into this country at any location other than a port of entry. 8 U.S.C. § 1325(a)(1). Any alien who commits this crime of illegal entry "shall" be fined up to $5,000, imprisoned for up to 6

months, or both. *Id.* § 1325(a), (b); 18 U.S.C. §§ 3559(a)(7), 3571(b)(6). Congress has also made it a crime for an alien to re-enter this country after having previously been "denied admission," been involuntarily "removed," or voluntarily "departed the United States." 8 U.S.C. § 1326(a). Any alien who commits this crime of illegal reentry "shall" be fined up to $250,000, imprisoned for up to 2 years, or both. *Id.*; 18 U.S.C. §§ 3559(a)(5), 3571(b)(3). Aliens with certain aggravating circumstances may face harsher penalties. 8 U.S.C. § 1326(b). Finally, Congress has directed immigration officials to "order removed from the United States without further hearing or review," *id.* § 1225(b)(1)(A)(i), any alien who lacks a "valid entry document," *id.* § 1182(a)(7). In lieu of completing removal proceedings, an alien may agree to a "stipulated order" of removal or "voluntarily depart the United States." *Id.* §§ 1229a(d), 1229c(a)(1). Meanwhile, an alien who fails to comply with a removal order is guilty of a felony. *Id.* §§ 1253(a)(1), 1229a(c)(5).

Now, consider what state law says. "Like 8 U.S.C. §1325(a)," SB4 makes it a state crime for an alien to cross into this country at any location other than a port of entry. US Compl. ¶ 23 (citing TEX. PENAL CODE § 51.02(a)). That offense is punishable by a fine of up to $2,000 and imprisonment up to 180 days. TEX. PENAL CODE § 51.02(b). "SB4, similar to 1326(a)," also makes it a crime to illegally re-enter this country after having previously been "denied admission," been involuntarily "removed," or voluntarily "departed the United States." US Compl. ¶ 24 (citing TEX. PENAL CODE § 51.03(a)). That offense is punishable by a fine of up to $4,000 and imprisonment up to one year. TEX. PENAL CODE § 51.03(b). Finally, SB4 directs a state court judge to order an alien to return after completing custodial sentence or, in lieu of prosecution, permits an alien to depart voluntarily. TEX. CODE CRIM. PROC. Art. 5B.002(c), (d). Like federal law, SB4 makes it a crime to fail to comply with a return order, much as federal law criminalizes non-compliance with removal orders. TEX. PENAL CODE § 51.04(a). At every step, SB4 mirrors federal-law standards.

The federal government may adopt state law for federal-law purposes. *See, e.g.*, *Parker Drilling Mgmt. Serv., Ltd. v. Newton*, 139 S. Ct. 1881, 1886 (2019). State governments may adopt federal law for state-law purposes. *See, e.g.*, *Gilbert v. Minnesota*, 254 U.S. 325, 330-31 (1920).

"[T]here can by definition be no conflict" between the laws of two sovereigns when they *comport* with one another. *Whiting*, 563 U.S. at 601–03 (finding no conflict preemption where state law "trace[s] the federal law"); *cf. Arizona*, 567 U.S. at 402–03 (noting that challenged state law authorized harsher criminal penalties than federal law). It is certainly not "impossible" for an alien to comply with both the Immigration and Nationality Act and SB4. *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990). He can easily comply with *both* sets of laws at the same time by not entering this country illegally between ports of entry, not reentering illegally, or complying with an order to depart this country.

Nor is SB4 somehow an "obstacle" to accomplishing "the full purposes and objectives of Congress." *Id.* Even the United States concedes that in all salient respects, the operative provisions in SB4 are "like" or "similar to" the proscriptions Congress provided in the INA. US Compl. ¶¶ 23–24. The conflict-preemption analysis ought to stop right there. "Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap. Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Kansas*, 140 S. Ct. at 806.[38] None of the three provisions Plaintiffs assail in their motions conflict with federal law.

State officials can implement SB4 in a way that maximizes cooperation with federal authorities. Escalon Decl. ¶¶ 7–8, 10–14; Clark Decl. ¶ 6–12; Barnes Dec. ¶ 4. Because this Court

---

[38] Plaintiffs seem to suggest miscellaneous provisions of SB4 would conflict with federal law. But they do not identify them as challenged provisions in their complaint. In any event, these claims rest on speculation about how SB4 will operate, which highlights why this pre-enforcement challenge is premature. In any event, the speculation is wrong. Though Plaintiffs claim that SB4 will prevent aliens from pursuing discretionary relief, nothing prevents an alien from seeking such relief while in state custody or from another country. *Cf.* Myah Ward & Jennifer Haberkorn, *Biden Admin to Set Up Migrant Processing Centers in Latin America Ahead of End of Title 42*, POLITICO (Apr. 27, 2023), https://www.politico.com/news/2023/04/27/biden-migrant-processing-centers-latin-america-00094151. And Texas law requires law enforcement agencies to honor detainer requests from U.S. Immigrations and Customs Enforcement (ICE). TEX. CODE CRIM. PROC. Art. 2.251(a); *see In re Wiles*, No. 08-18-00177-CR, 2019 WL 1810756, at *2–3 (Tex. App.— El Paso Apr. 24, 2019).

is presented with a pre-enforcement challenge, the Court may not follow Plaintiffs in assuming that enforcement of SB4 will take the antagonistic form they imagine. Rather, *United States v. Salerno* instructs that if some applications of the law are constitutional, then it survives facial attack. 481 U.S. 739, 745 (1987) (recognizing that the challenge fails unless "no set of circumstances exists under which the Act would be valid.").

Moreover, to the extent SB4's text omits other defenses available under federal law, it does not preclude them. Texas "courts must determine whether federal law prevents enforcement of a conflicting state law," *In re Academy, Ltd.*, 625 S.W.3d 19, 35 n.19 (Tex. 2021)—and those courts will construe SB4 to be consistent with federal law to the extent possible. *See Stockton v. Offenbach*, 336 S.W.3d 610, 618 (Tex. 2011); *Lebo v. State*, 90 S.W.3d 324, 326 (Tex. Crim. App. 2002); *Toledo v. State*, 519 S.W.3d 273, 279 (Tex. App.–Houston [1st Dist.] 2017) ("We presume that the legislature intended to enact a statute that comports with the Texas and federal constitutions.") (citing TEX. GOV'T CODE § 311.021(1)). Aliens may raise federal preemption as a defense in Texas courts under SB4. *See Sabine Consol., Inc. v. State*, 806 S.W.2d 553, 554–55 (Tex. Crim. App. 1991). Indeed, facial and as-applied constitutional challenges are cognizable in Texas courts on pretrial habeas review. *Ex parte Perry*, 483 S.W.3d 884, 896 (Tex. Crim. App. 2016).

Of course, SB4 may be an obstacle to the purposes and objectives of President Biden, Secretary Mayorkas, and other executive branch officials who favor open-border policies over following the law.[39] But those are manifestly *not* the priorities laid out by Congress in federal statutes that the current administration is committed to ignoring. "The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities of federal officers." *Kansas*, 140 S. Ct. at 807 (quoting U.S. Const. art. VI, cl. 2).

---

[39] *See* Speaker of the U.S. House, Biden Administration Actions that Have Undermined Border Security and Encouraged Illegal Immigration (Jan. 9, 2024), https://www.speaker.gov/wp-content/uploads/2024/01/Biden-Admin-Actions-Undermining-Border-Security.pdf (collecting 64 actions taken by the Administration to systematically undermine border security).

**B. No provision of SB4 is field preempted.**

Courts find field preemption only when an "unambiguous congressional mandate" ousts the State from the field. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). Nothing approaches such a mandate here. When, as here, the law "expressly contemplates concurrent regulation with States and localities," "[t]hat ends the matter;" there is no field preemption. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 797 (5th Cir. 2024).

States enjoy wide latitude to regulate within the "field" of alien misconduct. Indeed, there are myriad instances in the federal code indicating States are encouraged to aid federal entry and removal efforts, and the federal immigration code expressly recognizes States' authority and role in carrying out the type of conduct described in SB4. *See, e.g.,* 18 U.S.C. § 758 (crime for alien to "flee" from "State or local law enforcement" around immigration checkpoints); 8 U.S.C. § 1324(c) (State law enforcement given explicit authority to make arrests for violation of alien smuggling prohibition); 22 U.S.C. § 7105(c)(3)(C)(i) (contemplating "State or local" prosecution of alien "trafficking"). And the Supreme Court has rejected the idea that federal law field preempts "every state enactment which in any way deals with aliens." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), (superseded by statute on other grounds as recognized in *Arizona*, 567 U.S. at 404). When the law "expressly contemplates concurrent regulation with States and localities," "[t]hat ends the matter;" there is no field preemption. *Nat'l Press Photographers Ass'n*, 90 F.4th at 797. The courts have likewise never "conclude[d] that the States are without any power to deter the influx of persons entering the United States … and whose numbers might have a discernable impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982).

Yet, Citing *Arizona v. United States*, Plaintiffs argue that Section 1 of SB 4 is field preempted because it intrudes on the government's "exclusive" federal authority to control entry and removal. OP PI Mot. at 12-13; US PI Mot. at 24–26. But *Arizona* says no such thing. The opinion uses the word "exclusive" twice, and only to describe the standard for finding field preemption. The only field preemption recognized in *Arizona* is "the field of alien registration." *Arizona*, 567 U.S. at 403. The Court did not find that state laws concerning entry and removal were

field preempted. Indeed, the *Arizona* court concluded that one of Arizona's immigration statutes was *not* preempted. So plainly *Arizona* does not support Plaintiffs' argument that immigration regulation is exclusively federal.

Among other things, SB4 authorizes a magistrate, during an initial appearance, to issue a written order requiring an illegal alien to return to the foreign country from which the person illegally entered, assuming there exists probable cause based on an illegal entry or reentry, and assuming the alien agrees to the entry of the order. TEX. CODE CRIM. PROC. Art. 5B.002. *Arizona*, the cornerstone of the Plaintiffs' arguments, does not address whether the sort of judicial proceedings described under this provision of SB4 are field preempted. The only field preemption that *Arizona* recognized was in the federal alien-registration program. *Id.* That program is factually distinguishable from anything regulated under SB4: alien registration deals with a uniquely domestic method of tracking immigrants present within the country. It requires a unified database that affects the entire interior of the United States. It has nothing to do with the only issue here: border protection. The federal field of alien registration that the Supreme Court acknowledges in *Arizona* is thus wholly irrelevant to SB4. Plaintiffs do not and cannot cite any other cases to demonstrate that the provisions of SB4 intrude on a recognized federal field.

Even if removal were an exclusively federal field (it is not, and *Arizona* does not say it is), it is fundamentally inaccurate to classify the return orders described in SB4 as removals. The return orders contemplate the voluntary departure of an illegal alien, TEX. CODE CRIM. PROC. Art. 5B.002(c)(1), and they implicate the State's ability to prosecute illegal entry similar to its prosecution of criminal trespass violations under Section 30.05 of the Texas Penal Code. The return order simply identifies how an alien will be transported to a federal port of entry and which state officer or agency will monitor compliance with that order. Once at a federal port of entry, no state actor removes the illegal alien.  Escalon Decl. ¶¶ 13–15. Effectuating any forced removal from the country remains the task of federal CBP officers.

Granted, federal immigration law controls "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355;

*cf. Truax v. Raich*, 239 U.S. 33, 42 (1915). But the federal government's control over admission and exclusion does not preclude States' authority to regulate aliens in a host of other ways, like those at issue here. SB4 does not affect who is admitted, whether they will ultimately be removed, or the legal standard under which they can remain in the country. And the law recognizes and bows to the federal scheme in all critical respects, including by recognizing that if an alien enters at a port of entry, even without a legally cognizable basis for protection from removal, then he is not subject to SB4's penalties. *See* 8 U.S.C. § 1325 (aliens *must* enter at port of entry); TEX. PENAL CODE § 51.02(c)(2) (providing affirmative defense if alien complies with § 1325); Escalon Decl. ¶ 5; Barnes Decl. ¶ 3.

Plaintiffs also argue that SB4's illegal entry and reentry provisions are entirely field preempted because the State's creation of illegal entry and reentry crimes, *see* TEX. PENAL CODE §§ 51.02 (illegal entry), 51.03 (illegal reentry), intrudes on the federal government's authority to criminalize entry and reentry, which it has already done in 8 U.S.C. §§ 1325 and 1326. *See* OP PI Mot. at 23–24; US PI Mot. at 24, 27. But these sections are not field preempted.

As discussed above, both sections mirror federal law. And, "with respect to illegal aliens," State laws that "mirror[] federal objectives" are *more*—not less—likely to be upheld. *Plyler*, 457 U.S. at 225. Specifically, Tex. Penal Code § 51.02 effectively makes it a state crime for an illegal alien to violate federal law, which prohibits aliens from "enter[ing], or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers." 8 U.S.C. § 1325(a). Section 51.03 does the same with another provision of federal law, which prohibits aliens from "enter[ing], attempt[ing] to enter, or [be] found in the United States" if previously "denied admission … or removed" or if they have "departed the United States while an order of … removal is outstanding." 8 U.S.C. § 1326(a). "The mere fact that state laws like" SB4 "overlap to some degree with federal criminal provisions" on immigration "does not even begin to make a case for" preemption. *Garcia*, 140 S. Ct. at 806. And both provisions that mirror their federal counterparts are consistent with and reflect Texas's enforcement of its state criminal trespass law, TEX. PENAL CODE § 30.05, which has existed for years under Operation Lone Star to

prohibit an alien's illegal entry and presence in Texas. The federal government has not—and does not now—challenge State authority under Operation Lone Star to enforce the State's equally complementary, border-based criminal trespass law.

Nothing in *Arizona* precludes States from participating in entry and reentry; the *Arizona* Court does not say that these are exclusive federal fields, and indeed there are plenty of instances in which States have authority to create their own criminal immigration laws and prosecute federal immigration crimes that involve entering the country. *See* 8 U.S.C. § 1101(a)(15)(T)(i) (contemplating "State or local investigation or prosecution" of illegal trafficking); *id.* § 1101(a)(15)(U) (State and local criminal laws can include trafficking); 18 U.S.C. § 758 (making it a federal crime to evade an immigration checkpoint and "thereafter flee from Federal, State, or local law enforcement …").

*DeCanas* also confirms that SB4 is not field preempted. In that case, the Court upheld a California law prohibiting the knowing employment of illegal aliens. *DeCanas*, 424 U.S. at 355. There was no preemption because there was no "specific indication in either the wording or the legislative history of the [Immigration and Nationality Act] that Congress intended to preclude" such regulation. *Id.* at 358. So too here—nothing in the Immigration and Nationality Act suggests that Congress would prohibit the States from penalizing *exactly what the federal code already penalizes*.

Moreover, none of SB4 conflicts with the federal government's foreign relations—or even implicates it. Facilitating illegal aliens' compliance with federal law cannot possibly affect relations with other countries. Further, to the extent it might affect foreign relations, SB4's provisions do not present a conflict or obstacle to the federal government's foreign affairs because they do not require anything beyond what the federal government should already be doing. And Governors of States regularly interact with and make agreements with foreign governments.[40]

---

[40] *What Governor Newsom's Trip to China Accomplished*, Office of Governor Newsom,

None of the rest of the provisions of SB4, specifically Sections 3 through 9, are field preempted, and Plaintiffs do not argue otherwise. Plaintiffs only refer to Sections 1 and 2 in their Motion and only seek to enjoin those two sections.

### C. To the extent "field" preemption remains viable at all, SB4 is not preempted when the federal government has abandoned the "field" it now purports to occupy.

In *Arizona*, the Supreme Court used field preemption to invalidate a state-law misdemeanor concerning *alien registration*. *See* 567 U.S. at 400–03 (citing *Hines v. Davidowitz*, 312 U.S. 52 (1941)). It is no surprise, then, that Plaintiffs' lead argument here does not look for an express conflict between federal and state law, but instead focuses on the so-called "field" of immigration laws that Congress has passed in the INA. *See* US PI Mot. at 20–23; OP PI Mot. at 12–17.

Early field-preemption cases, however, required a plaintiff to identify an actual "conflict" between federal and state law. *See, e.g.*, *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265–66, 268 (1929). Several members of the Supreme Court have questioned the more recent and profligate use of field preemption, unmoored from that earlier focus on a textual conflict between the laws of a State and laws that Congress has enacted. *See, e.g.*, *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J., joined by Thomas and Kavanaugh, JJ.); *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring); *id.* at 640–41 (Sotomayor, J., concurring in part and dissenting in part). Because "[t]he Supremacy Clause supplies a rule of priority" as between "the Laws of the United States" and the "Laws of any state to the Contrary," federal courts arguably have no business wielding field preemption absent a textual conflict between federal and state law. *Virginia Uranium*, 139 S. Ct. at 1901 (quoting U.S. Const. art. VI, cl. 2).

But even if this loose new brand of conflict-free field preemption is here to stay, courts must

---

http://tinyurl.com/yc3s8kty (last visited Feb 1, 2024) (article discussing Governor Newsom's joint declaration with "China and California to cooperate on subnational climate action"); *see also* Julian G. Ku, *Gubernatorial Foreign Policy*, 115 Yale L.J. 2380 (2006).

still take the field analogy seriously: State law cannot be impliedly preempted from some regulatory area unless federal law is also *occupying* the same field. For the federal government to preempt state law absent a genuine conflict, it is not enough for Congress to merely pass legislation in the pertinent field; the federal executive branch must, in fact, take action to occupy that field. That is how California's Director of Agriculture for Raisin Proration Zone No. 1 avoided federal preemption—the Supreme Court found "no such occupation of the legislative field by the mere adoption of the Agricultural Marketing Agreement Act," because the U.S. Secretary of Agriculture had not issued any order "putting it into effect." *Parker v. Brown*, 317 U.S. 341, 358 (1943).

This principle counsels rejection of Plaintiffs' field-preemption argument, because the federal executive branch has abandoned the very field it now purports to occupy. Congress has: imposed mandatory criminal penalties for perpetrating or assisting illegal entry and reentry, 8 U.S.C. §§ 1325, 1326, 1327; commanded federal officials to detain various categories of aliens, *id.* §§ 1221, 1225, 1226, 1231; allowed for the parole of aliens "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," *id.* § 1182(d)(5)(A); directed federal officials to promptly dismiss asylum claims of economic migrants "at [the] port of entry," *id.* § 1225(b)(1)(B), and swiftly remove aliens in less than 90 days after ordering them removed, *id.* § 1231(a)(1)(A); and ordered federal officials to prevent illegal entry of aliens and secure the border, including by prioritizing "physical infrastructure enhancements," *id.* § 1701 Note.

The Biden Administration notoriously ignores each of these INA obligations, and others too, which is "akin to posting a flashing 'Come In, We're Open' sign on the southern border." *Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023). It "[d]isregard[s] that entering the United States by crossing the river other than at an official port of entry is a federal crime." *Texas*, 2023 WL 8285223, at *11 (Moses, C.J.). It paroles millions of aliens *en masse* into the United States—even though the INA says they "shall" be detained—"and tell[s] Congress to pound sand." *Texas v. Biden*, 20 F.4th 928, 982 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022). It refuses to dismiss at the port of entry the waves of economic migrants whose asylum claims are

patently frivolous. And rather than build up border infrastructure, it engages in escalatory self-help measures by tearing down Texas's concertina-wire fencing. In the words of Chief Judge Moses, the Biden Administration's "utter failure … to deter, prevent, and halt unlawful entry into the United States" is a sad product of "the statutory duties [it is] so obviously derelict in enforcing." *Texas*, 2023 WL 8285223, at *14.

Having refused to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, the federal executive branch cannot now invoke field preemption in service of the federal immigration statutes it is so committed to violating. Plaintiffs' field-preemption attack on SB4 correctly presupposes that our "Constitution, and the Laws of the United States which shall be made in Pursuance thereof," are "the supreme Law of the Land." U.S. Const. art. VI, § 2. Under the Supremacy Clause, however, "it is Congress rather than the courts that pre-empts state law." *Whiting*, 563 U.S. at 607. The Biden Administration cannot use opportunistic supremacy to defeat SB4—a state-law analogue to illegal-entry statutes Congress already has on the books—and then abandon the field again by ignoring the INA.

Indeed, the Supreme Court's decision in *Arizona* was further premised on the idea that the federal government was, at the time, making good-faith efforts to carry out its obligations under federal immigration statutes. *See, e.g.*, 567 U.S. at 397. Perhaps that is why Arizona never pressed this argument before the Supreme Court. In any event, it should be obvious that the border circa 2009 is nothing like the border of today. The federal government's abdication of duty is unprecedented, and so are the numbers. In FY2009, the year immediately preceding Arizona's passage of its challenged immigration bill, Border Patrol recorded a total of 540,851 apprehensions along the southwest border.[41] In FY2023, Border Patrol apprehended more than 2.4 million

---

[41] *See* U.S. Dep't of Homeland Security, Office of Immigration Statistics, Apprehensions by the U.S. Border Patrol: 2005-2010, at 2 (July 2011), https://www.dhs.gov/xlibrary/assets/statistics/publications/ois-apprehensions-fs-2005-2010.pdf.

aliens.[42] That huge surge in numbers is the predictable response to deliberate steps the Biden Administration has taken, contrary to federal statutes, to undermine the security of our international border.

### D. Texas is entitled to defend itself from invasion when the federal government abdicates its own duties—and *Arizona* never said anything to the contrary.

Even if federal immigration laws somehow did run up against SB4, those statutes could not be read to vitiate the federal government's obligation to protect the States from invasion, nor to trump Texas's constitutional entitlement to defend itself against invasion. Upon joining the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean, J.). After all, "[t]he Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas v. White*, 74 U.S. (7 Wall.) 700, 725 (1868).

The Constitution provides that "[n]o state shall, without the Consent of Congress, … engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. This self-defense provision represents "an acknowledgement of the States' sovereign interest in protecting their borders." *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part). The Constitution thus "leaves intact [States'] inherent power to protect their territory," *id.,* which the law of nations at the founding recognized for political subdivisions even in the absence of express authorization. *See* Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 Br. J. Am. Leg. Studies 1, 7 (2024). "[U]nder both the Articles of Confederation and the Constitution, the source of most *state* authority" for defensive war "preceded the Union and was largely reserved to the [S]tates," and the provisions addressing state war powers in both of those charters "served only as limitations or descriptions [of that pre-existing power], not grants" of authority. *Id*. at 11–

---

[42] Congressional Research Service, *U.S. Efforts to Manage Western Hemisphere Migration Flows*, https://crsreports.congress.gov/product/pdf/IF/IF12538.

12; *see also id.* at 16–19. The Constitution actually removed limits on state war powers imposed by the Articles—States could now engage in defensive war without any need to consult with the central government. *Id.* at 18.

The authority to determine whether Texas has been "actually invaded," U.S. Const. art. I, § 10, cl. 3, is vested in the Governor of Texas as the "Commander-in-Chief of the military forces of the State," Tex. Const. art. IV, § 7. Governor Abbott has asserted this power because, through President Biden's open-border refusal to faithfully execute federal immigration laws, the United States has unconstitutionally refused to "protect [the State of Texas] against Invasion" by transnational criminal cartels. U.S. Const. art. IV, § 4.

Whether a particular set of circumstances constitutes an "invasion" for purposes of these two constitutional clauses is a nonjusticiable political question. That is because "the nature of the power itself" is committed to executive discretion, *Sterling v. Constantin*, 287 U.S. 378, 399 (1932), ensuring a lack of judicially manageable standards to determine whether or when an cartel-driven influx of illegal aliens and deadly fentanyl will amount to constitute an invasion. *See California v. United States*, 104 F.3d 1086, 1090–91 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 469–70 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995).

Political questions are not the sole province of the federal government. They attach whenever the Constitution textually commits a decision to a political actor—federal *or* state—who is tasked with making the sorts of decisions courts are ill-equipped to make. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2495–96 (2019) (noting that U.S. Const. art. I, § 4, cl. 1 assigns districting to state legislatures); *id.* at 2498–2506 (identifying no judicially manageable standard to police partisan districting). Because the power of self-defense goes to the very core of sovereignty, its invocation poses a nonjusticiable question committed to the sovereign that wields it, *Moyer v. Peabody*, 212 U.S. 78, 83–85 (1909) (Holmes, J.), subject only to limited review as to whether the sovereign has invoked that authority in "good faith," *Constantin*, 287 U.S. at 400.

That does not mean the self-defense power is limitless. For one thing, federal courts should

presume that state officials will follow the Constitution. *See, e.g.*, *Sumner v. Mata*, 449 U.S. 539, 549 (1981); *Rose v. Raffensperger*, 584 F. Supp. 3d 1278, 1288 (N.D. Ga. 2022). As relevant here, that presumption includes the requirement that a State be "actually invaded" or "in … imminent Danger." U.S. Const. art. I, § 10, cl. 3. More fundamentally, though, States authorized to "engage in War" are—presumably like the United States itself—bound by the law of nations when responding to such threats. *See Miller v. United States*, 78 U.S. 268, 305–06 (1870).[43]

The *only* question here, then, is whether the States have the same kind of power when faced with an invasion as the federal government has. They most certainly do, because States—like other sovereigns—have "inherent power to protect their territory." *Arizona*, 567 U.S. at 419 (Scalia, J., concurring in part and dissenting in part); *cf. United States v. Cooley*, 141 S. Ct. 1638, 1643 (2021) (Indian tribes "retain inherent power" to address conduct that "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe").

The Constitution memorializes that inherent power in the ratified text. If "actually invaded, or in such imminent Danger as will not admit of delay," States *may* take action even "without the Consent of Congress." U.S. Const. art. I, § 10, cl. 3; *see Sveen v. Melin*, 584 U.S. 811, 827–28 (2018) (Gorsuch, J., dissenting); *Melendez v. City of New York*, 16 F.4th 992, 1018 (2d Cir. 2021). And Congress cannot countermand such state action by statute as it can *other* state action. *See* U.S. Const. art. I, § 10, cl. 2 (subjecting state tax laws "to the Revision and Controul of the Congress"). Elsewhere, the Constitution obliges the federal government to protect each State "against Invasion[] and … domestic Violence." U.S. Const. art. IV, § 4. On its face, this provision imposes an obligation on the federal government—not a limitation on States. But it also establishes two different rules for dealing with two different scenarios. For a "domestic" attack, States may seek help from the federal government, "on Application of the Legislature, or of the Executive."

---

[43] States, like other sovereigns, may take lesser defensive measures than full-scale war in an "imperfect" state of hostilities. *Bas v. Tingy*, 4 U.S. (4 Dall.) 37, 40–41 (1800) (Washington, J.); *see also* Natelson & Hyman, *supra*, at 8. Texas's restrained tactics in the face of imminent danger—including the enactment and implementation of SB4—are prudent.

*Id.* For an "Invasion," however, States need not invite federal protection. *Id.* Together, the two Invasion Clauses memorialize concurrent federal and state authority to repel invasions.

The framers took for granted that States had independent authority to defend themselves: "If the interposition of the general government should not be needed"—because a State could handle the matter itself under Article I, Section 10, Clause 3—the provision for federal intervention under Article IV, Section 4 "will be a harmless superfluity." The Federalist No. 43 (Madison). When it came to repelling an invasion, the Constitution permitted a State to work with the federal government—but if the federal government proved unnecessary or unwilling, the State could go it alone.

Supreme Court precedent further confirms that federal and state governments exercise the *same* power. Just as the President has exclusive "authority to decide whether the [foreign or domestic] exigency has arisen" for purposes of Article I, Section 8, Clause 15, *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29–30 (1827) (Story, J.), so too does the State have exclusive authority to decide whether the foreign or domestic exigency has arisen under Article I, Section 10, Clause 3, *Moyer*, 212 U.S. at 83–85. And because "the nature of the power itself" "necessarily" confers discretion, federal and state exercises of this power are subject only to the *same* good-faith constraint—not judicial second-guessing. *Constantin*, 287 U.S. at 399.

Other States may choose to allocate their self-defense power differently. But in Texas, the power to determine whether it has been "actually invaded" or otherwise faces "imminent Danger as will not admit of delay," U.S. Const. art. I, § 10, cl.3, is vested in the Governor as the commander-in-chief of Texas's militia, *see* Tex. Const. art. IV, § 7; *see also Abbott v. Biden*, 70 F.4th 817, 822–23, 842 (5th Cir. 2023). Governor Abbott has here asserted this power on behalf of the State because the United States has unconstitutionally refused to protect Texas—and, more importantly, its citizens—against the dangers posed by transnational cartels. There is no basis to second-guess Governor Abbott's determination that a sudden and unprecedented influx into Texas of hostile non-state actors perpetrating human slavery, violent assaults, weapon- and drug-smuggling, and other crimes justify Operation Lone Star's initiatives, including the enactment and

implementation of SB4. *See* Natelson & Hyman, *supra*, at 5–6, 9–10 (discussing law of war at the founding as applied to non-state actors).

In any event, this crisis that the federal government refuses to acknowledge—the sudden and mass entry of criminal cartels trafficking human beings, drugs, and weapons—plainly triggers Texas's self-defense authority.

Texas's sovereign power of self-defense is not limited to repelling invasions by state actors. Article I, Section 10, Clause 3 applies to invasions of all types, including invasions from non-state or quasi-state actors, such as the cartels. Natelson & Hyman, *supra*, at 23. Indeed, throughout American history, States have had to use military force to respond to hostile non-state actors. For example, James Madison referred to a band of smugglers at the Virginia Ratifying Convention to illustrate how state militia were customarily used at the time, in response to concerns about a federal standing army:

> Can any government be established, that will answer any purpose whatever, unless force be provided for executing its laws? The Constitution does not say that a standing army shall be called out to execute the laws. Is not this a more proper way? The militia ought to be called forth to suppress smugglers. Will this be denied? The case actually happened at Alexandria. There were a number of smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions. Should a number of smugglers have a number of ships, the militia ought to be called forth to quell them. We do not know but what there may be a combination of smugglers in Virginia hereafter.

3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 413–14 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836). Later that day, Madison discussed the concurrent military powers of the federal and state governments. *Id.* at 424–25. He first quoted the invasion provision in Article IV, Section 4, which guarantees that the federal government "shall protect each [State] against Invasion." He then quoted Article I, Section 10, Clause 3's reservation to the States of the right to self-defense. Pointing to that constitutional text, Madison said of the States: "They are restrained from making war, unless invaded, or in imminent danger. When in such danger, they are not restrained. I can perceive no competition in these clauses.  They cannot

26

be said to be repugnant to a concurrence of the power." *Id.* at 426.

And in 1792, Congress exercised its power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. art. I, § 8, by authorizing the President to call forth the militia "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or *Indian tribe.*" An Act to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792) (emphasis added). Congress reenacted the same provision in 1795. *See* An Act to provide for calling forth the Militia to execute the laws of the Union, suppress insurrections, and repel invasions; and to repeal the Act now in force for those purposes, 1 Stat. 424, 3d Cong., Sess. II, Ch. 36 (1795) ("imminent danger of invasion from any foreign nation or Indian tribe").

Any notion that "invasion" somehow hinges on the difference between state actors and non-state actors would seem wholly artificial to the framers, who drafted the Constitution to give Congress power to "grant Letters of Marque and Reprisal" authorizing *private actors* to cross international borders to commit hostile acts. U.S. Const. art. I, § 8, cl. 11; *see also Brown v. United States*, 12 U.S. (8 Cranch) 110 (1814); 1 Blackstone, Commentaries *249–51. In the immediate aftermath of the Constitution's ratification, Congress exercised this power to authorize private citizens to engage in piracy against French ships. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 267 (1990) (citing 1 Stat. 579); *see also* 4 Blackstone, Commentaries *82–83.

A historical practice of American governments engaging with non-state actors continued from the founding up to the present day. Joseph Story conceived of the Whiskey Rebellion—an uprising of nonstate actors in Pennsylvania between 1791 and 1794—as an insurrection. 3 Story, *supra*, § 1808; *see also SBC Commc'ns, Inc. v. FCC*, 154 F.3d 226, 236 n.17 (5th Cir. 1998) (quoting 4 Annals of Cong. 788 (1794)) (same). In 1916, the United States sent forces into Mexico to pursue a band of non-state actors because the Mexican government "was incapable of policing" its own border and tracking down Pancho Villa. John S.D. Eisenhower, Intervention! The United States and the Mexican Revolution 1913-1917, at 227–50 (1993). After the terrorist attacks of September

11, 2001, Congress authorized the use of military force against not only responsible "nations" but also "organizations" and "persons." Authorization for the Use of Military Force, Pub. L. 107-40, § 2(a), 115 Stat. 224 (Sept. 18, 2001). As the Obama Administration rightly observed, "[t]he inherent right of self-defense is not restricted to threats posed by States." Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force 9 (2016).

This lack of a limitation to state actors is consistent with the use of the word "invasion" near the founding. *See* Natelson & Hyman, *supra*, at 23. Webster's 1806 dictionary—the first American English dictionary—defines "invade" broadly, as meaning "to enter or seize in hostile manner." Noah Webster, A compendious Dictionary of the English Language 164 (1806). Webster's 1828 dictionary also defines "invade" broadly, to include not just the entrance of a foreign army into a country, but also "1 … to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate." 1 Noah Webster, American Dictionary of the English Language 113 (1828). Dictionary definitions at the time defined "invade" as simply "to enter in a hostile manner." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828). An "invasion" was a "hostile entrance" or "an attack." *Id.* Further, "hostile" is not defined to include only state actors. *Id.* ("HOSTILE. adj. [hostilis, Latin.] Adverse; opposite; suitable to an enemy."), (E'nemy. n.s. [ennemi, French; inimicus, Latin.] 1. A publick foe …. 2. A private opponent; an antagonist … 3. Any one who regards another with malevolence; not a friend…."). And "hostile" meant "adverse," so "for an entry to be an invasion it must be unauthorized and uninvited." Natelson & Hyman, *supra*, at 23. An "invasion" was not limited to armed force, but "could refer also to uninvited entry by groups of immigrants." *Id.* at 23–24 (discussing use of term "invasion" at the founding to refer to occasions of unarmed but unauthorized mass settlements of people from Connecticut into Pennsylvania).

Millions of aliens have entered the State of Texas illegally under the Biden Administration, including members of cartels that traffic in people, weapons, and vast quantities of drugs like

fentanyl.[44] This amounts to "ent[ry] in a hostile manner." And the State has the constitutional power to repel that invasion. U.S. Const. art. I, § 10, cl. 3. The State may do so to protect the health, safety, morals, and general welfare of its citizens. *House v. Mayes*, 219 U.S. 270, 282 (1911).

Texas's sovereign right of self-defense, as reserved to the States in Article I, Section 10, Clause 3, independently forecloses Plaintiffs' preemption claims against SB4. Under ordinary circumstances, that provision would not allow Texas to "engage in War" to stop illegal border-crossings because "the Consent of Congress" has not been granted. But these are extraordinary times, thanks to the Biden Administration's lawless refusal to enforce federal immigration laws. Indeed, President Biden has breached the federal government's promise to "protect [the State of Texas] against Invasion," in violation of Article IV, Section 4, by ignoring a series of letters demanding that he perform his constitutional duties and send reinforcements to secure the border. Pursuant to Article I, Section 10, Clause 3, therefore, Governor Abbott has declared that Texas is being "actually invaded" by hostile non-state actors—namely, the cartels—or is "in such imminent Danger as will not admit of delay."

As a result, Texas is empowered to take all necessary steps to repel the cartel invasion at our southern border by "engag[ing] in War." As Justice Holmes has explained, the greater power includes the lesser. *See Moyer*, 212 U.S. at 84–85. Accordingly, those measured steps include the Operation Lone Star deployment of Guardsmen from the Texas Military Department and Troopers from the Texas Department of Public Safety, who have enforced Texas's criminal laws against trespassing, human smuggling, drug trafficking, and the like; the deployment of border-barrier infrastructure such as concertina-wire fencing, border wall, and floating buoys barriers in

---

[44]     Press Release, *Governor Abbott Designates Mexican Cartels As Terrorist Organizations*, Office of the Texas Governor (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations; Victor Nava, *Armed Men Believed to be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, New York Post (August 8, 2023), https://nypost.com/2023/08/08/armed-men-in-body-armor-spotted-crossing-southern-border/.

the Rio Grande; and now the enactment and implementation, beginning on March 5, 2024, of SB4's state-law prohibitions against illegal entry and reentry. Under Article I, Section 10, Clause 3, Texas does not need "the Consent of Congress" to do any of these things in accordance with law. Natelson & Hyman, *supra*, at 8.

Nor is SB4 "subject to the Revision and Controul of the Congress." U.S. Const. art. I, § 10, cl. 2. Of course, that intratextual distinction hardly matters in this case, because Plaintiffs can point to no provision of the INA expressly preempting anything in SB4. That is why they must rely so heavily on the Supreme Court's implied-preemption holdings in *Arizona*, 567 U.S. at 400–10. But that case is not controlling here. The State of Arizona did not invoke, and thus the Supreme Court did not pass upon, the self-defense power that is expressly reserved to the sovereign States in Article I, Section 10, Clause 3.

This Court should decline Plaintiffs' invitation to conduct a "freewheeling judicial inquiry into whether [SB4] is in tension with federal objectives." *Kansas*, 140 S. Ct. at 801 (quoting *Whiting*, 563 U.S. at 599). There is no "brooding federal interest" or "judicial policy preference" to be found in this case that could overtake Article I, Section 10, Clause 3. *Id.* (quoting *Virginia Uranium*, 139 S. Ct. at 1901). Instead, this Court should construe the INA narrowly, so as to avoid the constitutional questions presented by its interaction with Texas's constitutional authority to repel invasions. *See United States v. Hansen*, 143 S. Ct. 1932, 1946 & n.3 (2023) (applying constitutional avoidance in immigration context). "Under the doctrine of constitutional avoidance, '[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 753–54 (5th Cir. 2008) (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568 (1988)). Here, Texas has adopted SB4 to prevent cartels from trafficking an unprecedented number of aliens, an unknown number of terrorists, and deadly drugs like fentanyl into the State. To prevent a collision between federal immigration laws and Texas's right to protect itself under Article I, Section 10, Clause 3, the Court should hold that the INA does

not impliedly preempt the new state-law crimes enacted in SB4.

Further, the failure of Plaintiffs to demonstrate that "no set of circumstances exists under which [SB4] would be valid," *Salerno*, 481 U.S. at 745,—*i.e.*, they have not overcome a "possible set" of "conditions not in conflict with federal law," *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987)—dooms their facial challenge. Because this is a necessarily such a challenge—as there have yet to be any actual applications of SB4—the Court need not decide all the contours of the self-defense powers of the States, or the full scope of the term "invasion." Whatever circumstances may be on the outer edge of that latter category sufficient to invoke a State's self-defensive war powers, they at least include violent, armed, organized groups of people unlawfully intruding into a State's territory. As at least some applications of SB4 will apply to members of such groups, those would clearly fall within the State's reserved defensive war powers and could not be preempted by any federal statutory law. The facial challenges here therefore must be rejected and the preliminary-injunction motions denied.

### E. The Foreign Commerce Clause does not prohibit States from proscribing illicit cross-border traffic of goods and people.

The United States contends that SB4 also violates the Constitution by encroaching on the United States' power to regulate foreign commerce. Yet the United States offers no explanation how a state law that prohibits illegal entry will impact international commerce. Instead, its argument presumes that illegal immigration is *itself* international commerce. Worse yet, the United States presents its challenge in the language of dormant Commerce Clause jurisprudence to argue that SB4 discriminates against foreign commerce by restricting entry into Texas. US PI Mot. at 37–40.

To begin, States have considerable authority to enact laws that affect interstate or international commerce. As the Supreme Court has explained, "a State may exclude from its territory, or prohibit the sale therein of any articles which, in its judgment, fairly exercised, are prejudicial to" its citizens. *Guy v. Baltimore*, 100 U.S. 434, 443 (1880). If illegal immigration can be said to have a "substantial effect" on interstate or foreign commerce, it may be an appropriate

object for the federal government's Commerce Clause power. But that does not mean States may not concurrently regulate it under their general police powers: "Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation." *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 766 (1945). Nothing prevents States from enacting laws that touch on foreign commerce. *Id.*; *see also Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286 (1976) (stating that nondiscriminatory tax, when applied to imported goods, does not impact federal government's regulation of foreign commerce).

The United States also argues that SB4's entry and reentry provisions violate the dormant aspect of the Foreign Commerce Clause. The Constitution permits States to regulate commerce when it takes place inside their territory, so long as they do not discriminate against out-of-state economic interests. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368–70 (2023); *cf. Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006). The United States claims that SB4 implicitly discriminates between citizen and non-citizen entrants, as it prohibits only the latter's entry between ports. US PI Mot. at 39. This theory, however, treats illegal entry as a commercial transaction and alien entrants as articles of international commerce.

The United States' theory hearkens back to a long-disregarded line of precedent. During part of the nineteenth century, the Foreign Commerce Clause was understood to permit the federal government to control at least some aspects of immigration. *See, e.g., Chy Lung v. Freeman*, 92 U.S. (2 Otto) 275, 280 (1875). Significantly, during this period the Supreme Court did not develop a consistent position on whether state regulations of entry through their ports violated the Foreign Commerce Clause. *Compare Henderson v. Mayor of City of New York*, 92 U.S. (2 Otto) 259, 273–74 (1875) (holding state requirement that shipowners pay a per-passenger tax on foreign nationals violates Foreign Commerce Clause), *with Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102, 113 (1837) (upholding state regulation on entry as valid exercise of state police power and finding it would be valid concurrent regulation if it implicated foreign commerce).

The link between the Foreign Commerce Clause and the immigration power—always

tenuous—did not last. *See* Jennifer Gordon, *Immigration as Commerce: A New Look at the Federal Immigration Power and the Constitution*, 93 Ind. L.J. 653, 671 (2018) ("It has been well over a century since the Supreme Court last held that the federal immigration power was rooted in the Foreign Commerce Clause."). The *Chinese Exclusion Case* began a trend of regarding Congress's power to regulate immigration as an inherent aspect of federal sovereignty. *Id.* at 676; *see generally Chae Chan Ping v. United States*, 130 U.S. 581, 609 (1889) (holding that "[t]he power of exclusion of foreigners [is] an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the constitution," and not addressing the Foreign Commerce Clause as a source of Congress's immigration power). Deepening the trend, modern cases source the United States' authority in immigration matters to "its inherent sovereign power to control and conduct foreign relations." *Arizona*, 567 U.S. at 387; *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Hines*, 312 U.S. at 77 (declining to follow *Henderson* in finding that "[t]he registration of aliens resident in a state is not a regulation of interstate or foreign commerce or of the entry or deportation of aliens").

Contemporary courts have largely declined invitations by various federal litigants to find state laws affecting immigrants violative of the Foreign Commerce Clause. *See, e.g., Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 608–11 (E.D. Va. 2004) (rejecting argument that state policy denying public university admission to illegal aliens imposes an undue burden on foreign commerce). There is no reason for this Court to break with recent caselaw and follow the United States through the looking glass into a bygone era of jurisprudence. Indeed, the United States provides no reasons for this Court to revive a defunct understanding of the Foreign Commerce Clause that imagines aliens themselves as foreign commodities and entry as foreign trade.

SB4 does not discriminate against foreign commerce, because it has no impact on foreign economic interests. The dormant Commerce Clause does not prohibit discrimination against out-of-state persons or entities across the board but against "out-of-state economic interests." *Pork Producers*, 598 U.S. at 369. The purpose of the dormant Commerce Clause is to "prevent[] the States from adopting protectionist measures and thus preserve[] a national market for goods and

services." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578 (1997) (stating that "economic isolationism" is "the very evil that the dormant Commerce Clause was designed to prevent"). To be sure, if SB4 targeted foreign transportation companies, it would intrude into familiar dormant Commerce Clause territory. *See, e.g., id.* at 577–79. However, stretching the dormant Commerce Clause to cover discrimination against migrants who enter between ports of entry would imbue it with a novel purpose.

The United States points out that SB4 could affect foreign relations with Mexico and other countries, albeit without explaining how these concerns are related to the Foreign Commerce Clause. US PI Mot. at 39–40. Precedent has acknowledged that certain areas of international and interstate commerce benefit from uniform legislation. *See, e.g., Japan Line v. Los Angeles*, 441 U.S. 434, 446–49 (1979) (concluding that taxation of foreign entities requires uniformity to prevent multiple taxation). However, the concern of this caselaw is with commercial relations, not with international relationships generally. *See id.* at 448 (endorsing need for "the Federal Government [of] speaking with one voice *when regulating commercial relations* with foreign governments" (emphasis added)); *Wardair Canada, Inc. v. Fla. Dep't of Revenue*, 477 U.S. 1, 8 (1986) (noting that "[i]n the *unique context of foreign commerce*, we have alluded to the special need for federal uniformity" (emphasis added)). Furthermore, because SB4 complements federal statutes, it does not disturb the uniformity of federal immigration law. Finally, the potential diplomatic repercussions of an otherwise valid state law do not furnish an independent legal argument. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 441–42 (2003) (Ginsburg, J., dissenting) (agreeing with the majority that firm international agreements can preempt state law but cautioning that this does not extend to federal statements of foreign policy needs); *Barclays Bank, PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 324–29 (1994) (finding foreign-government protests against California tax irrelevant to dormant Foreign Commerce Clause analysis). The United States' relationship with Mexico may or may not be strained due to SB4, but federal courts have refused to restrain far more

severe exercises of state power despite their ramifications for foreign affairs. *See Medellín v. Texas*, 552 U.S. 491, 496–98 (2008) (refusing to stay Texas's execution of Mexican national despite protest by Government of Mexico and the President's foreign affairs authority).

**F. All Plaintiffs face justiciability problems that bar this Court from awarding relief.**

**1. The Supremacy Clause furnishes no cause of action.**

To have any likelihood of success, Plaintiffs must show that they have a cause of action—that "a legislatively conferred cause of action encompasses [that] particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). In other words, courts "ask[ ] whether this particular class of persons ha[s] a right to sue under this substantive [federal] statute." *Id.* (cleaned up); *see also Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) ("*[C]ause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court"); David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 42 ("No one can sue … unless authorized by law to do so").

**a. The United States has no cause of action.**

"The federal government, of course may sue a state in federal court under any valid cause of action," but it "must first have a cause of action against the state," just "like any other plaintiff." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). The federal government's sovereign status does not alter this. "When the state as plaintiff invokes the aid of a court of equity, it is not exempt from the rules applicable to ordinary suitors." John Norton Pomeroy, Jr., *A Treatise on Equitable Remedies* 586 § 330 (1905). "[I]t must establish a case of equitable cognizance, and a right to the particular relief demanded." *Id.* Thus, a court cannot award relief unless it is convinced "that a cause of action cognizable in equity is alleged and proved," even when one sovereign sues another. *Texas v. Florida*, 306 U.S. 398, 411 (1939). For this reason, the United States must establish "a right of action given by some statute" or "a common-law right of action." *Denver & R.G.R. Co. v. United States*, 241 F. 614, 616 (8th Cir. 1917) (rejecting a claim by the federal government).

The United States has not identified any cause of action that could support this suit. It seeks an injunction, but "an injunction is not a cause of action." *Novedea Sys., Inc. v. Colaberry, Inc.*, No. 6:20-cv-180, 2020 WL 9211073, at *2 (E.D. Tex. Dec. 11, 2020); *see also Jones v. Wells Fargo Bank, N.A.*, No. 5-14-cv-943, 2015 WL 12734177, at *4 (W.D. Tex. Jan. 21, 2015). "[T]he Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action," either expressly or by implication, and it "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (cleaned up) (holding there is no private cause of action to enforce the Supremacy Clause). Instead, the Supremacy Clause "creates a rule of decision." *Id.* at 324. When the Supreme Court has allowed suits "to enjoin unconstitutional actions by state and federal officers," those cases have not been brought under the Supremacy Clause. *Id.* at 327. The United States is not singularly exempt from this rule. No precedent "hold[s] that considerations of federal supremacy can create a cause of action where none exists under state law or otherwise." *United States v. Hartford Acc. & Indem. Co.*, 460 F.2d 17, 19 (9th Cir. 1972) (affirming judgment against the federal government).

Rather, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Plaintiffs fail to identify a statute that contains any "'rights-creating' language" permitting their suits. *Id.* at 288. They therefore have no cause of action to enforce the supremacy of federal law.

The fact that the United States "has brought many lawsuits under the Supremacy Clause … without any questioning of [it] as the basis for a federal cause of action," *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021), does not support this Court finding a cause of action on that basis. Cases where other courts did not address whether there was a cause of action—an argument that is subject to waiver or forfeiture, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)—are not precedent on this. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Gann v. United States*, 142 S. Ct. 1, 2 (2021) (quoting *Webster*

*v. Fall*, 266 U.S. 507, 511 (1925)).

Nor is *In re Debs*, 158 U.S. 564 (1895), to the contrary. The Supreme Court there had no occasion to imply a cause of action under the Supremacy Clause because it was considering a petition for habeas corpus, not an appeal from the underlying injunction, but it was the well-known equitable cause of action to abate a public nuisance. "[T]he obstruction of a highway is a public nuisance, and a public nuisance has always been held subject to abatement at the instance of the government." *Id.* at 587 (citation omitted). Since long before *Debs*, it had been "settled, that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general." *City of Georgetown v. Alexandria Canal Co.*, 37 U.S. (12 Pet.) 91, 98 (1838). "The crux of the *Debs* decision" was "that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest." *United Steelworkers of Am. v. United States*, 80 S. Ct. 177, 186 (1959) (Frankfurter, J., concurring).

The cause of action to abate a public nuisance, however, is no help to the United States in this case. Moreover, even if *Debs* had created a cause of action, it would not apply where "there is … no factor of interstate commerce." *United States v. Solomon*, 563 F.2d 1121, 1129 (4th Cir. 1977). "Where … there was no basis on which to claim that interstate commerce was obstructed by a denial of civil rights in violation of some congressional enactment, four courts have held that the government lacks nonstatutory authority to sue." *Id.* at 1128.

*Sanitary District of Chicago v. United States* was, like *Debs,* a suit to enjoin a public nuisance—"to remove obstructions to interstate and foreign commerce." 266 U.S. 405, 426 (1925). *Sanitary District* "is not authority for a broad reading of *Debs*" because "the *Debs* elements of commerce and nuisance were both present and in *Sanitary District,* there were both a treaty and a federal statute defining the interests to be protected." *Solomon,* 563 F.2d at 1127. *Sanitary District* also involved an express statutory cause of action regarding obstructions of navigable waterways. 266 U.S. at 428.

*Wyandotte Transportation Co. v. United States*, 389 U.S. 191 (1967), is also inapposite. That case was about implied causes of action found in statutes. Because the United States does not claim

a statutory cause of action here, *Wyandotte* is irrelevant. In any event, "the unrefined analysis employed in *Wyandotte* is no longer an accurate statement of the law." *United States v. City of Philadelphia*, 644 F.2d 187, 192 (3d Cir. 1980). "In the mid-20th century, the Court followed a different approach to recognizing implied causes of action than it follows now." *Ziglar v. Abbasi*, 582 U.S. 120, 131 (2017); *Alexander*, 532 U.S. at 287.

Nor can the United States rely on *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963). In the opinions on rehearing, two members of the original three-judge panel partially withdrew their concurrences. *See* 320 F.2d 870 (5th Cir. 1963). Depriving the original opinion of a majority, those two judges specified that the federal government had "ample statutory authorization for the maintenance of th[e] suit" and therefore did "not reach the question whether the United States would have standing to sue under the Commerce Clause of the Constitution absent all of these enactments of the Congress." *Id.* at 872–73 (Bootle, J., specially concurring); *accord. id.* at 873 (Ainsworth, J., specially concurring). *Jackson*, then, depended on "statutory authorization" to sue, *id.* at 872 (Bootle, J., specially concurring), not any extra-statutory cause of action. In any event, the reasoning in the original majority opinion is not persuasive and has been "much criticized." *United States v. Mattson*, 600 F.2d 1295, 1298 (9th Cir. 1979).

This dooms *both* the United States's preemption claim *and* its claim under the Foreign Commerce Clause, but it is not based on any "affirmative enactment[] of Congress"—it is based on the dormant aspect of that Clause, which by definition involves no congressional exercise of that power. *In re Debs* and its progeny do not support a cause of action here for the United States.

If Plaintiffs mean to rely on *Ex parte Young*, 209 U.S. 123 (1908), for their cause of action, they must abide by that action's limitations. Thus, even when "no one … is arguing about sovereign immunity,"—as with the United States' claims—"the *second* of *Ex parte Young*'s holdings" is relevant to "whether [a plaintiff] has an equitable cause of action against" the named Defendants here. *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 n.3 (5th Cir. 2021).

Notably, the federal government cannot rely on the equitable cause of action provided by *Ex parte Young*. *First*, that cause of action may not be brought by governments—it is limited to

private parties. *See Whole Women's Health v. Jackson*, 142 S. Ct. 522, 532 (2021) (describing the doctrine as "a narrow exception … that allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws" against them); *Armstrong*, 575 U.S. at 326–327 (similar). Expanding this traditional equitable remedy to use by the United States would violate *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), which prohibits courts from invoking "equity" to create remedies and causes of action that did not exist when the original Judiciary Act was enacted in 1789. *See id.* at 318. Courts may not extend traditional causes of action even to closely related situations. *See id.* at 319 (refusing to recognize an equitable remedy that would allow pre-judgment creditors to restrain a debtor's assets, because this relief was traditionally available *only* to "creditor[s] who had already obtained a judgment establishing the debt").

The unifying theme of the Supreme Court's cause-of-action precedent is that judicially recognized causes of action may not undermine the more limited remedial schemes that Congress has established. *See Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 499–501 (5th Cir. 2020) (Oldham, J., concurring); *see also Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020). When identifying implied statutory causes of action, for example, "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Similarly, "when alternative methods of relief are available, a *Bivens* remedy usually is not," especially if the absence of an express cause of action "might be more than 'inadvertent.'" *Abbasi*, 582 U.S. at 143. And "where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 74 (1996). Even when interpreting an express cause of action like Section 1983, the Supreme Court is careful to ensure that the cause of action is not so broad that it would allow a plaintiff to "evade" a "requirement" of a more limited habeas remedy. *Preiser v. Rodriguez*, 411 U.S. 475, 489–90 (1973).

Section 1983, for example, creates a private cause of action for private individuals to sue

local governments as well as local and state officials to vindicate almost all federal-law rights. *See* 42 U.S.C. § 1983; *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). But Congress has not provided a similarly broad *civil* cause of action *for* the United States or *against* a State.

### b. The Organizational Plaintiffs have no cause of action.

The Organizational Plaintiffs also fail to point to any authorization of a private cause of action for any of their claims. As noted above, "the Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action" either expressly or by implication, and "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong,* 575 U.S. at 324–25 (cleaned up) (holding there is no private cause of action to enforce the Supremacy Clause). Rather, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Organizational Plaintiffs fail to identify a statute that contains any "'rights-creating' language" permitting their suit. *Id.* at 288. They therefore have no cause of action to enforce the supremacy of federal law.

*Ex parte Young* cannot help the Organizational Plaintiffs here. Although equity sometimes provides a cause of action that "enable[s] potential legal defendants to assert their defenses preemptively," John Harrison, *Ex Parte Young*, 60 Stan. L. Rev. 989, 999 (2008), the Organizational Plaintiffs do not and cannot invoke that proposition here. *Ex parte Young* involved that "staple of equity," the bill to restrain proceedings at law which permitted potential defendants to obtain an anti-suit injunction by preemptively asserting a defense as plaintiffs. *Id.* at 997. That was "the preemptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1213 (2012) (Roberts, C.J., dissenting, joined by Scalia, Thomas, and Alito, JJ.); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring, joined by Thomas, J.). However, plaintiffs can invoke *Young* only when the state officers responsible for enforcing the challenged statute "threaten and are about to commence proceedings" against them. *Young*, 209 U.S. 123, 155–56.

The Organizational Plaintiffs do not allege they are potential defendants to an enforcement action based on SB4. Nor have they asserted a defense by suing a defendant who may potentially enforce the law against them. In fact, Organizational Plaintiffs have not identified any way in which Director McCraw or District Attorney Hicks could theoretically enforce SB4 against them.

Organizational Plaintiffs therefore lack even an *Ex parte Young* cause of action against any of the Defendants, and they necessarily cannot prevail on the merits.

### 2. Organizational Plaintiffs lack standing.

The Organizational Plaintiffs' claims against Director McCraw and District Attorney Hicks are jurisdictionally barred. *See, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) ("A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue."); *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 964 (5th Cir. 2014) (reversing grant of preliminary injunction when the State defendants were immune and *Ex parte Young* did not apply).

None of the Organizational Plaintiffs has made a clear showing that they have the standing necessary to maintain a preliminary injunction. "[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). Courts persistently inquire into standing because "[w]ithout jurisdiction the court cannot proceed at all in any cause*.*" *Steel Co.,* 523 U.S. at 94 (cleaned up). "Each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof"—"with the manner and degree of evidence required at the successive stages of the litigation" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). At the preliminary-injunction stage, plaintiffs must make a "clear showing" that they have standing. *Barber v. Bryant,* 860 F.3d 345, 352 (5th Cir. 2017).

Nonprofit Plaintiffs do not describe themselves as having members; they therefore rely

exclusively on organizational standing, not associational standing.[45] *See NAACP v. City of Kyle*, 626 F.3d 233, 237–38 (5th Cir. 2010). This means that the Nonprofit Plaintiffs must themselves satisfy the three elements of Article III standing: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *El Paso County v. Trump,* 982 F.3d 332, 337 (5th Cir. 2020). Where, as here, plaintiffs seek prospective relief, they "can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019).

Because this is a facial pre-enforcement challenge, the Organizational Plaintiffs must show an imminent judicially cognizable injury through the test described in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). That means they must show an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and there exists a credible threat of prosecution thereunder." *Id*. at 158–59 (quotation omitted).

In their sole claim, the Nonprofit Plaintiffs allege that SB4 "violates the Supremacy Clause." OP PI Mot. at 25. But—as explained above regarding the cause-of-action requirement— "the Supremacy Clause is not the source of any federal rights." *Armstrong*, 575 U.S. at 324 (internal quotation marks and citations omitted) (citing *Golden State Corp.*, 493 U.S. at 107); *see also Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017). Rather, it "creates a rule of decision." *Armstrong*, 575 U.S. at 324. As the Supreme Court has explained, the Supremacy Clause instructs courts to "not give effect to state laws that conflict with federal laws."

---

[45] To be sure, both Nonprofit Plaintiffs—Las Americas and American Gateways— claim to work on behalf of various communities, *see, e.g.*, Babaie Decl. ¶ 10; Yang Decl. ¶¶ 3, 4, 25, but the beneficiaries of a plaintiff's services do not qualify as members for purposes of associational standing. *See Ne. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006). A plaintiff cannot have associational standing unless one of its members independently satisfies the Article III standing requirements. *Ctr. for Biological Diversity v. United States Envtl. Prot. Agency*, 937 F.3d 533, 536 (5th Cir. 2019). It goes without saying that an organization that lacks members is unable to satisfy this threshold requirement.

*Id.* In other words, the Supremacy Clause does not create a right to preemption a litigant can preemptively assert; instead, it "instructs courts what to do when state and federal law clash." *Id.* at 325–26. Accordingly, preemption is not a "right[] secured by the Constitution or laws of the United States." *Id.* at 324.

Because the Supremacy Clause is not the source of any rights, none of the consequences the Nonprofit Plaintiffs seek to avoid are affected with a constitutional interest or constitute an injury in fact. *See United States v. Texas*, No. EP-21-cv-173, 2022 WL 868717, *5 (W.D. Tex. Feb. 17, 2022) (Cardone, J.) (finding immigration groups lacked standing on this basis when challenging Texas immigration policy under Supremacy Clause).

Further, because the Nonprofit Plaintiffs' intended conduct is not itself "arguably proscribed by [the law] they wish to challenge" they lack standing in this pre-enforcement challenge. *Susan B. Anthony List*, 573 U.S. at 162. In *Susan B. Anthony List*, non-profit groups that intended to make statements about candidates' voting records challenged an Ohio statute that prohibited making "false statements concerning the voting record of a candidate." *Id.* at 152–53. The Supreme Court found that the groups' intended conduct was "arguably proscribed" because the law "swe[pt] broadly" and "cover[ed] the subject matter of [the nonprofits'] intended speech. *Id.* at 162. But the Nonprofit Plaintiffs' conduct is not subject to enforcement by any provision of SB4, which only applies to illegal aliens, not organizations. None of the conduct in which they intend to engage is "arguably proscribed" by any provision of SB4 and is therefore not traceable to Defendants' enforcement of that statute. For the same reason, relief from this Court enjoining enforcement of SB4 will not redress the Nonprofit Plaintiffs' injuries.

This also means Nonprofit Plaintiffs fail to satisfy the requirement that they face "a credible threat of prosecution." *Id.* at 158–59. They must show a threat of "prosecution [under SB4] if *plaintiffs* engage[] in their intended course of conduct." *Seals v. McBee*, 898 F.3d 587, 592 (5th Cir. 2018) (emphasis added). As SB4 may only be used to prosecute natural persons—illegal aliens—Nonprofit Plaintiffs cannot show this necessary element of standing in a pre-enforcement case.

Las Americas Immigrant Advocacy Center ("Las Americas") and American Gateways describe themselves as non-profit organizations dedicated to providing legal services to aliens. Neither has established that SB4 inflicts a cognizable harm on them sufficient to confer standing. To start with, Nonprofit Plaintiffs are not "the object of the government action or inaction [they] challenge[]," making it "substantially more difficult to establish" an injury in-fact. *Lujan*, 504 U.S. at 562 (quotation omitted). Instead, Plaintiffs argue that SB4's effects on third parties not before this court will force Las Americas and American Gateways to divert resources from their routine activities.

Though the diversion of resources can constitute a requisite injury under certain circumstances, "[n]ot every diversion of resources to counteract [a] defendant's conduct … establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. "The change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). Here, Plaintiffs bring their claim pursuant to the Supremacy Clause, which is not the source of any rights. *See* OP PI Mot. at 25. Hence, none of the consequences Nonprofit Plaintiffs seek to avoid are affected with a constitutional interest or constitute an injury in-fact.

Moreover, Nonprofit Plaintiffs' diversion of resource theory fails as it stems from voluntary strategic and budgetary choices. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012). For example, Nonprofit Plaintiffs argue that they will need to develop a new service program to assist people in state facilities, which could siphon funds from other projects. OP PI Mot. at 24–25; *see also* Babaie Decl. ¶¶ 30, 39; Yang Decl. ¶ 22. However, nothing in SB4 necessitates that Organizational Plaintiffs take this action. They can continue to maintain their current programs without interference. Their real objection is that after the effective date of SB4, some number of individuals, not yet known, may find themselves in a state court proceeding that the two organizations deem weighty enough to provide advice and representation. Many statutes can spur changes to an organization's strategy on how to best achieve its mission. But a "unilateral and uncompelled response to shifting needs of its [constituents] cannot manufacture an Article III

injury." *CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 238 (4th Cir. 2020), *vacated on other grounds*, 981 F.3d 311 (4th Cir. 2020). The Nonprofit Plaintiffs make no allegation that they currently serve all aliens detained by federal authorities, which would be implausible.  Even with SB4, they will have plenty of aliens detained by federal authorities to provide their services to—any expansion to also serve aliens detained by the State of Texas (which already occurs through Operation Lone Star criminal trespass prosecutions, as well as myriad other criminal laws applied to aliens) would be the Nonprofit Plaintiffs' voluntary choices.

Nonprofit Plaintiffs further argue that Las Americas and American Gateways both need to educate staff as well as members of the immigrant community about the new law. But the "self-serving observation that it has expended resources to educate its members and others regarding [the challenged law] does not present an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995). If standing were so broad, legal groups would have standing whenever a statute changed the law in their practice area. "To determine that an organization that decides to spend its money on educating members … suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Lane*, 703 F.3d at 675 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

It is also not clear "how the activities" Las Americas and American Gateways plan to "undertake[] in response to the defendant's conduct differ from its 'routine [] activities.'" *Def. Distributed v. U.S. Dep't of State*, No. 1:15-cv-372, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). Las Americas and American Gateways already offer aliens help navigating the immigration process. *See, e.g.*, Babaie Decl. ¶¶ 17–18; Yang Decl. ¶¶ 12–15. The services they intend to offer aliens detained pursuant to SB4 represent more of the same, even if it occurs in a state, as opposed to federal, facility. Furthermore, Nonprofit Plaintiffs affirm that "a central feature of their mission is to engage and educate immigrant communities." Yang Decl. ¶ 16. Informing their constituents about their rights under the law is part and parcel of the routine activities of both Las Americas and American Gateways.

Nonprofit Plaintiffs next argue that SB4 frustrates their respective missions by "creating major, new impediments to the ability of individuals to seek asylum in the United States." Babaie Decl. ¶ 25. Specifically, they allege that SB4 will prevent aliens in state custody from beginning or completing asylum applications. *Id.* ¶¶ 25, 32–33; Yang Decl. ¶¶ 19–22. There are two flaws with this assertion.

*First*, Nonprofit Plaintiffs cannot obtain standing by expressing concern that a third party not before this court may be harmed by the challenged law. Las Americas and American Gateways are not membership organizations, and even if they were, neither has identified a specific member who has met the elements of Article III standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Nor can Nonprofit Plaintiffs establish some alternative to membership that would allow them to litigate a third-party's alleged injury. The individuals who will be detained pursuant to SB4 are yet unknown. Nonprofit Plaintiffs therefore cannot claim a close relationship with an alien for whom SB4 poses a "certainly impending" risk of interfering with his ability to pursue asylum. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Absent this connection, Nonprofit Plaintiffs merely have a "generalized and unspecific" preference "no different from that of any American" who shares their views. *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 800 (D.C. Cir 1987) (Bork, J.) (noting that immigration groups lacking standing "do not assert that they have been deprived of an opportunity to meet with a particular alien concerning a particular subject, or, for that matter, that they know, or even know of, any of the interdicted Haitians with whom they wish to associate," but "merely that they have been deprived of an opportunity to associate with some number of a class of unidentified aliens seeking to enter the country.").

*Second*, even assuming the regulation of third parties could confer standing, Nonprofit Plaintiffs' assertions are entirely speculative. SB4 does not become effective until March 5, 2024— and thus no enforcement has yet to occur—and the Texas agencies responsible for implementing SB4 have yet to issue the policies and regulations that would govern the law's enforcement. Nonprofit Plaintiffs therefore do not know how SB4 will operate in practice but instead make unfounded assumptions about the actions state officials will take. Not only does this show that

Nonprofit Plaintiffs' alleged injuries are neither actual nor imminent, *see Clapper*, 568 U.S. at 402, but their description of how the law will operate is incorrect.

Illegal aliens detained pursuant to SB4 will have a full and fair opportunity to seek asylum, just as they would if detained by federal authorities. Texas agencies involved in the implementation of SB4's will fully accommodate the asylum process. Clark Decl. ¶ 12; Escalon Decl. ¶¶ 8, 11-13. Aliens in state custody will be allowed to speak with federal immigration officers on request as well as with counsel. Clark Decl. ¶ 9-11. They will be able to file an asylum application with the United States. *Id.* at ¶ 10, 12. And in the event an individual in state detention needs to attend a hearing or interview as part of the asylum process, state officers will either host the proceeding in the state facility or provide transportation to the appropriate location. *Id.* at ¶ 11.

The final injury Nonprofit Plaintiffs allege is that SB4 will frustrate their work representing victims of human trafficking and other violent crimes by instilling fear that reporting said crime will result in removal. However, a plaintiff's speculative belief about the reactions of third parties to a challenged law cannot support standing, both because it is based on "conjecture" and because it is "based on third parties' subjective fear" and therefore not traceable to SB4. *Clapper*, 568 U.S. at 417 n.7. Las Americas and American Gateways "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. *Id*. at 416.

In a diversion of resources case, "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treasury Emps. Union*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quotation omitted). "These are simply setbacks 'to the organization's abstract social interests.'" *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). The challenged action must make the organization's activities more difficult in addition to being at "loggerheads with the stated mission of the plaintiff." *Nat'l Treasury*, 101 F.3d at 1429 (quoting *Nat'l Treasury Emps. Union v. United States*, 929 F. Supp. 484, 489 (D.D.C. 1996)). Nonprofit Plaintiffs do not (and cannot) satisfy this burden since SB4 does not regulate, restrict, or otherwise impede the legal

services they currently provide aliens.

### 3. El Paso County cannot sue its parent State and has alleged no injury.

El Paso County's claim stumbles immediately out of the gate because a political subdivision of a State, as a rule, has no standing to sue the state that created it, and the very limited exception articulated in *Rogers v. Brockette* does not apply here since El Paso County does not have a federal statutory right put at risk by SB4. However, even if its claim were not barred by century-old precedent, El Paso County still fails to meet its Article III burden because the harm it alleges is speculative and pertains to El Paso County's abstract social interests, which do not constitute a cognizable injury in fact.

Precedent firmly establishes that local governments lack standing to sue their parent States. S*ee*, *e.g.*, *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923); *Town of Ball v. Rapides Par. Police Jury*, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984). In *Rogers v. Brockette*, the Fifth Circuit recognized, at most, a narrow exception for claims under the Supremacy Clause vindicating a federally created statutory right, but El Paso County does not fit within that carve out. 588 F.2d 1057 (5th Cir. 1979). There, a school district "allege[d] that Congress [] made it the proper body to decide" certain questions under the federal breakfast program but that the State had deprived the school district of that federally conferred discretion. *Id.* at 1062. Here, in contrast, there is no claim that Congress "interfere[d] with a state's internal political organization" to create a federal statutory right, which Texas law then undermined. *Id.* at 1070. To the contrary, the heart of Organizational Plaintiffs' argument is that SB4 interferes with the discretion of federal immigration officers—not that of local officials. *See* OP PI Mot. at 19–20.

The other case Organizational Plaintiffs rely on is equally unavailing. In *City of Alpine v. Abbott*, a group of local governments challenged the Texas Open Meetings Act as being violative of the First and Fourteenth Amendments. 730 F. Supp. 2d 630 (W.D. Tex. 2010). Despite ruling against the local governments, Organizational Plaintiffs latch onto an out of context statement by the court, which distinguished constitutional provisions that protect individual rights from those

that protect structural rights, such as the Supremacy Clause. OP PI Mot. at 25–26. Read in context, however, it becomes clear that the *City of Alpine* court merely summarized the holding in *Rogers*: namely, a claim brought by a political subdivision against its parent State to vindicate individual rights is categorically barred, while certain claims brought pursuant to the Supremacy Clause may be permitted so long as Congress conferred some federal statutory right upon the political subdivision. *City of Alpine*, 730 F. Supp. 2d at 632–33. After all, "Congress may interfere with a state's internal political organization in ways that the Constitution itself does not interfere." *Id.* at 632 (quoting *Rogers*, 588 F.2d at 1070).

In the present action, El Paso County seeks relief pursuant to the Supremacy Clause, but Plaintiffs do not allege—and the facts do not establish—that El Paso County has a federally-created statutory right put at risk by SB4. Its claim fails on this ground alone.

Likewise, even if El Paso County had not based its claim on the Supremacy Clause, it still would not have standing because SB4 does not inflict a cognizable injury in fact on it. Like Nonprofit Plaintiffs, El Paso County is not "the object of the government action or inaction [it] challenges," making it "substantially more difficult to establish" an injury in fact. *Lujan*, 504 U.S. at 562 (quotation omitted). Instead, it argues that SB4's effects on third parties not before this court will force El Paso County to expend additional funds, which could result in a diversion of resources or a tax increase. OP PI Mot. at 25–26. This argument fails. Not only are the consequences El Paso County seeks to avoid not affected with a constitutional interest, *see supra* Part I.F.2, but its argument turns on speculation and contradicts evidence that SB4 will deter illegal migration into Texas, thereby reducing the financial burden borne by Texas counties, including El Paso.

Indeed, El Paso County bases its diversion of resource theory on the assumption that "there *may be* over 8,000 additional arrests under S.B.4 in the El Paso area," Carrillo Decl.  ¶ 11 (emphasis added), but this number is sheer guesswork. El Paso County extrapolated it from an estimate the Director of the Texas Department of Public Safety gave the House State Affairs Committee before the legislation was ever finalized and enacted. *Id.* ¶¶ 10–11. Also, El Paso County simply assumes that the financial responsibility for each arrestee will land on its shoulders, *Id.*

¶¶ 11–14, whereas in practice the State may make alternative arrangements or provide additional funds[46] and infrastructure to defray the costs. Many arrestees may also choose to voluntarily leave Texas or be transferred into federal custody.

The fact is that SB4 does not become effective until March 5, 2024, and the Texas agencies responsible for implementing SB4 have yet to issue the policies and regulations that would govern the law's enforcement. El Paso County—like the Nonprofit Plaintiffs—therefore does not know how SB4 will operate in practice but instead engages in conjecture, which is insufficient for standing since an injury in-fact must be "certainly impeding." *Clapper*, 568 U.S. at 409. What's more, evidence indicates that the criminal penalties introduced by SB4 will prompt noncitizens "to enter the United States through Arizona, New Mexico, and California" or even be deterred from entering the country at all. Hott Decl. ¶ 20; BeMiller Decl. ¶ 6. This is likely to lead to overall *fewer* aliens in El Paso County jails. And a reduction in the number of Texas crossings will alleviate the burden of all social services that weighs on Texas border towns and counties, such as El Paso County, *see, e.g.*, Gutierrez Decl. ¶ 11, which would result in financial savings.

El Paso County next contends that SB4 will cause it to lose "about $20 million in federal funds since El Paso County jails would no longer have the space to house federal prisoners." Carrillo Decl. ¶ 13. However, this is even more attenuated than the preceding allegations as it is premised on "numerous predicted effects" of the challenged law, any one of which may or may not occur. *Bruni v. Hughs*, 468 F. Supp. 3d 817, 823 (S.D. Tex. 2020). Although an injury that stems from a chain of events does not always foreclose standing, courts may "reject as overly speculative those links which are predictions of future events." *Id.* (quoting *Arpaio v. Obama,* 797 F.3d 11, 21 (D.C. Cir. 2015)). In this case, Plaintiffs fashioned each link out of speculation and

---

[46] Texas in fact has expanded its Operation Lone Star Grant Program to help local governments, among other things, "increase capacity for detention operations" as well as "increase capacity and expediency in case preparation, magistration, pre/post-adjudication proceedings, and criminal trials" of border and immigration related defendants. *See* https://egrants.gov.texas.gov/fundingopp/operation-lone-star-grant-program-ols-fy2025.

conjecture; the chain of events is too remote to sustain standing.

The remaining alleged injuries El Paso County identifies fare no better. El Paso County clams that uncertainty over the law "*may* create mass walkouts from the [Migrant Support Services] Center, leading to homelessness, street sleeping, public loitering, and [] public safety concerns." Gutierrez Decl. ¶ 14. But, again, the assertion relies on a speculative chain of events too attenuated to support a cognizable injury. The "subjective fear" of third parties "does not give rise to standing." *Clapper*, 568 U.S. at 418. Finally, El Paso County contends that SB4 will erode public trust in local government, which "the County has set as a strategic goal." OP PI Mot. at 26; Gutierrez Decl. ¶ 18. However, at most, this constitutes an abstract concern, which is not particularized enough to confer standing. The allegation is also entirely speculative and hinges on the subjective reactions of individuals not before this court. El Paso County's motion for preliminary injunction should be denied.

And for the same reasons that the Nonprofit Plaintiffs fail to satisfy the test for a pre-enforcement challenge, *see supra* at Part I.F.2, El Paso County cannot show that its intended conduct is arguably affected with a constitutional interest, that its intended conduct is "arguably proscribed" by SB4, or that there is a credible threat that it will be prosecuted under it. El Paso County has no standing to challenge SB4.

### 4. The Organizational Plaintiffs' claim is barred by sovereign immunity and not subject to any exception.

Absent a waiver of immunity, sovereign immunity bars suits against States in federal court, regardless of the nature of the remedy sought. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01 (1984); *see also Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.") (internal citations omitted)). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. at 71 (1989). "Suits against state officials in their official capacity [] should be treated as suits against the State." *Hafer*

*v. Melo*, 502 U.S. 21, 25 (1991).

The Organizational Plaintiffs name two Defendants—DPS Director McCraw and District Attorney Hicks. The Department of Public Safety is an agency of the State of Texas. *See* TEX. GOV'T CODE § 411.002 ("The Department of Public Safety of the State of Texas is an agency of the state to enforce the laws protecting the public safety and provide for the prevention and detection of crime."). DPS Director McCraw is sued in his official capacity, and sovereign immunity "extends to state officials who are sued in their official capacities because such a suit is actually one against the state itself." *McKinley v. Abbott*, 643 F.3d 403, 406 (5th Cir. 2011) (holding that the Eleventh Amendment barred a suit against the Texas Attorney General in his official capacity). And Texas district attorneys are agents of the State when sued regarding their prosecutorial enforcement of state laws like SB4. *See Arnone v. Dallas Cnty.*, 29 F.4th 262, 268–69 (5th Cir. 2022); *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997); *Booth v. Galveston Cnty.,* 352 F.3d 718, 744–45 (S.D. Tex. 2019).

Organizational Plaintiffs may overcome sovereign immunity only through the "exception" of *Ex parte Young*, 209 U.S. 123 (1908). *See McCarthy ex rel. Travis v. Hawkins,* 381 F.3d 407, 412 (5th Cir. 2004) ("[T]he principle of state-sovereign immunity generally precludes actions against state officers in their official capacities, subject to an established exception: the *Ex parte Young* doctrine.") (citation omitted). The "Article III standing analysis and *Ex parte Young* analysis significantly overlap." *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (cleaned up). For the same reasons that no Organizational Plaintiff has standing, they all fail to satisfy the requirements of *Ex parte Young*.

"*Ex parte Young* allows suits for injunctive or declaratory relief against state officials [in their official capacities], provided they have sufficient 'connection' to enforcing" a state action that allegedly violates federal law. *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021). If there is no such connection to enforcement, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity." *Id.*

(citations omitted).

To have the requisite connection to enforcement, an official must have more than "the general duty to see that the laws of the state are implemented." *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014)). Rather, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted). This means the analysis is "provision-by-provision": the officer must enforce "the particular statutory provision that is the subject of the litigation." *Id.* (citation omitted); *see also Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020). And "'enforcement' means 'compulsion or constraint.'" *Texas All. for Retired Americans v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *City of Austin*, 943 F.3d at 1000). "If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (citing *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)).

Organizational Plaintiffs do not establish—or even allege—a waiver of sovereign immunity or how they satisfy an exception under *Ex parte Young*. Just as the Organizational Plaintiffs lack standing to challenge SB4, *see supra* at Part I.F.2–3, they fail to show that they are subject to enforcement of that statute by any of the Defendants sufficient to come within the *Ex parte Young* exception. Their preemption claim thus does not raise a defense to any threatened enforcement against them, and thus is not consistent with sovereign immunity. *See Harrison, supra*, at 990 ("Sovereign immunity permits private people to assert defenses against the government, so a suit against an officer that enforces a defense is consistent with sovereign immunity, not an exception to it, and requires no fiction for its justification.").

## II.   Plaintiffs cannot satisfy the remaining factors for injunctive relief.

In a pre-enforcement facial challenge like this one, there has not yet been any harm inflicted on any of the Plaintiffs, making the merits of the preemption challenges the whole ballgame for

whether there is any injury inflicted on them. As Plaintiffs' claims fail on the merits, there can be no injury in this facial challenge.

### A. Allowing Texas to enforce state criminal laws that track federal criminal laws already on the books would not inflict irreparable harm on the Plaintiffs.

Plaintiffs' bids for a preliminary injunction still should be denied at the outset because they cannot satisfy the key temporal prerequisite for such expedited, emergency relief: a "substantial threat of irreparable injury if the injunction is not granted." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "An injunction is appropriate only if the anticipated injury is imminent and irreparable." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Thus, "the asserted irreparable injury must be neither remote nor speculative." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted). Yet—as explained above—such unsubstantiated speculation about the effects of SB4 is all Plaintiffs offer in their motions.

SB4 merely enables one State to pick up a baton that the federal government has deliberately dropped. It cannot possibly constitute "irreparable harm" to the United States for another sovereign to enforce state laws that are consistent with the laws of the United States. As an alternative, the United States suggests SB4 harms its diplomatic relations with Mexico. US PI Mot. at 12. But States make decisions all the time that may displease neighboring countries. That does not confer upon the federal government a roving authority to superintend every decision of state governments that might offend international partners. *See, e.g.*, *Medellin*, 552 U.S. at 524, 530-32). In any event, Mexico's objections to SB4 are irrelevant, given it is (at best) incapable or (at worst) unwilling to abate an invasion from its own territory. A nominally friendly nation that cannot control invasions into a neighboring sovereign's territory forfeits its immunity from incursion and is subject to being treated as a hostile neighbor under the law of nations. *See* Vattel, Law of Nations Book II, §§ 72, 76-78 (1797) (describing how a nation may "become[] a party in the fault" by "authoris[ing] its citizens indiscriminately … to make inroads into the neighbouring countries").

The Organizational Plaintiffs fare no better. To the extent they rely on the actions of aliens whose conduct could be covered by SB4, they cannot claim irreparable harm based on anticipated

illegal activity. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974). In any event, even assuming SB4 could be unlawfully applied to a particular alien, that possibility is hardly irreparable. An alien subjected to prosecution under SB4 would be furnished a remedy capable of redressing any harm—namely, "the exorbitant gold standard of American justice—a full-dress criminal trial" in which he could press any argument in his defense. *Lafler v. Cooper*, 566 U.S. 156, 186 (2012) (Scalia, J., dissenting). Nor can the Organizational Plaintiffs avoid that problem by claiming SB4 will "chill" their activities. To the extent the organizational plaintiffs seek to facilitate illegal entries contrary to SB4, it is already a *federal crime* for them to encourage illegal entry under the INA. *See United States v. Hansen*, 599 U.S. 762, 766 (2023).

Texas and its officials, as the Defendants, do not need to show irreparable harm for this Court to deny a preliminary injunction. But if any parties could be irreparably harmed here it is Defendants. As the Chief Judge of this district has already found, the federal government is openly flouting its statutory duties at the border, enticing people to "undertake the dangerous task of crossing the river" and causing "irreparable harm" to Texas. *Texas,* 2023 WL 8285223, at *4, 17.

### B. The equities do not favor Plaintiffs, who either ignore their obligations under federal law or rest their injury on anticipated criminal entry.

Generally, the third and fourth factors under the preliminary injunction standard—weighing the alleged harm to both parties and assessing the public interest—"merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). When determining whether to issue a preliminary injunction, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

For the equities to weigh in favor of granting the extraordinary relief of a preliminary injunction "plaintiff[s] must establish that [their] irreparable harm is greater than the hardship that the preliminary injunction would cause Defendants." *Portee v. Morath*, No. 1:23-cv-551, 2023 WL 4688528, at *6 (W.D. Tex. July 21, 2023); *see also Winter*, 555 U.S. at 24 (2008) (stating that courts "must balance the competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief.").

Here, equity favors denying Plaintiffs' requested injunction. Texas's interest in addressing the ongoing border crisis is manifest. That interest, and the irreparable harm if officials cannot act to protect the State, merges with the public's interest. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 243 (5th Cir. 2020). And the Fifth Circuit generally considers a State enjoined from giving effect to its statutes to automatically suffer a form of irreparable injury. *E.g.*, *Vote.Org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022).

Not only do these harms outweigh Plaintiffs' alleged injuries, but Texas's stated interests are of the highest order. Just this past term, the Supreme Court was careful not to interpret an interstate compact broadly because it implicated "a fundamental aspect of a State's sovereign power—its ability to protect the people, property, and economic activity within its borders." *New York v. New Jersey*, 143 S. Ct. 918, 925 (2023). Those "fundamental" issues sit at the heart of the disaster that Texas seeks to address here, and state officials closest to the border crisis are also those best situated to respond to it effectively. As detailed above, former FBI officials recently warned that America is less safe today because of the unabated flow illegal entries into this Country and 2023 saw the highest number of suspected terrorists cross the southern border. Texas and its citizens, situated on the frontlines of this ongoing invasion, stand to lose more than those situated further inland. The injunction Plaintiffs seek here would plainly impede Texas's ability to defend its border and its citizens.

### C. Enforcing SB4 to deter drug smuggling, human trafficking, and terrorism is in the public interest.

It should be obvious that unlawful activity—like drug smuggling, human trafficking, terrorism, and the countless other ills associated with illegal immigration—harms the American public and aliens themselves. "[T]he public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). That is likely why Congress has passed laws prohibiting just what SB4 prohibits here—to deter illegal crossings and prevent the downstream harms accompanying that criminal activity.

Policing illegal entry not only helps secure sovereign territory. By directing aliens to ports of entry, it also reduces the risk to officers and aliens alike posed by dangerous river crossings. It prevents the risk of violent conflict between trespassers and landowners. It facilitates law enforcement's ability to detect contraband and criminal behavior. It enables authorities to carefully process, assess, and apprehend would-be entrants to this country. And it slows the pace of a wave of migration for which federal resources have proven inadequate.

Once again, the Chief Judge of this district has already found that the United States's open-borders approach to border security exacerbates harm to the public. Rather than prosecute aliens for the crime of illegal entry, "Defendants apparently seek to establish an unofficial and unlawful port of entry." *Texas*, 2023 WL 8285223, at *14. That approach to border security "provid[es] ample incentive for the individuals posing the greatest public danger to flee rather than deliver themselves to the Defendants," *id.* at *13, and entices people to "undertake the dangerous task of crossing the river," *id.* at *4. In other words, "the very [public] emergencies" the United States has pointed to elsewhere in challenged Texas's border security efforts "are of [the United States's] own creation." *Id.*

The United States and the Organizational Plaintiffs both argue that Texas has no legitimate interest in enforcing a preempted law, and that the public interest therefore favors an injunction. US PI Mot. at 45; OP PI Mot. at 26–27. But that argument merely recycles the merits. As discussed above, SB4 is *not* preempted by federal law. *See supra* at Part I.A.–D. The United States also heavily relies on supposed harms to foreign relations. US PI Mot. at 40–44. But for the reasons explained above, Mexico's repeated and ongoing failure to abide by its own law-of-nations obligations to Texas tips the equitable balance in Texas's favor. Finally, both sets of Plaintiffs claim SB4 will interfere with federal immigration relief available to aliens. US PI Mot. at 43–44; OP PI Mot. at 26–27. But nothing in SB4 precludes any alien applying for discretionary federal relief. Aliens in Texas's custody may meet with any federal immigration officer, attend any federal hearing, and Texas will comply with any federal immigration detainer.

Accordingly, given the substantial harms at stake for Texas and the relatively minor harms

about which Plaintiffs speculate, the balance of equities and the public interest weigh against granting a preliminary injunction here.

### III. Other equitable considerations caution against broadly enjoining SB4.

Plaintiffs contend that this Court should enjoin the entirety of SB4. *See* OP PI Mot. at 17; US PI Mot. at 46. As detailed above, Plaintiffs challenge SB4 on its face. Because Plaintiffs' challenges are premature, they raise many questions about how, in fact, SB4 will be enforced. That provides a good reason to abstain entirely and wait for as-applied litigation. Even if this Court were inclined to grant a preliminary injunction, however, the Court should limit its injunction to those particular applications of SB4 that it finds unlawful. And the Court should, in all events, limit any injunctive relief to the parties.

#### A. Abstention doctrines caution against entertaining this pre-enforcement challenge.

When a federal court is considering a pre-enforcement facial challenge to legislation, any uncertainty as to its effects "can be ameliorated by a state court's authoritative interpretations." *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (internal quotation marks omitted). That exercise of comity, in which "the federal courts, exercising a wise discretion, restrain their authority because of scrupulous regard for the rightful independence of the state governments and the smooth working of the federal judiciary," is known as *Pullman* abstention. *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941) (internal quotation marks omitted). "The paradigm of the 'special circumstances' that make abstention appropriate is a case where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979). This is so because courts are loath to deprive "state courts of the opportunity to construe a law to avoid constitutional infirmities." *NetChoice, LLC v. Paxton*, 49 F.4th 439, 449 (5th Cir. 2022) (cleaned up). *Pullman* abstention serves values of federalism, comity, and judicial administration because "no matter how seasoned the judgment" of a federal court may be on an issue of state law, "it cannot escape being a forecast rather than a

determination," as "the last word" on state law always rests with the state's courts. *Pullman*, 312 U.S. at 499–500.

"Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations." *Harman v. Forssenius*, 380 U.S. 528, 534 (1965). As Plaintiffs reiterate throughout their pleadings, their various federal constitutional theories are dependent upon, and may be materially altered by, determinations regarding uncertain issues of Texas law. *See, e.g.*, OP PI Mot. at 18 (speculating that aliens detained for SB4 offenses will have no opportunity to claim asylum); U.S. PI Mot. at 43–44 (same, in addition to other forms of immigration relief); *compare* U.S. PI Mot. at 34 (arguing SB4 would interfere with federal government's care of unaccompanied minors) with Escalon Decl. ¶ 7 & Barnes Decl. ¶ 4 (Texas turns them unaccompanied minors over to federal immigration authorities rather than arrest or prosecute them). To further the values of federalism, comity, and judicial administration, this Court should decline Plaintiffs' invitation to make the provisional pronouncements on these unsettled issues of Texas law that are necessary to adjudicate Plaintiffs' theories.

Abstention would be particularly appropriate here, where Plaintiffs seek a pre-enforcement facial challenge to a State's legislative acts. *See, e.g.*, *NetChoice*, 49 F.4th at 448–49. Pre-enforcement facial challenges are uniquely troubling because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 449 (further noting that "[t]he respect owed to a sovereign State" requires restraint when a plaintiffs asks "unelected federal judges to countermand the State's democratically accountable policymakers."). In abstaining from adjudication before the Texas courts can determine these questions of state law, this Court would be following the principled course of eschewing premature federal intervention as the States experiment with different approaches to this sensitive political issue. *Cf. Younger v. Harris*, 401 U.S. 37, 52 (1971) (even when pre-enforcement facial challenges present a case or controversy,

"the task of analyzing a proposed statute, pinpointing its deficiencies, and requiring correction of these deficiencies before the statute is put into effect, is rarely if ever an appropriate task for the judiciary.").

Normally abstention leads to a federal court "retain[ing] jurisdiction but … stay[ing] the federal suit pending determination of the state-law questions in state court." *Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 88 n. 14 (1975). "The Supreme Court, however, has recognized a limited exception to this rule for cases from Texas, whereby the district court dismisses the case *without prejudice* rather than retaining jurisdiction." *Nationwide Mut. Ins. Co. v. Unauthorized Prac. of L. Comm., of State Bar of Texas*, 283 F.3d 650, 655–56 (5th Cir. 2002). This Court should therefore dismiss these actions without prejudice and allow Texas courts to resolve the constitutionality of SB4.[47]

## B. The Court should not enjoin the enforcement of constitutional applications of SB4.

More fundamentally, SB4 includes a severability clause in Section 8, which directs courts to consider severable not only "every provision, section, subsection, sentence, clause, phrase, or word in th[e] Act," but also "every application of the provisions in th[e] Act to every person, group of persons, or circumstances." (emphasis added).

"It is axiomatic that 'a statute may be invalid as applied to one state of facts and yet valid as applied to another.'" *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 329 (2006) (citing *Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921)). "[W]hen confronting a constitutional flaw in a statute," this Court should "try to limit the solution to the problem." *Id.* at 328. It is preferable for courts "to enjoin only the unconstitutional applications of a statute while leaving other applications in force," or "sever its problematic portions while leaving

---

[47] Abstention applies equally to the claims of the Organizational Plaintiffs and the United States. *See* Wright & Miller, 17A Fed. Prac. & Proc. Juris. § 4242 (3d ed.) ("abstention … may be ordered, in a *Pullman*-type situation, even in a suit brought by the United States.").

the remainder intact." *Id.* at 329 (citing *United States v. Raines*, 362 U.S. 17, 20–22 (1960) and *United States v. Booker*, 543 U.S. 220, 227–29 (2005)).

"Three interrelated principles" should "inform [this Court's] approach to remedies." *Id.* First, the Court should not "nullify more of a legislature's work than is necessary" because a "ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* (citing *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)). "Accordingly, the 'normal rule' is that 'partial, rather than facial, invalidation is the required course,' such that a 'statute may ... be declared invalid to the extent that it reaches too far, but otherwise left intact.'" *Id.* (citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Second, the Court should be "mindful that [its] constitutional mandate and institutional competence are limited," and "restrain [itself] from 'rewrit[ing] state law to conform it to constitutional requirements' even as it strive[s] to salvage it." *Id.* (citing *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988)). And third, "the touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature." *Id.* at 330 (internal citation omitted). If this Court finds an application or section of SB4 unconstitutional, it should ask whether the legislature would "prefer[] what is left of its statute to no statute at all." *Id.*

Here, the Texas legislature has clearly expressed its preference for severability regarding the applications of SB4. *See* 2023 Tex. Sess. Law Serv. 4th C.S. Ch. 2 (S.B. 4) § 8 (addressing severability). "Severab[ility] is of course a matter of state law," *Virginia v. Hicks*, 539 U.S. 113, 121 (2003), and Texas law accords nearly dispositive weight to a severability clause. *See, e.g.*, *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022); *see also Leavitt v. Jane L.*, 518 U.S. 137, 138 (1996) ("Severability is of course a matter of state law."); *Dorchy v. Kansas*, 264 U.S. 286, 290 (1924) (same).

Plaintiffs should not prevail on any of their claims challenging SB4. However, if this Court holds otherwise on a challenge to any distinct provision, then it should craft a narrow remedy and sever only the particular applications of any provisions it determines are invalid rather than

preliminarily enjoining all applications of SB4.

### C. If the Court enters an injunction on behalf of the Organizational Plaintiffs, it should not protect any non-parties.

Organizational Plaintiffs' proposed order suffers from a fundamental defect. ECF No. 30-6 in Case No. 1:23-cv-1537 (proposed order seeking injunction against SB4 itself). "[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular … plaintiffs, and the State is free to prosecute others who may violate the statute." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). A "district court lack[s] authority to enjoin enforcement of [a challenged law] as to anyone other than the named plaintiffs." *In re Abbott*, 954 F.3d 772, 786 n.19 (5th Cir. 2020), *vacated as moot*, 141 S. Ct. 1261 (2021); *accord McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). But Organizational Plaintiffs' proposed order is invalid because it purports to enjoin the statutes themselves and therefore protect other parties not in this case. Federal courts do not enjoin statutes. "Remedies … ordinarily operate with respect to specific parties. In the absence of any specific party, they do not simply operate on legal rules in the abstract." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (quotations and citations omitted). Even when a court enjoins particular defendants, they enjoin "not the execution of the statute, but the acts of the official, the statute notwithstanding." *Commonwealth of Mass. v. Mellon*, 262 U.S. 447, 488 (1923). Any relief should be limited to the named Organizational Plaintiffs only.

### CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiffs' Motions for Preliminary Injunction.

Date: February 7, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Tex. State Bar No. 24105085

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**AMY SNOW HILTON**
Special Counsel
Texas Bar No. 24097834

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**MUNERA AL-FUHAID**
Special Counsel
Tex. State Bar No. 24094501

**HEATHER L. DYER**
Special Counsel
Tex. State Bar No. 24123044

**KIMBERLY GDULA**
Chief, General Litigation Division

**JACOB E. PRZADA**
Special Counsel
Tex. State Bar No. 24125371

*/s/Evan W. Weltge*
**EVAN W. WELTGE**
Tex. State Bar No. 24110523
Assistant District Attorney (deputized)
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Walters@oag.texas.gov
Amy.Hilton@oag.texas.gov
Munera.Al-fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov
Jacob.Przada@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
 OF TEXAS
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Evan.Weltge@oag.texas.gov

**COUNSEL FOR DEFENDANT**
**BILL D. HICKS**

**COUNSEL FOR DEFENDANTS**
**STATE OF TEXAS, GREG ABBOTT, TEXAS**
**DEPARTMENT OF PUBLIC SAFETY, AND STEVEN**
**C. MCCRAW**

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 7, 2024, and that all counsel of record were served by CM/ECF.

*/s/Ryan D. Walters*
**RYAN D. WALTERS**

# Exhibit F: ECF 25-1, Declaration of Mike Banks

# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

UNITED STATES OF AMERICA

    *PLAINTIFFS,*

v.

THE STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY

    *DEFENDANTS.*

CASE NO. 1:24-CV-00008-DAE (LEAD CASE)

CONSOLIDATED WITH 1:23-CV-1537-DAE

## EXHIBIT A: DECLARATION OF MIKE BANKS

# IN THE UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *PLAINTIFF,* | |
| V. | |
| THE STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY, | CASE NO. 1:24-CV-00008-DAE (LEAD CASE)<br><br>CONSOLIDATED WITH 1:23-CV-1537-DAE |
| *DEFENDANTS.* | |

## DECLARATION OF MICHAEL BANKS

My name is Michael Banks. I am over the age of 18 and fully competent to make this declaration. Pursuant to 28 U.S.C. §1746, I testify as follows:

1.  I am employed as the Special Advisor on Border Matters to the Governor of Texas, often referred to as the "Texas Border Czar." In that role, I am responsible for coordinating and implementing border security strategies under Operation Lone Star ("OLS").

**Education, Training and Experience**

2.  For almost three decades, I worked in security and law-enforcement operations along the U.S.-Mexico border. For 10 years, I served in the United States Navy, where I worked in border law enforcement as a member of the Navy Military Police. I then spent 23 years working as an agent in the U.S. Customs and Border Protection ("CBP"), U.S. Border Patrol ("USBP"), an agency housed within the U.S. Department of Homeland Security

1

("DHS"), serving under five different presidential administrations—from President Clinton to President Biden.

3. I carried out those duties in leadership roles for CBP with responsibilities across California, Arizona, and Texas. From 2019 to 2021, I served as Patrol Agent in Charge for the McAllen, Texas Border Patrol Station, with responsibility for the command of a large station with over 600 agents, 80 supervisors, and 7 support staff, and for the management of budget and a payroll. During my time at the station, manpower grew to 1,100 with the addition of 210 Office of Field Operations officers and 198 National Guard and Activity Duty soldiers.

4. In my role as Patrol Agent in Charge for McAllen, I managed and oversaw the following: various enforcement, detention, and processing operations; seizure of property; fleet maintenance and supplies; facility construction and alteration; budgeting and procurement; technology projects; community relations; and partnerships with other agencies. I managed these operations for a dynamic operating environment that spans 53 river miles and a total of 7,254 square miles, including 10 cities, 3 ports of entry, National Parks, and several wildlife refuges. I also led and managed the following: labor and employment issues; air coordination; disruption initiatives; intelligence; Processing Investigations Team; Common Intelligence Picture; administrative reports; pay cap issues; trend analysis; agent deployments; technology deployments; specialty units; employee recognition; budget; Continuity of Operations; training requirements; health and safety; Integrated Mission Analysis; joint operations; media relations; International Liaison Unit; facilities; station enforcement targets; vehicle fleet; and critical incidents.

2

5. From 2022 to 2023, I served as Patrol Agent in Charge for Weslaco, Texas, with responsibility for the command of a large station with over 400 agents, 60 supervisors, and 5 support staff, and for the management of an annual budget and payroll.

6. While serving as Patrol Agent in Charge of Weslaco, I managed and oversaw the following: various enforcement, detention, and processing operations; seizure of property; fleet maintenance and supplies; facility construction and alteration; budgeting and procurement; technology projects; community relations; and partnerships with other agencies. I managed these operations for a dynamic operating environment that spans 48 river miles and a total of 5,144 square miles, including 8 cities, 2 ports of entry, National Parks, and several wildlife refuges. I led and managed the following: labor and employment issues; air coordination; disruption initiatives; intelligence; Processing Investigations Team; Common Intelligence Picture; administrative reports; pay cap issues; trend analysis; agent deployments; technology deployments; specialty units; employee recognition; budget; Continuity of Operations; training requirements; health and safety; Integrated Mission Analysis; joint operations; media relations; International Liaison Unit; facilities; station enforcement targets; vehicle fleet; and critical incidents.

7. I have also held leadership positions in CBP with responsibility for areas outside of Texas. From 2021 to 2022, I served as Deputy Chief for Law Enforcement Operational Programs at the U.S. Border Patrol Headquarters in Washington, D.C. In that position, I was the number five official in charge of the U.S. Border Patrol and had direct supervision over the immigration, prosecution, custody, and detention division which oversees and implements U.S. Border Patrol Policy for the entire U.S. border with respect to immigration, prosecution, custody, and detention.

8. I have been recognized for my decades of federal service in CBP and the U.S. Navy and I have received numerous awards. In 1994, I received the Navy and Marine Corps Achievement Medal for superior performance. In 1997, I received the Navy and Marine Corps Achievement Medal gold star in lieu of second award for superior performance, among other Navy awards and accommodations. In 2022, I received the U.S. Border Patrol Meritorious Achievement Award for my leadership in handling the 2021 migrant surge. In the years 2006 through 2022, I received Outstanding Performance awards for my leadership in CBP and was rated the top performer in each of these years when rated against my peers. In each of those years I also received case awards for Outstanding Performance in leadership.

**Service as Texas Border Czar**

9. On January 30, 2023, Governor Abbott named me the first ever Border Czar for the State of Texas. In that role, I work closely with the Texas Military Department ("TMD"), the Texas Department of Public Safety ("DPS"), the Texas National Guard (the "Guard"), the Texas Facilities Commission ("TFC"), local and municipal governments, and private landowners along the border.

10. My responsibilities as Border Czar include facilitating the construction of Texas's border wall, strategic advising on the deployment of other border infrastructure like concertina wire and buoy systems, and regular consultation with federal, state, and local law-enforcement partners to respond to the surge of illegal migration.

11. During my tenure, I have worked with other state agencies participating in OLS to coordinate strategic placement of border infrastructure based on identifying historical hotspots for illicit traffic and shifting illegal migration patterns across the Rio Grande. I

4

have worked with private landowners along the border to secure agreements to permit state construction of steel-bollard fencing. I have also advised on the safety, effectiveness, and costs for the deployment of buoy systems in the Rio Grande and placement of concertina wire to deter illegal and dangerous crossings.

12. To facilitate regular supervision of these efforts along the southern border, my office is based in the border county of Hidalgo County, Texas. I regularly travel along Texas's border with Mexico as part of my responsibilities as the Texas Border Czar. I also regularly observe the construction of the border wall and deployment of concertina wire, meet with state and federal law-enforcement officials, and monitor the mass illegal entry of migrants into this country.

**The Border Crisis**

13. Texas is facing an unprecedented immigration crisis at the border. The Biden Administration's cessation of previously effective border security measures and lax federal border enforcement policies have invited mass migration and incentivized illegal crossings over the U.S. southern border. In the last three years, more than 6 million illegal immigrants from more than 100 countries have crossed the U.S. southern border.

14. In my role as Border Czar, I routinely review and often rely on official CBP published data regarding the frequency of border crossings. CBP data reflects that unlawful crossings of the Southwest border in Fiscal Year 2023 reached a record high of 2,475,699, and that number does not include known or unknown "gotaways." Fiscal Year 2024 appears on track to break last year's record, with 785,422 border encounters in the last three months. The data also reflects that in December 2023, the frequency of border crossings rose to 302,034, an all-time high.

15. In addition, I have reviewed official data published by the U.S. Department of Health and Human Services ("DHHS"), dated February 1, 2024, and located at https://www.hhs.gov/sites/default/files/uac-program-fact-sheet.pdf. That data reflects that the number of unaccompanied minors the department has cared for over the course of a year has skyrocketed from 15,381 in FY 2020 to 118,938 in FY 2023. This dramatic 673% increase—in just three years—in the number of unaccompanied minors under DHHS care, is consistent with the massive influx of illegal crossings and immigration patterns I have observed at the border.

**Effects of the Border Crisis**

16. Unfortunately, the tidal wave of illegal migration across the southern border has been accompanied by an increase in migrant mortalities that occurred during illegal border crossings. Illegal crossings at points other than sanctioned points of entry have resulted in scores of tragic migrant deaths.

17. In FY 2023, 148 migrants died in just the El Paso Sector while attempting border crossings. I understand that figure is the highest number ever recorded and more than double the number of fatalities in the Sector in FY 2022. Since 2021, a total of 2,321 migrants have died attempting to cross the southern border. And 556 of those deaths were in the Del Rio Sector alone.

18. During my service as Texas Border Czar, one of the consequences of unchecked migration I have observed, is an increase in crimes against property owners and residents along the border. I am aware of numerous instances of ranches and homesteads being illegally entered by illegal immigrants and have received a multitude of reports of homes being burglarized by migrants. Additionally, border community residents are regularly

subjected to dangerous vehicle bailouts by illegal immigrants that often take place following pursuits by law enforcement personnel.

19. I have also reviewed data collected by the Texas Department of Public Safety as part of OLS. According to the data, as of February 5, 2024, roughly 4,353 bailouts and 9,886 criminal trespass arrests have occurred near the border since the beginning of OLS.

20. CBP publishes regular updates that contain official statistics related to enforcement actions. I periodically review this information as part of my official duties. The data reflects that in FY 2023, Border Patrol agents arrested 15,267 illegal immigrants with criminal convictions in the United States, a record high. I have attached CBP's FY 2024 YTD statistics which are incorporated herein as Exhibit A.

21. In addition, Border Patrol has encountered 336 persons on the terrorist watchlist from FY 2021 to FY 2024 at the southern border. This is up from 15 of such individuals encountered from FY 2017 to 2020, according to the aforementioned data update published by CBP.

22. The alarming influx of immigrants with criminal convictions and suspected terrorists along the southern border presents a grave security risk. I am aware that FBI Director, Christopher Wray testified before the U.S. House on Homeland Security on November 15, 2023, that the border crisis currently poses a major threat to national security. Director Wray acknowledged that the number of individuals on the terrorist watchlist encountered at the border has increased and that the FBI is still attempting to locate individuals on the terrorist watchlist who have illegally crossed into the U.S.

23. Additionally, Border Patrol reported that it apprehended 1,819 illegal immigrants with gang affiliations from FY 2021 to FY 2024.

24. Cross border drug smuggling is another challenge exacerbated by the crisis at the border. I am aware that as a result of drug trafficking by Mexican cartels, fentanyl is now the leading cause of death for citizens between the ages of 18 and 45. According to official publications from the Texas Department of State Health Services, since President Biden has been in office, at least 5,351 Texans have died in fentanyl poisoning-related events. Additionally, according to official estimates from US Centers for Disease Control and Prevention's National Center for Health Statistics, the national drug overdose death toll has topped 112,000 in a twelve-month period for the first time in 2023.

25. The costs of defending the southern border have also continued to mount. Since 2021, Texas has spent $11.2 billion to help secure the border and protect public safety as part of OLS. Texas has spent $13.66 billion on securing the border since 2016.

26. As a result of the spike in illegal migration, and accompanying crime, counties along the southern border have been under a continuous state of disaster since May 31, 2021. Governor Abbott has renewed his border disaster declarations approximately 32 times.

**Texas's Efforts to Stem the Flow of Illegal Migration**

27. In 2021, Governor Greg Abbott declared a border-security disaster and launched OLS. OLS utilizes multiple state and local agencies, including the DPS, TMD, TFC, and others to stem the flow of unlawful immigration. OLS's border security efforts have included: the use of state military and law-enforcement officers to fill border staffing deficits, increased vehicle inspections at the border, constructing miles of border wall, and the deployment of marine barriers and concertina wire at key strategic border crossing points.

28. I am aware that Governor Abbott invoked the Invasion Clauses of Article I, § 10 of the U.S. Constitution and Article IV, § 7 of the Texas Constitution in Executive Order GA-

41 to authorize Texas to take necessary measures to stop the invasion at the Texas border. I have attached GA-41 to this declaration as Exhibit B. I have also reviewed a letter Governor Abbott sent to President Biden informing him of this action, dated November 16, 2022. I have attached this letter as Exhibit C.

29.  In an effort to push migrants towards legal ports of entry, Texas has purchased, constructed, and maintained 21 miles of steel bollard barriers and 83 miles of concertina wire fencing, and other border infrastructure.

30. To further relieve pressure on overwhelmed border towns, Texas has established a voluntary busing program to provide transportation services to illegal immigrants and allow them to travel from border areas to major cities throughout the country. To date, Texas has transported over 100,000 migrants to self-described "sanctuary cities."

31.  As of February 5, 2024, as part of OLS, Texas has made 39,054 criminal arrests in the border region, including 35,289 felony arrests. Texas has been able to deter 95,469 illegal entries since the onset of Operation Lone Star.  In addition, Texas has seized 461 pounds of fentanyl, or enough doses to kill 104 million Americans, as well as 27.8 thousand pounds of marijuana, 6 thousand pounds of cocaine, and 14.1 thousand pounds of meth near the Texas-Mexico border.

32. Following a withdrawal by federal officials, Texas law enforcement took operational control of Shelby Park in Eagle Pass, Texas. Eagle Pass is an area known to have a high number of illegal entries. Since Texas secured Shelby Park in Eagle Pass on January 11, 2024, there has been a 79% month to month decrease in illegal crossings in the area.

33. I am personally familiar with Texas's newly enacted law, SB 4, that I understand is the subject of consolidated lawsuits captioned *United States v. Texas*, No. 1:24-cv-8 (W.D. Tex.). I understand SB 4 goes into effect on March 5, 2024.

34. SB 4 creates criminal offenses related to illegal entry or reentry into the State from a foreign nation. It also allows magistrates and judges to issue orders to return to the foreign nation from which illegal entry or reentry occurred.

35. In my opinion, the provisions of SB 4 will provide law enforcement in Texas, primarily DPS, with important new tools to combat the massive influx of illegal migration and help stem the tide of illegal migration into Texas. When SB 4 is in effect, it will become a highly effective component of OLS's ongoing efforts to combat the crisis at Texas's southern border.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Executed on this 7th day of February, 2024.

*Michael Banks*
Michael Banks
Deputy Director, Border Czar
Office of Texas Governor Greg Abbott

10



# CBP Enforcement Statistics

U.S. Customs and Border Protection is the nation's largest federal law enforcement agency charged with securing the nation's borders and facilitating international travel and trade. Our top priority is to keep terrorists and their weapons from entering the United States.

At the nation's more than 300 ports of entry, CBP officers have a complex mission with broad law enforcement authorities tied to screening all foreign visitors, returning American citizens and imported cargo that enters the U.S. Along the nation's borders, the United States Border Patrol and Air and Marine Operations are the uniformed law enforcement arms of CBP responsible for securing U.S. borders between ports of entry.

Visit CBP's Southwest Border Migration page for demographic information regarding apprehensions and inadmissibles on the southwest border and the Assaults and Use of Force page for data on assaults on agents and officers, and uses of force by CBP personnel.

## Total CBP Enforcement Actions

Numbers below reflect Fiscal Year (FY) 2017 - FY 2024.

*Fiscal Year 2024 runs October 1, 2023 - September 30, 2024.*

| | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| **Office of Field Operations (OFO) Total Encounters**[1] | 216,370 | 281,881 | 288,523 | 241,786 | 294,352 | 551,930 | 1,137,452 | 354,753 |
| **U.S. Border Patrol Total Encounters**[2] | 310,531 | 404,142 | 859,501 | 405,036 | 1,662,167 | 2,214,652 | 2,063,692 | 634,066 |
| **Total Enforcement Actions** | 526,901 | 683,178 | 1,148,024 | 646,822 | 1,956,519 | 2,766,582 | 3,201,144 | 988,819 |

[1] Beginning in March FY20, OFO Encounters statistics include both Title 8 Inadmissibles and Title 42 Expulsions. To learn more, visit Title-8-and-Title-42-Statistics. Inadmissibles refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe.

[2] Beginning in March FY20, USBP Encounters statistics include both Title 8 Apprehensions and Title 42 Expulsions. To learn more, visit Title-8-and-Title-42-Statistics. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

# Search and Rescue Efforts

CBP agents frequently conduct life-saving efforts, while carrying out their respective missions. Numbers below reflect Fiscal Year (FY) 2019 - FY 2023.

*Fiscal Year 2024 runs October 1, 2023 - September 30, 2024.*

|  | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|
| **U.S. Border Patrol - Southwest Border Only** | 4,920 | 5,071 | 12,833 | 22,075 | 37,323 | 1,362 |
| **Air and Marine Operations - Nationwide** | 377 | 184 | 423 | 447 | 187 | 22 |

Close all  Open all

Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement

## Arrests of Individuals with Criminal Convictions or Those Wanted by Law Enforcement

Numbers below reflect FY 2017 - FY 2024.

*Fiscal Year 2024 runs October 1, 2023 - September 30, 2024.*

|  | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| **Office of Field Operations** |  |  |  |  |  |  |  |  |

| | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| **Criminal Noncitizens Encountered**[3] | 10,596 | 11,623 | 12,705 | 7,009 | 6,567 | 16,993 | 20,166 | 4,805 |
| **NCIC**[4] **Arrests** | 7,656 | 5,929 | 8,546 | 7,108 | 8,979 | 10,389 | 11,509 | 2,853 |
| **U.S. Border Patrol** | | | | | | | | |
| **Criminal Noncitizens Encountered**[3] | 8,531 | 6,698 | 4,269 | 2,438 | 10,763 | 12,028 | 15,267 | 4,247 |
| **Criminal Noncitizens with Outstanding Wants or Warrants** | 2,675 | 1,550 | 4,153 | 2,054 | 1,904 | 949 | 988 | 234 |

[3] Criminal noncitizens refers to noncitizens who have been convicted of crime, whether in the United States or abroad, so long as the conviction is for conduct which is deemed criminal by the United States. Criminal noncitizens encountered at ports of entry are inadmissible, absent extenuating circumstances, and represent a subset of total OFO inadmissibles. U.S. Border Patrol arrests of criminal noncitizens are a subset of total apprehensions. See U.S. Border Patrol Criminal Noncitizen Statistics for a breakdown of criminal noncitizen stats by type of conviction.

[4] NCIC (National Crime Information Center) arrests refers to the number of CBP arrests of individuals, including U.S. citizens, who are wanted by other law enforcement agencies.

Agriculture Enforcement

## Current Report

Fiscal Year 2022 Quarter 1 Agriculture Inspections Contaminated Products

## Fiscal Year 2022 Quarter 1 - Agriculture Inspections - Contaminated Products
Agriculture Enforcement Actions in Response to Contaminants Associated with Imported Cargo Shipments

Types of Contamination



Plant 24%

Animal 1%

Miscellaneous 75%

• Plant • Animal • Miscellaneous

| Country of Origin | Shipments |
|---|---|
| Mexico | 264 |
| Vietnam | 165 |
| Brazil | 124 |
| China | 109 |
| India | 108 |

| Article Name | Shipments |
|---|---|
| Metals, Minerals & Metal Products | 202 |
| Building Materials | 121 |
| Machinery | 121 |
| Miscellaneous Non-regulated Material | 67 |
| Flooring - laminate | 50 |

**1,148**
Shipments

| Destination State | Shipments |
|---|---|
| California | 197 |
| Illinois | 148 |
| Texas | 115 |
| Georgia | 102 |
| New York | 54 |

| Port of Issue Name | Shipments |
|---|---|
| Baltimore, Maryland | 364 |
| Savannah, Georgia | 123 |
| Long Beach, California | 120 |
| Otay Mesa, California | 104 |
| International Falls, Minnesota | 103 |

Count of Shipments by Date



U.S. Customs and Border Protection

## Previous Reports

Fiscal Year 2021 Quarter 4 Agriculture Inspections Contaminated Products

Fiscal Year 2021 Quarter 3 Agriculture Inspections Contaminated Products

Fiscal Year 2021 Quarter 2 Agriculture Inspections Contaminated Products

Fiscal Year 2021 Quarter 1 Agriculture Inspections Contaminated Products

Border Searches of Electronic Devices

In addition to longstanding federal court precedent recognizing the constitutional authority of the U.S. Government to conduct border searches, numerous federal statutes and regulations also authorize CBP to inspect and examine all individuals and merchandise entering or departing the United States, including all types of personal property, such as electronic devices. See, for example, 8 U.S.C. §§ 1225, 1357 and 19 U.S.C. §§ 482, 507, 1461, 1496, 1499, 1581, 1582. CBP established strict guidelines for conducting border searches of electronic devices in its January 2018 Directive on Border Searches of Electronic Devices.

Border searches of electronic devices have helped detect evidence relating to terrorist activity and other national security matters, child pornography, drug smuggling, human smuggling, bulk cash smuggling, human trafficking, export control violations, intellectual property rights violations and visa fraud. In Fiscal Year 2020, CBP processed more than 238 million travelers at U.S. ports of entry. During that same period of time, CBP conducted 32,038 border searches of electronic devices, representing less than .014 percent of arriving international travelers.

## International Travelers Processed with Electronic Device Search

| Month | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY2022 | FY2023 | FY2024YTD |
|-------|---------|---------|---------|---------|--------|--------|-----------|
| October | 2,539 | 3,026 | 3,959 | 2,969 | 3,275 | 3,493 | 3,689 |
| November | 2,446 | 2,962 | 3,805 | 2,909 | 2,991 | 3,250 | 3,614 |
| December | 2,509 | 3,365 | 3,966 | 2,760 | 3,894 | 3,343 | 3,588 |
| January | 3,090 | 3,765 | 4,450 | 3,014 | 3,642 | 3,441 | |
| February | 2,512 | 3,096 | 3,702 | 2,829 | 4,148 | 3,165 | |
| March | 2,921 | 3,526 | 2,514 | 3,445 | 4,976 | 3,401 | |
| April | 2,701 | 3,218 | 451 | 3,139 | 4,136 | 3,270 | |
| May | 2,764 | 3,138 | 616 | 3,323 | 4,156 | 3,758 | |
| June | 2,606 | 3,480 | 1,149 | 3,150 | 3,746 | 3,434 | |
| July | 2,798 | 3,458 | 2,047 | 3,244 | 3,524 | 3,333 | |
| August | 3,320 | 4,085 | 2,614 | 3,425 | 3,486 | 4,051 | |

| Month | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY2022 | FY2023 | FY2024YTD |
|---|---|---|---|---|---|---|---|
| September | 3,090 | 3,794 | 2,765 | 3,243 | 3,525 | 3,628 | |
| Total | 33,296 | 40,913 | 32,038 | 37,450 | 45,499 | 41,567 | 10,891 |

[ Currency Seizures ]

## OFO and USBP Currency Seizures Dashboard

Explore Office of Field Operations (OFO) and U.S. Border Patrol (USBP) Currency & Other Monetary Instrument Seizures by Fiscal Year.

## Monthly U.S. Border Patrol Nationwide Checkpoint Currency Seizures

Numbers below reflect FY 2018 - FY 2024.

*Fiscal Year 2024 runs October 1, 2023 - September 30, 2024.*

| | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|
| October | $35,829 | $49,247 | $33,558 | $196,378 | $60,687 | $421,148 | $80,382 |
| November | $26,285 | $51,269 | $114,297 | $17,528 | $11,683 | $16,527 | $50,185 |
| December | $2,822 | $63,697 | $156,961 | $66,907 | $5,118 | $4,054 | $10,920 |
| January | $203,213 | $59,857 | $52,649 | $192,116 | $178,971 | $162,679 | |
| February | $117,933 | $103,982 | $84,475 | $263,892 | $17,826 | $782,267 | |
| March | $157,669 | $110,924 | $36,301 | $135,123 | $22,114 | $127,327 | |
| April | $17,913 | $15,016 | $49,559 | $64,933 | $42,254 | $28,476 | |
| May | $256,033 | $129,766 | $691,640 | $29,188 | $49,491 | $110,894 | |
| June | $31,494 | $119,732 | $511,781 | $18,626 | $9,476 | $117,953 | |
| July | $14,339 | $86,696 | $159,504 | $73,779 | $181,194 | $63,240 | |

|  | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|
| **August** | $169,592 | $141,475 | $275,751 | $331,791 | $6,081 | $27,408 |  |
| **September** | $80,358 | $33,487 | $124,274 | $39,257 | $6,756 | $38,871 |  |
| **Total** | $1,113,480 | $965,148 | $2,290,750 | $1,429,519 | $591,651 | $1,900,844 | $141,487 |

Drug Seizures

## OFO and USBP Drug Seizures Dashboard

Explore Office of Field Operations (OFO) and U.S. Border Patrol (USBP) Drug Seizure Statistics by weight* and count of events by Fiscal Year.

## Monthly U.S. Border Patrol Nationwide Checkpoint Drug Seizures

Numbers below reflect FY 2024.

*Fiscal Year 2024 runs October 1, 2023- September 30, 2024.*

|  | Marijuana | Cocaine | Heroin | Methamphetamine | Fentanyl | Other |
|---|---|---|---|---|---|---|
| **October** | 183 | 115 | 0 | 1,083 | 167 | 13 |
| **November** | 3,705 | 51 | 9 | 723 | 289 | 27 |
| **December** | 183 | 66 | 10 | 296 | 5 | 14 |
| **Total** | 4,070 | 232 | 18 | 2,102 | 461 | 54 |

*weights are in pounds (lb)

See Air and Marine Operations Statistics for a breakdown of enforcement actions with non-CBP agencies.

Intellectual Property Rights (IPR) Seizures

## Intellectual Property Rights (IPR) Seizures Dashboard

Explore the Office of Trade's Intellectual Property Rights (IPR) Seizures dashboard by Fiscal Year.

Gang Affiliated Enforcement

## U.S. Border Patrol Nationwide Apprehensions by Gang Affiliation

Numbers below reflect FY2017 - FY2024.

*Fiscal Year 2024 runs October 1, 2023 - September 30, 2024.*

| Gang Affiliation | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| 107th St | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18th Street | 61 | 145 | 168 | 36 | 28 | 110 | 65 | 10 |
| Angelino Heights Sureno 13 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bandidos | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Barrio Azteca | 3 | 4 | 0 | 1 | 1 | 2 | 0 | 0 |
| Barrio Van Nuys | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Border Brothers | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 0 |
| Brazilian Thugs | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Brown Pride | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Chirizos | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Florencia 13 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Folk Nation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hard Times 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hells Angels | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Hermanos Pistoleros Latinos (HPL) | 3 | 2 | 2 | 2 | 1 | 1 | 2 | 0 |
| Kfs | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

| Gang Affiliation | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| Largo 36 | | | | | | | | 1 |
| Latin Kings | 6 | 7 | 24 | 4 | 6 | 11 | 13 | 3 |
| Locos Surenos Trece | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Los Traviosos | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Los Zetas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MS-13 | 228 | 413 | 464 | 72 | 113 | 312 | 178 | 19 |
| Mac 11 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Mara 18 | 0 | 1 | 2 | 1 | 1 | 0 | 0 | 1 |
| Mara-R | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Maravilla Salva Trucha | 0 | 2 | 0 | 1 | 0 | 0 | 1 | 0 |
| Market Street | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Mexican Mafia | 4 | 3 | 7 | 2 | 5 | 4 | 3 | 0 |
| Mexicles | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Mexikanemi | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| Nortenos | 6 | 5 | 6 | 1 | 5 | 2 | 3 | 2 |
| Other | 90 | 82 | 110 | 75 | 53 | 94 | 128 | 39 |
| Outlaws | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pacific Street Gang | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| Paisas | 53 | 62 | 90 | 93 | 79 | 146 | 133 | 27 |
| Partido Revolucionario Mexican (PRM) | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 |
| Playboys | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| San Fernando Valley Gang | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| South Los Angeles | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |

| Gang Affiliation | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| Southwest Cholos | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Surenos (sur-13) | 66 | 66 | 70 | 66 | 46 | 54 | 57 | 17 |
| Tango Blast | 8 | 8 | 20 | 7 | 7 | 10 | 9 | 2 |
| Texas Syndicate | 1 | 1 | 3 | 0 | 1 | 2 | 0 | 1 |
| Top Six | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 |
| Tortilla Flats | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 |
| Vallucos | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Vilanos-13 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| West Park | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Westside | | | 1 | 0 | 0 | 0 | 0 | 0 |
| Zetas | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 536 | 808 | 976 | 363 | 348 | 751 | 598 | 122 |

Terrorist Screening Data Set Encounters

*This table provides a summary of OFO encounters of all persons at ports of entry with records within the TSDS at the time of their encounter.*

| | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| **Office of Field Operations TSDS Encounters at Land Border Ports of Entry of All Nationalities*** | | | | | | | | |
| Southwest Border | 116 | 155 | 280 | 72 | 103 | 67 | 80 | 5 |
| Northern Border | 217 | 196 | 258 | 124 | 54 | 313 | 484 | 89 |
| Total | 333 | 351 | 538 | 196 | 157 | 380 | 564 | 94 |
| **U.S. Border Patrol TSDS Encounters Between Ports of Entry of Non-U.S. Citizens** | | | | | | | | |
| Southwest Border | 2 | 6 | 0 | 3 | 15 | 98 | 169 | 49 |

| | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24YTD |
|---|---|---|---|---|---|---|---|---|
| **Northern Border** | 0 | 0 | 3 | 0 | 1 | 0 | 3 | 1 |
| **Total** | 2 | 6 | 3 | 3 | 16 | 98 | 172 | 50 |
| **Percentage of Total USBP Encounters** | 0.0007% | 0.0015% | 0.0004% | 0.0007% | 0.0010% | 0.0044% | 0.0083% | 0.0079% |

*This table provides a summary of USBP encounters of non-U.S. citizens with records within the TSDS at the time of their encounter between U.S. ports of entry.*

The Terrorist Screening Dataset (TSDS) – also known as the "watchlist" – is the U.S. government's database that contains sensitive information on terrorist identities. The TSDS originated as the consolidated terrorist watchlist to house information on known or suspected terrorists (KSTs) but has evolved over the last decade to include additional individuals who represent a potential threat to the United States, including known affiliates of watchlisted individuals.

Encounters of watchlisted individuals at our borders are very uncommon, underscoring the critical work CBP Agents and Officers carry out every day on the frontlines. DHS works tirelessly to secure our borders through a combination of highly trained personnel, ground and aerial monitoring systems, and robust intelligence and information sharing networks.

TSDS watchlisted non-citizens encountered by the CBP Office of Field Operations at land ports of entry prior to entry into the United States may be denied admission to our country upon presentation, barring justification for their arrest under CBP policy. TSDS watchlisted individuals encountered by the U.S. Border Patrol (USBP) after entering the country without inspection may be detained and removed, to the extent possible under CBP policy, or turned over to another government agency for subsequent detention or law enforcement action, as appropriate.

*POE totals may include multiple encounters of the same individual.

U.S. Border Patrol Recidivism Rates

Recidivism percentages are updated at the end of each fiscal year.

| | FY 15 | FY 16 | FY 17 | FY 18 | FY 19 | FY 20 | FY21 |
|---|---|---|---|---|---|---|---|
| **Recidivism[5]** | 14% | 12% | 10% | 11% | 7% | 26% | 27% |

[5] Recidivism refers to percentage of individuals apprehended more than one time by the Border Patrol within a fiscal year. Beginning in March FY20, USBP encounters statistics and recidivism calculations include both Title 8 Apprehensions and

Title 42 Expulsions. To learn more, visit <u>Title-8-and-Title-42-Statistics</u>. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.

Weapons and Ammunition Seizures

### OFO and USBP Weapons and Ammunition Seizures Dashboard

Explore Office of Field Operations (OFO) and U.S. Border Patrol (USBP) <u>Weapons and Ammunition Seizures</u> dashboards by Fiscal Year.

## Related Resources

Previous Year Statistics

- <u>FY2023</u>

---

- <u>FY 2022</u>

---

- <u>FY 2021</u>

---

- <u>FY 2020</u>

---

- <u>FY 2019</u>

---

- <u>FY 2018</u>

---

**Source URL:** *https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics*



GOVERNOR GREG ABBOTT

July 7, 2022

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____ 1PM _____ O'CLOCK

JUL 0 7 2022

Secretary of State

The Honorable John B. Scott
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Mr. Secretary:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

Executive Order No. GA-41 relating to returning illegal immigrants to the border.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD:gsd

Attachment

# Executive Order

**BY THE
GOVERNOR OF THE STATE OF TEXAS**

**Executive Department
Austin, Texas
July 7, 2022**

**EXECUTIVE ORDER
GA 41**

*Relating to returning illegal immigrants to the border.*

---

WHEREAS, securing the international border is the federal government's responsibility, but President Biden has refused to enforce the immigration laws enacted by Congress, including statutes mandating detention of certain immigrants who have claimed asylum or committed a crime; and

WHEREAS, the cartels refer to these open-border policies as *la invitación* ("the invitation"), reflecting the perception that President Biden welcomes immigrants to make the dangerous trek across our southern border; and

WHEREAS, an immigrant's journey to the United States can even prove fatal, as evidenced by the recent discovery of 53 dead bodies inside a smuggler's truck, and by a recent report from a United Nations agency describing our southern border as the deadliest land crossing in the world during President Biden's first year in office; and

WHEREAS, at least 42 subjects on the terrorist watchlist have been arrested while attempting to cross the border illegally since January 2021, and an unknown number have crossed while evading detection, demonstrating that an insecure border is a pathway for terrorists to enter the United States; and

WHEREAS, President Biden's failure to protect our border has necessitated action by the State of Texas to ensure public safety and to defend against violations of its sovereignty and territorial integrity; and

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on May 31, 2021, which has been amended and renewed in each subsequent month effective through today, certifying under Section 418.014 of the Texas Government Code that the surge of individuals unlawfully crossing the Texas-Mexico border posed an ongoing and imminent threat of disaster for a number of Texas counties and for all state agencies affected by this disaster; and

WHEREAS, through Operation Lone Star, I have deployed thousands of brave men and women from the Texas National Guard and the Texas Department of Public Safety to secure the border, to enforce the laws of Texas, and to prevent, detect, and interdict transnational criminal behavior; and

WHEREAS, by employing a variety of strategies, Operation Lone Star has resulted in thousands of apprehensions and criminal arrests, along with the seizure of thousands of weapons, hundreds of millions of lethal doses of fentanyl, and other contraband; and

WHEREAS, the Biden Administration's decision to end Title 42 expulsions, which has been halted by a federal court, and to terminate the Remain-in-Mexico policy, will

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____ 1 PM _____ O'CLOCK

JUL 0 7 2022

invite the cartels to smuggle millions more illegal immigrants into Texas, as evidenced by the Biden Administration's projection that terminating Title 42 expulsions will result in as many as 18,000 immigrant apprehensions per day; and

WHEREAS, President Biden's border crisis hit a new record in May 2022, which saw the largest number of immigrants arrested or encountered along our southern border since U.S. Customs and Border Protection began keeping track in 2000, and these unprecedented numbers are overwhelming local communities across Texas; and

WHEREAS, President Biden's reckless refusal to secure the border will provide material support to the cartels, allow them to smuggle more dangerous people, drugs, and weapons into Texas, and embolden cartel gunmen to continue shooting at state and federal officials; and

WHEREAS, President Biden's failure to faithfully execute the immigration laws enacted by Congress confirms that he has abandoned the covenant, in Article IV, § 4 of the U.S. Constitution, that "[t]he United States . . . shall protect each [State in this Union] against Invasion," and thus has forced the State of Texas to build a border wall, deploy state military forces, and enter into agreements as described in Article I, § 10 of the U.S. Constitution to secure the State of Texas and repel the illegal immigration that funds the cartels; and

WHEREAS, in the Texas Disaster Act of 1975, the Legislature charged the Governor with the responsibility "for meeting . . . the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and expressly authorized the Governor to "issue executive orders . . . hav[ing] the force and effect of law" under Section 418.012; and

WHEREAS, the Governor can call on state military forces to enforce the law under Article IV, § 7 of the Texas Constitution and Sections 431.111 and 437.002 of the Texas Government Code; and

WHEREAS, an immigrant commits a federal crime under 8 U.S.C. § 1325(a)(1) by entering the United States between the ports of entry that have been designated as field offices by federal immigration officers; and

WHEREAS, the Supreme Court's opinion in *Arizona v. United States* specifically does not "address whether reasonable suspicion of illegal entry or another immigration crime would be a legitimate basis for prolonging a detention, or whether this too would be preempted by federal law," 567 U.S. 387, 414 (2012);

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby authorize and empower the Texas National Guard and the Texas Department of Public Safety to respond to this illegal immigration by apprehending immigrants who cross the border between ports of entry or commit other violations of federal law, and to return those illegal immigrants to the border at a port of entry.

This executive order shall remain in effect and in full force unless it is modified, amended, rescinded, or superseded by the governor. This executive order may also be amended by proclamation of the governor.

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____ 1 PM _____ O'CLOCK

JUL 0 7 2022

*Governor Greg Abbott*
July 7, 2022

*Executive Order GA-41*
Page 3



Given under my hand this the 7th
day of July, 2022.

GREG ABBOTT
Governor

ATTESTED BY:

JOHN B. SCOTT
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____1 PM_____ O'CLOCK

JUL 0 7 2022



GOVERNOR GREG ABBOTT

November 16, 2022

The Honorable Joseph R. Biden, Jr.
President of the United States
The White House
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Dear President Biden:

The U.S. Constitution won ratification by promising the States, in Article IV, § 4, that the federal government "shall protect each of them against Invasion." By refusing to enforce the immigration laws enacted by Congress, including 8 U.S.C. § 1325(a)(1)'s criminal prohibition against aliens entering the United States between authorized ports of entry, your Administration has made clear that it will not honor that guarantee. The federal government's failure has forced me to invoke Article I, § 10, Clause 3 of the U.S. Constitution, thereby enabling the State of Texas to protect its own territory against invasion by the Mexican drug cartels.

Your inaction has led to catastrophic consequences. Under your watch, America is suffering the highest volume of illegal immigration in the history of our country. This past year, more than 2 million immigrants tried to enter the country illegally, coming from more than 100 countries across the globe. Worse yet, your failed border policies recently prompted a United Nations agency to declare that the border between the United States and Mexico is the deadliest land crossing in the world.

Texans are paying the price for your failure. Ranches are being ripped apart, and homes are vulnerable to intrusion. Our border communities are regularly disrupted by human traffickers and bailouts. Deadly fentanyl is crossing the porous border to such a degree that it is now the leading cause of death for citizens between the ages of 18 and 45.

By opening our border to this record-breaking level of illegal immigration, you and your Administration are in violation of Article IV, § 4 of the U.S. Constitution. Your sustained dereliction of duty compels Texas to invoke the powers reserved in Article I, § 10, Clause 3, which represents "an acknowledgement of the States' sovereign interest in protecting their borders." *Arizona v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., dissenting). Using that authority, Texas will escalate our efforts to repel and turn back any immigrant who seeks to enter our State at a border crossing that Congress has designated as illegal; to return to the border those who do cross illegally; and to arrest criminals who violate Texas law.

The Honorable Joseph R. Biden, Jr.
November 16, 2022
Page 2

Know this: Article I, § 10, Clause 3 is not just excess verbiage. It reflects an understanding by our Founders, the authors of the Constitution, that some future President might abandon his obligation to safeguard the States from an extraordinary inflow of people who have no legal right of entry. They foresaw your failures. In the more than 240 years of our great nation, no Administration has done more than yours to place the States in "imminent Danger"—a direct result of your policy decisions and refusal to deliver on the Article IV, § 4 guarantee. In the absence of action by your Administration to secure the border, every act by Texas officials is taken pursuant to the authority that the Founders recognized in Article I, § 10, Clause 3.

All of this can be avoided, of course, if you will simply enforce the laws that are already on the books. Your Administration must end its catch-and-release policies, repel this unprecedented mass migration, and satisfy its constitutional obligation through faithful execution of the immigration laws enacted by Congress:

- You should aggressively prosecute the federal crimes of illegal entry and illegal reentry. *See* 8 U.S.C. § 1325, § 1326.

- You should comply with statutes mandating that various categories of aliens "shall" be detained. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(ii) & (iii)(IV) (aliens claiming asylum); *id.* § 1225(b)(2)(A) (aliens applying for admission); *id.* § 1226(c)(1) (criminal aliens); *id.* § 1231(a)(2) (aliens ordered removed); *id.* § 1222(a) (aliens who may carry disease).

- You should stop paroling aliens *en masse* in violation of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, which decrees that aliens applying for admission can be paroled into the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

- You should fully reinstate the Migrant Protection Protocols, such that aliens seeking admission remain in Mexico while proceedings unfold in the United States. *See* 8 U.S.C. § 1225(b)(2)(C).

- You should immediately resume construction of the border wall in Texas, using the billions of dollars Congress has appropriated for that purpose. *See* FY2021 DHS Appropriations Act § 210, Pub. L. 116-260, 134 Stat. 1182, 1456–57 (Dec. 27, 2020); FY2020 DHS Appropriations Act § 209, Pub. L. 116-93, 133 Stat. 2317, 2511–12 (Dec. 20, 2019).

Americans want an orderly immigration process that adheres to the laws enacted by the legislators they sent to Washington. In the words of Judge Oldham, however, you have "supplant[ed] the rule of law with the rule of say-so" while "tell[ing] Congress to pound sand." *Texas v. Biden*, 20 F.4th 928, 982, 1004 (5th Cir. 2021); *cf.* U.S. CONST. art. I, § 8, cl. 4 (empowering Congress "[t]o establish an uniform Rule of Naturalization").

The Honorable Joseph R. Biden, Jr.
November 16, 2022
Page 3

Before you took office, the United States enjoyed some of the lowest illegal-immigration figures it had seen in decades.  Your Administration gutted the policies that yielded those low numbers.  You must reinstate the policies that you eliminated, or craft and implement new policies, in order to fulfill your constitutional duty to enforce federal immigration laws and protect the States against invasion.

Your silence in the face of our repeated pleas is deafening.  Your refusal to even visit the border for a firsthand look at the chaos you have caused is damning.  Two years of inaction on your part now leave Texas with no choice but to escalate our efforts to secure our State.  Your open-border policies, which have catalyzed an unprecedented crisis of illegal immigration, are the sole cause of Texas having to invoke our constitutional authority to defend ourselves.

Sincerely,

Greg Abbott
Governor of Texas

GA:jsd

cc:     The Honorable Merrick B. Garland, U.S. Attorney General
        The Honorable Alejandro Mayorkas, U.S. Secretary of Homeland Security

# Exhibit G: ECF 32, Plaintiff USA's Reply in Support of Its Motion for Preliminary and Permanent Injunction

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

     v.

STATE OF TEXAS, *et al.*,

                Defendants.

Case No. 1:24-cv-00008-DAE

## UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

ARGUMENT .................................................................................................... 1

I.      The United States is likely to succeed on the merits............................................. 1

      A.     SB 4 is field preempted. .................................................................... 1

      B.     SB 4 conflicts with federal law in numerous respects...................................... 6

      C.     SB 4 violates the dormant Foreign Commerce Clause.................................. 10

II.     Texas has no valid defense to the United States' claims......................................... 13

      A.     Texas cannot rely on an alleged "invasion" to defend SB 4. ......................... 13

      B.     The United States can sue in its own courts to enforce
           federal law. ................................................................................. 16

III.    SB 4 will irreparably harm the United States and any benefit it may provide
       Texas can be achieved through other lawful means. ............................................ 18

IV.    There is no reason to apply any abstention or severability doctrine here................. 19

CONCLUSION ............................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................*passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015) ........................................................... 17, 18

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................ 16

*Bell v. Hood*,
   327 U.S. 678 (1946) ................................................................ 17

*California v. United States*,
   104 F.3d 1086 (9th Cir. 1997) .............................................. 13, 16

*City of Houston. v. Hill*,
   482 U.S. 451 (1987) ........................................................... 19, 20

*Covington & C. Bridge Co. v. Kentucky*,
   154 U.S. 204 (1894) ................................................................ 12

*Equal Access Educ. v. Merten*,
   305 F. Supp. 2d 585 (E.D. Va. 2004) ...................................... 11

*Ex Parte Young*,
   209 U.S. 123 (1908) ................................................................ 18

*Georgia Latino Alliance for Human Rights v. Georgia*,
   691 F.3d 1250 (11th Cir. 2012) ............................................. 3, 7

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................................ 17

*Heart of Atlanta Motel, Inc. v. United States*,
   379 U.S. 241 (1964) ................................................................ 12

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) .................................................................... 3

*In re Debs*,
  158 U.S. 564 (1895) ................................................................ 17

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020) ..................................................... 3, 4, 5, 7

*Medellin v. Texas*,
  552 U.S. 491 (2008) ................................................................ 11

*Mobile Cnty. v. Kimball*,
  102 U.S. 691 (1880) ................................................................ 12

*Montana v. Blackfeet Tribe of Indians*,
  471 U.S. 759 (1985) ................................................................ 15

*New Jersey v. United States*,
  91 F.3d 463 (3d Cir. 1996) ................................................. 13, 16

*Ohio Bureau of Emp. Servs. v. Hodory*,
  431 U.S. 471 (1977) ................................................................ 19

*Pa. R. Co. v. Pub. Serv. Comm'n of Com. of Pa.*,
  250 U.S. 566 (1919) .................................................................. 3

*Padavan v. United States*,
  82 F.3d 23 (2d Cir. 1996) ............................................. 13, 14, 16

*Parker v. Brown*,
  317 U.S. 341 (1943) .................................................................. 5

*Piazza's Seafood World, LLC v. Odom*,
  448 F.3d 744 (5th Cir. 2006) ................................. 10, 11, 12, 13

*Sanitary Dist. of Chi. v. United States*,
  266 U.S. 405 (1925) ................................................................ 17

*Santa Clara Pueblo v. Martinez*,
  436 U.S. 49 (1978) .................................................................. 15

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) .................................................................. 2

*Taylor v. United States*,
  579 U.S. 301 (2016) ................................................................ 12

iii

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ........................................................... 2

*Toll v. Moreno*,
  458 U.S. 1 (1982) .......................................................................... 12

*Truax v. Raich*,
  239 U.S. 33 (1915) .......................................................................... 3

*Turnage v. Britton*,
  29 F.4th 232 (5th Cir. 2022) ......................................................... 18

*United Servs. Auto. Ass'n v. Muir*,
  792 F.2d 356 (3d Cir. 1986) .......................................................... 19

*United States v. Abbott*,
  --- F. Supp. 3d. ---, 2023 WL 5740596 (W.D. Tex. Sept. 6, 2023) ...................... 13, 15, 16

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) .................................................... 3, 7

*United States v. Ballinger*,
  395 F.3d 1218 (11th Cir. 2005) ...................................................... 12

*United States v. Composite State Bd. of Med. Examiners*,
  656 F.2d 131 (5th Cir. 1981) ......................................................... 19

*United States v. Guest*,
  383 U.S. 745 (1966) ....................................................................... 12

*United States v. Hanigan*,
  681 F.2d 1127 (9th Cir. 1982) ...................................................... 12

*United States v. LeMay*,
  322 F.2d 100 (5th Cir. 1963) ......................................................... 17

*United States v. Minnesota*,
  270 U.S. 181 (1926) ....................................................................... 17

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ........................................................ 3, 7

*United States v. Supreme Ct. of N.M.*,
  839 F.3d 888 (10th Cir. 2016) ....................................................... 18

*United States v. Texas,*
    557 F. Supp. 3d 810 (W.D. Tex. 2021) ....................................................... 18

*Valle del Sol, Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ...............................................................3, 7

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013) ...............................................................6, 9

*Virginia Off. for Prot. & Advoc. v. Stewart,*
    563 U.S. 247 (2011) ..................................................................... 18

*Wyandotte Transp. Co. v. United States,*
    389 U.S. 191 (1967) ..................................................................... 17

**Constitutional Provisions**

U.S. Const. amend. III ..................................................................... 15

U.S. Const. art. I, § 9 ..................................................................... 15

U.S. Const. art. I, § 10 ...............................................................13, 16

U.S. Const. art. IV, § 4 ..................................................................... 14

**Statutes**

8 U.S.C. § 1101 ..................................................................... 4

8 U.S.C. § 1158 ...............................................................1, 8

8 U.S.C. § 1181 ..................................................................... 1

8 U.S.C. § 1182 ..................................................................... 1

8 U.S.C. § 1225 ..................................................................... 1

8 U.S.C. § 1227 ..................................................................... 1

8 U.S.C. § 1229 ..................................................................... 1

8 U.S.C. § 1229a ...............................................................1, 2

8 U.S.C. § 1231 ...............................................................1, 8, 9

8 U.S.C. § 1253 ..................................................................... 10

8 U.S.C. § 1323 .................................................................................................... 2

8 U.S.C. § 1324 ...................................................................................... 2, 3, 4, 7

8 U.S.C. § 1325 ................................................................................................ 3, 10

8 U.S.C. § 1326 ............................................................................................ 3, 9, 10

8 U.S.C. § 1327 .................................................................................................... 2

8 U.S.C. § 1328 .................................................................................................... 2

8 U.S.C. § 1357 .................................................................................................... 6

18 U.S.C. § 758 ................................................................................................... 4

22 U.S.C. § 7105 ................................................................................................. 4

28 U.S.C. § 1331 ............................................................................................... 17

28 U.S.C. § 1651 ............................................................................................... 17

Tex. Code of Crim Proc. art. 5B.002 ................................................................ 9

Tex. Code of Crim Proc. art. 5B.003 ................................................................ 8

Tex. Gov't Code § 508.145 .............................................................................. 20

Tex. Penal Code ch. 17 ..................................................................................... 20

Tex. Penal Code § 12.33 .................................................................................. 10

Tex. Penal Code § 51.02 .................................................................................... 9

Tex. Penal Code § 51.03 ................................................................................ 9, 10

Tex. Penal Code § 51.04 ................................................................................ 9, 10

**Other Authorities**

3 J. Story, Commentaries on the Constitution § 1668 .................................... 18

*Debates & Other Proceedings of the Convention of Virginia* (2d ed. 1805) .................. 14

*Debates of the Convention of Virginia* (2d ed., 1805) .................................. 14

Edmund Randolph, 3 Debates in the Several State Conventions (Elliot ed. 1836) ............. 14

Invasion, Noah Webster, American Dictionary of the English Language (1828) ............... 13

James Madison, *The Report of 1800* (Jan. 7, 1800), https://perma.cc/54f6-tw42 ................ 15

*The Federalist* No. 43 (Cooke ed.1961) .......................................................................... 14

*War*, Noah Webster, American Dictionary of the English Language (1828)...................... 14

# INTRODUCTION

The Supreme Court has repeatedly confirmed that "the Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona v. United States*, 567 U.S. 387, 394 (2012). And Congress has exercised that undoubted power to enact a comprehensive statutory scheme governing the entry and removal of noncitizens. SB 4 both intrudes on that exclusively federal field and conflicts with the laws Congress has enacted. Texas largely fails to respond to the United States' arguments and cited authorities demonstrating that SB 4 is unconstitutional. Instead, the State relies on a series of novel and unsupported arguments that primarily rest on a policy disagreement: in Texas's view, the federal government is not doing enough to combat irregular migration at the southern border. That policy disagreement, however, cannot override federal law. SB 4 is unconstitutional and should be enjoined.

# ARGUMENT

## I.     The United States is likely to succeed on the merits.

### A.     SB 4 is field preempted.

Congress has clearly occupied the field with respect to the entry and removal of noncitizens, displacing the ability of the 50 States to regulate in this area. PI Mot. at 14–21. The entry and removal of noncitizens implicate "dominant" federal interests relating to immigration, foreign relations, and the control of an international border. *Id.* at 14–17. There is also a "framework of regulation so pervasive that Congress left no room for the States to supplement it." *Id.* at 17 (quoting *Arizona*, 567 U.S. at 399). As explained in our motion (at 17–19), federal law sets forth in painstaking detail which noncitizens may be admitted to the United States (*see, e.g.*, 8 U.S.C. §§ 1181 & 1182), when, how, and to where they may be removed (*see, e.g., id.* §§ 1225, 1227, 1229, 1229a & 1231), and the protections afforded to noncitizens who are subject to removal (*see, e.g., id.* §§ 1158 & 1231(b)(3)). Indeed, Congress expressly specified that, unless otherwise provided, a *federal* removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be . . . removed

1

from the United States." *Id.* § 1229a(a)(3). Critically, federal law also sets forth a comprehensive framework criminalizing unlawful entry (*id.* § 1325), unlawful reentry (*id.* § 1326), and various acts that facilitate unlawful entry (*see, e.g., id.* §§ 1323, 1324, 1327 & 1328).

Texas has no response to these arguments and, tellingly, does not even reference the standard for field preemption. *Compare* PI Opp'n at 15–22 *with Arizona*, 567 U.S. at 399. Instead, Texas mischaracterizes the relevant field as "alien misconduct" (or sometimes "immigration regulation") to argue that federal law does not field preempt "every state enactment which in any way deals with aliens." PI Opp'n at 15–17. But the United States does not contend otherwise; it has argued only that Congress occupied the field of entry and removal. *See* PI Mot. at 14, 21. And, just as the federal alien-registration scheme field preempted the state law in *Arizona*, the federal statues governing entry and removal of noncitizens field preempt SB 4. *See id.* at 19–20.

Texas argues that the "only field preemption that *Arizona* recognized was in the federal alien-registration program." PI Opp'n at 15–16. But Texas gives no reason why the Arizona registration scheme was more susceptible to field preemption than SB 4; if anything, SB 4 intrudes on a field—entry and removal of noncitizens—that has a *stronger* connection to the dominant federal interests in immigration and foreign affairs. And Texas cannot dispute that "[t]he federal statutory directives" here "provide a full set of standards," including "punishment for noncompliance," and that SB 4 "adds a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400–01. *Arizona*'s reasoning thus fully supports field preemption here.

Texas contends that "Plaintiffs do not and cannot cite any other cases to demonstrate that the provisions of SB 4 intrude on a recognized federal field." PI Opp'n at 16. But the United States cited numerous cases explaining that the federal government has exclusive control over the entry and removal of noncitizens. PI Mot. at 17. The Fifth Circuit has confirmed that "[p]olicies pertaining to the entry of [noncitizens] and their right to remain here . . . are entrusted exclusively to Congress." *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022);

*see also Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States[.] . . . Under the Constitution the states are granted no such powers;"); *Hines v. Davidowitz*, 312 U.S. 52, 69 (1941) ("Congress has provided a broad and comprehensive plan describing the terms and conditions upon which aliens may enter this country . . . and the manner in which they may be deported."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power.").

Multiple courts of appeals have held that the federal scheme criminalizing various aspects of illegal entry—especially the federal provision criminalizing transporting and harboring noncitizens who have unlawfully entered the country, 8 U.S.C. § 1324—field preempt state-law analogs. *See* PI Mot. at 20–21; *see also Georgia Latino Alliance for Human Rights v. Georgia*, 691 F.3d 1250, 1263-65 (11th Cir. 2012); *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1023-26 (9th Cir. 2013); *Alabama*, 691 F.3d at 1285–87; *United States v. South Carolina*, 720 F.3d 518, 530–31 (4th Cir. 2013). Just as § 1324 and the related entry provisions field preempt state-law analogs, so too with SB 4. *See* PI Mot. at 20–21. Texas has no response these cases.

Texas emphasizes that SB 4 "mirror[s] federal law," but that is both incorrect and irrelevant. PI Opp'n at 17. As discussed below, SB 4 conflicts with federal law in critical ways. *See* Section I.B., *infra*. But more fundamentally, the Supreme Court has made clear that "[w]here Congress occupies an entire field," even "complementary state regulation is impermissible."[1] *Arizona*, 567 U.S. at 401. "Field preemption reflects a congressional decision to

---

[1] Texas cites *Kansas v. Garcia*, 140 S. Ct. 791, 806 (2020), for the proposition that "'[t]he mere fact that state laws like' SB 4 'overlap to some degree with federal criminal provisions' on immigration 'does not even begin to make a case for' preemption." PI Opp'n at 17 (quoting *Kansas*, 140 S. Ct. at 806). Texas, however, omits the word "conflict" from "conflict preemption." The passage of the *Kansas* opinion that Texas relies on was discussing *conflict* preemption, not *field* preemption. 140 S. Ct. at 806. Nothing in *Kansas* suggests that it was

foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.* And that is important here because the *federal* government needs the exclusive discretion to prosecute illegal entry and conduct removals. *See* PI Mot. at 16. Were it otherwise, "the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402.

Contrary to Texas's argument, federal law nowhere "expressly contemplates concurrent regulation with States and localities." PI Opp'n at 15. Rather, federal law specifies only narrow circumstances in which States may assist in enforcing federal immigration laws, which "would be meaningless if States already had the authority to criminalize, arrest, detain, and remove noncitizens for violating federal immigration law." PI Mot. at 18; *see* 8 U.S.C. § 1324(c) (allowing state arrests for human-smuggling); 18 U.S.C. § 758 (making it a *federal* crime for anyone at an immigration checkpoint to "flee[] Federal, State, or local law enforcement agents in excess of the legal speed limit"). Texas's other cited provisions recognize only that States can prosecute certain noncitizens if they violate *general* criminal laws (like those against trafficking). *See* 22 U.S.C. § 7105(c)(3) (contemplating the "prosecution of" usual "State and local crimes such as kidnapping" and "forced labor offenses" where "severe forms of trafficking appear to have been involved"); 8 U.S.C. § 1101(a)(15)(T)(i)(III) (referencing state "prosecution of acts of trafficking"); *id.* § 1101(a)(15)(U) (referencing state "criminal law[s]" against, among other things, "domestic violence," "murder," and "perjury"). None of Texas's cited laws invites States to regulate the entry and removal of noncitizens.

Texas's remaining two arguments—that field preemption may not be a viable doctrine and that there can be no field preemption where the Executive has allegedly "abandoned" the

---

overruling the century-old rule that even "complementary state regulation is impermissible" in an exclusively federal field. *Arizona*, 567 U.S. at 401; *Pa. R. Co. v. Pub. Serv. Comm'n of Com. of Pa.*, 250 U.S. 566, 569 (1919); *see also infra* p. 7 (discussing conflict-preemption holding).

field, PI Opp'n at 19–22—are wholly unsupported. Texas does not dispute that modern Supreme Court precedent recognizes field preemption; all nine justices recently applied that doctrine in a case Texas repeatedly relies on. *See Kansas v. Garcia*, 140 S. Ct. 791, 804 (2020); *id.* at 808 (Thomas, J., joined by Gorsuch, J.) (applying field preemption despite some skepticism); *id.* at 808–09 (Breyer, J., dissenting, joined by Ginsburg, Sotomayor, and Kagan, JJ.). And the Court in *Arizona* applied it to the noncitizen registration. *See* 567 U.S. at 400–03.

Nor is there any reason to accept Texas's novel argument that SB 4 is not field preempted because—in Texas's view—"the federal executive branch has abandoned the very field it now purports to occupy." PI Opp'n at 20. Even apart from the fact that the federal government has not abandoned the field—it regularly enforces the immigration laws, PI Mot. at 9—the argument fundamentally misunderstands the doctrine. Whether a field is entirely preempted depends on whether Congress has regulated comprehensively in the field. *See, e.g., Arizona*, 567 U.S. at 399 ("[T]he States are precluded from regulating conduct in a field that *Congress*, acting within its proper authority, has determined must be regulated by its exclusive governance." (emphasis added)). Texas cites no case holding that the manner of Executive Branch enforcement in a field is relevant to the inquiry. In the only case Texas cites, *Parker v. Brown*, 317 U.S. 341, 353–55 (1943), the Supreme Court found no preemption because the federal law at issue became "effective only if a program is ordered by the Secretary," and the Secretary had not issued any order "putting it into effect." *Id.* at 353. In other words, there was no field preemption because the federal law specifically "contemplate[d] the existence of state programs at least until such time as the Secretary shall establish a federal marketing program." *Id.* at 354. It did not involve the Executive Branch allegedly "abandoning" a field. Texas's theory also conflicts with its own argument that "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities of federal officers." PI Opp'n at 14 (quoting *Kansas*, 140 S. Ct. at 807). Here, the "Laws of the United States"—along with several dominant federal interests—pervasively occupy the field of noncitizen entry and removal.

5

**B.**     **SB 4 conflicts with federal law in numerous respects.**

SB 4 also conflicts with federal law in multiple ways.  *See* PI Mot. at 21–27.  Texas almost entirely disregards these conflicts, and argues only that SB 4 supposedly mirrors federal law.  PI Opp'n 11–14.  But SB 4's attempt to duplicate federal law is incompatible with federal immigration laws, and regardless, SB 4 is different than federal law.

<u>Conflict with Limited State Enforcement Role under Federal Law</u>.  As an initial matter, SB 4 conflicts with federal law by giving Texas the ability to unilaterally engage in immigration enforcement efforts not permitted under the statutory scheme enacted by Congress.  Texas does not dispute that federal law specifies only "limited circumstances in which state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408; s*ee* PI Mot. at 24.  Most notably, under 8 U.S.C. § 1357(g), state officers may assist with apprehension and detention, or other immigration-related duties, under "the direction and supervision of the [Secretary of Homeland Security]" or in "cooperation" with federal officials.  *Id.* § 1357(g)(1)-(3), (10).  Congress's purpose in enacting this provision was to ensure that state immigration-enforcement efforts would be "conducted under the watch of" federal officials and "in conformity with Federal standards."  PI Mot. at 25.

SB 4 directly conflicts with this regime by allowing Texas officials to engage in immigration-enforcement activities unilaterally.  *See Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 531–32 (5th Cir. 2013) (plurality) (holding that ordinance "interferes with the careful balance struck by Congress" by "giving state officials authority to act as immigration officers outside the limited circumstances specified by federal law" (internal quotation marks omitted)).  Texas's brief has only a one-sentence response: "[s]tate officials can implement SB 4 in a way that maximizes cooperation with federal authorities."  PI Opp'n at 13.  But Texas disregards the requirement that it act under the § 1357(g) framework or at least in coordination with federal officials.  "[N]o coherent understanding" of "cooperation" would "incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government."

*Arizona*, 567 U.S. at 410. SB 4 thus conflicts with the federal scheme in the same way that the challenged Arizona law did. *See id.* at 407–10.

    <u>Intrusion on Federal Discretion</u>. SB 4 also conflicts with the federal scheme by allowing Texas to interfere with the federal government's exclusive discretion regarding prosecution of violations of federal immigration law. Immigration matters inherently involve questions of foreign affairs and can lead to adverse actions against United States citizens abroad. The federal government must take these competing interests into account when determining what actions, if any, to take against noncitizens. Three courts of appeal found state-law analogs to 8 U.S.C. § 1324 to be conflict preempted for the same reason. *See GLAHR*, 691 F.3d at 1265 ("The [state law], however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."); *Valle del Sol*, 732 F.3d at 1027 ("[State law] conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes."); *Alabama*, 691 F.3d at 1287 ("[State law] undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration."); *South Carolina*, 720 F.3d at 532 (finding conflict because the state law would "strip federal officials of the authority and discretion necessary in managing foreign affairs"); *see also Arizona*, 567 U.S. at 403.

    Despite these differences, Texas argues that "[a]t every step, SB 4 mirrors federal law standards" and thus does not conflict with federal law under *Kansas v. Garcia*, 140 S. Ct. 791 (2020). PI Opp'n at 12. While *Kansas* recognizes that States generally may create state crimes that parallel federal crimes, *see* 140 S. Ct. at 806, that case did not overrule *Arizona* and does not stand for the proposition that even a truly parallel state immigration regime is lawful. *Kansas* involved a generally applicable law about "fraud, forgeries, and identity theft," which "apply to citizens and aliens alike," *id.* at 798, and which did not "frustrate[] any federal interests," *id.* at 806. Here, by contrast, SB 4 regulates entry and removal, which necessarily implicate sensitive issues of national security, border security, and foreign affairs. In that context, allowing a single State to imprison foreign nationals, or order them removed from

7

the United States, would fundamentally undermine the federal interests embodied in the scheme that Congress enacted.  And SB 4 is not a generally applicable law that could apply to citizens and noncitizens alike.  Rather SB 4 specifically targets the illegal entry of noncitizens and criminalizes their unlawful presence.

Conflict with Federal Protections for Noncitizens.  Texas has no persuasive response to the fact that SB 4 conflicts with federal protections afforded noncitizens facing removal who claim a fear of persecution or torture in their home country or the country to which they would be removed.  See PI Mot. at 21–22; Jacobstein Decl. ¶¶ 24–25.  Texas does not dispute that SB 4 lacks comparable protections.  To the contrary, the law makes clear that "a court may not abate the prosecution" on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  Tex. Code of Crim Proc. art. 5B.003.  Texas's only response, in a footnote, is that noncitizens can seek federal removal protection "while in state custody or from another country."  PI Opp'n at 13 n.38.  But SB 4 has no defenses to removal based on likely persecution or torture in the country of removal.  For those already deported under SB 4 to "another country", the conflict is even more glaring: if the noncitizen would have been eligible for withholding because of fear of persecution in Mexico, the noncitizen would have been already been refouled, not to mention that the noncitizen also could not apply for asylum (or other protections) while outside of the United States, see 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States . . . may apply for asylum").

Conflict with the Federal Removal.  Nor does Texas dispute that, under SB 4, state judges can issue removal orders without following the federally prescribed process for removal.  See PI Mot. at 22–23.  State judges can order a noncitizen to return to Mexico without first coordinating with that country or following the detailed federal process for selecting the country of removal.  See id.  For noncitizens traveling from Mexico and who do not enter through ports of entry, the process of selecting a country of removal is governed by 8 U.S.C.

8

§ 1231(b)(2).  First, the noncitizen can designate a country of removal, which can be disregarded only in certain circumstances.  *See* 8 U.S.C. § 1231(b)(2)(A), (C).  If the noncitizen cannot be removed to that country, there is a hierarchy of removal countries, starting with the noncitizen's country of citizenship, the country where he last resided, and so forth, unless removal to the country is impracticable, inadvisable, or impossible.  *See id.* § 1231(b)(2)(D)–(E).  Accordingly, under federal law, not every removal can be to Mexico. Yet, under SB 4, removal is always "to the foreign nation from which the person entered." Tex. Code of Crim Proc. art. 5B.002(c) & (d).  While Texas notes that it would not physically execute its own removal orders, *see* PI Opp'n at 16, Texas judges would still be issuing orders requiring certain noncitizens to leave the country or face felony charges.  *See* Tex. Penal Code § 51.04(b).  SB 4 therefore conflicts with the federal statutory scheme, which details when and how noncitizens are subject to removal orders.

Conflict With Determining Lawful Presence.  Texas does not contest that SB 4 would require state judges to determine whether noncitizens are "lawfully present" in the United States.  SB 4 provides an affirmative defense to unlawful entry where "the federal government has granted the defendant . . . lawful presence in the United States." Tex. Penal Code § 51.02(c)(1)(A).  But the Fifth Circuit has held that a state or local law requiring state judges to determine "lawful presence" conflicts with federal law given the significant complexities for making the determination.  *See* PI Mot. at 23 (*quoting Farmers Branch*, 726 F.3d at 535–36).

Conflict with Other Provisions of Federal Law.  Texas also does not deny that SB 4 is broader than its federal counterparts in certain respects.  *See* PI Mot. at 24.  For example, SB 4 criminalizes a noncitizen's reentry into the United States even when the federal government allows it.  Under federal law, a noncitizen who has previously been removed, for instance, may reenter if she has the consent of the Secretary of Homeland Security.  *See* 8 U.S.C. § 1326.  But SB 4 does not include any "consent" exception. Tex. Penal Code § 51.03(a).  SB 4 thus criminalizes conduct that federal law deems permissible.  And because SB 4's reentry provi-

sion applies to a person who merely is "found" in the state after having been removed, regardless of whether their subsequent crossing was authorized, it has the effect of criminalizing mere unlawful presence, in conflict with federal law. *See Arizona*, 567 U.S. at 407 ("As a general rule, it is not a crime for a removable alien to remain present in the United States."). SB 4 also in certain respects imposes penalties that are more severe than those imposed by its federal counterparts. *Compare* Tex. Penal Code § 51.03(b) (unlawful reentry under SB 4 is "felony of the second degree if the defendant was removed subsequent to a conviction for the commission of a felony") *and* Tex. Penal Code § 12.33 (a second-degree felony conviction is punishable by up to 20 years in prison), *with* 8 U.S.C. § 1326(b)(2) (unlawful reentry under federal law is punishable by up to 20 years in prison only if the noncitizen's prior "removal was subsequent to" an "*aggravated* felony" conviction (emphasis added)). And the punishment for willfully failing to comply with a federal removal order is generally a sentence of up to four years (or 10 years in certain circumstances), *see* 8 U.S.C. § 1253; 8 U.S.C. § 1253(a)(1), whereas it is up to 20 years for violating a state removal order under SB 4, *see* Tex. Penal Code § 51.04. Yet Texas itself acknowledges that under *Arizona*, a State's imposition of greater penalty could create a conflict with federal law. *See* PI Opp'n at 13.

Texas also cannot sidestep conflict preemption by arguing that state courts may resolve these conflicts when noncitizens raise preemption defenses in criminal prosecutions under SB 4. *See* PI Opp'n at 14. Such proceedings are an impermissible intrusion on the federal scheme; no unilateral state prosecution is consistent with federal law. And the possibility that a state court may hold SB 4 preempted later does not disprove that SB 4 is preempted today.

### C.     SB 4 violates the dormant Foreign Commerce Clause.

The United States is also likely to succeed on its Commerce Clause claim. Under the Constitution, "[f]oreign commerce is preeminently a matter of national concern." PI Mot. at 27 (citation omitted). Applying binding Fifth Circuit precedent on this issue, *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006), the United States explained that SB 4 is invalid because it improperly discriminates against foreign commerce: it criminalizes

solely the movement of noncitizens across an international boundary *into* Texas, but nothing about movement *within* or *out of* Texas, and nothing about the movement of American *citizens* entering Texas.  PI Mot. at 29.  SB 4 also improperly "create[s] a substantial risk of conflicts with foreign governments" and "undermine[s] the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states."  *Id.* at 28 (quoting *Piazza's Seafood*, 448 F.3d at 750).  By definition, restricting movement over an international boundary implicates the United States' foreign affairs.  *Id.* at 29–30.  And Mexico has already decried SB 4, confirming SB 4's impact on the nation's foreign relations.  *Id.*

Texas hardly engages with the analysis mandated by the Fifth Circuit.  For example, Texas asserts that States can "enact laws that affect interstate or international commerce."  PI Opp'n at 31.  But Fifth Circuit precedent explains that such laws violate the Foreign Commerce Clause when they "discriminat[e] against or unduly burden[] foreign or interstate commerce."  *Piazza's Seafood*, 448 F.3d at 750.  And while Texas points to one case that applies this analysis in a different context—Virginia's denial of public university admissions to unlawfully present noncitizens—it never explains how that case is relevant here.  *See* PI Opp'n at 33 (citing *Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585, 608–11 (E.D. Va. 2004)).[2]

Instead of engaging in the Commerce Clause analysis, Texas takes issue with the applicability of the legal standard itself, arguing under both prongs—discrimination and undermining federal uniformity—that "illegal entry" is not a "commercial transaction."  PI Opp'n at 32–34.  But Texas has no response to the United States' cited cases, which held that "movement of undocumented [noncitizen] laborers across a national boundary into this country" is

---

[2] Texas cites *Medellín v. Texas*, 552 U.S. 491, 496–98 (2008), for the proposition that even though "[t]he United States' relationship with Mexico may or may not be strained due to SB 4," federal courts "have refused to restrain far more severe exercises of state power despite their ramifications for foreign affairs."  PI Opp'n at 34–35.  But *Medellín* analyzed only the question of whether a treaty provision was self-executing and therefore had domestic legal effect.  *See Medellín*, 552 U.S. at 496.

"commerce" and the "illegal entry of foreign nationals" also "substantially affect[s] interstate commerce." PI Mot. at 27–28 (citations omitted).

More broadly, the movement of persons *is* commerce. The Supreme Court said long ago that "the thousands of people who daily pass and repass over" an interstate or international "bridge may be as truly said to be engaged in commerce as if they were shipping cargoes of merchandise from New York to Liverpool." *Covington & C. Bridge Co. v. Kentucky*, 154 U.S. 204, 218–19 (1894). "For more than 175 years of Commerce Clause precedent, this much has been clear: 'Within the flow of commerce' denotes movement or people or things across interstate borders." *United States v. Ballinger*, 395 F.3d 1218, 1232 (11th Cir. 2005) (collecting cases); *see Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255–56 (1964) (explaining that commerce is "intercourse," which includes "the movement of persons through more States than one"); *United States v. Hanigan*, 681 F.2d 1127, 1130 (9th Cir. 1982). That's why Congress has used its commerce power to regulate the interstate and international movement of people since the Founding. *See, e.g.*, *Taylor v. United States*, 579 U.S. 301, 306 (2016) ("Congress may regulate under its commerce power . . . persons or things in interstate commerce."); *United States v. Guest*, 383 U.S. 745, 758–59 (1966) ("[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate [or foreign] commerce of persons as well as commodities."); *Mobile Cnty. v. Kimball*, 102 U.S. 691, 702 (1880).

Texas argues that "modern cases source the United States' authority in immigration matters to 'its inherent sovereign power to control and conduct foreign relations.'" PI Opp'n at 33. But that is irrelevant: everyone agrees that Congress has the authority to regulate immigration and Texas never disputes the *current* test for Foreign Commerce Clause violations. *See Piazza's Seafood*, 448 F.3d at 750. In any event, Texas admits that "the Foreign Commerce Clause was understood to permit the federal government to control at least some aspects of immigration," and the State nowhere argues that the cases so holding have been overruled. *Id.* at 32. To the contrary, the Court has relied on the Foreign Commerce Clause as a basis

12

for immigration regulation even after Texas says the Supreme Court "began a trend of regarding Congress's power to regulate immigration as an inherent aspect of federal sovereignty." *Compare id.* at 33 (saying that this "trend" started in 1889), *with Toll v. Moreno*, 458 U.S. 1, 10 (1982) ("Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's . . . power '[t]o regulate Commerce with foreign Nations.'").

Despite Texas's protestation that SB 4 purportedly "complements federal statutes," PI Opp'n at 34, the Fifth Circuit has explicitly held that even if a state law is "consistent with federal policy" or "furthers the goals we might believe that Congress had in mind," a "state statute that violates the Commerce Clause cannot be saved by a showing that it is consistent with the purposes behind federal law." PI Mot. at 29 (quoting *Piazza's Seafood*, 448 F.3d at 751). As the United States explained, "[a] law need not be designed to further local economic interests in order to run afoul of the Commerce Clause." PI Mot. at 29 (citation omitted). SB 4 therefore violates the Commerce Clause.

## II. Texas has no valid defense to the United States' claims.

### A. Texas cannot rely on an alleged "invasion" to defend SB 4.

Texas argues that because the United States purportedly has "refused to 'protect [the State of Texas] against Invasion,'" Texas can "engage in War" to defend itself by enacting legislation that otherwise would be preempted by federal law. PI Opp'n at 23. This Court has rejected that "breathtaking" argument before, and it should do so again here. *United States v. Abbott*, --- F. Supp. 3d ---, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023) (Ezra, J.).

The State War Clause provides: "No State shall, without the Consent of Congress . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. Under no reasonable understanding can irregular migration or criminal cartels' smuggling activities amount to an "invasion" justifying Texas engaging in "war." For constitutional purposes, an invasion is an "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government." *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *California v.*

*United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (same); *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996) (same); *see also Invasion*, Noah Webster, American Dictionary of the English Language (1828) (defining "invasion" as "particularly, the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force").  It is not irregular migration or mere illegal activity by private, non-sovereign actors.

Texas invokes James Madison's discussion during the Virginian Ratifying Convention about the use of state militia to stop smugglers.  PI Opp'n at 26.  But as Texas acknowledges, *id.*, Madison's discussion was in response to concerns about Congress calling forth militia to execute federal law.  *See Debates & Other Proceedings of the Convention of Virginia*, 292–94 (2d ed. 1805).  And when Madison *did* discuss "invasion" in the context of the Invasion Clause, U.S. Const. art. IV, § 4, he recognized that it must be conducted by sovereigns.  *See, e.g., Debates of the Convention of Virginia*, 302 (2d ed., 1805) ("[the States] are to be protected from invasion from other states, as well as from foreign powers."); *The Federalist* No. 43 at 293 (Cooke ed.1961) ("A protection against invasion is due from every society to the parts composing it. The latitude of the expression here used seems to secure each State, not only against foreign hostility, but against ambitious or vindictive enterprises of its more powerful neighbors.").

Similarly, the State War Clause does not merely reference invasion in the abstract; it frees States from the restriction on "engag[ing] in War" when "actually invaded."  And "war" was traditionally understood to mean "[a] contest between nations or states, carried on by force." *War*, Noah Webster, American Dictionary of the English Language (1828).  To make sense of the Clause, the power granted to the State ("engage in War") must be commensurate with the triggering event ("actually invaded").  *See* Edmund Randolph, 3 Debates in the Several State Conventions 70 (Elliot ed. 1836) ("the powers to be given must be commensurate to the object" to be obtained).  Thus, to justify action as extreme as "engaging in war," the term "actually invaded" under this Clause must mean armed hostilities rising to the level of those typically engaged in war with a "state or foreign country" or at least the equivalent to a "political entity" that has comparable capacity, none of which Texas claims here.  *Padavan*,

82 F.3d at 28.[3]  Indeed, if the irregular migration and criminal cartels qualify as "invasion" justifying a "war" at the southern border, then the federal government could now suspend the constitutional writ of habeas corpus or provide for the quartering of soldiers.  *See* U.S. Const. art. I, § 9; *id.* amend. III.  Those would be obviously untenable results.

In any event, the State War Clause would not allow Texas to enact criminal legislation regarding entry and removal that conflicts with comprehensive federal law.  As an initial matter, enacting a criminal prohibition on entry and removal is not "engaging in War."  That is apparent as a matter of common sense, and it is consistent with the Founders' understanding.  S*ee* James Madison, *The Report of 1800* (Jan. 7, 1800) (noting that "[t]o protect against invasion is an exercise of the power of war" and arguing that removal of noncitizens was not an incident of war and could not be justified as a means of preventing an invasion), *available at* https://perma.cc/54f6-tw42.  There is also no basis to allow Texas to disregard federal law.  Texas claims that its declaration of an "invasion" allows it to override the pervasive federal scheme governing the entry and removal of noncitizens.  *See* PI Opp'n at 29.  But as this Court has previously recognized, "this is not a controversy between equals."  *Abbott*, 2023 WL 5740596, at *10 (citation omitted).  There is no question that the United States' plenary authority over the entry and removal of noncitizens is "superior to that of the States to provide for the welfare or necessities of their inhabitants"—"the interests of the nation are more important than those of any state."  *Id.* (citation omitted).  Texas acknowledges that in waging "war," it must still comply with the law of war.  *See* PI Opp'n at 23, 26.  But the State gives no reason why it need not similarly obey federal law.  Whatever the outer limits of a State's authority to repel an actual or imminent invasion, they do not cover the situation here: a State

---

[3] Texas argues that an early statute authorizing the President to call forth militia if the United States is invaded by "any foreign nation and *Indian tribes*" confirms that "invasion" is not limited to state actors.  PI Opp'n at 27.  But such tribes were "separate sovereigns pre-existing the Constitution," *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978), and retained their sovereign status, *see Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985).

intruding into an exclusive federal field and overriding federal immigration laws because the State would enforce those laws differently.

Even if there is an actual or imminent "invasion," a State's authority to repel it (and purportedly ignore conflicting federal law) does not last indefinitely. *See* U.S. Const. art. I, § 10 (noting Congress may consent to States waging war). The State War Clause was ratified at a time when every State was bordered by the sea, a foreign power, or both, and it might take weeks for word of invasion to reach Congress, much less for Congress to assemble and then deploy federal forces. Thus, this Court properly recognized that a State's "authority to act independently only lasts until resources of the federal government can reach the invasion." *Abbott*, 2023 WL 5740596, at *12. "Texas may not claim self defense from invasion at the border to justify a long-term usurping of Congressional authority." *Id.* And Congress has *already* enacted a statutory framework to address what Texas characterizes as an invasion.

Finally, this Court has already held that "whether Texas's claim of 'invasion' is legitimate is a non-justiciable political question." *Abbott*, 2023 WL 5740596, at *12. The Court need not reach that issue because there is no doubt that Texas's invasion must fail: there is no "invasion" or "war" at the southern border. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (political-question doctrine applies only when political question is inextricably linked with resolution of the case). In any event, the lesson from the cases on which Texas relies was not that courts must unquestioningly accept a State's assertion that an invasion was occurring, but that States were prohibited from relying on their invocation of an invasion to secure judicial action to which they would not otherwise have been entitled. *See Padavan*, 82 F.3d at 28; *California*, 104 F.3d at 1091 (same); *New Jersey*, 91 F.3d at 468 (same). If the Court decides this issue, it must assess the United States' claims without regard to Texas's nonjusticiable defense. *See Abbott*, 2023 WL 5740596, at *11.

## B. The United States can sue in its own courts to enforce federal law.

Texas fares no better in arguing that the United States has no cause of action. This preemption suit is no different than the one the United States successfully brought against

16

Arizona or the suits against Alabama and South Carolina, discussed above. Congress has empowered federal courts to exercise equity jurisdiction and to grant such relief as "was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999); *see* 28 U.S.C. §§ 1331, 1651. "[E]quitable relief is traditionally available to enforce federal law" by a proper plaintiff unless Congress has "displace[d]" it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . .").

Beyond the power federal courts possess generally to entertain actions for equitable relief, they have the power to grant injunctions to the United States to protect its sovereign interests. The Supreme Court has long recognized that "[e]very government, [e]ntrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other." *In re Debs*, 158 U.S. 564, 584 (1895). Both the Supreme Court and the Fifth Circuit have reaffirmed "the general rule that the United States may sue to protect its interests." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201–02 (1967); *see, e.g.*, *United States v. Minnesota*, 270 U.S. 181,194 (1926) (noting United States' "right to invoke the aid of a court of equity in removing unlawful obstacles to the fulfillment of its obligations"); *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405, 425–26 (1925) ("The Attorney General [ ] may bring this proceeding [to carry out treaty obligations] and no statute is necessary to authorize the suit."); *United States v. LeMay*, 322 F.2d 100, 103 (5th Cir. 1963) ("The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies").

Texas argues that these and other cases permitting suit by the United States involve the "well-known equitable cause of action to abate a public nuisance" or an implied right of action, are no longer good law, or fail to consider the issue. PI Opp'n at 36–37. But the case Texas centrally relies on, *Armstrong*, recognizes a nonstatutory cause of action in equity "to

sue to enjoin unconstitutional actions by state and federal officers." 575 U.S. at 327. "*Armstrong* holds only that the Supremacy Clause does not create a *private* cause of action"; it "does not limit the federal government's ability to enforce the supremacy of its laws." *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021). Thus, as one court of appeals has observed, *Armstrong* "counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest." *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 906 n.9 (10th Cir. 2016). Indeed, as Justice Story observed, "[i]t would be a perfect novelty in the history of national jurisprudence, as well as of public law, that a sovereign had no authority to sue in [its] own courts." 3 J. Story, Commentaries on the Constitution § 1668.

In any event, as *Armstrong* recognized, suits against state officials for prospective declaratory or injunctive relief are cognizable under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908); *see Turnage v. Britton*, 29 F.4th 232, 239 (5th Cir. 2022). Texas's argument that governmental plaintiffs may not rely on *Young* is meritless. *See* PI Opp'n at 39. Nothing in *Young* or later cases limits its scope to private parties, and the Supreme Court has squarely rejected that argument. *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011).

## III. SB 4 will irreparably harm the United States and any benefit it may provide Texas can be achieved through other lawful means.

The balance of the equities counsels in favor of granting the United States' requested relief. The United States will suffer irreparable harm absent a preliminary injunction. Texas does not deny that a Supremacy Clause violation, by itself, constitutes irreparable harm. *See* PI Mot. at 30. Texas also does not deny that SB 4 will harm foreign relations and discourage international cooperation, as demonstrated by the United States in its motion and supporting declaration. *See* PI Mot. at 30–31; Jacobstein Decl. ¶¶ 6, 7, 9, 32. This can lead to mistreatment of U.S. citizens abroad, and limit foreign cooperation on issues critical to U.S. interests. *See* PI Mot. at 30–31. In response, Texas merely notes that other, unspecified state actions may also harm foreign relations, *see* PI Opp'n at 54, but that has no bearing on the United States's showing that it will suffer harm if SB 4 takes effect. In addition to international harms,

18

SB 4 will also impose domestic harms since enforcement of SB 4 could, for example, interfere with federal law enforcement and intelligence-gathering efforts. *See* PI Mot. at 33–34.

While SB 4 would inflict concrete, irreparable harms on the United States, Texas fails to show that its absence will have any material impact. It largely argues that illegal immigration causes many harms. PI Opp'n at 56. To the extent Texas wants to assist with immigration enforcement, however, it can use lawful mechanisms in federal law, such as § 1357(g) agreements with DHS. Indeed, twenty-six Sheriff's Offices in Texas already have § 1357(g) agreements in place. *See* PI Mot. at 35. In any event, because this is a lawsuit by the United States, Texas can assert no cognizable interest in protecting its residents. *See* PI Mot. at 36.

## IV. There is no reason to apply any abstention or severability doctrine here.

Texas argues that the Court should refrain from reviewing this suit due to *Pullman* abstention. PI Opp'n at 58–60. That doctrine is an "exception" to judicial review. *City of Houston. v. Hill*, 482 U.S. 451, 467–68 (1987). And it allows federal courts to, in their discretion, abstain from resolving the constitutionality of a state law if "state courts may interpret" that law "so as to eliminate or at least to alter materially, the constitutional question presented." *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 477 (1977). But that doctrine has no applicability here: "abstention is inappropriate when, as here, the United States seeks in federal court to assert its federal interests against a [S]tate." *United States v. Composite State Bd. of Med. Examiners*, 656 F.2d 131, 136 (5th Cir. 1981). And *Pullman* abstention does not apply to preemption claims. *See, e.g.*, *United Servs. Auto. Ass'n v. Muir*, 792 F.2d 356, 363 (3d Cir. 1986) ("The holdings of" several Supreme Court cases "suggest that a federal court should not abstain under *Pullman* from interpreting a state law that might be preempted by a federal law."). Regardless, abstention is not justified if "the possible benefits of abstention" are "speculative." *Hodory*, 431 U.S. at 481. The statute must be "obviously susceptible of a limiting construction" that would resolve the constitutional issue. *City of Houston*, 482 U.S. at 468. Otherwise, "it is the duty of the federal court to exercise its properly invoked jurisdiction," including in "cases involving a facial challenge to a statute." *Id.*

Here, Texas offers no "obviously susceptible" construction of SB 4 that would resolve the United States' claims. Under any reasonable reading of SB 4, it will allow Texas to impose penalties on, and issue removal orders for, persons who have unlawfully entered or reentered the United States. That is the entire purpose and effect of the statute. SB 4 will thus invariably intrude on the federal government's exclusive control of the field of noncitizen entry and removal and interfere with the federal government's authority to enforce immigration law and regulate foreign commerce. Abstention is therefore inappropriate here for this reason as well.

Texas also argues that, if the Court agrees with Plaintiffs on the merits, it "should craft a narrow remedy and sever only the particular applications of any provisions it determines are invalid." PI Opp'n at 61. But the United States is not challenging only certain "applications" of SB 4's new criminal and removal-order provisions; it is arguing that those provisions are facially unconstitutional. Indeed, Texas does not identify a single "application" that could survive if the United States were to prevail on its claims. And the other provisions of SB 4 are generally derivative of the criminal and removal provisions. *See*, *e.g.*, Tex. Penal Code Ch. 17 (official immunity for enforcing SB 4); Tex. Gov't Code § 508.145(a) (denying parole to those serving a sentence for violating SB 4's criminal provisions). If the Court finds that the United States is likely to prevail on the merits, it should enjoin SB 4 in full.

## CONCLUSION

For the reasons explained previously and above, the Court should grant the United States' motion and enjoin enforcement of SB 4.

DATED: February 14, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAIME ESPARZA
United States Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

JEAN LIN
Special Litigation Counsel, Federal Programs Branch

*/s/ Stephen Ehrlich*
KUNTAL CHOLERA
STEPHEN EHRLICH
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

Samuel M. Shapiro
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, TX 78216
samuel.shapiro@usdoj.gov
Tel: (210) 384-7392

*Attorneys for the United States*

# Exhibit H: ECF 33, Plaintiff ACLU's Reply in Support of Its Motion for Preliminary Injunction

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff,*

    v.

STATE OF TEXAS, et al.,

    *Defendants.*

---

LAS AMERICAS IMMIGRANT
ADVOCACY CENTER; AMERICAN
GATEWAYS; and THE COUNTY OF EL
PASO, TEXAS,

    *Plaintiffs*,

    v.

STEVEN C. MCCRAW, in his official
capacity as Director of the State of Texas
Department of Public Safety, and BILL D.
HICKS, in his official capacity as District
Attorney for the 34th District,

    *Defendants.*

CASE NO. 1:24-cv-00008-DAE
(LEAD CASE)

CONSOLIDATED WITH
1:23-cv-01537

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

ARGUMENT .............................................................................................................. 1

    I.   SB4 Is Preempted. ......................................................................................... 1

    II.  Texas's Threshold Defenses Are Meritless. ............................................... 9

        A.  Plaintiffs Have a Cause of Action at Equity and Satisfy *Ex parte Young*'s Exception To Sovereign Immunity. ........................................ 9

        B.  Plaintiffs Have Standing. ........................................................................ 11

            1.  Plaintiffs Have Preenforcement Standing. ..................................... 11

            2.  Plaintiffs Have Demonstrated Standing. ........................................ 13

    III.   The Court Should Preliminarily Enjoin SB4. ............................................ 17

        A.  *Pullman* Abstention Is Inappropriate. ................................................. 17

        B.  SB4 Will Irreparably Harm Plaintiffs. .................................................. 17

        C.  An Injunction Is In The Public Interest. ................................................ 18

        D.  The Court Should Not Rewrite the Statute. ........................................... 19

        E.  The Court Should Enjoin SB4 Statewide. ............................................. 19

CONCLUSION .......................................................................................................... 20

## INTRODUCTION

SB4 is egregiously unconstitutional. It flies in the face of 150 years of Supreme Court precedent and conflicts with federal law in myriad ways. Because this is a textbook example of field and conflict preemption, Texas falls back on its claim that an "invasion" justifies its usurpation of federal authority. That baseless position is anathema to our constitutional structure.

Texas's threshold challenges similarly lack merit. Plaintiffs have standing where a sweeping law will interfere with the core of their operations and missions, and clear precedent establishes their ability to challenge state action that violates the Supremacy Clause.

Notably, Texas nowhere addresses the harms that SB4 will cause all Texans. Noncitizens seeking safety face summary removal to persecution or torture. Communities face the arrest and summary removal of loved ones and the separation of families. A preliminary injunction is necessary to prevent SB4, a patently unconstitutional law, from causing these severe harms.

## ARGUMENT

### I.    SB4 IS PREEMPTED.

SB4 is straightforwardly preempted. The core immigration function of regulating entry and removal is a quintessentially exclusive federal field. Mot. 5-10. SB4 additionally conflicts with Congress's protections for noncitizens; the federal Executive's broad discretion in this arena; exclusive federal control over foreign policy; and other features of the federal statutory regime. *Id.* at 10-17. Texas's contrary arguments ignore settled law, attempt to rewrite the statute, and advance an "invasion" defense that this Court has already rightly rejected.

1. For 150 years the Supreme Court has reiterated that entry and removal are exclusive federal matters. *Id.* at 6. Texas never (in 62 pages) grapples with that historical precedent, which is conclusive in this case. Texas likewise never addresses the numerous lower court decisions on

1

this question. *Id.* at 7 & n.3. Nor does it address the pervasive federal regulation of entry and removal matters. *Id.* at 8-9. This is a classic case of field preemption.

Texas does not contest that its statute operates in the field of entry, but does assert that SB4's "return orders" are not "removals." Opp. 16. However, SB4 itself defines a "removal" to include a return order. SB4 § 51.03(c). And just last week the Texas Office of the Attorney General confirmed to Congress that the statute operates by "expelling" noncitizens from the United States.[1] It does so by (1) ordering them to leave the country and (2) imprisoning them for up to 20 years if they fail to comply. Sophistry aside, that plainly amounts to deportation. *See Gutierrez v. State*, 380 S.W.3d 167, 170, 173 (Tex. Crim. App. 2012) (order to depart as probation condition was preempted "deportation" order). And even if SB4's orders did not amount to deportation, they would still infringe on exclusive federal removal authority. Mot. 7-8.

Texas also suggests that field preemption doctrine has been "questioned." Opp. 19. But the field preemption analysis Plaintiffs applied, Mot. 6, is black letter law. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 795-96 (5th Cir. 2024) (cited by Texas).

And contrary to Texas's argument, Opp. 15, nothing in federal law "expressly contemplates concurrent regulation" of entry and removal. *Cf. Nat'l Press Photographers*, 90 F.4th at 797 (agency specifically invited state regulation). To the contrary, *federal* statutes are "the sole and exclusive procedure" for determining who is admitted and who is removed. 8 U.S.C. § 1229a(a)(3); Mot. 8. The statutes Texas cites involve domestic conduct and at most give states a small and peripheral role in assisting *federal* enforcement—they are not invitation to enact a

---

[1] *See Written Testimony Before the Subcomm. on the Constitution and Limited Gov't of the H. Comm. on the Judiciary*, 118th Cong. (2024) (written statement of Brent Webster, First Assistant Att'y Gen. of Texas), https://perma.cc/497P-6EHY.

2

parallel *state* immigration scheme.[2] Of course various ordinary state crimes might "involve entering the country" in particular circumstances. Opp. 18. But SB4 does not regulate a normal criminal matter, like speeding, that may incidentally affect the border. It directly regulates immigration, by criminalizing noncitizens entering the country and authorizing state deportations. Congress never permitted, much less invited, that usurpation of federal power.[3]

In the end, Texas acknowledges that "[t]he authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see* Opp. 16-17. And none of Texas's cases remotely permit state regulation of such matters. *DeCanas v. Bica*, upheld a state *employment* regulation, but reiterated that the "[p]ower to regulate immigration is unquestionably exclusively a federal power." 424 U.S. 351, 354 (1976). *Kansas v. Garcia* rejected field preemption related to federal employment verification; it has no bearing on this law. 140 S. Ct. 791, 804 (2020). *Chamber of Commerce v. Whiting* permitted the state to "[r]egulat[e] in-state businesses through licensing laws" *because* that was not "an area of dominant federal concern." 563 U.S. 582, 604 (2011). And of course, after *Whiting*, the Court reiterated yet again in *Arizona v. United States* that "the removal process is entrusted to the discretion of the Federal Government." 567 U.S. 387, 409 (2012) (citing *Truax* and other cases). *Arizona* also held that states cannot even help enforce the *federal* immigration scheme outside of

---

[2] *See* 22 U.S.C. § 7105(c)(3)(C)(i) (addressing trafficking, which often involves purely domestic conduct, *see* 18 U.S.C. § 1590); 8 U.S.C. § 1101(a)(15)(T)(i) (same); 18 U.S.C. § 758 (addressing state assistance in pursuing fleeing vehicles fleeing checkpoints, which are typically not at the border); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263-64 (11th Cir. 2012) ("Congress chose to allow state officials to arrest for § 1324 crimes," many of which are domestic, but did not "permit[] state regulation in the field.").

[3] Texas suggests that Operation Lone Star's ongoing use of the generally applicable trespass statute to effectively criminalize entry into the United States means SB4 is lawful. Opp. 17-18. Operation Lone Star differs from SB4 in numerous respects, and its legality is not before the Court. In any event, that systemic use of trespass prosecutions to criminalize entry and seize control of federal immigration policy is preempted for many of the same reasons as SB4.

the limited situations Congress has authorized. *Id.* at 407-10, 413-14. That precludes the idea that states could bypass the federal scheme altogether and create their own.

2. Texas's conflict preemption responses likewise fail. *First*, SB4 upends Congress's design by authorizing arrest and deportation *regardless* of the many forms of relief available in the federal system, including asylum and related protections. Mot. 10-12. In response, Texas asserts that noncitizens prosecuted under SB4 "will have a full and fair opportunity to seek asylum." Opp. 47. But in the federal system, a person's asylum claim must be resolved before they can be deported. Under SB4, state courts are *prohibited* from halting prosecutions—and orders to return—because "a federal determination" as to relief "is pending or will be initiated." Tex. Code Crim. Proc. Art. 5B.003; *see* Mot. 11. That is not a "full and fair opportunity to seek asylum," Opp. 47—it is a complete bypass of the asylum system.[4]

Texas's declarant states that if a person is seeking asylum, "DPS intends to *coordinate* with federal immigration authorities before *executing* the order to return." ECF 25-3 at ¶ 13 (emphasis added). That must, of course, be understood in light of SB4's clear commands. Under SB4, any such "coordination" is beside the point; noncitizens will be subject to 20 years in prison for failure to depart—and potential federal defenses to removal do not change that fact.[5]

---

[4] Texas voices concern for unaccompanied children and victims of sexual violence and trafficking, Opp. 3-4, but the statute it enacted *denies* these groups the protection of federal laws designed for their benefit, *see* Mot. 11.

[5] Texas suggests in passing that noncitizens should seek federal relief from removal "from another country," after Texas has already deported them. Opp. 13 n.38. But the news article it cites is about refugee processing, which is Congress's humanitarian system for noncitizens abroad. 8 U.S.C. § 1157. Congress *also* (in the same Refugee Act) established asylum to protect noncitizens "physically present in the United States." *Id.* § 1158(a)(1). Texas cannot simply write the latter out of federal law. And even if a person could obtain relief from removal in federal proceedings before state deportation, the order to return would still be in effect, and the result would be "conflicting state and federal rulings" on whether the noncitizen may remain in the United States. *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc); *id.* at 559 (Owen, J. concurring in part); *id.* at 584 (Jones, J., dissenting).

*Second*, SB4 wipes away federal discretion—a central feature of the federal system—by seizing all authority into state hands. Mot. 12-13. Without squarely addressing this problem, Texas attempts to avoid it by imagining that the federal statutes make criminal prosecution, denial of asylum in truncated proceedings, and rapid removal "mandatory." Opp. 20. But that ignores the Supreme Court's repeated teachings—including in Texas's loss last term—that in the immigration sphere the federal government has broad discretion "over arrests[,] prosecutions," and "whether to remove a noncitizen." *United States v. Texas*, 599 U.S. 670, 679 (2023) (collecting cases); *see also, e.g.*, *Biden v. Texas*, 597 U.S. 785, 802 (2022) (rejecting another Texas effort to transform federal discretion into a mandate); *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 521-23 (BIA 2011) (agency has discretion to decide whether to invoke expedited removal provisions, *contra* Opp. 12, 20). Texas suggests there is no problem because it may "implement SB4 in a way that maximizes cooperation with federal authorities." Opp. 13. But it does not—and, under the text of SB4 cannot—say that federal authorities will get to choose whether noncitizens are arrested; prosecuted; removed; or granted relief from state deportation orders. *See* ECF No. 25-3 ¶ 13.

*Third*, SB4 infringes on the federal government's exclusive foreign affairs authority, particularly regarding Mexico. Mot. 13-14. Texas's primary response is that Mexico *should* be treated as a "hostile neighbor." Opp. 54. But that is a foreign policy judgment for the *federal* government to make. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000); Mot. 13 (citing cases). It likewise argues that SB4 creates no foreign affairs problem because it does "not require anything beyond what the federal government should already be doing." Opp. 18. As already explained, Texas's misapprehension of federal law ignores the broad sweep of federal discretion, which the Supreme Court again expressly tied to the federal foreign affairs authority

last term. *Texas*, 599 U.S. at 679. Further, nothing in federal law remotely suggests a federal obligation to remove non-Mexican nationals *to Mexico* (as SB4 directs). *Biden*, 597 U.S. at 806.

*Fourth*, Texas refuses to grapple with SB4's conflicts with federal law. Mot. 16-17. It repeatedly says SB4 "mirrors federal-law standards." Opp. 12. Yet it ignores the fact that its reentry crime is far broader than 8 U.S.C. § 1326, criminalizing people whom the federal government has expressly allowed to return. Mot. 16; *contra* Opp. 17 (misleadingly suggesting that the *entry* crime's affirmative defense applies to all of SB4). It also ignores SB4's directive to assess "lawful presence"—an intrusion *Farmers Branch* unanimously held was preempted. Mot. 16-17 & n.8.

SB4 simply cannot be reconciled with the federal regime. Whether viewed through a field or conflict lens, Congress set out a comprehensive scheme that discourages and penalizes entry between ports while also safeguarding multiple forms of relief from removal for those who enter between ports. Mot. 2-3, 9, 10-11. That scheme imposes detailed procedures that must be followed to determine people's ultimate immigration status, and places numerous kinds of discretion in the hands of federal officials. *Id*. at 15. In SB4, Texas seeks to remake immigration law by eliminating humanitarian relief, federal discretion, and federal control. That is manifestly not Congress's plan.[6]

3. Unable to defend SB4 on the merits, Texas falls back on political rhetoric dressed up as law: its claim that increased immigration is an "invasion" triggering state war powers. Opp. 22-31. This court has already rightly rejected this claim as "breathtaking." *United States v. Abbott*, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023).[7] Plaintiffs emphasize three points.

---

[6] *Kansas v. Garcia* is far afield. There, the Court rejected an argument that prosecutions under a general identity-theft statute based on income tax withholding forms were preempted merely because the same information was also included in employment verification forms, finding no congressional intent to foreclose tax-withholding prosecutions. 140 S. Ct. at 800, 806. *Kansas* involved "[n]othing similar" to the intricate statutory balance at issue here. *Id*. at 806.

[7] Relatedly, there is no basis to conclude the federal government has "abandoned" the field of entry and removal. Opp. 20. Congress has extensively legislated in it, and thousands of executive branch

First, Texas's claim to unilateral, unreviewable authority to disregard the federal scheme is anathema to our constitutional structure. In Texas's view, the governor's declaration of "war" on migration is conclusive; courts must take the governor's word for it; the President has no say in the matter; and even Congress "cannot countermand such state action." Opp. 24 & n.3, 25, 30. This position—that "the fiat of a State Governor" represents a "supreme and unchallengeable edict" that operates "beyond control" of the federal authorities even as it "subvert[s] the federal authority"—is "obviously untenable" under our system of government. *Sterling v. Constantin*, 287 U.S. 378, 397-98, 402 (1932) (cited by Texas). Federal supremacy is an absolute cornerstone of our constitutional structure, particularly with regard to foreign affairs and immigration. *See United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 317-18 (1936). To read the "invasion" clause as offering Texas a blank check free of all federal control would render the Constitution "a solemn mockery." *United States v. Peters*, 9 U.S. 115, 136 (1809).

Second, and in any event, invasion refers to "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government." *Padavan v. U.S.*, 82 F.3d 23, 28 (2d Cir. 1996); *California v. U.S.*, 104 F.3d 1086, 1091 (9th Cir. 1997); *New Jersey v. U.S.*, 91 F.3d 463, 469 (3d Cir. 1996). Texas argues at length that this can include "non-state actors." Opp. 27-28. But its sleight of hand becomes evident in suggesting that invasion "could refer" to immigration. *Id*. at 28. Of course the word "invasion" *can* be used in

---

employees apply the relevant statutes every day. Resisting this reality, Texas repeatedly cites criticisms of federal policy from the razor wire litigation—ignoring the Supreme Court's recent order vacating that injunction, *DHS v. Texas*, 2024 WL 222180 (U.S. Jan. 22, 2024)—but such assertions do not change the fact that entry and removal are exclusively federal matters. States cannot simply declare a field abandoned as a basis to interfere with a comprehensive federal scheme, and Texas fails to cite a single case that says otherwise.

numerous metaphorical ways.[8] But history, text, and common sense make clear the Constitution is talking about *literal* military invasion and *literal* war in response. Otherwise, any state could unilaterally turn a policy dispute into unlimited authority to upend federal law. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (warning against interpreting "isolated clauses . . . torn from context" to defeat "a workable government").

The asylum seekers who are trying to find safety in this country are not an invading army that could trigger a state's war powers. Texas tries to tie them to drugs and "terror." Opp. 28-29. That is baseless—for example, "fentanyl is overwhelmingly smuggled by U.S. citizens," and nearly all of that smuggling occurs at ports of entry.[9] And, in any event, if "some" people enter Texas with weapons or drugs, Opp. 31, Texas already has laws to address that conduct. But there is no basis to suggest that vulnerable people fleeing persecution and instability around the world are some sort of armed hostile force commanded by cartels or anyone else.

Third, the State is, of course, not *actually* waging war. It does not propose to engage militarily with cartels, for example. Rather, it is claiming a sweeping power to take whatever "lesser defensive measures" it wants. Opp. 24 n.43. This apparently includes disregarding federal law, ignoring congressional enactments, and rewriting the national immigration system. That is

---

[8] For example, might Texas declare war based on the "invasion" of residents from other states? Hooks, *Californians Could Ruin Texas—But Not the Way You Might Think*, Texas Monthly (Mar. 2021), https://perma.cc/H86T-8KV7 (Governor addressing "fears that Texas is being invaded").

[9] David Bier, *Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (2022), https://perma.cc/8RTW-MENH. Likewise, "undocumented immigrants have substantially lower crime rates than native-born citizens . . . across a range of felony offenses." Michael T. Light et al., *Comparing Crime Rates Between Undocumented Immigrants, Legal Immigrants, and Native-Born US Citizens in Texas*, PNAS (Dec. 22, 2020), https://perma.cc/J7ZJ-GJTD. As for the "terror watchlist," Opp. 7, it is "rife with inaccuracies" and leads to routine "false alarms," Levinson-Waldman & Gutiérrez, *Overdue Scrutiny for Watch Listing and Risk Prediction*, Brennan Ctr., at 2-3 (2023) (describing people added simply because of connections to a particular country, or relationships with relatives or friends).

not a type of war power, it is immigration policymaking based on a political disagreement with the current administration. "This is a job for the Nation's lawmakers, not for its military authorities." *Youngstown*, 343 U.S. at 587; *see id*. at 642, 644 (Jackson, J., concurring) (warning against "sinister and alarming" idea that war powers would make President "Commander-in-Chief of the country"). It is certainly not a job for one state's governor.[10]

## II.     TEXAS'S THRESHOLD DEFENSES ARE MERITLESS.

Texas raises several threshold defenses that are specific to the private plaintiffs. But the Court does not need to address any of them if it finds that the United States has standing and a cause of action, because the cases are consolidated, and only one plaintiff needs to satisfy these threshold requirements. *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (only addressing one plaintiff's standing in consolidated case); *La Union del Pueblo Entero v. Abbott*, 2023 WL 8263348, *1 n.2, 10, 12 (W.D. Tex. 2023) (same). In any event, all of the threshold defenses fail.

### A.  Plaintiffs Have a Cause of Action at Equity and Satisfy *Ex parte Young*'s Exception To Sovereign Immunity.

Plaintiffs have a straightforward equitable cause of action. In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court confirmed the "power of federal courts of equity" to "issue an injunction upon finding the state regulatory actions preempted." 575 U.S. 320, 326-27 (2015) (courts "regularly consider[]" such claims). The Fifth Circuit has since held that a plaintiff has "a

---

[10] In *Moyer v. Peabody*, on which Texas relies, the Court merely indicated that in the case of a declared insurrection, if the governor is allowed to order insurrectionists to be killed he may take the "milder measure" of detaining them. 212 U.S. 78, 84 (1909). Nothing in that case justifies Texas's attempt to control immigration policy. But *Moyer* does place the make-believe quality of Texas's "invasion" theory in sharp relief. Does Texas really think it could shoot migrants crossing the border as a war power? That is the implication of its argument. But when asked about his comments seeming to endorse such summary executions of people fleeing for their lives, the governor described such conduct as "obviously illegal." Texas Tribune, *Abbott's immigration rhetoric criticized again after interview response about shooting migrants* (Jan. 11, 2024). SB4 is no less obviously illegal, and the "invasion" defense is baseless.

9

cause of action . . . at equity" to enjoin preempted action. *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-35 (5th Cir. 2023) (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 & n.27 (5th Cir. 2020) (en banc)) (italics omitted).

To invoke this equitable cause of action against Defendant McCraw, Plaintiffs must satisfy the exception to sovereign immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908).[11] *Ex parte Young* applies where a plaintiff seeks prospective relief against a state officer, *Green Valley*, 969 F.3d at 471, who has "some connection with the enforcement of the act," *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). Texas does not contest that McCraw is a state officer charged with enforcing SB4. *See* Opp. 52-53 (discussing general *Ex parte Young* principles but not denying that Defendants have authority to enforce SB4); Tex. Gov't Code § 411.006(a)(1)-(2); 43.120(a)-(c).

Texas asserts just one objection regarding both of these issues. It claims that, under *Ex parte Young*, the equitable cause of action and the sovereign-immunity exception are available *only* to a "potential defendant[] to an enforcement action" who is "preemptively asserting a defense" to prosecution. Opp. 40-41 (cause of action); *id.* at 51-53 (sovereign immunity). But it does not cite a single case that limits *Ex Parte Young* in this way.[12] Cases laying out its requirements do not mention any such limit. *See, e.g.*, *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 515-19 (5th Cir. 2017). To the contrary, as the Supreme Court has explained, "there is no warrant in our cases for making the validity of an *Ex parte Young*

---

[11] Defendant Hicks has no sovereign immunity. *Nat'l Press Photographers*, 90 F.4th at 787.

[12] Other than a law review article, Texas cites only two opinions—a dissent and a two-Justice concurrence—neither of which even advocates for the rule Texas claims. One of those opinions approvingly explains that "[t]he Court has expanded the *Young* exception . . . to vindicate the federal interest in assuring the supremacy of federal law." *Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (cleaned up).

action turn on the identity of the plaintiff." *Va. Office for Protection & Advocacy*, 563 U.S. at 256. And courts regularly hold that plaintiffs satisfy *Ex parte Young* even though they are not potential defendants in any future enforcement action. *See, e.g.*, *id.* at 252 (agency plaintiff sought access to records); *Tex. Democratic Party*, 978 F.3d at 179 (voter plaintiffs sued Secretary of State to change forms for requesting absentee ballots).

### B. Plaintiffs Have Standing.

#### 1. Plaintiffs Have Preenforcement Standing.

Texas makes two sweeping standing arguments that, if true, would eliminate standing in a huge number of cases that courts routinely adjudicate. Neither is correct.

First, Texas argues that because Plaintiffs are not themselves subject to prosecution under SB4, they cannot satisfy the preenforcement standing test laid out in *Susan B. Anthony List v. Driehaus*, which requires an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [law], and [that] there exists a credible threat of prosecution thereunder." 573 U.S. 149, 158-59 (2014) (quotation omitted); Opps. 42-43.

But those requirements do not apply here, because they only govern standing "[w]hen an individual is subject to such a threat" of "arrest, prosecution, or other enforcement action." *Id.* at 159. For those plaintiffs, the *Susan B. Anthony* requirements simply ensure that a *potential defendant's* injury is not "speculative." *Id.* at 160. Those standards have no application to plaintiffs who are seeking to prevent harms *other* than prosecution. It would make no sense to require a "threat of prosecution" for a plaintiff who is injured by a policy but not regulated by it, or who is regulated but not subject to prosecution. Courts accordingly do not apply these requirements to plaintiffs whose injury does not involve prosecution. *See Davis v. FEC*, 554 U.S. 724, 734 (2008) (plaintiff had standing to prevent "prospective injury" from rule that regulated third party); *Young*

*Conservatives of Tex. Found. v. Univ. of N. Tex.*, 569 F. Supp. 3d 484, 489 (E.D. Tex. 2021) (citing *Susan B. Anthony* but applying regular *Havens* standing requirements to organizational plaintiff); *Mi Familia Vota v. Abbott*, 497 F. Supp. 3d 195, 208-209 (W.D. Tex. 2020) (same); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109-10 (2d Cir. 2017) (same); *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949-50 (7th Cir. 2019) (same).

Texas's position would amount to an Article III bar against preenforcement claims by any party who is not subject to prosecution under the law they challenge. It does not cite a single case endorsing that position. Opp. 42-43. And the implications would be stunning. It would mean that Texas itself has lacked standing in a host of challenges it has brought to policies that regulate third parties. *But see, e.g.*, *Texas v. United States*, 809 F.3d 134, 155-62 (5th Cir. 2015) (holding Texas had standing to bring preenforcement challenge). It would eliminate an enormous swath of litigation brought by states, organizations, businesses, and individuals. *See, e.g.*, *Shelby Cty. v. Holder*, 570 U.S. 529, 537 (2013) (cases "to block voting laws from going into effect"); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (environmental litigation); *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (APA cases by states harmed by third-party regulation).

Second, Texas argues that Plaintiffs lack standing because their preemption claim does not satisfy *Susan B. Anthony*'s requirement of a "constitutional interest." Opp. 43. But as explained above, *Susan B. Anthony*'s prosecution-focused requirements do not apply to plaintiffs whose injuries do not stem from future prosecution. That is enough to reject this defense.

In any case, Plaintiffs do have a constitutional interest under the Supremacy Clause, which is the basis for their claim. U.S. Const. art. VI, § 2. The Supreme Court has been clear that private parties have standing to "vindicate [their] own constitutional interests" in raising federalism claims, and "a direct interest in . . . laws that upset the constitutional balance." *Bond v. United*

*States*, 564 U.S. 211, 220-22 (2011). Accordingly, courts regularly hold that plaintiffs satisfy the *Susan B. Anthony* test when they challenge state laws under the Supremacy Clause. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1876 (2014); *E.F. Transit v. Indiana Alcohol & Tobacco Comm'n*, 2016 WL 4761438, *8 (S.D. Ind. 2016), *rev'd in part*, 878 F.3d 606 (7th Cir. 2018); *cf. Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022) (general "federalism principles" provided constitutional interest for preenforcement standing).

Like their previous defense, Texas's position here would cause a dramatic sea change, because it would mean that private parties of all kinds could no longer challenge preempted state laws. But such challenges are routine. *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (collecting cases); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 20 (2013); *Crown Castle Fiber*, 76 F.4th at 434-36; *Nat'l Press Photographers*, 90 F.4th at 795; *Farmers Branch*, 726 F.3d at 527; *Silva v. Farrish*, 47 F.4th 78, 86-87 (2d Cir. 2022).[13]

### 2. Plaintiffs Have Demonstrated Standing.

SB4 would upend Plaintiffs' operations, finances, and client bases. Mot. 17-19. Texas offers nothing to overcome this basic fact, which is more than enough for standing.

Texas suggests that "nothing in SB4" requires the organizations modify their "current programs." Opp. 44-45. That fundamentally misunderstands Plaintiffs' missions. Representing noncitizens who are incarcerated and facing removal under SB4 is central to their longstanding mission to help noncitizens seek federal protections like asylum. Las Americas, for example, is dedicated to "ensur[ing] that everyone has a fair opportunity" to seek protection and avoid

---

[13] Texas cites only one case for the idea that private parties can't bring preemption claims. *See United States v. Texas*, 2022 WL 868717, at *5 (W.D. Tex. Feb. 17, 2022). But in that case, no party had raised this issue, it had not been briefed, and the opinion contains little analysis. The plaintiffs in that case have moved to reconsider. *See id.*, No. 21-cv-173, Dkt. 25 (Jan. 18, 2024).

wrongful removal, and it thus "focus[es] [its] efforts on ensuring that those noncitizens at the greatest danger from removal are able to access protection." Babaie Decl. ¶¶ 11-12. Because SB4 creates a new system of rapid deportation without *any* relief, those subject to it will now be the "most vulnerable to removal," so representing them will be "a necessary part of and consistent with" the organization's mission. *Id*. at 13-14 (describing shift to address earlier federal summary removal system). The same is true for Plaintiff American Gateways. Yang Decl. ¶ 23.

SB4 simply will not allow Plaintiffs to just "maintain their current programs." Opp. 44. Its sweep is staggering, applying at the border and throughout the interior, enforced not only by DPS but by the more than 80,000 peace officers and 300 prosecutors in the state. And Defendant McCraw projected some 80,000 additional arrests annually under the law. Carrillo Decl. ¶ 10.

Texas dismisses the organizations' diversion injuries as "voluntary strategic and budgetary choices," Opp. 44, but the Supreme Court has "made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 297 (2022); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982) (organization had standing to challenge housing discrimination it had chosen to address). Here, the injuries the organizations face plainly "result[] from counteracting the effects of" SB4. *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000); *see also Vote.Org v. Callanen*, 89 F.4th 459, 471 (5th Cir. 2023) ("self-inflicted injuries" are those that are "not fairly traceable to the actions of the defendant") (quotation omitted).

Nor will representing those detained under SB4 be the same as the organizations' "routine activities." Opp. 44. People prosecuted under SB4 will be held in a different detention system, with different facilities and different rules. SB4 operates by threatening individuals into accepting

14

removal in lieu of prosecution, without any of the protections available in the federal removal system; it requires judges to order people removed upon conviction; and it provides no defense to those who are seeking or intend to seek federal immigration relief. SB4 thus completely changes the manner in which Plaintiffs must reach, counsel, and represent noncitizens. They must identify clients earlier in the process, to ensure they do not accept removal and therefore terminate their ability to obtain asylum or other relief; must help people navigate the federal immigration system from within state detention facilities; and must help them seek federal relief as quickly as possible. *See* Babaie Decl. ¶¶ 30-34; Yang Decl. ¶ 22. Most clients will still be seeking federal relief when the state sentence ends, given the length of time federal proceedings can take. Yang Decl. ¶ 19. Plaintiffs will then have to help clients navigate the conflict between the two regimes, with federal law providing a right to stay, and state law requiring them to leave.

Texas vaguely maintains that the Texas Department of Criminal Justice will accommodate people's attempts to apply for asylum from TDCJ custody. Opp. 47. But SB4 defendants will also be held in myriad local jails, about which Texas says nothing. And even if Texas preserves some ability to access the federal asylum system, these changes will still require profound shifts in Plaintiffs' operations—so such (potentially empty) promises are beside the point for standing.

Nor is it "speculative" (Opp. 47) that SB4 will make it much harder for Plaintiffs to continue serving people who are seeking visas designed for witnesses and victims of crime, domestic abuse, and human trafficking. Babaie Decl. ¶¶ 42-49; Gutierrez Decl. ¶¶ 8-13, 18 (explaining that SB4 is making people reluctant to interact with law enforcement). In fact, Plaintiffs are *already* encountering these fears and expending resources in response, for instance by changing the structure of their community education programs. Babaie Decl. ¶¶ 50-51.

These injuries match and exceed what the Fifth Circuit has held sufficient for standing. For instance, *OCA-Greater Houston v. Texas* held that a voter services organization had standing to challenge a new law that required it "to spend extra time and money" educating voters about the law. 867 F.3d 604, 610-12 (5th Cir. 2017) (diversion was "not large" but sufficient because it was aimed at "mitigating [the] real world" impact of the law). SB4 alters the core of Plaintiff Organizations' work, and thus they easily have standing.

Finally, despite the severe harms to El Paso County, Mot. 18-19, Texas argues that it cannot challenge a state law as preempted. Opp. 48-51. But, as courts in the Fifth Circuit and elsewhere have held, "a subdivision may sue its state under the Supremacy Clause." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019) ("In reaching this conclusion we join the Fifth and Tenth Circuits.") (citing *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979)); *Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 630 (10th Cir. 1998); *City of Alpine v. Abbot*, 730 F. Supp. 2d 630, 633 (W.D. Tex. 2010); *Cty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 368 (D.N.J. 2020). Indeed, the Supreme Court has repeatedly entertained cases between instrumentalities of the same state. *See Stewart*, 563 U.S. at 257-59 (court had jurisdiction even though "the opposing parties are both creatures of the [state]"); *Lassen v. Arizona*, 385 U.S. 458, 459 n.1 (1967) (no standing problem even though suit was "a controversy between two agencies of the State of Arizona"); *Tweed*, 930 F.3d at 73 (listing cases). Texas cites several cases for its supposed no-standing rule, but the Fifth Circuit has explained that those same cases "are *not* decisions about a municipality's standing to sue its state," but rather involve "substantive interpretations of the constitutional provisions involved." *Rogers*, 588 F.2d at 1068-1071 (emphasis added) (those cases impose "no bar to conferring standing" for a preemption claim). *Rogers* thus does not create a

"narrow exception" to any anti-standing rule, Opp. 48; its whole point is that no such rule exists in the first place.

### III.   THE COURT SHOULD PRELIMINARILY ENJOIN SB4.

#### A. *Pullman* Abstention Is Inappropriate.

*Pullman* abstention is plainly inapplicable. Opp. 58-60. Texas identifies no "issue of uncertain state law" that would "render unnecessary or substantially modify" the preemption issues. *Baran v. Port of Beaumont Nav. Dist.*, 57 F.3d 436, 442 (5th Cir. 1995) (cleaned up). Most obviously, Texas is field preempted from regulating entry and removal, regardless of how its courts resolve any minor ambiguities. Nor does Texas identify an interpretation that would restore federal discretion, end SB4's threat to foreign relations, or eliminate its mismatches with federal law. It suggests that state courts might address noncitizens' "opportunity to claim asylum." Opp. 59. But, as explained, SB4 is unambiguous—those applying for asylum are subject to conviction and removal regardless. *See City of Houston v. Hill*, 482 U.S. 451, 468 (1987) (*Pullman* abstention inappropriate where statute's "language is plain and its meaning unambiguous").

Even where the threshold *Pullman* requirement is met, "the district court must assess the totality of the circumstances . . . [including] the rights at stake and the costs of delay pending state court adjudication . . . before deciding whether to abstain." *Baran*, 57 F.3d at 442. The totality here—an unprecedented state usurpation of federal authority that will create chaos and subject vulnerable noncitizens to extraordinary harm—weighs decidedly against abstention.

#### B. SB4 Will Irreparably Harm Plaintiffs.

SB4 will irreparably harm Plaintiffs' operations and missions. Las Americas and American Gateways must develop entirely new programs in state detention centers. *See supra*. The County must restructure its operations to increase spending on jails, public defenders, and court staff.

Carrillo Decl. ¶¶ 11-13. These constitute irreparable harm. *See Valle del Sol*, 732 F.3d at 1029 (harms to organization were irreparable); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 56 (D.D.C. 2020) (same); *Texas Tribune v. Caldwell County, Tex.*, 2024 WL 420160, at *7 (W.D. Tex. Feb. 5, 2024) (similar).

Texas's contrary arguments are not persuasive. It contends that Plaintiffs cannot claim harm based on illegal activity. Opp. 54-55. But Plaintiffs are not and will not be engaging in illegal activity: They are providing legal and other services that are entirely consistent with longstanding law. Texas also asserts Plaintiffs won't be harmed because SB4 defendants will get a criminal trial. Opp. 55. But the criminal trial does nothing to mitigate Plaintiffs' operational harms described above, which are caused by Texas imprisoning and deporting asylum seekers.

### C.  An Injunction Is In The Public Interest.

Texas does not counter the significant harms SB4 will cause to noncitizens in the State: the separation of families, removal without access to humanitarian relief, and expulsion to violence. Mot. 19-20. Even people later granted federal relief from removal will live under the cloud of a potential 20-year prison sentence for failing to comply with the state's contrary deportation order. Nor does Texas address the severe impact SB4 will have on the public trust essential for public safety. Mot. 20. Texas contends that SB4 will prevent unlawful activity like fentanyl trafficking. Opp. 56-58. But, as noted above, fentanyl overwhelmingly enters Texas through ports of entry, smuggled by U.S. citizens, and Texas has a panoply of criminal statutes targeting drug trafficking and sales. More fundamentally, Texas has no interest in enforcing a preempted law. *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

### D. The Court Should Not Rewrite the Statute.

Texas cites the severability clause, but does not specify which provisions it believes can be severed. Texas law rejects severance where, as here, "all the provisions are connected in subject-matter, dependent on each other, [and] operating together for the same purpose ... [or] inseparably connected in substance[.]" *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990) (cleaned up).

The purpose and intent of SB4 was clear: to pass a unified bill providing for the arrest, conviction, and removal of noncitizens entering Texas from Mexico. As its sponsor explained, the legislature's goal was "not to incarcerate more people . . . . [T]he primary focus would be to return those folks to the country from which they came."[14] And the Legislature rejected a long series of narrower bills, insisting that all of SB4's provisions be enacted together.[15]

### E. The Court Should Enjoin SB4 Statewide.

Texas maintains that an injunction for the private plaintiffs "should be limited to the named Organizational Plaintiffs only." Opp. 62. Such a limit is inappropriate for three separate reasons.

First, as Texas appears to acknowledge, no such limit is warranted as long as the United States is granted relief. *See id.* (proposing limited injunction only as to the private plaintiffs). Given

---

[14] Phil Prazan, NBC DFW "Feud between House and Senate leaders may scuttle far reaching border security bill" (Nov. 5, 2023) https://perma.cc/9V3D-4B59; *see also, e.g.*, *id.* (House Speaker condemning version that lacked removal provisions, because it would impose "the exorbitant costs of [noncitizens'] long-term detention, including healthcare, housing, and meals"); *Hearing on Tex. S.B. 11 Before the Texas House Committee on State Affairs*, 88th Tex. Leg. (2023) (statement of Rep. Raymond) (similar); *House Floor Debate on SB4, 88th Tex. Leg. C.S. 4* (2023) (opposing amendment that would have weakened the removal provision).

[15] *See, e.g.*, Tex. H.B. 1600, 88th Leg., R.S. (2023); Tex. H.B. 5270, 88th Leg., R.S. (2023); Tex. H.B. 5281, 88th Leg, R.S. (2023); S.B. 2424, Tex. 88th Leg., R.S. (2023); S.B. 2, Tex. 88th Leg., 1st C.S. (2023); Tex. H.B. 23, 88th Leg. 3d C.S. (2023); Tex. H.B. 79, 88th Leg., 4th C.S. (2023); Tex. H.B. 104, 88th Leg., 3d C.S. (2023); Tex. S.B. 11, 88th Leg., 3d C.S. (2023).

that the United States is a plaintiff in this consolidated case, the Court does not even need to reach this argument. It should simply enjoin SB4 statewide.

Second, courts *never* impose this kind of limit when state laws are preempted, because such laws undermine the supremacy of federal law, not just the rights of individual plaintiffs. *See, e.g.*, *Farmers Branch*, 726 F.3d at 527 (preempted law enjoined as to everyone); *Alabama*, 691 F.3d at 1301 (same); *Valle del Sol*, 732 F.3d 1006 (same); *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013) (same); *Lozano v. City of Hazleton*, 724 F.3d 297 (3d Cir. 2013) (same).

Third, a narrower injunction would not adequately protect the private plaintiffs. The Fifth Circuit has held that an "injunction[] should be crafted to provide complete relief to the plaintiffs," even if it "benefit[s] non-parties" too. *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). Texas makes no attempt to explain how the Court could craft a narrower injunction that would still provide complete relief to the private plaintiffs, whose numerous constituents, offices, and operations are scattered throughout Texas, and whose client bases are constantly changing. *See* Babaie Decl. ¶¶ 3-4; Yang Decl. ¶ 4. Under these circumstances, the Fifth Circuit has held that it is appropriate to enjoin an illegal policy in full. *See Mock*, 75 F.4th at 587 (nationwide injunction appropriate for organization whose members were "scattered nationwide"). Any attempt to narrow the injunction "would prove unwieldy and would only cause more confusion." *Id.* (cleaned up).

## CONCLUSION

SB4 should be preliminarily enjoined.

20

| | |
|---|---|
| Dated: February 14, 2024 | */s/ Anand Balakrishnan* |
| | Anand Balakrishnan |
| David A. Donatti (TX Bar No. 24097612) | Omar Jadwat |
| Adriana C. Piñon (TX Bar No. 24089768) | Lee Gelernt |
| AMERICAN CIVIL LIBERTIES UNION OF | Wafa Junaid |
| TEXAS | AMERICAN CIVIL LIBERTIES |
| P.O. Box 8306 | UNION FOUNDATION |
| Houston, TX 77288 | IMMIGRANTS' RIGHTS PROJECT |
| Telephone: (713) 942-8146 | 125 Broad St., 18th Floor |
| Facsimile: (713) 942-8966 | New York, NY 10004 |
| ddonatti@aclutx.org | T: (212) 549-2660 |
| apinon@aclutx.org | F: (212) 549-2654 |
| | abalakrishnan@aclu.org |
| *For Plaintiffs Las Americas Immigrant* | ojadwat@aclu.org |
| *Advocacy Center, American Gateways, and* | lgelernt@aclu.org |
| *County of El Paso* | wjunaid@aclu.org |
| | |
| Tamara F. Goodlette (TX Bar No. 24117561) | Cody Wofsy |
| Erin D. Thorn (TX Bar No. 24093261) | Spencer Amdur |
| Daniel Hatoum (TX Bar No. 24099136) | Hannah Schoen |
| TEXAS CIVIL RIGHTS PROJECT | Morgan Russell |
| 1017 W. Hackberry Ave. | AMERICAN CIVIL LIBERTIES |
| Alamo, TX 78516 | UNION FOUNDATION |
| Telephone: (512) 474-5073, ext. 207 | IMMIGRANTS' RIGHTS PROJECT |
| Facsimile: (956) 787-6348 | 425 California Street, 7thFloor |
| tami@texascivilrightsproject.org | San Francisco, CA 94104 |
| erin@texascivilrightsproject.org | T: (415) 343-0770 |
| daniel@texascivilrightsproject.org | F: (415) 395-0950 |
| | samdur@aclu.org |
| *For Plaintiffs Las Americas Immigrant* | cwofsy@aclu.org |
| *Advocacy Center and American Gateways* | hschoen@aclu.org |
| | mrussell@aclu.org |
| Jo Anne Bernal, (TX Bar No. 02208720) | |
| El Paso County Attorney | *For Plaintiffs Las Americas Immigrant* |
| 320 S. Campbell St., Suite 200 | *Advocacy Center, American Gateways,* |
| El Paso, Texas 79901 | *and County of El Paso* |
| Tel: (915) 273-3247 | |
| joanneb@epcounty.com | |
| | |
| Bernardo Rafael Cruz, (TX Bar No. 24109774) | |
| Assistant County Attorney | |
| 320 S. Campbell St., Suite 200 | |
| El Paso, Texas 79901 | |
| Tel: (915) 273-3247 | |
| b.cruz@epcounty.com | |
| | |
| *For Plaintiff County of El Paso* | |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2024, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. A true and correct copy of this document has been served via the Court's CM/ECF system on all counsel of record.

_/s/ Anand Balakrishnan_
Anand Balakrishnan

# Exhibit I: Preliminary Injunction Hearing Transcript

1

<pre>
 1                 UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3  UNITED STATES OF AMERICA,      )
    Plaintiff,                     )
 4                                 )Case No.
    vs.                            )1:24-cv-00008-DAE
 5                                 )
    THE STATE OF TEXAS; GREG       )
 6  ABBOTT, in his official        )
    capacity as Governor of Texas; )
 7  TEXAS DEPARTMENT OF PUBLIC     )
    SAFETY; STEVEN C. MCCRAW, in   )
 8  his official capacity as       )
    Director of Texas Department   )
 9  of Public Safety,              )
    Defendants.                    )
10  *******************************)

11          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
              BEFORE THE HONORABLE DAVID A. EZRA
12             SENIOR UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  FOR THE PLAINTIFF UNITED STATES OF AMERICA:

15  BRIAN BOYNTON, ESQUIRE
    U.S. Department of Justice
16  950 Pennsylvania Ave, NW
    Washington, DC  20530
17  (202)305-5214
    brian.m.boynton@usdoj.gov
18
    JEAN LIN, ESQUIRE
19  DOJ-Civ
    1100L St., N.W.
20  Washington, DC  20005
    (202)514-3716
21  jean.lin@usdoj.gov

22  SAMUEL M. SHAPIRO, ESQUIRE
    U.S. Attorney's Office
23  601 NW Loop 410, Suite 600
    San Antonio, TX  78216
24  (210)970-5267
    samuel.shapiro@usdoj.gov

25
</pre>

1   APPEARANCES (CONT'D)

2   FOR AMERICAN GATEWAYS, COUNTY OF EL PASO, TEXAS and
    LAS AMERICAS IMMIGRANT ADVOCACY CENTER:

3

    ANAND BALAKRISHNAN, ESQ.
4   American Civil Liberties Union Foundation
    125 Broad Street, 18th Floor
5   New York, New York  10004
    (212)549-2536
6   abalakrishnan@aclu.org

7   CODY WOFSY, ESQ.
    American Civil Liberties Union Foundation
8   425 California Street
    7th Floor
9   San Francisco, CA  94104
    (415)343-0785
10  cwofsy@aclu.org

11  DAVID A. DONATTI, ESQ.
    ACLU of Texas
12  PO Box 8306
    Houston, TX  77288
13  (346)299-6817
    ddonatti@acluatx.org

14

    BERNARDO RAFAEL CRUZ, ESQ.
15  El Paso County Attorney's Office
    320 S. Campbell Street
16  Suite 200
    El Paso, TX  79901
17  (915)273-3247
    b.cruz@epcounty.com

18

19  FOR THE TEXAS CIVIL RIGHTS PROJECT:

20  TAMARA GOODLETTE, ESQ.
    139 Brightwood Place
21  San Antonio, Texas  78209
    (303)589-6401
22  tami@texascivilrightsproject.com

23  ERIN THORN, ESQ.
    1017 West Hackberry Avenue
24  Alamo, Texas  78516
    (956)787-8171
25  erin@texascivilrightsproject.org

1  APPEARANCES (CONT'D):

2  FOR THE DEFENDANT STATE OF TEXAS, GREG ABBOTT (in his official
   capacity as Governor of Texas), TEXAS DEPARTMENT of PUBLIC
3  SAFETY and STEVEN C. McCRAW (in his official capacity as
   Director of the State of Texas Department of Public Safety):

4
   RYAN D. WALTERS, ESQ.
5  Office of the Texas Attorney General
   Special Litigation Division
6  209 W. 14th Street, 7th Floor
   Austin, TX  78701
7  (512)936-2714
   ryan.walters@oag.texas.gov
8
   JACOB EDWARD PRZADA, ESQ.
9  KYLE TEBO, ESQ.
   MUNERA AL-FUHAID, ESQ.
10 Office of the Attorney General
   Special Litigation Division
11 P.O. Box 12548
   Austin, TX  78711
12 (512)936-2669
   jacob.przada@oag.texas.gov
13
   FOR THE UNITED STATES DEPARTMENT OF JUSTICE WESTERN DISTRICT:
14
   MARY KRUGER, ESQ.
15 MARGARET LEACHMAN, ESQ.
   ROBERT GRAY, ESQ.
16 JAIME ESPARZA, ESQ.
   601 Northwest Loop 410 #600
17 San Antonio, Texas  78216
   (210)384-7100
18
   FOR THE ATTORNEY GENERAL'S OFFICE:
19
   JAMES SULLIVAN, ESQ.
20 TREVOR EZELL, ESQ.
   1100 San Jacinto
21 Austin, Texas  78701

22

23

24

25

**4**

1  (February 15, 2024, 9:20 a.m.)

2              P R O C E E D I N G S

3          THE CLERK:  Austin 24-cv-8, United States of America,

4  et al., versus the State of Texas, et al.

5          THE COURT:  All right, counsel.  Can I please have

6  your appearances and the appearances of anyone who is here on

7  your behalf who may not be arguing today.

8          MR. BOYNTON:  Good morning, your Honor.  Brian Boynton

9  from the Department of Justice for the United States, and with

10  me at the counsel table is Jean Lin and Sam Shapiro.

11          THE COURT:  Sir.

12          MR. BALAKRISHNAN:  Good morning, your Honor.  Anand

13  Balakrishnan for the American Civil Liberties Union for the

14  plaintiffs Las Americas, American Gateways, and the County of

15  El Paso.  With me at counsel table is Cody Wofsy, David

16  Donatti, and Bernardo Cruz from the County of El Paso.

17          THE COURT:  All right.  Do you want to introduce the

18  people -- does somebody want to introduce the people that are

19  sitting there for the Bar?

20          MS. GOODLETTE:  Good morning, your Honor.  Tami

21  Goodlette with Texas Civil Rights Project on behalf of the

22  plaintiffs.  Alongside with me, this is my colleague Erin

23  Thorn.

24          THE COURT:  Okay.

25          MS. KRUGER:  Mary Kruger, your Honor.  I'll join with

1  Jaime as far as the U.S. Attorney for our district, Margaret

2  Leachman and Robert Gray.

3          THE COURT:  Thank you very much.  And, sir.

4          MR. WALTERS:  Good morning, your Honor.  Ryan Walters

5  from the Texas Attorney General's office on behalf of the

6  defendants, other than District Attorney Bill Hicks.

7          Also with me are (background noise) today, Jacob

8  Przada, Kyle Tebo, and Mr. Francisco Ortega representing

9  District Attorney Bill Hicks.

10          THE COURT:  And I have two gentlemen there that I know

11  well.  We need to have the names.

12          MR. SULLIVAN:  Yes, your Honor.  Jake Sullivan and

13  Trevor Ezell from the Governor's office, your Honor.

14          THE COURT:  Thank you very much.

15          Ladies and gentlemen, so that you will know what is

16  going to be transpiring this morning, this is a hearing on a

17  motion for a preliminary injunction filed by the United States

18  and by the -- you know, I have a hard time pronouncing your

19  client.

20          MR. BALAKRISHNAN:  There's three plaintiffs in the

21  other case, your Honor.  It's Las Americas, American Gateways,

22  and the County of El Paso.

23          THE COURT:  I don't have trouble with the County of

24  El Paso.

25          And of course, the defendants, you're aware of.

1              Normally, in a case, the Court will allocate 15

2    minutes per side for argument.

3              Because of the nature of this case, and the importance

4    of it, I have discussed this with counsel, and -- by the way,

5    counsel has been very, very cooperative on both sides, which I

6    really do appreciate, and very collegial.

7              And I am providing each side with one hour of

8    argument.

9              Generally speaking, in a motion like this, just like

10   in a trial, closing argument, the movant has an opportunity to

11   make the first argument, and then they have an opportunity to

12   offer a rebuttal after the other side has their opportunity to

13   make their argument to the Court.

14             In order to be fair to the State of Texas, I have told

15   the government that they have the -- the government and the

16   other plaintiff, that they have -- plaintiffs -- that they have

17   a total of one hour, and that if they wish to reserve time for

18   rebuttal, that they need to do so on their own.

19             So, to make it clear, let's say they take 45 minutes

20   for their argument, they would then have 15 minutes to divide

21   among themselves for rebuttal.  I am not going to give them an

22   hour for argument and then additional time for rebuttal.  I

23   hope I'm making myself clear.  So each side will have a total

24   of one hour.

25             Counsel, are you ready to proceed?

1           MR. BOYNTON:  Ready, your Honor.

2           THE COURT:  You may proceed.  Please do so at the

3    podium so it's easier.  Oh, and after the government finishes

4    its presentation, we're going to take a short recess.

5           I do that for two reasons, to give counsel an

6    opportunity to use the restroom if they need to, but most

7    important, to give my reporter an opportunity to rest her

8    hands, because it's very arduous and we want to make sure we

9    have a good transcript.  Even though we've got an absolutely

10   excellent and professional reporter, when you just keep going

11   like that for two hours straight, it's too much.

12          So we will take a short ten-minute recess or so after

13   the government finishes its argument.

14          You may proceed, sir.

15          MR. BOYNTON:  Thank you, your Honor.  Brian Boynton

16   from the Department of Justice for the United States.

17          The plaintiffs have agreed to allocate our hour as

18   follows:  The United States is taking 40 minutes, the

19   organizational plaintiffs and El Paso are taking 20.  Of our 40

20   minutes for the United States, I'm going to do 30 minutes on

21   direct and 10 ten on rebuttal.

22          I believe the organizational plaintiffs in El Paso are

23   going to split it five direct, 15 rebuttal, but they can let

24   you know if they've changed their mind about that.

25          THE COURT:  All right.  Thank you very much, Counsel,

1    and you have responsibility to stay in touch with your own

2    time, okay.

3        MR. BOYNTON:  Thank you, your Honor.  We're tracking

4    that.

5        SB4 is clearly invalid under several precedents and

6    this Court should enjoin it.

7        I'd like to first touch on field preemption.  The

8    Supreme Court in the Arizona case described the standards for

9    field preemption.  They made clear that a state law can be

10   field-preempted in one of two ways:  If there are dominant

11   federal interests at stake or if there's a comprehensive

12   legislative regime.

13       Here we have both in place.  The relevant field is the

14   entry and removal of noncitizens from the United States, and

15   that field is one where there are very dominant federal

16   interests.  There's the interest in state and foreign affairs

17   in controlling the border, national security, and regulating

18   immigration.

19       There's also a comprehensive federal legislative

20   regime in place.  Congress has enacted laws in great detail

21   specifying who is admissible to this country and when, how

22   people can be -- noncitizens can be removed from this country,

23   the procedures for removals, and the protections in place for

24   noncitizens who fear prosecution or torture if they're removed.

25   That comprehensive regime occupies the field.

1          Texas largely disregards the standard for field

2   preemption, the federal interests, and this comprehensive

3   legislative scheme that is in place.  Instead they make a

4   series of arguments against field preemption, none of which has

5   merit.

6          First, they try and redefine the field.  They argue

7   that perhaps the field is all of immigration law, or more

8   narrowly, that it's misconduct by noncitizens after they've

9   entered the United States.

10          Neither of those is correct.  We have a very narrow

11  field we've identified, and that's the entry and removal of

12  noncitizens from the United States.

13          Texas has also argued that we don't have any case law

14  supporting the notion that federal power in that field is

15  exclusive.  But that's not correct.  We have cited an abundance

16  of cases saying that federal power with respect to entry and

17  removal is exclusive.

18          The Fifth Circuit said that in the docket decision.  I

19  can quote from that.  They said, "Policies pertaining to the

20  entry of aliens and their right to remain here are entrusted

21  exclusively to Congress."  You can't get much clearer than

22  that.  The Supreme Court has said the same thing in the Hines

23  case, the Truax case, which we cite and which Texas does

24  acknowledge, the Alabama case we cited makes the same point,

25  the Takahashi case makes the same point.

1          We've also pointed the Court to four Court of Appeals

2    decisions that have considered field preemption with respect to

3    a provision of federal law that is adjacent to the primary

4    provisions that we're looking at here.

5          Here in U.S.C. Section 1325 and 1326, so the federal

6    provisions that govern unlawful entry and unlawful reentry of

7    noncitizens, we've cited four Court of Appeals decisions

8    dealing with Section 1324, the adjacent provision, which is the

9    federal transportation in a harbor prohibition.

10          And there, the courts of appeals have been unanimous,

11    that that provision is still preemptive of state laws that are

12    roughly parallel to that federal provision.

13          Here we have the same dynamic.  We have a state law,

14    SB4, that is, in some respects, parallel to the federal

15    provisions.

16          Now, as I'm going to discuss next when we get to

17    conflict preemption, it's not parallel.  In all respects there

18    are very important conflicts, but it's, in some respects,

19    parallel.

20          And the courts of appeals have been unanimous that

21    1324 is still preemptive, and we think your Honor should find

22    that 1325 and 1326, plus the array of other legislation

23    governing admissibility and removal, is still preemptive as

24    well.

25          Texas has argued that the INA somehow contemplates

1   that states would enact legislation governing entry and removal

2   but they don't cite any provision of the INA in support of that

3   proposition.  Instead they just point to some provisions that

4   allow state officials, in some circumstances, to cooperate with

5   DHS in the enforcement of federal law.  They don't cite any

6   provisions saying that a state can enact its own legislation

7   governing entry and removal.

8           THE COURT:  Counsel, it's -- it's my understanding

9   from carefully reviewing your papers that the United States is

10  not seeking to enjoin, in this case, the State of Texas'

11  ability to cooperate with the United States; am I correct?

12          MR. BOYNTON:  You're correct, your Honor.  We are not

13  seeking to enjoin efforts by state law enforcement to cooperate

14  with the federal government in enforcement of federal law.

15          What we're seeking to enjoin is the legislation

16  they're asking for, is the act by Texas to enact that law that

17  we're seeking to enjoin.

18          THE COURT:  Okay.  So the -- as I understand it, it

19  all boils down to what you call -- how we define supplement,

20  right?

21          So you would, I assume, define supplement to mean that

22  if, for instance, a border patrol agent -- not a border patrol

23  agent, a DPS agent, Department of Public Safety officer, were

24  driving along somewhere near Del Rio and there was a car that

25  was weaving back and forth and he pulled that car over, and it

1   appeared to him that there were undocumented individuals in

2   that car, he could then notify -- first of all, he could arrest

3   him if he was drunk driving, drunk driving, regardless of

4   whether they were undocumented or not. But he could also

5   notify the immigration authorities, federal immigration

6   authorities, for them to come pick these people up; am I

7   correct, you wouldn't have a problem with that?

8        MR. BOYNTON: No, your Honor. State law enforcement

9   can detain someone for violations of state law and then could

10   provide notice to DHS if they believe that somebody is an

11   unlawful noncitizen.

12        But this case is not about enforcement efforts at all.

13   It's just focused on the legislation SB4.

14        THE COURT: Well, the State has put a lot of emphasis

15   on the fact that they need to enforce the law because the

16   federal government, allegedly, is not enforcing the law.

17        MR. BOYNTON: Yes, your Honor. They made this

18   argument that they have a defense to field preemption because

19   they contend that the federal government has abandoned the

20   relevant field. That's not correct as a factual matter.

21   There's been no abandonment here.

22        In just the portion of 2023, after the Title 42 order

23   lifted in May, that portion from May through November of '23,

24   DHS removed over 400,000 individuals. If you go through

25   December, it was 472,000 individuals. That's more individuals

1    removed than in any single year since 2015.  So there's no

2    factual basis.

3            But more fundamentally, this is totally irrelevant to

4    the field preemption argument.  Field preemption looks at what

5    Congress has done.  Has Congress enacted legislation that

6    occupies the field?  Here we've explained that Congress has and

7    Texas has little response to that.

8            And so their critiques of enforcement efforts are

9    completely irrelevant to the field preemption argument.  They

10    make one other argument that's irrelevant to field preemption,

11    which I'll touch on quickly and then I'd like to move to

12    conflict preemption.

13            They also say that because there are some parallels

14    between SB4 and Section 1325 and 1326, the federal statutes,

15    there can be no field preemption.  But that's not how field

16    preemption works.

17            The Supreme Court in Arizona made clear that even

18    complementary state legislation is displaced if you have field

19    preemption.  It's different in that respect from conflict

20    preemption.

21            So let me turn now to conflict preemption.  That's an

22    independent reason why SB4 should be held to be preemptive.

23            Now, we've identified six different categories of

24    conflicts between SB4 and federal law.  Texas has very little

25    response to any of them.

1          First conflict is at a macro level.  The INA makes

2   clear that states do have some role to play in cooperation with

3   the federal government with respect to enforcing the

4   immigration laws.  But the INA nowhere gives states the right

5   to pass legislation independently regulating entry and removal

6   of noncitizens.

7          So that careful scheme laid out in the INA giving

8   states a limited role but not permitting them to enact

9   legislation like SB4 preempts SB4.  The Supreme Court in

10  Arizona reasoned just that way with respect to Section 6 of the

11  law at issue in Arizona.

12         The second conflict accepts for a minute Texas's

13  argument that SB4 is parallel to 1325 and 26.  We think it's

14  not parallel, but even if it were, there's still a conflict in

15  this unique field of immigration where the federal interests

16  are so strong, there are foreign affairs implications of how

17  federal laws are prosecuted.

18         And in this field, the Supreme Court in Arizona made

19  clear the federal government needs to have the discretion to

20  decide how to enforce the law, and states can't enact even a

21  mirror of state law, and then try to enforce that law in a way

22  that could conflict with the federal government's exercise of

23  discretion.  So that's the second conflict.

24         In addition to Arizona, we've cited four Court of

25  Appeals cases that make the same point with respect to state

1    laws mirroring Section 1324.

2         The third conflict has to do with the protections

3    afforded to noncitizens in federal law.  There's an elaborate

4    scheme under federal law for how a noncitizen who fears

5    prosecution or torture if they're removed is able to raise

6    certain defenses.  They can claim asylum, they can claim

7    withholding or removal or protection under the Convention

8    against Torture.  There is no analogue to any of that in SB4.

9         SB4 allows a state judge to order somebody removed

10   from the country for having unlawfully entered, without

11   providing them any protection equivalent to asylum, withholding

12   and CAT.  There's even a provision of the law that says that a

13   prosecution won't be abated because a noncitizen is seeking

14   protection under federal law.

15        The only portion of SB4 that addresses this is that

16   Section 5102 says that if a noncitizen has affirmatively been

17   granted asylum, that's a defense in their case.

18        But what we've posited is the problem here arises that

19   someone gets arrested by Texas for unlawfully entering, they're

20   sentenced, and then after their conviction, after their

21   sentence runs, they then have to be removed from the country by

22   Texas.

23        At that point, they have not had a chance to claim

24   asylum from the federal government so they won't have asylum

25   and they certainly won't have had asylum at the time they were

1  convicted for violating SB4.  And so there's nothing in SB4

2  that affords people the rights they have under federal law.

3          SB4 also disregards the elaborate scheme under federal

4  law for designating where someone should be removed.  SB4 says

5  everyone who crosses unlawfully, whether they're Mexicans or

6  non-Mexicans, will be returned to Mexico, the country from

7  which they entered.  That's not how it works under federal law,

8  and for good reason.

9          Mexico is not willing, except in certain

10 circumstances, to take back non-Mexicans.  It would be like if

11 Mexico were trying to expel Guatemalans to the United States

12 who crossed unlawfully into Mexico.  You can't just do that

13 without Mexico's agreement, and federal law makes that clear.

14         SB4 disregards those limits entirely.

15         Fourth conflict, SB4 requires judges to determine

16 whether a noncitizen prosecuted has lawful presence.  It's one

17 of the defenses to -- in Section 51 --

18         THE COURT:  You're talking about immigration judges at

19 one level and then Article III federal judges at another level.

20         MR. BOYNTON:  Yeah, so we're talking about -- here at

21 SB4 it would be state judges here in --

22         THE COURT:  I thought you were talking about the

23 scheme, the federal scheme.

24         MR. BOYNTON:  Right.  The federal scheme, correct, you

25 have immigration judges who are making determinations about

 1   asylum, withholding, protection under the Convention against

 2   Torture.

 3          THE COURT:  And then the B.02, a duly appointed

 4   Article III judge, under the powers of Article III, where they

 5   cannot be removed from office, would be circuit court judges.

 6          MR. BOYNTON:  Correct, your Honor.  The petition for

 7   review is directly and --

 8          THE COURT:  Particularly in Texas, they're subject to

 9   election.

10          MR. BOYNTON:  Regardless of how they're appointed or

11   removed, the Fifth Circuit has made clear in the Farmers Branch

12   case that you can't have state judges trying to figure out

13   whether someone is lawfully present.

14          That's a term that is not actually defined in federal

15   immigration law, and there's no mechanism under SB4 for state

16   judges to get some definitive determination of whether someone

17   is lawfully present.  Farmers Branch says that's another

18   conflict.

19          And then finally, I'd just like to point out a couple

20   other deviations between SB4 and federal law.

21          The second provision of SB4, 5103, is the unlawful

22   reentry provision, and it says that someone who is found in

23   Texas after having previously been removed violates the

24   unlawful reentry statute on the theory that they must have

25   unlawfully reentered again because they've been found in the

1   state.

2        But there's no defense for someone who's affirmatively

3   permitted to enter the United States by the federal government.

4   If DHS were to parole someone in, Texas would prosecute them

5   because they found them in the state, and they would prosecute

6   them even though the person had permission to enter.  That's a

7   stark conflict between SB4 and federal law.

8        So in the face of these conflicts and field

9   preemption, Texas resorts to a different and novel argument

10  under the constitutional provision that generally restricts

11  states from engaging in war.

12       The state war clause says states generally can't

13  engage in war.  But there's an exception if there's an

14  invasion.  This Court has already dealt with that issue in

15  another case so I know you're familiar with it, but there have

16  been some developments since then so I'd like to touch on this

17  argument briefly.

18       We think it's incorrect for five different reasons.

19       First of all, there's no invasion here.  We have four

20  courts of appeals that have -- three courts of appeals, the

21  Second Circuit, the Third, and one other have considered -- and

22  the Ninth -- have considered this exact issue.  Can the influx

23  of unlawful migration over the border constitute an invasion

24  for constitutional purposes?

25       They've all rejected the argument.  They said that's

1  not the kind of armed hostility by a political entity that

2  constitutes an invasion.  It seems very clear we're nowhere

3  near an invasion here.  So that's the first reason to reject

4  this argument right at the threshold.

5      Second, Texas is not engaging in war by enacting SB4.

6  They've enacted a criminal provision that calls for the removal

7  of people to Mexico.  Under no ordinary understanding is that

8  engaging in war.

9      Third, Texas has not justified the next step of their

10  argument, that even if they're allowed to engage in war, that

11  they're allowed to violate any federal law in the process of

12  doing that.

13      The state war clause is generally a restriction on states.

14  It says they can't engage in war.  There's an exception that

15  lifts the restriction in the case of invasion.  But it's not an

16  affirmative authorization to engage in war in disregard and in

17  conflict with any existing federal law that might govern.  So

18  this argument, even if you were to accept the invasion and war

19  part, doesn't justify SB4 disregarding federal law.

20      Fourth, and this is a point you touched on in your prior

21  decision, any authority Texas has under this clause is

22  time-limited.  In theory, they could take some action in the

23  face of an actual invasion to try to repel it.  But that's a

24  time-limited authorization at best.

25      And then finally, there's the political question doctrine,

1    and that's an issue I know you're familiar with, you touched on

2    in your prior decision.  It's also one that a number of judges

3    from the Fifth Circuit in a recent order denying mandamus

4    touched on as well.  They focused on this political question

5    element.  They talked about the invasion defense generally.

6         I don't read that decision as saying the invasion argument

7    generally works.  But there was some language in it that

8    suggests that at least those five judges, not the rest of the

9    court but those five judges, have questions about the political

10   question doctrine's applicability.

11        And they said what their -- one strand of political

12   question doctrine is whether the Constitution commits a

13   decision to a particular branch of government.  And if so,

14   then maybe courts can't decide that issue if it's textually

15   committed to a different branch.

16        What the judges in that concurrent dissent notes -- it's a

17   dissent -- has said was that here it doesn't make sense to say

18   the question is politically committed to the federal

19   government, because if a state's been invaded and they have to

20   defend themselves, they shouldn't have to wait for Congress to

21   authorize it.

22        Even if you were to accept that argument, and we actually

23   think that argument's incorrect, but even if you were to accept

24   it, there's a different political question problem, which is

25   the lack of judicially manageable standards in determining

1    what's an invasion.

2        This is an easy case.  It's very clear that what's

3    happening here isn't an invasion, but you could imagine tough

4    cases where it's hard to know whether something is an invasion.

5        But even on the textual commitment point, you have to look

6    at the different constitutional clauses together.  There's the

7    clause Texas relies on, Article 1, Section 10, Clause 3, but

8    there's another one, which is Article 4, Section 4, that says

9    the federal government has responsibility to come to the

10   assistance of states if there's an invasion.

11       When you think about that clause, it makes a lot of

12   sense that the federal government is going to make that

13   determination.

14       Invasions are also relevant to the suspension of habeas

15   clause as well.  And there, no one would think that the

16   discretion to decide whether there's been an invasion should be

17   vested in the state government rather than the federal

18   government.

19       I'm checking my time, your Honor, looks like I'm doing all

20   right.

21       I'd like to turn, then, to our foreign commerce clause

22   argument.  The Fifth Circuit in the Piazza Seafood case makes

23   clear what the governing standard is, and if you have a law

24   that discriminates against foreign commerce, that's

25   unconstitutional.

1        Additionally, if you have a law that regulates foreign
2   commerce, even in a nondiscriminatory way, it raises
3   constitutional concerns if it impedes the federal government's
4   ability to conduct foreign affairs.

5        Generally, we have both of those things.  We have
6   nondiscrimination and an intrusion into the federal
7   government's conduct of federal affairs.

8        SB4 regulates noncitizens in Mexico coming into the United
9   States.  It doesn't regulate U.S. citizens.  So it's, on its
10  face, discriminatory.

11       It also burdens the federal government's conduct of foreign
12  affairs for all the reasons we've set forth in our briefing,
13  including the declaration from the Department of State, which
14  runs through the interference.

15       Mexico objects to SB4.  This is impeding our ability to
16  negotiate with Mexico and other partners in the hemisphere to
17  deal with immigration issues.

18       And there's a real concern as well about reciprocal
19  treatment of Americans.  If a state can treat noncitizens in
20  ways that Mexico finds objectionable, it opens up American
21  citizens abroad to mistreatment as well.

22       Texas doesn't really respond to either of these.

23       Instead of disputing that there's discrimination against
24  foreign commerce, they argue, well, there's actually just no
25  commerce at all, because they say this is just a movement of

1  people.

2      We've cited numerous cases, however, that the movement of

3  people is commerce and affects commerce.  That's very

4  well-established and Texas doesn't have any case law going the

5  other way, that I'm aware of.

6      They also don't really dispute that this is comparing our

7  foreign affairs.  All they say is that it doesn't matter if

8  Mexico objects to this law because Mexico should be doing more,

9  in their view, to stop unlawful migration.

10      But that's not the relevant test here.  The test is whether

11  there's a burden on the United States' ability to conduct

12  foreign affairs.

13      So then stepping past our affirmative arguments under

14  preemption in the commerce clause, Texas has raised a couple of

15  additional defenses that I want to briefly touch on.

16      They've argued that the United States doesn't have a cause

17  of action to sue at all.  They don't cite any cases, though,

18  saying that the United States lacks the cause of action to sue

19  to enjoin a preemptive state law.

20      The United States does this quite frequently when

21  necessary.  The Arizona decision, the Supreme Court decided --

22  was a lawsuit by the United States against Arizona in exactly

23  the same circumstances we're facing here.  No one there

24  questioned whether the United States had a cause of action.

25      We similarly brought actions against Alabama and

1   South Carolina, and some of the cases the parties have cited

2   here, no question that there was a cause of action.

3       Texas relies primarily on the Armstrong decision from the

4   Supreme Court, and that decision discusses whether the

5   supremacy clause itself gives rise to a cause of action in a

6   suit by private parties.

7       That was a case where some providers, healthcare providers,

8   were trying to sue to get greater reimbursement under Medicaid.

9       And what the Supreme Court said is they can't challenge the

10  state reimbursement levels as a violation of the supremacy

11  clause under the supremacy clause.  The supremacy clause

12  doesn't provide the cause of action.

13      Now, they could have a cause of action in equity.  And the

14  Supreme Court reaffirmed that generally equity does provide a

15  cause of action.

16          THE COURT:  That case didn't involve the United

17  States.

18          MR. BOYNTON:  Correct.

19          THE COURT:  The United States was not a plaintiff in

20  the case.

21          MR. BOYNTON:  Correct, your Honor.

22          And what was critical is that Congress had displaced

23  the cause of action in the Medicaid statute itself by providing

24  a limited cause of action.

25          Here we have nothing in the INA that displaces the

1   United States' ability to bring a cause of action in equity to

2   enjoin this preemptive law.

3           Then additionally, Texas has raised an abstention

4   argument urging this Court to abstain from hearing the case.

5   We think that argument fails for at least three reasons.

6           First, we cite case law that abstention principles

7   don't generally apply when the United States is bringing a

8   lawsuit.

9           Second, Pullman abstention, which is the variety of

10  abstention they've invoked, that applies when there is a

11  constitutional challenge to a law and there's a question about

12  whether the law could be interpreted in a way to avoid the

13  constitutional challenge.

14          There's case law saying that that doesn't apply when

15  you have a preemption challenge, like we're bringing here, as

16  opposed to a straight constitutional challenge.

17          But then finally and most fundamentally, there's

18  nothing about SB4 that is ambiguous in a way that affects our

19  challenges here.

20          Our field preemption challenge is -- looks at SB4 as a

21  whole.  It says that a state cannot be involved in regulating

22  the entry and removal of noncitizens.  And nothing about the

23  particular ways in which SB4 is interpreted or applied is going

24  to have any relevance to that argument.

25          The same is true about at least some of our conflict

1    preemption arguments.  It doesn't matter what the circumstances

2    are or how SB4 is interpreted.  There's still a conflict with

3    federal law.  So we don't see any basis to abstain.

4         For all those reasons, we think we've shown the

5    likelihood of success on the merits.  We also think that we've

6    satisfied the remaining preliminary injunction factors.  We've

7    shown irreparable injury to the United States.

8         The fact that SB4 is preemptive by itself is per se

9    injury to the United States.  We've explained that in our

10   briefing.  Texas is not opposed to that in their opposition.

11   Additionally, as we've discussed a little bit, SB4 interferes

12   with foreign affairs.  It also interferes with DHS operations.

13        On the other side of the ledger, we think any injury

14   to Texas could be addressed through other means.  There are

15   mechanisms in the INA for Texas to cooperate with DHS if Texas

16   wants to do more to contribute to enforcement of the federal

17   immigration laws.  And nothing prevents Texas from taking the

18   step that 26 different counties have done in entering into

19   agreements under 1357G to aid the federal government in

20   immigration enforcement.

21        And then finally, the public interest tips sharply in

22   our favor.  There's very little interest in enforcing a

23   preemptive law.  There's a significant impact that this law

24   will have against noncitizens, and the harms to Texas are ones

25   that we think, in the balance, are outweighed by the harms from

1    enforcement of SB4.

2        So for all of these reasons, your Honor, we urge you

3    to enjoin SB4 and to do so obviously before the law takes

4    effect on March 5th.

5        THE COURT:  Thank you very much, Counsel.

6        Counsel.

7        Please watch your time so that you don't intrude on

8    the time you have for rebuttal.

9        MR. BALAKRISHNAN:  Of course, your Honor.

10        Anand Balakrishnan from the ACLU on behalf of

11    Las Americas, American Gateways, and the County of El Paso.

12        My clients, your Honor, are clearly not the federal

13    government and not the state, but SB4 is going to place them in

14    an impossible situation of being stuck between competing

15    regulations of immigration in the state of Texas.

16        I just want to speak very briefly and raise three

17    points.  I don't want to repeat arguments that Mr. Boynton has

18    made.  But I want to sort of address three points here from the

19    perspective of our clients who are coming in affected by SB4 in

20    a different way than the federal government.

21        The first point I wanted to make is the huge impact

22    that SB4's removal provision is going to make to noncitizens in

23    the State of Texas.

24        Once -- you know, before SB4, the only way noncitizens

25    could be removed from the United States was through the system

1    the federal government has created which, of course, starts a

2    balance between enforcement and forms of relief.  Some of those

3    forms of relief, which have existed for decades in the United

4    States, are humanitarian protections to protect people from

5    being deported, to persecution, torture or even death in other

6    countries.  SB4 provides for no such forms of relief, and, in

7    fact, directly interferes with the system the federal

8    government has created.

9          THE COURT:  The odd thing about this, from your

10    client's perspective, is that frequently your clients, the

11    ACLU, have been quite critical of the federal government for

12    being too harsh in and too quick to remove people from the

13    United States.

14          MR. BALAKRISHNAN:  Absolutely, your Honor.  But you

15    know, our positions on the federal government policies are very

16    different than what the state is doing here, which is

17    completely -- and I agree with the federal government in this

18    instance -- the state has no authority to legislate or operate

19    in the entire field of removal or, you know, governance of

20    entry into the country.

21          But I do think -- I just want to make one very quick

22    point so it's clear about the way that SB4 operates.  Take, for

23    example, a noncitizen who is arrested and placed under SB4 the

24    state has created.  At the end of that proceeding, they will

25    have a conviction for state illegal entry, they'll have a state

1   removal order.

2          If they refuse to cooperate with that removal order

3   and don't leave the United States, they're subject to up to 20

4   years of incarceration in the state prison system.

5          THE COURT:  Well, they can't refuse.  They get taken

6   to the border and good-bye.  It's the same thing the border

7   patrol does.

8          MR. BALAKRISHNAN:  Exactly, and that puts them --

9          THE COURT:  The border patrol doesn't cross into

10  Mexico and take them to their house.

11         MR. BALAKRISHNAN:  Right.  They could be forced out.

12  They could be told, either you leave or we put you in prison

13  for 20 years.  In either case what that means is that they're

14  unable to access the relief that the federal government has

15  provided to them or they're punished for doing so.  This is the

16  first very quick point I wanted to make.

17         I just wanted to make one other brief point before

18  sitting down and saving my time for rebuttal.  I do think that

19  an important issue here as well is that this doesn't just have

20  to do with people who are arrested and detained.  It also has

21  to do with people -- noncitizens and their citizen families

22  living in the community in places like the County of El Paso.

23         So the federal government, for example, has created --

24  the federal government knew that there was a problem there.

25  Victims of crime who are noncitizens were not reporting the

1    crimes, were not cooperating with law enforcement because they

2    were afraid of being deported.

3            So it created specific visas for victims of domestic

4    abuse and for victims of human trafficking.  And it said if you

5    go to a state, local, or federal law enforcement officer and

6    you report the crime and you cooperate in the investigation and

7    prosecution of the crime, we will -- you are eligible for a

8    specific visa.  Make sure that these crimes are investigated

9    and prosecuted.  And, you know, the organizations who are

10   clients here regularly assist people through that process.

11           But the problem with SB4 is they've -- you know, the

12   organizations in the county have already heard this.  People

13   don't think that if they go to a local law enforcement officer

14   or a state officer, they're going to be arrested, deported, and

15   if they're not deported by the state, incarcerated for 20

16   years.

17           That's a huge issue for public safety for citizens and

18   noncitizens, and, of course, important to all of the clients,

19   including the County of El Paso itself.

20           With that, I'll stop, unless your Honor has any

21   questions, and otherwise, I'll save my time for rebuttal.

22           Thank you.

23           THE COURT:  Thank you, sir.

24           All right.  So we have now heard from -- I don't

25   believe there's anybody else who's going to argue for the

1  movant.

2          MR. BOYNTON:  Correct, your Honor.

3          THE COURT:  All right.  We're going to take a

4  10-minute recess to give my reporter an opportunity to rest her

5  hands and to use the restroom, if necessary, and get a drink of

6  water so we get a good transcript for the State of Texas.

7          Thank you very much.  We will stand in brief recess.

8          (Recess was taken.)

9          THE COURT:  I forgot to mention this at the beginning.

10  I know that you see me over here with something to drink.  I

11  can assure you that I'm not trying to somehow be a prima donna

12  up here on the bench.  Many years ago I had a small vocal cord

13  cancer which fortunately they caught in time, but the

14  requirement is that you have radiation therapy.

15          Once you have radiation therapy, it does a job on your

16  vocal cords, and so I have to keep my vocal cords hydrated with

17  warm liquid or else I lose my voice.  So that's the reason I

18  have this up here.  I'm not just sitting up here sipping away

19  on coffee, I can assure you.

20          Counsel -- counsel, before we start, I do want you to

21  please take me there -- yeah, go ahead.  I want to say that

22  this Court is not unsympathetic with the concerns which have

23  been raised by Governor Abbott and other officials in the state

24  of Texas or the Texas legislature.  I personally have sat as a

25  United States District Judge on the border for decades, long

1   before even I came here.

2           I sat at the United States District Court for the

3   Southern District of California in San Diego.  You can step

4   outside of the courthouse, get on a trolley, in three minutes

5   you're in Tijuana, Mexico.

6           I sat in Arizona for 20 years by designation, on and

7   off, in Tucson and Phoenix.  Those are hot spots for

8   undocumented immigration.

9           I also, here in the Western District of Texas, sat for

10  two years in Del Rio, Texas, which is precisely what we're

11  talking about here, as a United States District Judge.  I sat

12  down there with now Chief Judge Alia Moses.

13          So I am very familiar with the concerns that have been

14  raised and to some substantial degree agree with those

15  concerns.  And so I don't want it to be suggested that somehow

16  I am not in any way, shape or form unaware of the issues that

17  Texas raises.  I have seen them for myself.

18          So are you ready to proceed, sir?

19          MR. TEBO:  I am, your Honor.  Thank you.

20          THE COURT:  Are you going to be making the entire

21  argument yourself, or are you going to be splitting it with one

22  of your colleagues?

23          MR. TEBO:  I'm just going to be doing it myself,

24  your Honor.

25          THE COURT:  The ladies and gentlemen don't know this,

1    but with the exception of some of the government's counsels,

2    these folks from Texas and other places and I are well aware of

3    each other and are friends.  They've been in my court many

4    times and Texas has won some big cases in front of me, so we're

5    not unfamiliar with each other.

6              Go ahead, Counsel.

7              MR. TEBO:  Thank you, your Honor.  It's great to be

8    here in your courtroom again.

9              I wanted to -- so I think this -- the key thing to

10   understand in this case as it's been litigated so far is that

11   this is a preenforcement facial challenge.  This law has not

12   gone into effect, and that has lots of problems and we've seen

13   that in the way this has been litigated so far.

14             There have been a lot of assumptions, including today,

15   even after some of the briefing that we've submitted that

16   somehow aliens under SB4, if they're being detained or

17   incarcerated by the State, that they will not be able to access

18   federal immigration protections like asylum or consent by the

19   Secretary of Homeland Security and the like.

20             Now, the way that that's done is that they said, well,

21   SB4 itself does not -- at least some of those provisions have

22   an explicit provision that says those are available, but that's

23   not how we interpret laws.

24             There's lots of things -- SB4 doesn't say that people

25   get a jury trial, either.  Those are from other sources of law.

1    We look at the entire Corpus Juris, the body of law, and that
2    includes federal law.

3         In Texas, the state courts, there's a canon
4    construction in the state code that says, "Penal Code
5    provisions are to be construed by the courts to be consistent
6    with both the state and the federal constitution, and that
7    includes preemption."

8         Defendants can raise preemption as a defense in state
9    courts as applied for facial.  That happens in state criminal
10   cases.  And to the extent there's any ambiguity, the State
11   applies the rule of lenity in interpreting criminal provisions
12   in favor of the defendant.

13        So if, for example, there's uncertainty about what is
14   meant by lawful presence as a defense, because there are --
15   that definition exists in several different categories of
16   federal law for different purposes.  For benefits -- for
17   benefits and for provisions of the -- criminal provisions of
18   the INA.

19        But to the extent there is any ambiguity, that is
20   always going to be interpreted in favor of the criminal
21   defendant.

22        We have a declaration from the Texas Department of
23   Criminal Justice, the Chief of Staff, Jason Clark, that talks
24   about how -- I mean, right now, this is -- it's not unusual --
25   SB4 is not the first time that the State of Texas is going to

35

1    have illegal aliens in its custody and its prisons.  Texas has

2    a lot of illegal aliens in its prisons.

3              It does not in any way forbid them from accessing

4    federal immigration hearings or officials.  It provides forums

5    for them.  It allows nonprofit lawyers to come and access them.

6              THE COURT:  Well, if someone, an undocumented alien,

7    crosses the border -- and by the way, I am not buying into this

8    argument that all undocumented aliens are criminals.  In fact,

9    the vast, huge majority of undocumented aliens are law-abiding

10   individuals, except for the fact that they crossed the border

11   illegally, which, of course, is a violation of the law, federal

12   law.

13             But let's assume we have somebody that has violated --

14   go to drunk driving.  They go drunk driving.  They get caught

15   drunk driving.  Well, they're subject to state prosecution for

16   being a drunk driver and they can go to state prison.

17             And when they get out of state prison, what happens

18   generally, in fact a hundred percent of the time under current

19   law, is that the State of Texas, the county or wherever it

20   happens to be, will turn them over to the federal government

21   who will either prosecute them for being an undocumented alien

22   or deport them.  That's what happens now.

23             So obviously, if somebody were an undocumented alien

24   who committed a burglary, which is a, you know, a serious

25   felony, they could end up in state prison somewhere for several

1    years.  And at the end of that term of imprisonment, the State

2    would notify the immigration authorities, the immigration

3    authorities would put a detainer on that individual, and then

4    that individual would be subject to, again, prosecution by the

5    federal government for -- not for the burglary, because that's

6    a state crime, but for being an undocumented alien and/or they

7    would be deported to whatever country they came from.  If they

8    came from Guatemala, they would go back to Guatemala.

9            So I think you would agree with me there; would you

10   not?

11           MR. TEBO:  I would, with one caveat, your Honor.  And

12   this is in the declaration of Jason Clark from TDCJ.  It's

13   actually very early in the process where we cooperated with the

14   federal government.  So as soon as someone comes into custody

15   of the Texas Department of Criminal Justice and they're

16   suspected to be an alien and not a U.S. citizen, they -- then

17   there's like an interview inside the TDCJ with the person in

18   custody.

19           Then they reach out to ICE, they run checks through

20   their system, they notify ICE, and typically ICE will place a

21   detainer early in the process, even before they're about to be

22   released, just to say, okay, when these -- before releasing

23   this person out after he's served his sentence, we'll take him

24   into custody.

25           THE COURT:  But the federal -- excuse me, I didn't

1  mean to interrupt you.

2          MR. TEBO:  No, go ahead.

3          THE COURT:  I didn't mean to talk over you.  The

4  federal government would not have, in my view, the authority --

5  he comes in, commits a burglary in Texas -- to just say, well,

6  I'm sorry, Texas, you can't prosecute that burglary.  That's a

7  state crime, and the State of Texas has the right to prosecute

8  that individual.

9          And once they do, they choose to do so, and it's been

10  done, regardless of when the detainer is put on -- and you may

11  be absolutely right.  I've had it both ways, to be honest with

12  you.  I just sentenced some guy to -- for having committed --

13  he had committed a crime in Texas.  He had been in jail in

14  Texas, he got indicted by the feds for being an undocumented

15  person, second time coming back, came to my Court, I sentenced

16  him, and then he will be deported when he finishes his federal

17  term of imprisonment.

18          So the State of Texas has not lost its sovereignty

19  here in terms of being able to prosecute these individuals.

20          Nobody -- if the federal government in this case is

21  suggesting that somehow undocumented aliens are immune from

22  prosecution in Texas, that's an argument they're going to lose

23  in this court.  But I don't think that's their argument.

24          MR. TEBO:  Your Honor, I would say that their argument

25  about field preemption comes pretty close to that.  Because,

1    for example, as your Honor is aware, the State of Texas has

2    been prosecuting over the last few years under Operation Lone

3    Star for public criminal trespass when aliens cross and they

4    come onto state or private land and they're trespassing.

5         So under their theory about field preemption, anything

6    about entering -- so when these people enter and they enter

7    into Texas and they're on either state or private land and

8    they're trespassing and we are prosecuting them, I don't know

9    what difference it would be to the government of Mexico, if

10   it's a Mexican national, for us to proceed under that provision

11   of Texas law as opposed to SB4.  It seems like it's the same

12   effect.

13        THE COURT:  Well, yes, but there's -- Counsel, you

14   made a very good point.  But there is a -- there is a

15   difference in the sense that under SB4 -- what you're talking

16   about here is somebody crossing over, they're found in Texas

17   and Texas then charges them for being in trespass, okay.

18        That isn't the issue that's in front of me today,

19   okay.  I don't know who has that issue.  We have so many

20   federal judges around here.  Judge Moses has got one case,

21   Judge Pitman, something else.  There's all kinds of cases

22   floating around involving these issues.  And that is -- believe

23   me, I'm trying to cabin my case as narrowly as I possibly can.

24        I think -- I'll wait to hear from the Government.  I

25   don't know whether they're going to take issue with that, but

1  SB4 goes far beyond that.  Otherwise, the state legislature

2  wouldn't need to pass SB4 in their own -- I mean, why pass a

3  law?  So the law that they passed gives the State the right to

4  not only arrest these people and put them in jail -- currently,

5  what they do is they turn them over to the federal government

6  and the federal government deports them.

7       It would give them the right to take them and put them

8  before -- I don't know what you would call the state judges,

9  state immigration judge, I don't know.  A state judge could

10 then order them to be deported and sent across the border, and

11 that is very different than what now exists.

12      Because if it was what Natalie says, there would be no

13 SB4.

14      MR. TEBO:  Your Honor, I would say, you know, this

15 is -- it is not the same as removal, the orders to return.

16 What the Court does is it does order the alien, upon completion

17 of a sentence, to be returned to the country he entered from,

18 which would be Mexico in any case, your Honor.

19      But we have a declaration from Victor Escalon from

20 DPS, from the Department of Public Safety, which is the agency

21 that would be responsible for monitoring compliance with this

22 order when it is to be executed, and he has said that the way

23 that this is done is they cooperate, they contact the

24 authorities in Mexico, which they have a working relationship

25 already with the Mexican national government and the states

1    that are adjacent to Texas, Mexican states, and with CBP,

2    Customs and Border Protection.

3            They will escort the aliens to the port of entry, and

4    they will -- if it's -- if Mexico says they will not take this

5    person, there is no attempt to forcibly push that -- put that

6    person into Mexico.

7            The compliance -- according to Mr. Escalon's

8    declaration, the monitoring for compliance is complete when

9    that person is escorted toward the Mexican side of the port of

10    entry, and if Mexico does not agree to let that person in, that

11    is the end of the matter and that is the end of compliance and

12    that person would not be prosecuted.

13            THE COURT:  They would be prosecuted; wouldn't they?

14            MR. TEBO:  No, your Honor.

15            THE COURT:  What if they walk away?  They say, well,

16    Mexico doesn't want me.  I'm from Honduras, they don't want me.

17    We get a lot from Honduras.  We get a lot from Guatemala.  They

18    don't want me.  They just get to go back into Del Rio and enjoy

19    a good life?

20            MR. TEBO:  Your Honor, they would go to CBP, Customs

21    and Border Protection officers there at the American side of

22    the port of entry.  But because it was not -- we have -- there

23    are mens rea requirements throughout the criminal law.

24            THE COURT:  See, one of the big problems here is

25    that -- or one of the issues here is that a little more care --

1   and by the way, this happens with federal laws also.  In fact,

2   maybe a lot more here.  It could have gone into drafting this

3   statute.

4          Basically, you are left with attempting to defend the

5   law, not of what the law says, but what somebody else says they

6   intend or hope to do about it.  We don't know.  This person

7   could be there.  He could retire tomorrow.  We don't know.

8          And it makes it very difficult for courts under those

9   circumstances.  I have to rule on what the law says, not what

10  maybe somebody thinks they're going to do or not do.  And

11  that's -- it's a very -- it's a difficult problem for the

12  Attorney General of Texas now to be put into the position of

13  attempting to defend the law, not on what it says will happen

14  or should happen or must happen, but, you know, yeah, well, we

15  understand that this is what the law says, but actually, we're

16  going to do something a little different.

17         MR. TEBO:  Well, your Honor, I would say, I think two

18  points on that.  One is federal law is part of state law, and

19  this is a norm in the way that Texas courts interpret state

20  laws to be consistent with federal law.  That's why people can

21  raise preemption as a defense.

22         So this is not saying we should ignore SB4.

23         THE COURT:  Does SB4 say anything about preemption as

24  a defense?

25         MR. TEBO:  It does not, but it doesn't have to.  It

1    also doesn't say they have a right to a jury trial, either.

2    These are from other sources of law in the state.

3            The other point I would make is that in Arizona versus

4    U.S., the case that is probably the most talked about by all

5    sides in these cases, it ruled on something similar to this

6    where it refused to rule on the preemption of a provision in

7    the Arizona law allowing officers to make efforts to verify

8    immigration status with the federal government.

9            And it said the federal government has brought suit

10   against a statute -- or against a sovereign state to challenge

11   the provision even before the law has gone into effect.  There

12   is a basic uncertainty about what the law means and how it

13   would be enforced.

14           At this stage, without the benefit of a definitive

15   interpretation from the state courts, it would be inappropriate

16   to assume it is preemptive.

17           And that's going into what we're talking about here,

18   and that's with these declaration -- there's been a lot of

19   assumptions made that somehow this law is just read in

20   isolation and there is no other law outside of it that applies

21   to the circumstances when it's going to be enforced.

22           THE COURT:  I don't know if that's the -- I don't know

23   whether that's the position that the federal government is

24   taking, but it certainly is the position that I'm taking.  I

25   mean, I'm looking at this in a more practical way.

1           One of the issues that even in -- you know, my late

2    friend, and he was a good friend, he and I sat on panels

3    together and I knew him well, Justice Scalia -- boy, do I miss

4    him.  He was a wonderful man and a great justice.  Even in his

5    dissent in U.S. versus Arizona, he said explicitly that

6    immigration and deportation are exclusively federal confines.

7    They are not for the states.  I don't have his exact language

8    here.  I'm not a Professor Chemerinsky who has the kind of a

9    memory that can recite --

10          MR. TEBO:  Well, your Honor, I would say that the

11   orders to return are not removals.  They are not expelling

12   people from the country.

13          So there are two different provisions of removals.

14   One is early in the process where the defendant has to agree to

15   it.  Now, this is, I would say, definitely the least

16   objectionable, because the -- an alien can always leave on

17   their own, right.  They can leave.  There's no federal law that

18   says you have to stay here.

19          So if they agree to it, in exchange for not being

20   prosecuted, they can leave, and the state court will issue an

21   order with their consent to go.

22          The other provision, which is the more objectionable

23   one that I think your Honor is talking about, is after they are

24   sentenced, they have to enter an order that when they complete

25   their sentence, they have to return to the country that they

1  entered from.

2         THE COURT:  The point is that they get sentenced.

3         Now we have, and I don't think counsel would disagree

4  with me here, we have an extremely elaborate system of federal

5  law covering immigration.  There are hundreds, maybe hundreds

6  of hundreds, I don't know, of immigration judges whose sole job

7  it is to do exactly what the State of Texas now proposes to do.

8         Then if people don't feel that they have been properly

9  adjudicated there, they have the right to appeal to an

10  Article III court, which is a court where the judges have

11  lifetime tenure and are therefore not subject to the whims of

12  the world.

13         The concern here is -- and I'm not -- I do not, under

14  any circumstances, mean to impugn the integrity of any state

15  judge.  We're not talking about that.  I have classmates that

16  went to law school with me here in Texas who are wonderful

17  state judges.

18         But Article III is one thing, and it is pretty

19  independent, and the judges that would be hearing these cases

20  are not Article III judges.  They are state judges who are

21  appointed by the governor and/or elected, sometimes both, under

22  state law, and they don't have Article III tenure, lifetime

23  tenure.  There's no judge in the State of Texas under the Texas

24  constitution that has lifetime tenure, to my knowledge.

25         MR. TEBO:  Your Honor, well, first, I would say the

1 | Supreme Court has said repeatedly that --

2 |        THE COURT:  You're talking about the U.S. Supreme

3 | Court?

4 |        MR. TEBO:  The U.S. Supreme Court.

5 |        There's a presumption that state courts follow the

6 | law.  So there is that presumption.  I don't think that because

7 | of the way they're -- most state judges in the country are

8 | elected, and originally, almost all federal litigation went

9 | through state courts and then to the Supreme Court.

10 |        It was very small, but there used to be, even on the

11 | federal question jurisdiction, a minimum amount of controversy.

12 | So most cases -- most federal cases went through state court

13 | systems, and then, obviously, the U.S. Supreme Court can hear

14 | those cases on certiorari coming out of the state court system.

15 | So there's always that --

16 |        THE COURT:  Well, you're right, but I think that we

17 | would presume that United States magistrate judges, many of

18 | whom, like the ones we have here -- we have one here, I know,

19 | that was a distinguished state judge, Judge Howell, are

20 | clearly, unequivocally, in my view, going to follow the law and

21 | are presumed that they will follow the law.

22 |        But the Supreme Court has said, also, in that

23 | instance, and statute also says it, that U.S. magistrate judges

24 | may not preside over a trial of a felony defendant, period, end

25 | of story, because they are not Article III judges.

1          Now, in civil cases -- civil cases, not criminal -- a

2    magistrate judge, with consent of the parties, but not without

3    consent of the parties, may preside over a jury trial.

4          You're talking about a possible 20-year sentence under

5    SB4.  That's a felony, and those people would not have the

6    benefit of an Article III judge, which the federal law would

7    require and does require for federal crimes.  So there we are.

8    It isn't required for state crimes obviously, obviously, but

9    that's where we are.

10         I mean -- and so that's an issue that has to kind of

11   be melded in here.  I mean, it's an issue of some concern.

12         MR. TEBO:  Well, I think -- one thing, your Honor, is

13   that I would say that even when you go through the state court

14   systems, there's always Supreme Court review.  That's just the

15   way our system is set up.

16         THE COURT:  Well, there's Supreme Court review --

17   would be Supreme Court review of any criminal case tried by

18   a -- by a federal magistrate judge if they were allowed to try

19   felonies, but they're not, because they're not Article III

20   judges.

21         MR. TEBO:  Right.  But I think that's -- that's

22   because of the power -- the U.S. Constitution that sets out the

23   judicial branch and says how they are to be selected when

24   they're exercising federal judicial power.

25         THE COURT:  The U.S. Constitution applies to the State

1    of Texas.

2              MR. TEBO:  It does, and that's why Texas State judges

3    comply with the U.S. Constitution all the time.  Most

4    litigation in this country is through the state court system

5    and they address federal all the time.  Federal law is part of

6    Texas law.  State courts in Texas apply federal law all the

7    time.  In fact, they're required by the Constitution to apply

8    federal law.

9              THE COURT:  I don't want to appear to be arguing with

10   you, Counsel, because I'm not.  This is the problem with being

11   a law professor for 38 years.  I ask tough questions

12   sometimes -- I'm not going to take any time away from you for

13   drinking some water, believe me.  Take as much time as you

14   need.

15             MR. TEBO:  I appreciate it.  So I'd like to talk

16   about --

17             THE COURT:  You only have a limited amount of time.

18             MR. TEBO:  I'd like to talk about field preemption.

19             So the federal government has cited out-of-circuit

20   cases on harboring and transportation of aliens under 1324 of

21   federal law as creating a field preemption over contract sales.

22             Now, that's not what we have here.  They -- there is

23   no -- they don't cite any cases specifically about field

24   preemption relating to entry, reentry, or removal.  So these

25   cases are not on point with this.  And there's also several

48

1  provisions of federal law that we cite.  If it's field

2  preemptive, that means that the states cannot have any, even

3  complimentary, laws, or any role at all in enforcement of this

4  field.

5       But several provisions of federal law do grant states

6  the ability to enforce laws involving entering the country,

7  including -- and we cite these in our response to the PI

8  motions.

9       THE COURT:  Yes, I read that.

10      MR. TEBO:  Yes.  So there are several provisions, so

11  that itself takes it out of field preemption.  So I think

12  that -- and the Fifth Circuit has said, in the El Cenizo case

13  from 2018, that you are to read the fields very narrow.

14      You are not to broadly -- now, the Fifth Circuit -- so

15  in Arizona versus U.S., the only field they said was

16  field-preempted was alien registration.  That's because it

17  operates internally throughout the country, so you have to have

18  one system.

19      SB4 is not like that.  SB4 involves things happening

20  at the border.  It does not happen -- this just involves entry

21  into Texas, and it's complimentary to the federal provisions

22  that it adopts, and it does not have more severe penalties for

23  compliance with them.  In fact, they are less severe on the

24  entry and reentry, and therefore, they do not conflict with

25  federal law.

49

1          THE COURT:  Can I ask you a question that's been kind

2    of -- it woke me up at 2:30 in the morning, which is what used

3    to happen to me when I was a trial lawyer.  I had my best

4    thoughts at 2:30 in the morning.

5          Let's say, just for purposes of argument, that I agree

6    with you and I rule that SB4 is perfectly fine.  Perfectly

7    constitutional, if I were to rule that way.  And the State of

8    California then says, oh wow, this SB4 is great.  Let's enact

9    California's version of SB4.  And then Maine does the same

10   thing, and let's say Louisiana does it, and then let's say that

11   New Mexico does it, and Arizona does it.  And each one of those

12   states is not going to have your man, the DPS man, there.

13   They're going to have somebody else.

14          So we then have all of these states who have their own

15   immigration law that they're interpreting differently.  There's

16   no national interpretation.  Everybody has their own

17   interpretation of immigration law.

18          It sounds to me that that then turns us from the

19   United States of America to a confederation of states where

20   each state has its own kind of laws and its own sovereignty in

21   this area, and that's precisely the same thing that the civil

22   war said you can't do.

23          So how do you have a -- what if California says, well,

24   you know, as far as we're concerned, let 'em in.  We'll let

25   everybody in.  We're not -- we've got our own little version of

1    SB4, and we're just going to -- we're just going to enforce it

2    in an incredibly lenient way.

3             Or Maine takes that position.  And then Texas takes a

4    really hard line and New Mexico takes a hard line and Arizona

5    takes a hard line, and somebody else interprets it a different

6    way -- Louisiana, I don't know.

7             I mean, it just -- it seems incredible to me that we

8    could have a situation where each state had its own immigration

9    law and then attempted to interpret it in its own way.

10            But because, you know, these appeals would go -- they

11   would go to federal court, and appeal for one of these district

12   courts would go to a Fourth Court of Appeals or a state Fourth

13   Court of Appeals or the second, whatever, and then go to the

14   state supreme court.  And then maybe, ultimately, to the U.S.

15   Supreme Court, maybe years down the road.

16            What a nightmare.

17            MR. TEBO:  Your Honor, if I could -- I think I have

18   two points on that.  One is you'd have to address whether these

19   laws are actually in conflict with -- once you move beyond the

20   whole field branch, if we agree that the whole field has not

21   been preempted by Congress --

22            THE COURT:  I haven't agreed to that.

23            MR. TEBO:  I know.  But if we move beyond to the

24   conflict preemption, that is the test for each state.  Does

25   their statute actually conflict with federal law.

1          The other thing I would say is the situation that you

2    talk about was really the norm before the late 1800s, when the

3    federal government really started to pass more comprehensive

4    federal immigration laws.  The states did have --

5          THE COURT:  I'm sorry, Counsel.  Please go ahead.

6          MR. TEBO:  I'm sorry, your Honor.

7          THE COURT:  No, I'm the one that interrupted you.  I

8    apologize.

9          MR. TEBO:  I appreciate it, your Honor.

10         So the states were the primary actors in regulating

11   the flow of people into their states, into the country up until

12   the late 1800s, when the federal government took a more

13   aggressive approach.

14         So this was not unheard of.  The federal government

15   had a more subsidiary role where it assisted the states in

16   doing that.  So the states actually did deport people.

17         There's a lot of articles cited in Justice Scalia's

18   dissent in Arizona versus U.S.  I think it's called the lost

19   hundred years of immigration law and it talks about this.  The

20   federal government really was not the primary actor for the

21   first 100 hundred years of this country in the immigration

22   space.  It was the states.

23         THE COURT:  Yes, but I would -- you know, one of the

24   reasons I enjoy having you here in argument is because you do

25   such a good job.  You're very bright and a very capable lawyer.

1              The problem is that -- exactly what you pointed out.

2     The states were doing their own thing, to a degree, and the

3     federal government saw, Congress saw, that this ain't working,

4     that they needed to have a uniform federal law throughout the

5     country that would regulate clearly and unambiguously the issue

6     of who can come into the United States, who cannot come into

7     the United States and who is deportable and/or parolable.

8              And that's why we have this.  Now, is it a great law?

9     I don't think anybody in their right mind would say that the

10    federal immigration law doesn't need some reform.  I mean,

11    Republicans believe that, the Democrats believe that.  We were

12    almost there, but it blew up at the last minute for whatever

13    reason, and it's not my purview.

14             But, yeah -- but that doesn't mean that the law we

15    have isn't enforceable.  We have all these immigration judges

16    whose sole job is to do this.  And then we have an appeal

17    process that used to come to the district courts.  Thank

18    goodness, it doesn't anymore.  It goes to the poor court of

19    appeals judges, but they are Article III judges for sure, and

20    they hear those appeals.  And when I sit on the Ninth Circuit,

21    as I do regularly, I hear those appeals.  It's a tough

22    question.

23             Now, I'd like to have you address something that I

24    think is important to address, and that's this whole issue of

25    invasion.  And I don't want you to miss that because of my

1    questions, because that's a big issue for you in this case.  So

2    why don't you go ahead and address that.

3          MR. TEBO:  Yes, your Honor.

4          THE COURT:  Maybe you don't want to address it.

5    You've addressed it very carefully in your --

6          MR. TEBO:  No.  Well, your Honor -- just going by the

7    points that the United States made on this issue.

8          So whether an influx of migration would constitute an

9    invasion in itself, I don't think this Court has to address

10   that full scope of this.  This is a facial challenge so the

11   plaintiffs have to show that every application is unlawful.

12         And I think at minimum, the presence of the cartels,

13   who are at least a quasi state, a paramilitary organization who

14   are very active on the border -- like you said, your Honor,

15   most people coming across the border are not, you know,

16   hardened criminals.  We agree with that.  But there is a lot of

17   criminal activity with the cartels who exercise, you know,

18   sadly, in Mexico, a lot of quasi sovereign authority.

19         THE COURT:  You know, I couldn't agree with you more,

20   Counsel.  I'm going to give you a few extra minutes for

21   arguments, because I have taken up some of your time with my

22   questions, and I think it's only fair to give you some time.

23         MR. TEBO:  Thank you, your Honor.  I appreciate your

24   questions and I'm happy to answer --

25         THE COURT:  I'm going to give you an extra ten minutes

1  because I have taken up some of your time and that's just not

2  fair.

3          I couldn't agree with you more, Counsel, that the

4  problem we have here is the cartels.  Look, I've said it many

5  times.  As someone who was a military officer, I've seen bad

6  things in my life, but I will tell you that the stuff that

7  these cartels do to human beings is like a training manual for

8  ISIS.  I mean, these are vicious, bad people.  There's no

9  question about it.  I sentenced a guy who worked for the

10  cartels who admitted to over 40 murders, but the FBI said that

11  was a fraction of what he actually did.  Bad people.

12          But the question here is, is the United States being

13  invaded in the sense that the United States Constitution gives

14  the state the authority to come in and essentially act in a way

15  that it has acted, or wants to act under SB4, to thwart that

16  invasion.  I'm not sure that -- what SB4 does actually does

17  much in that regard.

18          Now, we know that the governor controls the National

19  Guard, but the governor only controls the National Guard to the

20  extent that the president of the United States allows that to

21  happen under circumstances of provision.  Because what normally

22  happens in times of stress or a problem is that the federal

23  government, the president, federalizes the National Guard.

24          We've seen this happen.  We've seen it happen even in

25  situations where President Eisenhower federalized the National

55

1   Guard in order to prevent riots when children were -- children

2   of color were being allowed into the schools.  Federalized the

3   National Guard over the objection of the governor, in that

4   case.

5           In Vietnam, the Hawaii National Guard was federalized

6   and sent to Vietnam.  During World War II the National Guards

7   of many states, including Texas, I believe, were federalized

8   and sent overseas to fight the war.

9           I haven't seen, and the State of Texas can't point me

10  to, any type of military invasion of Texas.

11          Now, an influx of people, yes, for sure, there has

12  been, although that has gone down recently because of some

13  actions by Mexico.  But it's still problematic, for sure.  So

14  how do we deal with this?  How does this statute deal with

15  this?

16          Because that's one of your arguments, is there's been

17  this invasion.  That was Judge Ho's argument, invasion.  But I

18  know what an invasion looks like.  I mean, Governor Abbott

19  hasn't had the National Guard bring tanks out or 105 millimeter

20  howitzers or the Texas Air Guard patrolling the Rio Grande with

21  jets or helicopters.  None of this has ever happened.

22          MR. TEBO:  Well, your Honor, I would say that the

23  Texas Military Department does have a very active role down at

24  the border.  They have laid concertina wire, which is -- you

25  know, in the military, as you know, they have combat engineers

1  who do that sort of work, putting up barriers.  That is a

2  military function.

3       THE COURT:  I agree with that.  I think that that's

4  true.  There have been calls for President Biden to federalize

5  the Texas Guard but he hasn't done so.

6       So that's right.  I think that the Texas Guard has

7  played -- and so has the Department of Public Safety, by the

8  way.  Let's not cut them out.  They've played a significant

9  role here.

10       And this Court is not, N-O-T, by whatever action I

11  take, going to go outside the purview of SB4.  There are other

12  cases going on involving the barbed wire.  I mean, that's

13  Judge -- Chief Judge Moses' case, and, you know, the Supreme

14  Court recently, as you know, gave the border protection the

15  right to cut the wire to get to the --

16       MR. TEBO:  I would say, your Honor -- I would be more

17  careful in my language.  I would say they vacated an injunction

18  pending appeal against -- that ordered them not to.

19       THE COURT:  But they could cut the wire.

20       MR. TEBO:  Yeah, although, I would say, your Honor,

21  they have not since that time.  My understanding is they have

22  not cut the wire.

23       THE COURT:  Maybe they're being judicious.

24       MR. TEBO:  That is probably true, your Honor.

25       THE COURT:  I don't think that the Supreme Court

1    issues orders for nothing.  The point is that Texas fought that
2    and they didn't win.

3              MR. TEBO:  I would say we're back in the lower courts.
4    We're not down on that yet, your Honor.

5              THE COURT:  I understand.  Let's not argue that case,
6    all right.  I am not going to issue a ruling that has anything
7    to do with barbed wire or anything else.  That's not what I'm
8    here to do.  I'm here to rule on whether SB4 is constitutional
9    or unconstitutional.  That's it.

10             MR. TEBO:  Understood, your Honor.

11             One thing I would like to say, you know, you brought
12   up the point about how is SB4, you know, a response to an
13   invasion.  I would say Justice Holmes, a civil war veteran, in
14   Moyer versus Peabody --

15             THE COURT:  Decorated civil war veteran.

16             MR. TEBO:  That's right, your Honor.  He said the, you
17   know, the greater includes the lesser.  We cited this.  And
18   this -- in Blackstone's commentaries, he advocated that enemies
19   of the human race, like pirates, smugglers, who were proper
20   targets of military force, should be -- instead of being
21   treated as prisoners of war, they should be treated as common
22   criminals.

23             So criminal law is a way that -- you know, it is an
24   option for a state, for a nation to compliment its war powers.

25             It doesn't -- the civilian criminal law is not

1    precluded from being applied in service of a defensive war,

2    your Honor.

3            And the fact that Texas is not using cannons or

4    fighter jets to respond to this crisis at the border is a

5    prudent, you know -- and Texas is bound by the laws of war,

6    just like the United States is, even when it's using its

7    defensive war powers granted by the Constitution.  And it would

8    be obviously wrong and immoral -- unlawful under the laws of

9    war for it to take those sorts of actions against, you know,

10   unarmed people coming across the border.

11           THE COURT:  I could not agree with you more.  I think

12   the real question is some people have suggested that an

13   invasion requires -- and the Constitution speaks of invasion as

14   a war-like invasion, and I don't think that there's -- I really

15   do not see any evidence that Texas is at war.

16           A little -- that rhetoric has been used by, in some

17   cases, politicians, that Texas is at war.  Well, I don't think

18   Texas is at war.

19       But I think that Texas is definitely under pressure, no

20   question about that, that there have been a lot of illegal

21   immigration that's come into Texas and Texas has had to deal

22   with it.  And that includes -- even the plaintiffs in this

23   case, the County of El Paso, they have had plenty of illegal

24   immigration there.  But I don't think we have a war going on

25   here in the sense, in the sense that we would talk about war.

1      But here's one other thing I want to address with you.  One

2  of the big arguments that has been made is that because Texas

3  is under invasion, that it is necessary for the statute, okay.

4  And that is premised on the present circumstances, which

5  fluctuated.

6      Unfortunately, there is no sunset provision in this

7  statute, which is something that should have happened.  I'm

8  just -- I'm not a Texas legislator and I'm just offering my own

9  personal opinion.

10      I'm not going to rule on that necessarily, but I do think

11  that -- what happens if, regardless of who our new president

12  will be, whether it'll be President Biden or President Trump,

13  okay, they make a deal with Mexico and Mexico literally shuts

14  down the border.

15      There's no -- virtually no illegal immigration coming

16  through.  Illegal immigration has gone down dramatically

17  recently, but let's assume -- because Mexico has taken some

18  very proactive steps -- but let's assume either President

19  Trump, as he has said he would do, or President Biden, as he

20  has said he would do, actually get with Mexico and this --

21  SB4 -- just carries on.

22      MR. TEBO:  Well, your Honor, I would say first, the

23  invasion clause argument is not the sole basis for, you know,

24  supporting SB4.

25      THE COURT:  You need to tell that to a few certain

1    judges.  They've spent a lot of time on it in their dissent.

2            MR. TEBO:  Yes, your Honor.  Our contention,

3    obviously, is this is not preempted, even under -- you know,

4    not even extended information clause argument.  That this is

5    not in conflict.  This is complimentary to federal provisions.

6    It does not conflict with anything there.

7            It makes it illegal, the same conduct that the federal

8    government has made illegal, and it does not have any more

9    severe penalties as to that conduct.

10           I would say there are a couple different ways the

11   invasion clause is relevant here in addition to that.

12           One is the avoidance canon argument, that you should

13   not -- because of constitutional doubts with federal law

14   potentially conflicting with the state's reserve powers under

15   the Constitution, you should not interpret federal law in a

16   broad manner that would potentially clash with state powers

17   under that clause.

18           Obviously, if there's a conflict between the statute

19   and the Constitution, the Constitution wins.

20           THE COURT:  Always, yes.

21           MR. TEBO:  So you don't have to reach the

22   constitutional question in order to find that you should avoid

23   an overly broad reading of state field preemption, which is

24   consistent with what the Fifth Circuit has said in general.

25   Field preemption should not be likely assumed, and the field

1   should be defined as narrowly as possible.

2          And we should not, you know, assume that there's going

3   to be a conflict between state and federal law.  We should try

4   to harmonize state and federal law to the extent possible.

5          And then, of course, the other way that the invasion

6   clause is if -- if there is a true conflict and if the federal

7   government has not been performing its duties under the

8   invasion clause of Article 4, where it's supposed to protect

9   the states from an invasion, then the state's defensive war

10  powers would be justifiably called into being, and that would

11  be the strongest version of the invasion clause argument.

12         But we don't have to go there, because obviously, from

13  our perspective, this is not in conflict, it's not

14  field-preempted.  There's no direct case law saying that these

15  categories, these fields, are preempted in that way, and we

16  don't believe that there's any -- no federal immigration

17  statute has been pointed to where we are actually in conflict

18  with what the federal government is doing.

19         It is complimentary legislation.  So we don't think

20  you have to get there, but the invasion clause has, you know,

21  several -- there's several different layers of it going outward

22  from that argument, your Honor, from that straightforward

23  argument.

24         THE COURT:  Okay.  Anything else that you would like

25  to cover?

1          MR. TEBO:  Do I have time, your Honor?

2          THE COURT:  I'll give you -- yeah, we kind of used

3     that extra ten minutes.  You've got 15 minutes, my friend.

4     I'll give you the extra ten minutes because I was barraging you

5     with questions that I didn't -- because, you know, this is the

6     issue.  You passed the law.

7          MR. TEBO:  I appreciate it.

8          THE COURT:  Well, you didn't.

9          MR. TEBO:  Your Honor, now, one thing, the federal

10    government pointed to the Fifth Circuit's DACA ruling from

11    October of 2022 that talked about removal and -- well, entry

12    into the country being an exclusive federal function.

13         Now, that is true.  However, you have to look at the

14    context of that and what exactly happened there.  So DACA held

15    that alien classifications, a system of how you classify

16    aliens, whether they are involved here or not, that that was an

17    exclusive federal function.

18         But in that case, the harm to Texas, the -- from the

19    earlier DACA ruling, that -- one of the bases for standing was

20    Texas' driver's license law adopted the federal definition of

21    people being lawfully present.  And that made them eligible for

22    subsidized driver's licenses.  That was the basis for the

23    State's injury.

24         And that was upheld by the Fifth Circuit in the DACA

25    ruling of November 2015, which was the precursor to the DACA

1    ruling.

2         So they did not find that Texas was somehow wrong in

3    adopting the federal definition of lawful presence for issuing

4    its driver's license.  In fact, it said it was required.  It

5    could not adopt its own classification of who was lawfully

6    present or not.

7         So that is different from what Texas is doing here

8    where it also adopts the federal definitions of unlawful entry

9    and reentry for purposes of the provisions in SB4.

10        There's also the -- when the law expressly

11   contemplates concurrent regulation with states and localities,

12   that ends the matter and there's no field prevention.  That was

13   the Fifth Circuit last year in National Press Photographers

14   versus McCraw.

15        And so the examples that we listed of Texas being able

16   to enforce pursuant to the federal provisions, enforce federal

17   prohibitions of aliens entering the country, smuggling,

18   et cetera, those show that this is not field-preempted.  There

19   is a role for states and that takes it out of field preemption

20   and that's why we have to look at whether there's an actual

21   conflict with what SB4 does.

22        THE COURT:  You're making me dizzy, moving that thing

23   around.

24        MR. TEBO:  Sorry, it's an old habit.

25        So in the Kansas versus Garcia case from the Supreme

1    Court in 2020, they said that the conflict must be with the

2    federal statute, not with federal enforcement priorities or

3    discretion.  So a lot of what the federal government has argued

4    is -- now, this would apply in the, in the field -- their

5    arguments are more appropriate to the field preemption

6    argument, that somehow something should be field-preempted

7    if -- you know, it just can't be anything outside of the

8    federal purview of discretion and enforcement.

9         But when you get to conflict preemption, that is not

10   the case.  And it is not relevant what the executives

11   enforcement priorities or discretion is, whether the State of

12   Texas may have it different.  Because preemption is, by the

13   Congress's statutes, the supremacy clause does not apply to the

14   president's desires or the enforcement priorities.  It applies

15   to treaties, statutes, and the Constitution.

16        And as I said, your Honor, there's no conflict here

17   with all the provisions of -- the protective provisions for

18   aliens.  You know, they can raise preemption as a defense in

19   state court.

20        The declarations we have in this case show that we in

21   no way stiff arm any federal immigration authorities.  If

22   someone has to have a criminal fear interview, federal

23   immigration authorities have an open door to come into Texas

24   Department of Criminal Justice facilities at any time.

25        If they need to go somewhere for a hearing, the

1   incarcerated person, we will take them there.  If there was --

2   if they have a video call that they need to be on for those

3   purposes, if they need a form, we help them.  If they need

4   lawyers to access them, they're allowed to do it.

5          There's no evidence that SB4 is going to operate any

6   differently from all the other cases where illegal aliens are

7   in Texas custody and are available to avail themselves of all

8   the protections of federal immigration law.

9          The U.S. also says that state courts are, under SB4,

10  are violating the Fifth Circuit, the en banc pluralities

11  opinion in the Farmers Branch case, which was from 2013, and

12  said that state courts that involved a city ordinance that said

13  that state courts would make their own determinations about

14  whether someone was lawfully present, and it did give a

15  presumption to the federal determinations, but it was not

16  required to adopt it.

17         But in this case that does not apply to SB4.  There is

18  nothing in SB4 that says that state courts make an independent

19  determination of any federal determination as to -- if someone

20  has, say, asylum or any other sort of lawful status or lawful

21  presence, I should say, under any sort of provision, whether it

22  be the Secretary of Homeland Security's consent to them not

23  being subject to removal and the like.  And so that does not

24  apply here.

25         The federal government also says that the -- it makes

1    the point that if Texas removes people under the orders to

2    return, that that cuts short any asylum claims.

3          Now, there is a provision in SB4 that says a

4    prosecution under SB4 shall not be abated because of a pending

5    asylum claim.  We saw the status determination by the --

6          THE COURT:  That was something I found very

7    troublesome and very problematic.

8          MR. TEBO:  But what I would say, your Honor, is --

9          THE COURT:  I'll give you an opportunity, Counsel.

10   I'm sorry.  On the -- I want you to know where my concern is.

11         On the one hand you've said, well, you know, the DPS

12   says I'm going to do this and some other people who said

13   they're going to do that, and we would expect Texas to abide by

14   all of the general rules of law that Texas normally abides by.

15   And that's all well and good.

16         But then you have this provision in the statute itself

17   which says that the law shall not -- prosecution shall not be

18   abated.  You know what the word abated means, of course, by

19   federal considerations, and it just slaps the federal

20   immigration law right in the face.

21         MR. TEBO:  This is what I would say, your Honor.

22         THE COURT:  It's a hard provision to defend, Counsel.

23         MR. TEBO:  This is what I -- but that does not have

24   any relevance to the return orders, the orders to return,

25   because the prosecution has already ended.

1          So when this says the prosecution shall not be abated,

2    the prosecution ends upon conviction, sentencing.

3          THE COURT:  Well, let's assume here that you have --

4    someone who is arrested under SB4, they're brought before a

5    state judge and they say, well, Judge, I have a credible fear

6    of torture and/or whatever for whatever reason and here's my

7    evidence, and the judge says, well, I -- and their lawyer says

8    this prosecution needs to be abated so that this stopped so

9    that this individual can present their claim to the federal

10   government.  And the state judge says, I'm sorry, I'd like to

11   do that, but I can't because the law says it shall not be

12   abated.  You're going to trial.

13         MR. TEBO:  Your Honor, but I think that's how

14   prosecutions for state crimes already occur with illegal

15   aliens.  So just because someone has an asylum claim does not

16   mean they get out of, you know, being convicted for a state

17   crime.

18         THE COURT:  Yes, but we're not talking here about

19   somebody being charged with an independent state offense such

20   as burglary or drunk driving.  We're talking about somebody

21   who's been picked up for the sole reason that they are in the

22   United States illegally.

23         And Texas has caught them, some DPS official has

24   caught them crossing the border, grabs them, brings them in,

25   finds out this is the second time.  He gets indicted under SB4,

1　　and they get caught; trial.

2　　　　　　Now, there may be other reasons, but let's just assume

3　　that's it.  And the judge is going to have to say, well, you're

4　　either going to have to ignore that abated clause, or the judge

5　　is going to have to push forward and say, sorry, you're going

6　　to get prosecuted, and they get prosecuted.

7　　　　　　I mean, there's just no way to get around it.  It just

8　　says what it says.

9　　　　　　MR. TEBO:  Your Honor, it does say that, that the

10　　prosecution shall not be abated, but it does not in any way

11　　prevent people from applying for any of these sort of

12　　discretionary reliefs.

13　　　　　　THE COURT:  Why would they do it?  Why would the state

14　　legislature put that language there if they didn't mean it?

15　　　　　　MR. TEBO:  I'm not saying that they didn't mean it,

16　　your Honor.  I'm saying that the effect of it --

17　　　　　　THE COURT:  What's the purpose of it?

18　　　　　　MR. TEBO:  The effect of it is that, you know -- well,

19　　for example, asylum claims are really backed up and they take

20　　years.

21　　　　　　So, you know, if it was permitted -- like, well, if

22　　we're not going to prosecute you for the independent state

23　　crime of entering Texas, right, it's a state law crime, we're

24　　not going to prosecute that because you have a pending asylum

25　　application with the federal government that's going to take

1    years.  So you're just free to go and we're not going to

2    prosecute you.

3            Now, they're not being sent back to the country that

4    they're claiming that they are being persecuted in.  They're in

5    a Texas prison.  So there is, I guess, no safer place from, you

6    know, your home country persecuting you if you're in the walls

7    of a Texas prison.

8            THE COURT:  But the problem here is that the Texas

9    crime is being here in the United States.

10            MR. TEBO:  It's entering Texas.

11            THE COURT:  Okay.  All right.  The Texas crime is

12    entering the United States, which federal law says they have a

13    right to do if they are -- if they meet certain federal

14    criteria, limited though it may be, certain federal criteria.

15            For instance, if we have somebody who is -- been

16    tortured, verifiably tortured because of their political views,

17    they're threatened with imminent execution, and they come and

18    they're literally buzzing into the United States, to avoid that

19    happening, they get arrested because they are unlawfully in

20    Texas, they get brought before the state judge.

21            The state judge -- they say, wait a minute, I have an

22    asylum claim here.  And your explanation is, well, they can't

23    abate it because there's a big backup on these asylum claims.

24    So they go to jail.

25            MR. TEBO:  Well, I would say they don't abate the

1    prosecution for the process, if there was a determination that

2    someone is entitled to asylum or some other sort of relief.

3    They would have a preemption defense even if that is not in

4    SB4.

5              THE COURT:  It's not in SB4.

6              MR. TEBO:  It doesn't have to be in SB4, your Honor.

7              Preemption is a defense.  Preemption by federal law is

8    a defense to prosecution, and the Texas courts construe state

9    law to be consistent federal law.

10              THE COURT:  No, that's exactly what you're arguing.

11   You're saying this law is preempted.

12              MR. TEBO:  Right.  But I'm saying that Texas courts

13   interpret state law to be consistent with federal law, and

14   that's why, for example, we don't prevent anyone in our custody

15   from accessing the federal immigration relief.

16              THE COURT:  But the prosecution can't be abated.

17              MR. TEBO:  Right.  You can be prosecuted, but that

18   doesn't mean that you are going to be removed from the country,

19   which is beyond the prosecution.

20              THE COURT:  So you say --

21              MR. TEBO:  That's right, your Honor.

22              But if you have a defense, if you have a defense -- if

23   you have a defense based on -- so if what the federal -- if the

24   relief that the federal government has given you would make it

25   so that you would not -- that you did not illegally enter the

1    United States, if there was some sort of relief granted by the

2    Secretary of Homeland Security, for example, which has been

3    brought up by the United States, that would be a defense.  You

4    could raise that as a defense because it is piggy-backed on the

5    federal law, and that is part of federal law.

6            THE COURT:  Okay.  I think you have made the best

7    argument that you could possibly make.

8            MR. TEBO:  Your Honor, one other point I would like to

9    make on this is --

10           THE COURT:  I wish you had been in the state

11   legislature and drafted the statute.

12           MR. TEBO:  Your Honor, there is a severability clause.

13   So if your Honor would find some of these provisions to be

14   preemptive, that would -- you know, the severability clause

15   should be honored, and -- including any applications.  You

16   know, it's a very broad severability clause; not just

17   provisions of the law, but applications of the law.  And so I

18   would ask that your Honor consider that.

19           THE COURT:  I'm aware of the severability -- believe

20   me, I've read this statute, I can't tell you how many times,

21   and I have read all of your papers.  I want to make that clear.

22   Because some circuit judges seem to think that I don't read the

23   papers, but anyone who's been before me knows better than that,

24   including yourself, Counsel.  Thank you for nodding yes.

25           And I mean, you did a thorough job.  There's no

1  question about it.

2          MR. TEBO:  Could I talk a little bit more?

3          THE COURT:  Yeah.

4          MR. TEBO:  Okay.  So the foreign -- the dormant

5  foreign commerce clause claim that the United States brings --

6          THE COURT:  I know it's over, but I'm going to give

7  them a few more minutes.

8          MR. TEBO:  It's a novel argument.  Besides its

9  novelty, I think the biggest problem with it is -- you know,

10  the dormant commerce clause does not apply if Congress has

11  affirmatively spoken on the issue, right.

12          And the federal government has said that there is no

13  market, there is no commerce in -- these are illegal

14  transactions, so illegal aliens.  The federal government can

15  prohibit commerce under its commerce clause power.  If this is

16  commerce, if the flow of people is commerce, then the federal

17  government has prohibited it.

18          We are not prohibiting anything that the federal

19  government has not already prohibited.  We are piggy-backing on

20  the definitions of when someone's making an unlawful entry into

21  the United States, that the federal government has

22  affirmatively acted with, according to its commerce power,

23  assuming that that's the basis of what they're talking about.

24  Therefore, the dormant foreign commerce clause would not apply.

25          It does not apply to an unlawful black market.  It's

1    something that the federal government itself has made unlawful.

2    It said there is no market in the traffic of human beings

3    across the border of the United States and Mexico.

4           Even under the Piazza Seafood Test of the Fifth

5    Circuit, it said that even if the Court were to find that there

6    was a discrimination against foreign commerce, it would be

7    upheld if it serves a legitimate local purpose that could not

8    be served adequately by responsible nondiscriminatory

9    alternatives.

10          This is as direct as possible.  If the unlawful -- if

11   the legitimate local purpose is preventing people from

12   unlawfully coming into Texas, the most direct way is to

13   prevent -- is to make it unlawful for that conduct to occur.

14          THE COURT:  This is basically Governor Abbott's

15   argument, and he's been joined by several other governors and

16   many congressmen.  We've had an amicus brief from some

17   Republican Congress members in this case.  It's not enjoined by

18   many others, but it's enjoined by some, that the federal

19   government isn't doing its job in immigration.  That's

20   basically what you're arguing.

21          MR. TEBO:  Your Honor, I believe a majority of the

22   nation's governors has endorsed Texas' position.  A majority of

23   governors, a majority of the attorneys general in the country,

24   and --

25          THE COURT:  In this case?

1          MR. TEBO:  Not in this case, your Honor.  I'm talking

2     about there's a letter of support and --

3          THE COURT:  I don't know -- where is that at?

4          MR. TEBO:  It's cited in the brief.

5          THE COURT:  I know it's cited, but I didn't get a copy

6     of it.  Look, I'm not going to decide this case based on --

7          MR. TEBO:  That's right, your Honor.

8          THE COURT:  -- predicated on what a particular

9     attorney general in some state says is good or isn't good.

10    That's just not the way we decide cases in the federal court

11    system at any level.

12          You're kind of over, even in my overgenerous -- is

13    there anything else?

14          MR. TEBO:  Your Honor, I would also say that the

15    organizational plaintiffs, they do not have Article III

16    standing for the reasons that we explained.

17          THE COURT:  Yes, I'm familiar with that argument.

18    I've looked at it very carefully.

19          MR. TEBO:  And they also do not have a cause of

20    action.  Judge Cardone in El Paso had an on-point ruling.  This

21    was a challenge to a Texas immigration policy where Judge

22    Cardone found that the immigration advocacy groups did not

23    have -- they were making a preemption claim, supremacy clause

24    claim, just like here, and she found that they did not have

25    Article III standing because it was a preenforcement facial

1    challenge to a law that had not gone into effect.

2           So therefore, it was under the test of Susan B.

3    Anthony List versus Driehaus where the plaintiffs had to show

4    that they had a constitutional -- a constitutionally protected

5    interest, that they were possibly subject to being prosecuted,

6    and that their conduct was arguably covered by the law.

7           THE COURT:  I'm sorry, I'm going to look at that very

8    carefully, but there is no question -- I will tell you right

9    now there's no question in my mind that the United States has

10   standing there.

11          MR. TEBO:  We're not challenging the United States'

12   standing.

13          THE COURT:  I know that.  So one way or the other

14   we're going to get to the merits.

15          MR. TEBO:  Yes.  Although, your Honor, I would say on

16   the issue of the cause of action, the United States has said

17   that --

18          THE COURT:  You're getting notes here.

19          MR. TEBO:  Your Honor, I do want to say the letter of

20   support that I mentioned is at footnote 15 of our brief.

21          THE COURT:  Yes, I remember that.  It's stuck in the

22   footnote.

23          MR. TEBO:  But I would say that on the cause of

24   action, United States has said that, well, the -- we bring

25   these cases and no one challenges -- you know, it's not

1    rejected on the basis of cause of action.

2            But if it's not litigated, if it's not an issue,

3    that's not a jurisdictional element.  So like, you know, it's

4    forfeitable, it's waivable.  Just because it was not brought up

5    does not mean that that case stands for the proposition that

6    the United States did have a cause of action.

7            So, for example, they said in Arizona versus United

8    States that was not at issue in the case.  But they can't bring

9    an action under Ex parte Young.  The federal government says,

10    well, that's just not true.

11            We cite the Supreme Court cases that say it's a -- Ex

12    parte Young is a very limited exception that creates a cause of

13    action in favor of private individuals to sue state actors for

14    violating federal law.

15            But they say -- they do cite the Virginia Office for

16    Protection and Advocacy versus Stewart.  That's a 2011 Supreme

17    Court case.  That's where one state agency was suing another.

18            But that case -- so Ex parte Young has two aspects to

19    it, and this particular law, it's the Fifth Circuit case law.

20            There is one, the exception to sovereign immunity, the

21    Ex parte Young gives.  The other is whether there's an

22    equitable cause of action created.  Those are two separate

23    issues.

24            And the Virginia Office for Protection and Advocacy

25    case that they cite on behalf of having a cause of action under

1    Ex parte Young did not address cause of action at all.  It was

2    only about the exception to sovereign immunity, whether a

3    state -- a state needs to be suing another state agency under

4    Ex parte Young was somehow -- it violated the sovereign

5    immunity of the State of Virginia, and they said that it did

6    not.

7            THE COURT:  Well, the federal government has sued

8    states in numerous cases and there's never been a suggestion

9    that they lack standing with the authority to do so.

10            Now, let me say this.  If they were seeking monetary

11   damages from the state, which they are not; what they're doing

12   is they're seeking injunctive relief.  That's why we're here.

13   It's a preliminary injunction.

14            Anything else, Counsel?  You covered this in your

15   papers very carefully.

16            MR. TEBO:  I did, your Honor.

17            THE COURT:  That board you've got, you're moving

18   around.  I wish the Court of Appeals could see this board

19   spinning around in front of me.

20            MR. TEBO:  Yes.  Your Honor, I think we've covered

21   pretty much everything.

22            THE COURT:  I think so, too.  As usual, Counsel, you

23   do a great job, and you've done a thorough and careful job of

24   arguing this case, and I do understand your arguments.

25            I have reviewed the papers here, and so this Court is

1   not going to be making any flippant decisions predicated on

2   some minute area that you may have covered in your papers but

3   not covered in oral argument.  I can assure you that.

4           MR. TEBO:  Your Honor, I would just ask that if the

5   Court does enter a preliminary injunction, that it stay any

6   grant, pending appeal.  I'm just making that request.

7           THE COURT:  The Attorney General of Texas has no

8   problem at all finding its way from wherever you're located

9   here in Austin over to the federal court.  You know, the one

10  thing that is always -- that is always -- in fact, there's an

11  article about it, about the so-called administrative stays that

12  courts of appeals issue.

13          Theoretically, a stay is supposed to maintain the

14  status quo until the merits of the case can be heard by the

15  Court of Appeals.

16          It's always -- it's somewhat paradoxical that you can

17  have an administrative stay entered where a law has not gone

18  into effect, which there's no -- before there was no law,

19  right.

20          So that's -- status quo is the law that's not in

21  effect.  They entered the administrative stay which then allows

22  the law to go into effect, which is kind of not maintaining the

23  status quo.  And this is exactly what happened in, not just

24  buoy cases, put that aside, but Judge Albright ruled on the

25  case -- I think it's still under review.

1              MR. TEBO:  The Book People case.

2              THE COURT:  The Book People case or whatever it is.

3              Anyway, that law wasn't in effect.  The Fifth Circuit

4    issued an administrative stay, which then allowed the law to go

5    into effect.

6              A three-judge panel then decided the law was

7    unconstitutional.  I think Judge Willett might have written

8    that opinion.  Am I right?

9              MR. TEBO:  That's right, your Honor.

10             THE COURT:  And so the law -- for a period of time an

11   unconstitutional law was in effect because of the

12   administrative stay.  So it changed the -- and people are

13   rushing around trying to comply with the law.

14             So I don't know, where is that case now?  Is it --

15             MR. TEBO:  I believe that the -- I'm not personally

16   involved in that case, but I'm aware of it.

17             The mandate has been held by someone on the --

18             THE COURT:  So it may be going en banc.  So we don't

19   know.

20             MR. TEBO:  It may be going en banc.  I know that the

21   State of Texas did not file a petition for en banc review.

22             THE COURT:  They can do it themselves.  The judges of

23   the Court appeals --

24             MR. TEBO:  My understanding is that sometimes they

25   just -- you know, they want more time to review it and have a

1    negotiation.

2              THE COURT:   Sure.   As counsel knows, because I know

3    counsel, I hold the record for the most designated sittings on

4    the Ninth Circuit since it began in history.   I believe in the

5    appellate process.   And I believe in the Fifth Circuit Court of

6    Appeals.

7              And then some judges may not believe in me, but I've

8    been affirmed by every judge that wrote an opinion in the --

9    that was not all that kind, in the buoy case where they

10   received a mandamus, which the Court denied.

11             But I respect those judges and I respect Judge Ho.   I

12   respect all of those judges.   I don't have a problem with those

13   judges at all.   It's not my task here, and I don't rule

14   predicated on it.

15             The reason I mention Judge Ho is because he addressed

16   in his dissent, in a totally different case, the issue of

17   invasion, to some degree was citing Madison and going into

18   great detail.

19             So I wanted to give the parties an opportunity to

20   address it, because unless Judge Ho is going to change his

21   views all of a sudden, that may be something that gets

22   addressed on appeal.   That's why I wanted you to have the

23   opportunity to address it.   Not because I don't like Judge Ho.

24   He may not like me.   I don't know.

25             MR. TEBO:   I'm sure that's not the case, your Honor.

1              THE COURT:  I really don't have a problem with him.

2              MR. TEBO:  I would advocate that the Court closely

3       read Judge Ho's opinion on the invasion clause.

4              THE COURT:  Don't worry, I've read it.  And so have a

5       lot of judges around the country.  I've heard from a lot of

6       court of appeals judges and other judges about that whole

7       situation, but that's neither here nor there.

8              All right.  We're going to take a very short recess,

9       because we -- I gave you a lot more time than I would have

10      normally, because I did ask you questions, and in fairness, I

11      wanted you to have a full opportunity.  Do you feel like --

12             MR. TEBO:  I appreciate it, your Honor, yes.  I

13      appreciate your questions.  I don't want you to feel like your

14      questions were a distraction from anything, and obviously, I

15      want to answer your questions.  That's the most important thing

16      I can do up here.

17             THE COURT:  Well, thank you so much, and I appreciate

18      that.  So we're going to take a five-minute recess.  There's a

19      lot of people who are jiggling around in the audience, I think

20      might need to use the restroom.  So we're going to take a

21      five-minute recess so people can use the restroom, and give my

22      court reporter a break.  We've been going for quite awhile.

23             And then we'll come back and I'll hear from the

24      government.

25             (Recess was taken.)

1          THE COURT:  All right, Counsel.

2          MR. BOYNTON:  Thank you, your Honor.  My friends have

3    told me they're going to give me five minutes of their rebuttal

4    time to add to my own.  I'm not sure I'm going to need it.  But

5    I think that gives me at least 15 minutes.

6          THE COURT:  You do.

7          MR. BOYNTON:  Okay.  Thank you.

8          So to start off, Texas has suggested that this case

9    shouldn't proceed because in individual prosecutions under SB4

10   the defendant can raise a preemption defense, and therefore,

11   try to avoid their conviction.  If they lose in Texas courts,

12   they can take it all the way to the Supreme Court, eventually.

13         That's true all the time, federal law is supreme.

14   That was true of the statute in Arizona that was being

15   challenged.

16         THE COURT:  Now, I want to make it very clear that I

17   was not in any way -- and I don't think counsel took this to be

18   the case -- denigrating Texas' position when counsel -- your

19   opposing counsel and I were talking about the issue of

20   abatement of the prosecution, and I said, you know, yikes.

21   Because yikes, not -- I was not referring to the merits.

22         I was referring to the question of how do we

23   determine, you know, which judge abates what.  And that's an

24   issue.  It's an issue.

25         Go ahead.

1        MR. BOYNTON:  Yes, your Honor.  And one of the related

2   arguments that Texas seems to be suggesting is that even though

3   SB4 doesn't say anything about having a process to allow people

4   to raise the kinds of asylum and withholding claims that they

5   could under federal law, that maybe there's a way for them to

6   do that under SB4 that should be read in or could be read into

7   the statute.

8        Federal law is very clear that there cannot be a

9   parallel state removal system.  And there's a provision we cite

10  in our brief that I wanted to just point out here because it's

11  so directly on point, and that's 8 U.S.C. 1229a, a3.

12       It says, "Unless otherwise specified in this chapter,

13  a proceeding under this section shall be the sole and exclusive

14  procedure for determining whether the alien may be admitted to

15  the United States, or if the alien has been so admitted,

16  removed from the United States."

17       So that provision completely forecloses the idea that

18  there could be some parallel state procedure regarding whether

19  someone entered properly and about removal of individuals.

20       The other argument Texas seems to make is that perhaps

21  if someone was successful in obtaining asylum after they've

22  been convicted, that that might be a defense under SB4.  They

23  seem to concede that people aren't going to be able to obtain

24  asylum before they're convicted.  Counsel noted the very long

25  backlog for adjudicating asylum claims in the federal system.

1          But they suggest that perhaps if someone applies for

2     asylum from state jail, obtains asylum, that that might be a

3     defense.

4          THE COURT:  Well, that was my -- that was the basis of

5     my comment.  I wasn't -- I mean, I'm trying to figure out how

6     this would work, because if someone -- let's assume someone, as

7     we were discussing, as I was discussing with your able opposing

8     counsel, someone has a real credible fear of continued torture,

9     someone has been -- is running away from, you know, some

10    situation where -- let's say the immigration courts of the

11    United States would clearly find them to be eligible for

12    asylum, and they find themselves in the state system.

13         The state system says there shall be no abatement of

14    the prosecution.  The person says, well, I have this credible

15    fear, but then the state, as state counsel pointed out, there's

16    this huge backlog, which is the reason why they put this no

17    abatement in here.  So what is the state judge supposed to do

18    under those circumstances?

19         They're faced with two conflicting problems.  They've

20    got a federal situation which says that a person has the right

21    under federal law to raise, as a defense, deportation, a

22    credible fear of torture and other things, that we allow them

23    asylum, and yet the state law provides that there should be no

24    abatement of the prosecution.

25         And that -- my comment was how do you work this out?

1    I mean, I can't imagine some state judge sitting there going,

2    yikes, what do I do?  What do I do?  Do I follow the federal

3    law or I do follow the state law?  If I follow the state law,

4    then I'm going to be violating federal law.  If I violate the

5    federal law, then I may be violating the state law.  What in

6    the world do I do?

7         It is a quandary of some proportion, and that was my

8    comment.  And counsel's -- I mean, the state counsel, able

9    counsel, said, well, the problem -- the reason that's there is

10   because there's this huge backup of asylum.

11        Well, you're right, there is a backup, but in the

12   meantime the guy gets convicted for just being in Texas

13   illegally, which you say they can't do and -- under this law,

14   and goes to jail.

15        And they might have an asylum claim that would give

16   them the right to not be convicted, because they wouldn't be in

17   the United States illegally if they were entitled to asylum,

18   right.

19        MR. BOYNTON:  So it's correct --

20        THE COURT:  That's the problem.  You get -- you go

21   around in a circle here.

22        MR. BOYNTON:  We agree, your Honor, that there is an

23   intractable conflict between federal law and SB4 on this issue.

24        And to take it even a step further, after the person

25   completes their sentence, they're then facing the Texas SB4

1    removal order.  And if they don't comply with that order when

2    they are delivered to the port of entry, they somehow run off,

3    they can be convicted under SB4 for violating the removal order

4    and they face up to 20 years of further imprisonment for

5    violating that removal order.

6          Now, there was a back-and-forth about what's going to

7    happen at the port of entry when a Texas State law enforcement

8    official brings the person to the port of entry, and counsel

9    talked about the Escalon declaration.  The key paragraph is

10   paragraph 15 of the Escalon declaration.  There are two things

11   that are quite notable about that paragraph.

12         First, it says that the -- Texas is not going to

13   regard the removal order as having been effectuated unless the

14   person actually crosses over the border to the Mexican side.

15   There's no suggestion that they can just go to the port of

16   entry and then decide not to cross and have discharged the

17   removal order.

18         It further says that that's the case even if Mexico

19   refuses to accept the person.  The Escalon declaration says,

20   "If Mexican authorities do not accept the entrance of an alien

21   subject to an order of return, the officer is then going to

22   escort them to the POE."

23         And then it says, "Upon witnessing the alien cross to

24   the Mexican side of the international bridge, the officer will

25   consider the alien to have complied with the return order and

1    will cease monitoring the alien."

2        So as I read that, it's crystal clear that Texas is

3    going to make people return to Mexico under these orders or

4    face further prosecution, and that's the case even though they

5    might have valid protections under federal law that would

6    prevent their removal from the United States.

7        There was some discussion of Texas' prosecution of

8    noncitizens for trespass under state law.  We have -- the

9    United States has not brought an action challenging Texas'

10   abuse of state trespass law.

11       There are distinctions there with SB4 that are

12   important.  That's not a criminalization of the actual act of

13   crossing the border.  It's a criminalization of conduct that

14   occurs in Texas in the United States.  It's obviously quite

15   close in time but it's analytically distinct.

16       Additionally, when Texas convicts someone for a state

17   trespass law violation, they don't then issue a removal order

18   forcing the person to leave the country and go back to Mexico.

19       So that scenario is quite different from the scenario

20   that we're facing here.

21       We had some discussion about field preemption with

22   opposing counsel where he argued that the INA expressly gives

23   state law enforcement authority in some situations to assist

24   the federal government.

25       Now, the argument from Texas is that because there are

1    these provisions, there necessarily can't be field preemption.

2    But there's no basis for that contention.

3          We would agree that if the INA said states can

4    legislate in an area, then there wouldn't be field preemption.

5    But simply saying that state law enforcement officials can help

6    with enforcement is not giving states free reign to enact

7    legislation like they've done in SB4.

8          There's also some discussion of the Kansas versus

9    Garcia case, and that's the case that was dealing, in relevant

10   part, with conflict preemption.  Texas relies on it for the

11   proposition that a parallel state law is not conflict

12   preemptive because it's parallel to the federal law.

13         That is what the Court concluded in Kansas in the

14   situation of that case.  But that was a very different case

15   from Arizona.  That was a case where the laws at issue were

16   laws of general applicability.  Kansas was prosecuting under a

17   general identity theft law and a fraud law.  The analogous

18   federal law was a law about misstatements in employee

19   withholding forms.

20         These were not immigration law violations that were

21   being prosecuted, and that makes a critical difference.

22         It was the fact that immigration law was at issue that

23   caused the Supreme Court in Arizona to say that the parallel

24   Arizona alien registration law not only was field-preempted but

25   also actually conflicted with the federal statute because it

1 interfered with the federal discretion to enforce immigration

2 law.

3       The Court explained that because of the foreign

4 affairs implications, that state enforcement of even a parallel

5 immigration law causes a conflict.  So the situation here is

6 like that in Arizona and not like the situation in Kansas.

7    I'm not going to reopen the invasion clause issue as I

8 think we've discussed that sufficiently, but there was one

9 adjacent point that I wanted to touch on.

10    Counsel argued that even if you're not willing to go so far

11 as to say that the invasion clause applies here, the

12 Constitutional Avoidance Doctrine ought to kick in and cause

13 the Court to interpret the INA in a way that avoids the alleged

14 constitutional violation.

15    There are at least two problems with that argument.  One is

16 that the Avoidance Canon applies only when there's ambiguity in

17 a law, and here there's no ambiguity in federal law.

18    The provision I started off this rebuttal reading to you

19 could not be more clear, that the State cannot have their own

20 parallel system for removing noncitizens from the country.

21    Additionally, even under Texas's telling, there's not a

22 violation if the INA displaces SB4.  There's not a

23 constitutional violation.  And that's because the provision of

24 the Constitution we're talking about is a general restriction

25 on states engaging in war.

1          Now, there's an exception to that restriction in the case

2     of an invasion, but the clause itself is taking away the power

3     from the states.  So it's not in violation of the clause if

4     there is some federal legislation that still governs when a

5     state is engaging in war for the purposes of that clause.  And

6     that's the argument we've been making in the invasion clause

7     context, that it wouldn't displace federal law that is

8     otherwise applicable.

9          All the invasion does, if you had an actual invasion, is

10    remove the constitutional restriction on states engaging in

11    war.

12         We had some discussion about the foreign commerce clause,

13    and counsel made one point that I just wanted to address.  He

14    argued that if you have a state law that is parallel to the

15    federal law, then that doesn't violate the foreign commerce

16    clause.

17         We don't think that's correct.  The Piazza seafood case

18    that we've been talking about addresses this exact issue and

19    says that just because the state law is in harmony with the

20    federal law, if it is a discriminatory law and it's regulating

21    foreign commerce, then it violates the foreign commerce laws.

22              THE COURT:  Well, they take -- the State takes issue

23    with the question of whether individuals crossing the border

24    illegally are foreign commerce.

25              MR. BOYNTON:  Correct, your Honor, and we think that

1　that argument is misplaced.

2　　　　We think that there is sufficient authority saying

3　that the movement of people is itself commerce or affects

4　commerce.  And the fact that it's unlawful movements of people

5　doesn't negate the fact that it's commerce.

6　　　　There's all sorts of unlawful commerce that the

7　federal government regulates, right.  All the drug laws and gun

8　laws are based on the commerce clause authority, and that's all

9　conduct that is unlawful as a matter of federal law.

10　　　　And so if you had a state law that is discriminatorily

11　regulating and it's something that violates federal law, it's

12　still a foreign commerce clause or dormant commerce clause

13　problem.

14　　　　THE COURT:  Of course there are individuals who do

15　cross the border not through a port of entry -- or even through

16　a port of entry, actually, but let's assume not through a port

17　of entry, who are entitled to asylum.  And while they may have

18　crossed in an inappropriate way, they are entitled to asylum,

19　so they haven't committed a crime.

20　　　　MR. BOYNTON:  You are correct, your Honor, that

21　they're still entitled to --

22　　　　THE COURT:  Committed a state crime, that's the issue.

23　　　　MR. BOYNTON:  Yeah, they've actually committed a

24　federal crime to -- the unlawful crossing between ports of

25　entry is still a violation even for someone who's entitled to

1   asylum, but the asylum prohibits their removal.

2           THE COURT:  That's right.  So they committed a crime

3   but they don't get removed.

4           MR. BOYNTON:  Correct, your Honor.

5           THE COURT:  And usually the prosecution then gets

6   abated, which, you know, they don't get prosecuted.

7           MR. BOYNTON:  So the final point I'd like to make is

8   we are facing a March 5 date when this law -- unless the Court

9   acts -- this law would come into effect.  We would urge you to

10  rule on this case as soon as you can.  It seems evident that

11  there will be further appellate proceedings regardless of how

12  you come out on this issue.

13          THE COURT:  You know, I got blasted for doing that by

14  the Court of Appeals, some judges on the Court of Appeals, for

15  rushing a ruling.

16          MR. BOYNTON:  I would urge you to work carefully and

17  thoughtfully, but after you have fully considered the issues,

18  to issue an opinion as quickly as reasonably possible.

19          THE COURT:  Counsel, we don't start with the

20  arguments, oral arguments.  The Court prepares for oral

21  argument, looks at the papers, carefully reviews the law before

22  oral argument.

23          It isn't like I come in here and then I'm going to go

24  run back and say, Gee whiz, what did they say in their papers?

25  No.  The Court has clearly and unequivocally, I can assure you,

1   it's had a running start on this.

2            And, you know, look, every ruling that any federal

3   judge makes in an area like this is going to be appealed,

4   regardless of who the judge is.  I am no Oliver Wendell Holmes,

5   okay, but if Oliver Wendell Holmes was sitting here and made a

6   decision in this case, Oliver Wendell Holmes would be appealed

7   in the Fifth Circuit, okay, guaranteed.

8            So I only say that because my good friend over here

9   raised Oliver Wendell Holmes, and I do not equate myself with

10  Oliver Wendell Holmes; please.  I don't want somebody to

11  suggest that.  But it doesn't make any difference.

12           It could be Benjamin Cardozo making this ruling and it

13  would go to the Fifth Circuit, regardless of how he ruled.

14           And that's the way it should be, okay.  That's why we

15  have public courts.  That's why we have levels of appeal.  So

16  in important cases like this, we have more than one judge

17  making the ultimate decision.

18           It has to start some place.  I am the finder of fact,

19  but much of this is law.  And so the Court of Appeals will have

20  a broad brush opportunity to look at this, and should -- and

21  should.  And it would not surprise me at all that this case

22  would find its way to the United States Supreme Court.

23           I currently have two cases that I decided, one in

24  which I was affirmed by a three-judge panel, and then the

25  three-judge panel was reversed or vacated by a en banc panel.

1            And another one because -- a case in which there was a

2     strong dissent.  It was an unpublished decision.

3            Both of these cases are currently, this term, before

4     the Supreme Court.

5            This case is much more important than either of those

6     two cases so this will go to the Supreme Court, I am pretty

7     sure.

8            MR. BOYNTON:  We agree this is a very important case,

9     your Honor, and we appreciate your attention to it.

10           The final point I'll make.  This, no doubt, goes

11    without saying, but we would oppose any motion for a stay

12    pending appeal in the event you were to grant the preliminary

13    injunction.

14           Texas has asked for a stay pending appeal, if there

15    were a preliminary injunction granted.  We would oppose that.

16    For all the same reasons, we think a preliminary injunction

17    should be entered in the first place.

18           THE COURT:  Well, I -- yeah, okay, I understand your

19    position.  Thank you very much.

20           MR. BOYNTON:  Thank you, your Honor.

21           MR. BALAKRISHNAN:  Your Honor, I will be mercifully

22    brief.  I know that it's been a long morning and I thank you

23    for your attention as do our clients.

24           I just want to make three very quick points.

25           First, there was some discussion by the State, you

1    know, both in argument and its briefs, about the projected

2    operation of the statute in practice.  I think -- you know, we

3    agreed with your Honor that what's important here is the actual

4    text and what the statute says that it does.  I just wanted to

5    point you to two sort of textual clues that show that --

6            THE COURT:  Well, if you know my late friend, Justice

7    Scalia, I was sitting on a panel with him and somebody said,

8    well, how the hell do you interpret it, and this and that, and

9    different people interpreted it differently.  And Justice

10   Scalia stopped him.  I mean, he literally put his hand up and

11   said, wait a minute.  You look at the text of the statute.

12   That's what you look at.

13           MR. BALAKRISHNAN:  I agree.  I think that's important

14   in this case, particularly in a preemption case.  I just wanted

15   to point you to just two textual clues that I think help

16   support a broader reading of the statute than maybe the State

17   is suggesting.

18           The first is the fact that the statute excludes

19   certain sensitive locations from enforcement of illegal

20   reentry.

21           THE COURT:  Yes, I'm sure --

22           MR. BALAKRISHNAN:  Right, which clearly shows that

23   it's meant to extend beyond the sort of limited -- very limited

24   border enforcement that the State declarants refer to.

25           The second thing I'd point you to is, of course, the

1  fact that it authorizes all peace officers to be enforcing the

2  law, and, of course, that extends beyond simply the Department

3  of Public Safety.

4       THE COURT:  Why don't you address something that I

5  think is important here, and that is your standing to bring

6  this for yourself and for your co-plaintiffs.

7       MR. BALAKRISHNAN:  Sure, of course.

8       THE COURT:  He raised Judge Cardone, a very good

9  friend of mine and excellent judge, by the way.

10      MR. BALAKRISHNAN:  I understand.  I mean, of course,

11 we disagree with that opinion.  And I think that the State's

12 position here is, I guess, wrong and inconsistent with

13 governing law at a number of levels.

14      I'll just sort of walk through them very quickly for

15 your Honor because they are also in our briefs.  I think as an

16 initial matter, this argument that you don't -- a private party

17 doesn't have sort of an equitable cause of action via Ex parte

18 Young raises the suspension clause claim is flatly incorrect.

19      You know, there is clear, on-point Fifth Circuit law

20 fairly recently, which we cite in our briefs, which has private

21 parties doing this exact thing.

22      I think second, the idea that you can't raise a

23 preenforcement suspension clause -- sorry, preenforcement

24 supremacy clause claim is belied by the number of cases that

25 have, in fact, done just that; also cited in our brief.

1           I think that, you know, at bottom, it seems that what
2   the State's argument is is that the only way you can do --
3   bring a preenforcement suit is if you meet the Susan B. Anthony
4   test.  But the Susan B. Anthony test is clearly designed for
5   instances where somebody could be a defendant in a civil or
6   criminal enforcement.  And it's designed around that, so it's
7   looking at whether you'll actually be prosecuted.

8           But of course, Havens standing, which is what the
9   nonprofit organizations here are moving under, falls completely
10  outside the Susan B. Anthony line of cases.

11          And again, you know, Havens itself, you know, the
12  Fifth Circuit, multiple district courts have analyzed
13  preenforcement claims brought by individuals and organizations
14  who are not themselves the directly -- that regulated parties
15  under -- outside of the Susan B. Anthony test.

16      I think all the cases are in our reply brief.  So I think
17  those threshold claim -- those threshold challenges that the
18  State's making are flatly incorrect and contrary to precedent.

19      I think, you know, if your Honor wants me to, I can go
20  ahead and also, sort of, explain why we meet the governing
21  Havens test for organizational standing.

22          THE COURT:  It's in your papers, I believe.

23          MR. BALAKRISHNAN:  Yes, it is, and I just wanted to --

24          THE COURT:  I read it.

25          MR. BALAKRISHNAN:  Okay.  I wanted to just --

1              THE COURT:  I can read it again.

2              MR. BALAKRISHNAN:  If your Honor has any other

3    questions, I'd be happy to run through those for you.

4              THE COURT:  I don't, no.  Your opposing -- I'm sorry,

5    co-counsel, I should say, the government, answered the question

6    that I was going to be asking.

7              MR. BALAKRISHNAN:  Okay.  Great.  I will just, very

8    quickly just -- again, the scope of like the Statute SB4 is

9    clearly broader than the State would make it appear to be, you

10   know, as evidenced by the use of the term "peace officers,"

11   which means it's not just DPS who's going to be enforcing it.

12   It's potentially any of the people who are identified as peace

13   officers under the Texas code, and their declarant is only

14   speaking for one such enforcement agency.

15             So clearly, that's insufficient limited --

16             THE COURT:  I read the law.  I mean, you could have a

17   constable somewhere, you could have a police officer, you could

18   have a state chair, you could have any peace officer -- any law

19   enforcement officer in the state of Texas, I believe, is

20   encompassed in this group.

21             MR. BALAKRISHNAN:  Yeah, absolutely.  You know,

22   there's been some discussion about how you interpret the

23   operation of a state removal order in the criminal statute.

24   We've addressed that specifically at pages 2 and 4 of our reply

25   briefly, so I point you to that.

1          And I think just the final point I'd like to make,

2     unless your Honor has any other questions for us?

3          THE COURT:  I don't think I do.

4          MR. BALAKRISHNAN:  There was a quick discussion of

5     sort of the history of immigration regulation in the United

6     States.

7          I just wanted to point out, you know, in our opening

8     brief at page 6, we've laid out the line of cases that

9     established for 150 years, essentially since the start of

10    comprehensive federal immigration regulation, the Supreme Court

11    has time and time again stated that control of entry into the

12    United States, removal from the United States is the sole and

13    exclusive providence of the federal government.

14         And that is a line of cases that is not only old, 150

15    years old, but also continuous.  It's never been broken since

16    that time and has been constantly reiterated by the Supreme

17    Court, and we think that that principle controls the result in

18    this case.

19         And with that, I thank you for your time, unless you

20    have any other questions.

21         THE COURT:  All right, thank you.

22         First of all, before we go any further, I want to

23    sincerely thank counsel for their preparation.  I was a trial

24    lawyer.  It's not easy to get up and argue a case like this,

25    either side.  And it's clear to me that counsel were carefully

1    and thoroughly prepared for today's argument, and I do

2    sincerely appreciate that from both sides.

3           I will never apologize or step away from asking

4    counsel questions where I have a question or a comment to be

5    made.  I recognize that when I do so, everything I say is on

6    the record here, and for the first time in my career, recently,

7    a couple of judges who were writing dissenting opinions from

8    the denial of a bond chose to pick out some things and they

9    quoted my comments at length, which is their right, and I have

10   no problem with that.  And I'm sure that there are things that

11   I may have said here today that can be picked out and

12   criticized.

13          My job is not to try to second guess what the judge on

14   the Court of Appeals may find appealing or unappealing in terms

15   of argument.

16          My job is to try to ferret out and ask questions.  And

17   I think counsel for the State put it best and the way I would

18   have put it as a trial lawyer.  I would rather have the judge

19   ask a question and have the opportunity to answer it than have

20   the judge sit there mute and not say anything and then try to

21   figure out what they might be thinking or not thinking.

22          And quite frankly, oftentimes I will ask a question on

23   something where I think I might understand what the State or

24   the Government is arguing and then get an answer which will

25   help redirect me.  And there were a couple of instances here

1  where the State did just that, and I appreciate it, and the

2  Federal Government did it on one instance.

3           May I also say that I have personally attended and

4  have read transcripts of Fifth Circuit argument, and I can

5  assure you the Fifth Circuit Court of Appeals judges are not in

6  any way, shape or form shy about aggressive questioning of

7  lawyers who argue before them.

8           And so I think that is part of our process.  It's why

9  we call it oral argument.  And I appreciate very much the fact

10  that we have good lawyers in this case, and you were extremely

11  responsive.

12           I also want to thank very much the ladies and

13  gentlemen in the audience here who have very strong opinions,

14  I'm sure, many of you, on the issues that we had here today,

15  but you comported yourself in a very professional way and did

16  not, in any way shape or form, cause any issues for this Court

17  or any of the court officers.

18           And I know how difficult it is sometimes to listen to

19  people say things that you don't agree with and you just want

20  to jump up and say something.  But you didn't do that, and I

21  thank you very much for respecting the dignity of this Court

22  and the right of various parties here to argue their positions

23  and not be troubled by any difficult problems you might have

24  otherwise.

25           I wish that was always the case.  I've never really

1    had big problems, but we had a problem in San Antonio when I

2    first got there where somebody jumped up apparently and started

3    misbehaving in the courtroom, and I'm very happy we didn't have

4    that here.  And I thank you very much for that.

5         I will try to get my decision out as quickly as I

6    possibly can, consistent with, as counsel put it, a thorough

7    and careful analysis of the arguments raised by each side, and

8    I will do that as quickly as I can.

9         I will try to do it in enough time, and I'm trying to

10   look at the State's counsel here, but I've got -- I will try to

11   do it quickly enough so that a stay wouldn't be necessary, so

12   that you'll have plenty of time before the law goes into effect

13   if you wish to go to the Court of Appeals so that we don't have

14   to worry about stays.

15        It doesn't go into effect until March the 5th, and so

16   I'm going to work really hard with my law clerks in trying to

17   get this out in sufficient time so that you have an opportunity

18   before the law goes into effect to get to the Court of Appeals,

19   either of you, whoever it is wanting to get there.

20        Thank you so very much.

21        And by the way, I hope your bosses know, from both the

22   United States Attorney General and the State of Texas Attorney

23   General, that you most certainly earned your income today.

24        The Court stands in recess.

25                        * * * * *

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF TEXAS

3

4      I certify that the foregoing is a correct transcript from

5  the record of proceedings in the above-entitled matter.  I

6  further certify that the transcript fees and format comply with

7  those prescribed by the Court and the Judicial Conference of

8  the United States.

9

10  Date signed:  February 21, 2024

11

12  /S/ Lisa A. Blanks

13  _____

14  Lisa A. Blanks, CSR, CRR, RPR
    Official Court Reporter

15  262 West Nueva Street
    San Antonio, Texas  78207

16  (210)244-5038
    lisa_blanks@txwd.uscourts.gov

17

18

19

20

21

22

23

24

25

# Exhibit J: ECF 42, Order Granting Preliminary Injunction

**FILED**

February 29, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ ps

DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | No. 1:24-CV-8-DAE |
| | § | (lead case) |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| STATE OF TEXAS, GREG ABBOTT, | § | |
| *in his official capacity as Governor of* | § | |
| *Texas*, TEXAS DEPARTMENT OF | § | |
| PUBLIC SAFETY , and STEVEN C. | § | |
| MCCRAW, *in his official capacity as* | § | |
| *Director of Texas Department of Public* | § | |
| *Safety*, | § | |
| | § | |
| Defendants. | § | |

| | | |
|---|---|---|
| LAS AMERICAS IMMIGRANT | § | No. 1:23-CV-1537-DAE |
| ADVOCACY CENTER, AMERICAN | § | (consol. case) |
| GATEWAYS, and COUNTY OF EL | § | |
| PASO, TEXAS, | § | |
| | § | |
| Plaintiffs, | § | |
| vs. | § | |
| | § | |
| STEVEN C. MCCRAW, *in his official* | § | |
| *capacity as Director of Texas* | § | |
| *Department of Public Safety*, and BILL | § | |
| D. HICKS, *in his official capacity as* | § | |
| *District Attorney for the 34th District*, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING PRELIMINARY INJUNCTION

Before the Court is Plaintiff United States of America's Motion for a Preliminary Injunction, (Dkt. # 14). Also before the Court is Plaintiffs Las Americas Immigrant Advocacy Center ("Las Americas"), American Gateways, and County of El Paso, Texas's ("El Paso County") (collectively, the "Organizational Plaintiffs") Motion for a Preliminary Injunction.[1] Defendants State of Texas, Greg Abbott ("Abbott"), Texas Department of Public Safety ("DPS"), Steven C. McCraw ("McCraw"), and Bill D. Hicks ("Hicks") (collectively, "Defendants" or "Texas") filed a consolidated response to the motions. (Dkt. # 25). Plaintiffs filed separate replies. (Dkts. # 32, 33). The Court held a hearing on the motions on February 15, 2024. (Dkt. # 41). Having considered the parties' briefing and the relevant law, the Court will preliminarily enjoin Defendants from enforcing SB 4.

Several factors warrant an injunction. First, the Supremacy Clause and Supreme Court precedent affirm that states may not exercise immigration enforcement power except as authorized by the federal government. Second, SB 4 conflicts with key provisions of federal immigration law, to the detriment of the United States' foreign relations and treaty obligations. Third, surges in

---

[1] The Organizational Plaintiffs filed their preliminary injunction in the member case, Las Americas Immigrant Advocacy Ctr. v. McCraw, No. 1:23-CV-1537-DAE (W.D. Tex. filed Dec. 19, 2023) ("Las Americas"), prior to consolidation.

immigration do not constitute an "invasion" within the meaning of the Constitution, nor is Texas engaging in war by enforcing SB 4. Finally, to allow Texas to permanently supersede federal directives on the basis of an invasion would amount to nullification of federal law and authority—a notion that is antithetical to the Constitution and has been unequivocally rejected by federal courts since the Civil War.

BACKGROUND

This case concerns a law passed by Texas that makes it a crime under state law for a noncitizen to commit certain immigration offenses. Senate Bill 4, § 2, 88th Legis., 4th Spec. Sess. (Tex. 2023) (codified at Tex. Penal Code § 51.02(a)) ("SB 4"). The Court will first describe the Parties and SB 4 before turning to the merits of the case.

## I. The Parties

The United States filed suit on January 3, 2024, to enjoin SB 4 under the Supremacy Clause and Dormant Commerce Clause. (Dkt. # 1 at 1). In addition to the United States, three other plaintiffs have jointly sued to enjoin the law.

First, Plaintiff Las Americas is a nonprofit legal organization that serves the needs of low-income noncitizens and asylum seekers in West Texas, Southern New Mexico, and Ciudad Juarez, Mexico. Las Americas (Dkt. # 1 at 2). Las Americas aims to provide legal services to low-income immigrants and ensure

that they can avail themselves of humanitarian protections under federal law and integrate into the community. (Id. at 3). Las Americas alleges that SB 4 will force the organization to restructure its services, hinder its ability to inform asylum seekers about the application process and credible fear interviews, and reduce the effectiveness of programs that help noncitizen victims of violent crimes, abuse, and trafficking. (Id. at 11–12).

American Gateways is another nonprofit legal organization. It provides legal services to noncitizens, particularly around Austin, San Antonio, and Waco. (Id. at 3). It represents asylum seekers, victims of family violence, sexual assault, and human trafficking. (Id.). American Gateways alleges that SB 4 will frustrate its organizational mission because noncitizens will be arrested or deported before receiving asylum. (Id. at 14). Other noncitizen clients of American Gateways may fear reporting crimes of abuse or trafficking to police officers that will now be vested with the power to arrest them for immigration offenses under SB 4. (Id.). Like Las Americas, American Gateways states that it will have to spend more funds, resources, and time to achieve its same organizational goals. (Id.).

El Paso County is tasked with administering programs for its residents, including its county judicial system and jails, providing health and social services, and raising revenue. (Id. at 4). El Paso County states that its immigrant

community pays $591,800,000 annually in taxes, much of which goes back to the County. (Id.).

El Paso County operates several programs that may suffer as a result of SB 4. First, El Paso County plans to establish the Office of New Americans, a program to improve the inclusion and integration of the County's immigrants through citizenship workshops, English as a Second Language classes, and education of legal rights. (Id. at 15). El Paso County also manages a migrant services support center, which assisted over 56,000 asylum seekers in 2022 to travel to United States destinations if they have proof of a sponsor in the country. (Id.). El Paso County alleges that SB 4 will interfere with these programs by subjugating noncitizens to criminal prosecution, hurting the County's ability to work with noncitizens, and interfering with the County's relationship with Mexico and other international partners. (Id. at 16).

El Paso County also alleges that SB 4 will strain its jail system. The County estimates that it may see an additional 8,000 state arrests per year under SB 4. (Id. at 17). The County will have to pay for the additional jail space, public defenders, and the judicial system that these arrests will require. (Id.). Because federal use of the County's jail is the third-largest source of its revenue, SB 4 will significantly reduce the County's budget by forcing the jail to house inmates arrested under the state's immigration law. (Id.). SB 4 will also interfere with El

Paso County's organizational goals by forcing it to incarcerate individuals who are not a risk to public safety and diminishing trust between noncitizens and the County's law enforcement agencies. (Id.).

Turning to the Defendants, the United States sues Greg Abbott, in his official capacity as Governor of Texas, the State of Texas, and the Texas Department of Public Safety. The Organizational Plaintiffs sue two other Defendants. First, they bring suit against Defendant Steven C. McCraw, who is the Director and Colonel of the Texas DPS. Las Americas, (Dkt. #1 at 4). He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities, and has stated that DPS will enforce SB 4. (Id.) (citing Tex. Gov't Code § 411.006(a)(1)-(2)). He is sued in his official capacity. (Id.).

Second, the Organizational Plaintiffs bring suit Defendant Bill D. Hicks, who is the District Attorney for the 34th Judicial District, which includes El Paso County. (Id.) (citing Tex. Gov't Code § 43.120(a)). Hicks "represents the state in all criminal cases before every district court having jurisdiction in El Paso County" and "represents the state in all criminal cases pending in the inferior courts having jurisdiction in El Paso County," which will include charges brought under SB 4. (Id.) (citing Tex. Gov't Code §§ 43.120(b), (c)). Hicks is sued in his official capacity.

## II. SB 4

At a broad level, SB 4 criminalizes at the state level unauthorized entry or re-entry of noncitizens into Texas from outside the country, authorizes noncitizen removals to Mexico, and instructs state court judges not to abate proceedings on the basis of a pending federal determination of admissibility. Tex. Penal Code §§ 51.02–03; Tex. Code of Crim. Proc. arts. 5(B).002–003. In greater detail, SB 4 first makes it a crime for a noncitizen to "enter[] or attempt[] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a). It is an affirmative defense to violations of § 51.02 if "the federal government has granted the defendant . . . lawful presence in the United States or asylum . . . ." Id. § 51.02(c). SB 4 does not define "lawful presence." Id. Individuals approved under the Deferred Action for Childhood Arrivals ("DACA") program have an affirmative defense, while those approved under the Deferred Action for Parents of Americans ("DAPA") and Lawful Permanent Residents program do not have an affirmative defense. Id. §§ 51.02(c)–(d)

Violations of § 51.02 are Class B misdemeanors under Texas law, punishable by up to $2,000 in fines and 180 days of imprisonment. Id. § 51.02(b); § 12.22. However, if a noncitizen has previously been convicted under § 51.02, a

subsequent violation is a felony, punishable by fines up to $10,000 and imprisonment between 180 days and two years. Id. § 12.35.

Second, SB 4 makes it a crime for noncitizens to "enter[], attempt to enter," or be found in Texas after they have "been denied admission to" or removed from the United States or departed the United States while an order of "removal is outstanding." Id. § 51.03.[2] The section has no affirmative defenses. Violations of § 51.03 are Class A misdemeanors, punishable by fines up to $4,000 and imprisonment for up to one year. Id. § 51.03(b); § 12.21. Certain prior offenses may either elevate violations of § 51.03 to third-degree felonies, punishable by fines up to $10,000 and imprisonment between two and ten years, or second-degree felonies, punishable by fines up to $10,000 and imprisonment between two and twenty years. Id. § 12.21–23.

Third, SB 4 allows state judges to request or order the removal of noncitizens under certain circumstances. Tex. Code of Crim. Proc. art. 5(B).002. When an individual is charged with offenses under § 51.02 or § 51.03—but not yet convicted—a magistrate or state judge may "discharge the person and require the person to return to the foreign nation from which the person entered or attempted

---

[2] Section 51.02 criminalizes entry directly into Texas, so a noncitizen who enters directly into New Mexico and then crosses the state border into Texas does not violate the law. Tex. Penal Code § 51.02(a). Section 51.03, however, criminalizes a noncitizen who "is at any time found in" Texas after a removal order—regardless of whether they crossed directly back into Texas or through another state. Id. § 51.03(a).

to enter" if "the person agrees to the order" and has not "previously been" charged with or convicted of specific crimes. Id. art. 5(B).002(a)–(c). If a noncitizen is convicted under SB 4, the judge "shall enter" an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter" after serving their prison sentence. Id. art. 5(B).002(d).[3] Texas law enforcement must monitor the noncitizen's compliance with the state removal order. Id. art. 5(B).002(e). Failure to comply with the removal order is an additional second-degree felony. Tex. Penal Code § 51.04.

Fourth and finally, SB 4 states that a "court may not abate the prosecution" of one of these offenses "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5(B).003.[4]

## LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. Valley v. Rapides Par. Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a

---

[3] Texas's response to the preliminary injunction effectively states that all removals under SB 4 will be to Mexico. (Escalon Decl., Dkt. # 25 at 2–4).

[4] SB 4 contains other miscellaneous provisions. It prohibits enforcement in certain buildings, such as primary schools and places of worship. Tex. Code of Crim. Proc. art. 5(B).001. SB 4 also instructs that violations of the law should be added to criminal record databases Id. art. 42A.059. Finally, it indemnifies officers enforcing the law. Tex. Civ. Prac. & Rem. Code § 117.002.

preliminary injunction must establish that he is likely to succeed on the merits, that

he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The party seeking

injunctive relief carries the burden of persuasion on all four requirements. PCI

Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005).

Plaintiffs have met this high burden and have shown that a preliminary

injunction is warranted. Before reaching the merits of their motions, however, the

Court must first address threshold issues of standing, sovereign immunity, and

causes of action.

<u>JUSTICIABILITY</u>

**I. Standing**

*A. Nonprofit Plaintiffs*

Texas first contests the standing of the two nonprofit plaintiffs: Las

Americas and American Gateways ("Nonprofit Plaintiffs"). (Dkt. # 25 at 42). At

the preliminary-injunction stage, a plaintiff must make a "clear showing" that they

have standing. Barber v. Bryant, 860 F.3d 345, 352 (5th Cir. 2017). In particular, a

plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-

in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and

(3) that is likely to be redressed by a favorable decision. See, e.g., El Paso Cnty. v. Trump, 982 F.3d 332, 337 (5th Cir. 2020).

In certain pre-enforcement challenges, a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 160 (2014) (quoting Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979)). Because Plaintiffs bring a pre-enforcement challenge, Texas assumes that Susan B. Anthony applies and thereby suggests that the Nonprofit Plaintiffs lack a valid injury because their conduct is neither proscribed by statute nor threatened with prosecution. (Dkt. # 25 at 42–43).

However, the Babbitt/Susan B. Anthony line of cases sets out a test only for when a *directly* regulated party challenges a statute. See, e.g., Babbitt, 442 U.S. at 298; Susan B. Anthony, 572 U.S. at 160; Virginia v. Am. Booksellers Assn. Inc., 484 U.S. 383 (1988) (same). The test is simply not applicable to the Nonprofit Plaintiffs, who allege *indirect* harms under the law. The Nonprofit Plaintiffs allege impairment and frustration of their organizational purposes—not a direct threat of prosecution or regulation. Las Americas, (Dkt. # 1 at 11–14). Because no Plaintiffs claim that their injury stems from direct threats of prosecution, Babbitt does not apply. See Warth v. Seldin, 422 U.S. 490, 505 (1975) ("When a governmental

prohibition or restriction imposed on one party causes specific harm to a third party, . . . the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights.").

A different test for pre-enforcement injury applies when a law's regulation *indirectly* harms a plaintiff. In this context, a plaintiff organization "may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct" and "the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources.'" NAACP v. City of Kyle, Tex., 626 F.3d 233, 238 (5th Cir. 2010) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).

Diversion of resources alone does not always suffice to confer standing. "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." Ass'n for Retarded Citizens v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. Of Trustees, 19 F.3d 241, 244 (5th Cir. 1994). Still, "the injury in fact requirement under Article III is qualitative, not quantitative in nature." Ass'n of Cmty. Organizations for Reform Now v. Fowler, 178 F.3d 350, 357–58 (5th Cir. 1999) ("ACORN"). The injury "need not measure more than an identifiable trifle" so long as it is concrete

and particularized and actual or imminent. Id. at 358 (internal quotations omitted).

The question is not whether the Nonprofit Plaintiffs face direct prosecution, but

whether they have shown a sufficiently concrete and identifiable injury that

extends beyond upsetting their abstract social or political goals. Warth, 422 U.S. at

505; Havens, 455 U.S. at 379.

   The Nonprofit Plaintiffs have met this burden. SB 4 will "completely

change[] the manner in which Plaintiffs must reach, counsel, and represent

noncitizens," including forcing them to identify clients earlier, help noncitizens

navigate the federal immigration process while in state prison, and seek federal

relief as quickly as possible before a removal under state law. Las Americas, (Dkt.

# 33 at 15). SB 4 will require them to spend *more* resources on education and

outreach only to achieve the same outcomes. (Id. at 14–15). The organizations will

have to "divert resources from community representation to the resource intensive

process of representing people detained under SB 4, decreasing the total number of

people served in obtaining immigration relief." Las Americas, (Dkt. # 30 at 18;

Babaie Decl., Dkt. # 30-1 at 9; Yang Decl., Dkt. # 30-2 at 2–4).

   SB 4 will also moot many asylum applications, because pending

asylum determinations must be disregarded by state court judges under the law.

Tex. Code of Crim. Proc. Art. 5(B).003. The Nonprofit Plaintiffs will risk

expending substantial time and resources on an application that will end up

irrelevant if their client is removed by state officials prior to a federal asylum ruling. The Nonprofit Plaintiffs will be forced to expedite asylum applications in the hopes of achieving a determination prior to a conviction or removal order under SB 4. In sum, SB 4's prohibition on abating the removal of asylum applicants will frustrate a core part of Las Americas' and American Gateways' mission.

SB 4 will also frustrate the preparation of asylum applications by incarcerating noncitizens prior to removal and making it substantially harder for those noncitizens to apply for asylum within one year of entry. See 8 U.S.C. § 1158(a)(2)(B). Because the Nonprofit Plaintiffs assert that they currently lack contacts in state court jails, see Las Americas, (Babaie Decl., Dkt. # 30-1 at 7–9; Yang Decl., Dkt. # 30-2 at 3–5), they will have reduced ability to find asylum seekers. For example, Las Americas represents clients once they have passed credible fear interviews ("CFIs"). (Babaie Decl., Dkt. # 30-1 at 7–9). Since state officials cannot conduct official CFIs, Las Americas will likely struggle to prioritize successful asylum claims (if those claims may even be adjudicated before removal). Incarceration will also limit Las Americas' and American Gateways' contact with their clients, making it harder to conduct client interviews, obtain application materials, and counsel clients on their hearings. (See id.).

In addition, the Nonprofit Plaintiffs have shown that SB 4 will frustrate their programs that seek to aid victims of sex crimes and human

trafficking.[5] Currently, Las Americas operates a "crime victims practice," which helps noncitizens who have suffered crimes, and a Human Trafficking Program, which assists noncitizens in reporting their trafficking to law enforcement. (Id. at 11–12). American Gateways similarly focuses much of its efforts on assisting noncitizen victims of abuse or trafficking. (Yang Decl., Dkt. # 30-2 at 5–6).

Currently, under federal immigration law, victims of criminal activity may be offered a "U visa" that allows them to stay in the country if they have suffered certain crimes and are willing to assist law enforcement in the prosecution of the crime. 8 C.F.R. § 214.14. Alternatively, victims of human trafficking may apply for a "T visa" if they assist with any requests from law enforcement and would suffer extreme hardship if removed from the country. Id. § 214.11. Both Las Americas and American Gateways assist victims through the process of reporting crimes and obtaining U or T visas. See Las Americas, (Babaie Decl., Dkt. # 30-1 at 11–13; Yang Decl., Dkt. # 30-2 at 4–5). SB 4 will stifle those programs. Victims of crimes will likely fear reporting crimes to local law enforcement that has the authority to arrest or remove them under SB 4 for a previous unlawful entry. And SB 4 has no U or T visa counterpart. One of the organizations' key purposes—to protect noncitizen victims of crime—will become significantly tougher to

_____

[5] El Paso County will suffer a similar harm. By criminalizing immigration offenses at the state level, SB 4 will make it less likely that victims of domestic violence and abuse report these crimes to police officers with the power to arrest noncitizens. The removal provisions will also result in the loss of the witnesses of these crimes.

accomplish, if not altogether impractical. The impairment of their mission and the drain of organizational funds extends far beyond an abstract social harm and suffices to show injury. City of Kyle, 626 F.3d at 237.

In response, Texas first argues that "Nonprofit Plaintiffs' diversion of resource theory fails as it stems from voluntary strategic and budgetary choices." (Dkt. # 25 at 44) (citing Lane v. Holder, 703 F.3d 668, 675 (4th Cir. 2012)). Texas might be correct if the Nonprofit Plaintiffs *solely* alleged the mere diversion of resources. But their alleged injury goes further, alleging that SB 4 will frustrate their organizational missions, disrupt programming, and increase the risks associated with asylum applications and crime reporting. See Las Americas, (Dkt. # 33 at 14–15); OCA-Greater Houston v. Tex., 867 F.3d 604, 612 (5th Cir. 2017) (finding an "undertaking that consumed [an organization's] time and resources in a way they would not have been spent absent the Texas law" conferred standing). This is a perceptible and concrete drain of resources. See Havens, 455 U.S. at 379.

Next, Texas argues that the Nonprofit Plaintiffs lack third-party standing to assert the rights of their immigrant clients. (Dkt. # 25 at 46) ("Nonprofit Plaintiffs cannot obtain standing by expressing concern that a third party not before this court may be harmed by the challenged law."). Again, Texas is correct on the legal principle but wrong on its application to the case. The Nonprofit Plaintiffs need not assert the rights of their clients or other noncitizens

detained under SB 4 to show standing. The Nonprofit Plaintiffs, as organizations, face discrete injuries distinct from those suffered by their members or clients. See OCA-Greater Houston, 867 F.3d at 610 ("The organization can establish standing in its own name if it meets the same standing test that applies to individuals.") (citations omitted). The organizations may challenge SB 4 without asserting the constitutional rights of their clients.

Finally, Texas argues that the Nonprofit Plaintiffs only allege a speculative injury. (Dkt. # 25 at 46–47). Because Texas has yet to implement the law or promulgate regulations about how it will take effect, Texas alleges the Nonprofit Plaintiffs cannot know that their injuries are certain. (Id.). As SB 4 is set to take effect mere days from today on March 5, the injury is imminent. As for how Texas intends to enforce the law, the Court need only look at Texas's response. In defense of SB 4, Texas has taken the position that the law is necessary to prevent a "complete and total invasion" of transnational criminal cartels coming from a "failed narco-state" "preying on the American people" "shuttle[ing] deadly and illegal narcotics like fentanyl from Mexico into every corner of this country." (Dkt. # 25 at 2–3). This plainly contrasts with its standing contention, where Texas alleges there is no real risk it will enforce the law or any guarantee that SB 4 will result in more arrests. (Id. at 46–47). Texas cannot have it both ways. If SB 4 is

necessary to stop an "invasion," then the risk of enforcement cannot be speculative.[6]

   B.   *El Paso County*

       1. El Paso is not barred from suit as a state subdivision

       Texas next focuses its arguments on El Paso County. Texas asserts, "Precedent firmly establishes that local governments lack standing to sue their parent States." (Dkt. # 25 at 48) (citing City of Trenton v. New Jersey, 262 U.S. 182, 188 (1923); Town of Ball v. Rapides Par. Police Jury, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984))). The precedent is not as firm as Texas posits. The Supreme Court has long since clarified that "legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution." Gomillion v. Lightfoot, 364 U.S. 339, 344–45 (1960). On at least six other occasions, the Supreme Court has decided suits between a state and its political subdivision. See Tweed-New Haven Airport Auth. V. Tong, 930 F.3d 65, 73 (2d Cir. 2019) (collecting cases).

       The Fifth Circuit has explicitly recognized that a subdivision may sue the state under the Supremacy Clause. See Rogers v. Brockette, 588 F.2d 1057, 1070 (5th Cir. 1979) (affirming school district's standing to sue state under

---

[6] Far from "disavow[ing] any intention of invoking the criminal penalty provision," Texas has made clear it intends to rigorously enforce SB 4. Babbitt, 442 U.S. at 302; (Dkt. # 25 at 2–5).

Supremacy Clause); <u>Harrison v. Jefferson Par. Sch. Bd.</u>, No. CV 20-2916, 2021

WL 3286456, at *6 (E.D. La. Aug. 2, 2021) ("[A] subdivision can sue a state when

challenging state action under the Supremacy Clause.").[7] Both <u>Rogers</u> and

<u>Gomillion</u> limit the <u>City of Trenton</u> line of cases to claims under the Fourteenth

Amendment and Contract Clause. <u>See Gomillion</u>, 364 U.S. at 344 (cabining <u>City</u>

<u>of Trenton</u> and related cases to "the particular prohibitions of the Constitution

considered in those cases"); <u>Rogers</u>, 588 F.2d at 1058 (noting same); <u>see also</u> Note,

Brian P. Keenan, <u>Subdivisions, Standing and the Supremacy Clause: Can a</u>

<u>Political Subdivision Sue Its Parent State Under Federal Law</u>, 103 Mich. L. Rev.

1899, 1905 (2005) ("A review of the Supreme Court's holdings in this area shows

that they were limited to the clauses at issue in the cases, the Fourteenth

Amendment and the Contract Clause.").[8]

  To the contrary, <u>Rogers</u> states explicitly that the "<u>Trenton</u> line of cases

do[es] not, properly speaking, deal with a municipality's standing to sue the state

---

[7] Texas argues that the Court ought to distinguish <u>Rogers</u> on the facts, as that case dealt with Texas depriving a federal breakfast program to a school district. Id. at 1061. Texas argues that Rogers should apply only to cases where the state interferes with a federal statutory right (such as school breakfast programs). (Dkt. # 25 at 48). The distinction is unavailing. Nothing in <u>Rogers</u> limited its holding to cases where Congress had interfered with the states to create a federal statutory right. <u>Rogers</u>, 588 F.2d at 1070. Neither <u>Rogers</u> itself nor any subsequent cases citing <u>Rogers</u> appear to make this distinction.

[8] Other circuits have since followed suit. <u>See Branson Sch. Dist. RE-82 v. Romer</u>, 161 F.3d 619 (10th Cir. 1998); <u>Tweed-New Haven Airport</u>, 930 F.3d at 73 ("A subdivision may sue its state under the Supremacy Clause. In reaching this conclusion we join the Fifth and Tenth Circuits."). <u>But see Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank</u>, 136 F.3d 1360 (9th Cir. 1998) (denying standing to sue under Supremacy Clause).

that created it." 588 F.2d at 1070; <u>see also Branson Sch. Dist. RE-82 v. Romer</u>, 161 F.3d 619, 629 (10th Cir. 1998) ("Neither the [<u>Trenton</u>] line of cases nor any other subsequent Supreme Court case has held that a political subdivision is barred from asserting the structural protections of the Supremacy Clause of Article VI in a suit against its creating state."). Put simply, the Supreme Court has long shifted away from Texas's broad reading of <u>City of Trenton</u>, and under binding Fifth Circuit precedent, a political subdivision is not barred from suing the state under the Supremacy Clause. <u>Rogers</u>, 588 F.2d at 1070.

2. El Paso County asserts a valid Article III injury.

El Paso County also asserts a valid injury in fact. El Paso County estimates that SB 4 will lead to 8,000 more annual arrests in the County, leading to a corresponding 8,000 more jail bookings. <u>Las Americas</u>, (Dkt. # 30 at 19). The County will have to increase expenditures to provide counsel for these defendants and hire additional sheriff staff and policy officers. (<u>Id</u>.). Texas disputes this number, alleging that it comes from testimony that "the Director of the Texas Department of Public Safety gave the House State Affairs Committee before the legislation was ever finalized and enacted." (Dkt. # 25 at 49) (citing <u>Las Americas</u>, (Carrillo Decl., Dkt. # 3 at 3)). However, the declarant—Steven McCraw—is not just a legislative witness, but the principal state officer in charge of DPS and a Defendant in this case. McCraw could, but did not, personally dispute this number

in his response. And Texas provides no other evidence to impeach McCraw's testimony. That McCraw testified prior to SB 4's passage is irrelevant. Virtually all legislative testimony comes prior to a bill's enactment. It is not evident why this timing should reduce the testimony's credibility.

At any rate, El Paso County does not need to predict the number of arrests with pressing exactitude. Rather, the inquiry is whether the additional costs amount to more than an "identifiable trifle." ACORN, 178 F.3d at 358. Texas's own declarant, Victor Escalon, states that DPS expects to house and process noncitizens detained under SB 4 "primarily in State-owned facilities and does not anticipate a need for extensive use of county-owned jails." (Escalon Decl., Dkt. # 25-3 at 2). But extensive use is not required for standing—and even some use will amount to more than an "identifiable trifle." And again, given Texas's own statements that it plans to deploy SB 4 to stop a "warlike invasion" of fentanyl-smuggling cartels,[9] it is not unreasonable to expect that many of those arrests will be in El Paso County.

Texas suggests that "in practice the State may make alternative arrangements or provide additional funds and infrastructure to defray the costs."

---

[9] See United States v. Abbott, No. 23-50632, 2024 WL 551412, at *5 (5th Cir. Feb. 9, 2024) ("Our Nation is presently faced with a historic national security crisis at the border. The State of Texas has determined that the United States is failing to protect Texans from this danger, and has thus taken its own measures to combat the uncontrolled outbreak of illegal border crossings.") (dissenting opinion); (Dkt. # 25 at 3) ("These violent criminal organizations shuttle deadly and illegal narcotics like fentanyl from Mexico into every corner of this country.").

(Dkt. # 25 at 50). But Texas has not yet done so. Just as the Court cannot recognize mere speculation as injury, the Court cannot reject El Paso County's harm based on unsupported speculation about what the state might or might not do to mitigate those harms. SB 4 is set to take effect in days, and Texas has provided no evidence it actually intends to defray El Paso County's costs. As it stands, El Paso County has made a clear showing that SB 4 will force it to increase expenditures and jail capacity. That imminent harm is sufficient to confer standing.

## II. Sovereign Immunity

Texas argues that the two Defendants in the Las Americas case, DPS Director McCraw and District Attorney Hicks are both entitled to sovereign immunity. (Dkt. # 25 at 52). Hicks, as a district attorney, is not entitled to sovereign immunity. The Fifth Circuit has repeatedly held "that Texas district attorneys are not protected by the Eleventh Amendment precisely because they are county officials, not state officials." Nat'l Press Photographers Ass'n v. McCraw, 90 F.4th 770, 787 (5th Cir. 2024) (quoting Hudson v. City of New Orleans, 174 F.3d 677, 682 (5th Cir. 1999)) (cleaned up). Texas cites a recent Fifth Circuit case for the proposition that "Texas district attorneys are agents of the State when sued regarding their prosecutorial enforcement of state laws like SB4." (Dkt. # 25 at 52) (citing Arnone v. Dallas Cnty., 29 F.4th 262, 267 (5th Cir. 2022)). That citation is inapplicable. Arnone dealt with whether district attorneys act as state or county

policymakers under Section 1983—not whether they are entitled to sovereign immunity. 29 F.4th at 267. Indeed, Texas omits a key sentence from the case, stating the Section 1983 policymaker "inquiry is distinct from what we use to decide whether an official is a state actor for Eleventh Amendment purposes." Id.

As to Defendant McCraw, the relevant question is whether Ex parte Young applies. "Ex parte Young allows suits for injunctive or declaratory relief against state officials, provided they have sufficient "connection" to enforcing an allegedly unconstitutional law." In re Abbott, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott, 141 S. Ct. 1261 (2021). To have the requisite connection, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." Tex. Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted).

Texas argues that the "Organizational Plaintiffs do not establish—or even allege—a waiver of sovereign immunity or how they satisfy an exception under Ex parte Young." (Dkt. # 25 at 53). As to the particular duty to enforce the state's criminal laws, McCraw's enforcement position as head of DPS has already been established:

> Director McCraw [has] more than just the general duty to
> see that the state's laws are implemented—[he is] directly
> responsible for enforcing Texas's criminal laws . . . . DPS

> [] officers arrest people for violating Texas law, exercising
> "compulsion or constraint" in service of the law.

Nat'l Press Photographers, 90 F.4th at 786.

McCraw has also demonstrated a clear willingness to enforce SB 4. Once again, this is evident from the face of Texas's response, alleging "unprecedented influx of unlawful immigration for which the cartels are responsible," "deadly drug smuggling, human trafficking, and infiltration by suspected terrorists," "rampant criminal activity" and that the federal government has "has chosen to 'accept a failed narco-state.'" (Dkt. # 25 at 2–3). Indeed, the whole purpose of SB 4, as described by Texas, is to enforce immigration law where the federal government allegedly will not. A "scintilla of enforcement by the relevant state official with respect to the challenged law" will do, and McCraw has easily met that threshold. City of Austin v. Paxton, 943 F.3d 993, 1002 (5th Cir. 2019). In sum, McCraw has the legal authority to enforce SB 4 and has concretely demonstrated a willingness to do so, and therefore falls under the Ex parte Young exception. Thus, neither McCraw nor Hicks are entitled to sovereign immunity.

### III. Cause of Action

Relying principally on a 2015 Supreme Court case, Texas contends that the United States lacks a valid cause of action. (Dkt. # 25 at 35–36) (citing Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 324–25 (2015)). In Armstrong, the Supreme Court clarified that there is no implied cause of action

under the Supremacy Clause. 575 U.S. at 323–28 ("It is equally apparent that the

Supremacy Clause is not the source of any federal rights and certainly does not

create a cause of action. It instructs courts what to do when state and federal law

clash, but is silent regarding who may enforce federal laws in court, and in what

circumstances they may do so.") (cleaned up). Because the United States lacks an

implied cause of action under the Supremacy Clause, Texas believes that the

United States "therefore [has] no cause of action to enforce the supremacy of

federal law." (Dkt. # 25 at 35).

      Texas misreads <u>Armstrong</u>. The absence of an implied cause of action

is not necessarily a bar to suit altogether. <u>Armstrong</u> itself shows this. There, the

Supreme Court found no implied cause of action and then immediately turned to

whether it could entertain the suit in equity. 575 U.S. at 327 ("We turn next to

respondents' contention that, quite apart from any cause of action conferred by the

Supremacy Clause, this suit can proceed against Idaho in equity."). Nothing in

<u>Armstrong</u> bars suits in equity that are not displaced by Congress.

      The plaintiffs' case in <u>Armstrong</u> was not dismissed solely for lack of

a statutory cause of action, but also because the equitable cause had been

displaced. <u>Id.</u> at 327–30. <u>Armstrong</u> noted that suits in equity are "subject to

express and implied statutory limitations" that cannot be disregarded. <u>Id.</u> at 327.

The act at issue in <u>Armstrong</u>—the Medicaid Act—precluded certain enforcement

actions by private parties, establishing a congressional "intent to foreclose equitable relief." Id. at 328 (internal quotations omitted). That foreclosure, combined with the "judicially administrative nature of" the Medicaid Act, left the plaintiffs in Armstrong without a cause of action. Id.

Displacement by federal statutory causes of action does not apply here. Id. at 329 (noting that "equitable relief is traditionally available to enforce federal law" by a proper plaintiff unless Congress has "displace[d]" it). Texas does not identify any displacement. It alleges only that the United States[10] has failed to identify a cause of action. But for Texas's argument to succeed, Texas must identify some law that has displaced equitable relief, and it has not done so here.

Unsurprisingly, courts before and after Armstrong have allowed suits in equity under the Supremacy Clause. See United States v. Texas, 557 F. Supp. 3d

---

[10] Texas focuses its argument on the United States, but at times suggests that the Organizational Plaintiffs also lack a valid cause of action. (Dkt. # 25 at 34–35). However, Armstrong itself reaffirmed the availability of Ex parte Young as an example of a permissible suit. 575 U.S. at 326 ("[A]s we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." (citing Ex parte Young, 209 U.S. at 155–56). And although the opinion mentions a direct enforcement challenge as an example of Ex parte Young, the doctrine is not limited to potential defendants of a state criminal regulation. See Tex. Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020) (finding Texas Democratic Party asserted valid Ex parte Young challenge against secretary of state in challenge to absentee voting provisions); Virginia Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 256 (2011) ("Although respondents argue that [plaintiff's] status as a state agency changes the calculus, there is no warrant in our cases for making the validity of an Ex parte Young action turn on the identity of the plaintiff.").

810, 820 (W.D. Tex. 2021) (listing, as an example, six cases after Armstrong where the United States brought lawsuits under the Supremacy Clause). Arizona v. United States, the most recent Supreme Court immigration preemption case, was based off equitable remedies under the Supremacy Clause, like many preemption cases before it. 567 U.S. 387, 392 (2012); see also Sanitary Dist. of Chicago v. United States, 266 U.S. 405 (1925) ("The Attorney General [] may bring this proceeding [to carry out treaty obligations] and no statute is necessary to authorize the suit."). And the availability of suits in equity under the Supremacy Clause is established precedent in the Fifth Circuit. See Crown Castle Fiber, L.L.C. v. City of Pasadena, Tex., 76 F.4th 425, 434–35 (5th Cir. 2023) ("Even though [the statute] does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds. Accordingly, [plaintiff] can bring its federal preemption claim."). Another circuit even emphasized that Armstrong "counsels in favor of—not against—permitting the United States to invoke preemption in order to protect its interest." United States v. Supreme Ct. of N.M., 839 F.3d 888, 906 n.9 (10th Cir. 2016). Here, as there, "Defendants' reliance on Armstrong is misguided." Id.

## IV. Abstention

Texas also argues that the Court should abstain from deciding Plaintiffs' motions for preliminary injunctions under Pullman abstention. (Dkt. #

25 at 58–60). Pullman counsels that federal courts may abstain from resolving the constitutionality of a state law "so as to eliminate or at least to alter materially, the constitutional question presented." Ohio Bureau of Emp. Servs. v. Hodory, 431 U.S. 471, 477 (1977); (citing R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496 (1941)). Key to Pullman abstention is that "the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question." Babbitt, 442 U.S. at 306.

Generally, Pullman abstention does not apply to preemption claims. See, e.g., United Servs. Auto. Ass'n v. Muir, 792 F.2d 356, 363 (3d Cir. 1986) ("The holdings of [Pullman and Hodory], read together, suggest that a federal court should not abstain under Pullman from interpreting a state law that might be preempted by a federal law . . . ."). Nor does Texas identify "uncertain state law" issues that would "render unnecessary or substantially modify" the preemption issues. Baran v. Port of Beaumont Nav. Dist., 57 F.3d 436, 442 (5th Cir. 1995) (cleaned up). Field preemption applies no matter how Texas courts interpret ambiguities in SB 4. See infra, p. 29–52. And as the Court will explain in its discussion of conflict preemption, the Court need not wait to see if state courts abate proceedings under SB 4 pending federal determinations of admissibility, because SB 4 specifically prohibits them from doing so. See infra, p. 52–61.

Because Texas identifies no material ambiguity, there would be no value in

abstaining.

## LIKELIHOOD OF SUCCESS ON THE MERITS

## I. Field Preemption

Next, the Court turns to the merits, beginning with field preemption.

"The Government of the United States has broad, undoubted power over the

subject of immigration and the status of [noncitizens]." Arizona, 567 U.S. at 394.

The U.S. Constitution empowers the federal government to "regulate commerce

with foreign nations" and "establish a uniform Rule of naturalization." U.S. Const.

art. I, § 8; id. art. II, § 2. Pursuant to this authority, Congress has created a complex

and expansive system to regulate entry into and removal from the United States.

See, e.g., De Canas v. Bica, 424 U.S. 351, 353 (1976); Toll v. Moreno, 458 U.S. 1

(1982); Padilla v. Kentucky, 559 U.S. 356 (2010).

SB 4 directly challenges the federal government's long-held power to

control immigration, naturalization, and removal.[11] SB 4 extends federal

immigration penalties by authorizing Texas state officials to detain, arrest,

---

[11] Despite Texas's argument that SB 4 does nothing more than complement federal law. (Dkt. #
25), Greg Abbott himself declared that SB 4 was an exercise of constitutional authority
superseding federal immigration laws. See Press Release, Greg Abbott, Governor of Texas,
Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024),
https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf.  (noting that "Texas's
constitutional authority to defend and protect itself . . . is the supreme law of the land and
supersedes any federal statutes to the contrary.").

prosecute, and remove noncitizens without federal supervision. Supreme Court precedent squarely holds that SB 4's attempt to regulate the unlawful entry of noncitizens is field preempted. Arizona, 567 U.S. at 399. Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." Id. Applied to the field of immigration, the federal government has both a dominant interest and a pervasive regulatory framework that preclude state regulation in the area.

*A. The United States has a dominant interest in regulating immigration.*

As over a century of Supreme Court cases hold, "The authority to control immigration—to admit or exclude [noncitizens]—is vested *solely* in the Federal Government." Truax v. Raich, 239 U.S. 33, 42 (1915) (emphasis added) (citing Fong Yue Ting v. United States, 149 U.S. 698 (1893)). The Supreme Court has repeatedly stressed that "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," the state law must give way. Hines v. Davidowitz, 312 U.S. 52, 62 (1941); see also Hillsborough Cnty. v. Automated Med. Lab'ys., Inc., 471 U.S. 707, 719 (1985) (recognizing "the dominance of the federal interest" in immigration and foreign affairs as the

paradigmatic example of field preemption); Takahashi v. Fish & Game Comm'n,
334 U.S. 410, 419 (1948) (acknowledging that States "can neither add to nor take
from the conditions lawfully imposed by Congress upon admission, naturalization
and residence of [noncitizens] in the United States or the several states"); United
States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982) ("The power to regulate
immigration—an attribute of sovereignty essential to the preservation of any
nation—has been entrusted by the Constitution to the political branches of the
Federal Government."); Chy Lung v. Freeman, 92 U.S. 275, 280 (1875) ("The
passage of laws which concern the admission of citizens and subjects of foreign
nations to our shores belongs to Congress, and not to the States."); De Canas, 424
U.S. at 354 ("Power to regulate immigration is unquestionably exclusively a
federal power."); Arizona, 567 U.S. at 409 ("[T]he removal process is entrusted to
the discretion of the Federal Government.").

Beyond the federal government's interest in the admission and
removal of noncitizens, the field of immigration is also deeply intertwined with the
United States' foreign relations. First, "[i]mmigration policy can affect trade,
investment, tourism, and diplomatic relations for the entire Nation, as well as the
perceptions and expectations of [noncitizens] in this country who seek the full
protection of its laws." Arizona, 567 U.S. at 395. It is "fundamental" that "foreign
countries concerned about the status, safety, and security of their nationals in the

United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." Id. The "perceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." Id. "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." Hines, 312 U.S. at 63.

Second, "discretionary decisions" on how to enforce the nation's immigration laws "involve policy choices that bear on this Nation's international relations" and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." Id. at 396–97. That is particularly true for removal decisions. Such decisions include "the selection of a removed [noncitizen]'s destination" which "may implicate our relations with foreign powers," requiring "consideration of changing political and economic circumstances." Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 348 (2005) (citation omitted). The "removal process" must be "entrusted to the discretion of the Federal Government" because it touches "on foreign relations and must be made with one voice." Arizona, 567 U.S. at 409.

Third, the federal government must be entrusted with the power to control the country's international borders. "[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States," Hernandez v. Mesa, 885 F.3d 811, 819 (5th Cir. 2018) (quoting United States v. Delgado-Garcia, 374 F.3d 1337, 1345 (D.C. Cir. 2004)), aff'd, 140 S. Ct. 735 (2020), and "[n]ational-security policy" and foreign policy are "the prerogative of the Congress and President," Ziglar v. Abbasi, 582 U.S. 120, 142 (2017). Determination of which noncitizens may enter and remain in the United States "is unquestionably exclusively a federal power." De Canas, 424 U.S. at 354.

In short, it is undisputed that the federal government has a dominant and supreme interest in the field of immigration. Texas's own state courts acknowledge "the matter of entry into the United States" is "wholly preempted by federal law," Hernandez v. State, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980), as are "matters involving deportation." Gutierrez v. State, 380 S.W.3d 167, 173, 176 (Tex. Crim. App. 2012). By regulating a sphere dominated by federal interests, SB 4 violates the Supremacy Clause.

*B. Congress has enacted a pervasive regulatory framework.*

In regulating immigration, the federal government has also enacted a "framework of regulation so pervasive that Congress left no room for the States to supplement it." Arizona, 567 U.S. at 399 (internal quotations omitted); see also

Texas v. United States, 50 F.4th 498, 516 (5th Cir. 2022) ("[B]ecause policies pertaining to the entry of [noncitizens] and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted.") (cleaned up). Congress has created a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States. Ga. Latino All. for Hum. Rts. v. Governor of Ga., 691 F.3d 1250, 1264 (11th Cir. 2012) ("GLAHR").

Congress regulates immigration through countless statutes and treaties,[12] far too numerous to list in full. Congress has "authorized criminal penalties for individuals who bring [noncitizens] into the United States," GLAHR, 691 F.3d at 1264 (citing 8 U.S.C. § 1323), has "penalize[d] the transportation, concealment, and inducement of unlawfully present [noncitizens]," id. (citing 8 U.S.C. § 1324), has "impose[d] civil and criminal penalties for unlawful entry" and re-entry, id. (citing 8 U.S.C. § 1325–26), has prohibited "aid[ing] the entry of an

---

[12] See, e.g., Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.); Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.), Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (codified in scattered sections of 8 U.S.C.); Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214, 28 U.S.C. § 2254 et. seq.; REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 3028 (codified in scattered sections of 8 U.S.C.); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (codified in scattered sections of 6 U.S.C); USA Patriot Act, Pub. L. 107-56, 115 Stat. 272 (codified as amended in scattered sections of 8 U.S.C. 12 U.S.C., 15 U.S.C., 18 U.S.C., 31 U.S.C., and 42 U.S.C.); Illegal Immigration Reform and Immigrant Responsibility Act of 1986, Pub. L. 99-603, 100 Stat. 3445 (codified as amended in scattered sections of 8 U.S.C. and 42 U.S.C.).

inadmissible [noncitizen]," id. (citing 8 U.S.C. § 1327), and has banned the

"import [of] [a noncitizen] for an immoral purpose," id. (citing 8 U.S.C. § 1328).

As one circuit court has held, the country's immigration laws have "been described

as second only to the Internal Revenue Code in complexity." Singh v. Gonzales,

499 F.3d 969, 980 (9th Cir. 2007) (cleaned up). Another has noted the striking

resemblance between immigration law and "King Minos's labyrinth in ancient

Crete." Lok v. INS, 548 F.2d 37, 37 (2d Cir. 1977). The country's immigration

laws are massive, sprawling, detailed, complex, and pervasive.

Although Texas claims that the Biden Administration[13] has abandoned

the field, Congress has vested DHS and other executive agencies with substantial

enforcement power and duties.[14] DHS has "the power and duty to control and

guard the boundaries and borders of the United States." 8 U.S.C. § 1103(a)(5).

DHS and its subagencies retain the sole responsibility for "enforc[ing] and

administer[ing] all immigration laws," especially "the inspection, processing, and

admission of persons who seek to enter" the United States and "the detection,

---

[13] Throughout its briefing, Texas faults only the Executive Branch for abandoning the field of immigration. But congressional regulation of a field is far more relevant to preemption, or else the preemption analysis would constantly fluctuate depending on an agency's or administration's enforcement priorities.

[14] At the preliminary injunction hearing, the United States emphasized the scope of its recent immigration enforcement actions, noting that it removed 472,000 individuals between May through December of 2023—more than any single year since 2015. (Dkt. # 40 at 12).

interdiction, removal, [and] departure from the United States" of those here unlawfully. 6 U.S.C. § 211(c)(8).[15]

Congress has also made clear it occupies the field. Under the Immigration and Nationality Act ("INA"), a removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3).[16] The federal government alone is vested "with the powers of external sovereignty" and "the power to expel" noncitizens. United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 318 (1936). The power of removal is "inherently inseparably from the conception of nationality." Id.

In sum, there is no genuine question that the federal government occupies the field of immigration. Accordingly, the Court will next turn to whether SB 4 unlawfully intrudes upon the federal government's immigration authority.

    *C. SB 4's criminalization of unlawful entry and re-entry intrudes into the federal government's field.*

Beginning with Texas's prohibitions on unlawful entry and re-entry, Arizona expressly forbids the sort of "concurrent" criminalization that Texas seeks to impose. 567 U.S. at 400; Tex. Penal Code § 51.02–51.03. There, in response to

---

[15] State authorities may assist in this enforcement under federal supervision. E.g., 8 U.S.C. § 1357(g).
[16] Subject to certain other federal provisions.

surging numbers of immigrants crossing its southern border, Arizona passed SB 1070 to "discourage and deter the unlawful entry and presence of" noncitizens in the country. Id. at 392–93. SB 1070 had four separate provisions: Section 3, which made it a state crime to comply with federal registration requirements; Section 5(c), which made it a state crime for an unauthorized noncitizen to seek or engage in work in Arizona; Section 6, which authorized officers to arrest a person without a warrant if there was probable cause to believe they were removable; and Section 2(B), which allowed officers conducting stops or arrests to verify a person's immigration status. Id. at 393–94. The Court found that all provisions were preempted, except for Section 2(B), which the Court believed would be better suited to resolution after the law took effect. Id. at 415–16.

SB 4 and SB 1070 contain striking similarities. As SB 1070 did previously, SB 4 attempts to "add[] a state-law penalty for conduct proscribed by federal law." *Arizona*, 567 U.S. at 400; see Tex. Penal Code §§ 51.02–51.03 (criminalizing under Texas law violations that mostly match 8 U.S.C. § 1325(a) and 8 U.S.C. § 1326(a)). As the Supreme Court found in Arizona, these federal provisions already act as "a full set of standards" "designed as a harmonious whole." Arizona, 567 U.S. at 401. Even accepting for purposes of argument that SB 4 merely imposes state law penalties for existing federal crimes, ""[p]ermitting the State to impose its own penalties for the federal offenses [] would conflict with

the careful framework Congress adopted." <u>Id.</u> at 402. SB 4 allows the state to "bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." <u>Id.</u> at 402. For that reason, "[w]here Congress occupies an entire field, as it has in the field of [noncitizen] registration, complementary state regulation is impermissible." <u>Id.</u> at 401. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." <u>Id.</u> (citing <u>Silkwood v. Kerr–McGee Corp.</u>, 464 U.S. 238, 249 (1984)).

In sum, Sections 51.02 and 51.03 of SB 4 cannot be differentiated from Section 3 of SB 1070. Tex. Penal Code § 51.02–51.03. Both laws attempt to vest a state with the power to punish federal immigration offenses. But the "basic premise of field preemption," reaffirmed in <u>Arizona</u>, is that "[s]tates may not enter, in any respect, an area the Federal Government has reserved for itself[.]" <u>Id.</u> at 402. Under the holding of <u>Arizona</u>, SB 4 must be pre-empted.

*D. SB 4's removal authorization is patently unconstitutional.*

Texas's criminalization of unauthorized entry and re-entry is preempted under <u>Arizona</u> and the federal government's dominant interest in regulating immigration enforcement. Article 5(B).002 of SB 4, however, is an especially problematic intrusion on federal prerogatives. Tex. Code of Crim. Proc.

art. 5(B).002. Article 5(B).002 goes even further than Arizona's SB 1070 by authorizing Texas state or magistrate judges to remove noncitizens from the United States without notice or consent from the federal government. Id. Before conviction, a judge may only order removal if a noncitizen consents, but after conviction, a state judge "*shall* enter" a removal order. Id. art. 5(B).002(a)–(d) (emphasis added).

This exceeds even what the dissenting Justices in Arizona believed to be constitutional. Arizona, 567 U.S. at 427 (Scalia, J., dissenting in part) (arguing that SB 1070 was constitutional because it only allowed detention and "does not represent commencement of the removal process unless the Federal Government makes it so"); id. at 438 (Thomas, J., dissenting in part) (suggesting states have power to make arrests but not discussing power of removals); id. at 457 (Alito, J., dissenting in part) ("State and local officers do not frustrate the removal process by arresting criminal [noncitizens]. The Executive retains complete discretion over whether those [noncitizens] are ultimately removed.").

Removal touches upon some of the most sensitive foreign affairs considerations of federal immigration policy. Id. at 409 (majority opinion) ("A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice."); Jama, 543 U.S. at

348 ("Removal decisions, including the selection of a removed [noncitizen's] destination, may implicate [the United States'] relations with foreign powers and require consideration of changing political and economic circumstances.") (internal quotation marks omitted). To that end, the INA vests removal authority exclusively with the federal government. 8 U.S.C. § 1229a(a)(3) ("[A] proceeding under this section shall be the sole and exclusive procedure for determining whether a [noncitizen] may be admitted [or] removed from the United States."). To allow Article 5(B).002 to take effect would allow states and state-court judges to shape a key aspect of American foreign policy and intrude upon a field explicitly entrusted to federal control by Congress. The federal government's domain over removal prohibits concurrent state regulation. By authorizing state officials to conduct removals, Article 5(B).002 of SB 4 intrudes into a particularly sensitive area of foreign affairs and is field preempted.

E. *Arguments Against Field Preemption*

1. Nothing in Arizona limited field preemption to noncitizen registration.

Given that SB 4 goes even further to regulate immigration than SB 1070, the law is likely field preempted. Texas's arguments against field preemption are unavailing.

First, in response to the Plaintiffs' arguments on field preempted, Texas first argues that the "only field preemption recognized in Arizona is the

'field of [noncitizen] registration.'" (Dkt. # 25 at 15) (quoting <u>Arizona</u>, 567 U.S. at 403). This is simply not an accurate recitation of <u>Arizona</u>, which explicitly applied field preemption to parts of SB 1070 besides noncitizen registration. 567 U.S. at 403–11. Nothing in <u>Arizona</u> suggests [noncitizen] registration was the *sole* area of immigration to be field preempted. <u>Id.</u> The Supreme Court merely used the phrase "field of [noncitizen] registration" because it was discussing the specific portion of SB 1070 that regulated registration in that quote.

      <u>Arizona</u>'s preemption of other portions of SB 1070 shows that the decision was not limited to noncitizen registration. In its discussion of Section 6, <u>Arizona</u> explicitly ruled, "By authorizing state officers to decide whether [a noncitizen] should be detained for being removable, [Section 6 of SB 1070] violates the principle that the removal process is entrusted to the discretion of the Federal Government." <u>Id.</u> at 409.

      In fact, the Supreme Court's treatment of SB 1070's provision on removability determinations was even more harsh than its discussion of the provision on noncitizen registration. <u>See Arizona</u>, 567 U.S. at 401–09. SB 4's regulation of unauthorized entry and removability cuts against—not for—the constitutionality of the law. Regulation of unlawful entry has an even stronger connection to federal interests than noncitizen registration. Unlawful entry implicates key federal interests, including regulation of the border, the power of

removal, and diplomatic considerations such as when and where noncitizens may apply for asylum. See, e.g., id. at 401–11; Hines, 312 U.S. at 64–66. For those reasons, Congress has explicitly stated that federal immigration law is the "sole and exclusive" means of determining admissibility. 8 U.S.C. § 1229a(a)(3). Texas cannot dispute that "[t]he federal statutory directives" here "provide a full set of standards," including "punishment for noncompliance," and that SB 4 "adds a state-law penalty for conduct proscribed by federal law." Arizona, 567 U.S. at 400–01. Field preemption applies to the regulation of unlawful entry under SB 4, just as much as it applied to noncitizen registration and removability determinations in Arizona.

### 2. SB 4 authorizes the removal of noncitizens, and the power of removal is preempted.

Next, Texas argues that orders under SB 4 are not "removals." (Dkt. # 25 at 16). Texas relies on a declaration from a regional DPS director stating that Texas will not remove detainees from the state, but instead "have an officer escort the [noncitizen] to a port of entry." (Escalon Decl., Dkt. # 25-3 at 2). Despite stating that Mexico is a "failed narcostate" (Dkt. # 25 at 2), Texas's declarant Victor Escalon insists that Texas DPS "enjoys a cooperative relationship with" Mexican police and "expects to work with Mexican authorities to request they allow entry of [noncitizen] returnees." (Escalon Decl., Dkt. # 25-3 at 2–3). "If Mexican authorities do not accept the entrance of [a noncitizen] subject to an order

to return, the escorting DPS officer will deliver him to the American side of a port of entry and observe the [noncitizen] go to the Mexican side." (Id.).

Under Escalon's description, an officer takes a noncitizen, escorts them to another country, and departs after the noncitizen enters the other country. This is the same thing as a removal. Removal, Black's Law Dictionary (11th ed. 2019) ("The transfer or moving of a person or thing from one location, position, or residence to another."); see also Deportation, Black's Law Dictionary (11th ed. 2019) ("The act or an instance of removing a person to another country; esp., the expulsion or transfer of [a noncitizen] from a country."). Texas escorts a noncitizen to the border and they either depart into Mexico or are face 20 years in prison if they do not. Given that Texas may incarcerate someone for 20 years if they do not cross into Mexico, it is rather absurd to argue, as Texas does, that DPS officers are not "forcing" the noncitizen to cross. Tex. Penal Code § 51.04(b).

Texas contends, "Effectuating any forced removal from the country remains the task of federal CBP officers." (Dkt. # 25 at 16). This is simply not what Texas's declarant says. Escalon states that a Texas officer will deliver a noncitizen to a port of entry and the noncitizen will be charged with a second-degree felony if they do not then enter Mexico. (Escalon Decl., Dkt. # 25-3 at 2–3); Tex. Penal Code § 51.04. The sole difference, then, is whether the removal occurs

in handcuffs or under threat of handcuffs (and 20 years of prison), and that is not a distinction of constitutional significance.

Texas seems to argue that there are no foreign affairs considerations implicated by these removals so long as Mexican border officers consent to the entry. (Dkt. # 25 at 16). Mexico's own position on SB 4 flatly contradicts this theory. Despite Escalon's statement that DPS has a solid working relationship with Mexico, the country has repeatedly condemned SB 4. When SB 4 was adopted, Mexico expressed its opposition. See Press Release 476, Mexican Government opposes the anti-immigrant legislation passed in Texas, Secretary of Foreign Relations of Mexico (Nov. 15, 2023), available at https://perma.cc/RP7H-JXZR. Mexico noted that SB 4 would violate its own sovereign right "to determine its own policies regarding entry into its territory." Id. Mexico's President, Andrés Manuel López Obrador, called SB 4 "inhumane" and protested the law with the United States federal government. (Jacobstein Decl., Dkt. # 14-1 at 4). A representative of the U.S. State Department notes that "Mexico has signaled emphatically that" "removal orders under SB 4" would "frustrate the United States' relations with Mexico regarding noncitizen removals and likely other important bilateral issues." (Id. at 5). In sum, there is no need to engage in theoretical discussions about why removals *might* impact foreign affairs—it is

clear from the evidence that SB 4 *already has* impacted the United States' foreign relations.

Supreme Court precedent shows that only the federal government may remove noncitizens. Arizona, 467 U.S. at 409 (majority opinion); Jama, 543 U.S. at 348. Texas's attempts to circumvent this well-established precedent are unavailing. Regardless of whether DPS officers physically force noncitizens across the border, or if Mexican police officers agree to a removal, SB 4's removal provision significant implicates foreign affairs. These foreign policy decisions must be made by one voice: the federal government's.

### 2. Immigration enforcement laws with "concurrent" purposes are preempted.

Texas next argues that SB 4 "mirror[s] federal law" and is "consistent with" its federal counterparts. (Dkt. # 25 at 17-18). But Congress has spoken clearly on the issue, noting that federal statutes are the "the sole and exclusive procedure" for determining admissibility and removability of noncitizens. 8 U.S.C. § 1229a(a)(3). However, by permitting removals, SB 4 effectively allows state officials to make removability determinations, thereby authorizing state regulation of an exclusive federal field. There can be no "consistent" state regulation when Congress has explicitly designated federal law as the "sole and exclusive" authority. See Villas at Parkside Partners v. City of Farmers Branch, 726 F.3d 524, 531–32 (5th Cir. 2013) (plurality) (holding that an ordinance "interferes with the

careful balance struck by Congress" by "giving state officials authority to act as immigration officers outside the limited circumstances specified by federal law" (internal quotation marks omitted)).

Again, this was squarely addressed by <u>Arizona</u>. 567 U.S. at 408. <u>Arizona</u> makes clear that even concurrent laws risk thwarting federal immigration objectives. <u>Id.</u>; <u>see also GLAHR</u>, 691 F.3d at 1264 (noting from <u>Arizona</u> that "the Supreme Court dismissed the state's argument that its goal of concurrent enforcement was appropriate in a field occupied by federal regulation."). Allowing state officers to arrest noncitizens based on removability "would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some [noncitizens] . . . who federal officials determine should not be removed." <u>Id.</u> That is especially the case with SB 4, which will lead to the arrest and incarceration of (eventual) successful asylum applicants, noncitizens with credible fears of torture, and victims of abuse and trafficking who report their crimes to the police.

Due to the careful considerations involved in determining admissibility and how to treat removable noncitizens, <u>Arizona</u> specifies that Congress created a system with "limited circumstances in which state officers may perform the functions of an immigration officer." <u>Id.</u> SB 4 goes beyond those limited circumstances and exceeds the role Congress has granted the states in

immigration enforcement. For the same reason, courts have found state laws on human-smuggling preempted by federal immigration law. See, e.g., GLAHR, 691 F.3d at 1263–64 (finding a state human smuggling law preempted by comprehensive federal immigration provisions); United States v. South Carolina, 720 F.3d 518, 530-31 (4th Cir. 2013) (same); Valle del Sol Inc. v. Whiting, 732 F.3d 1006, 1024-25 (9th Cir. 2013) (same). "Congress has provided a broad and comprehensive plan describing the terms and conditions upon which [noncitizens] may enter this country, how they may acquire citizenship, and the manner in which they may be deported." Hines, 312 U.S. at 69. Congress "plainly manifested a purpose to do so in such a way as to protect the personal liberties of law-abiding [noncitizens] . . . and to leave them free from the possibility of inquisitorial practices and police surveillance." Id. at 74. States "cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." Id. at 66–67. SB 4's supposed concurrent purpose with federal law cannot save it from preemption.

> 3. Texas's dissatisfaction with immigration enforcement does not show complete abandonment by the United States.

Texas takes aim at existing Supreme Court precedent, suggesting that "[s]everal members of the Supreme court have questioned the more recent and profligate use of field preemption . . . ." (Dkt. # 25 at 19). A district or appeals court is not at liberty to disavow Supreme Court precedent based off freewheeling

speculation about whether the Supreme Court will change its mind. Stare decisis

commands that "today's Court should stand by yesterday's decisions" and this rule

applies inflexibly to lower courts. Kimble v. Marvel Entm't, LLC, 576 U.S. 446,

456 (2015). Whether Texas agrees with field preemption or not, Arizona

unambiguously instructs that field preemption forecloses state attempts to regulate

entry and removal. 567 U.S. at 400.[17]

           Nonetheless, Texas argues, field preemption does not apply because

the federal government has abandoned the role of immigration enforcement.[18]

(Dkt. # 25 at 19-20) ("[T]he federal executive branch has abandoned the very field

it now purports to occupy."). Texas relies on dicta in a recent decision from

another court in this district that found "[t]he evidence presented amply

demonstrates the utter failure of [DHS] to deter, prevent, and halt unlawful entry

into the United States." Texas v. DHS, No. DR-23-CV-00055-AM, 2023 WL

---

[17] The principle of stare decisis is particularly important in the context of a preliminary injunction. Preliminary relief is granted to maintain the status quo. See Ruiz v. Estelle, 650 F.2d 555, 565 (5th Cir. 1981). A change in precedent, by definition, cannot serve to maintain the status quo.

[18] In making this argument, Texas parrots the statements made by its governor and state politicians decrying the federal government's immigration policy. See, e.g., Greg Abbott, Press Release, Greg Abbott, Governor of Texas, Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf ("President Biden has refused to enforce [immigration] laws . . . ."). Political hyperbole cannot substitute for legal argument. The Court must decide issues based the laws and facts before it. It is improper for courts to accept a fact as true simply because a governor has declared it so or the House of Representatives narrowly declares so in a non-binding resolution.

8285223 (W.D. Tex. Nov. 29, 2023); <u>rev'd by injunction pending appeal,</u> 88 F.4th

1127 (5th Cir. 2023), <u>vacated,</u> No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024).

The Court cannot transfer the evidentiary findings of one case into

this one.[19] The record before this Court in this case does not establish

abandonment—in Texas or otherwise in the United States.[20] The Court is

sympathetic to Texas's concerns at the border, but to say that the Biden

Administration has "abandoned" the field of immigration is to take hyperbolic

criticism literally. Contrary to Texas's position, the record is replete with examples

and evidence of the federal government carrying out its immigration duties. DHS's

Executive Office for Immigration Review ("EOIR") employs 6,000 immigration

officers nationwide, while Homeland Security employs 6,100 special agents. (Hott

Decl., Dkt. # 14-4 at 2–3). Immigration and Customs Enforcement ("ICE")

manages a docket of 6.8 million cases, including noncitizens in removal

proceedings or those who have received removal orders. (<u>Id.</u>). ICE has 19,102 beds

for detained noncitizens in Texas alone. (<u>Id.</u> at 5).

---

[19] And at any rate, the failure to prevent all unlawful entries does not equate to abandonment. Texas cites no cases for the proposition that the failure to regulate with complete effectiveness constitutes abandonment.

[20] A party cannot simply rest on the dicta of a previous district court case to estop this court's fact-finding role. That is especially true when Texas described that district court's reasoning elsewhere as "mistaken" "unavailing" and an "outlier holding" parting ways with established circuit precedent. <u>Texas v. DHS</u>, 88 F.4th 1127 (5th Cir. 2023), (Pet. Br., Dkt. # 25 at 12, 17; Reply, Dkt. # 47 at 4).

From May 2023 to November 2023, DHS "removed or returned over 400,000 [individuals]", the vast majority at the southwest border. CBP, CBP releases November 2023 monthly update (Dec. 22, 2023), https://perma.cc/XQW4-55XW. These numbers "nearly [equal] the number removed and returned in all of fiscal year 2019 and exceeds the annual totals for each year 2015 – 2018." Id. "Daily removals and enforcement returns per day are nearly double what they were compared to the pre-pandemic average (2014 – 2019)." Id.

Beyond arresting and removing noncitizens, the United States has engaged in successful diplomatic talks to reduce unauthorized immigration. For example, the United States has "secured commitments from partner governments to" advance two programs designed to reduce immigration flows: the "Root Causes Strategy, which focuses on the main challenges that drive irregular migration, and the Collaborative Management Strategy, which is devoted to fostering the international cooperation necessary to enhance safety . . . and reduce irregular migration." (Jacobstein Decl., Dkt. # 25-1 at 6–7). The United States has partnered with Mexico for both initiatives and led a multilateral framework in Central America to reduce irregular migration. (Id.). Most recently, high-ranking cabinet officials met with President López Obrador in December 2023 stressing the need to reduce irregular migration and enhance border security efforts. (Id.; Dkt. # 14, at 10). Again, Texas may disagree with diplomatic efforts or contest their

effectiveness, but it cannot maintain in good faith that those efforts constitute "abandonment."

It is simply not accurate to say that hundreds of thousands of removals constitute abandonment. Texas mistakes the figurative for the literal. Whatever hyperbole Texas employs, DHS's actions do not constitute genuine abandonment as a legal determination. Texas may disagree with the number of removals or the way that DHS goes about immigration enforcement, but it cannot legitimately maintain that DHS does *nothing* at the southwest border.[21]

Again, Texas's argument on this point is foreclosed by Arizona. There, the Court recognized in the very first sentence of its opinion that Arizona passed SB 1070 "[t]o address pressing issues related to the large number of [noncitizens] within its borders who do not have a lawful right to be in this country." Arizona, 567 U.S. at 392. Nonetheless, it ruled that three of SB 1070's operative provisions were preempted. Id. Texas contends that Arizona was premised "on the idea that the federal government was, at the time, making good-

---

[21] Texas's sole citation on this point is to Parker v. Brown, 317 U.S. 341, 358 (1943). (Dkt. # 25 at 20). In Parker, California had established programs to restrict competition among farmers to help stabilize prices. Id. at 344–48. Brown, a farmer, sued, arguing the law was preempted by the federal Sherman Act and the Commerce Clause. Id. In particular, Brown argued that the federal Agricultural Marketing Agreement Act, which authorized the Department of Agriculture to limit certain agricultural quantity sales, preempted the law. The Court rejected that argument, noting that the Secretary had not issued any order "putting [the law] into effect." Id. at 358. That is plainly not the case here, where DHS and a litany of other federal agencies have issued hundreds of regulations related to immigration enforcement and conduct thousands of removals each day. See generally 8 C.F.R. §§ 1001. et. seq.

faith efforts to carry out its obligations under federal immigration statutes." (Dkt. #

25, at 21). But Arizona made the same arguments about abandonment as Texas

does. Arizona's brief before the Supreme Court complains at length about the

federal government's allegedly deficient immigration enforcement. See id., Brief

in Support of Petitioners, Arizona, 567 U.S. 387 (No. 11-182), 2012 WL 416748,

at *1 ("The President fairly describes our Nation's system of immigration

regulation and enforcement as 'broken.'"); id. at *8 ("Arizona has repeatedly asked

the federal government for more vigorous federal enforcement, but to no avail.").

Over these objections, the Supreme Court ruled that "authorizing state and local

officers to engage in [removal] enforcement activities as a general matter . . .

creates an obstacle to the full purposes and objectives of Congress" and should be

preempted. Arizona, 567 U.S. at 410.[22]

In sum, the federal government has not abandoned the field of

immigration. Undoubtedly, these government efforts fail to deter all unlawful

migration, and the federal government does not detain or timely remove all

---

[22] If Texas disagrees with the scope or allocation of federal resources to the border, it may still assist with immigration enforcement under the current congressional scheme. Under 8 U.S.C. § 1357(g), DHS may "enter into a written agreement with the state" to carry out "a function of an immigration officer in relation to the investigation, apprehension, or detention of [noncitizens]" in the United States. DHS has signed 150 agreements with local law enforcement, more than half of which have been signed after 2011. Congressional Research Service, The 287(g) Program: State and Local Immigration Enforcement (Aug. 12, 2021), https://perma.cc/GQN4-DVVF. Twenty-six Texas Sherrif's Offices have agreements with the federal government under § 1357(g). (Dkt. # 14 at 8).

noncitizens who unlawfully enter its borders. But those failures are a far cry from abandonment. The federal government retains a dominant interest in immigration and a complex legal framework to regulate noncitizen entry and removal. SB 4's intrusion into that federal arena is field preempted.

## II. Conflict Preemption

Beyond field preemption, SB 4 is conflict preempted. A state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67. To show conflict preemption, Plaintiffs need not show that the laws achieve different ends. Rather, a "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." Motor Coach Employees v. Lockridge, 403 U.S. 274, 287 (1971).

Arizona is again instructive. There, Section 5(c) of SB 1070 made it a state misdemeanor for "an unauthorized [noncitizen] to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor." Arizona, 567 U.S. at 403. [23] The Court found that "Congress enacted . . . a comprehensive framework for combatting the employment of illegal [noncitizens]." Id. Namely, Congress combatted this by regulating domestic

---

[23] In a brief discussion, the Supreme Court also found Section 3 to be conflict preempted. See Arizona, 567 U.S. at 402–03.

employers under the INA, whereas SB 1070 punished noncitizen employees. Id. Although federal law and SB 1070 both generally punished the employment of noncitizens, the Court found that SB 1070's differing enforcement mechanism "would interfere with the careful balance struck by Congress with respect to unauthorized employment of [noncitizens]." Id. at 406.

Arizona shows that state restrictions on immigration that exceed or differ in enforcement mechanisms from federal regulations are preempted. The question for SB 4 is whether its operative provisions conflict with federal law, stand as an obstacle to the objectives of Congress, or employ disruptive or conflicting techniques. See id. at 405–06.

At the broadest level, SB 4 conflicts with federal immigration law because it provides state officials the power to enforce federal law without federal supervision. See Farmers Branch, 726 F.3d at 531–32 (ordinance preempted where it gives "state officials authority to act as immigration officers outside the limited circumstances specified by federal law"); Arizona, 567 U.S. at 408 (noting that federal law specifies only "limited circumstances in which state officers may perform the functions of an immigration officer"). Congress has enacted a statutory scheme to ensure that federal immigration law is conducted under the watch of federal officials in a uniform way across all 50 states, and SB 4 interferes with that goal. See 8 U.S.C. § 1057(g).

SB 4 also divests federal immigration authorities of the discretion of the enforcement of immigration laws, which touches on delicate considerations of foreign affairs. Several circuit courts have held similar laws to be conflict preempted for this reason. See GLAHR, 691 F.3d at 1265 ("The [state laws], however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."); Valle del Sol, 732 F.3d at 1027 ("[State law] conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes."); United States v. Alabama, 691 F.3d 1269, 1287 (11th Cir. 2012) ("[State law] undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration."); United States v. South Carolina, 720 F.3d at 532 (finding conflict because the state law would "strip federal officials of the authority and discretion necessary in managing foreign affairs").

As the United States argues, SB 4's removal orders will also "prevent noncitizens from asserting affirmative defenses to removal that would have been available in the federal system, including asylum, see 8 U.S.C. § 1158(a)(1), withholding of removal, see id. § 1231(b)(3), or protections under the Convention Against Torture, see 8 C.F.R. § 1208.16(c)(2). (Dkt. # 14 at 22). SB 4 specifies that "a court may not abate the prosecution" on "the basis that a federal determination

regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003.

In response, Texas contends that "to the extent SB 4's text omits other defenses available under federal law, it does not preclude them" because Texas "courts must determine whether federal law prevents enforcement of a conflicting state law[.]" (Dkt. # 25 at 14) (citing In re Academy, Ltd., 625 S.W.3d 19, 35 n.19 (Tex. 2021)). But Texas ignores the provision of SB 4 that specifically instructs its courts "not [to] abate the prosecution" of noncitizens on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. Art. 5B.003. SB 4 plainly conflicts with federal law by instructing state judges to disregard pending federal defenses.

Texas invokes constitutional avoidance, but that doctrine is inapplicable to SB 4. "Under the doctrine of constitutional avoidance, where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Hersh v. U.S. ex rel. Mukasey, 553 F.3d 743, 753–54 (5th Cir. 2008) (cleaned up). However, the "canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" Jennings v. Rodriguez, 583 U.S. 281, 296 (2018) (quoting Clark v.

Martinez, 543 U.S. 371, 385 (2005)). "In the absence of ambiguity, the canon simply 'has no application.'" Id. (quoting Warger v. Shauers, 574 U.S. 40, 50 (2014)). Here, there is only one plausible interpretation of Article 5B.003: State courts may not abate a prosecution based on the pending federal determination of a noncitizen's immigration status. Tex. Code of Crim. Proc. Art. 5B.003.[24] By expressly disallowing the consideration of federal admissibility determinations, SB 4 conflicts with federal law. No substantive canons statutory construction can save the law from that conclusion.

Asylum, withholding, and protection against torture are all federal methods of determining a noncitizen's immigration status. *See* 8 U.S.C. § 1158(a)(1), id. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(2). Refusal to abate removal pending these determinations undermines federal law. See 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such [noncitizen's] status, may apply for asylum."); id. § 1158(c)(3) (authorizing removal upon determination of inadmissibility). A noncitizen cannot readily avail

---

[24] In addition, SB 4 supplants the role of Article I and Article III judges. At the preliminary injunction hearing, Texas attempted to defend SB 4 by suggesting that state court judges will interpret the state law consistent with the U.S. Constitution and federal law, including asylum defenses. But only federal judges may make these determinations. See, e.g., 8 U.S.C. § 1158(d)(1); id. § 1252; 8 C.F.R. § 1003.10; id. § 1003.1(b). A state court may not substitute a federal determination of credible fear of persecution for its own assessment. There can be no consistency in the state's assumption of powers delegated exclusively to the federal government.

themselves of these defenses if the state court cannot abate removal pending its determination. Because a state court cannot follow both SB 4 and federal immigration defenses, they conflict. Like SB 1070, SB 4's removal provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona, 567 U.S. at 399.

SB 4 also conflicts with federal law because noncitizens will be removed to Mexico, regardless of their country of origin and in contrast to federal law on removal destinations. (Dkt. # 14 at 22; Escalon Decl., Dkt. # 25 at 2–3). Federal law sets out the circumstances for where the federal government may remove a noncitizen, and the United States regularly engages in diplomatic discussions with foreign governments to determine whether they will accept noncitizens. See 8 U.S.C. § 1231(b). SB 4 states a judge may order a person "to the foreign nation from which the person entered or attempted to enter . . . ." Tex. Code of Crim. Proc. art. 5(B).002. Texas's response makes clear that these removals will all be to Mexico. (See Escalon Decl., Dkt. # 25-3 at 2–4). That policy decision conflicts with federal law, which requires officials to remove a noncitizen to their designated country of removal, subject only to certain exceptions. See 8 U.S.C. §§ 231(b)(2)(A), (C). The Department of State, for its part, has made clear that Texas's removal policy will hamper diplomatic discussions regarding immigration with Mexico. (Jacobstein Decl., Dkt. # 14-1 at

4–5, 10). Texas's decision to remove all noncitizens detained under SB 4 to Mexico will cause the federal government to lose the ability to speak "with one voice" on removals. <u>Arizona</u>, 567 U.S. at 409; <u>Jama</u>, 543 U.S. at 348.

        Mexico's objection to SB 4 shows why SB 4's choice-of-country removal is a serious problem. SB 4 will directly harm the United States's relationship with Mexico. Even before SB 4's enactment, Mexico "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), available at https://perma.cc/RP7H-JXZR. The Supreme Court recently explained that attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico[.]" <u>Biden v. Texas</u>, 597 U.S. 785, 806 (2022).

        Texas suggests that state laws should not be enjoined on the basis that it strains foreign relations. (Dkt. # 25 at 34–35) (citing <u>Medellín v. Texas</u>, 552 U.S. 491, 496–98 (2008)). <u>Medellín</u> dealt with the execution of a Mexican citizen in violation of the Vienna Convention on Consular Relations as determined by a non-self-executing decision of the International Court of Justice ("ICJ"). 552 U.S. at 493–96. In <u>Medellín</u>, Texas acted within its domestic police powers with no "directly enforceable federal law that pre-empt[ed] state limitations . . . ." <u>Id.</u> at

498. Here, by contrast, Texas attempts to act within a field directly related to foreign affairs that is governed by vast and sensitive agreements, treaties, and laws made by the federal government. (See Dkt. # 14 at 22–23; Jacobstein Decl., Dkt. # 14-1 at 4–5, 10). Put another way, Medellín deals with foreign policy's ability to regulate a state's police powers, not a state's ability to regulate foreign policy.

SB 4 conflicts with federal immigration law in other ways, too. It authorizes an affirmative defense for individuals who are "lawfully present" in the country, even though the Fifth Circuit has held that state judges may not make admissibility determinations due to the complexities of federal immigration law. Tex. Penal Code § 51.02(c)(1)(A); Farmers Branch, 726 F.3d at 535–36. SB 4 also lacks consent exceptions for re-entry into the United States, even though federal immigration law will allow it. See 8 U.S.C. § 1326. Penalties under SB 4 also exceed those under federal law. For example, failure to comply with a federal removal order generally includes a sentence of up to four years, see 8 U.S.C. § 1253; 8 U.S.C. § 1253(a)(1), but the penalty up to 20 years for violating a state removal order under SB 4. See Tex. Penal Code § 51.04.

Finally, the United States argues that SB 4 "conflicts with the statutory scheme Congress enacted that 'specifies [the] limited circumstances in which state officers may' assist with immigration enforcement." (Dkt. # 14 at 24) (citing Arizona, 567 U.S. at 408). 8 U.S.C. § 1357(g) specifies how and when a

state may cooperate with federal law enforcement to assist with immigration enforcement. Section 1357(g) serve a dual role, allowing the federal government to utilize state and local personnel to assist with enforcement while retaining ultimate monitoring and implementation control for the federal government. Arizona, 567 U.S. at 409; see also 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (Rep. Cox) (noting the purpose of § 1357(g) was to "expand the number of personnel who are involved in picking up people in violation of the law" while ensuring "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards."). Texas does not argue this point, and its response makes no mention of § 1357(g) at all. (See Dkt. # 25). SB 4 and § 1357(g) conflict because Congress cannot limit the authority of state officials to assist with enforcement while the state itself claims unlimited concurrent immigration authority.

Given the "significant complexities involved in enforcing federal immigration law," Congress delegated enforcement authority to state officials only under the supervision of DHS. Arizona, 567 U.S. at 409; 8 U.S.C. § 1357(g). "[N]o coherent understanding" of "cooperation" would "incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government." Arizona, 567

U.S. at 410. SB 4 frustrates key aspects of federal immigration law and is conflict preempted.

### III. Foreign Commerce Clause

The United States[25] argues that SB 4 violates the Foreign Commerce Clause because it regulates the movement of noncitizens across an international border. (Dkt. # 14 at 27–28). The Constitution provides that Congress may "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. "[P]recedents firmly establish[] that the federal commerce power surely encompasses the movement in interstate commerce of persons as well as commodities." United States v. Guest, 383 U.S. 745, 758–59 (1966); see also Edwards v. People of State of California, 314 U.S. 160, 172 (1941) ("[I]t is settled beyond question that the transportation of persons is 'commerce', within the meaning of that provision."). "State regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce." Piazza's Seafood World, LLC v. Odom, 448 F.3d 744, 749 (5th Cir. 2006). "Regulations that facially discriminate" against foreign commerce "are virtually per se invalid." Id. Conversely, "nondiscriminatory state regulations affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the

---

[25] The Organizational Plaintiffs do not raise a Foreign Commerce Clause claim.

federal government to 'speak with one voice' in regulating commercial affairs with foreign states." Id. at 750.

In response, Texas argues that courts have long shifted the federal government's authority to control immigration away from the Commerce Clause and towards an inherent aspect of federal sovereignty. (Dkt. # 25 at 32–35). Ultimately, Texas is correct that courts have shifted away from rooting the federal government's power to regulate immigration in the Commerce Clause towards the plenary power doctrine. See Jennifer Gordon, Immigration as Commerce: A New Look at the Federal Immigration Power and the Constitution, 93 Ind. L.J. 653, 671 (2018). But those cases do not signal a rejection of the Commerce Clause's ability to regulate immigration as much as a preference to locate that power in the nation's sovereignty and foreign affairs. Id. at 672–78 (discussing how the Supreme Court's opinion "offers no explanation for the Court's abandonment of the Commerce Clause as the primary source of the immigration power, and few commentators have explored the question."). Indeed, Texas cites no cases[26] holding the Commerce Clause to be inapplicable to immigration even after the shift in the late Nineteenth Century. See Chae Chan Ping v. United States, 130 U.S. 581, 609 (1889). The Supreme Court has repeatedly emphasized that the movement of

---

[26] Texas does cite Equal Access Educ. v. Merten, 305 F. Supp. 2d 585, 608–11 (E.D. Va. 2004), but that case applied a Dormant Commerce Clause test and found that the plaintiff had not met their burden under that standard. It does not hold that the standard is altogether inapplicable.

persons between states is commerce. See, e.g., Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 255–56 (1964); Taylor v. United States, 579 U.S. 301, 306 (2016) ("Congress may regulate under its commerce power . . . persons or things in interstate commerce."). That SB 4 may be preempted under federal immigration power does not negate the possibility it also violates the Dormant Commerce Clause.

Turning to the Fifth Circuit's Dormant Commerce Clause test, "regulations that facially discriminate" against foreign commerce "are virtually per se invalid," and "nondiscriminatory state regulations affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." Piazza's Seafood, 448 F.3d at 750. On its face, SB 4 discriminates against foreign commerce: it criminalizes solely the movement of noncitizens across an international boundary into Texas but says nothing about movement within or out of Texas or movement by U.S. citizens.[27] If SB 4 were not facially discriminatory, it would still violate the Dormant Commerce Clause by "undermin[ing] the ability of the federal government to speak with one voice in regulating commercial affairs with foreign

---

[27] Even if SB 4 is consistent with federal purposes, it "cannot be saved by a showing that it is consistent with the purposes behind federal law." Piazza's Seafood, 448 F.3d at 751.

states." Id. at 750 (internal quotations omitted). Forcing "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." Biden, 597 U.S. at 806. Under the standard set out in Piazza's Seafood, SB 4 violates the Dormant Commerce Clause.

TEXAS'S "INVASION" DEFENSE

In Governor Abbott's words, these federal laws do not apply because "Texas's constitutional authority to defend and protect itself" against an invasion "is the supreme law of the land and supersedes any federal statutes to the contrary." Press Release, Greg Abbott, Governor of Texas, Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf. To discuss "invasion" at length is to take the argument more seriously than it deserves. Still, in a dissenting opinion in a separate but related case, several judges on the Fifth Circuit expressed the importance of analyzing Texas's invasion claim. See United States v. Abbott, No. 23-50632, 2024 WL 551412, at *7–8 (5th Cir. Feb. 9, 2024) (dissenting opinion). That discussion, even if non-binding, weighs on this case. Accordingly, the Court will thoroughly discuss—but ultimately reject—Texas's invasion defense.

In short, Texas's argument fails for at least three reasons. First, unauthorized immigration does not constitute an "invasion" within the meaning of

the U.S. Constitution. Second, Texas is not "engag[ing] in war" by enforcing SB 4. Third, if Texas were engaging in a war, it would have to abide by federal directives in waging that war.

## I. Overview

Article I, Section 10 of the U.S. Constitution limits the states' power to undertake certain activities. U.S. Const. art. 1, § 10. Apart from the final few words, Section 10 describes what a state may *not* do, specifying that a state may not coin money, pass a bill of attainder or an ex post facto law, impose duties, keep troops, enter into foreign agreements, or "engage in war." Id. Clause 3 (the "State War Clause") says in full:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

Id. art. 1, § 10, cl. 3.

In short, the State War Clause provides that a state shall *not* engage in war, with a narrow exception of when it is "actually invaded[.]" When a state—and by extension the United States—is invaded, the federal government must protect from the invasion. As Article IV, Section 4 (the "Guarantee Clause") states:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application

> of the Legislature, or of the Executive (when the
> Legislature cannot be convened) against domestic
> Violence.

Id. art. IV, § 4.

Together, these provisions, along with the broad, interrelated provisions of the federal government's authority to wage war, lay out a structure where the state may respond to immediate military threats until "resources of the federal government can reach the invasion." United States v. Abbott, No. 1:23-CV-863, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023); Torres v. Tex. Dep't of Pub. Safety, 597 U.S. 580, 590 (2022) (detailing federal government's authority over war).

## II. Immigration does not constitute an invasion under Section 10.

To start, surges in unauthorized immigration alone do not qualify as an "invasion" as described in the Constitution. A court "must interpret the Constitution in light of its text, structure, and original understanding—as informed by history and tradition." See Abbott v. Biden, 70 F.4th 817, 827 (5th Cir. 2023) (internal quotations omitted). Therefore, the Court will analyze the phrase "actually invaded" through the definition of the term in the Eighteenth Century, its position within the Constitution, and the history and tradition of war powers and immigration.

Ultimately, all tools of constitutional construction cut against Texas's position. Contemporary definitions of "invasion" and "actually invaded" as well as common usage of the term in the late Eighteenth Century predominantly referred to an "invasion" as a hostile and organized military force, too powerful to be dealt with by ordinary judicial proceedings. This Court could not locate a single contemporaneous use of the term to refer to surges in unauthorized foreign immigration. The text and structure of the State War Clause imply that "invasion" was to be used sparingly for temporary, exigent, and dangerous circumstances. Put simply, the overwhelming textual and historical evidence does not support Texas's understanding of the State War Clause.

*A. Circuit courts have unanimously rejected Texas's position.*

Before undertaking this textual and historical analysis, however, the Court notes that each circuit court to have discussed whether immigration qualifies as an invasion has rejected that characterization. See California v. United States, 104 F.3d 1086, 1090–91 (9th Cir. 1997) (noting the State War Clause "afford[s] protection in situations wherein a state is exposed to armed hostility from another political entity" and "not intended to be used as urged" in the context of immigration); New Jersey v. United States, 91 F.3d 463, 469–70 (3d Cir. 1996) (noting the state failed to show "'invasion' to mean anything other than a military invasion"); Padavan v. United States, 82 F.3d 23, 28 (2d Cir. 1996) ("invasion"

must involve "armed hostility from another political entity" and does not

encompass "the influx of legal and illegal [noncitizens] into" the state). No case

differs from this unanimous position.

      *B. "Actually invaded" refers to an armed and organized hostile force.*

      <u>1. Definitions of "invasion" and "actually invaded" do not accord with Texas's understanding</u>

      Turning to the text, the Court's "analysis must begin with the

language of the instrument, which offers a fixed standard for ascertaining what our

founding document means." <u>Dobbs v. Jackson Women's Health Org.</u>, 142 S. Ct.

2228, 2244–45 (2022) (cleaned up); <u>see also N.Y. State Rifle & Pistol Ass'n v.

Bruen</u>, 597 U.S. 1, 36 (2022) ("[T]o the extent later history contradicts what the

text says, the text controls."). Definitions of "actually invaded" and "invasion"

show that the terms refer to an armed, hostile, organized force entering an area to

conquer or plunder. Immigration does not accord with this definition.

      "Invade" is defined as: "To enter (a country, city, or area) using

military force, in order to take control of it" Invade, Black's Law Dictionary (11th

ed. 2019). "Invasion" is defined as the "incursion of an army for conquest or

plunder." Invasion, Black's Law Dictionary (11th ed. 2019).[28] Webster's 1828

---

[28] Black's Law Dictionary also defines "invasion" to mean a "hostile or forcible encroachment on the rights of another." Invasion, Black's Law Dictionary (11th ed. 2019). An "invasion of rights" is an alternative definition not employed by the Constitution or by Texas.

Dictionary defines the term as a "hostile entrance into the possessions of another; particularly, the entrance of a hostile army into a country for the purpose of conquest or plunder, or the attack of a military force." 1 Noah Webster, American Dictionary of the English Language 113 (1828).[29] The 1828 Webster's dictionary defines "invade" as: "To enter a country, as an army with hostile intentions; to enter as an enemy, with a view to conquest or plunder; to attack." Id. As an example, it gives, "The French armies invaded Holland in 1795. They invaded Russia and perished." Id. Other definitions include, "To attack; to assault; to assail" and "To violate with the first act of hostility; to attack, not defend." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828).

It is not enough that Texas, scouring the contemporary dictionaries, argues that illegal immigration could be an invasion because it could arguably be considered "a hostile entrance." (Dkt. # 25 at 28). Courts look to the natural or normal meaning, not the broadest possible meaning. Noel Canning v. N.L.R.B., 705 F.3d 490, 500 (D.C. Cir. 2013), aff'd, 573 U.S. 513 (2014); Abbott, 70 F.4th at 829 ("[W]e start with the original public meaning of the Constitution's text.")

---

[29] The 1806 definition of "invasion" states, "a hostile entrance, attack, assault." Noah Webster, A Compendious Dictionary of the English Language 164 (1806). It defines "invade" as "to enter or seize in a hostile manner." Id. Johnson's dictionary defines "invasion" as a "hostile encroachment." Samuel Johnson, [Johnson's] Dictionary (reprint, Boston 1828). Providing an example of the term, the dictionary states, "We made an invasion upon the Cherethites," id., referring to military hostilities between King David and the Amalekites. 1 Samuel 30:14 (King James).

(quotation omitted). The natural and normal meaning of "invade," as shown by the predominant dictionary definition, is to enter a country with hostile intent, typically to assault, attack, seize, or plunder. Even accepting that some small number immigrants do traffic drugs or have cartel affiliations, Texas cannot genuinely maintain that noncitizens crossing the border are an organized military force aimed at conquest or plunder.

As for the definition of "actually invaded," crucially, this phrase appears as a term of art in the late eighteenth century, referring specifically to military occupation that is ongoing (as opposed to imminent).[30] It is not, as a modern reader might suppose, synonymous with "genuinely invaded" but instead was used exclusively to describe ongoing military incursions. As one researcher notes, a search of the phrase "actually invaded" (or "actual invasion") appears multiple times in the correspondence of the Founding Fathers. See Founders Online, Nat'l Archives, https://founders.archives.gov.[31] Each example refers to "actually invaded" as a wartime description of military hostilities. For example, George Washington wrote a colonel during the Revolutionary War,

> Application having been made to me by Governor
> Trumbull for Liberty to draw a Quantity of Arms out of

---

[30] See Joshua Treviño, The Meaning of Invasion Under the Compact Clause of the U.S. Constitution, at 6, Tex. Pub. Pol. Foundation (Nov. 2022) (analyzing uses of the phrase "actually invaded" and noting that the "phrase was used as a common term of art, first appearing in Georgia's 1732 colonial charter and at least 60 times in the Revolutionary- and Framing-era correspondence found in the National Archives' online database.").

[31] Id.

the Magazine at springfield for the Militia of that state in
case it should be invaded, I have complied with his request
upon the following Conditions which you will please
observe. That should the state be *actually invaded*, & a
sufficiency of Arms remains in the Magazine after
complying with the Orders which you will receive from
me in a short time under these Circumstances you are to
furnish him with a thousand stand . . . .

Letter from Gen. Goerge Washington to Col. Ezekiel Cheever, (July 7, 1777),

https://founders.archives.gov/documents/Washington/03-10-02-0205 (emphasis

added).

In another passage, Patrick Henry wrote to Henry Laurens:

When the requisition arrived here the Assembly was
sitting. It became necessary to lay the matter before them
as the Law gave the power of marching the Militia to a
Sister State only in cases of *actual Invasion*. An Act was
thereupon passed to enable the Executive to send out the
Militia when certain Intelligence of an intended Invasion
should be received.

Letter from Patrick Henry to Henry Laurens, (Nov. 23, 1778),

https://founders.archives.gov/documents/Madison/01-01-02-0088 (emphasis

added).

Dozens more examples abound,[32] each time in the context of war or a

military incursion. In the expansive sources reviewed by this Court, the Framers

---

[32] Governor William Livingston of New Jersey wrote to George Washington for requisitions,
stating that New Jersey had "been during all that time either actually invaded, or having the
Enemy so near us, as to require a constant Guard . . . ." Letter from William Livingston to
George Washington, (15–16 Aug 1777),
https://founders.archives.gov/documents/Washington/03-10-02-0613. Maryland delegates wrote

never use "actually invaded" to refer to immigration or anything less than a coordinated armed hostile foreign power. The historical use of "actually invaded" refers specifically to ongoing hostilities by a coordinated armed hostile military force. While some small fraction of immigrants may cross the border with malicious intent and some small fraction may be affiliated with paramilitary cartels, SB 4 simply does not target a coordinated armed hostile military force.

### 2. Texas's interpretation does not accord with the structure or context of the Constitution.

Beyond the definition, the Constitution's structure does not support Texas's broad reading of invasion. Article I specifies the powers granted to Congress, including powers related to foreign affairs and immigration. U.S. Const. art. 1; <u>U.S. ex rel. Knauff v. Shaughnessy</u>, 338 U.S. 537 (1950). Section 10 is often called the "Powers Denied States Clause" because it specifies what states may *not* do. U.S. Const. art. 1 § 10. It declares that "[n]o State shall, without the Consent of Congress, . . . engage in war." <u>Id.</u> The power to "engage in war" when "actually

---

to Washington, "[W]e do not look for any immediate aid from the main Army. Such as is consistent with the good of the whole, should the State be actually invaded." Letter from Maryland Delegates to George Washington, (May 23, 1779), https://founders.archives.gov/documents/Washington/03-20-02-0529.
As another example, a letter from Thomas Jefferson states, "I have ever understood that the rule of Congress was to admit no expences to be Continental which were incurred by any state merely under an apprehension of an invasion, but that whenever a state was actually invaded all expences became Continental." Letter from Thomas Jefferson to Friedrich Wilhelm von Steuben, (Jan. 9, 1781), https://founders.archives.gov/documents/Jefferson/01-04-02-0397 (emphasis added).

invaded" is not a broad grant of power but a narrow, temporary exception to a restriction on the states.

It is not a plausible interpretation that the Framers, in carefully specifying Congress's exclusive duty to wage war and control immigration, intended to grant states the unilateral power to disrupt that balance whenever they disagreed with federal immigration policy. To borrow a phrase from statutory construction, the Framers did not hide an elephant in a mousehole. See Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). The natural and plain meaning of "invasion" within the State War Clause is a narrow and time-constrained response in the face of imminent military emergency. The extreme reading adopted by Texas is inconsistent with a rational understanding of "invasion" and the structure of the Constitution.

The natural meaning of the State War Clause grants states the power to engage in war for a very limited time before the federal government can respond. This is clear from the phrase "in such imminent Danger as will not admit of delay," which places "actually invaded" in context. U.S. Const. art. 1, § 10, cl. 3. Again, borrowing from statutory construction, "[A] word is known by the company it keeps[.]" Yates v. United States, 574 U.S. 528, 543 (2015) (holding that words should be read in immediate context to avoid giving "unintended breadth" to certain words). It would be internally inconsistent for the Constitution

to refer to "invasion" as the regular and ongoing intrusion of immigrants into the state, while referring to "imminent danger" as an immediate military threat to which the federal government must rush to respond.[33]

### 3. Other mentions of "invasion" in the Constitution do not support Texas's expansive interpretation.

The Constitution mentions "invasion" three other times. No instance supports Texas's broad reading. See U.S. Const. art I, § 8 cl. 15; id. art. I, § 9, cl. 2; id. art. IV, § 4. First, Article I, Section 8 states that "Congress shall have Power To . . . provide for calling forth the Militia to execute the Laws of the Union, supress Insurrections and *repel Invasions*." Id. art. 1, § 8, cl. 1, 15 (emphasis added). If an "invasion" requires "calling forth the militia," it cannot naturally refer to routine unlawful immigration that is enforced by DPS or DHS officers through routine bureaucratic judicial proceedings.

Second, Article 1, Section 9 mentions "invasion" to note that the "Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Id. art. 1, § 9, cl. 2. The suspension of habeas corpus is a stunning exercise of power. The Writ of Habeas Corpus has been suspended only four times in this country's history: the

---

[33] Similarly, being "actually invaded" must be something to prompt the state to "engage in war." U.S. Const. art. 1, § 10, cl. 3. Unauthorized immigration, even if some small number of immigrants have cartel affiliations, does not provoke states to "engage in war." Id.

Civil War,[34] KKK insurrections during Reconstruction, a guerilla war in the

Philippines, and in Hawaii during World War II.[35] *See* Amanda L. Tyler,

*Suspension as an Emergency Power*, 118 Yale L.J. 600, 662–64 (2009). These

examples show that the Writ of Habeas Corpus has only ever been suspended in

the face of imminent and overwhelming violent direct threats to the stability of the

state or federal government.

      Immigration, however large and taxing on a state's resources, does not

accord with these instances. Unauthorized immigration is not akin to armed and

organized insurrection against the government. Even as Texas points to cartel

violence, it cannot maintain in good faith that the cartels will imminently

overthrow the state government. Nor can the mere presence of ongoing organized

crime, which has long existed in the United States, suffice to justify the suspension

of habeas corpus. Despite the serious threat to public safety that cartels may pose,

it is difficult to accept that the threat is so severe as to justify the wholesale

suspension of Due Process rights in Texas.

      Indeed, British suspension of the writ of habeas corpus was a leading

concern among American Revolutionaries and carefully limited by the Framers in

---

[34] See Ex parte Merryman, 17 F. Cas. 144, 151–152 (C.D. Md. 1861) (rejecting Lincoln's suspension as unconstitutional).
[35] The writ was also restricted to certain enemy combatants in 2006 before that restriction was ruled unconstitutional. See Military Commissions Act of 2006, 10 U.SC 948, Pub. L. 109-366, 120 Stat. 2600; Boumediene v. Bush, 553 U.S. 723 (2008).

the Constitution. See Amanda L. Tyler, Habeas Corpus and the American Revolution, 103 Cal. L. Rev. 645 (2014); Boumediene, 553 U.S. at 739–40 ("The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom."). For that reason, the Framers drafted the Constitution such that the writ could be suspended only in times of great emergency. See id. ("[H]istory counseled the necessity for specific language in the Constitution to secure the writ and ensure its place in our legal system."); Akhil R. Amar, Of Sovereignty and Federalism, 96 Yale L.J. 1425, 1509, n.329 (1987) ("[T]he non-suspension clause is the original Constitution's most explicit reference to remedies"). And as the Court explained in Boumediene, the Framers enacted the Constitution with structural barriers to prevent abusive suspension of the writ. Boumediene, 553 U.S. at 739–40. It is not plausible that the Framers, so cognizant of past abuses of the writ and so careful to protect against future abuses, would have granted states the unquestioned authority to suspend the writ based on the presence of undocumented immigrants.[36]

---

[36] Accepting, for the purposes of argument, that Texas is under invasion, the power to suspend the writ would lead to enormously disproportionate consequences. The Governor and the President would have unilateral and unchecked authority to detain anyone who might be suspected of entering the United States illegally. Anyone suspected of drug or arms trafficking could be arrested and indefinitely imprisoned without review. That suspension would carry on indefinitely, so long as there remained some level of unauthorized immigration or some threat of organized crime.

Finally, the Constitution mentions "invasion" in reference to the Guarantee Clause.[37] The Guarantee Clause is noteworthy because it differentiates "invasion" from "domestic violence." Texas's argument, however, rests on equating domestic criminal activity with a military "invasion." (See Dkt. # 25 at 25) (noting that Texas has launched operations to respond to "non-state actors perpetrating human slavery, violent assaults, weapon- and drug smuggling" within Texas). Again, the Court need not downplay the cartels' criminal activity to show that it does not speak to the wartime activity envisioned by "invasion" within the meaning of the Constitution.

In sum, the uses of "invasion" in the Constitution refer to pressing military emergencies. The power to suspend the writ of habeas corpus or repel invasions with militias strongly suggests that an "invasion" was not a term used lightly or metaphorically. In light of the Constitution's structure and contemporary use of "invasion," the original public meaning of the term would have referred to an exceptionally dangerous incursion of organized armed hostiles.

> *C. The historical tradition of the United States refers to invasion as an armed hostile force.*

---

[37] Texas posits that the Clause "establishes two different rules for dealing with two different scenarios." (Dkt. # 25 at 24). In domestic violence, a state "may seek help from the federal government," but for an "invasion," a state "need not invite federal protection." Id. Texas interprets the clause backwards. The federal government always retains the guarantee to "protect . . . against Invasion" but only has the same duty to protect against "domestic violence" if requested by the state. U.S. Const. art. IV, § 4. In other words, the federal government has more, not less, authority to protect against invasion than domestic violence.

<u>1. The Federalist Papers</u>

The history and tradition of the United States does not support the broad reading of invasion that Texas suggests. From the Federalist Papers to ratification debates, scant evidence supports Texas's understanding of invasion. In the Federalist Papers, every relevant invocation of the word speaks in terms of organized, hostile military or naval actions.

In support of its argument, Texas cites Federalist 43 for the proposition that a federal government's power to assist an invasion "will be a harmless superfluity" if the state is able to defend itself. (Dkt. # 25 at 25). Texas, however, cites a line that does not refer to "invasion"—much less to one under the State War Clause. (<u>Id.</u> at 25) (citing The Federalist No. 43 (Madison)). In the passage that Texas quotes, Madison discusses why the federal government must ensure a republican form of state governments under the Guarantee Clause—not why it must repel invasion. <u>Id.</u> The "harmless superfluity" is that the federal government will not need to intervene if a state already has a republican form of government. <u>Id.</u> Madison's quote does not refer to invasion.

To the contrary, Madison's actual discussion of "invasion" in Federalist 43 shows that the term referred to the incursion of hostile foreign militaries. Madison states, "A protection against invasion is due from every society to the parts composing it," again emphasizing the need for a *federal* response to

invasion. The Federalist No. 43 (Madison), at 275 (Clinton Rossiter ed., 1961). His discussion of "invasion" then invokes the Revolutionary War—"[a] recent and well-known event among ourselves [that] has warned us to be prepared for emergencies of a like nature." Id.

In his next essay, Madison again appears to reject Texas's broad expansion of the State War Clause. Federalist No. 44 (Madison). Rather than understanding the invasion clause to grant unchecked emergency powers to a state, Madison passes over the clause entirely, stating, "The remaining particulars of this clause fall within reasonings which are either so obvious, or have been so fully developed, that they may be passed over without remark." Federalist No. 44 (Madison), at 283 (Clinton Rossiter ed., 1961). Again, elephants do not hide in mouseholes. The natural and plain reading of the invasion clause, which allows Madison to pass it over without remark, is that the states may employ the war power as a stopgap military measure—not that states may unilaterally nullify the Supremacy Clause and indefinitely regulate immigration.

The other mentions of "invasion" in the Federalist Papers accord with the United States's view. In Federalist 41, for example, Madison refers to invaders as "predatory" and "licentious" pirates who force residents to "yield[] to their exactions" with residents "compelled to ransom themselves from the terrors of a conflagration . . . ." The Federalist No. 41 (Madison), at 261 (Clinton Rossiter ed.,

1961). Even as Texas might compare modern-day cartels to founding-era pirates, there is no evidence that cartels intend to seize American land, militarily plunder cities, or ransom U.S. citizens, as Madison discusses. Their crimes are not aimed at violently overwhelming domestic police and are not repelled via military responses.

Hamilton, meanwhile, repeatedly writes of "invasion" in the context of war, primarily to emphasize the need for a federal response to war.[38] Criticizing those who argued against two-year appropriations for military funds, Hamilton writes, "Few persons will be so visionary as seriously to contend that military forces ought not to be raised to quell a rebellion or resist an invasion." The Federalist No. 26 (Hamilton), at 187 (Clinton Rossiter ed., 1961). In the Federalist 25, Hamilton again writes that the United States must be able to raise armies so it is not "incapacitated by its Constitution to prepare for defense, before it was actually invaded." The Federalist No. 25 (Hamilton), at 165 (Clinton Rossiter ed.,

---

[38] In one essay, Hamilton encourages the federal government's power to raise duties by asking, "But would it be wise, or would it not rather be the extreme of folly, to stop at this point, and to leave the government intrusted with the care of the national defense in a state of absolute incapacity to provide for the protection of the community against future *invasions* of the public peace, *by foreign war or domestic convulsions*?" The Federalist No. 34 (Hamilton), at 207 (Clinton Rossiter ed., 1961) (emphasis added).

In another, Hamilton writes, "In times of insurrection, or *invasion, it would be natural and proper that the militia of a neighboring State should be marched into another, to resist a common enemy, or to guard the republic against the violence of faction or sedition.* . . . If the power of affording it be placed under the direction of the Union, there will be no danger of a supine and listless inattention to the dangers of a neighbor . . . ." The Federalist No. 29 (Hamilton), at 187 (Clinton Rossiter ed., 1961) (emphasis added).

1961). In the Federalist 8, Hamilton discusses how "chains of fortified places . . . mutually obstruct invasion." The Federalist No. 8 (Hamilton), at 66 (Clinton Rossiter ed., 1961). He explains that Great Britain's insular geography "guard[s] it in a great measure against the possibility of foreign invasion" and therefore does not need a large standing army within the kingdom. Id.

The third Federalist Paper author, John Jay, specifically used the term "invasion" to refer to war. In the Federalist 4, Jay warns against independent state responses to invasion, asking,

> What would the militia of Britain be if the English militia obeyed the government of England, if the Scotch militia obeyed the government of Scotland, and if the Welsh militia obeyed the government of Wales? *Suppose an invasion*; would those three governments (if they agreed at all) be able, with all their respective forces, to operate against the enemy so effectually as the single government of Great Britain would?

The Federalist No. 4 (Jay), at 48 (Clinton Rossiter ed., 1961) (emphasis added).

In sum, the Federalist Papers mention "invasion" solely in the context of an organized, hostile military incursion. And even then, Jay, Madison, and Hamilton all emphasize the need for a unified federal response to invasion. No use of "invasion" refers to immigration.

2. Other mentions of the State War Clause at the time of the Founding

Beyond the Federalist Papers, other mentions of "invasion" at the time of the Founding do not support Texas's definition.[39] In the <u>Debates in the Several State Conventions</u>, this Court could not locate a single mention of "invasion" that refers to unlawful immigration. <u>See</u> Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., 1836). To the contrary, uses of "invasion" refer to the term as a military incursion. <u>See, e.g.</u>, 2 Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., 1836), at 234 ("Those that were attacked called in foreign aid to protect them; and the ambitious Philip [of Macedon], under the mask of an ally to one, invaded the liberties of each, and finally subverted the whole.") (statement of Alexander Hamilton); <u>id.</u> at 137 ("Do you, sir, suppose that, had a British army invaded us at that time, such supineness would have been discovered?") (statement of Elias Mason).

Nor does early congressional legislation support Texas's interpretation. The First, Fifth, and Ninth Congresses all addressed immigration,

---

[39] Professor Frank Bowman III highlights several speeches from the Constitutional Convention mentioning "invasion" as a need to repel a foreign enemy. Frank O. Bowman III, Immigration Is Not an "Invasion" under the Constitution, Just Security, (Jan. 29, 2024), https://www.justsecurity.org/91543/immigration-is-not-an-invasion-under-the-constitution. As he notes, Massachusetts delegate Rufus King asked, "What are the great objects of the Genl. System? 1. defence agst. foreign invasion." <u>Id.</u> Hamilton disparaged the loose German confederation by stating it failed to "protect them against foreign invasion." <u>Id.</u> And Virgina Governor Edmund Randolph encouraged more executive military power to enable protection "against foreign invasion." <u>Id.</u> Bowman also notes that Rhode Island ratified the convention with the provision that "no person shall be compelled to do military duty otherwise than by voluntary enlistment, except in cases of general invasion." <u>Id.</u>

but none referred to it as an invasion. See Joshua Treviño, <u>The Meaning of Invasion Under the Compact Clause of the U.S. Constitution</u>, at 6, Tex. Pub. Pol. Foundation (Nov. 2022); First Congress, stat. II, ch. 33, § 5; Fifth Congress, stat. III, ch. 46, § 4; Ninth Congress, stat. II, ch. 46, § 1. Another early law, the Calling Forth Act of 1792 refers to invasion "from any foreign nation or Indian tribe." Ch. 28, 1 Stat. 264, <u>repealed by</u> the Calling Forth Act of 1795 1 Stat. 424, 3d Cong., Sess. II, Ch. 36 (1795) (repealed in part 1861 and codified at 10 U.S.C. § 12406).[40] The Calling Forth Act authorizes the militia to be deployed against "combinations too powerful to be suppressed by the ordinary course of judicial proceedings . . . ." <u>Id</u>. The notion that "invasions" will overcome judicial proceedings poses a challenge for Texas, which is attempting to regulate the purported immigrant "invasion" through judicial proceedings under SB 4.

In regulating the recently acquired Louisiana Territory, the Eighth Congress stated regional military commanders "shall be specially charged with the employment of the military and militia of his district, in cases of sudden invasion .

---

[40] Texas cites this act to suggest that "invasion" can refer to actions by non-state actors. (Dkt. # 25 at 27). The Court does not disagree with that proposition, but it also does not follow that all non-state actors are then "invaders." Indeed, the Calling Forth Act still speaks of invasion as the sort of hostile military necessity that the President must respond to with armed militias. Calling Forth Act of 1792, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28. ("[W]henever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States, to call forth such number of the militia of the state or states most convenient to the place of danger or scene of action, as he may judge necessary to repel such invasion, and to issue his orders for that purpose, to such officer or officers of the militia as he shall think proper.").

. . and at all times with the duty of ordering a military patrol . . . to arrest unauthorized settlers." Treviño, *supra*, at 7; Eighth Congress, stat. I, ch. 38, § 12. In other words, Congress specifically referred to unauthorized immigration as something separate from an invasion. Id.

Just over a decade after ratification, Madison categorically rejected the notion of removing noncitizens as an act of war in his Report of 1800:

> It is said, that the right of removing [noncitizens] is an incident to the power of war, vested in Congress by the constitution.
>
> This is a former argument in a new shape only; and is answered by repeating, that the removal of [noncitizen] enemies is an incident to the power of war; that the removal of [noncitizen] friends, is not an incident to the power of war.
>
> It is said, that Congress, are, by the constitution, to protect each state against invasion; and that the means of preventing invasion, are included in the power of protection against it.
>
> The power of war in general, having been before granted by the constitution; this clause must either be a mere specification for greater caution and certainty, of which there are other examples in the instrument; or be the injunction of a duty, superadded to a grant of the power.
>
> Under either explanation, it cannot enlarge the powers of Congress on the subject. The power and the duty to protect each state against an invading enemy, would be the same under the general power, if this regard to greater caution had been omitted. *Invasion is an operation of war. To protect against invasion is an exercise of the power of war.*

James Madison, <u>The Report of 1800</u>, (Jan. 7, 1800),

founders.archives.gov/documents/Madison/01-17-02-0202 (emphasis added).

Madison's report explicitly contradicts Texas's position. If the

removal of noncitizens is not an operation of war, then unlawful immigration

cannot constitute an "invasion" under the State War Clause.

\*               \*               \*

Overall, neither the text of the Constitution nor the contemporary

usage of "actually invaded" supports Texas's argument that an influx of

unauthorized immigrants constitutes an invasion. From the text of the Constitution

to the Federalist Papers to early congressional acts, "invasion" does not refer to

unauthorized immigration.

## III. SB 4 is not a wartime measure.

The State War Clause is not an unlimited grant of power in times of

invasion. Rather, it grants states only the power to "engage in War[.]" U.S. Const.

art. 1, § 10, cl. 3. Setting aside that immigration is not an invasion, SB 4 would still

not be constitutional because it does not authorize or relate to any "engage[ment]

in war." <u>Id.</u>

Again, SB 4 generally has three operating provisions. Officers may

arrest noncitizens for unauthorized entry into the state, Tex. Penal Code § 51.02(a),

noncitizens may be arrested for entering or attempting to enter after previous

removals, id. § 51.03, and noncitizens may be removed if they agree to removal or are convicted of an offense under SB 4. Tex. Code of Crim. Proc. Art. 5(B).002.

None of these provisions are operations of war. Rather, they are standard operations of criminal enforcement by state civil authorities. SB 4 is a "war" inasmuch as the "War on Drugs" is a war—a metaphorical invocation of the term "war" to denote a serious effort. Nothing more. SB 4 does not require use of a military, nor will the State send the National Guard into Mexico to wage war on cartels, call upon NATO allies for aid, or hold unauthorized immigrants as prisoners of war as a result of SB 4. In the most basic sense, SB 4 is not an act of war.

Texas instead argues that "the greater power includes the lesser." (Dkt. # 25 at 29) (quoting Moyer v. Peabody, 212 U.S. 78, 84–85 (1909)). In other words, if Texas may engage in war to repel immigrants, Texas posits that it may engage in less militaristic activities that accomplish the same objective. That argument is without merit. Texas is not engaging in war—through SB 4 or otherwise—so it cannot claim that SB 4 is a necessary domestic component of the war effort. And even if it did, the power to "engage in war" does not grant unlimited legislative or immigration authority. See, e.g., Youngstown Sheet &

<u>Tube Co. v. Sawyer</u>, 343 U.S. 579, 642–45 (1952) (Jackson, J., concurring).[41] If this is true for the federal government, then it is most certainly the case for the temporary and narrow exception given to states under the State War Clause. Engaging in war is one function of government; controlling immigration is another. Again, Madison's Report of 1800 specifically rejected the idea that control of immigration is incident to the power of war. James Madison, The Report of 1800, (Jan. 7, 1800), founders.archives.gov/documents/Madison/01-17-02-0202.

      The state's limited and temporary authority to engage in war to repel invasions of organized hostile forces does not amount to a wider authority to regulate in fields preempted by the federal government. The State War Clause itself makes this clear. Even when under invasion, the Clause forbids states from, *inter alia*, entering into treaties, granting letters of marque, laying duties, or keeping troops. The State War Clause authorizes a state only to "engage in war [if] actually invaded," it does not suspend any other restrictions contained in Section 10. U.S. Const. art. 1 § 10 cl. 3. The "actually invaded" clause affects only the power to engage in war and delegates no other powers to the state. Just as Texas

---

[41] <u>See also id.</u> at 649–50. ("[The Forefathers] knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies. Aside from suspension of the privilege of the writ of habeas corpus in time of rebellion or invasion, when the public safety may require it, they made no express provision for exercise of extraordinary authority because of a crisis.").

cannot unilaterally enter treaties or lay duties in wartime, the State War Clause does not grant it the power to violate the Supremacy Clause.

Texas defends SB4 because "[m]illions of [noncitizens] have entered the State of Texas illegally under the Biden Administration . . . and the State has the constitutional power to repel that invasion." (Dkt. # 25 at 28–29). But SB 4 is not limited to times of invasions. The law does not require the Governor's declaration of an invasion or war. Nor does SB 4 halt when immigration flows are reduced or when a new administration takes power or when the federal government increases border security measures. Even accepting for argument that SB 4 is a wartime response to an invasion, that would not make SB 4 constitutional. The law would remain preempted and unenforceable after the end of any "invasion" because the State War Clause affirmatively forbids enforcement of wartime acts once the invasion has ended. See U.S. Const. art. 1, § 10, cl. 3. If the state, by arresting removable noncitizens, is "engaging in war," then the state cannot continue to pursue a wartime measure once the invasion has ended.[42] The result, then, is that SB 4 must expire when immigration flows ebb to levels below those at the time of the governor's declaration. SB 4 contains no such clause.

---

[42] The absurd result of determining that routine criminal prosecutions are "engaging in war" is that the State War Clause would then forbid all state criminal enforcement except in times of invasion.

SB 4 does not begin when an invasion begins or end when an invasion ends. It has no characteristics of a wartime measure, nor does it support other operations of war. Under any rational sense of the phrase, Texas is not "engaging in war" by enforcing SB 4.

## IV. States may not derogate the federal government's war powers.

*A. States cannot engage in perpetual war against the federal government's directives.*

Accepting, again for the purposes of argument, that SB 4 would qualify as a wartime measure, it would be preempted by the federal government's wartime powers.[43] The federal government's control over war powers is uncontested in caselaw. See, e.g., Holmes v. Jennison, 39 U.S. 540, 551 (1840) ("The powers of war and peace, and of making treaties, are conferred upon the general government; and at the same time, expressly prohibited to the states. Every incident, therefore, which follows the grant, is equally included in the prohibition[.]"); United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 318 (1936) ("The powers to declare and wage war, to conclude peace, . . . if they had never been mentioned in the Constitution, would have vested in the federal

---

[43] If it is difficult to imagine why SB 4 as a military action would be preempted by the federal government's military control, that is because it is not a wartime measure. But if the Court were to accept that Texas *could* take military actions to repel immigrants, then the State could also take other actions to repel immigrant "invaders," including launching airstrikes against cartels in Mexico and deploying the state's National Guard into Mexican border cities. That obviously untenable prospect highlights why a state may not, on its own directive and against the federal government's wishes, engage in an indefinite war.

government as necessary concomitants of nationality."); <u>Torres</u>, 597 U.S. at 590 ("[T]he Constitution's text, across several Articles, strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense. . . . [T]he Constitution spells out the war powers not in a single, simple phrase, but in many broad, interrelated provisions."). As <u>Torres</u> notes, "The Constitution also divests the States of like power" and "[t]he States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy." 597 U.S. at 590–92.

   Article I, Section 8 grants Congress the ultimate power to "declare war" and "repel invasions." U.S. Const. art. 1, § 8, cl. 11, 15. The Constitution vests the President—not a governor—as the "Commander in Chief of the Army . . . and of the Militia of the several States." <u>Id.</u> art. 2, § 2, cl. 1. It cannot be that the President and Congress retain power to repel invasions, but the governor may also supplant the federal government's authority when actually invaded. To the contrary, even when the federal government lacks resources to respond, federal law allows the President to direct state resources to repel the invasion.[44] The

---

[44] <u>See</u> 10 U.S.C. § 12406 ("Whenever— (1) the United States . . . is invaded or is in danger of invasion by a foreign nation; (2) there is a rebellion or danger of a rebellion against the authority of the Government of the United States; or (3) the President is unable with the regular forces to execute the laws of the United States; the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws. Orders for these purposes shall be issued through the governors of the States . . . .").

Constitution makes clear that the power to conduct war and repel invasions is entrusted to the federal government. The State War Clause, read consistently with other provisions of the Constitution, authorizes states to respond to invasion only as an emergency interim measure before the federal government may respond.

Put simply, if Texas is engaging in war by enacting SB 4, it must cede authority to the federal government to conduct that war once the federal government has had time to respond to the purported invasion. Here, the United States has had time to respond, and it has directed Texas to halt enforcement of SB 4. (Dkt. # 1-1). If the United States is truly at war, Texas may not direct its officers to disobey that command.

### B. Sovereignty arguments do not allow Texas to ignore the Supremacy Clause or countermand military directives.

If SB 4 constitutes engaging in war, the federal government may direct the war.[45] If SB 4 is not engaging in war, then the State War Clause is largely irrelevant to the constitutionality of the state's action. Attempting to get

---

[45] Texas suggests that the federal government is "unwilling" to repel its purported invasion, and therefore "the State [can] go it alone." (Dkt. # 25 at 25) (citing The Federalist No. 43 (Madison)). Again, Texas quotes from a passage that does not discuss invasion. Moreover, the federal government is not unwilling or unable to respond. The federal government has responded and continues to respond to surges of immigration as they occur on the border. See supra, p. 47–50. Texas may disagree with the scope of that response, but the adequacy of the response is not a question for courts to decide. The determination of when to declare war, as well as satisfaction of the guarantee to repel an invasion, are questions left to the political branches. See California v. United States, 104 F.3d at 1091. If the Court cannot declare that the United States is failing the Guarantee Clause, see Luther v. Borden, 48 U.S. 1 (1849), then it cannot grant Texas's "unnecessary or unwilling" argument. (Dkt. # 25 at 25)

around this, Texas suggests that the State War Clause instead provides for the more general notion of sovereignty that allows the state to defend itself. (Dkt. # 25 at 26–27). The states' police powers, however, are already a part of the preemption analysis. The invocation of the State War Clause may reflect the state's sovereign powers, but it does not independently change the preemption analysis.

Instead, Texas quotes from Madison and John Marshall at Virginia's ratification debate to suggest the state's sovereign power to repel invasions "cannot be said to be repugnant to a concurrence of the [federal] power" to make war.[46] (Dkt. # 25 at 26–27) (quoting 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836)).

A full view of the Virginia ratification debates shows an argument over whether states may raise militias at all, not whether they may use those militias against the federal government's wishes. See Jeffrey M. Hirsch, War Powers Abrogation, 89 Geo. Wash. L. Rev 593, 632 (2021). Both Madison and

---

[46] Madison's full quote is more expository:

> No state shall, without the consent of Congress, lay any duty on tonnage, keep troops or ships of war in time of peace, enter into any agreement or compact with another state, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay." They are restrained from making war, unless invaded, or *in imminent danger*. When in such danger, they are not restrained. I can perceive no competition in these clauses. They cannot be said to be repugnant to a concurrence of the power.

3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836) (emphasis in original).

Marshall emphasize that a state militia may respond to more immediate exigent circumstances, but speak at the convention of the need for the *federal* government to respond to invasion.[47] Madison's quote about a "concurrence of the power" fits within that context, because the state's power to raise a militia to engage in a temporary and limited defensive war in pressing emergencies is not repugnant to the federal government's ultimate authority over war. 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836).

By relying on partial quotes taken in the context of the power to raise militias, Texas reads far too much into the Virginia debates.[48] The notion that

---

[47] Madison begins his speech by arguing that state control of militias in times of invasion would be disastrous. 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 424 (Jonathan Elliot ed., 1836) ("Is [the war power] to be vested in the state governments? If so, where is the provision for general defence? If ever America should be attacked, the states would fall successively. It will prevent them from giving aid to their sister states; for, as each state will expect to be attacked, and wish to guard against it, each will retain its own militia for its own defence. Where is there power to be deposited, then, unless in the general government, if it be dangerous to the public safety to give it exclusively to the states?"). Similarly, Marshall notes,

> What government is able to protect you in time of war? Will any state depend on its own exertions? The consequence of such dependence, and withholding this power from Congress, will be, that state will fall after state, and be a sacrifice to the want of power in the general government. *United we are strong, divided we fall*. Will you prevent the general government from drawing the militia of one state to another, when the consequence would be, that every state must depend on itself?

Id. at 420 (emphasis added).

[48] It is worth noting that Madison grew exasperated by hyper-technical arguments on this point, noting, "If we object to the Constitution in this manner, and consume our time in verbal criticism, we shall never put an end to the business." 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 425 (Jonathan Elliot ed., 1836).

states may call out the militia (or in modern terms, the National Guard), to respond to genuine exigencies is uncontroversial. The Virginia Debates speak to this uncontroversial power to call militias—not to a unilateral authority to declare and conduct war in contravention of the federal government's command.[49] See 10 U.S.C. § 12406 (authorizing President to command national guard); Hirsch, War Powers Abrogation, at 618 ("[T]here was no dispute that states were completely subservient to the federal government when it came to war powers.").[50] Madison's quote must be read in context. Courts must rely on more than just selective

---

[49] Marshall's entire argument is in support of federal war power. Elsewhere in the debates, he argues that the federal government's aim is to "protect the United States, and to promote the general welfare. Protection, in time of war, is one of its principal objects." 3 Debates in the Several State Conventions on the Adoption of the Federal Constitution 226 (Jonathan Elliot ed., 1836)). States "cannot do these things" and the power is vested "[b]y the national government only . . . . It is, then, necessary to give the government that power, in time of peace, which the necessity of war will render indispensable, or else we shall be attacked unprepared." Id. at 226–27.

[50] As Hamilton stated in ratification debates, for example:

> The great leading objects of the federal government, in which revenue is concerned, are to maintain domestic peace, and provide for the common defence. In these are comprehended the regulation of commerce,—that is, the whole system of foreign intercourse,—the support of armies and navies, and of the civil administration. . . . This principle assented to, let us inquire what are the objects of the state governments. Have they to provide against foreign invasion? Have they to maintain fleets and armies? Have they any concern in the regulation of commerce, the procuring alliances, or forming treaties of peace? No. Their objects are merely civil and domestic[.]"

2 The Debates in the Several State Conventions on The Adoption Of The Federal Constitution, 350 (Jonathan Elliot ed., 2d ed., 1836).

Hamilton noted that "federal control of military matters was unconstrained, as there was 'no limitation of that authority . . . to provide for the defence and protection of the community,' especially 'any matter essential to the formation, direction, or support of the national forces.'" Hirsch, supra, at 632 (quoting The Federalist No. 23, at 148 (Hamilton) (Jacob E. Cooke ed., 1961)).

quotations of extemporaneous remarks at one of many ratifying conventions to inform their understanding of the Constitution. And beyond one selective quote about a "concurrence of power," it is established constitutional law that "[t]he States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy." <u>Torres</u>, 597 U.S. at 592.[51]

In sum, for Texas to invoke the temporary "invasion" defense, the state must be "engaging in war" through SB 4. And if Texas is "engaging in war," then the federal government retains complete authority to direct that war once it has capacity to respond. "[T]he structure of the Constitution prevents States from frustrating national objectives in this field." <u>Torres</u>, 597 U.S. at 590. Texas either *is* engaging in war, in which case it must obey federal war directives once the federal military has responded, or it *is not* engaging in war, in which case the State War Clause does not apply.

## V. Nonjusticiability

Finally, Texas argues that an "invasion" is a nonjusticiable political question and therefore, this Court must accept its claim of invasion at face value.

---

[51] The Constitution guarantees the safety of states in event of invasion. The Guarantee Clause requires the federal government to respond to "provide protection from foreign invasion . . . ." U.S. Const. art. IV, § 4, cl. 1. The states, in forfeiting their individual right to wage war, gained the benefit of an unwaivable federal guarantee that they would be protected. Nor is there some issue regarding states being left unable to defend themselves when Congress is not in session. Almost immediately after ratification, Congress passed the Calling Forth Acts to delegate temporary defensive military authority to the President, which have remained in some form since 1792. 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792).

(Dkt. # 25 at 23). This stretches the political question doctrine beyond recognition. The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986).

Typically, a defendant contends that a plaintiff's claim is nonjusticiable and must therefore be dismissed. See, e.g., Rucho v. Common Cause, 139 S. Ct. 2484, 2495–96 (2019) (holding that claims of political gerrymandering are nonjusticiable by federal courts). Here, by contrast, Texas asserts an independent affirmative defense and then argues that its own affirmative defense is nonjusticiable. Put another way, there is a difference between the defense of nonjusticiability and a defense that is nonjusticiable.

Texas's argument conflates these two propositions. If the defense is nonjusticiable, then it should presumably be rejected in the same way that nonjusticiable claims are rejected.[52] See id. To hold otherwise would give any state the right to ignore the Supremacy Clause so long as it could imagine a

---

[52] Texas cites several circuit court cases for the proposition that claims of invasion are nonjusticiable. But those cases cited "invasion" in the context of the Guarantee Clause—not the State War Clause. See Chiles v. United States, 69 F.3d 1094, 1097 (11th Cir. 1995); Padavan v. United States, 82 F.3d 23, 28 (2d Cir. 1996); New Jersey v. United States, 91 F.3d 463, 468 (3d Cir. 1996); California v. United States, 104 F.3d 1086, 1091 (9th Cir. 1997). And the cases dealt with claims for declaratory judgments that the United States was failing its duties under the Invasion Clause. In other words, the claims, not the defenses, were nonjusticiable.

nonfrivolous claim of invasion.[53] That is not how constitutional adjudication works, especially where the incarceration of tens of thousands of individuals may depend on the "nonjusticiable" defense. See Baker v. Carr, 369 U.S. 186, 217 (1962) ("The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."). Indeed, the Supreme Court long ago rejected Texas's theory:

> If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the state may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity. Under our system of government, such a conclusion is obviously untenable.

Sterling v. Constantin, 287 U.S. 378, 397–98 (1932) (Holmes, J.).

Overall, Texas's invasion defense must fail. The Constitution does not refer to immigration as an "invasion." Texas is not engaging in war by enacting SB 4. And even if it was, Texas would necessarily cede that war authority to the federal government. At each step of the way, Texas's radical position falters.

---

[53] If, for example, California wished to enact environmental regulations that conflict with the EPA's, it could claim that pollutants are "invading" the state and that regulations are a necessary response to "engage in war" on pollution. If the United States sued to enjoin the preempted regulations, federal courts would be powerless to decide California's "nonjusticiable" defense.

## IRREPARABLE HARM

## I. The United States' Harm

The United States will suffer immediate irreparable harm if SB 4 takes effect. First, the United States has shown irreparable harm as a matter of law. "If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements." Tex. Midstream Gas Servs., LLC v. City of Grand Prairie, 608 F.3d 200, 206 (5th Cir. 2010); see also United States v. Arizona, 641 F.3d 339, 366 (9th Cir. 2011) (noting, in the context of obstacle preemption, that "an alleged constitutional infringement will often alone constitute irreparable harm"), aff'd in part, rev'd on other grounds, 567 U.S. 387 (2012); New Orleans Pub. Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 366–67 (1989) ("NOPSI") (noting that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of" the Supremacy Clause). "Because the United States has established a likelihood that the [state law] violates the Supremacy Clause, irreparable harm is presumed." United States v. Texas, 557 F. Supp. 3d 810, 821 (W.D. Tex. 2021).

Texas has not addressed per se irreparable harm, which this Court has previously held to effectively concede irreparable harm as a matter of law. See id. ("[F]ailure to enjoin the [state law] causes per se irreparable harm to the federal government. Texas did not respond to this argument in its Opposition brief, and . . .

Texas still did not address the issue at the hearing on this Motion."). Accordingly, it is uncontested that the federal government will suffer irreparable harm as a matter of law. If SB 4 violates the Supremacy Clause, irreparable harm to the United States follows. See NOPSI, 491 U.S. at 366–67.

The United States would also suffer irreparable harm because its foreign relations will be injured if SB 4 takes effect. A State Department representative expects that "SB 4 would result in significant and ongoing negative consequences for U.S. foreign relations." (Jacobstein Decl., Dkt. # 14-1 at 2). SB 4 would immediately disrupt sensitive foreign relations agreements, particularly around the destination for the removal of noncitizens. (Id.); *supra*, p. 42–44. These disruptions are costly, because the state's unconstitutional intrusion into foreign affair distracts from other productive discourse, risks antagonizing American allies, and undermines the country's ability to promulgate foreign policy with one voice. (Id.); Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 383–85 (2000) ("[T]he Executive has consistently represented that the state Act has complicated its dealings with foreign sovereigns and proven an impediment to accomplishing objectives assigned it by Congress.").

The United States engages in regular talks with Mexico to reduce irregular migration at the southern border. See Exec. Order 14010, 86 Fed. Reg. 8267 (Feb. 2, 2021). These discussions may become irreparably derailed if SB 4

takes effect. Id. Most recently, the two countries had a high-level diplomatic meeting resulting in the issuance of a joint communique to reduce irregular migration and continue diplomatic solutions in the area. The White House, Mexico-U.S. Joint Communique (Dec. 28, 2023), https://perma.cc/92CW-APKE. The two countries also lead multilateral negotiations to reduce irregular migration from the Northern Triangle and work to end corruption in the region. (Jacobstein Decl., Dkt. # 14-1 at 3–7). If the United States cannot speak with one voice, then it cannot engage in these talks effectively. The United States cannot, for example, make promises to Mexico about removing noncitizens to their original countries of origin if Texas removes noncitizens under SB 4 into Mexico regardless of their country of origin. It cannot guarantee that asylum applicants will have their claims adjudicated or promise uniform standards for admissibility under SB 4. Although SB 4 purports to deter irregular migration, it threatens to deteriorate diplomatic talks designed to achieve that same goal.

It is no surprise, then, that Mexico has engaged diplomatically with the United States to protest SB 4. (See Jacobstein Decl., Dkt. # 14-1 at 2); Crosby, 530 U.S. at 382 (noting that "a number of this country's allies and trading partners fili[ing] formal protests" was evidence the state law undermined effective diplomacy). Texas denigrates Mexico as "a failed narco-state," (Dkt. # 25 at 3), but that "failed narco-state" is also the United States's largest trading partner,

amounting to $863 billion in trade per year, or $2 million of trade each minute. U.S. International Trade in Goods and Services, U.S. Census Bureau, available at https://www.census.gov/foreign-trade/Press-Release/current_press_release/index.html. More than 1.6 million U.S. citizens live in Mexico, and the country is the top international tourist destination for Americans, with over 33 million traveling to the country in 2022. See U.S. Relations With Mexico, U.S. Dep't of State, https://www.state.gov/u-s-relations-with-mexico; International Visitation to and from the United States, Int'l Trade Admin., https://www.trade.gov/sites/default/files/2023-05/International-Visitation-to-the-United-States.pdf. The United States has a paramount interest in maintaining a strong diplomatic relationship with Mexico, and SB 4 would irreparably harm the federal government by injecting the state's unilateral policymaking into that diplomacy. See Arizona, 567 U.S. at 395 ("Perceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad.").

SB 4 also harms the United States's nonrefoulment obligations. As explained *supra*, p. 56–57, SB 4 frustrates the United States' efforts and obligations to protect individuals fleeing from persecution or torture. The State Department's representative estimates that it will hamper the country's advocacy "for the advancement of human rights" and could be seen as a sign that the country

is scaling back its commitment to international protection. (Jacobstein Decl., Dkt. #

14-1 at 6–11). This would risk incentivizing other countries to do the same—

including Mexico, which saw the third-largest number of asylum applications

globally last year, many of whom would have otherwise entered the United States.

(Id. at 8). The United States cannot, on the one hand, ask Latin American allies to

host asylum applicants while one of its own states simultaneously declines to do

the same. (See id.).

        Other forms of irreparable harm will follow from SB 4's enforcement,

too numerous to spell out in detail. Border Patrol will be unable to conduct

immediate reviews of apprehended migrants. (BeMiller Decl., Dkt. # 14-2 at 2–4).

Even if Texas does share all data related to noncitizen arrets with DHS, the agency

will have a diminished ability to detect time-sensitive threats. (Id.). Hindrances to

the operations of the federal government, especially as to counterterrorism efforts,

constitute irreparable harm. For noncitizens arrested under SB 4, DHS will likely

lose the ability to pursue expedited removals, which must be used to remove

noncitizens within 14 days of their arrival into the country. (See BeMiller Decl.,

Dkt. # 14-2 at 2–4); Designating Aliens For Expedited Removal, 69 Fed. Reg.

48877–01, 48880 (Aug. 11, 2004). SB 4 will result in changes to immigration

flows at the southern border towards the New Mexico, Arizona, and California

borders. (BeMiller Decl., Dkt. # 14-2 at 1–3). These changes will force increased

DHS responses to the region, which will include building new facilities and infrastructure, and may take years to complete. (Id.) (estimating costs of $20 million for single new facility that may hold 500 noncitizens). Terrain along these borders is also more rugged, resulting in more immigrant deaths. (Id.). By changing immigration patterns to more dangerous terrain, SB 4 will also risk placing DHS officers in more danger as they mount emergency responses to individuals in life-threatening situations. (Id.). In sum, the United States has made a clear showing of irreparable harm.

## II. The Organizational Plaintiffs' harm

The United States' harm is more than sufficient on its own to justify enjoining the law. But the Organizational Plaintiffs have also shown they will suffer irreparable harm if the preempted law takes effect.

Both Las Americas and American Gateways currently serve many clients who have entered the United States outside ports of entry and now risk prosecution under SB 4. By advocating for incarcerated clients and expediting asylum applications, the organizations will incur significant costs due to SB 4. These cannot be readily recovered through suits against the state for money damages. Rest. Law Ctr. v. U.S. Dep't of Labor, 66 F.4th 593, 597 (5th Cir. 2023) (noting that "[i]n determining whether costs are irreparable, the key inquiry is not so much the magnitude but the irreparability") (cleaned up); id. ("Even purely

economic costs may count as irreparable harm "where they cannot be recovered in the ordinary course of litigation.") (cleaned up). Likewise, the organization will lose the ability to apply for asylum or withholding on behalf of their clients because SB 4 directs state courts to disregard pending federal determinations of removability. See *supra*, p. 56–58.

SB 4 will particularly damage the Organizational Plaintiffs' programs that encourage victims of abuse or human trafficking to report crimes to the police. Las Americas, (Dkt. # 30 at 18). SB 4 contains no provision abating arrest or removal based on investigations into the abuse or trafficking.[54] Because SB 4 authorizes state police officers to arrest many unauthorized noncitizens, victims of abuse or human trafficking will risk arrest and removal if they report their crimes. This omission is particularly perverse because victims of trafficking will be removed while federal officials will lose key witnesses which may hinder the indictment, conviction, or removal of traffickers themselves. The requirement that state court judges disregard pending U or T visa determinations harms the United States, which uses those visas to help prosecute abuse and trafficking, as well as the Organizational Plaintiffs seeking to help victims to report their crimes and remain in the country.

---

[54] SB 4 does prevent officers from arresting individuals at a domestic violence "SAFE-ready facility" so long as they are "on the premises . . . for purposes of obtaining a forensic medical examination and treatment." Tex. Code of Crim. Proc. art. 5(B).004.

Likewise, Las Americas and American Gateways will likely lose their ability to represent many asylum applicants. <u>Las Americas</u>, (Yang Decl., Dkt. # 30-2 at 3–4). Because state judges may not consider federal asylum applications as a reason to abate state removal proceedings, many of these applications may be mooted prior to adjudication, frustrating the organizations' missions. The organization will likely have to expedite asylum applications for those detained under SB 4 in hopes to achieve a determination prior to the state's removal. (<u>Id.</u>). For the same reason, SB 4 may also decrease the organizations' funding, which is partially based off the number of asylum cases. (<u>Id.</u>).

Finally, El Paso County will also likely suffer irreparable harm. It will have to pay to expand its jail, provide counsel for indigent defendants, and hire more Sheriff deputies and court personnel. <u>Las Americas</u>, (Carillo Decl., Dkt. # 30–3 at 4–5). El Paso County may lose the ability to focus on high risk or violent criminals, harming its jail cost containment efforts. (<u>Id.</u>). Although funds for hosting federal prisoners is the third-largest source of revenue for El Paso County, the County could lose several million dollars if it instead must hold noncitizens arrested under state law—expenses that it cannot readily recover under the state even if SB 4 is eventually declared unconstitutional. And finally, SB 4 will likely frustrate the County's efforts to integrate its law enforcement office with migrant

support services and will make noncitizen crime victims less likely to report violent crimes.

<u>EQUITIES AND PUBLIC INTEREST</u>

When the United States is a party to a preliminary injunction motion, the final two factors of the inquiry—balance of the equities and public interest— merge. <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009). When the federal government sues under the Supremacy Clause, the contest "is not a controversy between equals." <u>Sanitary Dist. of Chicago</u>, 266 U.S. at 425. "The United States is asserting its sovereign power to regulate" a field dedicated to the federal government. <u>Id.</u> Texas may disagree with the federal government's policy decisions, but they are the federal government's to make. <u>See Trump v. Hawaii</u>, 138 S. Ct. 2392, 2421 (2018). ("[W]e cannot substitute our own assessment for the Executive's predictive judgments on such matters, all of which are delicate, complex, and involve large elements of prophecy.") (internal quotations omitted).

A state's "[f]rustration of federal statutes and prerogatives [is] not in the public interest." <u>United States v. Alabama</u>, 691 F.3d at 1301. That is particularly true as to SB 4, which strips away an asylum applicant's option to raise credible fears or torture or persecution in a state hearing. <u>See Nken v. Holder,</u> 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face

substantial harm."). And the record makes clear that removing noncitizens into Mexico risks subjecting them to death, torture, and rape. See Las Americas, (Junaid Decl., Dkt # 30-5).

Nor can Texas assert a legitimate interest in enforcing an unconstitutional law. See Trans World Airlines, Inc. v. Mattox, 897 F.2d 773, 784 (5th Cir. 1990) (states faced no injury from injunction of preempted regulation); United States v. Alabama, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation.").

Finally, despite Texas's statements that it must prevent against "drug smuggling, human trafficking, and terrorism," nothing in this Order prevents the state from doing so. (Dkt. # 25 at 56). Texas already criminalizes each of these activities. See, e.g., Tex. Health & Human Safety Code § 481.011; Tex. Penal Code § 20A.02; id. § 76.02. For the past century, Texas has relied on its expansive police powers afforded to it under the Constitution to regulate crime within its borders. Texas may continue to do so, but it cannot regulate the federal field of unlawful entry and removal.

## SCOPE OF THE INJUNCTION

Next, the Court discusses the scope of the injunction. See Fed. R. Civ. P. 65(d). Texas asks the Court to only enjoin the unconstitutional applications of SB 4 and sever any remaining constitutional sections. (Dkt. # 25 at 60–61).

Although cognizant of the "normal rule" that "partial, rather than facial,
invalidation is the required course," the nature of SB 4 does not lend itself to a
partial injunction. Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320,
329 (2006).

 The main provisions of SB 4—criminalizing illegal entry,
criminalizing illegal re-entry, authorizing removals of noncitizens, and denying the
defense of a federal determination—are each preempted under this Court's
analysis. The remaining provisions all depend on the validity of the criminal
prohibitions and are therefore nullified by the injunction.[55] Accordingly, the Court
will enjoin the law in full and prohibit Defendants and their officers, agents, and
employees from enforcing any provision of SB 4. See Fed. R. Civ. P. 65(d)(2).

 More fundamentally, SB 4 is not like Arizona's SB 1070 in one
critical aspect: SB 4 operates as an intertwined whole.[56] See Tex. Penal Code §§

---

[55] Sections 4, 6, and 7 all deal with supervision or parole of defendants under SB 4, which are
necessarily nullified by the underlying injunction on the criminal prohibitions themselves. SB 4
§§ 4, 6, 7. Section 5 requires criminal databases to include offenses under SB 4, which is
likewise nullified. Id. § 5. Section 8 is a severability clause, while Section 9 states that the law
will take effect on March 5, 2024. Id. §§ 8, 9.

[56] In Arizona, SB 1070 contained largely separate provisions, dealing with (1) authorizing stops
for officers to determine immigration status, (2) requiring noncitizen registration, (3)
criminalizing employment while being undocumented, and (4) authorizing arrests with probable
cause that a person is removable. See Arizona, 567 U.S. at 390. In the underlying litigation, the
district court made clear that it intended to address SB 1070 piecemeal, and that procedural
posture carried through on appeal. See Lucas Guttentag, Immigration Preemption and the Limits
of State Power: Reflections on Arizona v. United States, 9 Stan. J. C.R. & C.L. 1, 12–13 (2013)
(recounting procedural history of Arizona). Although each provision generally aimed to deter
immigration, see id., SB 1070 sought to accomplish that deterrence though the relatively
different fields of registration, employment, immigration status, and police stops.

51.02–03; Tex. Code of Crim. Proc. arts. 5(B).001–5(B).003. Removal orders under SB 4 operate for noncitizens accused of illegal entry (Tex. Penal Code § 51.02) or illegal re-entry (id. § 51.03). And the removal order provision (Tex. Code of Crim. Proc. art. 5B.002(c)) serves as a potential alternative to incarceration under SB 4.[57] One provision cannot be enjoined without significantly eliminating or mooting other key remedies under another provision. Despite the law's severability clause, SB 4 must be enjoined in whole.

<u>STAY PENDING APPEAL</u>

At the Court's hearing on February 15, 2024, the parties debated whether the Court should stay any injunction pending appeal. In light of the parties' arguments, and to allow the parties increased time to brief the matter before the Fifth Circuit, the Court will concurrently address Texas's conditional request for a stay. <u>See</u> Fed. R. App. P. 8(a)(2)(A)(ii).

The Fifth Circuit "consider[s] four factors in deciding whether to grant a stay pending appeal: (1) whether [Texas] has made a strong showing that [it] is likely to succeed on the merits; (2) whether [Texas] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the

---

[57] Section 9 of SB 4 contains a severability clause. While federal courts should normally respect severability clauses, it would not be practicable here. The only possibility of severance under the law would be if a court ruled that the removal provisions were preempted but not the underlying criminal offenses (the reverse could not be true because there could be no removal order absent an underlying offense). However, that would raise its own conflict preemption problem, because removal is an option to avoid incarceration under federal immigration law.

other parties interested in the proceeding; and (4) where the public interest lies." SEC v. Barton, 79 F.4th 573, 581 (5th Cir. 2023) (quoting Nken, 556 U.S. at 434).[58] Applying the Fifth Circuit's framework, the Court finds that a stay is not warranted.

First, given the discussion herein, Texas is not likely to succeed on the merits. Its arguments rest upon a narrow and untenable reading of Arizona and the many immigration preemption cases that preceded it. SB 4 intrudes onto especially dominant federal interests, such as the removal of noncitizens, and conflicts with federal law by disallowing consideration of pending asylum or withholding determinations. Texas's "actually invaded" defense, meanwhile, asserts a novel reading of "invasion" never once affirmed by any federal court (and, indeed, unanimously rejected by three circuit courts). Texas is unlikely to succeed on the merits.

---

[58] In NAACP v. Tindell, the court of appeals announced that it "evaluate[s] a request for an injunction pending appeal according to the standard for granting or denying a stay pending appeal." 90 F.4th 419, 422 (5th Cir. 2024) (citing Texas v. DHS, 88 F.4th 1127 (5th Cir. 2023), vacated, No. 23A607, 2024 WL 222180 (U.S. Jan. 22, 2024)); Mock v. Garland, 75 F.4th 563, 577 (5th Cir. 2023) (noting same). An injunction pending appeal is an extraordinarily high burden. "That authority is to be used 'sparingly and only in the most critical and exigent circumstances.'" Wisconsin Right to Life, Inc. v. Fed. Election Comm'n, 542 U.S. 1305, 1306 (2004) (citing Ohio Citizens for Responsible Energy, Inc. v. NRC, 479 U.S. 1312, 1313, (1986) (Scalia, J., in chambers)). "It is only appropriately exercised where (1) [n]ecessary or appropriate in aid of our jurisdiction . . . and (2) the [issues] are indisputably clear[.]" Id. (cleaned up). The more likely understanding of Tindell and Mock is that the Fifth Circuit meant to lower the standard for an injunction pending appeal—rather than raise the standard for a stay. But because the Court is uncertain, it notes that Texas has not shown the issues are so "indisputably clear" as to warrant a stay under the potentially heightened standard. Id.

Second, Texas will not suffer sufficient irreparable injury to warrant a stay. Although an injunction generally automatically results in a form of irreparable injury to the state, several factors mitigate that injury here. See Vote.Org v. Callanen, 39 F.4th 297, 308 (5th Cir. 2022). Unauthorized immigration is not new to the Texas border, and Texas has relied for decades on the existing federal regime to regulate immigration. See Wireless Agents, L.L.C. v. T–Mobile USA, Inc., 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction.") (cleaned up). Additionally, federal law already provides for state officers to conduct immigration enforcement measures. See 8 U.S.C. § 1357(g). In its responsive briefing, Texas failed to address § 1357(g) at all. Its true harm, then, is not that the state cannot enforce immigration laws, but that it cannot do so free of federal supervision. Finally, the Court does not doubt the risk that cartels and drug trafficking pose to many people in Texas. But as explained, Texas can (and does) already criminalize those activities. Nothing in this Order stops those enforcement efforts. No matter how emphatic Texas's criticism of the Federal Governments handling of immigration on the border may be to some, disagreement with the federal government's immigration policy does not justify a violation of the Supremacy Clause.

The third and fourth <u>Nken</u> factors largely merge as applied to SB 4. The United States has shown it will suffer diplomatic harms, as it will lose the ability to speak "with one voice" on immigration. It has shown that SB 4 will strain relations with Mexico, which has already protested the law and will likely continue to do so as Texas deports Central and South American immigrants into the country. Texas may remove or incarcerate many noncitizens with valid asylum or withholding claims, in violation of U.S. treaty obligations, which may induce other countries to follow suit. It has shown that federal agencies' ability to detect security risks will be harmed as Texas police disrupt DHS's ability to centrally and timely monitor illicit drug trades, human trafficking, and imminent threats.

If SB 4 takes effect, the law would immediately impose criminal liability on thousands of noncitizens who re-entered the state. The removal of noncitizens cannot be undone, even if a stay on this injunction is ultimately lifted. Thousands of individuals should not be arrested, incarcerated, or removed prior to resolution of SB 4's constitutionality.

Texas's "invasion" defense would make a stay particularly inappropriate here, as Texas has invoked a clause that would authorize the state to engage in war on Latin American immigrants arriving from Mexico. A summary stay of the injunction would leave open the question of whether Texas is being

"actually invaded" or at war. If Texas is to be granted these extreme powers, the consequences of that radical determination must be laid out in full.

If allowed to proceed, SB 4 could open the door to each state passing its own version of immigration laws. The effect would moot the uniform regulation of immigration throughout the country and force the federal government to navigate a patchwork of inconsistent regulations. SB 4 threatens the fundamental notion that the United States must regulate immigration with one voice.

In the final analysis, it is clear that the Plaintiffs, particularly the United States, will suffer grave irreparable harm were SB 4 to take effect, especially where Texas has other aspects of Operation Lone Star in full force. The balance of equities unequivocally weighs in favor of denying the stay pending appeal.

## CONCLUSION

**IT IS ORDERED** that the motions for preliminary injunctions, United States (Dkt. # 14) and Las Americas, (Dkt. # 30) are **GRANTED**. Defendants are preliminarily **ENJOINED** from enforcing SB 4.

**DATED**: Austin, Texas, February 29, 2024.

David Alan Ezra
Senior United States District Judge

# EXHIBIT K: ECF 43, DEFENDANTS' NOTICE OF APPEAL

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

UNITED STATES OF AMERICA

    *PLAINTIFFS,*

v.

THE STATE OF TEXAS; GREG ABBOTT IN HIS
OFFICIAL CAPACITY AS GOVERNOR OF
TEXAS; TEXAS DEPARTMENT OF PUBLIC
SAFETY; STEVEN MCCRAW, IN HIS OFFICIAL
CAPACITY AS DIRECTOR OF TEXAS
DEPARTMENT OF PUBLIC SAFETY

    *DEFENDANTS.*

CASE NO. 1:24-CV-00008-DAE (LEAD CASE)

CONSOLIDATED WITH 1:23-CV-1537-DAE

### STATE DEFENDANTS' NOTICE OF APPEAL

Defendants State of Texas, Greg Abbott in his official capacity as Governor of Texas, the Texas Department of Public Safety, and Steven McCraw in his official capacity as Director of Texas Department of Public Safety (State Defendants) appeal to the United States Court of Appeals for the Fifth Circuit from the trial court's Order signed on February 29, 2024 (Dkt. 42), granting Plaintiffs' Motions for Preliminary Injunction.

Date: February 29, 2024

Respectfully submitted.

**KEN PAXTON**
Attorney General

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Tex. State Bar No. 24105085

**BRENT WEBSTER**
First Assistant Attorney General

**AMY SNOW HILTON**
Special Counsel
Texas Bar No. 24097834

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**MUNERA AL-FUHAID**
Special Counsel
Tex. State Bar No. 24094501

**HEATHER L. DYER**
Special Counsel
Tex. State Bar No. 24123044

**JACOB E. PRZADA**
Special Counsel
Tex. State Bar No. 24125371

**KYLE TEBO**
Assistant Attorney General
Tex. State Bar No. 24137691

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Walters@oag.texas.gov
Amy.Hilton@oag.texas.gov
Munera.Al-fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov
Jacob.Przada@oag.texas.gov
Kyle.Tebo@oag.texas.gov

**COUNSEL FOR DEFENDANTS
STATE OF TEXAS, GREG ABBOTT, TEXAS
DEPARTMENT OF PUBLIC SAFETY, AND STEVEN
C. MCCRAW**

2

Case 2:23-cv-00003  Document 36  Page: 541  Date Filed: 02/29/2024

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on February 29, 2024 and that all counsel of record were served by CM/ECF.

*/s/ Ryan D. Walters*
Ryan D. Walters