# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF TEXAS; GREG ABBOTT, *in his official capacity as Governor of Texas*; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, *in his official capacity as Director of Texas Department of Public Safety*,

Defendants-Appellants.

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

Plaintiffs-Appellees,

v.

STEVEN C. MCCRAW, *in his official capacity as Director of Texas Department of Public Safety*,

Defendant-Appellant.

On Appeal from the United States District Court
for the Western District of Texas

## UNITED STATES' OPPOSITION TO MOTION FOR STAY PENDING APPEAL

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

JAIME ESPARZA
*United States Attorney*

DANIEL TENNY
LEIF OVERVOLD
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required as plaintiff-appellee is a governmental party.  5th Cir. R. 28.2.1.

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 1

STATEMENT ................................................................................................. 1

ARGUMENT .................................................................................................. 4

I.    Texas is unlikely to succeed on appeal. .................................................. 4

    A.    Texas's effort to regulate the entry and removal of noncitizens is barred by field preemption. ........................................................... 5

    B.    SB 4 impermissibly conflicts with federal law ............................. 8

    C.    SB 4 violates the Foreign Commerce Clause. ............................. 13

    D.    Texas cannot evade preemption principles by asserting that SB 4 is a response to an alleged "invasion." ....................................... 13

    E.    The United States may sue in equity to enjoin federally preempted state laws. ..................................................................................... 17

II.    The balance of harms and the public interest do not support a stay. ............... 19

CONCLUSION ............................................................................................. 22

CERTIFICATE OF COMPLIANCE

## INTRODUCTION AND SUMMARY OF ARGUMENT

In *Arizona v. United States*, 567 U.S. 387 (2012), the Supreme Court held that an Arizona law purporting to mirror federal criminal provisions regarding registration of noncitizens was preempted. Texas's Senate Bill 4 (SB 4) undermines federal immigration law even more directly because it interferes with the federal government's exclusive control over the core subjects of entry and removal of noncitizens and directly conflicts with federal law.

Allowing SB 4 to go into effect would upset the status quo between the United States and the States in the context of immigration that has existed for almost 150 years and cause the United States to suffer immediate and irreparable harm. It would impede the federal government's ability to conduct foreign relations, especially with Mexico, at a time when the United States is seeking diplomatic solutions to ameliorate irregular migration at the southern border. It would interfere with the United States' treaty obligations, federal law-enforcement efforts, and the orderly processing of noncitizens entering the United States. Because Texas cannot show that the preliminary injunction causes it comparable harm, Texas is not entitled to a stay pending appeal.

## STATEMENT

**1.** "The federal power to determine immigration policy is well settled." *Arizona*, 567 U.S. at 395. Pursuant to its "broad, undoubted power over immigration," *id.* at 394, Congress has enacted the Immigration and Nationality Act

(INA) as "the comprehensive federal statutory scheme for regulation of immigration," *DeCanas v. Bica*, 424 U.S. 351, 353 (1976), to be administered and enforced by the Secretary of Homeland Security and the Attorney General, 6 U.S.C. § 202; 8 U.S.C. § 1103(a)(1), (g). This comprehensive framework sets forth detailed rules governing the entry and removal of noncitizens.

**2.** The Texas legislature nonetheless passed and the Governor signed SB 4, which was scheduled to take effect on March 5 (90 days after the close of the legislative session). The law would impose state criminal penalties on noncitizens who unlawfully enter or attempt to enter Texas from Mexico and would allow Texas courts to order the removal of noncitizens from this country to Mexico.

As relevant here, SB 4 does three things. First, SB 4 effectively makes it a state crime to violate 8 U.S.C. § 1325(a), the federal unlawful-entry provision, by barring noncitizens from "enter[ing] or attempt[ing] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a). The law creates certain affirmative defenses, including that the noncitizen has been granted asylum or "lawful presence" by the federal government. *Id.* § 51.02(c).

Second, SB 4 creates a state crime resembling 8 U.S.C. § 1326(a), the federal unlawful-reentry provision, by barring noncitizens from "enter[ing], attempt[ing] to enter," or being found in Texas after the person "has been denied admission to" or "removed from the United States" or "has departed from the" United States "while

an order of exclusion, deportation, or removal is outstanding." Tex. Penal Code § 51.03. This provision has no affirmative defenses.

Third, SB 4 allows state judges to order the removal of noncitizens to Mexico. In particular, noncitizens charged but not yet convicted under SB 4 may be "discharge[d]" and "require[d] … to return to the foreign nation from which [they] entered or attempted to enter," if, among other things, "the person agrees to the order." Tex. Code of Crim. Proc. art. 5B.002(a)-(c). Upon conviction under SB 4, a state judge "shall enter" an order requiring "return to the foreign nation from which the person entered or attempted to enter" after completion of the sentence. *Id.* art. 5B.002(d). Failure to comply with a state removal order is a second-degree felony. Tex. Penal Code § 51.04.

For all three offenses created by SB 4, a "court may not abate the prosecution of [the relevant offense] on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003.

**3.** In separate lawsuits that were ultimately consolidated, the United States and a set of nonfederal plaintiffs brought suit challenging SB 4 and sought a preliminary injunction.

The district court granted a preliminary injunction. App114. The court held that SB 4 was invalid for multiple reasons. App29-64. The court comprehensively rejected Texas's argument that it could ignore federal law because it had been

"invaded," App65-98, and it confirmed that Congress has not displaced the United States' right to bring an equitable action for injunction, App24-27. The district court found that the United States would suffer irreparable harm—both in carrying out foreign relations and in enforcing federal immigration law—if SB 4 took effect. App99-104. Finally, the district court concluded that the balance of the equities favored an injunction. App107-08. Because Texas identified no provision of SB 4 that could constitutionally be applied, the district court enjoined defendants from enforcing the law in its entirety. App108-10. The court denied a stay pending appeal. App110-14.

This Court has entered an administrative stay and deferred Texas's motion for a stay pending appeal to the merits panel. The federal government is filing its response today to Texas's motion as it previously indicated to the Court.

## ARGUMENT

"A stay pending appeal is 'extraordinary relief' for which [movants] bear a 'heavy burden.'" *Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 373 (5th Cir. 2023). This Court analyzes a stay pending appeal under the familiar four-part standard. *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

Texas cannot meet its burden on any of the stay factors.

## I.     Texas is unlikely to succeed on appeal.

As relevant here, state law is preempted either when Congress occupies a field leaving no room for state regulation or when state law conflicts with federal law,

expressly or implicitly. *See Arizona*, 567 U.S. at 399. Both field and conflict preemption principles preclude Texas from enforcing SB 4. For similar reasons, SB 4 violates the dormant Foreign Commerce Clause. And Texas cannot avoid these conclusions by asserting either that SB 4 is a response to a supposed "invasion" or that the United States lacks a cause of action to enjoin a preempted law.

**A.    Texas's effort to regulate the entry and removal of noncitizens is barred by field preemption.**

**1.** "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (cleaned up).

Applying these principles in *Arizona*, the Supreme Court held that federal law preempted a criminal statute relating to noncitizen registration. 567 U.S. at 403. SB 4 undermines federal immigration law even more directly by intruding into the field of admitting and removing noncitizen and enforcing the related sanctions that the INA prescribes, functions that lie at the core of the federal government's sovereign prerogatives to regulate immigration.

The *Arizona* decision followed from basic principles regarding the division of authority between the federal government and the States. "The authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see also Arizona*, 567 U.S. at 409-10. "[T]he regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," state law must yield to federal. *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). "[I]nternational controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." *Id.* at 64.

Here, Congress has created a comprehensive and highly reticulated scheme governing the admission and removal of noncitizens. *See* App34-35; *Patel v. Garland*, 596 U.S. 328, 331 (2022). Congress decided which noncitizens may be admitted to the United States and how to admit them. 8 U.S.C. §§ 1181-88, 1201-04, 1225. Congress decided which noncitizens may be removed from the United States and how to remove them. *Id.* §§ 1182, 1225-29a; *see id.* § 1229a(a)(3) (providing that federal removal proceedings are "the sole and exclusive procedure" for determining whether to admit or remove a noncitizen). And Congress decided when a noncitizen's entry into the United States is—and is not—a crime. *Id.* §§ 1325(a)-(b), 1326.

That "framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," even through "complementary state regulation."

*Arizona*, 567 U.S. at 399, 401 (cleaned up).  Otherwise, "the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  *Id.* at 402.  The district court thus properly held that a patchwork of state-driven policies governing entry and removal would prevent the federal government from speaking with "one voice."[1] App32.  This holding echoed multiple courts of appeals that have applied similar reasoning to state analogs to other aspects of the federal immigration scheme. *E.g.*, *United States v. South Carolina*, 720 F.3d 518, 530-31 (4th Cir. 2013).

**2.**  Texas resists the application of these principles largely by observing that States may take some actions that relate in some way to immigration.  While it is common ground that Congress has not preempted "every state enactment which in any way deals with [noncitizens]," *DeCanas*, 424 U.S. at 355, this case concerns regulation of the entry and removal of noncitizens—the core of the federal power over immigration.  And Texas offers no support for the improbable proposition that while Congress preempted parallel state prosecutions in the area of noncitizen registration, it intended to allow States to directly enforce federal prohibitions on

---

[1] While the district court's language sometimes referred imprecisely to the "field of immigration," *e.g.*, App30, its analysis addressed the properly defined field: the federal government's dominant interest in and comprehensive regulation of the entry and removal of noncitizens and control of the international border, App29-53.

entry and to effect the removal of noncitizens from the United States to a non-consenting foreign nation. *See* App37-40.

The federal allowances for state action related to the enforcement of certain laws against noncitizens only underscore the error in Texas's assertion that Congress meant to allow it to unilaterally usurp through state law the core federal prerogatives of prosecuting the unlawful entry of noncitizens into the United States and effecting their removal from the country. States may cooperate with the federal government in the apprehension and detention of noncitizens. 8 U.S.C. § 1357(g); *see also* 18 U.S.C. § 758 (recognizing that state law enforcement agents may be at federal immigration checkpoints). States may also enforce their own generally applicable laws that may apply to the conduct of noncitizens. *See, e.g.*, 22 U.S.C. § 7105(b)(1)(E)(iv) ("kidnapping" and "forced labor offenses"); 8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) ("acts of trafficking"); *id.* § 1101(a)(15)(U)(iii) (various state "criminal law[s]"). None of Texas's cited laws invites States to regulate the entry and removal of noncitizens, much less suggests that Texas has more authority to do so than it would to prosecute violations of the federal registration provisions at issue in *Arizona*. Rather, Congress has expressly provided a way for States to assist in enforcing federal immigration law. *Id.* § 1357(g).

### B. SB 4 impermissibly conflicts with federal law.

SB 4 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. Determinations

related to the entry and removal of citizens of foreign nations must be based on the implementation of the complex immigration regime, which includes provisions regarding asylum, *see* 8 U.S.C. § 1158(a), withholding of removal, *id.* § 1231(b)(3), protection under Article 3 of the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *e.g.*, 8 C.F.R. § 1208.16(c), and the proper country of removal, 8 U.S.C. § 1231(b). *See* App55-58. They must also take account of the federal government's foreign-relations interests.

As in *Arizona*, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." 567 U.S. at 402. The exclusively federal character of the immigration system renders this case an even more straightforward application of conflict-preemption principles than *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), where the Supreme Court held that a State could not impose tort liability premised on fraud committed against a federal agency in light of the "inherently federal" nature of the relationship between the agency and the regulated entity. Allowing such tort claims could "skew[]" the "balance" of federal objectives achieved through the agency's own enforcement efforts. *Id.*

The inherently federal foreign-affairs context of immigration law makes that holding all the more applicable here. Enforcement of federal immigration law, which necessarily imposes consequences for foreign nationals based on acts committed in violation of federal law, involves a sensitive balancing of federal interests. *See Arizona*,

567 U.S. at 395; App55. In this circumstance, "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379 (2000). To the contrary, allowing a single State to imprison foreign nationals for unlawfully entering the United States, or order them removed to a non-consenting foreign country, without regard to the interests of the Nation as a whole would fundamentally undermine that congressional scheme and "compromise the very capacity" of the federal government "to speak for the Nation with one voice in dealing with other governments." *Id.* at 381; *see also* App58-59; *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 534 (5th Cir. 2013) (en banc) (plurality) (concluding that "unilateral state authority to prosecute as well as to detain" noncitizens based on perceived unlawful presence conflicts with federal immigration scheme).

Texas's only response is to suggest that parallel state and federal enforcement schemes are permissible as a general matter, a conclusion that has no relevance to a State's effort to regulate in an area that Congress has addressed through federal standards and definitive enforcement procedures and where parallel state enforcement could compromise foreign relations. The Supreme Court did not *sub silentio* overrule *Arizona* and the cases on which it relied in *Kansas v. Garcia*, 140 S. Ct. 791 (2020), which involved a generally applicable law about "fraud, forgeries, and identity theft" that "appl[ied] to citizens and [noncitizens] alike." *Id.* at 798. Nothing in that case— which involved a generally applicable law and not an immigration regulation—

suggests that a State may create a parallel state immigration regime regulating the entry and removal of noncitizens.

SB 4's specifics—which Texas nowhere addresses—underscore its incompatibility with the federal scheme. SB 4 affords no protections against removal of noncitizens facing persecution or torture. It bypasses the INA's guarantees of a noncitizen's right to federal removal or expedited removal procedures, including review by an immigration judge. The state enactment even expressly refuses to take account of federal removal proceedings that could result in a grant of asylum or other relief from removal: "'a court may not abate the prosecution' on 'the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated.'" App55-56 (quoting Tex. Code of Crim. Proc. art. 5B.003). SB 4 also contemplates a state judge's determining whether a noncitizen is lawfully present as an affirmative defense to the law's illegal-entry provision, even though this Court has held that state courts may not make such determinations without federal supervision. *See* App60; *Farmers Branch*, 726 F.3d at 534-36 (plurality). SB 4 also expressly declines to replicate the exemption from the federal prohibition on reentry for noncitizens entering with consent from the Secretary of Homeland Security. *See* App60 (citing 8 U.S.C. § 1326). And by allowing Texas to unilaterally engage in its own immigrant enforcement efforts, SB 4 vastly exceeds the "limited circumstances in which state officers may" assist and cooperate with federal enforcement. *Arizona*, 567 U.S. at 408; *see* 8 U.S.C. § 1357(g); *see also* p. 8, *supra*.

Texas also has no authority to bypass the detailed federal scheme for determining to which country noncitizens will be removed. *See* 8 U.S.C. § 1231(b)(2) (generally requiring removal to a non-contiguous country designated by the noncitizen or the noncitizen's country of nationality or residence). Allowing Texas to remove noncitizens, including non-Mexicans, to Mexico even over the objection of the Government of Mexico will "cause the federal government to lose the ability to speak "with one voice" on removals. App59 (quoting *Arizona*, 567 U.S. at 409); *see also Hines*, 312 U.S. at 63 ("The Federal Government … is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties."). The objection that the Government of Mexico has already lodged to SB 4 only underscores the damage that Texas's intended actions could cause to United States' relations with Mexico and other nations. *See id.*; *see also Biden v. Texas*, 597 U.S. 785, 806 (2022) (explaining that attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico"). In short, Texas cannot plausibly suggest that it is entitled to effect removal of noncitizens from the United States, and it cannot evade the issue by euphemistically referring to its removal orders—which are backed by felony criminal penalties—as allowing noncitizens to "depart voluntarily," Mot. 13, or "facilitating illegal aliens finding their way to ports of entry," Mot. 12. *See* App43 ("This is the same thing as a removal. … Texas escorts a noncitizen to the border and they either depart into Mexico or … face 20 years in prison if they do not.")

**C.     SB 4 violates the Foreign Commerce Clause.**

For similar reasons, SB 4 violates the Foreign Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3.  The power to regulate commerce has long been understood to encompass the power to regulate the movement of both persons and commodities.  *See* App62.  The Supreme Court has thus recognized that the authority to enact immigration laws "belongs to Congress, and not to the States." *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875).

"State regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce."  App62 (quoting *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006)).  SB 4 is invalid on both grounds.  It facially discriminates by criminalizing specifically and solely the movement of noncitizens across the U.S. border into Texas.  *See* App64.  And it has already created a risk of conflicts with foreign governments and undermined the government's ability to "speak with one voice" in this area, for the same reasons that, as discussed above, SB 4 conflicts with the federal immigration laws.  *See* App64-65.

**D.     Texas cannot evade preemption principles by asserting that SB 4 is a response to an alleged "invasion."**

Faced with the clear holdings of the Supreme Court's and this Court's cases, in district court Texas resorted to the remarkable defense that SB 4 may be enacted and enforced in the face of controlling preemption principles because, according to the State, the movement of migrants across the border constitutes an "invasion."  On

appeal, Texas retreats from that broad argument and urges that SB 4 could be validly applied in some circumstances against certain particularly potent cartels. Mot. 16-17. Both arguments are meritless.

**1.** The constitutional structure generally reflects a "complete delegation of authority to the Federal Government to provide for the common defense" along with a "divest[ment from] the States of like power." *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022). The Constitution thus generally forbids States to "engage in War" or take various other actions involving military or foreign affairs, subject to a very narrow exception if a State is "actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3.

**2.** The Framers did not conceal a broad license to override fundamental federal-supremacy principles in that narrow exception to a clause divesting power from the States. *See* App88-89. By its terms, the State War Clause does not broadly exempt States from the Supremacy Clause, much less entitle them to interfere with the comprehensive framework that Congress has enacted to address what Texas characterizes as an "invasion."

Relatedly, it is apparent as a matter of ordinary understanding that prosecution and removal of noncitizens for unlawfully entering the country does not constitute "engag[ing] in War." *See* App86-88. That common-sense notion is also consistent with the understanding of the Founders. *See* App85-86, 88 (citing James Madison,

The Report of 1800 (Jan. 7, 1800) (rejecting argument that removal of noncitizens could be justified as a means of preventing an invasion)).

Moreover, the Clause makes clear that it is a limited-time emergency authority to allow a State to respond to circumstances that "will not admit of delay" until the federal government has had an opportunity to respond—which, at the time of the Founding, could have taken substantial time. *See* App74-75. It does not confer authority to ignore congressional enactments that foreclose state legislation under the Supremacy Clause, nor does it entitle States to contradict the federal government's considered decision about whether (and how) to "engage in War" in response to particular circumstances. Accordingly, where, as here, the federal government explicitly seeks to halt specific actions by a State, the State War Clause provides no basis for opposing the federal government's efforts—even if the State would have been entitled to those actions prior to the federal government's involvement *See Torres*, 597 U.S. at 592 ("The States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy.").

Texas's reliance on the State War Clause is thus misplaced without regard to whether Texas has been "actually invaded." But Texas in any event has no plausible claim that such an asserted "invasion" should be recognized.

First, as the district court held, the State War Clause does not provide a justiciable defense against the United States. *See* App97 & n.52. Texas provides no response to that conclusion or the precedent on which the court relied.

Second, under no reasonable understanding can irregular migration or criminal cartels' smuggling activities amount to an "invasion" justifying Texas engaging in "war." The term "invasion" connotes "armed hostility" of the sort that could be used to "overthrow the state's government." *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *see also* App69-71, 78-86 (noting similar meaning at the Founding). Moreover, the Constitution provides that an "invasion" may justify action as extreme as "engag[ing] in War"—and, pursuant to other constitutional provisions, may authorize the federal government to suspend the writ of habeas corpus or provide for the quartering of soldiers, *see* U.S. Const. art. I, § 9; *id.* amend. III—underscoring that the term "actually invaded" under this Clause must mean armed hostilities rising to the level of those typically implicated in war, as opposed to irregular migration or criminal activity by private actors. *See Padavan*, 82 F.3d at 28; *see also* App75-78.

Texas cites as evidence that it is facing an "invasion" instances in which the federal and State governments sent forces into Mexico to pursue marauders. Mot. 17. But the federal government's efforts in "tracking down Pancho Villa" obviously did not depend on the State War Clause, and Texas identifies no evidence that its "response to marauders … before and after statehood" was understood to do so either. Mot. 16. Moreover, to the extent that Texas's argument implies that the activities of criminal cartels would justify the State's engaging in military activities in another sovereign nation over the express objections of the federal government, that claim just illustrates the implausibility of Texas's position.

Texas's suggestion that it could validly apply SB 4 only to members of criminal cartels would be an especially odd way to read the State War Clause. Even setting aside that criminal activity cannot reasonably be deemed an "invasion," there is no merit to Texas's novel view that an invasion is occurring that provides Texas with authority to "engage in War," but only through criminal prosecutions and removals where a state judicial officer concludes that an individual noncitizen has participated in conduct that (allegedly) rises to the level of an "invasion." Unsurprisingly, SB 4 does not on its face contemplate any such inquiry, which would embroil the state courts in sensitive foreign-relations determinations about which particular acts by noncitizens constitute an invasion that would authorize the State to engage in war with a foreign nation.

## E. The United States may sue in equity to enjoin federally preempted state laws.

**1.** "[E]quitable relief is traditionally available to enforce federal law," unless Congress has "displace[d]" it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). And of particular relevance here, federal courts undoubtedly may grant injunctions to the United States to protect its sovereign interests. *See Arizona*, 567 U.S. at 394. The Supreme Court unanimously recognized this principle in *In re Debs*, 158 U.S. 564 (1895), when it held that the federal government may obtain an injunction to "enforce in any part of the land the full and free exercise of all

national power," *id.* at 582; *see also, e.g.*, *United States v. City of Jackson*, 318 F.2d 1, 15 (5th Cir. 1963).

Contrary to Texas's suggestion (at 9-10), although *Debs* draws from public nuisance cases, *see* 158 U.S. at 592-93, its holding was not limited to such cases. On the contrary, *Debs* endorsed and embodied the "general rule that the United States may sue to protect its interests."[2] *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). And subsequent decisions have recognized the United States' right to sue to protect other sovereign interests. *See, e.g.*, *Sanitary District of Chicago v. United States*, 266 U.S. 405, 425 (1925) (authority to sue "to carry out treaty obligations"). Accordingly, because Congress has done nothing to displace the United States' ability to seek an injunction against a federally preempted law, the district court properly recognized that the United States could sue Texas in equity and obtain injunctive relief. *See* App25-26.

**2.** In any event, the United States may proceed against the official defendants under *Ex parte Young*, which permits courts to enjoin state officials from violating federal law. 209 U.S. 123, 167 (1908). That practice is not limited, as Texas suggests (at 8) to circumstances in which a "direct enforcement" action is threatened.

---

[2] *Debs* directly considered whether the United States could obtain a nonstatutory injunction to vindicate federal power. 158 U.S. at 577. That it arose in the posture of a habeas petition does not limit its holding; the same procedural posture does not limit the holding of *Ex parte Young*. Texas's reliance on *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980), which involved an action for damages and not an injunction, is likewise misplaced.

*Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2023). And the Supreme Court has squarely rejected Texas's assertion (at 9) that only private parties may sue under *Young*, finding "no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff." *See Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011).

## II. The balance of harms and the public interest do not support a stay.

**1.** The Supreme Court has suggested that irreparable harm inherently results from the enforcement of a preempted state law. *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989); *see also* App99 (collecting cases). Texas does not dispute that proposition. Beyond those inherent harms, enforcement of SB 4 would directly and irreparably harm core federal interests.

SB 4 would allow Texas to expel citizens of many nations into Mexico. When a country believes its nationals have been mistreated in the United States, it may respond with "harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395; App127. And the potential violation of Mexico's sovereignty, which Texas's actions threaten, may derail important bilateral negations. App120-24. For this and other reasons, if Texas enforces SB 4, it will seriously injure the United States' diplomatic relationships with Mexico and other nations. *See* App100-02. Far from helping to stem the tide of unlawful migration over the southern border, SB 4 would hamper federal efforts to address unlawful migration and its root cause by interfering

with the United States' relationship with Mexico, whose cooperation is important to addressing irregular migration. App122. Texas dismisses (at 17) these harms as "speculative." But the "representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate" that a state law interferes with federal foreign policy. *Crosby*, 530 U.S. at 386.

Moreover, SB 4 is inconsistent with the United States' treaty obligations. *See* App102-03. Most prominently, the Convention Against Torture, as implemented through federal law, prohibits refoulement—the return of a noncitizen to a country where he more likely than not would be tortured. *E.g.*, 8 C.F.R. § 1208.16(c)-.18; *see* 8 U.S.C. § 1231 note. SB 4 has no provision to prevent refoulement. App140.

SB 4 would also interfere with the federal government's orderly processing of noncitizens who have unlawfully entered the United States. The law forbids abating an SB 4 prosecution while the federal government is conducting asylum or adjustment of status proceedings. Tex. Code of Crim. Proc. art. 5B.003. A noncitizen facing simultaneous SB 4 enforcement proceedings and federal proceedings "would be unable to participate fully in federal immigration proceedings," "attend scheduled interviews," or "comply with required identity and security check procedures." App141. SB 4 would thus impede the federal government's enforcement of federal immigration law.

**2.** In contrast to the significant harms the United States would face if Texas enforced SB 4, Texas would not face significant harm from an injunction that merely

maintains the status quo that has been in place for nearly 150 years. App107-08. Texas has no legitimate state interest in intruding upon federal immigration enforcement. *Cf. Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023) (harm suffered by party prevented from acting as authorized by federal law outweighs harm suffered by jurisdiction trying to enforce preempted law). To the extent Texas wishes to cooperate with the federal government in its immigration enforcement efforts, it may do so. *See* 8 U.S.C. § 1357(g). Finally, because SB 4 will interfere with federal immigration enforcement and with the federal government's relationship with Mexico, staying the district court's injunction could worsen illegal immigration in Texas, not improve it. Texas, therefore, cannot met its burden to show harm from the injunction.

## CONCLUSION

For the foregoing reasons, appellants' motion should be denied.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

JAIME ESPARZA
*United States Attorney*

DANIEL TENNY
LEIF OVERVOLD

/s/ Maxwell A. Baldi
MAXWELL A. BALDI
*Attorneys, Appellate Staff*
*Civil Division, Room 7513*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 532-0211*
*maxwell.baldi@usdoj.gov*

March 2024

**CERTIFICATE OF COMPLIANCE**

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,185 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
MAXWELL A. BALDI