# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### Docket No. 24-50149

UNITED STATES OF AMERICA,

*Plaintiffs – Appellees*

v.

STATE OF TEXAS; GREG ABBOTT, Governor of the State of Texas,
in his Official Capacity,

*Defendants – Appellants*

---

LAS AMERICAS IMMIGRANT ADVOCACY CENTER, AMERICAN GATEWAYS,
and EL PASO COUNTY, TEXAS,

*Plaintiffs – Appellees*

v.

STEVEN MCCRAW, in his official capacity as Director of the Texas Department of
Public Safety; and BILL D. HICKS, in his official capacity as District Attorney for the
34th District,

*Defendants – Appellants*

---

On Appeal from the United States District Court for the Western District of Texas,
Austin Division, Nos. 1:24-cv-00008-DAE (lead case), 1:23-cv-01537

---

## PLAINTIFFS-APPELLEES' OPPOSITION TO
## DEFENDANTS-APPELLANTS' MOTION FOR STAY PENDING APPEAL

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways, and*
*County of El Paso*

Tamara F. Goodlette
(TX Bar No. 24117561)
Daniel Hatoum
(TX Bar No. 24099136)
Erin D. Thorn
(TX Bar No. 24093261)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
daniel@texascivilrightsproject.org
erin@texascivilrightsproject.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center and American Gateways*

Jo Anne Bernal
(TX Bar No. 02208720)
El Paso County Attorney

Cody Wofsy
Spencer Amdur
Hannah Schoen
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7thFloor
San Francisco, CA 94104
T: (415) 343-0770
F: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org
hschoen@aclu.org
mrussell@aclu.org

Anand Balakrishnan
Omar Jadwat
Lee Gelernt
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways, and*
*County of El Paso*

320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz,
(TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

# TABLE OF CONTENTS

I.    S.B. 4 IS PREEMPTED. ...............................................................2

     A.  S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal. ....................................................................................2

     B.  S.B. 4 Conflicts with Congress's Entry-and-Removal Scheme. .........9

     C.  Texas Cannot Demonstrate Any Likelihood of Success On the Merits. ...................................................................................12

II.    THE THRESHOLD CHALLENGES ARE BESIDES THE POINT, AND INCORRECT. ...............................................................15

III.    THE EQUITIES MILITATE AGAINST A STAY. ...............................18

     A. Texas Faces No Irreparable Harm......................................................18

     B. A Stay Would Harm the Plaintiffs and Thousands of Others. ...........20

CONCLUSION .........................................................................................22

Texas sought a stay pending appeal and an administrative stay in this case just before midnight on March 1. The *Las Americas* plaintiffs and the United States filed initial oppositions to the administrative stay within hours. This Court granted an administrative stay on March 2, over Judge Ramirez's dissent, and stayed its own stay for seven days "pending an application to the Supreme Court of the United States." ECF No. 43-2 at 2. The Court also deferred Texas's request for a stay pending appeal to the oral argument merits panel and expedited the appeal. *Id*. On March 4, the *Las Americas* Plaintiffs and the United States each filed applications to vacate this Court's stay with the Supreme Court. *See* Nos. 23A814 and 23A815. Justice Alito administratively stayed this Court's stay order until March 13 at 5:00 p.m. EDT, and directed a response to the applications be filed by March 11. The *Las Americas* plaintiffs now respectfully submit this opposition to Texas's request for a stay pending appeal.

The preliminary injunction maintains a longstanding status quo: For 150 years, the Supreme Court has been clear that no state can create an immigration system of its own. S.B. 4 defies this principle. It authorizes state officials to criminally punish people for what state officials determine to be an unlawful entry into the United States and unilaterally order people removed to Mexico. And it does so irrespective of the federal government's view or the noncitizen's federal statutory rights to remain in this country.

Texas now seeks a stay pending appeal.  But a stay is meant to "*preserv[e] the status quo*," not upend it.  *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (emphasis added).  A stay would cause chaos and cruelty—yielding unlawful arrests, state removal orders, and widespread confusion.  Organizations and local governments will have to scramble to respond and protect their clients and residents.  And an untold number of people will have their federal rights to asylum and other protections effectively nullified, because S.B. 4 imposes removal—backed by 20-year prison terms—without regard to a person's rights under the federal immigration system.

The Court should deny the stay.

## I.     S.B. 4 IS PREEMPTED.

### A. S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal

In S.B. 4, Texas has established a new state immigration system that entirely bypasses Congress's comprehensive statutes.  Texas has regulated and criminalized entry into the United States; chosen for itself who will be permitted to remain in the country, what statuses will qualify as defenses to removal, and what procedures will apply; and claimed the power to deport noncitizens by ordering them to depart the United States on pain of severe additional punishment.  But immigration is an exclusively federal power, and Congress has long occupied the field of entry and removal.  Thus, as the district court held, S.B. 4 is field preempted.  *See Arizona v.*

*United States*, 567 U.S. 387, 399 (2012) (standard for field preemption); ECF No. 42 ("Op.") 36-53.

      1.    The federal interest in immigration is "overwhelmingly dominant." *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012). For 150 years, the Supreme Court has been clear: Regulation of entry into and expulsion from the United States are exclusively federal matters from which the states are excluded. *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration . . . and deportation"); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, [and] the period they may remain," and "the states are granted no such powers"); *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Arizona*, 567 U.S. at 409 ("the removal process is entrusted to the discretion of the Federal Government"); Op. 30-31 (collecting cases).

This Court has recognized the same bedrock principle. "Policies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress," so any attempt to regulate such matters "would be preempted." *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) (cleaned up). Indeed, every member of the en banc Court in *Villas at Parkside Partners v. City of Farmers Branch*— which involved a housing regulation—agreed with "the longstanding, unremarkable principle that the federal government's authority to exclude or remove foreign nationals . . . is necessarily exclusive of infringement by state or local legislation." 726 F.3d 524, 545 (5th Cir. 2013) (en banc) (Dennis, J., specially concurring); *see id.* at 536-37 (plurality opinion); *id.* at 557 (Owen, J., concurring in part) ("the federal government undeniably has the exclusive power to determine questions of removal and deportation"); *id.* at 559 & n.77 (similar); *id.* at 567 (Jones, J., dissenting) (the Constitution "vests exclusive control over the 'authority to control immigration—to admit or exclude aliens— . . . solely in the Federal government'") (quotation omitted).

Texas does not cite or address this mountain of authority that states cannot regulate entry and removal, and instead focuses on just one case, *Arizona*. Mot. 11-12. But no part of *Arizona* retreats from any of these principles. Instead, *Arizona* built on this century of clear precedent and *reiterated* that "the removal process is entrusted to the discretion of the Federal Government." 567 U.S. at 409-10 (citing

*Truax* and other cases). *Arizona* also held that states cannot even help enforce the *federal* immigration scheme outside the limited circumstances Congress authorized. *Id.* at 407-10, 413-14. That obviously precludes the idea that states could bypass the federal scheme altogether and create their own.[1]

The fact that entry and removal are uniquely federal is no surprise: The authority to regulate immigration is "inherent in [the] sovereignty" of the United States as a nation. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). That sovereign authority includes the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe," *id.*, as well as to "expel" noncitizens from within the country, *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893); *see Arizona*, 567 U.S. at 394-95. States, by contrast, are not endowed with "powers of external sovereignty" such as "the power to expel" noncitizens. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936) (citing *Fong Yue Ting*).

---

[1] The only provision that survived *Arizona*, Section 2(B), simply permitted state officers "to communicate with ICE." *Id.* at 412. But the Court warned "it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision." *Id.* at 413. S.B. 4, of course, does that and much more to usurp federal immigration power. The Court concluded Section 2(B) "could be read to avoid these concerns." *Id.* But here there is no "basic uncertainty about what the law means," *id.* at 415—and Texas has never even suggested one.

Relatedly, immigration matters are so closely entwined with foreign relations that they "must be made with one voice." *Arizona*, 567 U.S. at 409; *see Jama v. ICE*, 543 U.S. 335, 348 (2005); Op. 31-32, 39-40.  The Supreme Court has reiterated this again and again.  *Chy Lung*, 92 U.S. at 279–280 (warning that state immigration regulation would allow "a single State . . . , at her pleasure, [to] embroil us in disastrous quarrels with other nations"); *Hines*, 312 U.S at 64 (emphasizing "the supremacy of the national power in the general field of foreign affairs, including power over immigration"); *Toll v. Moreno*, 458 U.S. 1, 10 (1982) (similar).

This principle resolves this case.  S.B. 4 regulates both entry into the country and expulsion from it.  But these are central aspects of the federal government's sovereign authority over immigration and an area of dominant federal interest.  *Nishimura Ekiu*, 142 U.S. at 659; *Fong Yue Ting*, 149 U.S. at 711.  This is a "paradigmatic" case for field preemption.  *See* Op. 31.

2.     Consistent with this dominant federal interest, Congress has "enacted a 'framework of regulation so pervasive that Congress left no room for the States to supplement it.'"  Op. 33 (quoting *Arizona*, 567 U.S. at 399); *see also Arizona*, 567 U.S. at 395-97 (addressing the "pervasiveness" of the "extensive and complex" immigration regulation system); Op. 35 ("The country's immigration laws are massive, sprawling, detailed, complex, and pervasive.").  This is a second and related reason why S.B. 4 is field preempted.

In particular, Congress has extensively regulated individuals who enter between ports of entry—those whom Texas is attempting to regulate through S.B. 4. On one hand, Congress has created multiple removal pathways, with detailed procedures and multiple layers of review by federal officials, including a special "expedited removal" system specifically for those who arrive at our borders without visas or other valid immigration documents. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1) (expedited removal procedures), 1229, 1229a (regular removal procedures), 1231(a)(5) (reinstatement of removal). Congress has also criminalized entry and re-entry between ports of entry, along with efforts to assist or facilitate entry between ports. *See id.* §§ 1323-28; *Ga. Latino All.*, 691 F.3d at 1264. And Congress has provided a detailed set of standards and procedures for when people who enter between ports may be arrested and detained by federal officials. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A).

On the other hand, Congress has established numerous forms of relief from removal for people who enter between ports: Asylum is available "whether or not" a noncitizen arrives "at a designated port of arrival," *id.* § 1158(a)(1), and can be accessed through multiple procedural channels, *see id.* § 1225(b)(1)(B), 1158(d); 8 C.F.R. § 208.4. Withholding of removal bars a person's removal to any country where they face persecution or torture. *See* 8 U.S.C. § 1231(b)(3) and Note. Individuals who are placed in full removal proceedings may apply for other forms

of relief Congress has extended, including cancellation of removal. *Id.* § 1229b(b). And noncitizens who have entered without inspection may also apply affirmatively, outside of removal proceedings, for numerous other forms of relief, including visas for victims of crimes and trafficking, *id.* §§ 1101(a)(15)(U), (T), temporary protected status, *id.* § 1254(a), and Special Immigrant Juvenile Status for noncitizens under 21 years of age, *id.* § 1101(a)(27)(J).

To implement this system, Congress entrusted *federal* officials to strike the right balance between enforcement and relief: "A principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Federal officials exercising this discretion must weigh humanitarian concerns, international law, "domestic law enforcement priorities," and "foreign-policy objectives." *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

Through these many intricate and interrelated provisions, Congress has "struck a careful balance" and established "a full set of standards governing" those who enter between ports, "including the punishment for noncompliance." *Arizona*, 567 U.S. at 400-01. In sum, the federal statutes are "designed as a 'harmonious whole.'" *Id.* at 401 (quoting *Hines*, 312 U.S. at 72). As such, "States may not enter" the field of entry and removal "in any respect," and "even complementary state regulation is impermissible." *Id.* at 401-02.

## B. S.B. 4 Conflicts with Congress's Entry-and-Removal Scheme

S.B. 4 is also preempted under conflict preemption principles in numerous respects. Op. 53-62. Plaintiffs highlight just a few.

*First*, S.B. 4 subjects noncitizens to directly conflicting determinations about their ability to remain in the country. Op. 55-58. If a noncitizen is convicted under S.B. 4, they must be issued a state deportation order, which requires them to leave the country under threat of an additional 20 year sentence. Op. 9. But that very same person may be granted asylum or another form of relief in the federal system, affording them indefinite permission to remain in this country, without a removal order, and with a path to lawful permanent residence and eventually citizenship. Federal law also allows people to remain in this country *pending a decision* about their asylum claim. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(A)(ii), (B) (diverting people with asylum claims out of expedited removal). S.B. 4 thus contradicts people's federal permission to remain in the country. Not only does it omit any defense for those seeking asylum, it specifically provides that a "court may not abate the prosecution of an offense under" its new criminal provisions "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003.

*Second*, S.B. 4 conflicts with the "broad discretion" which Congress enshrined as a "principal feature" of the federal system. *Arizona*, 567 U.S. at 396; Op. 54-55.

Congress endowed federal officials with a range of tools including prosecutions under 8 U.S.C. §§ 1325 and 1326; removals via various types of proceedings; and numerous forms of relief, prosecutorial discretion, deferred action, and many other ways to prioritize or mitigate the effects of the immigration laws in particular cases, all of which must take account of relations with Mexico and other countries. S.B. 4 sweeps all of that aside. Under S.B. 4, those forms of federal relief are no defense to prosecution; federal officials get no say in whether noncitizens are prosecuted; and state deportation orders, backed by decades-long prison terms, operate independently of any federal discretion. The statute thus blatantly "violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409.

Federal discretion is particularly critical because immigration is, as explained above, so closely connected to foreign affairs. *See Texas*, 599 U.S. at 679; Op. 58-59. Here, Texas plans to issue tens of thousands of orders to *non*-Mexicans to return *to Mexico* or face decades in prison. Mexico strongly opposes this. Op. 44. As the Supreme Court recently explained, efforts to negotiate similar returns to Mexico have, in the past, "played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Biden v. Texas*, 597 U.S. 785, 806 (2022) (internal quotation marks omitted). This time,

Texas is not merely advancing a statutory interpretation which would "tie the hands of the Executive" by allowing a court to supervise negotiations with Mexico. *Id*. Here, Texas is acting *unilaterally* to force noncitizens onto Mexico's sovereign territory, with potentially extreme consequences for our *national* government's relationship and agreements with Mexico.

*Third*, all this would be quite enough to render S.B. 4 conflict preempted even if its provisions "comport[ed]" with their federal counterparts, Mot. 13; *see* Op. 45-46. But they do not. For example, the state re-entry crime is far broader than the corresponding federal statute. Op. 60. Under the federal statute, a noncitizen cannot be convicted if she has obtained federal "consent" to again seek admission to the United States. 8 U.S.C. § 1326(a)(2)(A). A noncitizen might obtain such federal consent, despite a prior removal, if she has access to an immigrant visa to become a lawful permanent resident, *United States v. Sanchez-Milam*, 305 F.3d 310, 312 (5th Cir. 2002) (per curiam); 8 C.F.R. § 212.2(d), or if she is granted parole to return to the United States. 8 U.S.C. § 1182(d)(5)(A). Those individuals are not subject to federal prosecution under § 1326(a)(2)(A). But they are subject to prosecution under S.B. 4, which contains no such limits. Tex. Penal Code §51.03 (criminalizing noncitizen "found in this state after" she "has been . . . removed"); *cf.* Tex. Penal Code §51.03(c)(2) (providing affirmative defense for entry crime but not for reentry crime). The result is that people who the federal government has expressly permitted

to return to the United States, and who have been granted long-term legal status, are nevertheless criminalized by Texas.

S.B. 4 simply cannot be reconciled with the federal regime—whether viewed through a field or conflict lens. *See Arizona*, 567 U.S. at 403 ("These specific conflicts between state and federal law simply underscore the reason for field preemption."). Congress set out a comprehensive scheme that discourages and penalizes entry between ports while also safeguarding multiple forms of relief from removal for those who enter between ports. That scheme imposes detailed procedures that must be followed to determine people's ultimate immigration status, and places numerous kinds of discretion in the hands of federal officials. Texas cannot upend that system by enacting its own.

### C. Texas Cannot Demonstrate Any Likelihood of Success on the Merits

Texas offers little in response to this mountain of precedent and congressional action.

Texas invokes the "presumption against preemption." Mot. 11. But as explained, entry and removal are an area of dominant—indeed, exclusive—*federal* interest. Thus, no presumption applies, and if it did would be amply overcome. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012); Mot. Ex. C at 17 n.3 (collecting cases).

Unlike *National Press Photographers Association v. McCraw*, 90 F.4th 770, 797 (5th Cir. 2024), in which the federal agency specifically *invited* state regulation, nothing in federal law "expressly contemplates" state entry and removal laws, Mot. 11. Rather, Congress has specifically provided that the INA's provisions shall be "the sole and exclusive procedure" for determining such questions. 8 U.S.C. § 1229a(a)(3); *see Farmers Branch*, 726 F.3d at 537; Op. 36, 42. The statutes Texas cites, Mot. 11-12, at most give states a small and peripheral role in assisting *federal* enforcement. But the "limited" role Congress has carved out for state and local assistance under federal "direction and supervision," only underscores that States are *not* permitted to set up their own immigration regimes. *Arizona*, 567 U.S. at 408-09 (unilateral state immigration enforcement is preempted).

This is also not a case in which a generally-applicable criminal law may "overlap" with immigration matters in some specific instance. Mot. 13 (quoting *Kansas v. Garcia*, 140 S. Ct. 791, 806 (2020) (prosecutions under a general identity-theft statute were not preempted merely because the same information was also included in employment verification forms). S.B. 4 directly regulates immigration, by criminalizing noncitizens entering the country and authorizing state deportations.[2]

---

[2] Texas's separate effort to "use[]" general trespass law "to prohibit an alien's illegal entry and presence in Texas" on private property, Mot. 14, is not before the Court.

In the district court, Texas claimed that the clear preemption of S.B. 4 was irrelevant because Texas is constitutionally entitled to declare "war" on migration and enact its own immigration system in response. *See* Mot. Ex. H at 7. The district court cogently analyzed and rejected that remarkable claim to the usurpation of federal authority. Op. 65-98. Now, seemingly backing away from the idea that people crossing the border to seek safety and a better life constitute an "invasion," Texas frames the issue as one of facial relief—that S.B. 4 "cannot be preempted to the extent it applies against cartel members." Mot. 16; *but see Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013). Yet the immigration laws specifically address criminal conduct—reinforcing that Congress has exhaustively regulated in the field of entry and removal. *See, e.g.*, 8 U.S.C. §§ 1182(a)(2)(C) (drug trafficking); 1182(a)(2)(H) (human trafficking); 1182(a)(3) (security and terrorism).

The existence of some "armed and dangerous" individuals, Mot. 16 n.8, cannot be enough to unlock sweeping war powers free from any federal control, or else the Constitution's commitment of foreign policy to the *federal* government would be a farce. Op. 71, 90-96. S.B. 4 is simply not a valid war measure. It is immigration lawmaking based on a political disagreement with the current

---

Moreover, Operation Lone Star differs from S.B. 4 in many respects including the lack of any reentry or removal provisions, and in any event its legality is contested.

administration. "This is a job for the Nation's lawmakers, not for its military authorities." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952); *see id*. at 642, 644 (Jackson, J., concurring); Op. 86-90. It is not a job for one state's governor.

## II. THE THRESHHOLD CHALLENGES ARE BESIDES THE POINT, AND INCORRECT.

Texas raises several threshold issues, but none could remotely justify a stay.

While Texas's lead arguments are about the *Las Americas* plaintiffs' ability to bring suit, the *Las Americas* case is consolidated with the United States' case. Texas does not contest the federal government's standing, and there's no question the federal government can sue to block states from usurping federal authority. Op. 26, 27. In a multi-plaintiff case, only one plaintiff needs to satisfy threshold requirements. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (only addressing one plaintiff's standing in consolidated case, and noting the Court "need not consider the standing issue" for others); *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit."). Because the federal government can plainly sue to enjoin S.B. 4 in full, no threshold arguments as to the other plaintiffs could justify even a partial stay—thus, most of Texas's arguments are simply beside the point.

In any event, its threshold arguments are meritless.  As the district court correctly held, Op. 12, it is well established that a plaintiff organization "may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct," *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).  And here the plaintiff organizations made that showing—unsurprisingly, given that Plaintiffs' mission and work is dedicated to helping individuals secure relief from deportation.  S.B. 4 creates an entirely new state deportation system and Defendant McCraw projected 80,000 additional arrests each year, upending the plaintiffs' operations and forcing them to dramatically alter their provision of legal services.  *See* Op. 13-16; *cf. OCA-Greater Houston v. Texas*, 867 F.3d 604, 610-12 (5th Cir. 2017) (diversion was "not large" but sufficient because it was aimed at "mitigating [the] real-world" impact of the law).

Rather than attempting to contest that showing, Texas argues that only parties directly regulated and subject to enforcement action by the state may bring a pre-enforcement challenge.  But that is not and has never been the law.  Op. 11-13.  Texas's argument would eliminate standing in a host of challenges the State itself has brought to policies that regulate third parties.  *See, e.g., Texas v. United States*, 809 F.3d 134, 155-62 (5th Cir. 2015) (holding Texas had standing to bring pre-enforcement challenge).  It would eliminate an enormous swath of litigation brought

by states, organizations, businesses, and individuals. *See, e.g., Shelby County v. Holder*, 570 U.S. 529, 537 (2013) (cases "to block voting laws from going into effect"); *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (environmental litigation); *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (APA cases by states harmed by third-party regulation).

Texas also contests El Paso County's ability to sue, but ignores this Court's precedent "explicitly recogniz[ing] that a subdivision may sue the state under the Supremacy Clause." Op. 18-20 (citing *Rogers v. Brockette*, 588 F.2d 1057, 1070 (5th Cir. 1979)). Nor are the County's injuries speculative: "[G]iven Texas's own statements that it plans to deploy S.B. 4 to stop a 'warlike invasion,'" it stands to reason "that many of those arrests will be in El Paso County" and the County will bear "additional costs.'" Op. 21. S.B. 4 would upend the County's law enforcement operations. Op. 20-22, 106.

Finally, Texas claims plaintiffs lack a cause of action. But this Court has specifically held that a plaintiff has "a cause of action . . . at equity" to enjoin preempted action. *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-35 (5th Cir. 2023) (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc)) (italics omitted). Texas invokes sovereign immunity and argues that *Ex parte Young* applies *only* to a regulated party whom the state threatens with enforcement proceedings. Mot. 8. But it does not

identify a single case that has ever imposed that limit. To the contrary, as the Supreme Court has explained, "there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011). And courts regularly hold that plaintiffs satisfy *Ex parte Young* even though they are not potential defendants in any future enforcement action. *See, e.g.*, *id*. at 252 (agency plaintiff sought access to records); *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179-80 (5th Cir. 2020) (voter plaintiffs sued Secretary of State to change forms for requesting absentee ballots).

## III. THE EQUITIES MILITATE AGAINST A STAY.

Texas faces no irreparable harm from following the status quo that has prevailed for 150 years. And a stay would cause enormous harm, because it would sow chaos in the federal immigration system, upend the plaintiffs' operations, and allow Texas to nullify the federal rights of thousands of non-citizens who may ultimately be entitled to remain in the United States under the laws Congress has enacted.

### A. Texas Faces No Irreparable Harm.

For well over a hundred years, the Supreme Court has made clear that states are barred from enforcing a law like S.B. 4 that directly regulates entry into the United States and allows state officials to remove people from the country. It is hard

to imagine a more firmly established status quo. A stay is meant to "*preserv[e]* the status quo," not upend it. *Becerra*, 20 F.4th at 263 (emphasis added). Nor does Texas point to any event that requires enforcing S.B. 4 immediately, before its legality can even be adjudicated. *See* Op. 108, 112. Texas's long-standing dissatisfaction with federal immigration policy belies the notion that it faces some unique harm now that cannot await resolution of the merits of this appeal after full briefing and argument.

Texas equally lacks any interest in enforcing a preempted law. *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990); *Alabama*, 691 F.3d at 1301.

Texas claims that it needs S.B. 4 to address a variety of criminal activity. But Texas law already criminalizes smuggling, trafficking, and terrorism. Op. 108. Nor does S.B. 4 really address "fentanyl," Mot. 1, which "is overwhelmingly smuggled by U.S. citizens" at ports of entry. David Bier, *Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (Sept. 14, 2022), https://perma.cc/8RTW-MENH; *see* U.S. Sentencing Comm'n, Quick Facts: Fentanyl Trafficking Offenses (2022) (same), https://perma.cc/VZ95-GMX9.

Texas briefly faults the district court for not engaging with the law's severability provision, Mot. 18, but at no point, at the district court or in its stay application in this Court, has Texas explained what it seeks to be severed. The

district court examined the constitutionality of "[t]he main provisions of SB 4" and found each preempted. Op. 109. Texas has nowhere explained how the remainder of the bill can or should operate in their absence.

## B. A Stay Would Harm the Plaintiffs and Thousands of Others.

A stay would inflict immediate and severe harm on the plaintiffs, the federal immigration system, and thousands of individuals and families in Texas.

The plaintiffs' operations would be thrown into turmoil, as the district court laid out in detail. Op. 13-17, 20-22, 104-06. Texas has stated that it plans to prosecute and deport tens of thousands of people—and those actions would occur completely outside the federal system, and without regard for people's right to protection under federal law. *See id.* at 18 & n.6; ECF No. 30-3, No. 23-cv-01537, ¶ 10.

Families and individuals throughout Texas will suffer grievous harm starting as soon as S.B. 4 takes effect, as they will be separated from loved ones and denied the humanitarian protections provided by federal law. These harms would start immediately if the Court issued a stay. S.B. 4 allows state judges to order people removed at the very beginning of a prosecution. *See* Tex. Code of Crim. Proc. Art. 5B.002(a)-(c). And S.B. 4 coerces non-citizens into accepting these front-end removals, because otherwise they face jail time followed by the same removal order. *Id.* Art. 5B.002(d).

Texas does not deny that it will start seeking unilateral state removal orders as soon as it can. The State has been perfectly clear that the whole point of S.B. 4 is to "expel[]" people from the country.[3]  By doing so, S.B. 4 would nullify people's federal rights to seek asylum and numerous other forms of relief from removal. S.B. 4 explicitly provides that state officials should order removal even if the person is seeking asylum or other protection under federal law. Tex. Code of Crim. Proc. Art. 5B.003. "[T]here is a public interest in preventing [people] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). As the district court found, "the record makes clear that removing noncitizens into Mexico risks subjecting them to death, torture, and rape." Op. 108. "Thousands of individuals should not be arrested, incarcerated, or removed prior to resolution of SB 4's constitutionality." Op. 113.

For anyone who stays in Texas despite a removal order under S.B. 4, they will be thrust into an unacceptable conflict between the federal and state immigration regimes. On the one hand, federal law provides that people who are seeking humanitarian protection or challenging removal can live and often work in the United States while they pursue their claims—in fact they *must* remain here to effectively do so. And people who are granted relief from removal can stay here

---

[3] Written Testimony of Brent Webster, First Assistant Att'y Gen. of Texas, https://perma.cc/497P-6EHY.

indefinitely.  But under S.B. 4, the same people will be subject to a state order to leave the country, on pain of decades in jail.  And once a state removal order has been issued, even a *grant* of legal status by the federal government would not save a person from their Texas-law obligation to leave the country.  Tex. Penal Code § 51.04 (no defenses).

## CONCLUSION

The Stay should be denied.

Dated: March 5, 2024

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways,*
*and County of El Paso*

Tamara F. Goodlette
(TX Bar No. 24117561)
Daniel Hatoum
(TX Bar No. 24099136)
Erin D. Thorn
(TX Bar No. 24093261)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
daniel@texascivilrightsproject.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center and American Gateways*

Jo Anne Bernal
(TX Bar No. 02208720)
El Paso County Attorney
320 S. Campbell St., Suite 200

Respectfully Submitted,

*/s/ Cody Wofsy*
Cody Wofsy
Spencer Amdur
Hannah Schoen
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7thFloor
San Francisco, CA 94104
T: (415) 343-0770
F: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org
hschoen@aclu.org
mrussell@aclu.org

Anand Balakrishnan
Omar Jadwat
Lee Gelernt
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways, and*
*County of El Paso*

El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz,
(TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the type-volume limitation of Rule 27(d)(2) because it contains no more than 5323 words, and complies with the typeface and style requirements of Rule 32(a)(5) and (a)(6) because it was prepared in Microsoft Word using 14-point Times New Roman typeface.

*/s/ Cody Wofsy*
Cody Wofsy

**CERTIFICATE OF SERVICE**

I certify that, on March 5, 2024, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF document filing system, and on all counsel of record.

*/s/ Cody Wofsy*
Cody Wofsy