**No. 24-50149**

# In the United States Court of Appeals for the Fifth Circuit

———

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants-Appellants.*

———

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees,*

*v.*

STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY; BILL D. HICKS, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR THE 34TH DISTRICT,

*Defendants-Appellants.*

———

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

———

## BRIEF FOR APPELLANTS

———

*Counsel Listed on Inside Cover*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General


Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov


KATELAND R. JACKSON
JOSEPH N. MAZZARA
Assistant Solicitors General


COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendants-Appellants

## CERTIFICATE OF INTERESTED PERSONS

No. 24-50149
UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC
SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS
DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,
*Defendants-Appellants*.

———————————————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN
GATEWAYS; COUNTY OF EL PASO, TEXAS,
*Plaintiffs-Appellees*,

*v.*

STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY;
BILL D. HICKS, IN HIS OFFICIAL CAPACITY AS
DISTRICT ATTORNEY FOR THE 34TH DISTRICT,
*Defendants-Appellants*.

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ Aaron L. Nielson
AARON L. NIELSON
*Counsel of Record for*
*Defendants-Appellants*

i

## Statement Regarding Oral Argument

This Court has scheduled oral argument for Wednesday, April 3, 2024, at 9:00 A.M. in New Orleans. Defendants-Appellants the State of Texas, Governor Greg Abbott, the Texas Department of Public Safety, and Director Steven McCraw (collectively, "Texas") respectfully submit that oral argument will assist the Court's review of numerous statutory and constitutional issues raised by the district court's pre-enforcement, facial injunction of a validly enacted Texas law.

# Table of Contents

Page

Certificate of Interested Persons.................................................................i

Statement Regarding Oral Argument.........................................................ii

Table of Authorities ................................................................................. iv

Introduction .............................................................................................. 1

Statement of Jurisdiction ......................................................................... 2

Issues Presented........................................................................................ 3

Statement of the Case .............................................................................. 3

    I.    The Border Crisis ....................................................................... 3

    II.   Senate Bill 4................................................................................ 6

    III.  Proceedings in the District Court ................................................ 8

    IV.  Proceedings on Appeal ................................................................ 9

Summary of the Argument...................................................................... 10

Standard of Review ................................................................................. 12

Argument.................................................................................................13

    I.    Plaintiffs' Facial Challenge to S.B.4 Is Meritless........................13

        A.   These cases cannot be brought in federal court. ..................13

        B.   Federal immigration law does not preempt S.B.4. ............. 20

        C.   The dormant Foreign Commerce Clause does not preempt
            S.B.4. ................................................................................ 30

        D.   Texas has a constitutional power of self-defense. ............. 32

        E.   At a minimum, the district court misapplied severability. ................. 40

    II.   The Remaining Preliminary Injunction Factors Fully Support
       Texas. ...................................................................................... 41

        A.   Plaintiffs did not show they would suffer irreparable harm................ 42

        B.   The equities and public interest clearly favor Texas. ......................... 45

Conclusion .............................................................................................. 47

Certificate of Service............................................................................... 48

Certificate of Compliance ....................................................................... 48

iii

# Table of Authorities

Page(s)

**Cases:**

*In re Abbott*,
956 F.3d 696 (5th Cir. 2020)...............................................................16

*Alexander v. Sandoval*,
532 U.S. 275 (2001)...............................................................16

*Arizona v. United States*,
567 U.S. 387 (2012)..........................................11, 22-23, 25, 28-30, 33

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015)............................................................... 16, 19

*Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health &*
*Mental Retardation Ctr. Bd. of Trs.*,
19 F.3d 241 (5th Cir. 1994)...............................................................15

*Biden v. Texas*,
597 U.S. 785 (2022) ............................................................... 6

*Builder Recovery Servs., LLC v. Town of Westlake*,
650 S.W.3d 499 (Tex. 2022) ............................................................... 40

*Chevron Corp. v. Donziger*,
833 F.3d 74 (2d Cir. 2016)...............................................................15

*City of Trenton v. New Jersey*,
262 U.S. 182 (1923)...............................................................15

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)............................................................... 14

*Coleman v. Miller*,
307 U.S. 433 (1939) ...............................................................15

*Cotton v. United States*,
52 U.S. (11 How.) 229 (1850)............................................................... 18

*Davis v. FEC*,
554 U.S. 724 (2008) ...............................................................15

*In re Debs*,
158 U.S. 564 (1895) ...............................................................17-18, 20

*DeCanas v. Bica*,
424 U.S. 351 (1976) ............................................................... 23-24

iv

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ............................................................ 22, 26

*Florida v. United States*,
  660 F. Supp. 3d 1239 (N.D. Fla. 2023) ..................................... 24

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ...................................................................13

*Gann v. United States*,
  142 S.Ct. 1 (2021) .......................................................................19

*Golden State Transit Corp. v. Los Angeles*,
  493 U.S. 103 (1989) ....................................................................16

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999) ....................................................................17

*Harrison v. Young*,
  48 F.4th 331 (5th Cir. 2022) ..................................................... 12

*Hernandez v. Mesa*,
  140 S.Ct. 735 (2020) .............................................................17-18

*Hines v. Davidowitz*,
  312 U.S. 52 (1941) .................................................................. 24, 26

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ..................................................... 42

*Kansas v. Garcia*,
  140 S.Ct. 791 (2020) ....................................................... 11, 26, 43

*Koon v. United States*,
  518 U.S. 81 (1996) ......................................................................13

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) ..................................................... 14

*Leavitt v. Jane L.*,
  518 U.S. 137 (1996)..................................................................... 40

*Lujan v. Defs. Of Wildlife*,
  504 U.S. at 555 (1992) ................................................................ 14

*Martin v. Mott*,
  25 U.S. (12 Wheat.) 19 (1827) ................................................... 39

*Maryland v. King*,
  567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .................... 46

*Mayor of New York v. Miln*,
  36 U.S. 102 (1837)........................................................... 11, 31-32

v

*Medellin v. Texas*,
    552 U.S. 491 (2008) ....................................................... 30, 42

*Melendez v. City of New York*,
    16 F.4th 992 (2d Cir. 2021) ................................................ 33

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985).............................................. 45

*Moyer v. Peabody*,
    212 U.S. 78 (1909).................................................... 38-39

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ........................................... 14-15

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ..................................................... 30

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) .............................................. 13

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)...................................................... 44

*Parker v. Brown*,
    317 U.S. 341 (1943).................................................. 21-22, 24

*Parker Drilling Mgmt. Serv., v. Newton*,
    139 S.Ct. 1881 (2019), ................................................... 25

*PCI Transp., Inc. v. Fort Worth & W. R. Co.*,
    418 F.3d 535 (5th Cir. 2005) ............................................. 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ...................................................... 15

*Piazza's Seafood World, LLC v. Odom*,
    448 F.3d 744 (5th Cir. 2006)............................................. 32

*Planned Parenthood Ctr. for Choice v. Abbott*,
    141 S.Ct. 1261 (2021)................................................... 16

*Planned Parenthood of Greater Tex. Family Plan. & Preventative Health
    Servs., Inc. v. Kauffman*,
    981 F.3d 347 (5th Cir. 2020) (en banc) ................................ 12, 41

*Plyler v. Doe*,
    457 U.S. 202 (1982) ............................................... 11, 22, 26

*Quick v. City of Austin*,
    7 S.W.3d 109 (Tex. 1998).............................................. 8, 26

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) ...................................................... 21

*Rucho v. Common Cause*,
139 S.Ct. 2484 (2019).................................................. 39

*S. Pac. Co. v. Arizona*,
325 U.S. 761 (1945) ......................................................31

*Sanitary Dist. of Chi. v. United States*,
266 U.S. 405 (1925) ..................................................... 18

*Simon v. E. Kentucky Welfare Rts. Org.*,
426 U.S. 26 (1976) ....................................................... 14

*Smith v. Turner*,
48 U.S. (7 How.) 283 (1849) ...................................... 32

*Sterling v. Constantin*,
287 U.S. 378 (1932)...................................................... 39

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........................................... 10, 14-15

*Texas v. DHS*,
No. 2:23-cv-00055 (W.D. Tex. March. 5, 2024)................................ 44

*Texas v. DHS*,
No. 2:23-cv-00055, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ...... 3, 5-6, 24

*Truax v. Raich*,
239 U.S. 33 (1915) ....................................................... 21

*United States v. Abbott*,
87 F.4th 616 (5th Cir. 2023) ....................................... 43

*United States v. Abbott*,
92 F.4th 570 (5th Cir. 2024) ................................... 37, 40

*United States v. Brignoni-Ponce*,
422 U.S. 873 (1975) ..................................................... 46

*United States v. Hansen*,
599 U.S. 762 (2023) .................................................... 40

*United States v. Salerno*,
481 U.S. 739 (1987) ............................................ 13, 37-38

*United States v. San Jacinto Tin Co.*,
125 U.S. 273 (1888) ..................................................... 18

*United States v. Sineneng-Smith*,
140 S.Ct. 1575 (2020).................................................. 18

vii

*United States v. Texas*,
  557 F. Supp. 3d 810 (W.D. Tex. 2021)...............................................20

*United Steelworkers of Am. v. United States*,
  80 S.Ct. 177 (1959) .........................................................................17

*Veasey v. Abbott*,
  870 F.3d 387 (5th Cir. 2017).............................................................46

*Virginia Office for Protection and Advocacy v. Stewart*,
  563 U.S. 247 (2011) .........................................................................19

*Vote.org v. Callanen*,
  39 F.4th 297 (5th Cir. 2022) ............................................................46

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) .........................................................................13

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ...........................................................................19

*Winter v. Nat'l Res. Def. Council*,
  555 U.S. 7 (2008) .............................................................12, 42, 45

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967) .........................................................................18

*Wyeth v. Levine*,
  555 U.S. 555 (2009)..........................................................................21

*Ex parte Young*,
  209 U.S. 123 (1908)...............................................................15-16, 19

**Constitutional Provisions, Statutes and Rules:**

U. S. Const.:

amend. XI ...................................................................................16

art. I §8 ......................................................................... 34

art. I §8, cl. 15 ............................................................... 39

art. I §10, cl. 2 .............................................................. 39

art. I §10, cl. 3 ......................................................32-33, 39

art. IV, §4 ...................................................................... 35

8 U.S.C.:

§1101(a)(15)(T)(i)(III)(aa) ............................................. 22

§1101(a)(15)(U)(iii) ........................................................ 22

§1225(b)(1)(A)(i) ........................................................... 27

§1229a(d) ..................................................................... 27

§1229c(a)(1) .................................................................. 27

§1324(c) ....................................................................... 22

§1325(a) ....................................................... 6-7, 22, 26

§1326(a) ....................................................... 6-7, 22, 26

§1357(g)(1)-(10) ............................................................ 22

§1357(g)(10)(A) ............................................................. 22

18 U.S.C.:

§758 ............................................................................ 22

§13(a) .......................................................................... 25

22 U.S.C. §7105(c)(3)(C)(i) ................................................. 22

28 U.S.C.:

§1292(a)(1) ...................................................................... 2

§1331 ............................................................................. 2

§1345 ............................................................................. 2

Tex. Const. art. IV, §7 ........................................................ 36

Act of Nov. 14, 2023, 88th Leg., 4th C.S., ch. 2, §8 (2023) (S.B.4) .............. 8, 11, 40

Tex. Code Crim. Proc.:

art. 5B ....................................................................... 6-7

art. 5B.001 ...................................................................... 8

art. 5B.002 .............................................................7, 20, 41

art. 5B.002(b) ................................................................... 7

art. 5B.002(c) .................................................................. 26

art. 5B.002(c)(1) ................................................................ 7

art. 5B.002(d) .............................................................. 8, 26

art. 5B.002(e) ................................................................... 27

art. 5B.002(e)(1)-(2) ......................................................... 8

art. 5B.002(e)(2) ............................................................. 27

art. 5B.003 .......................................................................7, 27

Tex. Penal Code:

ch. 51 ............................................................................ 6-7

§30.05 ......................................................................... 20, 30

§51.02 ............................................................................. 41

§51.02(c) ........................................................................... 7

§51.02(c)(1) ...................................................................... 20

§51.03 ............................................................................. 41

§51.03(c) ........................................................................... 7

§51.02(a) ................................................................. 6, 20, 26

§51.03(a) ................................................................. 7, 20, 26

**Other Authorities:**

3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 414 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836) ................................................................. 34

Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 737 (2022) .............................. 17, 19-20

*An Act [t]o provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions*, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792) ........................................ 34

Anna Giaritelli, *Texas Drone Spots Armed Smuggler Leading Immigrants Across the Border*, WASH. EXAM'R (Aug. 3, 2023), https://tinyurl.com/29r5wz8k; ....................................... 37

H. Rep. No. 343 (Feb. 29, 1876) ................................................ 35

John S.D. Eisenhower, *Intervention! The United States and the Mexican Revolution 1913-1917*, at 227 (1993) ..................................... 35

Katie Pavlich, *FBI Director Confirms Prison Gangs and Islamic Terrorists Are Exploiting the Border*, Townhall (Mar. 11, 2024), https://tinyurl.com/mry282bu ............................................. 5, 37

Memo. from Acting Director, U.S. Immigr. & Customs Enforcement, Dep't of Homeland Sec. (Feb. 18, 2021), https://tinyurl.com/fu6h7epf ............................................. 6

Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022) ....................................................... 4

Noah Webster, *A Compendious Dictionary of the English Language* 164 (1806) ............................................................................................... 33

1 Noah Webster, *American Dictionary of the English Language* 113 (1828) ............................................................................................... 33

Off. of the Dir. of Nat'l Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community* (Feb. 5, 2024) ................................................5, 36-37

Office of Tex. Governor, *Press Release, Texas Arrests MS-13 Gang Members, Smugglers Known for Sexual Abuse* (Aug. 11, 2023), https://tinyurl.com/y7cy95au ...................................................... 37

President Joe Biden on the Bipartisan Senate Border Security Negotiations (Jan. 26, 2024), https://tinyurl.com/2y733m35 ........................... 6

Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico,* 381 Science 1312 (2023) ........................................ 4

Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States* 13 British J. Am. Leg. Studies 1 (2024) ........................................................................33, 38

Samuel Johnson, *[Johnson's] Dictionary* (reprint, Boston 1828) ............................ 33

*Transcript of President Joseph Biden's State of the Union Address*, Associated Press (Mar. 8, 2024), https://tinyurl.com/ypsxhuju.................. 4, 36

*Vice President Joe Biden, Remarks to the Press* (June 20, 2014), https://tinyurl.com/4fbb9v6k .......................................................... 4

Victor Nava, *Armed Men Believed to Be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, N.Y. POST (Aug. 8, 2023) ..................................................................... 37

William Barr, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023) ..................................................................................5, 36

## Introduction

The President of the United States has described the situation at the nation's border as a "crisis," and the Director of the Federal Bureau of Investigation warned Congress just this week about the terrorism risk that the current border poses. The flood of aliens into Texas has empowered transnational cartels—multi-billion-dollar enterprises with the firepower to outgun Mexico's government—to ship hundreds of millions of lethal doses of fentanyl into the United States. These cartels also use weaknesses in immigration enforcement to engage in rampant human trafficking and to smuggle weapons into Texas, while themselves engaging in brutal acts of violence on both sides of the Rio Grande.

In 2023, Texas enacted Senate Bill 4 (S.B.4) to help address this crisis. By design, S.B.4 mirrors federal immigration law. Congress has made it a federal crime to enter the United States outside of an official port of entry or to reenter the United States outside of an official port after having previously been removed; S.B.4 does the same. S.B.4 preserves defenses available under federal law and leaves questions about whether someone should be removed to federal immigration officials. Congress has repeatedly authorized Texas and every other State to enforce immigration law. S.B.4 allows Texas to do just that.

The district court here nonetheless facially enjoined enforcement of S.B.4 on February 29, 2024, just days before it was to take effect and before any Texas court has had an opportunity to construe any provision of it. Under the Supreme Court's standard for facial invalidation, that required a determination that *every* application of S.B.4 is preempted, no matter the facts. The district court, however, issued this

extraordinary pre-enforcement injunction even though S.B.4 does not apply to any Plaintiff—the federal government, El Paso County, and a pair of advocacy organizations—and no Plaintiff has a federal cause of action. It also turns preemption on its head to say that a state law that mirrors federal law is conflicted in *every* application. That the district court also did not engage in a meaningful severability analysis further underscores why a facial injunction is unwarranted. And if there was any doubt that Texas can enforce S.B.4, the Constitution's plain languages recognizes that Texas has the sovereign power to defend itself from violent transnational cartels.

By contrast, allowing S.B.4 to take effect will not cause any Plaintiff immediate or irreparable harm. S.B.4 does not do anything more than what Congress commands and the Constitution allows. At the same time, Texas suffers *per se* irreparable harm when enforcement of one of its statutes is facially enjoined. The State's injury is even sharper than usual here because Texas is at the epicenter of what even the federal government admits is an ongoing crisis. The Court should promptly vacate the district court's facial injunction and allow Texas to enforce its law.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§1331 and 1345. This appeal was timely filed the day the injunction was entered, giving this Court jurisdiction under 28 U.S.C. §1292(a)(1).

2

## Issues Presented

1. Whether Plaintiffs established a likelihood of success on the merits of this pre-enforcement, facial challenge to S.B.4, including whether: **(i)** this litigation can be pursued in federal court; **(ii)** every application of S.B.4 is preempted by federal immigration law; **(iii)** every application of S.B.4 is preempted by the dormant Foreign Commerce Clause; **(iv)** every application of S.B.4 is barred notwithstanding Texas's constitutional self-defense power; and **(v)** the district court correctly concluded it "would not be practicable" to perform an ordinary severability analysis.

2. Whether Plaintiffs established that the other preliminary injunction factors support a pre-enforcement, facial injunction of S.B.4, even though S.B.4 mirrors federal law and was enacted in response to an acknowledged border crisis.

## Statement of the Case

### I. The Border Crisis

Despite 28 legal entry points in Texas, U.S. Border Patrol encounters with individuals illegally crossing the border between ports of entry have increased from "a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022." *Texas v. DHS*, No. 2:23-cv-00055, 2023 WL 8285223, at \*3 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.). Over 6 million illegal immigrants from more than 100 countries have crossed the southern border in the last three years alone. ROA.283. In 2023, known unlawful crossings reached a record high of 2,475,699. ROA.283. That year, Border Patrol agents arrested 15,267 immigrants with criminal convictions.

3

ROA.285. Between 2021 and 2024, Border Patrol apprehended nearly 2,000 gang members and encountered 336 individuals on the terrorist watchlist at the border. ROA.285. And the number of unaccompanied minors has skyrocketed from 15,381 in 2020 to 118,938 in 2023—a 673% increase in just three years. ROA.284. "[T]he majority of" these minors cross the border through "very dangerous, not-nice, human-smuggling networks that transport them through Central America and Mexico to the United States." *Vice President Joe Biden, Remarks to the Press* (June 20, 2014), https://tinyurl.com/4fbb9v6k.

In recent years, such human smuggling has metastasized "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business." Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://tinyurl.com/487kykkh. Indeed, the cartels "have increasingly acquired a transnational dimension," and may now be the fifth-largest employer in Mexico. Rafael Prieto-Curiel et al., *Reducing Cartel Recruitment Is the Only Way to Lower Violence in Mexico*, 381 Science 1312 (2023). And as President Biden explained in this year's State of the Union address, "people pay these smugglers $8,000 to get across the border" because lapses in immigration enforcement make the investment worthwhile. *Transcript of President Joseph Biden's State of the Union Address*, Associated Press (Mar. 8, 2024), https://tinyurl.com/ypsxhuju. Recognizing the need for stronger border security measures, the President acknowledged that "it's highly unlikely that people will pay that money and come all that way knowing that they'll be … kicked out quickly." *Id.*

4

What is more, "the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl." *Texas*, 2023 WL 8285223, at *3. "Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." *Id.* Because fentanyl is a highly addictive opioid, smuggling it into "the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.*

Not only do these cartels operate "organized" human and drug smuggling networks, they are also "some of Mexico's most violent" criminals and terrorists. Jordan, *supra*. In fact, they "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military." William Barr, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023), https://tinyurl.com/drxcdnmv. One former U.S. Attorney General has thus stated that the cartels pose threats that look "more like ISIS than like the American mafia." *Id.* They were able to overwhelm Mexico's military with "700 cartel paramilitary fighters with armored cars, rocket launchers and heavy machine guns." *Id.* The FBI Director testified before Congress this week that "some of the overseas facilitators of the smuggling network have ISIS ties that we're very concerned about." Katie Pavlich, *FBI Director Confirms Prison Gangs and Islamic Terrorists Are Exploiting the Border*, Townhall (Mar. 11, 2024), https://tinyurl.com/mry282bu. And the *Annual Threat Assessment* issued by the U.S. Director of National Intelligence contains a sobering discussion of these "[t]ransnational criminal organizations." Off. of the Dir. of Nat'l Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community* (Feb. 5, 2024).

The President has thus recognized that the border is a "crisis." The White House, Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations (Jan. 26, 2024), https://tinyurl.com/2y733m35. Rightly so. Yet the federal government has not only failed to contain the crisis, it helped create it. One of the first actions of the current Administration was to terminate the "Remain in Mexico" program that required "certain non-Mexican nationals arriving by land from Mexico [to be] returned to Mexico to await the results of their removal proceedings." *Biden v. Texas*, 597 U.S. 785, 791 (2022). Further, the federal government instructed federal officers in certain circumstances to not arrest and deport aliens. *See* Memo. from Acting Director, U.S. Immigr. & Customs Enforcement, Dep't of Homeland Sec. (Feb. 18, 2021), https://tinyurl.com/fu6h7epf. And a federal court—after reviewing testimony and photographic and even video evidence—has documented federal officials refusing to enforce the law. *See, e.g.*, *Texas*, 2023 WL 8285223, at *3-4.

## II.  Senate Bill 4

In 2023, Texas enacted S.B.4 to help address the border crisis. Relevant to this litigation, S.B.4 amends Chapter 51 of the Texas Penal Code to include two state offenses that track federal immigration crimes prohibiting unlawful entry and reentry. *See* 8 U.S.C. §§1325(a), 1326(a). S.B.4 also amends Article 5B of the Texas Code of Criminal Procedure to grant state judges certain remedial powers with respect to individuals who violate S.B.4's illegal entry or reentry provisions.

Turning first to the illegal entry provision, Texas Penal Code §51.02(a) makes it a state crime for an individual to cross into Texas at any location other than a lawful

port of entry. *Cf.* 8 U.S.C. §1325(a). This provision provides affirmative defenses to prosecution in certain instances: If the federal government grants an individual asylum, if an individual receives lawful-presence status, or if the individual was approved for benefits under the Deferred Action for Childhood Arrivals program. *See* Tex. Penal Code §51.02(c).

Next, the illegal reentry provision under Texas Penal Code §51.03(a) makes it a state crime for an individual to illegally reenter the country after having previously "been denied admission to or excluded, deported, or removed from the United States," or after having previously "departed from the United States while an order of exclusion, deportation, or removal is outstanding." *Cf.* 8 U.S.C. §1326(a). This provision defines "removal" to include return orders issued by a magistrate or judge under Article 5B, or any other agreement in which an alien stipulates to voluntarily depart the United States pursuant to a pending criminal proceeding under either federal or state law. *Id.* §51.03(c). Prosecution under either unlawful entry offense in Chapter 51 may not be abated simply on the basis that a federal determination regarding an individual's immigration status is pending. Tex. Code Crim. Proc. art. 5B.003.

Finally, Article 5B.002 allows judges to issue orders requiring aliens who have crossed the border illegally to return to the foreign nation from which they entered. This provision allows a judge, at any time prior to conviction, to dismiss pending charges and issue an "order to return to foreign nation" in lieu of prosecution. *See* art. 5B.002(b). For a voluntary dismissal, the alien must "agree[] to the order." *Id.* art. 5B.002(c)(1). If, however, proceedings continue and an alien is convicted, the

7

judge issues a return order that takes effect after judgment. *Id.* art. 5B.002(d). Such an order does not itself remove anyone from the United States. Instead, the order merely requires a state official to transport the alien to an official port of entry. *Id.* art. 5B.002(e)(1)-(2); ROA.315. State officials will cooperate with federal officials when transporting an alien to a port of entry. ROA.315. And if a detained alien has a pending application for asylum or other relief with the federal government, state officials will coordinate with federal immigration authorities. ROA.316.

State officers are prohibited from enforcing S.B.4 in certain locations, including schools, churches, and hospitals. Tex. Code Crim. Proc. art. 5B.001. Likewise, S.B.4 makes "every provision, section, subsection, sentence, clause, phrase, [and] word" and "every application of the provisions [of S.B.4] to every person, group of persons, or circumstances … severable from each other." Act of Nov. 14, 2023, 88th Leg., 4th C.S., ch. 2, §8 (2023) (S.B.4). "If any application of any provision [of S.B.4] to any person, group of persons, or circumstances is found by a court to be invalid for any reason, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected." *Id.* Finally, although no Texas court has yet had an opportunity to interpret S.B.4, Texas courts would, "if possible, interpret the statute in a manner that avoids constitutional infirmity." *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998). Consistent with S.B.4's goal of mirroring federal law, S.B.4 will thus presumably be construed to avoid conflicts with that law.

## III. Proceedings in the District Court

On December 19, 2023, Las Americas Immigrant Advocacy Center and American Gateways ("the Organizational Plaintiffs"), along with El Paso County, sued

Steven C. McCraw, in his official capacity as Director of the Texas Department of Public Safety, and Bill D. Hicks, in his official capacity as District Attorney for the 34th Judicial District of Texas. ROA.792. On January 3, 2024, the federal government sued Texas; Greg Abbott, in his official capacity as Governor; the Texas Department of Public Safety; and Director McCraw in his official capacity. ROA.17. Alleging that S.B.4 is preempted, all Plaintiffs sought a pre-enforcement facial injunction on January 12, 2024. ROA.82; ROA.906.

The district court consolidated the cases and on February 29, 2024, mere days before the law's March 5 effective date, the district court granted a preliminary injunction and refused to stay its order pending appeal. ROA.478; ROA.587-591.

## IV. Proceedings on Appeal

Texas immediately appealed to this Court and sought an administrative stay of the injunction and a stay pending appeal. The Court granted the administrative stay on March 2, 2024, but deferred decision on Texas's request for a stay pending appeal and expedited this appeal to the next available argument calendar. It also stayed the administrative stay for seven days.

On March 4, 2024, Plaintiffs filed Applications in the U.S. Supreme Court seeking to vacate this Court's temporary administrative stay, which Plaintiffs mischaracterized as a stay pending appeal. *See* U.S. Application to Vacate Stay, *United States v. Texas*, No. 23A814 (U.S.) (hereinafter "U.S. App."); Las Americas Immigrant Advocacy Center, *et al.* Application to Vacate Stay, *United States v. Texas*, No. 23A815 (U.S.) (hereinafter "Las Americas App."). That same day, Justice Alito ordered Texas to respond to both Applications by March 11, and granted an

administrative stay through March 13, which he has extended through March 18. *See* Admin. Stay Orders, Nos. 23A814 & 23A815 (U.S. Mar. 4, 2024); Admin. Stay Orders, Nos. 23A814 & 23A815 (U.S. Mar. 12, 2024). The Applications faulted this Court for referring Texas's stay motion to the merits panel even though "[t]he Fifth Circuit has not yet indicated when it will assign the case to a merits panel or hold oral arguments." U.S. App. 16; *see also* Las Americas App. 1, 3 (claiming the stay was "indefinite" and the court was "postponing its resolution"). On March 5, however, this Court expedited the appeal and set oral argument in less than a month.

## Summary of the Argument

Neither of these pre-enforcement, facial challenges to S.B.4 belong in federal court and both fail on the merits: S.B.4 is not preempted, there is no dormant Foreign Commerce Clause violation, and Texas has the power to defend itself. And even if some applications of S.B.4 were preempted, the district court's truncated severability analysis was woefully deficient. Each of these errors requires reversal. Regardless, the equities overwhelmingly favor Texas.

**A.** These cases should not be in federal court. Principles of standing, sovereign immunity, and the lack of a cause of action all require dismissal. The Organizational Plaintiffs and El Paso County lack standing because they have not demonstrated that they intend "to engage in a course of conduct arguably affected with a constitutional interest, *but proscribed by*" S.B.4, or that there is a "credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) (emphasis added). Furthermore, no Plaintiff has a cause of action. The Supremacy Clause is not itself a cause of action, yet Plaintiffs press claims only under the Supremacy Clause. The

10

federal government's contention that it does not need a statutory cause of action because it has a freestanding equitable cause of action is contrary to both precedent and separation-of-powers principles.

**B.** S.B.4 is neither conflict nor field preempted. Plaintiffs invoke *Arizona v. United States*, 567 U.S. 387 (2012), but there the Supreme Court went out of its way to emphasize that States have an important role to play with respect to enforcing immigration laws. And the mere fact that state and federal law may overlap "does not even begin to make a case for" preemption. *Kansas v. Garcia*, 140 S.Ct. 791, 806 (2020). Further, state laws that "mirror[] federal objectives" with respect to illegal aliens are *more*—not less—likely to be upheld. *Plyler v. Doe*, 457 U.S. 202, 225 (1982).

**C.** S.B.4 also does not violate the dormant Foreign Commerce Clause. Because it is "not a regulation of commerce" but rather was "passed in the exercise of a power which rightfully belonged to the states," *Mayor of New York v. Miln*, 36 U.S. 102, 132 (1837), S.B.4 is squarely within the authority of Texas to regulate activities within its own territorial borders. Nor has Congress sat "dormant" here.

**D.** In all events, Texas has the power to defend itself—and the Constitution trumps any federal statute. At least some applications of S.B.4 are thus constitutional under any plausible reading of the Self-Defense Clause, defeating a facial challenge.

**E.** The district court also failed to meaningfully engage with S.B.4's severability clause, which requires "every provision, section, subsection, sentence, clause, phrase, [and] word" to be severed, if necessary, to preserve the law. Act of Nov. 14, 2023, *supra*. The district court recognized that ordinarily courts enjoin only

11

unconstitutional applications of statutes but declined to follow that rule here because it "would not be practicable." ROA.587 n.57. Whatever one's view of S.B.4, such treatment of severability is inadequate.

**F.** The remaining preliminary injunction factors also favor Texas. No Plaintiffs are harmed by S.B.4 because it will not be enforced against them. And concerns about "diplomatic harms" are speculative and misplaced. Texas, moreover, suffers irreparable injury when its laws are enjoined, and no one disputes that there is a crisis at the border that disproportionately harms Texas. By any measure, the district court's errors of law and faulty balancing of the equities require reversal.

### STANDARD OF REVIEW

A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion.'" *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022) (quoting *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005)). Plaintiffs "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008). This Court "review[s] the district court's grant of [a] preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Harrison*, 48 F.4th at 339; *Planned Parenthood of Greater Tex. Family Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc). "A district

12

court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

Furthermore, "pre-enforcement facial challenges to legislative acts are 'disfavored,'" *NetChoice, LLC v. Paxton*, 49 F.4th 439, 448 (5th Cir. 2022) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)), and "the legal standard for them is extraordinarily high," *id.* at 449. Accordingly, Plaintiffs must "establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## ARGUMENT

## I.   Plaintiffs' Facial Challenge to S.B.4 Is Meritless.

### A.   These cases cannot be brought in federal court.

The district court allowed these cases to proceed in federal court. The Organizational Plaintiffs and El Paso County, however, lack standing, and Congress has not provided any Plaintiff—including the federal government—with a statutory cause of action to enforce the Supremacy Clause. Such threshold flaws require reversal.

**1.** The Organizational Plaintiffs and El Paso County do not have standing to seek a facial injunction of S.B.4 because they cannot identify (1) an actual or imminent, concrete, and particularized "injury-in-fact" to themselves; (2) that is fairly traceable to S.B.4; and (3) that is likely to be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

S.B.4 is enforceable only against aliens illegally present in Texas, not advocacy organizations or Texas counties. Nor have Plaintiffs shown any intention "to engage

13

in a course of conduct arguably affected with a constitutional interest, but proscribed by [S.B.4]," much less have they shown "a credible threat of prosecution" under a law that can in no way be enforced against them. *Susan B. Anthony List*, 573 U.S. at 158-59.

Relying on *NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010), these Plaintiffs alleged in the district court that S.B.4 would prompt them to divert resources. Such strategic budgetary decisions, however, are not enough to confer standing. Not only did *City of Kyle* not involve a pre-enforcement challenge, but the Court held that not-withstanding a diversion of resources, the organizational plaintiff did *not* have standing because "[n]ot every diversion of resources to counteract [a] defendant's conduct … establishes an injury in fact." *Id*. at 238. Any change in Plaintiffs' programs is a voluntary strategic choice, which does not confer standing. *See, e.g.*, *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (citing *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40 (1976)).

Further, Organizational Plaintiffs' intended conduct—namely, distributing educational materials and providing services and resources—is not even "arguably proscribed" by S.B.4. *Susan B. Anthony List*, 573 U.S. at 162. Any threat of prosecution under S.B.4 thus will not affect their routine activities, and facially enjoining S.B.4 will not redress their purported injuries. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). As the Supreme Court has explained, Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). El Paso County, moreover, is a subdivision of Texas,

14

and such political subdivisions generally lack standing to sue their parent States. *See, e.g.*, *Coleman v. Miller*, 307 U.S. 433, 441 (1939); *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923).

The district court disagreed with this straightforward analysis by relying on *City of Kyle*, ROA.487-490—a case that supports Texas. The district court also concluded that *Susan B. Anthony List* does not apply, and that Organizational Plaintiffs' strategic choices to divert resources is an *indirect* injury sufficient to confer standing. ROA.487-490. Yet Plaintiffs' alleged diversion of resources alone does not suffice. Further, the question of the indirectness of an injury typically goes to traceability, not injury-in-fact. *See, e.g.*, *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016). And regarding the nature of the injury itself, the Supreme Court has said it requires a showing that "the threatened injury is real, immediate, *and direct*." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added). The lack of a direct injury here thus precludes standing. After all, as this Court has explained, "[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994).

**2.** For similar reasons, Plaintiffs cannot overcome sovereign immunity. They purport to sue state officials in their official capacities, who are protected by Texas's sovereign immunity. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984). While "*Ex parte Young*, 209 U.S. 123 (1908) allows suits for injunctive or declaratory relief against state officials [in their official capacities],

provided they have sufficient 'connection' to enforcing" a state action that allegedly violates federal law, where there is no such connection, "the suit is effectively against the state itself and thus barred by the Eleventh Amendment and sovereign immunity." *In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott*, 141 S.Ct. 1261 (2021). Because no Texas official will enforce any part of this law against these Plaintiffs, none can avail itself of *Ex Parte Young*. *Id*.

**3.** Ultimately, Plaintiffs' suits fail because each Plaintiff alleges only a cause of action under the Supremacy Clause. Yet "the Supremacy Clause is not the source of any federal rights" and "certainly does not create a cause of action," either expressly or by implication, and it "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324-25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). Instead, "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Because Plaintiffs fail to identify any statute containing "'rights-creating' language" permitting their suit, *id*. at 288, their suit is a nullity.

Similar analysis applies to the federal government. Because the Supremacy Clause is not itself a cause of action, the federal government—like any litigant—needs a separate cause of action to seek an equitable remedy. No one disputes that Congress has not enacted a statutory cause of action that would allow the federal government to bring its claim here.

16

Yet the federal government argues that it does not need a statutory cause of action because *In re Debs*, 158 U.S. 564 (1895), provides a freestanding equitable cause of action under the Supremacy Clause. ROA.419. Absent legislation from Congress, however, "the equity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). The federal government has not identified any case, much less one from 1789, holding that federal officers can bring a claim in equity to enforce the Supremacy Clause. This Court thus should not create a new cause of action given the judiciary's "traditionally cautious approach to equitable powers." *Id.* at 329. Indeed, in recent years the Supreme Court has made clear—repeatedly—that federal courts should not recognize new implied causes of action. *See, e.g.*, *Hernandez v. Mesa*, 140 S.Ct. 735, 742 (2020).

*Debs* is not to the contrary. *First*, *Debs* arose from a bill in equity to abate a public nuisance connected with federal proprietary interests, a long-settled action in equity. 158 U.S. at 585; *see also* Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 737 (2022) ("[W]here there is no statutory basis for injunctive relief, the plaintiff should be required to connect her claim to some proprietary interest."). In other words, "[t]he crux of the *Debs* decision" was "that the Government may invoke judicial power to abate what is in effect a nuisance detrimental to the public interest." *United Steelworkers of Am. v. United States*, 80 S.Ct. 177, 186 (1959) (Frankfurter, J., concurring in the opinion of the Court). The

17

federal government does not contend its claim here falls within that traditional cause of action, nor could it.

*Second*, the federal government's reliance on *Wyandotte Transportation Co. v. United States*, 389 U.S. 191 (1967), also misses the mark. Indeed, *Wyandotte* supports Texas's understanding of *Debs*. The Supreme Court in *Wyandotte* addressed the scope of relief available, not the existence of a cause of action. *Id.* at 193. The cases *Wyandotte* cites stand for the unremarkable proposition that "the United States may sue to protect its interests" *under an available cause of action*—something Texas does not dispute. *Id.* at 201 (citing *Cotton v. United States*, 52 U.S. (11 How.) 229 (1850) (action in trespass); *United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888) (action to quiet title); *Sanitary Dist. of Chi. v. United States*, 266 U.S. 405 (1925) (statutory cause of action)). Where the federal government has a cause of action in equity, it may obtain an injunction. But it has no such cause of action here.

*Third*, that the federal government relied on a non-existent cause of action in *Arizona* is irrelevant because no party in that case raised this issue. That is unsurprising, moreover, because the legal landscape has changed markedly from when *Arizona* was decided. Not only was *Arizona* decided pre-*Armstrong*, but it also predated the Supreme Court's wave of cases emphasizing that it is for Congress—not courts—to create causes of action. *See, e.g.*, *Hernandez*, 140 S.Ct. at 741-42. In all events, "[i]n our adversarial system of adjudication, we follow the principle of party presentation," *United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020), and "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to

18

constitute precedents," *Gann v. United States*, 142 S.Ct. 1, 2 (2021). Accordingly, neither *Arizona*, nor any other post-*Debs* case that merely assumed answers to a question never asked, can be read as a limitless "litigation superpower." Bamzai & Bray, *supra*, at 737.

Finally, the federal government has elsewhere suggested that it can pursue an equitable action under *Ex Parte Young*. ROA.420. Yet the sole case it relies on, *Virginia Office for Protection and Advocacy v. Stewart*, 563 U.S. 247 (2011), did not address the federal government at all. As the Court has explained, *Ex Parte Young* creates an exception to sovereign immunity that "allows *certain private parties* to seek judicial orders in federal court" enjoining unconstitutional acts by state officials. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021) (emphasis added). No case or statute authorizes the U.S. Department of Justice—itself created by Congress—to sue state officials acting in their official capacities without congressional authorization. Even if the federal government could pursue an *Ex Parte Young* action, it could not do so here because S.B.4 is not enforced against it.

The district court was unmoved by Texas's points. ROA.501-504. First, the district court suggested that *Armstrong* did not evaluate whether there was a cause of action in equity upon which the plaintiffs there could rely but rather evaluated whether relief in equity was available. ROA.501-502. This is inaccurate. *Armstrong* evaluated whether the plaintiffs had "an implied right of action under the Supremacy Clause to seek injunctive relief." 575 U.S. at 324. The discussion the district court refers to was simply a bifurcated analysis that rejected *both* the existence of a

19

constitutional or statutory grant of authorization to private plaintiffs to sue and of the authority to obtain injunctive relief under the Supremacy Clause. *Id.* at 324-35.

The district court also wrongly relied (at ROA.503-504) on the fact that the United States "has brought many lawsuits under the Supremacy Clause … without any questioning of [it] as the basis for a federal cause of action." *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021). But such cases do not grapple with the separation-of-powers problems posed by *Debs* or with the Supreme Court's recent cases holding that inferring causes of action is a disfavored judicial activity.

The federal government's assertion of authority is breathtaking. It claims the power to seek an injunction of any law passed by any State, despite Congress's failure to grant such authority and without any grounding in traditional equitable principles. Yet where, as here, "the basis for the suit by the United States is a reach back almost 130 years for a litigation superpower, … it is more than appropriate for the historic limits on that superpower to be brought along as well." Bamzai & Bray, *supra*, at 737. The district court abused its discretion holding otherwise.

### B. Federal immigration law does not preempt S.B.4.

Plaintiffs' merits arguments fare no better. Three provisions of S.B.4 are relevant to this appeal: Sections 51.02(a) and 51.03(a), which create state offenses for unlawfully entering and reentering Texas, and Article 5B.002, which permits judges to issue orders to return. *See* ROA.23-26; ROA.798-800. Sections 51.02(a) and 51.03(a) mirror federal law. Section 51.02 creates affirmative defenses if "the federal government has granted the defendant … lawful presence in the United States" or "asylum," Tex. Penal Code §51.02(c)(1). And Article 5B.002 allows an alien facing

20

prosecution to voluntary depart in lieu of potential conviction, which means that Texas will transport that person to a lawful port of entry. Nothing about S.B.4 facially conflicts with federal law.

**1.** To start, no provision of S.B.4 is field preempted. Plaintiffs argued below that "entry and removal" is an exclusive federal field, and the district court agreed. ROA.105-112; ROA.506-517; ROA.917-922. Plaintiffs asserted that the authority "to admit or exclude aliens" is a power "vested solely in the Federal Government." ROA.93 (citing *Truax v. Raich*, 239 U.S. 33, 42 (1915)); ROA.918 (same). No one doubts Congress's ability to enact and enforce the federal immigration code. But federal and state governments are separate sovereigns. A sovereign cannot preempt another's laws without clear legislative intent to occupy the entire field of law. *See Parker v. Brown*, 317 U.S. 341, 350-51 (1943). "In a dual system of government," the Constitution recognizes that "the states are sovereign, save only as Congress may constitutionally subtract from their authority." *Id*. at 351. Indeed, "in all pre-emption cases," *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), courts should "start with the assumption that the historic police powers of the States were not to be superseded … unless that was the clear and manifest purpose of Congress," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). State law cannot be impliedly preempted, as "an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker*, 317 U.S. at 351. Instead, preemption requires "[o]ccupation of a legislative field by Congress" as reflecting its intent "to suspend state laws." *Id*. at 350 (internal quotation omitted). And it is not enough for Congress to merely pass legislation in the pertinent field; the federal government

21

must, in fact, take action to occupy that field. *See, e.g., id.* at 358. Courts will recognize a preempted field only when an "unambiguous congressional mandate," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963), ousts the State entirely from a field that "Congress occupies" exclusively, *Arizona*, 567 U.S. at 401. Nothing approaches such a mandate here.

Under federal law, States enjoy wide latitude to regulate alien misconduct and prosecute crimes involving illegal entry and removal. Indeed, the federal immigration code is replete with state-federal cooperation.[1] Courts thus have never "conclude[d] that the States are without any power to deter the influx of persons entering the United States … and whose numbers might have a discernable impact on traditional state concerns." *Plyler*, 457 U.S. at 228 n.23. Nor does the federal code preclude States from facilitating aliens finding their way to ports of entry, the purpose of S.B.4's return orders. To the contrary, Congress wants everyone to present themselves at lawful ports of entry and has made it a federal crime for anyone to enter or exit anywhere else. *See* 8 U.S.C. §§1325(a), 1326(a).

---

[1] Examples abound: 18 U.S.C. §758 (crime for alien to "flee[]" from "State, or local law enforcement" around immigration checkpoints); 8 U.S.C. §1324(c) (States may make arrests for violation of alien smuggling prohibition); 22 U.S.C. §7105(c)(3)(C)(i) (contemplating "State or local" prosecution of alien "trafficking"); 8 U.S.C. §1101(a)(15)(T)(i)(III)(aa) (contemplating "State[] or local investigation or prosecution" of illegal trafficking); 8 U.S.C. §1101(a)(15)(U)(iii) (State and local criminal laws can include trafficking); 8 U.S.C. §1357(g)(1)-(10) (State and local officers perform functions of federal immigration officers related to the identification, apprehension, detention, and removal of illegal aliens); 8 U.S.C. §1357(g)(10)(A) (State and local officers communicate with federal officials regarding the immigration status of *any* individual).

Plaintiffs (and the district court) relied on *Arizona* to conclude that entry and removal is an *exclusive* federal field. ROA.105-112; ROA.513-515; ROA.917-922. But *Arizona* says no such thing. In *Arizona*, the Court considered four state-law provisions, holding that one—§3—was field preempted, two—§5(C) and §6—were conflict preempted, and another—§2(B)—was not preempted at all. *Arizona*, 567 U.S. at 403, 407, 410, 415. The provision that was field preempted, §3, would have created a state crime for failing to carry an alien registration card. *Id.* at 400. The Court explained that although a State ordinarily "may make violation of federal law a crime," a principle of law that supports Texas here, a State "cannot do so in a field" such as alien registration "that has been occupied by federal law." *Id*. at 402. Because §3 attempted to regulate within such a preempted field, it was preempted. *Id.* at 403-04 (citing *DeCanas v. Bica*, 424 U.S. 351, 356 (1976); *Hines v. Davidowitz,* 312 U.S. 52, 66-67 (1941)). But under *Arizona*, §3 would not have been field preempted had it simply mirrored federal law *without* intruding on an exclusive federal field.

The Court used the word "exclusive" only twice in *Arizona*, and only to describe the standard for finding field preemption. *Id.* at 399, 409. The only field preemption recognized in *Arizona* is "the field of alien registration," which is a domestic tracking program irrelevant here. *Id*. at 402. Moreover, *Arizona* did not find that state laws concerning entry and removal were field preempted, and nothing in *Arizona* precludes States from regulating entry and reentry or issuing return orders. Indeed, *Arizona* held that three of the four challenged state-law provisions were *not* field preempted, including a provision that would have directly impacted the removal of aliens. *Id.* at 416. And the Supreme Court has elsewhere rejected that

23

federal law field preempts "every state enactment which in any way deals with aliens." *DeCanas*, 424 U.S. at 355. Otherwise, no State could enact or enforce any law affecting immigration—a demonstrably untenable position.

Regardless, Plaintiffs' field preemption argument should be rejected because the federal government has abandoned the field it now purports to occupy. The federal government ignores its obligations under the code, essentially holding up "a flashing 'Come In, We're Open' sign on the southern border." *Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023). It "[d]isregard[s] that entering the United States by crossing … other than at an official port of entry is a federal crime." *Texas*, 2023 WL 8285223, at *11. The federal government's "utter failure … to deter, prevent, and halt unlawful entry into the United States" is thus a sad product of "the statutory duties [it is] so obviously derelict in enforcing." *Id.* at *14. Given such documented dereliction, and contrary to the district court's view, ROA.525-530, the fact that the federal government engages in some acts with respect to the border by no means demonstrates an "occupation of the legislative field." *Parker*, 317 U.S. at 358; *see also id.* (rejecting preemption of the "legislative field" where federal agency failed to put law "into effect").

**2.** Nor does S.B.4 conflict with federal immigration law. The district court held that S.B.4 is likely conflict preempted because "[a]t the broadest level, SB 4 conflicts with federal immigration law [by] provid[ing] state officials the power to enforce federal law without federal supervision." ROA.531. The court reasoned that:

24

- S.B.4 "divests federal immigration authorities of the discretion of the enforcement of immigration laws, which touches on delicate considerations of foreign affairs." ROA.532.

- "SB 4's removal orders will also prevent noncitizens from asserting affirmative defenses to removal that would have been available in the federal system, including asylum." ROA.532 (internal quotations omitted).

- S.B.4 is likely conflict preempted "because noncitizens will be removed to Mexico, regardless of their country of origin and in contrast to federal law on removal destinations." ROA.535.

The district court concluded that these perceived conflicts "will cause the federal government to lose the ability to speak with one voice on removals." ROA.536 (internal quotations omitted).

The district court's conclusions, however, rely on misunderstandings about dual sovereigns' overlapping laws and how S.B.4 comports with federal law. Texas and the federal government are dual sovereigns, and one sovereign may adopt the laws of another. The federal government, for example, may adopt state law for federal-law purposes. *See, e.g., Parker Drilling Mgmt. Serv., Ltd. v. Newton*, 139 S.Ct. 1881, 1886 (2019); 18 U.S.C. §13(a). State governments may do the same—S.B.4 is an example of Texas doing just that. A conflict between two sovereigns' laws arises only when it is "impossib[le]" to comply with both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. Here, it is readily possible to comply with both federal and Texas law because S.B.4 comports, rather than

conflicts, with Congress's purposes and objectives. At a minimum, there is no basis to say that *every* application of S.B.4 would conflict with federal law—the requirement for a facial, pre-enforcement injunction.

In the preemption context, a state regulation "'stands as an obstacle'" to federal objectives if there is an "actual conflict between the two schemes of regulation" such that "both cannot stand in the same area." *Paul*, 373 U.S. at 141 (citing *Hines*, 312 U.S. at 67). But "[t]he mere fact that state laws like" S.B.4 "overlap to some degree with federal criminal provisions" on immigration "does not even begin to make a case for" preemption. *Garcia*, 140 S.Ct. at 806. If courts "were to hold that federal criminal law preempts state law whenever they overlap," the "federal system would be turned upside down." *Id.* "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Id.* What is more, "with respect to illegal aliens," state laws that "mirror[] federal objectives" are *more*—not less—likely to be upheld. *Plyler*, 457 U.S. at 225. Likewise, because Texas courts "interpret … statute[s] in a manner that avoids constitutional infirmity," *Quick*, 7 S.W.3d at 115, S.B.4 will presumably be construed and applied to avoid conflicts with federal law.

Like its federal counterpart, S.B.4 makes it a crime to cross into Texas at any location other than a port of entry, Tex. Penal Code §51.02(a); 8 U.S.C. §1325(a), or to illegally re-enter after having previously been "denied admission," having been involuntarily "removed," or having voluntarily "departed from the United States," Tex. Penal Code §51.03(a); 8 U.S.C. §1326(a). S.B.4 also provides for return orders—something no federal law prohibits. Tex. Code Crim. Proc. art. 5B.002(c), (d);

26

8 U.S.C. §§1225(b)(1)(A)(i), 1229a(d), 1229c(a)(1). These orders do not eliminate federal defenses, like an individual's option to seek asylum.[2] Rather, a return order merely requires an alien be transported to a port of entry, at which point—as both a practical and legal matter—the alien's potential removal is a question for federal immigration officers. Tex. Code Crim. Proc. art. 5B.002(e). When a return order is issued, a state officer or agency is "responsible for monitoring compliance with the order," but has no additional authority to effectuate removal. *Id.* art. 5B.002(e)(2).

Nothing in S.B.4 prevents an alien from seeking asylum, or any other federal relief, from federal authorities, and S.B.4 does not authorize or require state officials to make removal determinations, assess an alien's removal defenses, or interfere with the federal government's removal proceedings. ROA.315-316. And S.B.4 does not alter state officers' routine practice of cooperating with federal authorities when an arrested or detained alien expresses a desire to seek asylum or other relief. ROA.316. If such a person has a pending application for asylum or other relief, S.B.4 does not prevent state officers from coordinating with federal immigration authorities. ROA.316. S.B.4's directive not to abate prosecution pending such application does not require removal, Tex. Code Crim. Proc. art. 5B.003; certainly, prosecution for violations of state law may proceed during the pendency of federal decisions regarding an individual's federal relief. Thus, by design, nothing in S.B.4 disrupts or

---

[2] Nor do return orders do what the district court claimed: Require an alien to "either depart into Mexico or … face 20 years in prison if they do not," or otherwise be forcefully removed "in handcuffs" or "under threat of handcuffs (and 20 years of prison)." ROA.520-521. Texas's declarant said no such thing. *See* ROA.313-316.

27

conflicts with federal law, including federal defenses and removal relief. And critically, *even if* federal law somehow does provide some defense or right that is not provided in S.B.4, that defense or right would continue to apply under basic principles of federal preemption. But it would not follow that *every* application of S.B.4 could be enjoined for that reason, including applications that have nothing to do with that defense or right.

Tellingly, Plaintiffs have never attempted to equate with any specificity the conflict preempted provisions in *Arizona* with S.B.4's challenged provisions—undoubtedly because the differences between the provisions underscore why conflict preemption does not apply. In *Arizona*, two provisions of Arizona's law were deemed conflict preempted: §5(C) and §6. As to §5(C), the Supreme Court explained that "Congress made a deliberate choice not to impose [the] criminal penalties" that §5(C) created. 567 U.S. at 405. Because Congress rejected the penalties §5(C) would impose, the state law was an "obstacle" to Congress's objectives. *Id.* at 406.

Similarly, the Supreme Court determined that §6 was conflict preempted because it allowed a state officer to arrest a person based on probable cause of removability but not the commission of a crime. *Id.* at 407-10. The Supreme Court explained that because "it is not a crime for a removable alien to remain present in the United States," "the usual predicate for an arrest [under §6] [was] absent." *Id.* at 407. Section 6 thus would have provided state officers "even greater authority to arrest aliens … than Congress has given to trained federal immigration officers," *id.* at 408, which would allow them to make a "unilateral decision," "defeating any need for real cooperation" between State and federal officials, *id.* at 410.

By contrast, the Supreme Court held that Arizona's §2(B), which requires state officers to determine an individual's immigration status if the individual is arrested or detained "on some other legitimate basis," is neither field nor conflict preempted. *Id*. at 411. Because assessing immigration status requires consultation between state and federal officials, "[t]he federal scheme thus leaves room" for state action. *Id*. at 413. The Supreme Court buttressed that holding with the recognition that "[t]he nature and timing" of a pre-enforcement, facial challenge "counsel caution in evaluating the validity" of a state-law "provision even before the law has gone into effect." *Id*. at 415. Accordingly, the Supreme Court held that "without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law." *Id*.

So too here. S.B.4's provisions mirror federal law and comport with federal objectives in reducing illegal border crossings. Critically, S.B.4 is unlike *Arizona*'s §3 because it does not intrude on a recognized, exclusive federal field; it certainly has nothing to do with the only field—alien registration—at issue in *Arizona*. *See supra* 22. Nor is S.B.4 like §5(C) or §6. Unlike §5(C), S.B.4 has *existing* federal law analogues. And unlike §6, S.B.4 empowers state officers to arrest and detain aliens only when there is probable cause of a criminal violation. S.B.4 does not allow a state officer's "unilateral decision" to arrest without probable cause of a crime, and it does not "provide state officers even greater authority" than their federal counterparts. *Arizona*, 567 U.S. at 408, 410. Instead, S.B.4 is most like *Arizona*'s §2(B), which facilitates a joint state-federal effort to enforce the law.

29

Critically, an alien can comply with *both* the federal immigration code and S.B.4 by entering this country legally at a port of entry and not reentering illegally. This has certainly been true with regard to Texas's enforcement of its state criminal trespass law, Tex. Penal Code §30.05, which has been used for years to prohibit an alien's illegal entry and presence in Texas. The federal government has never—and does not now—challenge the State's authority to enforce the State's equally complementary border-based criminal trespass law.[3]

## C.  The dormant Foreign Commerce Clause does not preempt S.B.4.

The district court also concluded that S.B.4 offends the dormant Foreign Commerce Clause—an argument raised only by the federal government. ROA.539. So long as States do not discriminate against out-of-state economic interests, however, the Constitution broadly permits them to exercise their police powers within their borders, *see, e.g.*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368-70 (2023), even when doing so may have consequences for international relations, *see, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 496-98 (2008). Here, Plaintiffs all but concede that S.B.4 is not motivated by protectionism and make no effort to show how S.B.4 flunks the so-called *Pike* balancing test.

---

[3] No provision of S.B.4 is preempted under *Arizona*. But if courts read *Arizona* so broadly that S.B.4 is preempted, *Arizona* should be overruled. Texas respectfully preserves its right to urge that position before the Supreme Court, though such an argument should not be necessary given that S.B.4 is designed to mirror—rather than conflict with—federal law.

Furthermore, even assuming that illegal border crossings constitute "commerce," there is nothing "dormant" about Congress's lawmaking here. "Congress has undoubted power" to supersede the so-called dormant commerce clause, *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945), and Congress not only declined to preempt the field, but itself criminalized illicit, cross-border human trafficking and repeatedly has welcomed state cooperation to enforce that prohibition, *see supra* 21. S.B.4 has no commercial component; it's a pure exercise of Texas's police power. It is thus "not a regulation of commerce" but was "passed in the exercise of a power which rightfully belonged to the states." *Miln*, 36 U.S. at 132.

The district court nonetheless concluded that S.B.4 is unlawful because "the movement of persons between states is commerce" and S.B.4 contravenes "the Fifth Circuit's Dormant Commerce Clause test." ROA.540-541. The district court conceded, however, that "Texas is correct that courts have shifted away from rooting the federal government's power to regulate immigration in the Commerce Clause towards the plenary power doctrine." ROA.540. The court reasoned that such a shift is irrelevant because Congress still has the constitutional power to treat "the movement of persons between states [a]s commerce" when it wants to do so. ROA.540-541. Yet the animating theory of the dormant Commerce Clause is that courts sometimes can presume that Congress intends them to block certain laws even if Congress has not said so because it is apparent that Congress does not want such laws. If Congress, however, does not choose to treat immigration as commerce, there is no reason for a Court to presume that Congress intends such treatment.

31

Cases like *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744 (5th Cir. 2006), are irrelevant, therefore, because S.B.4 does not regulate commerce at all, *see Miln*, 36 U.S. at 132, and even if it did, Congress has not been "dormant." Plaintiffs disagree with Texas about the meaning of the laws that Congress enacted, but they do not dispute Congress has been active in this space. Indeed, their preemption argument is premised on the supposedly comprehensive nature of congressional action—the *opposite* of dormancy. And even if the dormant Foreign Commerce Clause framework did apply, S.B.4 satisfies it. S.B.4 is not targeted at lawful travel itself but rather illicit trafficking, smuggling, and illegal transport; it promotes a host of essential "local interest[s]," *Piazza's Seafood*, 448 F.3d at 50; and—by tracking federal law—does not create risks of "conflicts with foreign governments" beyond those created by Congress itself, *id.* No aspect of *Piazza's Seafood* is relevant to S.B.4.

### D.  Texas has a constitutional power of self-defense.

Even if S.B.4 did conflict with federal statutory law or dormant Commerce Clause principles, Texas has constitutional authority to defend itself. Upon joining the Union, "the States did not part with that power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean, J.). This power is confirmed by the Self-Defense Clause, which recognizes that States may respond when "actually invaded." U.S. Const. art. I, §10, cl. 3. Under any plausible reading of that provision, S.B.4 can be applied in at least some cases. That fact independently defeats Plaintiffs' facial challenge.

**1.** "No state shall, without the Consent of Congress, … engage in War, *unless actually invaded*, or in such imminent Danger as will not admit of delay." *Id.*

32

(emphasis added). A State thus may defend itself "if it is 'actually invaded.'" *Melendez v. City of New York*, 16 F.4th 992, 1018 (2d Cir. 2021) (quoting U.S. Const. art. I, §10, cl. 3). On its face, this provision represents "an acknowledgement of the States' sovereign interest in protecting their borders." *Arizona*, 567 U.S. at 419 (Scalia, J., dissenting in part); *see also* Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 British J. Am. Leg. Studies 1 (2024) (detailing state authority to exercise the Constitution's "Self-Defense Clause").

The word "invasion" is capacious. Webster's 1806 dictionary—the first American English dictionary—broadly defines "invade" as meaning "to enter or seize in hostile manner." Noah Webster, *A Compendious Dictionary of the English Language* 164 (1806). Webster's 1828 dictionary further defines "invade" as including not just the entrance of a foreign army but also "1 … to enter as an enemy, with a view to conquest or plunder; to attack"; "2. To attack; to assail; to assault"; "3. To attack; to infringe; to encroach on; to violate." 1 Noah Webster, *American Dictionary of the English Language* 113 (1828). And Samuel Johnson defined "invade" as "to enter in a hostile manner," and "invasion" as a "hostile entrance" or "an attack." Samuel Johnson, *[Johnson's] Dictionary* (reprint, Boston 1828). The term has never required an all-out assault by a foreign state or a danger of conquest.

History confirms this understanding. In urging adoption of the Constitution, James Madison explained that smuggling could justify a State's military response:

> The militia ought to be called forth to suppress smugglers. Will this be denied? The case actually happened at Alexandria. There were a number of

33

smugglers, who were too formidable for the civil power to overcome. The military quelled the sailors, who otherwise would have perpetrated their intentions. Should a number of smugglers have a number of ships, the militia ought to be called forth to quell them.

3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 414 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836). Madison explained later that day that although States are generally "restrained from making war," that bar does not apply when they are "invaded, or in imminent danger. When in such danger, they are not restrained." *Id.* at 425. Nor was Madison alone in this opinion. According to John Marshall, it was "unquestionable that the state governments can call forth the militia, in case the Constitution should be adopted, in the same manner as they could have done before its adoption," and that "what excludes every possibility of doubt, is the last part of [the 10th section of the 1st article]—that 'no state shall engage in war, unless actually invaded, or in such imminent danger as will not admit of delay.' … This clearly proves that the states can use the militia when they find it necessary." *Id.* at 420.

As early as 1792, the United States determined that its power "[t]o provide for calling forth the Militia to … repel Invasions," U.S. Const. art. I, §8, authorized force to repel any "imminent danger of invasion from any … Indian tribe," *An Act [t]o provide for calling forth the Militia to execute the laws of the Union, suppress insurrections and repel invasions*, 1 Stat. 264, 2d Cong., Sess. I, Ch. 28 (1792). And the United States repeatedly (in 1859, 1860, 1873, 1877, and 1919) used defensive force against non-state actors along the Texas-Mexico border—even pursuing them across the border—because the Mexican government "was incapable of policing" individuals

34

who repeatedly crossed the Rio Grande into Texas to kill and plunder. *See, e.g.*, John S.D. Eisenhower, *Intervention! The United States and the Mexican Revolution 1913-1917*, at 227-50 (1993); *cf.* U.S. Const. art. IV, §4 (obligating federal government to protect States "against Invasion[]").

States have also exercised their power to repel invasion. Of particular significance, Texas repeatedly responded with force against marauders who crossed into Texas from Mexico, both before and (more importantly) after Texas's statehood (in 1855, 1859, 1860, 1874, and 1875). *See, e.g.*, H. Rep. No. 343, at 13-17 (Feb. 29, 1876). Congress thus created a "special committee on [the] Texas frontier troubles," *id.* at 1, to study Texas's use of such force against "bands of Indians and Mexicans, who crossed the Rio Grande River into the State of Texas," *id.* at I. The Special Committee quoted with approval Governor Sam Houston's letter to the U.S. Secretary of War about this "invasion"—Congress's word—"of Indians from Mexico in Texas," which justified Texas's "'repress[ing] such outrages upon our people.'" *Id.* at XV. Furthermore, after the U.S. Attorney General questioned in 1874 Governor Richard Coke's decision to respond with military force against "'thieves and marauders'" who crossed into Texas, Governor Coke observed that "[n]o state has surrendered the right of defense of its people" and expressly invoked the Self-Defense Clause. *Id.* at XV-XVI, 166. "Attorney General Williams acquiesced in these conclusions, and the orders remained in force." *Id.* at XVI. Because "[t]he protection of our border is a supreme duty," the Special Committee thus urged the President to assist Texas in protecting "the country between the Rio Grande and the Nueces River, in the State of Texas, from the cattle-thieves, robbers, and murderers

35

from the Mexican side of the river." *Id.* at XVI-XVII. After all, Texans "are Americans, and there are limits to patient suffering." *Id.* at XVI.

**2.** Governor Abbott—acting as the "Commander-in-Chief of the military forces of the State" of Texas, Tex. Const. art. IV, §7—has invoked Texas's power to defend itself against transnational cartels engaged in terrorism, human trafficking, and fentanyl and weapons smuggling. Cartels intentionally exploit vulnerable immigration policies and lapses in federal immigration enforcement for their financial gain—as President Biden recognized, "people pay these smugglers $8,000 to get across the border" because the consequences for illegally crossing the border can be relatively non-existent. State of the Union Address, *supra.*

The dangers of cartel activity are hard to overstate: Such lucrative, illicit conduct endangers border-state residents, oftentimes including vulnerable individuals and children, and results in extraordinary hazards and destruction. Fighting back against cartels that "have increasingly acquired a transnational dimension" and operate as a "potent paramilitary force," Barr, *supra*, is permissible under any plausible reading of the Self-Defense Clause. Indeed, the *Annual Threat Assessment* recently issued by the Director of National Intelligence warns that "[t]ransnational criminal organizations (TCOs) ... degrade the safety and security of the United States" and "endanger the health and safety of millions of individuals"; "Mexico-based TCOs are the dominant producers and suppliers of illicit drugs to the U.S. market"; and "aspects of fentanyl production are spilling over into the United States." Off. of the Dir. of Nat'l Intelligence, *supra* at 36. The report also warns that "TCOs bribe foreign political candidates and security officials in an effort to limit enforcement actions and

36

to protect illicit operations, such as illicit drug production or cross-border smuggling"; "engage in human trafficking[,] … drug trafficking, weapons smuggling, human smuggling, and money laundering"; and "coerce or defraud their victims into sex trafficking or forced labor." *Id.* at 37-38. Equally alarming, the FBI Director warns that "we are seeing a wide array of very dangerous threats that emanate from the border," and "some of the overseas facilitators of the smuggling network have ISIS ties that we're very concerned about." Pavlich, *supra*.

Plaintiffs do not dispute that armed and dangerous cartel members cross the border,[4] or that S.B.4 could be used to combat such incursions. Because Plaintiffs must "establish that *no set of circumstances* exists under which the Act would be valid," *Salerno*, 481 U.S. at 745 (emphasis added), by themselves such applications of S.B.4 defeat their facial challenge.

The district court dismissed Texas's self-defense power by contending that immigration can never be an invasion. *See, e.g.*, ROA.544-563. That proposition is hardly self-evident. *See, e.g.*, *United States v. Abbott*, 92 F.4th 570, 579-80 (5th Cir. 2024) (Ho, J., dissenting) (collecting examples of "weaponized migration"). But for purposes here, it is sufficient that even the district court recognized that "invasion"

---

[4] *See, e.g.*, Anna Giaritelli, *Texas Drone Spots Armed Smuggler Leading Immigrants Across the Border*, WASH. EXAM'R (Aug. 3, 2023), https://tinyurl.com/29r5wz8k; Victor Nava, *Armed Men Believed to Be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, N.Y. POST (Aug. 8, 2023), https://tinyurl.com/36apzadn; Office of Tex. Governor, *Press Release, Texas Arrests MS-13 Gang Members, Smugglers Known for Sexual Abuse* (Aug. 11, 2023), https://tinyurl.com/y7cy95au.

37

includes "a 'hostile entrance into the possession of another,'" "particularly"—not exclusively—by "a hostile army" seeking "conquest or plunder." ROA.546-547. The court also acknowledged that "'invasion' can refer to actions by non-state actors," ROA.561, and "some small fraction of immigrants may cross the border with malicious intent and… may be affiliated with paramilitary cartels," ROA.550. Thus, on the district court's own terms, some applications of S.B.4 are constitutional—defeating a facial injunction under *Salerno*.

The district court nonetheless concluded that an invasion requires a threat that cartels "will imminently overthrow the state government." ROA.553. No one, however, thought Juan Cortina was on the cusp of conquering Texas or that smugglers were about to overthrow Virginia. The district court also suggested that S.B.4 is not a "wartime measure" because it uses "standard operations of criminal enforcement." ROA.563-564. As Justice Holmes explained for the Supreme Court, however, the greater power to wage war against invaders and insurrectionists includes the lesser power to "arrest" them. *Moyer v. Peabody*, 212 U.S. 78, 84-85 (1909); *cf.* Natelson & Hyman, *supra*, at 8 & n.44 (describing how a belligerent "could take many defensive measures that … would fall short of (or be incidental to) full-blown hostilities"). The district court further observed that "SB 4 is not limited to times of invasions" and suggested that Texas's efforts to repel an invasion cannot be "perpetual." ROA.566-567. Nothing in the Constitution, however, says a State must stop defending itself. Regardless, a facial injunction is unwarranted under *Salerno* so long as S.B.4 can *ever* be constitutionally enforced. The district court's analysis at most suggests limits on S.B.4's application—not that it can *never* be applied.

38

Furthermore, it was inappropriate for the district court to second guess Texas's decision to engage in self-defense. So long as a State acts in "good faith," *Sterling v. Constantin*, 287 U.S. 378, 399-400 (1932), then just as the United States has exclusive "authority to decide whether [an] exigency has arisen" for purposes of Article I, Section 8, Clause 15 of the U.S. Constitution, *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29-30 (1827) (Story, J.), a State has exclusive authority to decide whether such an exigency has arisen within its own borders under Article I, Section 10, Clause 3, *see Moyer*, 212 U.S. at 83-85; *cf. Rucho v. Common Cause*, 139 S.Ct. 2484, 2495-96 (2019) (political question doctrine applies to state decisions). The district court disagreed, contending that it would open the floodgates, despite obvious political checks on this power. ROA.569-573. Here, however, even President Biden admits the border is in "crisis." Regardless, if such a fundamental decision could be second guessed by a court, history supports Texas. Congress' Special Committee, after all, agreed that Texas could combat bandits—the forerunners of today's even more dangerous cartels—who cross into Texas.

Nor is it correct that federal statutes can preempt a State's effort to defend itself. When it comes to self-defense, Texas is *not* required to obtain Congress's consent. *Compare* U.S. Const. art. I, §10, cl. 2 (describing state authority over duties and imposts "subject to the Revision and Controul of the Congress"), *with* U.S. Const. art. I, §10, cl.3 (describing state self-defense authority absent such limitation). Given the relationship between the States and Congress, it would contradict both history and "common sense" to say that States relinquished perhaps the most fundamental

39

feature of sovereignty: The right to fight back against hostile actors. *Abbott*, 92 F.4th at 579-80 (Ho, J., dissenting).

Finally, there is little reason to fear that S.B.4 may be applied even when Texas's self-defense power is not implicated. As the Supreme Court has explained, facial injunctions are the exception, not the rule, and where the requirements for such extraordinary relief are not met, "courts must handle unconstitutional applications as they usually do—case-by-case." *United States v. Hansen*, 599 U.S. 762, 770 (2023). Nothing in Texas's argument prevents as-applied challenges to S.B.4.

### E.   At a minimum, the district court misapplied severability.

The district court also failed to meaningfully engage with S.B.4's severability clause. That clause requires that "every provision, section, subsection, sentence, clause, phrase, [and] word" be severed, if necessary, to preserve the remainder of the law. Act of Nov. 14, 2023, *supra*. It also requires severability of "every application of the provisions of [S.B.4] to every person, group of persons, or circumstances" necessary to safeguard enforcement. *Id.* And it expressly commands that "[i]f any application of any provision [of S.B.4] to any person, group of persons, or circumstances if found by a court to be invalid for any reason, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected." *Id.* "Severability is of course a matter of state law," *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam), and Texas gives near-dispositive weight to a severability clause, *see e.g.*, *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022).

40

The district court recognized that it should enjoin only unconstitutional applications of S.B.4. ROA.587 n.57. Yet the district court chose to set aside the severability inquiry because it "would not be practicable" to do so here. ROA.587 n.57. The district court observed that it could sever the criminal offenses while enjoining the return order provisions but did not do so because, apparently, it believed they may also raise conflict-preemption issues that the district court did not explore. ROA.587 n.57. Yet the district court should have investigated whether some applications could survive. For example, even if Article 5B.002's provision regarding return orders conflicts with federal removal relief programs or disrupts foreign relations, as Plaintiffs mistakenly contend, the district court should have severed that provision from the rest of S.B.4. Doing so would allow §51.02 and §51.03, which mirror federal unlawful entry and reentry crimes, to take effect. And S.B.4's severability clause expressly requires this outcome; indeed, it requires that every word be severed if necessary, and every application of the law to every group of persons be individually assessed.

## II.  The Remaining Preliminary Injunction Factors Fully Support Texas.

Because the district court's injunction rests on numerous legal errors, this Court should vacate it and remand to the district court with instructions to apply the correct legal analysis. *See, e.g.*, *Kauffman*, 981 F.3d at 354. If the Court considers the remaining factors, the case for vacatur becomes even stronger. Plaintiffs' theory that Texas has little to no role to play in combatting the border crisis that is overwhelming the nation in general—and Texas in particular—is anything but equitable.

## A.  Plaintiffs did not show they would suffer irreparable harm.

**1.** Contrary to the district court's conclusion that "the United States has shown irreparable harm as a matter of law," ROA.576, all the Plaintiffs' harms are speculative or rest on alleged harms to third parties.

To start, the premise of the district court's analysis was that the federal government will be irreparably harmed because S.B.4 is "expressly preempted." ROA.576. But that is the very merits argument that this Court must decide. Because S.B.4 is not preempted at all—and certainly not facially—the district court's irreparable harm is infected with legal error and thus constitutes an abuse of discretion.

The federal government's alleged diplomatic harms are speculative. Yet "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Speculation is simply not enough. *See Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011). And it is especially inappropriate to rely on speculation here because Congress has already weighed whether to criminalize entry outside of a port of entry and enacted a statutory scheme that invites state cooperation with respect to immigration enforcement. *See supra* 21. And the Supreme Court has rejected an even stronger argument regarding foreign relations. *See Medellin*, 552 U.S. at 532.

The district court again disagreed, but its analysis could be used with respect to essentially *any* case involving border security. The United States and Mexico frequently engage in "diplomatic meeting[s]" and "multilateral negotiations." ROA.578. The United States always "has a paramount interest in maintaining strong diplomatic ties with Mexico." ROA.579. And enforcing state law with respect to

42

border communities—as Texas does with its criminal trespass statute—could wrongly be attacked as "undermin[ing] the country's ability to promulgate foreign policy with one voice." ROA.577. But it hardly follows that every state measure goes too far. *See, e.g.*, *United States v. Abbott*, 87 F.4th 616, 642 (5th Cir. 2023) (Willett, J., dissenting), *reh'g en banc granted, opinion vacated*, 90 F.4th 870 (5th Cir. 2024). To the contrary, "in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Garcia*, 140 S.Ct. at 806. That observation is even more salient here because enforcing S.B.4 does not prevent the federal government from enforcing (or failing to enforce) immigration law.

The district court also observed that S.B.4 "frustrates the United States' efforts and obligations to protect individuals fleeing from persecution or torture." ROA.579. But that observation overlooks what S.B.4 says; as explained, the statute provides an affirmative defense with respect to asylum, and if S.B.4 for some reason does not provide every federal defense then preemption would apply with respect to that precluded defense. Again, S.B.4 is designed to mirror federal law. Properly understood, S.B.4 therefore poses no danger that "other countries" would stop "host[ing] asylum applicants." ROA.580.

The district court's laundry list of remaining alleged harms "too numerous to spell out in detail" is also unpersuasive. ROA.580. There is no reason to believe—especially in a facial, pre-enforcement posture—that Texas will not timely "share all data related to noncitizen arrests," especially if it relates to "counterterrorism." ROA.580. Nor is there any reason to conclude that Texas will not facilitate federal

efforts "to pursue expedited removals." ROA.580. Not only does that same risk apply to Texas's criminal trespass statute, which the federal government does not challenge, but Texas wants to *support* federal efforts. And the district court's concerns about "changes to immigration flows," ROA.580, ignores Texas's criminal trespass statute and, more broadly, the reality that immigration flows can always change.[5]

**2.** The Organizational Plaintiffs also will not suffer irreparable injury. Their arguments fall into two categories: S.B.4 (1) affects their business models and (2) will affect nonparties. Neither argument is persuasive. First, S.B.4 does not proscribe their intended conduct—distributing educational materials and resources. Second, their assumptions that S.B.4 will affect the actions of aliens fail to demonstrate harm to *them*. And even if they could piggyback on the alleged harms of non-parties—they cannot, *cf. O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974)—their injuries are still wholly speculative and largely based on illegal conduct, which is insufficient to support the district court's injunction.

The district court faulted S.B.4 for not containing a carveout for "victims of trafficking" who may be reluctant to "risk arrest and removal if they report their crimes." ROA.582. S.B.4, however, mirrors federal law, and in appropriate circumstances, Texas may exercise prosecutorial discretion. That is not a question that can

---

[5] The district court relied (at ROA.580) on the declaration of David S. BeMiller to show the irreparable harm that the federal government would allegedly suffer absent an injunction. But last week in *Texas v. DHS*, No. 2:23-cv-00055 (W.D. Tex. Mar. 5, 2024), BeMiller testified that his declaration filed in this litigation relied on speculation. Texas will address this issue in greater detail when the transcript becomes available.

be resolved facially. What is plain, however, is that Texas cannot enforce S.B.4 in sensitive places like schools, churches, and hospitals—precisely where at-risk people are most likely to seek assistance. The district court also failed to appreciate that S.B.4 helps just such people. Far too many migrants end up as victims of human trafficking because a cartel promises them that enforcement is not a threat, after which the cartel takes advantage of the vulnerable person. By increasing the threat of enforcement, S.B.4 reduces those dangerous incentives.

**3.** Finally, the district court also erred with respect to El Paso County. The court ventured that S.B.4 may require the County to invest more resources in enforcement, lose funding opportunities, and "frustrate the County's efforts to integrate its law enforcement office with migrant support services." ROA.583-584. Yet none of the challenged provisions of S.B.4 require the County to change staffing practices or direct how any government organizes itself. Rather, the challenged provisions create state crimes that mirror federal ones and expand judicial proceedings.

## B.  The equities and public interest clearly favor Texas.

The equities also heavily favor Texas. "The public interest standard is a hurdle which must be overcome before employing the drastic remedy of interim injunctive relief, not a clarion call for action before reaching final judgment." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 633 (5th Cir. 1985). Courts thus "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

The harm to Texas is obvious. After all, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form

45

of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also, e.g.*, *Vote.org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022). The public also has an interest in seeing that laws are enforced. *See, e.g.*, *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017). Thus, even in an ordinary case, the district court's facial injunction of a validly enacted state law would be alarming.

This, however, is not an ordinary case. Unlawful activity—like drug smuggling, human trafficking, terrorism, and the countless other ills associated with the border crisis—harms the American public and aliens themselves. Indeed, "the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). S.B.4 is an important measure to address such harms. As President Biden observed in this year's State of the Union, nothing will change absent a credible threat of enforcement. By providing such a credible threat, S.B.4 reduces the risk to officers and aliens alike posed by unlawful crossings. S.B.4 also reduces the risk of violent conflict and slows the wave of migration for which federal resources have proven inadequate.

The district court again disagreed with Texas. For example, it stated that the "policy decisions" here "are the federal government's to make," and that Texas has no "interest in enforcing an unconstitutional law." ROA.584-585. Those conclusions are wrong as a matter of law and thus are abuses of discretion *per se*. The district court also concluded that Texas is free to "criminalize" all sorts of activities—just not those within "the federal field of unlawful entry and removal." ROA.585. That conclusion is again wrong as a matter of law, but also misses the point: So long as immigration law goes unenforced, Texas will *never* be able to fully

protect the public. Transnational cartels sell human smuggling as a costly, illicit service. Defeating the cartels therefore cannot be separated from immigration enforcement. By design, S.B.4 comports with federal law and Texas should enforce it.

## Conclusion

The Court should reverse the order granting a preliminary injunction.

Respectfully submitted.

/s/ Aaron L. Nielson

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Kateland R. Jackson
Joseph N. Mazzara
Assistant Solicitors General

Coy Allen Westbrook
Assistant Attorney General

Counsel for Defendants-Appellants

47

## CERTIFICATE OF SERVICE

On March 13, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,885 words, excluding the parts of the brief exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON