No. 24-50149

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States of America,**

**Plaintiff-Appellee,**

v.

**State of Texas; Greg Abbott in his official capacity as Governor of Texas; Texas Department of Public Safety; Steven C. McCraw, in his official capacity as Director of Texas Department of Public Safety,**

**Defendants-Appellants.**

---

**Las Americas Immigrant Advocacy Center; American Gateways; County of El Paso, Texas,**

**Plaintiffs-Appellees,**

v.

**Steven C. McCraw, in his official capacity as Director of the State of Texas Department of Public Safety; Bill D. Hicks, in his official capacity as District Attorney for the 34th District,**

**Defendants-Appellants.**

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

## BRIEF FOR *AMICUS CURIAE*
## IMMIGRATION REFORM LAW INSTITUTE
## IN SUPPORT OF APPELLANTS

*Counsel Listed on Next Page*

**MATT A. CRAPO**
**CHRISTOPHER J. HAJEC**
**Immigration Reform Law Institute**
**25 Massachusetts Ave., NW, Suite 335**
**Washington, DC 20001**
**Telephone: (202) 232-5590**
**mcrapo@irli.org**
**chajec@irli.org**

**Attorneys for *Amicus Curiae***

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1 and Fed. R. App. P. 26.1, *amicus curiae* Immigration Reform Law Institute makes the following disclosures:

1)     For non-governmental corporate parties please list all parent corporations: None.

2)     For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3)     The following entity has an interest in the outcome of this case: Immigration Reform Law Institute.

DATED: March 18, 2024                    Respectfully submitted,

/s/ Matt Crapo
MATT A. CRAPO
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590

Attorney for *Amicus Curiae*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF *AMICUS CURIAE* ............................................................... 1

INTRODUCTION ........................................................................................ 2

ARGUMENT ................................................................................................ 4

I.    The Various States Retained Their Inherent Right to Self-Defense Upon Admission to the Union ........................................................................ 4

II.   Texas's Exercise of Its Retained, Sovereign Prerogative to Repel an Invasion is Nonjusticiable ..................................................................... 7

III.  General Immigration Regulations Cannot Constrain Texas's Constitutional Power to Repel an Invasion ........................................... 19

CONCLUSION ............................................................................................ 23

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ariz. Dream Act Coalition v. Brewer,*
    855 F.3d 957 (9th Cir. 2017) ............................................................. 1

*Arizona v. United States,*
    567 U.S. 387 (2012) ......................................................................... 20

*Baker v. Carr,*
    369 U.S. 186 (1962) ................................................................... 7, 8, 9

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ...................................................... 8, 11

*Chiles v. United States,*
    874 F. Supp. 1334 (S.D. Fla. 1994), *aff'd* 69 F.3d 1094 (11th Cir. 1995) ........... 9

*Florida v. United States,*
    660 F. Supp. 3d 1239 (N.D. Fla. 2023) ........................................... 19

*Fourco Glass Co. v. Transmirra Products Corp.,*
    353 U.S. 222 (1957) ......................................................................... 21

*Gregory v. Ashcroft,*
    501 U. S. 452 (1991) .......................................................................... 7

*Kennedy v. Mendoza-Martinez,*
    372 U.S. 144 (1963) ........................................................................... 6

*Lichter v. United States,*
    334 U.S. 742 (1948) .................................................................... 16, 20

*Morton v. Mancari,*
    417 U.S. 535 (1974) .................................................................... 21, 22

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
    584 U.S. 453 (2018) ..................................................................... 5, 7

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996) .............................................................9, 11

*Nishimura Ekiu v. United States*,
    142 U.S. 651 (1892)...........................................................................5

*Nixon v. United States*,
    506 U.S. 224 (1993)..........................................................................11

*Padavan v. United States*,
    82 F.3d 23 (2d Cir. 1996) ................................................................12

*Posadas de Puerto Rico Assocs. v. Tourism Co.*,
    478 U.S. 328 (1986)..........................................................................16

*Matter of Silva-Trevino*,
    26 I. & N. Dec. 826 (B.I.A. 2016) .....................................................1

*Sterling v. Constantin*,
    287 U.S. 378 (1932)..........................................................................10

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018)........................................................................1

*United States v. Borden Co.*,
    308 U.S. 188 (1939)..........................................................................22

*United States v. Estate of Romani*,
    523 U.S. 517 (1998)..........................................................................21

*United States v. S.-E. Underwriters Ass'n*,
    322 U.S. 533 (1944)..........................................................................13

*United States v. Texas*,
    599 U.S. 670 (2023)............................................................................1

*Young v. Hawaii*,
    992 F.3d 765 (9th Cir. 2021) .............................................................7

*Wash. All. Tech Workers v. U.S. Dep't Homeland Security*,
50 F.4th 164 (D.C. Cir. 2022)................................................................1

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012)........................................................................11

## CONSTITUTION

U.S. Const. art. I, § 10, cl. 3 ("State Self-Defense Clause") .....................4, 6, 10, 18

U.S. Const. art. IV, § 4.....................................................................6, 9

U.S. Const. art. VI, cl. 2...................................................................22

U.S. Const. amd. X ...........................................................................6

## STATUTES

8 U.S.C. § 1101(a)(15).......................................................................5

8 U.S.C. § 1153..............................................................................5

8 U.S.C. § 1182..............................................................................5

8 U.S.C. § 1227..............................................................................5

8 U.S.C. § 1325..............................................................................5

8 U.S.C. § 1326..............................................................................5

S.B. 4, 88th Leg., 4th C.S. (2023).........................................................3

## MISCELLANEOUS

9 Nicolay and Hay, Works of Abraham Lincoln (1894) .........................................20

Brnovich, A.G. Opinion, No. I22-001, Re: The Federal Government's Duty to
Protect the States and the States' Sovereign Power of Self Defense when
Invaded, Feb. 7, 2022....................................................................15

C. Hughes, War Powers Under the Constitution (Sept. 5, 1917) ............................16

Declaration of Independence .......................................................................5

Samuel Johnson, *Dictionary of the English Language*, 1773 (4th folio ed.) ..........13

The Federalist No. 39 .................................................................................7

## INTEREST OF *AMICI CURIAE*[1]

The Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases on behalf of, and in the interests of, United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. For more than twenty years the Board of Immigration Appeals has solicited supplementary briefing, drafted by IRLI staff, from the Federation for American Immigration Reform, of which IRLI is a supporting organization. IRLI has litigated or filed *amicus curiae* briefs in a wide variety of cases, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 599 U.S. 670 (2023); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't Homeland Security*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

---

[1] All parties have consented in writing to the filing of IRLI's *amicus curiae* brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION

The measures of Texas challenged in this case are in response to the federal government's ongoing abdication of its duty to protect States from invasion and to take care that the nation's immigration laws are faithfully executed. Since January 20, 2021, the Biden administration has purposely facilitated mass illegal entries into this country. It has temporarily paused all removals, gutted immigration enforcement guidelines, terminated the Migrant Protection Protocols (colloquially known as the "Remain in Mexico policy"), halted all border wall construction projects, reinstated "catch and release" at the border, weakened asylum requirements, and adopted mass parole programs.

The abdication of both this administration's statutory duty to secure the border and its constitutional obligation to protect the States from invasion resulted in an estimated 5.5 million illegal aliens' crossing the border from inauguration day in 2021 through fiscal year 2022. *FAIR Analysis: 5.5 Million Illegal Aliens Have Crossed our Borders Since Biden Took Office—How is Secretary Mayorkas Still Employed?*, available at: https://www.fairus.org/press-releases/border-security/fair-analysis-55-million-illegal-aliens-have-crossed-our-borders (last visited Mar. 16, 2024). The number of encounters has only increased since. In fiscal year 2023 alone, Customs and Border Protection ("CBP") encountered over 3.2 million aliens, including nearly 2.5 million at the southwest border, with more

than half of those encounters, or nearly 1.4 million, being in Texas alone. CBP,

*Nationwide Encounters*, available at:

https://www.cbp.gov/newsroom/stats/nationwide-encounters (last visited Mar. 16,

2024). Over 85 percent of aliens encountered on the southern border are released

into the United States. Fox News, *Mayorkas tells Border Patrol agents that 'above*

*85%' of illegal immigrants released into US: sources*, available at:

https://www.foxnews.com/politics/mayorkas-tells-border-patrol-agents-illegal-

immigrants-released-into-us-sources (last visited Mar. 16, 2024).

In the absence of any meaningful federal action, Texas has taken several

measures to secure its borders and repel the invasion of criminal drug cartels and

the flood of illegal aliens from around the world whom the cartels traffic into

Texas. Most recently, the Texas legislature passed and the Governor signed Senate

Bill 4 ("SB4"), which criminalizes illegal entry and reentry into the State from a

foreign nation and authorizes state judicial officers to order offenders to return to

the foreign nation from which they illegally entered. S.B. 4, 88th Leg., 4th C.S.

(2023). Although SB4 parallels similar federal criminal offenses and does not

interfere with Congress's power to decide which classes of aliens are admissible or

removable,[2] Plaintiffs seek to enjoin the enforcement of SB4, arguing that it is

---

[2]  Texas represents that a return order under SB4 "merely requires an alien
be transported to a port of entry at which point—as both a practical and legal

preempted by federal law. Because federal immigration regulations cannot preempt Texas's exercise of its sovereign self-defense power to repel an invasion, Plaintiffs cannot show a likelihood of success, and their requests for an injunction should therefore be denied.

## ARGUMENT

As Texas persuasively argues in its brief, SB4 is not preempted, because it is consistent with federal immigration law and does not conflict with parallel federal provisions. Tex. Br. at 24-30. In addition, under Article I, section 10, of the Constitution ("the State Self-Defense Clause"), Congress's regulation of immigration cannot preempt a State's valid invocation of its sovereign power, "without the consent of Congress," to "engage in War" if "actually invaded." To the extent that there is a conflict between Texas's valid exercise of its constitutional war power and the Immigration and Nationality Act ("INA"), it is the latter that must give way. To decide otherwise would read "without the consent of Congress" out of the State Self-Defense Clause.

### I. The Various States Retained Their Inherent Right to Self-Defense Upon Admission to the Union.

"When the original States declared their independence, they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence,

---

matter—the alien's potential removal is a question for federal immigration officers." Brief for Appellants ("Tex. Br.") at 27.

the authority 'to do all . . . Acts and Things which Independent States may of right do.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (quoting Declaration of Independence ¶ 32). Inherent in the sovereignty of an independent State, "and essential to self-preservation," is the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Since the ratification of the Constitution, Congress has adopted extensive regulations governing immigration. For example, Congress has defined the classes of aliens who are admissible and removable. *See* 8 U.S.C. §§ 1101(a)(15) (defining classes of nonimmigrant aliens); 1153 (allocating immigrant visas among various classes of aliens); 1182 (defining inadmissible aliens); 1227 (defining deportable aliens). Congress has also criminalized illegal entry and reentry. *Id.* at §§ 1325, 1326. No one questions Congress's power to set immigration policy, and no State may adopt immigration policies that conflict with federal immigration law.

When it came to invasion, however, the original States, though they entered the Union with the understanding that the federal government would be responsible for the common defense of the new nation, did not cede their own inherent right to self-defense. Rather, the Constitution explicitly recognizes that right in the State Self-Defense Clause, which reads (emphasis added):

5

> *No State shall, without the Consent of Congress*, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or *engage in War, unless actually invaded*, or in such imminent Danger as will not admit of delay.

U.S. Const. art. I, § 10. A corresponding constitutional provision, sometimes referred to as "the Invasion Clause," requires the federal government to protect each state from invasion. U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion").

These two constitutional provisions, read together with the reservation of state powers in the Tenth Amendment,[3] show that the people conferred upon the federal government the primary responsibility to protect each State against invasion, but that the States *retained* their respective sovereign prerogatives to "engage in War" if "actually invaded." Thus, the Founders foresaw the possibility that the federal government might not fulfill its obligation to protect the States from invasion and explicitly recognized the States' inherent, retained power to defend themselves. Providently, the State Self-Defense Clause ensures that "the Constitution . . . is not a suicide pact." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963).

---

[3] The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

The Constitution, therefore, "limited but did not abolish the sovereign powers of the States, which retained 'a residuary and inviolable sovereignty.'" *Murphy*, 584 U.S. at 470 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961)). "[B]oth the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of 'dual sovereignty.'" *Id.* (quoting *Gregory v. Ashcroft*, 501 U. S. 452, 457 (1991)). Thus, at the very least, if the federal government fails to protect a State from invasion, the various States, as recognized by the State Self-Defense Clause, retain their inherent authority to engage in war. *See Young v. Hawaii*, 992 F.3d 765, 815 (9th Cir. 2021) (citing the prohibition in the State Self-Defense Clause as "corresponding[]" to the federal government's duty to defend against invasion), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022).

## II.    Texas's Exercise of Its Retained, Sovereign Prerogative to Repel an Invasion is Nonjusticiable.

The Court should reverse the district court's preliminary injunction because this case calls for the Court to resolve nonjusticiable questions. The questions of whether an invasion has occurred within the meaning of the State Self-Defense Clause and what measures a State may take in response to such an invasion are both committed by the Constitution to the various States.

In *Baker v. Carr*, the Supreme Court set forth the political question standard as follows:

7

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

Under this standard, as several courts of appeals have held, the question of whether an invasion has occurred within the meaning of the Invasion Clause is nonjusticiable and committed to the political branches of the federal government. For example, the Ninth Circuit has held that "to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government and would result in the Court making an ineffective non-judicial policy decision." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). And the Third Circuit (quoting *Baker, supra*) has held this question nonjusticiable because of "'a textually demonstrable constitutional commitment of the issue to a coordinate political department,' and 'a lack of judicially

8

discoverable and manageable standards for resolving it.'" *New Jersey v. United States*, 91 F.3d 463, 468-470 (3d Cir. 1996). *See also Chiles v. United States*, 874 F. Supp. 1334, 1342-1344 (S.D. Fla. 1994) (finding the invasion question nonjusticiable because of a lack of judicially discoverable and manageable standards for resolving it), *aff'd* 69 F.3d 1094, 1097 (11th Cir. 1995) (citing *Baker* generally). In short, the Invasion Clause in Article IV of the Constitution, because it places responsibility to protect against invasion on the federal government, and because there are no workable judicial standards to resolve whether an invasion has occurred, commits that question to the policy making (or political) branches of the federal government, not the judicial branch.

But, just as Article IV, § 4, of the Constitution commits the question of whether an invasion has occurred to the political branches of the *federal* government, the State Self-Defense Clause, at least within broad limits not reached here, commits the same question *to the States*. The Clause recognizes that the States *retain* their inherent power to engage in war in the event of an actual invasion. And they do not retain it subject to the oversight of Congress, but rather even without its consent. To read the Clause as committing this decision to the *federal* government instead of the *State* government would read the phrase "without the consent of Congress" out of that provision.

As Texas points out, the States' invocation of the Self-Defense Clause is subject only to the limited review of whether the invocation is in "good faith." Tex. Br. at 39 (citing *Sterling v. Constantin*, 287 U.S. 378, 400 (1932)). There is no question that Texas has met that minimum standard. On July 7, 2022, Governor Abbott issued Executive Order GA-41, in which he invoked the State of Texas's inherent right to self-defense, as recognized by Article I, § 10, of the United States Constitution, and to "secure the State of Texas and repel the illegal immigration that funds the cartels."[4] Governor Abbott authorized State officials "to respond to this illegal immigration by apprehending immigrants who cross the border between ports of entry or commit other violations of federal law, and to return those illegal immigrants to the border at a port of entry." Exec. Order GA-41 at 2.

The district court erred in concluding that if a defense in nonjusticiable, it should be rejected in the same way that nonjusticiable claims are rejected. D. Ct. ECF Doc. 42 at 97. "A *controversy* is nonjusticiable—i. e., involves a political question—where there is 'a textually demonstrable constitutional commitment of

---

[4] Executive Order No. GA-41, relating to returning illegal immigrants to the border, is available at: https://gov.texas.gov/uploads/files/press/EO-GA-41.pdf (last visited Mar. 16, 2024). Two months later, on September 21, 2022, Governor Abbott issued Executive Order No. GA-42, in which he designated certain Mexican drug cartels as foreign terrorist organizations. Available at: https://gov.texas.gov/uploads/files/press/EO-GA-42_Mexican_cartels_foreign_terrorist_orgs_IMAGE_09-21-2022.pdf (last visited Mar. 16, 2024).

the issue to a coordinate political department ….'" *Nixon v. United States*, 506
U.S. 224, 228 (1993) (emphasis added). "In such a case, … a court lacks the
authority to decide the *dispute* before it." *Zivotofsky v. Clinton*, 566 U.S. 189, 195
(2012) (emphasis added). It matters not whether the claim is raised by a Plaintiff or
Defendant; if a controversy or dispute calls upon a court to decide an issue
committed by the Constitution to a coordinate political department, or, as in this
case, the various States, the court lacks authority to decide the issue. If it were
otherwise, lawsuits challenging a state's exercise of its war power would always be
successful, however obviously valid that exercise might be, because the "defense"
of the State Self-Defense Clause could never be sustained by a court—and courts
would be forced to enjoin valid exercises of a state's constitutional powers. By
contrast, courts' throwing out challenges, as nonjusticiable, to states' actions under
the Clause, where it is invoked in good faith, carries no such absurd consequence.
The recognition of the question as political simply puts the people, through their
elected representatives, in charge of war and peace.

    In any event, the district court erred in concluding that Texas is not being
invaded. The district court began its analysis by relying on dicta from various
Circuit courts to conclude that immigration cannot constitute an invasion. D. Ct.
ECF Doc. 42 at 68. In each such case, however, the court held that it lacked
authority to decide that question. *See California*, 104 F.3d at 1091; *New Jersey*, 91

F.3d at 470; *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In any event, the plaintiff's Invasion Clause claim is nonjusticiable.").

Crucially, moreover, the district court misconstrued the nature of the invasion by characterizing it as nothing more than immigration. It is first and foremost an invasion by armed, hostile non-state actors, the foreign trafficking cartels. Governor Abbott recognized as much in Executive Order GA-41, in which he sought to "secure the State of Texas and repel the illegal immigration that funds the cartels." Texas's invocation of the Self-Defense Clause is therefore more than a "disagree[ment] with federal immigration policy," as the district court characterized it. D. Ct. ECF Doc. 42 at 74; *see also id.* at 76 ("Unauthorized immigration is not akin to armed and organized insurrection against the government."). Whether or not the cartels are enaged in an "insurrection" against the government of Texas, they are certainly invading the state, and that invasion consists, in part, of the mass illegal entries that the cartels both facilitate and profit from. As former Border Patrol Chief Rodney Scott has stated: "[t]here's nothing that crosses the southwest border without working with the cartels. They're either directly paying the cartels or the cartels are controlling their movements for another benefit, meaning to systematically overwhelm Border Patrol, create a gap in the border security, and then bring the narcotics across." Virginia Allen, THE DAILY SIGNAL (Feb. 10, 2023), https://www.dailysignal.com/2023/02/10/no-one-

crosses-unlawfully-from-mexico-without-working-with-cartels-former-border-patrol-chief-says/ (last visited Mar. 18, 2024). According to former Chief Scott, the cartels "control the border today." *Id.*

The term "invasion," as used in the Self-Defense Clause, is not limited to hostile state actors. First, the ordinary meaning of "invade" is not limited to actions by foreign states. "Ordinarily courts do not construe words used in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written." *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 539 (1944), *superseded by statute on other grounds*. As Texas points out, Tex. Br. at 33, Webster's 1806 dictionary defines "invade" broadly, as "to enter or seize in hostile manner." And, in a dictionary widely known when the Constitution was ratified, "invasion" was defined, without limitation to state action, as "[h]ostile entrance upon the rights or possessions of another; hostile encroachment." Samuel Johnson, *Dictionary of the English Language*, 1773 (4th folio ed.). "Encroachment," in turn, was defined as "[t]o advance into the territories or rights of another." *Id.*

In light of this broad understanding of the terms used in the Self-Defense Clause, there is no reason to conclude that it applies only to hostilities by foreign states and not to those by non-state actors such as cartels or gangs. Indeed, historically, the State of Texas has exercised its self-defense powers against non-

state actors. For example, in 1859, the governor of Texas authorized "an improvised expedition of state-funded Texas Rangers to counter" a Tejano militancy led by Juan Nepomuceno Cortina. Maj. Nathan Jennings, *The Army's Rio Grand Campaign of 1859: A Total Force Case Study*, Infantry Magazine, p. 36, Vol. 107, No. 2, April-June 2018, available at: https://www.moore.army.mil/infantry/magazine/issues/2018/Apr-Jun/PDF/APR-JUN18_mag.pdf (last visited Mar. 16, 2024). Cortina has been described as a "son of a respected Mexican ranching family" and also "the head of a band of desperadoes" who "was making life and property in the Brownsville area unsafe." William John Hughes, *"Rip" Ford, Texan: the Public Life and Services of John Salmon Ford, 1836-1883*, a Dissertation in History, pp. 228 (June 1958), available at: https://ttu-ir.tdl.org/items/26ee077d-4668-4526-8f3f-a816921c7f55 (last visited Mar. 16, 2024). The Governor "distrusted the dispersed U.S. Army garrisons to respond quickly," Jennings, at 36, and dispatched John S. Ford, with the rank of major, to lead a company of Texas Rangers with orders "to protect the western frontier against Cortinas and his band and to arrest them if possible." Hughes, at 230. Eventually, the U.S. Army consolidated its dispersed garrisons and joined forces with the Texas Rangers to combat Cortina's gang. Jennings, at 36.

In addition, the then-Attorney General of Arizona, Mark Brnovich, issued an opinion on February 7, 2022, in which he concluded that the well-documented and

persistent violence and lawlessness caused by cartels and gangs at Arizona's border "can satisfy the definition of 'actually invaded' and 'invasion' under the U.S. Constitution." Brnovich, A.G. Opinion, No. I22-001, Re: The Federal Government's Duty to Protect the States and the States' Sovereign Power of Self Defense when Invaded, Feb. 7, 2022, at 3, available at: https://www.azag.gov/sites/default/files/2022-02/I22_001b.pdf (last visited Mar. 16, 2024). General Brnovich found that "[t]here is nothing in federal constitutional or statutory law authorizing the federal executive to thwart States from ensuring on-the-ground safety and an orderly border within the State's own territory. Nor is there any conflict with this and the orderly conduct of immigration policy by the federal executive." *Id.* at 3-4.

In short, because the Constitution commits the question of whether an invasion has occurred to the policy-making branches of the State of Texas, and because Governor Abbott's invocation of the State's inherent and retained authority to defend itself was made in good faith, the State's invocation of its right to self-defense is nonjusticiable.

The district court claimed that "[n]one of these [SB4] provisions are operations of war. Rather, they are standard operations of criminal enforcement by state civil authorities." D. Ct. ECF Doc. 42 at 87. But what actions constitute a permissible exercise of the war power is also, at least within broad limits,

nonjusticiable and is committed by the Constitution to any State that has been invaded. As the Supreme Court has recognized, "'[t]he power to wage war is the power to wage war successfully.'" *Lichter v. United States*, 334 U. S. 742, 780 (1948) (quoting address by C. Hughes, War Powers Under the Constitution (Sept. 5, 1917)). Though it is for an invaded State to decide, the greater power to "engage in War" granted in the Constitution would unquestionably include the lesser power to return illegal entrants to the country from which they entered in order to prevent or deter illegal entries and thereby thwart the criminal cartels that both drive and profit from illegal immigration. *See*, *e.g.*, *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 345-46 (1986) (holding under this principle that the greater power to ban gambling casinos includes the lesser power to ban their advertising); *Lichter*, 334 U.S. at 778-79 ("[T]he exercise of broad discretion as to methods to be employed may be essential to an effective use of its war powers by Congress.").

Here, Texas enacted SB4 as part of its effort to secure its border and repel the invasion by criminal cartels by reducing both their criminal activities—their trafficking of illegal immigrants and drugs—and their material support—profits from that trafficking.[5] According to the sponsor of SB4, it was designed to

---

[5]  In addition to enacting SB4, Texas has taken several other measures to repel this invasion. For example, Texas deployed concertina wire along the Rio Grande to "prevent, detour, and interdict transnational criminal activity and illegal

"[p]rotect Texans from the danger of the border crisis" and to "address the issue of

border security…." S.B. 4; Bill Analysis, Author's/Sponsor's Statement of Intent,

available at:

https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004I.pdf#navpanes=0 (last

visited Mar. 16, 2024).[6] Upon signing SB4 into law, Governor Abbott stated that

"[t]he goal of Senate Bill 4 is to stop the tidal wave of illegal entry into Texas."

CBS News, *Texas immigration law known as SB4, allowing state to arrest*

*migrants, signed by Gov. Greg Abbott*, available at:

https://www.cbsnews.com/news/texas-immigration-law-sb4-signed-greg-abbott/

(last visited Mar. 16, 2024); *see also* Press Release, *Governor Abbott Signs*

*Historic Border Security Measures in Brownsville*, available at:

https://gov.texas.gov/news/post/governor-abbott-signs-historic-border-security-

---

migration." FoxNews, *Texas installs miles of concertina wire along border near Rio Grande* (June 8, 2022), available at: https://www.foxnews.com/us/texas-installs-miles-concertina-wire-border-rio-grande (last visited Mar. 16, 2024). Texas also deployed "marine floating barriers" in the Rio Grande to "mak[e] it more difficult to cross the Rio Grande and reach the Texas side of the southern border." Press Release, *Governor Abbott Signs Sweeping Package Of Border Security Legislation* (June 8, 2023), available at: https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation (last visited Mar. 16, 2024).

[6] *See also* S.B. 4 House Committee Report, available at: https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004H.pdf#navpanes=0 (last visited Mar. 16, 2024) (noting "record-high" migrant encounters along the southern border, efforts such as "Operation Lone Star" to "help secure the border" and stating that "S.B. 4 seeks to further address the issue of border security by creating criminal offenses related to illegal entry….").

measures-in-brownsville (last visited Mar. 16, 2024) (denouncing the Biden administration's "deliberate inaction" on the border and proclaiming that SB4 and other laws "will help stop the tidal wave of illegal entry into Texas").

Texas's enactment and implementation of SB4 is clearly a self-defense measure. Inasmuch as Texas has the inherent power to "engage in War" in response to an actual invasion, U.S. Const., art. I, § 10, cl. 3, it has the lesser-included power to jail illegal entrants or reentrants and order them to return to the country from which they illegally entered the State. As a war measure, this one is humane and notably restrained, but it remains a war measure adopted in good faith. As such, whether it is an appropriate means of advancing war aims is not for the judiciary to second-guess.

In sum, under the State Self-Defense Clause, the various States reserved and did not surrender their respective inherent sovereign prerogatives to engage in war in the event of an actual invasion. What constitutes an actual invasion is committed to the respective States, and neither this question nor the question of what means of waging war are appropriate is amenable to judicial resolution. This Court should hold that whether an invasion of Texas has occurred and whether Texas has chosen an appropriate means to engage in war are both nonjusticiable political questions, to be decided by Texas. And, because Texas's determinations are nonjusticiable, it is not for this Court to second-guess their validity under the Constitution.

**III.    General Immigration Regulations Cannot Constrain Texas's Constitutional Power to Repel an Invasion.**

The district court also determined that even if SB4 were a war measure, Texas would be constrained by federal directives. D. Ct. ECF Doc. 42 at 96 ("[I]f Texas is engaging in war, then the federal government retains complete war authority to direct that once it has capacity to respond. The structure of the Constitution prevents States from frustrating national objectives in this field.") (internal quotations omitted). But the district court failed to identify any federal directives that Texas violates. Instead, SB4 is congruent with Congress's immigration laws. *See* Tex. Br. at 20-21 ("Sections 51.02(a) and 51.03(a) mirror federal law."). And, as noted above, the federal government has abdicated its role in securing the border and enforcing Congress's immigration laws. As one federal court recently found, Executive branch officials "have effectively turned the Southwest Border into a meaningless line in the sand and little more than a speedbump for aliens flooding into the country." *Florida v. United States*, 660 F. Supp. 3d 1239, 1249 (N.D. Fla. 2023). The district court's doctrine that "national objectives" control a state's war power, even when the national objectives are those of surrender, negates both the State Self-Defense Clause and its prophylactic purpose.

The district court also concluded that SB4 is preempted by the INA. D. Ct. ECF Doc. 42 at 29-48. But to reach that conclusion even where Texas has validly

invoked its right to self-defense in response to an actual invasion is to read "without the consent of Congress" out of the State Self-Defense Clause. The district court relied extensively on *Arizona v. United States*, 567 U.S. 387 (2012), but in that case, the State of Arizona did not invoke, and the Supreme Court did not pass upon, the self-defense power that is expressly reserved to the sovereign States in the State Self-Defense Clause.

*Lichter* is instructive in the preemption analysis. There, the Supreme Court quoted President Lincoln's reflection on the power of Congress to pass a Conscription Act as follows:

> The Constitution gives Congress the power [to raise and support armies], but it does not prescribe the mode, or expressly declare who shall prescribe it. In such case Congress must prescribe the mode, or relinquish the power. There is no alternative . . . . The power is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; nor if the men to compose the armies are entirely willing; but it is a power to raise and support armies given to Congress by the Constitution, without an "if."

334 U.S. at 756 n.4 (quoting 9 Nicolay and Hay, Works of Abraham Lincoln 75-77 (1894)). Likewise, there is no "if" in the State Self-Defense Clause pertaining to Congress or any political branch of the federal government, no condition allowing Congress to control the States in exercising their inherent war-making power. On the contrary, the Constitution recognizes that the various States may exercise this power even *without the consent of Congress*.

Because the Constitution thus broadly dispenses with any need for approval by Congress, Congress's otherwise-applicable immigration laws cannot be applied to the detriment of a State's method of repelling an invasion. Impermissibly, such applications would effectuate Congress's *dis*approval of these measures. Thus, that State war powers, if validly invoked, may be exercised without congressional consent disposes of any statutory or preemption arguments based on the INA. To accept the district court's findings would be to abrogate the phrase "without the consent of Congress" in the State Self-Defense Clause.

Finally, whether Texas is bound by Congress's general rules and regulations, and whether the INA preempts SB4, is also decidable by the more specific provision over the more general canon. The INA is a general law governing immigration. In contrast, the State Self-Defense Clause deals with the specific circumstance of a State's exercising its war power in the event of an invasion. Ordinarily, specific terms prevail over general terms. "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228 (1957) (citations omitted). The same principle should be used to resolve conflict between two constitutional provisions. *C.f.*, *United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (holding that a later, more specific statute governs); *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)

(holding that a general statute will not repeal by implication a more specific one unless there is "clear intention otherwise").

It is, of course, impossible for a statute to preempt a constitutional provision, since the only laws that are, along with the Constitution itself, "the supreme Law of the Land" are those "made in Pursuance" of the Constitution. U.S. Const. art. VI, cl. 2. To the extent that a federal statute conflicts with the Constitution, as would be necessary somehow to preempt it, it is not a constitutional statute and cannot preempt anything, let alone the constitutional provision with which it conflicts. Thus, States' exercises of their authority under the State Self-Defense Clause are not preempted by the INA. Rather, as with statutes,

> [t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible."

*Mancari*, 417 U.S. at 551 (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)). The INA and the State Self-Defense Clause, both being the supreme law of the land, should both be given effect, and that is accomplished by the displacement of the INA only in narrow situations where the State Self-Defense Clause is validly invoked. And, as shown above, the validity of an invocation of the Clause, at least within broad parameters, is not to be decided by courts, but is a nonjusticiable political question committed to the States.

In sum, even if the Court were to decide that SB4 conflicts with the terms of the INA, Texas retains its inherent authority to implement SB4 under the State Self-Defense Clause. As long as Texas validly takes this action to repel an actual invasion, as it has, the Constitution recognizes its authority to take it without Congress's consent. Because Texas's valid invocation of its retained inherent authority under the State Self-Defense Clause, and its valid choice of means of defense, takes precedence over Congress's otherwise-applicable law, Plaintiffs cannot show any substantial likelihood of success on the merits of this action.

## **CONCLUSION**

For the forgoing reasons, the Court should reverse the district court and vacate its preliminary injunction.

DATED: March 18, 2024

Respectfully submitted,

/s/ Matt Crapo
MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC  20001
Telephone: (202) 232-5590
mcrapo@irli.org
chajec@irli.org

Attorneys for *Amicus Curiae*

**CERTIFICATE OF SERVICE**

I certify that on March 18, 2024, I electronically filed the foregoing *amicus* brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

<u>/s/ Matt Crapo</u>
Matt A. Crapo

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 29(a)(5) because it contains 5,419 words, as measured by Microsoft Word software, which is fewer than one-half of the 13,000 word limit for a party's principal brief under Fed. R. App. P. 32(a)(7)(B). The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

DATED: March 18, 2024                    Respectfully submitted,

                                         /s/ Matt Crapo
                                         Matt A. Crapo