**No. 24-50149**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | On Appeal from the |
| Plaintiff-Appellee, | : | United States District Court |
| | : | for the Western District of |
| v. | : | Texas |
| STATE OF TEXAS; GREG ABBOTT, | : | |
| IN HIS OFFICIAL CAPACITY AS GOV- | : | District Court Case Nos. |
| ERNOR OF TEXAS; TEXAS DEPART- | : | 1:24-cv-8 |
| MENT OF PUBLIC SAFETY; STEVEN | : | 1:23-cv-1537 |
| C. MCCRAW, IN HIS OFFICIAL CA- | : | |
| PACITY AS DIRECTOR OF TEXAS DE- | : | |
| PARTMENT OF PUBLIC SAFETY, | : | |
| Defendants-Appellants. | | |

## BRIEF OF *AMICI CURIAE* OHIO, SOUTH CAROLINA, AND 20 OTHER STATES SUPPORTING APPELLANTS AND REVERSAL

| | |
|---|---|
| ALAN WILSON | DAVE YOST |
| South Carolina Attorney General | Ohio Attorney General |
| ROBERT D. COOK | T. ELLIOT GAISER |
| Solicitor General | Solicitor General |
| J. EMORY SMITH, JR. | *Counsel of Record |
| Deputy Solicitor General | KATIE ROSE TALLEY |
| THOMAS HYDRICK | Deputy Solicitor General |
| Assistant Deputy Solicitor General | 30 E. Broad St., 17th Fl. |
| JOSEPH D. SPATE | Columbus, Ohio 43215 |
| Assistant Deputy Solicitor General | 614-466-8980 |
| 1000 Assembly St. | thomas.gaiser@ohioago.gov |
| Columbia, SC 29201 | |
| 803-734-3371 | |
| josephspate@scag.gov | |

*Counsel for Amici Curiae States*
*Additional counsel listed alongside signature block*

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES**

*Amici Curiae* are governmental parties. Under Fifth Circuit Rule 28.2.1, a certificate of interested persons is not required.

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES ..................... i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES ................................................... iii

STATEMENT OF *AMICI* INTEREST AND SUMMARY OF ARGUMENT.... 1

ARGUMENT ..................................................................... 5

  I.    The constitutional nature of preemption requires that courts interpret state and federal laws in harmony when possible. ..................... 5

      A.    The Supremacy Clause constitutionalizes preemption........................ 5

      B.    Constitutional avoidance should guide preemption analysis............... 8

      C.    Constitutional avoidance in preemption analysis is particularly appropriate when the state law is challenged on its face or implicates a separate constitutional provision. ......................................................15

      D.    The district court sought conflict, when the better interpretation of the relevant state and federal statutes avoids conflict. ....................... 18

  II.    *Arizona v. United States* does not require that this Court conclude S.B.4 is preempted....................................................................... 20

      A.    *Arizona* is an outlier and should be read narrowly in this Court's preemption analysis. ................................................................. 20

          1.    S.B.4 is not field preempted by Congress's statutes governing illegal alien removal. ................................................... 20

          2.    S.B.4 does not impermissibly conflict with federal law................ 25

      B.    To the extent the *Arizona* decision is as expansive as the district court concluded, it is entitled to little *stare decisis* effect and is ripe for overruling by the Supreme Court. ..................................................... 27

CONCLUSION ................................................................ 30

ADDITIONAL COUNSEL ....................................................31

CERTIFICATE OF SERVICE ............................................... 32

CERTIFICATE OF COMPLIANCE............................................ 33

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Agostini v. Felton,*
   521 U.S. 203 (1997) ............................................................. 28

*Alden v. Me.,*
   527 U.S. 706 (1999) ............................................................... 8

*Anderson v. Edwards,*
   514 U.S. 143 (1995) ............................................................. 16

*Arizona v. United States,*
   567 U.S. 387 (2012) ..................................................... *passim*

*Atascadero State Hosp. v. Scanlon,*
   473 U.S. 234 (1985) ............................................................. 12

*Bond v. United States,*
   572 U.S. 844 (2014) ............................................................... 1

*Camps Newfound/Owatonna v. Town of Harrison,*
   520 U.S. 564 (1997) ............................................................. 14

*Chamber of Commerce of the U.S. v. Whiting,*
   563 U.S. 582 (2011) ............................................................. 19

*Cohens v. Virginia,*
   19 U.S. (6 Wheat.) 264 (1821) ............................................ 27

*De Canas v. Bica,*
   424 U.S. 351 (1976) ............................................................. 24

*Frisby v. Schultz,*
   487 U.S. 474 (1988) ............................................................. 10

*Gearlds v. Entergy Servs.,*
   709 F.3d 448 (5th Cir. 2013) .............................................. 27

*Gibbons v. Ogden,*
   22 U.S. (9 Wheat.) 1 (1824) ......................................... 3, 5-6

*Granite Re, Inc. v. NCUA Bd.*,
  956 F.3d 1041 (8th Cir. 2020) ........................................................... 10

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ................................................................. 4, 12, 18

*Helvering v. Hallock*,
  309 U.S. 106 (1940) ......................................................................... 27

*Hillsborough Cty. v. Automated Med. Lab'ys, Inc.*,
  471 U.S. 707 (1985) ......................................................................... 14

*Hooper v. Cal.*,
  155 U.S. 648 (1895) ........................................................................... 9

*Huron Portland Cement Co. v. Detroit*,
  362 U.S. 440 (1960) ......................................................................... 26

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ........................................................................... 9

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
  585 U.S. 878 (2018) ......................................................................... 28

*Jennings v. Rodriquez*,
  583 U.S. 281 (2018) ......................................................................... 15

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020) ................................................................. *passim*

*Kurns v. RR Friction Prods. Corp.*,
  565 U.S. 625 (2012) ......................................................................... 14

*La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*,
  461 F.3d 529 (5th Cir. 2006) ........................................................... 10

*Martin v. Hunter's Lessee*,
  14 U.S. (1 Wheat.) 304 (1816) ......................................................... 17

*MediaOne Grp., Inc. v. Cty. of Henrico*,
  257 F.3d 356 (4th Cir. 2001) ............................................................. 9

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ........................................................................... 8

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ........................................ 6

*N.J. Payphone Ass'n v. Town of W.N.Y.*,
    299 F.3d 235 (3d Cir. 2002) ............................ 10

*Netchoice, L.L.C. v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) ........................... 16

*Payne v. Tennessee*,
    501 U.S. 808 (1991) .................................... 27, 28

*Philadelphia v. New Jersey*,
    430 U.S. 141 (1977) ..................................... 6

*Planned Parenthood v. Sanchez*,
    403 F.3d 324 (5th Cir. 2005) ........................... 10

*Plyler v. Doe*,
    457 U.S. 202 (1982) .................................... 24

*Printz v. United States*,
    521 U.S. 898 (1997) ..................................... 8

*R.J. Reynolds Tobacco Co. v. Durham Cnty.*,
    479 U.S. 130 (1986) .................................... 20

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947) .................................... 20

*Sackett v. EPA*,
    143 S. Ct. 1322 (2023) .................................. 9

*Smith v. Allwright*,
    321 U.S. 649 (1944) .................................... 28

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ................................. 10-11

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) .................................... 11

*Torres v. Precision Indus.*,
    938 F.3d 752 (6th Cir. 2019) ............................ 9

*Truax v. Raich*,
239 U.S. 33 (1915) ............................................................... 23

*Turtle Island Foods, S.P.C. v. Strain*,
65 F.4th 211 (5th Cir. 2023) ................................................ 16

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936) ............................................................ 23

*United States v. Hansen*,
143 S. Ct. 1932 (2023) ........................................................... 9

*United States v. Salerno*,
481 U.S. 739 (1987) ..................................................... 4, 15, 16

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ............................................................... 9

*Va. Uranium, Inc. v. Warren*,
139 S. Ct. 1894 (2019) ..................................................... 3, 13

*Valle Del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ............................................ 29

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ........................................................... 9

*Wyeth v. Levine*,
555 U.S. 555 (2009) ..................................................... *passim*

## Statutes and Constitutional Provisions

1 Pa. Cons. Stat. §1922 ......................................................... 11

8 U.S.C. §1229a ................................................................... 23

8 U.S.C. §1325 ..................................................................... 17

8 U.S.C. §1326 ..................................................................... 17

15 U.S.C. §45 ....................................................................... 24

42 U.S.C. §2000bb ............................................................... 24

Colo. Rev. Stat. §2-4-201 ..................................................... 11

Iowa Code §4.4 .................................................................... 11

Minn. Stat. §645.17 ............................................................ 11

N.D. Cent. Code §1-02-38 ................................................... 11

N.M. Stat. Ann. §12-2A-18 .................................................. 11

Ohio Rev. Code Ann. §1.47 .................................................. 11

Ohio Rev. Code Ann. §4165.01 ............................................ 24

S.C. Code Ann. §1-32-10 ..................................................... 24

Tex. Gov't Code Ann. §311.021 ........................................ 4, 11

Tex. Penal Code Ann. §51.02 ............................................... 19

Tex. Penal Code Ann. §51.02 ............................................... 17

Tex. Penal Code Ann. §51.03 ............................................... 17

U.S. Const. amend. X .......................................................... 11

U.S. Const. art. I, § 8 ..................................................... 11, 22

U.S. Const. art. VI ...................................................... 3, 6, 26

## Other

Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109 (2010) ................................................................. 9

Allison H. Eid, *Preemption and the Federalism Five*, 37 Rutgers L.J. 1 (2005) .......... 8

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000) .................................... 6, 8, 13

Charles W. Tyler and Heather K. Gerkin, *The Myth of Laboratories of Democracy*, 122 Colum. L. Rev. 2187 (2022) ................................ 12, 13

David A. Dana, *Democratizing the Law of Federal Preemption*, 102 Nw. U. L. Rev. 507 (2008) .................................................... 2

Garrick B. Pursely, *Preemption in Congress*, 71 Ohio St. L.J. 511 (2010) ................. 2

S. Candice Hoke, *Preemption Pathologies and Civic Republican Values*, 71 B.U. L. Rev. 685 (1991) ................................................. 2

The Federalist No. 32 (Hamilton) ............................................ 11

The Federalist No. 45 (Madison) ............................................ 11

The Virginia Resolutions (May 29, 1787), *in* THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION (John P. Kaminski et al. eds., 2009) .... 7

Thomas Merrill, *Preemption and Institutional Choice*, 102 Nw. U. L. Rev. 727 (2008) ................................................................................................. 2

U.S. Customs and Border Protection, *Nationwide Encounters* (Feb. 5, 2024) .......... 1

U.S. Homeland Security Committee, *"Every State is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023) ................................................................. 1

Viet D. Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085 (2000) ............ 7

**STATEMENT OF *AMICI* INTEREST AND SUMMARY OF ARGUMENT**

The national immigration crisis has rendered "every state [] a border state" — including Amici States Ohio, South Carolina, Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Dakota, Tennessee, Utah, Virginia, West Virginia, and Wyoming.  U.S. Homeland Security Committee, *"Every State is Now a Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis* (Dec. 7, 2023), https://perma.cc/HTS5-BP7U.  The past three years have seen an unprecedented influx of illegal aliens—over 9 million— overwhelming the national infrastructure.  U.S. Customs and Border Protection, *Nationwide Encounters* (Feb. 5, 2024), https://perma.cc/EDU3-98CP.  And the crisis has only intensified; last December saw a historic high for illegal alien encounters at the U.S. southern border (over 302,000 that month).  *Id.*  There are no signs of abatement.  Amici States bear the brunt of the significant economic, health, and public safety issues generated by this mass migration crisis and the federal government's failure to adequately enforce national immigration laws.

The Amici States also bear an obligation to their citizens to address the attendant public crisis.  That obligation implicates one of Amici States' core sovereign prerogatives—enacting legislation pursuant to their police powers to protect their

citizens' safety.  *See Bond v. United States*, 572 U.S. 844, 854 (2014).  Relatedly, Amici States have a paramount interest in ensuring that their validly enacted state laws are not improperly held unconstitutional under incorrect preemption analyses. Amici States write primarily to address the proper rubric for preemption analysis— both as a general matter and with respect to immigration in particular—an issue squarely implicated by the district court's decision and broadly relevant to public law beyond this case.

Preemption is "one of the most widely applied doctrines in public law," Thomas Merrill, *Preemption and Institutional Choice*, 102 Nw. U. L. Rev. 727, 730 (2008), and is the "issue of constitutional law that most directly impacts everyday life."  Garrick B. Pursely, *Preemption in Congress*, 71 Ohio St. L.J. 511, 514 (2010). That is because preemption "implicates not just particular regulatory outcomes, but also our fundamental commitments to preserving and fostering democratic values." David A. Dana, *Democratizing the Law of Federal Preemption*, 102 Nw. U. L. Rev. 507, 507 (2008).  Put differently, federal preemption "impede[s] the ability of those governmental bodies that are structured to be most responsive to citizens' public values and ideas—state and local governments—and have concomitantly undermined citizens' rights to participate directly in governing themselves."  S. Candice Hoke, *Preemption Pathologies and Civic Republican Values*, 71 B.U. L. Rev. 685, 687 (1991).

As such, preemption presents significant federalism concerns. "The preemption of state laws represents a serious intrusion into state sovereignty." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1904 (2019) (Gorsuch, J.) (internal quotation marks and citation omitted). And the expansion of federal power and sweeping breadth of federally regulated domains raises the stakes for preemption, rendering a proper calibration of preemption doctrine more critical now than ever.

The district court here missed that mark because it misunderstood the fundamental nature of preemption doctrine. Preemption first and foremost is a *constitutional* doctrine grounded in the Supremacy Clause's pronouncement that federal law is "the supreme law of the land." U.S. Const. art. VI, cl. 2; *Gibbons v. Ogden*, 22 U.S. 1, 129–30 (1824). At its core, preemption is a constitutional choice-of-law rule applied to federal law (enacted pursuant to constitutionally enumerated powers) and state law (enacted pursuant to constitutionally reserved powers).

The constitutional nature of preemption has consequences for the statutory interpretation courts conduct in a preemption analysis. Relevant here, the potential invalidation of state law under the Supremacy Clause implicates the constitutional-avoidance canon of construction. Thus, courts should interpret state statutes and federal laws in harmony if there is a plausible way to do so. That harmonious-reading approach comports with Texas state-law modes of statutory interpretation, which

3

include a presumption that state law does not conflict with the federal constitution. Tex. Gov't Code §311.021(1).  More importantly, applying constitutional avoidance during preemption analysis upholds the constitutional balance of federal and state power.  *See Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

Amici States further highlight two scenarios in which the justifications for applying constitutional avoidance are especially forceful.  First, when challengers attack a state law on its face, they bear a "heavy burden" to establish the law's unconstitutionality in all applications.  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Second, when a state law implicates multiple constitutional provisions—such as the Invasion Clause in Article I, Section 10, Clause 3—preemption analysis poses a risk of intra-constitutional conflict.  *Gregory*, 501 U.S. at 464–70.  In both instances, there is all the more reason to avoid unnecessary constitutional analysis.  Because this case presents both scenarios, the Court should be especially inclined to apply constitutional avoidance.

No Supreme Court case, including *Arizona v. United States*, 567 U.S. 387 (2012), is to the contrary.  And were that case as broad as the district court read it, the Supreme Court should overrule it.

## ARGUMENT

### I. The constitutional nature of preemption requires that courts interpret state and federal laws in harmony when possible.

Courts often begin a preemption analysis with a familiar refrain: a primer on the various "types" of preemption. *See, e.g.*, App.Op. at 30, 53 [Dkt. 42]. That analysis inevitably includes a textbook citation to the Supremacy Clause. But often lost in such rote taxonomy is how the constitutional roots of the doctrine bear on the preemption analysis. Because preemption always presents a constitutional question—whether state law runs afoul of the Supremacy Clause—courts should apply the canon of constitutional avoidance when interpreting state law for purposes of preemption. That canon instructs that courts ought to read statutes to avoid unconstitutionality (here, conflict with federal law) if reasonable to do so.

Applying constitutional avoidance to the preemption analysis orients that process toward harmonizing state and federal law. But when courts begin from a different starting point, the resulting process often defaults to search for dissonance and *conflict*. Any such analysis is deeply at odds with the nature of preemption doctrine and damaging to the federal-state balance of powers struck by the Constitution.

### A. The Supremacy Clause constitutionalizes preemption.

Preemption is a constitutional principle. For two hundred years, the Supreme Court has rooted the doctrine of preemption in the Supremacy Clause. Beginning

with *Gibbons v. Ogden*, 22 U.S. 1, 129–30 (1824), the Court articulated preemption as a conflicts-of-law rule stemming from Article VI's pronouncement that federal law "shall be the supreme law of the land." U.S. Const., art. VI, cl. 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."). And the Supreme Court has continued to hold that "federal preemption of state statutes is . . . ultimately a question under the Supremacy Clause." *Philadelphia v. New Jersey*, 430 U.S. 141, 142 (1977); *see also Murphy v. NCAA*, 584 U.S. 453, 477 (2018).

When otherwise validly enacted state laws are preempted, it is always because courts determined that those laws ran afoul of the Supremacy Clause. "[T]he Supreme Court and virtually all commentators have acknowledged" that "the Supremacy Clause is the reason that valid federal statutes trump state law." Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 234 (2000). As a result, there is a constitutional gloss to all preemption analyses.

This constitutional backdrop affects preemption doctrine in practice. Critically, the Supremacy Clause is not a source of congressional power. It simply

supplies a constitutional rule of decision for courts that face conflicting state and federal law.

The Supremacy Clause's history, structure, and interpreting precedent supports that rule-of-decision understanding. During constitutional debates, the Framers rejected an early formulation of the Supremacy Clause, proposed in the Virginia Plan, that would have given Congress affirmative power to veto state laws. The Virginia Resolutions (May 29, 1787), *in* 7 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, 243 (John P. Kaminski et al. eds., 2009) (granting Congress authority "to negative all laws passed by the several States contravening in the opinion of the National Legislature the articles of the Union"). Ratification history thus supports reading the Supremacy Clause "not as the repository of Congress's power to preempt state laws, but as a constitutional rule to resolve conflicts between state and federal laws." Viet D. Dinh, *Reassessing the Law of Preemption*, 88 Geo. L.J. 2085, 2090 (2000).

Constitutional structure likewise reflects that the Supremacy Clause does not enlarge Congress's authority. The Supremacy Clause resides in Article VI rather than "the metropolis of congressional power, Article I, Section 8," which houses the "affirmative grant[s] of congressional power." *Id.* at 2088. And the Supreme Court has made clear that the Supremacy Clause is not a fount of substantive congressional

power. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 731–32 (1999) (Supremacy Clause does not grant Congress authority to abrogate state sovereign immunity); *Printz v. United States*, 521 U.S. 898, 935 (1997) (Supremacy Clause does not permit Congress to commandeer state officials). Rather, the overwhelming consensus is that "the Supremacy Clause embeds a fundamental conflict of law rule in the text of the Constitution," dictating the legal status of federal and state laws. Allison H. Eid, *Preemption and the Federalism Five*, 37 Rutgers L. J. 1, 28–29 (2005) (noting scholarly consensus on this point) (internal quotation marks and citation omitted).

## B.    Constitutional avoidance should guide preemption analysis.

Courts consistently approach preemption as an exercise in statutory interpretation, with Congress's intent being the "touchstone" for interpretations of the federal law at issue. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U. S. 470, 485 (1996)). But the constitutional moorings of the preemption doctrine—and the constitutional implications to any preemption holding—should color *how* courts engage in that statutory interpretation. "For too long, [] courts have treated the Supremacy Clause chiefly as a symbol" when it "is a practical provision of law that addresses and resolves some of the critical questions in the modern debate over preemption." Nelson, *Preemption*, 234.

The constitutional question inherent in preemption suggests that courts should apply constitutional avoidance in preemption analyses. Classical constitutional avoidance is a centuries-old rule of statutory interpretation, which provides "that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Hooper v. California*, 155 U.S. 648, 657 (1895); *see also INS v. Cyr*, 533 U.S. 289, 299–300 n. 12 (2001), *superseded by statute* (collecting authorities). The canon of constitutional avoidance emerged shortly after ratification of the Constitution, Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 139 (2010), and continues to play an active role in the interpretation of modern federal statutes. *See, e.g.*, *United States v. Hansen*, 143 S. Ct. 1932, 1946 (2023); *West Virginia v. EPA*, 142 S. Ct. 2587, 2619 (2022) (Gorsuch, J., concurring); *see also Sackett v. EPA*, 143 S. Ct. 1322, 1341–42 (2023) (federalism canon as means of constitutional avoidance); *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 323, 327–28 (2014) (major-questions doctrine as form of constitutional avoidance).

Several circuit courts also recognized that preemption is a constitutional exercise rooted in the Supremacy Clause. Those courts have held that constitutional avoidance requires courts to resolve cases on alternative grounds when available to avoid preemption questions. *See, e.g.*, *Torres v. Precision Indus.*, 938 F.3d 752, 754–56 (6th Cir. 2019); *MediaOne Grp., Inc. v. Cty. of Henrico*, 257 F.3d 356, 361 (4th Cir.

2001); *see also Granite Re, Inc. v. NCUA Bd.*, 956 F.3d 1041, 1048 (8th Cir. 2020); *La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529, 532 & n.5 (5th Cir. 2006); *N.J. Payphone Ass'n v. Town of W. N.Y.*, 299 F.3d 235, 248–49 (3d Cir. 2002) (Alito, J., concurring). And this Court has taken that premise to its logical conclusion, applying constitutional avoidance to interpret state law once it *did* reach the preemption issue. *Planned Parenthood v. Sanchez*, 403 F.3d 324, 341–42 (5th Cir. 2005).

Constitutional avoidance explains other interpretive canons that courts deploy with respect to preemption, such as the presumption against preemption. The presumption against preemption is focused primarily on interpreting federal law and narrowly construing congressional preemptive intent. *Wyeth*, 555 U.S. at 565 n.3. Courts rely on the presumption "because respect for the States as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt" state laws. *Id.* (quotation omitted). Constitutional avoidance explains *why* that presumption makes sense. And constitutional avoidance provides a more holistic interpretive method that encompasses the state-law side of the preemption equation.

Thus, when courts properly assess claims of preemption, they should apply constitutional avoidance. *See Frisby v. Schultz*, 487 U.S. 474, 483 (1988) (applying

the "well-established principle that statutes will be interpreted to avoid constitutional difficulties" to state law); *see also Stenberg v. Carhart*, 530 U.S. 914, 941 (2000) (recognizing obligation to interpret state laws to "avoid constitutional doubts" if the text supports a narrow reading). Indeed, several states—including Texas—have expressly codified a presumption that their laws are *not* intended to conflict with federal law. Tex. Gov't Code §311.021(1); *see also* Colo. Rev. Stat. §2-4-201; Iowa Code §4.4; Minn. Stat. §645.17; N.D. Cent. Code § 1-02-38; N.M. Stat. §12-2A-18; Ohio Rev. Code §1.47; 1 Pa. Cons. Stat. § 1922.

More fundamentally, federalism principles enshrined within the Constitution underscore the importance of applying constitutional avoidance to preemption analysis. The Constitution bestows on the federal government limited, enumerated powers, U.S. Const., art. 1, §8, while ensuring the States retain a vast well of reserved and concurrent powers. U.S. Const., amend. X; The Federalist No. 45 (Madison). Even the most nationalist of Framers understood that under the Constitution, "State governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, exclusively delegated to the United States." The Federalist No. 32 (Hamilton).

That division of powers derives from the premise that "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations

imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). This constitutional design was intentional: the "federalist structure of joint sovereigns preserves to the people" the benefit of "a decentralized government that will be more sensitive to the needs of a heterogenous society" and a safeguard against "the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

Applying constitutional avoidance in preemption analysis upholds this constitutional calibration. It does so by leaving States free to regulate in their constitutionally reserved sphere unless state law cannot fairly be read as compatible with federal law. Conversely, divorcing preemption analysis from the constitutional considerations that should guide it risks federal aggrandizement by removing limiting principles that restrict how easily courts may imply conflicts. *See Wyeth*, 555 U.S. at 583 (Thomas, J., concurring); Charles W. Tyler and Heather K. Gerkin, *The Myth of Laboratories of Democracy*, 122 Colum. L. Rev. 2187, 2230 (2022) ("Wherever preemption exists, federal law displaces state law, thereby stifling state-by-state diversity and experimentation." (quotation omitted)).

The avoidance canon also throws into sharp relief the tension between the "constitutionally mandated balance of power," *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (quotation omitted), and some formulations of

preemption—namely, implied preemption. Implied preemption doctrines (including obstacle or conflict preemption and field preemption) are problematic because they begin with the upside-down presumption that Congress intended to displace valid state laws, without any express indication requiring that interpretation. *See Wyeth*, 555 U.S. at 583 (Thomas, J., concurring) ("[I]mplied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution.").

That conflict-seeking approach to preemption ignores that the Constitution provides for broad areas of concurrent federal and state legislation. Tyler and Gerkin, *The Myth of Laboratories of Democracy* at 2230–31. And it substitutes federal laws—sometimes in an entire area of concurrent jurisdiction—for state laws enacted pursuant to constitutionally reserved powers, absent any clear directive from Congress or any unavoidable conflict. Implied preemption thus creates a freeway to eliminating broad swaths of valid state legislation. After all, "nearly every federal statute addresses an area in which the states also have authority to legislate." Nelson, *Preemption*, 225.

These criticisms are borne out in the Supreme Court's increased skepticism of implied preemption and shift toward a more robust view of statutory interpretation in the preemption context. *See, e.g.*, *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907–09 (2019) (Gorsuch, J.) (rejecting field and obstacle preemption theories

and holding the Supremacy Clause cannot "be deployed here to elevate abstract and unenacted legislative desires above state law"); *id.* at 1907 ("any evidence of preemptive purpose" must be "sought in the text and structure of the statute at issue" (internal quotation omitted and alteration accepted)); *Kansas v. Garcia*, 140 S. Ct. 791, 807 (2020) (Thomas, J., concurring) ("the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption."); *Kurns v. RR Friction Prods. Corp.*, 565 US 625, 640–41 (2012) (Sotomayor, J., dissenting) ("our recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it." (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 617 (1997) (Thomas, J., dissenting))); *Wyeth*, 555 U.S. at 583 (Thomas, J., concurring) (expressing increased skepticism of "the Supreme "Court's 'purposes and objectives' preemption jurisprudence," under which "the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law"); *see also Hillsborough Cty. v. Automated Med. Labs. Inc.*, 471 US 707, 716–17 (1985) (inferring field preemption "whenever an agency deals with a problem comprehensively" is inconsistent with "the federal-state balance embodied in our Supremacy Clause jurisprudence"). This development in the Supreme Court's recent preemption jurisprudence not only

14

counsels against implying a conflict between federal and state laws but is consistent with employing constitutional avoidance to seek harmony, not conflict between the laws of the sovereigns.

To be sure, constitutional avoidance has no application where there are no plausible alternative interpretations of the statute. *Jennings v. Rodriquez*, 583 U.S. 281, 286 (2018). That is surely true when there is no valid interpretation that harmonizes state and federal law. But when a plausible statutory interpretation exists that avoids conflict, courts should adopt that reading.

### C. Constitutional avoidance in preemption analysis is particularly appropriate when the state law is challenged on its face or implicates a separate constitutional provision.

The rationale for interpreting state law through a conflict-avoidance lens applies with even greater force when the state law is subject to a facial challenge or implicates a separate constitutional provision. Both factors are at play here and offer additional support for reversal.

It is well-established that a facial challenge to the constitutionality of a statute is "the most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). That is because "the challenger must establish that *no set of circumstances* exists under which the Act would be valid." *Id.* (emphasis added). The Supreme Court has articulated its reluctance to hold a statute unconstitutional in its

entirety by establishing a "heavy burden" for litigants waging facial challenges to laws. *Id.*; *see also Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (applying *Salerno* in the preemption context).

Pre-enforcement facial challenges to state laws are "particularly trouble-some" because they seek to "deprive[] state courts of the opportunity to construe a law to avoid constitutional infirmities." *Netchoice, L.L.C. v. Paxton*, 49 F.4th 439, 449 (5th Cir. 2022). The "respect owed to a sovereign State thus demands that [this Court] look particularly askance" at such attempts. *Id.* Appellees implicate these concerns here by levying a pre-enforcement facial challenge to a state law.

The high hurdle Appellees must clear to succeed on this challenge is com-pounded by the applicability of the constitutional-avoidance canon of statutory con-struction, which operates as a second barrier to holding S.B.4 unconstitutional. In-deed, this Court recently applied constitutional avoidance as an *additional* principle of judicial restraint operating alongside the facial-challenge standard. *See Turtle Is-land Foods, S.P.C. v. Strain*, 65 F.4th 211, 219 (5th Cir. 2023).

Appellees cannot meet their "heavy burden," not least because the chal-lenged S.B.4 provisions mirror federal law. Texas essentially has codified portions of federal immigration law as Texas state law. *Compare* Tex. Penal Code §§51.02(a),

51.03(a), *with* 8 U.S.C. §§1325(a), 1326(a).  That renders much, if not all, of S.B.4 complimentary to federal law, not in conflict with it.

Separately, one of the grounds Texas has raised to support the validity of S.B.4 implicates a novel constitutional question—the interpretation of Article I, Section 10, Clause 3 of the U.S. Constitution ("Invasion Clause").  The Invasion Clause's bearing on this dispute heightens the necessity of applying a proper preemption analysis here—one grounded in a conflict-avoidance approach to statutory interpretation—because there otherwise looms the potential for a clash between two constitutional provisions of equal strength (the Supremacy Clause and the Invasion Clause). Should the Invasion Clause independently authorize Texas's enactment of S.B.4, the Supremacy Clause is no longer mediating between federal law and state law enacted pursuant to generally reserved powers, but state law expressly authorized by an independent constitutional provision.

The interest in avoiding intra-constitutional conflicts amplifies the well-established interest in interpreting statutes to avoid unconstitutionality where feasible. Courts should not "under the sanction of the constitution . . . defeat the constitution itself." *Martin v. Hunter's Lessee*, 14 U.S. 304, 329 (1816).  When faced with a potential conflict between the Supremacy Clause and another constitutional provision, the Court should interpret the relevant statute narrowly to avoid that potential clash.

*See Gregory*, 501 U.S. at 464–70 (reading the ADEA narrowly to avoid implicating a clash between the Tenth Amendment and the Supremacy Clause). Taking the broad approach to preemption analysis employed by the district court here, unconstrained by the canon of constitutional avoidance, needlessly tees up an intra-constitutional conflict and is doctrinally incorrect.

### D. The district court sought conflict, when the better interpretation of the relevant state and federal statutes avoids conflict.

The district court erred, both in the preemption analysis it applied and the result it reached. The district court employed the wrong lens from the start. Its preemption analysis opens with a sweeping sentence on congressional power, App.Op. at 29, but makes no mention of the Supremacy Clause or of any obligation to avoid interpreting state law as conflicting with federal law if possible.

The district court then implied a sweepingly broad version of field preemption, which it inferred almost exclusively from judicial dicta—not the text or structure of the federal immigration statute. *Id.* at 30–33. Some of the cases it cited predate the federal Immigration and Nationality Act (INA) at issue. As discussed below, the cornerstone case in the district court's analysis, *Arizona v. United States*, concluded that Congress had preempted "the field of alien *registration*" but made no such determination regarding regulation of unlawful entry. 567 U.S. 387, 401 (2012). The district court argued that *Arizona* does not *prohibit* implying field preemption

here.  App.Op. at 41. Of course, that flips preemption on its head.  Courts should *avoid* interpreting state law to conflict with federal law unless absolutely necessary, not seek to justify a conflict.  That is particularly true here, where Texas took great efforts to avoid a federal-law conflict by creating affirmative defenses under S.B.4 for individuals with valid asylum claims or lawful-presence status under federal law or approval under the federal Deferred Action for Childhood Arrivals program.  *See* Tex. Penal Code §51.02(c).

Tellingly, the district court addressed constitutional avoidance only briefly in a paragraph near the close of its preemption analysis. *Id.* at 56–57.  Despite acknowledging that S.B.4 mirrors federal law, the district court held that dual compliance with state and federal laws was wholly impossible—a conclusion reached while addressing only *one* of the challenged S.B.4 provisions. *Id.*

The district court's preemption analysis is exactly the "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives" that the Supreme Court has cautioned against, *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011), and warrants reversal.

**II.** ***Arizona v. United States* does not require that this Court conclude S.B.4 is preempted.**

S.B.4 is not preempted by federal immigration law under *Arizona v. United States*. But to the extent that precedent is as broad as the district court concluded it was, it should be overruled by the Supreme Court.

**A.** ***Arizona* is an outlier and should be read narrowly in this Court's preemption analysis.**

The Supreme Court's opinion in *Arizona* was a narrow one. And it should be narrowly applied. The district court failed to recognize that fact and incorrectly held that *Arizona* required finding that S.B.4 was both field preempted and conflict preempted by federal statute. This Court should correct that error.

**1.     S.B.4 is not field preempted by Congress's statutes governing illegal alien removal.**

It is only "[i]n rare cases" that "the Court has found that Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation'. . . ." *Kansas*, 140 S. Ct. at 804 (quoting *R. J. Reynolds Tobacco Co. v. Durham Cty.*, 479 U.S. 130, 140 (1986)). That is for good reason. "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Importantly, "all preemption arguments[] must be grounded in the text and

structure of the statute at issue," not a "free-wheeling judicial inquiry" into whether state law conflicts with federal objectives. *Kansas*, 140 S. Ct. at 804 (quotation omitted).

In unnecessarily extending *Arizona* to imply field preemption of S.B.4, the district court ignored those principles. Indeed, the district court's preemption analysis relies primarily on *Arizona* to support enjoining S.B.4. App.Op. 30 (citing *Arizona*, 567 U.S. at 399). That reliance is misplaced. The district court's characterization of "immigration" as a standalone field under the United States' occupation (App.Op. 30) casts far too wide a net. Nor does *Arizona* support the district court's assertion that "only the federal government may remove noncitizens." App.Op. 45.

In *Arizona*, the Court concluded only that the federal government fully occupied the "field of alien registration." 567 U.S. at 402. And the Court recently confirmed that this plain, narrow reading of its *Arizona* field-preemption holding is correct: "In *Arizona*, . . . we held that federal immigration law occupied the field of alien registration. 'Federal law,' we observed, 'makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders.'" *Kansas*, 140 S. Ct. at 805–06 (quoting *Arizona*, 567 U.S. at 401–02) (internal citations omitted)). Appellees may wish that the Court had simply declared that all state laws touching on immigration are field preempted under the guise

that Congress has exclusive control over every aspect of immigration policy. But that is not what the Supreme Court did, and for good reason: that is not what the constitutional division of powers supports.

The Constitution grants Congress limited, enumerated powers—among them, the power to regulate "naturalization." U.S. Const., Art. 1 §8, cl. 4. Unlike exclusive federal powers, the Constitution's text does not preclude the States from concurrently exercising power over naturalization. And the Constitution says nothing at all about other aspects of the immigration process. The Supreme Court consequently has recognized—even in outlier decisions like *Arizona*— that the "power to regulate immigration" does not mean the entire topic of immigration is off limits to state governments. *Arizona*, 567 U.S. at 416. In fact, in *Arizona*, a state law requiring "state officers to conduct [an immigration] status check during the course of an authorized, lawful detention or after a detainee has been released" was specifically *not* preempted. *Id.* at 414–15.

*Arizona* simply did not address the States' concurrent power to regulate removal of illegal aliens, nor did it prophylactically hold that States may never enact legislation involving immigration issues. That is likely because there is no basis to imply a sweeping field preemption covering all state criminal and expulsion laws applicable to immigrants. The federal government's general "power to *expel*

undesirable aliens," *Curtiss-Wright*, 299 U.S. at 318 (emphasis added), is not exclusive, *contra* the United States' power to "exclude" aliens. *Truax*, 239 U.S. at 42. As such, nothing precludes states from complimenting federal removal efforts with state law analogues.

The district court's finding of field preemption separately relies upon 8 U.S.C. §1229a(a)(3), which provides that "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." But this provision applies to the process for admission and removal of aliens that were *previously admitted* into the United States, not aliens who evaded admission requirements and entered between ports of entry without authorization. S.B.4 deals with the latter. Thus, even though "the removal process is entrusted to the discretion of the Federal Government," *Arizona*, 567 U.S. at 409, and "[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States," *id.*, that process as articulated in the INA does not govern the conduct regulated by S.B.4. States have room under the federal statute to aid in the removal of aliens who were never lawfully admitted into the United States in the first place.

That understanding is aligned with the Constitution's balance of federal-state power and with the Supreme Court's approach to concurrent legislation more broadly, as discussed above. States have "authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal." *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (citing *DeCanas v. Bica*, 424 U.S. 351, 96 (1976)). That fits within the general rule, which *Arizona* acknowledged, that "a State may make violation of federal law a crime" in the State. *Id.* at 402. Otherwise, state analogues to countless federal statutes, such as the Unfair or Deceptive Acts or Practices statute, 15 U.S.C. §45, and Religious Freedom Restoration Act, 42 U.S.C. §2000bb, would be prohibited. Yet such analogues are common. *See, e.g.*, Ohio Rev. Code §4165.01 *et seq.* (deceptive trade practices); S.C. Code §1-32-10 *et seq.* (Religious Freedom Restoration Act). States can and do enact legislation that mirrors federal legislation all the time. And such laws are permissible when the federal government does not occupy the field in question. Such is the case with S.B.4.

In sum, Congress has not preempted the entire "field" of immigration, and the district court erred by searching for that result through an expansive reading of *Arizona* when it could have sought harmony between federal and state law. Even if the United States occupies some fields within the topic of immigration, such as alien registration, it has not occupied the field of removal of aliens lacking authorization

to be present in a state. The federal statutes governing removal of aliens do not preclude concurrent state legislation that is compatible with federal law.

## 2.    S.B.4 does not impermissibly conflict with federal law.

The district court similarly erred by glossing over key distinctions between *Arizona* and S.B.4 in its analysis of conflict preemption. Federal law preempted the state law in *Arizona* for two primary reasons. First, the state law conflicted with federal law because the state law prescribed harsher criminal penalties than Congress. *Arizona*, 567 U.S. at 402–03. That is not the case here. Second, the state law criminalized conduct for which Congress had conferred a right to be free from criminal penalties. *Id.* at 404–07. Again, there is no parallel here. Congress has not conferred a right for aliens to enter the United States without authorization. S.B.4 simply makes unlawful that which is already unlawful under federal law.

The Supreme Court's ruling in *Kansas v. Garcia* confirms that reading. There, the Supreme Court applied its holding in *Arizona* and found that Kansas's identity-theft and false-information statutes were not preempted by the federal Immigration Reform and Control Act, even though the laws overlapped. 140 S. Ct. at 806–07. As the Supreme Court recognized, "[t]he mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption." *Id.* at 806. Rather than

apply *Kansas*'s instruction to the distinct facts in this case—most notably, how S.B.4 mirrors federal law—the district court shoehorned this case into *Arizona* and manufactured a conflict with federal law that the court could have avoided.

The district court's preemption analysis also focused on deference to the federal Executive Branch's discretion in how and when to enforce immigration law at the expense of State efforts to complement Congress's objectives. Ultimately, however, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas*, 140 S. Ct. at 807. That is because "the Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities of federal officers." *Id.* (quoting U.S. Const. art. VI, cl. 2).

Consistent with constitutional avoidance principles, the Supreme Court has cautioned against "seeking out conflicts between state and federal regulation where none clearly exists." *Arizona*, 567 U.S. at 415 (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446 (1960)). The district court ignored that instruction. This Court should narrowly construe *Arizona* and reverse.

**B.    To the extent the *Arizona* decision is as expansive as the district court concluded, it is entitled to little *stare decisis* effect and is ripe for overruling by the Supreme Court.**

To the extent that *Arizona* reaches as broadly as the district court and Appellees claim, that view is entitled to little-to-no stare decisis effect. As explained above, the *Arizona* decision involved different state and federal statutes and legal issues. And the Supreme Court has already rebuffed attempts to expand *Arizona* beyond its narrow holdings, implicitly rejecting such a broad approach. *See Kansas*, 140 S.Ct. at 805–06; *see also Cohens v. State of Virginia*, 19 U.S. 264, 399 (1821) ("It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."); *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013) (describing the circumstances in which "serious consideration" is given to dicta in a Supreme Court opinion).

To the extent a broader view of the *Arizona* decision is viewed as precedential, that decision should be overruled by the Supreme Court. Stare decisis is not an "inexorable command" but rather "it 'is a principle of policy and not a mechanical formula of adherence to the latest decision.'" *Payne v. Tennessee*, 501 U.S. 808, 828 (1991) (quoting *Helvering v. Hallock*, 309 U.S. 106, 119 (1940)). The policy is at its

weakest when interpreting the Constitution. *Agostini v. Felton*, 521 U.S. 203, 235 (1997).

And although the Supreme Court often considers adherence to precedent to be the preferred course of action, it "has never felt constrained to follow precedent." *Payne*, 501 U.S. at 827 (quoting *Smith v. Allwright*, 321 U.S. 649, 665 (1944)). In determining whether to overrule a prior decision, the Supreme Court weighs a variety of factors, including the quality of a decision's reasoning, the workability of the rule the decision established, the decision's consistency with other related decisions, developments since the decision was handed down, and reliance on the decision. *See Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 585 U.S. 878, 917 (2018). The Court will also consider the margins of the decision, the rigor of the dissent, and the subsequent application of the decision. *See Payne*, 501 U.S. at 829–31 ("Booth and Gathers were decided by the narrowest of margins, over spirited dissents challenging the basic underpinnings of those decisions. They have been questioned by Members of the Court in later decisions, and have defied consistent application by the lower courts.").

Here, these factors strongly weigh in favor of overruling *Arizona*. As an initial matter, *Arizona* was decided over three "spirited dissents." *See id.* at 829–31; *Arizona*, 567 U.S. at 416 (Scalia, J., dissenting); *id.* at 437 (Thomas, J., dissenting); *id.*

at 440 (Alito, J., dissenting).  Although the substance of these dissents differed in certain respects, all three envisioned a broader role for States in immigration than the majority found.  These dissenting opinions also reveal significant flaws in the legal reasoning of the *Arizona* decision itself.

Moreover, the *Arizona* decision has proved to be increasingly unworkable. States have struggled to determine what role they play in confronting the illegal migration crisis.  Unsurprisingly, this has led to splits within the federal courts of appeals.  *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1026 n.18 (9th Cir. 2013) (describing the circuit split).

Relatedly, *Arizona* certainly does not implicate any legitimate reliance interests.  States and citizens are harmed rather than helped by the result in *Arizona*.  And subsequent decisions have undermined any notion that *Arizona* established a broad rule regarding preemption of state immigration measures.  *See, e.g.*, *Garcia*, 140 S. Ct. at 805–06; *supra* at 12–13.

## CONCLUSION

For these reasons, this Court should reverse the district court.

ALAN WILSON
South Carolina Attorney General

ROBERT D. COOK
Solicitor General
J. EMORY SMITH, JR.
Deputy Solicitor General
THOMAS T. HYDRICK
Assistant Deputy Solicitor General
JOSEPH D. SPATE
Assistant Deputy Solicitor General
1000 Assembly St.
Columbia, SC 29201
803-734-3371
josephspate@scag.gov

DAVE YOST
Ohio Attorney General

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Solicitor General
  *\*Counsel of Record*
KATIE ROSE TALLEY
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614-466-8980
thomas.gaiser@ohioago.gov

*Counsel for Amici Curiae
  States*

## ADDITIONAL COUNSEL

Steve Marshall
Alabama Attorney General

Tim Griffin
Arkansas Attorney General

Christopher M. Carr
Georgia Attorney General

Raúl R. Labrador
Idaho Attorney General

Theodore E. Rokita
Indiana Attorney General

Brenna Bird
Iowa Attorney General

Kris Kobach
Kansas Attorney General

Russell Coleman
Kentucky Attorney General

Liz Murrill
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Andrew Bailey
Missouri Attorney General

Austin Knudsen
Montana Attorney General

Michael T. Hilgers
Nebraska Attorney General

Gentner Drummond
Oklahoma Attorney General

Marty Jackley
South Dakota Attorney General

Jonathan Skrmetti
Tennessee Attorney General
and Reporter

Sean D. Reyes
Utah Attorney General

Jason Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General

Bridget Hill
Wyoming Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2024, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ T. Elliot Gaiser*
T. Elliot Gaiser
Ohio Solicitor General

## CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume requirements and contains 6,347 words.  *See* Fed. R. App. P. 29(a)(5), 32(a)(7).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ T. Elliot Gaiser*
T. Elliot Gaiser
Ohio Solicitor General

*Counsel for Amici Curiae*
 *States*

March 20, 2024