Case No. 24-50149

## IN THE UNITED STATES COURT OF APPEALS
## FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

v.

STATE OF TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, in his official capacity as Director of Texas Department of Public Safety,

*Defendants-Appellants*

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees*

v.

STEVEN C. MCCRAW, in his official capacity as Director of the State of Texas Department of Public Safety; BILL D. HICKS, in his official capacity as District Attorney for the 34th District,

*Defendants-Appellants*

**On Appeal from the United States District Court for the Western District of Texas**

**Brief of Amicus Curiae the Government of the United Mexican States in Support of Plaintiffs-Appellees and Affirmance of the District Court's Preliminary Injunction Order**

| | |
|---|---|
| Sinéad O'Carroll<br>SBN 24013253<br>Manasi Rodgers<br>SBN 24090361<br>Kayla Kelly (Carrick)<br>SBN 24087264 | REEVES & BRIGHTWELL LLP<br>3103 Bee Caves Rd, Ste 240<br>Austin, Texas 78746-5581<br>(512) 334-4500<br>(512) 334-4492 (Facsimile) |

ATTORNEYS FOR AMICUS CURIAE
THE GOVERNMENT OF THE UNITED MEXICAN STATES

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record makes this supplemental statement of interested parties pursuant to Fifth Circuit Rule 29.2 and identifies:

The Government of the United Mexican States, Amicus Curiae.

Sinéad O'Carroll, Manasi Rodgers, and Kayla Kelly (Carrick), Reeves & Brightwell LLP, counsel for Amicus Curiae.

# **TABLE OF CONTENTS**

Page(s)

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

TABLE OF CONTENTS ........................................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iii

IDENTITY AND INTEREST OF AMICUS CURIAE AND
   SOURCE OF AUTHORITY TO FILE BRIEF ................................................... 1

STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E) ............................... 3

ARGUMENT & AUTHORITIES ........................................................................... 3

  I.  Enforcement of SB 4 Would Negatively Impact Mexican Nationals. ............ 3

     A. Discriminatory Enforcement of SB 4 Would Harm Mexican
        Nationals. ................................................................................................ 4

     B. SB 4 is Causing Fear and Concern among Mexican Nationals Living
        in Texas and Straining Mexico's Available Consular Resources. .......... 7

 II.  Enforcement of SB 4 Would Frustrate Diplomatic Relations Between
     Mexico and the United States. ..................................................................... 8

     A. SB 4 Prevents the United States from Speaking with One Uniform
        Voice on Immigration Matters. ............................................................... 8

     B. SB 4's Removal Provisions Ignore Mexico's Right to Determine its
        Own Policies Regarding Entry into its Territory. .................................. 11

     C. SB 4 Would Derail Collaborative Efforts Toward a Uniform Legal
        Migration Framework and Border Management. .................................. 12

     D. SB 4 Would Hinder Mexico-U.S. Trade. ............................................. 14

CONCLUSION .................................................................................................... 16

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a) ...................... 18

CERTIFICATE OF SERVICE ............................................................................. 19

# TABLE OF AUTHORITIES

Page(s)

Cases

*Arizona v. U.S.*,
  567 U.S. 387 (2012).........................................................................................9

*Brown v. City of Oneonta*,
  221 F.3d 329 (2d Cir. 2000)............................................................................6

*Chy Lung v. Freeman*,
  92 U.S. 275 (1875)...........................................................................................8

*FNC Bank v. Banco Para el Comercio*,
  462 U.S. 611 (1983).........................................................................................5

*Hartford Fire Ins. Co. v. California*,
  509 U.S. 764 (1993).........................................................................................5

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)...........................................................................................4

*The Paquete Habana*,
  175 U.S. 677 (1900).........................................................................................5

*U.S. v. Avery*,
  137 F.3d 343 (6th Cir. 1997) ..........................................................................5

*U.S. v. Montero-Camargo*,
  208 F.3d 1122 (9th Cir. 2000) ........................................................................4

*U.S. v. Swindle*,
  407 F. 3d 562 (2d Cir. 2005)...........................................................................5

Statutes

H.R. 2162, 49th Leg., 2d Reg. Sess., Ch. 113 (Ariz. 2010) ......................................9

S.B. 4, 88th Leg., 4th Spec. Sess. (Tex. 2023) ................................................. passim

S.F. 2340, 90th General Assembly (Iowa 2024) ....................................................10

TEX. CODE OF CRIM. PROC. art. 5B.002 ......................................................... 11, 12

TEX. PENAL CODE §§ 51.04, 12.33..........................................................................12

Rules

FED. R. APP. P. 29.............................................................................. ii, 3, 18

FED. R. APP. P. 32...............................................................................................18

Fifth Circuit Rule 29.2 ....................................................................................... i

Other Authorities

Alicia Ward, *U.S. Nonimmigrant Admissions: 2022*, U.S. DEPARTMENT OF
    HOMELAND SECURITY OFFICE OF HOMELAND SECURITY STATISTICS 1, 4 (Nov.
    2023), https://www.dhs.gov/sites/default/files/2024-
    02/2023_0818_plcy_nonimmigrant_   fy2022.pdf ............................................13

Article IV of the United States-Mexico Bilateral Consular Convention (*Bilaterial
    Consular Conventions: Mexican Treaty*, U.S. DEPARTMENT OF STATE - BUREAU
    OF CONSULAR AFFAIRS (Aug. 12, 1942),
    https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/intl-
    treaties/Bilateral-Consular-Conventions/mexican-treaty.html)............................7

Article 5 of the Vienna Convention on Consular Relations (*Vienna Convention on
    Consular Relations*, UNITED NATIONS (1963),
    https://legal.un.org/ilc/texts/instruments/english/conventions/9_2_1963.pdf) .....7

*International Convention on the Protection of the Rights of All Migrant Workers
    and Members  of Their Families*, UNITED NATIONS: HUMAN RIGHTS
    INSTRUMENTS (Dec. 18, 1990), https://www.ohchr.org/en/instruments-
    mechanisms/instruments/international-convention-protection-rights-all-migrant-
    workers..............................................................................................................6

Mohamad Moslimani, Luis Noe-Bustamante & Sono Shah, *Facts on Hispanics of Mexican Origin in the United States*, PEW RESEARCH CENTER (2021), https://www.pewresearch.org/hispanic/fact-sheet/us-hispanics-facts-on-mexican-origin-latinos/#:~:text=An%20estimated%2037.2%20million%20Hispanics, Census%20Bureau's%20American%20Community%20Survey ........................12

Office of the Press Secretary, *Declaration by The Government Of The United States Of America and The Government Of The United Mexican States Concerning Twenty-First Century Border Management*, THE WHITE HOUSE (May 19, 2010), https://obamawhitehouse.archives.gov/the-press-office/declaration-government-united-states-america-and-government-united-mexican-states-c ...................................................................................................13

Secretaría de Relaciones Exteriores de México, *Doing Business with Mexico: Trade With Mexico Supports U.S. Jobs*, MEXICAN EMBASSY IN THE U.S., https://embamex.sre.gob.mx/eua/index.php/en/2016-05-11-14-29-59/economic-affairs-menu (last visited March 20, 2024)............................................................15

Secretaría de Relaciones Exteriores, *Mexican Government opposes the anti-immigrant legislation passed in Texas*, GOBIERNO DE MÉXICO PRESS RELEASE 476 (Nov. 15, 2023) https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-immigrant-legislation-passed-in-texas ....................................12

Seminar, *Statistical Information of the Mexican Population Abroad*, NATIONAL SYSTEM OF STATISTICAL AND GEOGRAPHICAL INFORMATION (April-May 2023), https://en.www.inegi.org.mx/eventos/2023/innametra/ ......................................12

*State Immigration Data Profiles: Texas*, MIGRATION POLICY INSTITUTE (2022), https://www.migrationpolicy.org/data/state-profiles/state/demographics/TX ......3

## <u>IDENTITY AND INTEREST OF AMICUS CURIAE AND<br>SOURCE OF AUTHORITY TO FILE BRIEF</u>

The Government of the United Mexican States ("Mexico") herein expresses its significant concerns over Texas Senate Bill 4 from the 2023 legislative session ("SB 4")[1] and underscores the importance of affirming the preliminary injunction entered by the United States District Court for the Western District of Texas.

Mexico's interest arises from ensuring that its citizens are accorded human and civil rights when present in the United States of America ("U.S." or "United States") and that their ethnicity is not used as a basis for state-sanctioned acts of bias. Mexico is deeply concerned that SB 4 will be applied in a discriminatory manner and fears that its enforcement will lead to improper harassment, detention, removal, and criminalization of Mexican citizens and individuals of Latino appearance. Moreover, if SB 4 is permitted to take effect, Texas would become a "show me your papers" state, unconstitutionally restricting freedom and diminishing the civil and constitutional rights and dignity of Latinos who live in and visit Texas.  SB 4's enforcement threatens the well-being of persons erroneously detained under its auspices, as well as their families, including family members who are U.S. citizens. The unforeseen ramifications of this law would have a substantial impact and hardship on the Mexican community.

---

[1] S.B. 4, 88th Leg., 4th Spec. Sess. (Tex. 2023).

Mexico's interests also include the substantial tension enforcement of SB 4 would place on international relations between Mexico and the United States. Mexico seeks to ensure that its bilateral diplomatic relations with the United States are transparent, consistent, reliable, and not frustrated by individual U.S. states' actions. Enforcement of SB 4 would inappropriately burden the uniform and predictable sovereign-to-sovereign relations between Mexico and the United States, by criminalizing the unauthorized entry of noncitizens into Texas from outside the county and creating diverging removal requirements between and among individual states and the national government. Enforcement of SB 4 would also interfere with Mexico's right to determine its own policies regarding entry into its territory, undermine U.S.-Mexico collaboration on a legal migration framework and border management, and hinder U.S.-Mexico trade.

Mexico expressly and publicly acknowledges the sovereign right of every country to decide on the public policies that should apply in its territory, but respectfully asserts its own right to protect the rights of Mexican nationals in the U.S., to determine its own policies regarding entry into its territory, and to ensure that its diplomatic relations with the United States are not adversely impacted by the actions of the State of Texas. Mexico further asserts its right not to receive nationals from other countries who do not want to enter its country of their own desire, but at the imposition of a state that is exercising unlawful immigration policies.

Mexico respectfully submits this brief as amicus curiae in support of Plaintiffs-Appellees so that the Court may take these important matters into consideration when analyzing the legality of SB 4.

Mexico is authorized to file this brief by Federal Rule of Appellate Procedure 29(a)(2) because all parties have consented to the filing of this amicus curiae brief.

## STATEMENT PURSUANT TO FED. R. APP. P. 29(a)(4)(E)

No party or party's counsel, nor any other person other than the amicus curiae or its counsel, authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting the brief.

## ARGUMENT & AUTHORITIES

### I.    Enforcement of SB 4 Would Negatively Impact Mexican Nationals.

There are approximately 2.4 million individuals who were born in Mexico living in Texas who could be negatively impacted by the enforcement of SB 4.[2] Indeed, SB 4 is already causing significant fear and concern among Mexican nationals living in Texas.  The Government of Mexico has a significant interest in protecting the international and constitutional rights and ensuring the safety and wellbeing of each of these individuals and endeavors to help any Mexican national

---

[2] *See State Immigration Data Profiles: Texas*, MIGRATION POLICY INSTITUTE (2022), https://www.migrationpolicy.org/data/state-profiles/state/demographics/TX.

living in Texas needing consular assistance.

### A. Discriminatory Enforcement of SB 4 Would Harm Mexican Nationals.

Discriminatory enforcement of the law has adverse legal, social, economic, and political implications. Mexico has a legitimate interest in ensuring that its citizens, regardless of their migratory status, are not deprived of international and constitutional protections or subjected to hostile attitudes or actions by U.S. state actors or the society at large. *See Hines v. Davidowitz*, 312 U.S. 52, 64 (1941) ("One of the most important and delicate of all international relationships, recognized immemorially as a responsibility of a government, has to do with the protection of the rights of a country's own nationals when those nationals are in another country.").

Mexico is deeply concerned that enforcement of SB 4 by Texas's officers could lead to improper harassment, detention, removal, and criminalization of Mexican citizens and individuals of Latino appearance. SB 4 impliedly encourages the use of race, color, or national origin in implementing SB 4's immigration provisions, and Mexico believes that SB 4 cannot be applied in a race-neutral manner. Latino appearance simply is not a proper factor for consideration by law enforcement, particularly given the increasing number of Latinos living in the United States. *U.S. v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir. 2000) ("Hispanic appearance is of little or no use in determining which particular individuals among

the vast Hispanic populace should be stopped by law enforcement officials on the lookout for illegal aliens" and "at this point in our nation's history, and given the continuing changes in our ethnic and racial composition, Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required"); *see also U.S. v. Swindle*, 407 F. 3d 562, 569-70 (2d Cir. 2005) ("race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop"); *U.S. v. Avery*, 137 F.3d 343, 354 (6th Cir. 1997) ("the reasonable suspicion requirement for an investigative detention cannot be satisfied when the sole factor grounding suspicion is race").

In addition to the imminent risk of violations of Mexican citizens' rights under the U.S. Constitution, SB 4 conflicts with principles of international law protecting the rights of foreign nationals in host countries. As noted by the late Justice Scalia, "statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia J., dissenting); *see also FNC Bank v. Banco Para el Comercio*, 462 U.S. 611, 623 (1983) (recognizing that international law "is part of our law") (quoting *The Paquete Habana*, 175 U.S. 677, 700 (1900)). The potentially arbitrary enforcement of SB 4 directly conflicts with international law. In particular, SB 4 is contrary to the United Nations International

Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families, which provides in Article 16 that "migrant workers and members of their families shall have the right to liberty and security of person" and "shall not be subjected individually or collectively to arbitrary arrest or detention."[3]   While international sources may not be binding upon this Court, they remain relevant in evaluating SB 4's intrusion in foreign policy and Mexico's concerns with respect to the statute's regulation of foreign persons and their conduct in the U.S.

Furthermore, Mexico is concerned about the impact of this potentially discriminatory cross-deputization regime on the wellbeing and safety of its citizens. Discriminatory targeting of Mexican nationals and persons of Latino appearance under SB 4 will lead to the harmful separation of families, negatively affecting both Mexican and U.S. citizens.  Requiring the police to act as immigration officers may undermine police legitimacy in Latino communities, reducing crime reporting and leading to an increase in criminal activity.  *See Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000) ("Law enforcement officials should always be cognizant of the impressions they leave on a community, lest distrust of law enforcement undermine its effectiveness.").

---

[3] *International Convention on the Protection of the Rights of All Migrant Workers and Members of Their Families*, UNITED NATIONS: HUMAN RIGHTS INSTRUMENTS (Dec. 18, 1990), https://www.ohchr.org/en/instruments-mechanisms/instruments/international-convention-protection-rights-all-migrant-workers.

**B.   SB 4 is Causing Fear and Concern among Mexican Nationals Living in Texas and Straining Mexico's Available Consular Resources.**

The Government of Mexico has 11 consulates in Texas all charged with performing duties such as helping Mexican citizens living or traveling in the U.S. who need assistance when dealing with U.S. laws and legal issues, or who need vital documents such as passports, identifications, and birth certificates.[4] Consular officials also strengthen relations with local authorities, as well as business and community organizations in the region, and serve to promote Mexico as a country of economic, touristic, gastronomic, scientific, academic, cultural, and artistic interest.

Based on Mexico's consultations with its consular officials stationed throughout Texas, it is undeniable that SB 4 is creating fear, panic, and uncertainty among Mexican nationals living in Texas regardless of their immigration status, as well as among Mexicans visiting Texas for both business and leisure travel. This widespread concern is causing a disproportionate share of the time and resources of Mexican consular officials in Texas to be focused on addressing the immigration

---

[4] Mexico offers these and other consular services pursuant to Article 5 of the Vienna Convention on Consular Relations (*Vienna Convention on Consular Relations*, UNITED NATIONS (1963), https://legal.un.org/ilc/texts/instruments/english/conventions/9_2_1963.pdf) and Article IV of the United States-Mexico Bilateral Consular Convention (*Bilateral Consular Conventions: Mexican Treaty*, U.S. DEPARTMENT OF STATE - BUREAU OF CONSULAR AFFAIRS (Aug. 12, 1942), https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/intl-treaties/Bilateral-Consular-Conventions/mexican-treaty.html).

enforcement concerns of Mexican nationals located in Texas instead of promoting commercial, economic, cultural, and scientific relations between Mexico and the United States. The possibility that thousands of Mexican nationals authorized to study, work, and reside in Texas are now under threat of detention, removal, and criminalization—and the related separation from their families—upon any interaction with a Texas law enforcement official has engendered unprecedented levels of anxiety in the Mexican community.

## II. <u>Enforcement of SB 4 Would Frustrate Diplomatic Relations Between Mexico and the United States.</u>

### A. SB 4 Prevents the United States from Speaking with One Uniform Voice on Immigration Matters.

The U.S. Supreme Court has long recognized that state encroachment into immigration enforcement could be injurious to U.S. foreign policy. Beginning with *Chy Lung v. Freeman*, 92 U.S. 275 (1875), the U.S. Supreme Court expressed concern that a California immigration law could "embroil us in disastrous quarrels with other nations." *Id.* at 280. In response to this possibility, the Court held the law unconstitutional and reasoned that the founders would never have "done so foolish a thing as to leave [immigration] in the power of the States to pass laws whose enforcement renders the general government liable to just reclamations which it must answer, while it does not prohibit to the States the acts for which it is held responsible?" *Id.* The Court recognized that any diplomatic tensions created by one

state's immigration laws could accrue to the detriment of the entire United States, and thus emphasized the importance of speaking with one voice on immigration law.

More recently, the U.S. Supreme Court reiterated the importance of the United States speaking with one voice on immigration in *Arizona v. U.S.*, 567 U.S. 387 (2012), which invalidated many provisions of an Arizona immigration law[5] like SB 4.  *Id.* at 416.  The U.S. Supreme Court provided the most definitive statement yet on this principle, declaring that "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States."  *Id*. at 395.  The Supreme Court added that "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws," *id.* (citing Brief for United Mexican States as Amici Curiae), and held that "[t]he dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397.

The law is beyond clear that foreign nations must be able to confer with "one national sovereign, not the 50 separate States," regarding the safety and security of their nationals. *Ariz.*, 567 U.S. at 395.  SB 4 wholly eviscerates this one-voice

---

[5] H.R. 2162, 49th Leg., 2d Reg. Sess., Ch. 113 (Ariz. 2010), as amended.

principle by requiring Mexico to engage with not only the U.S. government, but also several levels of state and local law enforcement in Texas to address individual apprehensions, detentions, and removals pursuant to SB 4. If SB 4 is upheld, additional states may pass similar laws, further increasing the number of state and local law enforcement officials Mexico will have to engage with to address the needs of its citizens.[6] In addition to significantly complicating Mexico's ability to address individual apprehensions, detentions, and removals, SB 4's violation of the one-voice principle will require Mexico to deploy significant resources to protect its nationals in Texas to ensure that they are not wrongfully detained or deported.

SB 4 would further undermine the one-voice principle by adversely impacting diplomatic relations between Mexico and the U.S. should Texas state or local law enforcement officials violate either state or federal law while executing SB 4. When Mexico engages its U.S. counterparts about improper conduct by Texas officials, the federal government will be unable to resolve the incident or prevent similar incidents from occurring in the future. If an officer in Texas detains or removes a Mexican national with an uncommon immigration status and creates an international incident,

---

[6] In fact, Iowa lawmakers passed a similar bill on March 19, 2024, making return to Iowa following deportation a state crime and, depending on the circumstances, allowing or requiring state court judges to issue removal orders. *See* S.F. 2340, 90th General Assembly (Iowa 2024).

the federal government will be powerless to take action to allay Mexico's legitimate concerns.

###### B.  SB 4's Removal Provisions Ignore Mexico's Right to Determine its Own Policies Regarding Entry into its Territory.

SB 4 allows Texas state court judges to request or order removal of noncitizens to Mexico under certain circumstances.  *See* TEX. CODE OF CRIM. PROC. art. 5B.002.  Enforcement of these provisions would exacerbate diplomatic relation concerns by removing noncitizens to Mexico, regardless of their nationality and without regard for Mexico's own policies regarding entry into its territory or the noncitizens' desire to enter Mexico.

More specifically, SB 4 provides that a magistrate or state court judge may "discharge" a person charged with illegal entry into the United States "and require the person to return to the foreign nation from which the person entered or attempted to enter"—which will almost always be Mexico[7]—if the person agrees to the order and has not been previously charged with or convicted of specific crimes.  *Id.* art. 5B.002(a)-(c).  For any noncitizen convicted under SB 4, SB 4 requires the state court judge to enter an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter"—which again will almost

---

[7] As the District Court noted, "Texas's response to the preliminary injunction effectively states that all removals under SB 4 will be to Mexico."  Prelim. Inj. Order at 9 n.3 (Feb. 29, 2024) (Dkt. No. 42) (citing Escalon Decl. at 2-4 (Dkt. No. 25)).

always be Mexico—after serving their prison sentence. *Id.* art. 5B.002(d). Failure to comply with the state removal order is an additional second-degree felony, which is punishable for a term of "not more than 20 years or less than 2 years." TEX. PENAL CODE §§ 51.04, 12.33.

These provisions apply equally to Mexican nationals and nationals of any other county who enter the United States from Mexico, regardless of whether they are Mexican citizens or have the legal right or desire to enter Mexico. Mexico has publicly expressed its opposition to SB 4, expressly noting that that enforcement of SB 4 would interfere with Mexico's sovereign right to determine who enters its territory.[8] It is also likely to cause confusion and chaos at the border as people seek to enter Mexico to avoid criminal penalties under SB 4.

### C. SB 4 Would Derail Collaborative Efforts Toward a Uniform Legal Migration Framework and Border Management.

With over 11.7 million Mexican nationals[9] and 37.2 million persons of Mexican origin[10] living in the U.S., Mexico has a significant interest in ensuring the

---

[8] *See* Secretaría de Relaciones Exteriores, *Mexican Government opposes the anti-immigrant legislation passed in Texas*, GOBIERNO DE MÉXICO PRESS RELEASE 476 (Nov. 15, 2023) https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-immigrant-legislation-passed-in-texas.

[9] Seminar, *Statistical Information of the Mexican Population Abroad*, NATIONAL SYSTEM OF STATISTICAL AND GEOGRAPHICAL INFORMATION (April-May 2023), https://en.www.inegi.org.mx/eventos/2023/innametra/.

[10] Mohamad Moslimani, Luis Noe-Bustamante & Sono Shah, *Facts on Hispanics of Mexican Origin in the United States*, PEW RESEARCH CENTER (2021), https://www.pewresearch.org/hispanic/fact-sheet/us-hispanics-facts-on-mexican-origin-

secure, orderly, and legal movement of its citizens in and through the U.S. Safe and orderly migration conditions can only be achieved through comprehensive, nationwide U.S. immigration policy. Immigration is regularly a principal discussion topic at bilateral meetings of the U.S. and Mexican governments. The effects of Mexico-U.S. migration on labor markets, tourism, business travel, and education are of great importance to both countries. Indeed, Mexican citizens comprised the highest percentage (30.4%) of the almost 45 million non-immigrant admissions (including tourists, business travelers, specialty workers, and students) into the U.S. in 2022.[11]

Similarly, effective bilateral collaboration is particularly crucial to the communities on the Mexico-U.S. border. Accordingly, on May 19, 2010, Mexico and the United States entered a declaration concerning twenty-first century border management to strengthen collaboration regarding economic trade, tourism, and against criminal organizations. That declaration expressly recognized "the importance of securing and facilitating the lawful flow of goods, services, and people between their countries," "that joint and collaborative administration of their common border is critical to transforming management of the border to enhance

---

latinos/#:~:text=An%20estimated%2037.2%20million%20Hispanics,Census%20Bureau's%20A
merican%20Community%20Survey.

[11] Alicia Ward, *U.S. Nonimmigrant Admissions: 2022*, U.S. DEPARTMENT OF HOMELAND SECURITY OFFICE OF HOMELAND SECURITY STATISTICS 1, 4 (Nov. 2023), https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_nonimmigrant_fy2022.pdf.

security and efficiency," and "that law enforcement coordination between the Participants is essential to preventing crime and to disrupting and dismantling transnational criminal organizations."[12]

Collaboration is essential to ensure that immigration reform does not have an adverse impact on the economies of the border regions.  The widespread benefits of international collaboration to the border regions are another reason why Mexico and the United States recognize the importance of addressing bilateral issues, including immigration policy, through comprehensive diplomatic negotiations that prioritize a wide array of concerns.  Contrary to this inclusive approach, SB 4 institutes a state immigration enforcement system that impedes crucial border management collaboration at the national level.  Mexico and the United States cannot cooperatively manage border issues when states interfere with bilateral goals.

### D.    SB 4 Would Hinder Mexico-U.S. Trade.

Mexico is also greatly concerned with the repercussions of SB 4 on trade and commercial relations between Mexico and the United States generally, as well as between Mexico and Texas specifically. U.S. trade with Mexico surpassed $779 billion in 2022, up 18% compared to 2021, setting a new historical level and making

---

[12] Office of the Press Secretary, *Declaration by The Government Of The United States Of America and The Government Of The United Mexican States Concerning Twenty-First Century Border Management*, THE WHITE HOUSE (May 19, 2010), https://obamawhitehouse.archives.gov/the-press-office/declaration-government-united-states-america-and-government-united-mexican-states-c.

Mexico the United States's second-most important economic partner. Mexico is Texas's largest export market, with 2022 exports from Texas to Mexico at $144.2 billion. In addition, over 200,000 U.S. jobs in Texas rely on bilateral trade with Mexico.[13] The interaction of labor markets, tourism, business travel, and student migration are of great importance to both countries.

Strained diplomatic relations substantially impede the ability of Mexico and the United States to jointly develop, enhance, and maintain commercial exchange critical to the border and both economies. Those bilateral efforts are meaningless when the population and business communities on both sides of the border are discouraged from engaging in trade and economic exchange. If SB 4 is ever fully implemented, Mexican citizens, regardless of their immigration status and country of residence, will be rightly afraid to visit Texas, engage in commercial trucking through Texas, or travel on rail through Texas, for work or pleasure, out of concern that they will be subject to unlawful police scrutiny and detention.

Economic trade between Mexico and the United States will be further compromised if international businesspersons and entities feel threatened when conducting business within and through Texas. The United States and Mexico will

---

[13] *See* Secretaría de Relaciones Exteriores de México, *Doing Business with Mexico: Trade With Mexico Supports U.S. Jobs*, MEXICAN EMBASSY IN THE U.S., https://embamex.sre.gob.mx/eua/index.php/en/2016-05-11-14-29-59/economic-affairs-menu (last visited March 20, 2024).

be unable to effectively work together to develop a mutually beneficial commercial relationship if their joint trade resolutions are effectively nullified by the actions of individual states.

## **<u>CONCLUSION</u>**

Mexico respectfully submits that the likely damage outlined above that enforcement of SB 4 would cause to Mexican nationals living in Texas and U.S.-Mexico diplomatic relations significantly outweighs any harm that Texas might suffer if the preliminary injunction is affirmed.  Affirming the District Court would simply preserve the status quo that has been in place for decades, with local jurisdictions retaining authority to govern their affairs and the federal government maintaining the responsibility to enforce federal immigration law.  Accordingly, the Government of Mexico respectfully asks this Court to affirm the order of the District Court and maintain the preliminary injunction entered on February 29, 2024 blocking the enforcement of SB 4 pending further proceedings.

Respectfully submitted,

*s/Sinéad O'Carroll*

Sinéad O'Carroll
State Bar No. 24013253
Manasi Rodgers
State Bar No. 24090361
Kayla Kelly (Carrick)
State Bar No. 24087264
REEVES & BRIGHTWELL LLP
3103 Bee Caves Rd, Ste 240
Austin, Texas 78746-5581
(512) 334-4500
(512) 334-4492 (Facsimile)
socarroll@reevesbrightwell.com
mrodgers@reevesbrightwell.com
kkelly@reevesbrightwell.com

COUNSEL FOR AMICUS CURIAE
THE GOVERNMENT OF UNITED
MEXICAN STATES

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)</u>

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief Amicus Curiae of The Government of the United Mexican States in support of Plaintiff-Appellees complies with the type-volume limitation of FED. R. APP. P. 29(a)(5) because this brief contains 3,626 words, excluding the parts of the brief exempted by FED. R. APP. R. 32(f).

2.     This brief complies with the typeface requirements for FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*s/ Sinéad O'Carroll*
Sinéad O'Carroll

## **CERTIFICATE OF SERVICE**

I certify that, on March 21, 2024, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF document filing system and to all counsel of record.

*s/ Sinéad O'Carroll*
Sinéad O'Carroll