No. 24-50149

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STATE OF TEXAS; GREG ABBOTT, *in his official capacity as Governor of Texas*; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, *in his official capacity as Director of Texas Department of Public Safety*,

Defendants-Appellants.

---

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

Plaintiffs-Appellees,

v.

STEVEN C. MCCRAW, *in his official capacity as Director of the State of Texas Department of Public Safety*; BILL D. HICKS, *in his official capacity as District Attorney for the 34th District*,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the Western District of Texas

---

## BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES OF AMERICA

---

BRIAN M. BOYNTON
*Principal Deputy Assistant
Attorney General*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

JAIME ESPARZA
*United States Attorney*

DANIEL TENNY
LEIF OVERVOLD
MAXWELL A. BALDI
*Attorneys, Appellate Staff
Civil Division, Room 7513
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-0211*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as plaintiff-appellee is a governmental party.  5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled oral argument on April 3, 2024.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... v

INTRODUCTION ............................................................................... 1

STATEMENT OF JURISDICTION ..................................................... 2

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE ............................................................. 3

    A.    Statutory Background ............................................................. 3

    B.    Factual Background ................................................................ 6

    C.    Prior Proceedings ................................................................. 8

SUMMARY OF ARGUMENT ........................................................... 13

STANDARD OF REVIEW ................................................................ 16

ARGUMENT .................................................................................... 16

I.    The United States Is Likely To Succeed On The Merits ................... 16

    A.    Texas's effort to regulate the entry and removal of noncitizens is barred by field preemption .......................................................... 17

    B.    SB 4 impermissibly conflicts with federal law and is an obstacle to the operation of federal immigration law and the conduct of foreign policy ........................................................................... 22

    C.    SB 4 violates the Foreign Commerce Clause ............................ 30

    D.    Texas's defenses to the United States' claims are meritless ........ 33

        1.    Texas cannot evade preemption principles by asserting that SB 4 is a response to an alleged "invasion." ........................ 33

2.    The United States may sue in equity to enjoin federally preempted state laws....................................................................42

3.    All applications of SB 4 are invalid...................................46

II.   The District Court Did Not Abuse Its Discretion In Concluding That The Balance Of Harms And The Public Interest Warrant A Preliminary Injunction...........................................................................................47

CONCLUSION ...............................................................................................50

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                               **Page(s)**

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) ........................................................................... 44

*American Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) ........................................................................... 47

*American Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902) ........................................................................ 42–43

*Arizona v. United States,*
  567 U.S. 387 (2012) .................................................................... *passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) ........................................................................... 43

*Attorney-General v. Corporation of Poole,*
  (1838) 41 Eng. Rep. 7 (High. Ct. Ch.), *aff'd sub nom.*
  *Parr v. Attorney-General,* (1842) 8 Eng. Rep. 159 (H.L.) ........................ 43–44

*Biden v. Texas,*
  597 U.S. 785 (2022) ..................................................................... 28, 48

*Buckman Co. v. Plaintiffs' Legal Comm.,*
  531 U.S. 341 (2001) ..................................................................... 21, 24

*California v. United States,*
  104 F.3d 1086 (9th Cir. 1997) ............................................................. 36

*California v. Zook,*
  336 U.S. 725 (1949) ........................................................................... 21

*Chiles v. United States,*
  69 F.3d 1094 (11th Cir. 1995) ............................................................. 36

*Chy Lung v. Freeman,*
  92 U.S. 275 (1875) ........................................................................... 31

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) ..................................................................... 23, 48

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
  76 F.4th 425 (5th Cir. 2023) ............................................................... 50

*Debs, In re,*
    158 U.S. 564 (1895) ................................................................. 44

*DeCanas v. Bica,*
    424 U.S. 351 (1976) ............................................................. 3, 19

*Fox v. Ohio,*
    46 U.S. (5 How.) 410 (1847) ..................................................21

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................. 43

*Georgia Latino All. for Human Rights v. Georgia,*
    691 F.3d 1250 (11th Cir. 2012) ............................................. 19

*Gilbert v. Minnesota,*
    254 U.S. 325 (1920) ..................................................................21

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ................................................................. 42

*Hernández v. Mesa,*
    140 S. Ct. 735 (2020) ............................................................. 44

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ................................................................. 19

*Hughes v. Trustees of Morden Coll.,*
    (1748) 27 Eng. Rep. 973 (High Ct. Ch.) ............................. 43

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ............................................................. 30

*Japan Line, Ltd. v. County of Los Angeles,*
    441 U.S. 434 (1979) ......................................................... 30, 32

*Kansas v. Garcia,*
    140 S. Ct. 791 (2020) ......................................................... 25

*Loney, In re,*
    134 U.S. 372 (1890) ..................................................................21

*Medellín v. Texas,*
    552 U.S. 491 (2008) ............................................................. 32

*Moyer v. Peabody*,
   212 U.S. 78 (1909) ................................................................ 35, 37

*New Jersey v. United States*,
   91 F.3d 463 (3d Cir. 1996) ........................................................ 36

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
   491 U.S. 350 (1989) .................................................................. 47

*Osborn v. Bank of the U.S.*,
   22 U.S. 738 (1824) ................................................................... 46

*Padavan v. United States*,
   82 F.3d 23 (2d Cir. 1996) ..................................................... 36, 38

*Patel v. Garland*,
   596 U.S. 328 (2022) .................................................................. 18

*Perpich v. Department of Def.*,
   496 U.S. 334 (1990) .................................................................. 33

*Piazza's Seafood World, LLC v. Odom*,
   448 F.3d 744 (5th Cir. 2006) ................................................ 31, 32

*Plyler v. Doe*,
   457 U.S. 202 (1982) .................................................................. 25

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) .................................................................. 47

*Sanitary Dist. v. United States*,
   266 U.S. 405 (1925) .................................................................. 45

*Sterling v. Constantin*,
   287 U.S. 378 (1932) .................................................................. 37

*Takahashi v. Fish & Game Comm'n*,
   334 U.S. 410 (1948) .................................................................. 18

*Terrett v. Taylor*,
   13 U.S. (9 Cranch) 43 (1815) .................................................... 43

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ...................................................... 18

*Torres v. Texas Dep't of Pub. Safety*,
  597 U.S. 580 (2022) ................................................................ 33, 36

*Truax v. Raich*,
  239 U.S. 33 (1915) .................................................................. 18, 43

*Turnage v. Britton*,
  29 F.4th 232 (5th Cir. 2022) ........................................................ 46

*United States v. American Bell Tel. Co.*,
  128 U.S. 315 (1888) ..................................................................... 44

*United States v. City of Jackson*,
  318 F.2d 1 (5th Cir. 1963) ............................................................ 45

*United States v. Guest*,
  383 U.S. 745 (1966) ..................................................................... 31

*United States v. San Jacinto Tin Co.*,
  125 U.S. 273 (1888) ..................................................................... 44

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) ........................................................ 19

*United States v. Texas*,
  143 U.S. 621 (1892) ..................................................................... 44

*Valentine v. Collier*,
  956 F.3d 797 (5th Cir. 2020) ........................................................ 49

*Valle del Sol, Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ...................................................... 19

*Villas at Parkside Partners v. City of Farmers Branch*,
  726 F.3d 524 (5th Cir. 2013) ............................... 10, 24, 25, 27

*Virginia Office for Prot. & Advocacy v. Stewart*,
  563 U.S. 247 (2011) ..................................................................... 46

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*,
  80 F.4th 536 (5th Cir. 2023) ........................................................ 16

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ....................................................................... 46

*Winter v. Natural Res. Def. Council*,
  555 U.S. 7 (2008) ........................................................... 16

*Wisconsin Dep't of Indus. v. Gould Inc.*,
  475 U.S. 282 (1986) ........................................................21

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967) ........................................................ 45

*Young, Ex parte*,
  209 U.S. 123 (1908) ........................................................ 45

**U.S. Constitution:**

Art. I, § 8, cl. 3 ................................................................. 30

Art. I, § 8, cl. 15 ............................................................... 38

Art. I, § 9, cl. 2 ................................................................. 38

Art. I, § 10, cl. 2 .............................................................. 42

Art. I, § 10, cl. 3 .......................................... 10, 14, 34, 35, 38, 39

Art. IV, § 4 ...................................................................... 33

**Statutes:**

6 U.S.C. § 202 .................................................................. 3

6 U.S.C. § 251 .................................................................. 5

8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) .............................. 20

8 U.S.C. § 1101(a)(15)(U)(iii) ....................................... 20

8 U.S.C. § 1103(a)(1) ....................................................... 3

8 U.S.C. § 1103(a)(10) .................................................. 25

8 U.S.C. § 1103(g) ........................................................... 3

8 U.S.C. § 1158(a) ......................................................... 22

8 U.S.C. § 1158(a)(1) ................................................................ 30

8 U.S.C. § 1158(a)(2)(A) ............................................................. 4

8 U.S.C. § 1158(a)-(b) ............................................................... 4

8 U.S.C. §§ 1181–82 ................................................................. 3

8 U.S.C. §§ 1181–88 ............................................................... 18

8 U.S.C. § 1182 ..................................................................... 18

8 U.S.C. § 1182(a) ................................................................... 4

8 U.S.C. § 1188 ...................................................................... 3

8 U.S.C. §§ 1201–04 ............................................................... 18

8 U.S.C. §§ 1223–25 ................................................................. 3

8 U.S.C. § 1225 ................................................................. 4, 18

8 U.S.C. §§ 1225–29a ............................................................. 18

8 U.S.C. § 1225(b)(1) .............................................................. 26

8 U.S.C. § 1227 ...................................................................... 4

8 U.S.C. § 1229 ...................................................................... 4

8 U.S.C. § 1229a ..................................................................... 4

8 U.S.C. § 1229a(a)(3) ...................................................... 4, 18, 26

8 U.S.C. § 1231(b) ............................................................. 4, 23

8 U.S.C. § 1231(b)(1)(B) ............................................................ 4

8 U.S.C. § 1231(b)(2) ............................................................... 4

8 U.S.C. § 1231(b)(2)(A) ........................................................... 27

8 U.S.C. § 1231(b)(2)(B) ....................................................... 4, 27

8 U.S.C. § 1231(b)(2)(C) ........................................................... 27

8 U.S.C. § 1231(b)(2)(D)-(E) ............................................................ 27

8 U.S.C. § 1231(b)(3) .................................................................. 4, 22

8 U.S.C. § 1231 note ...................................................................... 48

8 U.S.C. § 1232 ............................................................................... 4

8 U.S.C. § 1252c .............................................................................. 5

8 U.S.C. § 1252c(a) ......................................................................... 5

8 U.S.C. § 1324(c) ........................................................................... 5

8 U.S.C. §§ 1325–26 ....................................................................... 3

8 U.S.C. § 1325(a) ........................................................................... 6

8 U.S.C. § 1325(a)–(b) ................................................................... 18

8 U.S.C. § 1326 ......................................................................... 18, 27

8 U.S.C. § 1326(a) ........................................................................... 6

8 U.S.C. § 1357(g) ....................................................... 5, 10, 20, 25, 50

8 U.S.C. § 1357(g)(1)-(9) ................................................................ 5

8 U.S.C. § 1357(g)(3) ...................................................................... 5

8 U.S.C. § 1357(g)(10) .................................................................... 6

18 U.S.C. § 758 .............................................................................. 20

22 U.S.C. § 7105(b)(1)(E)(iv) ........................................................ 20

28 U.S.C. § 1292(a)(1) ..................................................................... 2

28 U.S.C. § 1331 ........................................................................ 2, 42

28 U.S.C. § 1345 ............................................................................. 2

28 U.S.C. § 1651 ............................................................................ 42

Tex. Code Crim. Proc. art. 5B.002(a)–(c) ........................................ 7

Tex. Code Crim. Proc. art. 5B.002(d) ............................................... 7, 27, 28, 29

Tex. Code Crim. Proc. art. 5B.002(e) ...................................................... 7, 29

Tex. Code Crim. Proc. art. 5B.003 ................................................ 8, 26, 29, 49

Tex. Penal Code § 12.21 ............................................................................ 7

Tex. Penal Code § 12.22 ............................................................................ 6

Tex. Penal Code § 12.33 ............................................................................ 7

Tex. Penal Code § 12.35 ............................................................................ 6

Tex. Penal Code § 51.02(a) ...................................................................... 6

Tex. Penal Code § 51.02(b) ...................................................................... 6

Tex. Penal Code § 51.02(c) ...................................................................... 6

Tex. Penal Code § 51.03 ............................................................................ 7

Tex. Penal Code § 51.03(b) ...................................................................... 7

Tex. Penal Code § 51.04 ...................................................................... 7, 29

**Regulations:**

8 C.F.R. §§ 208.16(c)-208.18 ................................................................ 4

8 C.F.R. § 241.15 .................................................................................... 4

8 C.F.R. § 1208.16(c) ............................................................................ 22

8 C.F.R. § 1208.16–1208.18 .................................................................. 48

8 C.F.R. §§ 1208.16(c)-1208.18 ............................................................ 4

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ...................................................................... 2

**Legislative Materials:**

H.R. Rep. No. 44-343, at III–IV (1876)................................................................41

Texas Senate Bill 4, 88th Leg., 4th Sess. (Tex. 2024) ........................................ 6

**Other Authorities:**

*Samuel L. Bray & Paul B. Miller, Getting into Equity,*
  97 Notre Dame L. Rev. 1763 (2022) ........................................................ 43

James Madison, The Report of 1800 (Jan. 7, 1800),
  https://perma.cc/3XV9-2MEE ..................................................................34

Press Release, Secretaría de Relaciones Exteriores (Mar. 19, 2024),
  https://perma.cc/LJ8T-N3QL............................................................ 13, 48

Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023),
  https://perma.cc/RP7H-JXZR......................................................................48

3 *The Debates in the Several State Conventions on the Adoption of the*
  *Federal Constitution* (Jonathan Elliot ed., 2d ed. 1836),
  https://perma.cc/R7ZPNRSD ....................................................................39

The Federalist No. 3 (John Jay) (Clinton Rossiter ed. 2003) ...........................33

# INTRODUCTION

In *Arizona v. United States*, 567 U.S. 387 (2012), the Supreme Court held that federal law preempted an Arizona law that would have allowed the State to punish a noncitizen's failure to comply with federal registration requirements.  By creating state-law offenses for unlawful entry and by authorizing state courts to order noncitizens to leave the United States, Texas Senate Bill 4 (SB 4), impinges on matters even more central to the federal government's power to regulate immigration.  Texas provides no basis for this Court to conclude that SB 4 is valid even though the registration provisions in *Arizona* were invalid.

The defenses that Texas offers do nothing to save SB 4.  Texas invokes an exception to a provision of the Constitution that strips from States the right to use military force to assert the power to ignore federal law based on Texas's unilateral declaration that it is under invasion.  The Framers did not conceal a broad license to override federal law in a narrow exception to a clause divesting power from the States.  Nor can Texas escape judicial review by contending that the federal government lacks a right of action.  Courts have long recognized equitable actions for prohibitory injunctions to halt a governmental actor from directly harming a plaintiff in violation of the Constitution.  Even more than most litigants, the United States may invoke that equitable right of action to defend its sovereign interests.

If SB 4 goes into effect, the United States will suffer irreparable harm.  If Texas begins to prosecute noncitizens for unlawful entry and to remove noncitizens—

whether nationals of Mexico or another country—into Mexico, it will undermine ongoing diplomatic efforts to address immigration at the southern border. Dealing with SB 4 will take on an outsized role in U.S.–Mexico relations to the detriment of other U.S. foreign policy priorities, including addressing irregular migration. SB 4 also contains no provisions to ensure that the United States remains in compliance with its treaty obligations. And Texas's enforcement of SB 4 would impede the federal government from processing and vetting those who cross the border in violation of federal law.

This Court should affirm the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1345 over the United States' constitutional challenge. The district court issued an order preliminarily enjoining SB 4 on February 29, 2024, and defendants-appellants timely appealed from that order on March 1, 2024. ROA.592; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court abused its discretion in preliminarily enjoining a Texas law that would impose state criminal penalties on noncitizens who unlawfully enter or attempt to enter Texas from Mexico and would allow Texas courts to order the removal of those noncitizens to Mexico.

# STATEMENT OF THE CASE

## A.   Statutory Background

"The federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012); *see also, e.g., DeCanas v. Bica*, 424 U.S. 351, 354 (1976) (recognizing that the "[p]ower to regulate immigration is unquestionably exclusively a federal power"). Pursuant to this "broad, undoubted power over the subject of immigration and the status of [noncitizens]," *Arizona*, 567 U.S. at 395, Congress has enacted the Immigration and Nationality Act (INA) as "the comprehensive federal statutory scheme for [the] regulation of immigration," *DeCanas*, 424 U.S. at 353, to be administered and enforced by the Secretary of Homeland Security and the Attorney General, 6 U.S.C. § 202; 8 U.S.C. § 1103(a)(1), (g).

This comprehensive framework sets forth detailed rules governing the entry and removal of noncitizens. It identifies who may or may not be admitted, *see, e.g.,* 8 U.S.C. §§ 1181–82, 1188, indicates how noncitizens may enter the country lawfully, *see, e.g., id.* §§ 1223–25, and imposes criminal and civil penalties on those who unlawfully enter, *see id.* §§ 1325–26.

Federal law also comprehensively regulates the removal of noncitizens. Congress provided for removal proceedings to be conducted before an immigration judge, with the right to appeal to an Article III court. With specified exceptions for other federally initiated procedures, these proceedings are the "sole and exclusive

3

procedure for determining whether [a noncitizen] may be . . . removed from the United States." 8 U.S.C. § 1229a(a)(3). Federal law also establishes, among other things, the grounds on which a noncitizen may be ordered removed, *see, e.g.*, *id.* §§ 1182(a), 1227, and the requirements for commencing and administering proceedings and the procedural protections afforded to noncitizens, *see, e.g.*, *id.* §§ 1225, 1229, 1229a. And it establishes the grounds on which a noncitizen may apply for relief or protection from removal, including asylum, withholding of removal, and protections under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture). *See, e.g.*, *id.* §§ 1158(a)–(b), 1231(b)(3), 1232; 8 C.F.R. §§ 208.16(c)–208.18, 1208.16(c)–1208.18.

Federal law also establishes the process for selecting and coordinating with the country to which noncitizens may be removed. *See* 8 U.S.C. § 1231(b); 8 C.F.R. § 241.15; *see also* 8 U.S.C. § 1158(a)(2)(A). Federal law establishes an ordering of countries to which a noncitizen may be removed, 8 U.S.C. § 1231(b)(2), and imposes particular limits on removing noncitizens to a contiguous country of which they are not a "native, citizen, subject, or national," or prior resident, *id.* § 1231(b)(2)(B); *see also id.* § 1231(b)(1)(B).

Federal law also addresses how state and local officers may assist or cooperate with federal officials in their enforcement of federal immigration law. The INA expressly authorizes state and local law-enforcement officers to make arrests for

violations of a narrow subset of the INA's prohibitions, concerning smuggling, transporting, or harboring noncitizens. *See* 8 U.S.C. § 1324(c). And where state and local officers have received prior confirmation from federal immigration officials regarding a noncitizen's immigration status, they may also (if authorized by state law) arrest and detain a noncitizen who is illegally present in the United States if the noncitizen was previously convicted of a felony in the United States and then was removed from or left the United States. *Id.* § 1252c. That detention, however, may extend no longer than necessary for federal officers to take the noncitizen into custody for purposes of removal proceedings. *Id.* § 1252c(a).

Congress has also authorized the Department of Homeland Security (DHS) to enter into written cooperative agreements with States and localities. 8 U.S.C. § 1357(g). Under those agreements, appropriately trained and qualified state and local officers may perform specified functions of a federal immigration officer relating to the investigation, apprehension, or detention of noncitizens, *id.* § 1357(g)(1)–(9), "subject to the direction and supervision of the [Secretary]," *id.* § 1357(g)(3).[1] Even absent such an agreement, the INA provides that state and local officers may "communicate with the [Secretary] regarding the immigration status of any individual" or "otherwise . . . cooperate with the [Secretary] in the identification, apprehension,

---

[1] Section 1357 refers to the Attorney General, but those functions have been transferred to the Secretary. *See* 6 U.S.C. § 251.

detention, or removal of [noncitizens] not lawfully present in the United States." *Id.* § 1357(g)(10).

### B.     Factual Background

In the face of this comprehensive federal immigration framework, Texas enacted SB 4, 88th Leg., 4th Sess. (Tex. 2023), which was to take effect on March 5 (90 days after the close of the legislative session). The law would impose state criminal penalties on noncitizens who unlawfully enter or attempt to enter Texas from Mexico and would allow Texas courts to order the removal of noncitizens from this country to Mexico.

As relevant here, SB 4 does three things. First, SB 4 effectively makes it a state crime to violate 8 U.S.C. § 1325(a), the federal unlawful-entry provision, by barring noncitizens from "enter[ing] or attempt[ing] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a). The law creates certain affirmative defenses, including that the noncitizen has been granted asylum or "lawful presence" by the federal government. *Id.* § 51.02(c). Violations of Section 51.02 are Class B misdemeanors, punishable by fines up to $2,000 and 180 days of imprisonment. *Id.* § 12.22. If a noncitizen has previously been convicted under this section, a subsequent violation is a felony, punishable by fines up to $10,000 and 180 days to two years of imprisonment. *Id.* §§ 12.35, 51.02(b).

Second, SB 4 creates a state crime resembling 8 U.S.C. § 1326(a), the federal unlawful-reentry provision, by barring noncitizens from "enter[ing], attempt[ing] to

enter," or being "found in" Texas after the person "has been denied admission to" or "removed from the United States" or "has departed from the United States while an order of exclusion, deportation, or removal is outstanding." Tex. Penal Code § 51.03. This provision has no affirmative defenses. Violations are Class A misdemeanors, punishable by fines up to $4,000 and imprisonment for up to one year. *Id.* §§ 12.21, 51.03(b).

Third, SB 4 allows state judges to order the removal of noncitizens to Mexico under certain circumstances. In particular, when a noncitizen is charged with an offense under SB 4 but not yet convicted, a state judge may "discharge the person and require the person to return to the foreign nation from which the person entered or attempted to enter," if "the person agrees to the order" and has not "previously been" charged with or convicted of specified crimes. Tex. Code Crim. Proc. art. 5B.002(a)–(c). If a noncitizen is convicted under SB 4, the state judge "shall enter" an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter" after completion of the state prison sentence. *Id.* art. 5B.002(d). Texas law-enforcement personnel must monitor the noncitizen's compliance with the state removal order. *Id.* art. 5B.002(e). Failure to comply with a state removal order is a second-degree felony, Tex. Penal Code § 51.04, punishable by a fine of up to $10,000 and two to 20 years of imprisonment, *id.* § 12.33.

For all three offenses created by SB 4, the law provides that a "court may not abate the prosecution . . . on the basis that a federal determination regarding the

immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003. In other words, the fact that the federal government has paroled an asylum seeker into the United States during the pendency of immigration-court proceedings, consistent with the INA, would not be a defense to removal, nor would the fact that an individual detained by Texas authorities expressed an intention to request asylum.

### C.    Prior Proceedings

1. In separate lawsuits, the United States and a set of plaintiffs comprising the County of El Paso and two private groups brought suit challenging SB 4 in the Western District of Texas. ROA.18, 792. Plaintiffs in each case moved for preliminary injunctions, and the district court consolidated the cases. ROA.82, 906, 1614–15.

2. The district court granted a preliminary injunction in a thorough, 114-page opinion. ROA.478–591. The court first rejected various threshold arguments raised by defendants-appellants. ROA.487–506. It concluded that the nonfederal plaintiffs have standing to challenge SB 4 and rejected Texas's argument that certain defendants have sovereign immunity. ROA.487–501. And it held that the United States is entitled to bring a suit for equitable relief against Texas, recognizing that this Court and others have repeatedly allowed suits in equity to enforce the Supremacy Clause and concluding that Texas had identified nothing that displaced the availability of equitable relief in this circumstance. ROA.501–04.

Turning to the merits, the district court held that the plaintiffs are likely to succeed on the merits of their claims that SB 4 is field preempted, conflict preempted, and inconsistent with the Foreign Commerce Clause. ROA.506–41. With respect to field preemption, the court explained that "over a century of Supreme Court cases" recognize the federal government's dominant interest in regulating the entry and removal of noncitizens, ROA.507, and that Congress had occupied the field by enacting a comprehensive framework, ROA.510–13. It noted that the Supreme Court has squarely rejected state attempts to enact "the sort of 'concurrent' criminalization that Texas seeks to impose." ROA.513 (quoting *Arizona*, 567 U.S. at 400). The court also rejected Texas's argument that *Arizona*'s holding was limited to the field of noncitizen registration, reasoning that "SB 4's regulation of unauthorized entry and removability cuts against—not for—the constitutionality of the law." ROA.518. And the court dismissed Texas's efforts to characterize orders under SB 4 as something other than "removals," concluding that it was "absurd to argue, as Texas does, that [Texas Department of Public Safety] officers are not 'forcing' the noncitizen to cross" the border in enforcing an order under the state law. ROA.520.

With respect to conflict preemption, the district court held that SB 4 conflicts with federal law in numerous respects. It concluded that SB 4 "provides state officials the power to enforce federal law without federal supervision," ROA.531, and noted that interference with federal immigration authorities' discretion "touches on delicate considerations of foreign affairs," ROA.532. It further held that SB 4 conflicts with

federal law by "prevent[ing] noncitizens from asserting affirmative defenses to removal that would have been available in the federal system," ROA.532 (citation omitted), and does not adhere to federal law governing the country to which a noncitizen may be removed, ROA.535–36. It noted that Mexico's objection to the law made clear that SB 4 would harm the United States' foreign relations. ROA.536. The court further noted that the law required state judges to make determinations regarding whether individuals were "lawfully present," notwithstanding this Court's holding that state judges may not do so absent federal supervision. ROA.537 (citing *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 535–36 (5th Cir. 2013) (en banc) (plurality opinion)). And it held that SB 4 conflicted with the manner in which 8 U.S.C. § 1357(g) contemplates state participation in immigration enforcement, noting that Texas did not try to rebut this point. ROA.538.

The court held that SB 4 violates the Foreign Commerce Clause as well. *See* ROA.539–42. It held that SB 4 facially discriminates against foreign commerce by criminalizing the movement of noncitizens only across an international boundary, and that the law undermines the federal government's ability to "speak with one voice in regulating commercial affairs with foreign states." ROA.541 (citation omitted).

The district court regarded Texas's argument based on the State War Clause— which provides that States may not "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay," U.S. Const. art. I, § 10, cl. 3—as insubstantial. ROA.543. But the court nonetheless extensively refuted it. ROA.542–

75. The court reasoned that the exception on which Texas relies is naturally read to provide a time-constrained ability to respond in the face of "imminent military emergency," not to provide States with the "unilateral power to disrupt" the Framers' conferral on Congress of the exclusive power to wage war and control immigration "whenever they disagreed with federal immigration policy." ROA.551. Citing Founding-era dictionaries and every court of appeals to address the issue, the court concluded that "unauthorized immigration does not constitute an 'invasion' within the meaning of the U.S. Constitution." ROA.542–43, 545–50, 555–63. The court also noted that the other consequences specified by the Constitution in the event of an invasion, including that Congress could suspend the writ of habeas corpus, further made clear that the term did not encompass unlawful immigration. ROA.552–55.

The court additionally concluded that SB 4's criminal penalties and removal provisions did not represent "operations of war" but rather "standard operations of criminal enforcement by state civil authorities," ROA.564. And the court concluded that, even if SB 4 could be considered an exercise of war powers, "it would be preempted by the federal government's wartime powers." ROA.567. Finally, the court rejected Texas's contention that its "invasion" claim must be accepted at face value to avoid resolving a nonjusticiable political question, noting that a contrary approach "would give any state the right to ignore the Supremacy Clause so long as it could imagine a nonfrivolous claim of invasion." ROA.574–75.

The district court held that the United States would suffer irreparable harm—both in carrying out foreign relations and in enforcing federal immigration law—from the enforcement of SB 4.  ROA.576–81.  It found that the unilateral state policymaking reflected in SB 4 could derail diplomatic discussions with Mexico designed to address irregular migration, ROA.577–79, that the law would frustrate the federal government's efforts and obligations to protect individuals fleeing from persecution and torture, ROA.579–80, and that the state law would hamper DHS's ability to detect time-sensitive threats and pursue expedited removals, among many other harms, ROA.580–81.  Finally, the district court concluded that the balance of equities favored an injunction.  ROA.584–85.  And because Texas identified no provision of SB 4 that could constitutionally be applied, the district court enjoined defendants from enforcing the law in its entirety.  ROA.585–87.  The court denied a stay pending appeal.  ROA.587–81.

3.  Texas sought a stay pending appeal from this Court.  A motions panel issued an administrative stay, but due to temporary stays of that stay by this Court and the Supreme Court, SB 4 was in effect for only a matter of hours before the merits panel dissolved the administrative stay.  But in the short period when the law was in effect, the Government of Mexico publicly "condemn[ed]" SB 4's taking effect and "categorically reject[ed] any measure that allows state or local authorities to exercise immigration control, and to arrest and return nationals or foreigners to Mexican

territory." Press Release, Secretaría de Relaciones Exteriores (Mar. 19, 2024), https://perma.cc/LJ8T-N3QL.

## SUMMARY OF ARGUMENT

**I.** The United States is likely to succeed on the merits of its claim. SB 4 is preempted by federal law and violates the Foreign Commerce Clause, and Texas's defenses are meritless.

**A.** As the Supreme Court has long recognized, Congress has wholly occupied the field of regulating the entry and removal of noncitizens. Congress's comprehensive and highly reticulated scheme leaves no room for state regulation—even if the State attempts to complement federal law. The federal government must exercise exclusive prosecutorial discretion in this field to preserve a single national immigration policy. SB 4 impermissibly intrudes into an exclusively federal field and is thus preempted.

**B.** SB 4 also conflicts with federal law in multiple respects. In addition to interfering with the federal government's ability to carry out foreign affairs, the law would fundamentally disrupt the federal immigration regime by allowing a single State to make unilateral determinations regarding unlawful entry and removal, far in excess of the carefully limited circumstances in which Congress has authorized state officials to perform or assist in the functions of federal immigration officers. SB 4's specifics only confirm its incompatibility with the federal scheme. They include that SB 4 expressly declines to take account of federal removal proceedings that could result in

a grant of asylum or other relief or protection and requires state judges to order

noncitizens removed to Mexico, without Mexico's consent and in disregard of the

congressionally mandated process for selecting the country of removal.

**C.**  For similar reasons, SB 4 violates the Foreign Commerce Clause.  As with

interstate commerce, Congress's power to regulate foreign commerce encompasses

the movement of persons across territorial borders.  And it bars state laws that

prevent the federal government from speaking with one voice in matters involving

foreign affairs, as SB 4 plainly does.

**D.**  Texas's defenses to the United States' claims are meritless.

**1.**  In response to SB 4's obvious legal infirmities, Texas takes the extraordinary

position that at least some applications of SB 4 are valid under the Constitution's State

War Clause, which generally provides that States may not "engage in War, unless

actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const.

art. I, § 10, cl. 3.  But enforcement of SB 4 is unconstitutional because it is preempted

under the Supremacy Clause and inconsistent with the Foreign Commerce Clause, not

because it constitutes prohibited war-making.  Nothing in the State War Clause offers

States a broad exemption to other constitutional provisions, much less entitles States

to interfere with the comprehensive framework that Congress has enacted to address

what Texas characterizes as an "invasion."

In any event, Texas has no plausible claim that any asserted "invasion" should

be recognized.  The State War Clause does not provide a justiciable defense against

the United States.  And as the district court thoroughly demonstrated, the Clause's text and context preclude treating irregular migration or criminal cartels' smuggling activities as an "invasion" justifying Texas's engaging in "War."

**2.**  Texas cannot square its argument that the United States lacks a right of action with the long tradition of equitable suits for prohibitory injunctions to prevent governmental officials from directly injuring a plaintiff in violation of the Constitution, including the materially identical suit in *Arizona*.  That equitable right of action exists unless Congress has displaced it, and Texas makes no argument that Congress has precluded the United States from suing in equity to vindicate its sovereign interests.  And in any event, the United States may maintain this action under *Ex parte Young*.

**II.**  The balance of equities and the public interest supports the preliminary injunction.  The United States inherently suffers harm when a State enforces a preempted law.  Beyond that inherent harm, enforcement of SB 4 would interfere with the federal government's efforts to find diplomatic solutions to irregular migration across the southern border, as evidenced by Mexico's vehement objection to the State's enactment.  Enforcement would risk retaliation against American nationals abroad, likely cause the United States to violate its treaty obligations, and hamper the federal government's efforts to process noncitizens who have unlawfully entered the United States.  In contrast, Texas's claimed harms to its effort to regulate in areas in which the federal government has exclusive authority are not cognizable.

And because SB 4 will interfere with federal immigration enforcement and with the federal government's relationship with Mexico, vacating the district court's injunction could worsen irregular migration, rather than improving it. The district court did not abuse its discretion in entering the preliminary injunction.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion a district court's grant of a preliminary injunction. *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536, 543 (5th Cir. 2023). It reviews findings of fact for clear error and conclusions of law de novo. *Id.*

## ARGUMENT

The district court correctly concluded that the government is likely to succeed on the merits, would suffer irreparable harm absent a preliminary injunction, and had established that the balance of the equities and the public interest favor an injunction. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

## I.   The United States Is Likely To Succeed On The Merits.

As relevant here, state law is preempted either when Congress occupies a field leaving no room for state regulation or when state law conflicts with federal law, expressly or implicitly. *See Arizona v. United States*, 567 U.S. 387, 399 (2012). Both field and conflict preemption preclude Texas from enforcing SB 4. For similar reasons, SB 4 violates the dormant Foreign Commerce Clause. And Texas cannot

16

avoid these conclusions by asserting that SB 4 is a response to a supposed "invasion" or that the United States cannot sue to enjoin a preempted law.

**A.     Texas's effort to regulate the entry and removal of noncitizens is barred by field preemption.**

**1.** "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 567 U.S. at 399. "The intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (cleaned up).

Applying these principles in *Arizona*, the Supreme Court held that federal law preempted a state criminal statute relating to noncitizen registration. 567 U.S. at 403. SB 4 undermines federal immigration law even more directly by intruding into the federal government's regulation of the entry and removal of noncitizens. Imposing those regulations and enforcing the related sanctions that the INA prescribes lie at the core of the federal government's sovereign prerogatives. SB 4, therefore, is preempted as well.

The *Arizona* decision followed from basic principles regarding the division of authority between the federal government and the States. "The authority to control immigration—to admit or exclude [noncitizens]—is vested solely in the Federal

government." *Truax v. Raich*, 239 U.S. 33, 42 (1915); *see also Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what [noncitizens] shall be admitted to the United States[.] . . . Under the Constitution the states are granted no such powers . . . ."); *Arizona*, 567 U.S. at 409–10. As this Court has confirmed, "[p]olicies pertaining to the entry of [noncitizens] and their right to remain here . . . are entrusted exclusively to Congress." *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022).

Exercising that federal authority, "Congress has comprehensively detailed the rules by which noncitizens may enter and live in the United States. When noncitizens violate those rules, Congress has provided procedures for their removal." *Patel v. Garland*, 596 U.S. 328, 331 (2022); *see also* ROA.511–12. Congress decided which noncitizens may be admitted to the United States and how to admit them. 8 U.S.C. §§ 1181–88, 1201–04, 1225. Congress decided which noncitizens may be removed from the United States and how to remove them. *Id.* §§ 1182, 1225–29a; *see id.* § 1229a(a)(3) (providing that federal removal proceedings are "the sole and exclusive procedure" for determining whether to admit or remove a noncitizen). And Congress decided when a noncitizen's entry into the United States is—and is not—a crime. *Id.* §§ 1325(a)–(b), 1326.

That "framework of regulation [is] so pervasive that Congress left no room for the States to supplement it," even through "complementary state regulation." *Arizona*, 567 U.S. at 399, 401 (cleaned up). Otherwise, "the State would have the

power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402; *see also Hines v. Davidowitz*, 312 U.S. 52, 66 (1941) ("[T]he regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the [S]tate also acts on the same subject," state law must yield to federal.).

The district court thus properly held that a patchwork of state-driven policies governing entry and removal would prevent the federal government from speaking with "one voice."[2] ROA.509. This holding echoed multiple courts of appeals that have applied similar reasoning to state analogs to other aspects of the federal immigration scheme. *E.g.*, *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1023–26 (9th Cir. 2013); *United States v. South Carolina*, 720 F.3d 518, 530–31 (4th Cir. 2013); *Georgia Latino All. for Human Rights v. Georgia*, 691 F.3d 1250, 1263–65 (11th Cir. 2012).

**2.** Texas resists the application of these principles largely by observing that States may take some actions that relate in some way to immigration. While it is common ground that Congress has not preempted "every state enactment which in any way deals with [noncitizens]," *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), if Texas

---

[2] While the district court's language sometimes referred imprecisely to the "field of immigration," *e.g.*, ROA.507, its analysis addressed the properly defined field: the federal government's dominant interest in and comprehensive regulation of the entry and removal of noncitizens and control of the international border, ROA.506–30.

were correct that this fact alone precluded field preemption, *Arizona* would have come out the other way. Indeed, all of Texas's arguments, at bottom, reduce to the proposition that while Congress preempted parallel state prosecutions in the area of noncitizen registration, it intended to allow States to directly enforce federal prohibitions on entry and to order the removal of noncitizens from the United States to a non-consenting foreign country. Texas offers no support whatsoever for that implausible proposition or for confining *Arizona* to its facts. If anything, Congress's desire to maintain federal control over the core immigration determinations regarding entry and removal is more evident than its need to preclude complementary state regulation of ancillary matters like noncitizen registration.

Far from allowing States to unilaterally usurp the core federal prerogatives of prosecuting the unlawful entry of noncitizens and ordering their removal, Congress provided a much more limited role for States in immigration enforcement. States may cooperate with the federal government in the apprehension and detention of noncitizens. 8 U.S.C. § 1357(g); *see also* 18 U.S.C. § 758 (recognizing that state law-enforcement agents may be at federal immigration checkpoints). States may also enforce their own generally applicable laws to the conduct of noncitizens. *See*, *e.g.*, 22 U.S.C. § 7105(b)(1)(E)(iv) ("kidnapping" and "forced labor offenses"); 8 U.S.C. § 1101(a)(15)(T)(i)(III)(aa) ("acts of trafficking"); *id.* § 1101(a)(15)(U)(iii) (various state "criminal law[s]"). But that does not mean that States may enforce their own immigration schemes independent of the federal government.

In this respect, the Court in *Arizona* followed a long line of decisions barring parallel state-law enforcement in fields fully occupied by federal law. 567 U.S. at 402 (citing *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001); *Wisconsin Dep't of Indus. v. Gould Inc.*, 475 U.S. 282, 288–89 (1986); *California v. Zook*, 336 U.S. 725, 730–31 (1949); *In re Loney*, 134 U.S. 372, 375–76 (1890)). For instance, the Court held in *Loney* that States have no power to punish perjury before a federal tribunal. The state prosecution was impermissible not because federal and state perjury laws were substantively different, but because a federal witness's breach of his duty of truthfulness does not impair "any authority derived from the State." *Loney*, 134 U.S. at 374. And *Loney* distinguished that circumstance from cases where the Court had recognized that "the same act" may validly constitute "a violation of the laws of the State, as well as of the laws of the United States." *Id.* In those cases, unlike in *Loney*, the state statutes addressed questions of legitimate local concern distinct from the federal offense. *Id.* at 375 (citing *Fox v. Ohio*, 46 U.S. (5 How.) 410 (1847); *Gilbert v. Minnesota*, 254 U.S. 325 (1920)).

The same principles apply here. Whether or not a noncitizen violated federal law by unlawfully entering the United States, Texas may prosecute a noncitizen who commits violent crimes, possesses illegal drugs, or otherwise violates the State's generally applicable criminal laws that do not turn on noncitizens' immigration status. By contrast, compliance with federal entry and reentry provisions does not lie within any traditional police power of the State but is instead a field of national and

international concern occupied by Congress. Even parallel state regulation, therefore, is preempted.

Finally, Texas's argument (at 24) that the United States has abandoned the field is both incorrect and irrelevant. The district court recognized that the federal government has "removed 472,000 individuals between May through December of 2023—more than any single year since 2015." ROA.512. Texas recognizes that the federal government is working to address irregular migration at the border. *See* Br. 46. Moreover, the relevant question is whether Congress has regulated a field, not the degree to which Congress has appropriated enforcement resources or the Executive Branch has exercised its enforcement discretion.

### B.    SB 4 impermissibly conflicts with federal law and is an obstacle to the operation of federal immigration law and the conduct of foreign policy.

**1.** Given the dominant federal interests and comprehensive federal scheme in this area, it is no surprise that SB 4 also "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (citation omitted). It would fundamentally disrupt the federal immigration regime to allow a single State to make unilateral determinations regarding unlawful entry and removal. Such determinations must be based on the implementation of the complex immigration regime, which includes provisions regarding asylum, *see* 8 U.S.C. § 1158(a), withholding of removal, *id.* § 1231(b)(3), protection under Article 3 of the Convention Against Torture, *e.g.*, 8 C.F.R. § 1208.16(c), and the proper country of

removal, 8 U.S.C. § 1231(b). *See* ROA.532–55. Decisions regarding entry and removal must also take account of the federal government's foreign-relations interests.

As in *Arizona*, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." 567 U.S. at 402. Enforcement of federal immigration law, which necessarily imposes consequences for foreign nationals based on acts committed in violation of federal law, can involve a sensitive weighing of interests in national security, border security, foreign affairs, and reciprocal treatment of U.S. citizens abroad. *See id.* at 395; ROA.532. In this circumstance, "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379 (2000). To the contrary, allowing a single State to imprison foreign nationals for allegedly unlawfully entering the United States, or to order them removed from the United States to a non-consenting foreign country, without regard to the interests of the Nation as a whole, would fundamentally undermine that congressional scheme and "compromise the very capacity" of the federal government "to speak for the Nation with one voice in dealing with other governments." *Id.* at 381; *see also* ROA.535–36.

The exclusively federal character of the immigration system renders this case an even more straightforward application of conflict-preemption principles than *Buckman*, where the Supreme Court held that a State could not impose tort liability premised on fraud committed against a federal agency in light of the "inherently

federal" nature of the relationship between the agency and the regulated entity. 531 U.S. at 347. The federal government's authority over immigration is likewise used "to achieve a somewhat delicate balance of statutory objectives," and SB 4 could "skew[]" this "balance" and consequently would conflict with the scheme. *Id.* at 348.

Following *Arizona*, this Court has recognized the need for the federal government to retain control of immigration enforcement. In *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) (en banc), the Court held preempted a municipal ordinance that purported to require an occupancy license conditioned on citizenship or lawful immigration status to live in certain housing, on pain of criminal penalties. *See id.* at 529 (plurality opinion). The controlling opinion concluded that the ordinance impermissibly granted "unilateral state authority to prosecute as well as to detain" noncitizens based on perceived unlawful presence and consequently conflicted with the federal immigration scheme. *Id.* at 534; *see also* ROA.531. Texas fails to cite, much less distinguish, *Farmers Branch*, and that case refutes Texas's suggestion (at 28) that *Arizona*'s concern with unilateral state action in immigration enforcement is limited to arrests without probable cause. SB 4's purported grant of power to state officials not just to detain noncitizens but to prosecute and imprison them for unlawful entry and remove them from the United States heightens, rather than ameliorates, its conflict with the federal immigration laws.

The unilateral authority that SB 4 purports to confer also cannot be squared with federal enactments that set out the "limited circumstances in which state officers may" assist and cooperate with federal enforcement. *Arizona*, 567 U.S. at 408; *Farmers Branch*, 726 F.3d at 534; *see* 8 U.S.C. § 1357(g); *see also, e.g, id.* § 1103(a)(10) (providing a mechanism for the Secretary to authorize state and local law-enforcement officers to exercise powers conferred by the INA in the event of a "mass influx of [noncitizens]"). Texas simply ignores the analysis in *Arizona* and *Farmers Branch* making clear that the unilateral authority Texas arrogates to itself goes far beyond that permitted by the federal immigration laws.

Texas's observation (at 26) that parallel state and federal enforcement schemes are permissible as a general matter has no relevance to a State's effort to regulate in an area that Congress has addressed through federal standards and definitive enforcement procedures, and where parallel state enforcement could compromise foreign relations. The Supreme Court did not *sub silentio* overrule *Arizona* and the cases on which it relied in *Kansas v. Garcia*, 140 S. Ct. 791 (2020), which involved a generally applicable law about "fraud, forgeries, and identity theft" that "appl[ied] to citizens and [noncitizens] alike." *Id.* at 798. Nothing in that case—which did not involve an immigration regulation—suggests that a State may create a parallel immigration regime regulating the entry and removal of noncitizens. *See also supra* pp. 20–22. Similarly misplaced is *Texas*'s reliance on *Plyler v. Doe*, 457 U.S. 202, 225 (1982), which held that a State's effort to refuse to provide undocumented children

with a free public education was inconsistent with the Equal Protection Clause—a holding that has no evident relevance here.

**2.** The specifics of SB 4's entry and removal provisions underscore its incompatibility with the federal scheme. SB 4 denies both the federal government and individual noncitizens access to the INA's removal procedures including expedited removal, *see* 8 U.S.C. § 1225(b)(1), and hearings before an immigration judge with the opportunity to seek any relief or protection from removal for which a noncitizen is eligible, *see id.* § 1229a(a)(3). It would prevent the federal government from deciding whether to pursue removal or criminal prosecution and which grounds for removal to charge, and it would prevent noncitizens from asserting, and the federal government from adjudicating, defenses to removal that would be available in the federal system, including asylum, withholding of removal, and protection under the Convention Against Torture. Indeed, the state enactment expressly refuses to take account of federal removal proceedings that could result in a grant of asylum or other relief or protection from removal: "'a court may not abate the prosecution' on 'the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated.'" ROA.532–33 (quoting Tex. Code Crim. Proc. art. 5B.003). In so doing, "SB 4 plainly conflicts with federal law by instructing state judges to disregard pending federal defenses." ROA.533.

SB 4 also contemplates that state judges will determine whether a noncitizen is lawfully present, even though this Court has held that state officers may not make

such determinations without federal supervision. *See* ROA.537; *Farmers Branch*, 726 F.3d at 534–36 (plurality opinion). And it declines to replicate the exemption from the federal prohibition on reentry for noncitizens entering with consent from the Secretary of Homeland Security, meaning that SB 4 criminalizes conduct that federal law expressly sanctions. *See* ROA.537 (citing 8 U.S.C. § 1326).

SB 4 further conflicts with federal law in permitting state judges to order a noncitizen to return to Mexico without following the federally prescribed process for selecting the country of removal. Under federal law, a noncitizen who does not enter through a port of entry first must designate a country of removal, which can be disregarded only in specified circumstances. 8 U.S.C. § 1231(b)(2)(A), (C). If the noncitizen cannot be removed to that country, federal law sets out an ordering of removal countries, starting with the noncitizen's country of citizenship, *id.* § 1231(b)(2)(D)-(E), and places specific limits on removal to a "foreign territory contiguous to the United States," *id.* § 1231(b)(2)(B). Accordingly, removal to Mexico is not permissible in every case under federal law.

Under SB 4, however, removal is always "to the foreign nation from which the person entered" Texas. Tex. Code Crim. Proc. art. 5B.002(d). That requirement cannot be squared with federal law and would "hamper diplomatic discussions regarding immigration with Mexico." ROA.535. Allowing Texas (or any other State) to remove noncitizens, including non-Mexicans, to Mexico even over the objection of the Government of Mexico will "cause the federal government to lose the ability to

speak 'with one voice' on removals." ROA.536 (quoting *Arizona*, 567 U.S. at 409). The objections that the Government of Mexico have already lodged to SB 4, both publicly and through diplomatic channels, only underscore the damage that Texas's intended actions could cause to United States' relations with Mexico and other nations. *See* ROA.536; *see also Biden v. Texas*, 597 U.S. 785, 806 (2022) (explaining that attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico").

These glaring conflicts illustrate the dangers of allowing state judges to determine the lawfulness of a noncitizen's entry and the appropriateness of removal from the United States. Arresting, prosecuting, and removing noncitizens without any federal involvement or oversight goes far beyond any "coherent understanding" of cooperation. *Arizona*, 567 U.S. at 410.

**3.** Texas cannot plausibly suggest that it is entitled to effect removal of noncitizens from the United States, and it cannot evade the issue by rewriting, in litigation, the state enactment. Thus, while Texas argues that a removal order under SB 4 "merely requires an alien be transported to a port of entry," Br. 27, or "facilitat[es] aliens finding their way to ports of entry," Br. 22, SB 4 directs a state judge following a conviction to enter an order "requiring the person [subject to the order] to return to the foreign nation from which the person entered or attempted to enter" on pain of felony criminal penalties, Tex. Code Crim. Proc. art. 5B.002(d); *see*

*also* Tex. Penal Code § 51.04.  And it specifies that Texas law-enforcement personnel must "monitor[] compliance" with the state removal order.  Tex. Code Crim. Proc. art. 5B.002(e).  As Texas's own declarant indicated, that provision requires state officer to "observe the alien go to the Mexican side" and only "[u]pon witnessing the aliens cross to the Mexican side of the international bridge" will Texas "consider the aliens to have complied with the return order and will cease monitoring the alien."  ROA.316.  As the district court recognized, when "Texas escorts a noncitizen to the border and they either depart into Mexico or . . . face 20 years in prison," that "is the same thing as a removal."  ROA.520.  Texas's assertion that "potential removal is a question for federal immigration officers" under SB 4 "as both a practical and legal matter," Br. 27, cannot be reconciled with the statute's text.

Texas's litigation position (at 27) is that SB 4 would not prevent a noncitizen from seeking asylum or other relief from removal.  Again, SB 4 says otherwise.  Texas only glancingly mentions SB 4's express prohibition on a state court's "abat[ing a] prosecution" on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated," Tex. Code Crim. Proc. art. 5B.003, asserting that this provision "does not require removal," Br. 27.  But SB 4 itself requires that a removal order be entered upon conviction in a prosecution that cannot be abated during a pending federal asylum proceeding.  *See* Tex. Code Crim. Proc. art. 5B.002(d).

Texas simultaneously asserts that "S.B. 4 does not authorize or require state officials to . . . assess . . . removal defenses," Br. 27, and that if "federal law somehow does provide some defense or right that is not provided in S.B. 4, that defense or right would continue to apply under basic principles of federal preemption," Br. 28. Neither proposition is tenable: state officials may neither act without regard to federal immigration law nor make determinations reserved for the federal government. For example, asylum is fundamentally a matter of the "discretion" of the Executive Branch, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987), so a State could not make the determination whether asylum is appropriate, but it would be equally problematic for a noncitizen to be removed under SB 4 without the opportunity to seek asylum or other protections from removal, which would be unavailable after the noncitizen is removed. *See, e.g.*, 8 U.S.C. § 1158(a)(1) (providing that a noncitizen be physically present in the United States or arrive at a port of entry to apply for asylum). More generally, Texas's indecision about whether state judges applying SB 4 will refrain from applying federal law or be compelled to do so highlights that the entire state enactment usurps an area of exclusively federal authority.

## C.    SB 4 violates the Foreign Commerce Clause.

For similar reasons, SB 4 violates the Foreign Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3. "Foreign commerce is pre-eminently a matter of national concern." *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979). And the power to regulate commerce has long been understood to encompass the power to

regulate the movement of both persons and commodities. *See* ROA.539; *see also, e.g.*, *United States v. Guest*, 383 U.S. 745, 758–59 (1966). The Supreme Court has thus recognized that the authority to enact immigration laws "belongs to Congress, and not to the States" because Congress "has the power to regulate commerce with foreign nations," and "the responsibility for the character of those regulations, and for the manner of their execution, belongs solely to the national government." *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875).

As this Court has recognized, "[s]tate regulations violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce." ROA.539 (quoting *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 750 (5th Cir. 2006)). "Regulations that facially discriminate" against foreign commerce "are virtually per se invalid," while "nondiscriminatory state regulations affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments[] or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states." ROA.539–40 (quoting *Piazza's Seafood*, 448 F.3d at 750).

SB 4 is invalid on both grounds. It facially discriminates by criminalizing specifically and solely the movement of noncitizens across the U.S. border into Texas. *See* ROA.541. And it has already created a risk of conflicts with foreign governments and undermined the government's ability to "speak with one voice" in this area, for

the same reasons that, as discussed above, SB 4 conflicts with the federal immigration laws. *See* ROA.541–42.

Texas claims (at 30) that States may exercise their police powers even when those powers have consequences for foreign affairs, citing *Medellín v. Texas*, 552 U.S. 491 (2008). But *Medellín* concerned whether a treaty provision was self-executing and therefore had domestic legal effect on the State's prosecution of a Mexican national for murder. *Id.* at 501–05. That question, and the foreign-policy effects of a state law regulating purely domestic conduct more generally, have no bearing on the validity of a state law that directly regulates foreign commerce in an area "of national concern." *Japan Line*, 441 U.S. at 448.

Texas also notes that modern cases have tended to root the federal government's powers in sources other than the Commerce Clause, like the federal government's inherent sovereign power to control and conduct foreign relations. *See* Br. 31 (citing ROA.540). But while that argument underscores that SB 4 is separately preempted by the federal immigration laws given the dominant federal interests in this area, it does nothing to rebut the Supreme Court's conclusion that the commerce power also encompasses the international movement of persons or suggest that SB 4 can satisfy the requisite dormant Foreign Commerce Clause analysis. And the INA plainly does not expressly authorize SB 4, as would be required to "permit a state to enact legislation that would otherwise violate the Commerce Clause." *Piazza's Seafood*, 448 F.3d at 751 (citation omitted).

**D.     Texas's defenses to the United States' claims are meritless.**

**1.     Texas cannot evade preemption principles by asserting that SB 4 is a response to an alleged "invasion."**

Faced with the clear holdings of the Supreme Court's and this Court's cases, Texas resorted in district court to the remarkable defense that SB 4 may be enacted and enforced in the face of controlling preemption principles because, according to the State, the movement of migrants across the border constitutes an "invasion." *See* ROA.563.  On appeal, Texas retreats from that broad argument and urges that SB 4 could be validly applied as a response to the threat posed by certain particularly potent cartels.  *See* Br. 37–38.  Both arguments are meritless.

**a.**  The constitutional structure generally reflects a "complete delegation of authority to the Federal Government to provide for the common defense" along with a "divest[ment from] the States of like power."  *Torres v. Texas Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022).  This structure reflects "the supremacy of federal power in the area of military affairs," *Perpich v. Department of Def.*, 496 U.S. 334, 351 (1990); *see also* U.S. Const. art. IV, § 4 (conferring on the federal government the duty to "protect each of [the States] against Invasion."), prompted in part by the Framers' concerns that a contrary approach would allow individual States to spark foreign-relations incidents or even wars, *see* The Federalist No. 3, at 39 (John Jay) (Clinton Rossiter ed. 2003) (observing that federal power would be necessary in part because "bordering States[] . . . under the impulse of sudden irritation, and a quick sense of apparent

interest or injury, will be most likely, by direct violence, to excite war" with other countries), *cited in Arizona*, 567 U.S. at 395. The Constitution thus generally forbids States to "engage in War," subject to a narrow exception if a State is "actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3.

**b.** The Framers did not conceal a broad license to override fundamental federal-supremacy principles in that narrow exception to a clause divesting power from the States. *See* ROA.565–66. By its terms, the provision on which Texas relies is an exception to the State War Clause's general prohibition on "engag[ing] in War." U.S. Const. art. I, § 10, cl. 3. It is not that prohibition, however, that renders SB 4 invalid. Enforcement of SB 4 is unconstitutional because it is preempted under the Supremacy Clause and inconsistent with the Foreign Commerce Clause, not because it qualifies as prohibited war-making. Nothing in the State War Clause offers States a broad exemption to other constitutional provisions, much less entitles them to interfere with the comprehensive framework that Congress has enacted to address what Texas characterizes as an "invasion."

Relatedly, it is apparent as a matter of ordinary understanding that prosecution and removal of noncitizens for unlawfully entering the country does not constitute "engag[ing] in War." *See* ROA.563–65. That common-sense notion is consistent with the understanding of the Framers. *See* ROA.562–63, 565 (citing James Madison, The Report of 1800 (Jan. 7, 1800), https://perma.cc/3XV9-2MEE (rejecting argument that removal of noncitizens could be justified as a means of preventing an invasion)).

Texas does not dispute this point but argues that the "greater power to wage war against invaders and insurrectionists includes the lesser power to 'arrest' them." Br. 38 (quoting *Moyer v. Peabody*, 212 U.S. 78, 84–85 (1909)). But, as the district court observed, "Texas is not engaging in war—through SB 4 or otherwise—so it cannot claim that SB 4 is a necessary domestic component of the war effort." ROA.564.

Moreover, the State War Clause's text makes clear that it provides a time-limited emergency authority to allow a State to respond to circumstances that "will not admit of delay" until the federal government has had an opportunity to respond, U.S. Const. art. I, § 10, cl. 3—which, at the time of the Founding, could have taken substantial time. *See* ROA.551–52. It does not confer authority to ignore congressional enactments that foreclose state legislation under the Supremacy Clause, nor does it entitle States to contradict the federal government's considered decision about whether (and how) to "engage in War" in response to particular circumstances. The suggestion in this case that the ongoing situation at the border would authorize Texas to engage in armed hostilities with another Nation or with a group of foreign nationals, without regard to the foreign policy of the United States as a whole, is extraordinary.

Here, Congress has enacted a statutory scheme that comprehensively addresses immigration, including the unlawful entry of noncitizens. And, in this suit, the United States is invoking that scheme and seeking to enjoin Texas's enforcement of SB 4, which would seriously harm the Nation's foreign relations. Under these

circumstances, the State War Clause provides no basis for allowing Texas to enforce SB 4 over the United States' explicit opposition. *See Torres*, 597 U.S. at 592 ("The States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy.").

**c.** Texas's reliance on the State War Clause is thus misplaced without regard to whether Texas has been "actually invaded." But Texas in any event has no plausible claim that such an asserted "invasion" should be recognized.

First, as the district court held, the State War Clause does not provide a justiciable defense against the United States. *See* ROA.574 & n.52. Texas does not respond to that conclusion or the precedent on which the district court relied except by asserting (at 39) that the question whether an "invasion" is occurring is committed to *Texas*'s unreviewable discretion. But Texas's invocation of an "invasion" is fundamentally different from the cases cited by the district court, in which courts concluded that plaintiffs could not invoke Article IV's Invasion Clause to obtain a judicial order requiring the federal government to protect them from a self-declared invasion. *See California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995). The courts in those cases did not unquestioningly accept a State's assertion that an invasion was occurring, as Texas urges, but rather rejected States' efforts to rely on an asserted

invasion to secure judicial action to which they would not otherwise have been entitled.

But that is exactly what SB 4 purports to do. Texas urges that it may go to state court in order to incarcerate noncitizens and remove them from the United States because of a purported "invasion," when the ordinary operation of the Supremacy Clause would prohibit such proceedings. No principle of justiciability or federalism justifies that result, and in fact, as the district court recognized, even the cases on which Texas relies rebut its assertion. *See* ROA.575. As the Supreme Court has recognized in declining to uncritically accept a state governor's justification of his actions based on an asserted need for the exertion of military power, "[i]f this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land." *Sterling v. Constantin*, 287 U.S. 378, 397–98 (1932).[3]

Second, under no reasonable understanding can irregular migration or criminal cartels' smuggling activities amount to an "invasion" justifying Texas's engaging in "War." As the district court thoroughly demonstrated, "[c]ontemporary definitions of 'invasion' and 'actually invaded' as well as common usage of the term in the late Eighteenth Century predominantly referred to an 'invasion' as a hostile and organized

---

[3] Texas also cites the Supreme Court's decision in *Moyer*, but there the Court simply held, based on a good-faith declaration of an insurrection, that a governor could not "be subjected to an action [for damages] after he is out of office." 212 U.S. at 85.

military force, too powerful to be dealt with by ordinary judicial proceedings."
ROA.545; *see also* ROA.546–50 (surveying contemporaneous dictionaries and usage).

Context confirms this understanding. The State War Clause reflects an intent
generally to prohibit States from "engag[ing] in War." U.S. Const. art. I, § 10, cl. 3.
In recognizing an exception from that prohibition, it was natural for the Framers to
refer to circumstances in which the States' police powers would be inadequate. In
other circumstances, there would have been no need to authorize States to take an
action as extreme as "engag[ing] in War"—and, pursuant to other constitutional
provisions, to authorize the federal government to suspend the writ of habeas corpus
or provide for the quartering of soldiers, *see id.* art. I, § 9, cl. 2; *id.* amend. III. It is
thus no surprise that courts have consistently understood that the term "actually
invaded" under this Clause must mean armed hostilities rising to the level of those
typically implicated in war, as opposed to irregular migration or criminal activity by
private actors. *See, e.g., Padavan*, 82 F.3d at 28; *see also* ROA.552–55.

James Madison's speech during the Virginia ratifying convention, on which
Texas relies (at 33–34), confirms that conclusion. Contrary to Texas's implication,
Madison did not suggest that smuggling activities qualified as an "invasion." Instead,
Madison's remarks were offered in defense of the federal government's authority to
call out the militia, rather than a standing army, to "execute the Laws." U.S. Const.
art. I, § 8, cl. 15. Madison explained that "[t]he Constitution does not say that a
standing army shall be called out to execute the laws" and argued that the "more

proper" way of ensuring that the laws are executed is for "[t]he militia . . . to be called forth to suppress smugglers." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 414 (Jonathan Elliot ed., 2d ed. 1836), https://perma.cc/R7ZPNRSD. Far from supporting Texas's view that smuggling qualifies as an "inva[sion]" to which States may respond by "engag[ing] in War," U.S. Const. art. I, § 10, cl. 3, those remarks demonstrate that the Framers viewed smuggling as an issue to be addressed through the robust "execut[ion] of the laws"— that is, a matter for law enforcement. And they provide no basis for Texas's apparent view that the various foreign-relations authorities upon which the federal government would rely in responding to threats from abroad were all conferred on the States without regard to Congress's exercise of its own authority.

**d.** Texas does not meaningfully defend its district-court position that an influx of unlawful immigration, by itself, constitutes an "inva[sion]" within the meaning of the State War Clause. *See* Br. 37 (noting only that the district court's contrary holding was "hardly self-evident"). Rather, Texas now focuses on criminal cartels, arguing that at least certain cartel members have "actually invaded" the State and that the State War Clause therefore authorizes enforcement of SB 4 as to those members or perhaps in some broader fashion as a response to cartel activity. But contrary to Texas's claim, it certainly is disputed that SB 4 may be validly applied to "armed and dangerous cartel members [that] cross the border," *id.* Indeed, Texas's suggestion that it could validly apply SB 4 only to such cartel members would be an especially odd way to read

the State War Clause. Even setting aside that criminal activity cannot reasonably be deemed an "invasion," Texas provides no support whatsoever for the idea that such activity authorizes it to "engage in War" through criminal prosecutions and removals where a state judicial officer concludes that an individual noncitizen has participated in conduct that (allegedly) rises to the level of an "invasion." Unsurprisingly, SB 4 does not on its face contemplate any such inquiry, which would embroil the state courts in sensitive foreign-relations determinations about which particular acts by noncitizens constitute an invasion that would authorize the State to engage in war with a foreign country.

And Texas cannot in any event seriously maintain that misdemeanor prosecution and removal under SB 4 is an appropriate response to violent crime by cartel members. Indeed, it is entirely unclear why SB 4 would be necessary in circumstances in which a noncitizen committed acts that could plausibly qualify as part of an "invasion." Texas does not explain, for example, how a noncitizen could do so without violating any preexisting and generally applicable state laws. And the commission of violent crime or membership in a cartel has nothing to do with whether SB 4 is violated, so it is unclear why the application of SB 4 to distinct conduct would be any more justified if those circumstances happened to be present.

The historical examples on which Texas relies (at 34–35) do not advance its argument. While Texas notes, for example, that it sent men into Mexico in the mid-19th century, it did so primarily in pursuit of forces led by Juan Cortina that had

previously captured the American city of Brownsville and later sent large raiding parties across the Rio Grande to plunder towns and ranches near the border before fleeing back to Mexico. *See* H.R. Rep. No. 44-343, at III–IV (1876); *see also id.* at 13–15 (describing subsequent raids by Cortina's forces). Even assuming the historical examples Texas identifies involved invasions of the sort that would justify "engag[ing] in War," Texas does not contend that cartels are carrying out comparable attacks on its cities today. And even in the mid-19th century, the Governor of Texas recognized that if the federal government concluded that his order to pursue the raiding parties into Mexico was "in contravention of the laws of the United States, when notified of the decision, I will revoke the order" because "if the officers of the United States Government entertain a different view, they have the power to prevent its enforcement." *Id.* at 167. To the extent that Texas takes the opposite position now and suggests that criminal cartels' activities would justify the State's engaging in military activities in another sovereign nation over the federal government's express objections, that only demonstrates the implausibility of its position.

Texas does not advance its argument by noting that another of the limitations in Article I, section 10, expressly renders state inspection laws subject to congressional control. To the extent that this provision is relevant, it merely underscores that Article I, section 10, contains restrictions on States with narrow exceptions and does not conceal gaping loopholes in the overall plan of the Constitution. The clause on which Texas specifically relies precludes "Imposts or Duties" with an exception for

those "absolutely necessary" to the State's "inspection Laws," and it goes on to provide that "all such Laws shall be subject to the Revision and Controul of the Congress." U.S. Const. art. I, § 10, cl. 2. The Framers' determination that an indefinite exception, premised on the States' own inspection laws, to the general prohibition on imposts or duties should be accompanied by an explicit reservation of Congress's rights to supersede the laws that give rise to the exception has no evident bearing on the State War Clause. Given the implicit recognition that States could enact their own inspection laws—which, again, has no analog in the State War Clause—it made sense to confirm Congress's authority to override them. But the State War Clause by its terms confers a time-limited emergency authority designed to let the States act before the federal government has had an opportunity to respond, and a reiteration of the general constitutional principle that the war power and foreign relations are vested more generally in the federal government was hardly necessary.

### 2. The United States may sue in equity to enjoin federally preempted state laws.

**a.** Congress has empowered federal courts to exercise equity jurisdiction and to grant such relief as "was traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999); *see* 28 U.S.C. §§ 1331, 1651. The United States has presented a classic equitable grievance—that the defendant is causing it direct harm through unlawful acts, here by interfering with

federal operations and responsibilities. *See, e.g., American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902).

In these circumstances, "equitable relief is . . . traditionally available to enforce federal law," unless Congress has "displace[d]" it. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327, 329 (2015). That principle is especially true in a suit brought by the United States to vindicate its sovereign interests. Texas does not even attempt to demonstrate that Congress has displaced equitable remedies in the circumstances of this case, so its challenge to the invocation of equitable remedies lacks merit.

To invoke an equitable right of action, a party must present the type of grievance for which an equitable remedy lies for that party. *See Samuel L. Bray & Paul B. Miller, Getting into Equity*, 97 Notre Dame L. Rev. 1763 (2022); *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (injunctions may be sought to halt unconstitutional activity even without a "private right of action" (citation omitted)). In line with this principle, courts have long used injunctions— with or without express statutory authorization—to prevent governmental officials from violating the law. *See, e.g., Truax*, 239 U.S. at 36; *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43 (1815); *Hughes v. Trustees of Morden Coll.* (1748) 27 Eng. Rep. 973 (High Ct. Ch.). The historical tradition also reflects that courts may entertain equitable actions brought by governmental actors to prevent other governmental actors from acting unlawfully. *See, e.g., Attorney-General v. Corporation of Poole*, (1838) 41 Eng. Rep. 7

(High. Ct. Ch.) (equitable action by Crown against local officials), *aff'd sub nom. Parr v. Attorney-General*, (1842) 8 Eng. Rep. 159 (H.L.).

Texas contends that Congress must expressly create an equitable right of action before a plaintiff may seek an injunction against unconstitutional activity. In addition to *Armstrong*, Texas points to *Hernández v. Mesa*, which refused to expand an implied cause of action for damages to a new context, 140 S. Ct. 735, 749 (2020). Neither case helps its cause. Texas also relies on *Alexander v. Sandoval*, which spoke to *private* rights of action and involved a statute and regulations that Congress expressly empowered the government to enforce. 532 U.S. 275, 289 (2001). *Alexander*, therefore, has no bearing on whether the federal government can enforce a federal statute, much less the federal Constitution.

**b.** History and precedent also confirm that the United States has authority to seek injunctive relief of the kind at issue here. *See United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888). Like a private party, the United States may seek a prohibitory injunction to shield itself from direct injury. *Id.* at 286. Of particular relevance here, federal courts undoubtedly may grant injunctions to the United States to protect its sovereign interests. The United States has frequently sued in equity when those interests were threatened or harmed. *See, e.g., id.* (invalidation of land grant); *Arizona*, 567 U.S. 387 (preemption of state immigration law); *United States v. Texas*, 143 U.S. 621 (1892) (boundary dispute); *United States v. American Bell Tel. Co.*, 128 U.S. 315 (1888) (invalidation of patent). Here, the United States has a sovereign

interest in its ability to uniformly enforce federal immigration law free from state interference. The United States also has a sovereign interest in its ability to adhere to treaty obligations and to conduct diplomacy with its neighbors. It may sue in equity to vindicate those interests.

The Supreme Court unanimously recognized that the United States may bring such suits in *In re Debs*, 158 U.S. 564 (1895), when it held that the federal government may obtain an injunction to "enforce in any part of the land the full and free exercise of all national powers," *id.* at 582. Contrary to Texas's suggestion (at 17–18), although *Debs* draws from public nuisance cases, *see id.* at 592–93, its holding was not limited to such cases. Rather, *Debs* endorsed and embodied the "general rule that the United States may sue to protect its interests." *Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967). And subsequent decisions have recognized the United States' right to sue to protect other sovereign interests. *See, e.g.*, *Sanitary Dist. v. United States*, 266 U.S. 405, 425 (1925) (authority to sue "to carry out treaty obligations"); *United States v. City of Jackson*, 318 F.2d 1, 15 (5th Cir. 1963) (authority to sue to protect interstate commerce). In any event, this case does not turn on the United States' authority as a sovereign under *Debs* because it involves the long-established right of action to enjoin constitutional violations that directly harm the plaintiff.

**c.** The doctrine of *Ex parte Young*, 209 U.S. 123 (1908), leaves no doubt that the United States may pursue relief here. *See* ROA.420 (making this argument). *Ex parte Young* endorsed the longstanding practice of actions to enjoin state officials from

45

violating the federal Constitution. *See* 209 U.S. at 167 (citing *Osborn v. Bank of the U.S.*, 22 U.S. 738 (1824)).

To invoke *Ex parte Young*, a plaintiff must (1) name official-capacity defendants, (2) allege an ongoing violation of federal law, and (3) seek prospective relief. *Turnage v. Britton*, 29 F.4th 232, 239 (5th Cir. 2022). Texas does not deny that the United States has met these requirements. *See also* ROA.19 (naming Governor and Director of the Department of Public Safety); ROA.29–33 (alleging ongoing violations of Supremacy Clause and Foreign Commerce Clause); ROA.34 (seeking only prospective relief).

Texas's argument (at 19) that governments may not rely on *Ex parte Young* is meritless. Although, in a suit brought by private parties, the Supreme Court has described *Ex parte Young* in passing as a right of action for private parties, *see Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021), when the Court expressly addressed the issue Texas raises here, it held that "there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff," *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 256 (2011).

### 3.    All applications of SB 4 are invalid.

Texas repeatedly asserts that SB 4 should not have been enjoined in all of its applications or that the district court failed to respect the statute's severability clause. But Texas identifies no circumstance in which the law, which contemplates unilateral state enforcement of federal immigration laws, could constitutionally be applied. The

state-registration provisions were declared invalid on their face in *Arizona*, and there is

no basis for a different result here.

Nor does Texas identify any provision of the law that could properly be

severed. As discussed above, the criminal provisions and the authorization for state

judges to order removal from the United States are preempted. And the remaining

provisions are ancillary provisions that have no force and effect in the absence of the

preempted ones. *See* ROA.586 n.55.

## II.   The District Court Did Not Abuse Its Discretion In Concluding That The Balance Of Harms And The Public Interest Warrant A Preliminary Injunction.

**1.** The Supreme Court has suggested that the enforcement of a preempted

state law inherently produces irreparable harm. *See New Orleans Pub. Serv., Inc. v.*

*Council of New Orleans*, 491 U.S. 350, 366–67 (1989); *see also* ROA.576 (collecting cases).

Texas does not dispute that proposition. Beyond those inherent harms, enforcement

of SB 4 would also directly and irreparably harm core federal interests in multiple

ways.

A State may not interfere with the federal government's foreign policy.

*See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003). But in threatening to

remove citizens of many nations into Mexico, SB 4 does just that. ROA.131. The

decision to remove a noncitizen implicates foreign-policy and, often, national-security

concerns. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491

(1999). When a country believes its nationals have been mistreated in the United

States, it may respond with "harmful reciprocal treatment of American citizens abroad." *Arizona*, 567 U.S. at 395; ROA.141. And the potential violation of Mexico's sovereignty, which Texas's actions threaten, may derail important bilateral negotiations. ROA.132–34. For this and other reasons, if Texas enforces SB 4, it will seriously injure the United States' diplomatic relationships with Mexico and other nations. *See* ROA577–79. Texas dismisses (at 42) these harms as "speculative," without addressing Mexico's express protest of SB 4. *See* ROA.536 (citing Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR); Press Release, Secretaría de Relaciones Exteriores (Mar. 19, 2024), *supra*. But "representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to demonstrate" that a state law interferes with federal foreign policy. *Crosby*, 530 U.S. at 386. And the Supreme Court has recognized that requiring the removal of non-Mexican nationals into Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico." *Biden*, 597 U.S. at 806.

Moreover, SB 4 is inconsistent with the United States' treaty obligations. *See* ROA.579–80. Most prominently, the Convention Against Torture, as implemented through federal law, prohibits refoulement—the return of a noncitizen to a country where he more likely than not would be persecuted or tortured. *E.g.*, 8 C.F.R. § 1208.16–1208.18; *see* 8 U.S.C. § 1231 note. SB 4 has no provision to prevent refoulement. ROA.138–39, 154. Implementing SB 4 would also undermine

U.S. efforts to convince governments worldwide to implement or strengthen their international protection systems and uphold their respective treaty obligations. ROA.140. Indications that the United States is scaling back its own systems would be viewed as a sign that the U.S. commitment to international protection has waned and could encourage other governments to abandon or minimize their own efforts. ROA.140.

SB 4 also irreparably injures the United States by preventing the federal government from enforcing federal law and by interfering with exclusively federal functions. *See* ROA.580–81; *Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (per curiam). Enforcing SB 4 would interfere with the federal government's orderly processing of noncitizens who have unlawfully entered the United States. The law forbids abating an SB 4 prosecution while the federal government is conducting asylum or adjustment of status proceedings. Tex. Code of Crim. Proc. art. 5B.003. A noncitizen facing simultaneous SB 4 enforcement proceedings and federal immigration proceedings "would be unable to participate fully in federal immigration proceedings," "attend scheduled interviews," or "comply with required identity and security check procedures." ROA.155. SB 4 would thus impede the federal government's enforcement of federal immigration law.[4]

---

[4] Texas asserts (at 44 n.5) that at a hearing earlier this month in another case, one of the declarants cited by the district court "testified that his declaration filed in this litigation relied on speculation." A transcript of that hearing is not yet available,

*Continued on next page.*

**2.**  In contrast to the significant harms the United States would face if Texas enforced SB 4, Texas would not face significant harm from an injunction that merely maintains the status quo that has been in place for nearly 150 years.  ROA.584–85. Texas's contrary argument largely reprises its erroneous merits arguments.  *Cf. Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 441 (5th Cir. 2023) (harm suffered by a party prevented from acting as authorized by federal law outweighs harm suffered by a jurisdiction trying to enforce its own preempted law).  To the extent Texas wishes to cooperate with the federal government in its immigration-enforcement efforts, it may do so.  *See* 8 U.S.C. § 1357(g).  Finally, because SB 4 will interfere with federal immigration enforcement and with the federal government's relationship with Mexico, vacating the district court's injunction could worsen irregular migration, rather than improve it.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be affirmed.

---

but the government understands the testimony in question to have concerned a DHS official's predictions about the potential effect of SB 4 on noncitizens' choices regarding where to cross into the United States—a point that was not central to the district court's analysis.  *See* ROA.580–81.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

JAIME ESPARZA
  *United States Attorney*


DANIEL TENNY
LEIF OVERVOLD

 */s/ Maxwell A. Baldi*
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-0211*
  *maxwell.baldi@usdoj.gov*

MARCH 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,746 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
Maxwell A. Baldi

**ADDENDUM**

# TABLE OF CONTENTS

U.S. Const., Art. I, § 10, cl. 3.................................................................A1

Tex. Code Crim. P. art. 5B.002.............................................................A2

Tex. Code Crim. P. art. 5B.003.............................................................A4

Tex. Penal Code § 51.02.......................................................................A5

Tex. Penal Code § 51.03.......................................................................A6

Tex. Penal Code § 51.04.......................................................................A7

**U.S. Const., Art. I, § 10, cl. 3.**

No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

**Tex. Code Crim. P. art. 5B.002.**

**art. 5B.002. Order to Return to Foreign Nation.**

(a)  A magistrate during a person's appearance under Article 14.06 or 15.17 may, after making a determination that probable cause exists for arrest for an offense under Section 51.02 or 51.03, Penal Code, order the person released from custody and issue a written order in accordance with Subsection (c).

(b)  The judge in a person's case at any time after the person's appearance before a magistrate under Article 14.06 or 15.17 may, in lieu of continuing the prosecution of or entering an adjudication regarding an offense under Section 51.02 or 51.03, Penal Code, dismiss the charge pending against the person and issue a written order in accordance with Subsection (c).

(c)  A written order authorized by Subsection (a) or (b) must discharge the person and require the person to return to the foreign nation from which the person entered or attempted to enter, and may be issued only if:

   (1)  the person agrees to the order;

   (2)  the person has not previously been convicted of an offense under Chapter 51, Penal Code, or previously obtained a discharge under an order described by Subsection (a) or (b);

   (3)  the person is not charged with another offense that is punishable as a Class A misdemeanor or any higher category of offense; and

   (4)  before the issuance of the order, the arresting law enforcement agency:

      (A)  collects all available identifying information of the person, which must include taking fingerprints from the person and using other applicable photographic and biometric measures to identify the person; and

      (B)  cross-references the collected information with:

         (i)  all relevant local, state, and federal criminal databases; and

         (ii)  federal lists or classifications used to identify a person as a threat or potential threat to national security.

(d)  On a person's conviction of an offense under Chapter 51, Penal Code, the judge shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter.  An order issued under this subsection takes effect on completion of the term of confinement or imprisonment imposed by the judgment.

(e)  An order issued under this article must include:

(1)  the manner of transportation of the person to a port of entry, as defined by Section 51.01, Penal Code; and

(2)  the law enforcement officer or state agency responsible for monitoring compliance with the order.

(f)  An order issued under this article must be filed:

(1)  with the county clerk of the county in which the person was arrested, for an order described by Subsection (a); or

(2)  with the clerk of the court exercising jurisdiction in the case, for an order described by Subsection (b) or (d).

(g)  Not later than the seventh day after the date an order is issued under this article, the law enforcement officer or state agency required to monitor compliance with the order shall report the issuance of the order to the Department of Public Safety for inclusion in the computerized criminal history system under Chapter 66.

**Tex. Code Crim. P. art. 5B.003.**

**art. 5B.003. Abatement of Prosecution on Basis of Immigration Status Determination Prohibited.**

A court may not abate the prosecution of an offense under Chapter 51, Penal Code, on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated.

**Tex. Penal Code § 51.02.**

**§ 51.02. Illegal Entry from Foreign Nation.**

(a)  A person who is an alien commits an offense if the person enters or attempts to enter this state directly from a foreign nation at any location other than a lawful port of entry.

(b)  An offense under this section is a Class B misdemeanor, except that the offense is a state jail felony if it is shown on the trial of the offense that the defendant has been previously convicted of an offense under this section.

(c)  It is an affirmative defense to prosecution under this section that:

   (1)  the federal government has granted the defendant:

      (A)  lawful presence in the United States; or

      (B)  asylum under 8 U.S.C. Section 1158;

   (2)  the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a); or

   (3)  the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021.

(d)  The following federal programs do not provide an affirmative defense for purposes of Subsection (c)(1):

   (1)  the Deferred Action for Parents of Americans and Lawful Permanent Residents program; and

   (2)  any program not enacted by the United States Congress that is a successor to or materially similar to the program described by Subsection (c)(3) or Subdivision (1).

A5

**Tex. Penal Code § 51.03.**

**§ 51.03. Illegal Reentry by Certain Aliens.**

(a)  A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state after the person:

    (1)  has been denied admission to or excluded, deported, or removed from the United States; or

    (2)  has departed from the United States while an order of exclusion, deportation, or removal is outstanding.

(b)  An offense under this section is a Class A misdemeanor, except that the offense is:

    (1)  a felony of the third degree if:

        (A)  the defendant's removal was subsequent to a conviction for commission of two or more misdemeanors involving drugs, crimes against a person, or both;

        (B)  the defendant was excluded pursuant to 8 U.S.C. Section 1225(c) because the defendant was excludable under 8 U.S.C. Section 1182(a)(3)(B);

        (C)  the defendant was removed pursuant to the provisions of 8 U.S.C. Chapter 12, Subchapter V; or

        (D)  the defendant was removed pursuant to 8 U.S.C. Section 1231(a)(4)(B); or

    (2)  a felony of the second degree if the defendant was removed subsequent to a conviction for the commission of a felony.

(c)  For purposes of this section, "removal" includes an order issued under Article 5B.002, Code of Criminal Procedure, or any other agreement in which an alien stipulates to removal pursuant to a criminal proceeding under either federal or state law.

**Tex. Penal Code § 51.04.**

**§ 51.04. Refusal to Comply with Order to Return to Foreign Nation.**

(a)  A person who is an alien commits an offense if:

  (1)  the person has been charged with or convicted of an offense under this chapter;

  (2)  a magistrate or judge, as applicable, has issued an order under Article 5B.002, Code of Criminal Procedure, for the person to return to the foreign nation from which the person entered or attempted to enter; and

  (3)  the person refuses to comply with the order.

(b)  An offense under this section is a felony of the second degree.