# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

Docket No. 24-50149

UNITED STATES OF AMERICA,

*Plaintiff – Appellee*

v.

STATE OF TEXAS; GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY;
STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants – Appellants*

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN
GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs – Appellees*

v.

STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY; BILL D.
HICKS, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR THE
34TH DISTRICT,

*Defendants – Appellants*

## On Appeal from
United States District Court for the Western District of Texas,
Nos. 1:24-cv-00008-DAE (lead case), 1:23-cv-01537

## BRIEF FOR *LAS AMERICAS* PLAINTIFFS-APPELLEES

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways, and*
*County of El Paso*

Tamara F. Goodlette
(TX Bar No. 24117561)
Daniel Hatoum
(TX Bar No. 24099136)
Erin D. Thorn
(TX Bar No. 24093261)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
daniel@texascivilrightsproject.org
erin@texascivilrightsproject.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center and American Gateways*

Cody Wofsy
Spencer Amdur
Hannah Schoen
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California St., 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
samdur@aclu.org
hschoen@aclu.org
mrussell@aclu.org

Anand Balakrishnan
Omar Jadwat
Lee Gelernt
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways, and*
*County of El Paso*

Jo Anne Bernal
(TX Bar No. 02208720)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz,
(TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| American Gateways | Cody Wofsy<br>Spencer Amdur<br>Hannah Schoen<br>Morgan Russell<br>American Civil Liberties Union Foundation, Immigrants' Rights Project<br>San Francisco, CA<br><br>Anand Balakrishnan<br>Omar Jadwat<br>Lee Gelernt<br>Wafa Junaid<br>American Civil Liberties Union Foundation, Immigrants' Rights Project<br>New York, NY<br><br>David A. Donatti<br>Adriana Piñon<br>American Civil Liberties Union of Texas<br>Houston, TX<br><br>Tamara F. Goodlette<br>Daniel Hatoum<br>Erin D. Thorn<br>Texas Civil Rights Project<br>Alamo, TX |

| | |
|---|---|
| County of El Paso, Texas | Cody Wofsy<br>Spencer Amdur<br>Hannah Schoen<br>Morgan Russell<br>American Civil Liberties Union<br>Foundation, Immigrants' Rights<br>Project<br>San Francisco, CA<br><br>Anand Balakrishnan<br>Omar Jadwat<br>Lee Gelernt<br>Wafa Junaid<br>American Civil Liberties Union<br>Foundation, Immigrants' Rights<br>Project<br>New York, NY<br><br>David A. Donatti<br>Adriana Piñon<br>American Civil Liberties Union of<br>Texas<br>Houston, TX<br><br>Jo Anne Bernal<br>Bernardo Rafael Cruz<br>County Attorney's Office<br>El Paso, TX |
| Las Americas Immigrant Advocacy Center | Cody Wofsy<br>Spencer Amdur<br>Hannah Schoen<br>Morgan Russell<br>American Civil Liberties Union<br>Foundation, Immigrants' Rights<br>Project<br>San Francisco, CA<br><br>Anand Balakrishnan<br>Omar Jadwat<br>Lee Gelernt |

|  | Wafa Junaid<br>American Civil Liberties Union Foundation, Immigrants' Rights Project<br>New York, NY<br><br>David A. Donatti<br>Adriana Piñon<br>American Civil Liberties Union of Texas<br>Houston, TX<br><br>Tamara F. Goodlette<br>Daniel Hatoum<br>Erin D. Thorn<br>Texas Civil Rights Project<br>Alamo, TX |
| United States of America | Samuel Shapiro<br>U.S. Attorney's Office<br>San Antonio, TX<br><br>Daniel Bentele Hahs Tenny<br>Maxwell A. Baldi<br>Brian Boynton<br>Jean Lin<br>Leif Eric Overold<br>Stephen Ehrlich<br>Kuntal Cholera<br>US Department of Justice<br>Washington, DC |

| **Appellants:** | **Counsel for Appellants:** |
|---|---|
| Greg Abbott | Aaron Lloyd Nielson<br>Munera Al-Fuhaid<br>Susanna Dokupil<br>Heather Lee Dyer<br>Amy Snow Hilton<br>Kateland R. Jackson<br>Jospeh N. Mazzara |

| | Jacob Przada<br>Kyle Tebo<br>Ryan Daniel Walters<br>Coy Allen Westbrook<br>Office of the Attorney General<br>Austin, TX |
|---|---|
| Steven McCraw | Aaron Lloyd Nielson<br>Munera Al-Fuhaid<br>Susanna Dokupil<br>Heather Lee Dyer<br>Amy Snow Hilton<br>Kateland R. Jackson<br>Jospeh N. Mazzara<br>Jacob Przada<br>Kyle Tebo<br>Ryan Daniel Walters<br>Coy Allen Westbrook<br>Office of the Attorney General<br>Austin, TX |
| State of Texas | Aaron Lloyd Nielson<br>Munera Al-Fuhaid<br>Susanna Dokupil<br>Heather Lee Dyer<br>Amy Snow Hilton<br>Kateland R. Jackson<br>Jospeh N. Mazzara<br>Jacob Przada<br>Kyle Tebo<br>Ryan Daniel Walters<br>Coy Allen Westbrook<br>Office of the Attorney General<br>Austin, TX |
| Texas Department of Public Safety | Aaron Lloyd Nielson<br>Munera Al-Fuhaid<br>Susanna Dokupil<br>Heather Lee Dyer<br>Amy Snow Hilton<br>Kateland R. Jackson<br>Jospeh N. Mazzara<br>Jacob Przada |

| | Kyle Tebo<br>Ryan Daniel Walters<br>Coy Allen Westbrook<br>Office of the Attorney General<br>Austin, TX |
| --- | --- |
| Bill D. Hicks | Francisco J. Ortega<br>ScottHulse, P.C.<br>El Paso, TX |

*/s/ Cody Wofsy*
Cody Wofsy

*Attorney of Record for*
*Plaintiffs-Appellees Las Americas*
*Immigrant Advocacy Center, American*
*Gateways, and County of El Paso*

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled oral argument for Wednesday, April 3, 2024. Appellees respectfully submit that oral argument will assist the Court in reviewing the important issues raised in this case.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................xx

INTRODUCTION ...........................................................................1

ISSUE PRESENTED .......................................................................2

STATEMENT OF THE CASE ...........................................................3

    A. The Federal Government's Authority to Regulate Immigration ...........3

    B. Senate Bill 4 .........................................................................5

    C. Procedural History ..................................................................8

SUMMARY OF ARGUMENT .........................................................10

STANDARD OF REVIEW .............................................................12

ARGUMENT ..............................................................................12

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .............12

    A. Texas Is Not Likely to Succeed on its Threshold Arguments.................12

      1. Plaintiffs have standing. ......................................................13

      2. Plaintiffs have a cause of action and satisfy *Ex parte Young* ................20

    B. S.B. 4 Is Preempted. ..............................................................24

      1. S. B. 4 Intrudes on the Field of Entry and Removal ............................24

      2. S. B. 4 Conflicts with Federal Law.......................................28

**3. Texas's responses lack merit.** ...............................................................33

**4. The scope of the injunction was not an abuse of discretion.** ................44

**II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN**

      **WEIGHING THE EQUITIES.** ...................................................49

**A. S.B. 4 Will Irreparably Harm the Plaintiffs and the Public.** ...................49

**B. Texas Faces No Comparable Harm.** ...........................................................52

**CONCLUSION** ...............................................................................................54

**CERTIFICATE OF SERVICE** .......................................................................57

**CERTIFICATE OF COMPLIANCE** ..............................................................57

# TABLE OF AUTHORITIES

## Cases

*All. for Hippocratic Med. v. FDA*,
   No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023)................................15

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
   570 U.S. 1 (2013) ................................................................................18

*Arizona v. United States*,
   2012 WL 1332574 (Apr. 17, 2012) ............................................... 42, 44

*Arizona v. United States*,
   567 U.S. 387 (2012)...................................................................... passim

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015)............................................................................21

*Arrowsmith v. Voorhies*,
   55 F.2d 310 (E.D. Mich. 1931)..........................................................46

*Ayotte v. Planned Parenthood of N. New Eng.*,
   546 U.S. 320 (2006)............................................................................49

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023).......................................................................16

*Biden v. Texas*,
   142 S. Ct. 2528 (2022).........................................................................4

*Biden v. Texas*,
   597 U.S. 785 (2022)...........................................................................31

*Bond v. United States*,
   564 U.S. 211 (2011)...........................................................................18

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) .................................................. 12, 13, 53

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ..................................................................... 13, 18

*Branson Sch. Dist. RE-82 v. Romer,*
  161 F.3d 619 (10th Cir. 1998) ...............................................20

*Builder Recovery Servs., LLC v. Town of Westlake,*
  650 S.W.3d 499 (Tex. 2022)...................................................48

*Chae Chan Ping v. United States,*
  130 U.S. 581 (1889)................................................................43

*Chy Lung v. Freeman,*
  92 U.S. 275 (1875)................................................... 25, 26, 45

*City of Alpine v. Abbot,*
  730 F. Supp. 2d 630 (W.D. Tex. 2010) ...............................20

*City of El Cenizo v. Texas,*
  890 F.3d 164 (5th Cir. 2018) ......................................... 37, 47

*Club Madonna Inc. v. City of Miami Beach,*
  42 F.4th 1231 (11th Cir. 2022) .............................................42

*Cnty. of Ocean v. Grewal,*
  475 F. Supp. 3d 355 (D.N.J. 2020).......................................20

*Crane v. Texas,*
  766 F.2d 193 (5th Cir. 1985) ................................................23

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000)...............................................................31

*Crown Castle Fiber, L.L.C. v. City of Pasadena,*
  76 F.4th 425 (5th Cir. 2023) ......................................... 18, 20

*Daves v. Dallas Cnty.,*
  22 F.4th 522 (5th Cir. 2022) ................................................23

*Davis v. FEC*,
    554 U.S. 724 (2008)............................................................16

*De Canas v. Bica*,
    424 U.S. 351 (1976)............................................................38

*Ex parte Ah Cue*,
    101 Cal. 197 (1894) ...........................................................46

*Ex parte Young*,
    209 U.S. 123 (1908)................................................ 11, 20, 21, 22

*Fed. Election Comm'n v. Cruz*,
    596 U.S. 289 (2022)............................................................15

*Fong Yue Ting v. United States*,
    149 U.S. 698 (1893)................................................... 26, 35

*Free Speech Coal., Inc. v. Paxton*,
    --- F.4th---, 2024 WL 982225 (5th Cir. 2024)......................................53

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
    691 F.3d 1250, 1265 (11th Cir.2012)…………………………………………5, 17, 25

*Galvan v. Press,*
    347 U.S. 522 (1954).................................................... 25, 45

*Green Valley Special Util. Dist. v. City of Schertz*,
    969 F.3d 460 (5th Cir. 2020) .................................................21

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)................................................ 10, 13, 16, 17

*Hernandez v. State*,
    613 S.W.2d 287 (Tex. Crim. App. 1980) ...........................................46

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)................................................... passim

*Hudson v. City of New Orleans*,
  174 F.3d 677 (5th Cir. 1999) .................................................23

*Huisha-Huisha v. Mayorkas*,
  27 F.4th 718 (D.C. Cir. 2022).................................................51

*In re Abbott*,
  956 F.3d 696 (5th Cir. 2020) .................................................23

*INS v. Yueh-Shaio Yang*,
  519 U.S. 26 (1996)..............................................................5

*Jackson v. Wright*,
  82 F.4th 362 (5th Cir. 2023) .................................................23

*Jama v. ICE*,
  543 U.S. 335 (2005)........................................................ 26, 32

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020)...................................................... 39, 40

*Kentucky v. Yellen*,
  54 F.4th 325 (6th Cir. 2022) .................................................18

*La. ACORN Fair Hous. v. LeBlanc*,
  211 F.3d 298 (5th Cir. 2000) .................................................14

*Lassen v. Arizona*,
  385 U.S. 458 (1967)...........................................................19

*League of Women Voters of Ind., Inc. v. Sullivan*,
  5 F.4th 714 (7th Cir. 2021) ..................................................42

*Lozano v. City of Hazleton*,
  724 F.3d 297 (3d Cir. 2013) .................................................42

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018)....................................................... 26, 42

*NAACP v. City of Kyle, Tex.*,
   626 F.3d 233 (5th Cir. 2010) ................................................................. 13

*Nat'l Press Photographers Ass'n v. McCraw*,
   90 F.4th 770 (5th Cir. 2024) ...................................................... 18, 23, 24

*Nishimura Ekiu v. United States*,
   142 U.S. 651 (1892) ..................................................................... 26, 35, 45

*Nken v. Holder*,
   556 U.S. 418 (2009) .............................................................................. 51

*OCA-Greater Houston v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ................................................................ 15

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) .............................................................................. 38

*Parker v. Brown*
   317 U.S. 341 (1943) .............................................................................. 36

*Plyler v. Doe*,
   457 U.S. 202 (1982) .............................................................................. 45

*Reno v. American-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) .............................................................................. 31

*Rest. Law Ctr. v. U.S. Dep't of Labor*,
   66 F.4th 593 (5th Cir. 2023) ................................................................ 50

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) .............................................................................. 25

*Rogers v. Brockette*,
   588 F.2d 1057 (5th Cir. 1979) .............................................................. 20

*Rose v. Drs. Hosp.*,
   801 S.W.2d 841 (Tex. 1990) ................................................................ 48

*Seila Law LLC v. CFPB*,

140 S. Ct. 2183 (2020) ............................................................................49

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ...............................................................................18

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013) .............................................................................16

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) .............................................................................16

*Sterling v. Constantin*,
  287 U.S. 378 (1932) .............................................................................41

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ............................................................... 16, 17, 18

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) .............................................................................25

*Tex. Democratic Party v. Abbott*,
  978 F.3d 168 (5th Cir. 2020) .................................................. 21, 22, 23

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ........................................................ 27, 46

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ..............................................................16

*Town of Ball v. Rapides Par. Police Jury*,
  746 F.2d 1049 (5th Cir. 1984) ............................................................20

*Trans World Airlines, Inc. v. Mattox*,
  897 F.2d 773 (5th Cir. 1990) ..............................................................53

*Truax v. Raich*,
  239 U.S. 33 (1915).......................................................................25, 34

*Tweed-New Haven Airport Auth. v. Tong*,
  930 F.3d 65 (2d Cir. 2019) ..................................................................20

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012) ..................................................... 28, 35

*United States v. Booker,*
   543 U.S. 220 (2005)............................................................................49

*United States v. Curtiss-Wright Exp. Corp.,*
   299 U.S. 304 (1936)................................................................ 26, 35, 41

*United States v. Locke,*
   529 U.S. 89 (2000)...........................................................................40

*United States v. Peters,*
   9 U.S. 115, 136 (1809)......................................................................41

*United States v. Salerno,*
   481 U.S. 739 (1987)..................................................................... 42, 43

*United States v. Sanchez-Milam,*
   305 F.3d 310 (5th Cir. 2002) ..............................................................32

*United States v. Texas,*
   2016 WL 1213267 (U.S.) ...................................................................17

*United States v. Texas,*
   599 U.S. 670 (2023)..........................................................................31

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ..................................................... 18, 50

*Villas at Parkside Partners v. City of Farmers Branch,*
   726 F.3d 524 (5th Cir. 2013) ......................................................... passim

*Virginia Off. for Prot. & Advoc. v. Stewart,*
   563 U.S. 247 (2011)..................................................................... 19, 22

*Wages & White Lion Invs., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..............................................................50

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)................................................................................12

## Statutes and Constitutional Provisions

8 U.S.C. § 1101(a)(15)(T) ....................................................................4

8 U.S.C. § 1101(a)(15)(U) ....................................................................4

8 U.S.C. § 1101(a)(27)(J) ......................................................................4

8 U.S.C. § 1158(a)(1) ............................................................................4

8 U.S.C. § 1158(d)(2) ..........................................................................29

8 U.S.C. § 1225(b)(1) ............................................................................3

8 U.S.C. § 1225(b)(1)(A)(ii) ................................................................29

8 U.S.C. § 1229a ....................................................................................3

8 U.S.C. § 1229a(a)(3) ........................................................................28

8 U.S.C. § 1229a(b)(5)(A) ..................................................................29

8 U.S.C. § 1229b(b) ..............................................................................4

8 U.S.C. § 1231(a)(1)(A) ....................................................................29

8 U.S.C. § 1231(b)(3) ............................................................................4

8 U.S.C. § 1252 ......................................................................................3

8 U.S.C. § 1254a ....................................................................................4

8 U.S.C. § 1321 ......................................................................................3

8 U.S.C. § 1323 ......................................................................................3

8 U.S.C. § 1324 ......................................................................................3

8 U.S.C. § 1325 ......................................................................................3

8 U.S.C. § 1325(a) ................................................................. 5, 32

8 U.S.C. § 1326 ................................................................. 3, 6, 46

8 U.S.C. § 1326(a)(2) ...............................................................6

8 U.S.C. § 1326(a)(2)(A) ..........................................................32

8 U.S.C. § 1357(g)(10)(B) ........................................................47

8 U.S.C. §§ 1151–1382 .............................................................3

S.B. 2, Tex. 88th Leg., 1st C.S. (2023) .....................................49

S.B. 2424, Tex. 88th Leg., R.S. (2023)…………………………………..49

Tex. Code Crim. Proc. art. 5B.002 (e)(2) ...............................33

Tex. Code Crim. Proc. art. 5B.002 (g) ....................................33

Tex. Code Crim. Proc. art. 5B.002 ..........................................52

Tex. Code Crim. Proc. art. 5B.002(a) ........................................6

Tex. Code Crim. Proc. art. 5B.002(b) ........................................6

Tex. Code Crim. Proc. art. 5B.002 (c) ................................. 6, 33

Tex. Code Crim. Proc. art. 5B.002(d) .................................. 6, 33

Tex. Code Crim. Proc. art. 5B.003 .................................. 7, 30, 52

Tex. Gov't Code § 43.120(a)-(c) ...............................................23

Tex. Gov't Code § 411.006(a)(1) ..............................................21

Tex. Gov't Code § 411.006(a)(2) ..............................................21

Tex. H.B. 104, 88th Leg., 3d C.S. (2023) ...............................49

Tex. H.B. 1600, 88th Leg., R.S. (2023) ...................................48

Tex. H.B. 23, 88th Leg. 3d C.S. (2023) ....................................................49

Tex. H.B. 5270, 88th Leg., R.S. (2023) ..................................................49

Tex. H.B. 5281, 88th Leg, R.S. (2023) ...................................................49

Tex. H.B. 79, 88th Leg., 3d C.S. (2023) .................................................49

Tex. Health & Safety Code §§ 481.112-141 .........................................53

Tex. Penal Code § 12.33 ...........................................................................6

Tex. Penal Code § 12.33 .........................................................................34

Tex. Penal Code § 12.33(a).....................................................................34

Tex. Penal Code § 20A.02 ......................................................................53

Tex. Penal Code § 51.02(a)........................................................................5

Tex. Penal Code § 51.02(c) .................................................................. 5, 30

Tex. Penal Code § 51.02(c)(1) ................................................................33

Tex. Penal Code § 51.02(c)(2) ................................................................32

Tex. Penal Code § 51.03...........................................................................32

Tex. Penal Code § 51.03(a).......................................................................6

Tex. Penal Code § 51.03(c) ......................................................................34

Tex. Penal Code § 51.04 ...................................................................... 6, 30

Tex. Penal Code § 51.04 (a)(2) ...............................................................33

Tex. Penal Code § 51.04 (b) ....................................................................33

Tex. Penal Code § 76.02 .........................................................................53

Tex. S.B. 11, 88th Leg., 3d C.S. (2023) ...................................................49

U.S. Const. art. I, §10, cl. 3 ....................................................................40

U.S. Const. art. VI, cl. 2 .........................................................................18

## Regulations

8 C.F.R. § 214.14 ...................................................................................52

8 C.F.R. § 209.2 .....................................................................................29

8 C.F.R. § 208.7 .....................................................................................29

8 C.F.R. § 212.2(d) .................................................................................32

8 C.F.R. § 214.14 ...................................................................................52

8 C.F.R. §§ 208.14(e),.............................................................................29

## Other Authorities

*Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato
Inst. (Sept. 14, 2022) https://perma.cc/8RTW-MENH............................................52

*Feud Between House and Senate Leaders May Scuttle Far Reaching Border
Security Bill*, NBC DFW (Nov. 5, 2023), https://perma.cc/9V3D-4B59 ...............7

*Mexico, a Key U.S. Ally on Migration, Pushes Back Hard on Texas Law*, Wash.
Tex. Code Crim. Proc. art. 5B.002 (d).....................................................31

Statement of Brian Sulc, Executive Director, Transnational Organized Crime
Mission Center, Office of Intelligence and Analysis, Department of Homeland
Security (May 18, 2022), https://perma.cc/76WQ-4YTU
…........................................53

U.S. Sentencing Comm'n, Quick Facts: Fentanyl Trafficking Offenses (2022),
https://perma.cc/XDY9-S49M ..............................................................53

*Written Testimony Before the Subcomm. on the Constitution and Limited Gov't of*

*the H. Comm. on the Judiciary*, 118th Cong. (2024) (written statement of Brent Webster, First Assistant Att'y Gen. of Texas), https://perma.cc/497P-6EHY  34

# INTRODUCTION

Senate Bill 4, 88th Legis., 4th Spec. Sess. (Tex. 2023) ("S.B. 4"), makes certain entries into this country state crimes, and allows state officials to issue deportation orders. As the district court rightly held, S.B. 4 fails under both of the well-established tests for field preemption (even though either would suffice): (1) The federal government has a dominant interest in the field of entry into and removal from the United States, which displaces any concurrent state regulation, and (2) Congress has fully occupied the field by exhaustively regulating entry and removal in general, and noncitizens entering between ports in particular. In addition to field preemption, S.B. 4 conflicts with federal immigration laws in multiple respects: It erases the federal discretion and control Congress placed the heart of our immigration laws, interferes with the federal government's foreign policy authority, and upsets Congress's careful balance of myriad national interests—including access to asylum and other protections.

Texas's threshold defenses fail. The federal government has sued in this consolidated case, and there can be no real doubt that the United States may seek relief in its own courts against states that try to usurp its power. In any event, the plaintiffs—two organizations dedicated to advancing and protecting the rights of noncitizens and the County of El Paso—have standing and a cause of action under clear precedent, and Texas's unsupported contrary arguments would wipe out huge

swaths of routine litigation, including Texas's own.

On the merits, Texas attempts to rewrite its own statute, portraying the state removal orders as nearly meaningless—even though the text of S.B. 4 says they require people to leave the country, with 20-year prison terms backing them up. It also repeatedly claims S.B. 4 "mirrors" federal law, but field preemption excludes even complementary state laws, and in any event, S.B. 4 diverges from and conflicts with federal law in numerous ways. Ultimately, the State asserts that an amorphous "war" allows it to unilaterally dispose of the Supremacy Clause. This limitless claim to state supremacy flies in the face of our constitutional structure. Texas cannot so easily overturn 150 years of Supreme Court precedent barring states from regulating entry and removal.

The district court also properly weighed the equities, concluding that Texas has no cognizable interest in this preempted law and that it will severely harm the plaintiffs and the communities they serve. There was no abuse of discretion in blocking this unlawful statute, and the Court should affirm.

## ISSUE PRESENTED

Whether the district court abused its discretion in preliminarily enjoining S.B. 4 as preempted, where 150 years of Supreme Court precedent excludes states from enacting their own entry and removal regulations, and S.B. 4 intrudes on and conflicts with Congress's comprehensive regime.

## STATEMENT OF THE CASE

### A.    The Federal Government's Authority to Regulate Immigration

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens. *Arizona v. United States*, 567 U.S. 387, 394 (2012); *see Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration . . . and deportation"). In the Immigration and Nationality Act ("INA"), Congress created a complex system to regulate entry into and removal from the United States. *See generally* 8 U.S.C. §§ 1151–1382. Congress's scheme strikes a careful balance between discouraging irregular entry between ports and providing humanitarian and other protections.

For enforcement, Congress provided federal officials with a range of civil and criminal options. On the civil side, to decide whether a person who entered without inspection at a port will be removed, Congress has established several alternative removal procedures, including full removal proceedings with trial-like processes subject to administrative and judicial appeals, 8 U.S.C. §§ 1229a, 1252, and expedited removal proceedings applicable to recent border crossers, *id.* § 1225(b)(1). On the criminal side, unlawful entry and reentry into the country are federal offenses, *id.* §§ 1325, 1326, and irregular entries are also governed by various other criminal regulations, *see, e.g.*, *id.* §§ 1321, 1323, 1324.

3

Along with these enforcement tools, Congress enacted a range of protections that are available despite unlawful entry.  Asylum is specifically available "whether or not" a noncitizen enters "at a designated port of arrival," and "irrespective of such [noncitizen's] status."  8 U.S.C. § 1158(a)(1).  Congress also barred officials from removing people to likely persecution or torture, in compliance with the United States' obligations under international treaties.  *See id.* § 1231(b)(3) and Note.  In addition, individuals who are placed in full removal proceedings may apply for other forms of relief, including cancellation of removal.  8 U.S.C. § 1229b(b).  Noncitizens who have entered without inspection may also apply affirmatively for numerous forms of relief outside of removal proceedings, including visas for victims of crimes and trafficking, *id.* §§ 1101(a)(15)(U); 1101(a)(15)(T); temporary protected status, *id.* § 1254a; and Special Immigrant Juvenile Status for noncitizens under 21 years of age, *id.* § 1101(a)(27)(J).

Given the complexities of the immigration system, Congress has determined that federal discretion and control are vital.  A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.  Federal officials "decide whether it makes sense to pursue removal at all." *Id.*  Federal officials choose among the several removal processes Congress established.  *See Biden v. Texas*, 142 S. Ct. 2528, 2535 (2022).  Federal officials decide whether to deploy the associated criminal immigration charges.  *See Ga.*

*Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1265 (11th Cir. 2012).

And once removal procedures have been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens.  *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).  Under "the system Congress created," state officers may assist federal efforts in certain "limited circumstances," but only "subject to the [federal government's] direction and supervision."  *Arizona*, 567 U.S. at 409.

### B.    Senate Bill 4

S.B. 4 establishes three new state crimes that criminalize entry into the United States and authorize state deportations without any federal direction or protection from removal.

S.B. 4 makes it a crime for a noncitizen to enter or attempt to enter Texas directly from a foreign nation—Mexico, as a practical matter—at any location other than a port of entry.  Tex. Penal Code § 51.02(a).  Affirmative defenses are available for this charge only when the conduct does not violate the federal illegal entry statute, 8 U.S.C. § 1325(a), or when a noncitizen has already been granted "lawful presence," asylum, or benefits under the Deferred Action for Childhood Arrivals program.  Tex. Penal Code § 51.02(c).  S.B. 4 does not provide an affirmative defense for noncitizens seeking federal status, including those with pending asylum claims.  *Id.*

S.B. 4 also creates a new state "reentry" charge, applicable if a noncitizen

enters, attempts to enter, or is at any time found in Texas after the person has been denied admission to, excluded, deported, or removed from the United States, or departed from the United States while such an order was outstanding.  Tex. Penal Code § 51.03(a).  S.B. 4 provides no affirmative defenses for this crime.  *Id*.  In particular, the fact that an individual could not be convicted of the federal reentry charge, 8 U.S.C. § 1326—because, for example, they reentered with the express "consent" of the federal government, *id.* § 1326(a)(2)—is not a defense to § 51.03.

As part of prosecuting these crimes, S.B. 4 empowers state officials to unilaterally order the deportation of individuals from the United States.  If a person is convicted under S.B. 4's entry or reentry provisions, the state judge "shall" issue "an order requiring the person to return to the foreign nation from which the person entered"—even if the INA would dictate a different country of removal.  Tex. Code Crim. Proc. art. 5B.002(d).  Refusal to comply with an Order to Return is a state crime punishable by up to 20 years in prison; there are no affirmative defenses.  Tex. Penal Code §§ 12.33, 51.04.  A state magistrate or judge may alternatively enter an Order to Return in lieu of continuing the prosecution if the noncitizen accepts that order.  Tex. Code Crim. Proc. art. 5B.002(a)-(c).

As to all of these offenses, S.B. 4 specifically prohibits "abat[ing] the prosecution . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated," even if under federal law the

noncitizen's removal would be statutorily prohibited if he ultimately prevailed in the immigration proceeding.  *Id.* art. 5B.003.

These provisions work together to quickly generate state deportation orders. An individual arrested under S.B. 4's entry or reentry crimes will often lack a defense to the state criminal charge, especially because federal defenses like asylum eligibility cannot be raised as a defense to conviction and removal under S.B. 4.  That person will therefore face a near-certain conviction, sentence, and mandatory removal order.  But S.B. 4 offers them an alternative: accept a state deportation order at the outset, in lieu of prosecution.  Since the noncitizen will be issued a removal order after conviction anyway, the incentive is strong to simply accept the removal order.  And once the removal order is in place, S.B. 4 requires the person to return to Mexico, regardless of their nationality, or face an additional 20 years in prison, with no affirmative defenses.

S.B. 4's focus on removal is no accident.  As its sponsor explained, the legislature's goal was "not to incarcerate more people . . . . [T]he primary focus would be to return those folks to the country from which they came."[1]  The speaker of the house further noted that a system with only entry and reentry crimes, but lacking the mechanisms to funnel people into state deportation as an alternative to

---

[1] Phil Prazan, *Feud Between House and Senate Leaders May Scuttle Far Reaching Border Security Bill*, NBC DFW (Nov. 5, 2023), https://perma.cc/9V3D-4B59.

conviction and prison terms, would impose "the exorbitant costs of [noncitizens']

long-term detention, including healthcare, housing, and meals" on Texas.  *Id.*

### C.    Procedural History

Plaintiffs are Las Americas Immigrant Advocacy Center and American

Gateways, two legal services organizations, and the County of El Paso.  Defendants

are Steven C. McCraw in his official capacity as Director of the Texas Department

of Public Safety and Bill D. Hicks in his official capacity as District Attorney for the

34th Judicial District of Texas (which includes El Paso County).  The United States

filed a parallel challenge to S.B. 4 against Texas, Governor Greg Abbott, the Texas

Department of Public Safety, and McCraw.[2]

The plaintiffs moved for preliminary injunctions in both cases, which were

then consolidated.   On February 29, the district court preliminarily enjoined

enforcement of S.B. 4.  It held that Las Americas and American Gateways had

standing because S.B. 4 will "completely change[]" their core operations and

frustrate their missions, ROA.487-95, and that El Paso County had standing because

S.B. 4 would interfere with its law enforcement programs, ROA.495-99.  The district

court also concluded that the plaintiffs and the United States had an equitable cause

of action.  ROA.499-504.

---

[2] Except where relevant, the plaintiffs refer to McCraw and the other defendants in the federal government's suit as "Texas."  Hicks filed a separate brief on appeal.

The district court then held that S.B. 4 was preempted.  ROA.506-39.  The federal government, the court explained, has a "dominant interest in immigration and a complex legal framework to regulate noncitizen entry and removal," rendering S.B. 4 field preempted.  ROA.530.  It likewise held that S.B. 4 conflicts with federal law in multiple respects, including by eliminating federal supervision and discretion, directing prosecutions to continue despite the availability of federal relief from removal, and interfering with the federal government's ability to conduct foreign policy.  ROA.530-39.

The district court also rejected Texas's claim that migration across the southern border constituted an "actual invasion" under the Constitution's State War Clause, or that S.B. 4 would be a proper exercise of any war power the State might be able to claim.  ROA.544-67.  It explained that "to allow Texas to permanently supersede federal directives on the basis of an invasion would amount to nullification of federal law and authority—a notion that is antithetical to the Constitution and has been unequivocally rejected by federal courts since the Civil War."  ROA.480; *see id*. at 567-75.

Shortly after the district court's order, Texas sought an emergency stay pending appeal and an administrative stay from this Court.  On March 2, the Court issued an order granting an administrative stay.  ECF No. 43-2.  Judge Ramirez dissented.  *Id.*  The Court deferred consideration of a stay pending appeal to the

merits panel and ordered the appeal expedited. *Id.*

The plaintiffs in both cases filed applications to vacate this Court's stay with the Supreme Court. On March 19, 2024, the Supreme Court denied the applications. 601 U.S. ___, Nos. 23A814, 23A815. Justices Kagan, Sotomayor, and Jackson dissented. Justices Barrett and Kavanaugh concurred, citing the "very unusual procedural posture" of reviewing an administrative stay. *Id.* at 2. Later that day, this Court dissolved the administrative stay. ECF No. 121-1. Judge Oldham dissented. *Id.*

## SUMMARY OF ARGUMENT

I.    The district court correctly held the plaintiffs are likely to succeed on the merits.

A.    Texas's threshold arguments as to the *Las Americas* plaintiffs are beside the point because the federal government can plainly challenge this preempted law, and the Court can therefore reach the merits. In any event, the district court rightly held that the plaintiffs have standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). Unable to contest standing under settled law, Texas advances a theory that would wipe out standing for any party not directly regulated by a challenged law—even though Texas itself brings such cases all the time.

Likewise, the plaintiffs have an equitable cause of action under clear circuit

precedent. And this suit falls comfortably within the *Ex parte Young* exception to sovereign immunity for all defendants. Hicks, moreover, is not entitled to sovereign immunity as a local official.

B.    On the merits, S.B. 4 is straightforwardly preempted. The federal interest in entry and removal is dominant and exclusive, and Congress has fully occupied the field with a comprehensive statutory scheme. S.B. 4 is also conflict preempted in numerous ways, including because it directs removal without access to federal protections, strips away federal discretion, and impairs foreign policy.

Texas attempts to rewrite S.B. 4 to mitigate the obvious conflicts, but cannot escape the text of the law as enacted. It likewise tries to twist *Arizona* into an unrecognizable form, but *Arizona* strongly supports the plaintiffs in this case. And it ultimately falls back on the breathtaking assertion that it may declare an amorphous "war" as justification for usurping federal authority, and no branch of the federal government has any say in the matter. The district court rightly rejected that position as contrary to our constitutional system.

The district court was correct to enjoin S.B. 4 in full. Its entry, reentry, and removal provisions are all preempted, whether separately or together. And its removal process is not severable in any event.

II.    Nothing in the district court's equities analysis was an abuse of discretion. S.B. 4 will upend the plaintiffs' operations and dramatically harm the

public interest, with thousands of illegal arrests, prosecutions, and removals, and chaos and confusion at ports. By contrast, Texas suffers no harm from the injunction of a preempted statute. And S.B. 4 will not address Texas's concerns about drugs and crime, which can be handled with ordinary criminal laws.

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court "review[s] the district court's grant of Plaintiffs' preliminary injunction for abuse of discretion, reviewing underlying factual findings for clear error and legal conclusions de novo." *Book People, Inc. v. Wong*, 91 F.4th 318, 328 (5th Cir. 2024) (cleaned up).

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Texas Is Not Likely to Succeed on its Threshold Arguments.

Texas raises various threshold arguments to avoid defending S.B. 4 on its merits. Its arguments are incorrect under clear precedent, as explained below, but there is ultimately no need for the Court to resolve them. Texas does not contest the federal government's standing, and—notwithstanding its extraordinary arguments

to the contrary, Texas Br. 16-20—there can be no real doubt that the United States may sue in its own courts to block individual states from usurping federal authority, ROA.503-04.  That is enough to proceed directly to the merits.  *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (only addressing one plaintiff's standing in consolidated case, and noting the Court "need not consider the standing issue" for others).

### 1.  Plaintiffs have standing.

1.  As the district court held, all of the plaintiffs have standing.  At this stage, the plaintiffs must "show only that each element of standing is *likely* to obtain in the case at hand."  *Book People*, 91 F.4th at 329 (emphasis added) (internal quotation marks omitted).

A plaintiff "may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct." *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see* ROA.489-90.  As the district court explained, the uncontested factual record shows that S.B. 4 requires the plaintiff organizations to divert substantial resources and will frustrate their organizational missions.  *See* ROA.490-95.

Hicks says that S.B. 4 changes nothing because the plaintiff organizations "already offered immigrants help navigating the immigration process."  Hicks Br.

43.  But this is a *different*, state-law "immigration process."  Unlike the federal system, S.B. 4 operates by threatening individuals into accepting removal in lieu of prosecution; it requires state judges to order people removed upon conviction; and it provides no defense to those who would seek federal immigration relief.  S.B. 4 thus completely changes the manner in which the plaintiffs must reach, counsel, and represent noncitizens.  *See* ROA.490-91; *id.* at 942-47, 952-55.

These diversion injuries plainly "result[] from counteracting the effects of" S.B. 4 consistent with the organizations' missions.  *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000).  Las Americas, for example, "focus[es] [its] efforts on ensuring that those noncitizens at the greatest danger from removal are able to access protection."  ROA.937.  Because S.B. 4 creates a new system of rapid deportation without *any* relief, those subject to S.B. 4 will now be the "most vulnerable to removal," so representing them will be "a necessary part of and consistent with" the organization's mission.  ROA.937-38 (describing similar shift to address earlier federal summary removal system).  The same is true for American Gateways.  ROA.952-53.

The scale of these operational changes is clear from Texas's stated plans to enforce S.B. 4 against some 80,000 immigrants every year, which will cause an enormous shift in the asylum system in Texas.  *See* ROA.959-60.  And it is particularly important for the plaintiffs to obtain pre-enforcement relief, because

14

much of the irreparable harm will be done if S.B. 4 is implemented and plaintiffs are forced to dramatically alter their operations before post-enforcement litigation.  No defendant offers any factual response on these issues, nor any argument that any of the district court's factual conclusions were clear error.

These injuries match and exceed what this Court has held sufficient for standing.  For instance, *OCA-Greater Houston v. Texas* held that a voter services organization had standing to challenge a new law that required it "to spend extra time and money" educating voters about the law.  867 F.3d 604, 610-12 (5th Cir. 2017) (diversion was "not large" but sufficient because it was aimed at "mitigating [the] real world" impact of the law); *see also All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725, at *11 (5th Cir. Apr. 12, 2023) (unpublished) (policy "frustrated" plaintiff's "organizational efforts to educate their members and the public" and "impaired its ability to provide . . . services" ) (internal quotation marks omitted).

Texas dismisses this diversion of resources as "a voluntary strategic choice." Texas Br. 14.  But labeling a diversion as "voluntary" changes nothing; the Supreme Court has "made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred."  *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 297 (2022); *see Havens Realty*, 455 U.S. at

374 (organization had standing to challenge housing discrimination it had chosen to address). S.B. 4 alters the core of the plaintiff organizations' work, and thus they have standing.

2. Unable to contest standing based on settled law, Texas proposes a sea change in standing doctrine. It points to an out-of-context quote from *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), and argues for an Article III bar against pre-enforcement claims by any party who is not subject to a "threat of prosecution" under the challenged law. Texas Br. 10, 14. But it does not cite a single case endorsing that position.

The implications would be stunning. It would mean that Texas itself has lacked standing in a host of challenges it has brought to policies that regulate third parties. *But see, e.g.*, *Texas v. United States*, 809 F.3d 134, 155-62 (5th Cir. 2015) (holding Texas had standing to bring *pre-enforcement* challenge). And it would mean that all manner of businesses, organizations, individuals, and government entities could no longer bring challenges to regulations that injure them but do not subject them to any enforcement action. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972) (environmental litigation); *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023) (APA cases by states harmed by third-party regulation); *Davis v. FEC*, 554 U.S. 724, 734 (2008) (plaintiff had standing to prevent "prospective injury" from rule that regulated third party); *Shelby Cnty. v. Holder*, 570 U.S. 529, 537 (2013)

(describing pre-enforcement voting cases to "to block voting laws from going into effect"); *Ga. Latino All.*, 691 F.3d at 1260 (pre-enforcement *Havens Realty* standing).

The *Susan B. Anthony* requirements make sense when a regulated party brings a pre-enforcement suit. To ensure that such a party's injury is not "speculative," courts ask whether the "individual is subject to" "a threat" of "arrest, prosecution, or other enforcement action." 573 U.S. at 157-58, 160 (internal quotation marks omitted). But parties who will be injured by a law's enforcement in ways other than prosecution can never, by definition, show that they are subject to a threat of prosecution. Texas itself has previously refuted this baseless argument. *See* Br. for Respondents 20-21, *United States v. Texas*, 2016 WL 1213267 (U.S.) (explaining that standing is not limited to situations in which "the plaintiff is the object of the government action" or "direct regulation") (cleaned up); *see also id.* (citing *Susan B. Anthony*). This Court should likewise reject it.

Hicks suggests that the plaintiffs lack standing because their preemption claim does not satisfy *Susan B. Anthony*'s requirement of a "constitutional interest." Hicks Br. 40-41. But as just explained, *Susan B. Anthony* does not apply to plaintiffs whose injuries do not stem from the threat of future prosecution. That is enough to reject this defense.

In any case, the plaintiffs have a constitutional interest to bring their

17

Supremacy Clause claim. U.S. Const. art. VI, cl. 2. The Supreme Court has been clear that private parties have standing to "vindicate [their] own *constitutional interests*" in raising federalism claims, and "a direct interest in . . . laws that upset the constitutional balance." *Bond v. United States*, 564 U.S. 211, 220-22 (2011) (emphasis added). Accordingly, plaintiffs who are subject to the *Susan B. Anthony* test can satisfy it when they challenge state laws as preempted. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013), *cert. denied*, 572 U.S. 1060 (2014); *cf. Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022) (general "federalism principles" provided constitutional interest for pre-enforcement standing). Holding otherwise would mean that private parties of all kinds would be constitutionally barred from challenging preempted state laws—contrary to well-established law. *See*, *e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (collecting cases); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 20 (2013); *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 795 (5th Cir. 2024); *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-36 (5th Cir. 2023).

3. Defendant Hicks dedicates much of his brief to contesting El Paso County's standing. Hicks Br. 26-39. Of course, the Court need only find one plaintiff has standing to proceed. *Bowsher*, 478 U.S. at 721. In any event, his arguments lack merit.

Under S.B. 4, the County will have to pay to hold people in its jails, to provide

appointed counsel, and to train Sheriff staff, police officers, and court personnel. ROA.960-61.  S.B. 4 will also erode the public trust the County has worked to develop with its most vulnerable communities, whose members will now fear that interactions with County officials could lead their families to be separated because of arrest and removal under S.B. 4.  ROA.482-83, 583-84; *id.* at 967.

Hicks vaguely contests the magnitude of these harms, for instance by objecting to the County's "valuation" of per-inmate incarceration costs, and by claiming that not every arrest will lead to prosecution.  Hicks Br. 32-34.  Such nit-picking does not establish clear error.  In any event, as the district court explained, even a small injury would be sufficient for standing, so Hicks' arguments are beside the point.  ROA.498.  As for his argument that the injuries are not traceable to him, Hicks Br. 35-36, Hicks has offered no reason to believe he will not follow his normal practice of enforcing criminal laws, and cannot avoid suit by refusing to comment on his plans.  *See infra* Part I.A.2.

Hicks and Texas also contend that El Paso County, as a subdivision of the State, cannot sue other state entities.  Hicks Br. 31 n.2; Texas Br. 14-15.  But the Supreme Court has repeatedly held that courts can entertain cases where "the opposing parties are both creatures of the [state]." *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 257-59 (2011); *see Lassen v. Arizona*, 385 U.S. 458, 459 n.1 (1967).  As this and other courts have held, *Rogers v. Brockette*, 588 F.2d 1057

(5th Cir. 1979), a "subdivision may sue its state under the Supremacy Clause," *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019); *see Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 630 (10th Cir. 1998) (same); *City of Alpine v. Abbot*, 730 F. Supp. 2d 630, 633 (W.D. Tex. 2010) (same); *Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 368-70 (D.N.J. 2020) (same).

The cases defendants cite, by contrast, "are *not* decisions about a municipality's standing to sue its state," but rather involve "substantive interpretations of the constitutional provisions involved." *Rogers*, 588 F.2d at 1068-1071 (emphasis added) (explaining that those same cases impose "no bar to conferring standing" for a preemption claim); *cf. Town of Ball v. Rapides Par. Police Jury*, 746 F.2d 1049, 1051 n.1 (5th Cir. 1984) (cited by Hicks) (town could not assert Fourteenth Amendment claim).

### 2.  Plaintiffs have a cause of action and satisfy *Ex parte Young*.

Texas contends that the plaintiffs lack a cause of action, suggesting that to sue plaintiffs must establish a "private right[] of action" by pointing to statutory "rights-creating language."  Texas Br. 16 (internal quotation marks omitted).

This Court has already rejected that argument.  *Crown Castle Fiber* specifically held that plaintiffs have "'a cause of action . . . at equity'" to seek "relief on preemption grounds" even where the relevant federal statute "does not confer a private right."  76 F.4th at 434-35 (quoting *Green Valley Special Util. Dist. v. City*

*of Schertz*, 969 F.3d 460, 475 & n.27 (5th Cir. 2020) (en banc)) (italics omitted). Texas invokes *Armstrong v. Exceptional Child Center, Inc.*, but that case said the same thing—that "'relief may be given in a court of equity'" unless Congress acts affirmatively to "preclude the availability of equitable relief." 575 U.S. 320, 327-28 (2015). *Armstrong* undertook an entirely *separate* analysis to determine whether, apart from the equitable cause of action, Congress had provided an implied statutory cause of action. *See id*. at 331-32. Texas does not acknowledge the binding precedent of *Crown Castle Fiber* (even though plaintiffs have cited it throughout this litigation), which relies on *Armstrong*, nor does it advance any argument that Congress has "preclude[d]" equity here. *Armstrong*, 575 U.S. at 328.[3]

Texas also raises sovereign immunity for Defendant McCraw. Texas Br. 15-16. But *Ex parte Young*, 209 U.S. 123 (1908), provides an exception to immunity where a plaintiff seeks prospective relief against a state officer, *Green Valley*, 969 F.3d at 471, who has "some connection with the enforcement of the act," *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020). Texas does not contest that McCraw is a state officer charged with enforcing S.B. 4. *See* Tex. Gov't Code § 411.006(a)(1)-(2).

---

[3] *Armstrong* held that Congress's provision of a specific remedy for the quasi-contractual preemption claim at issue in that case, plus "the judicially unadministrable" mandate at issue, together implicitly displaced the equitable cause of action. *Id.* at 328-29. Neither is present here.

Rather, Texas cryptically suggests that *Ex parte Young* requires that McCraw will enforce S.B. 4 "against *these Plaintiffs*."  Texas Br. 16 (emphasis added).  But it does not cite a single case that limits *Ex Parte Young* to potential defendants, and as the Supreme Court has explained, "there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff."  *Virginia Off. for Prot. & Advoc.*, 563 U.S. at 256.  Courts regularly hold that plaintiffs satisfy *Ex parte Young* even though they are not potential defendants in any future enforcement action.  *See, e.g.*, *id.* at 252 (agency plaintiff sought access to records); *Tex. Democratic Party*, 978 F.3d at 179 (voter plaintiffs sued to change forms).

Hicks also raises sovereign immunity, arguing that the plaintiffs have not proved that he intends to prosecute S.B. 4 violations.  Hicks Br. 23.  That defense fails for at least three reasons.

First, Hicks is advancing a factual issue—whether he will actually prosecute—but never gave the plaintiffs or the factfinder any opportunity to examine the question in district court.  Had he done so, the plaintiffs might have sought his testimony on the issue, and the district court might have made findings regarding his intentions.  This Court should decline to entertain this issue in the first instance, particularly given this case's preliminary injunction posture.

Second, in any case, "Texas district attorneys are not protected by the Eleventh Amendment," because "they are county officials, not state officials."  *Nat'l*

*Press Photographers*, 90 F.4th at 787 (cleaned up). Hicks addresses his funding and duties at great length. Hicks Br. 9-21. But this Court has squarely rejected the exact same arguments, concluding that the same factors show that "a Texas district attorney" is "properly viewed as a county official." *Crane v. Texas,* 766 F.2d 193, 194-95 (5th Cir. 1985) (per curiam) (addressing funding and duties); *see Hudson v. City of New Orleans*, 174 F.3d 677, 682 (5th Cir. 1999) ("In *Crane* [], we held that Texas district attorneys were not protected by the Eleventh Amendment."). Hicks cites two unpublished cases, Hicks Br. 25, but this Court has already rejected them as contrary to the Court's "categorical" approach in precedential opinions, *Nat'l Press Photographers*, 90 F.4th at 787.[4]

Third, even if Hicks was a state official, the *Ex parte Young* exception to sovereign immunity would still apply. It is enough that Hicks is "statutorily tasked with enforcing the challenged law." *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (cleaned up), *vacated on other grounds*, 141 S. Ct. 1261 (2021); *see* Tex. Gov't Code § 43.120(a)-(c); *Tex. Democratic Party*, 978 F.3d at 180 (statutory authority satisfied *Ex parte Young*); *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) (same). And Hicks does not actually deny that he would enforce S.B. 4, the same way he enforces

---

[4] Of course, this does not mean that a district attorney is a local official for all purposes. *See, e.g.*, *Daves v. Dallas Cnty.*, 22 F.4th 522, 533-34 (5th Cir. 2022) (explaining the difference between sovereign immunity analysis and § 1983 analysis).

all of the State's criminal laws.  *Cf. Nat'l Press Photographers*, 90 F.4th at 786 (longstanding statute had "*never*" been enforced).  Again, Hicks cannot avoid suit by staying silent.

### B.    S.B. 4 Is Preempted.

On the merits, S.B. 4 is straightforwardly preempted.  As the district court held, the law intrudes into a field—entry and removal—of dominant federal interest in which Congress has enacted a comprehensive and exclusive federal scheme.  S.B. 4 also conflicts with federal law in fundamental ways.  Texas can offer little in response within the framework of settled preemption law, instead mostly attempting to rewrite its statute.  Ultimately, Texas claims a blank check to disregard and override Congress's handiwork.  That remarkable position is untenable.

### 1.  S. B. 4 Intrudes on the Field of Entry and Removal

In S.B. 4, Texas established a state immigration system that entirely bypasses Congress's comprehensive scheme.  Texas has regulated and criminalized entry into the United States; chosen for itself who will be permitted to remain in the country, what statuses will qualify as defenses to removal, and what procedures will apply; and claimed the power to deport noncitizens by ordering them to depart the United States on pain of severe additional punishment.  But immigration is an exclusively federal power, and Congress has long occupied the field of entry and removal.  S.B. 4 is thus field preempted.

Courts infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The federal interest in immigration is "overwhelmingly dominant," *Ga. Latino All.*, 691 F.3d at 1264. For 150 years—ever since Congress began systematically regulating immigration—the Supreme Court has been crystal clear: Regulation of entry into and expulsion from the United States are exclusively federal matters from which the States are excluded. *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Hines*, 312 U.S. at 62 & n.10 (similar); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (similar); *Arizona*, 567 U.S. at 409 ("Policies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress") (quoting *Galvan v. Press,* 347 U.S. 522, 531 (1954) (cleaned up); ROA.507-08 (collecting cases).

Core immigration powers are "inherent in [the] sovereignty" of the United

States as a nation. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). That sovereign authority includes the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe," *id.*, as well as to "expel" noncitizens from within the country, *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893); *see Arizona*, 567 U.S. at 394-95. States, by contrast, are not endowed with "powers of external sovereignty" such as "the power to expel" noncitizens. *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936) (citing *Fong Yue Ting*).[5]

Relatedly, immigration decisions are so "deeply intertwined with the United States' foreign relations," that they "must be made with one voice." *Arizona*, 567 U.S. at 409; *see also Jama v. ICE*, 543 U.S. 335, 348 (2005) (similar); ROA.508-09, *id.* at 516-17. "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona*, 567 U.S. at 395. The Supreme Court has explained time and again that allowing states to regulate immigration could lead to "disastrous" consequences. *See Chy Lung*, 92 U.S. at 279–80 (explaining how "a single State c[ould], at her pleasure, embroil us in disastrous quarrels with other nations"); *Hines*, 312 U.S. at 64

---

[5] States do have certain "elements of sovereignty." *Arizona*, 567 U.S. at 398. For example, the federal government may not "compel[] state officers to enforce federal law." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 463 (2018).

(similar).

Similarly, this Court recently explained that "[p]olicies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress," and thus "[a]n attempt by Texas to establish an alternative classification system . . . would be preempted." *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) (cleaned up). And the same principle is reflected in *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) (en banc). While the housing ordinance at issue in that case yielded disagreement, every member of the en banc Court agreed with "the longstanding, unremarkable principle that the federal government's authority to exclude or remove foreign nationals . . . is necessarily exclusive of infringement by state or local legislation." *Id.* at 545 (Dennis, J., specially concurring); *see id.* at 536-37 (plurality opinion); *id.* at 557 (Owen, J., concurring in part) ("the federal government undeniably has the exclusive power to determine questions of removal and deportation"); *id.* at 559 & n.77 (similar); *id.* at 567 (Jones, J., dissenting) (the Constitution "vests exclusive control over the 'authority to control immigration—to admit or exclude aliens— . . . solely in the Federal government'").

Consistent with this dominant federal interest, Congress has "enacted a 'framework of regulation so pervasive that Congress left no room for the States to supplement it.'" ROA.510 (quoting *Arizona*, 567 U.S. at 399). Through the INA,

Congress has established an exceptionally detailed, complex, and finely reticulated regulatory framework governing the inspection, admission, and removal of noncitizens seeking to enter the United States.  *See United States v. Alabama*, 691 F.3d 1269, 1294 (11th Cir. 2012) (discussing "Congress's comprehensive statutory framework governing alien removal").   Congress has created multiple removal pathways, has criminalized entry and reentry between ports of entry, and has provided numerous protections from removal; where removal is authorized, Congress has dictated the particular countries to which the noncitizen may be sent. *See supra* pages 3-4.  And it has specifically provided that these provisions shall be "the sole and exclusive procedure" for determining the status of a noncitizen.  8 U.S.C. § 1229a(a)(3); *see Farmers Branch*, 726 F.3d at 537 (relying on this provision).  Through these many intricate and interrelated provisions, Congress has established "a full set of standards governing" the entry and removal of noncitizens, "including the punishment for noncompliance"—a system that is "designed as a 'harmonious whole.'" *Arizona*, 567 U.S. at 401 (quoting *Hines*, 312 U.S. at 72).  As such, "States may not enter" this field "in any respect," and "even complementary state regulation is impermissible." *Id*. at 401-02.

### 2.  S. B. 4 Conflicts with Federal Law.

S.B. 4 is also conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in

multiple respects. *Arizona*, 567 U.S. at 399 (quoting *Hines,* 312 U.S. at 67).

*First*, S.B. 4 *requires* state officials to contradict federal law, by mandating state removal despite a person's federal permission to remain in the United States while their claims for asylum or other relief are pending, and by requiring noncitizens to comply with state removal orders even if they are later granted legal status in the United States.

If a noncitizen is convicted under S.B. 4, they must be issued a state deportation order. *Supra* page 6. But in the federal system, that very same person may be granted asylum, or various other forms of status, which would give them permission to remain in this country, and a path to lawful permanent residence and eventually citizenship. 8 C.F.R. §§ 208.14(e), 209.2. And, critically, federal law also allows people to remain in this country *pending* a decision about their asylum claim. 8 U.S.C. § 1225(b)(1)(A)(ii) (preventing removal while a person's asylum claim is heard); *see id*. § 1158(d)(2); 8 C.F.R. § 208.7 (providing for work authorization while an asylum decision is pending). In fact, federal law *requires* people to remain in this country while they are pursuing asylum or other relief. *See, e.g.*, 8 U.S.C. § 1229a(b)(5)(A) (requiring noncitizens to attend their federal hearings). And more generally, federal law allows people to remain in the country while their removal proceedings play out. *See* 8 U.S.C. § 1231(a)(1)(A) (removal only after "an alien is ordered removed" in federal removal proceedings).

Yet S.B. 4 explicitly rejects any defense for people who are applying for asylum or other federal relief.  It provides that a "court may not abate the prosecution of an offense under" its new criminal provisions "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  Tex. Code Crim. Proc. Art. 5B.003.  And S.B. 4's penalties for disobeying a state removal order contain no defense for people who are later *granted* federal relief.  *Compare* Tex. Penal Code § 51.04 (no defenses), *with id.* § 51.02(c) (listing defenses to entry crime).  That blatantly conflicts with "the system Congress created."  *Arizona*, 567 U.S. at 408.

*Second*, S.B. 4 conflicts with one of the main pillars of the federal scheme: the "broad discretion" which Congress enshrined as a "principal feature" of the federal immigration system.  *Arizona*, 567 U.S. at 396.  Congress endowed federal officials with a range of tools—prosecutions, various kinds of removal proceedings, numerous forms of relief and prosecutorial discretion—so that federal officials could make enforcement decisions in a way that serves federal immigration priorities, domestic law enforcement, humanitarian concerns, and relations with other countries.  *See supra* pages 3-5.  Texas's new scheme wipes all of that away.  Under S.B. 4, federal officials get no say in whether noncitizens are prosecuted and ordered removed.  The statute thus "violates the principle that the removal process is entrusted to the discretion of the Federal Government."  *Arizona*, 567 U.S. at 409.

Federal discretion is particularly critical in this context because immigration is so closely connected to foreign affairs. *See United States v. Texas*, 599 U.S. 670, 679 (2023) (explaining that the federal government's discretion in immigration proceedings "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives'") (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999); ROA.535-37.   For example, Texas plans to issue tens of thousands of orders to *non*-Mexicans to return *to Mexico* or face decades in prison.   Mexico strongly opposes this.   ROA.521.[6]   As the Supreme Court recently explained, previous federal efforts to negotiate limited, temporary returns of certain non-Mexicans to Mexico "played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration." *Biden*, 597 U.S. at 806 (internal quotation marks omitted).   Here, Texas is acting *unilaterally* to force noncitizens onto Mexico's sovereign territory, with potentially extreme consequences for our national government's relationship and agreements with Mexico.   This interference with the federal government's foreign policy powers is extraordinary. *See id.*; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380-86 (2000).   Moreover, by setting

---

[6] *See* Mary Beth Sheridan, *Mexico, a Key U.S. Ally on Migration, Pushes Back Hard on Texas Law*, Wash. Post (Mar. 21, 2024), https://perma.cc/B5WN-2FBL.

*Mexico* as the country to which noncitizens are deported, S.B. 4 conflicts with the federal scheme governing the appropriate country of removal. ROA.535-36; *see Jama*, 543 U.S. at 338-41.

*Third*, the interference with federal control, discretion, and relief would be quite enough to render S.B. 4 conflict preempted even if its provisions tracked their federal counterparts. But they do not. For example, S.B. 4's state reentry crime is far broader than the corresponding federal statute. Under the federal statute, a noncitizen cannot be convicted if she has obtained federal "consent" to again seek admission to the United States. 8 U.S.C. § 1326(a)(2)(A). So, for example, a noncitizen previously removed from the United States who has access to an immigrant visa may seek and obtain federal consent to return to the United States and be admitted as a lawful permanent resident. *See United States v. Sanchez-Milam*, 305 F.3d 310, 312 (5th Cir. 2002) (per curiam); 8 C.F.R. § 212.2(d). That person is not subject to federal prosecution under § 1326(a)(2)(A). But the new Texas law contains no such limitation. *See* Tex. Penal Code § 51.03 (criminalizing noncitizen "found in this state after" she "has been . . . removed"); *cf.* Tex. Penal Code § 51.02(c)(2) (providing affirmative defense to entry crime, inapplicable to reentry crime, where "the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a)"). The result is that people who the federal government has expressly permitted to return to the United States are nevertheless criminalized by

Texas.[7]

### 3.  Texas's responses lack merit.

Texas advances a number of arguments to avoid the clear preemption of S.B. 4 under settled law.  None has merit.

1.  Texas does not contest that S.B. 4 regulates entry into the United States. But with regard to removal, it runs away from S.B. 4's plain and obvious meaning. The State claims that a "return order" issued under the law "merely requires a state official to transport the alien to an official port of entry" and then "potential removal is a question for federal immigration officers."  Texas Br. 8, 27.  But S.B. 4 could not be clearer: its removal orders "require the person to return *to the foreign nation from which the person entered.*"  Tex. Code Crim. Proc. art. 5B.002 (c), (d) (emphasis added); Tex. Penal Code § 51.04 (a)(2) (similar).  Indeed, Texas agents are "required to monitor compliance with the order" to leave the United States.  Tex. Code Crim. P. art. 5B.002 (g), (e)(2).  And if the person does not leave the United States, they commit a "felony of the second degree," Tex. Penal Code § 51.04 (b)

---

[7] Additionally, S.B. 4 incorporates a flaw emphasized by *Farmers Branch*: empowering "state courts to assess the legality of a non-citizen's presence."  726 F.3d at 536.  Under S.B. 4, state courts are tasked with deciding who "the federal government has granted . . . lawful presence in the United States."  Tex. Penal Code § 51.02(c)(1).  This Court was unanimous in concluding that this kind of unilateral state assessment of lawful presence was preempted.  *See* 726 F.3d at 533, 536 (plurality opinion); *id.* at 549 (Dennis, J., concurring); *id.* at 558-59 (Owen, J., concurring in part); *id.* at 584 (Jones, J., dissenting).

(titled "Refusal to comply with order to return to foreign nation"), which carries up to 20 years in jail, *id.* § 12.33(a).

As the district court observed: "Given that Texas may incarcerate someone for 20 years if they do not cross into Mexico, it is rather absurd to argue" the state orders are anything but deportations. ROA.520. S.B. 4 itself defines a "removal" to include a state return order. Tex. Penal Code § 51.03(c). And Texas has elsewhere been perfectly clear that the whole point of S.B. 4 is to "expel[]" people from the country.[8] Indeed, the law's sponsor explained that the "primary focus" of S.B. 4 "would be to return those folks to the country from which they came." *See supra*, page 7. And even Texas's own declaration states that an individual will only be deemed "to have complied with [a] return order" when they "cross to the Mexican side of the international bridge" or are turned over to Mexican authorities. ROA.316. Texas makes no attempt to square its description of S.B. 4 as merely "facilitating aliens finding their way to ports of entry," Texas Br. 22, with the statute's actual text.

States have no authority to come anywhere *close* to expelling noncitizens from our shores. *See Truax*, 239 U.S. at 42 (rejecting state law that was "tantamount to the assertion of the right to deny [noncitizens] entrance and abode" in the state—a

---

[8] *Written Testimony Before the Subcomm. on the Constitution and Limited Gov't of the H. Comm. on the Judiciary*, 118th Cong. (2024) (written statement of Brent Webster, First Assistant Att'y Gen. of Texas), https://perma.cc/497P-6EHY.

power which "is vested solely in the Federal government"); *Arizona*, 567 U.S. at 408 (broad arrest authority would "allow the State to achieve its own immigration policy" even though state officers could not order removal); *Alabama*, 691 F.3d at 1294 (holding that laws "seeking to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state" represented a preempted "policy of expulsion"). Here, S.B. 4 directly orders noncitizens to leave the country.

2. Texas also barely engages with the extensive precedent demonstrating S.B. 4 is preempted.

Texas claims that *Arizona*'s field preemption analysis is limited to registration schemes only, and that entry and removal has not previously been "recognized" as a preempted field. Texas Br. 29. But Texas does not contest entry and removal is an area of dominant federal interest, nor does it contest that the entry-and-removal scheme is comprehensive. The entirety of *Arizona*'s field preemption analysis thus applies with even greater force here. ROA.513-16.

The most Texas can muster is to suggest—with *no* explanation—that registration is more subject to preemption because it is "domestic." Texas Br. 23. But the Supreme Court's cases teach the exact opposite: The regulation of entry and removal is uniquely federal largely *because* it implicates the United States' "powers of external sovereignty." *Curtiss-Wright*, 299 U.S. at 318; *see Arizona*, 567 U.S. at 394-95; *Nishimura Ekiu*, 142 U.S. at 659; *Fong Yue Ting*, 149 U.S. at 711. The

Supreme Court has held that noncitizen registration laws, though they operate within the United States, warrant field preemption in large part because of their connection to foreign relations. *See Hines*, 312 U.S. at 66 (connecting registration to "the exterior relation of this whole nation with other nations and governments") (internal quotation marks omitted). If that is true of registration requirements, it cannot be less true for the direct regulation of entry and removal, which is the very core of Congress's sovereign immigration powers.[9]

*Arizona*'s analysis of the other provisions at issue in that case further undercuts Texas's defense. Contra Texas Br. 23-24, 28-29. The State suggests *Arizona* "'leaves room' for state action," *id.* at 29, but the Court was clear that *unilateral* action is not permitted. Thus, the Court invalidated Section 6, which authorized unilateral state immigration arrests. 567 U.S. at 407-10. Unlike S.B. 4, that statute did not purport to establish state entry crimes or authorize state removals. Yet even in that far more limited context, the Court was clear that "the unilateral decision of state officers to arrest an alien for being removable . . . violates the

---

[9] Texas argues that the current administration "has abandoned" the field of entry and removal. Texas Br. 24. That is plainly inaccurate as thousands of federal officials implement Congress's entry and removal statutes every day. *See* ROA.512-13 & n.14, 527-28 & n.21. By contrast, *Parker v. Brown* rejected preemption based on the mere existence of a statutory authority to issue market control orders, explaining that no such orders had actually been issued. 317 U.S. 341, 353, 358 (1943).

principle that the removal process is entrusted to the discretion of the Federal Government." *Id*. at 409-10; *see also Farmers Branch*, 726 F.3d at 534-36 (similar); *City of El Cenizo v. Texas*, 890 F.3d 164, 179, 188-89 (5th Cir. 2018) (similar). S.B. 4 goes far beyond unilateral arrest, placing in state hands the sole decision whether to prosecute, convict, imprison, and deport noncitizens for immigration violations. Indeed S.B. 4 lets state officers *contradict* federal decisions; at oral argument, Texas confirmed that if state police executing a removal order brought a defendant to federal authorities, and the federal authorities decided *not* to arrest or remove that individual, Texas would then proceed to *re-arrest* them "for violation of the Texas statute." *See* Stay Argument Recording at 6:08-6:55.

*Arizona* applied the same principle to Section 2(B): "[I]t would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence *without federal direction and supervision*." 567 U.S. at 413 (emphasis added). While the Court did not enjoin Section 2(B), that was only because the provision "could be read" to merely authorize state officers to "communicate with ICE," which is expressly permitted under federal law. *Id* at 411-13. Nothing similar is true here, because S.B. 4 goes far beyond mere communication.

Texas suggests that it *can* take unilateral action to arrest, prosecute, and remove people for immigration violations so long as its officers have "probable

cause of a criminal violation." Texas Br. 29. But *Arizona*'s emphatic demand for federal direction and supervision precludes the idea that states can enact their *own* immigration schemes by enacting criminal laws. *See Arizona*, 567 U.S. at 402 (emphasizing elimination of federal control over registration prosecutions); *Farmers Branch*, 726 F.3d at 534 (unilateral criminal prosecution involved "more interference with federal law than did the Arizona arrest-only authority invalidated by the Court").[10]

As for Section 5(C) of the Arizona law, it addressed the employment of noncitizens, an arena in which the Supreme Court has permitted some state regulation—unlike core immigration matters like entry and removal. *See De Canas v. Bica*, 424 U.S. 351, 354-55, 358, 364 (1976) (upholding employment law, explaining that not every state law "touching on" noncitizens "is a regulation of immigration," which "is unquestionably exclusively a federal power"). Even so, *Arizona* held Section 5(C) preempted because it interfered with Congress's

---

[10] Texas argues that federal law is "replete with state-federal cooperation." Texas Br. 22 & n.1. It appears to have abandoned its earlier claim that federal law *invites* states to set up their own entry and removal schemes—an obviously untenable and unsupported claim. *See* ECF No. 61 at 13. Far from "wide latitude" for states to regulate immigration, Texas Br. 22, *Arizona* explained that States may only assist in federal efforts "in specific, limited circumstances," and any further involvement is preempted, 567 U.S. at 410. That narrow permission only underscores that S.B. 4's claim to independent state authority is meritless. *See id.* at 408; *cf. Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 & n.25 (1983) (field of nuclear safety preempted even though statute "specifically authorized" a limited role for states).

"deliberate choice" not to penalize employees.  567 U.S. at 405.  Texas wrongly suggests that this holding helps it because (unlike Section 5(C)) "S.B. 4 has *existing* federal law analogues."  Texas Br. 29.  But *Arizona* made clear that although Section 5(C) "attempt[ed] to achieve one of the same goals as federal law," it was preempted because "it involves a conflict in the method of enforcement."  567 U.S. at 406.  So too here.  Federal law reflects a range of goals and considerations and broad discretion for federal officials in balancing those goals in particular cases.  S.B. 4 elevates just one approach—prosecution and removal, without any federal relief or discretion—a stark conflict in method even apart from the other conflicts with federal law.[11]

For similar reasons, Texas's reliance on *Kansas v. Garcia*, 140 S. Ct. 791 (2020), is unavailing.  *Garcia* involved prosecutions under a generally applicable identity-theft statute, based on information submitted in income tax withholding forms.  *Id.* at 798-800.  The court rejected an argument that the prosecutions were preempted merely because the same information was also included in employment verification forms, finding no congressional intent to foreclose tax-withholding

---

[11] Texas's separate effort to "use[]" general trespass law "to prohibit an alien's illegal entry and presence in Texas" on private property, Texas Br. 30, is not before the Court.  Moreover, Operation Lone Star differs from S.B. 4 in many respects, including the lack of any reentry or removal provisions, and in any event its legality is contested.

prosecutions. *Id.* at 806. Here, S.B. 4 regulates core immigration matters of entry and removal, not tax issues. And S.B. 4 does far more than "overlap to some degree" with the federal system. Texas Br. 26 (quoting *Garcia*, 140 S. Ct. at 806). It displaces and interferes with a comprehensive federal system, in which Congress "made a considered decision" to balance enforcement, humanitarian relief, and foreign affairs, by placing discretion in the hands of federal officials; "[n]othing similar" was present in *Garcia*. 140 S. Ct. at 806.

Ultimately, preemption of S.B. 4 follows inexorably from *Arizona*; perhaps that is why Texas anticipates asking for it to be overruled. Texas Br. 30 n.3. But even that would not allow Texas to prevail. *Arizona* applied and built on 150 years of clear precedent in reaffirming that a state cannot "achieve its own immigration policy." 567 U.S. at 408; *see supra* page 25. Tellingly, Texas has never grappled with those many other cases, which also make clear that S.B. 4 cannot stand.[12]

3. Unable to defend S.B. 4 on its merits, Texas resorts to a remarkable claim to state supremacy based on the State War Clause, U.S. Const. art. I, §10, cl. 3. On its view, Texas's governor can unilaterally declare an "invasion"; the legislature may then enact immigration laws as an exercise of limitless "war power"; Texas's laws

---

[12] Texas gestures at the presumption against preemption. Texas Br. 21. Such a presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000); *see* ROA.108 n.3

can conflict with and displace longstanding federal authority and a comprehensive federal regulatory regime; Congress can exercise no control; the President is powerless; and the federal courts must defer to a single state's "exclusive authority to decide." Texas Br. 33, 35, 39. The district court rebutted every step of this flawed reasoning, explaining that at bottom the Framers did not "intend[] to grant states the unilateral power" to disregard federal law "whenever they disagreed with federal immigration policy." ROA.551.

The Supreme Court has previously considered a similar claim that "the fiat of a State Governor" represents a "supreme and unchallengeable edict" that operates "beyond control" of the federal authorities even as it "subvert[s] the federal authority"—rejecting it as "obviously untenable" under our system of government. *Sterling v. Constantin*, 287 U.S. 378, 397-98, 402 (1932) (cited by Texas). Federal supremacy is an absolute cornerstone of our constitutional structure, particularly with regard to foreign affairs and immigration. *See Curtiss-Wright*, 299 U.S. at 317-18. To read the State War Clause as offering Texas a blank check free of all federal control would render the Constitution "a solemn mockery." *United States v. Peters*, 9 U.S. 115, 136 (1809).

Below, Texas suggested its war was on migrants themselves—a further warping of the constitutional permission that the district court amply rebutted. ROA.544-63. Now, Texas offers a different gloss. Invoking *United States v.*

41

*Salerno*, 481 U.S. 739 (1987), Texas argues that it can declare war on cartels, that maybe some of the S.B. 4 defendants will be cartel members, and that therefore S.B. 4 should be left in place as to *everyone*. Texas Br. 37. That fares no better. *Salerno* has never been used to keep in place a broadly preempted law merely because a defendant can "conjure up" some "hypothetical factual scenario" to defeat an injunction. *Lozano v. City of Hazleton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013); *see Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022); *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 728-29 (7th Cir. 2021). Indeed, in *Arizona*, the Court held Section 6 facially invalid, even though it was conceivable that state officers might make some arrests in "cooperation" with federal officials. 567 U.S. at 410. In doing so, the Court rejected Arizona's argument—just like Texas's here—that Section 6 could not be enjoined because of hypothetically valid applications. *See* Reply Br. for Petitioners 18, *Arizona v. United States*, 2012 WL 1332574 (Apr. 17, 2012).

Even on its own terms, Texas's *Salerno* argument fails because S.B. 4 *is* preempted in every application. Each time it is enforced, it would contravene Congress's decision "to foreclose *any* state regulation in the area" of entry and removal. *Murphy*, 584 U.S. at 479 (emphasis added) (quoting *Arizona*, 567 U.S. at 401). S.B. 4 also conflicts with federal law in every application. Every time the State orders someone removed—which is mandatory after every conviction—it

42

defies Congress's mandate that people can only be removed after following the procedures laid out in the INA. And every time the State enforces S.B. 4, it denies federal officials the discretion that Congress gave them as a cornerstone of the federal system.

The State's shifting positions on who exactly it is supposedly at "war" with further undermine its *Salerno* argument. If Texas wants to enact some law that subjects cartel members specifically—and not the undifferentiated body of noncitizens—to some special regulation in the name of "war powers," then it should do so and raise its narrowed "invasion" theory as a defense. But Texas cannot be allowed to override federal law for *everyone* based on hypothetical cases that would only be "valid" if one accepts an unprecedented new theory striking at the heart of our constitutional order. *Salerno* has never worked like that and Texas cannot cite an example of such fanciful reasoning.

Ultimately, while Texas portrays the current immigration situation as unique, the truth is that similar rhetoric and fears have always been expressed by opponents of immigration. When large numbers of people from Asia traveled to California following the 1848 gold rush, that State warned that "their immigration was in numbers approaching the character of an Oriental invasion, and was a menace to our civilization." *Chae Chan Ping v. United States*, 130 U.S. 581, 595 (1889). After millions of immigrants from eastern and southern Europe arrived in subsequent

decades, Pennsylvania warned of the threat of spies and enemies among immigrant communities at the height of World War II.  *See* Br. for Appellants at 15, *Hines v. Davidowitz*, 1910 WL 21007 (1941).  The State of Arizona likewise warned against the same threats Texas highlights.  *See* Br. for Petitioners 3, *Arizona v. United States*, 2012 WL 416748 (2012) ("drugs," "criminals," and "cartels").  Yet time and again, despite these concerns, the Supreme Court has rejected state control over entry and removal.  *See Arizona*, 567 U.S. at 419 (Scalia, J., dissenting in part) (noting State War Clause).

### 4.  The scope of the injunction was not an abuse of discretion.

Finally, Texas argues that the district court should not have enjoined S.B. 4 in full, and faults it for "fail[ing] to meaningfully engage with" S.B. 4's general severability clause.  Texas Br. 40.  But Texas made no argument at all to the district court about which parts of S.B. 4 could or should be severed, it simply cited the severability clause in the most general terms.  *See* ROA.274-75, 729.  The district court meaningfully engaged with the argument Texas made, and concluded that "each [of the three provisions considered are] preempted under [the] Court's analysis" and the "remaining provisions all depend on the validity of the criminal prohibitions."  ROA.586-87.  Texas may raise further arguments as the case proceeds to the merits, but for purposes of the preliminary injunction, the district

court's treatment of this issue was no abuse of discretion.

In any event, Texas's new severability argument is wrong on the merits for two reasons. The entry and reentry crimes are fully preempted even without removal. And even if they were valid, removal is an integral part of S.B. 4 that is not severable.

The entry crimes would be preempted without removal because they would still regulate the preempted field of entry, and would still conflict with the federal scheme in numerous ways. "Policies pertaining to the *entry* of aliens and their right to remain here are entrusted exclusively to Congress." *Arizona*, 567 U.S. at 409 (emphasis added) (quoting *Galvan*, 347 U.S. at 531) (cleaned up); *see also e.g.*, *Plyler v. Doe*, 457 U.S. 202, 229 n.23 (1982) (cited by Texas) (explaining that "the State has no direct interest in controlling *entry* into this country, that interest being one reserved by the Constitution to the Federal Government" and noting "the exclusive federal control of this Nation's borders") (emphasis added); *Chy Lung*, 92 U.S. at 280 (similar). Regulating entry is no less a core aspect of federal sovereignty than regulating removal. *See Nishimura Ekiu*, 142 U.S. at 659 (noting "power, as inherent in sovereignty . . . to forbid the entrance of foreigners").

This Court has explained that, because "[p]olicies pertaining to the entry of aliens" are exclusively federal, "[a]n attempt by Texas to establish an alternative classification system or work authorizations would be preempted." *Texas*, 50 F.4th

45

at 516 (cleaned up).  If that is true of matters as far removed from entry as work authorization, it necessarily must also be true of a statute like S.B. 4 that directly regulates entry itself.  *See id*.; *Hines*, 312 U.S. at 61 n.8 (approvingly citing *Arrowsmith v. Voorhies*, 55 F.2d 310 (E.D. Mich. 1931), and *Ex parte Ah Cue*, 101 Cal. 197 (1894), each of which struck down state laws regulating entry); *Hernandez v. State*, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980) (holding "the matter of entry into the United States" is "wholly preempted by federal law").

Indeed, everything *Arizona* said about alien registration applies with even greater force to entry.  If a state entry law "were valid, every State could give itself independent authority to prosecute federal [entry] violations, diminishing the Federal Government's control over enforcement[,] detracting from the integrated scheme of regulation created by Congress," and allowing prosecution "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402 (cleaned up).   And, as with registration, there are also unacceptable "inconsistenc[ies] between" S.B. 4's entry and reentry crimes "and federal law." *Id.* at 402-03.  Most glaringly, the state reentry crime criminalizes people whom 8 U.S.C. § 1326 does not, and who have explicit federal permission to return to the United States. *See supra* pages 32-33.

Letting the State unilaterally prosecute entry and reentry violations is also

46

impossible to square with *Arizona* as a whole. The through line of the entire opinion is rejection of unilateral state immigration enforcement. Section 6 was preempted because it allowed unilateral state arrests; Section 2(B) would have been preempted if it allowed unilateral detention; and Section 3 was preempted in part because it allowed unilateral state prosecutions. *Arizona*, 567 U.S. at 402, 407-10, 413.[13] This Court has underscored that federal law does not allow "unilateral enforcement activity" by states. *El Cenizo*, 890 F.3d at 179-80. And if unilateral *arrests* alone were enough for preemption in *Arizona*, then unilateral arrests, prosecutions, and detention under S.B. 4 must be preempted as well. *See Farmers Branch*, 726 F.3d at 534-35. That S.B. 4 goes even further by authorizing unilateral removals does not make these *other* unilateral actions any less preempted.

Unilateral prosecutions under S.B. 4 would also interfere with the federal statutory scheme at every turn, because they would deprive federal officials of their discretion to balance enforcement against foreign policy, humanitarian, and law-enforcement concerns. *See Arizona*, 567 U.S. at 396-97 (describing the "many factors" that federal officials must weigh). Even if federal officials thought that a particular prosecution or set of prosecutions would harm relations with a foreign

---

[13] By contrast, federal law permits limited "cooperation" with federal officials. *See id*. at 410 (citing 8 U.S.C. § 1357(g)(10)(B). "[B]ut no coherent understanding of the term would incorporate" unilateral action "absent any request, approval, or other instruction from the Federal Government." *Id*.

country, or would undermine humanitarian protections, or jeopardize a "criminal investigation," or conflict with our international obligations, they would have no say in the matter. *Id.* at 396-97, 408 (citing these as reasons why unilateral state action is preempted).

S.B. 4's entry and reentry provisions are thus fully preempted, even without removal. But even if they were valid, they would not be severable. Under Texas law, there is no severability where the valid and invalid "provisions are connected in subject-matter, dependent on each other, [and] operat[e] together for the same purpose." *Rose v. Drs. Hosp.,* 801 S.W.2d 841, 844 (Tex. 1990) (internal quotation marks omitted); *see Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022) (continuing to apply the *Rose* standard). That is plainly the case here, because removal is an integral part of the scheme that Texas enacted. As previously explained, the entry and removal provisions work together to pressure noncitizens to accept state deportation orders early in the prosecution, thus achieving the legislature's goals of effectuating removals without federal supervision while minimizing impact on the state fisc. *See supra*, pages 7-8. Indeed, the Texas Legislature made abundantly clear that it did not want a prosecution-only system without removals. It rejected at least nine different versions of the bill that did not include removal as part of criminal prosecution.[14] S.B. 4's sponsors were explicit:

---

[14] *See, e.g.*, Tex. H.B. 1600, 88th Leg., R.S. (2023); Tex. H.B. 5270, 88th

the bill's "primary focus would be to return those folks to the country from which they came," "not to incarcerate [them]." *See supra*, page 7. And they gave a clear reason for this choice: Without removal, S.B. 4 would impose on the State the "exorbitant costs of long-term detention," which they were not willing to incur. *Id*. at 8.

Thus the Court should not—particularly at this stage—"use its remedial powers to circumvent the intent of the legislature" and enact the system that Texas rejected. *United States v. Booker*, 543 U.S. 220, 247 (2005) (cleaned up) (internal quotation marks omitted). The severability clause does not authorize a court to do the "quintessentially legislative work" of imposing a different regulatory scheme from the one the legislature chose. *Ayotte v. Planned Parenthood of N. New Eng*., 546 U.S. 320, 329 (2006); *see Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209 (2020) (no severability, despite clause, where "there is strong evidence that [the legislature] intended otherwise") (internal quotation marks omitted).

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES.

### A.    S.B. 4 Will Irreparably Harm the Plaintiffs and the Public.

S.B. 4 will cause enormous harm to the plaintiffs, along with thousands of

---

Leg., R.S. (2023); Tex. H.B. 5281, 88th Leg, R.S. (2023); S.B. 2424, Tex. 88th Leg., R.S. (2023); S.B. 2, Tex. 88th Leg., 1st C.S. (2023); Tex. H.B. 23, 88th Leg. 3d C.S. (2023); Tex. H.B. 79, 88th Leg., 3d C.S. (2023); Tex. H.B. 104, 88th Leg., 3d C.S. (2023); Tex. S.B. 11, 88th Leg., 3d C.S. (2023).

noncitizens and their families.

S.B. 4's massive changes will upend the plaintiff organizations' existing practices and force them to develop entirely new programs to identify, counsel, and advocate for noncitizens in state and local jails so that they can attempt to obtain asylum and other protections from removal. ROA.481. They also "will likely lose their ability to represent many asylum applicants" as they are swiftly forced to leave the country under S.B. 4. *Id.* at 583. And S.B. 4 will "particularly damage" Las Americas' and American Gateways' specific program to assist victims of crime, because S.B. 4 now exposes noncitizens who report crimes to arrest, prosecution, and removal, despite their ability to pursue federal visas for crime victims. *Id.* at 582; *see Valle del Sol*, 732 F.3d at 1029 (harm to organizational missions was irreparable).

The County's operations will likewise be severely harmed. ROA.583. Because its jail space will be used for arrests under S.B. 4, the County "may lose the ability to focus on high risk or violent criminals." *Id.* The County could also lose its third-largest source of funding—the money it is paid to house federal prisoners— if it instead has to use jail space to house thousands of individuals arrested under S.B. 4. *Id.* at 581, 583 (costs that cannot be later recovered constitute irreparable harm); *see Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Rest. Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023). And

multiple county programs will be undermined by the fear that S.B. 4 is already generating. ROA.583-84. These harms are clear from the scale of enforcement that Texas is planning. *See* ROA.960.

S.B. 4 will also impose enormous harms on thousands of members of the public. Individuals crossing the border into the United States—including those fleeing persecution and torture—will be arrested, prosecuted, and forced to leave the country without any opportunity to raise federal defenses to removal. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). That harm is particularly acute because S.B. 4 directs that noncitizens be removed to Mexico, where it is well documented that migrants face truly extraordinary dangers of abduction, rape, torture, and death. *See* ROA.969-1546 (documenting harms to asylum seekers in Mexico); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (pointing to "stomach-churning evidence of death, torture, and rape" caused by policy of expelling migrants, primarily to Mexico). S.B. 4 contains no prohibition on enforcement against parents, who would likely have to be separated from their children for prosecutions to take place. Nor is S.B. 4 limited to very recent entrants; it thus threatens to rip individuals away from their families and communities years after they entered the country.

In addition, allowing S.B. 4 to take effect would, among other things,

undermine federal and local efforts to address human trafficking and other crimes. Federal law encourages people to help law enforcement by offering visas to victims and witnesses who come forward and support an investigation or prosecution. *See supra* page 4. And federal officials have numerous other tools—like deferred action and prosecutorial discretion—that they can use to encourage people to help with criminal enforcement. S.B. 4 erases these tools, because it requires state judges to order people removed even if they are seeking visas and other federal protections for crime victims and witnesses. *See* Tex. Code Crim. Proc. art. 5B.002, 5B.003. And by cutting federal officials out of enforcement decisions, S.B. 4 takes away their ability to encourage cooperation by sparing victims and witnesses from prosecution or removal. Despite the concern Texas expresses for victims of crime, S.B. 4 would deny them the explicit protections that federal law provides.

### B. Texas Faces No Comparable Harm.

On the other end of the balance, Texas raises concerns about crime, and contends that S.B. 4 will prevent unlawful activity like fentanyl trafficking. But arresting noncitizens who enter between ports will not meaningfully address drug smuggling. Fentanyl overwhelmingly enters Texas through ports of entry, not between them, and is smuggled by U.S. citizens, not migrants. David Bier, *Fentanyl Is Smuggled for U.S. Citizens by U.S. Citizens, Not Asylum Seekers*, Cato Inst. (Sept. 14, 2022) ("[F]entanyl is smuggled through official crossing points specifically

because it is easier to conceal it on a legal traveler or in legal goods than it is to conceal a person crossing the border illegally."), https://perma.cc/8RTW-MENH; *see* U.S. Sentencing Comm'n, Quick Facts: Fentanyl Trafficking Offenses (2022), https://perma.cc/XDY9-S49M; Statement of Brian Sulc, Executive Director, Transnational Organized Crime Mission Center, Office of Intelligence and Analysis, Department of Homeland Security (May 18, 2022), https://perma.cc/76WQ-4YTU. Moreover, Texas law already criminalizes the various activities the State mentions, including drug trafficking and sales. *See, e.g.*, Tex. Health & Safety Code §§ 481.112-141; Tex. Penal Code §§ 20A.02, 76.02; ROA.585 (criminal penalties for drug smuggling, human trafficking, terrorism). Texas thus has ample tools to address this conduct without creating its own immigration system.

More fundamentally, Texas emphasizes its concerns about immigration policy and its disagreements with the current administration. But as already explained, immigration is a federal, not state, power and responsibility. Because its attempt to take control of immigration law is preempted, Texas is "not injured by the injunction." *Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990); *see Free Speech Coal., Inc. v. Paxton*, --- F.4th---, 2024 WL 982225, at *19 (5th Cir. 2024) ("[T]he government suffers no injury when a court prevents it from enforcing an unlawful law."); *Book People, Inc.*, 91 F.4th at 341 ("Neither the State nor the public has any interest in enforcing a regulation that violates federal law.") (cleaned

up) (internal quotation marks omitted). While Texas may have "frustrations with the problems caused by illegal immigration," it "may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416.

## CONCLUSION

This Court should affirm the district court's preliminary injunction order.

Dated: March 21, 2024

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways,*
*and County of El Paso*

Tamara F. Goodlette
(TX Bar No. 24117561)
Daniel Hatoum
(TX Bar No. 24099136)
Erin D. Thorn
(TX Bar No. 24093261)
TEXAS CIVIL RIGHTS PROJECT
1017 W. Hackberry Ave.
Alamo, TX 78516
Telephone: (512) 474-5073, ext. 207
Facsimile: (956) 787-6348
tami@texascivilrightsproject.org
daniel@texascivilrightsproject.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center and American Gateways*

Respectfully Submitted,

*/s/ Cody Wofsy*
Cody Wofsy
Spencer Amdur
Hannah Schoen
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California St., 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
cwofsy@aclu.org
samdur@aclu.org
hschoen@aclu.org
mrussell@aclu.org

Anand Balakrishnan
Omar Jadwat
Lee Gelernt
Wafa Junaid
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
abalakrishnan@aclu.org
ojadwat@aclu.org
lgelernt@aclu.org
wjunaid@aclu.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways, and*
*County of El Paso*

55

Jo Anne Bernal
(TX Bar No. 02208720)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
joanneb@epcounty.com

Bernardo Rafael Cruz,
(TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcounty.com

*For Plaintiff County of El Paso*

**CERTIFICATE OF SERVICE**

I certify that, on March 21, 2024, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF document filing system, and on all counsel of record.

*/s/ Cody Wofsy*
Cody Wofsy

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with the type-volume limitation of Rule 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), it contains 12,992 words, and complies with the typeface and style requirements of Rule 32(a)(5) and (a)(6) because it was prepared in Microsoft Word using 14-point Times New Roman typeface.

*/s/ Cody Wofsy*
Cody Wofsy