No. 24-50149

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants-Appellants.*

———————————————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees,*

*v.*

STEVEN C. MCCRAW, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY; BILL D. HICKS, IN HIS OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR THE 34TH DISTRICT,

*Defendants-Appellants.*

————

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

————

## REPLY BRIEF FOR APPELLANTS

————

*Counsel Listed on Inside Cover*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

KATELAND R. JACKSON
JOSEPH N. MAZZARA
Assistant Solicitors General

COY ALLEN WESTBROOK
Assistant Attorney General

Counsel for Defendants-Appellants

# TABLE OF CONTENTS

Page

Table of Authorities ..................................................................................ii

Introduction ............................................................................................. 1

Argument .................................................................................................. 2

    I.   S.B.4 Survives a Pre-enforcement Facial Challenge ................... 2

        A.  This litigation does not belong in federal court .................... 2

        B.  S.B.4 does not regulate an exclusive federal field ................ 5

        C.  S.B.4 does not conflict with federal immigration law .......... 9

        D.  S.B.4 comports with the dormant Foreign Commerce Clause .......... 13

        E.  Texas has a constitutional power of self-defense ............... 15

        F.  The district court's severability analysis requires vacatur ................. 18

    II.  The Remaining Preliminary-Injunction Factors Support Texas .............. 20

        A.  Plaintiffs still have not shown irreparable harm ..................... 20

        B.  The equities and public interest clearly favor Texas ......................... 23

Conclusion ............................................................................................... 24

Certificate of Service ............................................................................... 25

Certificate of Compliance ....................................................................... 25

# Table of Authorities

**Page(s)**

**Cases:**

*In re Abbott*,
  956 F.3d 696 (5th Cir. 2020) ................................................................. 3

*American School of Magnetic Healing v. McAnnulty*,
  187 U.S. 94 (1902) ................................................................................ 5

*Arizona v. United States*,
  567 U.S. 387 (2012) ......................................................................... 6-11

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ........................................................................... 4-5

*AT&T Commc'ns v. BellSouth Telecomm's Inc.*,
  238 F.3d 636 (5th Cir. 2001) .............................................................. 4

*Atlas Life Ins. Co. v. W. I. Southern, Inc.*,
  306 U.S. 563 (1939) ........................................................................... 4-5

*Buckman Co. v. Plaintiffs' Legal Committee*,
  531 U.S. 341 (2001) ........................................................................... 10

*Chy Lung v. Freeman*,
  92 U.S. (2 Otto) 275 (1875) ............................................................... 13

*Crown Castle Fiber, LLC v. City of Pasadena*,
  76 F.4th 425 (5th Cir. 2023) ............................................................... 3

*Davis v. FEC*,
  554 U.S. 724 (2008) .............................................................................. 2

*DeCanas v. Bica*,
  424 U.S. 351 (1976) ........................................................................... 11

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ........................................................................... 10

*In re Facebook, Inc.*,
  625 SW 3d 80 (Tex. 2021) ................................................................. 20

*Gamble v. United States*,
  587 U.S. 678 (2019) .............................................................................. 7

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ........................................................................... 14

*Henderson v. Mayor of New York*,
    92 U.S. (2 Otto) 259 (1875) ................................................................. 13

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) .................................................................................. 10

*Hughes v. Trustees of Morden Coll.*
    (1748) 27 Eng. Rep. 973 ......................................................................... 5

*Japan Line Ltd. v. Los Angeles County*,
    441 U.S. 434 (1979) ............................................................................... 13

*Kansas v. Garcia*,
    140 S.Ct. 791 (2020) ............................................................ 6-9, 10-12

*Lewis v. Scott*,
    28 F.4th 659 (5th Cir. 2022) .................................................................. 4

*Linda R. S. v. Richard D.*,
    410 U.S. 614 (1973) ......................................................................... 2, 22

*In re Loney*,
    134 U.S. 372 (1890) ................................................................................ 8

*Louisiana ACORN Fair Housing v. LeBlanc*,
    211 F.3d 298 (5th Cir. 2000) .................................................................. 3

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers) ........................... 23

*Mayor of New York v. Miln*,
    36 U.S. (11 Pet.) 102 (1837) .................................................. 8, 10, 13

*Medellin v. Texas*,
    552 U.S. 491 (2008) ................................................................................ 7

*Moyer v. Peabody*,
    212 U.S. 78 (1909) ................................................................................ 17

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ............................................................................... 13

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) .................................................................. 4

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) .............................................................................. 22

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) .................................................................. 3

*Parker v. Brown*,
    317 U.S. 341 (1943) ................................................................................ 9

*Planned Parenthood Ctr. for Choice v. Abbott*,
  141 S.Ct. 1261 (2021) ............................................................ 3

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947) ............................................................... 7

*Rogers v. Brockette*,
  588 F.2d 1057 (5th Cir. 1979) ................................................ 3

*Rose v. Doctors Hospital*,
  801 S.W.2d 841 (Tex. 1990) .................................................20

*S. Pac. Co. v. Arizona*,
  325 U.S. 761 (1945) ............................................................. 13

*Sanitary Dist. of Chicago v. United States*,
  266 U.S. 405 (1925) ............................................................... 5

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .......................................................... 2, 3

*Terrett v. Taylor*,
  13 U.S. (9 Cranch) 43 (1815) ................................................. 5

*Texas v. DHS*,
  No. 2:23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ..................... 1, 9

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) .................................................. 7

*United States v. Abbott*,
  92 F.4th 570 (5th Cir. 2024) (en banc) ................................. 17

*United States v. City of Jackson*,
  318 F.2d 1 (5th Cir. 1963) ..................................................... 5

*United States v. Guest*,
  383 U.S. 745 (1966) ............................................................. 13

*United States v. Hansen*,
  599 U.S. 762 (2023) ............................................................. 18

*United States v. Morrison*,
  529 U.S. 598 (2000) ............................................................. 14

*United States v. Salerno*,
  481 U.S. 739 (1987) ........................................................ 17-18

*United States v. San Jacinto Tin Co.*,
  125 U.S. 273 (1888) .............................................................. 5

*United States v. Texas*,
  599 U.S. 670 (2023) ........................................................ 2, 22

*Villas at Parkside Partners v. City of Farmers Branch*,
  726 F.3d 524 (5th Cir. 2013) (en banc) ............................................ 11

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021) ................................................................................ 4

*Younger v. Harris*,
  401 U.S. 37 (1971) .............................................................................. 17

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const. art. I, §10, cl. 3 .............................................................. 16, 18

6 U.S.C. §202(2) ...................................................................................... 9

8 U.S.C.:
  §1103(a)(1) ............................................................................................ 20
  §1225(b)(1) ............................................................................................ 9
  §1231(a)(2) ............................................................................................ 9
  §1325(a) .................................................................................................. 9
  §1326(a) .................................................................................................. 9
  §1357(g) .................................................................................................. 9
  §1357(g)(10)(B) .................................................................................... 20

18 U.S.C. §758 ........................................................................................ 9

Act of Nov. 14, 2023, 88th Leg., 4th C.S., ch. 2, §8 (2023) .................. 19

Tex. Code Crim. Proc. art. 5B.002(e)(1) .............................................. 19

Tex. Penal Code:
  §51.02 ...................................................................................................... 21
  §51.02(c)(1)(A) ...................................................................................... 12

**Other Authorities:**

3 *The Debates in the Several State Conventions on the Adoption of the
  Federal Constitution* (J. Elliot ed., Wash., D.C., 2d ed. 1836) ........... 15

Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity
  Jurisdiction*, 98 Notre Dame L. Rev. 699 (2022) ............................... 5

H. Rep. No. 343 (Feb. 29, 1876) .......................................................... 16

Unaccompanied Children at the Border: Federal Response and the
  Way Forward, Hearing Before the Subcomm. on Border Security,
  Facilitation, and Operations of the H. Comm. on Homeland Sec.,
  117th Cong. 28 (2021) .......................................................................... 23

*Migrants Break Barriers and Rush Border Guards in Shocking Scene at El
  Paso*, N.Y. POST (Mar. 22, 2024) ........................................................ 1

## Introduction

Just last week, the nation watched a violent mob rush across the border, tear down fencing, and overwhelm National Guard soldiers. *See Migrants Break Barriers and Rush Border Guards in Shocking Scene at El Paso*, N.Y. Post (Mar. 22, 2024), https://www.youtube.com/watch?v=EAqAA_Y9hY0. Yet that same day, the federal government urged this Court to prevent Texas from defending itself. This jarring situation once more reflects the federal government's "culpable and duplicitous conduct" with respect to the border and its "utter failure . . . to deter, prevent, and halt unlawful entry into the United States." *Texas v. DHS*, No. 2:23-cv-55, 2023 WL 8285223, at *3, *14 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.).

S.B.4 is a self-protection measure. By mirroring federal law, it empowers Texas to protect millions of innocent Texans who find themselves at the epicenter of an ever-worsening crisis.  Plaintiffs launch a volley of arguments against S.B.4, but none hits its mark. Plaintiffs cannot bring their claims at all and even if they could, precedent and principles of federalism support Texas. The Supreme Court has repeatedly held that States can mirror federal law and, regardless, on its face the Constitution recognizes that States never relinquished their sovereign authority to protect themselves. The Court accordingly should vacate the preliminary injunction and allow Texas to enforce this important law.

## ARGUMENT

## I. S.B.4 Survives a Pre-enforcement Facial Challenge.

### A. This litigation does not belong in federal court.

**1.** The Organizational Plaintiffs contend (at 14) they have standing because S.B.4 disrupts their mission of "ensuring that those noncitizens at the greatest danger from removal are able to access protection." But nothing about S.B.4 prevents them from accomplishing that mission—any more than the *existing* federal laws S.B.4 mirrors keep them from doing so. They insist that arresting and prosecuting aliens indirectly harms them, but they "lack[] standing to contest the policies of the prosecuting authority when [they themselves are] neither prosecuted nor threatened with prosecution." *United States v. Texas*, 599 U.S. 670, 674 (2023) (quoting *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

They also argue (at 16-17) that applying *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), here would represent a "sea change" in standing doctrine. This argument is wrong three times over:

- Reading *Susan B. Anthony List* to mean what it says would not prevent regulated entities from bringing pre-enforcement suits; the problem for the Organizational Plaintiffs is that S.B.4 cannot be enforced against them.

- The Organizational Plaintiffs assert (at 16) that the plaintiff in *Davis v. FEC*, 554 U.S. 724 (2008), "had standing to prevent 'prospective injury' from [a] rule that regulated [a] third party." But the *Davis* plaintiff was challenging campaign-finance laws that regulated him as much as they regulated his opponent. *See id.* at 729.

- The Organizational Plaintiffs wrongly conflate (at 16-18) organizational standing with other types of standing, such as Texas's interest in defending its laws, any entity's interest in remedying its own financial injuries, or an association's interest in harm to its members. By its terms, the Supreme Court's holding in *Susan B. Anthony List* applies where, as here, an organization brings a pre-enforcement challenge to a law that can never regulate its conduct.

For its part, El Paso County relies (at 19-20) on nonbinding cases and *Rogers v. Brockette*, 588 F.2d 1057 (5th Cir. 1979), to assert standing. In *Rogers*, the Court recognized an exception to the rule that counties cannot sue their parent States. Here, however, Congress did not attempt to "interfere with a state's internal political organization" by bestowing on El Paso County a right that Texas is somehow undermining. *Id.* at 1070. Regarding the other cases: *Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000), is not a pre-enforcement challenge, and pre-dates *Susan B. Anthony List* in any event. And in *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610-12 (5th Cir. 2017), the Court did not mention *Susan B. Anthony List* because it was a challenge to a decades-old law that had already been applied.

**2.** As to sovereign immunity, the Organizational Plaintiffs and El Paso County primarily rely (at 20-21) on *Crown Castle Fiber, LLC v. City of Pasadena*, 76 F.4th 425 (5th Cir. 2023). But *Crown Castle* involved a law that directly regulated the plaintiff. Because no Texas official can enforce S.B.4 against these plaintiffs, none can avail itself of *Ex parte Young. See In re Abbott*, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), *cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott*, 141 S.Ct. 1261 (2021). It does not matter whether the defendant can

enforce the statute against *someone else*—only whether the named defendant has the authority to "enforce[]" the challenged law through some means against the plaintiff and a demonstrated willingness to do so. *Lewis v. Scott*, 28 F.4th 659, 663-64 (5th Cir. 2022); *see also, e.g.*, *AT&T Commc'ns v. BellSouth Telecomm's Inc.*, 238 F.3d 636, 640 (5th Cir. 2001) ("[T]he aggrieved carriers … seek prospective injunctive relief against the commissioners … to terminate further operation of the agreement *against them*; therefore, the doctrine of *Ex parte Young* permits the suit to proceed against the commissioners.") (emphasis added). Although this inquiry often overlaps with standing, they are analytically distinct, and both burdens must be met. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024).

**3.** The Organizational Plaintiffs and El Paso County (at 21) misread *Armstrong*, which evaluated whether the plaintiffs had "an implied right of action under the Supremacy Clause to seek injunctive relief." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015). After rejecting an implied right of action, the Court further held the plaintiffs also could not rely on equity because Congress displaced equitable relief. *Id.* at 324-35. Here, as explained, no plaintiff satisfies the requirements to bring an equitable claim under *Ex parte Young*.

**4.** The federal government reasserts the same arguments (at 42-46) it offered in response to Texas's stay motion and before the Supreme Court. Texas responded to these arguments in its principal brief and responsive briefs. It bears emphasizing, however, that "the equitable powers of federal courts"—whether invoked by the United States or otherwise—"are limited by historical practice." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (citing *Atlas Life Ins. Co. v. W. I. Southern,*

*Inc.*, 306 U.S. 563, 568 (1939)). Because neither a statute nor a traditional equitable cause of action authorize the federal government to sue here, the federal courts may not intervene.    Indeed, the federal government's failure to explain how it can exercise a "litigation superpower" while disregarding "the historic limits on that superpower" speaks volumes. Aditya Bamzai & Samuel L. Bray, Debs *and the Federal Equity Jurisdiction*, 98 Notre Dame L. Rev. 699, 737 (2022). Nor can *Ex parte Young* provide a workaround. Even if the federal government could pursue a claim under *Ex parte Young* (which the court has never held) that claim would fail here: S.B.4 can no more be enforced against the federal government than it can against the other plaintiffs.

The federal government's cases are inapposite. In *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902), the federal government was the defendant; *Hughes v. Trustees of Morden Coll.* (1748) 27 Eng. Rep. 973; *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43 (1815), and *United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888), all sought to quiet title; and *Sanitary Dist. of Chicago v. United States*, 266 U.S. 405 (1925), involved water rights and a statutory cause of action. And *United States v. City of Jackson*, 318 F.2d 1 (5th Cir. 1963), which pre-dates *Armstrong* by half a century, involved enforcement of a federal statute; the Court cited *Debs* to show the government had "standing" to seek an injunction to prevent unlawful discrimination that obstructs commerce, *id.* at 14-17. None of these issues are presented here.

## B.  S.B.4 does not regulate an exclusive federal field.

The federal government cites *Arizona* (at 17) for the proposition that "States are precluded from regulating conduct in a field that Congress, acting within its proper

authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Yet contrary to the federal government's (at 17-22) and the other plaintiffs' contentions (at 24-28), S.B.4 does not regulate within an exclusive federal field. As the Supreme Court has explained, *Arizona* never held that entry or removal constitutes an exclusive federal field. *See, e.g.*, *Kansas v. Garcia*, 140 S.Ct. 791, 805-06 (2020) (explaining that *Arizona* addressed "the field of alien registration"). Plaintiffs thus seek to extend *Arizona*. But even if this Court determines, for the first time, that entry or removal is exclusively federal, S.B.4 causes no "intrusion upon the federal scheme." *Arizona*, 567 U.S. at 402. Simply put, S.B.4 is not field preempted.

**1.** The federal government all but admits there is no exclusive federal field here when it observes (at 17) that "SB 4 undermines federal immigration law even more directly" than the field of alien registration at issue in *Arizona*.[1] Plaintiffs have repeatedly argued that if alien registration, a domestic tracking program, is a recognized federal field, "entry and removal" must be exclusively federal, too. No one disputes that Congress is tasked with granting lawful status and that the registration program relates to such status. Protecting the border, however, does not relate to granting or withdrawing lawful status. Contrast this with S.B.4, which helps prevent crimes *in Texas* and protects *Texans* who live *in Texas*—a task that requires and anticipates Texas's law enforcement efforts.

---

[1] It also concedes (at 19 n.2) that the district court relied on legal error by "imprecisely" finding a "field of immigration," which even Plaintiffs disavow.

Regardless, Plaintiffs' argument fails for a more fundamental reason. Courts infer field preemption rarely because States are sovereigns and their police powers are not easily set aside. *See, e.g.*, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *cf. Medellin v. Texas*, 552 U.S. 491, 497-98 (2008). S.B.4 is a criminal statute, and "[f]rom the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today." *Kansas*, 140 S.Ct. at 806. The federal government's authority to regulate criminal activity—as evidenced in Title 18 of the U.S. Code—does *not* impliedly field preempt all overlapping state criminal laws. *See, e.g.*, *Gamble v. United States*, 587 U.S. 678 (2019).

The federal government's cite (at 18) to *Texas v. United States*, 50 F.4th 498 (5th Cir. 2022), is not to the contrary. Even if Congress is "entrusted exclusively" with establishing "[p]olicies" for "entry" and the "*right* to remain here," *id.* at 516 (emphasis added), it does not follow that federal officials have *sole enforcement authority* over such issues, especially when Congress created a different scheme. The federal government invokes (at 18) *Arizona*'s analysis regarding the field of alien registration to conclude that entry and removal similarly provide a "framework of regulation" that is "so pervasive that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399. But without clear congressional intent to oust a State entirely from a specific, identified field occupied wholly by the federal government, there cannot be field preemption. *Id.* Here, as Texas explained in its opening brief, federal statutes repeatedly acknowledge *some* State authority with respect to protecting the border. That is fundamentally inconsistent with field preemption that eschews "even complementary state regulation." *Id.*

7

**2.** Even if entry or removal constitute an exclusive federal field, S.B.4 does not intrude on it. The federal government points (at 21) to a century-old case, *In re Loney*, 134 U.S. 372 (1890), for the proposition that States cannot enforce immigration laws. But *Loney*—which does not involve immigration at all—holds that state enforcement is impermissible when the underlying conduct does not impair "any authority derived from the State." *Id.* at 374. The Court distinguished cases in which States can enforce "a violation of the laws of the State, as well as of the laws of the United States," *id.*, because such laws may have legitimate local concerns distinct from the federal offense. *Id.* at 375. That is the case here. And as another century-old precedent recognizes, there are few laws with more legitimate local concern than one aimed at protecting a State's border. *See Mayor of New York v. Miln*, 36 U.S. (11 Pet.) 102, 132-33 (1837).

Regardless, the federal government has abandoned whatever field may exist. Field preemption asks whether the federal government "occupies an *entire* field." *Arizona*, 567 U.S. at 401 (emphasis added). In the realm of entry and removal, however, federal officials now facilitate mass illegal entry and parole rather than detain and remove those aliens —all in violation of federal law. The federal government's only response (at 22) is to suggest that its failures are "irrelevant," and Congress has not "appropriated enforcement resources." If lack of resources were the problem, though, a State supplying *additional* resources should not be a preemption issue. The current administration may prioritize mass illegal immigration. But "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas*, 140 S.Ct. at 807. And the federal government can no more

occupy a field it functionally abandons than one it has never entered. *See Parker v. Brown*, 317 U.S. 341, 358 (1943) ("no such occupation of the legislative field" where Agriculture Secretary issued no orders "putting [law] into effect").

To the extent Congress implicitly defined a federal field here at all, it did so on the assumption that the federal government would comply in good faith with its chosen policies to prevent illegal entry, 8 U.S.C. §§1325(a), 1326(a); secure and maintain border control, *e.g.*, 6 U.S.C. §202(2); 8 U.S.C. 1701 Note; and detain aliens for swift removal, 8 U.S.C. §§1225(b)(1), 1231(a)(2). A federal judge, however, has weighed the evidence and found that such an assumption is "obviously" unwarranted. *Texas*, 2023 WL 8285223, at *3-4. The premise of implied field preemption is absent.

## C.  S.B.4 does not conflict with federal immigration law.

S.B.4 also does not conflict with federal law. The federal government claims (at 22) that S.B.4 is conflict preempted because "[i]t would fundamentally disrupt the federal immigration regime to allow a single State to make unilateral determinations regarding unlawful entry and removal." It points (at 22-23) to several federal removal protections, including asylum, and "foreign-relations interests." And the other plaintiffs claim (at 28-29) that, under *Arizona*, S.B.4 "stands as an obstacle" to the "purposes and objectives of Congress." Yet even the federal government agrees (at 20) "States may cooperate with the federal government in the apprehension and detention of noncitizens" and protect the integrity of immigration checkpoints. 8 U.S.C. §1357(g); *see also* 18 U.S.C. §758. And it admits (at 20) "States may also enforce their own generally applicable laws to the conduct of noncitizens." But

it asserts (at 20) that none of this means "that States may enforce their own immigration schemes independent of the federal government."

Plaintiffs, misread *Arizona*. A conflict between two sovereigns' laws arises only when it is "impossib[le]" to comply with both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399. And "[t]he mere fact that state laws like" S.B.4 "overlap to some degree with federal criminal provisions" on immigration "does not even begin to make a case for" preemption. *Garcia*, 140 S.Ct. at 806. Here, S.B.4 does not "'stand[] as an obstacle'" to any federal objective related to removal or foreign affairs because there is not an "actual conflict between the two schemes" such that "both cannot stand in the same area." *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). For all the reasons Texas has previously explained, it is readily possible to comply with both federal and Texas law because S.B.4 comports, rather than conflicts, with both Congress's enacted language and its purposes and objectives.

The federal government invokes (at 23-24) *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), to argue that any state criminal law that applies to aliens inherently conflicts with federal immigration law. But *Buckman* holds no such thing. There, the Court recognized that "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Id.* at 347-48 (cleaned up). By contrast, S.B.4 reflects Texas's assertion of a core "police" power. *Miln*, 36 U.S. at 132. If *Buckman* had anything to say about a case like this, *Arizona* would have no occasion to note that, "[i]n preemption analysis, courts should assume that the

historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." 567 U.S. at 400.

Next, the federal government relies (at 24-25) on a plurality opinion in *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524 (5th Cir. 2013) (en banc), to support its expansive theory. There, a city ordinance would have criminalized "occupying an apartment or [home] without first obtaining a valid occupancy license," which could be revoked if the occupant was not lawfully present in the country. *Id.* at 527, 532. Landlords, in turn, would have been prohibited from renting to someone without such a license. *Id.* at 527. In a splintered decision, a plurality reasoned that the ordinance "disrupt[s]" the federal immigration framework, *id.* at 529, because the offenses "allow[ed] state officers to hold aliens in custody for possible unlawful presence without federal direction and supervision," *id.* (internal quotations omitted). Unlike the law in *DeCanas v. Bica*, 424 U.S. 351 (1976), for example, the plurality explained the "Ordinance predicates arrests, detentions, and prosecutions based on a classification—the ability to obtain rental housing—that does not exist under [the relevant federal statute] or anywhere else in federal law." 726 F.3d at 532. Here, S.B.4 does not enable "unilateral state action" that would disrupt the federal immigration framework based on a classification unknown to federal law. Rather, S.B.4 predicates arrests on violations of state law that echo existing proscriptions in federal law.

The federal government also argues (at 27-28) that it must not lose its ability to speak "with one voice" on immigration issues. ROA.536. *Congress*, however, has already decided what the United States should say. And *Garcia* held that "[t]he

Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." 140 S.Ct. at 807. S.B.4 does not contravene Congress's message—which is "the Law[] of the United States."

Despite the federal government's (at 26-27) and the remaining plaintiffs' (at 29-30, 32) arguments to the contrary, nothing in S.B.4 prevents an alien from seeking asylum, or any other federal relief, from federal authorities, and S.B.4 does not authorize or require state officials (including state judges) to make removal determinations, assess an alien's removal defenses, or interfere with the federal government's removal proceedings. ROA.315-316. Contrary to the federal government's contentions (at 8, 27), S.B.4 does not allow prosecution of paroled individuals or anyone else who, under federal law, maintains "lawful presence in the United States." §51.02(c)(1)(A). And S.B.4 does not alter Texas's routine practice of cooperating with federal authorities when an alien wishes to seek asylum or other relief. ROA.316. Nor does S.B.4's directive not to abate prosecution require removal; certainly, prosecution for violations of State law may proceed during the pendency of federal decisions. Finally, *even if* federal law somehow does provide some defense or right that is not provided in S.B.4, *see* U.S. Br. 26-27, that defense or right could ground a claim of conflict preemption in an as-applied challenge to S.B.4—all the more reason to respect S.B.4's robust severability provision.

## D.  S.B.4 comports with the dormant Foreign Commerce Clause.

The federal government—but not the other plaintiffs—continues to say (at 30-32) S.B.4 also offends the dormant Foreign Commerce Clause. That fallback argument does not remotely justify a facial, pre-enforcement challenge.

To begin, illegal border crossings are not "commerce." The Supreme Court has already held as much. *See Miln*, 36 U.S. at 132. To be sure, if Texas were to impose a fee, that could well constitute commerce. In *Henderson v. Mayor of New York*, 92 U.S. (2 Otto) 259 (1875), for example, the Supreme Court addressed a per-passenger tax, and in *Chy Lung v. Freeman*, 92 U.S. (2 Otto) 275, 278 (1875), it addressed an official who could bar vessels from coming into port unless they "paid such a sum of money as the commissioner may in each case think proper to exact." Furthermore, *United States v. Guest*, 383 U.S. 745 (1966), addressed Congress's efforts to protect the constitutional right to interstate travel, and *Japan Line Ltd. v. Los Angeles County*, 441 U.S. 434 (1979), concerned a direct "tax" on "the instrumentalities of foreign commerce."

S.B.4 is different in kind. Rather than addressing commerce, it is a pure exercise of Texas's police power, not unlike Texas's criminal trespass statute. Not even the federal government, however, claims Texas's criminal trespass statute is preempted. Given that the Supreme Court has recently rejected an expansive view of the dormant Commerce Clause even with respect to commerce itself, *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023), there is no reason for this Court to adopt an even more expansive view of the dormant Foreign Commerce Clause.

Even if S.B.4 did regulate commerce, there is nothing dormant about Congress's actions here. Congress has repeatedly recognized that the States have a role to play in defending the border. The federal government does not dispute the basic constitutional point that Congress can displace the operation of the dormant Commerce Clause. *See S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945). So, *even if* this were commerce, the federal government's claim would still fail. Furthermore, this entire doctrine rests on a theory of implied congressional intent. Yet the federal government admits that for more than a century Congress has avoided treating human beings as items of foreign commerce. It thus would directly undermine Congress's choice for this Court to do what Congress has declined to do.

The federal government's response (at 31-32) seems to be that Congress sometimes could treat international travel as commerce. That is beside the point. Although the federal government claims (at 31) that S.B.4 "criminaliz[es] specifically and solely the movement of noncitizens across the U.S. border into Texas," it cannot dispute that citizens and aliens alike daily cross back and forth between Texas and Mexico *lawfully* at ports of entry. S.B.4 hinders none of that lawful traffic. Illegally fording an international water boundary, however, is *not* commerce by any stretch of the word. *Cf. United States v. Morrison*, 529 U.S. 598, 610 (2000). The federal government also says (at 32) that S.B.4 has foreign-policy implications. Yet S.B.4—by mirroring federal law—has no *new* foreign-policy implications because Congress already chose this policy. The Court should not presume that Congress—without saying so, *but see Gregory v. Ashcroft*, 501 U.S. 452, 467 (1991) (clear-statement

requirement)—wants to prevent Texas from enforcing a state law that mirrors federal law and is designed to protect Texans' health and safety.

### E.  Texas has a constitutional power of self-defense.

Plaintiffs also give short shrift to Texas's power to protect itself. The notion that S.B.4 can never be used to combat an "invasion" is hard to take seriously when even the President admits there is a border crisis and just last week the whole world witnessed the National Guard being physically overrun by hundreds of individuals who violently crossed the border. Furthermore, as Texas explained previously and Plaintiffs altogether ignore, the Director of the Federal Bureau of Investigation testified that one cartel is associated with ISIS, and the U.S. Director of National Intelligence has publicly identified the border as a security threat to the United States.

Texas has already explained why—under the district court's own analysis—at least some applications of S.B.4 fall within Texas's constitutional power of self-defense. Nothing in Plaintiffs' briefing is to the contrary. The federal government, for examples, urges (at 37) the Court to read the State Self-Defense Clause narrowly and argues that "smuggling" can't be an invasion. James Madison thought otherwise,[2]

---

[2] The federal government's suggestion (at 38) that Madison intended the militia to be used for regular law enforcement ignores his statement that the "smugglers … were too formidable for the civil power to overcome," and the "militia ought to be called forth to quell them." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 414 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836). It also ignores John Marshall's observation that the State Self-Defense Clause guarantees the States the power to call forth the militia—precisely the situation Madison envisioned. *Id.* at 420. Moreover, Congress's Special Committee went out of its way to indicate that the invasion into Texas included "cattle-thieves, robbers,

and, in any event, armed incursions by violent transnational cartels are not mere "smuggling." Furthermore, Congress's Special Committee on the "Texas Frontier Troubles" endorsed Governor Sam Houston's view that an "invasion" of non-state actors from Mexico justified Texas's use of violent force, and Governor Richard Coke's invocation of the State Self-Defense Clause to justify force against "'thieves and marauders'" who crossed into Texas. H. Rep. No. 343, at XV-XVI (Feb. 29, 1876). The situation today is not different in kind. When the U.S. Director of National Intelligence reports that transnational organizations threaten the security of the United States, we have left the world of ordinary law enforcement.

Nonetheless, the federal government says (at 33) "[t]he constitutional structure generally reflects a 'complete delegation of authority to the Federal Government to provide for the common defense' along with a 'divestment from the States of like power.'" The word "generally" in that sentence sticks out like a sore thumb: The State Self-Defense Clause provides that "[n]o state shall, without the Consent of Congress, … engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, §10, cl. 3. Plaintiffs have no answer for that plain language, which provides in no uncertain terms that States do not need Congress's "Consent" to defend themselves. This core sovereign power—perhaps the *most* core power—belongs to the States. Nor could it be otherwise; no State

---

and murderers from the Mexican side of the river," H. Rep. No. 343, at 16-17 (Feb. 29, 1876)—not just those who lay siege to a city.

consented to allowing their liberty to rest in the hands of others. *See, e.g.*, *United States v. Abbott*, 92 F.4th 570, 579-80 (5th Cir. 2024) (en banc) (Ho, J., dissenting).

Governor Abbott has invoked Texas's authority under the State Self-Defense Clause. Plaintiffs do not contend that he has done so in bad faith. Therefore, no court can second-guess Texas's invocation of the power to defend itself; whether to employ state self-defense measures is inherently a political question that the U.S. Constitution commits to Texas, just as the Constitution commits to the federal political branches whether to employ federal self-defense measures.

The federal government thus falls back on its argument (at 34-36) that S.B.4 is not a "war" measure. Yet the greater power to wage war against includes the lesser power of "arrest." *Moyer v. Peabody*, 212 U.S. 78, 84-85 (1909). The federal government says almost nothing about the analysis in *Moyer*. Under at least some applications of S.B.4 (which suffices to defeat a facial challenge), Texas can incarcerate individuals who unlawfully enter—thus limiting the threat. As in *Moyer*, the fact that Texas has not employed even more drastic self-defense measures should be seen as a virtue. And the notion that Texas judges will be unable to determine which applications are permissible ignores that they regularly evaluate federal defenses to state crimes, *see Younger v. Harris*, 401 U.S. 37, 45 (1971), and confirms that a pre-enforcement injunction is flawed because no Texas court has construed S.B.4.

The federal government also says (at 41) the State Self-Defense Clause "confers a time-limited emergency authority designed to let the States act before the federal government has had an opportunity to respond." This argument is wrong in at least three ways. First, such a fact-specific objection is irrelevant under *United States v.*

*Salerno*, 481 U.S. 739 (1987). Second, a State may defend itself without federal consent under two circumstances: when "actually invaded, *or* in such imminent Danger as will not admit of delay." U.S. Const. art. I, §10, cl. 3 (emphasis added). As to the second circumstance, the power ends with the imminent danger does. But as to the first, nothing bars a State from continuing to respond to ongoing hostilities. And third, any suggestion that Texas cannot defend itself because the federal government will protect the States ignores that the federal government has demonstrably proven unable or unwilling to do just that.

Finally, the remaining plaintiffs' efforts to satisfy the *Salerno* standard also falter.[3] They say (at 42) Texas can address crimes committed by cartels but only so long as Texas law is not preempted. The Constitution, however, trumps any statute. They also contend (at 42-43) that *Salerno* doesn't mean what it says and urge the Court to ignore how S.B.4 can be used in response to violent cartel members. But as Texas previously explained, facial injunctions are the exception, and where the requirements for such extraordinary relief are not met, "courts must handle unconstitutional applications as they usually do—case-by-case." *United States v. Hansen*, 599 U.S. 762, 770 (2023). Plaintiffs say nothing about *Hansen*.

## F.   The district court's severability analysis requires vacatur.

At a minimum, the district court's severability analysis is inadequate. Should any application of S.B.4 be preempted, S.B.4 requires severability of "every

---

[3] These plaintiffs also claim (at 41-42) that Texas's emphasis on *Salerno* is new. Not so. *See* ROA.226 (quoting *Salerno*, 481 U.S. at 745).

[preempted] application … to every person, group of persons, or circumstances" and provides that "[i]f any application of any provision [of S.B.4] to any person, group of persons, or circumstances if found by a court to be invalid for any reason, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected." Act of Nov. 14, 2023, 88th Leg., 4th C.S., ch. 2, §8 (2023).

No provision of S.B.4 is preempted—and certainly not facially. But if the Court disagrees, then a meaningful severability analysis is required. Consider the district court's misreading of S.B.4's order-to-return provisions. Assuming that S.B.4 would allow State officers to force an alien across an international boundary (rather than just take the person to a "port of entry," article 5B.002(e)(1)), the district court was still required to sever those provisions from S.B.4's substantive criminal proscriptions. States *can* proscribe what federal law proscribes, even if they cannot operate repatriation flights by themselves. Depending on the scope of any preemption determination, there almost certainly will be other non-preempted applications. The district court recognized as much; it concluded (erroneously) that S.B.4's removal provisions were preempted but did not address whether other applications of S.B.4 could survive. That is error.

Plaintiffs' responses also underscore why vacatur is required. The federal government says (at 46-47) essentially nothing about severability. And the others argue (at 42) that it is not enough that Texas can "conjure up" hypothetical situations. But it does not require conjuring to say, for example, that federal officials will seek assistance when Texas officers witness border crossings outside of a port of entry but in

places not subject to Texas trespass law. After all, federal law *allows* but cannot *require* such cooperation. *See* 8 U.S.C. §1103(a)(1); 8 U.S.C. §1357(g)(10)(B). Instead, as the federal government recognizes (at 5), such cooperation must be "authorized by state law." If nothing else, S.B.4 plainly provides such authorization.

The remaining plaintiffs also claim (at 48) for the first time that *Rose v. Doctors Hospital*, 801 S.W.2d 841 (Tex. 1990), supports their position, even though Rose *upheld* application of a severability clause; S.B.4's severability clause is extraordinarily broad; and no state court had had an opportunity to address this question of state law. They further ask (at 48-49) the Court to ignore what the severability clause here says because of legislative history, even though no Texas court would read S.B.4 that way. *See, e.g.*, *In re Facebook, Inc.*, 625 SW 3d 80, 88 n.4 (Tex. 2021).

## II. The Remaining Preliminary-Injunction Factors Support Texas.

### A. Plaintiffs still have not shown irreparable harm.

**1.** The federal government will not suffer irreparable harm if S.B.4 is allowed to go into effect. To start, S.B.4 is not preempted. So, each of the federal government's purported harms arising from preemption (at 47) are unavailing. Next, the federal government argues (at 48) that S.B.4 will affect treaty obligations, "[m]ost prominently, the Convention Against Torture." Not so. Under S.B.4 "[a]liens held in custody or serving a sentence under SB 4 will be able to apply for any federal immigration relief (including, but not limited to, asylum and *Convention Against Torture claims*)." ROA.311 (emphasis added).

Mexico hypothesizes potential harms to Mexican nationals. *See* Mexico Amicus Br. at 4-5. Such harms are also unfounded: S.B.4 has no effect on Mexican nationals who lawfully enter the United States. Further, Mexico's reliance (at 5-6) on a treaty to which the United States is not a signatory is unpersuasive. Moreover, any argument that S.B.4 frustrates international relations (at 8-14) misunderstands S.B.4 and federal law. An alien subject to a return order will be brought to a port of entry. ROA.316. Texas does not claim authority to deport anyone but rather has enacted a statute that is broadly designed to mirror federal law. Furthermore, Texas has explained that "to be lawfully arrested without a warrant" under §51.02 "the offense [must] take place in plain view of a law enforcement officer, which is most likely to occur in areas adjacent to the physical border of Texas with the Republic of Mexico." ROA.319. Mexico's concerns about profiling are misplaced—especially given the deluge of illegal entry from all over the world.

The federal government is equally incorrect regarding the functioning of S.B.4. It asserts (at 49)—relying solely on the declaration of a DHS official—that "[a] noncitizen facing simultaneous SB 4 enforcement proceedings and federal immigration proceedings 'would be unable to participate fully in federal immigration proceedings,' 'attend scheduled interviews,' or 'comply with required identity and security check procedures.'" Yet, each point is refuted by Texas's declarations and the historic relationship between Texas and the federal government in handling aliens in Texas's custody. First, Texas "has not and will not interfere with a confined or incarcerated aliens' ability to fully participate in federal immigration proceedings or federal court or state hearings." ROA.311. Second, the State provides confined or

incarcerated aliens with both access via Zoom or other electronic means as well as transportation to any court hearing or interview. ROA.311. Finally, the State will continue to work with federal officials regarding identifying aliens. ROA.310.

**2.** The Organizational Plaintiffs again advance (at 49-50) alleged harms to non-parties premised upon continued illegal conduct. Yet they cannot rely on the illegal activity of third parties to justify an equitable remedy. *Cf. O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974). They also "lack a judicially cognizable interest in the prosecution of another," *Texas*, 599 U.S. at 677 (quoting *Linda R.S.*, 410 U.S. at 619) (cleaned up)—this "Article III holding" "applies to challenges" of "whether to arrest or prosecute," including arrests and prosecutions in the immigration context. *Id.* Next, they allege (at 50) that "[t]hey also 'will likely lose their ability to represent many asylum applicants' as they are swiftly forced to leave the country under S.B. 4." This is contradicted by Texas's declarations below. Texas permits "non-profit legal service organizations" to enter State facilities "to contact confined and incarcerated aliens and provide their services." ROA.311. And Texas will not prevent access to federal proceedings—including immigration proceedings. ROA.311. S.B.4 thus will not cause anyone to "lose their ability" to represent asylum seekers. Also, contrary to Organizational Plaintiffs' assertion (at 52) that S.B.4 "erases" tools of the federal government by requiring state judges to order removal even if aliens are seeking visas or other federal protection, S.B.4 does no such thing—and certainly not in every application. To the contrary, State officials routinely inform aliens of their opportunities to seek federal relief, ROA.315, and assist in pursuing it, ROA.311.

**3.** Finally, El Paso County's alleged injury (at 50-51) is complying with State law. That is not harm. Nothing in S.B.4 requires it to change its practices or priorities. S.B.4 merely enacts a new State crime. El Paso County can enforce S.B.4 like it does any other Texas law. Despite contrary assertions (at 50-51), S.B.4 will not "undermine[]" the County's "ability to focus on high risk or violent criminals" or otherwise "generat[e]" "fear" within the County's community relations.

## B.  The equities and public interest clearly favor Texas.

No Plaintiff has rebutted that the equities favor Texas. Indeed, the harm to Texas is obvious. Aside from the fact that enjoining a constitutional State law is *per se* irreparable harm, *see e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), the public interest and equities squarely favor Texas.

Violent conduct is rampant at the southern border. S.B.4 will help protect Texans from that violence and address the humanitarian crisis caused by transnational cartels. For example, human trafficking is now a multi-billion-dollar revenue source for cartels. *See, e.g.*, Unaccompanied Children at the Border: Federal Response and the Way Forward, Hearing Before the Subcomm. on Border Security, Facilitation, and Operations of the H. Comm. on Homeland Sec., 117th Cong. 28 (2021) (statement of Patrick J. Lechleitner, Acting Executive Associate Director, Homeland Security Investigations) ("U.S.-bound human smuggling and related criminal activities are estimated by the Homeland Security Operational Analysis Center to produce revenues of $2 billion to $6 billion per year."). Furthermore, hundreds of millions of lethal doses of fentanyl are ferried across the border by illegal crossings that S.B.4

seeks to prevent, as are dangerous weapons and other contraband. Such dangers from the border crisis are direct harms to Texans and the American public.

In short, S.B.4 is not preempted, Texas will suffer irreparable harm if S.B.4 is facially enjoined, and the equities overwhelmingly favor Texas. S.B.4 mirrors federal law and assists the State in what even the federal government admits is a crisis. Texas has the duty and the power to defend itself and its citizens from this crisis.

## Conclusion

The Court should reverse the order granting a preliminary injunction.

Respectfully submitted.

/s/ Aaron L. Nielson

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Aaron L. Nielson
Solicitor General
Aaron.Nielson@oag.texas.gov

Kateland R. Jackson
Joseph N. Mazzara
Assistant Solicitors General

Coy Allen Westbrook
Assistant Attorney General

Counsel for Defendants-Appellants

## Certificate of Service

On March 26, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
Aaron L. Nielson

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,476 words, excluding the parts of the brief exempted by rule; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
Aaron L. Nielson