

# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

Aaron L. Nielson  
Solicitor General

Aaron.Nielson@oag.texas.gov  
(512) 463-2100

March 21, 2025

**VIA CM/ECF**

Mr. Lyle W. Cayce, Clerk  
Court of Appeals for The Fifth Circuit  
600 S. Maestri Place  
New Orleans, LA 70130-3408

    Re:    *United States v. State of Texas*, No. 24-50149

Dear Mr. Cayce:

Counsel submits this letter in response to the Court's notice of February 11, 2025, directing the parties to file a supplemental letter brief answering three questions about the district court's jurisdiction and the parties' continued positions on appeal.

1. **What jurisdiction, if any, does the district court have to clarify or modify the scope of the preliminary injunction in light of the Supreme Court's decisions in *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), and *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56 (1982), which recognize the "longstanding tenet of American procedure" that an appeal "divests" the district court of jurisdiction?**

The district court lacked jurisdiction to issue an order modifying the preliminary injunction. Texas's appeal of the preliminary injunction divested the court of jurisdiction over that order. No party requested the relief that the district court purported to award. And the modified relief clearly exceeds the scope of the actions brought by the federal government and the other plaintiffs. For these reasons, Texas had planned to move to vacate the modified injunction in the district court but chose to await doing so in light of the Court's briefing order.

Federal and state governments have independent authority to administer separate—and often overlapping—criminal codes. *See, e.g.*, *Gamble v. United States*,

587 U.S. 678, 683–91 (2019) (discussing the separate sovereigns doctrine and "dozens of cases over 170 years" approving the operation of state criminal laws that overlap with federal criminal laws). In 2023, to address an acknowledged border crisis, Texas enacted S.B.4 to create two state criminal offenses that mirror federal criminal offenses: Namely, S.B.4 amends Chapter 51 of the Texas Penal Code by making it a state crime to illegally enter or reenter Texas, just like it is a federal crime to illegally enter or reenter the United States.

On December 19, 2023, the Las Americas Plaintiffs brought this facial pre-enforcement challenge to S.B.4. *See* ECF 1, No. 1:23-cv-1537 (W.D. Tex.). On January 3, 2024, the federal government brought another facial challenge to the law. *See* ECF 1, No. 1:24-cv-8 (W.D. Tex.). Neither complaint identified a cause of action authorizing suit; instead, both complaints simply claimed that Texas's new criminal laws were preempted by federal criminal laws and presumed upon an unidentified "action in equity" to press that claim. On January 31, 2024, the district court consolidated the two cases. *See* ECF 45, No. 1:23-cv-1537. On February 29, 2024, the district court granted a preliminary injunction to both plaintiffs: "**IT IS ORDERED** that the motions for preliminary injunctions, United States (Dkt. # 14) and Las Americas, (Dkt. # 33) are **GRANTED**." ROA.591. It "enjoin[ed] the law in full" despite the severability clause. ROA.586. The same day, Texas appealed that preliminary injunction to this Court.

Although the district court's preliminary injunction remains pending before this Court, on January 31, 2025, the district court ordered the parties to appear for a conference in chambers. As the docket reflects, no party sought to modify or clarify the preliminary injunction. And no party requested such relief during the in-chambers conference. Nevertheless, the district court entered what it stylized as an "Order clarifying/modifying preliminary injunction issued on February 29, 2024." ECF 77, No. 1:24-cv-8 (W.D. Tex. Jan. 31, 2025) (capitalization altered). The order says that it "clarifies/modifies its injunction" to "avoid any unintentional violation" of that injunction. *Id.* at 5. It also states, among other things, that: Texas personnel may assist federal personnel with "apprehension, arrest, and detention" of aliens; Texas personnel may not "engage in the actual deportation" of aliens; any federal-state collaboration on removal "would likely violate both Federal Immigration statutes and the United States Constitution." *Id.* at 5–6.

Although Texas appreciates the district court's recognition that the State should

be allowed to assist in addressing the many serious problems at the State's southern border, the district court's order modifying the preliminary injunction is of no legal effect because that court had no jurisdiction to issue such an order.

*First*, because Texas appealed the district court's preliminary injunction, and that appeal is pending before the Court, the district court lacks jurisdiction to modify it. It is a "longstanding tenet of American procedure" that "[a]n appeal, including an interlocutory appeal, 'divests the district court of its control over those aspects of the case involved in the appeal.'" *Coinbase*, 599 U.S. at 740 (quoting *Griggs*, 459 U.S. at 58). Or as this Court has previously explained, "once a party has filed an appeal of a district court's order granting an injunction, the district court no longer has any authority to amend or vacate the order." *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989). A district court may exercise jurisdiction over the underlying merits in a case where a party has sought appellate review of an interlocutory order. *See, e.g.*, *Satanic Temple, Inc. v. HHSC*, 79 F.4th 512, 514 (5th Cir. 2023). But it has no jurisdiction over the interlocutory order *itself*.

Members of this panel have explained before why that is. *See United States v. Lucero*, 755 F. App'x 384, 386 (5th Cir. 2018) (per curiam) (Owen, C.J., Willett, Oldham, J.J.). "The filing of a notice of appeal is an event of jurisdictional significance." *Griggs*, 459 U.S. at 58. And the matter that is the subject of that appeal "can exist only in one court at a time." *United States v. Willis*, 76 F.4th 467, 471 (5th Cir. 2023) (quoting *Lucero*, 755 F. App'x at 386-87). Under the "one-court-at-a-time rule," then, only this Court may exercise jurisdiction over the district court's preliminary injunction. *Id.* At most, a district court deprived of jurisdiction by appeal may issue an "indicative ruling": "Where a party asks a 'district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending,' a district court may state 'that it would grant the motion' if it could." *Lucero*, 755 F. App'x at 387 (quoting Fed. R. App. Proc. 12(a) and discussing the indicative ruling doctrine).

*Second*, no party requested the modified relief the district court purported to award here. District courts should not grant non-party injunctions. *See, e.g.*, *Labrador v. Poe ex rel. Poe*, 144 S.Ct. 921, 923, 927 (2024) (Gorsuch, J., concurring in grant of stay); *id.* at 933 n.4 (Kavanaugh, J., concurring in grant of stay). By the same token, courts should not award relief that the parties before them never asked for: "Our system 'is designed around the premise that [parties represented by competent

counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)). Departing from that rule also "strays from equity's traditional bounds." *Labrador*, 144 S.Ct. at 927. A court's ability to modify an injunction is triggered by "the *request of the party* who obtained equitable relief." 11A Wright & Miller, Fed. Prac. & Proc. §2961 (3d ed.) (emphasis added); *cf.* Fed. R. Civ. Proc. 60(a), (b) (while court may correct a clerical mistake "on its own," it may modify order "[o]n motion and just terms").

*Third*, setting aside the foregoing, the district court exceeded the scope of this case in its modified injunction. Both sets of plaintiffs pressed the same theory in their complaints: Federal criminal laws preempt overlapping state criminal laws. The district court's original injunction addressed that question, albeit erroneously, by concluding that federal laws criminalizing illegal entry and reentry preempt state laws that criminalize the same conduct. That dispute concerns the authority of the United States and Texas to separately administer *separate* legal codes. The modified injunction, however, addresses a different matter: Whether and how two sovereigns may collaborate in administering a *single* criminal code.

The district court suggests State personnel assisting federal officers in carrying out functions under the Immigration and Nationality Act could "unintentional[ly] violat[e]" the injunction. ECF 77 at 5. That suggestion is well outside the scope of this case or controversy and is incorrect. By agreeing to assist the United States in enforcing federal criminal law, Texas was never at risk of violating an injunction against enforcing state criminal law. Federal and state law permit such assistance. *See, e.g.*, 8 U.S.C. §1103(a)(10); Tex. Gov't Code §431.111. Because plaintiffs have not brought claims other than those relating to S.B.4, a judicial order modifying the district court's preliminary injunction is not necessary for any State official to do anything other than enforce S.B.4. Put another way, that plaintiffs have instituted lawsuits challenging S.B.4's enforcement as preempted does not give the federal judiciary a supervisory power over Texas's law enforcement more generally.

2. **What is the effect, if any, of President Trump's Executive Orders 14,159 and 14,165, which invite Federal-State cooperation in enforcing immigration laws and securing the border, and Governor Abbott's Executive Orders GA-50-54, which direct Texas officials to assist in enforcing immigration laws and securing the border, on the district court's preliminary injunction and on this appeal?**

President Trump's Executive Orders and Proclamations confirm that this Court must vacate the preliminary injunction. A second, non-justiciable finding that invasion conditions exist shows that facial relief was always improper. A now-shared goal of immigration enforcement means the previous assessment of the equitable factors no longer holds. And the possibility of collaboration—now actualized—undercuts the district court's preemption analysis based on enforcement priorities.

The Constitution provides that the federal government "shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion." U.S. Const. art. IV, §4. In a letter on Inauguration Day, Governor Abbott explicitly asked the President to exercise his federal self-defense authority under this provision based on the same conditions that justified the Governor's invocation of self-defense authority under Article I, Section 10, Clause 3: "The *en masse* entry into this country by violent criminals, known terrorists, and other hostile foreign actors murdering at will is an invasion, as FBI officials told Congress just last year. These criminals come in open defiance of our laws and often by force, outfitted with body armor, burying improvised explosive devices, and decorating trees with trophies from sexual assaults." X, Greg Abbott (@GregAbbott_TX) (Jan. 20, 2025, 12:04 PM), https://x.com/GregAbbott_TX/status/1881402347617972410.

Later that day, the President echoed the Governor's assessment. In Executive Order 14,165, President Trump recognized that the United States has been invaded:

> Over the last 4 years, the United States has endured a large-scale invasion at an unprecedented level. Millions of illegal aliens from nations and regions all around the world successfully entered the United States where they are now residing, including potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent.

Letter to Mr. Cayce, Clerk
Page 6

*Securing Our Borders*, Exec. Order No. 14,165, 90 Fed. Reg. 8,467, 8,467 (Jan. 20, 2025). In a Proclamation, the President determined that these conditions triggered the federal self-defense authority under Article IV, Section 4:

> By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the southern border until I determine that the invasion has concluded.

*Guaranteeing the States Protection Against Invasion*, Proc. No. 10,888, 90 Fed. Reg. 8,333, 8,335 (Jan. 20, 2025).

These developments are highly relevant. *First*, Texas has explained why invocation of its own authority under the Self-Defense Clause, U.S. Const. art. I, §10, cl. 3, is a political question. *See, e.g.*, Texas.Br.39; Post-Argument Supplemental En Banc Brief for Appellants at 1-5, *United States v. Abbott,* 110 F.4th 700 (5th Cir. 2024) (No. 23-50632), ECF 229. Texas has also explained that plaintiffs' facial challenges to S.B.4 fail because they are based on federal statutes and the U.S. Constitution trumps federal statutory law. *See* Texas.Br.39-40. At least some applications of S.B.4 are plainly lawful under the Self-Defense Clause—for example, against members of transnational cartels. *See* Texas.Br.36-40. That is sufficient to defeat a facial challenge because plaintiffs cannot "establish that *no set of circumstances* exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added). In other words, to prevail the plaintiffs would need to show S.B.4 is unlawful "in *every* application." Texas R. 28(j) Letter, ECF 200 (citing *United States v. Rahimi*, 602 U.S. 680 (2024)).

In this Court's order denying a stay pending appeal, the Court disagreed that the Self-Defense Clause is relevant to the preemption issues here because—in the panel majority's preliminary view—federal statutory law preempts S.B.4 notwithstanding Texas's invocation of its own sovereign authority to defend itself. *See United States v. Texas*, 97 F.4th 268, 294–95 (5th Cir. 2024).

President Trump's recognition of an invasion fundamentally undermines that analysis. As the federal government explained to the en banc Court in *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024), whether an invasion is occurring is a political question committed (in the federal government's view) to the political branches of the federal government. *See, e.g.*, Post-Argument Supplemental En Banc Brief for Appellee at 2, No. 23-50632, ECF 231. Because the federal government now recognizes an invasion, including with respect to "potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent," 90 Fed. Reg. 8,467 at 8,467, applying S.B.4 to such individuals cannot be preempted. Accordingly, there is no basis for a facial challenge to S.B.4, thus defeating a preliminary injunction. Under the Constitution, valid federal statutory law applies "unless" a State is "actually invaded." U.S. Const. art. I, §10, cl. 3. Given the President's non-justiciable recognition of an invasion—in *addition* to the Governor's recognition of the same—any statutory preemption argument necessarily fails with respect to at least some applications of S.B.4.

*Second*, the district court's balance of the remaining preliminary-injunction factors is no longer sustainable. The Supreme Court has declared that "the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). The district court, however, granted a preliminary injunction by focusing on alleged harms should S.B.4 be enforced. For example, the district court placed great weight on potential harms to "foreign relations." ROA.508-10, 577. That analysis—based on a record compiled in February 2024—also no longer applies in light of Executive Orders 14,159 and 14,165, which radically change the relevant "foreign relations" landscape.

The district court also suggested that enforcing S.B.4 would harm the federal government's "nonrefoulment obligations." ROA.579-80. Yet the President declared in Executive Order 14,165 that the federal government "shall take all appropriate action to resume the Migrant Protection Protocols in all sectors along the southern border of the United States." 90 Fed. Reg. 8,467 at 8,468. Again, this is a material change that nullifies the district court's analysis. Any concerns, moreover, that enforcing S.B.4 could harm cooperation with the federal government fails because the federal government has announced that it intends to "[c]ooperat[e] fully with State and local law enforcement officials in enacting Federal-State

partnerships to enforce Federal immigration priorities." *Id.* at 8,467. Each of these changes requires a rebalancing of the preliminary injunction factors.

Similar analysis governs the district court's evaluation of the equities and public interest factors. The federal government now agrees with Texas about the crisis at the border and advances a "policy" consistent with S.B.4. ROA.507-10. The district court's analysis depends on the federal government's "determin[ation] that prosecution would frustrate federal policies." ROA.515 (quoting *Arizona v. United States*, 567 U.S. 387, 402 (2012)). But current federal policy is to "prioritize the prosecution of offenses that relate to the borders of the United States," 90 Fed. Reg. 8,467 at 8,468-69, and especially those "offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States," Exec. Order No. 14,159, 90 Fed. Reg. 8,443, 8,444 (Jan. 20, 2025). Indeed, Executive Order 14,159 recognizes that "[m]any … aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities." *Id.* at 8,443. In evaluating the public interest, the district court cannot disregard S.B.4's obvious value in combating what the federal government agrees are "significant threats to national security and public safety." *Id.* The district court's balancing—which rests on a presumption of a divergence of policy—thus no longer holds.

*Third*, what was once a possibility of federal-state collaboration is now an actuality. Texas had previously highlighted how federal laws authorize collaboration with State personnel on immigration enforcement. *See, e.g.*, 8 U.S.C. § 1357(g). All that has changed is the federal government's enforcement priorities: The district court once thought application of S.B.4 would "frustrate federal policies," but now President Trump is determined to enforce the INA with the help of the States. The Supremacy Clause gives priority to federal laws, "not the criminal law enforcement priorities or preferences of federal officers." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). But that is what the district court's preliminary injunction rests on—the shifting sand of enforcement priorities, not the actual text of immigration laws.

The federal government now has expressly invited States to cooperate with it in enforcing federal immigration laws. Executive Order 14,159 directs the Secretary of Homeland Security "[t]o ensure [that] State and local law enforcement … can assist with the protection of the American people" by "authoriz[ing] State and local law

enforcement officials … to perform the functions of immigration officers." 90 Fed. Reg. 8,443 at 8,445. And Executive Order 14,165 declares that "[i]t is the policy of the United States" to "enact[] Federal-State partnerships to enforce Federal immigration priorities." 90 Fed. Reg. 8,467 at 8,467.

In response to these and other actions by the President, Governor Abbott issued five Executive Orders aimed at assisting federal officials in regaining and maintaining border security. The orders specifically direct State agencies and officials to:

- deploy "any physical infrastructure to improve operational security at the southern border," Executive Order GA-50, 50 Tex. Reg. 807, 807 (2025);

- eliminate "the operations of designated foreign terror organizations, like Mexican cartels … by sharing intelligence" with the federal government, Executive Order GA-51, 50 Tex. Reg. 807, 808 (2025);

- lease facilities "suitable and available for use by Immigration and Customs Enforcement" to the federal government, Executive Order GA-52, 50 Tex. Reg. 808, 809 (2025);

- develop a plan to assist the federal government in securing the border, Executive Order GA-53, 50 Tex. Reg. 809, 810 (2025); and

- "assist federal actors … with carrying out functions under federal immigration laws," Executive Order GA-54, 50 Tex. Reg. 810, 810 (2025).

Consistent with this last order, the Governor entered into a Memorandum of Understanding with U.S. Customs and Border Protection authorizing Texas National Guard soldiers to investigate, arrest, and transport illegal aliens. That includes transport "for the purposes of removal and/or repatriation." CBP-TNG MOU art. V (Jan. 31, 2025); *see also* X, Ali Bradley (@AliBradleyTV) (Feb. 2, 2025, 9:29 AM), https://x.com/AliBradleyTV/status/1886436756741877882 (attaching memorandum). Applying S.B.4 is one additional way that Texas personnel may help federal officers regain and maintain operational control of the border.

To be clear, unless the Court orders the district court to dismiss this litigation outright, Texas respectfully urges the Court to also address the merits of the district court's preemption analysis rather than simply vacate the preliminary injunction on the grounds that the balancing of the relevant factors must be redone. Instruction

Letter to Mr. Cayce, Clerk
Page 10

from this Court with respect to the merits will greatly expedite resolving this litigation. But under no circumstances can the Court affirm the district court's preliminary injunction given President Trump's recent Executive Orders.

3. **Since the recent change in administration, have the parties' positions on any issues in the appeal changed?**

Texas's arguments have not changed. The district court's expansive understanding of *Arizona v. United States*, 567 U.S. 387 (2012), remains incorrect, particularly after *Kansas v. Garcia*, 589 U.S. 191 (2020). *See* Texas.Br.26, 42-43. The district court's expansive view of organizational standing also remains incorrect, especially after *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). *See* Texas R. 28(j) Letter, ECF 193. The district court's approach to facial challenges also fails in light of recent Supreme Court decisions in *Rahimi* and *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). *See* Texas R. 28(j) Letter, ECF 200. And its embrace of a freewheeling "action in equity" is plainly wrong. A change in presidential administration does not undermine the rule that Congress alone creates federal causes of action, and that the federal government lacks one here. As Texas explained in response to the Court's prior request for supplemental briefing, hundreds of federal statutes would be superfluous if the federal government could sue without an express statutory cause of action. *See* Texas.Supp.Br.1-5, ECF No. 179.

Recent changes now only confirm there are exceedingly good reasons to revisit many of this Court's prior conclusions. In its stay opinion, this Court: rested jurisdiction exclusively on the *federal government's* standing to sue, *Texas*, 97 F.4th at 278; found that the *federal government* had an implied cause of action based on impacts "to foreign policy and relations with other countries, as well as its authority over immigration," *id*; based a finding of field preemption on "the [*federal*] *Executive's* decision not to pursue either civilly or criminally the very noncitizens" who violate the INA and not to request "Texas's assistance under various statutes," *id.* at 281, 283; based a finding of conflict preemption on the notion that "the *United States* would have no voice in the matter" about punishment under S.B.4 "before the federal government has made a decision" whether an individual entered illegally or should be permitted to stay, *id.* at 291; rejected Texas's defense based on the idea that "federal statutes addressing matters such as noncitizen entry and removal are still supreme" if the *federal government* does not think an invasion is occurring, *id.* at

295; and found equitable factors favored an injunction based on supposed foreign relations complications for the *federal government*, like the risk of "taking the United States out of compliance with its treaty obligations," *id.* at 296.

In sum, this Court's stay analysis—at practically every step—turned on the presence and participation of the federal government as a plaintiff here. On Tuesday, March 18, 2025, however, the federal government voluntarily dismissed its case against Texas. *See* Notice of Voluntarily Dismissal, *United States v. Texas*, No. 1:24-cv-0008-DAE (W.D. Tex. Mar. 18, 2025).

The federal government's decision to abandon its challenge to S.B.4 warrants revisiting the stay panel's conclusions or, at the very least, vacating the stay opinion. The premises of that decision have been undercut by the federal government's departure. Under any other circumstance, this is precisely when a court would order vacatur under *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950): A plaintiff who prevailed at an earlier stage of litigation voluntarily dismisses his claim and seeks to terminate the action as moot—all while the losing party is still seeking appellate review of his loss. *See, e.g.*, *Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4–5 (2023) (vacating court of appeals opinion after plaintiff, who previously won, voluntarily dismissed her suit and filed suggestion of mootness). "[V]acatur must be granted where mootness results from the unilateral action of the party who prevailed in the lower court." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994).

The presence of the other plaintiffs should not defeat that ordinary rule. *Munsingwear* vacatur principles are "rooted in equity." 13C Wright & Miller, Fed. Prac. & Proc. §3533.10 (3d ed.). It would be inequitable to conclude that a defendant who suffered a loss at the hands of a plaintiff who later abandons its arguments must suffer *permanently* because of the happenstance of two cases being consolidated: The federal government is gone, the Las Americas plaintiffs lack standing, and the only remaining plaintiff seemingly factored into the court's stay decision not at all. Vacatur plainly serves the public interest here, because that decision has already been cited in ten cases, the very outcome *Munsingwear* is designed to prevent: Vacatur "is commonly utilized in precisely this situation to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." *Munsingwear*, 340 U.S. at 41.

Texas's position remains the same, but the foundations of this Court's stay decision have essentially disappeared. Given the federal government's change of heart about the nature of the crisis at the border and its recent dismissal of its lawsuit against Texas, if this Court were to dismiss the remaining plaintiffs for lack of standing (as cases like *Alliance for Hippocratic Medicine* require), this litigation would end altogether. Challenges to S.B.4, if any, could be brought by individuals in as-applied litigation, which—"[f]or a host of good reasons"—is how litigation presumptively should occur. *Moody*, 603 U.S. at 723; *see also id.* ("facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways") (quotation omitted).

\*    \*    \*

The district court lacked jurisdiction to modify its preliminary injunction—and modification was not necessary anyway because nothing about an injunction enjoining S.B.4 enforcement prevents (or even could prevent) Texas from cooperating with the federal government under different legal authorities. Furthermore, changed circumstances confirm that the district court's preliminary injunction must be vacated because there is no plausible basis for a facial injunction and, at a minimum, the district court's balancing fails given significantly changed facts. The Court should allow Texas to enforce its own criminal laws, vacate the stay panel opinion, and order the district court to dismiss this litigation.

        Respectfully submitted,

        /s/ Aaron L. Nielson
        Aaron L. Nielson
        *Counsel for the State of Texas*

cc: All counsel of record (via CM/ECF)