# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 3, 2025

Lyle W. Cayce
Clerk

———————

No. 24-50149

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

STATE OF TEXAS; GREG ABBOTT, *in his official capacity as Governor of Texas*; TEXAS DEPARTMENT OF PUBLIC SAFETY; FREEMAN F. MARTIN, *in his official capacity as Director of Texas Department of Public Safety*,

*Defendants—Appellants,*

———————————————————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs—Appellees,*

*versus*

FREEMAN F. MARTIN, *in his official capacity as Director of the State of Texas Department of Public Safety*,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 1:23-CV-1537, 1:24-CV-8

---

Before Richman, Oldham, and Ramirez, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

The State of Texas enacted legislation known as S. B. 4 that prohibits noncitizens from illegally entering or reentering the state and sets forth removal procedures. The United States, as well as several other plaintiffs, filed two separate lawsuits challenging S. B. 4, and these plaintiffs filed motions for preliminary injunctions in each case.[1] After consolidating the cases,[2] the district court granted a preliminary injunction, staying the effectiveness of the new laws.[3] The defendants filed an interlocutory appeal,[4] and this court denied a motion to stay the district court's injunction pending appeal.[5] We now consider the merits of the appeal from the grant of the preliminary injunction.

The United States voluntarily dismissed its complaint without prejudice in the district court pursuant to Rule 41(a)(1)(A)(i) on March 18, 2025.[6] The United States' appeal is now moot.

---

[1] *See United States v. Texas*, 719 F. Supp. 3d 640, 651 & n.1 (W.D. Tex. 2024).

[2] ROA.1614-15.

[3] *Texas*, 719 F. Supp. 3d at 702.

[4] ROA.592-93.

[5] *United States v. Texas*, 97 F.4th 268, 298 (5th Cir. 2024).

[6] Notice of Voluntary Dismissal at 1, *Texas*, 719 F. Supp. 3d 640 (No. 1:24-CV-8), Dkt. No. 79.

No. 24-50149

The remaining plaintiffs are Las Americas Immigrant Advocacy Center (Las Americas) and American Gateways (to whom we will refer collectively as the Nonprofit Plaintiffs), and the County of El Paso, Texas. The remaining defendants in the district court are the District Attorney for the 34th Judicial District of Texas and Freeman F. Martin in his official capacity as Director of the State of Texas Department of Public Safety (DPS). (The plaintiffs sued Stephen C. McCraw in his official capacity as Director of DPS, and Martin has since replaced McCraw as the Director.[7]) However, the District Attorney moved to dismiss his appeal in our court,[8] and we granted that motion.[9] Accordingly, the district court's preliminary injunction as to the claims against the District Attorney for the 34th Judicial District of Texas remains in effect.

We affirm the district court's order granting a preliminary injunction as it pertains to Las Americas's claims against Director Martin. It is therefore unnecessary to consider matters raised in this appeal with regard to American Gateways or El Paso County.

# I

The origins of this litigation and its course through March 2024 are set forth in our decision denying a stay pending appeal of the preliminary injunction.[10] We will not recount that background here, except as necessary to resolve the issues presently before us.

---

[7] *See* Fed. R. Civ. P. 25(d); Fed. R. App. P. 43(c)(2).

[8] Agreed Motion to Dismiss Appeal at 2-3, *Texas*, 97 F.4th 268 (No. 24-50149), Dkt. No. 244.

[9] Order, *Texas*, 97 F.4th 268 (No. 24-50149), Dkt. No. 247-2.

[10] *See Texas*, 97 F.4th at 272-74.

No. 24-50149

In November 2023, the Texas legislature passed Senate Bill 4 (S. B. 4).[11] The bill's preamble reflects that its purpose is to prohibit "the illegal entry into or illegal presence in [the] state by" an alien.[12] The bill "authoriz[es] or requir[es] under certain circumstances the removal of persons who violate those prohibitions."[13] S. B. 4 amended the Texas Penal Code to include two new criminal offenses entitled "Illegal Entry from Foreign Nation" and "Illegal Reentry by Certain Aliens."[14] Those and other implementing laws are the primary focus of this appeal.

The crime of "Illegal Entry from Foreign Nation" is codified at Texas Penal Code § 51.02. The section provides: "A person who is an alien commits an offense if the person enters or attempts to enter this state directly from a foreign nation at any location other than a lawful port of entry."[15] The section also enumerates affirmative defenses, including when: (1) the federal government has granted the defendant "lawful presence in the United States"; (2) the federal government has granted the defendant asylum under 8 U.S.C. § 1158; (3) the defendant's conduct does not constitute a violation of 8 U.S.C. § 1325(a), which prohibits illegal entry into the United States; and (4) the defendant "was approved for benefits under the federal Deferred Action for Childhood Arrivals" program between certain dates.[16]

The crime of "Illegal Reentry by Certain Aliens" is codified at Texas Penal Code § 51.03. This section prohibits aliens from "enter[ing],

---

[11] S. B. 4, 88th Leg., 4th Called Sess. (Tex. 2023).

[12] *Id.*

[13] *Id.*

[14] *Id.* § 2 (codified at Tex. Penal Code §§ 51.02-03).

[15] Tex. Penal Code § 51.02(a).

[16] *Id.* § 51.02(c).

No. 24-50149

attempt[ing] to enter," or being "found in" the state after the person "(1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding."[17] This provision does not identify any affirmative defenses.[18]

If a person violates § 51.02 or § 51.03, S. B. 4 empowers Texas state judges and magistrates to order them to return to the foreign nation from which they entered or attempted to enter.[19] Under Texas Code of Criminal Procedure article 5B.002, a state judge or magistrate "may" enter such an order if "the person agrees to the order," among other requirements.[20] Under the same provision, the presiding judge "shall" issue the order if the defendant is convicted of either offense.[21] Failure to comply with an article 5B.002 order is a second-degree felony,[22] punishable by a fine of up to $10,000 and up to twenty years of imprisonment.[23]

Importantly, S. B. 4 provides that a "court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."[24]

---

[17] *Id.* § 51.03(a).

[18] *See id.* § 51.03.

[19] S. B. 4 § 1 (codified at Tex. Code Crim. Proc. art. 5B.002).

[20] Tex. Code Crim. Proc. art. 5B.002(c).

[21] *Id.* art. 5B.002(d).

[22] Tex. Penal Code § 51.04.

[23] *Id.* § 12.33.

[24] S. B. 4 § 1 (codified at Tex. Code Crim. Proc. art. 5B.003).

No. 24-50149

The district court granted a preliminary injunction precluding the enforcement of the new laws promulgated in S. B. 4. Director Martin asks us to vacate that preliminary injunction, arguing that the plaintiffs do not have standing to assert their claims and that, if we reach the merits of those claims, S. B. 4 is not preempted by federal law.

We note that we are confined to the record that was before the district court. The district court issued a preliminary injunction prior to the November 2024 elections, and before President Trump assumed office. The dissenting opinion hinges some of its positions on the fact that President Trump's policies and how his administration partners with Texas regarding immigration issues differ markedly from former President Biden's policies. Again, our review is based on the evidence and record that was before the district court.

## II

The first issue we confront is standing. The district court concluded that the Nonprofit Plaintiffs had standing.[25]

In determining whether to grant a stay pending appeal, we did not consider whether the Nonprofit Plaintiffs or El Paso County had standing to pursue their respective claims. That was because we concluded that the United States did have standing to pursue its claims, and that applying the factors set forth in *Nken v. Holder*,[26] a stay of the preliminary injunction should not issue.[27] It was therefore unnecessary to consider the standing of

---

[25] *United States v. Texas*, 719 F. Supp. 3d 640, 655-58 (W.D. Tex. 2024).

[26] 556 U.S. 418 (2009).

[27] *See United States v. Texas*, 97 F.4th 268, 274-75 (5th Cir. 2024).

No. 24-50149

the other plaintiffs.[28] Since the United States has dismissed its complaint in the district court in its entirety, we now consider whether at least one of the remaining plaintiffs has standing to pursue its claims against Director Martin, the only remaining appellant.

The Supreme Court has explained that "[a]t the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing."[29] To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."[30] The injury "must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon."[31] "[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury."[32]

---

[28] *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("The Court of Appeals did not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

[29] *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

[30] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (first citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); and then citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[31] *Id.* at 381 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).

[32] *Id.* (citing *Clapper*, 568 U.S. at 401).

No. 24-50149

## A

Las Americas alleges that S. B. 4 will directly affect its ability to provide legal services to immigrants. It is not suing on behalf of those who have entered or reentered, or may enter or reenter, Texas illegally; it is not asserting "associational standing."[33]

The Supreme Court's decision in *Havens Realty Corp. v. Coleman*[34] strongly signals that Las Americas has demonstrated injury and has standing. In *Havens Realty*, an organization known as HOME (Housing Opportunities Made Equal) brought suit "in its own right" seeking damages from defendants who were alleged to have steered potential renters who were black away from specific properties by falsely telling them there were no apartments available.[35] The Supreme Court observed that "HOME also alleged injury" to itself because it "asserted that the steering practices of [a defendant] had frustrated the organization's counseling and referral services, with a consequent drain on resources."[36] The Supreme Court quoted a passage in HOME's complaint that described its injury:

> Plaintiff HOME has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. Plaintiff

---

[33] *See generally OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) ("'Associational standing' is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose. By contrast, 'organizational standing' does not depend on the standing of the organization's members. The organization can establish standing in its own name if it 'meets the same standing test that applies to individuals.'" (footnotes omitted) (first quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006); and then quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999))).

[34] 455 U.S. 363 (1982).

[35] *Id*. at 368, 378.

[36] *Id*. at 369.

No. 24-50149

HOME has had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices.[37]

The Court held that if these allegations were true, "there can be no question that the organization has suffered injury in fact."[38] The Court characterized the injury as "steering practices [that] have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers."[39] The Court continued, "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."[40] We see no daylight between Las Americas's allegations (supported by evidence presented during the preliminary injunction proceedings) and those in *Havens Realty* regarding standing.

Implementation of S. B. 4 would cause a concrete injury to Las Americas's provision of legal services to immigrants. In an affidavit executed by one of Las Americas's directors, Las Americas averred it will "need to train staff members to address the specific needs of those detained pursuant to S.B. 4, and develop new materials to advise defendants of their rights and the manner in which the state law intersects with their rights under federal law."[41] At a minimum, the cost of developing new materials and training staff to facilitate representation of those detained under Texas's new immigration laws is an economic injury. "For standing purposes, a loss of

---

[37] *Id*. at 379 (alteration in original).

[38] *Id*.

[39] *Id*.

[40] *Id*.

[41] ROA.943, ¶ 35.

No. 24-50149

even a small amount of money is ordinarily an 'injury.'"[42]  This economic injury could also be labeled a "diversion of resources," but attaching such a label cannot transmogrify a cost.  It is what it is: a cost that requires an outlay of money.

Texas's new immigration laws have affected or will affect Las Americas's provision of legal services to immigrants, its "core" activity, in other direct and concrete ways.[43]  Las Americas described in the district court proceedings how the enactment of S. B. 4 has already caused it to expend resources in order to provide legal counsel to immigrants seeking to deal with the new laws' ramifications.[44]  But the prospective impact on Las Americas's provision of legal services is greater.  If S. B. 4 is preempted by federal statutes and regulations but goes into effect for a period of time before that determination is made, Las Americas will have expended time and resources in creating and implementing an entirely new operation to serve immigrants arrested under S. B. 4 that would be irretrievably lost.[45]

Its success in assisting state detainees in obtaining relief under federal immigration laws is also likely to be significantly less than when it represents federal detainees due to the differences under the new state immigration laws.[46]  Las Americas maintains that its "purpose will be frustrated, as S.B. 4 will subject noncitizens to rapid removal outside of federal removal proceedings and before Las Americas can assist them in seeking the relief

---

[42] *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017).

[43] *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("In other words, Havens's actions directly affected and interfered with HOME's core business activities.").

[44] ROA.940, ¶ 24; ROA.945, ¶¶ 44-46; ROA.946-47, ¶¶ 50-51.

[45] *See* ROA.947, ¶ 52.

[46] ROA.945-48.

No. 24-50149

federal law provides."[47]  An affidavit submitted by Las Americas explains that "reaching out when individuals are arrested [under the new Texas laws] is critical to ensuring that they are advised as to their ability to apply for asylum, and submit timely applications."[48]

But for the implementation of S. B. 4, the time and resources focused on those detained under the new state immigration laws would instead be expended representing immigrants who are contending only with the federal system.[49]  And, because Las Americas cannot serve as many immigrants arrested and detained under S. B. 4 as it can through its existing operations for immigrants navigating the federal system, the total number of immigrants Las Americas can serve in obtaining asylum or other relief will be lower.[50] The evidence supporting these assertions is detailed in the record, as follows.

Las Americas is a nonprofit legal services organization based in El Paso, Texas.[51]  Las Americas has provided legal, counseling, and referral services to immigrants for more than thirty-seven years, since 1987.[52]

According to the affidavit, Las Americas seeks "to ensure that individuals have a fair opportunity to establish their eligibility for relief from removal from the United States, with a primary focus on ensur[ing] individuals are not wrongfully removed to persecution or torture."[53]  It "provide[s] immigration counseling and representation to immigrants

---

[47] ROA.948, ¶ 56.

[48] ROA.942, ¶ 32.

[49] ROA.945-48.

[50] ROA.945-48.

[51] ROA.935, ¶ 3.

[52] ROA.937, ¶ 10.

[53] ROA.935, ¶ 3.

No. 24-50149

seeking asylum and those detained by the U.S. government in and around West Texas, New Mexico, and Ciudad Juarez, Mexico, including by assisting and representing individuals living in the community to apply affirmatively for asylum."[54]  It also counsels "individuals facing expedited removal who are undergoing Credible Fear Interviews (CFIs)" and "represent[s] people subject to reinstatement of a prior removal order in Reasonable Fear Interviews (RFIs)."[55]  The affidavit further explains that "[f]or individuals who are able to clear the CFI hurdle, [Las Americas's] detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more."[56] "Where resources allow, [it] provide[s] these services as part of full representation in immigration court and before the Board of Immigration Appeals.  In other cases, [it] offer[s] these services as pro se assistance.  For pro se individuals, [it] also provide[s] assistance with document preparation and translation."[57]

The affidavit explains that until the passage of S. B. 4, "[t]he staffing of Las Americas, and the allocation of resources, has always been designed to provide the assistance and representation people need to seek protection through the federal immigration system."[58]  Las Americas counsels and

---

[54] ROA.935, ¶ 4.

[55] ROA.935-36, ¶ 4.

[56] ROA.939, ¶ 18.

[57] ROA.939, ¶ 18 (italics omitted).

[58] ROA.940, ¶ 22.

No. 24-50149

represents immigrants in CBP or ICE detention[59] and has immigrant clients who are not in detention.[60]

For those detained by ICE, Las Americas "provides know-your-rights presentations in the ICE facilities, and then screens individuals for further legal representational needs."[61]    Las Americas "has developed systems to gain access to detainees, arrange for group presentations, reserve sufficient time and space in the facility for confidential attorney-client meetings, track the progress of detained noncitizens, and remain in contact with clients through video conference, phone calls, and written correspondence throughout their case."[62]

Las Americas "serves its non-detained clients through a community representation model."[63]    Under this model, Las Americas "works with partner organizations like shelters, churches, hospitals, and consulates to make contact with noncitizen clients, who then come to Las Americas['s] offices in person for further consultation and representation."[64]    In 2023, Las Americas "served approximately 480 people through these non-detained services."[65]

The enactment of S. B. 4 opened an entirely new front that Las Americas must navigate to serve its clients.    S. B. 4 "creates a new state system to regulate immigration that operates independently of the federal

---

[59] ROA.941, ¶ 28.

[60] ROA.941, ¶ 26.

[61] ROA.941, ¶ 28.

[62] ROA.941, ¶ 28.

[63] ROA.941, ¶ 27.

[64] ROA.941, ¶ 27.

[65] ROA.941, ¶ 27.

No. 24-50149

system."[66]   The affidavit relates that "Las Americas does not have any programs or provide any services to individuals in state or county jails or prisons.  S.B. 4 requires Las Americas to develop an entirely new operation to provide immigration representation to those arrested under S.B. 4."[67] The impact of S. B. 4 on Las Americas's delivery of services is direct.   The affidavit asserts, "Las Americas will have to divert its resources to create an entirely new representation program and *Know Your Rights* trainings to ensure that those detained pursuant to S.B. 4 can seek critical humanitarian protections such as asylum."[68]  As already noted, Las Americas will "need to train staff members to address the specific needs of those detained pursuant to S.B. 4, and develop new materials to advise defendants of their rights and the manner in which the state law intersects with their rights under federal law."[69]

Las Americas avers that development of a program to serve those arrested or detained under the new Texas laws "will require a major investment of resources."[70]   The evidence recounted above supports a factual finding in this regard.  Las Americas will be paying its employees to retool and to represent immigrants caught up in the newly enacted state laws.[71]

The Texas Department of Public Safety (DPS) has the authority to arrest and detain illegal immigrants under S. B. 4.  The Director intends to

---

[66] ROA.940, ¶ 23.

[67] ROA.942, ¶ 30.

[68] ROA.947, ¶ 54.

[69] ROA.943, ¶ 35.

[70] ROA.942, ¶ 34.

[71] *See* ROA.938, ¶ 16; ROA.942, ¶ 30; ROA.942-43, ¶¶ 34-35.

No. 24-50149

authorize DPS to exercise that authority.[72]  Las Americas's director said in her affidavit that

> [e]ven if the removal provisions of S.B. 4 did not exist, the law would still negatively [sic] Las Americas' resources, as arrests and detention under the law will continue to negatively impact people's ability to apply for asylum and other forms of lawful immigration status and make representing our clients more difficult and time-consuming.[73]

She related, "For example, even without S.B. 4's removal provisions, our legal staff would still need to decide asylum sooner than they would have previously for some of our clients to protect their right to seek asylum because of the risks of arrest and detention under S.B. 4."[74]  She explained, "We will still have to develop an S.B. 4 specific program to screen, assist and represent those detained under S.B. 4 to ensure they can meet the one year deadline to affirmatively [sic] for asylum."[75]

Las Americas avers that it must prioritize its numerous goals and services, and that its primary goal is "to serve as many asylum seekers as possible with [its] limited resources while focusing [its] efforts on ensuring that those noncitizens at the greatest danger from removal are able to access protection."[76]  To that end, it "focus[es] on assistance to those facing summary removal in expedited removal proceedings."[77]  In the past, Las

---

[72] ROA.314-15, ¶¶ 3-9; ROA.959-60, ¶ 10.

[73] ROA.947, ¶ 52.

[74] ROA.947, ¶ 52.

[75] ROA.947, ¶ 52.

[76] ROA.937, ¶ 12.

[77] ROA.937, ¶ 13.

No. 24-50149

Americas has "shifted [its] priorities . . . to meet this goal in response to changes in federal policies."[78]  The affidavit avers that

> We are one of the only organizations providing pro bono representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area.  For this reason, we have consistently focused our efforts on the most vulnerable to removal, such as asylum seekers and the victims of crime, and those whom the private bar may be less able or willing to represent.[79]

The affidavit states that "[r]esponding to S.B. 4 through changes to our programs is a necessary part of and consistent with our programmatic mission."[80]

Las Americas's director of legal services at its immigrant advocacy center said in her affidavit that S. B. 4 "has already forced us to divert our limited resources."[81]  The organization has "received questions from community members about S.B. 4—whether and when interaction with state law enforcement will result in questioning about form of entry into the United States and, thus, arrest and removal from the United States."[82]  Las Americas has "received questions about the potential for noncitizen parents of U.S. citizen children being arrested and removed because of interaction

---

[78] ROA.937, ¶ 13.

[79] ROA.938, ¶ 14.

[80] ROA.938, ¶ 14.

[81] ROA.940, ¶ 24.

[82] ROA.945, ¶ 46.

No. 24-50149

with state officers; the interaction between S.B. 4 and federal removal proceedings; and the impact of S.B. 4 on the ability to seek asylum."[83]

There are also geographic and institutional considerations. Legal service providers would have to contend with the fact that their clients or those they seek to represent would be arrested by federal officers and detained in federal facilities, while state officers would independently conduct arrests and detain at least some, if not many, immigrants in state or county facilities.[84]

The Las Americas affidavit averred, "These changes in Las Americas' services will necessarily require diverting funding and staff time from community-based representation programs, and decrease the number of people Las Americas can serve."[85] That is a reasonable deduction, and the district court's factual findings in this regard are not clearly erroneous.

Las Americas has identified and described impacts S. B. 4 would have on its operations that are far more detailed and at least as impactful as those the Supreme Court held to have established injury to an organization in *Havens Realty Corp.*[86] The Supreme Court's more recent decision in *FDA v. Alliance for Hippocratic Medicine*[87] reinforces, rather than undermines, our conclusion that Las Americas has likely established standing. The *Alliance for Hippocratic Medicine* decision addressed *Havens Realty Corp.* It is also

---

[83] ROA.946, ¶ 50.

[84] ROA.314-15, ¶¶ 3-4.

[85] ROA.948, ¶ 55.

[86] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

[87] 602 U.S. 367 (2024).

No. 24-50149

apparent that the factual circumstances in the case before us and those in *Alliance for Hippocratic Medicine* are not comparable.

In *Alliance for Hippocratic Medicine*, "pro-life medical associations, as well as several individual doctors," sued the Food and Drug Administration (FDA) over its approval of mifepristone, an abortion drug.[88] None of the plaintiffs used or prescribed the drug.[89] Instead, "the plaintiffs want[ed] FDA to make mifepristone more difficult for other doctors to prescribe and for pregnant women to obtain."[90] The Court thoroughly dissected the individual physicians' claims and readily concluded they did not have standing.[91] We will not dwell on that analysis, though it is certainly not irrelevant. The most salient analysis is that of the organizations' standing.

In analyzing how an organization could establish its own injury for standing purposes, the Supreme Court contrasted the organizational plaintiffs' alleged injuries in *Havens Realty* with those of the organizational plaintiffs in *Alliance for Hippocratic Medicine*.[92] The organizational plaintiffs in the latter case asserted that when the FDA relaxed regulation of the abortion drug mifepristone, that "'forced' the associations to 'expend considerable time, energy, and resources' drafting citizen petitions to FDA, as well as engaging in public advocacy and public education."[93] In explaining why the organizational plaintiffs had not established an injury for purposes of standing, the Court explicated its holding in *Havens Realty*. The Court said,

---

[88] *Id.* at 376-77.

[89] *Id.* at 374.

[90] *Id.*

[91] *Id.* at 386-93.

[92] *Id.* at 395.

[93] *Id.* at 394.

No. 24-50149

"Critically, HOME [(an organizational plaintiff)] not only was an issue-advocacy organization, but also operated a housing counseling service."[94] In the case before us, Las Americas is not only an issue-advocacy organization—it operates to provide legal services and legal counseling to low-income immigrants. The Supreme Court further explained its holding in *Havens Realty*, saying, "[W]hen Havens [(a defendant)] gave HOME's employees false information about apartment availability, HOME sued Havens because Havens 'perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.'"[95]

In the present case, Las Americas contends that the State of Texas has enacted immigration laws that are preempted by federal statutes and regulations, and those state laws would perceptibly impair its ability to provide counseling and referral services for low- and moderate-income immigrant clients. The state laws differ in significant respects from federal laws and were intended to permit the state to apprehend and arrest large numbers of immigrants that the federal government had not apprehended or would not apprehend. The state laws would also expedite the processing of immigrants, which would have the impact of limiting or in some cases eliminating the opportunity or time to seek admittance under numerous federal laws.[96] The new state laws specifically provide that a "court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."[97]

---

[94] *Id.* at 395.

[95] *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

[96] *See infra* pp. 64-65, 77-80, 83-88.

[97] Tex. Code Crim. Proc. art. 5B.003.

No. 24-50149

In *Alliance for Hippocratic Medicine*, the Supreme Court explained its holding in *Havens Realty*, saying "[i]n other words, Havens's actions directly affected and interfered with HOME's core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer."[98] Las Americas's core activity is providing legal representation and legal counseling to low-income immigrants, prioritizing reaching immigrants in time to assist them in asserting asylum or other claims under federal immigration laws.[99] The state laws at issue directly interfere with that activity. Las Americas is not "dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer."[100] Texas has manufactured new laws that, if preempted, would unlawfully interfere with the federal immigration process that immigrants navigate. Las Americas provides legal services and counseling to immigrants who are affected by the new state laws, much like the "retailer" analogy in *Alliance for Hippocratic Medicine*. The state laws add a new, separate, independent, state immigration regime to which those whom Las Americas serves would be wrongfully subjected if the new state laws are preempted. Just as the defendants' "false information about apartment availability" in *Havens* "perceptibly impaired [the non-regulated organizational plaintiff's] ability to provide counseling and referral services for low- and moderate-income homeseekers,"[101] the Texas laws at issue would increase the need for legal services and counseling, and decrease the overall number of low- and moderate-income immigrants Las Americas could successfully assist in asserting asylum and other federal

---

[98] *All. for Hippocratic Med.*, 602 U.S. at 395.

[99] ROA.945-48.

[100] *All. for Hippocratic Med.*, 602 U.S. at 395.

[101] *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

No. 24-50149

immigration claims.[102]   Las Americas has shown "far more than simply a setback to the organization's abstract social interests."[103]

The dissenting opinion attempts to distinguish *Havens Realty* as well as the Supreme Court's discussion of *Havens Realty* in *Alliance for Hippocratic Medicine*.   First, the dissenting opinion says, in *Havens Realty*, there was "an action by the defendant against the plaintiff 'directly,'" which was "a lie told by the defendant to the plaintiff."[104]   The dissenting opinion then asserts, "So, as *Alliance for Hippocratic Medicine* emphasized, HOME's theory of standing was just like that of 'a retailer who sues a manufacturer for selling [it] defective goods.'"[105]   With great respect, we disagree with the dissenting opinion's characterization.   The defendant in *Havens Realty* falsely told an employee of HOME that there were no apartments for rent.   Neither the employee nor HOME was actually interested in renting an apartment.   They were attempting to determine if the defendant was illegally "steering" people away from its properties based on race.[106]   The direct injury to HOME was that the lie, i.e. illegal steering, made it more difficult for those whom HOME counseled and provided services to obtain housing.   The Supreme Court made this clear in *Alliance for Hippocratic Medicine* in saying "when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because Havens 'perceptibly impaired

---

[102] ROA.945-48.

[103] *All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Havens Realty*, 455 U.S. at 379).

[104] *Post* at 108.

[105] *Post* at 108 (alteration in original) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395).

[106] *Havens Realty*, 455 U.S. at 373 ("In the present context, 'testers' are individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices.").

No. 24-50149

HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.'"[107]

That is no different from the injury in the present case. When Texas enacted new laws to regulate entry and removal of aliens, it represented directly not only to immigrants, but the plaintiffs in this case, and indeed the public, that it has the lawful authority to do so. The former Director of DPS publicly testified—representing to immigrants, Las Americas, and the public—that he intended to enforce the state entry and removal laws based on his authority as the Director of DPS.[108] Again, the representations that the DPS, acting under the direction of the Director, has such authority are false if the laws are preempted. As part of its core activities, Las Americas intends to represent at least some asylum seekers or seekers of other federal immigration rights who would be arrested or detained by the new Texas laws. Las Americas is in the same position as HOME. HOME's standing was not precluded by "voluntarily"[109] representing homeseekers, any more than Las Americas should be precluded from "voluntarily" providing pro bono legal services to immigrants. The Supreme Court did not deem the "voluntary" provision of counseling and services to low- and moderate-income clients as disqualifying from a standing perspective. To the contrary, the Court deemed it as part of the core business purpose of the organization.

The dissenting opinion states that the Supreme Court in *Clapper*[110] explained that "'self-inflicted' injuries cannot ground Article III

---

[107] *All. for Hippocratic Med.*, 602 U.S. at 395 (quoting *Havens Realty*, 455 U.S. at 379).

[108] *See* ROA.959-60, ¶ 10 & n.1.

[109] *See post* at 108.

[110] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).

No. 24-50149

standing."[111]   However, the Supreme Court explained in *Clapper* that self-inflicted injuries are not a basis for Article III standing specifically when a plaintiff has made expenditures based on a feared future occurrence that is not "certainly impending."[112]   By contrast, here, the harm is certainly impending.

The homeseekers in *Havens Realty* and immigrants in the present case are essentially consumers for purposes of the analogy in *Alliance for Hippocratic Medicine*.   HOME was a retailer in the sense that it counseled homeseekers, while Las Americas is a retailer in the sense that it counsels immigrants in seeking to assert rights under federal immigration laws.   The manufacturer in *Havens Realty* was the illegally steering defendant.   The manufacturer in the present case is Director Martin, who would undertake to enforce preempted state laws to arrest and remove immigrants on a rapid basis without the opportunity to assert federal rights.   Again, the state law is clear about this,[113] as is affidavit evidence.[114]

Although *Havens Realty* "was an unusual case," and the Supreme Court "has been careful not to extend the *Havens* holding beyond its

---

[111] *Post* at 108.

[112] *Clapper*, 568 U.S. at 416 ("Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending.   In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.   Any ongoing injuries that respondents are suffering are not fairly traceable to [the statute]." (citations omitted)).

[113] *See* Tex. Penal Code § 51.02(a); Tex. Code Crim. Proc. art. 5B.002.

[114] *See* ROA.315-16, ¶¶ 5, 9, 15.

No. 24-50149

context,"[115] it is not a dead letter, as *Alliance for Hippocratic Medicine* confirms.

**B**

A plaintiff must show that "the injury likely was caused or will be caused by the defendant."[116] The Supreme Court observed in *Alliance for Hippocratic Medicine* that when "a plaintiff challenges the government's 'unlawful regulation (or lack of regulation) of *someone else*,' 'standing is not precluded, but it is ordinarily substantially more difficult to establish.'"[117] "When the plaintiff is an unregulated party, causation 'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'"[118] "Yet the Court has said that plaintiffs attempting to show causation generally cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts.'"[119] "[T]o thread the causation needle in those circumstances, the plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs."[120] "The causation requirement precludes speculative links—

---

[115] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024).

[116] *Id.* at 380.

[117] *Id.* at 382 (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

[118] *Id.* at 383 (alteration in original) (quoting *Lujan*, 504 U.S. at 562).

[119] *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)).

[120] *Id.* (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)).

No. 24-50149

that is, where it is not sufficiently predictable how third parties would react to government action."[121]

In discussing "alleged future injuries to unregulated parties from government regulation," the Supreme Court explained that "the causation requirement and the imminence element of the injury in fact requirement can overlap."[122] That is because "[b]oth target the same issue: Is it likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?"[123]

Texas has enacted new laws that regulate immigrants. Those immigrants are "third parties" or "someone else" for the purposes of the standing analysis as explained in *Alliance for Hippocratic Medicine*. There is a long history in Texas of immigrants illegally entering, reentering, and remaining in the state. It is entirely predictable, if not virtually certain, that there will be illegal immigrants in Texas in significant numbers that would be covered by the new laws. In other words, large numbers of illegal immigrants will not be motivated to exit the state or refrain from entering or reentering because of the enactment of the new state laws.

Then-Director McCraw predicted that DPS would arrest large numbers of illegal immigrants under the new laws. Director McCraw testified before the Texas Senate Committee on Border Security that he estimated immigration enforcement like that required under S. B. 4 may lead

---

[121] *Id.* (first citing *Allen v. Wright*, 468 U.S. 737, 757-59 (1984); and then citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-46 (1976)).

[122] *Id.* at 385 n.2.

[123] *Id.*

No. 24-50149

to an additional 75,000 to 80,000 arrests per year in Texas.[124]  It is highly unlikely Director McCraw would have testified under oath that his estimate is 75,000 to 80,000 additional arrests or detentions per year if he instead thought there might be zero or some relatively small number of arrests. Given the number of illegal immigrants who reside in the El Paso area or illegally enter or reenter in that vicinity, it is reasonably predicable, if not highly probable, that arrests would be made by DPS in the El Paso area at the direction or under the leadership of the Director.

This is congruent with the Declaration of Victor Escalon, the Regional Director for DPS, submitted in the district court proceedings.[125]  He averred that "DPS has responsibility to enforce the criminal laws of the State of Texas" and that he is "personally familiar with the strategy DPS plans to deploy to enforce Texas's recently enacted law, SB 4."[126]  He explained that "DPS will prioritize enforcement of SB 4 in counties that are close to facilities operated by TDCJ and the State.  DPS expects to house and process aliens detained under SB 4 primarily in State-owned facilities."[127] There is a state detention facility in El Paso, the Rogelio Sanchez State Jail, that has the capacity for 1,100 inmates.[128]

---

[124] ROA.959-60, ¶ 10 & n.1 (citing *Texas Senate Committee on Border Security*, at 49:19-50:45 (Nov. 1, 2023), https://senate.texas.gov/videoplayer.php?vid=18888& lang=en) (statement of Steve McCraw, Director, Tex. Dep't of Pub. Safety)).

[125] ROA.314-16.

[126] ROA.314, ¶ 3.

[127] ROA.315, ¶ 4.

[128] *See Sanchez (RZ)*, Tex. Dep't of Crim. Just., https://www. tdcj.texas.gov/unit_directory/rz.html [https://perma.cc/86QF-BAUN] (last visited July 3, 2025).

No. 24-50149

As already discussed, the fact that state detainees would be housed in facilities separate from federal detainees would add to the difficulties Las Americas would face in representing state detainees in addition to those it represents who are housed in federal facilities.[129] The difficulty is not only a geographic one. As noted, Las Americas would have to establish new contacts and procedures to coordinate with completely separate state personnel.[130]

In considering the requirement of causation in *Alliance for Hippocratic Medicine*, the Supreme Court also explained that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way."[131] The medical associations in that case had argued "that FDA has 'caused' the associations to conduct their own studies on mifepristone so that the associations can better inform their members and the public about mifepristone's risks."[132] The Supreme Court held this did not suffice to establish causation of an injury for standing purposes.[133] The Court also explained that standing is not demonstrated just because "an organization diverts its resources in response to a defendant's actions."[134] In contrasting what *would* establish causation of injury, the

---

[129] ROA.941-43.

[130] ROA.943-44.

[131] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024).

[132] *Id.*

[133] *See id.*

[134] *Id.* at 395.

No. 24-50149

Supreme Court again pointed to its decision in *Havens Realty*.[135]  The Court said, "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service."[136]

Las Americas provides legal services to immigrants.  That is its core operation.  Its "staff consists of 15 people, including attorneys, accredited representatives, and paralegals.  Two additional staff work in Mexico."[137]  Its total budget in the fiscal year ending 2023 was approximately $1.4 million.[138]  The fact that Las Americas also advocates regarding immigration issues does not negate the fact that its core operation will be injured by the enforcement of S. B. 4.  As discussed earlier, it gives priority to immigrants who face imminent removal and are at risk of losing asylum or other relief under federal immigration laws.[139]

Las Americas has demonstrated that it is likely to suffer injury caused by the Director enforcement of the new laws enacted under S. B. 4.

## C

Las Americas has also shown that the injury likely would be redressed by the requested judicial relief.  It seeks, and the district court granted, a preliminary injunction against Director Martin, enjoining him from enforcing Texas's new immigration laws.

---

[135] *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

[136] *Id.* (citing *Havens Realty*, 455 U.S. at 368).

[137] ROA.938, ¶ 16.

[138] ROA.938, ¶ 15.

[139] *See* ROA.937-38, ¶¶ 12-14.

No. 24-50149

DPS, under Director Martin's leadership, would be the primary arm of the state making arrests under S. B. 4.[140]  The state defendants submitted a declaration (the Banks declaration) in the district court that said:

> SB 4 will provide law enforcement in Texas, primarily DPS, with important new tools to combat the massive influx of illegal migration and help stem the tide of illegal migration into Texas. When SB 4 is in effect, it will become a highly effective component of [Operation Lone Star's] ongoing efforts to combat the crisis at Texas's southern border.[141]

The Banks declaration explained that Operation Lone Star "utilizes multiple state and local agencies, including the DPS, TMD [Texas Military Department], TFC [Texas Facilities Commission],[142] and others to stem the flow of unlawful immigration."[143]  However, as discussed above, it is DPS, led by Director Martin, who will prioritize where to concentrate its arrest efforts.[144]  The Escalon declaration says that DPS intends to "prioritize enforcement of SB 4 in counties that are close to facilities operated by TDCJ and the State."[145]  Such a facility exists in El Paso.

It is unlikely that the state will rely on the District Attorney who serves the El Paso area to take the lead, or virtually any role, in making arrests under the new state immigration laws.  That is because the District Attorney is a

---

[140] ROA.288, ¶ 35 (Declaration of Michael Banks, Deputy Director, Border Czar, Office of Texas Governor Greg Abbott).

[141] ROA.288, ¶ 35.

[142] ROA.282, ¶ 9.

[143] ROA.286, ¶ 27.

[144] *See* ROA.315, ¶ 4 (Declaration of Victor Escalon, Regional Director, Texas Department of Public Safety).

[145] ROA.315, ¶ 4.

No. 24-50149

defendant in this litigation, and he was enjoined from enforcing the new immigration laws by the district court. Though he initially appealed, he dismissed that appeal. He remains subject to the injunction. It appears that he will not seek to uphold the constitutionality of the new laws or enforce them.

*　*　*

Las Americas has likely established each element of standing.

## III

Director Martin is represented by the same counsel as the State of Texas and other state defendants. The Director did not file a separate brief. We considered the arguments raised in that briefing in our decision denying a stay of the preliminary injunction.[146] Director Martin is the only remaining appellant.

Before we reach the merits, we consider a second jurisdictional issue. In the district court, the Director suggested that this case presents a nonjusticiable political question.[147] The Director likewise gestures toward that argument before our court. Regardless of whether that sufficed to preserve the issue,[148] the political question doctrine is a "jurisdictional limitation[] imposed upon federal courts by the 'case or controversy' requirement of Art. III."[149] "Unlike most arguments, challenges to subject-

---

[146] *See generally United States v. Texas*, 97 F.4th 268 (5th Cir. 2024).

[147] ROA.236.

[148] *See Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021) (explaining that a party can forfeit an argument "by failing to adequately brief the argument on appeal").

[149] *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("The doctrines of mootness,

No. 24-50149

matter jurisdiction" must be considered by courts "sua sponte."[150] Accordingly, we consider whether this case presents a nonjusticiable political question.

"CHIEF JUSTICE MARSHALL famously wrote that it is 'the province and duty of the judicial department to say what the law is.'"[151] "Sometimes, however, 'the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights.'"[152] "In such a case the claim is said to present a 'political question' and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction."[153] A controversy involves a nonjusticiable political question "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'"[154]

As discussed further below, Director Martin contends that S. B. 4 is a lawful exercise of the authority of the state of Texas under Article I, § 10 of

---

ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does."); *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) ("[T]he political question doctrine implicates the district court's jurisdiction.").

[150] *Fort Bend County v. Davis*, 587 U.S. 541, 548 (2019) (italics omitted).

[151] *Rucho v. Common Cause*, 588 U.S. 684, 695 (2019) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)).

[152] *Id.* at 695-96 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (plurality opinion)).

[153] *Id.* at 696 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

[154] *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker*, 369 U.S. at 217).

No. 24-50149

the Constitution. The relevant portion of that provision, the State War Clause, provides:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.[155]

There is some caselaw supporting the proposition that whether Texas has been "actually invaded" or is "in such imminent Danger as will not admit of delay" is nonjusticiable.[156] The Supreme Court has recognized that the Texas Governor "is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen," and that the Governor's "decision to that effect is conclusive."[157]

Still, the Supreme Court's cases make clear that we have jurisdiction to resolve this dispute. For example, in *Zivotofsky ex rel. Zivotofsky v. Clinton*,[158] the Court explained that evaluating the constitutionality of statutes is firmly within the bailiwick of the judiciary, even if an unreviewable

---

[155] U.S. Const. art. I, § 10, cl. 3.

[156] *See, e.g.*, *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (holding that a claim there has been an invasion within the meaning of Article IV, § 4 "implicates foreign policy concerns which have been constitutionally committed to the political branches"); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995) ("[W]e conclude that whether the level of illegal immigration is an 'invasion' of Florida [within the meaning of Article IV, § 4] and whether this level violates the guarantee of a republican form of government present nonjusticiable political questions."); *see also Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (holding, in the alternative, that a claim that the United States failed to protect a state from an invasion within the meaning of Article IV, § 4 is nonjusticiable).

[157] *Sterling v. Constantin*, 287 U.S. 378, 399 (1932).

[158] 566 U.S. 189 (2012).

No. 24-50149

political determination exists somewhere in the case.[159]  In *Zivotofsky*, a federal statute required that certain official documents for U.S. citizens born in Jerusalem record the place of birth as Israel.[160]  But the State Department refused to specify "Israel" on a U.S. citizen's official documents that reflected Jerusalem as his place of birth.[161]  The district court and the D.C. Circuit held that the resulting case presented a nonjusticiable political question.[162]  The Supreme Court reversed.[163]  The Court explained:

> The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be.  Instead, Zivotofsky requests that the courts enforce a specific statutory right.  To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise.[164]

The Court sketched the relevant constitutional inquiry:

> In this case, determining the constitutionality of [the statute] involves deciding whether [it] impermissibly intrudes upon Presidential powers under the Constitution.  If so, the law must be invalidated and Zivotofsky's case should be dismissed for failure to state a claim.  If, on the other hand, the statute does not trench on the President's powers, then the Secretary must

---

[159] *See also Baker*, 369 U.S. at 215 n.43 (discussing *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1 (1831), as "a noteworthy example of the limited and precise impact of a political question" when the case otherwise came in a justiciable form).

[160] *Zivotofsky*, 566 U.S. at 191.

[161] *Id.* at 192-93.

[162] *Id.* at 193-94.

[163] *Id.* at 194.

[164] *Id.* at 196.

No. 24-50149

be ordered to issue Zivotofsky a passport that complies with [the statute]. Either way, the political question doctrine is not implicated.[165]

Our task in this case involves a similarly familiar judicial exercise. Las Americas claims that S. B. 4 may not be constitutionally enforced because it is preempted by federal law. One of the reasons Director Martin contends that S. B. 4 may lawfully be enforced is because the statute is authorized under the State War Clause. Examining "the textual, structural, and historical evidence put forward by the parties regarding the nature of" the relevant powers "is what courts do."[166]

The military aspect of the State War Clause power relied upon by the Director does not disrupt this usual order. In *Sterling v. Constantin*,[167] the Supreme Court reviewed an injunction against the Governor of Texas, which enjoined him from limiting oil production despite the Governor having done so to prevent insurrection.[168] The Governor had issued a proclamation stating that certain Texas counties were in a state of insurrection, and he directed the Texas National Guard to limit production of oil in those counties.[169] Oil-leasehold owners sued, alleging, among other things, violations of the Due Process Clause.[170] The Governor argued that the judiciary "was powerless thus to intervene, and that the Governor's order had the quality of a supreme and unchallengeable edict, overriding all

---

[165] *Id.*

[166] *Id.* at 201.

[167] 287 U.S. 378 (1932).

[168] *Id.* at 387-90.

[169] *Id.* at 387-88.

[170] *Id.* at 387.

34

No. 24-50149

conflicting rights of property and unreviewable through the judicial power of the federal government."[171]  The Supreme Court disagreed, explaining:

> If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases, the futility of which the state may at any time disclose by the simple process of transferring powers of legislation to the Governor to be exercised by him, beyond control, upon his assertion of necessity.[172]

Instead, the Court said, a state's wide discretion during times of military exigency does not mean "that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat."[173]  The Court remarked that it was "well established" that "the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."[174]

Accordingly, we see no reason to conclude that this case is nonjusticiable.  This case calls us to evaluate the claim that S. B. 4 is unenforceable under the Supremacy Clause and also to consider Director Martin's contrary invocation of the State War Clause.  These questions of constitutional interpretation are "a familiar judicial exercise."[175]

---

[171] *Id.* at 397.

[172] *Id.* at 397-98.

[173] *Id.* at 400.

[174] *Id.* at 401.

[175] *See Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012).

No. 24-50149

## IV

We come to the merits of this appeal. "A preliminary injunction is an extraordinary remedy never awarded as of right."[176] A party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[177] In deciding whether to issue such relief, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"[178] "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward."[179]

We review the district court's grant of a preliminary injunction for abuse of discretion.[180] A district court abuses its discretion when it bases its decision on errors of law or clearly erroneous factual determinations.[181] We review conclusions of law de novo and findings of fact for clear error.[182]

---

[176] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)).

[177] *Id*. at 20.

[178] *Id*. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

[179] *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) (citation omitted) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

[180] *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam); s*ee also Planned Parenthood of Greater Tex. Fam. Plan. & Preventative Health Servs., Inc. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc).

[181] *See Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018).

[182] *See Kauffman*, 981 F.3d at 354.

No. 24-50149

## V

The first question is the likelihood of success on the merits. Our discussion proceeds in four parts. First, we consider whether the Eleventh Amendment bars Las Americas's claims against Director Martin and whether Las Americas has a cause of action to pursue its challenge. Second, we discuss the scope of the facial challenge inquiry. Third, we analyze whether federal law likely preempts S. B. 4. Fourth, we assess Director Martin's argument that S. B. 4's application to transnational cartel members is a constitutionally authorized response to an "invasion."

### A

#### 1

Director Martin asserts that Las Americas's claims are barred by sovereign immunity. It maintains that the claims do not come within the *Ex parte Young*[183] exception to sovereign immunity.

"As an exception to the general rule of state sovereign immunity, *Ex parte Young* permits plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law."[184] "The officer sued must have 'some connection with the enforcement of the [challenged] act.'"[185] The required "connection," our circuit has recognized, can be

---

[183] 209 U.S. 123 (1908).

[184] *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 785 (5th Cir. 2024) (quoting *Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022)).

[185] *Id.* (alteration in original) (quoting *Lewis*, 28 F.4th at 663).

No. 24-50149

difficult to articulate.[186] Regardless, several "guideposts" aid our analysis.[187] "[T]he official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'"[188] "A history of prior enforcement is not required, especially in the pre-enforcement context that applies here."[189] "Nevertheless," Las Americas "must allege *some* action taken by [Director Martin] to show a demonstrated willingness to enforce."[190] Additionally, an official "must have more than 'the general duty to see that the laws of the state are implemented.'"[191] Furthermore, an official must be able to "compel or constrain" obeyance of the challenged law.[192]

---

[186] *See Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 396 (5th Cir. 2025) ("[O]ur decisions are not a model of clarity on what constitutes a sufficient connection to enforcement." (alteration in original) (quoting *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024))); *Lewis*, 28 F.4th at 663 ("[O]ur circuit has struggled to define this 'connection' requirement . . . ."); *Tex. All. for Retired Ams. v. Scott* (*TARA*), 28 F.4th 669, 672 (5th Cir. 2022) ("How much of a 'connection' has been hard to pin down, though."); *Tex. Democratic Party v. Abbott* (*TDP II*), 978 F.3d 168, 179 (5th Cir. 2020) ("This circuit has not spoken with conviction about all relevant details of the 'connection' requirement.").

[187] *TARA*, 28 F.4th at 672.

[188] *Id.* (quoting *TDP II*, 978 F.3d at 179).

[189] *Mi Familia Vota*, 105 F.4th at 330 (citing *Calhoun v. Collier*, 78 F.4th 846, 851 (5th Cir. 2023)).

[190] *Id.* (citing *Tex. Democratic Party v. Abbott* (*TDP I*), 961 F.3d 389, 401 (5th Cir. 2020)).

[191] *TARA*, 28 F.4th at 672 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 999-1000 (5th Cir. 2019)).

[192] *Id.* ("'[E]nforcement' means 'compulsion or constraint.' If the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." (citation omitted) (quoting *City of Austin*, 943 F.3d at 1000)).

No. 24-50149

These requirements are met as to Director Martin as the Director of DPS.  We recently held that the DPS Director has "more than just the general duty to see that the state's laws are implemented—[he is] *directly* responsible for enforcing Texas's criminal laws."[193]  Moreover, we stated DPS officers "arrest people for violating Texas law, exercising 'compulsion or constraint' in service of the law."[194]  Finally, there is direct evidence from state officials that DPS, under the direction of the Director, will make arrests and detain immigrants to enforce Texas's new immigration laws.[195]  As already noted, then-Director McCraw himself testified before a Texas legislative committee that S. B. 4 may lead to an additional 75,000 to 80,000 arrests per year in Texas.[196]  Accordingly, the Director has demonstrated a willingness to enforce the new immigration laws and is not entitled to sovereign immunity.

The Supreme Court has clearly stated, "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"[197]  Las Americas has satisfied that

---

[193] *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024).

[194] *Id.* (quoting *TARA*, 28 F.4th at 672).

[195] *See supra* notes 124-27 and accompanying text.

[196] ROA.959-60, ¶ 10 & n.1 (citing *Texas Senate Committee on Border Security*, at 49:19-50:45 (Nov. 1, 2023), https://senate.texas.gov/videoplayer.php?vid=18888&lang=en) (statement of Steve McCraw, Director, Tex. Dep't of Pub. Safety)).

[197] *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (second alteration in original) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

No. 24-50149

requirement in its complaint and by evidence presented during the preliminary injunction proceedings.

Director Martin asserts that "no Texas official will enforce any part of this law against" Las Americas, so it cannot "avail itself of *Ex Parte Young*" to overcome sovereign immunity. But Director Martin has pointed to no holding that *Ex parte Young* suits must fail when the challenged law will not be enforced against the plaintiff. Indeed, the Supreme Court and our court have permitted many plaintiffs to overcome sovereign immunity based on *Ex parte Young* even when the challenged law is not being, or will not be, enforced directly against the plaintiff itself.[198]

**2**

Director Martin also contends that Las Americas lacks a cause of action to pursue its claim. The Director appears to advance two arguments in support. First, in his motion for a stay pending appeal, the Director argued that Las Americas lacks an equitable cause of action because it does "not allege enforcement of S.B. 4 threatens imminent legal proceedings against" it and it has not "sued any official who may potentially enforce the law against" it. It is unclear whether the Director continues to rely on this argument in connection with his cause-of-action contention in the merits briefing. Instead, the Director's merits briefing seemingly limits this "wrong

---

[198] *See, e.g.*, *id.* at 255-57 (suit by independent state agency to obtain records from another state agency); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471-73 (5th Cir. 2020) (en banc) (suit by a utility district to prevent state officials from, inter alia, certifying other water- or wastewater-service entities); *TDP II*, 978 F.3d 168, 179-80 (5th Cir. 2020) (suit by, inter alia, a political party arguing that limitations on mail-in-voting were unconstitutional); *see also Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024) ("[T]he same type of direct enforcement found in *Ex*[*p*]*arte Young*, for instance, where the attorney general threatened civil and criminal prosecution . . . is not required." (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017))).

No. 24-50149

plaintiff" argument to the sovereign immunity issue, as discussed above, rather than the cause-of-action issue. But to the extent that Director Martin maintains the argument that this characteristic of Las Americas's suit undermines its cause of action, that argument likewise fails. The Supreme Court has on multiple occasions allowed actions in equity to proceed based on *Ex parte Young* even when the government was not enforcing the challenged law directly against the plaintiff.

The Supreme Court's decision in *Truax v. Raich*[199] is one example. Arizona had enacted a law that made it a crime for most businesses to employ a workforce consisting of less than eighty percent "qualified electors or native-born citizens of the United States."[200] Truax, a restaurant owner, told his employee Raich, a native of Austria, he would be fired because of the new law.[201] Raich filed a suit in equity against Truax, as well as Arizona's attorney general and a county attorney, seeking "a decree declaring the act to be unconstitutional and restraining action thereunder."[202] The defendants objected "that the complainant cannot sue save to redress his own grievance; that is, that the servant cannot complain for the master, and that it is the master who is subject to prosecution, and not the complainant."[203] The Supreme Court rejected this argument, concluding that the injury caused by the law would be felt by employees like Raich.[204] The Court said:

> It is, therefore, idle to call the injury indirect or remote. It is also entirely clear that unless the enforcement of the act is

---

[199] 239 U.S. 33 (1915).

[200] *Id.* at 35.

[201] *Id.* at 36.

[202] *Id.*

[203] *Id.* at 38 (citation omitted).

[204] *Id.* at 38-39.

No. 24-50149

restrained the complainant will have no adequate remedy, and hence we think that the case falls within the class in which, if the unconstitutionality of the act is shown, equitable relief may be had.[205]

The same reasoning prevailed in *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*.[206] There, Oregon had imposed criminal penalties on persons who had charge of a child and who "fail[ed] or neglect[ed] or refuse[d] to send such child to a public school."[207] Religious corporations that owned or operated private schools sued the Governor of Oregon in equity alleging that the law violated the Fourteenth Amendment.[208] The Supreme Court acknowledged that the plaintiffs, as corporations, "cannot claim for themselves the liberty which the Fourteenth Amendment guarantees."[209] Yet, citing *Truax*, the Court reached the merits because the corporations alleged that the law would cause them to shutter their schools.[210] It was no obstacle that the Oregon law imposed penalties on children's custodians, not on schools. So too, here, the fact that Director Martin will not enforce S. B. 4 against Las Americas does not disenable it from suing in equity to challenge the law.

Second, Director Martin argues that Las Americas lacks a cause of action because Las Americas "alleges only a cause of action under the Supremacy Clause." As the Director points out, the Supreme Court held in

_____

[205] *Id.* at 39.

[206] 268 U.S. 510 (1925).

[207] *Id.* at 530 n.1.

[208] *See id.* at 533.

[209] *Id.* at 535.

[210] *Id.*

No. 24-50149

*Armstrong v. Exceptional Child Center, Inc.*[211] that the Supremacy Clause "does not create a cause of action."[212] Director Martin argues that Las Americas must identify a statute containing "'"rights-creating" language' permitting [its] suit" but has not done so, making its suit "a nullity."[213]

The Director misunderstands both Las Americas's suit and the Supreme Court's analysis in *Armstrong*. Las Americas can sue in equity to enjoin an allegedly preempted state law. Even if a statute "does not confer a private right, a plaintiff is not prevented from gaining equitable relief on preemption grounds."[214] "The 'ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity.'"[215]

The *Armstrong* decision itself exemplifies the existence of a preemption cause of action in equity. There, the Supreme Court held the Supremacy Clause "certainly does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so."[216] The Court explained, "[t]he ability to sue to enjoin unconstitutional

---

[211] 575 U.S. 320 (2015).

[212] *Id.* at 324-25.

[213] *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001).

[214] *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 434-45 (5th Cir. 2023); *see also* Richard H. Fallon, Jr., et al., Hart and Wechsler's the Federal Courts and the Federal System 845 (7th ed. 2015) ("[T]he rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision . . . long appeared to be well-established.").

[215] *Crown Castle Fiber*, 76 F.4th at 434 (quoting *Armstrong*, 575 U.S. at 327); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir. 2020) (en banc) (holding that the plaintiff "has a cause of action against [state officials] *at equity*, regardless of whether it can invoke § 1983").

[216] *Armstrong*, 575 U.S. at 325.

No. 24-50149

actions . . . is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England."[217] "It is a judge-made remedy."[218]  Accordingly, despite rejecting the argument that the plaintiffs in that case could assert a cause of action under the Supremacy Clause, the remainder of the *Armstrong* opinion analyzed whether the plaintiffs' preemption claim could "proceed against Idaho in equity."[219]  The Court accepted that "equitable relief . . . is traditionally available to enforce federal law," but it ultimately held that Congress had displaced the *Armstrong* plaintiffs' equitable cause of action in that case by enacting the Medicaid Act.[220]  Given the absence of such displacement here, as the district court recognized,[221] Las Americas may proceed against Director Martin in equity.

Finally, we disagree with the dissenting opinion's contention that Las Americas lacks an equitable cause of action because enforcement of S. B. 4 will not invade its legal rights.[222]  Neither Director Martin nor Las Americas addressed this issue in their briefing, so we lack a fulsome response from the parties about this alleged deficiency in Las Americas's case.  The Supreme Court, however, said the following about the schools' suit in *Pierce*:

> Generally, it is entirely true, as urged by counsel, that no person in any business has such an interest in possible customers as to enable him to restrain exercise of proper power of the state upon the ground that he will be deprived of patronage.  But the injunctions here sought are not against the

---

[217] *Id.* at 327.

[218] *Id.*

[219] *Id.*

[220] *Id.* at 327-29.

[221] *See United States v. Texas*, 719 F. Supp. 3d 640, 661-62 (W.D. Tex. 2024).

[222] *See post* at 141-42.

No. 24-50149

exercise of any proper power. Appellees asked protection against arbitrary, unreasonable, and unlawful interference with their patrons and the consequent destruction of their business and property. Their interest is clear and immediate, within the rule approved in *Truax v. Raich*, *Truax v. Corrigan*,[223] and *Terrace v. Thompson*,[224] and many other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers.[225]

Given the parallels between the patrons in *Pierce* and the immigrant-clients in this case, as well as Texas's improper exercise of power, we can readily imagine Las Americas successfully articulating a similar argument here. At this early stage of the litigation, no more is necessary.

**B**

We must determine what the plaintiff must show to prevail on this facial challenge. "[A] plaintiff bringing a facial challenge must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'"[226] Director Martin contends that this standard means the preliminary injunction must be vacated if there is a single hypothetical application of S. B. 4 that may be legitimately enforced.

---

[223] 257 U.S. 312 (1921).

[224] 263 U.S. 197 (1923).

[225] *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535-36 (1925) (citation omitted).

[226] *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (second alteration in original) (citations omitted) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); and then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

No. 24-50149

Of course, if a law intrudes on a field occupied by Congress, every application of that law is preempted.[227] That is because "[w]here Congress occupies an entire field, . . . even complementary state regulation is impermissible."[228] The dissenting opinion points to the Supreme Court's decision in *Moody v. NetChoice, LLP*,[229] for the proposition that "in all cases outside the First Amendment, courts must apply *United States v. Salerno*."[230] However, *Moody* was not a preemption case, and it did not consider how, as a matter of logic, *Salerno* could apply when every application of a law in a field occupied by Congress is preempted.

Field preemption aside, it is not clear-cut that Director Martin's standard, based on *Salerno*, is correct. Some of our sister circuits have expressed uncertainty about whether the *Salerno* standard—that a plaintiff must "establish that no set of circumstances exists under which the [law] would be valid"[231]—applies in the preemption context.[232] Those circuits have further reasoned that even if the *Salerno* standard applies, positing a

---

[227] *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 589 (1987) (explaining that "[i]f the Federal Government occupied the field of environmental regulation of unpatented mining claims in national forests," state environmental regulation would be preempted regardless of their form).

[228] *Arizona v. United States*, 567 U.S. 387, 401 (2012).

[229] 603 U.S. 707 (2024).

[230] *Post* at 159 (citing *Moody*, U.S. at 723); *see United States v. Salerno*, 481 U.S. 739 (1987).

[231] *Salerno*, 481 U.S. at 745.

[232] *See, e.g.*, *Club Madonna Inc. v. City of Mia. Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022); *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 728-29 (7th Cir. 2021); *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 917 (10th Cir. 2016); *Lozano v. City of Hazelton*, 724 F.3d 297, 313 n.22 (3d Cir. 2013). *But see Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 n.6 (9th Cir. 2016).

No. 24-50149

hypothetical non-preempted application is not sufficient to defeat a facial preemption challenge.[233]

We see support for our sister circuits' interpretation in the Supreme Court's cases. The Court has vindicated facial preemption challenges despite possible non-preempted applications.[234] However, in a much earlier decision, the Court held that to defeat a facial challenge in which it was asserted that the federal regulation "per se" preempted state regulation, the state governmental authority "needed merely to identify a possible set of permit conditions not in conflict with federal law."[235] Ultimately, however, we need not take a side in this debate. For the reasons we discuss below, Las Americas has likely shown there are no non-preempted applications of Texas's new immigration laws.

Before turning to that analysis, we discuss two important limits on the scope of the facial challenge inquiry. First, in *City of Los Angeles v. Patel*,[236] the Supreme Court explained that a court's assessment of a facial challenge is limited to a law's applications that are not already legitimately authorized by other laws. The *Patel* decision concerned a facial challenge to a Los Angeles ordinance that compelled "'[e]very operator of a hotel to keep a

---

[233] *See, e.g., Club Madonna*, 42 F.4th at 1256; *Sullivan*, 5 F.4th at 728-29; *Sup. Ct.*, 839 F.3d at 917; *Lozano*, 724 F.3d at 313 n.22. *But see Metro PCS Cal., LLC v. Picker*, 970 F.3d 1106, 1122 (9th Cir. 2020).

[234] *See Arizona v. United States*, 567 U.S. 387, 408-10 (2012) (holding a state law provision was facially conflict preempted without asking whether there were applications of the provision that would be consistent with federal law or citing *Salerno*); *see also id.* at 457-58 (ALITO, J., concurring in part and dissenting in part) (dissenting in part on the basis that "[t]he point is that there are plenty of permissible applications of § 6" and citing *Salerno*, contending the United States did not show there was no set of circumstances under which the statute would be valid).

[235] *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987).

[236] 576 U.S. 409 (2015).

No. 24-50149

record' containing specified information concerning guests and to make this record 'available to any officer of the Los Angeles Police Department for inspection' on demand."[237] Los Angeles argued that "facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications."[238] The Supreme Court remarked that Los Angeles misunderstood how courts analyze facial challenges.[239] The Court said:

> Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a "law is unconstitutional in all of its applications." But when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct.[240]

The *Patel* decision reasoned: "Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant."[241] The Court further rejected the argument that "a statute authorizing warrantless searches may still have independent force if it imposes a penalty for failing to cooperate in a search conducted under a warrant or in an exigency."[242] The Court explained that "[t]his argument gets things backwards. An otherwise facially unconstitutional

---

[237] *Id.* at 412 (alteration in original) (quoting L.A., Cal. Municipal Code § 41.49(2), (3)(a), (4) (2015)).

[238] *Id.* at 417.

[239] *Id.* at 418.

[240] *Id.* (citation omitted) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).

[241] *Id.*

[242] *Id.* at 419 n.1.

No. 24-50149

statute cannot be saved from invalidation based solely on the existence of a penalty provision that applies when searches are not actually authorized by the statute."[243] *Patel* teaches that, in resolving a facial challenge, the relevant universe of applications are those not already authorized by other laws—even if the challenged law imposes a new penalty.

Second, in *Whole Woman's Health v. Hellerstedt*,[244] the Supreme Court explained that a robust severability clause is not sufficient to save an otherwise unconstitutional law. Of course, *Hellerstedt*, which held that a Texas law was facially unconstitutional because it imposed an undue burden on the ability to obtain an abortion, has been largely abrogated by *Dobbs v. Jackson Women's Health Organization*.[245] Nevertheless, the Court's analysis of the law's severability clause was not abrogated by *Dobbs* and remains good law.

After holding the law was unconstitutional, *Hellerstedt* turned to Texas's arguments against facial invalidation. Texas argued that "facial invalidation of both challenged provisions is precluded by H.B. 2's severability clause."[246] That severability clause was substantially identical to S. B. 4's severability clause in this case.[247] The severability clause in *Hellerstedt* stated that "every provision, section, subsection, sentence,

---

[243] *Id.*

[244] 579 U.S. 582 (2016), *abrogated by*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

[245] 597 U.S. 215 (2022).

[246] *Hellerstedt*, 579 U.S. at 624.

[247] S. B. 4's severability clause reads: "It is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act to every person, group of persons, or circumstances, is severable from each other." S. B. 4, 88th Leg., 4th Called Sess., § 8 (Tex. 2023).

No. 24-50149

clause, phrase, or word in this Act, and every application of the provision in this Act, are severable from each other."[248]  It further provided that if "any application of any provision in this Act to any person, group of persons, or circumstances is found by a court to be invalid, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected."[249]  The Court rejected the idea that the severability clause precluded facial invalidation.  It reiterated its reasons for holding that the statute imposed an undue burden and stated, "The provisions are unconstitutional on their face: Including a severability provision in the law does not change that conclusion."[250]

> Significantly, the Court explained:
>
> Severability clauses, it is true, do express the enacting legislature's preference for a narrow judicial remedy.  As a general matter, we attempt to honor that preference.  But our cases have never required us to proceed application by conceivable application when confronted with a facially unconstitutional statutory provision.  "We have held that a severability clause is an aid merely; not an inexorable command." *Reno v. American Civil Liberties Union*, [521 U.S. 844, 884 n.49] (1997) (internal quotation marks omitted).  Indeed, if a severability clause could impose such a requirement on courts, legislatures would easily be able to insulate unconstitutional statutes from most facial review.  See *ibid.* ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.  This would, to some

---

[248] 579 U.S. at 624.

[249] *Id.*

[250] *Id.* at 624-25.

extent, substitute the judicial for the legislative department of the government" (internal quotation marks omitted)). A severability clause is not grounds for a court to "devise a judicial remedy that . . . entail[s] quintessentially legislative work." *Ayotte v. Planned Parenthood of Northern New Eng.*, [546 U.S. 320, 329] (2006). Such an approach would inflict enormous costs on both courts and litigants, who would be required to proceed in this manner whenever a single application of a law might be valid. We reject Texas' invitation to pave the way for legislatures to immunize their statutes from facial review.[251]

The Court concluded that "Texas' attempt to broadly draft a requirement to sever 'applications' does not require us to proceed in piecemeal fashion when we have found the statutory provisions at issue facially unconstitutional."[252]

We proceed with our preemption analysis with these limitations in mind.

## C

The Supremacy Clause makes the laws of the United States "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[253] The Clause declares a simple truth, "which flows immediately and necessarily from the institution of a federal government"—that federal law preempts contrary state law.[254] In doing so, the Clause serves as a cornerstone of our system of federalism,

---

[251] *Id.* at 625.

[252] *Id.* at 626.

[253] U.S. Const. art. VI, cl. 2.

[254] The Federalist No. 33, at 205 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

No. 24-50149

providing the federal government with a "decided advantage" to "impose its will on the States."[255]

Under the doctrine of preemption, Congress may displace state law expressly by using explicit language in a federal statute.[256]   In such a case, "the courts' task is an easy one."[257]   We focus on the "plain wording" of the preemption language to determine the preemptive effect of the statute.[258]   However, Congress does not always make its intent readily apparent.   In the absence of an explicit preemption clause, congressional intent may be inferred "from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"[259]   We refer to this doctrine as field preemption.

Federal law also "naturally preempt[s]" state law to the extent the state law conflicts with a federal statute.[260]   "This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' and those instances where the challenged state law 'stands as

---

[255] *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

[256] *See, e.g.*, *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

[257] *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).

[258] *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011) (quoting *CSX Transp., Inc.*, 507 U.S. at 664).

[259] *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

[260] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"[261] We refer to this doctrine as conflict preemption.

It is undisputed that Congress has not explicitly preempted S. B. 4 by including specific language in any of its enactments governing the entry and removal of aliens. Instead, the plaintiffs contend S. B. 4 is both field and conflict preempted by federal law. In light of these concerns, Las Americas brought a facial challenge to enjoin the enforcement of S. B. 4. We address the preemption arguments in two parts: (1) we analyze whether S. B. 4 intrudes on a field Congress intended to occupy, and (2) we examine the extent to which S. B. 4 conflicts with federal law.

1

Field preemption occurs when "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance."[262] The Supreme Court has indicated that courts should hesitate to infer field preemption unless "the nature of the regulated subject matter permits no other conclusion" or "Congress has unmistakably so ordained."[263] When analyzing field preemption, "the relevant field should be defined narrowly."[264] The operative question, therefore, is whether Congress

---

[261] *Arizona*, 567 U.S. at 399 (first quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); and then quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[262] *Id.*

[263] *DeCanas v. Bica*, 424 U.S. 351, 356 (1976) (quoting *Fla. Lime & Avocado Growers*, 373 U.S. at 142).

[264] *City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) (first citing *Arizona*, 567 U.S. at 400-01; and then citing *DeCanas*, 424 U.S. at 360 n.8).

No. 24-50149

intended to "occupy the field"[265] of immigration policies concerning entry into and removal from the United States.

The district court concluded that "the federal government has both a dominant interest and a pervasive regulatory framework" to control immigration into the United States, "preclud[ing] state regulation in the area."[266] We agree.

For nearly 150 years, the Supreme Court has recognized that the power to control immigration—the entry, admission, and removal of aliens—is *exclusively* a federal power.[267] Despite this fundamental axiom, S. B. 4 creates separate, distinct *state* criminal offenses for unauthorized entry and reentry of aliens into Texas from a foreign nation, and it provides procedures

---

[265] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing *California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989)).

[266] *United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024).

[267] *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) ("[T]he State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government . . . ."); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976) ("It is important to note that the authority to control immigration is . . . vested solely in the Federal Government, rather than the States . . . ."); *DeCanas*, 424 U.S. at 354 ("Power to regulate immigration is unquestionably exclusively a federal power."); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("[T]hat the formulation of . . . policies [regarding the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly [e]mbedded in the legislative and judicial tissues of our body politic as any aspect of our government."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of [C]ongress . . . ."); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Henderson v. Mayor of New York*, 92 U.S. 259, 272 (1875) (holding immigration is a "power[], which, from [its] nature, [is] exclusive in Congress").

No. 24-50149

for their removal. More specifically, §§ 51.02 and 51.03 prohibit the unlawful entry and reentry of aliens into the state from outside the country,[268] and article 5B.002 empowers Texas state judges and magistrates to order aliens to return to the foreign nation from which they entered or attempted to enter.[269]

The Supreme Court's decision in *Arizona v. United States*[270] provides considerable guidance as to whether the plaintiffs are likely to succeed on their claim that these provisions are field preempted by federal law. There, the Court held a provision of Arizona's S. B. 1070—§ 3—was field preempted.[271] The state provision punished an alien's "willful failure to complete or carry an alien registration document,"[272] adopting the same substantive standards as the federal law that required aliens to carry proof of registration.[273] After analyzing the federal regulations in the "field of alien registration," the Court observed, "The framework enacted by Congress leads to the conclusion . . . that the Federal Government has occupied the field of alien registration."[274] The Court noted, "The federal statutory directives provide a full set of standards governing alien registration,

---

[268] Tex. Penal Code §§ 51.02-03.

[269] Tex. Code Crim. Proc. art. 5B.002.

[270] 567 U.S. 387 (2012).

[271] *Id.* at 403.

[272] *Id.* at 400 (quoting Ariz. Rev. Stat. Ann. § 13-1509(A)).

[273] *Id.* at 402.

[274] *Id.* at 401.

No. 24-50149

including the punishment for noncompliance."[275]  The Court explained this national registration scheme "was designed as a 'harmonious whole.'"[276]

Director Martin correctly observes the statutes at issue in *Arizona* did not regulate the entry and removal of aliens.  But the Court's holding in *Arizona* provides guiding principles.  The Court held: "Where Congress occupies an entire field, as it has in the field of alien registration, even complementary state regulation is impermissible.  Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards."[277]

Applying *Arizona*'s guiding principles, we believe Congress also intended to occupy the field of immigration policies concerning entry into and removal from the United States.  In 1952, Congress enacted the Immigration and Nationality Act (INA) to establish a "comprehensive federal statutory scheme for regulation of immigration and naturalization" and to set "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country."[278]  The Act's "central concern" is the "entry and stay of aliens" in the United States.[279] The Act makes it unlawful for any alien to enter the United States other than through a port of entry,[280] and it punishes any alien who unlawfully reenters

---

[275] *Id.*

[276] *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 72 (1941)).

[277] *Id.* (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 249 (1984)).

[278] *DeCanas v. Bica*, 424 U.S. 351, 353, 359 (1976); *accord Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011).

[279] *DeCanas*, 424 U.S. at 359.

[280] 8 U.S.C. § 1325(a).

No. 24-50149

or remains in the United States.[281]   By enacting the INA, Congress established a comprehensive framework to identify *who* may enter,[282] *how* they may enter,[283] *where* they may enter,[284] and *what* penalties apply for those who enter unlawfully.[285]

When analyzing § 3 of S. B. 1070, the *Arizona* Court explained that "[f]ederal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders."[286]  This logic applies to the equally—if not more—sensitive topic of aliens entering and remaining in the country.

The very moment an alien enters the United States, they are subject to an intricate system of federal commands.  In describing this system, we note at the outset that after the Homeland Security Act of 2002, many

---

[281] *Id.* § 1326(a).

[282] *See, e.g.*, *id.* § 1182 (establishing classes of aliens ineligible for visas or admission).

[283] *See, e.g.*, *id.* § 1181 (establishing document requirements for admission); *id.* § 1225 (establishing aliens "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers"); *id.* § 1185 ("Unless otherwise ordered by the President, it shall be unlawful . . . for any alien to depart from or enter . . . the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.").

[284] *See, e.g.*, *id.* § 1224 (authorizing the Attorney General to designate ports of entry for aliens arriving by aircraft); *see also* 8 C.F.R. § 100.4 (establishing different ports of entry for different classes of aliens).

[285] *See, e.g.*, 8 U.S.C. § 1325(a) (establishing criminal penalties for improper entry by aliens); *id.* § 1326(a) (establishing criminal penalties for improper reentry of removed aliens).

[286] *Arizona v. United States*, 567 U.S. 387, 401-02 (2012).

No. 24-50149

references in the INA to the "Attorney General" are now read to mean the Secretary of Homeland Security.[287] With that context, we proceed.

When an alien enters the United States, they immediately receive the federal immigration status of "applicant for admission" and may lawfully remain in this country only with federal permission.[288] If an alien enters the United States "at any time or place other than as designated by the Attorney General," they are "inadmissible" and removable under 8 U.S.C. §§ 1182(a)(6)(A)(i) and 1229a(e)(2).[289] But, before they are removed, all aliens are subject to federal inspection.[290] Congress has created a comprehensive—and likely exclusive—system for federal immigration officers to determine the admissibility and removability of aliens.

Congress criminalized the unlawful entry and reentry of aliens under 8 U.S.C. §§ 1325(a) and 1326(a). But regardless of whether an alien violates these provisions, an immigration officer must still determine whether they may remain in the United States or whether they must be removed. The "usual removal process involves an evidentiary hearing before an immigration judge."[291] At that hearing, the alien may be represented by counsel, present evidence on their behalf, and attempt to show why they should be admitted.[292] Among other things, the alien may claim asylum by expressing fear of persecution or harm upon return to their home country; seek relief from removal by asserting a Convention Against Torture (CAT)

---

[287] *See* 6 U.S.C. § 557; *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005).

[288] 8 U.S.C. § 1225(a)(1); *see also id.* §§ 1181, 1182.

[289] *Id.* §§ 1182(a)(6)(A)(i), 1229a(e)(2).

[290] *Id.* § 1225(a)(3).

[291] *DHS v. Thuraissigiam*, 591 U.S. 103, 108 (2020).

[292] *See* 8 U.S.C. § 1229a(b)(4); 8 C.F.R. § 1240.11(c).

No. 24-50149

claim; or seek dispensation from the Attorney General.[293]  If their claim is rejected and the alien is ordered removed, they can appeal the removal order to the Board of Immigration Appeals.[294]  If that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals.[295]

There is also a more expedited procedure for removal.  If an immigration officer determines that an alien who is arriving in the United States is inadmissible because they misrepresented their admission status or lack valid admission documentation, the officer must order the alien removed from the United States without further hearing or review.[296]  Other aliens who are already present in the United States are subject to the same expedited removal if they "(1) [are] inadmissible because [they] lack a valid entry document; (2) [have] not 'been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility'; and (3) [are] among those whom the Secretary of Homeland Security has designated for expedited removal."[297]  All aliens subject to this expedited removal procedure can avoid removal by claiming asylum or a fear of persecution, at which point they are referred to an asylum officer.[298]  If the asylum officer finds the applicant does not have a

---

[293] *See* 8 C.F.R. § 1240.11(c) (asylum); *id.* § 208.16 (CAT); 8 U.S.C. § 1229b (dispensation from Attorney General); *see also Arizona v. United States*, 567 U.S. 387, 396 (2012) ("If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal.").

[294] 8 U.S.C. § 1229a(c)(5); 8 C.F.R. § 1003.1(b).

[295] 8 U.S.C. § 1229a(c)(5), 1252(a).

[296] *Id.* §§ 1225(b)(1)(A)(i), 1182(a)(6)(C), 1182(a)(7).

[297] *DHS v. Thuraissigiam*, 591 U.S. 103, 109 (2020) (citing 8 U.S.C. § 1225(b)(1)(A)(i), (b)(1)(A)(iii)(I)-(II)).

[298] 8 U.S.C. § 1225(b)(1)(A)(ii).

No. 24-50149

credible fear, a supervisor will review the asylum officer's determination.[299] The supervisor's review can be appealed to an immigration judge.[300]

Against the backdrop of this national immigration system, and applying the guiding principles espoused in *Arizona*, it becomes clear that the new Texas laws pertaining to entry and removal infringe on a preempted field.

First, the Supreme Court in *Arizona* explained that "[a] principal feature of the [federal] removal system is the broad discretion exercised by immigration officials."[301]   As part of this discretion, the *Arizona* Court acknowledged, "Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."[302]

Indeed, the INA indicates executive discretion is paramount to immigration policy.   Congress gave the Executive the authority to establish "reasonable rules, regulations, and orders" regarding any aliens attempting to depart from or enter the United States.[303]   Congress gave the Attorney General authority to waive various requirements that would otherwise stand

---

[299] 8 C.F.R. § 208.30(e)(8).

[300] *Id.* § 1003.42.

[301] *Arizona v. United States*, 567 U.S. 387, 396 (2012).

[302] *Id.*

[303] 8 U.S.C. § 1185(a)(1).

No. 24-50149

in the way of admission.[304]   Congress also allowed immigration judges the ability to "cancel removal" of an alien who meets certain statutory criteria.[305]

Further, Congress has given the Executive statutory authority to determine when state officers can "perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States," and has generally subjected any state officers performing one of these functions to supervision by the Executive.[306]  If it chose to do so, the Executive could rely upon statutory authority to request Texas to assist, under the supervision of federal officers, in arresting the very aliens whom the Director now says DPS has the authority to arrest under state law, unsupervised by any federal officer or agency.  The Executive Branch has in fact sought Texas's assistance under various statutes, but the federal government has not utilized Texas's resources to the extent desired by the Director.  Regardless of the wisdom of the Executive's actions and inactions,

---

[304] *See, e.g., id.* § 1158(b)(2)(A)(v) (providing Attorney General discretion to waive asylum eligibility requirements if he believes "there are not reasonable grounds for regarding the alien as a danger to the security of the United States"); *id.* § 1227(a)(1)(H) (providing Attorney General discretion, under certain circumstances, to waive removal provisions for aliens deemed inadmissible because of misrepresenting material facts when seeking admission); *id.* § 1182(a)(9)(B)(v) (providing Attorney General the "sole discretion" to waive certain admissibility bars for aliens "unlawfully present" if refusal to admit the alien would result in "extreme hardship" to "lawfully resident spouse or parent"); *id.* § 1182(d)(1) (providing Attorney General discretion to waive admissibility requirements for aliens aiding law enforcement when the Attorney General believes it is in the "national interest to do so"); *id.* § 1182(d)(14) (providing Secretary of Homeland Security discretion to waive admissibility requirements for aliens that are victims of certain crimes and helpful to law enforcement when the Secretary considers it to be "in the public or national interest to do so").

[305] *Id.* § 1229b(a)-(b).

[306] *See id.* § 1357(g)(1)-(3); *see also infra* notes 412 and accompanying text.

No. 24-50149

the congressionally designed system allows the Executive to decide whether and how to pursue aliens illegally present in the United States.

Congress evinced an intent that the Executive should have the sole discretion to enforce the INA's entry and removal provisions. The broadest exercise of this discretion is the Executive's decision not to pursue either civilly or criminally the very aliens whom the Texas legislature has drawn a bead upon in enacting new state laws. In fact, the Court observed in *Arizona* that "[d]iscretion in the enforcement of immigration law embraces immediate human concerns" and "policy choices that bear on this Nation's international relations."[307] For instance, "[r]eturning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission."[308] "The dynamic nature of relations with other countries requires the *Executive Branch* to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities."[309]

The Supreme Court reinforced the Executive's discretion in enforcing immigration laws in *United States v. Texas*.[310] There, Texas and Louisiana challenged the Biden Administration's guidelines that "prioritize[d] the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently."[311] Texas and Louisiana also "contend[ed] that for certain noncitizens, such as those who are removable

---

[307] *Arizona*, 567 U.S. at 396.

[308] *Id.*

[309] *Id.* at 397 (emphasis added).

[310] 599 U.S. 670 (2023).

[311] *Id.* at 673.

No. 24-50149

due to a state criminal conviction, § 1226(c) of Title 8 says that the Department 'shall' arrest those noncitizens and take them into custody when they are released from state prison."[312]   Though the Supreme Court resolved the case based on standing, the reasoning supporting the Supreme Court's holding appears to be equally applicable in assessing whether S. B. 4—which is aimed at increasing arrests and prosecutions of illegally present aliens—impinges on discretion granted by the Constitution to the Executive.   The Supreme Court held: "Article II of the Constitution assigns the 'executive Power' to the President and provides that the President 'shall take Care that the Laws be faithfully executed.'"[313]   The Court said: "Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"[314]   "[T]he Executive Branch has *exclusive* authority and absolute discretion to decide whether to prosecute a case."[315]   The Supreme Court held that this exclusive authority extended to enforcement of the immigrations laws at issue: "That principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'"[316]   The exclusive authority over removal was expressly set forth: "In line with those principles, this Court has declared that the

---

[312] *Id.* at 674.

[313] *Id.* at 678 (citing U.S. Const. art. II, § 1, cl. 1; § 3).

[314] *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U. S. 413, 429 (2021)).

[315] *Id.* at 679 (emphasis added) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

[316] *Id.* (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

No. 24-50149

Executive Branch also retains discretion over whether to remove a noncitizen from the United States."[317]

Second, as part of its field-preemption analysis in *Arizona*, the Supreme Court pointed to the fact that the Arizona law regarding alien registration "rules out probation as a possible sentence (and also eliminates the possibility of a pardon)," while federal law did not.[318] In the present case, a defendant may be removed before federal proceedings that would permit her to remain in the United States lawfully have been initiated or concluded. Under federal law, an alien who does not enter through a designated port of arrival may nevertheless seek asylum.[319] A claim for asylum can be pursued before, during, or after the conclusion of prosecution under federal law for illegal entry.[320] In contrast, the Texas laws do not permit abatement of prosecution and removal proceedings,[321] and, as a result, an alien may be removed under article 5B.002(d) before asylum proceedings are concluded.

The Texas laws also fail to provide an alien the ability to pursue a CAT claim once proceedings are commenced. Federal law markedly differs. An alien in removal proceedings with a reasonable fear of persecution or torture in her home country may request relief from removal based on the CAT.[322] "[T]he Attorney General has no discretion to deny relief to a

---

[317] *Id.* (citing *Arizona v. United States*, 567 U.S. 387, 396 (2012)).

[318] *Arizona*, 567 U.S. at 403.

[319] 8 U.S.C. § 1158(a)(1).

[320] *See, e.g., United States v. Vasquez-Hernandez*, 924 F.3d 164, 169 (5th Cir. 2019).

[321] Tex. Code Crim. Proc. art. 5B.003.

[322] *See* 8 C.F.R. §§ 208.16, 208.31.

No. 24-50149

noncitizen who establishes his eligibility.    [Even a] conviction of an aggravated felony has no effect on CAT eligibility . . . ."[323]

Finally, the Supreme Court in *Arizona* emphasized the breadth of the United States' power "to control and conduct relations with foreign nations" and the reasons for the existence of that power.[324]   The Supreme Court said in *Arizona*:

- "Decisions [regarding removal] touch on foreign relations and must be made with one voice."[325]
- "Removal decisions, including the selection of a removed alien's destination, may implicate [the Nation's] relations with foreign powers and require consideration of changing political and economic circumstances."[326]
- "The federal power to determine immigration policy is well settled. Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws."[327]
- "Perceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad."[328]
- "It is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be

---

[323] *Moncrieffe v. Holder*, 569 U.S. 184, 187 n.1 (2013).

[324] *See Arizona v. United States*, 567 U.S. 387, 395 (2012).

[325] *Id.* at 409.

[326] *Id.* (alteration in original) (quoting *Jama v. ICE*, 543 U.S. 335, 348 (2005)).

[327] *Id.* at 395.

[328] *Id.*

No. 24-50149

able to confer and communicate on this subject with one national sovereign, not the 50 separate States."[329]

• "This Court has reaffirmed that '[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country.'"[330]

These considerations apply in full force to S. B. 4 and certainly auger in favor of concluding that Congress intended to occupy the field regarding the entry and removal of aliens.

To be sure, *Arizona* did not recognize this field. But the Supreme Court has held that federal law occupies a variety of other fields, including alien registration;[331] nuclear safety;[332] aircraft noise;[333] the "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tanker vessels;[334] wholesales of

---

[329] *Id.* (first citing *Chy Lung v. Freeman*, 92 U.S. 275, 279-80 (1875); and then citing The Federalist No. 3, at 44-45 (John Jay) (Clinton Rossiter ed., 1961) (observing that federal power over foreign relations avoids situations where "bordering States . . . under the impulse of sudden irritation, and a quick sense of apparent interest or injury" might take actions that could undermine foreign relations)).

[330] *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941)).

[331] *See, e.g.*, *id.* at 401; *see also Hines*, 312 U.S. at 68 ("[I]t is of importance that this legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority. Any concurrent state power that may exist is restricted to the narrowest of limits . . . .").

[332] *See, e.g.*, *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 82-85 (1990).

[333] *See, e.g.*, *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973).

[334] *See, e.g.*, *United States v. Locke*, 529 U.S. 89, 111 (2000) (quoting 46 U.S.C. § 3703(a)).

No. 24-50149

natural gas in interstate commerce;[335] and locomotive equipment.[336] Alien entry and removal is equally, if not more important, to the interest of the national sovereign.[337] Congress's creation of a complex, national system for determining whether an alien may enter and remain in the United States is strong evidence Congress intended to occupy the field of alien entry and removal. The national immigration system in the INA touches a field "in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."[338]

We do not write on a clean slate. There is nearly 150 years of Supreme Court precedent suggesting that the power to control the entry and removal of aliens is "vested solely in the Federal Government, rather than the States."[339] In *DeCanas v. Bica*,[340] the Supreme Court declared—in unmistakable terms—that the "[p]ower to regulate immigration is unquestionably exclusively a federal power."[341] The Court further explained that the "comprehensiveness of legislation governing *entry and stay of aliens*

---

[335] *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 305, 310 (1988); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 184, 187 (1983).

[336] *See Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 636 (2012); *Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 613 (1926).

[337] *Cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government.").

[338] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

[339] *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976); *see also supra* note 301 and accompanying text.

[340] 424 U.S. 351 (1976).

[341] *Id.* at 354.

No. 24-50149

was to be expected in light of the nature and complexity of the subject."[342] In light of this caselaw, Texas cannot step into the shoes of the national sovereign under our Constitution and federal laws. If every state could regulate the unlawful entry, reentry, and removal of aliens, "[e]ach additional statute [would] incrementally diminish[] the [federal government]'s control over enforcement" and "detract[] from the 'integrated scheme of regulation' created by Congress."[343]

The dissenting opinion, citing a law review article and a quote from an 1837 case, retorts that states regulated immigration in the nineteenth century as part of their police powers until Congress began to legislate on immigration in 1875.[344] Even assuming that the dissenting opinion's historical assertions are true, they do not control because a preemption analysis can change upon the introduction of new federal legislation. In *Arizona*, the Court explained that "[w]hen there was no comprehensive federal program regulating the employment of unauthorized aliens, this Court found that a State had authority to pass its own laws on the subject," but "[c]urrent federal law is substantially different from the [previous] regime" because "Congress enacted IRCA as a comprehensive framework for 'combating the

---

[342] *Id.* at 359 (emphasis added). The Court also noted that federal immigration law controls "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* at 355; *cf. Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government.").

[343] *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 288-89 (1986).

[344] *Post* at 150 (citing *Mayor of New York v. Miln*, 36 U.S. 102, 132-33 (1837); Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 COLUM. L. REV. 1833, 1846-59 (1993)).

No. 24-50149

employment of illegal aliens.'"[345]  Therefore, a portion of Arizona S. B. 1070 barring unauthorized aliens for working or seeking employment in Arizona was preempted by IRCA.[346]

Director Martin makes three counterarguments.  First, he argues that "state laws that 'mirror[] federal objectives' are *more*—not less—likely to be upheld."[347]  The Supreme Court, however, rejected this exact argument in *Arizona*, stating it "ignores the basic premise of field preemption—that States may not enter, in any respect, an area the Federal Government has reserved for itself."[348]  In fact, the resemblance between S. B. 4's provisions and the federal provisions criminalizing illegal entry and reentry—§§ 1325(a) and 1326(a)—make the Court's analysis in *Arizona* particularly salient.  In the same way Arizona S. B. 1070 "add[ed] a state-law penalty for conduct proscribed by federal law,"[349] S. B. 4 criminalizes behavior already prohibited by the INA.

The Supreme Court in *Arizona* explained why § 3 was field preempted despite its apparent congruence with federal law.  The Court relied on the fact that "[w]ere § 3 to come into force, the State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine[d] that prosecution would frustrate federal policies."[350]  The

---

[345] *Arizona v. United States*, 567 U.S. 387, 404 (2012) (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).

[346] *Id.* at 403-07.

[347] *See Plyler v. Doe*, 457 U.S. 202, 225 (1982).

[348] *Arizona*, 567 U.S. at 402.

[349] *Id.* at 400.

[350] *Id.* at 402.

No. 24-50149

Supreme Court explained that "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted."[351]  This logic applies with equal force to the Texas laws regarding entry and removal.

Second, Director Martin cites several federal statutes that he contends reflect that federal immigration law regularly encourages States to aid in federal entry and removal.  The Director cites 18 U.S.C. § 758 for the proposition that it is a crime for an alien to "flee" from "State[] or local law enforcement" around immigration checkpoints.  But that federal statute makes it a *federal* crime when someone "flees Federal, State, or local law enforcement agents in excess of the legal speed limit."[352]  This statute would not prohibit Texas from arresting or prosecuting a person for violating state-established speed limits under state law.  Indeed, a federal statute provides that state law extends over immigration stations and that officers in charge of immigration stations shall admit "State and local officers charged with the enforcement of the laws of the State or Territory . . . in order that such State and local officers may preserve the peace and make arrests for crimes under the laws of the States and Territories."[353]  But it does not authorize Texas to (1) enact a statute making it a *state* crime to flee a checkpoint or (2) arrest or prosecute anyone under § 758.  Most importantly, this statute does not pertain to whether someone should be allowed to enter or remain in the United States or whether they should be deported or removed if they enter illegally.

---

[351] *Id.*

[352] 18 U.S.C. § 758.

[353] 8 U.S.C. § 1358.

No. 24-50149

Director Martin points to 8 U.S.C. § 1324(c), arguing that "States may make arrests for violation[s] of alien smuggling prohibition[s]." But, here again, this statute has nothing to do with whether an alien should be prosecuted or removed for being in the United States illegally. Rather, this statute makes it a crime for anyone, whether they are an alien, a United States citizen, or a person lawfully in the United States, to engage in smuggling aliens into the United States or harboring or transporting them.[354]

The Director argues that 22 U.S.C. § 7105(c)(3)(C)(i), 8 U.S.C. § 1101(a)(15)(T)(i), and 8 U.S.C. § 1101(a)(15)(U) contemplate state prosecution or investigation of illegal trafficking. But, here again, these statutes do not authorize Texas to determine whether a person is illegally present in the United States in order to take action to remove or deport her.

Director Martin fails to explain how these laws are relevant to the entry or removal provisions. While Texas undoubtedly can assist the federal government in arresting aliens who violate federal law when federal law permits it to do so,[355] the question is not whether Congress intended to occupy the entire field of immigration.[356] The laws cited by Director Martin do not facilitate the inquiry pertinent in the present case, which is whether Congress intended to occupy the field of immigration policies concerning entry into or removal from the United States.

Third, Director Martin maintains the federal government has "abandoned" the field because the Executive Branch has failed to enforce

---

[354] *Id.* § 1324(a).

[355] *See, e.g.*, *id.* § 1357(g) (allowing a state to enter into an agreement with the federal government to aid in "the investigation, apprehension, or detention" of aliens).

[356] *See City of El Cenizo v. Texas*, 890 F.3d 164, 177-78 (5th Cir. 2018) (first citing *Arizona*, 567 U.S. at 400-01; and then citing *DeCanas v. Bica*, 424 U.S. 351, 360 n.8 (1976)).

No. 24-50149

immigration policy in dereliction of its statutory duties.   Regardless of whether these claims are accurate, our task is to determine whether Congress "'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'"[357]   "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue," not enforcement decisions by the Executive.[358]   Here, there is strong support for the conclusion that Congress has "legislated so comprehensively" in the field of alien entry and removal that it "left no room for supplementary state legislation."[359]

## 2

Las Americas has shown that it is likely to prevail on its argument that certain provisions of S. B. 4 are conflict preempted.  Generally speaking, the Supreme Court has recognized that a state statute may be preempted by

---

[357] *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)).  Texas references *Parker v. Brown*, 317 U.S. 341, 358 (1943), for the proposition that the mere adoption of an act by Congress, without executive action putting the legislation into effect, does not implicate field preemption.  However, *Parker* is distinguishable for two reasons.  First, *Parker* did not involve the Executive Branch allegedly abandoning a field but rather related to a congressional act (the federal Agricultural Marketing Agreement Act of 1937).  *Id.* at 352-58.  Second, the Supreme Court held there was no field preemption because the Act specifically "contemplate[d] the existence of state programs at least until such time as the Secretary [of Agriculture] shall establish a federal marketing program."  *Id.* at 354.  The Secretary had not adopted implementing regulations, and the Court held there was no "occupation of the legislative field" by the adoption of the Agricultural Marketing Agreement Act.  *Id.* at 358.  In contrast, the intersecting web of national immigration laws does not contemplate state regulation.

[358] *See CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see also Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (GORSUCH, J., joined by THOMAS and KAVANAUGH, JJ.) (lead opinion) (noting "Congress's authority to delimit the preemptive effect of its laws").

[359] *Kansas*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co.*, 479 U.S. at 140).

No. 24-50149

federal law when (1) it is impossible for a person to comply with both the state law and federal law, or (2) the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[360]  The Court has described the relationship between these concepts this way:

> This Court, when describing conflict pre-emption, has spoken of pre-empting state law that "under the circumstances of th[e] particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"—whether that "obstacle" goes by the name of "conflicting;   contrary   to; . . . repugnance;   difference; irreconcilability;  inconsistency;  violation;  curtailment; . . . interference," or the like.  The Court has not previously driven a   legal   wedge—only   a   terminological   one—between "conflicts" that prevent or frustrate the accomplishment of a federal objective and "conflicts" that make it "impossible" for private parties to comply with both state and federal law. Rather, it has said that both forms of conflicting state law are "nullified" by the Supremacy Clause . . . .[361]

---

[360] *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[361] *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 873 (2000) (alterations and omissions in original) (citations omitted) (first quoting *Hines*, 312 U.S. at 67; then citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977); then citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982); then citing *United States v. Locke*, 529 U.S. 89, 109 (2000); and then citing *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990)); *see also Arizona*, 567 U.S. at 399-400; *Hines*, 312 U.S. at 67 ("In the final analysis, there can be no one crystal clear distinctly marked formula.  Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (citing *Savage v. Jones*, 225 U.S. 501, 533 (1912))).

No. 24-50149

*Arizona*, which we have already discussed, employed an "obstacle" analysis to assess whether state laws related to immigration were preempted.[362]  So did *Hines v. Davidowitz*,[363] another similar case.[364]  We take that approach, too.

The Texas entry provisions make it unlawful for an alien to enter or reenter the state from a location other than a port of entry.[365] Director Martin contends that these provisions mirror federal-law standards, with S. B. 4 "adopt[ing]" federal law.  It is true that the "mere fact" that a state law "overlap[s]" with a federal criminal provision does not, by itself, make a case for conflict preemption.[366]  But Las Americas has done much more than merely identify that S. B. 4 overlaps with its federal criminal analogues— indeed, conflicts abound between S. B. 4 and a number of federal laws.

To begin, S. B. 4 affects aliens whom Congress has assigned a federal immigration status—that of an "applicant for admission"[367]—and interferes with federal immigration officials' ability to determine the applicant's admissibility.  The relevant statute provides: "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . ) shall be deemed for purposes of this chapter an applicant for admission."[368]  Congress directed that all applicants for admission "shall" be inspected by a federal

---

[362] *Arizona*, 567 U.S. at 410.

[363] 312 U.S. 52 (1941).

[364] *Id.* at 67.

[365] Tex. Penal Code §§ 51.02-03.

[366] *Kansas v. Garcia*, 589 U.S. 191, 211 (2020).

[367] 8 U.S.C. § 1225(a)(1).

[368] *Id.*

immigration officer.[369]  We described this process in more detail above and we summarize it again here.  First, the immigration officer must determine the alien's admissibility, a status defined in part by statute and in part by a designation from the Secretary of Homeland Security.[370]  Second, if the immigration officer determines that an alien who is "arriving in the United States" or is present but has "not been admitted or paroled" may be inadmissible, the officer must then decide whether the alien is inadmissible under two specified statutory provisions.[371]  Aliens deemed inadmissible under those specific statutory provisions are generally subject to expedited removal unless they indicate an intention to apply for asylum.[372]  Aliens who are not subject to expedited removal (and who are not "clearly and beyond a doubt entitled to be admitted") are detained for further proceedings before an immigration judge, who "shall" determine whether the alien is in fact inadmissible.[373]

In light of this process, it is problematic that state courts will determine if an alien has entered illegally and order their removal.  In *Villas at Parkside Partners v. City of Farmers Branch*,[374] a majority of our en banc

---

[369] *Id.* § 1225(a)(3).

[370] *Id.* § 1225(b)(1)(A), (b)(2)(A); *see DHS v. Thuraissigiam*, 591 U.S. 103, 108-09 & n.3 (2020).

[371] 8 U.S.C. § 1225(b)(1)(A)(i) (directing the federal immigration officer to determine whether the alien is inadmissible under either 8 U.S.C. § 1182(a)(6)(C) or (a)(7)); *id.* § 1182(a)(6)(C) (designating as inadmissible aliens who, by fraud or willfully misrepresenting a material fact, procure or seek to procure an immigration document or other immigration benefit); *id.* § 1182(a)(7) (designating as inadmissible aliens who did not have a valid entry document at the time they applied for admission).

[372] *Id.* § 1225(b)(1)(A)(i)-(ii); *see Thuraissigiam*, 591 U.S. at 108-09.

[373] 8 U.S.C. §§ 1225(b)(2)(A), 1229a(a)(1).

[374] 726 F.3d 524 (5th Cir. 2013) (en banc).

No. 24-50149

court concluded that state courts may not assess the legality of an alien's presence.[375] There, the ordinance at issue allowed for state judicial review as to whether an individual was lawfully present in the country.[376] The lead opinion concluded that because of "the discretion and variability inherent in a determination of whether an alien is 'lawfully present in the United States.' . . . the judicial review section of the Ordinance [] is preempted by federal law."[377]

The Texas law regarding entry grants Texas judges significantly more power than the ordinance at issue in *Farmers Branch*.[378] It allows Texas courts to impose criminal sanctions and order removal if an alien is found to have entered or remained in Texas illegally.[379] As some jurists have recognized, "[T]he structure of the [federal] immigration statutes makes it impossible for [a] State to determine which aliens are entitled to residence, and which eventually will be deported."[380]

---

[375] Although there was no majority opinion in *Farmers Branch*, ten judges agreed that the judicial review sections of the city ordinance at issue were preempted in part by federal law. *See id.* at 537 (HIGGINSON, J., joined by STEWART, C.J., and DAVIS, SOUTHWICK, and HAYNES, JJ.) (lead opinion); *id.* at 542-43 (REAVLEY, J., joined by GRAVES, J., concurring in the judgment); *id.* at 547 (DENNIS, J., joined by REAVLEY, PRADO, and GRAVES, JJ., specially concurring); *id.* at 559 (RICHMAN, J., concurring in part and dissenting in part).

[376] *Id.* at 536 (lead opinion).

[377] *Id.* at 537 (citing 8 U.S.C. § 1229a(a)(3)).

[378] In *Farmers Branch*, the ordinance indicated that an alien's unlawful presence was to be "determined under federal law." *Id.* at 536. S. B. 4 goes further, allowing state judges to determine an alien's unlawful presence under state law. *See, e.g.*, TEX. PENAL CODE § 51.03(c).

[379] *See, e.g.*, TEX. CODE CRIM. PROC. art. 5B.002(d).

[380] *Plyler v. Doe*, 457 U.S. 202, 236 (1982) (BLACKMUN, J., concurring); *id.* at 241 n.6 (POWELL, J., concurring).

No. 24-50149

The Texas entry and removal provisions also conflict with federal law because they prohibit abatement of prosecutions under Chapter 51 of the Penal Code on the grounds that federal proceedings have been or will be commenced regarding the immigration status of the defendant.  S. B. 4 amended the Texas Code of Criminal Procedure to add article 5B.003.  It provides:

> **Art. 5B.003. Abatement of Prosecution on Basis of Immigration Status Determination Prohibited**
>
> A court may not abate the prosecution of an offense under Chapter 51, Penal Code, on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated.[381]

S. B. 4 then requires a court convicting a defendant of a Chapter 51 offense to order the removal of the defendant.[382]  But federal law provides that an alien may be permitted to remain in the United States lawfully even if they have been convicted of illegal entry.[383]  It would therefore conflict with federal law to remove an alien before (1) the federal government has decided whether that alien is permitted to remain in the United States because asylum should be granted, (2) the federal government has decided whether a CAT claim is valid, or (3) the United States Attorney General has decided whether to exercise discretion to waive obstacles to removal and admit the alien.[384]

The removal provision appears to create another conflict by authorizing Texas state judges and magistrate judges to remove aliens from

---

[381] Tex. Code Crim. Proc. art. 5B.003.

[382] *Id.* art. 5B.002(d).

[383] *See supra* notes 288-91 and accompanying text.

[384] *See supra* notes 291-95 and accompanying text.

No. 24-50149

the United States without notice to or consent from the federal government.[385] This runs headlong into federal law. Congress has identified the grounds for removal, the requirements for commencing and administering removal proceedings, the protections afforded to aliens throughout removal proceedings, and the process for selecting the country to which aliens may be removed.[386] A "principal feature" of this complex removal system is the "broad discretion" exercised by federal immigration officials.[387] Contrast this discretion with the S. B. 4 removal provision's grant to *Texas judges* of the unilateral power to order aliens removed. The removal provision sidesteps the sensitive issues that federal immigration officers are to consider.[388]

The Texas removal provisions will significantly conflict with the United States' authority to select the country to which aliens will be removed. Many aliens who cross into Texas from Mexico are not citizens or

---

[385] *See* TEX. CODE CRIM. PROC. art. 5B.002.

[386] *See, e.g.*, 8 U.S.C. §§ 1182(a), 1225, 1227, 1229, 1229a, 1231(a)-(b).

[387] *Arizona v. United States*, 567 U.S. 387, 396 (2012).

[388] *Cf., e.g.*, *Plyler v. Doe*, 457 U.S. 202, 241 n.6 (1982) (POWELL, J., concurring) ("But it is impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize. Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country, perhaps even as a citizen. Indeed, even the Immigration and Naturalization Service cannot predict with certainty whether any individual alien has a right to reside in the country until deportation proceedings have run their course.").

No. 24-50149

residents of Mexico.[389]  Nevertheless, S. B. 4 would require removing them to Mexico.[390]  The United States would have no say in the matter.

Furthermore, the Supreme Court has cautioned that "conflict is imminent" when "two separate remedies are brought to bear on the same activity."[391]  The remedies available under S. B. 4 are not congruent with federal remedies.[392]

The INA provides the federal government discretion to decide whether to initiate criminal proceedings or civil immigration proceedings once an alien is apprehended.  The Texas scheme blocks this exercise of discretion.  An alien apprehended illegally entering or remaining in Texas is charged with a crime punished by removal, and the federal government has no voice in further proceedings.  To the extent that state law affords prosecutorial discretion, it vests that discretion in a *state official*, not the United States Attorney General or another federal officer.  An arrest or conviction under S. B. 4 would interfere with federal law because the Texas

---

[389] *See* Br. of the Government of the United Mexican States as *Amicus Curiae* at 11-12 (noting that "that enforcement of SB 4 would interfere with Mexico's sovereign right to determine who enters its territory").

[390] *See* Tex. Code Crim. Proc. art. 5B.002(c)-(d) (directing that an order pursuant to S. B. 4 shall "require the person to return to the foreign nation from which the person entered or attempted to enter"); Tex. Penal Code § 51.02 (criminalizing entry into Texas "directly from a foreign nation").

[391] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000) (alteration omitted) (quoting *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould, Inc.*, 475 U.S. 282, 286 (1986)).

[392] *Compare* Tex. Penal Code §§ 51.02-03, *and* Tex. Code Crim. Proc. art. 5B.002, *with* 8 U.S.C. § 1325(a).  *See also* 8 U.S.C. § 1326(a) (stating the criminal punishment for a removed alien attempting to reenter the United States shall be a "fine[] under Title 18, or imprison[ment] not more than 2 years, or both").

No. 24-50149

process for arrests and convictions suppresses or subverts federal authority over an alien's status in the United States.

It is evident that the Texas entry and removal laws significantly eliminate the exercise of discretion by federal immigration officials, including the United States Attorney General.[393]  Though the Texas laws carve out some room for instances in which the federal government has already exercised such discretion,[394] the Texas laws by no means afford an alien the opportunity to benefit fully from the broad discretion available under federal law.

The dissenting opinion's analysis and hypotheticals ignore these crucial points.  The challenged provisions are not preempted because they conflict with the policy preferences of a particular administration[395]—but because, inter alia, they rob every administration of the very discretion in alien removal matters that Congress granted to the federal executive and not to the States.

The preliminary injunction does not prohibit Director Martin from arresting illegal aliens and turning them over to federal authorities if and when the federal executive branch requests Texas to do so.  The injunction only prohibits Director Martin from asserting authority based on a *state* law that is likely preempted.  The Director may arrest tens of thousands of aliens that are in Texas illegally as long as Texas has been requested to do so by the federal government and complies with all federal laws and regulations that govern such a request.  But the fact that federal law permits such cooperation

---

[393] *See supra* note 339 and accompanying text.

[394] *See* Tex. Penal Code § 51.02(c).

[395] *Post* at 155-56, 162-63.

No. 24-50149

does not save from preemption a state law that allows its law enforcement officers to arrest and remove aliens, independent of federal law.[396]

Director Martin invites us to read S. B. 4's removal provisions as merely requiring that an alien subject to an order under Texas Code of Criminal Procedure article 5B.002 "be transported to a port of entry, at which point—as both a practical and legal matter—the alien's potential removal is a question for federal immigration officers."[397] That is not what the statute says. The statute says that the order shall "requir[e] the person to return to the foreign nation from which the person entered or attempted to enter."[398] An alien subject to an order commits a second-degree felony if they "refuse[] to comply with the order."[399] A second-degree felony carries a punishment of two to twenty years of imprisonment and up to a $10,000 fine.[400] In short, S. B. 4 directs state judges to order an alien to leave the United States on pain of up to twenty years in prison and a $10,000 fine. It blinks reality to argue the statute's plain terms do anything other than require the removal of aliens.

Director Martin directs us to the declaration of Victor Escalon, a Regional Director for DPS, who explained DPS's plans for enforcing S. B. 4.[401] But that declaration, too, confirms that article 5B.002 orders are removal orders. Regional Director Escalon stated that, to enforce an article 5B.002 order, DPS plans to contact Mexican immigration authorities and

---

[396] *See post* at 162-63.

[397] *See* Tex. Code Crim. Proc. art. 5B.002(e).

[398] *Id.* art. 5B.002(d).

[399] Tex. Penal Code § 51.04.

[400] *Id.* § 12.33.

[401] ROA.314-16, ¶¶ 1, 3.

No. 24-50149

inform U.S. Customs and Border Protection before bringing the alien to a port of entry.[402]  He further explained that "[i]f Mexican authorities do not accept the entrance of an alien subject to an order to return, the escorting DPS officer will deliver him to the American side of a port of entry and observe the alien go to the Mexican side."[403]  He continued: "Upon witnessing the alien[] cross to the Mexican side of the international bridge, the officer will consider the alien[] to have complied with the return order and will cease monitoring the alien."[404]  Director Martin envisions a scheme in which aliens subject to an article 5B.002 order are brought to a port of entry and either released directly into Mexican custody or expected to cross to Mexico.  Only when the officer statutorily directed to "monitor[] compliance with the order"[405] witnesses the alien cross into Mexico will the officer consider the alien to have complied with the order.  Failure to comply is a second-degree felony.[406]  That is a removal scheme.

The dissenting opinion—relying principally on Texas's representations at oral argument—seemingly accepts Director Martin's contention that enforcement of article 5B.002 orders will operate differently from what the governing statutes direct.[407]  The dissenting opinion reasons that Director Martin has thus "proffered a seemingly constitutional application of the return provisions," and Texas district attorneys may still

---

[402] ROA.315, ¶ 9-11.

[403] ROA.316, ¶ 15.

[404] ROA.316, ¶ 15.

[405] Tex. Code Crim. Proc. art. 5B.002(e)(2) (requiring that an order include "the law enforcement officer or state agency responsible for monitoring compliance with the order").

[406] Tex. Penal Code § 51.04.

[407] *Post* at 164-66.

"come up with an additional constitutional application."[408]    Assertions by those "charged with enforcement and construction" of state laws are "entitled to 'respectful consideration,'" not unquestioning deference.[409] We decline to rewrite the statute's plain terms and ignore the declarations in the record.[410]  Moreover, a state cannot insulate unconstitutional laws from legal challenges simply by making a nonbinding promise at oral argument to enforce such laws in ways wholly divorced from their text and plain meaning. The dissenting opinion's logic provides states with an end-run around constitutional scrutiny.

Even setting aside S. B. 4's removal consequence, the remaining provisions nevertheless conflict with federal law.  "Federal law specifies [the] limited circumstances in which state officers may perform the functions of an immigration officer."[411]   At all times, those circumstances require federal supervision or authorization.  Under 8 U.S.C. § 1357(g), the Attorney General "may enter into a written agreement with a State" or any of its "political subdivision[s]," allowing state or local officers "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States."[412]  In performing those functions, the officers must "be subject to the direction and

---

[408] *Post* at 170.

[409] *L. Students C.R. Rsch. Council, Inc. v. Wadmond*, 401 U.S. 154, 163 (1971) (quoting *Fox v. Standard Oil Co. of N.J.*, 294 U.S. 87, 96 (1935)).

[410] *Cf. Dubin v. United States*, 599 U.S. 110, 131 (2023) ("Finally, the Government makes a familiar plea: There is no reason to mistrust its sweeping reading, because prosecutors will act responsibly.  To this, the Court gives a just-as-familiar response: We 'cannot construe a criminal statute on the assumption that the Government will "use it responsibly."'" (quoting *McDonnell v. United States*, 579 U.S. 550, 576 (2016))).

[411] *Arizona v. United States*, 567 U.S. 387, 408 (2012).

[412] 8 U.S.C. § 1357(g)(1).

No. 24-50149

supervision of the Attorney General."[413]  This federal law expressly provides that an agreement is not required for any state or political subdivision of a state to communicate with the Attorney General about the immigration status of an individual, including "reporting knowledge that a particular alien is not lawfully present in the United States."[414]  That same provision, § 1357(g)(10), further provides that an agreement is not necessary for a state or local government "otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States."[415]  This is not a grant of authority to a state to enact a statute making it a state crime to be unlawfully present.  Nor is it a grant of authority to a state to enact a statute that gives authority under state law to state officials to arrest or remove someone illegally present.  This provision does not even grant a state the authority to arrest or remove under *federal* law.  Similarly, other statutes expressly authorize state officers' arrest authority—but only in narrow circumstances.[416]  The Texas laws at issue permit state authorities to prosecute an individual for being unlawfully

---

[413] *Id.* § 1357(g)(3); *see also City of El Cenizo v. Texas*, 890 F.3d 164, 177 (5th Cir. 2018) ("Federal law," including § 1357(g), "regulates *how* local entities may cooperate in immigration enforcement.").

[414] 8 U.S.C. §1357(g)(10)(A).

[415] *Id.* § 1357(g)(10)(B).

[416] *See id.* § 1103(a)(10) (empowering the Secretary of Homeland Security to "authorize any State or local law enforcement officer" to "perform or exercise the powers . . . conferred" to federal immigration officers "[i]n the event the [Secretary] determines that an actual or imminent mass influx of aliens arriving off the coast of the United States, or near a land border, presents urgent circumstances requiring an immediate Federal response"); *id.* § 1324(c) (permitting all officers "whose duty it is to enforce criminal laws" to make arrests for the offense of "bringing in and harboring certain aliens").

No. 24-50149

present without any consultation or cooperation with the Attorney General of the United States.

S. B. 4 also permits an end run around 8 U.S.C. § 1252c. Section 1252c authorizes "State and local law enforcement officials" to "arrest and detain" aliens "illegally present in the United States" only if the alien "has previously been convicted of a felony in the United States and deported or left the United States after such conviction." [417] S. B. 4, however, permits Texas law enforcement to arrest and detain aliens illegally present in Texas regardless of whether the alien has been deported after being convicted of a felony or otherwise left the United States after such conviction.[418] Compounding the problem, § 1252c contains another condition on state officers' arrest authority: the officer may arrest the alien

> only after the State or local law enforcement officials obtain appropriate confirmation from the Immigration and Naturalization Service of the status of such individual and only for such period of time as may be required for the Service to take the individual into Federal custody for purposes of deporting or removing the alien from the United States.[419]

S. B. 4 clearly conflicts with this statute.

Allowing state law enforcement officers to arrest and prosecute aliens in these circumstances "would allow the State to achieve its own immigration policy. The result could be unnecessary harassment of some aliens (for

---

[417] 8 U.S.C. § 1252c(a).

[418] *See* Tex. Penal Code §§ 51.02-03; *see also* 8 U.S.C. § 1182(a)(9)(B)(ii) ("For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled.").

[419] 8 U.S.C. § 1252c(a).

No. 24-50149

instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed."[420] A motivating concern for the Supreme Court in *Hines* was that a state might use the registration requirement at issue there to harass aliens.[421] Allowing state law enforcement officials to arrest aliens who have not been admitted but who may be eligible for various status determinations that would allow them to remain in the United States raises the same concerns expressed in *Hines*.

Director Martin cites § 1357(g) as evidence of state-federal cooperation that allows states "wide latitude" to "prosecute crimes involving illegal entry and removal." But the Supreme Court addressed a similar argument in *Arizona* when analyzing § 6 of S. B. 1070, which authorized state officers to arrest a person if the officer had probable cause to believe that person was removable.[422] The Supreme Court explained that "no coherent understanding of the term [cooperation] would incorporate the unilateral decision of state officers to arrest an alien for being removable absent any request, approval, or other instruction from the Federal Government."[423] The same logic applies to S. B. 4's entry provisions. Allowing Texas to detain aliens "without any input from the Federal

---

[420] *Arizona v. United States*, 567 U.S. 387, 408 (2012).

[421] *See Hines v. Davidowitz*, 312 U.S. 52, 74 (1941) (concluding that Congress manifested an intent to impose a uniform registration system to leave aliens "free from the possibility of inquisitorial practices and police surveillance").

[422] *Arizona*, 567 U.S. at 408.

[423] *Id.* at 410.

No. 24-50149

Government about whether an arrest is warranted in a particular case . . . would allow the State to achieve its own immigration policy."[424]

Director Martin emphasizes the Supreme Court's decision in *Kansas v. Garcia*.[425]  In *Garcia*, the Court held that a Kansas law criminalizing the fraudulent use of another person's identifying information was not conflict preempted when applied to aliens who used false identities on work forms.[426] The challengers claimed the conflict arose from upsetting federal prosecutorial discretion and enforcement priorities given federal laws criminalizing the same conduct.[427]  The Court explained that "there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap."[428]  But our conclusion here does not depend one whit on S. B. 4's overlap with its federal criminal analogues.  Our discussion above identifies the many ways in which S. B. 4 conflicts with a variety of different statutes.

Director Martin contends that "S.B.4's directive not to abate prosecution" pending applications for asylum or other relief "does not require removal," and that "S.B.4 does not prevent state officers from coordinating with federal immigration authorities" while those applications are pending.  S. B. 4, however, states that a judge "shall" enter a removal order "[o]n a person's conviction of an offense under Chapter 51," and that order will "take[] effect on completion of the term of confinement or

---

[424] *Id.* at 408; *see also United States v. Texas*, 599 U.S. 670, 723 (2023) (ALITO, J., dissenting) ("Texas's entry into the Union stripped it of the power that it undoubtedly enjoyed as a sovereign nation to police its borders and regulate the entry of aliens.").

[425] 589 U.S. 191 (2020).

[426] *Id.* at 210-11.

[427] *Id.* at 211.

[428] *Id.* at 212.

No. 24-50149

imprisonment imposed by the judgment."[429]  Because "[a] court may not abate the prosecution of an offense under Chapter 51 . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated,"[430] a defendant with an unresolved claim for federal immigration relief will be pushed toward removal regardless of the status of their claim.  No amount of "coordinating with federal immigration authorities" can soothe this conflict.

In sum, there are "significant complexities" in determining an alien's immigration status.[431]  S. B. 4 runs roughshod over them.  Las Americas is likely to succeed as to its contention that the entry and removal provisions are conflict preempted.

## D

In a facial challenge to a legislative act, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[432] Director Martin posits that the district court erred by granting a preliminary injunction in this facial challenge because some applications of S. B. 4 are valid.  The Director's argument for why S. B. 4 would be valid relates to the State's contention that it has been invaded and has the right to defend itself. Director Martin asserts that Article I, § 10 of the Constitution (the State War Clause) permits some applications of S. B. 4.   The State War Clause provides:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace,

---

[429] Tex. Code Crim. Proc. art. 5B.002(d).

[430] *Id.* art. 5B.003.

[431] *Arizona v. United States*, 567 U.S. 387, 409 (2012).

[432] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

No. 24-50149

> enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.[433]

Specifically, Director Martin contends that, at a minimum, S. B. 4's application to transnational cartel members is a constitutionally authorized response to an "invasion," and federal statutes cannot "preempt a State's effort to defend itself."

Constitutional text, structure, and history provide strong evidence that federal statutes addressing matters such as alien entry and removal are still supreme even when the State War Clause has been triggered. The Supreme Court recently framed the State War Clause as *divesting* the states of power whereas "the Constitution's text . . . strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense."[434]    It seems strange that a state could rely on this Clause—which, with limited exceptions, primarily divests states of power—as a defense to a suit seeking to vindicate the Supremacy Clause, especially in an area of regulation that the Supreme Court has consistently reiterated is exclusively a federal power.[435]    One would expect a contemporary commentator to have noticed such a proposition. Instead, in The Federalist No. 44, James Madison glossed over the relevant portion of the State War Clause by writing: "The remaining particulars of this clause fall within

---

[433] U.S. Const. art. I, § 10, cl. 3.

[434] *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 590 (2022).

[435] *See supra* note 267 and accompanying text.

No. 24-50149

reasonings which are either so obvious, or have been so fully developed, that they may be passed over without remark." [436]

Las Americas has persuaded us that it is likely to succeed on the merits despite Texas's State War Clause arguments.

\* \* \*

In sum, Las Americas is likely to succeed on the merits of its preemption claims. There is considerable authority supporting that the core provisions of S. B. 4 are field, or alternatively, conflict preempted by federal law. We are also persuaded that the State War Clause likely does not compel a contrary result.

# VI

The remaining preliminary injunction factors require the plaintiff to demonstrate "[2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." [437] They weigh in favor of a preliminary injunction.

The harm that Las Americas will likely suffer if Director Martin enforces the new immigration laws—considered above in subpart II(A)—is irreparable under our precedents. [438] To summarize, the harm is that the time

---

[436] THE FEDERALIST NO. 44, at 283 (James Madison) (Clinton Rossiter ed., 1961).

[437] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[438] *See Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023) (noting that economic harms were irreparable because "the [defendant] cannot be sued due to its sovereign immunity," as here (citing *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021))); *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597-98 (5th Cir. 2023) (noting that "nonrecoverable compliance costs are usually

No. 24-50149

and expense Las Americas would expend representing immigrants detained under preempted Texas laws could never be regained. Its expenditures of actual costs in paying its employees to represent those improperly entangled in a state immigration regimes also come at the expense of cutting back its representation of clients navigating only the federal regime. These losses cannot be recouped.

We weigh the risk of irreparable harm to the Director. We recognize that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."[439] Furthermore, the new immigration laws are intended to protect the citizens of Texas.

There are countervailing public interest considerations, however. There is a high risk that enforcement of S. B. 4 would cause international friction. Mexico—the United States' largest trading partner[440]—has already protested S. B. 4 and signaled that the statute's enforcement would frustrate bilateral efforts, including alien removals.[441] The Supreme Court has said that "repeated representations by the Executive Branch supported by formal diplomatic protests and concrete disputes are more than sufficient to

_____

irreparable harm"); *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142 ("Indeed, complying with [an agency order] later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." (alteration in original) (quoting *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016))); *see also Texas*, 829 F.3d at 433-34 (noting that when analyzing whether costs constitute irreparable harm, "it is not so much the magnitude but the irreparability that counts" (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)))).

[439] *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).

[440] *See United States v. Texas*, 719 F. Supp. 3d 640, 696 (W.D. Tex. 2024).

[441] *See id.* at 670; Br. of the Government of the United Mexican States as *Amicus Curiae* 11-12; ROA.133-34 (Declaration of Eric Jacobstein).

No. 24-50149

demonstrate that the state Act stands in the way of Congress's diplomatic objectives."[442]

The enforcement of S. B. 4 also risks taking the United States out of compliance with its treaty obligations. Under the CAT, for example, "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[443]  S. B. 4 provides an affirmative defense if the United States has granted asylum to the defendant.[444] However, an alien whose meritorious CAT claim has not yet been adjudicated may still be refouled under S. B. 4 in violation of the CAT.

There are competing public interest considerations in permitting Director Martin to implement the arrest and removal provisions of the new Texas immigration laws.  However, the Supreme Court explained in *Hines v. Davidowitz* that state and local interests are subservient to those of the nation at large, at least with regard to matters regarding foreign relations:

> The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties.  "For local interests the several states of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power."  Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free

---

[442] *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000).

[443] U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85.

[444] Tex. Penal Code § 51.02(c).

No. 24-50149

from local interference. As Mr. Justice Miller well observed of a California statute burdening immigration: "If (the United States) should get into a difficulty which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?"[445]

The harms counsel that the equities weigh in favor of a preliminary injunction.

## VII

On June 27, 2025, the Supreme Court issued its decision in *Trump v. CASA, Inc.*[446] It held that the Government is likely to succeed on its argument that under the Judiciary Act of 1789, federal courts do not have equitable authority to issue "universal injunctions."[447] The Court discussed the limits of injunctive relief that federal courts may provide under that statute. Neither our court nor the district court has had the benefit of briefing regarding the impact of the *Trump v. CASA* decision as to the preliminary injunctive relief the district court granted in this case. Like the Supreme Court in *Trump v. CASA*, we "decline to take up . . . in the first instance" arguments as to the permissible scope of injunctive relief in the present case.[448] "[W]e therefore leave it" to the district court to consider any arguments the parties may present in this regard.[449]

---

[445] 312 U.S. 52, 63-64 (1941) (footnotes omitted) (first quoting *Ping v. United States*, 130 U.S. 581, 606 (1889); and then quoting *Chy Lung v. Freeman*, 92 U.S. 275, 279 (1875)).

[446] ____ S. Ct. ____, 2025 WL 1773631 (2025).

[447] *Id.* at *6.

[448] *Id.* at *12.

[449] *Id.*

No. 24-50149

\*     \*     \*

The district court's grant of a preliminary injunction against Director Martin is AFFIRMED.

No. 24-50149

Andrew S. Oldham, *Circuit Judge*, dissenting:

Today's majority usurps the State of Texas's sovereign right to police its border and to battle illegal immigration. In doing so, it underrules the Supreme Court's standing doctrine. It defenestrates our rule of orderliness. It turns upside down the standards for preliminary injunctions and facial pre-enforcement review. It finds that Congress somehow preempted the field of immigration—by *affirmatively authorizing* States to participate in it. And it subverts the other preliminary-injunction factors by holding, for example, that the Biden Administration's criticisms of Texas create a public interest in facially enjoining all applications of the State's immigration law—while the Trump Administration's partnership with Texas to battle the immigration crisis is irrelevant.

\*

Much more could be said about the errors our court commits today. But as it stands, barring emergency intervention by the en banc court or the Supreme Court, the State of Texas will be forced to stand trial in just a few days. I do not want to exacerbate that emergency. So this is the best I could do in the short time allotted.

Part I discusses the crisis at the southern border, Texas's place at the epicenter of it, and the State's decision to enact a landmark immigration law called "Senate Bill 4" or "S.B. 4." Part II explains that the majority flouts Supreme Court precedent by recognizing the private plaintiffs' standing to challenge S.B. 4's enforcement. Part III explains that El Paso County's theory of standing is equally unavailing. Part IV explains that plaintiffs lack a cause of action. Part V explains that Texas's laws are neither field nor conflict preempted. Part VI discusses the remaining preliminary-injunction factors.

I respectfully but emphatically dissent.

No. 24-50149

## I

## A

The United States is in the throes of an immigration "crisis." *Statement from President Joe Biden on the Bipartisan Senate Border Security Negotiations*, The White House (Jan. 26, 2024), https://perma.cc/ K9S8-TLZV; *see also* Declaring a National Emergency at the Southern Border of the United States, Proclamation No. 10886, 90 Fed. Reg. 8327 (Jan. 20, 2025). From 2021 to 2024, millions upon millions of aliens illegally streamed across the U.S.–Mexico border. *See Southwest Land Border Encounters*, U.S. Customs & Border Prot. (May 12, 2025), https://perma.cc/XNW9-6TAL; *see also* ROA.215, 283, 376. To put the numbers into perspective, when this case was filed in December 2023, Customs and Border Protection ("CBP") had over 300,000 encounters with aliens at the border in that month alone. *See Southwest Land Border Encounters*, *supra*; ROA.330. In February 2025, the first full month after President Biden left office, there were only 11,710 border encounters. *See Southwest Land Border Encounters*, *supra*. That is an astonishing 96 percent reduction, and the numbers have remained at that low level since. *See ibid.*

Many of the aliens who illegally entered the United States during the Biden Administration have disappeared into the country's interior. Out of the millions who were stopped, cited, and told to wait for removal proceedings in our overburdened immigration system over the past four years, *see ibid.*; *see also Southwest Land Border Encounters FY22*, U.S. Customs & Border Prot. (Feb. 12, 2025), https://perma.cc/F693-T7VS, as many as 85 percent were released pending proceedings, ROA.377. For comparison, in President Trump's first 100 days in office, only nine aliens were released into the country pending removal proceedings. *See*

No. 24-50149

*Promises Made, Promises Kept: Border Security Achieved in Fewer than 100 Days*, THE WHITE HOUSE (Apr. 28, 2025), https://perma.cc/438F-9NRH.

During the Biden Administration, innumerable aliens were never encountered at all. These "gotaways" evaded law enforcement and now live throughout the country without having ever been screened by immigration officials. *See* Adam Shaw & Bill Melugin, *New Data Reveals Illegal Immigrants Eluding Border Patrol Spiked Under Biden, Surpassing Predecessors*, FOX NEWS (May 15, 2024), https://perma.cc/D9N5-U7U8. Over the past four years, an estimated 1.7 million gotaways entered the United States—more than the total number that entered the country over the entire preceding decade. *See ibid.* (relying on records received from the Federal Government under FOIA). The upshot is this: Today "[w]e have limited information on the precise whereabouts of a great number of the[] illegal immigrants" who streamed across the border "over the last 4 years." *See* Securing Our Borders, Exec. Order No. 14165, 90 Fed. Reg. 8467, 8467 (Jan. 20, 2025).

The risks posed by these millions of "gotaways" are impossible to overstate—precisely because we know nothing about them. Untold numbers of "potential terrorists, foreign spies, members of cartels, gangs, and violent transnational criminal organizations, and other hostile actors with malicious intent" now reside in the United States. *Ibid.*

For instance, from 2021 to 2024, Border Patrol "encountered 336 persons on the terrorist watchlist" at the southern border, "up from 15 of such individuals" over the previous four years. ROA.285. Not all have been caught and sent back either. The FBI continues to try "to locate" some "on the terrorist watchlist who have illegally crossed into the U.S." *Ibid.*; *see also ICE Arrests 11 Iranian Nationals Illegally in the U.S. over the Weekend*, HOMELAND SEC. (June 24, 2025), https://perma.cc/6QB2-QGA9 (highlighting the arrests of "an individual with admitted ties to Hezbollah, a

No. 24-50149

known or suspected terrorist, and an alleged former sniper for the Iranian army"). And the foreign terrorist organization Tren de Aragua has infiltrated the United States, conducted widespread narco-terrorism at the behest of the Venezuelan government, and taken over apartment complexes. *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, Proclamation No. 10,903, 90 Fed. Reg. 13033 (Mar. 14, 2025).

Gang members have also flooded into the country. *See* ROA.285. That should be no surprise since much of the southern border is controlled by the cartels, *see* Declaring a National Emergency at the Southern Border, 90 Fed. Reg. at 8327, "potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military," ROA.216 (quoting William P. Barr, *The U.S. Must Defeat Mexico's Drug Cartels*, Wall St. J. (Mar. 2, 2023), https://perma.cc/555D-S96J); *see also* ROA.711. Cartel members have been found on various occasions marching across the border in "body armor, . . . armed with rifles and tactical gear." Victor Nava, *Armed Men Believed to Be Mexican Cartel Members Wearing Body Armor Spotted Crossing Southern Border into Texas*, N.Y. Post (Aug. 8, 2023), https://perma.cc/7CQY-769A. Not only do these cartels look "more like ISIS than like the American mafia." ROA.216 (quoting Barr, *supra*); *see also* ROA.712 (comments of Ezra, J., at preliminary-injunction hearing) ("[T]he stuff that these cartels do to human beings is like a training manual for ISIS. I mean, these are vicious, bad people. . . . I sentenced a guy who worked for the cartels who admitted to over 40 murders, but the FBI said that was a fraction of what he actually did. Bad people."). They also appear to have "ISIS ties." Katie Pavlich, *FBI Director Confirms Prison Gangs and Islamic Terrorists Are Exploiting the Border*, Townhall (Mar. 11, 2024), https://perma.cc/BSX2-UER9.

No. 24-50149

Cartel members are not the only gang members who have illegally entered the country. In fiscal year 2024 alone, CBP apprehended 523 gang members from over 20 different gangs. *See CBP Enforcement Statistics*, U.S. Customs & Border Prot. (Apr. 22, 2025), https://perma.cc/M5KP-NH7Y; *see also* ROA.296–98 (showing the same pattern in previous years). Seventy-two of those individuals were affiliated with MS-13, *CBP Enforcement Statistics*, *supra*, whose "motto is 'kill, rape, control,'" Dep't of Just., Fact Sheet on MS-13, at 1 (2017). In pursuit of such evils, MS-13 sends "representatives to cross into the U.S. illegally, to gain control of local MS-13 cliques and reconstitute them." *Ibid.* That leads "the American MS-13 cliques to become more violent." *Id.* at 2. Not only do they "kill[] rivals"; they also "extort[] legitimate businesses run by legal Central American immigrants." *Ibid.*

CBP has also encountered other criminals. In just the last fiscal year, for instance, CBP had almost 40,000 encounters with aliens who had criminal convictions or outstanding warrants, *CBP Enforcement Statistics*, *supra*, and Border Patrol made over 17,000 arrests, *Criminal Alien Statistics*, U.S. Customs & Border Prot. (Apr. 14, 2025), https://perma.cc/ZY5T-SD8V; *see also* ROA.285, 291.

This flood of terrorists, gang members, and criminals has carried with it "[d]eadly narcotics and other illicit materials." Securing Our Borders, 90 Fed. Reg. at 8467. In each of the past three fiscal years, well over 500,000 pounds of illicit drugs were seized by border officials. *Drug Seizure Statistics*, U.S. Customs & Border Prot. (Apr. 14, 2025), https://perma.cc/5DVV-PTKR. And in the past four fiscal years combined, enough fentanyl poured into the country to kill every single person on the entire planet "nearly twice over." *See California Seizes Record 62,000 Pounds of Fentanyl*, Governor Gavin Newsom, https://perma.cc/MA2M-B8P3; *see also* *Facts About Fentanyl*, U.S. Drug Enf't Agency, https://perma.cc/

No. 24-50149

Q36W-CH8Q (noting that a lethal dose of fentanyl can be about 2 mg); *see Drug Seizure Statistics*, *supra* (revealing that more than 60,000 pounds of fentanyl crossed our southern border in the past four fiscal years). Naturally, "fentanyl" has become "the leading cause of death for citizens between the ages of 18 and 45," and as a whole, "the national drug overdose death toll" reached peak numbers in 2023. ROA.286.

Deadly narcotics are not the only illicit materials that have poured in. Thousands upon thousands of guns and explosives have also crossed the southern border. *See* ROA.241, 302–03; *see also Weapons and Ammunition Seizures*, U.S. Customs & Border Prot. (Apr. 14, 2025), https://perma.cc/WB3D-DPE6. To make matters worse, the cartels launder the profits from all this illicit smuggling through Chinese money-laundering syndicates. Dylan Tokar, Justin Baer & Vipal Monga, *Bags of Cash from Drug Cartels Flood Teller Windows at U.S. Banks*, Wall St. J. (May 14, 2025), https://perma.cc/F3A9-EYGM.

As if this deluge of crime and terror were not enough, illegal immigration has also given rise to serious public health concerns. When immigrants use the visa system, they "are screened for" any health issue that might threaten the public. Guaranteeing the States Protection Against Invasion, Proclamation No. 10888, 90 Fed. Reg. 8333, 8333 (Jan. 20, 2025). So if an alien applying for a visa has "a communicable disease of public health significance" or "has failed to present documentation of having received vaccination against vaccine-preventable diseases," such as "mumps," "measles," or "hepatitis B," he is prevented from entering until he becomes eligible to be admitted. *See* 8 U.S.C. § 1182(a)(1)(A). So too if an alien has "a mental disorder" that may threaten people's "property, safety, or welfare." *Ibid.* But the Government is obviously incapable of screening gotaways to prevent the spread of "communicable diseases of public-health concern."

No. 24-50149

Guaranteeing the States Protection Against Invasion, 90 Fed Reg. at 8334. Nor can it prevent mentally unstable gotaways from entering our country.

The human cost of this crisis is hard to fathom. For example, in January 2024, a six-year-old girl in Dallas was shot and killed by an illegal alien. ROA.346. And in 2023, in Cleveland, Texas, another criminal alien brutally murdered five people, including a young boy. *See* ROA.347. Innumerable Texans have died from the drugs that cartels have trafficked across the border. And as the criminals, gang members, and terrorists fade further from the Government's view with time, the promise of future crime and violence becomes surer.

Illegal immigration also poses grave danger to aliens. The past four years saw a significant increase in "migrant mortalities." ROA.284. In fiscal year 2023, "in just the El Paso Sector," "148 migrants died . . . while attempting border crossings." ROA.284. And since 2021, well over 2,000 migrants have died while attempting to illegally cross our borders. ROA.284. And that is not to mention the innumerable people abused and trafficked at the border. *See* ROA.216–18; ROA.1017–21.

But perhaps the best illustration of the human cost of illegal immigration is the plight of unaccompanied minors. In 2023, 118,938 unaccompanied minors crossed the border, up from only 15,381 in 2020. *See* ROA.284. "[T]he majority of" these minors crossed the border through "very dangerous, not-nice, human-smuggling networks." *Remarks to the Press with Q&A by Vice President Joe Biden in Guatemala*, The White House (June 20, 2014), https://perma.cc/G8JK-9H28. The smugglers often sell these child migrants into "forced labor or prostitution . . . in order to recover their costs." William A. Kandel et al., Cong. Rsch. Serv., R43628, Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration 10 (2014).

No. 24-50149

Other children have simply been left in the middle of the desert to perish. The victims include the most "vulnerable." *See* Ali Bradley, *Abandoned 2-Month-Old Found by Rio Grande Border Patrol*, NewsNation (Sep. 26, 2023), https://perma.cc/Q5GE-UA4X (recounting the story of Border Patrol rendering emergency medical aid to a 2-month-old baby abandoned at the southern border). Not long ago, for instance, Border Patrol agents rescued "two female tender-aged toddlers," who were "dropp[ed]" by two smugglers "from the top of the approximately 14-foot-high border barrier" and "abandoned." *U.S. Border Patrol Rescues Toddlers Dropped by Smuggler over Border Barrier*, U.S. Customs & Border Prot., https://perma.cc/UCJ7-62KD (Jan. 28, 2025). Others have been less fortunate. *See* Chantal Da Silva, *2 Children Dead, Baby in Critical Condition After Attempted Border Crossings*, NBC News (Aug. 24, 2022), https://perma.cc/VH8W-J9DH.

### B

#### 1

At "the epicenter" of this border crisis stands the State of Texas. *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 193 (5th Cir. 2024). Texas and Mexico share about two-thirds of the nearly 2000-mile southern border. As a result, approximately half of the immigrants who have crossed the southern border have crossed into Texas. *See* Br. of *Amici Curiae* America's Future et al. at 17 (claiming that "in fiscal year 2023 alone, nearly 2 million illegal aliens poured over Texas' border, some 50 percent of all illegal U.S. border crossings"). This "spike in illegal migration" has placed "counties along the southern border" in "a continuous state of disaster." ROA.286.

Texas has responded to the crisis by spending more than $11 billion of its citizens' money to secure the southern border. *See ibid.* The State has built

border walls, deployed Texas military officers "to fill border staffing deficits," and bussed immigrants to other jurisdictions. *See* ROA.286–87. It has also trained and reimbursed local law enforcement. *See infra*, at 123–24, 126. These efforts over the past four years have led to 533,800 alien apprehensions and more than 54,300 criminal arrests, resulting in more than 45,800 felony charges. *See Operation Lone Star Seizes $2.4 Million Worth of Methamphetamine*, Off. of the Tex. Governor (June 20, 2025), https://perma.cc/9PUQ-LQUK. And it has led to the seizure of 735 million lethal doses of fentanyl. *See ibid.*

2

As part of its effort to secure its border and protect Texans, the State of Texas passed S.B. 4. *See* Acts 2023, 88th Leg., 4th C.S., ch. 2, § 2 (eff. Mar. 5, 2024) ("S.B. 4"). That law is the subject of this appeal. Three of its provisions merit introduction.

First, S.B. 4 makes it "an offense" for a person to "enter[] or attempt[] to enter" the State of Texas "directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a); *compare* 8 U.S.C. § 1325(a) (prohibiting entry or attempted entry into "the United States at any time or place other than as designated by immigration officers"). Several affirmative defenses tether this provision to federal law. *See* Tex. Penal Code § 51.02(c). For example, it is a defense to prosecution if "the federal government has granted the defendant" either "lawful presence in the United States" or "asylum." *Id.* § 51.02(c)(1). In addition, it is a defense if "the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a)." *Id.* § 51.02(c)(2).

Second, S.B. 4 makes it unlawful for "an alien" to "enter[], attempt[] to enter, or [be] at any time found" in the State of Texas if that alien has previously (1) "been denied admission to or excluded, deported, or removed

No. 24-50149

from the United States," or (2) "departed from the United States while an order of exclusion, deportation, or removal is outstanding." *Id.* § 51.03(a). This provision, too, mirrors federal law. *See* 8 U.S.C. § 1326(a) (making it an offense for an alien to "enter[], attempt[] to enter, or [be] at any time found in, the United States," if that alien "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding").

I refer to these first two provisions together as S.B. 4's "arrest provisions."

Third, S.B. 4 empowers state courts to enter return orders. If an alien charged with one of the above two offenses "agrees to the order," the state court may enter an ordering "requir[ing] the person to return to the foreign nation from which the person entered or attempted to enter." Tex. Code Crim. Proc. art. 5B.002(c). If instead the alien is convicted of one of those offenses, "the judge shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter." *Id.* art. 5B.002(d). These bear some similarity to orders of removal that federal immigration judges can enter, *see* 8 U.S.C. §§ 1229a(d), 1229a(c)(1)(A), but it is entirely unclear whether a return order requires physically removing the alien to a foreign nation or simply turning him over to federal officials at a port of entry. *See infra*, at 164–65.

I refer to these provisions as S.B. 4's "return provisions."

3

A single day after S.B. 4 was enacted, and months before it would become effective or operate against anyone, plaintiffs rushed to the courthouse. The Las Americas Immigrant Advocacy Center ("Las Americas"), American Gateways, and El Paso County, Texas, filed a pre-

No. 24-50149

enforcement suit against the Director of the Texas Department of Public Safety ("DPS"), Freeman Martin.[1]

The plaintiffs requested a declaration that "S.B. 4 is unlawful in its entirety," and sought a facial pre-enforcement injunction against S.B. 4's application to anyone under any circumstances. ROA.809. The plaintiffs claimed entitlement to such extraordinary relief on the grounds that S.B. 4 was preempted by the Immigration and Nationality Act ("INA"), the statutory scheme S.B. 4 mirrors.

Before S.B. 4 even became effective or could be enforced against a single alien, the district court entered a preliminary injunction. *See United States v. Texas*, 719 F. Supp. 3d 640, 651 (W.D. Tex. Feb. 29, 2024). As relevant here, the court concluded that S.B. 4 was impliedly preempted by federal law. *See id.* at 663–79. So the district court issued the broadest relief imaginable. As the district court put it, "the Court will enjoin the law in full and prohibit Defendants and their officers, agents, and employees from enforcing any provision of SB 4." *Id.* at 699. The injunction thus not only blocked the defendants' enforcement of S.B. 4 against *any* individual (even nonparties); it also blocked enforcement of numerous provisions in S.B. 4 the parties never even challenged, much less cited or mentioned. *See, e.g.*, Tex. Civ. Prac. & Rem. Code §§ 117.001, .002, .003, .004, .005; Tex.

---

[1] Plaintiffs sued the previous DPS Director, Steven McCraw, in his official capacity. Director Martin replaced McCraw in December 2024. Plaintiffs also sued a state district attorney, but this court granted his motion to voluntarily dismiss his appeal. In addition, the United States filed a separate suit. The cases were consolidated. But after President Trump took office, and while appeal was pending, the United States voluntarily dismissed its suit. *See* Fed. R. Civ. P. 41(a)(1)(A)(i). That case is thus moot. *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 5 (2023).

No. 24-50149

Gov't Code § 508.149; Tex. Code Crim. Proc. arts. 5B.001, 42A.059, 66.102. The DPS Director immediately appealed.[2]

## II

As always, jurisdiction first.

The Supreme Court recently reminded our court that we must be careful in holding plaintiffs to their burden to establish standing. *See Murthy v. Missouri*, 603 U.S. 43 (2024). Standing is "a bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It "help[s] ensure that the plaintiff has such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction." *Murthy*, 603 U.S. at 57 (quotation omitted); *see also Diamond Alt. Energy, LLC v. EPA*, 606 U.S. ---, --- (2025), 2025 WL 1716141, at *6 ("[P]laintiffs must show that they . . . are not mere bystanders."). And it "helps safeguard the Judiciary's proper—and properly limited—role." *Texas*, 599 U.S. at 675–76. Thus, "[t]he proper approach" to standing has long been "to 'presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.'" John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1225–26 (1993) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

Adopting plaintiffs' main theory of standing would contravene these basic principles. Here, I (A) explain that *FDA v. Alliance for Hippocratic*

---

[2] While the case was on appeal, the district court entered an order "clarify[ing]/modify[ing] the scope of" the preliminary injunction. Although that order appeared to violate the "longstanding tenet of American procedure" that "[a]n appeal, including an interlocutory appeal, 'divests the district court of its control over those aspects of the case involved in the appeal,'" *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)), any modifications are not material here. So I do not address this issue further.

No. 24-50149

*Medicine*, 602 U.S. 367 (2024), forecloses the plaintiffs' theory of standing. Then, I (B) offer some responses to the majority's contrary holding.

## A

Las Americas is an organization that opposes S.B. 4's operation on illegal immigration and that provides legal and counseling services to illegal immigrants. Its main theory of standing relies on an expansive reading of organizational standing in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).[3] But just last Term, in *Alliance for Hippocratic Medicine*, the Supreme Court emphatically and unanimously told us not to expand organizational standing. *See* 602 U.S. at 396. The majority nonetheless expands *Havens*, ignores *Alliance*, and thus turns standing doctrine on its head.

## 1

Start with *Havens*. In that case, the plaintiff organization, HOME, had standing only because "Havens's actions directly affected and interfered with HOME's core business activities." *Id.* at 395. Specifically, Havens lied directly to the plaintiff about the availability of housing. *Ibid.* HOME itself was the victim because HOME itself was injured by the lie. So Havens "directly affected and interfered with" the plaintiff's counseling services concerning the availability of housing. *Ibid.*

Why is *direct* impact or *direct* interference so central to the *Havens* analysis? The point cannot be overemphasized: "[O]rganizations must satisfy the usual standards for" standing. *Id.* at 393–94. That includes classic principles of standing, like "when the plaintiff is not himself the object of the government action or inaction he challenges," standing is "substantially

_____

[3] Because the majority focuses only on Las Americas, so do I. But all three plaintiffs offer similar theories of standing.

more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

Plaintiffs cannot dodge those difficulties—as they try to do here—by voluntarily altering their activities in response to government action. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013) (explaining that such "self-inflicted" injuries cannot ground Article III standing). So just as an individual who earnestly desires to counsel immigrants in his free time cannot complain that some new law will lead him to spend resources to counsel those immigrants more effectively, so too a political organization cannot. That is true regardless of "the intensity of" either party's "interest or the fervor of his advocacy." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982).

Rather, plaintiffs generally need what HOME had—an action by the defendant against the plaintiff "directly." *All. for Hippocratic Med.*, 602 U.S. at 395. There it was a lie told by the defendant to the plaintiff. So, as *Alliance for Hippocratic Medicine* emphasized, HOME's theory of standing was just like that of "a retailer who sues a manufacturer for selling [it] defective goods." *Id.* at 395. In both cases, the defendant has a direct relationship with the plaintiff, and that defendant's actions directly affect and interfere with the plaintiffs' operations. In other words, *Havens* was a traditional case involving a plaintiff who complains that a defendant has imposed a direct injury (like a lie) on him.

In this case, by contrast, S.B. 4 does absolutely nothing directly to the plaintiffs, nor will it in any way be directly enforced against them. This is a modern public-law dispute where one party complains about governmental regulation *of third parties*. The plaintiffs complain about Director Martin's threatened actions against immigrants not before the court. They do not allege anyone has plans to arrest Las Americas, charge El Paso County with

No. 24-50149

a misdemeanor, or enter a return order against American Gateways. In other words, the impact on the plaintiffs is wholly indirect. So this case is nowhere close to *Havens*.

To the contrary, it is squarely governed by *Alliance for Hippocratic Medicine*. In that case, the Supreme Court considered whether an organization had standing where it (1) was not the object of an FDA regulation but (2) would incur indirect costs by its voluntary choice *to serve clients* who were the object of the regulation. *See* 602 U.S. at 394. The Court unanimously held no. *See ibid.*

What of the organizations' invocation of *Havens*? The organizations in *Alliance for Hippocratic Medicine* contended that their standing was fully consistent with *Havens* because the FDA's actions would "force[]" them to spend money, to educate their members, and to expend organizational resources that would otherwise be devoted to their core missions. *Ibid.* In rejecting the organizations' argument, the Supreme Court admonished us that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *Id.* at 396. If that is not a specific instruction to limit *Havens* to its facts, I do not know what is. *Cf. Egbert v. Boule*, 596 U.S. 482, 491–92 (2022) ("[R]ecognizing a cause of action under [*Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971)] is a disfavored judicial activity." (quotation omitted)); *see also Goldey v. Fields*, 606 U.S. --- (2025), 2025 WL 1787625 (summarily reversing an appeals court that found a plaintiff had a cause of action under *Bivens*).

For reasons I cannot understand, however, the plaintiffs and the majority have quite literally copied and pasted the theory of standing that the *Alliance* Court so emphatically rejected. Compare the Las Americas Brief and the majority's opinion to the Supreme Court's holding in *Alliance for Hippocratic Medicine*:

No. 24-50149

- Plaintiffs: Standing exists under *Havens* because they will "divert substantial resources" in response to Director Martin's enforcement of S.B. 4 against third parties. Br. for Plaintiff–Appellee Las Americas ("Las Americas Br.") at 13.[4]

- Today's majority: Las Americas has standing because S.B. 4's enforcement will cause it "to divert its resources." *Ante*, at 14; *see also, e.g.*, *id.* at 16 (explaining that "S. B. 4 has already forced [Las Americas] to divert [its] limited resources" (quotation omitted)); *id.* at 17 (noting that in response to S.B. 4's enforcement, "Las Americas' services will necessarily require diverting funding and staff time").

- Supreme Court: "The medical associations respond that under *Havens Realty Corp. v. Coleman*, standing exists when an organization diverts its resources in response to a defendant's actions. **That is incorrect**." *All. for Hippocratic Med.*, 602 U.S. at 395 (emphasis added); *see also* Tr. of Oral Arg. at 19, *All. for Hippocratic Med.*, 602 U.S. 367 (No. 23–235) (Barrett, J.) (noting that this theory of standing mirrored "the kinds of allegations [courts] see by immigration advocacy groups," *i.e.*, "diversion of resources, increased expenses that result from the complications of having to address and explain . . . changes" to immigration policy).

That should have made this case simple. Plaintiffs allege only—just as the doctors did in *Alliance*—that they want *to serve clients* who are impacted by the law. That makes the organizations' standing every bit as impermissible

_____

[4] Even El Paso County asserts this sort of injury. It alleges that it "plans to establish the Office of New Americans, a program to improve the inclusion and integration of the County's immigrants" and that it already "manages a migrant services support center." *See Texas*, 719 F. Supp. 3d at 652. The County "alleges that SB 4 will interfere with these programs." *Id.* at 653.

No. 24-50149

as it was in *Alliance*. And it means the only way to find standing here is to ignore *Alliance*, revivify *Havens*, and then extend *Havens* to confer standing on virtually all organizations under all circumstances. That is the *precise opposite* of what the Supreme Court unanimously told us to do a year ago, when it admonished us "not to extend the *Havens* holding beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396. Moreover, *Havens* was a purely private dispute—it was not a public law dispute like this one. So simply by telling us "not to extend the *Havens* holding beyond its context," the Supreme Court told us not to extend *Havens* to the realm of public-law disputes. And that admonition makes good sense because, as illustrated by this case and by *Alliance*, public-law disputes often have different and often-more-attenuated harms than private-law disputes have. It is beyond me how the majority can read *Alliance*'s instructions to allow today's result.

And if that was not bad enough, the majority *also* overrules circuit precedent reaffirming the *Alliance* instructions. *See Deep S. Ctr. For Env't Just. v. EPA*, 138 F.4th 310, 319 (5th Cir. 2025) (explaining that *Havens* has been "limited . . . to its facts"); *see also El Paso County v. Trump*, 982 F.3d 332, 343 (5th Cir. 2020) ("[A]n organization does not automatically suffer a cognizable injury in fact by diverting resources in response to a defendant's conduct."). In sum, the majority limits *Alliance for Hippocratic Medicine* to its facts and expands *Havens*. That is backwards.

2

The majority nonetheless contends that S.B. 4 somehow "directly interfere[s]" with Las Americas—even if the bill cannot ever be enforced against the organization. *Ante*, at 20. How so? In the majority's view, Las Americas is identical to a plaintiff retailer that purchases defective goods from a defendant manufacturer. And so too is Las Americas identical to HOME.

No. 24-50149

Respectfully, that is absurd. To stay within the first analogy, the State of Texas (the "manufacturer") is allegedly acting unlawfully against ("selling defective goods to") *aliens* (the "retailer"). Las Americas is, at best, akin to the retailer's management consultant. I suppose a McKinsey consultant is marginally inconvenienced when his retailer client purchases defective goods because that is one more thing that must be addressed in the PowerPoint deck. But make no mistake: Only the retailer (here the alien) is *directly* injured by the defective goods, and the retailer's consultant (here Las Americas) suffers only a *derivative and wholly indirect* injury by having to update its advice on how to handle the problem.

True, in public-law cases, multiple parties can be "directly" affected by a law or regulation. For example, if the Government "bans hot dog sales in stadiums, then hot dog manufacturers, not just stadiums, might be considered objects of the regulation." *Diamond Alternative Energy*, 2025 WL 1716141, at *8. Or if a State prohibits parents from sending their kids to private schools, those schools (not just the parents) might be considered the object of the State's regulation. *Id.* at *9 (discussing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535–36 (1925)). Or if a law bans employers from hiring certain aliens, then alien-employees (not just their would-be employers) might be directly affected by the law. *Truax v. Raich*, 239 U.S. 33, 38 (1915). That is sensible enough: As a matter of economic reality, a law banning buying hot dogs is just like a law banning selling them; a law banning parents from sending kids to private schools is just like a law banning private schools; and a law banning hiring certain employees for certain jobs is just like a law banning those employees from holding those jobs.

But in all events, direct impact is necessary. And in no event would Las Americas be directly impacted by enforcement of S.B. 4. If the State's law said, "aliens cannot seek legal services," that law could directly impact both the aliens and the organizations (like Las Americas) that provide legal

services. But S.B. 4 says nothing about Las Americas or any of the services it wants to provide. That makes Las Americas a complete stranger to the statute and its enforcement. And it prohibits us from exercising jurisdiction over Las Americas' challenges to S.B. 4.

So where does the majority find its "direct" impact on Las Americas? Well, this is a real doozy: The majority seems to concede that Las Americas has no particularized interest in this case. But that doesn't matter to the majority because it would confer standing on *literally everyone* in Texas. The majority reasons: "The former Director of DPS publicly testified—representing to immigrants, Las Americas, and the public—that he intended to enforce the state entry and removal laws based on his authority as the Director of DPS." *Ante*, at 22. This representation was "false," the majority says, because Texas's "laws are preempted." *Ibid.* Thus, the majority concludes, the DPS director "lied" to everyone in his legislative testimony—and thus injured everyone (aliens, their lawyers and counselors at Las Americas, and the public writ large) just like HOME was injured in *Havens. See ibid.*

This is deeply wrong. In *Havens*, the defendant told falsehoods *to the plaintiff*. The plaintiff HOME thus suffered a real, concrete, and particularized injury, caused by the defendant, that differentiated it from every other conceivable plaintiff in the universe. *See Lujan*, 504 U.S. at 560 & n.1. In this case, by contrast, there is only one group of would-be plaintiffs that would suffer such an injury from the enforcement of S.B. 4: the group of aliens who could be arrested or removed. Everyone else—including Las Americas and also including, say, my law clerks, legislative staffers in the Texas Capitol, and the handful of people who might have watched the DPS Director's public testimony—has the same, undifferentiated, and *de minimis* "injury" associated with hearing a man say "I'll enforce this law" when in fact he cannot because it is allegedly preempted. The majority thus

egregiously conflates aliens (who might be injured), their lawyers at Las Americas (whose injuries are wholly self-inflicted and otherwise derivative of their alien clients' injuries), and members of the public (who are not injured at all).

Each step of the majority's logic is deeply flawed. First, it presumes that Texas state law is unconstitutional. *But see Respect Maine PAC v. McKee*, 562 U.S. 996, 996 (2010) (per curiam) (explaining that "state legislative act[s]" are "presumptively constitutional"). Then, it treats the DPS Director's statement that "I will enforce this law" as somehow equivalent to Havens' lying. *But see All. for Hippocratic Med.*, 602 U.S. at 396 ("*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context."). Then it treats that lie as directed at anyone in the world. *But see ibid.* Finally, it ignores the fact that plaintiffs' choices to devote resources to counseling and legal services are completely voluntary and self-inflicted—because according to the majority, *Clapper*'s ban on considering self-inflicted injuries in standing cases is limited to the facts of that case. *See ante*, at 22–23.

The majority's upshot? After today, there is universal standing to bring preemption challenges because every member of "the public" is equally injured by a State's enactment of a preempted law. *Id.* at 22. If anyone thinks that Law *X* is unconstitutional or preempted or otherwise unlawful, they can sue anyone who could theoretically enforce Law *X*—because merely saying "the law is *X*" is tantamount to the lie in *Havens*. The majority also separately recognizes standing for anyone who allegedly provides counseling or legal services to any client subject to any illegality ever. *But see All. for Hippocratic Med.*, 602 U.S. at 394 (rejecting organizations' theory that they had standing under *Havens* because they "conduct[ed] their own studies" in response to allegedly unlawful agency action concerning mifepristone "so that" they could "better inform their members . . . about mifepristone's

No. 24-50149

risks"). This is not just a flagrant violation of *Alliance*; it is inconsistent with every standing decision since *Lujan*. It turns the federal courts into "ombudsmen of the general welfare." *Valley Forge*, 454 U.S. at 487. And it grants every member of the general public "a special license to roam the country in search of governmental wrongdoing and to reveal their discoveries in federal court." *Ibid.*

B

That is far from the only problem with today's standing analysis. Over and over and over, the majority takes a hatchet to standing doctrine. That is a shame. As Professor Wechsler once said:

> The duty [of the courts] is not that of policing or advising legislatures or executives, nor even, as the uninstructed think, of standing as an ever-open forum for the ventilation of all grievances that draw upon the Constitution for support. It is the duty to decide the litigated case and to decide it in accordance with the law, with all that that implies *as to a rigorous insistence on the satisfaction of procedural and jurisdictional requirements.*

Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv. L. Rev. 1, 6 (1959) (emphasis added).

Traceability is one such neutral principle. A "plaintiff has standing only if" his injury is "fairly traceable *to the defendant's allegedly unlawful conduct.*" *California v. Texas*, 593 U.S. 659, 668–69 (2021) (emphasis added) (quotation omitted); *see also id.* at 671 (holding that a statute's "language," absent some specific official's enforcement of that statute, is irrelevant). Instead, the majority intones over and over that *S.B. 4* is causing harm to Las Americas. *See, e.g., ante*, at 14 ("The impact of S. B. 4 on Las Americas's delivery of services is direct."); *id.* at 19 ("[T]he State of Texas has enacted immigration laws that … perceptibly impair [Las Americas's] ability to

No. 24-50149

provide counseling and referral services. . . ."); *id.* at 20 ("The state laws at issue directly interfere with" Las Americas' legal and counseling services.). As if S.B. 4 is some anthropomorphized boogeyman, lurking around the Las Americas office complex and thwarting its counseling calls.[5] The only thing that matters, *contra* the majority's imagination, is *how Director Martin will enforce* S.B. 4—and it is undisputed that he will do literally nothing to enforce it against the plaintiffs. Director Martin will not lie to the plaintiffs, as Havens Realty did. He will not deport the plaintiffs, regulate the plaintiffs, investigate the plaintiffs, talk to the plaintiffs or otherwise even know the plaintiffs exist. When it comes to enforcement of S.B. 4, the plaintiffs are quite literally strangers to Director Martin.

This aspect of standing doctrine—that the plaintiff's injury must be traceable to the defendant's wrongful conduct—is not some procedural technicality. It is grounded in one of the most fundamental principles of federal courts: that courts "have no right to pronounce an abstract opinion upon the constitutionality of a . . . law." *Georgia v. Stanton*, 73 U.S. 50, 75 (1868). This principle goes back to *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), where Chief Justice Marshall recognized that the power of judicial review was a byproduct of the power to render a judgment in an individual case. *See* William Baude et al., Hart & Wechsler's The Federal Courts and the Federal System 92 (8th ed. 2025). So when the majority today asks how the law in the abstract might affect Las

---

[5] This is untenable for another reason. As much as the majority may protest that "S.B. 4 requires Las Americas" to divert its resources, *ante*, at 14; *see also, e.g., ibid.* (claiming that "Las Americas will have to divert its resources" and will "need to train staff members"); *id.* at 15 ("Las Americas avers that it must prioritize its numerous goals and services. . . ."), S.B. 4 requires Las Americas to do literally nothing. There are precisely zero provisions in S.B. 4 requiring Las Americas to counsel or provide legal services to immigrants. And there are precisely zero provisions in S.B. 4 that affect or direct or limit or change the ways anyone may choose to provide counseling or legal services.

No. 24-50149

Americas, rather than how some enforcement action might, one should see what is really going on. The majority has untethered the power of judicial review from the historical obligation "solely to decide on the rights of individuals." *Marbury*, 5 U.S. (1 Cranch) at 170. And it has asserted a freestanding power of judicial nullification, akin to the Council of Revision rejected at the Founding. *See* 1 The Founders' Constitution 322 (Philip B. Kurland & Ralph Lerner eds., 1987).

Even the majority seems to recognize this. Its opinion includes multiple pages explaining that Director Martin will *never* enforce S.B. 4 against Las Americas. *Compare ante*, at 20 (claiming that S.B. 4 "directly interfere[s] with" Las Americas's mission), *with id.* at 24–25 (explaining that S.B. 4 "regulate[s] immigrants" who "are 'third parties' or 'someone else' for the purposes of the standing analysis as explained in *Alliance for Hippocratic Medicine*"). But somehow the irony escapes the majority. Las Americas—as all now admit—is not *directly* affected by S.B. 4's enforcement.

As if all of that were not bad enough, the majority then purports to distinguish *Alliance for Hippocratic Medicine* on the grounds that the organization in that case was an issue-advocacy organization, whereas the organization in this one is a counseling organization.

But that has what to do with the price of tea in China? So too was it true that in *Alliance for Hippocratic Medicine*, the organization's name started with an "A," rather than an "L." But that is irrelevant. Our Constitution does not afford special solicitude in the standing analysis for organizations the majority likes, nor does it matter how the organization spells its name, nor does it matter if the organization advocates for issues, law, policy, or counseling. *See also All. for Hippocratic Med.*, 602 U.S. at 393–94 (explaining

No. 24-50149

that *all* "organizations must satisfy the usual standards" for Article III standing).

True, as the majority points out, *Alliance for Hippocratic Medicine* does contain the following sentence: "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* at 395. But read just one more sentence in *Alliance for Hippocratic Medicine*. That should make clear that the Supreme Court did not endorse the majority's counseling-organization-solicitude doctrine. Instead, the fact that HOME "operated a housing counseling service" was "critical[]" *only because* "Havens gave HOME's employees false information about apartment availability." *Ibid.* That meant Havens "directly affected and interfered with HOME's" housing counseling services by directly lying to the organization. *Ibid.* So the question here is not whether Las Americas engages in counseling services. The question is whether Director Martin's enforcement of S.B. 4 against third parties is tantamount to telling a lie to Las Americas and hence directly injuring the organization. The answer is a resounding "no."

*

One should not miss the consequence of today's decision. Today, the majority ensures that "all the organizations in America" can "challenge almost every [governmental] policy that they dislike." *Ibid.* All an organization must do is provide "counseling" services or "legal representation" concerning some subset of governmental polices. *Ante*, at 20. When any government entity changes its policy, the organization will spend money in response to the policy it dislikes. *Et voilà*: The organization has standing. Because organizations are to be treated no better than private individuals, every individual in America will equally be able to take advantage of the majority's theory. And every federal court will be transfigured into a

No. 24-50149

sovereign ruler "with revisory power over" all governmental entities. *Muskrat v. United States*, 219 U.S. 346, 361 (1911).

## III

Equally unavailing are the theories of standing El Paso County offers. On appeal, El Paso County argues it has standing because (A) S.B. 4's enforcement will "erode the public trust the County has worked to develop," Las Americas Br. at 19, and (B) the County will suffer increased costs resulting from an increase in the annual number of arrests, *id.* at 18–19.[6] I take each in turn.

---

[6] Below El Paso hinted at six other theories of standing, one of which I have already addressed, *see supra*, at 110 n.4. Perhaps recognizing the weakness of these theories, El Paso spares nary a word on them here. Regardless, each fails.

*First*, the County previously alleged it would "have to fund the legal defense of any County official sued . . . for implementing S.B. 4." ROA.808. And? Any local official—who the County would need to show would be sued for enforcing S.B. 4, and the County would be required to indemnify under S.B. 4—is not a defendant here. And this court could enjoin Freeman Martin and DPS a million times over, but that would not prevent a single local official from enforcing S.B. 4. So the County would still suffer the same injury from having to fund the legal defense of these county officials. Thus, there is no redressability. *See Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) ("[R]edressability requires that the court be able to afford relief *through the exercise of its* power, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment))).

*Second*, the County previously alleged it might lose tax revenues. The allegation is puzzling. El Paso has never even alleged that a single illegal immigrant pays even a single cent in taxes to the County. The County alleged only that its "immigrant community," which includes "individuals who have naturalized, individuals who hold permanent resident status," and "individuals with temporary status," pays about $590 million in taxes and that there are illegal immigrants among the "immigrant community." ROA.806. So El Paso does not explain how it would lose even one cent in tax revenues if unknown and unidentified immigrants at some time in the future enter Texas illegally, settle in El Paso County, and then have S.B. 4 enforced against them by Director Martin.

No. 24-50149

_____

Regardless, this theory of tax-collector standing fails. First, the County has alleged only a vague and generic loss in tax revenue, but it must offer "a direct injury in the form of a loss of specific tax revenues" to ground Article III standing. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (emphasis added). Second, the presence of more people paying taxes in El Paso County does not make the County more money. Counties are not for-profit enterprises. The taxes counties like El Paso collect just reimburse them for public expenditures. So any additional tax revenues El Paso might collect from illegal immigrants will just help the County cover the additional costs from having more people in the County. That is especially true when dealing with illegal immigrants, who undoubtedly pay minimal amounts in taxes despite sapping significant public resources. *See Texas v. United States*, 40 F.4th 205, 217 (5th Cir. 2022) (drawing a connection between "an increase in the number of aliens" and increased "education costs"); *see also* Jeffery C. Mays, *Mayor Adams Says Migrant Influx Will Cost New York City $12 Billion*, N.Y. Times (Aug. 9, 2023), https://perma.cc/369F-D83V.

*Third*, the County previously alleged that "S.B. 4 further requires law enforcement agents to collect certain biometric information," thereby costing (for unexplained reasons) "the County" (unspecified) quantities of money. ROA.808. But whatever injury might arise is not "traceable to the defendant's allegedly unlawful conduct." *California*, 593 U.S. at 669. El Paso does not argue that the defendant, DPS Director Freeman Martin, will enforce any biometric-data-collection provision against El Paso. Nor does El Paso argue that that provision is somehow unlawful. So whatever hypothetical unspecified costs El Paso might incur by having to collect data under this unchallenged provision of S.B. 4 are not fairly traceable to any "allegedly unlawful conduct" by the actual "defendant." *Ibid.* Thus, there is no standing.

*Fourth*, the County previously alleged that enforcement of S.B. 4 would "interfere with [the County's] organizational goals by forcing it to incarcerate individuals who are not a risk to public safety." *Texas*, 719 F. Supp. 3d at 653. No matter what the County meant by this utterly vague allegation, the theory fails. To the extent El Paso meant that it was upset that non-threatening individuals might be incarcerated, the theory fails because plaintiffs "may not establish standing simply based on" their "strong opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394. To the extent El Paso meant that it had some abstract interest in keeping non-threatening people out of its own jails and S.B. 4 would disturb that, *see* ROA.808 (noting that El Paso County hopes to "lead[] justice reform" by not "incarcerat[ing] persons that may not be a high risk to public safety"), the theory fails because plaintiffs "must show far more than simply a setback to [its] abstract social interests," *All. for Hippocratic Med.*, 602 U.S. at 394 (quotation omitted). To the extent El Paso meant that S.B. 4 would interfere with its own ability to prosecute individuals who threaten the public safety, the theory fails because it is obviously false. Nothing in S.B. 4 prohibits the County from also prosecuting and incarcerating such

No. 24-50149

A

The County's first theory is that S.B. 4's enforcement will "dilut[e] the trust the El Paso County community has in its local government." ROA.809; *see also* Las Americas Br. at 19.

This theory is so abstract that Jackson Pollock couldn't make sense of it. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). What could possibly be more abstract than the dilution of the trust a community has in its local government? How is that trust measured before and after S.B. 4's enactment? Is there a generally accepted method for measuring public trust?

---

people. And anyway, the relevant inquiry would be whether *Director Freeman Martin's allegedly unlawful enforcement of S.B. 4* would somehow get in the way of the County's prosecution of these individuals. *See California*, 593 U.S. at 668–69. But obviously Director Martin will do nothing to stop El Paso from prosecuting high-risk criminals. To the extent this theory has any legs, then, it is only insofar as El Paso alleges that DPS's enforcement of S.B. 4 will somehow drain the County's resources, which might in turn prevent it from prosecuting certain people because of resource constraints. But that theory of standing, focused on monetary costs to the County, I address below. *See infra*, Part III.B.

*Fifth* and finally, the County previously alleged that S.B. 4 would "require [it] to provide training to peace officers." ROA.808. Yet again, that misconceives the standing inquiry. The County must trace its injury "to the *defendant's allegedly unlawful conduct*." *California*, 593 U.S. at 669 (emphasis added). So it is of no moment that *S.B. 4* might require the County to train peace officers. Director Martin's enforcement of S.B. 4 against third-party aliens will obviously not force the *County* to train anyone. Nor, for that matter, has the County argued that even if Director Martin were somehow to enforce these training requirements, that that would be "unlawful." *Ibid.*

Regardless, does S.B. 4 even require such trainings? The record suggests if El Paso County decides to conduct any trainings, that will be its own voluntary choice. And if it does, Texas has made available appropriations to reimburse the County for just these sorts of expenses. *See infra*, at 123–24. Regardless, it is unclear why El Paso County would conduct any training exercises when Texas has affirmatively required DPS and other state officials to conduct such trainings. *See* Tex. Gov't Code § 411.02093; *see also* Tex. Occ. Code § 1701.359 (providing for additional help in "administering . . . the border operations training program" and offering incentives to officers for "successfully complet[ing] the program").

No. 24-50149

Why would citizens of El Paso County lose trust in local government because of State lawmakers' decisions in Austin? The questions go on and on, but the answers are altogether absent. So it should be unsurprising that El Paso has never even tried to "identif[y] a close historical or common-law analogue for th[is] asserted injury." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). To the contrary, it is simply abstraction stacked on abstraction.

Finally, El Paso's theory is limitless. It boils down to this: The political subdivision thinks it should be able to sue the State that created it because its local officials dislike S.B. 4. That, after all, is why El Paso's politicians think the state law will diminish public trust, while (say) Lubbock County's politicians might think the state law will improve it. Such standing-by-strong-feelings is antithetical to the principle that federal courts decide matters "of a Judiciary Nature." *See* 2 Records of the Federal Convention of 1787, at 430 (Max Farrand ed. 1966) (statement of James Madison).

B

Now turn to El Paso County's theory that it will lose money if S.B. 4 is enforced by Director Martin. *See California*, 593 U.S. at 668–69 ("A plaintiff has standing only if . . . [his] injury [is] fairly traceable to the defendant's allegedly unlawful conduct."). Of course, Director Martin will not enforce S.B. 4 against El Paso County. Director Martin will enforce S.B. 4 only against third-party aliens. And when a plaintiff complains about "the government's regulation (or lack of regulation) of someone else" standing is "substantially more difficult" to establish. *All. for Hippocratic Med.*, 602 U.S. at 382 (quotation omitted); *see also id.* at 382–83 (collecting cases).

El Paso County has failed to meet its burden to establish standing here. To the contrary, (1) all of El Paso County's theories depend on speculative assessments of the costs that might arise from additional arrests and

No. 24-50149

detentions if S.B. 4 were enforced by DPS.[7] Although this alone should be enough to dispose of El Paso's case, I (2) explain the deficiencies in each of El Paso County's cost theories.

1

El Paso asserts that if S.B. 4 is enforced, 8,000 new people will be arrested in the El Paso area and 8,000 people will therefore end up in the County's jails. These unsupported estimates do nothing to establish standing.

a

Start with perhaps the most damning fact for El Paso: Texas will extensively reimburse the County for any costs it might incur in S.B. 4's enforcement. Texas recently made available, for example, $1.5 *billion* to "provide grants to local governments and local law enforcement agencies to alleviate costs associated with an increased demand on local prosecutorial, judicial, and correctional resources." *See* Act of Dec. 18, 2023, 88th Leg., 4th C.S., ch. 1, § 1 (S.B. 3) (eff. Mar. 5, 2024). That money was made available because of the precise concerns El Paso raises here: that "municipal government[s] [might] incur increased costs while enforcing SB 4." *See* Uriel J. Garcia, *Texas Legislature Send $1.54 Billion Bill for Border Barriers to Gov. Abbott*, Tex. Tribune (Dec. 1, 2023), https://perma.cc/Y7ED-K4WA; *see also* Tex. Senate, *Senate Session (Part I)*, at 1:16–36 (Dec. 1, 2023), https://www.senate.texas.gov/videoplayer.php?vid=19231. And that is far from the only money that has been made available to local governments. *See id.* at 1:55–2:08. For his part, Governor Abbott has consistently

---

[7] A brief note on doctrinal categories. My discussion will invoke language common to both the imminence and traceability inquiries. That is because the two inquiries dovetail in this context. *See All. for Hippocratic Med.*, 602 U.S. at 385 n.2.

No. 24-50149

"encourage[d] local government to apply for these funds." Press Release, *Governor Abbott Announces Operation Lone Star Grant Program To Enhance Border Security Operations*, OFF. OF THE TEX. GOVERNOR (Sept. 20, 2021), https://perma.cc/EE9W-KZK5. So the idea that El Paso will lose one penny—*even if* its estimates are accurate—is speculative.

b

But putting reimbursement to one side, El Paso County's estimate of how many new people will end up detained in its facilities still does nothing to ground standing.

El Paso does not clearly allege—let alone establish—that 8,000 new people will be detained in county facilities. El Paso says only that if S.B. 4 is enforced, "there *may be* over 8,000 additional arrests . . . in the El Paso area." ROA.960 (emphasis added). That statement is absolutely true. There "may" be 8,000. Or 50,000. Or 5 million additional arrests. Or there "may" be zero additional arrests. Anything "may" happen. Such vague allegations cannot ground standing.

Anyway, the estimate is absurdly speculative. El Paso appears to base it on former DPS Director McCraw's testimony before the Texas Senate Committee on Border Security. On the County's telling, during a committee hearing, Director McCraw argued that enforcement of S.B. 4 would lead to an additional 75,000–80,000 arrests by DPS in Texas annually. From there, the County "estimate[d]" that 8,000 of those arrests would be in the El Paso area. ROA.960. But the County mischaracterizes Director McCraw's testimony. Director McCraw never said that the enforcement of S.B. 4 would lead to 75,000–80,000 arrests. He said only that it *might* lead to a "*maximum amount*" of 75,000–78,000 arrests throughout the State. *See* TEX. SENATE, *Senate Committee on Border Security*, at 49:25–50:25 (Oct. 10, 2023),

No. 24-50149

https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=18423 (emphasis added) ("McCraw Testimony").

Regardless, one cannot extrapolate from Director McCraw's testimony that there might be up to 78,000 arrests at the hands of DPS in *Texas* that 8,000 of those arrests will occur in *El Paso*. El Paso itself offers no reason to draw this inference. Instead, it relies on a declaration submitted by Melissa Michelle Carrillo, a county administrator who appears to have plucked the estimate out of thin air. *See* ROA.960.

In any event, the estimate rests on a misconception about enforcement of S.B. 4. The estimate assumes that *DPS* will broadly enforce S.B. 4 in El Paso. (Recall that *DPS* is the only defendant that El Paso County wants to enjoin from enforcing S.B. 4.) But at least to the extent no state facilities near El Paso County have been made available for detaining immigrants, there is no reason to think DPS will enforce S.B. 4 in the El Paso area.[8] *See* ROA.315 (Escalon Decl.) (explaining that DPS will "prioritize enforcement of SB 4 in counties that are close to facilities operated by TDCJ and the State"); *see also Ex parte Aparicio*, 707 S.W.3d 189, 200 n.44 (Tex. Crim. App. 2024) (explaining that "DPS has the discretion" in deciding whether or not "to arrest"). So even if DPS makes 78,000 arrests in Texas, it will not necessarily make many, or any, in El Paso.

Frankly, it should come as no surprise that *other* officials might instead bear the lion's share of enforcement responsibilities in the El Paso region. A host of other officials, both local and state, may enforce S.B. 4. For instance, the Texas Tactical Border Force, part of the Texas Military Department, was

---

[8] And to the extent state facilities near El Paso County, such as the Rogelio Sanchez State Jail, have been made available to DPS, the County runs into another problem: The State will house S.B. 4 detainees in those state facilities rather than the County's facilities. *See infra*, at 127.

commissioned just a few months before S.B. 4's passage to help with the enforcement of Texas law at the border. *See* Press Release, *Governor Abbott Deploys New Texas Tactical Border Force*, Off. of the Tex. Governor (May 8, 2023), https://perma.cc/T29G-27V4. And surprise, surprise. As it turns out, the first place Governor Abbott deployed multiple units of "hundreds of trained service members" of this new force was El Paso. *Ibid.* And that is not to mention the many local officials who will help enforce S.B. 4. Those officials will be trained to enforce S.B. 4 *by DPS itself. See* Tex. Gov't Code § 411.02093; *see also* Tex. Occ. Code § 1701.359 (providing for additional help in "administering . . . the border operations training program" and offering incentives to officers for "successfully complet[ing] the [training] program"). So *DPS* has little need to make arrests in El Paso.

That also creates a redressability problem for El Paso County. As the Supreme Court has explained, "[r]edressability requires that the court be able to afford relief *through the exercise of its* power, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment)); *see also Diamond Alt. Energy*, 2025 WL 1716141, at *11 ("Article III's redressability requirement serves to align injuries and remedies."). But does the exercise of our power—the issuance of injunctive relief barring Director Martin *and only Director Martin* from enforcing S.B. 4—do much of anything to redress El Paso's alleged injuries? Why should it? There are plenty of other law enforcement officials in and around El Paso County trained to enforce S.B. 4 who may well enforce it all the more vigorously in DPS's absence. The only reason those law enforcement officials would not do so is because of the supposedly "awe-inspiring . . .

No. 24-50149

opinion" this august court has released today. *Brackeen*, 599 U.S. at 294. But that does not satisfy redressability.

Regardless, to the extent DPS were to make some additional arrests in and around El Paso over and above the arrests other officials would make in DPS's absence, there is still little reason to think DPS will house the arrestees in El Paso County facilities. Although El Paso County assumes that 1 arrest = 1 migrant detained in El Paso facilities, it offers no explanation for that presumption. Yet again it relies on the bald assertions in the Carrillo declaration. But Carrillo's estimate is puzzling. As the district court itself acknowledged, "DPS expects to house and process noncitizens detained under SB 4 primarily in State-owned facilities." *Texas*, 719 F. Supp. 3d at 659 (quotation omitted); *see* ROA.315. And there is a state-owned facility near El Paso County that may well be made available to DPS: the Rogelio Sanchez State Jail. Moreover, the number of estimated arrests obviously "include[s]" some unspecified *quantum* of "family units." McCraw Testimony at 50:50–51:00. But such family units are handed over to the Federal Government as a matter of DPS policy. *Id.* at 22:34–23:01, 57:50–58:05, 58:48–58:54. And this is far from the only time that state officials will work with and hand over arrested aliens to federal officials.

Moreover, the connection between arrests and detention is tenuous at best. S.B. 4 is not a bill geared towards detention. Many aliens would *never* go to prison under S.B. 4. After all, an alien *charged* with a criminal offense under S.B. 4 may "agree[] to [an] order" requiring "the person to return to the foreign nation from which the person entered or attempted to enter." Tex. Code Crim. Proc. art. 5B.002(c). If we have learned anything from plea bargaining, many who are arrested will choose to avoid trial (and hence detention) if they can. *Cf. United States v. West*, 138 F.4th 357, 362 (5th Cir. 2025) (Oldham, J., dissenting from denial of rehearing en banc). Even if some refuse to do so and are ultimately convicted, the vast majority would be

No. 24-50149

convicted only of misdemeanors, *see* TEX. PENAL CODE §§ 51.02(b), 51.03(b), which are punishable by *either* a small fine or short period of confinement, *see id.* §§ 12.21, 12.22.[9] The main punishment those individuals would receive is the enforcement of a return order. *See* TEX. CODE CRIM. PROC. art. 5B.002(d). Since S.B. 4 focuses so little on imprisonment, there is no reason to think arrestees will be systematically thrown in prison.

El Paso County does not even seem to allege that S.B. 4's enforcement by DPS will force a single individual into El Paso facilities post-conviction. Instead, El Paso seems to rely on the fact that some modicum of detainees will be taken by DPS to El Paso County facilities for pre-trial detention. But again, the detainees seized by DPS will be largely housed in state facilities pre-trial. *See* ROA.315. And if any single individual detained by DPS were to be detained in one of the County's facilities, that individual may well be detained for under 24 hours. After all, "El Paso County jail has a 24-hour magistration system." ROA.958. So "within 24 hours of" when "a person is booked into the County Jail, they appear before a magistrate for an initial appearance and assessment of bond." *Ibid.* Presumably, those magistrates will allow many arrestees to be released on bond—especially given that most S.B. 4 offenses will be misdemeanors subject to minor penalties. And other arrestees will be released because the magistrate will determine probable cause did not support the arrest in the first place.

─────────────

[9] Even repeat violations of TEX. PENAL CODE § 51.02 are classified only as a "state jail felony," which merit 180 days to two years in prison. *Id.* § 12.35. And only a subset of those who violate § 51.03 are subject to a felony offense. If the offender "was removed subsequent to a conviction for the commission of a felony," then he commits a second-degree felony. *Id.* § 51.03(b)(2). If the offender (A) was previously removed after "a conviction for commission of two or more misdemeanors involving drugs" or "crimes against a person"; (B) was "excluded" because he is a terrorist; or (C)–(D) was previously removed under certain provisions of federal law, he commits a third-degree felony. *Id.* § 51.03(b)(1).

No. 24-50149

One last point. Assume every argument I have made so far is dead wrong. Still, why would El Paso County's jails be any fuller than they are today? If anything, S.B. 4 seems likely to free up space in El Paso's facilities. The purpose of S.B. 4 is "to *deter* illegal entry into the State." *See* McCraw Testimony at 4:09–11 (emphasis added). And the bill should succeed in reducing illegal immigration. *See* ROA.287 (explaining that, as of February 2024, Operation Lone Star had resulted in roughly 40,000 arrests but had deterred almost 100,000 illegal entries). As the former President explained, "it's highly unlikely that people" will cross illegally "knowing that they'll be . . . kicked out quickly." *Transcript of President Joseph Biden's State of the Union Address*, Associated Press (Mar. 8, 2024), https://perma.cc/7K36-355E. Thus, the Federal Government has predicted that if S.B. 4 were enforced, "migrants would instead seek to enter the United States through" other States. ROA.145. With less illegal immigration in Texas, the County should expect to see more room in its jails. The County itself seems to recognize that. It acknowledges that in recent years it has had an influx of individuals convicted of crimes such as "human trafficking." ROA.962. So lo and behold, the very crimes illegal immigration foments are the ones leading to crowding of El Paso County jails. *See supra*, at 101–02 (noting that human trafficking is one of the primary evils caused by the border crisis). So if anything, S.B. 4's enforcement should reduce the incidence of crimes such as human trafficking, thereby freeing up space in El Paso County jails.

2

Now to El Paso County's specific theories of costs. Those may be sorted into four buckets. Specifically, the County argues that (a) it will lose federal revenues; (b) it will have to build a new jail and hire more staff; (c) it will have to house more people in its county jails; and (d) it will face increased costs in operating its judicial and prosecutorial system. Of course, none will

No. 24-50149

be relevant if Texas reimburses the County for its expenses—something that is all the more likely given how small the County's expenses are likely to be. Moreover, each theory depends on the County's vague and speculative allegation about the number of arrests that will occur if DPS enforces S.B. 4. And all but the final bucket of costs also depend on the County's even more speculative claim about the number of detentions that will occur in El Paso's facilities. Those problems have already been detailed. Here, I focus only on the additional problems that beset the County's cost theories.

a

First, El Paso County theorizes that S.B. 4 would reduce the revenue it receives from the Federal Government. When the County houses a federal prisoner in one of its jails, the Federal Government pays the County. But because the County "estimates there may be over 8,000 additional arrests under S.B. 4 in the El Paso area," it asserts that its jails would have less space to house federal prisoners. ROA.960. And, so the logic goes, fewer federal prisoners means fewer federal dollars for the County.

Problems with this theory abound. The theory relies on the assumption that Director Martin's enforcement of S.B. 4 will so overwhelm El Paso County's jails that it will have to turn away federal prisoners. The County thinks this would happen because it believes that all, or most, of the aliens that it estimates will be arrested under S.B. 4 in El Paso would be housed in the County's jails. But that is utterly unfounded. *See supra*, Part III.B.1.

Still, El Paso's theory fails for an even simpler reason: Federal funds *merely reimburse* the County. Despite offering minimal explanation about how the federal funding scheme operates, the County's declarant gives the game away with one comment: The "amount that is billed to the federal government for detainees" is the "cost . . . for each inmate housed."

ROA.961. So adding a federal prisoner to or subtracting one from an El Paso jail does *absolutely nothing* to the County's pocketbook. El Paso does not "lose" a cent either way.

b

El Paso next surmises that it will suffer an economic injury because it may need to "hire more Detention Officers/Deputies" and because of the "[p]ossible need for a new jail to be built to house additional inmates if [its] current bed capacity is exhausted." ROA.960–61. Both theories fall flat.

For either theory to work, DPS's enforcement of S.B. 4 must balloon the County's jail population to the point of complete capacity. No evidence remotely supports that proposition, especially given that many migrants will serve minimal, if any, time in county jails. *See supra*, Part III.B.1. So even if a few aliens were sent to an El Paso jail, most of their stays would never overlap. Since El Paso's jails will be far from overrun, even if El Paso chose to hire new detention officers or construct a new prison, that would be an entirely voluntary choice traceable to its own misguided assumptions. *See Clapper*, 568 U.S. at 416–18.

But let's ignore these myriad problems and assume that El Paso's jails would swell to a point nearing capacity. If it ever were to reach this point, DPS officials would obviously not seek to house aliens in the County's jails. Rather, they would send aliens to facilities not overworked or overextended. DPS would thereby obviate any need to hire more prison guards or build a new facility. For El Paso's "overflow" theory to work, it must show that not only its facilities would be full—but that *all* facilities would be full. It does not even attempt to do that.

This is more than enough to sink these two "overflow" theories. Still, let me highlight three more problems. First, El Paso's theories must fail because the County does not share information that would be critical to

No. 24-50149

support its Rube Goldberg chain of inferences. For example, El Paso does not tell us how many inmates it currently houses. Nor does it tell us how many detention officers are on its staff. Second, El Paso intimates that it might need to hire more detention officers because of its preferred "target" detention officer to inmate ratio. ROA.961. I recognize that adequate staffing is important to maintaining prison safety and security. But if El Paso were to hire more detention officers to follow this seemingly self-set target ratio, that is the County's own voluntary choice. S.B. 4's enforcement cannot be blamed. Third and finally, if a new jail or more detention officers were needed, this would be traceable to enforcement of *all* the various criminal laws in Texas that necessitated imprisonment in El Paso's jails. S.B. 4 prisoners would likely make up only a fraction of the jail population. It would be odd, then, to trace a possible staff or building expansion to DPS's enforcement of S.B. 4.

c

Next, the County claims it will suffer economic harm because it costs money to house S.B. 4 detainees in County facilities. Specifically, the County "estimates" a cost of $105–112 per day per prisoner. ROA.961. "This cost includes operation, personnel and unfunded requirements for medical and mental health care required by the state." *Ibid.*

This theory fails. As noted above, it is unclear that S.B. 4's enforcement by DPS specifically will do anything to change the number of people detained in El Paso County's jails. *See supra*, Part III.B.1.

In addition, this per-prisoner cost estimate includes several costs that are not traceable to S.B. 4's enforcement. Operation costs and personnel costs are fixed costs. The County will pay to keep the lights on and to keep the facility staffed regardless of whether the prison will house additional inmates under S.B. 4.

No. 24-50149

Moreover, it is entirely speculative whether medical and mental health care costs are traceable to S.B. 4's enforcement by Director Martin. No one explains what "medical care" even includes, what the cost breakdown is for each aspect of that broad category, nor what percentage of the total cost-per-day estimate falls under the umbrella of "medical care." This is problematic. The bulk of the County's medical costs may just be paying the salaries of doctors and nurses. So even if an S.B. 4 inmate sees a doctor and thus uses "medical care," that does not mean that inmate increased the County's medical costs. The doctor is getting paid no matter what. And most S.B. 4 inmates will probably never receive medical care or attention of any kind because their jail stays will be exceedingly short. *See supra*, at 128.

d

Finally, El Paso claims that Director Martin's enforcement of S.B. 4 will cause an "increase in judicial costs." ROA.961. "*Depending* on the number of persons detained under enforcement of S.B. 4," El Paso's declarant claims, "several processes in the County's criminal justice system *may* be negatively impacted." ROA.958 (emphasis added). El Paso appears to make two separate claims about these possible negative impacts.

i

The first turns on hiring. El Paso's declarant states that "any *significant* increase to current caseload would require the County to devote more resources to hire more indigent defense lawyers, prosecutors, and CJC personnel." ROA.959 (emphasis added). This "would likely" occur because the declarant assumes that the County's courts will see "[a]n increase of 8,000 cases" under S.B. 4. ROA.959.

There is no evidence whatsoever of the requisite "significant" increase to the County courts' caseload necessary for the County to sustain

No. 24-50149

this injury. The County far too hastily infers that there will be 8,000 more cases in its courts because of the 8,000 arrests it guesses might occur in the area. But that estimate again runs into a host of problems. *See supra*, Part III.B.1. Moreover, the El Paso County courts only have criminal jurisdiction over misdemeanors. *See Estrada v. Texas*, 148 S.W.3d 506, 508 (Tex. App.—El Paso 2004) (citing, *inter alia*, Tex. Const. art. V, § 17; Tex. Gov't Code § 25.0732). But repeat offenses under Tex. Penal Code § 51.02 and certain offenses under § 51.03 are only subject to felony offenses. None of those arrested aliens will go before a county court. In addition, some number of charges will simply be dropped, as county prosecutors "bear discretion in deciding which cases to prosecute." *Ex parte Aparicio*, 707 S.W.3d at 199. And some number of arrestees will likely be turned over to federal officials before being processed in any state or local court. Regardless, many of the cases that are initiated in county courts will be short-lived, as many aliens will agree to the entry of a return order and will then depart from the country. So in sum, it is entirely speculative to suppose that El Paso's courts will have a "significant" increase in work.

El Paso also receives state money for prosecuting illegal aliens. The County admits that it receives millions of dollars in grant money to help operate its judicial system. ROA.958–59. But it fails to mention the grant money the State has made available for helping to secure the border—grant money that is explicitly made available to reimburse counties for "costs associated with an increased demand on local prosecutorial" and "judicial . . . resources," among other things. *Supra*, at 123.

Anyway, any decision to hire more defense lawyers, prosecutors, and court personnel is a voluntary choice. Nothing in S.B. 4 requires localities to increase staffing. And a core function of prosecutorial discretion is to choose not to pursue cases based on resource constraints. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985). As such, any hiring decisions would be traceable to El

No. 24-50149

Paso's own independent choices, not to Director Martin's enforcement of S.B. 4 against third-party aliens. *See Clapper*, 568 U.S. at 416–18.

ii

El Paso's second claim turns on the cost per case. Specifically, El Paso asserts that "an additional 8,000 prosecutions to the courts *could* cost approximately $5 million per year based on $700 per case." ROA.959 (emphasis added). There is no need to (again) explain why there will not be 8,000 prosecutions resulting from Director Martin's enforcement of S.B. 4, nor why, even if there were, the County very well might be reimbursed down to the last penny. Instead, I focus here only on the completely unfounded assumption that every single prosecution will cost the County $700.

The County provides no information concerning where it gets its $700 cost-per-case statistic. It never details what inputs are included and how much each input costs. That lack of explanation alone means that El Paso has not met its burden to establish an economic injury.

But even more importantly, many costs that El Paso claims to pay have nothing to do with S.B. 4's enforcement. For example, the County states that it funds judicial salaries. *See* ROA.958. But a salaried judge will not receive a dime for trying an extra case. The same is likely true for at least the overwhelming majority of its prosecutors, defense attorneys, and court staff. Or consider the County's claim that it "provides general funds to the Juvenile Probation Department." ROA.959. Once again, that alleged cost, which might well be part of that $700 figure, has nothing to do with S.B. 4's enforcement. Indeed, the evidence establishes that the State will likely not enforce S.B. 4 against minors. *See* ROA.315.

In any event, imagine the consequences of El Paso's theory. If a government entity suffers an economic injury any time a new law threatens to incidentally affect judicial resources, counties would suffer injury any time

135

No. 24-50149

a State passes any new law at all. And why stop at counties? States, too, would suffer economic injury any time Congress passes a new statute (at least outside the criminal realm). After all, state courts must apply federal law, *see Testa v. Katt*, 330 U.S. 386, 393 (1947), and there is a strong presumption that federal claims can be heard in state courts, *see Haywood v. Drown*, 556 U.S. 729, 735 (2009). So whenever the Federal Government passes nearly any new law, at least *some* state judicial resources will be affected—either because new additional federal suits are filed in state court or simply because it takes the state court more time to figure out the new contours of federal law. Such an absurdly unlimited theory of Article III injury has no basis in law or logic. *Cf. All. for Hippocratic Med.*, 602 U.S. at 391–92.

El Paso's judicial costs theory is also in tension with another principle of standing doctrine: Parties cannot rely on incidental litigation costs to establish standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107–08 (1998). If Article III does not allow a party's litigation costs to ground standing, it would be odd to allow a government's incidental litigation costs to ground standing.

\*

El Paso County throws a mind-numbing array of theories at the wall praying that one will stick. That poses a challenge in trying to analyze whether the County has standing. (Perhaps that explains why the majority ignores the issue and reaches to find *Havens* standing for Las Americas instead.) But upon inspection, the basis for El Paso's theories becomes clear: It is pure speculation. That is insufficient to establish standing, and it means

No. 24-50149

we have no jurisdiction over the plaintiffs' purely political dispute with a state law they do not like.[10]

## IV

Now I turn to whether the plaintiffs have a cause of action. Like the standing requirement, the cause-of-action requirement exists to "help[] courts stay in their lane." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 497 (5th Cir. 2020) (en banc) (Oldham, J., concurring). So the majority's disregard for the cause-of-action requirement evinces its disregard for the limits on its powers.

I begin by (A) explaining that plaintiffs lack a cause of action. Then, I (B) explain the cases the majority relies upon are not to the contrary. Finally, I (C) respond to the plaintiffs' lone counterargument.

## A

Even if the plaintiffs have standing, they still must establish that this court has equitable jurisdiction. *See* Samuel L. Bray & Paul B. Miller, *Getting Into Equity*, 97 Notre Dame L. Rev. 1763, 1764, 1772–73 (2022) (explaining that equity does not have "causes of action" but instead a "suitor in equity" must have "a grievance" sufficient to invoke "equitable jurisdiction" (quotation omitted)). The plaintiffs say they meet that

---

[10] Texas argues there is an additional jurisdictional problem. Adjudicating this dispute would require us to pass on a non-justiciable political question: whether Texas was invaded under the State War Clause. I agree with Texas that we cannot second-guess the Governor's declaration of an invasion. *See, e.g.*, *Moyer v. Peabody*, 212 U.S. 78, 83 (1909) (holding that a "Governor's declaration that a state of insurrection existed [was] conclusive of that fact"); *see also Sterling v. Constantin*, 287 U.S. 378, 399 (same). The implications of that declaration are not immediately obvious, however. In the interest of time, and given the exigencies posed by the State's upcoming trial, I must rest on the simple jurisdictional problem that plaintiffs have no standing. *See Acheson Hotels, LLC v. Laufer*, 601 U.S. 1, 4 (2023) (explaining that courts "can address jurisdictional issues in any order").

No. 24-50149

requirement because voluntarily diverting resources or spending a dollar allows them to invoke equitable jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908). That case stands for the principle that "federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

But the *Ex parte Young* doctrine has many important limits. Of particular relevance here, the doctrine is "without application" unless the plaintiff invoking the court's equitable jurisdiction alleges the invasion of "*a legal right*,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137 (1939) (emphasis added); *see also Stark v. Wickard*, 321 U.S. 288, 290 (1944) (explaining that to bring a suit for non-statutory injunctive relief,[11] plaintiffs must show "an interference with some legal right of theirs"); Caleb Nelson, *"Standing" and Remedial Rights in Administrative Law*, 105 Va. L. Rev. 703, 715–16 (2019) ("To qualify for relief under general principles of equity jurisprudence, the plaintiff normally needed to establish not only that the defendants were behaving unlawfully, but also that their behavior amounted to an invasion of recognized legal rights (or legally protected interests) that the law conferred upon the plaintiff in particular." (quotation and footnote omitted)). Put another way, there is a rough symmetry between the kind of injury that can support a prospective equitable action for non-statutory injunctive relief under *Ex parte Young* and the kind of injury that can support a retrospective legal action for damages. *See* Nelson, *supra*, at 715–16; *see also*

---

[11] When I use the term "non-statutory" in reference to injunctive relief, I mean injunctive relief issued not under any specific statute but under what the Supreme Court has deemed federal courts' more general "equitable authority . . . under the Judiciary Act of 1789." *Trump v. CASA, Inc.*, 606 U.S. ---, --- (2025), 2025 WL 1773631, at *5.

No. 24-50149

Comm. on Admin. Proc., Off. of the Att'y Gen., Final Report of the Attorney General's Committee on Administrative Procedure 81 (1941), https://perma.cc/7RYE-XDPB (explaining that "the private action for damages . . . and the equity injunction . . . rest[] on the same theory").

Consider, for example, *Tennessee Electric*. That case concerned the Tennessee Valley Authority, a federal agency created to generate and sell electric power from dams on the Tennessee River. 306 U.S. at 127. A group of utility providers sued the Authority and three of its officers because they thought the Federal Government had no constitutional authority to charter what amounted to a power company. *Id.* at 136. The providers did not have a statutory cause of action because the case arose before Congress enacted the Administrative Procedure Act ("APA") in 1946. So they filed a non-statutory bill in equity pursuant to "the doctrine that one threatened with direct and special injury by the act of an agent of the government . . . may challenge the validity of the statute in a suit against the agent." *Id.* at 137. That is, they sued under *Ex parte Young*. *See* 306 U.S. at 137–38 n.6 (citing *Ex parte Young*, 209 U.S. 123). The question presented was whether the providers could sue. No one disputed the providers alleged injury in fact; they certainly stood to lose money if the Authority was allowed to compete in the electricity business. *Id.* at 137. The providers argued this injury in fact alone gave them equitable standing to challenge the constitutionality of Congress's statutory grant of power to the Authority. *Id.* at 139. But the Court rejected that argument.

As the Court explained, persons aggrieved by unlawful agency action may sue to obtain a non-statutory injunction only if they allege the challenged action invades a right recognized by law—*i.e.*, a right "of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." *Id.* at 137. So the providers'

injury was not enough. They had no legally protected right to be free from competition, so they had no "right to sue" for non-statutory injunctive relief from the Authority's activities. *Id.* at 140.

The same rule controlled one year later in *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940). *Perkins* concerned the Public Contracts Act. The Act provided that the Federal Government would not buy goods from a company unless the company paid its employees a minimum wage determined by the Secretary of Labor. *Id.* at 116–17. The statute directed that the prevailing minimum wage was a function of the industry and the "locality" in which the relevant goods were produced or sold. *Ibid.* Some thought the word "locality" meant political subdivision. *Id.* at 119. But the Secretary reasoned that interpretation would "nullify the law" because if "locality" referred to town-sized units, then the law would merely require manufacturers to pay the "minimum wage prevailing in each plant." *Ibid.* So the Secretary determined that locality meant something like a region of the country. He accordingly divided the nationwide steel industry into six localities and assigned a prevailing minimum wage to each. *Ibid.*

A group of steel producers sued for non-statutory injunctive relief from the Secretary's implementation of the law. *See id.* at 120. They certainly alleged injury in fact. The Secretary's decision to lump producers from diverse States—*e.g.*, New York and West Virginia—together for purposes of calculating the prevailing minimum wage meant some producers had to raise their wages by more than 15 percent or forgo sales to the Federal Government altogether. *See id.* at 123–24.

But that did not matter: It was "by now clear," the Court proclaimed, "that neither damage nor loss of income in consequence of the action of Government, which is not an invasion of recognized legal rights, is in itself a source of legal rights in the absence of constitutional legislation recognizing

No. 24-50149

it as such." *Id.* at 125. In other words, lost income did not amount to violation of a legal right unless some source of law made it so. And the Court held it may grant non-statutory injunctive relief only to prevent a violation of a legal right. *See ibid.* ("[T]o have standing in court, [plaintiffs] must show an injury or threat to a particular right of their own."). Because the steel producers did not have a legally protected right to bid "for Government contracts free from any obligation to abide by the minimum wage determination," *id.* at 124, the Court dismissed their suit.

Thus, Supreme Court precedent makes clear a plaintiff cannot obtain non-statutory injunctive relief under *Ex parte Young* merely by asserting government action will cause him an Article III injury. He must also explain how, at a bare minimum, the law under which the government threatens to act violates his legally protected rights.[12]

The plaintiffs do no such thing. They allege only that Texas's enforcement of S.B. 4 will cost them money and affect their organizational missions. *See, e.g.*, Las Americas Br. at 14. But the plaintiffs do not have some statutory or constitutional right to pursue their organizational missions free from incidental burdens imposed by enforcement of the laws of the State of Texas against third parties. So even assuming the plaintiffs have suffered an

─────────────

[12] Importantly, the scope of federal courts' non-statutory equity powers is distinct from federal courts' power to grant relief under the APA. The APA cause of action authorizes courts to grant relief to any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under Supreme Court precedent, that provision authorizes courts to grant relief to a broader class of persons than would meet the "legal right" test articulated by the Court in *Tennessee Electric. See, e.g.*, *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986) (applying the "zone of interests" test). But here, Congress has not expanded the class of persons who may obtain equitable relief. So the "legal right" test still applies.

No. 24-50149

injury in fact, it is "*damnum absque injuria*, and will not support . . . a right to sue." *Tenn. Elec.*, 306 U.S. at 140 (italics added).

That makes sense. Consider what it would mean if the plaintiffs were right that they could get into equity merely by alleging indirect economic injuries. It would mean anyone could sue for pre-enforcement injunctive relief from "a state law so long as they could plausibly allege enforcement of the law against unidentified third parties would cost them a dollar." *United States v. Texas* ("*Texas 2024*"), 97 F.4th 268, 310–11 (5th Cir. 2024) (Oldham, J., dissenting). And universal injunctive relief would at least be on the table, because no lesser relief could actually remedy an indirect economic injury. *See* Las Americas Response to Rule 28(j) Letter at 2 (Apr. 19, 2024) ("Texas has never even tried to explain how something less than a statewide injunction would provide complete relief for the Las Americas plaintiffs— two organizations and a municipality harmed by the systemic application of S.B. 4."); *see also Trump v. CASA, Inc.*, 606 U.S. ---, --- (2025), 2025 WL 1773631, at *11–12 (explaining the "complete relief" principle). So the limit on *Ex parte Young* I have explained is yet another important limit that prevents plaintiffs from finding workarounds to the longstanding principle of equity—finally vindicated by the Supreme Court—that federal courts may not issue universal injunctions. *See CASA*, 2025 WL 1773631, at *8.[13]

---

[13] In *CASA*, the Supreme Court recognized two other critical limits applicable here.

First, the complete relief principle. Although the complete relief principle means a court *may* issue sweeping injunctive relief when necessary to give complete relief to a party, the court should more narrowly tailor its injunction when the plaintiff's injury is minimal and sweeping relief would impose a massive burden on the defendant. *See id.* at *15–17 (Thomas, J., concurring); *see also id.* at *12 (majority opinion). Here, the minor, incidental burdens on Las Americas hardly justify the district court's universal injunction.

Second, third-party standing. *See id.* at *4 n.2. Third-party standing imposes an important limit on plaintiffs who seek sweeping injunctive relief even though they "are not

No. 24-50149

Moreover, reading *Ex parte Young* as the majority does to permit any plaintiff with Article III standing to sue in equity would vest federal courts with equitable powers unknown at the Founding. That is a problem. Under *Grupo Mexicano de Desarrollo SA v. All. Bond Fund, Inc.*, 527 U.S. 308 (1999), courts may issue non-statutory injunctive relief only if that relief has "a founding-era antecedent." *CASA*, 2025 WL 1773631, at *8; *see also ibid.* (explaining that non-statutory injunctive relief is available only if it or "a sufficiently comparable predecessor was available from a court of equity at the time of our country's inception"); *supra*, at 138 n.11. *Ex parte Young* is no exception. *See CASA*, 2025 WL 1773631, at *8 n.9. But the majority's read of *Ex parte Young* takes that case far afield from what the Supreme Court has deemed its historical origins—namely, the "historical[]" power of "a court of equity" to "issue an antisuit injunction to prevent an officer from engaging in tortious conduct." *Ibid.* Because the anyone-with-standing-can-sue-under-*Ex-parte-Young* approach to equity "lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority." *Id.* at *8.

In sum, the plaintiffs' theory is deeply misguided. *Ex parte Young* permits federal courts to grant injunctive relief to protect plaintiffs' legal rights. It does not permit federal courts to "govern an entire State" merely

————————————————

directly subject to the challenged policy in the relevant respect and face, at most, collateral injuries." *See id.* at *18 (Alito, J., concurring). Third-party standing prevents the plaintiffs here from working around the limits on universal injunctions. There is no apparent "hindrance" to the third-party aliens' "ability to protect [their] own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004); *see also id.* at 131, 133 (holding there is no hindrance if the third party may vindicate his rights in state criminal proceedings). At most, an alien who remains outside the United States but has plans to enter illegally might have trouble challenging S.B. 4 in a pre-enforcement posture. But that is irrelevant because there is no "unqualified right to pre-enforcement review of constitutional claims in federal court." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). Moreover, the plaintiffs have no "close relationship" with hypothetical future clients or residents. *See Kowalski*, 543 U.S. at 131.

No. 24-50149

because one plaintiff with Article III standing asked. *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 926 (2024) (Gorsuch, J, concurring in the grant of a stay).

B

Neither case cited by the majority—*Truax v. Raich* and *Pierce v. Society of Sisters*—is to the contrary.

*Truax* dealt with an Arizona law that limited certain employers' ability to hire immigrant workers. *See* 239 U.S. at 35. Mike Raich, an Austrian native and Arizona resident, worked as a cook at William Truax's restaurant. *Id.* at 36. After the law was passed, and solely because of fear of prosecution under the law, Truax informed Raich that he would be fired. *Ibid.* Raich sued Truax, the Arizona Attorney General, and the local county attorney. *Ibid.* The Supreme Court held that Raich could sue in non-statutory equity. *Id.* at 38–39. In *Pierce*, Oregon passed a law requiring parents to send their children to public school. 268 U.S. at 530. Some corporations that owned and operated private schools sued. *Id.* at 531. Relying on *Truax*, the Court permitted the corporations to sue in equity. *See id.* at 535–36.

If anything, both cases confirm my analysis of *Ex parte Young*. In *Truax*, the Supreme Court said a federal court could enjoin enforcement of the Act because that was "essential to the safeguarding of rights of property." 239 U.S. at 38; *see also ibid.* (discussing *Lochner*-era conceptions of liberty and property such as the "right to earn a livelihood and to continue in employment unmolested by efforts to enforce void enactments"); *id.* at 41 (explaining that the legislation interfered with the "right" of "lawful inhabitants . . . to work for a living in the common occupations of the community," a right that was "of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure"). The Court offered another theory, too. It said an injunction was

proper because it would block the State from tortiously interfering with the plaintiff's employment contract. *See ibid.* (explaining that "the unjustified interference of third persons is actionable" even if "employment is at will"). But on either theory, the Supreme Court did only what *Tennessee Electric* later said courts could do: intervene to protect against the invasion of "a legal right,—one of property, one arising out of contract, [or] one protected against tortious invasion." 306 U.S. at 137.

So too in *Pierce*. The Court held the corporations could sue in equity only because they had "business and property for which they claim protection" that "were threatened with destruction." 268 U.S. at 573; *see also id.* at 536 (holding that the corporations could seek injunctive relief to protect "their business and property" from "arbitrary, unreasonable, and unlawful interference"). So *Pierce* is yet another example of the chancellor intervening only to protect against the invasion of "legal right[s]" such as rights "of property." *Tenn. Elec.*, 306 U.S. at 137.

Nor in any way did the Court embrace the proposition that random people could sue under *Ex parte Young* just because they might incidentally suffer some harm when the statute is enforced against absent third parties. As I explained above, barring an employer from hiring an employee for a job can be thought of as equivalent to barring the employee from holding that job. *See supra*, at 112. So the law in *Truax* was deemed "to operate directly" upon the immigrant-employee Raich just as much as the employer Truax. *Truax*, 239 U.S. at 38. And it was "idle to call the injury indirect or remote." *Id.* at 39. So too in *Pierce*. "[E]ven though" in one sense the "parents were the directly regulated parties," in another sense the state law "prohibit[ing] parents from sending their children to private schools" regulated the schools, too. *Diamond Alt. Energy*, 2025 WL 1716141, at *9 (discussing *Pierce*, 268 U.S. at 535–36). So neither case stands for the proposition that incidentally affected parties—like the plaintiffs here—may patrol the galaxy for any

No. 24-50149

unlawful behavior that might impose $1 of costs upon them thirty links down the causal chain.[14] Both cases reaffirm that plaintiffs may sue in non-statutory equity to protect against violation of *their own* legal rights.

## C

The plaintiffs lodge only one counterargument. They contend the requirement that an *Ex parte Young* plaintiff must assert a violation of some legally protected right is not "borne out in the cases." Oral Arg. at 55:09-11. This assertion is particularly confounding because the requirement is borne out in numerous cases, including *Tennessee Electric*, *Perkins*, and *Stark*. But the plaintiffs tell us that does not matter because they think other binding precedents hold that indirect economic injuries are cognizable in equity. For that proposition they cite two authorities: *Ex parte Young* itself and *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024). *See* Oral Arg. at 55:11-56:06. They misunderstand both.

Start with *Ex parte Young*. That case was an original habeas action in the Supreme Court. Andrew S. Oldham, Adam I. Steene, & John W. Tienken, *The* Ex parte Young *Cause of Action: A Riddle, Wrapped in a Mystery, Inside an Enigma*, 120 Nw. U. L. Rev. (forthcoming 2026) (manuscript at 1). It arose after Minnesota passed a railroad rate regulation law. *See id.* at 1–2. Railroad company shareholders filed a cluster of lawsuits against their corporations to forbid them from complying with the law. *Id.* at 2. The shareholders also sued Minnesota's Attorney General, Edward T. Young, to

---

[14] This interpretation accords with *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015). *Armstrong* suggested *Ex parte Young* might presumptively be available in a suit to enjoin "preempted" "state regulatory action" by "an individual" who "claims federal law immunizes *him* from state regulation." *Id.* at 326 (emphasis added) (citing *Ex parte Young*, 209 U.S. at 155–56). The court did not suggest that *unregulated* parties could sue because of incidental injuries suffered as a result of the State's allegedly preempted regulation of *someone else*.

No. 24-50149

stop him from enforcing the law. *Ibid.* The circuit court agreed with the shareholders, so it issued a preliminary injunction against Young. *Ibid.*; *see also Perkins v. N. Pac. Ry. Co.*, 155 F. 445 (C.C.D. Minn. 1907). The Attorney General disobeyed the injunction, and the circuit court held him in contempt. *Ex parte Young*, 209 U.S. at 133–34. Young then filed a habeas petition to challenge the contempt finding on the ground that the circuit court's injunction was invalid. *Id.* at 126–27, 134. The Supreme Court disagreed. As relevant here, the Court held the circuit court in *Perkins* did not exceed its equitable jurisdiction by granting injunctive relief to the shareholders. *See* Oldham et al., *supra*, at 3.

The plaintiffs apparently think that holding resolves this case. Best I can tell, they reason as follows: Minnesota's rate regulation law applied to railroads, not their shareholders. Since railroad shareholders were not directly regulated by Minnesota's law, the law caused them only indirect economic injuries. The Supreme Court affirmed the circuit court's injunction. That must mean the Supreme Court implicitly held a plaintiff may sue for non-statutory equitable relief from enforcement of a state law even if that enforcement will cause him only indirect economic injuries?

Respectfully, no. The railroad shareholders who sued in *Perkins* were directly injured by Minnesota's rate regulation law for the obvious reason that the corporations were injured, and *the shareholders own the corporations*. *See, e.g.*, *Perkins*, 155 F. at 448. In fact, it would be more accurate to say the railroad shareholders were asserting the corporations' rights, because their suit was a derivative one. *See* Oldham et al., *supra*, at 1–2. The shareholders were allowed to sue Young only because they made demands on each corporation's managers to do the same, and the managers refused. *Perkins*, 155 F. at 448. And the crux of the shareholders' suit was that Minnesota's rate regulation law violated the corporations' due process rights. *See id.* at 447, 456. So in essence, the shareholders in *Perkins* alleged injuries that arose

from a violation of the corporations' legal rights, which they were entitled to do by virtue of corporate ownership. That means they did not ask for injunctive relief to prevent mere indirect economic injuries but rather to prevent a certainly impending invasion of their own constitutional rights.

The plaintiffs' reliance on *Book People v. Wong* is even further afield. That case involved a Texas law called the READER Act. The READER Act proscribed "library-material vendors" from selling "library materials to a school district" unless the vendor has "issued appropriate ratings" for the materials. 91 F.4th at 325 (quotation omitted). Two booksellers who were directly regulated by the Act sued Texas officials under 42 U.S.C. § 1983 for violating their First Amendment rights. *See id.* at 328. So this case had *nothing* to do with *Ex parte Young*'s holding concerning non-statutory equitable jurisdiction.[15] And in any event, the booksellers did not base their claim for injunctive relief on indirect economic injuries. Rather, the booksellers alleged the READER Act violated their own constitutional rights. So it is difficult to understand how the plaintiffs could think that case supports their theory.

In sum, the plaintiffs cannot muster a single case to support their novel theory of non-statutory equity. Their alleged injury cannot even support Article III standing, let alone injunctive relief under *Ex parte Young*.

V

Next, preemption. In my opinion dissenting from the panel majority's decision to deny Texas's application for a stay, I explained at length why S.B. 4's arrest provisions are not preempted by federal immigration law. *See Texas 2024*, 97 F.4th at 315–29 (Oldham, J., dissenting). And I explained that because the district court's injunction prevents Texas from enforcing *any* of

---

[15] Perhaps the plaintiffs are confused because the opinion discussed *Ex parte Young*'s other holding concerning state sovereign immunity. *See id.* at 334–36.

No. 24-50149

S.B. 4's provisions—including the arrest provisions—the district court's injunction is overbroad. *See id.* at 329. Thus, even assuming any plaintiff raises a justiciable claim, the district court's injunction should be vacated. *See ibid.* I also explained why the return provisions are not preempted. *See id.* at 329–31. Here, I raise several additional points.

I (A) begin with a few preemption principles. We must presume there is no preemption. And coincidence with federal law makes preemption less likely. Then I (B) show why Texas's law is plainly not field preempted. Congress affirmatively invited the States to participate in the field of entry and removal of aliens, so it cannot be said that Congress ousted the States from this expansive field entirely. Finally, I (C) address conflict preemption. I show there is at least one constitutional application of S.B. 4's arrest and return provisions. That is enough to avoid facial preemption of S.B. 4.

A

I start with two general principles and their application in this case.

*First*, consider the "presumption against the pre-emption of state police power regulations." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 518 (1992). The central "teaching" of the Court's preemption jurisprudence forbids "seeking out conflicts between state and federal regulation where none *clearly* exists." *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990) (quotation omitted) (emphasis added). This is true in "all pre-emption cases," but this presumption has special force when a State is exercising its traditional police powers. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (plurality opinion). As the Court has articulated many times, "the historic police powers of the States are not superseded unless that was the *clear* and *manifest* purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012) (emphasis added) (quotation omitted). Nothing short "of an

No. 24-50149

unambiguous congressional mandate to that effect" will do. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146–47 (1963).

This makes sense because "the [S]tates are sovereign," *Parker v. Brown*, 317 U.S. 341, 351 (1943), and "preemption of state laws represents 'a serious intrusion into state sovereignty,'" *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019) (lead opinion of Gorsuch, J.) (quoting *Medtronic*, 518 U.S. at 488). That rationale applies no matter which category of preemption is at issue because implied field preemption and implied conflict preemption "are not rigidly distinct." *Id.* at 773 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, n.6 (2000)).

Restrictions on persons entering a State from a foreign country have historically been within the States' domain. *See, e.g.*, *Mayor of New York v. Miln*, 36 U.S. 102, 132–33 (1837) (explaining that state laws "prevent[ing the State] from being burdened by an influx of persons . . . from foreign countries" are "regulation[s], not of commerce, but police" that are "within the competency of the states"); Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1875)*, 93 COLUM. L. REV. 1833, 1846–59 (1993) (listing numerous examples of early state regulations of immigration, including "entry" and "removal" of immigrants); *Arizona*, 567 U.S. at 417–422 (Scalia, J., concurring in part and dissenting in part) (providing robust historical support); J.A.C. Grant, *The Scope and Nature of Concurrent Power*, 34 COLUM. L. REV. 995, 1002 (1934) (finding "conclusive proof" that the first "Congress did not consider its authority over naturalization to be exclusive"). As such, S.B. 4 is presumptively valid and is not "lightly" deemed preempted. *See Parker*, 317 U.S. at 351. Rather, the plaintiffs (and the majority) must point to clear evidence of real conflicts between state and federal law, and it cannot imagine or manufacture them.

No. 24-50149

*Second*, state laws that coincide with federal laws make preemption much less likely. Take *California v. Zook*, 336 U.S. 725 (1949), for example. In that case, California passed a statute that was "substantially the same" as a federal statute. *Id.* at 726–27. "Both . . . require[d] respondents to sell transportation only in carriers having permits from the I.C.C." *Id.* at 727. When California enforced its law against respondents, respondents claimed that California's law was preempted because "coincidence is as ineffective as opposition, and State laws aiding enforcement are invalid." *Id.* at 729 (quotation omitted).

The Court rejected that theory. As the Court put it, the "fact of identity does not mean the automatic invalidity of State measures." *Id.* at 730. In fact, applying that theory "in an area as imbued with the state's interest as is this one would lead" to an absurd conclusion: A host of state legislation—from "fraud" to ordinary criminal prosecutions—would be preempted. *Id.* at 732. All this "to satisfy a congressional purpose which would be only the product of this Court's imagination." *Id.* at 732–33. Identity was crucial to the Court's analysis: "The case would be different if there were conflict in the provisions of the federal and California statutes. But there is no conflict in terms, and no possibility of such conflict, for the state statute makes federal law its own." *Id.* at 735. And thus "the State may punish as it has in the present case for the safety and welfare of its inhabitants; the nation may punish for the safety and welfare of interstate commerce. There is no conflict." *Id.* at 738.

As our court recently explained, that makes sense of "preemption first principles." *Zyla Life Scis., LLC v. Wells Pharma of Hou., LLC*, 134 F.4th 326, 332 (5th Cir. 2025). Preemption is grounded in the Supremacy Clause. *See City of Philadelphia v. New Jersey*, 430 U.S. 141, 142 (1977) (per curiam). "But as the Supreme Court explained over a century ago, when state law mirrors federal law, it 'recognizes the supremacy of the national law' by

No. 24-50149

'conform[ing] to it." *Zyla*, 134 F.4th at 332 (quoting *Asbell v. Kansas*, 209 U.S. 251, 258 (1908)).

True, if "Congress intended to make its jurisdiction exclusive" and occupy the field, state legislation can be preempted by identical federal law. *Zook*, 336 U.S. at 731. But to latch onto coincidence as a factor counseling in favor of preemption of any kind "beg[s] the only controversial question." *Ibid.* And Congress itself rejected that approach to preemption 200 years ago. *See Zyla*, 134 F.4th at 332–34 (discussing *Houston v. Moore*, 18 U.S. (5 Wheat.) 1 (1820), and the congressional response to it).

Here, because S.B. 4's provisions mirror federal statutes and federal objectives, conflict preemption is impossible, and field preemption is no more likely. As the Supreme Court put it:

> The mere fact that state laws . . . overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption. From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today. . . . Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap, and there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap.

*Kansas v. Garcia*, 589 U.S. 191, 211–12 (2020); *see also* Richard H. Fallon et al., Hart & Weschler's Federal Courts and the Federal System 680 (7th ed. 2015) [hereinafter Hart & Wechsler (7th ed.)] ("Generally, federal law permits parallel or supplemental state law to co-exist."). And this straightforward application of basic preemption principles does not change merely because S.B. 4 touches on immigration. The States retain "some authority to act with respect to illegal aliens, at least where such action *mirrors* federal objectives and furthers

a legitimate state goal." *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (emphasis added).

## B

With those principles in mind, I turn to field preemption. Aside from the problems I noted previously, *see Texas 2024*, 97 F.4th at 317–24 (Oldham, J., dissenting), there is another significant problem with finding field preemption here: (1) Congress has affirmatively authorized States to participate in immigration enforcement. It should go without saying that Congress does not preempt the field by inviting States to play on it. In spite of this, (2) the majority throws caution to the wind and significantly extends *Arizona*. That is the opposite of how courts should approach field-preemption questions.

### 1

All preemption constitutes "a serious intrusion into state sovereignty." *Va. Uranium*, 587 U.S. at 773 (lead opinion of Gorsuch, J.). But field preemption works an even more remarkable encroachment on the States, for it excludes States from entire domains. That is true even when state laws are entirely consistent with federal law. *See Arizona*, 567 U.S. at 402. For that reason, field preemption "is not easily established." HART & WESCHLER (7th ed.), *supra*, at 679. Indeed, the Court has recently called it "rare." *Garcia*, 589 U.S. at 208. The majority ignores those cautions. It goes out of its way to find field preemption here, despite having to extend all existing precedent to do so.

It makes no sense to say the States are preempted from the field when numerous federal statutes throughout the United States Code establish that Congress affirmatively welcomes state enforcement of and participation in regulating the entry and removal of unlawful aliens. Just consider a small sampling.

No. 24-50149

"State and local law enforcement officials are authorized to arrest and detain an individual who" is "an alien illegally present in the United States," and has been convicted of a felony and previously deported or left the country, if federal officials confirm the alien's status. 8 U.S.C. § 1252c(a). True, the time of detention is limited to the "period of time as may be required for [INS] to take the individual into Federal custody for purposes of deporting or removing the alien." *Ibid.* But that does not change the fact that Congress allowed States to arrest and detain unlawful aliens.

The "Attorney General may enter into a written agreement with a State" and thereby permit certain State officials "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." *Id.* § 1357(g)(1). Moreover, no agreement is required for States to "communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States," or for States "otherwise to cooperate" in the "identification, apprehension, detention, or removal of aliens not lawfully present in the United States." *Id.* § 1357(g)(10). Once again, as far as Congress is concerned, state officials can enforce immigration laws touching on entry and removal, including apprehension and detention of unlawful aliens.

The list continues. Congress gave "all" officers responsible for "enforc[ing] criminal laws"—including state officers—the authority to arrest persons for bringing in and harboring certain aliens. *Id.* § 1324(c). Congress required federal officials to "assist State and local law enforcement officials in working with Federal law enforcement to obtain continued presence for victims of a severe form of trafficking in cases investigated or prosecuted at the State or local level." 22 U.S.C. § 7105(c)(3)(C). Congress required federal "officers in charge of the various immigrant stations" to "admit" state officials to "preserve the peace and make arrests" for state

No. 24-50149

crimes. 8 U.S.C. § 1358. Congress made it a crime for aliens to "flee[]" state officials near border checkpoints in excess of the speed limit. 18 U.S.C. § 758. Congress gave the Attorney General the power to "authorize any State or local law enforcement officer . . . to perform or exercise any of the powers, privileges, or duties" of a federal immigration officer, if the Attorney General finds that an "influx of aliens" requires an urgent response. 8 U.S.C. § 1103(a)(10). And finally, States have the power to arrest and prosecute persons for trafficking or trafficking related offenses. *See id.* § 1101(a)(15)(T)(i)(III)(aa), (a)(15)(U)(i)(III).

These statutes welcome States to play a role in various matters touching on the entry and removal of aliens. That is critical. These statutes—not the last Administration's non-enforcement priorities—are what determine whether S.B. 4 is preempted. Why? Because "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Garcia*, 589 U.S. at 212 (quoting U.S. Const. art. VI, cl. 2); *see also* 3 Joseph Story, Commentaries on the Constitution of the United States § 1831 (1833) ("[T]he supremacy of the laws is attached to those only, which are made in pursuance of the constitution. . . ."); *Va. Uranium*, 587 U.S. at 776–78 (lead opinion of Gorsuch, J.). Here, numerous statutory provisions invite States to the field of entry and removal of aliens—the previous Administration's priorities to the contrary notwithstanding.[16]

---

[16] Regardless, to the extent presidential enforcement priorities are informative, they would counsel *against* preemption here. The current Administration has quite literally invited States to the field of entry and removal. Shortly after his inauguration, President Trump issued an executive order that directed federal officials to begin "[c]ooperating fully with State and local law enforcement officials in enacting Federal-State partnerships to enforce Federal immigration priorities." Securing Our Borders, 90 Fed. Reg. at 8467. That

No. 24-50149

True, none of these laws affirmatively "authorize" S.B. 4. *Ante*, at 70–71. This case would be easy if they did. But it has never been true that a state statute is preempted unless it is affirmatively authorized by Congress. In fact, the law is precisely the opposite: We presume that each sovereign is allowed to enact its own laws, unless and until Congress says otherwise. And that presumption is not overcome here. These statutes help establish that S.B. 4 does not undermine federal law by treading upon exclusively federal territory. Congress repeatedly invited the States to enter.

No field that the Court has deemed preempted, moreover, has included analogous congressional authorizations. For example, several aspects of grain warehousing are field preempted. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 235–36 (1947). The field of "regulation of aircraft noise" is preempted. *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973). The "wholesal[ing] of natural gas in interstate commerce" is field preempted. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (quotation omitted). The field of "nuclear safety" is preempted. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 211–12 (1983) (explaining that "the federal government maintains complete control of the safety and 'nuclear' aspects of energy generation," while "the states exercise their traditional authority

---

same day, the President issued another executive order, which authorized "State and local law enforcement officials . . . to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States." Protecting the American People Against Invasion, Exec. Order No. 14159, 90 Fed. Reg. 8443, 8445 (Jan. 20, 2025). In response, Governor Abbott issued several executive orders directing Texas officials to assist in securing the border. *See* Tex. Gov. Exec. Order No. GA-50, 50 Tex. Reg. 807 (2025); Tex. Gov. Exec. Order No. GA-51, 50 Tex. Reg. 807 (2025); Tex. Gov. Exec Order No. GA-52, 50 Tex. Reg. 808 (2025); Tex. Gov. Exec. Order No. GA-53, 50 Tex. Reg. 809 (2025); Tex. Gov. Exec. Order No. GA-54, 50 Tex. Reg. 810 (2025).

No. 24-50149

over" economic matters). The "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of tanker vessels" is field preempted. *United States v. Locke*, 529 U.S. 89, 111 (2000) (quotation omitted). And the regulation of the "equipment of locomotives" is field preempted. *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 636 (2012) (quotation omitted). But Congress did not affirmatively invite state regulation in *any* of those fields like it did in the INA. That is presumably one reason why the Supreme Court has held that one and only one field of immigration is preempted—alien registration. *Hines v. Davidowitz*, 312 U.S. 52, 70–74 (1941); *Arizona*, 567 U.S. at 401.

2

What does the majority opinion have to say about all this? Unfortunately, a lot. But many pages of legal errors do not sum to a valid argument.

The majority concedes that *Arizona* was limited to alien registration and that S.B. 4 says nothing about registration. But the majority is so confident in its analysis that it plows ahead anyway, concluding that the entire field of "entry into and removal from the United States" is preempted. *Ante*, at 53–54. In doing so, it breaks new ground, extending *Arizona* far beyond what the Supreme Court has ever before held.

This extension of precedent is deeply problematic for many reasons. Begin with a repeated instruction from the Supreme Court: Courts must "narrowly" define the relevant field. Hᴀʀᴛ & Wᴇꜱᴄʜʟᴇʀ (7th ed.), *supra*, at 679. But the majority's defined field sweeps in a swath of state laws that touch on entry and removal, including traditional offenses such as criminal trespass. What's more, the majority's reasoning is suspect. The majority largely relies on broad statements about Congress's and the Executive's power over immigration. Of course, Congress and the President have

No. 24-50149

substantial power over immigration. And of course, immigration has numerous important foreign policy implications. But the majority's reasoning proves too much. There is no field preemption of all of immigration law. If there were, *Arizona* and *Hines* would have been far easier. Moreover, *Arizona* itself found that part of the State's law was *not* preempted. *See* 567 U.S. at 415. That apparently does not matter to the majority, which finds field preemption anyway. And the majority's underruling of Supreme Court precedent does not stop there: It also red-flags *Kansas v. Garcia*, 589 U.S. 191, *DeCanas v. Bica*, 424 U.S. 351 (1976), and *Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011).

\*

The majority runs roughshod over the presumption against preemption and its attendant federalism concerns, which are especially weighty in the field preemption context. It ignores numerous statutes that invite States to the field of entry and removal of aliens. And it goes far beyond *Arizona*'s holding. Its decision cannot be squared with the INA, *Arizona*, or basic field preemption principles.

## C

Neither does S.B. 4 impliedly conflict with federal purposes, objectives, or statutes. *See Texas 2024*, 97 F.4th at 324–31 (Oldham, J., dissenting). I (1) provide a word about the proper standards of analysis. I then (2) explain that S.B. 4's arrest provisions are entirely consistent with the purposes and objectives of the INA. Next, I (3) explain that it is not at all clear how S.B. 4 will be enforced. That makes it impossible to say S.B. 4's return provisions will, in its future enforcement, trip upon one of Congress's purposes or objectives. Finally, I (4) address the majority's main response.

No. 24-50149

1

A state law is preempted if it creates an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (quotation omitted). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* at 565 (quotation omitted). The inquiry, however, "must be grounded in the text and structure of the statute at issue." *Garcia*, 589 U.S. at 208 (quotation omitted). And it is worth emphasizing again that preemption comes *only* from *statutes*—not from Executive enforcement priorities, important though they are. *See id.* at 212 (citing U.S. Const. art. VI, cl. 2). The question here is thus whether S.B. 4 interferes with purposes that Congress expressed in the text of the INA.

Still, the plaintiffs brought a facial challenge, and that choice "comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Because facial challenges create serious practical and legal problems, they are "disfavored," *id.* at 744, and "hard to win," *id.* at 723; *see also id.* at 749–66 (Thomas, J., concurring in the judgment) (arguing that facial challenges are inconsistent with Article III and "create practical problems"). So finding some "hypothetical scenarios where [S.B. 4] might" conflict with federal law is not enough to preempt S.B. 4 in its entirety. *United States v. Rahimi*, 602 U.S. 680, 701 (2024). The reverse is true. As the Court instructed just this last Term, in all cases outside the First Amendment, courts must apply *United States v. Salerno*, 481 U.S. 739 (1987). *See Moody*, 603 U.S. at 723. Even in cases involving no constitutional claims at all, courts may need to apply the *Salerno* test. *See Bondi v. VanDerStok*, 145 S. Ct. 857, 892 (2025) (Alito, J., dissenting); *id.* at 866 n.2 (majority opinion). And under *Salerno* "the challenger must establish that *no set of circumstances exists* under which the [law] would be valid." 481 U.S. at 745 (emphasis added). In other words, if

No. 24-50149

there is even *one* hypothetical constitutional application of a law, a facial challenge fails.

This is as true in the preemption context as elsewhere. Our court has held that *Salerno* applies in the context of preemption challenges. *See Zyla*, 134 F.4th at 331 n.2. Consider also *California Coastal Commission v. Granite Rock Co.*, 480 U.S. 572 (1987). There, a mining company challenged a California permit requirement on the ground that the requirement was preempted by federal law. In rejecting that argument, the Court explained that "[t]o defeat Granite Rock's facial challenge, [California] needed merely to identify a possible set of permit conditions not in conflict with federal law." *Id.* at 593; *see also Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (applying the *Salerno* standard in a preemption case).

The majority suggests *Salerno*'s "no-set-of-circumstances" standard does not apply to facial preemption challenges because the Supreme Court did not apply *Salerno* when it analyzed § 6 of S.B. 1070 in *Arizona*. *See ante*, at 47 & n.234. But the *Arizona* Court did not decline to apply *Salerno* because it failed to cite *Salerno*; it simply assumed *Salerno* was satisfied. Did *Arizona* overrule *Lujan* because it failed to cite it or even conduct a standing inquiry? Obviously not.

The majority's suggestion is mistaken for three additional reasons. First, to hold that *Arizona sub silentio* overruled *Granite Rock* and *Anderson* merely by declining to apply *Salerno* would be to ignore the Supreme Court's constant reminder that it does not overrule "earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). Second, the Supreme Court has consistently commanded that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its

No. 24-50149

own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). Third, the Supreme Court held just this last Term that *every* non-First Amendment facial challenge is governed by *Salerno*. *See Moody*, 603 U.S. at 723. So despite the majority's protestations, *Salerno* governs.

Eventually, the majority begrudgingly accepts that. But its preemption analysis does not even attempt to grapple with hypothetical applications of S.B. 4 that are constitutional. Instead, it applies the inverse-*Salerno* doctrine: It looks for one possible unconstitutional application here, and another there, and then concludes that S.B. 4 is facially preempted. *See, e.g., ante*, at 78–79 (finding a "significant[] conflict" because there are some illegal aliens that the Federal Government would hypothetically remove to a country other than Mexico); *id.* at 79 (arguing that a "conflict is imminent," *i.e.*, there is a *possible* conflict, when federal and state remedies are not identical); *id.* at 86 (finding a conflict because allowing state officials to arrest illegal aliens "might" allow those officials "to harass aliens"). But when federal and state statutes "brush up against each other," our "task is to seek harmony, not to manufacture conflict." *Rahimi*, 602 U.S. at 701 (quotation omitted).

2

What was Congress's purpose in enacting the INA? As relevant here, Congress intended to prohibit aliens from entering the country through a place other than a port of entry. *See* 8 U.S.C. § 1325(a). It also intended to prohibit entry or re-entry into the country by an alien that had already "been denied admission, excluded, deported, or removed or ha[d] departed the United States while an order of exclusion, deportation, or removal [was] outstanding." *Id.* § 1326(a). And it intended to make such aliens removable unless they have a federally protected immigration status. *See, e.g., id.*

No. 24-50149

§§ 1227, 1229a, 1158. In short, the purpose of the INA is to prohibit illegal immigration.[17]

S.B. 4 shares that exact same purpose. And it does so by expressly tethering itself to federal law.

The purpose of the INA is *not* to allow some unspecified amount of illegal immigration. There is no golden mean of illegal immigration as far as the laws of the United States are concerned. *Cf.* ARISTOTLE, NICOMACHEAN ETHICS bk. II (Lesley Brown ed., David Ross trans., Oxford World's Classics 2009) (c. 350 B.C.). *All* of it is, well, illegal. That a particular president might tolerate illegal immigration is of no moment because Congress's purpose—which is all that matters—was to prohibit it.

Consider this example. The current Administration has sought Texas's help in remedying the problem of illegal immigration. So imagine Texas, in response, uses S.B. 4 and other state resources to identify convicted criminals who have re-entered the country illegally, who are subject to final orders of removal, and who can be removed to Mexico without risk of persecution. And imagine that Texas obtains confirmation and approval from federal officials that Texas can arrest and detain a group of such aliens. Can Texas arrest them? Surely the answer to that question is "yes." But what would be the difference between this hypothetical and one set during the previous Administration? There is only one: the position of the Executive

---

[17] Of course, there are higher-order purposes for wanting to cut off illegal immigration. *See, e.g.*, *INS v. Errico*, 385 U.S. 214, 220 (1966) (noting that Congress intended to restrict immigration via the INA to keep "harmful aliens out of the country"); *INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 194 (1991) ("We have often recognized that a primary purpose in restricting immigration is to preserve jobs for American workers." (quotation omitted)).

No. 24-50149

Branch. And that does not carry preemptive power—only statutes do. *See Garcia*, 589 U.S. 211–12.

The majority claims that various other provisions, such as §§ 1252c, 1103(a)(10), 1357(g), and 1324(c), conflict with S.B. 4. But the exact same illustration applies here, too. It might be true that the Biden Administration generally opposed States' efforts to fight the immigration crisis. But the Trump Administration not only permits, but wants, States to help arrest and detain illegal immigrants. It would be absurd for preemption to turn on the position of the Executive Branch when it changes with elections. And indeed, it does not. *See Garcia*, 589 U.S. 211–12. The question is whether S.B. 4 is an obstacle—in every possible hypothetical application—to Congress's purposes as expressed in the text of federal statutes. It is not. This simple illustration reveals the majority's failure to take seriously the test set forth in *Salerno*. The majority does not grapple with the fact that there is at least one application of S.B. 4's arrest provisions that is not in conflict with congressional purposes.

In response, the majority attempts to argue that S.B. 4's arrest and return provisions are preempted in every possible application because the INA has given the Executive Branch exclusive enforcement authority. *See ante*, at 80. That fails, too. As all agree, there is no express provision granting such exclusive authority to the Executive Branch. (This is implied obstacles and purposes preemption we are dealing with, after all.) And it is not enough that the INA grants extensive enforcement discretion to the Executive Branch. As our court recently held, "many federal statutes grant the Executive Branch extensive enforcement discretion," but "those statutes do not preclude parallel . . . state regulation of the same conduct." *Zyla*, 134 F.4th at 338. And the Supreme Court has itself recently held that distinct state regulation is not preempted by federal immigration law. *See Garcia*, 589

No. 24-50149

U.S. at 198, 212. "If that does not conflict with federal enforcement prerogatives, neither does parallel state regulation." *Zyla*, 134 F.4th at 338.

Finally, think about the upshot of the majority's analysis. The upshot is that *federal law allows* Director Martin to "arrest tens of thousands of aliens that are in Texas illegally." *Ante*, at 80. If federal law allows such arrests, how in the world could arresting aliens in Texas illegally under S.B. 4 somehow conflict with federal purposes? At a bare minimum, such arrests are wholly consistent with federal law, as the majority concedes.

3

In *Texas 2024*, I explained the district court erred by facially enjoining S.B. 4's return provisions before Texas ever enforced those provisions against anyone. That is because there is considerable uncertainty about how those "provisions would operate in practice." 97 F.4th at 330 (Oldham, J., dissenting). It makes little sense to facially enjoin enforcement of a law in the face of such uncertainty because the burden is on the *challenger* to prove that there is not even *one* constitutional application of the law. *Salerno*, 481 U.S. at 745 ("[T]he challenger must establish that no set of circumstances exists under which the [law] would be valid.").

The panel majority nonetheless refused to stay the district court's universal, facial, preliminary, pre-enforcement injunction. It did so in large part because it concluded that in enforcing S.B. 4, Texas might remove an alien "before federal proceedings that would permit her to remain in the United States lawfully have been initiated or concluded." *Texas 2024*, 97 F.4th at 280.

At oral argument, Texas told us the majority's concerns were unfounded. It explained that S.B. 4 does not permit Texas officials to seek removal of *anyone* from the United States. *See* Oral Arg. at 10:13–15:16; *id.* at 10:46–48 ("Texas does not deport anybody."). Instead, the Attorney

No. 24-50149

General expects that Texas officials will enforce the return provisions by taking an alien who violates S.B. 4's entry provisions to a lawful port of entry so that the Federal Government can process the alien and decide what to do pending the alien's removal proceedings. *See id.* at 10:47–51 ("Texas takes [the alien] to the port of entry, and the United States then decides what to do.").

Thus, according to the Texas Attorney General, enforcement of S.B. 4 will work like this: If Texas discovers that an alien crossed the border somewhere other than a lawful port of entry, Texas will prosecute that alien. Tex. Pen. Code § 51.02(a). If the alien consents to return to the nation from which he entered the United States, the judge may dismiss the charge and enter a return order. Tex. Code Crim. Proc. art. 5B.002(a)–(c). Texas will execute the return order by taking the alien to a lawful port of entry and turning him over to the Federal Government. If the charge is not dismissed, the alien may be convicted, sentenced, and ordered returned to the nation from which he entered the United States. Tex. Pen. Code § 51.02(b); *see also supra*, at 127–28 & n.9 (explaining the varying punishments for certain kinds of offenses). After the alien serves his term of incarceration, Texas will execute the return order by taking the alien to a lawful port of entry and turning him over to the Federal Government. That is it.

It is hard to see how the return provisions could be preempted if they are enforced as Texas's Attorney General understands them. It is one thing to argue Congress enacted a removal system so comprehensive that Texas would interfere by unilaterally removing an alien to a foreign country. It is quite another to argue Texas could interfere with Congress's purposes by turning an alien over to the Federal Government so it can place the alien in the very system Congress devised. It is impossible to say the latter application

No. 24-50149

of S.B. 4 conflicts with federal law, and that dooms plaintiffs' facial challenges.

The plaintiffs seemed to concede that Texas's enforcement of the return provisions would not conflict with federal law if DPS officers enforce them in the manner Texas described at oral argument. But the plaintiffs nonetheless defended the district court's decision to facially enjoin enforcement of the return provisions, mostly because the plaintiffs disagree with the Attorney General's reading of state law. *See* Oral Arg. at 26:31–27:55. The majority today does the same. At bottom, then, the majority's holding rests on this: It does not believe the Attorney General's representations about how the State will enforce its law. But it has long "been the settled practice of the Court, in contexts no less significant, fully to accept representations such as these as parameters for decision." *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974). And at bare minimum, the Attorney General's representations underscore the considerable uncertainty concerning how S.B. 4 will be enforced. You might think that would counsel in favor of letting the law go into effect and seeing if the State honors federal law. Instead, the majority presumes that the Attorney General is lying. And it chooses to enjoin first and ask questions never.

Even assuming the plaintiffs are right, that argument still would not justify the district court's facial pre-enforcement injunction. That is because federal courts cannot enjoin laws; they can enjoin only "defendants from taking specified unlawful actions." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021). So what matters is how Texas plans to enforce the return provisions, because all the district court had power to do was to enjoin Texas officers from taking enforcement action that conflicts with federal law. Put differently, it is of no concern to the federal courts that the return provisions may authorize some unconstitutional action that no Texas official intends to take. Without unconstitutional *action*, there is simply nothing to enjoin.

No. 24-50149

To make things more concrete, consider the following hypothetical: A State enacts a statute that makes it unlawful to dump toxic chemicals into public waters. Section $X$ of the statute further provides that when the statute is violated, the district attorney "shall" seek, and state courts "shall" order, statutory penalties of $1,000,000. The statute also contains a severability clause that instructs the district attorney and the courts to give effect to every conceivable constitutional application of the statute. A prospective defendant (call him James) sues a state environmental enforcement officer in federal court for pre-enforcement relief from § $X$ of the statute. James alleges that he intends to dump toxic chemicals into public waters, that the district attorney has demonstrated an intent to enforce the statute against him, and that a fine of $1,000,000 would be excessive under the Eighth Amendment. The district attorney concedes that a $1,000,000 fine would violate the Eighth Amendment, so he tells the court that if James violates the statute, he will seek only a $100 fine. To make the hypo as illustrative as possible, James concedes the Eighth Amendment allows $100 fines.

Could the federal court issue a facial, pre-enforcement injunction against § $X$'s $1,000,000 fine provision? I do not see how. As I have explained, the court could not enjoin the statute itself. And the district attorney represented that all he will do to enforce the statute against James is seek a $100 fine. That fine does not violate the Eighth Amendment, so the district attorney would not violate the Constitution by seeking it. The court could not enjoin the district attorney from seeking a $100 fine because federal courts obviously have no authority to enjoin lawful conduct. Nor should federal courts enjoin enforcement actions that the defendant has disclaimed. *See Murthy*, 603 U.S. at 70 (holding a plaintiff had no standing to demand an injunction where the Government stopped censoring and disclaimed any intention to do so again); *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (explaining plaintiffs must allege a "credible threat of

No. 24-50149

prosecution" to lodge a pre-enforcement challenge). But even assuming a federal court could enjoin the district attorney from taking an action he disclaimed an intent to take, the injunction would have to be narrowly tailored to prevent a constitutional violation. That means it would have to specify, with particularity, the size of the fine the Eighth Amendment permitted the district attorney to seek. If the court issued a broader injunction, it would enjoin lawful action—something it may not do.

James might argue that the officer's representations do not matter because § *X* uses mandatory language—the district attorney "shall" seek, and state courts "shall" order, statutory penalties of $1,000,000. James might therefore contend that the district attorney cannot seek lesser, Eighth Amendment–compliant penalties. And if § *X requires* the district attorney to seek a $1,000,000 fine, the court's injunction need not be so precise.

But in the law–enforcement context, "shall" does not always mean "shall"; some enforcement discretion is generally preserved. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (noting "law-enforcement discretion" exists "even in the presence of seemingly mandatory legislative commands"); *see also Texas*, 599 U.S. at 682 & n.4. There is accordingly no reason the officer could not decide to pursue lesser penalties to avoid a constitutional problem.

What if James argues that § *X*'s mandatory language means the court has no statutory authority to impose a fine in an amount less than $1,000,000? Well, even if is true that the district attorney would violate *state* law by seeking a fine under $1,000,000, it is beyond cavil that federal courts cannot enjoin state officials on the basis of violations of state law. *See Pennhurst State Sch. v. Halderman*, 465 U.S. 89, 91, 103–06 (1984). Moreover, the question whether the State's severability provision allows less-than-$1,000,000 fines is a state-law severability question that, again, is irrelevant

No. 24-50149

to the federal court in a constitutional pre-enforcement challenge. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) (explaining that interpreting a severability provision in a state statute is "a matter of state law"). In short, a federal court could not grant James an injunction restraining the district attorney from seeking a $100 fine.

That hypothetical is essentially this case. Assume for the sake of argument that the plaintiffs are correct—that a return order as contemplated by the return provisions could require an alien to return to a foreign nation. *See* Tex. Code Crim. Proc. art. 5B.002(d) ("On a person's conviction of an offense under [the arrest provisions], the judge shall enter in the judgment in the case an order requiring the person to return to the foreign nation from which the person entered or attempted to enter."). Even if such an order would conflict with federal law, that still would not justify the district court's facial injunction against any and all hypothetical applications of S.B. 4. That is because Texas district attorneys and judges are entitled to interpret the return provisions—in conjunction with S.B. 4's severability clause—to avoid constitutional problems. *See* S.B. 4, § 8 ("It is the intent of the legislature that every provision, section, subsection, sentence, clause, phrase, or word in this Act, and every application of the provisions in this Act to every person, group of persons, or circumstances, is severable from each other.").[18]

---

[18] The majority downplays the significance of S.B. 4's severability clause. *See ante*, at 49–51. It relies exclusively on the Supreme Court's decision in *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016)—one of many abortion cases that the Supreme Court has noted "distort[ed]" numerous "legal doctrines," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 286 (2022). Anyway, *Hellerstedt* does not say what the majority thinks it says. Because all the challenged provisions were facially unconstitutional there, the Court simply concluded that the severability clause could not save those facially unconstitutional provisions. *See Hellerstedt*, 579 U.S. at 624–25 ("The provisions are unconstitutional on

No. 24-50149

At oral argument, Texas made clear its Attorney General had adopted one such interpretation: District attorneys should not seek orders requiring convicted aliens to return to a foreign nation; instead, they should seek orders requiring convicted aliens to return to a lawful port of entry. That makes perfect sense. The return provisions contemplate that execution of a return order involves transporting an alien to a lawful port of entry. *See* TEX. CODE CRIM. PROC. art. 5B.002(e)(1) (A return order "must include . . . the manner of transportation of the person to a port of entry."). So as best I (or anyone else) can tell at this preliminary, pre-enforcement stage of the proceedings, a return order really consists of two things: (1) an order requiring the alien to let Texas transport him to a lawful port of entry; and (2) an order requiring him to cross the border. Just as state officials could conclude that the greater power to seek a $1,000,000 fine includes the lesser power to seek a $100 fine, Texas officials could conclude that the greater power to seek a full-fledged return order includes the lesser power to seek an order authorizing Texas to transport an alien to a lawful port of entry. That is especially true because the Texas legislature has instructed Texas officials to give effect to every constitutional application of the return provisions. And the question of how to apply that instruction is for Texas officials, not federal courts. *See Jane L.*, 518 U.S. at 139.

All that demonstrates the trouble with the district court's facial pre-enforcement injunction. Texas's Attorney General has proffered a seemingly constitutional application of the return provisions. And any one of the 334

---

their face: Including a severability provision in the law does not change that conclusion."). That decision did not undermine the enforceability or relevance of a severability clause when only part of a statute is deemed unconstitutional. Here, the return provisions are not facially unconstitutional. So *Hellerstedt* provides no help for the majority. And even if the return provisions are facially unconstitutional, S.B. 4's severability clause reinforces the fact that the arrest provisions should not be enjoined too.

No. 24-50149

district attorneys in Texas who help enforce S.B. 4 might come up with an additional constitutional application. *See State v. Stephens*, 663 S.W.3d 45, 50 (Tex. Crim. App. 2021) (noting that Texas district attorneys are responsible for "prosecut[ing] the pleas of the state in criminal cases"). Yet the district court decided that none of those district attorneys should have the opportunity to attempt to enforce the return provisions in a constitutional manner.[19]

Why? The district court must have concluded that if it did not grant a global, facial injunction, Texas officials might attempt to enforce the return provisions in a manner that violates the Supremacy Clause. That is unfortunate. Federal courts are not supposed to "'assume the States will refuse to honor the Constitution,' . . . because 'States and their officers are [also] bound by obligations imposed by the Constitution.'" *DeVillier v. Texas*, 601 U.S. 285, 293 (2024) (quoting *Alden v. Maine*, 527 U.S. 706, 755 (1999)); *see* Tex. Const. art. XVI, § 1(a) ("All elected and appointed officers, before they enter upon the duties of their offices, shall take the

---

[19] That even constitutionally dubious statutes might have constitutional applications is one reason a proper *Ex parte Young* defendant must be "'clothed with some duty in regard to the enforcement of the laws of the state'" and must "'threaten and [be] about to commence'" enforcement of "an unlawful act against certain affected parties." *United States v. Abbott*, 85 F.4th 328, 334 (5th Cir. 2023) (quoting *Ex parte Young*, 209 U.S. at 155–56). Federal courts do not enjoin enforcement of statutes but rather enforcement of unconstitutional *applications* of statutes. It is impossible for a court to predict whether a law will be applied in an unconstitutional manner until some official reveals just how he plans to enforce the law. If a court enjoins the official before that, it risks overstepping by enjoining him from enforcing even constitutional applications. If the court waits until the official reveals his plans, in contrast, it can adjudicate the constitutionality of a particular application of the law in the context of a relatively concrete dispute. This pre-enforcement challenge is thus especially troubling because there is no threatened proceeding to concretize the otherwise abstract constitutional questions presented by the return provisions. The closest thing we have is Texas's representation about how its Attorney General understands those provisions.

No. 24-50149

following Oath or Affirmation: 'I . . . do solemnly swear (or affirm), that I will faithfully execute the duties of [my] office . . . , and will to the best of my ability preserve, protect, and defend *the Constitution and laws of the United States* and of this State, so help me God.'" (emphasis added)).

The vagaries in enforcement here counsel against the harsh remedy of a pre-enforcement facial injunction because no one can tell what is going to be preempted until Director Martin acts. We cannot simply presume that "a defendant [will] be removed before federal [removal] proceedings . . . have been initiated or concluded." *Ante*, at 64.

4

The majority makes one final effort to avoid applying *Salerno*. The majority suggests that my hypothetical applications of S.B. 4 run afoul of an "important limit[] on the scope of the facial challenge inquiry"—namely, that we must ignore any application of S.B. 4 that is "not already legitimately authorized by other laws." *Id.* at 47. In so holding, the majority primarily relies on *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), which itself primarily relies on *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 883 (1992).

The majority is wrong. First, it is unclear *Patel*'s analysis of facial challenges even survives *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). *Patel* used *Casey* as its primary (sole?) authority in describing how facial challenges should operate. *See Patel*, 576 U.S. at 418–19. But *Casey* was one of many old cases that stretched legal doctrines to reaffirm abortion rights. *See Dobbs*, 597 U.S. at 230, 286–87. As relevant here, *Casey* "diluted the strict standard for facial constitutional challenges." *Id.* at 286 (juxtaposing the *Salerno* standard with *Casey*'s understanding of facial challenges). So it should come as no surprise that *Patel* has been cited precisely one time at the Supreme Court—in a Justice Thomas concurrence

reasoning that all "[f]acial challenges are fundamentally at odds with Article III." *Moody*, 603 U.S. at 752 (Thomas, J., concurring in the judgment).

Anyway, the majority is mistaken about what *Patel* said. For example, in *Zook*, the punishment of an ICC-permit violation was "legitimately authorized by other laws" (specifically, federal law). Does that mean the Court was obligated to ignore all applications of California's law? Of course not. *Patel* said nothing to that effect. Indeed, on the majority's view, facial preemption challenges would often be rigged against the States. That is because as we are trying to determine if a state statute is consistent with federal law, the majority would have us ignore all applications that are authorized by federal law. In other words, the majority demands that we ignore many constitutional applications when only one is enough to save the statute. That cannot be correct.

What *Patel* actually said is that we must consider the universe of S.B. 4's applications to people it will affect and ignore the applications to people it will not affect. *See* 576 U.S. at 418–19. So let's do that. Imagine an alien is subject to a final order of removal. This alien is a violent terrorist and convicted felon who entered outside a port of entry 10 times. He was released from a jail in a sanctuary city that does not honor ICE detainers. So federal officials want to detain and arrest him. To obtain help in that effort, they share information with Texas with the hope that both sovereigns can cooperate in apprehending the man. While everyone is looking for the alien, he is pulled over for a minor traffic violation by Texas State Troopers. Instead of releasing him with a ticket, can State Troopers instead detain him under S.B. 4? Can they transport him to a port of entry? Can they rely on state law to get the man from the side of the road to federal custody? Of course they can. That offends no part of federal law. It requires reliance on the state statute, so the state statute is not "irrelevant" as *Patel* and *Casey* understood the laws in those cases to be. *Patel*, 576 U.S. at 418 (quoting *Casey*, 505 U.S.

No. 24-50149

at 894). And it is obviously an application of S.B. 4's arrest provisions that is not crosswise with federal law.

Now let's tweak the hypo. Suppose this same terrorist, whose home country is Mexico, was first arrested and prosecuted by federal officials. Suppose further that he was ordered removed from the country. But for some reason, the man is not in federal custody, though federal officials are looking for him in order to execute the removal order. Now suppose Texas officials apprehend and arrest him under S.B. 4. A local district attorney quickly prosecutes the man, and the state court enters a return order. Immediately thereafter, assume that state officials execute the return order as the majority fears—by removing him at the border into Mexico. How is that meaningfully different from the first hypo? The majority cannot say because they are functionally the same. Neither conflicts with federal law.

\*

In sum, the majority searches for a conflict between S.B. 4 and the INA. Not only is that the opposite of how we ought to approach implied conflict preemption questions. It is also a deeply misguided endeavor, as there is no conflict between federal law and every possible application of any of S.B. 4's provisions.

## VI

Finally, the other preliminary-injunction factors. It is well settled that "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). The plaintiff "must make a clear showing that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest."

No. 24-50149

*Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (emphasis added) (quotation omitted).

Here, I (A) show that the plaintiffs have failed to establish an irreparable injury. Then, I (B) explain that they have also failed to prove that the balance of the equities and the public interest tilt in their favor.

A

1

Plaintiffs come nowhere close to establishing an irreparable injury. Plaintiffs offer only vague and ill-defined theories of harm. But "generalized claim[s] of harm" are no basis for granting a preliminary injunction. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024).

Consider plaintiffs' theory that enforcement of S.B. 4 would deprive them of "their ability to represent many asylum applicants." Las Americas Br. at 50.[20] Even if that were true—and it is not[21]—that generalized claim of

---

[20] El Paso County offers its own theories of irreparable injury. But those theories mirror its theories of standing. Since non-existent monetary costs are not a sufficient injury for Article III purposes, it follows *a fortiori* that they are not an irreparable injury for equitable purposes. *See also infra*, at 175–76.

[21] Even if S.B. 4 is enforced vigorously, the plaintiff organizations should have plenty of asylum applicants to represent. "More than 800,000" people "applied for asylum" in 2022, for instance. Eileen Sullivan, *Asylum in America, by the Numbers*, N.Y. Times (Nov. 21, 2023), https://perma.cc/PSP8-9PTZ. Why should we presume the plaintiffs will have an insufficient number of clients in the federal system? In any event, Texas avers it will continue to permit "'non-profit legal service organizations' to enter State facilities 'to contact confined and incarcerated aliens and provide their services.'" Reply Br. for Appellants at 22 (quoting ROA.311). "And Texas will not prevent access to federal proceedings—including immigration proceedings." *Ibid.* (citing ROA.311). So we have no idea how many fewer aliens, if any, the organizations would counsel because of Director Martin's enforcement of S.B. 4.

No. 24-50149

harm falls far short of the "*clear showing*" required to establish irreparable injury and to induce a court to grant the "extraordinary and drastic remedy" of a preliminary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). It does not even suffice to establish an *ordinary* injury for purposes of Article III standing. Concern over one's own ability to represent asylum seekers is at best "a setback to" an "abstract social interest[.]" *All. for Hippocratic Med.*, 602 U.S. at 394. But the Supreme Court has said such injuries are insufficient for purposes of Article III standing. But if an injury is insufficiently traditional to even count as a "Case[]" in "Equity," how could it be sufficiently traditional for the chancellor to intervene? U.S. Const. art. III, § 1; *see also TransUnion*, 594 U.S. at 417; *Grupo*, 527 U.S. at 318–19. It could not.

2

So why does the majority think plaintiffs will suffer an irreparable injury? It appears to be because they have standing in a public-law case. The majority argues Las Americas will suffer irreparable injury for the reasons "considered above in subpart II(A)." *Ante*, at 90. That is, according to the majority, Las Americas is irreparably injured because it will voluntarily spend money to serve clients who are impacted by S.B. 4. And because of state sovereign immunity, the plaintiffs cannot recoup their voluntary expenses from Director Martin later. *Id.* at 90 & n.438.

It is true that plaintiffs could not sue Director Martin—but state sovereign immunity has nothing to do with it. The reason plaintiffs cannot recoup their costs from Director Martin is that he is not regulating them, does not care a wit about them, and could not control their voluntary expenditures if he wanted to. Plaintiffs seeking to recoup their organizational costs from Director Martin would be like me seeking to recoup my frequent flyer miles from Starbucks: The defendant in either case would quite reasonably be

No. 24-50149

befuddled by the out-of-left-field claim that is grounded in neither law nor logic.

In any event, it is quite wrong to say all voluntary expenditures constitute irreparable injury in public-law cases. On the majority's logic, a preliminary injunction against the Government would no longer be "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, according to the majority, all a plaintiff needs to do to satisfy irreparable injury is allege an Article III injury under the most expansive theory of standing available. Then if there is any reason whatsoever that even the slightest cognizable injury under Article III cannot be redressed by a different action, as will often be true in public-law cases, the plaintiff establishes irreparable injury—and for purposes of a preliminary injunction at that. In short, whenever one sues the Government, standing = irreparable injury. Gone is the Supreme Court's insistence that "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). Instead, as the majority would have it, we should "churn" out preliminary injunctions "as if on a convey[o]r belt." Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 810 (2025).

Moreover, even if one understood Las Americas to say that it would be forced—involuntarily—to spend money to comply with S.B. 4, there is still no irreparable injury here. Of course, this is an absurd hypothetical and misconstruction of S.B. 4, which forces Las Americas to do precisely nothing. But in any event, "the Supreme Court has specifically rejected the idea that routine compliance costs count as irreparable injury." *Id.* at 856. So in *Petroleum Exploration v. Public Service Commission of Kentucky*, 304 U.S. 209 (1938), the Supreme Court rejected a regulated entity's claim that it would suffer "irreparable injury because it would have to spend $25,000 (in 1930s dollars) in response to a state commission's order." Bray, *supra*, at 856.

No. 24-50149

Instead, the Supreme Court explained that the mere necessity of spending money to comply with government regulation "is not the sort of irreparable injury against which equity protects." *Petroleum Expl.*, 304 U.S. at 220–21; *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (rejecting a claim of irreparable injury by an oil company stemming from the FTC filing a complaint against it because the "expense and annoyance" the company would suffer in litigation were "part of the social burden of living under government" (quotation omitted)). So *contra* the majority, some expenses, even if "substantial and unrecoupable" will "not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974).[22]

\*

At bottom, plaintiffs' theory of irreparable injury boils down to this: We do not like that aliens could be removed. But courts have no business enjoining state laws because political opponents dislike them. And it is especially inappropriate here. The Supreme Court has rejected the idea that removal automatically constitutes irreparable injury *even to the removed alien. Nken v. Holder*, 556 U.S. 418, 435 (2009). It follows *a fortiori* that removal does not automatically constitute irreparable injury to some third-party organization simply because that organization finds immigration restrictions distasteful.

---

[22] Some of our precedents need not be read to conflict with Supreme Court precedent on this front. In *Wages & White Lion Investments, LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021), for example, we explained that a business had irreparable injury for irrecoverable compliance costs that would "*threaten[] the very existence* of its business." *Id.* at 1142 (quotation omitted) (emphasis added). To the extent we also said that even $1 in compliance costs categorically satisfies irreparable injury when not recoverable, that was only because the defendant had "forfeited" any "argument contesting irreparable harm." *Ibid.* To the extent other precedents speak more broadly, they of course cannot override binding Supreme Court precedent.

No. 24-50149

B

Next, the balance of the equities and public interest also cut in Texas's favor.[23] That alone would justify denying a preliminary injunction. *See Winter*, 555 U.S. at 23–24 (denying a preliminary injunction against the Government even assuming plaintiffs established likelihood of success and irreparable injury); *see also Starbucks*, 602 U.S. at 346.

I (1) explain the interests that weigh in favor of permitting enforcement of S.B. 4. Then, I (2) weigh those against the interests that counsel against enforcement of S.B. 4.

1

On one side of the ledger, Texas's interests strike at the very heart of its sovereignty. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation omitted); *see also Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (adopting this position). But Texas's interests go far beyond that. This injunction does not block Texas from enforcing any old statute. It blocks Texas from vindicating its "paramount interest in protecting . . . its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *cf. Ohio v. EPA*, 603 U.S. 279, 291 (2024) (recognizing States' weighty "sovereign interests in regulating their own industries and citizens"). The inherent right of a sovereign to "direct and regulate at its pleasure every thing that passes in" its territory has been recognized since the Founding. EMER DE VATTEL, THE LAW OF NATIONS § 204 (1797). Texas retains that right subject only to "limitations expressed in the

---

[23] Generally, "when the Government is the opposing party," the balance of equities and the public interest "merge." *Nken*, 556 U.S. at 435. So I analyze them together.

No. 24-50149

Constitution or constitutionally imposed by Congress." *Arizona*, 567 U.S. at 417 (Scalia, J., concurring in part and dissenting in part). So if wrongfully enjoined—as we must presume when considering the balance of the equities at the preliminary-injunction stage—Texas will suffer an injury striking at the very core of its sovereignty.

Moreover, if Texas is unable to enforce S.B. 4, both the State and its citizens will suffer concretely. As I noted in Part I, the crisis at our southern border has led to an influx of drugs and crime, and it has raised public-health concerns. I need not repeat the dangers this has imposed upon the people of Texas.

The public interest favors Texas for another reason. "There is always a public interest in prompt execution" of the laws. *Nken*, 556 U.S. at 436. Enforcement of Texas's law vindicates that interest. "The continued presence of an" illegal alien "permits and prolongs a continuing violation of United States law." *Ibid.* (quotation omitted). By helping to remove these people in accordance with federal law, Texas would "bring to an end" thousands upon thousands of "*ongoing violation[s]* of United States law." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999). Thus, "the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border," the very thing Texas seeks to do here. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).[24]

---

[24] At bare minimum, the public interest favors narrowing the injunction. As *Nken* explained, "[t]he interest in prompt removal may be heightened by the circumstances as well—if, for example, the alien is particularly dangerous, or has substantially prolonged his stay by abusing the processes provided to him." 556 U.S. at 436. Since many of the illegal aliens Texas would enforce its laws against will be "particularly dangerous" or have "abus[ed] the processes provided" to "substantially prolong[]" their stay, the public interest favors prompt enforcement at least as to them.

No. 24-50149

2

So what is on the other side of the ledger? Not much. The majority points to two interests. Both are insubstantial at best and baseless at worst. And I see no other interests that favor enjoining S.B. 4's enforcement.

a

First, the majority argues "[t]here is a high risk that enforcement of S. B. 4 would cause international friction" with "Mexico." *Ante*, at 91. What is the basis for this "high risk"? It was an argument made by the Biden Administration back when it was involved in this appeal. And the Biden Administration said that Mexico had complained about S.B. 4.

Obviously, the views of the Executive Branch as to foreign affairs are entitled to great, if not conclusive, weight by the courts. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (explaining that in matters involving "sensitive and weighty interests of national security and foreign affairs," courts must defer to the "evaluation of the facts by the Executive"). But today, to put it mildly, the Executive Branch has changed course on immigration and on this suit. Today, the Executive Branch has given us every reason to think it *wants* Texas to enforce S.B. 4. The Executive Branch dismissed its suit *after* the court had already issued a preliminary injunction against enforcement of S.B. 4 and this court had denied Texas's stay application. *See supra*, at 105 n.1. And as if the Executive Branch needed to be any clearer, it has affirmatively invited Texas's help in controlling the southern border. *See supra*, at 155 n.16. So the very deference invoked by the majority is self-defeating: It counsels *against* a preliminary injunction.

The majority's invocation of *Crosby* changes nothing. As the majority notes, *Crosby* said only that "repeated representations by the Executive Branch supported by formal diplomatic protests *and concrete disputes*" demonstrated a risk of interference with federal foreign policy. 530 U.S. at

No. 24-50149

386 (emphasis added). But deference to the Executive Branch counsels against finding interference with federal foreign policy for the reasons I just explained. Moreover, in *Crosby*, the "EU and Japan" had "lodg[ed] formal complaints against the United States in the World Trade Organization." *Id.* at 383. Here, by contrast, there are zero "concrete disputes." Mexico's Secretaría de Relaciones Exteriores under its prior President issued a press release complaining that Texas's law will "foster[] hostile environments . . . against migrant communities" in Texas. Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), https://perma.cc/RP7H-JXZR. At the risk of stating the obvious, that press release has not "embroil[ed] the National Government" in formal "international dispute proceedings." *Crosby*, 530 U.S. at 383. Nor does Mexico's filing of an amicus brief in this case change anything—especially when Mexico's main complaint turns only on the removal provisions. *See* Br. of *Amicus Curiae* the Government of the United Mexican States at 11–12. And the United States' decision to drop its case against Texas means it is no longer here to support the majority's unfounded fears about international affairs.

b

Second, the majority claims that "[t]he enforcement of S. B. 4 also risks taking the United States out of compliance with its treaty obligations . . . [u]nder the" Convention Against Torture ("CAT"). *Ante*, at 92. That is wrong.

Texas plans to comply fully with CAT. *See Texas 2024*, 97 F.4th at 336 (Oldham, J., dissenting). Texas has represented, for instance, that under S.B. 4 "[a]liens held in custody or serving a sentence under SB 4" remain eligible "for any federal immigration relief," including under the "Convention Against Torture." ROA.311.

No. 24-50149

But, the majority protests, CAT forbids the removal of an individual "where there are substantial grounds for believing that he would be in danger of being subjected to torture." *Ante*, at 92. So, the majority says, some subset of aliens who have a "meritorious CAT claim" that "has not yet been adjudicated may still be refouled under S. B. 4 in violation of the CAT." *Ibid*.

That is far from obvious. As discussed above, Texas represents it will simply turn convicted aliens over to federal officials. And it has long "been the settled practice of the Court, in contexts no less significant, fully to accept representations such as these as parameters for decision." *DeFunis*, 416 U.S. at 317. Anyway, even if S.B. 4's return provisions operate as the majority fears, there is no reason to think many, if any, aliens would be removed to any country where their rights under CAT would be violated.

But suppose the majority were completely right and some substantial number of aliens would be removed to a country where their rights under CAT would be violated. It still could not justify the district court's facial injunction against enforcement of S.B. 4. It is well settled that "a federal court may not issue an equitable remedy 'more burdensome to the defendant than necessary to [redress]' the plaintiff's injuries." *Poe*, 144 S. Ct. at 923 (Gorsuch, J., concurring in the grant of a stay) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also Gill v. Whitford*, 585 U.S. 48, 66 (2018) ("'[A] 'remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). But as I have already explained, S.B. 4's arrest provisions could not possibly threaten our treaty obligations because their operation is purely domestic. *Texas 2024*, 97 F.4th at 336 (Oldham, J., dissenting). It is only the return provisions that could lead to hypothetical violations of CAT. And even so, all the court would need to do is enjoin DPS from enforcing the return orders in such a way that would prevent any alien who might have a

No. 24-50149

meritorious CAT claim from being able to raise it. So the broader relief the court blesses is flagrantly overbroad.

c

Nor is there anything else that might tilt the equities in plaintiffs' favor. No one claims that anyone involved in passage or enforcement of S.B. 4 has engaged in the sort of bad-faith conduct that is the traditional concern of equity—such as opportunism, or what Justice Story called "crafty evasions." 1 Joseph Story, Commentaries on Equity Jurisprudence, as Administered in England and America § 17 (Bos., Hilliard, Gray & Co. 1836); *see also* Henry E. Smith, *Equity as Meta-Law*, 130 Yale L.J. 1050, 1082–84 (2021). And such a claim would have to overcome the "presumption" of "good faith." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024).

In sum, given the weighty interests that augur in favor of permitting enforcement of S.B. 4 and the miniscule interests weighing against such enforcement, I cannot see how the majority can claim that plaintiffs have made "a clear showing . . . that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Starbucks*, 602 U.S. at 346. So a preliminary injunction is unwarranted.

*    *    *

Today is a sad day for Texas and for our court. It is a sad day for the millions of Americans who are concerned about illegal immigration and who voiced those concerns at ballot boxes across Texas and the Nation—only to have their voices muted by federal judges. And it is a sad day for the rule of law. If we really believe in neutral principles—like standing, the cause of action requirement, the preemption standard, and the preliminary-injunction factors—those principles must be, well, neutral.

No. 24-50149

Perhaps the new rules announced today will be neutral. Perhaps in future Fifth Circuit cases, all lawyers, political interest groups, and political subdivisions will have universal standing to challenge any law they dislike. Perhaps all state laws will be preempted when they merely coincide with federal law. And perhaps all plaintiffs will win sweeping, facial, pre-enforcement injunctions whenever they satisfy Article III's minimum requirements for standing.

But I fear that is not true. I fear today's rules are for today's case. And that the normal rules governing justiciability, preliminary injunctions, and preemption will come back tomorrow. I suppose we should all hope for a return to normalcy, even if it comes too late for this case. But for now, and for today's myriad errors, I respectfully dissent.