No. 24-50149

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STATE OF TEXAS; GREG ABBOTT IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants-Appellants.*

———————————————

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees,*

*v.*

FREEMAN F. MARTIN IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## DEFENDANTS-APPELLANTS' SUPPLEMENTAL EN BANC BRIEF

*(Counsel Listed on Inside Cover)*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General
William.Peterson@oag.texas.gov

WILLIAM F. COLE
Principal Deputy Solicitor General

DANIEL M. ORTNER
Assistant Solicitor General

GARRETT C. GRAY
Assistant Attorney General

*Counsel for Defendants-Appellants*

# Certificate of Interested Persons

No. 24-50149

United States of America,

*Plaintiff-Appellee,*

*v.*

State of Texas; Greg Abbott in his official capacity as Governor of Texas; Texas Department of Public Safety; Freeman F. Martin, in his official capacity as Director of Texas Department of Public Safety,

*Defendants-Appellants.*

———————————

Las Americas Immigrant Advocacy Center; American Gateways; County of El Paso, Texas,

*Plaintiffs-Appellees,*

*v.*

Freeman F. Martin, in his official capacity as Director of the State of Texas Department of Public Safety,

*Defendants-Appellants.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ William R. Peterson
William R. Peterson
*Counsel of Record for Defendants-Appellants*

i

## Statement Regarding Oral Argument

The Court has set this case for oral argument during its January 2026 en banc sitting. Appellants respectfully submit that oral argument will assist the Court in its review of numerous statutory and constitutional issues raised by the district court's preliminary injunction in this pre-enforcement, facial challenge.

# TABLE OF CONTENTS

Certificate of Interested Persons ...............................................................i

Statement Regarding Oral Argument .......................................................ii

Table of Contents ....................................................................................iii

Table of Authorities .................................................................................v

Introduction ............................................................................................. 1

Statement of Jurisdiction ......................................................................... 2

Issues Presented ...................................................................................... 2

Statement of the Case ............................................................................. 3

Summary of the Argument....................................................................... 10

Argument................................................................................................. 14

    I.    The Remaining Plaintiffs Do Not Having Standing................................. 14

        A.   The Supreme Court restricted organizational standing in *Alliance for Hippocratic Medicine.* .................................................................. 14

            1.   There is no "direct services" exception to *Alliance for Hippocratic Medicine.*.................................................... 16

            2.   Organizations do not have standing to challenge laws that interfere with their missions, no matter how they frame that challenge. ......................................................... 19

            3.   *Havens Realty* does not support the Nonprofit Plaintiffs' standing.......................................................................22

        B.   El Paso County does not have standing. ...........................23

    II.   Plaintiffs Lack a Cause of Action to Challenge S.B.4................................26

    III.  Texas's Invocation of the Self-Defense Clause Presents a Non-Justiciable Political Question. ...............................................................................30

    IV.  Plaintiffs Are Unlikely to Prevail on the Merits.....................................33

        A.   S.B.4 is not field preempted. .......................................... 35

        B.   S.B.4 is not conflict preempted. ......................................40

    V.   Plaintiffs Did Not Satisfy the Other Preliminary Injunction Factors. .......48

Conclusion..............................................................................................50

Certificate of Service...............................................................................51

Certificate of Compliance ........................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*All. for Hippocratic Med. v. FDA*,
  No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023) ................................ 15

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008) ..................................................................................... 34

*Arizona v. United States*,
  567 U.S. 387 (2012) ............................................................................. *passim*

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ............................................................................. 26, 27

*Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health &*
  *Mental Retardation Ctr. Bd. of Trs.*,
  19 F.3d 241 (5th Cir. 1994) ................................................................ 10, 17

*Baker v. Carr*,
  369 U.S. 186 (1962) ..................................................................................... 32

*Barrosse v. Huntington Ingalls, Inc.*,
  70 F.4th 315 (5th Cir. 2023) ................................................................ 35, 40

*Builder Recovery Servs., LLC v. Town of Westlake*,
  650 S.W.3d 499 (Tex. 2022) ...................................................................... 49

*California v. Zook*,
  336 U.S. 725 (1949) ..................................................................................... 42

*Chamber of Com. v. Whiting*,
  563 U.S. 582 (2011) ...................................................................... 40, 42, 43

*Cipollone v. Liggett Grp., Inc.*,
  505 U.S. 504 (1992) ..................................................................................... 34

*City of Burbank v. Lockheed Air Terminal Inc.*,
  411 U.S. 624 (1973) ..................................................................................... 39

*City of El Cenizo v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ........................................................ 13, 38, 39

*City of Hugo v. Nichols*,
  656 F.3d 1251 (10th Cir. 2011) .................................................................. 30

*City of Trenton v. New Jersey*,
  262 U.S. 182 (1923) ..................................................................................... 23

*Coleman v. Miller,*
    307 U.S. 433 (1939) ...................................................................... 23

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) .............................................................. 44, 45

*Crystal Clear Special Util. Dist. v. Jackson,*
    142 F.4th 351 (5th Cir. 2025) ............................................... 34, 35

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993) ...................................................................... 40

*Deanda v. Becerra,*
    96 F.4th 750 (5th Cir. 2024) ................................................. 34, 40

*Deep South Center for Env't Just. v. EPA,*
    138 F.4th 310 (5th Cir. 2025) ....................................... 17, 20, 22

*Deerfield Med. Ctr. v. City of Deerfield Beach,*
    661 F.2d 328 (5th Cir. 1981) ....................................................... 48

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ...................................................................... 28

*Donelon v. La. Div. of Admin. Law ex rel. Wise,*
    522 F.3d 564 (5th Cir. 2008) ................................................ 23, 29

*El Paso County, Tex. v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ...................................................... 26

*FDA v. All. for Hippocratic Med.*
    602 U.S. 367 (2024) ................................................................*passim*

*Fla. Lime & Avocado Growers, Inc. v. Paul,*
    373 U.S. 132 (1963) ...................................................................... 35

*Friberg v. Kan. City S. Ry. Co.,*
    267 F.3d 439 (5th Cir. 2001) ....................................................... 34

*Gamble v. United States,*
    587 U.S. 678 (2019) ................................................................44-45

*Green Valley Special Util. Dist. v. City of Schertz,*
    969 F.3d 460 (5th Cir. 2020) (en banc) .................................. 26, 27

*Gregory v. Stetson,*
    133 U.S. 579 (1890) ...................................................................... 27

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ........................................................ 11, 22, 23

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ........................................................................ 40

*June Med. Servs. L.L.C. v. Russo*,
   591 U.S. 299 (2020) ........................................................................ 29

*Kansas v. Garcia*,
   589 U.S. 191 (2020) ................................................................. *passim*

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ................................................................ 17, 18

*Kurns v. R.R. Friction Prods. Corp.*,
   565 U.S. 625 (2012) ......................................................................... 39

*La Union Del Pueblo Entero v. Abbott*,
   151 F.4th 273 (5th Cir. 2025) ........................................................ 16

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
   469 U.S. 256 (1985) .................................................................... 29-30

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ................................................................. 27, 29

*Luftig v. McNamara*,
   373 F.2d 664 (D.C. Cir. 1967) ...................................................... 32

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................ 14

*Martin v. Mott*,
   25 U.S. 19 (1827) ............................................................................ 32

*Maryland v. King*,
   567 U.S. 1301 (2012) ................................................................. 48-49

*Mayor of New York v. Miln*,
   36 U.S. 102 (1837) ......................................................................... 35

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
   No. 23-60494, 2025 WL 2602899 (5th Cir. Sept. 9, 2025) ............... 33

*Moyer v. Peabody*,
   212 U.S. 78 (1909) ......................................................................... 33

*Newsom v. Trump*,
   141 F.4th 1032 (9th Cir. 2025) ..................................................... 32

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) ........................................................................ 39

*Perkins v. Lukens Steel Co.*,
   310 U.S. 113 (1940) ........................................................................ 28

*Philadelphia v. New Jersey*,
   430 U.S. 141 (1977) ........................................................................ 34

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925) ................................................................ 29

*Plyler v. Doe,*
    457 U.S. 202 (1982) ................................................................ 42

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) .......................................................... 34, 39

*Rogers v. Brockette,*
    588 F.2d 1057 (5th Cir. 1979) .............................................. 29

*Schneidewind v. ANR Pipeline Co.,*
    485 U.S. 293 (1988) ................................................................ 39

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983) ............................................................ 11, 27

*Smith v. Turner,*
    48 U.S. (7 How.) 283 (1849) ................................................ 31

*Sterling v. Constantin,*
    287 U.S. 378 (1932) ................................................................ 32

*Tenn. Elec. Power Co. v. Tenn. Valley Auth.,*
    306 U.S. 118 (1939) .......................................................... 27, 28

*Tesmer v. Granholm,*
    333 F.3d 683 (6th Cir. 2003) .............................................. 17

*Texas v. DHS,*
    123 F.4th 186 (5th Cir. 2024) .............................................. 3

*Texas v. DHS,*
    No. 2:23-cv-00055, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ................. 3

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) .......................................................... 23, 28

*Truax v. Raich,*
    239 U.S. 33 (1915) ................................................................ 29

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025) ...................................................... 27, 29, 49

*United States v. Abbott,*
    110 F.4th 700 (5th Cir. 2024) .............................................. 33

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ................................................................ 49

*United States v. Flores-Montano,*
    541 U.S. 149 (2004) ................................................................ 36

*United States v. Hansen,*
  599 U.S. 762 (2023) ................................................................ 46
*United States v. Locke,*
  529 U.S. 89 (2000) .................................................................. 39
*United States v. Rahimi,*
  602 U.S. 680 (2024) ................................................................ 46
*United States v. Texas,*
  144 F.4th 632 (5th Cir. 2025) ........................................*passim*
*United States v. Texas,*
  97 F.4th 268 (5th Cir. 2024) ................................................ 8, 49
*Va. Uranium Inc. v. Warren,*
  587 U.S. 761 (2019) ............................................................35, 41
*Valley Forge Christian Coll. v. Ams. United for Separation of Church &*
  *State, Inc.,*
  454 U.S. 464 (1982) ................................................ 12, 28, 30
*Villas at Parkside Partners v. City of Farmers Branch,*
  726 F.3d 524 (5th Cir. 2013)................................................ 43
*Warth v. Seldin,*
  422 U.S. 490 (1975) ................................................................28
*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) ....................................................................48
*Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.,*
  134 F.4th 326 (5th Cir. 2025) .......................................*passim*

**Constitutional Provisions and Statutes:**

U.S. Const.:
  art. I, § 10, cl. 3 ............................................ 12, 30, 31
  art. IV § 4............................................................. 9, 32
  art. VI, cl. 2 ...................................................... 34, 46
Tex. Const. art. IV, § 7 .............................................32

8 U.S.C.:

§ 1158 ................................................................................................ 4
§ 1225(b)(1)(A)(i) ........................................................................... 41
§ 1229a(d) ........................................................................................ 41
§ 1229c(a)(1) .................................................................................... 41
§ 1252c(a)(1)-(2) ............................................................................. 37
§ 1324(c) ........................................................................................... 38
§ 1325(a) ..................................................................................... 4, 41
§ 1326(a) .................................................................................. 4, 5, 41
§ 1357(g)(1) ..................................................................................... 37
§ 1357(g)(10) ............................................................................. 38, 44
§ 1357(g)(10)(A)-(B) ..................................................................... 38
§ 1357(g)(10)(B) ............................................................. 12, 38, 39
§ 1358 ............................................................................................... 38

18 U.S.C. § 758 ...................................................................................... 38

28 U.S.C.:

§ 1292(a)(1) ....................................................................................... 2
§ 1331 .................................................................................................. 2

Tex. Code Crim. Proc.:

art. 5B.002 ................................................................................... 5, 41
art. 5B.002(b) .................................................................................. 41
art. 5B.002(c)(1) ............................................................................. 47
art. 5B.002(e) ............................................................................. 43-44
art. 5B.002(e)(1)-(2) .................................................................. 6, 41
art. 5B.003 ................................................................................... 5, 43

Tex. Penal Code:

§ 51.01(2) ......................................................................................... 45
§ 51.02 ................................................................................................. 5
§ 51.02(a) ..................................................................................... 4, 41
§ 51.02(c) ....................................................................... 4, 41, 43, 45
§ 51.03 ................................................................................................. 5
§ 51.03(a) ..................................................................................... 5, 41
§ 51.014(a) ......................................................................................... 6

## Other Authorities:

Act of Dec. 18, 2023, 88th Leg., 4th C.S., ch. 1, § 1, 2023
  Tex. Gen. Laws 4769 ...................................................................... 25

Act of Nov. 14, 2023, 88th Leg., 4th C.S., ch. 2, 2023
    Tex. Gen. Laws 4750 ........................................................................... 4, 6

Caleb Nelson, *"Standing" and Remedial Rights in Administrative Law*,
    105 VA. L. REV. 703 (2019) ................................................................. 28

The Debates in the Several State Conventions on the Adoption of the Federal
    Constitution (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836) .................. 31

Governor of the State of Texas, Executive Order GA-41, 47 Tex. Reg.
    4213 (July 7, 2022). .............................................................. 12, 30, 32

H. Rep. No. 343 (Feb. 29, 1876) ........................................................... 31

Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar
Business*, N.Y. TIMES (July 25, 2022) .................................................. 3

Samuel L. Bray & Paul B. Miller, *Getting Into Equity*,
    97 NOTRE DAME L. REV. 1763 (2022) .................................................. 27

Statement of Governor Greg Abbott (Jan. 24, 2024) ........................................ 30

*United States v. Texas*, No. 24-50149, Oral Argument (April 3, 2024) .................... 6

William Barr, *The U.S. Must Defeat Mexico's Drug Cartels*,
    WALL ST. J. (Mar. 2, 2023) ........................................................... 3, 32

## Introduction

This en banc proceeding presents important questions regarding *Ex parte Young*, the rights of States to defend themselves against invasion, preemption of state laws regarding immigration, and the standard for pre-enforcement, facial challenges.

This Court need not reach these issues, however, because Plaintiffs' preemption claim fails a preliminary step: the United States has withdrawn its claims, and the only remaining plaintiffs lack standing. Under the Supreme Court's decision in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394, 395 (2024), Las Americas Immigrant Advocacy Center and American Gateways (the "Nonprofit Plaintiffs")—nonprofit organizations that counsel immigrants about federal immigration law and whose mission includes assisting aliens with removal proceedings—lack standing to challenge laws with which they disagree, no matter how strenuous their opposition and even if those laws interfere with their "missions" and broad societal goals. Nor can they spend their way into standing by planning to provide services to individuals who will be charged under the law. The County of El Paso, a political subdivision that presumptively lacks standing to sue the State, alleges only speculative financial harm and non-cognizable reputational injury.

Senate Bill 4 ("S.B.4") is important to the sovereignty of Texas and its right to preserve its territorial integrity. Although the State would welcome a holding confirming that S.B.4 is not preempted by federal law, because the remaining plaintiffs lack standing, that decision can wait for another day. For a host of reasons, the district court's injunction cannot stand.

## Statement of Jurisdiction

Plaintiffs invoked the district court's subject-matter jurisdiction under 28 U.S.C. § 1331, ROA.793. This Court has jurisdiction over this appeal of the grant of a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1). This appeal is timely because the preliminary injunction was entered on February 29, 2024 and Defendants timely noticed their appeal that same day. ROA.478, ROA.592.

## Issues Presented

1. Whether Plaintiffs have standing to challenge S.B.4 under *Alliance for Hippocratic Medicine*.

2. Whether Plaintiffs, who are not directly regulated by S.B.4 and do not allege that it deprives them of any federal right, have a non-statutory cause of action in equity to seek an injunction against enforcement of S.B.4.

3. Whether S.B.4 falls within the State's constitutional powers of self-defense pursuant to a declared invasion.

4. Whether Plaintiffs have established a likelihood of success on the merits of their claim that S.B.4 is preempted by federal immigration law.

5. Whether Plaintiffs established that the other preliminary injunction factors support an injunction.

## Statement of the Case

S.B.4 was enacted in response to an unprecedented border crisis. Between 2020 and 2022, illegal border crossings exploded fivefold, from 458,000 in 2020 to 2.4 million in 2022. *Texas v. DHS*, No. 2:23-cv-00055, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023). During three years of the Biden Administration, more than 6 million illegal immigrants from over 100 countries flooded across Texas's southern border. ROA.283.

The human toll has been staggering. Of nearly 2.5 million individuals who illegally crossed in 2023, 118,938 were unaccompanied minors—a 673% increase from 2020. ROA.283-84. Between 2021 and 2024, Border Patrol agents arrested 15,267 immigrants with criminal convictions, apprehended nearly 2,000 gang members, and encountered 336 individuals on the terrorist watchlist at the border. ROA.285. As these numbers grew, so did the cartels.

Violent transnational cartels came to dominate the border. They engaged in "trafficking humans" and shipping "vast quantities" of "illegal drugs like fentanyl" into the United States. *Texas v. DHS*, 123 F.4th 186, 193 (5th Cir. 2024). Their human-trafficking operations evolved "from a scattered network of freelance 'coyotes' into a multi-billion dollar international business." Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://tinyurl.com/487kykkh. They became "potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military." William Barr, *The U.S. Must Defeat Mexico's Drug Cartels*, WALL ST. J. (Mar. 2, 2023), https://ti-nyurl.com/drxcdnmv.

### *Texas Enacts Senate Bill 4*

In response, Texas enacted Senate Bill 4 in 2023, Act of Nov. 14, 2023, 88th Leg., 4th C.S., ch. 2, 2023 Tex. Gen. Laws 4750 (S.B.4). S.B.4 amends Chapter 51 of the Texas Penal Code to include two state offenses that track federal immigration crimes prohibiting unlawful entry and reentry. 8 U.S.C. §§ 1325(a), 1326(a).

Section 51.02(a) makes it a crime for a person to cross into Texas at "any location other than a lawful port of entry":

> A person who is an alien commits an offense if the person enters or attempts to enter this state directly from a foreign nation at any location other than a lawful port of entry.

TEX. PENAL CODE § 51.02(a). This language tracks federal law. *See* 8 U.S.C. § 1325(a) (prohibiting "enter[ing] or attempt[ing] to enter the United States at any time or place other than as designated by immigration officers"). The statute also includes affirmative defenses to prosecution:

(1) the federal government has granted the defendant:

  (A) lawful presence in the United States; or

  (B) asylum under 8 U.S.C. Section 1158;

(2) the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a); or

(3) the defendant was approved for benefits under the federal Deferred Action for Childhood Arrivals program between June 15, 2012, and July 16, 2021.

TEX. PENAL CODE § 51.02(c). All three defer to federal determinations about admissibility.

Section 51.03(a) makes it a crime for a person to reenter the country after being denied admission or removed:

> A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state after the person:
>
> > (1) has been denied admission to or excluded, deported, or removed from the United States; or
> >
> > (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding.

TEX. PENAL CODE § 51.03(a). Again, this language tracks federal law. *See* 8 U.S.C. § 1326(a) (prohibiting "enter[ing], attempt[ing] to enter, or [being] at any time found in, the United States" after an alien "has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding").

Prosecution may not be abated merely because a federal determination regarding an individual's immigration status is pending. TEX. CODE CRIM. PROC. art. 5B.003. But the State has represented that its officials will cooperate with federal officials regarding pending applications for asylum, as it ordinarily does when making criminal defendants available for other sovereigns' legal proceedings. ROA.315-16.

If a person charged with violating section 51.02 or 51.03 agrees, a judge may dismiss the charge and enter a written order "requir[ing] the person to return to the foreign nation from which the person entered or attempted to enter." TEX. CODE CRIM. PROC. art. 5B.002. This brief refers to these orders as "return orders." If a person is convicted of an offense under Chapter 51, the judge shall enter a return order that takes effect after confinement or imprisonment. *Id.*

Although the parties hotly dispute how return orders will be enforced, the State has consistently represented that it will transport aliens to a port of entry and deliver them to federal officials. *See* TEX. CODE CRIM. PROC. art 5B.002(e)(1)-(2) (requiring a return order to note a manner of transportation); ROA.315-16. If a detained alien has a pending application for asylum or other relief with the federal government, state officials will coordinate with federal immigration authorities. ROA.316.

A person also commits a criminal offense if that person "refuses to comply with" a return order. TEX. PENAL CODE § 51.014(a). The word "refuses" is significant. As the State explained at argument, a person who is unable to "return to the foreign nation from which the person entered or attempted to enter"—whether because the person is in federal custody, because the foreign nation refuses to accept the person, or for some other reason—has not "refuse[d] to comply." *United States v. Texas*, No. 24-50149, Oral Argument at 5:11-6:12 (April 3, 2024), https://www.ca5.uscourts.gov/OralArgRecordings/24/24-50149_4-3-2024.mp3.

S.B.4 makes "every provision, section, subsection, sentence, clause, phrase, [and] word" and "every application . . . to every person, group of persons, or circumstances . . . severable from each other." S.B.4, 2023 Tex. Gen. Laws at 4750, 4755. "If any application of any provision [of S.B.4] to any person, group of persons, or circumstances is found by a court to be invalid for any reason, the remaining applications of that provision to all other persons and circumstances shall be severed and may not be affected." *Id.* at 4755.

***The Federal Government, the Nonprofit Plaintiffs, and El Paso County Sue***

Before S.B.4 took effect, in December 2023, Las Americas Immigrant Advocacy Center, American Gateways, and El Paso County sued to challenge it. ROA.792.

Las Americas Immigrant Advocacy Center and American Gateways are nonprofit organizations that provide legal services to noncitizens. ROA.793-94. According to Las Americas, its mission is to "ensur[e] that newly arrived noncitizens can access the humanitarian protections available under federal law," and its work includes "direct representation of noncitizens in every stage of the federal removal system; legal advice and referral support;" and "Know Your Rights seminars on federal immigration policies." ROA.794. Las Americas alleges that enforcement of S.B.4 will "frustrate [its] mission," ROA.801, "require [it] to restructure its services," ROA.802, and cause it "to divert resources away from those it currently serves in the community," ROA.804. American Gateways alleges that enforcement of S.B.4 will "frustrate [its] mission" and cause it "to divert organizational resources and develop new programming." ROA.805.

El Paso County alleges that enforcement of S.B.4 will cause it to incur various costs, including building additional jail space and hiring additional officers. ROA.807-08. It also alleges that S.B.4 will "frustrate [its] efforts to provide . . . legal services by diluting the trust the El Paso County community has in its local government," ROA.808-09.

The federal government filed a similar suit several weeks later, ROA.17, and the district court consolidated the cases. ROA.1614-15.

Following a hearing, the district court granted a preliminary injunction against S.B.4's enforcement. ROA.479. The court found that S.B.4 likely was preempted by federal immigration law and that the other preliminary injunction factors were satisfied. ROA.506-39, 576-91.

Regarding standing, the district court noted that the Nonprofit Plaintiffs "allege *indirect* harms under the law," *i.e.*, "impairment and frustration of their organizational purposes." ROA.488. It determined they had standing because "SB 4 will require them to spend *more* resources on education and outreach only to achieve the same outcomes." ROA.490. The district court similarly found that El Paso County had standing because S.B.4 would lead to additional arrests and jail bookings, forcing El Paso County "to increase expenditures and jail capacity." ROA.497, 499.

Texas appealed the grant of the preliminary injunction to this Court and requested a stay pending appeal. This Court granted an administrative stay but deferred decision on a stay pending appeal, expediting that issue to the next available argument calendar. Following oral argument, the panel denied the stay over Judge Oldham's dissent. *United States v. Texas*, 97 F.4th 268, 272 (5th Cir. 2024) (*Texas I*). The decision denying the stay relies on the standing of the federal government and does not address Plaintiffs' standing. *Id.* at 275 ("[O]ne plaintiff's successful demonstration of standing is sufficient to satisfy Article III's case-or-controversy requirement."). The following week, the panel heard oral argument on the merits.

In between oral argument and the panel's decision on the merits, two events significantly reshaped the standing analysis. First, on June 13, the Supreme Court decided *Alliance for Hippocratic Medicine*, narrowing organizational standing and

rejecting the diversion-of-resources theory on which the Nonprofit Plaintiffs and El Paso County relied. Second, after President Trump took office in January 2025, he issued an executive order recognizing that "the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States." Dkt. 223. And on March 18, 2025, the United States dismissed its claims and withdrew from the lawsuit. Dkt. 243. The State highlighted both developments for the panel. Dkt. 250.

In July 2025, the panel affirmed the preliminary injunction, again over Judge Oldham's dissent. *United States v. Texas*, 144 F.4th 632, 640 (5th Cir. 2025) (*Texas II*). Texas filed a petition for rehearing en banc, Dkt. 306, which this Court granted, Dkt. 322.

## Summary of the Argument

**I.** Neither the Nonprofit Plaintiffs nor El Paso County have standing to challenge S.B.4, which is enforceable only against illegal aliens, not nonprofits or Texas counties. Plaintiffs are not directly regulated by S.B.4 and instead complain about the "unlawful regulation . . . of someone else." *All. for Hippocratic Med.*, 602 U.S. at 382 (citation omitted).

The Nonprofit Plaintiffs rely on their voluntary diversion of resources to counteract S.B.4. But the Nonprofit Plaintiffs cannot "spend [their] way into standing" or "manufacture [their] own standing." *Id.* at 394-95. They present exactly the "expansive theory" of standing rejected in *Alliance for Hippocratic Medicine*. *Id.* at 395.

The Nonprofit Plaintiffs are incorrect to suggest that this ruling does not apply because they provide "direct services to individuals." The Supreme Court rejected this argument in *Alliance for Hippocratic Medicine*, holding that the respondents' argument that the petitioners "impaired [their] ability to provide services . . . does not work to demonstrate standing." *Id.* at 394 (citation omitted).

This Court, too, has already rejected the contention that a legal advocacy organization had standing because of its mandate "to protect and advocate the rights of . . . individuals," including "to provide [them] with legal representation." *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (*ARC*). Nor can the Nonprofit Plaintiffs establish standing by alleging that S.B.4 "directly impacts and fundamentally frustrates [their] purpose." ROA.941. Impairing their ability to achieve their

missions does not demonstrate standing, *Alliance for Hippocratic Medicine*, 602 U.S. at 394, even if S.B.4 requires them to spend more resources to achieve the same policy goals. ROA.490.

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), does not allow Plaintiffs to establish standing. It was "an unusual case" that the Supreme Court "has been careful not to extend . . . beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396. The key context of *Havens Realty* was a traditional tort—a misrepresentation—made directly to the plaintiff by the defendant. *See id.* at 395 ("[W]hen Havens gave HOME's employees false information about apartment availability, HOME sued Havens[.]"). It does not provide standing to raise preemption challenges to state laws regulating third parties.

El Paso County also does not have standing. Its theory that S.B.4's enforcement will "erode the public trust" in the County, Appellees' Br. 19, is not a legally cognizable injury—it is entirely subjective and would provide standing for any political subdivision to challenge any state law. El Paso County's claim that S.B.4 would force it to incur costs is conclusory and speculative—S.B.4 has never gone into effect, and the budgetary impact will depend on the voluntary choices of numerous independent actors. Not only do counties lack standing to challenge any state law with a *de minimis* budgetary impact, but El Paso County cannot show that it will not be reimbursed by Texas for its expenses.

**II.** Plaintiffs do not have a cause of action to challenge S.B.4. Although federal courts have "jurisdiction over suits to enjoin state officials from interfering with federal rights," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983), Plaintiffs

do not allege any infringement of their own federal rights, and a plaintiff generally "must assert his own legal rights and interests," not "the legal rights or interests of third parties," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (citation omitted). Any implied, non-statutory equitable cause of action would not extend to Plaintiffs, who allege, at most, economic injuries from state regulation of third parties.

**III.** Plaintiffs' claims also fail because enforcement of S.B.4 falls within the Self-Defense Clause of the United States Constitution, U.S. CONST. art. I, § 10, a non-justiciable political question. Governor Abbott has declared—and the President now agrees—that the border crisis constitutes an invasion. Governor of the State of Texas, Executive Order GA-41, at 2, 47 Tex. Reg. 4213, 4214 (July 7, 2022).

**IV.** If this Court reaches the merits, Plaintiffs are not likely to prevail. Congress has not occupied the entire field of immigration enforcement. In *Arizona v. United States*, the Supreme Court held that Congress "occupied the field of alien registration" by "provid[ing] a full set of standards governing alien registration" that were "designed as a harmonious whole." 567 U.S. 387, 401 (2012) (internal citations omitted). The Supreme Court did not hold that all of Arizona's challenged laws touching on immigration were subject to field preemption, holding instead that two were subject to conflict preemption and one was not preempted at all.

With respect to immigration enforcement, federal law expressly invites state cooperation, including with respect to the "apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). This provision "indicates that some state and local regulation of [this] cooperation is

permissible," *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018), confirming that Congress has not occupied the entire field.

S.B.4 is also not conflict preempted, especially not facially. Plaintiffs cannot rebut the presumption against preemption because they challenge *overlapping* criminal laws. S.B.4 complements, rather than conflicts with, federal immigration law. And at a minimum, there are some lawful applications of S.B.4, particularly when enforcement is undertaken in cooperation with the federal government.

**V.** The other factors do not support a preliminary injunction. Plaintiffs at most suffer economic injuries, not the invasion of any federal right of their own. On the other hand, the preliminary injunction interferes with Texas's ability to protect its border and protect its citizens from transnational cartels, drug and human trafficking, and other serious harms.

*    *    *

S.B.4 was enacted in response to an unprecedented border crisis, as an act of self-defense guaranteed by the Constitution in response to a declared invasion. This traditional exercise of the State's police powers is not preempted, and this Court should reverse the grant of the preliminary injunction.

ARGUMENT

## I.  The Remaining Plaintiffs Do Not Having Standing.

S.B.4 is enforceable only against aliens illegally present in Texas, not advocacy organizations or Texas counties. Plaintiffs challenge what they allege is an "unlawful regulation . . . of someone else," *All. for Hippocratic Med.*, 602 U.S. at 382, and standing is thus "substantially more difficult" to establish, *id.*; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Their primary theory for standing—the voluntary diversion of resources to counteract S.B.4—was repudiated by the Supreme Court, and they have no other basis for standing.

### A.  The Supreme Court restricted organizational standing in *Alliance for Hippocratic Medicine*.

In *Alliance for Hippocratic Medicine*, the Supreme Court rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. The argument that the government has "'impaired [organizations'] ability to provide services and achieve their organizational missions' . . . does not work to demonstrate standing." *Id.* at 394 (citation omitted). "[A]n organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *Id.* (citation omitted). Nor can an organization "spend its way into standing" or "manufacture its own standing" by diverting resources to oppose a defendant's action. *Id.* at 394-95.

Before the district court and in their appellate briefing, the Nonprofit Plaintiffs unapologetically pressed the "impairment of mission" and "diversion of resources"

14

theories that the Supreme Court subsequently rejected. They argued to the district court, for example, that their "diversion injuries" give rise to standing even if those injuries were "willingly incurred" because they spent money "countering the effects of SB4." ROA.439 (internal quotation marks omitted); *see also* ROA.488 ("The Nonprofit Plaintiffs allege impairment and frustration of their organizational purposes[.]"); ROA.805 (alleging that S.B.4 "will frustrate American Gateways' mission"); ROA.952 (same); ROA.929 ("S.B.4 directly conflicts with and frustrates the mission of [Las Americas.]"); ROA.937 (discussing Las Americas' "mission" and "goal"). Crediting this theory of standing, the district court found that S.B.4 will "frustrate their organizational missions." ROA.493.

On appeal, the Nonprofit Plaintiffs repeated their theory that "S.B.4 requires the plaintiff organizations to divert substantial resources and will frustrate their organizational missions." Appellees' Br. 13. They argued that they suffered "diversion injuries" from "counteracting the effects of S.B.4 consistent with the organizations' missions." *Id.* at 14 (internal quotation marks omitted); *see also id.* at 15 (citing *All. for Hippocratic Med. v. FDA*, No. 23-10362, 2023 WL 2913725 (5th Cir. Apr. 12, 2023), *rev'd*, 602 U.S. 367 (2024)).

These are precisely the standing theories rejected by the Supreme Court in *Alliance for Hippocratic Medicine*. No matter how strong their opposition to S.B.4, the Nonprofit Plaintiffs lack standing, even if S.B.4 impairs their ability to provide services and achieve their missions and even if they divert resources in response.

### 1. There is no "direct services" exception to *Alliance for Hippocratic Medicine*.

The Nonprofit Plaintiffs' response to the State's petition for rehearing en banc argues that *Alliance for Hippocratic Medicine* applies only to organizations engaged in "issue advocacy spending" and not organizations that offer "direct services to individuals." Opp. En Banc Pet. 4-5.

The Supreme Court's decision refutes this argument. Like the Nonprofit Plaintiffs, Alliance for Hippocratic Medicine argued that the government's actions "impaired [their] organizations' ability to provide services." Respondents' Br. 43. But this argument, the Supreme Court held, "does not work to demonstrate standing." 602 U.S. at 394. Put simply, an organization "cannot spend its way into standing," *id.*, regardless of whether it spends that money on advocacy or on providing services to individuals.

This Court correctly applied *Alliance for Hippocratic Medicine* in *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 287 (5th Cir. 2025), holding that disability-rights groups lacked standing to challenge disclosure requirements for assistants for disabled voters. The groups alleged that they had been required to "expend resources" "to educate their members about the provisions." *Id.* But this Court recognized that *Alliance for Hippocratic Medicine* foreclosed their standing, regardless of any individual services provided.

The alternative—holding that an organization acquires standing by voluntarily diverting resources to provide services to individuals—would resurrect precisely the "expansive theory" of standing rejected by the Supreme Court. *All. For Hippocratic*

*Med.*, 602 U.S. at 395; *see also id.* ("[T]hat theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies.").

This is particularly true of providing legal services, which this Court and the Supreme Court have held does not confer standing: "[D]iverting resources to litigation and legal counseling in response to actions or inactions of another party" does not confer standing. *Deep South Center for Env't Just. v. EPA*, 138 F.4th 310, 318 (5th Cir. 2025) (internal quotation marks omitted).

Over thirty years ago, this Court correctly rejected the arguments of a legal advocacy organization with a "statutory mandate . . . to protect and advocate the rights of disabled individuals" that it had standing because it "provide[d] disabled individuals with legal representation." *ARC*, 19 F.3d at 244. This theory would allow "any sincere plaintiff [to] bootstrap standing by expending its resources" or claiming that "it believed the rights of its targeted beneficiaries had been violated." *Id.* But advocacy groups "have no legally-protected interest in *not* expending their resources on behalf of individuals for whom they are advocates." *Id.*

The Supreme Court similarly rejected the argument that an attorney—even an attorney who could "make a credible claim that a challenged regulation would affect his income to satisfy Article III"—would have standing "to bring in court the claims of future unascertained clients." *Kowalski v. Tesmer*, 543 U.S. 125, 134 & n.5 (2004) (citing and quoting *Tesmer v. Granholm*, 333 F.3d 683, 709 (6th Cir. 2003) (Rogers,

J., concurring in part and dissenting in part)). If this were permitted, "the possibilities would be endless." *Id.* at 134 n.5.

In their response to the petition for rehearing en banc, the Nonprofit Plaintiffs argued that *Kowalski* is inapplicable because it concerns third-party standing. Opp. En Banc Pet. 6. But this response begs the question. Like the hypothetical attorney in *Kowalski*, even if the Nonprofit Plaintiffs could identify some pocketbook Article III injury, they still could not assert the rights of the individuals regulated by the state and federal laws at issue. Any right—and any claim—under federal law would belong to those individuals. *See supra* at 26-30.

The Nonprofit Plaintiffs' theory of "lawyer standing" closely resembles the theory of "doctor standing" rejected in *Alliance for Hippocratic Medicine*: "[T]he law has never permitted doctors to challenge the government's loosening of general public safety requirements simply because more individuals might then show up at emergency rooms or in doctors' offices with follow-on injuries." 602 U.S. at 391. "[T]here is no Article III doctrine of 'doctor standing' that allows doctors to challenge general government safety regulations." *Id.*

There is similarly no Article III doctrine of "lawyer standing" that allows lawyers or organizations providing legal services to challenge general government regulations on behalf of the beneficiaries of those services. Such a theory of standing would be boundless: "Firefighters could sue to object to relaxed building codes that increase fire risks. Police officers could sue to challenge a government decision to legalize certain activities that are associated with increased crime." *Id.* at 392. It would be absurd, the Supreme Court held, if "teachers in border states could sue to

challenge allegedly lax immigration policies that lead to overcrowded classrooms." *Id*. The effect of changes to immigration policy on the Nonprofit Plaintiffs is no greater than its effect on these teachers.

The Supreme Court refused to start the federal judiciary down the path of providing "virtually every citizen [with] standing to challenge virtually every government action that they do not like." *Id*. at 392. The Nonprofit Plaintiffs are free to oppose S.B.4, but their opposition—no matter how heartfelt—does not provide them with standing to challenge the law in court, even if they intend to provide services to individuals affected by the law.

### 2. Organizations do not have standing to challenge laws that interfere with their missions, no matter how they frame that challenge.

Nor does it matter that the Nonprofit Plaintiffs contend they will be "forced" to divert resources in response to S.B.4. These assertions merely repackage the same theory—rejected by the Supreme Court—that they have standing because S.B.4 impairs their ability to achieve their organizational missions. *Id*. at 394.

Before the district court, for example, Las Americas explained that S.B.4 "directly impacts and fundamentally frustrates our organization's purpose" to "ensur[e] access to asylum and protection from removal." ROA.941. To continue achieving this purpose, Las Americas stated that it would "develop an entirely new operation to provide immigration representation to those arrested under S.B.4." ROA.942. In other words, Las Americas contends that it was "required" to develop a new program because, without such a program, S.B.4 would impair the fulfillment of its mission. The district court's findings capture this theory: "SB 4 will require

them to spend *more* resources on education and outreach only *to achieve the same outcomes*." ROA.490 (second emphasis added). All the Nonprofit Plaintiffs' arguments about what they "will need to" do, ROA.943, what they "will have to" do, ROA.947, and what S.B.4 "will necessarily require," ROA.948, merely restate the argument that S.B.4 will impair their ability to achieve their organizational missions—precisely the theory of standing the Supreme Court rejected.

In *Deep South Center*, 138 F.4th at 318, this Court correctly held that environmental groups lacked standing to challenge a rule granting Louisiana primary enforcement authority over underground wells. "Only in the rarest cases can organizations demonstrate standing by showing a defendant's action interferes with their activities." *Id.* at 318. It was not enough for a group to change "its programming or activities in response to the defendants' actions" even if it dedicated hundreds of hours "to education and advocacy." *Id.* at 319, 320. Nor was the "drain on the organization's resources" enough. *Id.* at 319. Because the EPA's approval "place[d] no obstacles" and "neither prevent[ed]" the group "from engaging in its advocacy, education, and training activities nor compel[led] it to take any action," the group had no standing. *Id.* at 319-20.

The Nonprofit Plaintiffs also repackage their theory that the law interferes with their missions by characterizing their existing activities at a high level of generality. Las Americas, for example, now describes its "core business activity" as "representing recent entrants and ensuring that they 'have a fair opportunity to establish their eligibility for relief from removal.'" Opp. En Banc Pet. 2. (internal citation omitted). But this does not describe Las Americas' ongoing activities—it

describes Las Americas' mission and "abstract social interests." *All. For Hippocratic Med.*, 602 U.S. at 394.

Before the district court, Las Americas candidly described its existing activities far more narrowly: "The staffing of Las Americas, and the allocation of resources, has always been designed to provide the assistance and representation people need to seek protection *through the federal immigration system*." ROA.940 (emphasis added); *see also* ROA.940-42 (detailing that Las Americas' existing activities involve only the federal immigration system).

Generalizing these existing activities—to "representing recent entrants" and ensuring a fair opportunity to avoid removal—merely restates the assertion that S.B.4 impairs Las Americas' mission. If this generalization were permissible, then there is no reason that the Nonprofit Plaintiffs' existing activities could not be described at an even higher level of generality, such as "pursing justice" and "ensuring liberty," providing them standing to challenge any law that they dislike. As the State explained in its petition for rehearing en banc—and the Nonprofit Plaintiffs did not deny in response—their theory of standing would mean that an organization that seeks to reduce incarceration by providing counseling to individuals about criminal laws would have standing to challenge any new criminal law enacted anywhere in the country. Pet. 9.

Following the passage and enactment of S.B.4, the Nonprofit Plaintiffs remain free to continue offering counseling regarding federal immigration law. That they might choose additionally to assist individuals with navigating S.B.4 is a voluntary

diversion of resources that does not give rise to standing, even if not doing so would interfere with the organizations' broad societal goals.

### 3. *Havens Realty* does not support the Nonprofit Plaintiffs' standing.

*Havens Realty*—on which the Nonprofit Plaintiffs relied heavily at the district court and on appeal—does not create the broad exception to *Alliance for Hippocratic Medicine* that they suggest. *See* Appellees' Br. 10, 13, 16-17 (citing *Havens Realty*); ROA.755 (relying on "*Havens* standing").

The Supreme Court described *Havens Realty* as "an unusual case" and refused to extend its "holding beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396. This Court recognizes that that the decision is "limited . . . to its facts." *Deep S. Ctr.*, 138 F.4th at 319.

*Havens Realty* involved a traditional tort committed directly against the plaintiff organization—it offers no support to organizations seeking to raise facial, pre-enforcement challenges to state laws regulating third parties. In *Havens Realty*, a real estate company provided a housing counseling organization with false information about apartment availability, which interfered with the organization's ability to find homes for its clients. 455 U.S. at 368. As the Supreme Court explained in *Alliance for Hippocratic Medicine*, this misrepresentation "directly affected and interfered" with the plaintiff's "business activities" in the same way that a retailer would be harmed by being "s[old] defective goods" by a manufacturer. 602 U.S. at 395. In other words, *Havens Realty* involved a traditional tort—an intentional misrepresentation—committed directly against the plaintiff organization that allowed it to assert a claim under the Fair Housing Act.

There is nothing remotely similar in this case; the Nonprofit Plaintiffs merely object to a law that they believe will interfere with their abstract societal goals and that regulates individuals to whom they voluntarily provide services. As Judge Oldham explained in dissent, they are "a complete stranger to the statute and its enforcement." *Texas II*, 144 F.4th at 698 (Oldham, J., dissenting). *Havens Realty* does not support the broad theory of standing pressed by the Nonprofit Plaintiffs.

The Nonprofit Plaintiffs' expansive theory of organizational standing would have been incorrect before *Alliance for Hippocratic Medicine*, but the Supreme Court's decision confirms that they lack standing.

## B. El Paso County does not have standing.

El Paso County is a subdivision of Texas and thus, as a "general rule," lacks standing to sue the State. *Donelon v. La. Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 567 n.6 (5th Cir. 2008); *see also, e.g.*, *Coleman v. Miller*, 307 U.S. 433, 441 (1939); *City of Trenton v. New Jersey*, 262 U.S. 182, 188 (1923).

Even if El Paso could sue, S.B.4 does not injure it. El Paso County first contends that S.B.4's enforcement will "erode the public trust the County has worked to develop with its most vulnerable communities." Appellees' Br. 19. This theory of standing is equally expansive and erroneous. It has no "close historical or common-law analogue" and no relationship to any injury that this Court or the Supreme Court has ever recognized. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).

There is a good reason that this theory has not been adopted. The loss of trust a community has in its local government is impossible to measure and is entirely subjective. *Texas II*, 144 F.4th at 703-04 (Oldham J., dissenting). In the State's view,

public trust is undermined far more by unchecked illegal immigration than it would be by robust enforcement of S.B.4. The "injury" is in the eye (and the policy preferences) of the beholder. As Judge Oldham noted, "[t]hat, after all, is why El Paso's politicians think the state law will diminish public trust, while (say) Lubbock County's politicians might think the state law will improve it." *Id.* at 704 (Oldham J., dissenting). Practically any policy could be said to harm the "reputation" of a political subdivision among those who oppose it. If a county has standing to sue anytime a law would hurt its "reputation" among some constituents, no limiting principle prevents cities and counties from challenging any law that they dislike.

El Paso also contends that it has standing because it will be required to incur costs in order to "house and process noncitizens detained under S.B.4." Appellee's Br. 18-19. This alleged injury is highly conclusory and speculative. It assumes that people will be detained in El Paso prisons for a lengthy period of time under S.B.4, but this is unlikely. Many people convicted under S.B.4 may be punished with only a small fine or a short period of confinement, likely in facilities run by the State rather than the County. ROA.315 (Escalon Decl.) (explaining that DPS will "prioritize enforcement of SB 4 in counties that are close to facilities operated by TDCJ and the State"). And the law is designed to facilitate Texas's cooperation with federal authorities to remove illegal immigrants from the State, so it is just as likely to free up space in El Paso's facilities by removing illegal immigrants and deterring additional illegal border crossings. S.B.4. has never taken effect, and El Paso has no

basis for its speculative claims regarding the law's impact. *Texas II*, 144 F.4th at 705-06 (Oldham J., dissenting).[1]

Moreover, these alleged injuries are based on the "the unfettered choices made by independent actors not before the courts." *All. for Hippocratic Med.*, 602 U.S. at 383 (internal citation omitted). In particular, any injury to El Paso County depends on the extent to which S.B.4 is enforced in El Paso County, the exercise of prosecutorial authority, the choices of defendants to stand trial rather than accept a return order, and judicial decisions to detain arrestees rather than release them on bond. How these decisions will be made is entirely unknown.

Any injury to El Paso County is also speculative because Texas will likely reimburse the County for its expenses. Texas has already passed a law appropriating $1.5 billion to "alleviate costs associated with an increased demand on local prosecutorial, judicial, and correctional resources." *See* Act of Dec. 18, 2023, 88th Leg., 4th C.S., ch. 1, § 1, 2023 Tex. Gen. Laws 4769 (S.B. 3) (eff. Mar. 5, 2024). As the party with the burden to establish standing, El Paso County needs to demonstrate that the State *would not* reimburse it for any expenses. It has not, and cannot, do so.

El Paso County's theory would give counties standing to challenge any state law with even a *de minimis* impact on county budgets or resources. This is particularly

---

[1] El Paso's theory that its jails will be so full that it will be unable to house federal prisoners is speculative. Appellees' Br. 50; ROA.583. Additionally, as Judge Oldham noted, El Paso County is reimbursed only for its actual costs for housing these inmates and therefore is not injured by being unable to receive additional federal prisoners. *Texas II*, 144 F.4th at 708-09 (Oldham J., dissenting).

problematic because El Paso County relies on *judicial* costs. But *any* new law will have at least an incidental impact on judicial resources *anytime* it is enforced. Under this theory, "counties would suffer injury any time a State passes any new law at all." *Texas II*, 144 F.4th at 711 (Oldham J., dissenting).

This Court has correctly rejected efforts by counties to bring challenges on the basis of generalized economic injuries such as "the loss of general tax revenues." *El Paso County, Tex. v. Trump*, 982 F.3d 332, 345 (5th Cir. 2020). This appeal should be no exception.

*   *   *

Both the Nonprofit Plaintiffs and El Paso County lack standing. They are not injured by S.B.4 because they are not regulated by the law, and their alleged injuries stem from either voluntary organizational choices (for the Nonprofit Plaintiffs) or the downstream speculative economic impact of the law (for El Paso County). This Court should enforce Article III's limits and hold that their challenge to S.B.4 must be dismissed for lack of jurisdiction.

## II. Plaintiffs Lack a Cause of Action to Challenge S.B.4.

Even if Plaintiffs could satisfy Article III, they lack a cause of action. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (explaining that the Supremacy Clause "does not create a cause of action"). This Court and the Supreme Court have recognized a non-statutory, implied "cause of action . . . at equity," *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 475 (5th Cir.

2020) (en banc) (emphasis omitted);[2] *Armstrong*, 575 U.S. at 327, but neither has held that the right to bring such an action is coextensive with Article III, *see also Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (rejecting the presumption for statutory causes of action that "an action is available to anyone who can satisfy the minimum requirements of Article III" and noting "the unlikelihood that Congress meant to allow all factually injured plaintiffs to recover" (internal quotation marks omitted)).

Federal courts have "jurisdiction over suits to enjoin state officials from interfering with federal rights," *Shaw*, 463 U.S. at 96 n.14, but "the right invaded [must be] a legal right—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege," *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137 (1939).

This Court should hold that the non-statutory cause of action at equity exists only for the party whose right has been invaded. The right at issue must necessarily belong to the plaintiff. *See Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025) ("It is an elementary principle that a court cannot adjudicate directly upon a person's right without having him either actually or constructively before it." (quoting *Gregory v. Stetson*, 133 U.S. 579, 586 (1890)). A litigant "must assert his own legal rights and

---

[2] As Judge Oldham's dissent notes, the phrase "'grievance' sufficient to invoke 'equitable jurisdiction'" may be more accurate than "cause of action." *See Texas II*, 144 F.4th at 712 (Oldham, J., dissenting) (discussing Samuel L. Bray & Paul B. Miller, *Getting Into Equity*, 97 NOTRE DAME L. REV. 1763, 1764, 1765 (2022)). For readability and consistency with *Green Valley*, this brief refers to "cause of action."

interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian Coll.*, 454 U.S. at 474 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

When, as in this case, no federal right of the plaintiff has been invaded, the plaintiff has no cause of action at equity.[3] "To qualify for relief under general principles of equity jurisprudence, the plaintiff normally needed to establish not only that the defendants were behaving unlawfully, but also that their behavior amounted to an invasion of recognized legal rights (or legally protected interests) that the law *conferred upon the plaintiff in particular*." Caleb Nelson, *"Standing" and Remedial Rights in Administrative Law*, 105 Va. L. Rev. 703, 716 (2019) (emphasis added; internal quotation marks omitted); *see also Tenn. Elec. Power Co.*, 306 U.S. at 137-40 (holding that plaintiffs, despite alleging economic injuries, had no "right to sue" because they had no legally protected "right to be free of competition"); *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 125 (1940) ("[N]either damage nor loss of income in consequence of the action of Government, which is not an invasion of recognized legal rights, is in itself a source of legal rights in the absence of constitutional legislation recognizing it as such.").

---

[3] Although this inquiry closely resembles standing (and, in many cases, as in this case, a party will lack both standing and a cause of action at equity), it is analytically distinct. For example, a party can demonstrate an injury under Article III by demonstrating harm arising from "the predictable effect of Government action on the decisions of third parties," *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019), but such a party would not possess a cause of action at equity unless the government invaded the party's legal rights. Conversely, a party may well possess a cause of action without suffering an Article III injury. *TransUnion LLC*, 594 U.S. at 426.

The Supreme Court has allowed parties to assert equitable claims based on the rights of non-parties only in limited circumstances. *See June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 359-60 (2020) (Thomas, J., dissenting) (noting "deviat[ions] from th[e] traditional rule against third-party standing," including *Truax v. Raich*, 239 U.S. 33, 38-39 (1915), and *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535-36 (1925), and describing these cases as examples of cases in which one party "was permitted to assert the rights of" another).[4] In this case, Plaintiffs have disavowed any attempt to assert claims based on the rights of individuals not before the court. Opp. En Banc Pet. 6 n.3.

As noted above, political subdivisions as a "general rule" cannot sue the State. *Donelon*, 522 F.3d at 567 n.6. But political subdivisions may seek injunctions against enforcement of state laws that allegedly infringe rights specifically conferred on the political subdivision by federal law. *See Rogers v. Brockette*, 588 F.2d 1057, 1061 (5th Cir. 1979) (noting the plaintiff's assertion that "federal breakfast statutes [provide the school district] the right to decide, on the local level, whether to accept the breakfast program");[5] *Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S.

---

[4] The Supreme Court has struggled to identify the "[third-party standing] doctrine's proper place in the standing firmament." *Lexmark*, 572 U.S. at 127 n.3. At least with respect to non-statutory equitable actions, "third-party standing" could be interpreted as addressing the existence of a non-statutory cause of action in equity. *See also CASA*, 606 U.S. at 866-867 (Alito, J., concurring) (discussing third-party standing limitations).

[5] *But see Donelon*, 522 F.3d at 566-67 (suggesting that *Rogers* is "anomalous" and arguably out of step with the general principle "that state officials lack standing to

256, 263 (1985) (involving a suit by a local government challenging a state law that allegedly interfered with the federal "objective of ensuring local governments the freedom and flexibility to spend the federal money as they saw fit"). As the Tenth Circuit explained, political subdivisions can challenge state laws as preempted only when they assert "substantive rights" arising from "a federal statute directed at protecting political subdivisions." *City of Hugo v. Nichols*, 656 F.3d 1251, 1257 (10th Cir. 2011). "[C]ourts have allowed such suits only when Congress has enacted statutory law specifically providing rights to municipalities." *Id.* El Paso County identifies no such specially conferred federal right here.

Even if Plaintiffs could satisfy the requirements of Article III, because they do not allege an invasion of "[their] own legal rights and interests," *Valley Forge*, 454 U.S. at 474, they do not have a cause of action in equity, and their claims fail.

## III. Texas's Invocation of the Self-Defense Clause Presents a Non-Justiciable Political Question.

S.B.4 cannot be facially preempted because, at the very least, the law may be applied pursuant to Texas's authority under the Self-Defense Clause of the United States Constitution. U.S. CONST. art. I, § 10, cl. 3. Governor Abbott previously declared an invasion along the Texas-Mexico border, and the exercise of authority under that declaration presents a non-justiciable political question. *Supra* Executive Order GA-41, at 2; Statement of Governor Greg Abbott (Jan. 24, 2024), *available at* https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf.

---

challenge the constitutional validity of a state statute when they are not adversely affected by the statute").

When Texas joined the Union, it did not surrender the "power of self-preservation which must be inherent in every organized community." *Smith v. Turner*, 48 U.S. (7 How.) 283, 400 (1849) (McLean, J.). When a State is "actually invaded, or in such imminent Danger as will not admit of delay," the State is free to exercise its sovereign power to "engage in War" "without the Consent of Congress." U.S. CONST. art. I, § 10, cl. 3.

The concept of an "invasion" was understood broadly by the Framers. *See* Appellants' Br. 33 (recounting early-1800s definitions); 3 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 420 (Jonathan Elliot ed., Washington, D.C., 2d ed. 1836) (John Marshall arguing that the Self-Defense Clause meant that states "can use the militia when they find it necessary"). From the dawn of statehood, Texas's history reflects a similarly broad understanding—encompassing repeated cross-border depredations by non-state actors for theft, smuggling, property damage, or violence. In 1874, for example, Texas Governor Coke invoked the Self-Defense Clause in a letter to the U.S. Attorney General explaining the State was taking defensive measures "to defend the people of Texas against hostile invasion" by criminal gangs entering from Mexico. According to the U.S. House of Representative's Special Committee on Texas Frontier Troubles, "Attorney General Williams acquiesced in those conclusions." *See* H. Rep. No. 343, XV-XVI, 13-17, 164-67 (Feb. 29, 1876).

Governor Abbott, as the "Commander-in-Chief of the military forces of the State," TEX. CONST. art. IV, § 7, invoked Texas's power to defend itself against transnational cartels engaged in terrorism, human trafficking, and weapons

smuggling. *See* Executive Order GA-41, *supra*. Repelling cartels operating as a "potent paramilitary force," Barr, *supra*, fits squarely within the Self-Defense Clause. The President of the United States agrees "that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States." *See* Dkt. 223 (United States informing this Court of a January 20th proclamation issued by President Trump); Dkt. 250 (Texas explaining that the President's "second, non-justiciable finding that invasion conditions exist shows that facial relief was always improper").

No party has argued that Governor Abbott's assessment was made in bad faith. *See Baker v. Carr*, 369 U.S. 186, 213 (1962) (noting that the Supreme Court has refused to review military questions like "the political departments' determination of when or whether a war has ended" due to "the need for finality in the political determination" because "emergency's nature demands 'A prompt and unhesitating obedience'" (quoting *Martin v. Mott*, 25 U.S. 19, 20, 6 L. Ed. 537 (1827))); *Luftig v. McNamara*, 373 F.2d 664, 665-66 (D.C. Cir. 1967) ("It is difficult to think of an area less suited for judicial action than . . . the use and disposition of military power"); *see also* Texas's Supplemental Letter Brief, *United States v. Abbott*, No. 23-50632 (5th Cir. May 22, 2024). The Ninth Circuit recently reached a similar conclusion, pointing to a case Texas has repeatedly cited for the *Governor's* authority to make "good faith" determinations "within the discretion of the Executive" under the Self-Defense Clause. *See Newsom v. Trump*, 141 F.4th 1032, 1050-51 (9th Cir. 2025) (citing *Sterling v. Constantin*, 287 U.S. 378, 399-400 (1932)).

The means by which Texas has chosen to combat this invasion presents a non-justiciable political question. If Texas has the power to wage war against invaders, it necessarily has the lesser power to "arrest" them if it deems that the most effective way to respond to the invasion. *See Moyer v. Peabody*, 212 U.S. 78, 84-85 (1909) (Holmes, J.) (holding that the governor's power to "repel invasion" included the power to arrest individuals "to prevent the exercise of hostile power"). S.B.4 may therefore be lawfully applied as an exercise of Texas's constitutional authority under the Self-Defense Clause.

Because at least some applications of S.B.4 fall within Texas's self-defense authority, thus presenting a non-justiciable political question, Plaintiffs' claim that S.B.4 is facially invalid fails.[6]

## IV. Plaintiffs Are Unlikely to Prevail on the Merits.

Even if this Court had jurisdiction and Plaintiffs had a cause of action, the district court's preliminary-injunction order should be reversed because Plaintiffs are unlikely to succeed on the merits.

---

[6] Whether the presence of this non-justiciable political question within the case deprives a court of jurisdiction over the case as a whole is unclear. *Compare United States v. Abbott*, 110 F.4th 700, 725 (5th Cir. 2024) (Ho, J., concurring in the judgment in part and dissenting in part), *with id.* at 723 (Oldham, J., concurring), *and McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, No. 23-60494, 2025 WL 2602899, at *12-13 (5th Cir. Sept. 9, 2025) (distinguishing between a defense "beyond the power and cognizance of civil courts" and jurisdiction in the "narrower Rule 12(b)(1) sense"). Holding that Plaintiffs lack standing allows this Court to avoid this more complex issue.

"All preemption has a constitutional source: the Supremacy Clause." *Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*, 134 F.4th 326, 328 (5th Cir. 2025) (citing *Philadelphia v. New Jersey*, 430 U.S. 141, (1977) (per curiam)). And "[u]nder the Supremacy Clause, any state law that contradicts federal law is preempted." *Id.* (citing U.S. Const. art. VI, cl. 2). "But barring any contradiction, the States retain their sovereign prerogatives to regulate." *Id.* Reflecting this latter principle, "[p]reemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (second alteration in original)); *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (instructing that preemption analysis must begin "with the assumption that the historic police powers of the States [are] not to be superseded . . . unless that [is] the clear and manifest purpose of Congress" (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (alterations in original)).

"Supreme Court precedent establishes a preemption taxonomy." *Zyla*, 134 F.4th at 328. "The first division is between express and implied preemption." *Id.* (citing *Kansas v. Garcia*, 589 U.S. 191, 202-03 (2020)). Only the latter is at issue in this case. "Implied preemption is divided into two types: field preemption and conflict preemption." *Id.* (citing *Garcia*, 589 U.S. at 209-11). "[F]ield preemption applies 'where state law intrudes in an area that Congress has reserved for federal jurisdiction.'" *Crystal Clear Special Util. Dist. v. Jackson*, 142 F.4th 351, 364 (5th Cir. 2025) (quoting *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001)).

And conflict preemption applies "(1) where complying with both federal and state law is impossible; or (2) where the state law creates an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023)).

Federal law does not occupy the entire field of all criminal laws touching on immigration, and S.B.4 does not conflict with federal law, particularly in the facial, pre-enforcement posture of this case.

## A. S.B.4 is not field preempted.

Field preemption exists only where Congress has "occupie[d] an entire field," reflecting "a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona*, 567 U.S. at 401. Nothing short "of an unambiguous congressional mandate to that effect" suffices. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). Field preemption is "rare," *Garcia*, 589 U.S. at 208, and represents a "serious intrusion into state sovereignty," *Va. Uranium Inc. v. Warren*, 587 U.S. 761, 773 (2019) (lead opinion of Gorsuch, J.) (citation omitted), because it "excludes States from entire domains" even "when state laws are entirely consistent with federal law," *Texas II*, 144 F.4th at 722 (Oldham, J., dissenting) (citation omitted).

The presumption against field preemption applies with special force because "[r]estrictions on persons entering a State from a foreign country have historically been within the States' domain." *Id.* at 720 (citing *Mayor of New York v. Miln*, 36 U.S. 102, 132-33 (1837)). S.B.4 touches upon Texas's "paramount interest in

protecting . . . its territorial integrity." *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004).

The Supreme Court illustrated this cautious approach to field preemption in *Arizona*. The Supreme Court carefully analyzed four different provisions of Arizona's S.B.1070 related to illegal immigration, concluding that only one was field preempted. 567 U.S. at 400-03. Defining the relevant field, the Court explained that Congress occupied "the field of alien registration" by enacting a "full set of standards governing alien registration" that were "designed as a harmonious whole" creating "a comprehensive and unified system." *Id.* at 401-02 (citation omitted). As a result, section 3 of the Arizona law, which created a state crime for failing to carry an alien registration card, was field preempted. *Id.* at 400.

But three other challenged provisions were not. *Id.* at 403-16. Two challenged provisions were preempted because they conflicted with federal law, and one challenged provision (section 2(B)) was not preempted at all. The Supreme Court proceeded provision by provision, defining the relevant field for each and examining whether Congress had fully occupied that space. For example, section 2(B) required police officers to communicate with ICE to check the immigration status of every person stopped, detained, or arrested if reasonable suspicion existed that the person was unlawfully present. *Id.* at 412-14. That was true even though application of this provision might well conflict with the Attorney General's "federal enforcement priorities." *Id.* at 412.

Rather than track *Arizona*'s careful, provision-by-provision approach to field preemption, the panel declared that Congress preempted the entire "field of alien

entry and removal" because it is an area "importan[t] to the interest of the national sovereign." *Texas II*, 144 F.4th. at 674. But the Supreme Court has never defined a field so abstractly, based on the presence of "some brooding federal interest." *Garcia*, 589 U.S. 202 (citation omitted). Were it so, field preemption would be far from "rare." *Id.* at 208. And if Congress had truly preempted the entire "field of alien entry and removal," as Judge Oldham explained, "*Arizona* and *Hines* would have been far easier." *Texas II*, 144 F.4th at 724 (Oldham, J., dissenting). Rather than looking closely at each provision of Arizona law, the Supreme Court would have simply declared that because Arizona's laws involved the "field of alien entry and removal," they were preempted in their entirety. But even in *Arizona*, the Court upheld a law bearing on alien entry and removal. *See* 567 U.S. at 411-13.

The federal immigration code is replete with provisions that presuppose state-federal cooperation, refuting any suggestion that "Congress occupies" the field of entry and removal and leaves no role for the States. Under federal law:

- "State and local law enforcement officials are authorized to arrest and detain an individual who" is "an alien illegally present in the United States," and has been convicted of a felony and previously deported or left the country, 8 U.S.C. § 1252c(a)(1)-(2);

- "The Attorney General may enter into a written agreement with a State" to permit state officials "to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States," *id.* § 1357(g)(1);

- No agreement with the Attorney General is required for "any officer or employee of a State" to: "communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States" or "otherwise to cooperate with the Attorney General in the

identification, apprehension, detention, or removal of aliens not lawfully present in the United States," *id.* § 1357(g)(10)(A)-(B);

- State officers may arrest individuals for harboring illegal aliens or engaging in smuggling of aliens, *id.* § 1324(c);

- Federal officials must "admit" state officials to immigration stations to "preserve the peace and make arrests" for state crimes, *id.* § 1358; and

- It is a federal crime for aliens to "fle[e]" state officials near border checkpoints, 18 U.S.C. § 758.

These provisions negate any suggestion that "Congress occupies" the field of entry and removal, leaving no room for the States. "It makes no sense to say the States are preempted from the field when numerous federal statutes establish that Congress affirmatively welcomes state enforcement of and participation in regulating the entry and removal of unlawful aliens." *Texas II*, 144 F.4th at 722 (Oldham, J. dissenting).

Far from excluding States entirely from the field of immigration enforcement, Congress has expressly invited the States to "cooperate" in the "apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10)(B). The State intends to enforce S.B.4's return orders in cooperation with the federal government, precisely as invited by Congress, by delivering aliens to federal officials at lawful points of entry. ROA.315-16. State officers and employees must, of course, act according to state law, and it is absurd to suggest that Congress allows state officers to cooperate with the federal government in identifying, apprehending, detaining, and removing aliens not lawfully present but that state legislatures cannot pass laws enabling or regulating this cooperation. *See City of El Cenizo*, 890 F.3d at 177 (explaining that section 1357(g)(10) "expressly allows cooperation in immigration enforcement" and "indicates that some state and local

regulation of cooperation is permissible"). States cannot, of course, "cooperate" in a manner that conflicts with federal law, *id.* at 178, but Congress's authorization of cooperation by state officials—which necessarily includes state regulation of that cooperation—confirms that Congress did not occupy the entire field of "immigration enforcement."

Consider, for example, a voluntary return order that the State enforces by delivering a detained alien, pursuant to the alien's agreement, to federal officers at a lawful point of entry. ROA.315-16. This is precisely the type of cooperation with federal officials and federal immigration enforcement invited by Congress in section 1357(g)(10)(B). Congress has not occupied this field, and to the extent that the means for cooperation authorized by S.B.4 might conflict with federal law, it is a question of conflict preemption, not field preemption.

The Supreme Court has never found field preemption where Congress has invited state participation. The fields the Supreme Court has found field preempted—such as grain warehousing, *Rice*, 331 U.S. at 235-36; aircraft noise regulation, *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633 (1973); wholesaling natural gas in interstate commerce, *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988); nuclear safety, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 211-12 (1983); design and operation of tanker vessels, *United States v. Locke*, 529 U.S. 89, 111 (2000); and locomotive equipment regulation, *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 636 (2012)—contain no statutory provisions affirmatively inviting state participation comparable to those in the INA. And in the only immigration context where the Supreme Court

has found field preemption—alien registration—Congress enacted no provisions inviting state participation. *Arizona*, 567 U.S. at 401; *Hines v. Davidowitz*, 312 U.S. 52, 70-74 (1941).

As the Supreme Court held in *Arizona*, Congress has occupied "the field of alien registration," 567 U.S. at 401-02, but it has not occupied the entire field of all laws touching on immigration or immigration enforcement. S.B.4 is not field preempted.

## B. S.B.4 is not conflict preempted.

**1.** S.B.4 is not conflict preempted either. Conflict preemption comes in two forms: impossibility and purposes-and-objectives. Because Plaintiffs do not claim that "it is impossible to obey both" S.B.4 and federal immigration law, *Zyla*, 134 F.4th at 329, only purposes-and-objectives preemption is at issue here. That type of conflict preemption "arises when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Hines*, 312 U.S. at 67).

But "[t]his kind of preemption claim must clear a 'high threshold.'" *Deanda*, 96 F.4th at 761 (quoting *Barrosse*, 70 F.4th at 320). "Courts may not conduct 'a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'" because "such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Barrosse*, 70 F.4th at 320 (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (plurality op.)). Instead, "[e]vidence of pre-emptive purpose [must be] sought in the text and structure of the [federal provision] at issue." *Zyla*, 134 F.4th at 329 (alterations in original) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).

"Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." *Va. Uranium*, 587 U.S. at 767.

Plaintiffs' conflict preemption argument fails because S.B.4 does not conflict with, but instead complements and mirrors, federal immigration law. For example, S.B.4's illegal-entry provisions make it a crime to cross into Texas at any other location than a port of entry, TEX. PENAL CODE § 51.02(a), or to illegally re-enter after having previously been "denied admission," having been involuntarily "removed," or having voluntarily "departed from the United States," *id.* § 51.03(a). Federal immigration law prohibits the exact same things. *See* 8 U.S.C. §§ 1325(a), 1326(a). And S.B.4 defers to federal law (and federal determinations) on which aliens are lawfully present, making asylum, lawful presence, or deferred-action status an affirmative defense to an illegal-entry charge. TEX. PENAL CODE § 51.02(c).

Likewise, S.B.4 empowers judges to enter return orders against defendants who violate the illegal entry or reentry prohibitions. TEX. CODE CRIM. PROC. art. 5B.002. But no federal law prohibits this scheme. In fact, much like federal law, S.B.4's return-order provisions allow for an alien to voluntarily agree to return in lieu of prosecution. *Compare* TEX. CODE CRIM. PROC. art. 5B.002(b), *with* 8 U.S.C. §§ 1229a(d), 1229c(a)(1). And even if a state judge enters a return order, Texas will enforce such an order—not by physically removing anyone from the United States— but by a state official transporting the alien to a port of entry, *see* TEX. CODE CRIM. PROC. art. 5B.002(e)(1)-(2); ROA.315, where a federal immigration official may repatriate the alien, *see* 8 U.S.C. § 1225(b)(1)(A)(i).

These provisions of S.B.4 do not hinder, but complement, federal immigration law. As this Court recently explained, "parallel state regulation" does not raise conflict preemption concerns. *Zyla*, 134 F.4th at 338. The Supreme Court has repeatedly reinforced this principle. States retain "some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal." *Plyler v. Doe*, 457 U.S. 202, 225 (1982). And an "overlap" between state and federal law "does not even begin to make a case for conflict preemption." *Garcia*, 589 U.S. at 212; *see also Whiting*, 563 U.S. at 602 (finding no conflict preemption where a state law "traces" and "closely tracks IRCA's provisions in all material respects"); *California v. Zook*, 336 U.S. 725, 726-27 (1949) (holding a state law was not conflict preempted where it is "substantially the same" as a federal statute). Stated simply, "[t]he purpose of the INA is to prohibit illegal immigration." *Texas II*, 144 F.4th at 726 (Oldham, J., dissenting). "S.B.4 shares that exact same purpose" and furthers it "by expressly tethering itself to federal law." *Id.*

2.    The district court and the panel identified several alleged conflicts between S.B.4 and federal immigration law, but none is a true conflict.

*First*, the district court and the panel held that S.B.4 conflicts with federal law because it allows state courts to "determine if an alien has entered illegally and order their removal," thus interfering with "federal immigration officials' ability to determine the applicant's admissibility." *Id.* at 678, 679 (majority op.); ROA.537.

This analysis overlooks that S.B.4's illegal entry provisions expressly *incorporate* federal officials' admissibility determinations, making the federal government's

"grant" of lawful presence, asylum, or deferred-action status an affirmative defense to prosecution. TEX. PENAL CODE § 51.02(c). S.B.4 therefore does not run afoul of the principle that "the power to classify non-citizens is reserved exclusively to the federal government," *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 537 (5th Cir. 2013) (en banc) (plurality op.), because it does not authorize state judges to "establish unlawful status apart from the federal determination," *id.* at 536 (quoting *Whiting*, 563 U.S. at 601 n.7), or allow state courts to ignore the federal determination if it is not "conclusive," *id.* The federal determination controls, so S.B.4 does not "ope[n] the door to conflicting state and federal rulings on the question." *Id.*

*Second*, the district court and the panel held that S.B.4's provisions forbidding the abatement of illegal-entry or -reentry prosecutions on the grounds that a federal determination is pending or will be initiated, TEX. CODE CRIM. PROC. art. 5B.003, conflicts with federal law to the extent it allows Texas "to remove an alien before" the federal government has resolved a CAT claim, asylum application, or otherwise determined to admit the alien. *Texas II*, 144 F.4th at 680; ROA532-35.

But this abatement directive does not require removal. It directs courts not to pause a state criminal prosecution but does not foreclose a prisoner's transfer to federal custody, as in other contexts such as a criminal detainer or a writ of *habeas corpus ad testificandum*. Moreover, this contention misunderstands state law. As Texas has repeatedly explained, S.B.4 does not allow the State to deport anyone but instead authorizes state officials to transfer an individual against whom a return order has been entered to a port of entry and into the custody of federal officials. *See* TEX.

43

CODE CRIM. PROC. art. 5B.002(e); Appellants' Br. 21; Appellants' Reply Br. 12; Apr. 3, 2024, Oral Arg. Tr. at 10:00-14:00. It is "hard to see how" Texas "could interfere with Congress's purposes by turning an alien over to the Federal Government so it can place the alien in the very system Congress devised." *Texas II*, 144 F.4th at 728 (Oldham, J., dissenting).[7] And federal law recognizes that the States need no *ex ante* "agreement" from the federal government "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10). That is precisely what the return-order provisions of S.B.4 do.

*Third*, the panel observed that while S.B.4 makes illegal entry and re-entry a criminal-law violation, the federal government might instead choose to initiate civil immigration proceedings. *Texas II*, 144 F.4th at 680. It then concluded that "'conflict is imminent' when 'two separate remedies are brought to bear on the same activity.'" *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 380 (2000)). But this notion is irreconcilable with the separate-sovereigns doctrine, which recognizes that federal and state governments may administer separate criminal codes that penalize the same underlying conduct. *Gamble v. United States*,

---

[7] This misconception of the return-order provision as authorizing Texas to conduct unilateral deportations, explains why the panel and district court were also wrong to find a conflict on the basis that S.B.4 authorizes Texas "to remove aliens from the United Sates without notice to or consent from the federal government" and undercuts "the United States' authority to select the country to which aliens will be removed." *Texas II*, 144 F.4th at 680, 681; *see also* ROA.535-36.

587 U.S. 678, 683-91 (2019). It is harmony—not conflict—for a State to criminalize what the federal government criminalizes.

It is not supported by *Crosby* either. In *Crosby*, the Supreme Court addressed circumstances where Congress set a ceiling as well as a floor on state regulation. 530 U.S. at 377 ("Congress manifestly intended to limit economic pressure against the Burmese Government to a specific range."). There is no similar suggestion here that Congress intended to limit enforcement of immigration law "to a specific range" or to "steer a middle path." *Id.* at 377-78. To the contrary, "[t]here is no golden mean of illegal immigration as far as the laws of the United States are concerned. All of it is, well, illegal." *Texas II*, 144 F.4th at 726-27 (Oldham J., dissenting) (citation omitted).

Nor is *Arizona* to the contrary. *See id.* at 684-86 (majority op.); ROA.530-31. Arizona's laws conflicted with the purposes and objectives of federal law because, unlike Texas, Arizona "enact[ed] a state criminal prohibition where no federal counterpart exists" and where "Congress made a deliberate choice not to impose criminal penalties." 567 U.S. at 403, 405, 408. No similar conflict exists here where S.B.4 mirrors, and defers to, federal law on which aliens are lawfully present. TEX. PENAL CODE §§ 51.01(2), 51.02(c). There is no suggestion that Texas criminalizes conduct that Congress "made a deliberate choice" not to criminalize.

*Fourth*, the panel stated that S.B.4 "significantly eliminate[s] the exercise of discretion by federal immigration officials." *Texas II*, 144 F.4th at 681. But this argument "does not even begin to make a case for conflict preemption." *Garcia*, 589 U.S. at 211. Conflict must arise from "either the Constitution itself or a valid

statute enacted by Congress." *Id.* at 202. "[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Id.* at 212 (quoting U.S. CONST. art. VI, cl.2). Preemption cannot "turn on the position of the Executive Branch when it changes with elections," as this case exemplifies. *Texas II*, 144 F.4th at 727 (Oldham, J., dissenting).

**3.** At minimum, Plaintiffs' conflict-preemption arguments must fail at this time because they cannot satisfy the exacting standards required to prevail on a facial challenge. Those standards required them to prove "that no set of circumstances exists under which [S.B.4] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). But if S.B.4 can be lawfully applied in some circumstances, Plaintiffs' facial challenge must be rejected. Facial injunctions are the exception, and where the requirements for such extraordinary relief are not met, "courts must handle unconstitutional applications as they usually do—case-by-case." *United States v. Hansen*, 599 U.S. 762, 770 (2023).

There are circumstances where there is little question that S.B.4 can be lawfully applied. For instance, S.B.4's arrest provisions could apply to an alien who has already been adjudicated to be illegally in the United States without a lawful defense against removal or to an alien whom the United States encourages Texas to arrest and charge. In such circumstances, there is no possible conflict between federal objectives and the enforcement of S.B.4. Similarly, there is no conflict with federal objectives in the State enforcing a return order that is agreed to by the alien and by

transferring the alien to federal immigration authorities. TEX. CODE CRIM. PROC. art. 5B.002(c)(1).

The panel's conflict-preemption analysis underscores these points. For example, the panel and the district court found conflict preemption because allowing a state to prosecute illegal entry and reentry might interfere with "federal immigration officials' ability to determine the applicant's admissibility." *Supra* at 43. But in a circumstance where those determinations are overlapping—say, for example, when an alien can assert a valid federal affirmative defense or when federal immigration officials have already adjudicated the alien inadmissible—there would be no state interference and thus no conflict. Likewise, the panel's concern that federal law provides broader remedies—civil as well as criminal sanctions—can create no conflict where state and federal officials both opt for criminal proceedings. *Cf. supra* at 44-46. And of course, the panel's conclusion that state officials' enforcement of S.B.4 might interfere with federal enforcement priorities, *supra* at 46, can generate no conflict where enforcement priorities cannot ground preemption, *Garcia*, 589 U.S. at 212, and in any event those federal priorities are now *aligned* with S.B.4's state-enforcement scheme, *see Texas II*, 144 F.4th at 727 (Oldham, J., dissenting).

\* \* \*

Congress has not occupied the entire field of laws related to immigration or immigration enforcement but has instead left room for state cooperation and parallel state legislation. S.B.4 does not conflict with federal immigration law, particularly

not under the stringent standard required for a facial, pre-enforcement challenge. Plaintiffs have not demonstrated a likelihood of success on the merits.

## V. Plaintiffs Did Not Satisfy the Other Preliminary Injunction Factors.

In addition to failing to demonstrate a likelihood of success on the merits, Plaintiffs did not show that they are "likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).

None of Plaintiffs' alleged injuries would constitute irreparable harm. As detailed above, neither the Nonprofit Plaintiffs nor El Paso County contend that they will lose any right protected by federal law in the absence of an injunction. *See supra* at 26-30. The Nonprofit Plaintiffs contend instead that they will suffer, at most, downstream economic injuries caused by their diversion of resources in response to the State's regulation of third parties. El Paso County's alleged economic losses are similar. Even if these pocketbook injuries could confer Article III standing, they do not constitute irreparable harm that would justify injunctive relief. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies."). The sole exception is El Paso County's claim of "reputational injury," but as detailed above, the reputation of a governmental entity is not a cognizable injury. *Supra* at 23-24.

Nor do the balance of equities and public interest favor a preliminary injunction. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v.*

*King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (alteration in original). And the public interest "demands effective measures to prevent the illegal entry of aliens." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Enforcement of S.B.4 will reduce the countless harms associated with the border crisis, including drug smuggling, human trafficking, and terrorism, plainly in the public interest. In addition, even if the district court correctly found that *some* applications of S.B.4 were preempted, it was not in the public interest to enjoin the law on its face given S.B.4's robust severability clause, which in Texas "prevails when interpreting the ordinance." *Builder Recovery Servs., LLC v. Town of Westlake*, 650 S.W.3d 499, 507 (Tex. 2022).

The district court also erred by issuing a universal injunction that "prevents enforcement of any part of S.B.4 against anyone at any time and under any circumstances forever." *Texas I*, 97 F.4th at 298 (Oldham, J., dissenting). In its recent decision in *Trump v. CASA*, the Supreme Court held that universal injunctions "fal[l] outside the bounds of a federal court's equitable authority." 606 U.S. at 844. "When a federal court enters a universal injunction against the Government," it improperly intrudes on "a coordinate branch of the Government" causing irreparable harm. *Id.* at 859. At a minimum, this Court should direct the district court to amend its injunction "to the extent that [it is] broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861.

49

## Conclusion

For these reasons, this Court should reverse the order granting a preliminary injunction and order the district court to dismiss Plaintiffs' claims for lack of jurisdiction.

Respectfully submitted.

/s/ William R. Peterson

| | |
|---|---|
| Ken Paxton<br>Attorney General of Texas | William R. Peterson<br>Solicitor General<br>William.Peterson@oag.texas.gov |
| Brent Webster<br>First Assistant Attorney General | William F. Cole<br>Principal Deputy Solicitor General |
| Office of the Attorney General<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1700<br>Fax: (512) 474-2697 | Daniel M. Ortner<br>Assistant Solicitor General<br><br>Garrett C. Gray<br>Assistant Attorney General |

*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

On October 13, 2025, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ William R. Peterson
WILLIAM R. PETERSON

## CERTIFICATE OF COMPLIANCE

This petition complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 12,951 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ William R. Peterson
WILLIAM R. PETERSON