No. 24-50149

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

STATE OF TEXAS; GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY; FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants-Appellants.*

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees,*

v.

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Western District of Texas

## BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE* SUPPORTING APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
BENJAMIN HAYES
  *Attorneys*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## CERTIFICATE OF INTERESTED PARTIES

*Amicus Curiae* is a governmental entity.   Under Fifth Circuit Rule 28.2.1, a certificate of interested parties is not required.

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ........................................................................1

STATEMENT OF THE ISSUES ..........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

STATEMENT OF THE CASE .............................................................................4

I.     The federal prohibition on illegal entry and reentry ...............................4

II.     Senate Bill 4 .............................................................................................5

III.     Prior Proceedings ....................................................................................7

ARGUMENT .......................................................................................................8

I.     Supreme Court precedent forecloses organizational standing in this case. ..........8

II.     Senate Bill 4 is not preempted. ............................................................. 12

     A.     Senate Bill 4 is not field preempted. ............................................13

     B.     Senate Bill 4 is not conflict preempted. ......................................18

CONCLUSION ................................................................................................. 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Arizona v. United States,*
   567 U.S. 387 (2012) ............................................................... 14, 15, 16, 18, 23

*California v. Zook,*
   336 U.S. 725 (1949) ...................................................................................21

*Chamber of Com. of the U.S. v. Whiting,*
   563 U.S. 582 (2011) ...................................................................................19

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ...................................................................................10

*DeCanas v. Bica,*
   424 U.S. 351 (1976) ............................................................................. 13, 14

*Deep S. Ctr. for Env't Justice v. EPA,*
   138 F.4th 310 (5th Cir. 2025) .............................................................. 10, 11

*FDA v. Alliance for Hippocratic Medicine,*
   602 U.S. 367 (2024) .................................................................. 2, 8, 9, 10, 11

*Gamble v. United States,*
   587 U.S. 678 (2019) ...................................................................................20

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher,*
   267 F.3d 1228 (11th Cir. 2001) ..................................................................20

*Gilbert v. Minnesota,*
   254 U.S. 325 (1920) ...................................................................................20

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ........................................................................... 2, 8, 10

*Hines v. Davidowitz,*
   312 U.S. 52 (1941) .....................................................................................14

*Kansas v. Garcia,*
   589 U.S. 191 (2020) .............................. 2, 3, 12, 13, 14, 16, 18, 19, 20, 22

*Moody v. NetChoice. LLC,*
   603 U.S. 707 (2024)........................................................................... 19, 24

*National Pork Producers Council v. Ross*,
  598 U.S. 356 (2023)...................................................................................20

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015).............................................................11

*Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*,
  485 U.S. 495 (1988)...................................................................................12

*Plyler v. Doe*,
  457 U.S. 202 (1982) ..................................................................................20

*R.J. Reynolds Tobacco Co. v. Durham Cnty.*,
  479 U.S. 130 (1986) ...................................................................... 2, 13, 14

*United States v. Salerno*,
  481 U.S. 739 (1987)...................................................................................19

*United States v. Texas*,
  719 F. Supp. 3d 640 (W.D. Tex. 2024)...............7, 8, 10, 15, 16, 17, 18, 21, 22, 23, 24

*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024) .....................................................................7

*United States v. Texas*,
  144 F.4th 632 (5th Cir. 2025) .....................8, 10, 11, 12, 16, 17, 18, 19, 21, 22, 23, 24

*Virginia Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)........................................................................ 3, 12, 18

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008)........................................................................ 3, 19, 22

*Wisconsin Dep't of Industry, Lab. & Hum. Rels. v. Gould*,
  475 U.S. 282 (1986)...................................................................................23

**U.S. Constitution:**

U.S. Const. art. VI, cl. 2.............................................................................12

**Statutes:**

8 U.S.C. § 1302............................................................................................14

8 U.S.C. § 1302(c)........................................................................................15

8 U.S.C. § 1303(a) .................................................................................. 14, 15

8 U.S.C. § 1304 .......................................................................................... 14

8 U.S.C. § 1305 .......................................................................................... 14

8 U.S.C. § 1306 .......................................................................................... 15

8 U.S.C. § 1324(c) ...................................................................................... 21

8 U.S.C. § 1325(a) ..................................................... 1, 4, 5, 13, 17, 23

8 U.S.C. § 1325(b) ........................................................................................ 4

8 U.S.C. § 1325(c) ........................................................................................ 4

8 U.S.C. § 1325(d) ........................................................................................ 4

8 U.S.C. § 1326(a) ..................................................... 1, 4, 13, 17, 23

8 U.S.C. § 1326(a)(2) .................................................................................... 5

8 U.S.C. § 1326(b)(1) .................................................................................... 5

8 U.S.C. § 1326(b)(2) .................................................................................... 5

8 U.S.C. § 1326(b)(3) .................................................................................... 5

8 U.S.C. § 1326(b)(4) .................................................................................... 5

8 U.S.C. § 1326(c) ........................................................................................ 5

8 U.S.C. § 1357(g) ...................................................................................... 21

8 U.S.C. § 1357(g)(1) .................................................................................. 21

8 U.S.C. § 1357(g)(2) .................................................................................. 21

8 U.S.C. § 1357(g)(3) .................................................................................. 21

8 U.S.C. § 1357(g)(4) .................................................................................. 21

8 U.S.C. § 1357(g)(5) .................................................................................. 21

8 U.S.C. § 1357(g)(8) .................................................................................. 21

8 U.S.C. § 1357(g)(10) ........................................................................20

Tex. Code Crim. Proc. art. 5B.002(d) ...................................................7

Tex. Code Crim. Proc. art. 5B.003 ........................................... 6, 7, 23

Tex. Penal Code § 51.02 ........................................................................5

Tex. Penal Code § 51.02(a) ...................................................................5

Tex. Penal Code § 51.02(b) ...................................................................6

Tex. Penal Code § 51.02(c) ............................................................ 6, 24

Tex. Penal Code § 51.02(d) ...................................................................6

Tex. Penal Code § 51.03 .....................................................................5, 6

Tex. Penal Code § 51.03(a) ...................................................................6

Tex. Penal Code § 51.03(b) ...................................................................6

Tex. Penal Code § 51.04 ........................................................................7

## INTEREST OF AMICUS CURIAE

The United States is responsible for the enforcement of the Nation's immigration laws. Accordingly, the United States has an interest in ensuring that the doctrines of preemption are applied in a manner that preserves the federal government's primacy over the areas that are within its constitutional authority, including immigration, while preserving the ability of States to adopt complementary legislation that advances the federal policy. The United States also has a significant interest in the proper application of Article III standing principles. The United States submits this amicus brief because the district court misapplied standing and preemption doctrine to preliminarily enjoin Senate Bill 4.

## STATEMENT OF THE ISSUES

1.    Whether the organizational plaintiffs have Article III standing.

2.    Whether Senate Bill 4 is field preempted.

3.    Whether Senate Bill 4 is facially conflict preempted.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Texas enacted Senate Bill 4 into law, seeking to do its part to redress the crisis of illegal immigration. The Texas law makes it a state crime for an alien to enter, attempt to enter, or be found in Texas after having entered or reentered the United States in violation of the federal Immigration and Nationality Act's (INA) prohibitions on illegal entry and reentry. *See* 8 U.S.C. §§ 1325(a), 1326(a). Senate Bill 4 thus complements existing federal immigration law by punishing those within, or that come within, Texas's

1

regulatory reach who entered or reentered the country in violation of United States immigration law. Although Senate Bill 4 is largely identical to the federal prohibitions on illegal entry and reentry, the district court preliminarily enjoined that law in all its applications on the ground that it is preempted by the INA's entry and reentry provisions—both as a matter of field preemption and conflict preemption—and a panel of this Court affirmed. Those decisions are wrong and the injunction should be reversed.

As a threshold matter, the lower court's injunction should be reversed for lack of Article III standing. The panel majority and the district court held that a non-profit organization suffered injury-in-fact because it would divert its resources to respond to Senate Bill 4, relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But the Supreme Court rejected that theory of standing in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024). An organization "cannot spend its way into standing simply by expending money to gather information and advocate against" government action. *Id.* at 394–95. That is the precise theory of standing embraced by the panel majority and the district court.

The lower court's and panel majority's merits analyses are equally infirm. The Supreme Court has made clear that field preemption arises only in the "rare case[]" where "Congress [has] 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)). The federal

2

provisions prohibiting unlawful entry and reentry do not meet that high standard. Ultimately, Senate Bill 4 imposes state-law penalties on those who have entered or reentered the United States in violation of existing federal immigration law. The INA's prohibitions on unauthorized entry and reentry do not foreclose that kind of complementary state legislation and a "brooding federal interest" in the treatment of illegal aliens has no preemptive effect. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion).

Senate Bill 4 also is not conflict preempted. The Texas statute's prohibitions are largely identical to the federal entry and reentry provisions. And they *further* the purposes of federal immigration law. No different from a state criminal law that borrows from a federal statute to punish the same wrongdoing, Texas's statute merely adds a state-level punishment for what federal law already proscribes, with respect to conduct (illegal immigration) that Congress wishes to prevent in full. The district court and the panel majority held this supplemental punishment preempted on the ground that it entrenched on the federal government's enforcement discretion. But the mere "possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas*, 589 U.S. at 212. At a minimum, Senate Bill 4 does not conflict with federal law "in *all* of its applications," *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008), which is enough to reject the district court's ruling that Senate Bill 4 is likely *facially* conflict preempted.

# STATEMENT OF THE CASE

## I.    The federal prohibition on illegal entry and reentry

The INA prohibits aliens from unlawfully entering or reentering the United States.  As to unlawful entry, the INA contains a straightforward provision that creates a criminal offense applicable to

> [a]ny alien who (1) enters or attempts to enter the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) attempts to enter or obtains entry to the United States by a willfully false or misleading representation or the willful concealment of a material fact.

8 U.S.C. § 1325(a).  An initial violation of this section is punishable by a fine or imprisonment up to 6 months (or both), and a subsequent violation may result in a fine and imprisonment for a term of "not more than 2 years."  *Id.*  Separate civil penalties may be imposed.  *Id.* § 1325(b).[1]

The INA also prohibits unlawful reentry.  Specifically, it imposes criminal liability on an alien who has "been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter … enters, attempts to enter, or is at any time found in, the United States."  8 U.S.C. § 1326(a).  A violation is punishable by a fine and "not more than 2 years" in prison (or both).  *Id.*  However, a violation does not occur if either:

---

[1] Section 1325 contains provisions unrelated to unlawful entry, which prohibit entering into a marriage or commercial enterprise to "evad[e] any provision of the immigration laws."  8 U.S.C. § 1325(c)–(d).

(A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act.

*Id.* § 1326(a)(2). The INA imposes a series of escalating sentences of incarceration for violators with prior convictions for certain offenses, *id.* § 1326(b)(1)–(2), or those who were previously removed or excluded from the United States under certain authorities, *id.* § 1326(b)(3)–(4). Finally, an alien who was removed prior to the completion of a term of imprisonment and reenters the country must be "incarcerated for the remainder of the sentence of imprisonment." *Id.* § 1326(c).

## II.    Senate Bill 4

Governor Abbott signed Senate Bill 4 into law in November 2023. That law creates two new criminal offenses under Texas law that are largely identical to federal law's prohibitions on unlawful entry and reentry. *See* Tex. Penal Code §§ 51.02–51.03.

**A.**  As to unlawful entry, the Texas law provides that an "alien commits an offense" if the alien "enters or attempts to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a). It is an affirmative defense to prosecution if (1) "the federal government has granted the defendant … (A) lawful presence in the United States; or (B) asylum under 8 U.S.C. § 1158"; (2) "the defendant's conduct does not constitute a violation of 8 U.S.C. § 1325(a)"; or (3) "the defendant was approved for benefits under the federal Deferred

5

Action for Childhood Arrivals Program [DACA] between June 15, 2012, and July 16, 2021." *Id.* § 51.02(c).[2]  A violation of the unlawful entry prohibition is a misdemeanor, but "is a state jail felony if it is shown at the trial of the offense that the defendant has been previously convicted of an offense under this section."  Tex. Penal Code § 51.02(b).  Further, Senate Bill 4 provides that "[a] court may not abate the prosecution of an offense … on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  Tex. Code Crim. Proc. art. 5B.003.

    **B.**  Senate Bill 4 also reinforces the federal prohibition on illegal reentry of unauthorized aliens.  *See* Tex. Penal Code § 51.03.  It provides that an "alien commits an offense if the person enters, attempts to enter, or is at any time found in [Texas] after the person:  (1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding."  *Id.* § 51.03(a).  This offense is a misdemeanor but may be charged as a felony if the alien's prior exclusion or removal was due to certain offenses or pursuant to certain authorities.  *Id.* § 51.03(b).  As with the entry provision, "[a] court may not abate the prosecution of an offense … on the

---

[2]  The following programs do not provide an affirmative defense from prosecution:  (1) the Deferred Action for Parents of Americans and Lawful Permanent Residents program (DAPA); and (2) any program not enacted by Congress that is a successor to or materially similar to DACA or DAPA.  Tex. Penal Code § 51.02(d).

basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003.

**C.** Separately, Senate Bill 4 provides that upon conviction for violation of either the entry or reentry provisions, the state judge "shall enter … an order requiring the person to return to the foreign nation from which the person entered or attempted to enter." Tex. Code Crim. Proc. art. 5B.002(d). Refusal to comply with such an order is a felony. Tex. Penal Code § 51.04.

## III.    Prior Proceedings

Private plaintiffs—two non-profit organizations and El Paso County—filed a lawsuit in federal district court challenging Senate Bill 4. *Las Americas Immigrant Advocacy Ctr. v. Martin, et al.*, No. 23-cv-1537 (W.D. Tex.). The United States under the prior administration also brought suit. *United States of America v. Texas, et al.*, No. 24-cv-00008 (W.D. Tex.). The district court granted the United States' and the other plaintiffs' motions for preliminary injunctions, *see United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024). Relevant here, the district court held that both organizational plaintiffs had Article III standing, *id.* at 655–60, and that Senate Bill 4 is field and conflict preempted, *id.* at 663–77.

Defendants appealed. In March 2025, the United States voluntarily dismissed its lawsuit, which mooted the appeal of the preliminary injunction in its favor.

A panel of this Court denied Defendants' motion for a stay pending appeal, *United States v. Texas*, 97 F.4th 268 (5th Cir. 2024), and then issued a decision affirming

the preliminary injunction for the non-profit plaintiffs, *United States v. Texas*, 144 F.4th 632 (5th Cir. 2025). The panel held that one of the non-profit organizations—Las Americas—had organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and that Senate Bill 4 is facially invalid as a matter of both field and conflict preemption. This Court granted rehearing en banc.

## ARGUMENT

### I.     Supreme Court precedent forecloses organizational standing in this case.

The panel majority affirmed the injunction on a theory of organizational standing that was expressly rejected by the Supreme Court in *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024).

**A.**     In general, organizations may "sue on their own behalf for injuries they have sustained," but like all litigants they must establish standing to sue by "satisfy[ing] the usual standards for injury in fact, causation, and redressability." *Alliance for Hippocratic Med.*, 602 U.S. at 393–94 (quotation omitted). Here, the district court and the panel majority held that the organizational plaintiffs have Article III standing because Senate Bill 4 will require them to "divert" and expend additional resources to respond to Senate Bill 4. *See United States v. Texas*, 144 F.4th 632, 643–44, 646–47 (2025); *United States v. Texas*, 719 F. Supp. 3d 640, 655–57 (W.D. Tex. 2024).

That theory of standing no longer has any vitality after the Supreme Court's decision in *Alliance for Hippocratic Medicine*. In that case, four associations challenged

FDA's loosening of "regulatory requirements for mifepristone"—an abortion drug that the associations neither prescribed nor used. 602 U.S. at 372–73, 376. The associations asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (quotation omitted). More specifically, the associations asserted that they had "incurr[ed] costs to oppose FDA's actions," including, for example, by "conduct[ing] their own studies on mifepristone," which required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (quotation marks omitted).

The Supreme Court unanimously rejected this theory of organizational standing. The Court explained that it "is incorrect" that "standing exists when an organization diverts its resources in response to a defendant's actions"—organizations "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance for Hippocratic Med.*, 602 U.S. at 394, 395. Without any actual "impediment to [their] advocacy business," the associations' assertions of generic setbacks to their missions did not establish Article III standing. *Id.* at 395.

The theory of organizational standing advanced by the panel majority and the district court is indistinguishable from that rejected by *Alliance for Hippocratic Medicine*. As in that case, the organizational plaintiffs here are not the objects of the government action they challenge. "[Senate Bill 4] does absolutely nothing directly to the plaintiffs,

9

nor will it in any way be directly enforced against them." *Texas*, 144 F.4th at 696 (Oldham, J., dissenting). The law does not "directly affect" or "interfere with" the organizations' activities, *Alliance for Hippocratic Med.*, 602 U.S. at 395, it does not "prevent[]" them "from engaging in [their] advocacy, education, and training activities," and it does not "compel[] [them] to take any action," *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 319 (5th Cir. 2025). They are, in other words, "unregulated parties who seek to challenge [the State's] regulation *of others*." *Alliance for Hippocratic Med.*, 602 U.S. at 385; *see Texas*, 144 F.4th at 698 (Oldham, J., dissenting) (plaintiffs are "complete stranger[s] to the statute and its enforcement").

Likewise, the organizational plaintiffs here cannot manufacture standing on the theory that Senate Bill 4 will lead them to divert resources on various activities to accomplish their legal-service and advocacy missions. *See, e.g.*, *Texas*, 144 F.4th at 643–44; *Texas*, 719 F. Supp. 3d at 656–57. The Supreme Court has longer rejected plaintiffs' efforts to create standing "by voluntarily altering their activities in response to government action." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013). And *Alliance of Hippocratic Medicine* confirms that organizational plaintiffs "cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394.

**B.** The district court and panel majority placed considerable weight on the Supreme Court's earlier decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). But as *Alliance for Hippocratic Medicine* explained, *Havens* is "an unusual case" whose

10

holding must not be extended "beyond its context." 602 U.S. at 396; *see Deep S. Ctr. for Env't Just.*, 138 F.4th at 319 (*Havens* has been "limited … to its facts"). This case is nothing like *Havens*.

In *Havens*, the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Alliance for Hippocratic Med.*, 602 U.S. at 395. "[T]he defendant [in *Havens*] told falsehoods *to the plaintiff*," *Texas*, 144 F.4th at 699 (Oldham, J., dissenting), who had "a specific legal right to truthful, non-discriminatory housing information," *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1099–1100 (D.C. Cir. 2015) (Millett, J., dubitante). That sort of direct interference with a specific legal right was central to the Supreme Court's holding; it is why "[t]he plaintiff HOME … suffered a real, concrete, and particularized injury … that differentiated it from every other conceivable plaintiff in the universe." *Texas*, 144 F.4th at 699 (Oldham, J., dissenting).

The organizational plaintiffs here, by contrast, do not argue that Senate Bill 4 has interfered with a specific legal right, nor does Senate Bill 4 directly interfere with their business activities. They are thus no differently situated than any other member of the public. But "[j]ust as an individual who earnestly desires to counsel immigrants in his free time cannot complain that some new law will lead him to spend resources to counsel those immigrants more effectively, so too a political organization cannot." *Texas*, 144 F.4th at 696 (Oldham, J., dissenting). The panel majority's and district court's

conceptions of organizational standing thus expand *Havens* far beyond its narrow context to "authorize universal standing to bring preemption challenges because every member of the public is equally injured by a State's enactment of a preempted law." *Id.* at 699 (quotation marks omitted). That is "the precise opposite of what the Supreme Court unanimously" directed in *Alliance for Hippocratic Medicine*. *Id.* at 697.

The organizational plaintiffs lack Article III standing.

## II.    Senate Bill 4 is not preempted.

The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Its command is simple: if a state law and federal law conflict, the federal law wins. *See Kansas v. Garcia*, 589 U.S. 191, 202 (2020). Although Congress may preempt state laws by express statutory language, that intent may also be inferred. *Id.* at 203. "In all cases," however, "the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress." *Id.* at 202. "There is no federal preemption *in vacuo*," *id.* (quoting *Puerto Rico Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988)), and "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion). Rather, "a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." *Id.*; *see also Kansas*,

589 U.S. at 208 (implied preemption "must be grounded 'in the text and structure of the statute at issue'").

All agree that the INA does not expressly preempt Senate Bill 4. Rather, the panel majority and the district court held that Texas's law is preempted under two theories of implied preemption: (1) field preemption, and (2) conflict preemption. Those decisions are wrong on both scores.

## A.    Senate Bill 4 is not field preempted.

Senate Bill 4 is not field preempted. That theory of preemption applies only in the "rare case[]" where "Congress [has] 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)). "Only a demonstration that complete ouster of state power[,] including state power to promulgate laws not in conflict with federal laws[,] was the clear and manifest purpose of Congress" will justify a finding of field preemption. *DeCanas v. Bica*, 424 U.S. 351, 357 (1976) (quotation marks omitted).

**1.**    The regulation of those unlawfully present in the United States is not one of those rare areas in which Congress intended to occupy the field to the exclusion of state legislation (like Senate Bill 4) that supplements and reinforces federal law. The federal prohibitions on entry and reentry are each contained in a single statutory subsection—indeed, in a single *sentence* in a single subsection. *See* 8 U.S.C. §§ 1325(a), 1326(a). Their prohibitions are not complex; nor do the provisions contain carefully

crafted exceptions.  *See id.*   Such general prohibitions are not the kind of "comprehensive[]" regulatory scheme, *Kansas*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co.*, 479 U.S. at 140), sufficient to evince a "clear and manifest purpose" by Congress to effect a "complete ouster" of complementary state law, *DeCanas*, 424 U.S. at 357 (quotation marks omitted).  If they were, then virtually any federal prohibition would give rise to field preemption, and the Supreme Court's directive that field preemption may be found only in the "rare case[]" would be an empty promise.

  2.    The Supreme Court's decision in *Arizona v. United States*, 567 U.S. 387 (2012), does not support field preemption here.  There, the Court applied its decades-old precedent in *Hines v. Davidowitz*, 312 U.S. 52 (1941), to an Arizona law that "add[ed] a state-law penalty" for failing to comply with the INA's registration requirement. *Arizona*, 567 U.S. at 400.  Following that longstanding precedent, the Court held that the Arizona registration scheme was field preempted.  In addition to the registration requirement itself, *see* 8 U.S.C. § 1302, the INA's registration provisions:  (1) authorize the Attorney General to "prescribe special regulations and forms" to govern the registration of fingerprinting of aliens holding certain professions, *id.* § 1303(a); (2) specify items that must be included in those forms, provide for the confidentiality of registration forms and fingerprints, impose an oath requirement, provide for the issuance of a "certificate of alien registration" for aliens successfully registered, and require that the card be carried "at all times," *id.* § 1304; (3) govern notification of a change of address, *id.* § 1305; and (4) impose penalties for the failure to comply with

the registration requirements and other offenses, *id.* § 1306. Consistent with *Hines*, the Supreme Court concluded that these multiple interlocking provisions "provide a full set of standards governing alien registration" that "occup[y] the field of alien registration," such that "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401.

The INA's alien registration provisions are far more complex and comprehensive than the straightforward entry and reentry provisions. That is especially true given that multiple of the alien registration provisions specifically authorize the Attorney General to promulgate rules regarding alien registration, which only adds to the complexity and comprehensiveness of the federal alien-registration scheme. *E.g.*, 8 U.S.C. §§ 1302(c), 1303(a). And there is no Supreme Court precedent holding that the entry and reentry provisions form a comprehensive scheme that displaces supplemental state legislation.

**3.**    None of the reasons offered by the district court or the panel majority alter this conclusion. The district court reasoned that Senate Bill 4 is field preempted on the theory that the federal government has a "dominant interest in regulating immigration" and that "[i]n regulating immigration" Congress has enacted a "pervasive" regulatory framework. *Texas*, 719 F. Supp. 3d at 663, 666 ("there is no genuine question that the federal government occupies *the field of immigration*" (emphasis added)); *id.* at 666 ("The country's *immigration laws* are massive, sprawling, detailed, complex, and pervasive." (emphasis added)). That conception of field preemption is far too expansive. "There is no field preemption of all immigration law. If there were

15

*Arizona* … would have been far easier." *Texas*, 144 F.4th at 724 (Oldham, J., dissenting). The Court would have simply declared the entire field of immigration preempted and invalidated the Arizona law on that basis. It did not. Instead, the Court analyzed the *specific* "field of alien registration" and determined that "[t]he federal statutory directives provide a full set of standards governing alien registration." *Arizona*, 567 U.S. at 401.[3]

The district court's definition of the field is thus inconsistent with *Arizona*. It is also incompatible with the Court's analysis in *Kansas*. There, the Court held that a Kansas law making it a crime to commit identify theft was not field preempted as-applied to aliens. 589 U.S. at 195, 208–10. In conducting the field preemption analysis, the Court recognized that it must "first identify the field" in which the law operates, and then analyzed a narrowly defined "field relating to the federal employment verification system." *Id.* at 208. The district court's approach cannot be squared with the Court's tailored definitions of the fields in *Arizona* and *Kansas*. Even the panel majority in this case acknowledged that "the relevant field should be defined narrowly." *Texas*, 144 F.4th at 667; *see also id.* at 724 (Oldham, J., dissenting) ("Courts must 'narrowly' define the relevant field.").

---

[3] The district court argued that *Arizona*'s field preemption analysis was not limited to the field of alien registration. *Texas*, 719 F. Supp. 3d at 668–69. That is wrong. The Court held that the Arizona law's alien registration provision was field preempted, but invalidated the remaining provisions based on *conflict* preemption. *See Arizona*, 567 U.S. at 406, 407, 410; *see Kansas*, 589 U.S. at 210 (recognizing that *Arizona* "held that federal immigration law occupied *the field of alien registration*" (emphasis added)).

16

Here, the field of regulating those who have unlawfully entered or reentered the United States is a distinct subset of the INA's numerous subjects of regulation—like that of alien registration—and it must be evaluated on its own for purposes of the field preemption analysis. The district court, however, did not purport to explain how the regulation of unlawful entry/reentry in §§ 1325(a) and 1326(a) is sufficiently comprehensive to trigger field preemption. (They are not, as just explained.) Indeed, the lower court barely mentioned the federal entry/reentry statutes, giving them only passing attention in the context of discussing the "countless statutes" that "regulate[] immigration" and have nothing to do with entry or reentry specifically. *Texas*, 719 F. Supp. 3d at 665–66. The panel majority committed the same fundamental error. It observed that "[t]he Act makes it unlawful for any alien to enter the United States" and "punishes any alien who unlawfully reenters or remains in the United States." *Texas*, 144 F.4th at 669. But rather than explain how Sections 1325 and 1326 are themselves sufficiently comprehensive to trigger field preemption, the panel expanded the scope of its analysis to cover the "comprehensive framework" of the INA more broadly. *Id.* at 668–69. Again, if the INA's overall comprehensiveness were sufficient for field preemption, then the Supreme Court's focused analysis on the field of alien registration would have been entirely unnecessary.

Separately, the district court reasoned that Senate Bill 4's regulation of unlawful entry/reentry were field preempted because they "implicate[] key federal interests, including regulation of the border, the power of removal, and diplomatic consideration

17

such as when and where noncitizens may apply for asylum." *Id.* at 669. "Implied preemption "must be grounded 'in the text and structure of the statute at issue,'" *Kansas*, 589 U.S. at 208; a "brooding federal interest" is "never … enough to win preemption of a state law." *Virginia Uranium, Inc.*, 587 U.S. at 767 (plurality opinion). Again, if mere invocation of "key federal interests" were enough, *Texas*, 719 F. Supp. 3d at 669, then *Arizona* would have been written differently. For these same reasons, "diplomatic considerations" and other foreign policy concerns, by themselves, do not have preemptive effect. *Cf.*, *Texas*, 719 F. Supp. 3d at 669; *Texas*, 144 F.4th at 673–74. The fact that one aspect of immigration law "implicates" another may indicate why Congress chose to regulate comprehensively in a particular field, but that is not a *basis* for field preemption.[4]

### B.    Senate Bill 4 is not conflict preempted.

Senate Bill 4 also is not facially unconstitutional as a matter of conflict preemption. A state law may "conflict with federal law" when "compliance with both federal and state regulations is a physical impossibility," or—in limited circumstances— "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation marks omitted). As with field preemption, conflict preemption "does not

---

[4] The United States does not address here the portions of Senate Bill 4 that provide for judicial orders requiring illegal aliens who violate its entry/reentry prohibitions to leave the United States. *See Texas*, 719 F. Supp. 3d at 667–68 (addressing removal provisions); *Texas*, 144 F.4th at 669–71, 672 (same).

justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" as "such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion) (quotation marks omitted).

There is no dispute that it is "possible" for Plaintiffs "to comply" with both federal law and Senate Bill 4. *Kansas*, 589 U.S. at 210–11. Even so, the district court and the panel majority thought that Senate Bill 4 is preempted because it conflicts with federal immigration enforcement priorities. That is wrong. And at a minimum, Senate Bill 4 does not conflict with federal law *on its face*—such that "no set of circumstances exists under which the Act would be valid'" and the law is "unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (reaffirming "no set of circumstances" standard for all non-First Amendment cases). "If there is even *one* hypothetical constitutional application of [Senate Bill 4], a facial challenge fails." *Texas*, 144 F.4th at 725 (Oldham, J., dissenting).

    **1.**    Senate Bill 4 does not conflict with the federal entry and reentry statutes. The Texas law's entry and reentry provisions do not authorize any conduct forbidden by federal law, but instead uses language borrowed nearly verbatim from the INA to prohibit conduct that parallels conduct prohibited by the INA. *Supra*, pp. 4–7. Texas's law is in harmony, not conflict, with federal law. *See Texas*, 144 F.4th at 726 (Oldham,

J., dissenting) ("[Senate Bill 4] shares th[e] exact same purpose" as the INA "[a]nd does so by expressly tethering itself to federal law"); *accord* 8 U.S.C. § 1357(g)(10) (authorizing states to "cooperate with the Attorney General" in immigration enforcement).[5]

The mere fact that Senate Bill 4 "overlap[s]" with federal law "does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211–12; *see also id.* at 212 (mere "overlap" between federal and state law provides "no basis for inferring" a preemptive conflict). States generally are free to criminalize conduct also proscribed by Congress, and to attach additional penalties to those offenses. No one would doubt that states may adopt the elements of a federal criminal offense as their own and attach additional penalties for violations—a prohibition on felons possessing firearms, for example. *Cf. Gamble v. United States*, 587 U.S. 678 (2019). Laws targeting illegal immigration are no exception. The Supreme Court has said so explicitly: "Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982); *accord Gilbert v. Minnesota*, 254

---

[5] It is true that Senate Bill 4 differs from federal law in that it is triggered when an unauthorized alien enters Texas, whereas federal law prohibits unauthorized entry into the United States broadly. That in-state nexus is merely a reflection of the Constitution's limits on a state's ability to regulate outside the state's borders. *See, e.g.*, *National Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023); *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236 (11th Cir. 2001). Senate Bill 4 merely punishes persons within its jurisdiction who are unlawfully present under federal law because they illegally entered or reentered the country.

U.S. 325, 331 (1920) ("[T]he state is not inhibited from making the national purposes its own purposes, to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes." (quotation marks omitted)); *California v. Zook*, 336 U.S. 725, 735 (1949) ("[T]here is no conflict in terms, and no possibility of such conflict, [if] the state statute makes federal law its own….").

**2.**    Neither the district court nor the panel majority identified any conflict between the conduct proscribed by Senate Bill 4 and that prohibited by the INA that justifies a *facial* injunction.  They first reasoned that Senate Bill 4 conflicts with the INA's provisions that specify when state officials may "assist with immigration enforcement." *Texas*, 719 F. Supp. 3d at 677 (citing 8 U.S.C. § 1357(g)); *Texas*, 144 F.4th at 683–84. That misunderstands the function of Section 1357(g).  The agreements authorized by § 1357(g) allow state or local officials to step into the shoes of *federal* immigration officers to enforce *federal* law.  8 U.S.C. § 1357(g)(1)–(5), (8) (state official acting under agreement with Attorney General "shall be considered to be acting under color of Federal authority"); *see also id.* § 1324(c) (authorizing state officials to enforce federal anti-harboring prohibition).  It makes sense that cooperation, rather than unilateral action, would be the rule when *state* officials are acting under color of *federal* law.  But that does not imply congressional intent to foreclose complementary state *legislation*, including in the field of unlawful entry/reentry.

The court also thought Senate Bill 4 preempted because it "divests federal immigration authorities of the discretion of the enforcement of immigration laws."

21

*Texas*, 719 F. Supp. 3d at 674; *see also Texas*, 144 F.4th at 681 ("It is evident that the Texas entry and removal laws significantly eliminate the exercise of discretion by federal immigration officials"). That line of reasoning is foreclosed by *Kansas*: "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." 589 U.S. at 212. As Judge Oldham noted, "it is not enough [for conflict preemption] that the INA grants extensive enforcement discretion to the Executive Branch." *Texas*, 144 F.4th at 727 (Oldham, J., dissenting). Only federal *law* has preemptive effect—"the criminal law enforcement priorities or preferences of federal officers" do not. *Kansas*, 589 U.S. at 212.[6] Even were it otherwise, here the enforcement priorities of the United States and Texas now align—both favor maximum enforcement of the immigration laws to deter illegal immigration. And even if some disagreement in priorities were to later arise in a particular case or context, that still would not render Senate Bill 4 in conflict with federal enforcement priorities "in *all* of its applications." *Washington State Grange*, 552 U.S. at 449 (emphasis added).

Nor does conflict arise simply because penalties under Senate Bill 4 "exceed those under federal law." *Texas*, 719 F. Supp. 3d at 677; *see also Texas*, 144 F.4th at 681.

---

[6] A different case would be presented if a state sought to regulate on a subject where the federal agency with statutory authority over that subject had exercised its discretion not to promulgate regulations (or had adopted regulations different than the state law). In that context, conflict preemption may apply. It does not follow, however, that preemption follows simply because a complementary state law may be in tension with the existing administration's preferred level of enforcement (or non-enforcement). *See Kansas*, 589 U.S. at 212.

Although the Supreme Court has recognized that in some contexts, "[c]onflict is imminent whenever two separate remedies are brought to bear on the same activity," *Arizona*, 567 U.S. at 403 (quoting *Wisconsin Dep't of Industry, Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986)), the Supreme Court did not, through that language, undermine the general rule that parallel federal and state enforcement are permissible. Rather, the Court thought that the differing penalties "underscored the reason *for field preemption*," after having concluded that the INA established a "comprehensive scheme" to govern the field of alien registration. 567 U.S. at 400–03 (emphasis added). Where, as here, there is no "careful framework" governing illegal entry and reentry, *id.* at 402— and thus no field preemption, *supra*, pp. 13–18—a mere difference in penalties between Senate Bill 4 and the federal entry and reentry provisions (Sections 1325(a) 1326(a)) does not support conflict preemption. Indeed, far from *conflicting* with the INA's objectives, state-level penalties like those in Senate Bill 4 *help further* those objectives, further combatting and disincentivizing the very conduct that Congress has sought to eliminate in full.

Finally, the district court thought that Senate Bill 4 is conflict preempted because it forbids state courts from "abat[ing] the prosecution" of an alien "on 'the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated.'" *Texas*, 719 F. Supp. 3d at 675 (quoting Tex. Code Crim. Proc. art. 5B.003); *see also Texas*, 144 F.4th at 680. Senate Bill 4 contains provisions specifically designed to avoid conflict with federal law. Specifically, it provides that it is an

"affirmative defense to prosecution" that (a) "[t]he federal government has granted the defendant" "lawful presence in the United States" or "asylum," (b) the alien's "conduct does not constitute a violation of [the federal entry bar]"; or (c) the alien is subject to DACA. Tex. Penal Code § 51.02(c). These provisions manifest Texas's intent to *avoid* conflict with federal law.

More fundamentally, to the extent Senate Bill 4 would seek to punish an alien who is pursuing legal status under the federal immigration laws (*e.g.*, asylum), that alien could bring an as-applied challenge to that enforcement action. But the mere possibility of some conflict is not sufficient to render Senate Bill 4 facially in conflict with federal law, such that there are "*no* set of circumstances under which the law would be valid." *Moody*, 603 U.S. at 723 (quotation marks omitted, emphasis added, and alternation omitted). The same goes for the district court's assertion that Senate Bill 4 "lacks consent exceptions for reentry into the United States, even though federal immigration law will allow it." *Texas*, 719 F. Supp. 3d at 677 (citing 8 U.S.C. § 1326). An alien may be able to bring a successful *as-applied* challenge to the extent his case turns on "exceptions for reentry" in the federal reentry provision, *id.*, but identifying "one possible unconstitutional application here, and another there" falls far short of satisfying the demanding standard for facial invalidity. *Texas*, 144 F.4th at 726 (Oldham, J., dissenting).

\*     \*     \*

Accordingly, Senate Bill 4 is not preempted, either as a matter of field preemption or conflict preemption.

## CONCLUSION

The district court's preliminary injunction should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC McARTHUR
  *Deputy Assistant Attorney General*

*s/ Benjamin Hayes*
MARK R. FREEMAN
BENJAMIN HAYES
  *Attorneys*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-1754*
  *Benjamin.T.Hayes@usdoj.gov*

October 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,499 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Benjamin Hayes*
Benjamin Hayes

# CERTIFICATE OF SERVICE

I hereby certify that on October 20, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Benjamin Hayes*
Benjamin Hayes