No. 24-50149

# United States Court of Appeals for the Fifth Circuit

_____

United States of America,
*Plaintiff-Appellee,*
*v.*
State of Texas; Greg Abbott in his official capacity as
Governor of Texas; Texas Department of Public Safety;
Freeman F. Martin, in his official capacity as
Director of Texas Department of Public Safety,
*Defendants-Appellants.*

_____

Las Americas Immigrant Advocacy Center; American
Gateways; County of El Paso, Texas,
*Plaintiffs-Appellees,*
*v.*
Freeman F. Martin in his official capacity as Director of
the State of Texas Department of Public Safety,
*Defendant-Appellant*

_____

On Appeal from the United States District Court for the
Western District of Texas, Austin Division
USDC No. No. 1:24-CV-8
USDC No. 1:23-CV-1537

═══════════════════════════════════

*EN BANC* BRIEF OF *AMICUS CURIAE* AMERICA FIRST
POLICY INSTITUTE SUPPORTING DEFENDANTS-
APPELLANTS AND REVERSAL

═══════════════════════════════════

GARRETT GREENE*
  *COUNSEL OF RECORD
LEIGH ANN O'NEILL
GINA M. D'ANDREA
AMERICA FIRST POLICY
INSTITUTE
1455 Pennsylvania
Ave., N.W, Suite 225
Washington, DC 20004

No. 24-50149
United States of America,
*Plaintiff-Appellee,*
*v.*
State of Texas; Greg Abbott in his official capacity as
Governor of Texas; Texas Department of Public Safety;
Freeman F. Martin, in his official capacity as
Director of Texas Department of Public Safety,
*Defendants-Appellants.*

————————————

Las Americas Immigrant Advocacy Center; American
Gateways; County of El Paso, Texas,
*Plaintiffs-Appellees,*
*v.*
Freeman F. Martin in his official capacity as Director of
the State of Texas Department of Public Safety,
*Defendant-Appellant*

————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
USDC No. No. 1:24-CV-8
USDC No. 1:23-CV-1537

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the appellees Certificate of Interested Persons–the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees**
United States of America (Terminated)
American Gateways
County of El Paso, Texas
Las Americas Immigrant Advocacy Center

**Attorneys for Plaintiffs-Appellees**
Cody Wofsy
Spencer Amdur
Anand Balakrishnan
David A. Donatti
Lee P. Gelernt, Esq.
Daniel Hatoum
Kathryn Huddleston
Omar C. Jadwat
Adriana Cecilia Pinon
Erin D. Thorn
Bernardo Rafael Cruz

**Defendants-Appellants**
State of Texas
Greg Abbott, in his official capacity as Governor of Texas
Texas Department of Public Safety
Steven C. McCraw, in his official capacity as Director of Texas Department of Public Safety (Terminated)
Freeman F. Martin, in his official capacity as Director of Texas Department of Public Safety
Bill D. Hicks (Terminated)

**Attorneys for Defendants-Appellants**
William Francis Cole, Esq
William R. Peterson
Munera Al-Fuhaid
Monroe David Bryant, Jr.
Susanna Dokupil
Amy Snow Hilton
Daniel Ortner
Jacob Przada
Kyle Tebo
Ryan Daniel Walters

**Amici Curiae**

America's Future
Gun Owners of America, Incorporated
Gun Owners Foundation
Gun Owners of California
Tennessee Firearms Association
Tennessee Firearms Foundation
Citizens United
Citizens United Foundation
Presidential Coalition
Senior Citizens League
U.S. Constitutional Rights Legal Defense Fund
Conservative Legal Defense and Education Fund
Immigration Reform Law Institute
Government of the United Mexican States
State of Florida
State of Alaska
State of North Dakota
State of Ohio
State of South Carolina
State of Alabama
State of Arkansas
State of Georgia
State of Idaho
State of Indiana
State of Iowa
State of Kansas
State of Kentucky
State of Louisiana
State of Mississippi
State of Missouri
State of Montana
State of Nebraska
State of Oklahoma
State of South Dakota
State of Tennessee
State of Utah
State of Virginia
State of West Virginia
State of Wyoming

**Attorneys for Amici Curiae**
William Jeffrey Olson, Esq.
Matt A. Crapo
Sinead Mary O'Carroll
Mathura Sridharan

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that Amicus Curiae America First Policy Institute is a non-stock, nonprofit corporation, has no parent companies, and no person or entity owns it or any part of it.

Respectfully submitted,

/s/ *Garrett Greene*
Garrett Greene
Attorney of Record for *Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................................ii

TABLE OF CONTENTS...................................................................................................vi

TABLE OF AUTHORITIES ...........................................................................................vii

INTEREST OF AMICUS CURIAE ...............................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT..............................................2

ARGUMENT......................................................................................................................5

I.    The District Court's "Invasion" Analysis Failed to Give due Deference to the Executive and Presents an Overly Cramped Reading of how That Term was Originally Understood. ...........................................................................................5

      A.  Whether an invasion exists is a political question beyond judicial review.....5

      B.  Even assuming courts can have a say in what constitutes an "invasion," the district court applied an ahistorically narrow definition of that term. ................11

II.   The District Court Wrongly Based its Conflict Preemption Analysis on Federal Enforcement Priorities.........................................................................................17

CONCLUSION.................................................................................................................24

CERTIFICATE OF SERVICE.........................................................................................25

CERTIFICATE OF COMPLIANCE ..............................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
  567 U.S. 387 (2012)................................................................4, 23

*Biden v. Texas*,
  597 U.S. 785 (2022)..........................................................................22

*California v. United States*,
  104 F.3d 1086 (9th Cir. 1997) ...........................................................6

*Calvin's Case* (1608) 77 Eng. Rep ......................................................2

*Chiles v. United States*,
  69 F.3d 1094 (11th Cir. 1995) ............................................................6

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993) .........................................................................18

*Ex parte Quirin*,
  317 U.S. 1 (1942)..............................................................................14

*Florida v. United States*,
  660 F. Supp. 3d 1239 (N.D. Fla. 2023) ........................................22, 23

*In re Charge to Grand Jury-Treason*,
  30 F. Cas. 1049 (C.C.D. Mass. 1861)...............................................16

*Kansas v. Garcia*,
  589 U.S. 191 (2020).....................................................................17, 20

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ............................................................11

*Luther v. Borden*,
  48 U.S. 1 (1849)..................................................................................5

*Martin v. Mott*,
  25 U.S. 19, (1827)..........................................................................7, 16

*Moyer v. Peabody*,
  212 U.S. 78 (1909).............................................................................16

*O'Hair v. White*,
  675 F.2d 680 (5th Cir. 1982) ..............................................................5

*Pac. States Tel. & Tel. Co. v. State of Oregon*,
  223 U.S. 118 (1912)............................................................................5

*Padavan v. United States*,
  82 F.3d 23 (2d Cir. 1996) ...................................................................6

*People of State of Cal. v. Zook*,
  336 U.S. 725  (1949)..........................................................................19

*Rice v. Santa Fe Elevator Corp.*,
  331 U.S. 218 (1947)...........................................................................23

*Chamber of Com. of the U.S. v. Whiting*,
  563 U.S. 582 (2011)...................................................................................18
S*pivey v. Chitimacha Tribe of Louisiana*,
  79 F.4th 444 (5th Cir. 2023) ......................................................................19
*Sterling v. Constantin*,
  287 U.S. 378  (1932)............................................................................7, 11
*State of Texas v. U.S. Dep't of Homeland Sec.*,
  2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ......................................8, 23
*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022)......................................................................22
*TikTok Inc. v. Garland*,
  145 S. Ct. 57  (2025)..................................................................................10
*United States v. Abbott*,
  110 F.4th 700 (5th Cir. 2024)....................................................................11
*United States v. Brig Malek Adhel*,
  43 U.S. (2 How.) 210 (1844) .....................................................................15
*United States v. Rahimi*,
  602 U.S. 680 (2024)............................................................................11, 16
*United States v. Smith*,
  18 (5 Wheat.) U.S. 153 (1820) ..................................................................16
*United States v. Texas*,
  719 F. Supp. 3d 640 (W.D. Tex.) (2024) ......................................12, 14, 16
*United States v. Texas*,
  97 F.4th 268 (5th Cir. 2024)................................................................21, 24
*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)...................................................................................23
*W.M.M. v. Trump*,
  No. 25-10534, 2025 WL 2508869 (5th Cir. Sept. 2, 2025)...........................4
*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008)...................................................................................20
*Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*,
  134 F.4th 326 (5th Cir. 2025) ...............................................................18, 20

**Constitutional Provisions**
U.S. Const.
  art. I, § 10, cl. 3 ..........................................................................................3
  art. I, § 8, cl. 11 .........................................................................................12
  art. IV, § 4. .................................................................................................3
  **Statutes**
8 U.S.C. § 1325(a) ..........................................................................................19
8 U.S.C. § 1326(a) ..........................................................................................19

**Other Authorities**

1 William Blackstone, Commentaries ..........................................................2, 16

Aaron R. Petty,
   *Migrants As A Weapons System*, 13 J. NAT'L SECURITY L. & POL'Y 113 (2022) .........10

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL
   TEXTS (2012)) ......................................................................................19

Caleb Nelson,
   *Preemption*, 86 VA. L. REV. 225, 260–261 (2000)........................................17

Christopher J. Curran*, Spillover: Evolving Threats and Converging Legal Authorities in
   the Fight Against Mexican Drug Cartels*, 6 HARV. NAT'L SEC. J. 344 (2015). ..............9

De Christopher A. Chrisman, *Article III Goes to War: A Case for A Separate Federal
   Circuit for Enemy Combatant Habeas Cases*, 21 J.L. & Pol. 31 (2005) ......................14

Emer de Vattel, The Law of Nations, § 204 (1797) .........................................21

Josh Blackman, *Four Questions and Few Answers About the Invasion Clause*, CIVITAS
   INST. (Feb. 13, 2025)..............................................................................6

Kenneth Chan,
   *State Failure and the Changing Face of the* Jus ad Bellum, 18 J. CONFLICT &
   SECURITY L. 395 (2013)...........................................................................9

*Letter from Benjamin Franklin to Peter Collinson*, Jun. 26, 1755................................13

Nicholas Dockery,
   Modern War Institute at West Point, *The Domestic Fentanyl Crisis in Strategic
   Context, Part III: Responding China's Drug Warfare* (Apr. 2025) (MWI Report). ......9

Philip Hamburger,
   *Beyond Protection*, 109 COLUM. L. REV. 1823 (2009)................................2

Robert G. Natelson & Andrew T. Hyman,
   *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 BRIT. J.
   AM. LEGAL STUD. 1...........................................................................12, 13, 15

Steven J. Heyman,
   *The First Duty of Government: Protection, Liberty and the Fourteenth Amendment*, 41
   DUKE L.J. 507 (1991)..........................................................................2, 3

The Declaration of Independence (U.S. 1776) ..............................................3

THE FEDERALIST No. 10 ........................................................................3

THE FEDERALIST No. 43 ........................................................................12

U.S. Dep't of Homeland Sec.,
   *Myth/Fact: Known and Suspected Terrorists/Special Interest Aliens*, DHS (Jan. 7,
   2019) .............................................................................................10

# INTEREST OF AMICUS CURIAE[1]

The America First Policy Institute (AFPI) is a non-profit, non-partisan research institute dedicated to the advancement of policies that put the American People first. Its guiding principles are liberty, free enterprise, the rule of law, America-first foreign policy, and a belief that American workers, families, and communities are the key to the success of our country. It is the job of policymakers to advance and serve these interests above all others. As part of its mission, AFPI seeks to advance policies that couple American innovation with national-security efforts to protect the public safety and security of Americans.

AFPI has an interest in this matter because the district court's opinion undermines both national security and federalism by preventing states from protecting their citizens when the federal government fails to do so. The district court's ruling contradicts fundamental principles of state sovereignty established in the Constitution, which reserves to states like Texas certain powers to defend their territory and population. By enjoining Texas from enforcing laws that mirror federal immigration statutes, the court's decision prevents states from addressing the documented public safety threats, resource strains, and community disruptions that result from unprecedented levels of illegal immigration.

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than amicus curiae, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Executive has a duty to protect its citizens. This is no less true of the President of the United States than it is of the Governor of Texas. This duty to protect has "deep roots in the English Legal Tradition." Steven J. Heyman, *The First Duty of Government: Protection, Liberty and the Fourteenth Amendment*, 41 DUKE L.J. 507, 513 (1991). For centuries, legal theorists like Sir Edward Coke articulated a reciprocal relationship between sovereign and subject. At its core, this principle rested on a simple bargain: obedience of the law in return for protection. Those under the sovereign's rule, bound by his laws, were entitled to his shield. *See generally* Philip Hamburger, *Beyond Protection*, 109 COLUM. L. REV. 1823 (2009). Protection and allegiance were a "*duplex et reciprocum ligamen*," a dual and reciprocal bond. *Calvin's Case* (1608) 77 Eng. Rep. 377, 382, 7 Co. Rep. 1 a, 5 a; *see also id*. 382, 7 Co. Rep. at 4 b (stating that "as the subject oweth to the King his true and faithful ligeance and obedience, so the Sovereign is to govern *and protect* his subjects") (emphasis added). John Locke's social contract theory refined this idea, arguing that individuals consent to government authority for the purpose of securing their natural rights. Heyman, *supra* at 513–16. In the words of Blackstone, "[a]llegiance is the tie, or ligamen, which binds the subject to the king, in return for that protection which the king affords the subject." 1 William Blackstone, Commentaries *354; *see also* Hamburger, *supra* at 1838–40.

By the 18th century, these principles shaped English constitutional thought and profoundly influenced the American colonists. The Declaration of Independence famously underscored the importance of protection, listing among King George III's many grievances his abdication of government by "declaring us out of his *Protection* and waging War against us." The Declaration of Independence (U.S. 1776), available at https://tinyurl.com/27bc28rv. (emphasis added). After achieving independence, state constitutions were framed around the notion that government exists mainly to protect natural rights. Several early state constitutions explicitly declared that government "is, or ought to be, instituted for the common benefit, *protection, and security of the people*." Heyman, *supra* at 523 (emphasis added) n. 85 (collecting sources). The Framers of the Federal Constitution embraced this same vision. James Madison emphasized that the "protection" of "the faculties of men," including the rights of property, was "the first object of government." THE FEDERALIST No. 10 (James Madison), available at https://tinyurl.com/3thbjcfz.

It's no surprise, then, that the Constitution codifies this fundamental understanding at both the state and federal levels. Article IV requires the federal government to protect each state against invasion. U.S. Const. art. IV, § 4. But it also recognizes that states retain sovereign self-defense power independent of the federal government when they are "actually invaded, or in such imminent Danger as will not admit of delay." U.S. Const. art. I, § 10, cl. 3. Indeed, "the defining characteristic of sovereignty" whether that of the state or the federal government, lies in "the power to exclude from the sovereign's territory

people who have no right to be there." *Arizona v. United States*, 567 U.S. 387, 417 (2012) (Scalia, J., dissenting). When the federal government fails to protect a state's borders, the state must act to protect itself. That's exactly what Texas has done. With the federal government missing in action, Texas used its sovereign self-defense powers reserved under the Constitution to shield its citizens from the escalating border crisis and enacted legislation (S.B.4) that mirrors federal law by making illegal entry and reentry into Texas a state-law crime.

The district court committed several errors when it enjoined S.B.4. Chief among them was the second-guessing of Texas's determination that an invasion is taking place at the southern border. That decision is for the Governor alone to make, not "generals-in-robes." *W.M.M. v. Trump*, No. 25-10534, 2025 WL 2508869, at *44 (5th Cir. Sept. 2, 2025) (Oldham J., dissenting), *reh'g en banc granted, opinion vacated*, No. 25-10534, 2025 WL 2784957 (5th Cir. Sept. 30, 2025). The district court's intrusion in the prerogative of the Executive was compounded by an ahistorically narrow definition of "invasion" that the Founders would not recognize.

Beyond that, the district court's conflict preemption analysis flips federalism on its head by making state sovereignty subject to whether the federal government decides to enforce the law. This is particularly problematic in the realm of immigration enforcement, where the previous administration not only failed to enforce the immigration laws, but actively facilitated mass illegal immigration. The Constitution is not a suicide-pact, and states cannot be held hostage and prevented from enforcing state immigration laws that

mirror federal ones simply because a state's enforcement of the law may upset the non-enforcement priorities of any future federal administration.

## ARGUMENT

**I.    The District Court's "Invasion" Analysis Failed to Give due Deference to the Executive and Presents an Overly Cramped Reading of how That Term was Originally Understood.**

The district court made two fundamental errors in rejecting Texas's sovereign self-defense arguments. First, it second-guessed the Governor's determination that an invasion is occurring—a determination that belongs to the political branches alone. Courts lack manageable standards to decide whether an invasion exists, and the Constitution vests that power in every branch except the judiciary. Second, even if courts could review invasion determinations made by the Executive, the district court applied a definition untethered from the Founding. The term "invasion" originally meant far more than organized military campaigns by armed forces. It covered incursions by non-state actors like pirates and brigands, unarmed crossings that later inflicted harm, and systematic hostile entries regardless of scale. Both errors are fatal to the judgment below.

### A. Whether an invasion exists is a political question beyond judicial review.

In the same way that "suits arising under the guarantee clause clearly present nonjusticiable political questions." *O'Hair v. White*, 675 F.2d 680, 684 (5th Cir. 1982) (citing *Luther v. Borden*, 48 U.S. 1 (1849) and *Pac. States Tel. & Tel. Co. v. State of Oregon*, 223 U.S. 118, 142 (1912)), so too do suits arising under U.S. Const. art. I, § 10,

5

cl. 3. Indeed, "there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). That is why each case with dicta cited favorably by the district court *held* that determining whether an invasion has occurred for purposes of Article IV, section 4, is a nonjusticiable political question. *See California*, 104 F.3d at 1090–91 (addressing whether a state had been "invaded" for constitutional purposes would require making "non-judicial policy decision[s]"); *Padavan v. United States*, 82 F.3d 23 28 (2d Cir. 1996) ("[T]he plaintiffs' Invasion Clause claim is nonjusticiable. The protection of the states from 'invasion' involves matters of foreign policy and defense, which are issues that the courts have been reluctant to consider."); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995) ("[W]hether the level of illegal immigration is an 'invasion' of Florida and whether this level violates the guarantee of a republican form of government present nonjusticiable political questions."); *see also* Josh Blackman, *Four Questions and Few Answers About the Invasion Clause*, CIVITAS INST. (Feb. 13, 2025), https://www.civitasinstitute.org/research/four-questions-and-few-answers-about-the-invasion-clause (collecting research and concluding that "[t]he Constitution affords Congress, the president, and the states the power to declare an invasion—*every branch except the judiciary*.") (emphasis added).

This deference to the political branches makes sense because "core strategic matters of warmaking belong in the hands of those who are best positioned and most politically accountable for making them." *Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (plurality

opinion). There is no reason to afford any less deference to the Governor of Texas's determination that an invasion is occurring than what is afforded to the President. *See Martin v. Mott,* 25 U.S. 19, 30, (1827) (holding that the President's determination that there was an invasion was "*conclusive*") (emphasis added). After all, if the Texas Governor's determination that a group of East Texas oil field owners were in a "state of insurrection" through "reckless production" of oil and gas is "conclusive," so too is the Texas Governor's determination that unchecked illegal immigration is an invasion. *Sterling v. Constantin,* 287 U.S. 378, 389, 399 (1932). In other words, if upholding the "conservation laws" of the state is of sufficient "gravity" to afford conclusive "discretion to determine whether an exigency requiring military aid. . . has arisen," the well-documented harms from illegal immigration no doubt entitle the Governor the same degree of discretion. *Sterling,* 287 U.S. at 389; *see also id.* at 398 ("In the performance of its essential function, in promoting the security and well-being of its people, the state must, of necessity, enjoy a broad discretion.").

Indeed, the only recognized constraint on the Executive's authority to declare an exigency such as an invasion are that it must be made in "good faith." *Sterling,* 287 U.S. at 400. That is no doubt the case here given the crime, drugs, and threats to national security that mass illegal immigration entails.

For example According to the Texas Department of Public Safety (DPS), between June 1, 2011, and September 30, 2025: 330,000 illegal aliens were charged with more than 585,000 criminal offenses which included arrests for 1,086 homicide charges; 76,293

assault charges; 10,392 burglary charges; 68,401 drug charges; 1,472 kidnapping charges; 29,788 theft charges; 46,029 obstructing police charges; 3,343 robbery charges; 7,477 sexual assault charges; 8,484 sexual offense charges; and 7,367 weapon charges.[2] These numbers have names. Just last year, two illegal aliens were charged with capital murder for strangling and raping twelve-year-old girl Jocelyn Nungaray, before dumping her body into a creek.[3]

Beyond that, cartels exploit the infrastructure built for human smuggling to ship drugs, notably fentanyl. "Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border." *State of Texas v. U.S. Dep't of Homeland Sec.*, No. DR-23-CV-00055-AM, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023). Because fentanyl is a highly addictive opioid, smuggling it into "the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels." *Id.* In FY 2023, CBP seized 240,000 pounds of drugs at the southwest border[4]—including an estimated 1.1 billion doses of fentanyl.[5] Forty-four percent of total drug seizures and 99 percent of fentanyl seizures occurred at the southwest

---

[2] Texas Department of Public Safety, *Texas Criminal Illegal Alien Data*, https://www.dps.texas.gov/section/crime-records/texas-criminal-illegal-alien-data (last visited Oct. 14, 2025).

[3] Courtney Carpenter & Jonathan Mejia, *Jocelyn Nungaray Murder: Grand Jury Indicts 2 Men on Capital Murder Charges in Death of 12-Year-Old Houston Girl,* KHOU 11 (June 21, 2024), https://www.khou.com/article/news/local/12-year-old-jocelyn-nungaray-capital-murder-illegal-immigrants/285-25f895ca-b2c0-455a-840b-0b1e72823379.

[4] *Drug Seizure Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited Oct. 14, 2025).

[5] *Drug Dosage, Value, and Weight Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/cbp-drugs-dosage-value-and-weight (last visited Oct. 14, 2025).

border.[6] And it isn't just the cartels. An "analysis of Chinese military strategy suggests" that fentanyl can be used as "a deliberate tool of asymmetric warfare." Nicholas Dockery, Modern War Institute at West Point, *The Domestic Fentanyl Crisis in Strategic Context, Part III: Responding China's Drug Warfare* (Apr. 2025) (MWI Report), https://tinyurl.com/yfvj6tcu.

And there are the inherent national security concerns. Drug cartels, for example, "pose a hybrid threat" beyond ordinary criminal activity that "combin[es] characteristics of organized crime, insurgency, and terrorism." Christopher J. Curran*, Spillover: Evolving Threats and Converging Legal Authorities in the Fight Against Mexican Drug Cartels*, 6 HARV. NAT'L SEC. J. 344, 364 (2015). Recognizing the threat these cartels pose to the Country, the President has rightfully designated them as foreign terrorist organizations.[7]

Beyond the transnational criminal cartels, it is well understood that "[f]orced migration is a stimulant for the mobilization of insurgents across boundaries, can destabilize volatile territories, and create conflicts in [neighboring] States." Kenneth Chan, *State Failure and the Changing Face of the* Jus ad Bellum, 18 J. CONFLICT & SECURITY L. 395, 418 (2013). Indeed, over 60,000 nationals from China—"a designated

---

[6] Per CBP data, in FY 2023, out of 549,000 pounds of drugs seized, 240,000 pounds were seized at the southwest land border; out of 27,000 pounds of fentanyl of seized, 26,700 pounds were seized at the southwest land border. *Drug Seizure Statistics*, U.S. Customs & Border Prot., https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (last visited Oct. 14, 2025).

[7] *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, Exec. Order No. 14,157, 90 Fed. Reg. 8439 (Jan. 20, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/.

foreign adversary," *TikTok Inc. v. Garland*, <u>145 S. Ct. 57, 69</u> (2025), have been apprehended illegally crossing the Southwest border since FY 2021.[8] Our adversaries can use these migrants and refugees as "instruments of warfare and military strategy." Aaron R. Petty, Aaron R. Petty, *Migrants As A Weapons System*, 13 J. Nat'l Security L. & Pol'y 113, 130 (2022). Just last year, Texas DPS troopers encountered a group of 176 individuals crossing the border illegally, with eleven of those apprehended being Special Interest Aliens (SIA) from Afghanistan.[9] According to DHS, an SIA is a "non-U.S. person who, based on an analysis of travel patterns, potentially poses a national security risk to the United States or its interests." U.S. Dep't of Homeland Sec., *Myth/Fact: Known and Suspected Terrorists/Special Interest Aliens*, DHS (Jan. 7, 2019), <u>https://tinyurl.com/bde3ycd6</u>. And that "[o]ften such individuals or groups are employing travel patterns known or evaluated to possibly have a nexus to terrorism." *Id*. There is no telling how many of these individuals are currently in the country today, as recent reports indicate the Biden-Harris administration granted nearly 7,000 exemptions to foreign nationals who otherwise would have been ineligible for entry due to terrorism-related backgrounds.[10]

　　Given the gravity of the harms happening because of illegal immigration, coupled

---

[8] U.S. Customs and Border Prot., *Southwest Land Border Encounters*, *Peoples Republic of China*, <u>https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters</u> (last visited Oct. 14, 2025).

[9]　　Chris　Olivarez　(@LtChrisOlivarez),　X　Post,　Dec.　2,　2024,　available　at <u>https://x.com/LtChrisOlivarez/status/1863680637254738212</u>.

[10] Adam Shaw, *Biden DHS Exempted Thousands of Immigrants from Terror-Related Entry Restrictions in FY 2024*, Fox News (Jan. 14, 2025), <u>https://www.foxnews.com/politics/biden-dhs-exempted-thousands-immigrants-from-terror-related-entry-restrictions-fy-2024</u>.

with the consensus among several states, counties, and the federal government that there is an invasion happening at the southern border—there is no question that S.B.4 is within the "permitted range of honest judgment as to the measures to be taken in" repelling such an invasion and "preserv[ing] the peace." *Sterling*, 287 U.S. at 399–400. The district court was wrong to second-guess that determination.

The result is that the district court lacked jurisdiction over this matter. To succeed on their facial challenge, Plaintiffs must prove "no set of circumstances exists under which [S.B. 4] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). But at least some applications of S.B. 4 fall within Texas's self-defense authority in response to the invasion the Governor has conclusively determined is occurring. *See infra* § I(B). Thus, "resolving the Plaintiffs' [facial challenge] invariably require[s]" a court to analyze whether Texas is being actually invaded, *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008)—a non-justiciable political question. Since Plaintiffs "cannot prevail without requiring the court to answer" that question, *United States v. Abbott,* 110 F.4th 700, 739 (5th Cir. 2024) (Ho, J., concurring), the district court lacked jurisdiction and the preliminary injunction should be reversed on that basis alone.

### B. Even assuming courts can have a say in what constitutes an "invasion," the district court applied an ahistorically narrow definition of that term.

The Constitution's text and the history of this Country counsel against the district court's cramped reading of what qualifies as an "invasion." Indeed, each show that "invasion" was intended to encompass far more than "organized" military campaigns by

an "armed" force. *United States v. Texas*, 719 F. Supp. 3d 640, 680 (W.D. Tex.) (2024), *vacated*, 144 S. Ct. 797 (2024), *aff'd*, 144 F.4th 632 (5th Cir. 2025), *reh'g en banc granted*, *opinion vacated*, 150 F.4th 656 (5th Cir. 2025). As James Madison emphasized in Federalist No. 43, the term "invasion" included the government's ability to secure each state "not only against foreign hostility, but against ambitious or vindictive enterprizes [sic] of its more powerful neighbours." THE FEDERALIST No. 43 (James Madison), available at https://tinyurl.com/5n8d5kme. This understanding reflects a concern for any incursion—whether foreign or domestic, organized or ad hoc—that disrupts the stability and security of the states. By its plain text, the Constitution's use of the term "invasion" encompasses any unauthorized and uninvited crossing of a boundary—no matter its size— that either yields or threatens harm beyond the mere fact of entry. This broad definition naturally extends to instances of illegal immigration whose scope, scale, or organizational sophistication poses a risk of meaningful injury. *See* Robert G. Natelson & Andrew T. Hyman, *The Constitution, Invasion, Immigration, and the War Powers of States*, 13 BRIT. J. AM. LEGAL STUD. 1, 41.

It makes sense, then, for the Framers to authorize Congress to issue letters of marque and reprisal, a power specifically designed to combat non-state actors such as pirates and brigands. U.S. Const. art. I, § 8, cl. 11. The Framers understood that threats to public order often came not from traditional armies but from irregular forces, rogue actors, and unauthorized groups whose actions imperil the public good. Natelson, *supra* at 23.

Nor does the Constitution's definition of "invasion" hinge on whether the invading force is armed when entering the Country. For example, during the Founding era, unarmed Connecticut settlers who were seemingly migrating peacefully into Pennsylvania were labeled as "invaders" because they attempted to purchase land that the Pennsylvania government did not recognize as legally belonging to them. Natelson, *supra* at 24. In fact, Benjamin Franklin wrote a plan "to divert the Connecticut Emigrants from their design of *Invading* this province [Pennsylvania] and to induce them to go where they would be less injurious and more useful." *Letter from Benjamin Franklin to Peter Collinson*, Jun. 26, 1755, https://tinyurl.com/h4652zna (emphasis added) (last visited Oct. 8, 2025).

In the same way, the Founders understood that unarmed individuals who enter unlawfully may later acquire the means to defend their position, commit violence, or otherwise amplify the harm caused by their incursion. Indeed, there seems to have been no resort to arms when the Connecticut "invasion" crossed the Pennsylvania border until the unlawful "Connecticut settlers sought to defend themselves" from the Pennsylvania authorities. *Natelson*, *supra* at 242.

This principle is vividly illustrated by the September 11, 2001, terrorist attacks. The 9/11 terrorists entered the United States unarmed and acquired the means to inflict catastrophic harm after their arrival.[11] They hijacked commercial aircraft and used them

---

[11] Five of the terrorists had overstayed their visas and were in the United States illegally. *ICE Brings into Custody Czech Woman Who Exploited Non-Immigrant Visa System; Caused More Than $15 Million in Lost Wages to U.S. Workers* (Sept. 16, 2015), https://www.ice.gov/news/releases/ice-brings-custody-czech-woman-who-exploited-non-immigrant-visa-system-caused.

to kill thousands of Americans in what is still the worst terrorist attack in this Nation's history. By any reasonable, historical understanding of the term, the 9/11 terrorists would have been seen as invaders by the Founders though they were neither a traditional "military force," or armed when they crossed the Nation's borders. *Texas*, <u>719 F. Supp. at 683</u>.

Nor does an "invasion" hinge on the number of invaders. Even a "small fraction" will do. *Id*. After all, there were only nineteen 9/11 hijackers. And in *Ex parte Quirin*, <u>317 U.S. 1</u> (1942), eight Nazi saboteurs were labeled invaders, even though they were neither numerous nor heavily armed.

This notion was understood at the founding as it was the basis for one of the complaints during the Constitutional debates by a prominent Massachusetts opponent to the Constitution writing under the pseudonym "John DeWitt." DeWitt complained that "should an insurrection or an invasion, *however small*, take place, in Georgia" then habeas corpus could be suspended in Massachusetts. *See* De Christopher A. Chrisman, *Article III Goes to War: A Case for A Separate Federal Circuit for Enemy Combatant Habeas Cases*, 21 J.L. & Pol. 31, 40–41 (2005) (citing "John DeWitt," Essay II (Oct. 27, 1787), in the Anti-Federalist Papers and the Constitutional Convention Debates 197–98) (emphasis added)). That attempt to distinguish between large and small invasions did not make it into

the Constitution, likely because there was broad consensus that any invasion, no matter its scale, had to be dealt with swiftly and decisively before it could take root.[12]

Even setting aside that there is no brightline numerical threshold of intruders before something is called an "invasion" what is happening now would no doubt qualify. At the time of the founding, the total population of the United States was less than 4,000,000.[13] Even conservative estimates have the number of illegal immigrants in this Country as 14 million,[14] more than triple the entire population of the United States at the Founding. A nation of fewer than four million would have had no difficulty recognizing such an unregulated mass entry as an invasion.

At minimum, the transnational criminal cartels are part of an invasion. Under Founding-era international law, certain non-state actors, such as pirates, were classified as *hostes humani generis*—enemies of the human race. *See* Natelson, *supra* at 9–10. These actors were treated as invaders "[b]ecause [they] commit[] hostilities upon the subjects and property of any or all nations, without any regard to right or duty, or any pretense of public authority." *United States v. Brig Malek Adhel*, 43 U.S. (2 How.) 210, 232 (1844). Today's transnational cartels, which orchestrate the trafficking of violence, fentanyl,

---

[12] Andrew Hyman, *What the Constitution's Framers Really Meant by 'Invasion'*, DAILY CALLER (Jan. 30, 2024, 3:22 PM ET), https://dailycaller.com/2024/01/30/hyman-constitution-invasion-founding-fathers-james-madison/.

[13] C. Wright & W. Hunt, *The History and Growth of the United States Census* 17 (1900), available at https://www2.census.gov/library/publications/decennial/1900/history-growth-census.pdf.

[14] Jeffrey S. Passel & Jens Manuel Krogstad, *U.S. Unauthorized Immigrant Population Reached a Record 14 Million in 2023*, PEW RESEARCH CTR. (Aug. 21, 2025), https://www.pewresearch.org/race-and-ethnicity/2025/08/21/u-s-unauthorized-immigrant-population-reached-a-record-14-million-in-2023/.

human beings, and other contraband, are the modern equivalent of these pirates. Like pirates, "[t]hey carry on war, but it is not natural war." *In re Charge to Grand Jury-Treason*, 30 F. Cas. 1049, 1049 (C.C.D. Mass. 1861). Their systematic and hostile incursions across the southern border undermine public safety, strain state resources, and destabilize communities. Thus, "all nations [may punish] all persons, whether natives or foreigners, who have committed this offence against any persons whatsoever[.]" *United States v. Smith*, 18 (5 Wheat.) U.S. 153, 161 (1820). The district court opined that "[n]one of the provisions [of S.B.4] are operations of war," while acknowledging S.B.4 may be applied to paramilitary cartels. *Texas*, 719 F. Supp. 3d at 683, 689. At the founding, proclaiming war against these "unauthorized volunteers [sic] in violence," 1 William Blackstone, Commentaries *249, was "*always*" just. Natelson, *supra* at, 10 (emphasis added) (citing 2 Hugo Grotius, *The Rights of War and Peace* at 1022–23) (1625). If Texas can proclaim and engage war against these individuals, it must also be able to arrest them. *Moyer v. Peabody*, 212 U.S. 78, 84–85 (1909) (Holmes, J.); *Mott*, 25 U.S. at 29 ("[T]he power to provide for repelling invasions includes the power to provide against the attempt and danger of invasion."). In other words, if S.B.4 applies to no one else, it applies to transnational cartels. And since it applies to even a "small fraction" of "paramilitary cartels," *Texas*, 719 F. Supp. at 683, there is at least one instance where it has a "valid" application. *Rahimi*, 602 U.S. at 693.

## II.    The District Court Wrongly Based its Conflict Preemption Analysis on Federal Enforcement Priorities.

The district court's preemption analysis fails for many reasons, as Texas has already identified in its briefing. The court's conflict preemption reasoning is particularly flawed. It wrongly concluded S.B. 4 was preempted based on alleged interference with federal officials' immigration enforcement discretion. *See Texas*, 719 F. Supp. 3d at 674–75. But this is wrong twice over.

First, any preemption analysis must be grounded in statutory text, not executive policy. Obstacle preemption—a variant of conflict preemption—is already constitutionally unsound since it improperly relies on "judicial guesswork about broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law." *Kansas v. Garcia*, 589 U.S. 191, 213–15 (2020) (Thomas, J., concurring). In any event, for true conflict preemption to exist, there must be a logical contradiction between federal and state law. *See generally* Caleb Nelson, *Preemption*, 86 VA. L. REV. 225, 260–261 (2000). Hypothetical conflicts with discretionary enforcement decisions by the federal government are no such contradiction. That is because "[t]he Supremacy Clause gives priority to 'the Laws of the United States.'" *Garcia*, 589 U.S. at 212 (citation modified). Discretionary policies do not constitute "Laws of the United States" under the Supremacy Clause because they are not rooted in "constitutional text, federal statute, or treaty made under the authority of the United States." *Id*. at 202. Since preemption must be "grounded in the text and structure

of the statute at issue," *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993), the district court erred by basing its analysis on amorphous policy priorities rather than identifying any federal law that logically contradicts S.B. 4. *See Chamber of Com. of the U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion) (conflict preemption "does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" as "such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law.") (citation modified). This includes part of the district court's analysis giving weight to a foreign government's policy considerations. *Texas*, 719 F. Supp. 3d at 676 (considering "Mexico's objection to SB4" as part of the conflict preemption analysis.). The out of circuit cases cited by the district court in support of its analysis, *id*. at 674–75, cannot be reconciled with the Supreme Court's more recent decision in *Garcia*.

A recent opinion from a panel of this Court is instructive here. *Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*, looked at whether state laws that incorporate federal drug approval standards are preempted by the Federal Food, Drug, and Cosmetic Act (FDCA). 134 F.4th 326 (5th Cir. 2025). There, the court rejected Wells Pharma's argument that state laws mirroring federal requirements create conflict preemption because they might interfere with FDA enforcement discretion. The court emphasized that "many federal statutes grant the Executive Branch extensive enforcement discretion," but "those statutes do not preclude parallel . . . state regulation of the same conduct." *Zyla*, 134 F.4th at 338. So too here, the district court erred by basing its preemption analysis on

S.B. 4's alleged interference with federal enforcement discretion rather than identifying an actual logical contradiction between S.B. 4 and the Immigration and Nationality Act ("INA"). Rather, S.B. 4 mirrors federal law by making it a state offense to enter Texas from a foreign nation except at lawful ports of entry (like 8 U.S.C. § 1325(a)) and prohibiting previously deported or removed aliens from entering or being found in Texas (like 8 U.S.C. § 1326(a)). As in *Zyla*, where the state law incorporated federal standards, S.B. 4 "makes federal law its own" and thus "there can be 'no conflict in terms' and no preemption.'" 134 F. 4th at 332 (citing *People of State of Cal. v. Zook*, 336 U.S. 725, 735, (1949)).

  Second, even if weighing discretion was proper (it is not) nothing in the INA vests Federal Government officials with any discretion to arrest an alien for crossing the border at an unlawful location. *See* 8 U.S.C. § 1325(a) ("Any alien who [ ] enters or attempts to enter the United States at any time or place other than as designated by immigration officers. . . *shall*, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both, and, for a subsequent commission of any such offense, be fined under title 18, or imprisoned not more than 2 years, or both."); 1326(a) (also requiring an alien who illegally reenters "*shall*" be punished) (emphasis added); *Spivey v. Chitimacha Tribe of Louisiana*, 79 F.4th 444, 447 (5th Cir. 2023) (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112 (2012)) (explaining how "shall" is a mandatory word, and mandatory words

impose a duty.); READING LAW 112 ("The text of this canon is entirely clear, and its content so obvious as to be hardly worth the saying.").

Even if that wasn't the case, here the enforcement priorities of the United States and Texas align.[15] And even if some disagreement in priorities were to later arise in a particular case or context, that is insufficient to find S.B. 4 preempted. *Garcia*, <u>589 U.S. at 212</u>. Nor would that mean S.B. 4 would necessarily conflict with federal enforcement priorities "in *all* of its applications." *Washington State Grange v. Washington State Republican Party*, <u>552 U.S. 442, 449</u> (2008).

Finally, the district court's theory would produce staggering consequences for our federal system. Indeed, accepting such a theory would mean that "any time a State regulates the same conduct that the Federal Government does, the state regulation should be preempted because it might upset federal enforcement prerogatives." *Zyla*, <u>134 F.4th at 335</u>. This concern is particularly acute in our "post-*Wickard* world," where "the Federal Government has its hands in nearly every facet of human existence." *Id*. Given the "extraordinary reach of federal law," accepting the district court's theory would mean that "[p]ractically any conduct the State wants to regulate is already regulated by the Federal Government"—and thus preempted whenever federal agencies possess enforcement

---

[15] Current federal policy is to "prioritize the prosecution of offenses that relate to the borders of the United States," <u>90 Fed. Reg. 8,467</u> at 8,468–69, and especially those "offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States," Exec. Order No. 14,159, <u>90 Fed. Reg. 8,443</u>, 8,444 (Jan. 20, 2025). Indeed, Executive Order 14,159 recognizes that "[m]any. . . aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities." *Id*. at 8,443.

discretion. *Id*. This would strip states of "the fundamental features of sovereignty," including "the power to regulate 'every thing that passes' within [their] own territory.'" *Id*. (quoting Emer de Vattel, The Law of Nations, § 204 (1797)).

Relying on federal enforcement discretion as a basis for preemption is particularly problematic in the immigration context, where certain executive administrations have abandoned their responsibilities to enforce the immigration laws. Indeed, "[t]he problems at the border stem—at least in part—from [the prior administration's] decision not to enforce the immigration laws Congress wrote." *United States v. Texas*, 97 F.4th 268, 302 (5th Cir. 2024) (Oldham, J., dissenting). Not only did the previous administration abandon its duty to enforce immigration laws, but it did everything in its power to undermine statutory safeguards against unlawful border crossings.

For example, on his first day in office, then President Biden paused deportation of aliens and halted all construction on the southern border wall.[16] The Biden-Harris administration then did away with 89 previously successful border policies within their first year in office.[17] That administration also ended Title 42, a policy instituted during the pandemic that allowed the U.S. to turn away more than 60 percent of migrants at the

---

[16] Jaclyn Diaz, *Biden Suspends Deportations, Stops 'Remain in Mexico' Policy*, NPR (Jan. 21, 2021), https://www.npr.org/sections/president-biden-takes-office/2021/01/21/959074750/biden-suspends-deportations-stops-remain-in-mexico-policy; Elliot Spagat, *Biden Halts Border Wall Building After Trump's Final Surge*, AP NEWS (Jan. 20, 2021), https://apnews.com/general-news-political-news-bc664278ac096e6ff878116034ec06bb.
[17] Muzaffar Chishti & Jessica Bolter, *Biden Has Taken Nearly 300 Executive Actions on Immigration in His First Year, Outpacing Trump*, MIGRATION POLICY INSTITUTE (Jan. 19, 2022), https://www.migrationpolicy.org/news/biden-executive-actions-immigration-first-year.

southern border, amounting to nearly 2 million people over a two-year span.[18] That administration also terminated the highly effective "Remain in Mexico" program that required "certain non-Mexican nationals arriving by land from Mexico [to] be returned to Mexico to await the results of their removal proceedings." *Biden v. Texas*, <u>597 U.S. 785, 791</u> (2022); *see id*. at 819 (Alito, J., dissenting) (observing that DHS "found that total border encounters decreased by 64 percent after" this program "was implemented," and DHS considered it an "indispensable tool in addressing the ongoing crisis at the southern border").

The Biden-Harris administration also created categorical parole programs, in direct conflict with the INA's parole provision, that released aliens into the interior en masse. *See, e.g., Florida v. United States*, <u>660 F. Supp. 3d 1239</u> (N.D. Fla. 2023), *appeal dismissed*, No. 23-11528, <u>2023 WL 5212561</u> (11th Cir. July 11, 2023). And it established enforcement guidelines that would "increase[] the number of aliens with criminal convictions and migrants with final orders of removal released into the United States." *Texas v. United States*, <u>40 F.4th 205, 218</u> (5th Ci<u>r. 2022</u>) (per curiam) (quotations omitted), *abrogated on jurisdictional grounds*, <u>143 S. Ct. 1964</u> (2023). Indeed, those guidelines effectively compelled ICE and border patrol officers to stand down forcing them to allow incoming aliens to remain unlawfully in the United States.

---

[18] Pew Research Center, *Key Facts About Title 42, the Pandemic Policy That Has Reshaped Immigration Enforcement at U.S.-Mexico Border*, PEW RESEARCH CENTER (Apr. 27, 2022), <u>https://www.pewresearch.org/short-reads/2022/04/27/key-facts-about-title-42-the-pandemic-policy-that-has-reshaped-immigration-enforcement-at-u-s-mexico-border/</u>.

In short, there was an "utter failure of the [Biden-Harris administration] to deter, prevent, and halt unlawful entry into the United States" in contradiction to "the statutory duties they are so obviously derelict in enforcing." *State of Texas v. U.S. Dep't of Homeland Sec.*, 2023 WL 8285223, at *14 (W.D. Tex. Nov. 29, 2023). That abdication effectively posted a "flashing 'Come In, We're Open' sign on the southern border." *Florida*, 660 F. Supp. 3d at 1253.

States typically "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. When the federal government abandons its enforcement responsibilities, these consequences fall disproportionately on border states like Texas, whose communities face escalating crime, overwhelmed public services, and depleted resources. The district court's preemption theory would leave states powerless to protect their citizens and make state sovereignty contingent on whether federal officials decide to enforce the law—creating a void where neither federal nor state law is enforced. Preserving state authority to enforce laws that mirror federal immigration statutes is essential to protecting citizens and communities from the harms of unchecked illegal immigration. But rather than looking to the "'clear and manifest'" purpose of Congress, *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), the district court "invok[ed] some brooding federal interest[s]" and gave federal non-enforcement priorities primacy over the text of the constitution and the historic police powers of Texas. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion of Gorsuch, J.); *see also* U.S. CONST. art. VI, cl. 2.

The result if that reasoning stands is that Texas—and any other state, "is forever helpless: [they] can do nothing because Congress apparently did everything, yet federal non-enforcement means Congress's everything is nothing." *Texas*, 97 F.4th at 337 (Oldham, J., dissenting).

## CONCLUSION

For these reasons, among others, this Court should reverse the order granting a preliminary injunction and order the district court to dismiss Plaintiffs' claims for lack of jurisdiction.

Dated: October 17, 2025

Respectfully submitted,

/s/ *Garrett Greene*\*
Garrett Greene
Leigh Ann O'Neill
Gina M. D'Andrea
America First Policy Institute
1455 Pennsylvania Ave., N.W, Suite 225
Washington, DC 20004
(210) 232-4345
ggreene@americafirstpolicy.com
LOneill@americafirstpolicy.com
gdandrea@americafirstpolicy.com

\*Counsel of Record

*Counsel for Amicus Curiae America First Policy Institute*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Garrett Greene*
Garrett Greene

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because it contains 6,159 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P.32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14 which is the same system used to calculate the wordcount.

/s/ *Garrett Greene*
Garrett Greene