No. 24-50149

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

**United States of America,**

**Plaintiff-Appellee,**

v.

**State of Texas; Greg Abbott, in his official capacity as Governor of Texas; Texas Department of Public Safety; Freeman F. Martin, in his official capacity as Director of Texas Department of Public Safety,**

**Defendants-Appellants.**

---

**Las Americas Immigrant Advocacy Center; American Gateways; County of El Paso, Texas,**

**Plaintiffs-Appellees,**

v.

**Freeman F. Martin, in his official capacity as Director of the State of Texas Department of Public Safety,**

**Defendants-Appellants.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

---

## BRIEF FOR *AMICUS CURIAE*
## FEDERATION FOR AMERICAN IMMIGRATION REFORM
## IN SUPPORT OF APPELLANTS

---

***Counsel Listed on Next Page***

**MATT A. CRAPO**
**CHRISTOPHER J. HAJEC**
**Federation for American Immigration Reform**
**25 Massachusetts Ave., NW, Suite 330**
**Washington, DC 20001**
**Telephone: (202) 328-7004**
**mcrapo@fairus.org**
**chajec@fairus.org**

**Attorneys for *Amicus Curiae***
**Federation for American Immigration Reform**

## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1 and Fed. R. App. P. 26.1, undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.:

1)     For non-governmental corporate parties please list all parent corporations: None.

2)     For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3)     The following entity has an interest in the outcome of this case: Federation for American Immigration Reform.

DATED: October 20, 2025          Respectfully submitted,

/s/ Matt Crapo
MATT A. CRAPO
Attorney for *Amicus Curiae*
Federation for American Immigration Reform

# TABLE OF CONTENTS

<u>**Page**</u>

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

TABLE OF AUTHORITIES ...................................................................... ii

INTEREST OF *AMICUS CURIAE* ............................................................1

INTRODUCTION ...................................................................................1

ARGUMENT ..........................................................................................3

I.     The Constitution Reserves a Power of Self-Defense to the States ..................4

II.    Texas's Good-Faith Exercise of its Power of Self-Defense is
       Nonjusticiable ...............................................................................6

III.   General Immigration Regulations Cannot Constrain Texas's
       Constitutional Power to Repel an Invasion ...................................................17

CONCLUSION ......................................................................................21

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................18

*Baker v. Carr*,
369 U.S. 186 (1962)......................................................................6, 7

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) ....................................................7, 11

*Chiles v. United States*,
874 F. Supp. 1334 (S.D. Fla. 1994), *aff'd* 69 F.3d 1094 (11th Cir. 1995) ...........8

*Florida v. United States*,
660 F. Supp. 3d 1239 (N.D. Fla. 2023) ...........................................17

*Fourco Glass Co. v. Transmirra Products Corp.*,
353 U.S. 222 (1957)........................................................................19

*Kennedy v. Mendoza-Martinez*,
372 U.S. 144 (1963).........................................................................6

*Lichter v. United States*,
334 U.S. 742 (1948)....................................................................15, 18

*Morton v. Mancari*,
417 U.S. 535 (1974)....................................................................19, 20

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018).........................................................................4

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996) ...........................................................8, 11

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025) ..........................................................9

*Nishimura Ekiu v. United States*,
  142 U.S. 651 (1892)............................................................4

*Nixon v. United States*,
  506 U.S. 224 (1993)............................................................9

*Padavan v. United States*,
  82 F.3d 23 (2d Cir. 1996) ................................................12

*Posadas de Puerto Rico Assocs. v. Tourism Co.*,
  478 U.S. 328 (1986)..........................................................15

*Sterling v. Constantin*,
  287 U.S. 378 (1932)..........................................................10

*United States v. Borden Co.*,
  308 U.S. 188 (1939)..........................................................20

*United States v. Estate of Romani*,
  523 U.S. 517 (1998)..........................................................19

*United States v. S.-E. Underwriters Ass'n*,
  322 U.S. 533 (1944)..........................................................13

*Young v. Hawaii*,
  992 F.3d 765 (9th Cir. 2021) ...............................................6

*Zivotofsky v. Clinton*,
  566 U.S. 189 (2012)............................................................9

## CONSTITUTION

U.S. Const. art. I, § 10, cl. 3 ("State Self-Defense Clause") ...................... 3, *passim*

U.S. Const. art. IV, § 4..........................................................................5, 8

U.S. Const. amd. X ...............................................................................5

## STATUTES

8 U.S.C. § 1101(a)(15)................................................................4

8 U.S.C. § 1153 .........................................................................4

8 U.S.C. § 1182 .........................................................................4

8 U.S.C. § 1227 .........................................................................4

8 U.S.C. § 1325 .........................................................................5

8 U.S.C. § 1326 .........................................................................5

S.B. 4, 88th Leg., 4th C.S. (2023)..............................................3

## MISCELLANEOUS

9 Nicolay and Hay, Works of Abraham Lincoln (1894) ........................................18

C. Hughes, War Powers Under the Constitution (Sept. 5, 1917) ...........................15

Declaration of Independence ......................................................................4

Executive Order GA-41, 47 Tex. Reg. 4213 (July 7, 2022)........................10, 12, 16

Executive Order GA-42, 47 Tex. Reg. 6521 (Sept. 21, 2022) ................................16

Samuel Johnson, *Dictionary of the English Language*, 1773 (4th folio ed.) ..........13

## INTEREST OF *AMICI CURIAE*[1]

*Amicus curiae* Federation for American Immigration Reform ("FAIR") is a non-profit 501(c)(3) public interest organization dedicated to informing the public about the effects of both unlawful and lawful immigration, and to defending in court the interests of Americans in limiting overall immigration, enhancing border security, and ending illegal immigration.

FAIR has been involved in more than 100 legal cases since 1980, either as a party or as *amicus curiae*. The decision in this case will likely have an impact on the ability of state and local officials to cooperate with and assist the federal government in identifying and dealing efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million. FAIR therefore has direct and vital interests in the outcome of this case.

## INTRODUCTION

The measures of Texas challenged in this case are in response to the federal government's abdication, from 2021 through 2024, of its duty to protect the states from invasion and to take care that the nation's immigration laws be faithfully executed. Beginning on January 20, 2021, the Biden administration purposely

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

facilitated mass illegal entries into this country. It temporarily paused all removals, gutted immigration enforcement guidelines, terminated the Migrant Protection Protocols (colloquially known as the "Remain in Mexico policy"), halted all border wall construction projects, reinstated "catch and release" at the border, weakened asylum requirements, and adopted various mass parole programs.

This abdication of both the executive branch's statutory duty to secure the border and its constitutional obligation to protect the states from invasion resulted in an estimated 5.5 million illegal aliens' crossing the border from inauguration day in 2021 through fiscal year 2022. *FAIR Analysis: 5.5 Million Illegal Aliens Have Crossed our Borders Since Biden Took Office—How is Secretary Mayorkas Still Employed?*, available at: https://www.fairus.org/press-releases/border-security/fair-analysis-55-million-illegal-aliens-have-crossed-our-borders (last visited Oct. 15, 2025). The number of encounters only increased in fiscal year 2023, during which Customs and Border Protection ("CBP") encountered nearly 2.5 million aliens at the southwest border, a number that does not include known and unknown "gotaways." ROA.283. Over 85 percent of aliens encountered on the southern border were released into the United States. Fox News, *Mayorkas tells Border Patrol agents that 'above 85%' of illegal immigrants released into US: sources*, available at: https://www.foxnews.com/politics/mayorkas-tells-border-

patrol-agents-illegal-immigrants-released-into-us-sources (last visited Oct. 15,

2025).

In the face of this onslaught, Texas took several measures to secure its

borders and repel an invasion by foreign criminal cartels that were trafficking a

vast number of illegal aliens into Texas. One of those measures, challenged here,

was the passage of Senate Bill 4 ("S.B.4"), which criminalizes both illegal entry

and reentry into Texas from a foreign nation and authorizes state judicial officers

to order offenders to return to the foreign nation from which they illegally entered.

S.B.4, 88th Leg., 4th C.S. (2023). Although S.B.4 parallels similar federal criminal

offenses and does not interfere with Congress's power to decide which classes of

aliens are admissible or removable,[2] Plaintiffs seek to enjoin its enforcement,

arguing that it is preempted by federal law. Because federal immigration

regulations cannot preempt Texas's exercise of its sovereign self-defense power to

repel an invasion, Plaintiffs cannot show a likelihood of success. The district

court's injunction should therefore be reversed.

## **ARGUMENT**

Under Article I, section 10, of the Constitution ("the State Self-Defense

Clause"), Congress's regulation of immigration cannot preempt a state's valid

---

[2]  Texas represents that a return order under S.B.4 merely requires an alien
be transported to a port of entry and delivered to federal officials. Appellants Supp.
Br. at 6.

invocation of its sovereign power, "without the consent of Congress," to "engage in War" if "actually invaded." To the extent that there is a conflict between Texas's valid exercise of its constitutional war power and the Immigration and Nationality Act ("INA"), it is the latter that must give way. To decide otherwise would read "without the consent of Congress" out of the State Self-Defense Clause.

## I.    The Constitution Reserves a Power of Self-Defense to the States.

"When the original States declared their independence, they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all . . . Acts and Things which Independent States may of right do.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (quoting Declaration of Independence ¶ 32). Inherent in the sovereignty of an independent state, "and essential to self-preservation," is the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).

Under the Constitution, Congress is empowered to regulate immigration into the United States. Congress has exercised this power by defining the classes of aliens who are admissible and removable. *See* 8 U.S.C. §§ 1101(a)(15) (defining classes of nonimmigrant aliens); 1153 (allocating immigrant visas among various classes of aliens); 1182 (defining inadmissible aliens); 1227 (defining deportable

aliens). Congress has also criminalized illegal entry and reentry. *Id.* at §§ 1325, 1326.

When it comes to invasion, however, that same Constitution expressly recognizes the sovereign power of states to defend themselves. The State Self-Defense Clause reads:

> *No State shall, without the Consent of Congress*, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or *engage in War, unless actually invaded*, or in such imminent Danger as will not admit of delay.

U.S. Const. art. I, § 10 (emphases added). A corresponding constitutional provision, sometimes referred to as "the Invasion Clause," requires the federal government to protect each state from invasion. U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion").

In these two constitutional provisions, read together with the reservation of state powers in the Tenth Amendment,[3] the people conferred on the federal government the responsibility to protect each state against invasion, but also reserved to the states their respective sovereign prerogatives to "engage in War" if "actually invaded." The protection against invasion was thus doubled, ensuring

---

[3] The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

that, in the event of federal inattention to, or abdication of, the duty to repel an invasion (as happened between 2021 and 2024), "the Constitution" would not become "a suicide pact" for any state. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963). Rather, at the very least, if the federal government fails to protect a state against invasion, that state, as recognized by the State Self-Defense Clause, may exercise its reserved power to engage in war. *See Young v. Hawaii*, 992 F.3d 765, 815 (9th Cir. 2021) (citing the prohibition in the State Self-Defense Clause as "corresponding[]" to the federal government's duty to defend against invasion), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022). This is not to say, however, that a state's power of self-defense is only available when the federal government *has* failed to protect it; rather, the sole condition for its exercise in the State Self-Defense Clause is that the state be "actually invaded."

## II.    Texas's Good-Faith Exercise of its Power of Self-Defense is Nonjusticiable.

Because this case involves nonjusticiable questions, this Court should reverse. The questions of whether an invasion has occurred within the meaning of the State Self-Defense Clause and what measures a state may take in response to such an invasion are both committed by the Constitution to the various states.

In *Baker v. Carr*, the Supreme Court set forth the political question standard as follows:

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

Under this standard, as several courts of appeals have held, the question of whether an invasion has occurred within the meaning of the Invasion Clause is nonjusticiable and committed to the political branches of the federal government. For example, the Ninth Circuit has held that "to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government and would result in the Court making an ineffective non-judicial policy decision." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). And the Third Circuit (quoting *Baker, supra*) has held this question nonjusticiable because of "'a textually demonstrable constitutional commitment of the issue to a coordinate political department,' and 'a lack of judicially

discoverable and manageable standards for resolving it.'" *New Jersey v. United States*, 91 F.3d 463, 468-470 (3d Cir. 1996). *See also Chiles v. United States*, 874 F. Supp. 1334, 1342-1344 (S.D. Fla. 1994) (finding the invasion question nonjusticiable because of a lack of judicially discoverable and manageable standards for resolving it), *aff'd* 69 F.3d 1094, 1097 (11th Cir. 1995) (citing *Baker* generally). In short, the Invasion Clause in Article IV of the Constitution, because it places responsibility to protect against invasion on the federal government, and because there are no workable judicial standards to resolve whether an invasion has occurred, commits that question to the policy making (or political) branches of the federal government, not the judicial branch.

Just as Article IV, § 4, of the Constitution commits the question of whether an invasion has occurred to the political branches of the *federal* government, the State Self-Defense Clause, at least within broad limits not reached here, commits the questions of invasion and response *to the states*. The Clause prohibits to the states the power to engage in war without the consent of Congress except when the states are "actually invaded." Meanwhile, the Tenth Amendment reserves to the states all war-making power neither prohibited to the states nor delegated to the federal government—including the power, expressly not prohibited to the states in the State Self-Defense Clause, to engage in war without the consent of Congress in case of invasion. This power is not subject to the oversight of Congress, but rather,

by definition, is a power to act without its consent. To read the State Self-Defense Clause as committing the question of war to the *federal* government instead of the *state* government would be to read the phrase "without the consent of Congress" out of that provision.

The district court erred in concluding that, if a defense raises a nonjusticiable question, it should be rejected in the same way that claims raising a nonjusticiable question are rejected. ROA.574. Nonjusticiability applies to controversies, disputes, and questions, not defenses. "A *controversy* is nonjusticiable—i.e., involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department ....'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (emphasis added). "In such a case, … a court lacks the authority to decide the *dispute* before it." *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (emphasis added). Once the war-power defense was invoked, the nonjusticiability of Texas's exercise of its war power meant that the dispute before the court could not be resolved without deciding nonjusticiable questions—a reason to dismiss the case, not to deprive Texas of a defense under the Constitution.

As Texas points out, the States' invocation of the Self-Defense Clause is subject only to limited review, on the question of whether the invocation is in "good faith." Appellant's Supp. Br. at 32 (citing *Newsom v. Trump*, 141 F.4th

1032, 1050-51 (9th Cir. 2025); and *Sterling v. Constantin*, 287 U.S. 378, 400

(1932)). There is no question that Texas has met that minimum standard, if only

because, nonjusticability aside, Texas's invocation and exercise of its war power *is*

constitutionally valid.

On July 7, 2022, Governor Abbott issued Executive Order GA-41, in which

he invoked the State of Texas's inherent right to self-defense, as recognized by

Article I, § 10, of the United States Constitution, and to "secure the State of Texas

and repel the illegal immigration that funds the cartels." 47 Tex. Reg. 4213, 4214.

Governor Abbott authorized State officials "to respond to this illegal immigration

by apprehending immigrants who cross the border between ports of entry or

commit other violations of federal law, and to return those illegal immigrants to the

border at a port of entry." *Id.* Subsequently, Texas enacted S.B.4 as part of its

effort to secure its border and repel the invasion by criminal cartels by reducing

both their criminal activities—their trafficking of illegal immigrants and drugs—

and their material support—profits from that trafficking. According to the sponsor

of S.B.4, it was designed to "[p]rotect Texans from the danger of the border crisis"

and to "address the issue of border security…." S.B. 4; Bill Analysis,

Author's/Sponsor's Statement of Intent, available at:

https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004I.pdf#navpanes=0 (last

visited Oct. 15, 2025).[4] Upon signing S.B.4 into law, Governor Abbott stated that

"[t]he goal of Senate Bill 4 is to stop the tidal wave of illegal entry into Texas."

CBS News, *Texas immigration law known as SB4, allowing state to arrest

migrants, signed by Gov. Greg Abbott*, available at:

https://www.cbsnews.com/news/texas-immigration-law-sb4-signed-greg-abbott/

(last visited Oct. 15, 2025); *see also* Press Release, *Governor Abbott Signs Historic

Border Security Measures in Brownsville*, available at:

https://gov.texas.gov/news/post/governor-abbott-signs-historic-border-security-

measures-in-brownsville (last visited Mar. 16, 2024) (denouncing the Biden

administration's "deliberate inaction" on the border and proclaiming that S.B.4 and

other laws "will help stop the tidal wave of illegal entry into Texas").

   In concluding, contrary to the judgment of the state's political

representatives, that Texas is not being invaded, the district court relied on

summary dicta from various Circuit courts that "immigration" cannot constitute an

invasion. ROA.545. In each such case, however, the court held that it lacked

authority to decide that question, *see California*, 104 F.3d at 1091; *New Jersey*, 91

---

[4] *See also* S.B.4 House Committee Report, available at:
https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004H.pdf#navpanes=0 (last
visited Oct. 15, 2025) (noting "record-high" migrant encounters along the southern
border, efforts such as "Operation Lone Star" to "help secure the border" and
stating that "S.B. 4 seeks to further address the issue of border security by creating
criminal offenses related to illegal entry….").

F.3d at 470; *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In any event, the plaintiff's Invasion Clause claim is nonjusticiable."). These courts' admittedly unauthoritative statements that immigration cannot constitute an invasion can carry no weight.

Crucially, moreover, the district court misconstrued the nature of the invasion by characterizing it as nothing more than immigration. It is first and foremost an invasion by armed, hostile non-state actors, the foreign trafficking cartels. Governor Abbott recognized as much in Executive Order GA-41, in which he sought to "secure the State of Texas and repel the illegal immigration that funds the cartels." 47 Tex. Reg. at 4214. Texas's invocation of the Self-Defense Clause is therefore more than a "disagree[ment] with federal immigration policy," as the district court characterized it. ROA.551; *see also* ROA.553 ("Unauthorized immigration is not akin to armed and organized insurrection against the government."). Whether or not the cartels are enaged in an "insurrection" against the government of Texas, they are certainly invading the state, and that invasion consists, in part, of the mass illegal entries that the cartels both facilitate and profit from. As former Border Patrol Chief Rodney Scott has stated: "[t]here's nothing that crosses the southwest border without working with the cartels. They're either directly paying the cartels or the cartels are controlling their movements for another benefit, meaning to systematically overwhelm Border Patrol, create a gap

in the border security, and then bring the narcotics across." Virginia Allen, THE
DAILY SIGNAL (Feb. 10, 2023), https://www.dailysignal.com/2023/02/10/no-one-
crosses-unlawfully-from-mexico-without-working-with-cartels-former-border-
patrol-chief-says/ (last visited Oct. 15, 2025).

The term "invasion," as used in the Self-Defense Clause, is not limited to
hostile state actors. First, the ordinary meaning of "invade" is not limited to actions
by foreign states. "Ordinarily courts do not construe words used in the Constitution
so as to give them a meaning more narrow than one which they had in the common
parlance of the times in which the Constitution was written." *United States v. S.-E.
Underwriters Ass'n*, 322 U.S. 533, 539 (1944), *superseded by statute on other
grounds*. As Texas points out, Appellant's Opening Br. at 33, Webster's 1806
dictionary defines "invade" broadly, as "to enter or seize in hostile manner." And,
in a dictionary widely known when the Constitution was ratified, "invasion" was
defined, without limitation to state action, as "[h]ostile entrance upon the rights or
possessions of another; hostile encroachment." Samuel Johnson, *Dictionary of the
English Language*, 1773 (4th folio ed.). "Encroachment," in turn, was defined as
"[t]o advance into the territories or rights of another." *Id.*

In light of this broad understanding of the terms used in the Self-Defense
Clause, there is no reason to conclude that it applies only to hostilities by foreign
states and not to those by non-state actors such as cartels or gangs. Indeed,

historically, the State of Texas has exercised its self-defense powers against non-state actors. For example, in 1859, the governor of Texas authorized "an improvised expedition of state-funded Texas Rangers to counter" a Tejano militancy led by Juan Nepomuceno Cortina. Maj. Nathan Jennings, *The Army's Rio Grand Campaign of 1859: A Total Force Case Study*, Infantry Magazine, p. 36, Vol. 107, No. 2, April-June 2018, available at: https://www.benning.army.mil/infantry/magazine/issues/2018/Apr-Jun/PDF/APR-JUN18_mag.pdf (last visited :Oct. 15, 2025). Cortina has been described as a "son of a respected Mexican ranching family" and also "the head of a band of desperadoes" who "was making life and property in the Brownsville area unsafe." William John Hughes, *"Rip" Ford, Texan: the Public Life and Services of John Salmon Ford, 1836-1883*, a Dissertation in History, pp. 228 (June 1958), available at: https://ttu-ir.tdl.org/items/26ee077d-4668-4526-8f3f-a816921c7f55 (last visited Oct. 15, 2025). The Governor "distrusted the dispersed U.S. Army garrisons to respond quickly," Jennings, at 36, and dispatched John S. Ford, with the rank of major, to lead a company of Texas Rangers with orders "to protect the western frontier against Cortinas and his band and to arrest them if possible." Hughes, at 230. Eventually, the U.S. Army consolidated its dispersed garrisons and joined forces with the Texas Rangers to combat Cortina's gang. Jennings, at 36.

The district court also claimed that "[n]one of these [S.B.4] provisions are operations of war. Rather, they are standard operations of criminal enforcement by state civil authorities." ROA.564. Here, again, the district court takes a too narrow view of a constitutional power meant to ensure safety. "'The power to wage war is the power to wage war successfully.'" *Lichter v. United States*, 334 U. S. 742, 780 (1948) (quoting address by C. Hughes, War Powers Under the Constitution (Sept. 5, 1917)). Though it is for an invaded state to decide, the greater power to "engage in War" granted in the Constitution unquestionably includes the lesser power to return illegal entrants to the country from which they entered in order to prevent or deter illegal entries and thereby thwart the criminal cartels that both drive and profit from illegal immigration. *See*, *e.g.*, *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 345-46 (1986) (holding under this principle that the greater power to ban gambling casinos includes the lesser power to ban their advertising); *Lichter*, 334 U.S. at 778-79 ("[T]he exercise of broad discretion as to methods to be employed may be essential to an effective use of its war powers by Congress.").

Seen in context, Texas's enactment and implementation of S.B.4 is plainly a self-defense measure. War may be fought by many means, and S.B.4 is part of a larger war effort by Texas that includes Texas's deployment of concertina wire along the Rio Grande to "prevent, detour, and interdict transnational criminal

activity and illegal migration," FoxNews, *Texas installs miles of concertina wire along border near Rio Grande* (June 8, 2022), available at:

https://www.foxnews.com/us/texas-installs-miles-concertina-wire-border-rio-grande (last visited Oct. 15, 2025); its placement of "marine floating barriers" in the Rio Grande to "mak[e] it more difficult to cross the Rio Grande and reach the Texas side of the southern border," Press Release, *Governor Abbott Signs Sweeping Package Of Border Security Legislation* (June 8, 2023), available at:

https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation (last visited Oct. 15, 2025); Executive Order No. GA-41, 47 Tex. Reg. at 4214 (relating to returning illegal immigrants to the border); and Executive Order No. GA-42, 47 Tex. Reg. 6521 (Sept. 21, 2022) (designating certain Mexican drug cartels as foreign terrorist organizations).

In short, because the Constitution commits the question of whether an invasion has occurred to the policy-making branches of the State of Texas, and because Governor Abbott's invocation of the state's reserved power to defend itself was, at the very least, made in good faith, the state's invocation of its right to self-defense is a nonjusticiable political question for its people, through their elected representatives, to decide.

### III. General Immigration Regulations Cannot Constrain Texas's Constitutional Power to Repel an Invasion.

The district court also determined that even if S.B.4 were a war measure, Texas would be constrained by federal directives. ROA.573 ("[I]f Texas is engaging in war, then the federal government retains complete war authority to direct that once it has capacity to respond. The structure of the Constitution prevents States from frustrating national objectives in this field.") (internal quotations omitted). But the district court failed to identify any federal directives that Texas violates. Instead, S.B.4 is congruent with Congress's immigration laws. *See* Appellants' Supp. Br. at 41 ("S.B.4 does not conflict with, but instead complements and mirrors, federal immigration law."). And, as noted above, the federal government had abdicated its duty to secure the border and enforce Congress's immigration laws. As one federal court observed, Executive branch officials had "effectively turned the Southwest Border into a meaningless line in the sand and little more than a speedbump for aliens flooding into the country." *Florida v. United States*, 660 F. Supp. 3d 1239, 1249 (N.D. Fla. 2023). The district court's doctrine that "national objectives" control a state's war power, even in the face of federal surrender, negates both the State Self-Defense Clause and its purpose.

The district court also concluded that S.B.4 is preempted by the INA. ROA.506-25. But to reach that conclusion even where Texas has validly invoked

its right to self-defense in response to an actual invasion is, once again, to read "without the consent of Congress" out of the State Self-Defense Clause. The district court relied extensively on *Arizona v. United States*, 567 U.S. 387 (2012), but in that case, the State of Arizona did not invoke, and the Supreme Court did not pass on, the self-defense power that is expressly reserved to the sovereign states in the Constitution.

*Lichter* is instructive in the preemption analysis. There, the Supreme Court quoted President Lincoln's reflection on the power of Congress to pass a Conscription Act as follows:

> The Constitution gives Congress the power [to raise and support armies], but it does not prescribe the mode, or expressly declare who shall prescribe it. In such case Congress must prescribe the mode, or relinquish the power. There is no alternative . . . . The power is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; nor if the men to compose the armies are entirely willing; but it is a power to raise and support armies given to Congress by the Constitution, without an "if."

334 U.S. at 756 n.4 (quoting 9 Nicolay and Hay, Works of Abraham Lincoln 75-77 (1894)). Likewise, there is no "if" in the State Self-Defense Clause pertaining to Congress or any political branch of the federal government, no condition allowing Congress to control the states in exercising their reserved war-making power. On the contrary, the Constitution recognizes that the various states may exercise this power even *without the consent of Congress*.

18

Because the Constitution thus broadly dispenses with any need for approval by Congress, Congress's otherwise-applicable immigration laws cannot be applied to the detriment of a state's method of repelling an invasion; any such applications would effectuate Congress's *dis*approval of these measures. Thus, that state war powers, if validly invoked, may be exercised without congressional consent disposes of any statutory or preemption arguments based on the INA. To accept the district court's conclusions would be to abrogate the phrase "without the consent of Congress" in the State Self-Defense Clause.

Whether Texas is bound by Congress's general rules and regulations, and whether the INA preempts S.B.4, is also decidable by the more specific provision over the more general canon. The INA is a general law governing immigration. In contrast, the State Self-Defense Clause deals with the specific circumstance of a state's exercising its war power in the event of an invasion. Ordinarily, specific terms prevail over general terms. "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228 (1957) (citations omitted*). See also United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (holding that a later, more specific statute governs); *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (holding that a general

statute will not repeal by implication a more specific one unless there is "clear intention otherwise"). As the Court held in *Mancari*,

> [t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible."

*Mancari*, 417 U.S. at 551 (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)). The same reasoning applies to constitutional provisions. The INA and the State Self-Defense Clause, both being the supreme law of the land, should both be given effect, and that is accomplished by the displacement of the INA only in narrow situations where the State Self-Defense Clause is validly invoked.

In sum, even if the Court were to decide that S.B.4 conflicts with the terms of the INA, Texas has exercised a reserved power to implement S.B.4 under the State Self-Defense Clause. As long as Texas validly takes this action to repel an actual invasion, as it has, the Constitution recognizes its authority to take it without Congress's consent. Because Texas's valid invocation of its reserved power under the State Self-Defense Clause, and its valid choice of means of defense, takes precedence over Congress's otherwise-applicable law, Plaintiffs cannot show any substantial likelihood of success on the merits of this action.

## <u>CONCLUSION</u>

For the forgoing reasons, the Court should reverse the district court and

vacate its injunction.

DATED: October 20, 2025          Respectfully submitted,

/s/ Matt Crapo
MATT A. CRAPO
CHRISTOPHER J. HAJEC
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC  20001
Telephone: (202) 328-7004
mcrapo@fairus.org
chajec@fairus.org

Attorneys for *Amicus Curiae*
Federation for American Immigration Reform

**CERTIFICATE OF SERVICE**

I certify that on October 20, 2025, I electronically filed the foregoing *amicus* brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Matt Crapo

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 29(a)(5) because it contains 4,673 words, as measured by Microsoft Word software, which is fewer than one-half of the 13,000 word limit for a party's principal brief under Fed. R. App. P. 32(a)(7)(B). The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

DATED: October 20, 2025          Respectfully submitted,

/s/ Matt Crapo