No. 24-50149

In the
United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

STATE OF TEXAS; GREG ABBOTT, in his official capacity as Governor of Texas; TEXAS DEPARTMENT OF PUBLIC SAFETY; STEVEN C. MCCRAW, in his official capacity as Director of Texas Department of Public Safety,

*Defendants-Appellants*.

LAS AMERICAS IMMIGRANT ADVOCACY CENTER; AMERICAN GATEWAYS; COUNTY OF EL PASO, TEXAS,

*Plaintiffs-Appellees*,

v.

STEVEN C. MCCRAW, in his official capacity as Director of Texas Department of Public Safety,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of Texas

Brief of *Amici Curiae* America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of Cal., Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, The Presidential Coalition, The Senior Citizens League, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund in Support of Defendants-Appellants and Reversal

J. MARK BREWER
  Johnson City, TX
MICHAEL BOOS
DANIEL H. JORJANI
  Washington, DC
JOHN I. HARRIS III
  Nashville, TN
PATRICK M. MCSWEENEY
  Powhatan, VA
RICK BOYER
  Lynchburg, VA

WILLIAM J. OLSON*
JEREMIAH L. MORGAN
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Ave. W., Ste. 4
  Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com
Attorneys for *Amici Curiae*
March 13, 2024
*Counsel of Record*

Case No. 24-50149

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

UNITED STATES,

Plaintiff-Appellee,

v.

STATE OF TEXAS, *et al.*,

Defendants-Appellants,

---

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

United States of America; Las Americas Immigrant Advocacy Center; American Gateways; and County of El Paso, Texas, Plaintiffs-Appellees

State of Texas, *et al.*, Defendants-Appellants

America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, The Presidential Coalition, LLC, The Senior Citizens League, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, *Amici Curiae*.

William J. Olson, Jeremiah L. Morgan, Robert J. Olson, J. Mark Brewer, Michael Boos, Daniel H. Jorjani, John I. Harris III, Patrick M. McSweeney, and Rick Boyer are counsel for *Amici Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *Amici Curiae* America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, The Presidential Coalition, LLC, The Senior Citizens League, U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them.

i

 /s/ William J. Olson
William J. Olson
Attorney of Record for *Amici Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INTEREST OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.    TEXAS HAS AUTHORITY TO REPEL BOTH INCURSIONS AND
      INVASIONS OF ILLEGAL ALIENS INTO ITS TERRITORY . . . . . . . . . . . . 2

      A.    SB4 Exercises a Valid State Power Not Yielded to the
            National Government. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The State of Texas Has the Same Inherent Authority to Protect
            Its Borders as Does the U.S. Government . . . . . . . . . . . . . . 5

      C.    The Invasion Clause Expressly Reserves the Right of Self-
            Defense against Invasion to the States, up to and Including
            War. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      D.    The Supremacy Clause Subordinates Only State Laws that
            Conflict with Proper Federal Laws . . . . . . . . . . . . . . . . . . 10

      E.    The District Court's Interpretation of the Invasion Clause
            Creates an Absurdity . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.   BY ANY MEASURE, TEXAS HAS BEEN AND IS BEING INVADED . . . . . . . 16

      A.    The Objective Reality of the Border Invasion . . . . . . . . . . . . 17

B.    Texas' History of Responding to Border Invasions with Military Force Demonstrates Texas' Constitutional Right to Defend Itself . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C.    The Historical Understanding of the Word "Invasion" Does Not Require Military Involvement . . . . . . . . . . . . . . . . . . . 21

III.   THE FRAMERS INCLUDED THE INVASION CLAUSE TO ENSURE STATES COULD ACT TO DEFEND THE PEOPLE IF THE NATIONAL GOVERNMENT FAILED ITS DUTY . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

iv

# TABLE OF AUTHORITIES

Page

**U.S. CONSTITUTION**

Article I, Sec. 8, cl. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . .  4
Article I, Sec. 8, cl. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
Article I, Sec. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
Article I, Sec. 10, cl. 3 . . . . . . . . . . . . . . . . . . . . . .  9, 16, 30
Article II, Sec. 1. . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 28
Article VI, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10
Amendment X . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11
Amendment XXV . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

**STATUTES**

5 *Stat*. 797 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
8 U.S.C. § 1101(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . .  3
8 U.S.C. § 1325 . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
Tex. Code Crim. Proc. Art. 5B.002 . . . . . . . . . . . . . . . . . . .  3
Tex. Penal Code § 51.02 . . . . . . . . . . . . . . . . . . . . . . . .  3

**CASES**

*Alden v. Me.*, 527 U.S. 706, 714 (1999) . . . . . . . . . . . . . .  12, 14
*Arizona v. United States*, 567 U.S. 387 (2012). . . . . . . . . . .  5, 12, 13
*Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135 (1892) . . . . . . . . . . .  4
*Gregory v. Ashcroft*, 501 U.S. 452 (1991) . . . . . . . . . . . . .  6, 14
*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92
    (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5
*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . .  11
*Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023). . . . . . . . . . . . .  29
*United States v. Butler*, 297 U.S. 1 (1936) . . . . . . . . . . . . . . .  15

**MISCELLANEOUS**

American State Papers: Military Affairs (William S. Hein & Co., Inc.
    1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9
B. Blankley, "51st Texas county declares invasion at southern border,"
    *TheCenterSquare.com* (Jan. 25, 2024) . . . . . . . . . . . . . . . .  17, 18

L. Cacciatore, "Seven More States to Send National Guard to Texas
    Border," *TexasScorecard.com* (Feb. 12, 2024) . . . . . . . . . . . . . . . 18

T. Cooley, <u>A Treatise on the Constitutional Limitations Which Rest Upon
    the Legislative Power of the States of the American Union</u> (1868) . . . . 15

The Debates in the Several State Conventions on the Adoption of the Federal
    Constitution (Jonathan Elliot ed., 2d ed. 1836) . . . . . . . . . . . . . . . 8

E. de Vattel, <u>The Law of Nations</u> (B. Kapossy & R. Whatmore eds. 2008) . . 5

Federalist No. 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Federalist No. 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Federalist No. 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A. Fletcher, "The First Calling Forth Clause: The Constitution's
    Non-Emergency Power to Call Forth the Militia to Execute the
    Laws," 13 J. NAT'L SECURITY L. & POL'Y. 1 (2022) . . . . . . . . . . . 7

M. Fox, "The U.S. national debt is rising by $1 trillion about every 100
    days," *CNBC* (Mar. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . 27

P. Hamburger, "Beyond Protection," 109 COLUM. L. REV. 1823
    (Dec. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

K. Housler, "25 Republican Governors Release Joint Statement in Support
    of Texas," *Tennessee Star* (Jan. 25, 2024) . . . . . . . . . . . . . . . . . 17

A. Hyman, "What The Constitution's Framers Really Meant By
    'Invasion'" *Daily Caller* (Jan. 30, 2024) . . . . . . . . . . . . . . . . . . 23

Madison's Debates, July 20, 1787, The Avalon Project . . . . . . . . . . . 28, 29

J. Mazzone, "The Security Constitution," 53 UCLA L. REV. 29 (Oct. 2005) . 7

R. Natelson, "Understanding the Constitution: How States May Respond
    to Illegal Immigration, Part I," *Epoch Times* (Jan. 8, 2024) . . . . . . . 22

R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration,
    and the War Powers of States," forthcoming in Br. J. Am. Leg.
    Studies (2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

S. Nelson, "White House won't say if Biden family's China biz is
    'security issue,'" *New York Post* (Aug. 18, 2023) . . . . . . . . . . . . . 29

"Pancho Villa," History.com (Nov. 9, 2009) . . . . . . . . . . . . . . . . . . 20

R. Reilly, "Biden won't be charged in classified docs case; special counsel
    cites instances of 'poor memory,'" *NBC News* (Feb. 8, 2024) . . . . . . 30

Report of U.S. House Special Committee on Texas Frontier Troubles
    (Feb. 29, 1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

J. Rippy, <u>The United States and Mexico</u> (Alfred A. Knopf: 1926) . . . . . . . . 18

J. Sandos, "The Plan of San Diego: War & Diplomacy on the Texas Border
    1915-1916," ARIZONA AND THE WEST (Spring 1972) . . . . . . . . 19, 20

A. Scalia and B. Garner, <u>Reading Law</u> (Thomson West: 2012) . . . . . . . . . . 15

C. Shor, "Mitch McConnell is out of step with the majority of
    Americans," *Cincinnati.com* (Dec. 15, 2023) . . . . . . . . . . . . . . . . 29

A. Syal, M.D., "As Biden's memory issues draw attention, neurologists
    weigh in," *NBC News* (Feb. 10, 2024). . . . . . . . . . . . . . . . . . . . . . 30

Texas Dep't of Public Safety, "Texas Criminal Illegal Alien Data" . . . . . . . 17

C. Todd, "Poll: 68% of voters have worries about Biden's mental and
    physical health," *NBC News* (June 27, 2023). . . . . . . . . . . . . . . . . 30

J. Tierney, <u>Chasing Ghosts: Unconventional Warfare in American History</u>
    (Potomac Books: 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

United Nations, Declaration 29, 2030 Agenda for Sustainable
    Development (Sept. 25, 2015) . . . . . . . . . . . . . . . . . . . . . . 26, 27

UN Global Issues, International Migration . . . . . . . . . . . . . . . . . . . . . . 27

## INTEREST OF *AMICI CURIAE*[1]

America's Future, Gun Owners of America, Inc., Gun Owners

Foundation, Gun Owners of California, Tennessee Firearms Association,

Tennessee Firearms Foundation, Citizens United, Citizens United Foundation,

The Senior Citizens League, U.S. Constitutional Rights Legal Defense Fund, and

Conservative Legal Defense and Education Fund are nonprofit organizations

which work to defend constitutional rights and protect liberties.  The Presidential

Coalition, LLC is a political committee.

## STATEMENT OF THE CASE

On December 18, 2023, Texas Governor Greg Abbott signed SB4 into

law, making illegal entry across the Texas border a criminal offense, punishable

as a misdemeanor, but providing that proceedings may be abated if the individual

agrees to return to the country from which he entered the United States.

Subsequent violations are punishable as a felony.  The Texas law was

immediately challenged by the United States based on the Supremacy Clause and

---

[1]  All parties have consented to the filing of this *amici curiae* brief.  No party's counsel authored the brief in whole or in part.  No party or party's counsel contributed money intended to fund preparing or submitting the brief. No person other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

1

the Dormant Commerce Clause.  *See United States v. Texas*, 2024 U.S. Dist. LEXIS 36721 (W.D. Tex. 2024) ("*Texas*").  On February 29, 2024, the district court issued a preliminary injunction.  *Id.* at *7.

On March 2, 2024, this Court granted an administrative stay of the injunction (*United States v. Texas*, 2024 U.S. App. LEXIS 5175 (5th Cir. 2024)).  On March 4, 2024, Justice Alito issued an administrative stay of this Court's order (thus allowing the district court's injunction to go into effect) until March 13, 2024 at 5:00 pm (EDT), while the Supreme Court considers whether to allow the injunction of SB4 to remain in effect.  *United States v. Texas*, 2024 U.S. LEXIS 1209 (2024).  On March 12, 2024, Justice Alito extended the administrative stay to March 18, 2024 at 5:00 pm (EDT).

## ARGUMENT

## I. TEXAS HAS AUTHORITY TO REPEL BOTH INCURSIONS AND INVASIONS OF ILLEGAL ALIENS INTO ITS TERRITORY.

In enacting SB4, Texas exercised two types of authority.  First, it exercised its authority as a sovereign state to exclude illegal aliens — a power that it shares with the national government — a power that was never yielded exclusively to the national government.  Additionally, the U.S. Constitution

recognizes Texas' power to do more than exclude — to engage in war — if invaded, which has occurred.

### A.     SB4 Exercises a Valid State Power Not Yielded to the National Government.

In broad terms, SB4 criminalizes the entry into Texas at any place other than a lawful port of entry by an "alien" as defined under federal law — "any person not a citizen or national of the United States" (8 U.S.C. § 1101(a)(3)). However, Texas law authorizes that for any such person against whom there are no other charges pending, and who is not a repeat immigration offender, the judge has authority to dismiss the charges if the person agrees to return to the foreign nation from which the person entered the country.  *See* Tex. Code Crim. Proc. Art. 5B.002.  Under Tex. Penal Code § 51.02, Texas allows affirmative defenses, including where (i) the defendant has lawful presence; or (ii) asylum was approved under Deferred Action for Childhood Arrivals ("DACA"); or (iii) the alien had not violated 8 U.S.C. § 1325.[2]

The district court asserted that "[b]y regulating a sphere dominated by federal interests, SB 4 violates the Supremacy Clause." *Texas* at *8, *38.  The

---

[2]  Under Section 1325, "Any alien who … enters or attempts to enter the United States at any time or place other than as designated by immigration officers…" commits a federal crime.

court asserted the national government has "'broad, undoubted power over the subject of immigration'" (*id*. at \*34 (citation omitted)) relying on some amalgam of the naturalization power, the power to regulate commerce with foreign nations, and the dormant commerce clause. *Texas* at \*34.[3]

The primary power in this area vested in the national government is set out in seven words in Article I, Sec. 8, cl. 4. — "To establish an uniform Rule of Naturalization." "Naturalization" has been defined as "the act of adopting a foreigner, and clothing him with the privileges of a native citizen." *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 162 (1892). The Constitution never once uses the word "immigration." It never expressly vests any power in the national government to regulate immigration. Yet the United States has this power, not because it is enumerated or implied from the Constitution, but because it is inherent in the nature of a sovereign. **Thus, the national power and the state power over immigration are both drawn from the same source, and neither is superior to the other.**

---

[3] When the national government is unable to identify a specific power granted to it in the Constitution, it often relies on some assortment of clauses, which can be a "tell" that it possesses no such power.

4

**B.    The State of Texas Has the Same Inherent Authority to Protect Its Borders as Does the U.S. Government.**

The Founders created a "Union of sovereign States." *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 104 (1938).  When Texas entered the union in 1845, it did so "on an equal footing" with the other States. 5 *Stat.* 797.  Thus, any analysis of State and national power here must begin with the reality that there are **two sovereigns in this case.**  "[T]he defining characteristic of sovereignty [is] the power to exclude from the sovereign's territory people who have no right to be there." *Arizona v. United States*, 567 U.S. 387, 417 (2012) (Scalia, J., dissenting).  That was not only the opinion of Justice Scalia in a dissent; it was an undisputed principle described by Emer de Vattel in his widely read and relied upon Founding-era treatise on The Law of Nations as follows:

> The **sovereign may forbid the entrance of his territory** either to **foreigners** in general, or in particular cases, or to certain persons, or for certain particular purposes, according as he may think it advantageous to the state.  There is nothing in all this, that does not flow from the rights of domain and sovereignty.…  [E. de Vattel, The Law of Nations, bk. II, ch. VII, § 94, p. 309 (B. Kapossy & R. Whatmore eds. 2008) (emphasis added).]

The inherent — and unsurrendered — rights of the States to defend their own sovereignty is well established:

5

> The people of each State compose a State, having its own
> government, and **endowed with all the functions essential to
> separate and independent existence**…  [I]t may be not
> unreasonably said that **the preservation of the States**, and the
> maintenance of their governments, **are as much within the design**
> and care of the Constitution **as the preservation of the Union** and
> the maintenance of the National government.  [*Gregory v. Ashcroft*,
> 501 U.S. 452, 457 (1991) (emphasis added) (internal quotations
> omitted).]

One indispensable attribute of a state's ability to maintain a "separate and

independent existence" is the ability to defend itself from millions of aliens

coming across its border.  The militia provided State governments with the

means to carry out that sovereign function.  Founding-era State constitutions and

State statutes addressed the power of a governor to call out the militia to defend

their State's borders.  "[M]ost state executives during the War of Independence

detained, questioned, and expelled British enemy aliens without legislative

authorization."[4]  The post-Revolutionary 1784 New Hampshire Constitution

authorized the governor to "be commander in chief [and to] expulse, repel, resist

and pursue by force of arms ... every such person ... as shall ... in a hostile

manner attempt or enterprize the destruction, invasion, detriment, or annoyance

of this State."  *Id*. at n.359.  The 1780 Massachusetts Constitution, written by

---

[4] P. Hamburger, "Beyond Protection," 109 COLUM. L. REV. 1823, 1930
(Dec. 2009).

John Adams, had nearly identical language.[5]  New Jersey provided by statute,

"'[t]hat in case of sudden Invasion, Insurrection, Sedition, or Alarm … it shall

be lawful for the governor … to call out and array the Whole of the Militia … as

he may think necessary to repel the Invasion, and to Restore the Peace of the

State.'"[6]  Pennsylvania and New York had similar statutes.  *Id.* at 19-20.

The district court misread history in assuming the Framers intended to

limit the right of States to prevent aliens from unlawfully crossing their borders.

In fact, "the ratifying generation put in place a uniquely federalist security

apparatus.…  [T]he national government is permitted, indeed encouraged, to …

call[] forth the militia into federal employ to carry out the requirements of the

Protection Clause.…  The remainder of the time, states are free to use their

militia for their own purposes."[7]

The militia was not established to respond to tornadoes or floods, or being

sent to fight foreign wars, but to defend the state.  George Nicholas directly

---

[5]  [1780 Massachusetts Constitution](#), *ConSource.com.*

[6]  A. Fletcher, "The First Calling Forth Clause: The Constitution's Non-Emergency Power to Call Forth the Militia to Execute the Laws," 13 J. Nat'l Security L. & Pol'y. 1, 19 n.104 (2022).

[7]  J. Mazzone, "The Security Constitution," 53 UCLA L. Rev. 29, 90 (Oct. 2005).

responded to Anti-Federalist Patrick Henry's concern that the Constitution might

be misread to grant a power to the national government as conferring an

exclusive power:

> **The power of arming [the militias] is concurrent** between the
> general and state governments; for the power of arming them rested
> in the state governments before: and although the power be given to
> the general government, yet it is **not given exclusively**; for, **in
> every instance where the Constitution intends that the general
> government shall exercise any power exclusively of the state
> governments, words of exclusion are particularly inserted**.
> Consequently, in every case where such words of exclusion are not
> inserted, **the power is concurrent** to the state governments and
> Congress.…  Virginia may arm the militia, should Congress neglect
> to arm them.[8]

After ratification, in 1814, Massachusetts Governor Caleb Strong called

the militia into state service to resist a British invasion and then requested federal

reimbursement of the expense.  Three years before becoming President, then-

Secretary of War James Monroe responded to Strong, not to criticize his use of

State militia to resist invasion, but rather to state:  "The measures which may be

adopted by a **State Government for the defence of a State** must be considered

---

[8]  Debate before the Convention of the Commonwealth of Virginia
(Statement of George Nicholas) (June 14, 1788), in 3 The Debates in the Several
State Conventions on the Adoption of the Federal Constitution at 391 (Jonathan
Elliot ed., 2d ed. 1836) (emphasis added).

as its own measures and not those of the United States — The expences attending them are chargeable to the State and not to the United States."[9]

### C.    The Invasion Clause Expressly Reserves the Right of Self-Defense against Invasion to the States, up to and Including War.

Lest there be any doubt that the States retained sovereign power to defend their borders, even to the point of waging War, the Invasion Clause expressly reserves that power to the States:  "No State shall, **without the Consent of Congress** … engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  Article I, Sec. 10, cl. 3 (emphasis added). This clause speaks to a number of scenarios.

The most obvious meaning of this clause is that, should there be an "invasion" or "risk of imminent Danger," the State may even engage in "War" — "without the consent of Congress."  "War" presupposes the existence of a foreign threat, and thus is of particular significance to States which border foreign nations.  This clause is located in section 10 of Article I (addressing Powers Denied to the States) and was designed to clarify that the War power expressly vested in Congress by Article I, Sec. 8, cl. 11 did not divest the States

---

[9] Letter from James Monroe, Secretary of War, to Caleb Strong, Governor of Massachusetts (Sept. 17, 1814), in 1 American State Papers: Military Affairs at 614 (William S. Hein & Co., Inc. 1993) (emphasis added).

of the War power in the specified circumstances. There is nothing express or implied in this clause that indicates that, short of waging war, the State's inherent power to defend its border is limited in the absence of an invasion.

Thus, this case does not turn on whether there was a military invasion into Texas. Texas' exercise of its power to exclude is modest and certainly cannot be considered exercising a War power. Therefore, while it could wage war, together with the greater authority to use force and violence, which that implies, if it was invaded, its authority to resist immigration by non-citizens exists irrespective of whether there is an invasion.

### D. The Supremacy Clause Subordinates Only State Laws that Conflict with Proper Federal Laws.

The district court enjoined the Texas statute on the ground, *inter alia*, that it violates the Supremacy Clause:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land…. [Article VI, cl. 2.]

The Supremacy Clause is not a general grant of power to the national government. It does not empower the national government to violate limitations on its own power. It does not negate the inherent powers of the States not

10

yielded to the national government (*see* Section I.A and I.B, *supra*). It certainly has no bearing on powers expressly reserved to the States in the Constitution (*see* Section I.C., *supra*). Texas law in no way conflicts with the constitutional naturalization power or laws made pursuant thereto. The Supremacy Clause cannot be invoked to subtract from or weaken a State's reserved powers, authorizing the national government to violate the Tenth Amendment.

The Supremacy Clause does not claim — as the district court seemed to rule — that the States are subordinate to the national government's policy choices in every respect. Where an inherent State power not yielded to the national government is involved, or when the Constitution's express text reserves a power to the States, federal law — and federal policy choices — are powerless to invade the reserved right. Indeed, it is the national government that is acting in an unconstitutional manner, for "an act of the legislature, repugnant to the constitution, is void." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Texas makes no claim that its laws can trump contrary federal laws — it is defending against a federal violation of its own sphere of authority. Texas' claim is not one of nullification, as the district court seemed to believe, but of defense of its own inherent, reserved, unyielded powers.

11

The federal system established by our Constitution … reserves to [the States] a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status.… **[E]ven as to matters within the competence of the National Government**, the constitutional design secures the founding generation's rejection of "the concept of a central government that would act upon and through the States" in favor of "a system in which the State and Federal Governments would exercise **concurrent authority** over the people who were, in Hamilton's words, 'the only proper objects of government.'" [*Alden v. Me.*, 527 U.S. 706, 714 (1999) (emphasis added).]

Thus, the "constitutional design" rejects allowing federal "policy choices" to override powers expressly reserved to States. And the right to defend themselves against invasions — as well as the right to determine when an invasion occurs ("without the consent of Congress") — is expressly reserved to the States by the Constitution's language.

The clearest explanation on this topic came from Justice Scalia, who explained the thinking in Philadelphia in 1797:

Through ratification of the fundamental charter that the Convention produced, the States ceded much of their sovereignty to the Federal Government. But much of it remained jealously guarded — as reflected in the innumerable proposals that never left Independence Hall. Now, **imagine a provision** — perhaps inserted right after Art. I, § 8, cl. 4, the Naturalization Clause — which included among the enumerated powers of Congress **"To establish Limitations upon Immigration that will be exclusive and that will be enforced only to the extent the President deems appropriate."** The delegates to

12

the Grand Convention would have rushed to the exits. [*Arizona* at 436 (Scalia, J., dissenting) (emphasis added).]

**E.     The District Court's Interpretation of the Invasion Clause Creates an Absurdity.**

The district court explains the duty of the federal government to protect a state against invasion:

> [w]hen a state — and by extension the United States — is invaded, the federal government must protect from the invasion. As Article IV, Section 4 (the "Guarantee Clause") states: The United States shall guarantee to every State … a Republican Form of Government, and shall protect each of them against Invasion. [*Texas* at *72-73.]

However, those are words on paper. We are living through a time when the national government has refused to protect the States against invasion. The district court misreads the existence of that obligation on the national government as if it constituted a restriction imposed on State governments. The court gave passing acknowledgment to the Invasion Clause, but stated that it "authorizes states to respond to invasion only as an emergency interim measure before the federal government may respond." *Id.* at *98. But the constitutional text wholly undercuts the district court's position. Nothing in the text of the Invasion Clause limits it to an "emergency" role, supplemental only and superseded as soon as the federal government says so. Nor does the Clause require States to submit to

13

an invasion if the federal government, through negligence or ill intent, refuses to defend against it. It expressly authorizes States to act "without consent of Congress" when delay is too dangerous or when an invasion exists. It is not limited temporally, in scale or in scope. Rather than being supplemental, it is concurrent. *See Alden* and *Gregory*, *supra*. It neither terminates if the federal government steps in to assist nor if the federal government refuses to do so.

The district court asserted that "if Texas were engaging in a war, it would have to abide by federal directives in waging that war." *Texas* at *71. The district court's speculation about both Texas and Congress exercising its War power at the same time is completely irrelevant here, as the national government has neither declared war, nor engaged in military action, nor even enforced its immigration laws. If the national government were now to rush to protect the southern border, there is little doubt that Texas would be pleased to have the federal government assume its duties under the Guarantee Clause, but that issue is not before this court.

The district court's decision renders the Invasion Clause a nullity. Under its decision, if: (i) the national government refuses to defend a border; (ii) and then, a state offers defense; (iii) but then, the national government declares that

14

no invasion exists; (iv) as a result, the State cannot act.  This view negates the state's expressly recognized power and renders the Invasion Clause mere constitutional surplusage.  The surplusage canon "holds that it is no more the court's function to revise by subtraction than by addition.  A provision that seems to the court unjust or unfortunate … must nonetheless be given effect."[10]

To all practical effect, the district court reads the Invasion Clause to say instead that "a state may not engage in War even if actually invaded if the national government refuses to consent or withdraws consent."  But the Framers expressly specified that the consent of Congress was not required — giving the national government no role whatsoever.  "[W]ords cannot be meaningless, else they would not have been used."  *United States v. Butler*, 297 U.S. 1, 65 (1936).  As Thomas Cooley's famous treatise put it, "the courts must … lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory."[11]

The district court misreads the Invasion and Supremacy Clauses, reaching the wrong conclusion.  Texas possesses reserved sovereign authority to defend its

---

[10]  A. Scalia and B. Garner, Reading Law at 174 (Thomson West: 2012).

[11]  T. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union at 58 (1868).

borders, without congressional permission, when an invasion exists.  The

authority to act without congressional permission necessarily defeats the district

court's position that the federal government is the sole determinant if an invasion

exists.  Texas has the authority it needs.  It has the permission it needs in the

Constitution.  It needs none from Washington.

## II.    BY ANY MEASURE, TEXAS HAS BEEN AND IS BEING INVADED.

The Biden Administration would have this Court make the State's power to

even "engage in War" under Article I, Sec. 10, cl.3 subject to the approval of

the national government.  However, the clause allows this power to be exercised

"without the Consent of Congress."  If Congress' consent is not necessary,

neither is that of the Executive or the Judiciary.  Neither the district court nor

this court has authority to override Texas' finding that it has been invaded.

However, in fact, Texas, most certainly, has been invaded.

## A.      The Objective Reality of the Border Invasion.

The district court blithely dismisses the crisis in Texas as though it did not exist.  But in fiscal year 2023 alone, nearly 2 million illegal aliens poured over Texas' border, some 50 percent of all illegal U.S. border crossings.[12]

According to the Texas Department of Public Safety, between 2011 and 2023:

> 297,000 illegal aliens were charged with more than 509,000 criminal offenses which included arrests for 940 homicide charges; 64,127 assault charges; 9,246 burglary charges; 59,936 drug charges; 1128 kidnapping charges; 25,441 theft charges; 39,694 obstructing police charges; 2,912 robbery charges; 6,422 sexual assault charges; 7,410 sexual offense charges; and 6,193 weapon charges.[13]

Twenty-five governors signed a statement supporting Texas' constitutional right to defend against the invasion.[14]  Twelve governors pledged National Guard

---

[12]  B. Blankley, "51st Texas county declares invasion at southern border," *TheCenterSquare.com* (Jan. 25, 2024).

[13]  Texas Dep't of Public Safety, "Texas Criminal Illegal Alien Data."

[14]  K. Housler, "25 Republican Governors Release Joint Statement in Support of Texas," *Tennessee Star* (Jan. 25, 2024).

troops to defend Texas' border militarily.[15]  Fifty-one Texas counties have declared that an invasion exists.[16]

### B.    Texas' History of Responding to Border Invasions with Military Force Demonstrates Texas' Constitutional Right to Defend Itself.

From its earliest days, Texas has repeatedly deployed State armed forces in resisting cross-border incursions from Mexico, including many not conducted by regular troops of the Mexican government or military.  Ten years after the Civil War, invasions of Texas by gangs of Mexican bandits forced Texas Governor Richard Coke to appeal repeatedly to the federal government for help:

> [A] joint committee of the state legislature … recommended the increase of state forces on the southwestern frontier and expressed the fervent hope that ere long the federal government would do its full duty….  The governor not only forwarded this report to Washington, but sent protest after protest and plea after plea for federal assistance.[17]

When the federal government failed, as it has been doing today, to properly defend the border, the governor commissioned a force of Texans of Mexican descent, ordering them to engage the Mexican bandits:  "Should the

---

[15]  L. Cacciatore, "Seven More States to Send National Guard to Texas Border," *TexasScorecard.com* (Feb. 12, 2024).

[16]  Blankley, *supra*.

[17]  J. Rippy, The United States and Mexico at 292 (Alfred A. Knopf: 1926).

company be in close pursuit of thieves or marauders with their plunder, it will follow as far as possible, whether on this side of the Rio Grande or the other."[18] When U.S. Attorney General George Williams questioned the legality of the order, Coke replied:

> No state has surrendered the right of defense of its people in its own way against aggressions from neighboring states or people.... [I]nternational courtesy, comity, and amity have never been required by the law of nations, carried to the romantic extent of surrendering the great natural right of self-defense against the constant infliction of serious, permanent, and wrongful injury upon the people of one nation by those of another.  [*Id*. at xvi.]

History shows that "Attorney-General Williams acquiesced in these conclusions, and the orders remained in force."  *Id*.

In the early 1900s, as Europe began to take up sides for World War I, the German government sought to destabilize the southern border of the United States.  Groups of Mexican bandits, encouraged by German agents, developed the "Plan of San Diego."

> According to the Plan, there would be an armed uprising ... against ... the United States....  [T]he Plan would reclaim for Mexico, the

---

[18]  Report of U.S. House Special Committee on Texas Frontier Troubles at xv (Feb. 29, 1876).

territory comprising Texas, New Mexico, Arizona, Colorado, and California.[19]

In 27 cross-border incursions, "raiders killed thirty-three Americans and wounded twenty-four, and destroyed several thousand dollars worth of property. They disrupted economic activity in four Texas counties, causing thousands of families to flee the Lower Rio Grande Valley." *Id.* at 23.[20]

The U.S. Army played the primary role in putting down the "San Diego" raids and the associated cross-border raids of Pancho Villa, which killed some 30 additional Americans.[21] But the Texas Rangers continued to provide protection of the border and military defense against Mexican bandits.[22]

The deaths caused by Villa and the "San Diego" border raids, both in terms of death toll and economic destruction, pale in comparison to the number of Americans killed by illegal aliens in the modern border invasion. Yet

---

[19]  J. Sandos, "The Plan of San Diego: War & Diplomacy on the Texas Border 1915-1916," ARIZONA AND THE WEST at 8 (Spring 1972).

[20]  "Pancho Villa," History.com (Nov. 9, 2009).

[21]  *Id.*

[22]  J. Tierney, Chasing Ghosts: Unconventional Warfare in American History at 117 (Potomac Books: 2006).

20

apparently not until recent years has the authority of Texas to defend its border militarily ever even been questioned.

### C.    The Historical Understanding of the Word "Invasion" Does Not Require Military Involvement.

The district court mocks Texas' invasion defense, stating that "[t]o discuss 'invasion' at length is to take the argument more seriously than it deserves." *Texas* at *71.  The district court sought to build a historical case to show that the Framers understood "invasion" only to mean an armed assault against one nation by the organized military forces of another nation.  But the court began with unreliable sources and reached an incorrect historical conclusion.

The court began by referencing two modern dictionaries that define "invasion" as the court wished to define it, then cited the 1828 <u>Webster's Dictionary</u>, which uses armed assaults by organized national militaries as a descriptor of "invasion."  But <u>Webster's</u> does not limit the term only to such military operations.  Most Founding-era dictionaries in fact support Texas' view. As Professor Rob Natelson notes:

> [Of] thirteen editions published between 1713 and 1789 … [o]nly one of the thirteen limited "invade" and "invasion" to formal military incursions.  The other twelve included the military definitions, but also added definitions like "to intrude," "to

21

encroach," and "to enter in a hostile manner." [And] "hostile" usually meant only "without permission."[23]

In Federalist No. 43, Madison wrote, "The latitude of the expression here used [invasion], seems to secure each State, not only against foreign hostility, but against ambitious or vindictive enterprises of its more powerful neighbors." In other words, "invasion" is a broad term with considerable latitude, not limited to international militaries. In Federalist No. 41, Madison refers to "pirates and barbarians" as "invaders." Madison did not view invasion as limited to the likes of a D-Day or an Anzio.

The district court referenced "one researcher" who collected numerous writings of the Framers between 1776 and 1812 referring to "invasions," which mostly referred to international military actions. *Texas* at *77. This is utterly unremarkable. The writings, mostly letters, refer to actual or threatened invasions by the British during the War of Independence and the War of 1812, threatened invasions by the French when the XYZ Affair nearly resulted in war, and threatened invasions of Indian tribes. These events were the daily headlines

---

[23] R. Natelson, "Understanding the Constitution: How States May Respond to Illegal Immigration, Part I," *Epoch Times* (Jan. 8, 2024). *See also* R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration, and the War Powers of States," forthcoming in Br. J. Am. Leg. Studies at 13 (2024) (detailing the 13 dictionaries and their definitions of "invasion").

the Framers faced between 1776 and 1812. It is quite unsurprising that their letters referred to military invasions they faced, not mass invasions of millions of aliens directed by drug cartels and abetted by foreign governments, which they did not face.

The district court failed to consider numerous historical evidences that the Framers did not limit "invasion" solely to organized military actions. Before the Constitution's ratification, the State of Connecticut claimed the Wyoming Valley in Pennsylvania. "In 1754, [Benjamin] Franklin had authored a plan which he said would 'divert the Connecticut Emigrants from their Design of Invading this Province.' [I]n 1783, the Pennsylvania legislature labeled the illegal Connecticut settlers as 'invaders of the State.'"[24] The Connecticut "invasion" was a mere migration. But "the invaded state could use force against the peaceful invaders, as Pennsylvania did in the so-called Pennamite War…." *Id.* (The Massachusetts Constitution did, and still does, refer in the disjunctive to "time of war **or** invasion."[25])

---

[24] A. Hyman, "What The Constitution's Framers Really Meant By 'Invasion,'" *Daily Caller* (Jan. 30, 2024).

[25] MASS. CONST., Part the Second, chap. II, § 1, art. VII (emphasis added).

"Invasion" need not refer to the organized military force of an opposing

nation. "Participants in the constitutional debates referred to 'invasions of

barbarous tribes,'[26] 'invasion of the savages,'[27] and 'hostile invasions of lawless

and ambitious men intending … to … introduce anarchy, confusion, and every

disorder[28].'"[29] "The actual or threatened detriment from invasion could be injury

to persons; physical damage, such as that resulting from plundering; or the

breakdown of normal processes of law and communication." *Id.*

Former Border Patrol Chief Rodney Scott testified to Congress that armed

Mexican drug cartels "control the border today … because of this mass migration

[26] Charles Carroll of Carrollton, Draft Speech for Maryland Convention, Jan.-Mar., 1788, in 12 The Documentary History of the Ratification of the Constitution 832, 856 (John P. Kaminski, et. al. eds., 1976-2023) (41 vols.)

[27] "A Democratic Federalist," PA. HERALD, Oct. 17, 1787, reprinted in 13 DOCUMENTARY HISTORY … at 386, 391. *See also* 12 Journal of the Continental Congress 1774-1789 (Gaillard Hunt ed., 1912) at 1006 (Oct. 13, 1778) ("repelling the invasions of the savages on the frontiers of New York, New Jersey, and Pennsylvania").

[28] "Monitor," Hampshire Gazette, Oct. 24, 1787, reprinted in 4 DOCUMENTARY HISTORY, *supra* … at 116, 117.

[29] R. Natelson and A. Hyman, "The Constitution, Invasion, Immigration, and the War Powers of States." Forthcoming in BR. J. AM. LEG. STUDIES 13 (2024) (detailing the 13 dictionaries and their definitions of "invasion") (footnotes within quoted text contained in original).

to a level that they've never had."[30]  Arizona Senator Kyrsten Sinema stated that "The cartels are … controlling what's happening on the southern border, not the United States government."  *Id.*  If armed cartels of foreign nationals control the border and traffic aliens and drugs into the United States with impunity, it is most certainly an invasion.

## III.  THE FRAMERS INCLUDED THE INVASION CLAUSE TO ENSURE STATES COULD ACT TO DEFEND THE PEOPLE IF THE NATIONAL GOVERNMENT FAILED ITS DUTY.

The Framers did not act without reason when they expressly made clear that the States reserved their power to engage in war to defend against invasion, despite vesting the War Power generally in Congress.  Although Texas' powers to defend against invasion are in no way dependent on a judicial finding of a failure of the national government to enforce the border, as a practical matter, had the President been enforcing the nation's immigration laws and protecting the nation's southern border, there would have been no reason for Texas to enact SB4.

---

[30]  House Homeland Security Committee Republicans, "'Now nobody crosses without paying:' Senior Border Patrol agents describe unprecedented cartel control at southwest border" (Dec. 14, 2023).

25

The national power and responsibility to enforce immigration law is vested exclusively in the President.  Article II, Sec. 1, cl. 1.  If a President wants to open the borders, neither a cabinet secretary nor Congress can do much to force him, short of impeachment and removal, and an invasion does not allow for a delayed response awaiting congressional action.  The truth is that there has been a massive national failure of enforcement of the nation's immigration laws,[31] and under the government's view, no State can act when the President stands down. A president can fail to enforce many laws without risking the collapse of the nation, but a presidential failure to protect the border can have catastrophic consequences for the nation.  It is a strengths of the federalist system they designed, that not just one, but two levels of government are charged with the duty to protect the citizens of each State.  The Framers reasonably anticipated Presidential inaction could arise under a number of scenarios.

First, a President could adopt an "internationalist" view, now strongly urged by the United Nations, that each nation must "recognize the positive contribution of migrants for inclusive growth and sustainable development [and]

---

[31]  *See generally* House Oversight Committee, "Wrap Up: Biden Administration's Policies Have Fueled Worst Border Crisis in U.S. History" (Jan. 17, 2024).

cooperate internationally to **ensure** safe, orderly and **regular migration**." The United Nations, Declaration 29, 2030 Agenda for Sustainable Development (Sept. 25, 2015) (emphasis added). The UN calls for nations to "**[f]acilitate** orderly, safe, regular and responsible **migration and mobility** of people … through [im]migration policies." *Id*. at Target 10.7 (emphasis added). *See also* UN Global Issues, International Migration. A President who shares the UN's view could believe that our nation's immigration laws impede internationalist goals, and refuse to enforce them, believing they are not deserving of enforcement.

Second, the President could conclude that massive immigration would lead to a political advantage for his party. If Americans turn against his party, he may believe that importing vast numbers of immigrants dependent on government handouts, and unfamiliar with constitutional liberties, would improve his party's political chances.

Third, at some point, the national government could become financially unable to protect the nation from massive immigration. At present, our national debt is $34.496 trillion. It is increasing about $1 trillion every 100 days. *See* M. Fox, "The U.S. national debt is rising by $1 trillion about every 100 days,"

*CNBC* (Mar. 2024).  It is possible that the President would chose to spend limited funds on other matters, abandoning border security.  At the same time, a State might have a very different view, believing the enforcement of the border is essential to stem an existential threat.

Fourth, the President could come under the influence of a foreign power. This was the main interest of the Founders in requiring the President to be a "natural born Citizen" (Article II, Sec. 1) who would have allegiance only to this nation — not to the nation of the President's parents or the place of the President's birth.  It was also the reason for Article I, Sec. 9, which forbids any "Person holding any Office … without the Consent of the Congress, [to] accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign state."  We know these concerns were real in Philadelphia in 1787, as Madison recorded that Gouverneur Morris became persuaded that an impeachment power was required because:

> **Our Executive** was not like a Magistrate having a life interest, much less like one having an hereditary interest in his office.  He **may be bribed by a greater interest to betray his trust**; and no one would say that we ought to expose ourselves to the danger of seeing the first Magistrate in foreign pay, without being able to guard agst. it by displacing him.  One would think the **King of England** well secured agst. bribery.  He has as it were a fee simple in the whole Kingdom.  Yet **Charles II was bribed by Louis XIV.**

28

[Madison's Debates, July 20, 1787, The Avalon Project (emphasis added).]

One would hope that evidence of bribery would lead to the impeachment and removal process, but there are many reasons that Congress might remain passive and decline to use the impeachment power, particularly since social media — our national town meeting — has been shown to be often controlled by the President's administration.  *See Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023).  Moreover, there are many who believe that the Chinese government may have acquired outsized access and influence over high-ranking persons in both parties in the U.S. Government.[32]

Fifth, the President could lose the mental capacity to properly exercise his responsibilities.[33]  The 25th Amendment certainly addresses this problem, but an

---

[32]  *See generally* S. Nelson, "White House won't say if Biden family's China biz is 'security issue,'" *New York Post* (Aug. 18, 2023) ("When asked if the White House is concerned that the Biden family's financial dealings with China could compromise national security, after House Oversight Committee Chairman James Comer (R-KY) expressed that '[w]e're concerned that the president is compromised because of the millions of dollars that his family has received,' White House spokesman Jake Sullivan replied only, 'I don't have any comment on that'"); C. Shor, "Mitch McConnell is out of step with the majority of Americans," *Cincinnati.com* (Dec. 15, 2023).

[33]  Special Counsel Robert Hur recently declined to prosecute President Biden for his mishandling of classified documents which "present serious risks to national security," as the President could be seen as an "elderly man with a poor

invasion cannot afford delay in response, and there are many reasons why the Vice President and Cabinet would not want to use this power, at least until after an upcoming Presidential election.[34]

The Framers of our Constitution certainly did not believe that men were angels. *See* Federalist No. 51, G. Carey & J. McClellan, <u>The Federalist Papers</u> (Liberty Fund: 2000). Perhaps, Article I, Sec. 10, cl. 3 was written for a time such as this.

## CONCLUSION

For the foregoing reasons, the district court should be reversed.

---

memory." R. Reilly, "<u>Biden won't be charged in classified docs case; special counsel cites instances of 'poor memory</u>,'" *NBC News* (Feb. 8, 2024).

[34] C. Todd, "<u>Poll: 68% of voters have worries about Biden's mental and physical health</u>," *NBC News* (June 27, 2023). *See* A. Syal, M.D., "<u>As Biden's memory issues draw attention, neurologists weigh in</u>," *NBC News* (Feb. 10, 2024).

Respectfully submitted,

*/s/ William J. Olson*
_____

J. MARK BREWER
  209 N. Nugent Avenue
  Johnson City, TX  78646

MICHAEL BOOS
DANIEL H. JORJANI
  CITIZENS UNITED
  1006 Pennsylvania Avenue SE
  Washington, DC  20003

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN  37203

PATRICK M. MCSWEENEY
  3358 John Tree Hill Rd.
  Powhatan, VA  23139

RICK BOYER
  Integrity Law Firm
  P.O. Box 10953
  Lynchburg, VA  24506

  William J. Olson*
  Jeremiah L. Morgan
  Robert J. Olson
    WILLIAM J. OLSON, P.C.
    370 Maple Ave. W., Ste. 4
    Vienna, VA  22180
  (703) 356-5070
  wjo@mindspring.com

Attorneys for *Amici Curiae*
*Counsel of Record

March 13, 2024

31

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al*. in Support of Defendants-Appellants and Reversal, was made, this 13th day of March, 2024, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.     That the foregoing Brief *Amicus Curiae* of America's Future, *et al*. in Support of Defendants-Appellants and Reversal complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,495 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

    */s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*
Dated:  March 13, 2024