**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

Docket No. 24-50149

UNITED STATES OF AMERICA,

*Plaintiff – Appellee*

v.

STATE OF TEXAS; GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF TEXAS; TEXAS DEPARTMENT OF PUBLIC SAFETY;
FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendants – Appellants*

LAS AMERICAS IMMIGRANT ADVOCACY CENTER, AMERICAN
GATEWAYS, COUNTY OF EL PASO, TEXAS,

*Plaintiffs – Appellees*

v.

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF
TEXAS DEPARTMENT OF PUBLIC SAFETY; JAMES MONTOYA, IN HIS
OFFICIAL CAPACITY AS DISTRICT ATTORNEY FOR THE 34TH DISTRICT,

*Defendants – Appellants*

**On Appeal from**
United States District Court for the Western District of Texas,
Nos. 1:24-cv-00008-DAE (lead case), 1:23-cv-01537

**PLAINTIFFS-APPELLEES' SUPPLEMENTAL EN BANC BRIEF**

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways, and*
*County of El Paso*

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Kate Gibson Kumar
(TX Bar No. 24137588)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
kate@texascivilrightsproject.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center and American Gateways*

Cody Wofsy
Spencer Amdur
Hannah Steinberg
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org
mrussell@aclu.org

Kathryn Huddleston*
(TX Bar No. 24121679)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
khuddleston@aclu.org

Omar Jadwat
Anand Balakrishnan
Lee Gelernt
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
ojadwat@aclu.org
abalakrishnan@aclu.org
lgelernt@aclu.org

Christina Sanchez
(TX Bar No. 2406298)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
ch.sanchez@epcountytx.gov

Bernardo Rafael Cruz
(TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcountytx.gov

*For Plaintiff County of El Paso*

*For Plaintiffs-Appellees
Las Americas Immigrant Advocacy
Center, American Gateways, and
County of El Paso*


*\*Barred in Texas and Arizona only;
supervised by a member of the D.C.
Bar*

# CERTIFICATE OF INTERESTED PERSONS

Appellees certify that the following listed persons and entities described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Private Appellees**
Las Americas Immigrant Advocacy Center
American Gateways

**Counsel for Private Appellees**

| | |
|---|---|
| Cody Wofsy | David A. Donatti |
| Spencer Amdur | Adriana C. Piñon |
| Hannah Steinberg | Daniel Hatoum |
| Morgan Russell | Kate Gibson Kumar |
| Kathryn Huddleston | |
| Omar Jadwat | |
| Anand Balakrishnan | |
| Lee Gelernt | |

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF TEXAS

TEXAS CIVIL RIGHTS PROJECT

Appellants and Appellee County of El Paso are government officials and entities.

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled oral argument for January 22, 2026.

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE ..............................................................3

   A.   The Federal Government's Regulation of Entry and Removal ..................3

   B.   Texas's Senate Bill 4 ...................................................................5

   C.   Procedural History .....................................................................7

SUMMARY OF ARGUMENT ..............................................................8

ARGUMENT ........................................................................................9

   I.   TEXAS IS NOT LIKELY TO SUCCEED ON ITS THRESHOLD
       ARGUMENTS....................................................................................9

       A.   Las Americas Has Standing. ...............................................9

       B.   Las Americas May Sue In Equity. ......................................22

       C.   El Paso County Has Standing And May Sue. ....................27

  II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS............29

       A.   The Entry-and-Reentry Crimes Are Field Preempted. ......................30

       B.   The Entry-and-Reentry Crimes Are Conflict Preempted. .................37

       C.   The Removal Provision Is Preempted...............................................44

       D. The State War Clause Cannot Justify S.B.4. ......................................47

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
    WEIGHING THE EQUITIES. ....................................................................52

CONCLUSION .......................................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Arizona v. United States,*
    567 U.S. 387 (2012)...............................................................................*passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015)...................................................................22, 25, 26

*Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health &*
    *Mental Retardation Ctr. Bd. of Trs.,*
    19 F.3d 241 (5th Cir. 1994) ...............................................................13

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
    178 F.3d 350 (5th Cir. 1999) ......................................................13, 16

*Baker v. Carr,*
    369 U.S. 186 (1962)...........................................................................51

*Bank of Am. Corp. v. City of Miami,*
    581 U.S. 189 (2017)...........................................................................17

*Barzelis v. Flagstar Bank, F.S.B.,*
    784 F.3d 971 (5th Cir. 2015) .............................................................31

*Biden v. Texas,*
    597 U.S. 785 (2022).............................................................................4

*Bond v. United States,*
    564 U.S. 211 (2011)...................................................................24, 25, 26

*Bosse v. Oklahoma,*
    580 U.S. 1 (2016)................................................................................3

*Buntion v. Lumpkin,*
    982 F.3d 945 (5th Cir. 2020) ..............................................................3

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ..........................................................48

*Chamber of Com. of U.S. v. Whiting,*
    563 U.S. 582 (2011)...........................................................................42

*Chy Lung v. Freeman,*
92 U.S. 275 (1875) ................................................................30, 32

*City of El Cenizo v. Texas,*
890 F.3d 164 (5th Cir. 2018) ...............................................54

*City of Los Angeles v. Patel,*
576 U.S. 409 (2015) ..............................................................46

*Collins v. Yellen,*
594 U.S. 220 (2021) ..............................................................24

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ..............................................................40

*Crown Castle Fiber v. City of Pasadena,*
76 F.4th 425 (5th Cir. 2023) ................................................25

*De Canas v. Bica,*
424 U.S. 351 (1976) ..............................................................42

*Deep South Ctr. for Envt'l Just. v. U.S. EPA,*
138 F.4th 310 (5th Cir. 2025) ..............................................17

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ..............................................................15

*Matter of E-R-M-,*
25 I.&N. Dec. 520 (BIA 2011) ..............................................4

*FDA v. Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) .......................................................*passim*

*FEC v. Cruz,*
596 U.S. 289 (2022) ..............................................................16

*Fla. Immigrant Coal. v. Uthmeier,*
780 F. Supp. 3d 1235 (S.D. Fla. 2025) ..................................1

*Fla. Immigrant Coal. v. Uthmeier,*
No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025) ......*passim*

*Fong Yue Ting v. United States*,
  149 U.S. 698 (1893)..................................................................45, 49

*Fuld v. Palestine Liberation Org.*,
  606 U.S. 1 (2025)............................................................................32

*Green Valley Special Util. Dist. v. City of Schertz*,
  969 F.3d 460 (5th Cir. 2020) (en banc) ..................................23, 25, 27

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).................................................................*passim*

*Hayes Int'l Corp. v. McLucas*,
  509 F.2d 247 (5th Cir. 1975) ........................................................26

*Idaho Org. of Res. Councils v. Labrador*,
  780 F. Supp. 3d 1013 (D. Idaho 2025) ..........................................1, 29

*Iowa Migrant Movement for Just. v. Bird*,
  __F.4th__, No. 24-2263, 2025 WL 2984379 (8th Cir. Oct. 23,
  2025) ......................................................................................*passim*

*J.G.G. v. Trump*,
  No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025)...........................48, 51

*Jefferson v. City of Tarrant*,
  522 U.S. 75 (1997).........................................................................17

*Kansas v. Garcia*,
  589 U.S. 191 (2020).................................................................40, 41, 43

*Kurns v. R.R. Friction Prods. Corp.*,
  565 U.S. 625 (2012).......................................................................35

*La. ACORN Fair Housing v. LeBlanc*,
  211 F.3d 298 (5th Cir. 2000) .........................................................15

*La Union Del Pueblo Entero v. Abbott*,
  151 F.4th 273 (5th Cir. 2025) .......................................................17

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) .........................................................51

*Lozano v. City of Hazleton*,
    724 F.3d 297 (3d Cir. 2013) ............................................................31

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)........................................................................14

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ..............................................12, 15, 21

*New Jersey v. United States*,
    91 F.3d 463 (3d Cir. 1996) .............................................................48

*Nishimura Ekiu v. United States*,
    142 U.S. 651 (1892).................................................................32, 36

*Nken v. Holder*,
    556 U.S. 418 (2009).......................................................................53

*OCA-Greater Houston v. Texas*
    867 F. 3d 604, 612 (5th Cir. 2017) ................................................13

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*,
    8 F.4th 176 (3d Cir. 2021) ..................................................25, 28, 29

*Pac. Gas & Electric Co. v. State Energy Rsch. Conservation & Dev.
Comm'n*,
    461 U.S. 190 (1983).................................................................34, 35

*Padavan v. United States*,
    82 F.3d 23 (2d Cir. 1996) ...............................................................48

*Padres Unidos de Tulsa v. Drummond*,
    785 F. Supp. 3d 993 (W.D. Okla. 2025)...................................1, 29, 41

*Perkins v. Lukens Steel Co.*,
    310 U.S. 113 (1940).......................................................................26

*Plyler v. Doe*,
    457 U.S. 202 (1982).......................................................................30

*Pub. Utilities Comm'n of Ohio v. United Fuel Gas Co.*,
    317 U.S. 456 (1943).......................................................................53

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999)................................................................33

*Rogers v. Brockette*,
    588 F.2d 1057 (5th Cir. 1979) ...........................................27, 28

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983)..............................................................23

*Sterling v. Constantin*,
    287 U.S. 378 (1932)............................................................52

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)............................................................14

*Tenn. Electric Power Co. v. Tenn. Valley Auth.*,
    306 U.S. 118 (1939)............................................................26

*Tex. Tribune v. Caldwell County*,
    121 F.4th 520 (5th Cir. 2024) ...............................................22

*Trans World Airlines, Inc. v. Mattox*,
    897 F.2d 773 (5th Cir. 1990) ................................................53

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)............................................................54

*Tweed-New Haven Airport Auth. v. Tong*,
    930 F.3d 65 (2d Cir. 2019) ...................................................28

*U.S. Dep't of Com. v. Montana*,
    503 U.S. 442 (1992)............................................................50

*United States v. Abbott*,
    110 F.4th 700 (5th Cir. 2024) ...........................................48, 49

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) .............................................31

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936)............................................................32

*United States v. Flores-Montano*,
　　541 U.S. 149 (2004).......................................................32

*United States v. Iowa*,
　　737 F. Supp. 3d 725 (S.D. Iowa 2024) ............................2

*United States v. Johnson*,
　　632 F.3d 912 (5th Cir. 2011) ..........................................26

*United States v. Locke*,
　　529 U.S. 89 (2000)....................................................31, 35

*United States v. Peters*,
　　9 U.S. 115 (1809).........................................................50

*United States v. Texas*,
　　144 F.4th 632 (5th Cir. 2025) ..................................*passim*

*United States v. Texas*,
　　599 U.S. 670 (2023)...................................................4, 33

*United States v. Vargas*,
　　74 F.4th 673 (5th Cir. 2023) ...........................................3

*Uthmeier v. Fla. Immigrant Coal.*,
　　145 S. Ct. 2872 (2025)..............................................2, 29

*Va. Off. for Prot. & Advoc. v. Stewart*,
　　563 U.S. 247 (2011)......................................................23

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
　　429 U.S. 252 (1977)......................................................15

*Villas at Parkside Partners v. City of Farmers Branch*,
　　726 F.3d 524 (5th Cir. 2013) .....................................30, 31

*Vote.Org v. Callanen*,
　　89 F.4th 459 (5th Cir. 2023) .........................................15

*Wages & White Lion Invs., L.L.C. v. FDA*,
　　16 F.4th 1130 (5th Cir. 2021) ........................................52

*Ex parte Young*,
209 U.S. 123 (1908)..................................................................8, 22, 23, 25, 27

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)..............................................................................49, 50

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012)..............................................................................50, 51

*Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*,
134 F.4th 326 (5th Cir. 2025) ....................................................................40

**Statutes and Constitutional Provisions**

8 U.S.C § 1101(a)(15)(T)..................................................................4, 33, 38

8 U.S.C § 1101(a)(15)(U) .................................................................4, 33, 38

8 U.S.C § 1158 .............................................................................................4

8 U.S.C § 1158(a)(1)...........................................................................33, 38

8 U.S.C § 1158(d) ......................................................................................33

8 U.S.C § 1182 .............................................................................................4

8 U.S.C § 1182(a)(6)(A) ..............................................................................4

8 U.S.C § 1182(a)(6)(A)(ii) ...............................................................4, 33, 38

8 U.S.C § 1182(a)(14).............................................................................4, 38

8 U.S.C § 1182(d)(13).............................................................................4, 38

8 U.S.C § 1225(b)(1).....................................................................................4

8 U.S.C § 1229a.............................................................................................4

8 U.S.C § 1229b(b) ...............................................................................33, 38

8 U.S.C § 1231(b)(3).....................................................................................4

8 U.S.C § 1255(l)........................................................................................33

8 U.S.C § 1255(m) ......................................................................................33

8 U.S.C § 1321 ...................................................................................4

8 U.S.C § 1322 ...................................................................................4

8 U.S.C § 1323 ...................................................................................4

8 U.S.C § 1324 ...................................................................................4

8 U.S.C. 1325 .................................................................................4, 32

8 U.S.C. § 1325(a) .............................................................................5

8 U.S.C. 1326 .............................................................................4, 32, 37

8 U.S.C. § 1326(a)(2) .........................................................................5

8 U.S.C. § 1326(a)(2)(A) ...................................................................37

8 U.S.C § 1327 ...................................................................................4

8 U.S.C § 1328 ...................................................................................4

Tex. Code Crim. Proc. art. 5B.002(a) ...............................................6

Tex. Code Crim. Proc. art. 5B.002(b) ...............................................6

Tex. Code Crim. Proc. art. 5B.002(c) ...............................................6

Tex. Code Crim. Proc. art. 5B.002(d) ...............................................6

Tex. Code Crim. Proc. art. 5B.003 ....................................................6

Tex Gov Code Sec. 753.051 .............................................................54

Tex. Penal Code § 12.33 ....................................................................6

Tex. Penal Code § 51.02(a) ...............................................................5

Tex. Penal Code § 51.02(c) ...............................................................5

Tex. Penal Code § 51.03 ...................................................................37

Tex. Penal Code § 51.03(a) ...............................................................5

Tex. Penal Code § 51.04 ....................................................................6

U.S Const. art. 1, § 9, cl. 2 ........................................................................50

U.S. Const. art. I, § 10, cl. 3 ...............................................................47, 50

U.S. Const. art. VI, cl. 2 ...........................................................................50

**Regulations**

8 C.F.R. § 212.2(d) ....................................................................................37

**Other Authorities**

Eileen Sullivan, *More Migrants on Terrorism Watch List Crossed
U.S. Border* (NYT Nov. 15, 2023) .......................................................48

Executive Order GA-41 .............................................................................47

U.S. Customs & Border Prot., *Frontline Against Fentanyl* (last
modified May 22, 2025), https://perma.cc/4NAU-9GSY ................................54

# INTRODUCTION

The panel faithfully applied longstanding Supreme Court precedent to affirm the preliminary injunction of Senate Bill 4 ("S.B.4"), and this Court should reinstate its judgment.

"For nearly 150 years, the Supreme Court has recognized that the power to control immigration—the entry, admission, and removal of aliens—is *exclusively* a federal power." *United States v. Texas*, 144 F.4th 632, 667 (5th Cir.), *vacated*, 150 F.4th 656 (5th Cir. 2025) (en banc).  Under settled doctrine culminating in *Arizona v. United States*, 567 U.S. 387 (2012), S.B.4's state immigration regime, which criminalizes entry into the United States and imposes state deportation orders, is patently field and conflict preempted.  It is little surprise then that every court to address the merits—indeed, every judge except the dissenting panel member in this case—has concluded that laws like S.B.4 are unlawful.  *See Iowa Migrant Movement for Just. v. Bird*, __F.4th__, No. 24-2263, 2025 WL 2984379 (8th Cir. Oct. 23, 2025) ("*Iowa*"); *Fla. Immigrant Coal. v. Uthmeier*, No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025) ("*FLIC*") (denying application for stay); *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993 (W.D. Okla. 2025); *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013 (D. Idaho 2025) ("*IORC*"); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235 (S.D. Fla. 2025);

1

*United States v. Iowa*, 737 F. Supp. 3d 725, 751 (S.D. Iowa 2024). And the Supreme Court recently declined to stay the injunction of Florida's version of S.B.4's entry-and-reentry crimes—with no noted dissents. *Uthmeier v. Fla. Immigrant Coal.*, 145 S. Ct. 2872 (2025).

Perhaps recognizing its weakness on the merits, Texas focuses its argument on standing. But the panel faithfully applied *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), as recently reaffirmed by *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), finding "no daylight between" the factual showing here and the Supreme Court's standard, 144 F.4th at 643. Indeed, the impact of S.B.4 on plaintiffs' core activities of representing recent entrants and ensuring that they have a fair opportunity to seek relief from removal is dramatic. The statute establishes an entirely new parallel state immigration enforcement scheme at the border, which empowers state officers to arrest, prosecute, and imprison asylum seekers for unlawful entry—and then to order them to return to Mexico (on pain of twenty years in Texas prison for noncompliance). And Texas has said it will implement the law on a massive scale—predicting some 80,000 arrests in the first year alone. The record demonstrates that this sea change in immigration law would force the plaintiffs to dramatically alter their core operations in order to serve their fundamental goal—ensuring noncitizens can access asylum and other forms of relief under federal law. Given this factual record, the panel rightly held that *Alliance*

"reinforces, rather than undermines," standing here.  *Id.* at 647-48.

At bottom, Texas's argument is that *Arizona* and *Havens* are "a dead letter." *Id.* at 651.  But that is simply wrong and, in any event, is not for this Court to say. Supreme Court "decisions remain binding precedent until [that Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."  *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016).  "That remains true even when litigants—or courts, for that matter" claim to have identified "'infirmities' so severe as to leave a Supreme Court case standing on 'wobbly, moth-eaten foundations.'"  *Buntion v. Lumpkin*, 982 F.3d 945, 950 (5th Cir. 2020).  Unless and "[u]ntil the Supreme Court overrules" its precedents, this Court has a "duty" to apply them "faithfully."  *United States v. Vargas*, 74 F.4th 673, 678 (5th Cir. 2023) (en banc); *see also id*. at 699 (Oldham, J., concurring in part) (this Court is not "free to predict what the Supreme Court" might do).  The panel adhered to these principles; this Court sitting en banc should now do the same.

## STATEMENT OF THE CASE

### A.      The Federal Government's Regulation of Entry and Removal

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]."  *Arizona*, 567 U.S. at 394. Congress exercised that power in the Immigration and Nationality Act ("INA"), a comprehensive scheme that balances various policy goals and provides federal

officers with a range of criminal and civil tools to regulate irregular entry. On the criminal side, unlawful entry and reentry after removal are federal offenses, 8 U.S.C. §§ 1325, 1326, alongside various other crimes related to irregular entries, *id.* §§ 1321–28. On the civil side, Congress has specified categories of noncitizens who may be denied admission to the United States, *see id.* § 1182, including those who enter between ports of entry, *see id.* § 1182(a)(6)(A). To decide whether a person will be removed, Congress has established an extensive administrative system for adjudicating removal cases, *id.* §§ 1229a, 1225(b)(1), and provided various forms of relief from removal that are available to those who enter between ports of entry, including asylum, *id.* § 1158; withholding of removal and relief under the Convention Against Torture, *id.* § 1231(b)(3); and status for victims of crime, trafficking, and domestic violence, *id.* §§ 1101(a)(15)(U), (T), 1182(a)(6)(A)(ii), (d)(13), (14).

"A principal feature of the removal system" that Congress designed "is the broad discretion" delegated to the federal Executive. *Arizona*, 567 U.S. at 396. Federal officials "decide whether it makes sense to pursue removal at all," *id.*, and choose among the several removal processes Congress established, *see Biden v. Texas*, 597 U.S. 785, 801–03 (2022); *United States v. Texas*, 599 U.S. 670, 679 (2023); *Matter of E-R-M-*, 25 I.&N. Dec. 520 (BIA 2011). And "federal officials in charge of the comprehensive scheme" decide whether "to bring criminal charges

against individuals" under the associated federal criminal laws, or whether doing so "would frustrate federal policies." *Arizona*, 567 U.S. at 402. In making these decisions, federal officials take into consideration various factors, including humanitarian concerns and the need to encourage cooperation by victims and witnesses of crimes. *Id.* at 396-97.

### B. Texas's Senate Bill 4

S.B.4 makes it a crime for a noncitizen to enter or attempt to enter Texas directly from a foreign nation and not at a port of entry. Tex. Penal Code § 51.02(a). Affirmative defenses are limited to conduct which does not violate 8 U.S.C. § 1325(a); or when a noncitizen has already been granted "lawful presence," asylum, or Deferred Action for Childhood Arrivals status. Tex. Penal Code § 51.02(c). There is no defense for noncitizens who are applying for federal status, including asylum. *Id.*

S.B.4 also creates a state "reentry" crime, applicable when a noncitizen enters, attempts to enter, or is at any time found in Texas after the person has been removed from the United States. Tex. Penal Code § 51.03(a). There are no affirmative defenses; indeed, unlike the federal reentry crime, even noncitizens who reenter with the express "consent" of the federal government may be prosecuted. *Id.*; *cf.* 8 U.S.C. § 1326(a)(2).

5

If a person is convicted under S.B.4's entry or reentry crimes, the state judge "shall" issue "an order *requiring* the person to return to the foreign nation from which the person entered." Tex. Code Crim. Proc. art. 5B.002(d) (emphasis added). Refusal to comply with an Order to Return is a crime punishable by up to twenty years in prison, with no affirmative defenses. Tex. Penal Code §§ 12.33, 51.04. A state judge may alternatively enter an Order to Return in lieu of continuing the prosecution if the noncitizen consents. Tex. Code Crim. Proc. art. 5B.002(a)-(c).

These provisions work together to quickly generate state deportation orders. Individuals arrested under S.B.4's entry or reentry crimes who lack an affirmative defense will face a near-certain conviction, sentence, and mandatory state deportation order. But S.B.4 offers them an alternative: accept a state deportation order at the outset, in lieu of prosecution and imprisonment, since the defendant will be subject to the state deportation order either way. Indeed, that was the point. *See* Appellees' Br. 5-6 (explaining legislative design).

As to all three offenses, S.B.4 *prohibits* abating the prosecution "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003.

**C. Procedural History**

The plaintiffs are legal services organizations—Las Americas Immigrant Advocacy Center and American Gateways—and the County of El Paso. The defendant on appeal is the Director of the Texas Department of Public Safety.[1]

The district court granted a preliminary injunction, finding that S.B.4 will "completely change[]" the plaintiff organizations' core operations. ROA.487-95. It held S.B.4 both field and conflict preempted, ROA.506-39, and not a permissible exercise of power under the Constitution's State War Clause, ROA.544-67.

On appeal, a panel of this Court denied Texas's motion to stay the preliminary injunction and later affirmed the preliminary injunction. The panel concluded that *Alliance* "reinforces, rather than undermines," standing here. 144 F.4th at 647-48. It then held that S.B.4 was likely field preempted because entry is an "exclusively" federal authority and the "central concern" of the INA is noncitizens' "entry and stay" in the United States. *Id.* at 668. The panel also concluded that S.B.4 was likely conflict preempted because it interferes with federal officials' authority and discretion in numerous ways. *Id.* at 677–78.

---

[1] The United States also sued originally, but later dismissed its case. *See Texas*, 144 F.4th at 639-40. Likewise, the 34th Judicial District Attorney initially appealed but later dismissed his appeal. *Id.*

# SUMMARY OF ARGUMENT

I. Texas's threshold arguments fail.

A. Las Americas has organizational standing under *Havens* and *Alliance*. S.B.4 perceptibly impairs Las Americas' core activities, namely providing legal services; indeed, Las Americas will need to create an unprecedented system in state jails and prisons, dramatically undermining its ability to serve current and new clients. *Alliance* reaffirmed *Havens* and underscores standing here.

B. Las Americas may also sue in equity. *Ex Parte Young* involves a straightforward inquiry, the elements of which are now uncontested. Texas's effort to narrow that doctrine is unfounded.

C. El Paso County also has standing and may sue. Municipalities may sue under the Supremacy Clause to police the federalism principles central to our constitutional order.

II. S.B.4 is preempted.

A. The entry-and-reentry crimes are field preempted, as the federal government has an overwhelmingly dominant interest in and has comprehensively regulated entry into the country. Federal law's "specific, limited" role for state officers, *Arizona*, 567 U.S. at 410, only reinforces that conclusion.

B. Those crimes are also conflict preempted, as S.B.4 asserts state authority to use just one of the many tools Congress provided to the federal executive—the

most severe tool—without federal discretion or control.

C.  S.B.4's deportation scheme is likewise field and conflict preempted.  Texas barely contests that conclusion, instead seeking to rewrite the statute.  But S.B.4's orders to depart are backed by twenty years in prison.

D.  Texas's invocation of the State War Clause cannot save S.B.4.  There is no invasion within the meaning of the Clause; the Clause does not authorize state immigration schemes; the Clause does not override federal supremacy; and nothing in the narrow political question doctrine prohibits this Court from saying so.

III.  The equities strongly favor an injunction.  Texas relies on a border "crisis," but the federal government is already enforcing immigration law, and Texas is already empowered to cooperate in the ways federal law permits.

## ARGUMENT

### I.  TEXAS IS NOT LIKELY TO SUCCEED ON ITS THRESHOLD ARGUMENTS.

#### A.  Las Americas Has Standing.

Nonprofit organizations, like other plaintiffs, have standing when they "satisfy the usual standards for injury in fact, causation, and redressability." *Alliance*, 602 U.S. at 393-94.  As the panel explained, Las Americas has demonstrated those requirements.  S.B.4 "'directly affect[s] and interfere[s] with'" Las Americas' "'core business activities'" of providing legal representation and ensuring that recent entrants "have a fair opportunity to establish their eligibility for

relief from removal." 144 F.4th at 645, 649 (quoting *Alliance*, 602 U.S. at 395). Texas's primary response is that *Alliance* "repudiated" *Havens* standing. Br. 14. But that is simply wrong: *Alliance* explicitly *reaffirmed Havens*, recognizing that an organization can show standing when its core operations—providing services to individuals—are impaired by the defendants' conduct. *Alliance* merely rejected an "issue-advocacy organization['s]" very different effort to assert standing based on its lobbying and public education activities. 602 U.S. at 395. That holding, which is consistent with this Court's pre-*Alliance* cases, has no application here.

1. "[T]here can be no question" that nonprofit organizations may suffer an injury in fact when the defendant's action has "perceptibly impaired" the organization's operations. *Havens*, 455 U.S. at 379. Thus, in *Havens,* the Court held that an organization had standing to challenge a property owner's "racial steering practices"—directing homeseekers away from particular neighborhoods based on their race—because those practices "perceptibly impaired [its] ability to provide counseling and referral services" to those homeseekers. *Id*. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id*.; *see id*. (organization "had to devote significant resources to identify and counteract the defendant's [*sic*] racially discriminatory steering practices").

10

*Alliance* explicitly reaffirmed this principle. There, the Court held that an organization may not establish standing to challenge a policy based on resources expended to *advocate* in opposition to *that very policy*; but it can establish standing where the challenged policy "perceptibly impair[s]" the organization's preexisting "core business activities" like providing services. *Alliance*, 602 U.S. at 395.

*Alliance* was a challenge by medical associations, among others, to FDA actions lifting certain regulations on the drug mifepristone. 602 U.S. at 375-76, 397. The *Alliance* plaintiff organizations claimed standing because they had expended resources on political and advocacy activities to counter those FDA actions, including by filing a citizen petition with the FDA advocating for reversal of the actions, engaging in "public advocacy and educational activities exposing the risks of FDA's . . . actions," and conducting their own studies of mifepristone for such public education. Br. for Respondents, *Alliance*, at 43-44. The Court held that this was not enough to establish standing, explaining that an organization cannot "manufacture" standing to challenge a policy it "dislikes[s]" by "spend[ing] a single dollar" advocating against it. *Alliance*, 602 U.S. at 394-95.

But *Alliance* reaffirmed *Havens. See Texas*, 144 F.4th at 647-49. As *Alliance* explained, the key difference was this: "Critically," the organizational plaintiff in *Havens* "not only was an issue-advocacy organization, but also operated a housing counseling service." *Alliance*, 602 U.S. at 395. The *Havens* defendant's allegedly

11

unlawful actions, *Alliance* explained, "perceptibly impaired [the plaintiff's] ability to provide" its services. *Id.* (quoting *Havens*, 455 U.S. at 379). Thus, the *Havens* organizational plaintiff established injury-in-fact because the defendant's "actions directly affected and interfered with [the plaintiff's] core business activities." *Alliance*, 602 U.S. at 395.

In *Alliance*, by contrast, the FDA's actions "ha[d] not imposed any similar impediment to the medical associations' advocacy businesses," *id.*; they did not, for example, create new regulatory rules that obstructed its lobbying efforts. And the *Alliance* plaintiffs had no separate "core business activit[y]"—like the *Havens* counseling services—that had been harmed by the mifepristone policies. *Id.* In other words, a policy that "'perceptibly impair[s]'" an organization's normal operations, like the provision of services to individuals, and forces it to reallocate its resources, can establish standing; but an organization "cannot manufacture its own standing" simply by expending resources to advocate against the challenged policy. *Id.* at 394-95 (quoting *Havens*, 455 U.S. at 379).

2. Texas suggests this holding was a major shift. But the line *Alliance* drew between lobbying and services was already the longstanding law in this circuit.

This Court has long recognized that lobbying efforts against a challenged law or action cannot give rise to standing. *See, e.g.*, *NAACP v. City of Kyle*, 626 F.3d 233, 239 (5th Cir. 2010) (such harm to "abstract social interests" is not enough).

Likewise, "an organization cannot, of course, manufacture the injury necessary to maintain suit from its expenditure of resources on *that very suit*." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358-59 (5th Cir. 1999) (emphasis added) ("*ACORN*").[2]

By contrast, this Court has held that an organization can demonstrate standing where the challenged law has "perceptibly impaired" its ability to carry out operations that are core to its service mission. In *OCA-Greater Houston v. Texas*, for example, the Court distinguished the earlier *Kyle* decision by emphasizing: "Here, by contrast, OCA is *not a lobbying group*." 867 F.3d 604, 612 (5th Cir. 2017) (emphasis added). That distinction was key: OCA had standing because it had to take steps "to counteract the effect of" the challenged law with a view toward "mitigating its real-world impact" on its services, and so the law "'perceptibly impaired' OCA's ability to 'get out the vote' among its members." *Id*. at 612 & n.29. That is precisely the distinction between lobbying and services that the

---

[2] Texas suggests that this Court applied a broader rule against standing for organizations "providing legal services," Br. 17, in *Ass'n for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Center. Board. of Trustees*, 19 F.3d 241 (5th Cir. 1994). But that case addressed a situation in which "the only resources 'lost' [we]re the legal costs of the particular advocacy lawsuit." *Id.* at 244. Texas relatedly suggests that *Alliance*'s rejection of "doctor standing" implies a general rule against "lawyer standing." Br. 18. But *Alliance*'s "doctor standing" discussion was about a "lack of *causation*" for injuries that were "too speculative or otherwise too attenuated." 602 U.S. at 390 (emphasis added). There is no such speculation on this record. *See infra*.

Supreme Court emphasized in *Alliance*.

3.   Texas nevertheless tries to transform *Alliance* into a rejection of *Havens*, but all its efforts—directly contrary to *Alliance* itself—fall flat.

Texas asserts that *Alliance* "repudiated" the idea that "diversion of resources to counteract" a policy can ever provide standing.   Br. 14.   That is incorrect. Diversion *alone* may be insufficient, insofar (as already explained) one cannot manufacture standing to challenge a policy based on resources spent advocating against *that very policy*.   602 U.S. at 395.   But where a policy impairs an organization's core service activities, that "injury to the organization's activities— with the consequent drain on the organization's resources" caused by moving to counteract the policy—can provide standing.  *Havens*, 455 U.S. at 379.

That such "diversion" may be part of a concrete economic injury should not be surprising.  In *Monsanto Co. v. Geertson Seed Farms*, for example, farmers had standing because, facing the threat of genetic contamination, they "would have to conduct testing to find out whether and to what extent their crops have been contaminated" and "to take certain measures to minimize" contamination, leading to "increased cost."  561 U.S. 139, 154-55 (2010).  While nonprofits may operate to advance different goals than for-profit organizations, such economic injuries are not limited to profit-seeking ventures. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (nonprofit organization's need to "divert significant time and

14

resources" due to challenged action contributed to Article III injury); *Vote.Org v. Callanen*, 89 F.4th 459, 471 (5th Cir. 2023) (similar); *see also Dep't of Com. v. New York*, 588 U.S. 752, 766-67 (2019) (state standing based on injuries including "diversion of resources"); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977) ("nonprofit corporation" had standing even though "[i]ts interest" was not "a desire for economic gain" but rather "in making suitable low-cost housing available").

Texas claims, however, that *Alliance* must doom standing here because "[t]here is no 'direct services' exception" to *Alliance*'s analysis.  Br. 16.  But it was "[c]ritical[]" to the Court that the *Havens* plaintiff "not only was an issue-advocacy organization, but also operated a housing counseling service."  602 U.S. at 395.  That is, treating service organizations differently is not an "exception" to *Alliance*'s analysis, but a direct application of it.

To be sure, a "direct services" label alone cannot establish standing.  After all, "organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals."  *Id*. at 393-94.  This Court's precedents illustrate various ways that particular plaintiffs' factual showings may fall short. *See, e.g.*, *La. ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000) (only "conjectural and hypothetical" resource drain); *Kyle*, 626 F.3d at 238 (no "specific projects that the [plaintiff] had to put on hold or otherwise curtail");

*ACORN*, 178 F.3d at 360 (harm not "fairly traceable to any particular action by" defendants).  But here, Las Americas clears that bar.  *See infra*.

Texas argues that *Havens* is different from this case because it "involved a traditional tort—an intentional misrepresentation" about housing.  Br. 22.  But far from being the "key context," Br. 11, whether the challenged action is tortious is irrelevant to the *Havens*/*Alliance* analysis, and Texas tellingly cites no authority for this idea.  Again, the "critical[]" fact in *Havens* was that the organization was a *service provider* whose preexisting activities had been perceptibly impaired. *Alliance*, 602 U.S. at 395.

Texas next suggests that the problem in *Havens* was that the misrepresentation was "committed directly against the plaintiff organization" through its employees. Br. 22.  But the allegation in *Havens* was that the defendant's "*steering practices* ha[d] perceptibly impaired [the organization's] ability to provide counseling and referral services."  455 U.S. at 379 (emphasis added).  The employees were testers dispatched "to determine *whether* [the defendant] practiced racial steering."  *Id*. at 368 (emphasis added); *see Texas*, 144 F.4th at 650 (explaining this); *FEC v. Cruz*, 596 U.S. 289, 297 (2022) (explaining *Havens* tester was "posing as a renter").  The organizational harm was thus not the false information given to the organization's employees, but the racial steering practices *proven* by the employees, which "perceptibly impaired" the organization's "ability to provide counseling and referral

16

services" to its clients who were subjected to racial steering. *Alliance*, 602 U.S. at 395 (quoting *Havens*, 455 U.S. at 379); *see Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 198 (2017) (explaining *Havens* organization "spent money to combat housing discrimination"); *Texas*, 144 F.4th at 650 (the injury was the "illegal steering," which "made it more difficult for those whom [the organization] counseled and provided services to obtain housing").

Finally, Texas contends that *Alliance* "limited" *Havens* "to its facts." Br. 22.[3] But the Supreme Court knows how to say that, *see*, *e.g.*, *Jefferson v. City of Tarrant*, 522 U.S. 75, 83 (1997) ("confin[ing]" a prior case "to the precise circumstances the Court there confronted"), and *Alliance* did no such thing. While the Court declined "to extend the *Havens* holding *beyond* its context," 602 U.S. at 396 (emphasis added), it nevertheless reaffirmed its precedential force *within* that context. An organization's ability to satisfy *Havens*'s requirements—not mere opposition to the

---

[3] For this, Texas quotes *Deep South Center for Environmental Justice v. U.S. EPA*, 138 F.4th 310, 319 (5th Cir. 2025). Notably, *Deep South* was about the same kind of lobbying and advocacy that was addressed in *Alliance* (and this Court's prior precedents), so its statement about *Alliance*'s impact on other possible cases was dicta. *Id.* at 318 ("conducting research, preparing comments, lobbying EPA to disapprove the project, and creating an 'education campaign'"). *Deep South*'s "limited . . . to its facts" language is wrong, as explained in the text, and the Court should now disavow it. Similarly, *La Union Del Pueblo Entero v. Abbott* appears to have held only that diversion of resources *alone* "does not establish standing." 151 F.4th 273, 287 (5th Cir. 2025). But to the extent it rejected standing even where the challenged action "perceptibly impaired" the organization's "ability to provide" services, *Havens*, 455 U.S. at 379; *see Alliance*, 602 U.S. at 395 (same), the Court should reject it.

defendant's actions, but that those actions "directly affected and interfered with [its] core business activities"—may end up being "unusual." *Alliance*, 602 U.S. at 395-96; *see supra* (discussing this Court's precedents). But where (as here) an organization can do so, *Havens* and *Alliance* establish standing. *See Texas*, 144 F.4th at 651 (*Alliance* "confirms" that *Havens* is not a "dead letter").

4. On the record here, the district court found that "SB 4 will completely change the manner in which Plaintiffs must reach, counsel, and represent noncitizens, including forcing them to identify clients earlier, help noncitizens navigate the federal immigration process while in state prison, and seek federal relief as quickly as possible before a removal under state law." ROA.490 (cleaned up). Its findings are "are not clearly erroneous," and, as the panel rightly held, establish standing under *Havens* and *Alliance*. *Texas*, 144 F.4th at 642-54.

Two facts are particularly salient. First, S.B.4 represents a sea change in immigration enforcement. The State has set up its own new immigration system: arresting noncitizens, imprisoning them for immigration violations, and rapidly forcing them back to Mexico without an opportunity to seek asylum or other forms of federal relief from removal. ROA.490-91. And Texas has been clear that it will implement the law at a large scale—predicting some 80,000 arrests in the first year alone. ROA.959-60; *see* ROA.494-95; ROA.581-82 (discussing impact of the new system).

Second, Las Americas triages the needs of new arrivals to the United States in furtherance of its mission of ensuring that people have a "fair opportunity" to seek asylum, ROA.935, "focusing [its] efforts on ensuring that those noncitizens at the greatest danger from removal are able to access protection." *Texas*, 144 F.4th at 646-47 (quoting ROA.937). Under S.B.4's scheme, it will be noncitizens in the new state proceedings who are the most at risk of removal without protection. *See supra* (describing statute).

Texas argues that this explanation of the need to address S.B.4 "does not describe Las Americas' ongoing activities" because its efforts previously focused on representing noncitizens "'through the federal immigration system.'" Br. 20-21 (quoting ROA.940). To be sure, consistent with its mission, Las Americas has focused "'on assistance to those facing summary removal in expedited removal proceedings'"—a federal immigration process through which noncitizens may be rapidly removed, but are entitled to an asylum screening. *Texas*, 144 F.4th at 647 (quoting ROA.937). But Las Americas also previously had to tackle another novel and extraordinary system set up to quickly remove people *outside* of the procedures Congress established through the INA, just like S.B.4. *See* ROA.937-38, 940 (discussing its efforts in response to the "Title 42" system of summary public health expulsions). And the fact that prior removal systems were *federal* reflects nothing more than the longstanding reality that removals are federal (not state) business. *See*

*infra.* Here, the undisputed record echoes common sense—Las Americas' mission is not about providing services in a *particular system*, but about protecting newly arrived immigrants from deportation without fair access to asylum and other forms of protection. ROA.937-38.

Given Las Americas' mission, it should be no surprise that S.B.4 will "perceptibly impair[,]" "directly affect[,] and interfere[] with" Las Americas' "core . . . activities," and require the organization to expend additional resources to address those effects. *Alliance*, 602 U.S. at 395. For example, the organization has a robust infrastructure for serving individuals in federal immigration detention, including "gain[ing] access to detainees, . . . track[ing] the progress of detained noncitizens, and remain[ing] in contact with clients," but lacks any such system to assist noncitizens "in state or county jails or prisons." ROA.941; *see* ROA.938-39. S.B.4's new paradigm—that noncitizens will be held in state jail pending state deportation—"requires Las Americas to develop an entirely new operation to provide immigration representation to those arrested under S.B.4." ROA.942. Doing so "will require a major investment of resources" to "create a new services model and infrastructure to identify, reach, advise, and represent charged and incarcerated non-citizens to seek and obtain federal immigration relief." ROA.942-44; *Texas*, 144 F.4th at 646 (noting organization's need "to retool").

Likewise, S.B.4 will interfere with Las Americas's current work for non-detained individuals. Its model enables the organization "to reach and assist the largest number of noncitizens" through community meetings, clinics, and office consultations. ROA.943. In part because many new arrivals "do not plan on remaining in Texas, . . . Las Americas' work is [often] limited to initial counseling and referrals." ROA.943. But under S.B.4, those same noncitizens will be held in Texas jails, meaning Las Americas will "need to provide more comprehensive representation" itself, such as "screen[ing] them for asylum eligibility or other immigration pathways, and then provid[ing] them with legal assistance while they are detained in county jails." ROA.942-43; *see* ROA.942 (identifying necessary tasks relating to the INA's one-year asylum bar). "Incarceration will also limit" Las Americas's contact with its clients, "making it harder to conduct client interviews, obtain application materials, and counsel clients on their hearings." ROA.491.

All this increased time spent on those subject to S.B.4's new state immigration system "will require Las Americas to decrease work done in other areas," including reducing "the number of clinics and shelter based legal services" it provides. ROA.943; *see Kyle*, 626 F.3d at 239 (discussing "specific projects" organization must "put on hold or otherwise curtail in order to respond to" challenged ordinances).

21

Moreover, S.B.4's rapid state-law removals without access to federal protection will prevent Las Americas from assisting some individuals at all. *Texas*, 144 F.4th at 644. S.B.4 will thus decrease the organization's "success in assisting" immigrants "in obtaining relief under federal immigration laws." *Id.*; *see Tex. Tribune v. Caldwell County*, 121 F.4th 520, 526-27 (5th Cir. 2024) (denial of access to magistration proceedings, such that organization could not obtain information and support individuals, was injury in fact). Las Americas will also "risk expending substantial time and resources on an application that will end up irrelevant if their client is removed by state officials prior to a federal asylum ruling." ROA.490-91.

In sum, as the panel correctly concluded, "Las Americas has identified and described impacts S.B.4 would have on its operations that are far more detailed and at least as impactful as those the Supreme Court held to have established injury to an organization in *Havens*." *Texas*, 144 F.4th at 647. Las Americas thus has standing.[4]

## B.    Las Americas May Sue In Equity.

As the panel correctly held, Las Americas may sue in equity under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908). *Texas*, 144 F.4th at 660. Indeed, such equitable preemption challenges have a "long history," *Armstrong v. Exceptional*

---

[4] American Gateways suffers similar injuries, but the Court need not address its standing. *See Texas*, 144 F.4th at 640.

*Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and are vital to policing the federal-state boundaries so central to our constitutional structure, *see Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983); *Iowa*, 2025 WL 2984379, at *6.

This Court has explained that applying *Young* involves "a simple, 'straightforward inquiry.'" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (indirectly quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011)). That inquiry requires Plaintiffs to name a proper defendant, allege an ongoing violation of federal law, and seek prospective relief. *Id.*; *see Iowa*, 2025 WL 2984379, at *6; *FLIC*, 2025 WL 1625385, at *3. Texas apparently no longer contests that Plaintiffs have identified an appropriate *Young* defendant, *see Texas*, 144 F.4th at 659 (rejecting the contrary argument), and concedes the other requirements.

The State nevertheless argues that *these plaintiffs* cannot invoke *Young*. "But the Supreme Court has stated that 'there is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff.'" *Iowa*, 2025 WL 2984379, at *6 (quoting *Stewart*, 563 U.S. at 256). As this Court confirmed sitting en banc just five years ago, once a plaintiff "has satisfied *Young*'s requirements, its suit for injunctive relief" "*at equity*" "may go forward." *Green Valley*, 969 F.3d at 475.

23

In response, Texas contends that an equity plaintiff must assert "'a legal right'" which "must necessarily belong to the plaintiff," and that here "no federal right of the plaintiff[s have] been invaded." Br. 27-28. This argument is wrong, and the Panel correctly rejected it. 144 F.4th at 662.

*First*, Texas argues that "[a] litigant must assert his own legal rights and interests" and that "any claim" here "would belong" only to "regulated" parties, i.e. noncitizens subject to prosecution. Br. 18, 27-28 (cleaned up). But the Supreme Court has held that, unlike certain individual constitutional rights, "structural principles" like federal supremacy are not subject to "the prudential rule that a party 'generally must assert his own legal rights and interests.'" *Bond v. United States*, 564 U.S. 211, 221-22 (2011) (Tenth Amendment). Accordingly, any plaintiff with an injury that is "concrete, particular, and redressable" "has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States." *Id.* at 222; *see Collins v. Yellen*, 594 U.S. 220, 245 (2021) ("any aggrieved party with standing may file a constitutional challenge" under structural protections). That is, so long as Article III is satisfied, the Supreme Court has required no further inquiry into structural protections "belonging" to any particular litigant. *See Bond*, 564 U.S. at 222. Settled law thus allows Plaintiffs "to vindicate [their] own constitutional interests" in the Supremacy Clause's "principles

of federalism." *Id.* at 220, 222; *see also Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of N.J.*, 8 F.4th 176, 180 (3d Cir. 2021).

*Second*, Texas attempts to artificially narrow *Ex Parte Young* to require that a plaintiff assert an interest involving "property," "contract," "tort[]," or a "statut[ory]" "privilege." Br. 27. But that taxonomy of interests is not part of the Supreme Court's "simple, 'straightforward inquiry.'" *Green Valley*, 969 F.3d at 471. And it is impossible to square with countless equitable preemption cases, which have never required plaintiffs to identify a statutory privilege or common-law right. Indeed, while the State suggests that noncitizens subject to S.B.4 would be able to satisfy this requirement to show one of those interests, it never explains how.

Contrary to the notion that Congress must provide a "statut[ory]" "privilege," Br. 27, this Court has been clear that plaintiffs may seek "equitable relief on preemption grounds" even without a statutory cause of action. *Crown Castle Fiber v. City of Pasadena*, 76 F.4th 425, 434-35 (5th Cir. 2023) (citing *Green Valley*, 969 F.3d at 475 (same)). And *Armstrong* makes the same point, demonstrating that statutory and equitable causes of action are separate and have distinct requirements. Whereas a statutory cause of action requires "rights-creating language" in the statute, an equitable cause of action presumptively exists unless Congress affirmatively acts to "preclude the availability of equitable relief." *Armstrong*, 575 U.S. at 330 n.*,

25

327-28, 331-32.[5]  That analysis would make no sense if equity required a statutory privilege.

*Third*, Texas seeks support for its narrow list of admissible "legal interests" in *Tennessee Electric Power Company v. Tennessee Valley Authority*, 306 U.S. 118 (1939).  But that case does not speak to the issue here.  The Supreme Court has explained that *Tennessee Electric* held only that the "state law [at issue] did not purport to grant any of the [plaintiff] power companies a monopoly."  *Bond*, 564 U.S. at 218.  Just as in *Bond*, that idiosyncratic *merits* "holding that state utilities regulations did not supply a cause of action against a competitor is of no relevance to the instant case."  *Id*. at 220.

Moreover, *Tennessee Electric* is widely recognized to be a relic of a long-discarded approach to standing analysis, paired with confusing terminology.  *See, e.g.*, *Bond*, 564 U.S. at 218 (noting lack of "precision" in *Tennessee Electric*); *United States v. Johnson*, 632 F.3d 912, 919 (5th Cir. 2011) (discussing *Tennessee Electric*'s "long-since-repudiated 'legal interest' test"); *Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 254 (5th Cir. 1975) (similar, addressing *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940)).  When *Tennessee Electric* was decided, "[a] party had standing or a 'right to sue' if it was correct in its claim on the merits that the statutory or

---

[5]  Congress has not precluded equity here—and Texas now makes no argument to the contrary.  *See Texas*, 144 F.4th at 662 (rejecting this argument); *FLIC*, 2025 WL 1625385, at *3 (same).

constitutional provision in question protected its interests." *Rogers v. Brockette*, 588 F.2d 1057, 1070 (5th Cir. 1979) (citing *Tennessee Electric*).  Under contemporary law, by contrast, courts applying *Ex Parte Young* take care to avoid "consider[ing] the merits of the underlying claims," *Green Valley*, 969 F.3d at 471, and, as already noted, the structural principles at issue protect everyone's interests.  So *Tennessee Electric* is of no help to the State.

### C. El Paso County Has Standing And May Sue.

Texas also advances threshold challenges specific to El Paso County.  Br. 23-26, 29-30.  The district court rightly rejected these contentions, ROA.495-99, but the panel did not need to reach them because it found that Las Americas could sue, *see* 144 F.4th at 640.  The Court could take the same approach here.  In any event, Texas's arguments are meritless.

Under S.B.4, the County will have to pay to hold people in its jails, to provide appointed counsel, and to train Sheriff staff, police officers, and court personnel.  ROA.960-61.  For example, the County adduced undisputed evidence, which the district court credited, that S.B.4 would "lead to 8,000 more annual arrests in the County, leading to a corresponding 8,000 more jail bookings."  ROA.497.  Texas comes nowhere close to establishing "clear error" in that conclusion.  *Texas*, 144 F.4th at 658.  It emphasizes that DPS plans to "prioritize enforcement of SB 4 in counties that are close to facilities operated by TDCJ and the State."  Br. 24 (quoting

ROA.315). But El Paso is just such a county. *Texas*, 144 F.4th at 654. And Texas submitted no evidence that S.B.4 prisoners will be held only in state facilities. To the contrary, DPS's stated intent was to enforce S.B.4 against some 80,000 immigrants every year, ROA.959-60—straining jail capacity statewide, including in El Paso County. Texas asserts that it "will likely reimburse the County for its expenses," Br. 25, but the district court rightly rejected that claim as "unsupported speculation" because the State "provided no evidence it actually intends to defray El Paso County's costs." ROA.499.

Shifting ground, Texas argues that even if El Paso County can show an Article III injury, as a political subdivision it still "cannot sue the State." Br. 29. But this and other courts have specifically held that a "subdivision may sue its state under the Supremacy Clause," *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019); *see Rogers*, 588 F.2d at 1070-71 (same). The "Supremacy Clause claims protect the interests of the federal government against encroachment by the states" and "[p]olitical subdivision suits invoking the Supremacy Clause are one of the main ways of ensuring that this does not occur." *Ocean Cnty.*, 8 F.4th at 181 (internal quotation marks omitted) (citing, *inter alia*, *Rogers*). By contrast, the cases Texas cites (at 23) involved "substantive interpretations of [other] constitutional provisions." *Rogers*, 588 F.2d at 1068, 1071.

Texas asserts that "[c]ourts have allowed such suits only when Congress has enacted statutory law specifically providing rights to municipalities." Br. 30. Not so. For example, Judge Hardiman recently concluded that a county could sue to challenge state policies as both field and conflict preempted by "federal immigration law." *Ocean Cnty.*, 8 F.4th at 181. He did not inquire into what rights Congress may have afforded municipalities, instead broadly explaining that precedent "permits a political subdivision to bring Supremacy Clause-based claims against its creator state in federal court." *Id.* at 182.

## II.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

Every court around the country to address state entry-and-reentry laws like S.B.4's has held them preempted. *See Iowa*, 2025 WL 2984379; *FLIC*, 2025 WL 1625385; *Padres Unidos*, 785 F. Supp. 3d 993; *IORC*, 780 F. Supp. 3d 1013; *FLIC*, 780 F. Supp. 3d 1325. And when the Supreme Court turned away Florida's request for a stay of the injunction of its entry-and-reentry law—which, notably, lacks S.B.4's state deportation provisions—no Justice issued a dissent. 145 S. Ct. 2872.

Texas never acknowledges this consensus, much less attempts to grapple with it. Instead, it advances only a meritless effort to escape longstanding precedent, and a startling invitation to disregard the Supremacy Clause's role as a "cornerstone of our system of federalism," 144 F.4th at 666, in the name of purportedly unreviewable "self-defense."

### A. The Entry-and-Reentry Crimes Are Field Preempted.

As the panel held, S.B.4's entry-and-reentry crimes are field preempted. 144 F.4th at 667-77. Such preemption may be inferred "from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)) (cleaned up). Here, both alternatives are satisfied. *See id.* at 667; *FLIC*, 2025 WL 1625385, at *3 (finding likely preemption of "the field of alien entry into and presence in the United States").

There can be no real question that the federal interest here is dominant. "For nearly 150 years, the Supreme Court has recognized" that regulation of entry "is *exclusively* a federal power." *Texas*, 144 F.4th at 667 & n.267 (collecting cases); *see, e.g.*, *Arizona*, 567 U.S. at 409 ("Policies pertaining to the entry of" noncitizens "are entrusted exclusively to Congress."); *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) (cited by Texas) ("the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government"); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) (similar).

Indeed, in *Villas at Parkside Partners v. City of Farmers Branch*, every member of this Court sitting en banc agreed with "the longstanding, unremarkable principle that the federal government's authority to exclude or remove foreign

30

nationals . . . is necessarily exclusive of infringement by state or local legislation." 726 F.3d 524, 545 (5th Cir. 2013) (en banc) (Dennis, J., specially concurring); *see id*. at 536-37 (plurality opinion); *id*. at 557, 559 & n.77 (Owen, J., concurring in part); *id*. at 567 (Jones, J., dissenting).  Dismissing "this fundamental axiom," *Texas*, 144 F.4th at 667-68, as merely "some brooding federal interest," Br. 37, does not make it so.

Texas nevertheless suggests that the Court apply a presumption *against* preemption in this exclusively federal realm.  Br. 35-36.  But "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."  *United States v. Locke*, 529 U.S. 89, 108 (2000); *see Barzelis v. Flagstar Bank, F.S.B*., 784 F.3d 971, 974 n.2 (5th Cir. 2015) (same).  That is undisputably the case here.  Accordingly, every court has rightly rejected Texas's argument.  *See Iowa*, 2025 WL 2984379, at *7 (explaining "immigration is not a traditional subject of state regulation"); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (no "presumption against preemption applies" to an "attempt to regulate immigration"); *Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (similar); *see also Texas*, 144 F.4th at 675 (rejecting contrary reliance on "nineteenth century" state laws).

Resisting this conclusion, Texas suggests that a presumption against preemption applies because *the State* has a "paramount interest in protecting . . . its

territorial integrity." Br. 35 (quoting *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004)). Not so: "It is axiomatic that *the United States*, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Flores-Montano*, 541 U.S. at 153 (emphasis added). Indeed, the Supreme Court long ago held that Congress's power "to forbid the entrance of foreigners" is "inherent in [the] sovereignty" of the United States as a nation. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). States, by contrast, are not endowed with such "powers of external sovereignty." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936); *see also Chy Lung*, 92 U.S. at 280 (external sovereign power "belongs solely to the national government"); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025) ("the Federal Government's broader sovereign authority" is "categorically different" than states').

Moreover, here Congress has exercised that exclusive authority by establishing "a comprehensive framework to identify *who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully." *Texas*, 144 F.4th at 669 (collecting citations) (footnotes omitted). Congress has criminalized entry and reentry between ports of entry, *id.* §§ 1325, 1326, as well as efforts to assist or facilitate entry between ports, *id.* §§ 1323, 1324, 1327, 1328, 1329. It has also provided a detailed set of standards and procedures for when individuals who enter without inspection may be arrested and detained by

federal officials. *See, e.g., id.* §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A). At the same time, Congress recognized that some people who enter unlawfully—such as victims of trafficking, refugees, and close relatives of U.S. citizens—should be permitted to stay, obtain lawful status, and make their residence permanent. *See, e.g., id.* §§ 1101(a)(15)(U), (T), 1158(a)(1), (d), 1182(a)(6)(A)(ii), 1255(l), (m), 1229b(b). This federal entry scheme is as complex and "pervasive" as it gets, and therefore leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399.

Broad discretion is "[a] principal feature" of the immigration system, and absolutely central to Congress's scheme, which allows federal immigration officials to determine whether enforcement serves national interests. *Arizona*, 567 U.S. at 396; *see Iowa*, 2025 WL 2984379, at *7 (collecting cases). Federal prosecutors and immigration officials are empowered to deploy *or forgo* criminal charges or civil proceedings to ameliorate the potential harshness of the immigration laws. *See Arizona*, 567 U.S. at 396, 402, 409; *Texas*, 599 U.S. at 679. And their discretion "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Texas*, 599 U.S. at 679 (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490–91 (1999)). "The broadest exercise of this discretion is the Executive's decision not to pursue either civilly or criminally the very [noncitizens] whom the [State] legislature has drawn a bead upon in enacting new state laws." *Texas*, 144 F.4th at 671.

Texas has nothing to say about the attention Congress has paid to the question of how to address those who enter without inspection, nor does it acknowledge the various tools Congress entrusted the federal Executive with discretion to choose among. Indeed, its only response to this comprehensive scheme is to suggest that Congress *invited* States to disregard its own handiwork and fashion fifty different solutions to the challenges of irregular immigration. Br. 37-38. But the most it can muster are the "specific, limited circumstances" in which Congress allowed state officers to make immigration arrests under federal direction and supervision. *Arizona*, 567 U.S. at 410; *see Texas*, 144 F.4th at 676-77, 683-84 (rebutting specific cited statutes).

Still, Texas contends, even that highly circumscribed state role is enough to defeat field preemption, asserting that "[t]he Supreme Court has never found field preemption where Congress has invited state participation." Br. 39. That is incorrect. Consider, for example, *Pacific Gas & Electric Co. v. State Energy Research Conservation & Development Commission*, 461 U.S. 190 (1983) (cited by Texas). There, Congress had permitted state regulation of various matters connected to nuclear safety, including empowering the federal government to enter into "agreements" under which States would assume "regulatory authority over certain nuclear materials under limited conditions," *id*. at 209 & n.20, and "specifically authoriz[ing]" States to regulate radioactive air pollutants, *id*. at 212 n.25. Yet the

34

Court rejected the argument that this scheme meant that "State safety regulation" would be "preempted only when it conflicts with federal law." *Id*. at 212; *see* Br. 39 (advancing the same argument, that entry "is a question of conflict preemption, not field preemption"). "Rather, the federal government has occupied the entire field of nuclear safety concerns, *except the limited powers expressly ceded to the states*." 461 U.S. at 212 (emphasis added).

So too, here. While Congress has "expressly" permitted certain "limited powers" to State officers, such as to make immigration arrests under federal supervision and pursuant to federally authorized "agreements," *id*. at 209, 212, nothing in federal law remotely approaches "a grant of authority to a state to enact a statute making it a state crime to be unlawfully present," *Texas*, 144 F.4th at 683-84; *see also, e.g.*, *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 632-33 (2012) (cited by Texas) (field preemptive law allowed limited state role in "interstitial areas of railroad safety"); *United States v. Locke*, 529 U.S. 89, 112 (2000) (cited by Texas) (similar, acknowledging certain permissible "[l]ocal rules" in preempted field).

Nor, for similar reasons, can Texas get traction by pointing out that the Supreme Court upheld one provision of the law at issue in *Arizona*—section 2(B). Br. 36. The Court concluded that provision could be read to require only "a status check" with ICE, and explained that federal law specifically authorized such checks. 567 U.S. at 412, 414. That is, the State's limited involvement fell within one of those

narrow, express roles Congress had carved out.  In striking down Section 6 of the *Arizona* law, which authorized unilateral arrests, the Court rejected a similar argument, holding that the state had overstretched the limited statutory permission to cooperate.  *Id*. at 410.  This analysis in no way undermines the panel's holding that establishing a state entry-and-reentry scheme infringes on the otherwise occupied federal field.

By contrast, all the reasons the Supreme Court gave for finding Section 3 of the *Arizona* statute field preempted "appl[y] with equal force to the Texas laws regarding entry and removal." *Texas*, 144 F.4th at 676.  As with Arizona's noncitizen registration crime, "[i]f every state could regulate the unlawful entry, reentry, and removal of aliens, '[e]ach additional statute [would] incrementally diminish[] the [federal government]'s control over enforcement' and 'detract[] from the "integrated scheme of regulation" created by Congress,'" *Texas*, 144 F.4th at 675, allowing prosecution "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies," *Arizona*, 567 U.S. at 402.  And the regulation of entry is, if anything, *more* uniquely federal than registration, as it lies at the very core of Congress's sovereign immigration powers.  *See Arizona*, 567 U.S. at 394-95; *Nishimura Ekiu*, 142 U.S. at 659.

Furthermore, as with Arizona's registration scheme, there are unacceptable "inconsistenc[ies] between" S.B.4's entry-and-reentry crimes "and federal law." *Arizona*, 567 U.S. at 402-03. Most glaringly, the state reentry crime criminalizes people whom 8 U.S.C. § 1326 does not. Under the federal statute, a noncitizen cannot be convicted if she has obtained federal "consent" to again seek admission to the United States. 8 U.S.C. § 1326(a)(2)(A); 8 C.F.R. § 212.2(d). But S.B.4 contains no such limitation. *See* Tex. Penal Code § 51.03 (criminalizing noncitizen "found in this state after" she "has been . . . removed"); *see also Iowa*, 2025 WL 2984379, at *8 (noting same problem with Iowa statute). "These specific conflicts between state and federal law simply underscore the reason for field preemption." *Arizona*, 567 U.S. at 403; *see also Texas*, 144 F.4th at 673-74 (collecting other conflicts); Br. 47 (acknowledging different penalties).

### B. The Entry-and-Reentry Crimes Are Conflict Preempted.

Likewise, S.B.4's entry-and-reentry crimes are conflict preempted. The panel highlighted various ways that "conflicts abound between [S.B.4] and a number of federal laws" and that S.B.4 "runs roughshod" over Congress's immigration scheme. *Texas*, 144 F.4th at 678, 686. Texas's responses misapprehend Congress's approach to irregular border crossings and ignore *Arizona*'s most fundamental holding.

Texas asserts that there can be no conflict preemption here because "[t]he purpose of the INA is to prohibit illegal immigration" and "S.B.4 shares that exact

same purpose." Br. 42 (quoting *Texas*, 144 F.4th at 726 (Oldham, J., dissenting)). That fundamentally misunderstands the INA. To be sure, Congress made crossing the border unlawfully a crime, and rendered those who do so removable. But it also provided for various circumstances in which unlawful entry might be outweighed by other important federal interests. For example, it specifically provided that asylum must be available "whether or not" the noncitizen arrives "at a designated port of arrival." 8 U.S.C. § 1158(a)(1). Likewise, it has provided various forms of relief from removal leading to permanent immigration status that are available even if one enters the country unlawfully, including for victims of crime or trafficking and for those with close U.S. citizen family members. *See id.* §§ 1101(a)(15)(U), (T), 1182(a)(6)(A)(ii), (d)(13), (14), 1229b(b). To suggest that Congress had only one purpose—"to prohibit illegal immigration," Br. 42—ignores the wide range of statutory provisions touching on people who enter without inspection.

Of course, these different congressional interests may point in different directions at times. That is why Congress vested the federal executive with "broad discretion"—indeed, why such discretion is "[a] principal feature of the [federal] removal system." *Texas*, 144 F.4th at 670 (quoting *Arizona*, 567 U.S. at 396). Congress recognized that "[t]he equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service," as well as "policy

choices that bear on this Nation's international relations," such as when "[t]he foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return." *Arizona*, 567 U.S. at 396-97. And so it provided the federal executive with a wide range of tools—criminal prosecution, yes, but also expedited removal proceedings, regular removal proceedings, various discretionary paths to relief, and even the choice "not to pursue either civilly or criminally the very aliens whom the Texas legislature has drawn a bead upon in enacting new state laws." *Texas*, 144 F.4th at 671; *see Iowa*, 2025 WL 2984379, at *8 (Eighth Circuit holding nearly identical law creates "an obstacle to the exercise of the discretion that Congress gives federal officials charged with enforcing federal immigration law" and collecting cases recognizing broad federal discretion).

S.B.4 claims for the *State* an ability to use the most severe of those tools whenever it wants, without regard to federal discretion. Indeed, it goes so far as to "prohibit abatement of prosecutions . . . on the grounds that federal proceedings have been or will be commenced regarding the immigration status of the defendant." *Texas*, 144 F.4th at 680. That is, even when federal officials decline to pursue criminal enforcement and instead place a noncitizen in proceedings that might regularize her immigration status, not only may the State choose instead to prosecute—but the state courts are specifically forbidden from halting that

prosecution in light of the federal government's contrary choice. "This is not the system Congress created." *Arizona*, 567 U.S. at 408.

Texas objects that "federal and state governments may administer separate criminal codes that penalize the same underlying conduct." Br. 44. That may be true in many other circumstances, "[b]ut not here." *Iowa*, 2025 WL 2984379, at *9 (rejecting this argument). Congress's choice to accommodate various interests through broad federal discretion sets this case apart from the mine-run of parallel crimes. As in *Crosby v. National Foreign Trade Council*, here "Congress clearly intended the federal Act to provide the [Executive] with flexible and effective authority." 530 U.S. 363, 374 (2000). And, just as in that case, Texas's "unyielding application" of criminal sanctions whenever it sees fit "undermines the [executive's] intended statutory authority by making it impossible" for the federal executive to chart the course it thinks best in particular circumstances. *Id.* at 377. Moreover, as the Eighth Circuit recently observed, like the foreign policy regulation at issue in *Crosby*, "[i]mmigration is not a traditional subject of state regulation." *Id.* (contrasting this Court's precedent addressing the state's "traditional prerogative to police drug safety") (quoting *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 328 (5th Cir. 2025)).

That is also why *Kansas v. Garcia*, 589 U.S. 191 (2020), on which Texas so heavily relies, is inapposite. There, Kansas prosecuted noncitizens under a generally

applicable state identity theft statute for using fraudulent social security numbers on *tax withholding forms*. *Id.* at 195, 198-99. The noncitizens based their preemption theory on the fact that the tax withholding process at the beginning of a job is typically conducted alongside employment verification, which in turn is related to the immigration system. *Id.* at 197, 208-09. In contrast to tax forms' glancing relevance to immigration employment rules, S.B.4 does not merely "overlap to some degree" with federal immigration law. *Id.* at 211. Instead, it asserts state control in derogation of the comprehensive federal system in which Congress "made a considered decision" to balance various interests by placing discretion in federal officials' hands. *Id.* "Nothing similar" was present in *Garcia*. *Id.*; *see Texas*, 144 F.4th at 685 (rejecting reliance on *Garcia*); *Iowa*, 2025 WL 2984379, at *9 (same); *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1005-07 (same).

Indeed, conflict preemption here follows directly from *Arizona*. At its most fundamental level, that case held that a state may not "'achieve its own immigration policy,' ignoring the discretionary decisions of federal officials." *Iowa*, 2025 WL 2984379, at *9 (quoting *Arizona*, 567 U.S. at 408). *Arizona*'s throughline is that federal law does not allow "unilateral state action" in immigration enforcement. *Arizona*, 567 U.S. at 410. Section 6—authorizing state immigration arrests—was conflict preempted because it allowed "unilateral state action" that usurped the federal government's ability to exercise discretion. *Id.* at 407–10. Section 3, by

claiming the "independent authority to prosecute" registration violations, would similarly "diminish[] the Federal Government's control over enforcement" and "frustrate federal policies." *Id.* at 401–02 (cleaned up). And with regard to Section 2(B), the Court explained that "it would disrupt the federal framework" to allow state detention "for possible unlawful presence without federal direction and supervision," but the Court upheld the provision because it could be read to merely authorize communication with federal authorities. *Id.* at 413. If state officers may not unilaterally detain or arrest for immigration violations, they obviously cannot unilaterally detain, arrest, prosecute, sentence and imprison for such violations. *See id.* at 408.

Texas ignores this holding, and instead only addresses (at 45) the Supreme Court's analysis of Section 5(C)—a provision addressing *employment* of noncitizens. *Arizona*, 567 U.S. at 403-07. But employment is a very different context from core immigration powers like entry and removal; indeed, the Court has permitted state employment regulations in the past. *See id*. at 404 (discussing prior precedent, but finding congressional changes preempted Section 5(C)); *De Canas v. Bica*, 424 U.S. 351, 354-55 (1976) (emphasizing that the "[p]ower to regulate immigration is unquestionably a federal power" but upholding state employment law that had a "purely speculative and indirect impact on immigration"); *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 604 (2011) (similar).

Texas suggests that preemption is inappropriate because "federal priorities are now aligned with S.B.4's state-enforcement scheme." Br. 47 (citing *Texas*, 144 F.4th at 727 (Oldham, J., dissenting)). "But the 'Supremacy Clause gives priority to the Laws of the United States, not the criminal law enforcement priorities or preferences of federal officers.'" *Iowa*, 2025 WL 2984379, at *10 (quoting *Garcia*, 589 U.S. at 212) (some internal quotation marks omitted). "The challenged provisions are not preempted because they conflict with the policy preferences of a particular administration—but because, inter alia, they rob every administration of the very discretion in alien removal matters that Congress granted to the federal executive and not to the States." *Texas*, 144 F.4th at 681 (footnote omitted). "Because the Act conflicts with the discretion that Congress gives to federal officials, the Act is preempted, even if federal officials support the Act." *Iowa*, 2025 WL 2984379, at *10.

For much the same reason, Texas's invocation of the "standards required to prevail on a facial challenge" fall flat. Br. 46. For one thing, "if a law intrudes on a field occupied by Congress, every application of that law is preempted." *Texas*, 144 F.4th at 663. Texas effectively concedes as much, focusing its facial-challenge arguments on the question of conflict preemption. Br. 46-47. But every time the State enforces S.B.4, it flouts *Congress*'s direction that executive officials will exercise discretion to decide which tools are used to address irregular entries. Thus,

"every application of the Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Iowa*, 2025 WL 2984379, at *13 (holding Iowa's statute facially conflict preempted); *Texas*, 144 F.4th at 664 (same for S.B.4).

Texas posits that S.B.4 could be legally applied to a person "who has already been adjudicated" unlawfully present, or who federal officers "encourage[] Texas to arrest and charge." Br. 46; *id*. at 47 (similar). But much the same could have been said in *Arizona*, where the Court struck down Section 6 on its face for permitting unilateral arrests, even while Justice Alito argued that there were "plenty" of permissible applications of the law. *See Texas*, 144 F.4th at 663 n.234. The majority held otherwise: "By authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409. So too, here.

### C. The Removal Provision Is Preempted

The panel rightly held that the entry-and-reentry provisions are preempted "[e]ven setting aside S.B.4's removal consequence." *Texas*, 144 F.4th at 683. Indeed, other state entry-and-reentry laws have been blocked, even where they lack similar removal provisions. *See, e.g.*, *FLIC*, 2025 WL 1625385, at *3; *see also Iowa*, 2025 WL 2984379, at *10 (finding substantive provisions preempted before turning

44

to removal). And if those crimes are enjoined, the remaining provisions of the law must fall because they have no independent effect.

But the removal scheme represents an extraordinary further intrusion into the federal government's domain. Like entry, expulsion is an exclusively federal authority inherent in the nation's external sovereignty. *See Texas*, 144 F.4th at 667 n.267 (collecting cases); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893). And there is a comprehensive federal scheme addressing who may be removed, what procedures apply to removal, and to which countries they may be removed. *See Texas*, 144 F.4th at 667, 669-70, 680; *Iowa*, 2025 WL 2984379, at *11. A state deportation regime plainly intrudes in this exclusively federal field and conflicts with federal law in every case.

Texas first asserts that "S.B.4 does not allow the State to deport anyone," and instead the State will deliver defendants "to federal officials at lawful points of entry." Br. 38, 43. "That is not what the statute says." *Texas*, 144 F.4th at 682; *see Iowa*, 2025 WL 2984379, at *12 (rejecting same request "to ignore the plain meaning of the statute"). S.B.4 "directs state judges to order an alien to leave the United States on pain of up to twenty years in prison and a $10,000 fine." *Texas*, 144 F.4th at 682. "It blinks reality to argue the statute's plain terms do anything other than require the removal of aliens." *Id.*; *see Iowa*, 2025 WL 2984379, at *12 (similar).

Texas next objects that this scheme is lawful when noncitizens "voluntarily agree" to leave the country. Br. 41; *see id*. at 39. But *any* state deportation orders intrude into an exclusively federal field. Moreover, it is myopic to suggest Texas's "voluntary return order[s]" are either truly voluntary or consistent with federal law. Br. 39. Under S.B.4, noncitizens are faced with criminal prosecution and a sentence, followed by a *mandatory* state deportation order, and then offered the "opportunity" to instead avoid the punishment and immediately take that same deportation order. That is, these supposedly "voluntary" choices are predicated on Texas dictating that person must leave the country *either way*, with no opportunity to seek the relief established by federal law. A starker conflict is hard to imagine.[6]

Finally, Texas seeks to escape S.B.4's abatement provision, which allows for removal under the state scheme "before asylum proceedings are concluded." *Texas*, 144 F.4th at 673. "By prohibiting abatement of the state prosecution, [this provision] undermines the discretion Congress gives federal officials to decide if, when, and how to address the case of an individual alien." *Iowa*, 2025 WL 2984379, at *13

---

[6] Texas suggests that defendants unable to leave because they are in federal custody will not be deemed to have "refused to comply" with the order. Br. 6. It tellingly does not say what happens if those individuals are released from federal custody, because the statute is clear: They must leave on pain of imprisonment. In any event, "the proper focus" when considering a facial challenge is the government's regulatory actions "that the law actually authorizes, not those for which it is irrelevant." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015). If the order is ineffective in some circumstances, those situations are irrelevant under *Patel*.

(rejecting identical provision).  Texas responds that this provision "does not foreclose a prisoner's transfer to federal custody," suggesting the state could produce the defendant to testify in federal proceedings.  Br. 5, 43.  That is irrelevant: "[A] defendant with an unresolved claim for federal immigration relief will be pushed toward [state] removal regardless of the status of their [federal] claim," and "[n]o amount of 'coordinating with federal immigration authorities' can soothe this conflict."  *Texas*, 144 F.4th at 685; *see Iowa*, 2025 WL 2984379, at *13 (similar).

### D. The State War Clause Cannot Justify S.B.4.

Unable to defend S.B.4 under longstanding preemption doctrine, Texas turns to a deeply troubling argument.  Texas has been "invaded," it claims, triggering the State War Clause, U.S. Const. art. I, § 10, cl. 3; that Clause, it further asserts, empowers the State to enact its own immigration scheme; the "invasion" also allows the State to ignore federal law preempting such legislation; and the political question doctrine prohibits any court from saying otherwise.  Such a "nullification" theory "is antithetical to the Constitution and has been unequivocally rejected by federal courts since the Civil War."  ROA.480.

First, there has been no invasion within the meaning of the State War Clause.  Texas is studiously imprecise about what it thinks triggers the Clause here.  Its state executive order purports "to respond to . . . illegal immigration," Executive Order GA-41 at 2, but Texas also invokes other concerns like "human trafficking, and

weapons smuggling," Br. 31-32.[7] None of this is enough. "The term 'invasion' was a legal term of art with a well-defined meaning at the Founding" which "required far more than an unwanted entry; to constitute an invasion, there had to be hostilities." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *see also Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (similar); *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996) (similar); *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (similar).

Second, even if such circumstances could qualify as an "invasion," that would not authorize Texas to enact its own immigration scheme. The State War Clause provides authority to do a particular thing: namely, to *make war*. That makes sense—a military invasion allows for the state to *fight back* in a military sense, at least until the federal government can respond. *See United States v. Abbott*, 110 F.4th 700, 759 (5th Cir. 2024) (en banc) (Douglas, J., dissenting) (powers under the Clause "lapse once Congress can be notified and respond"). But it does not unlock different powers otherwise denied to the State, such as the powers of external sovereignty that belong to the federal government. For example, States may not "enter into any

---

[7] Texas's reliance on "terrorism," Br. 31, appears to refer to individuals "on the terrorist watchlist" arrested at the border, *id.* at 3, not any acts of terrorism. Texas notes the increased number of such arrests, but that may well reflect nothing more than shifting migration patterns. *See, e.g.*, Eileen Sullivan, *More Migrants on Terrorism Watch List Crossed U.S. Border* (NYT Nov. 15, 2023) (noting increase may be Columbians formerly associated with organization since removed from list of terrorist organizations).

Agreement or Compact . . . with a foreign Power," *id.*, a constitutional denial of state authority that is not lifted in the case of invasion. So too the power to make "war" does not establish any authority to create a state immigration system—such powers are "expressly forbidden" to the States. *Fong Yue Ting*, 149 U.S. at 712.

Texas asserts the state war power must include "the lesser power to 'arrest'" invaders. Br. 33. But Texas is defending a law which creates new immigration crimes, punishable by prison time, to be followed with a summary state deportation. That is not a matter of "[r]epelling" an organized, military force but one of fashioning the *immigration* policy Texas would prefer. *Cf. Abbott*, 110 F.4th at 737 & n.14 (Ho, J., dissenting in part) (acknowledging that states "do not enjoy unlimited war power" but contending that a "a buoy barrier along an international border river" was permissibly analogous to "installing and enforcing a military perimeter"). Resolving longstanding immigration policy disputes is "a job for the Nation's lawmakers, not for its military authorities." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952); *see id.* at 642, 644 (Jackson, J., concurring) (warning against "sinister and alarming" idea that war powers would make President "Commander-in-Chief of the country"). It is certainly not a job for one State to unilaterally decide.

Third, any such war powers certainly could not override federal supremacy—so S.B.4 would be illegal even in case of an "invasion." Again, the State War Clause

is a limited exception to a particular *denial* of state authority, namely that "[n]o State shall . . . engage in War." U.S. Const. art. I, § 10, cl. 3. Where the Framers intended an invasion exception to other constitutional provisions, they added one. *See, e.g.*, *id*. art. 1, § 9, cl. 2 (Habeas Corpus Suspension Clause). But there is no such exception to the Supremacy Clause. *See id.* art. VI, cl. 2. The panel was thus rightly skeptical "that a state could rely on this Clause—which, with limited exceptions, primarily divests states of power—as a defense to a suit seeking to vindicate the Supremacy Clause, especially in an area of regulation that the Supreme Court has consistently reiterated is exclusively a federal power." *Texas*, 144 F.4th at 686. To read the State War Clause as offering Texas a blank check free of all federal control would render the Constitution "a solemn mockery." *United States v. Peters*, 9 U.S. 115, 136 (1809); *see Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) (warning against interpreting "isolated clauses" of the Constitution "torn from context" to defeat "a workable government").

Fourth, and finally, there is no merit to Texas's claim that no court can review "[t]he means by which Texas has chosen to combat" the supposed "invasion." Br. 33. The Supreme Court has been clear that the political question doctrine is a "narrow exception to [courts'] presumptive exercise of jurisdiction." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). Interpreting constitutional provisions are "well within the competence of the Judiciary." *U.S. Dep't of Com. v.*

*Montana*, 503 U.S. 442, 458 (1992) (rejecting doctrine's application to "interpretation of the apportionment provisions of the Constitution"). Likewise, "evaluating the constitutionality of statutes is firmly within the bailiwick of the judiciary." *Texas*, 144 F.4th at 655 (discussing *Zivotofsky*). Rejecting Texas's arguments thus represents a "familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196; *cf. id.* (by contrast, imposing "the courts' own unmoored determination" of policy would be barred).[8]

It makes perfect sense that the Court is fully empowered to strike down S.B.4. The political questions doctrine "is primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and so "[t]he Judicial Branch appropriately exercises" review "where the question is whether [one branch] is 'aggrandizing its power at the expense of another branch,'" *Zivotofsky*, 566 U.S. at 197; *see Lane v. Halliburton*, 529 F.3d 548, 559 (5th Cir. 2008) (similar). Here, Texas's invocation of the State War Clause is an extraordinary effort to aggrandize the State's power at the expense of the federal government.

---

[8] The panel noted several out-of-circuit cases suggesting that at least some invasion questions are nonjusticiable. 144 F.4th at 655 & n.156. These cases addressed the Guarantee Clause and very different legal theories. *See J.G.G.*, 2025 WL 914682, at *7 & n.4 (Henderson, J., concurring) (explaining these cases "concluded that declaring an invasion by judicial fiat would pervert the proper role of the political branches, and also that illegal immigration is not an 'invasion'"). To the extent they might be read to bar review here, such a broad version of the political questions doctrine is inconsistent with the Supreme Court's later explanation and application of the "narrow" doctrine in *Zivotofsky*. 566 U.S. at 195.

In this respect, Texas's claim of state supremacy echoes the one rejected in *Sterling v. Constantin*, 287 U.S. 378 (1932). There, the Texas governor sought to regulate oil production by declaring an insurrection. *See Texas*, 144 F.4th at 656-57. The Supreme Court rejected the notion that the "the Governor's order had the quality of a supreme and unchallengeable edict," explaining that this "extreme position" would mean "the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land." *Sterling*, 287 U.S. at 397. The same is true here. *Texas*, 144 F.4th at 657.

## III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES.

The equities "weigh in favor of a preliminary injunction." *Texas*, 144 F.4th at 687. As the district court correctly found, S.B.4's creation of a new state immigration regime will force the plaintiff organizations to develop entirely new programs to identify, counsel, and advocate for noncitizens in state and local jails. ROA.481; *see* ROA.581-83. The court likewise found that S.B.4 will force the County to "expand its jail, provide counsel for indigent defendants, and hire more . . . court personnel." ROA.583. Texas argues that these "economic losses" do not constitute irreparable harm. Br. 48. That is wrong: These "losses cannot be recouped," *Texas*, 144 F.4th at 687, because Texas "enjoy[s] sovereign immunity for any monetary damages," *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

52

S.B.4 will also impose enormous harms on the public, including the removal of noncitizens without any opportunity to seek federal protection such as asylum. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."); ROA.484-85. Noncitizens also "face many [other] harms from the enforcement of" S.B.4, including arrest and imprisonment. *Iowa*, 2025 WL 2984379, at *15. The court also found that S.B.4 will stifle the plaintiff organizations' programs to aid victims of crime and human trafficking by instilling fear of cooperation with local law enforcement, ROA.491-92—likewise harming the public interest. By contrast, Texas suffers no comparable harm from being unable to enforce a preempted statute. *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990). Indeed, enforcing a state statute preempted by federal law "would work injury . . . to the public interest." *Pub. Utilities Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 469 (1943).[9]

Texas invokes "harms associated with the border crisis." Br. 49. But "[f]ederal officials of course already enforce immigration law," *FLIC*, 2025 WL 1625385, at *6, and Texas already cooperates with them through the mechanisms permitted by federal law, which "ameliorates [the] concern about an illegal

---

[9] Texas alludes to harm based on the statute's severability clause, Br. 49, but does not explain what it believes to be severable. As the panel held, none of S.B.4 survives scrutiny. *See Texas*, 144 F.4th at 665-66.

immigration crisis," *Iowa*, 2025 WL 2984379, at \*15. Indeed, the State recently required localities to "enter into an immigration law enforcement agreement" with the federal government, Tex Gov Code Sec. 753.051, building on prior mandatory cooperation provisions, *see City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018). As for concerns about fentanyl, Br. 3, the federal government confirms that drug is smuggled overwhelmingly at ports of entry by U.S. citizens, not between ports by migrants—so S.B.4 is irrelevant. *See* U.S. Customs & Border Prot., *Frontline Against Fentanyl* (last modified May 22, 2025), https://perma.cc/4NAU-9GSY ("More than 90% of interdicted fentanyl is stopped at Ports of Entry (POEs), where cartels attempt to smuggle it primarily in vehicles driven by U.S. citizens.").

In the end, while Texas may have "frustrations with the problems caused by illegal immigration," it "may not pursue policies that undermine federal law." *Arizona*, 567 U.S. at 416.[10]

## CONCLUSION

This Court should affirm.

---

[10] Texas says that the district court should "amend its injunction 'to the extent that [it is] broader than necessary.'" Br. 49 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831 (2025)). That is what the panel properly directed, leaving it to the district court to consider the impact of *CASA* in the first instance. *Texas*, 144 F.4th at 688; *see also Iowa*, 2025 WL 2984379, at \*16 (same).

Dated: November 21, 2025

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center, American Gateways,*
*and County of El Paso*

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Kate Gibson Kumar
(TX Bar No. 24137588)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
kate@texascivilrightsproject.org

*For Plaintiffs-Appellees*
*Las Americas Immigrant Advocacy*
*Center and American Gateways*

Respectfully Submitted,

*/s/ Cody Wofsy*
Cody Wofsy
Spencer Amdur
Hannah Steinberg
Morgan Russell
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (415) 395-0950
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org
mrussell@aclu.org

Kathryn Huddleston*
(TX Bar No. 24121679)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
khuddleston@aclu.org

Omar Jadwat
Anand Balakrishnan
Lee Gelernt
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
ojadwat@aclu.org

Christina Sanchez
(TX Bar No. 2406298)
El Paso County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
ch.sanchez@epcountytx.gov

Bernardo Rafael Cruz
(TX Bar No. 24109774)
Assistant County Attorney
320 S. Campbell St., Suite 200
El Paso, Texas 79901
Tel: (915) 273-3247
b.cruz@epcountytx.gov

*For Plaintiff County of El Paso*

abalakrishnan@aclu.org
lgelernt@aclu.org

*For Plaintiffs-Appellees
Las Americas Immigrant Advocacy
Center, American Gateways, and
County of El Paso*

*\*Barred in Texas and Arizona only;
supervised by a member of the D.C.
Bar*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation of Rule 27(d)(2) because it contains no more than 12968 words and complies with the typeface and style requirements of Rule 32(a)(5) and (a)(6) because it was prepared in Microsoft Word using 14-point Times New Roman typeface.

## CERTIFICATE OF SERVICE

I certify that, on November 21, 2025, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF document filing system, and on all counsel of record.

*/s/ Cody Wofsy*
Cody Wofsy